1  DANIEL H. SLATE (SBN: 78173)
   RICHARD P. ORMOND (SBN: 207442)
2  BUCHALTER NEMER
   A Professional Corporation
3  1000 Wilshire Boulevard, Suite 1500
   Los Angeles, CA 90017-2457
4  Telephone: (213) 891-0700
   Facsimile: (213) 896-0400
5  Email: dslate@buchalter.com
   Email: rormond@buchalter.com
6
   Attorneys for Bank of America, N.A., individually and as
7  Administrative Agent for a Group of Lenders

8

9              UNITED STATES BANKRUPTCY COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                SAN FERNANDO VALLEY DIVISION

12

13  In re                                    Case No. 1:09-bk-14214-GM

14  ROOSEVELT LOFTS, LLC, a Delaware         Chapter: 11
    limited liability company,
15                                           BANK GROUP'S MEMORANDUM OF
                Debtor.                      POINTS AND AUTHORITIES IN
16                                           OPPOSITION TO DEBTOR'S MOTION
                                             FOR ORDER AUTHORIZING SALE OF
17                                           CERTAIN CONDOMINIUM UNITS
                                             PURSUANT TO 11 U.S.C. §363(f)
18
                                             Date:   June 10, 2009
19                                           Time:   10:00 a.m.
                                             Place:  Courtroom 303
20                                                   21041 Burbank Blvd.
                                                     Woodland Hills, CA 91367
21

22

23

24

25

26

27

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION
FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

**TABLE OF CONTENTS**

**PAGE**

I. PRELIMINARY STATEMENT ..................................................................................1

II. STATEMENT OF FACTS ..........................................................................................3

III. LEGAL ARGUMENT...................................................................................................6

    A. THE DEBTOR IS NOT ELIGIBLE FOR A HUD EXEMPTION; THERE IS NO NEED TO FORCE THE DEBTOR TO A PIECEMEAL SALE PROCESS ...........................................................................................................6

    B. SALE OF THE UNITS IS NOT IN THE BEST INTERESTS OF THE CREDITORS OR THE ESTATE .....................................................................10

        1. Even One Sale Will Lead to the Imposition of Substantial Homeowner's Association Fees..................................................................10

        2. The Debtor Fails to Discuss A Budget, Timeline and Source of Funding for Completion..................................................................................11

    C. THE BANK GROUP'S SECURITY INTEREST IS ENTITLED TO ADEQUATE PROTECTION ......................................................................12

IV. CONCLUSION............................................................................................................14

i

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aboujaoude v. Poinciana Development Company II*,
    509 F.Supp.2d 1266 (S.D. Fla. 2007) .................................................................................7, 8

*In re Bear River Orchards*,
    56 B.R. 976 (Bankr. E.D. Cal. 1986) ........................................................................................13

*In re Chevy Devco*,
    78 B.R. 585 (Bankr. C.D. Cal. 1987) .......................................................................................13

*In re Havik, Inc.*,
    13 B.R. 294 (Bankr. N.D. Ga. 1981) ........................................................................................13

*In re Kenny Kar Leasing, Inc.*,
    5 B.R. 304 (Bankr. C.D. Cal. 1980) ..........................................................................................12

*In re Magnus*,
    50 B.R. 241 (Bankr. D. ND. 1985) ...........................................................................................13

*In re Mosello*,
    195 B.R. 277 (Bankr. S.D.N.Y. 1996) ......................................................................................13

*Markowitz v. Northeast Land Company*,
    906 F.2d 100 (3rd Cir. 1990) ..................................................................................................7, 8

*Stein v. Paradigm Mirsol, LLC*,
    551 F.Supp.2d 1323 (M.D. Fla. 2008) ....................................................................................7, 8

**Statutes**

11 U.S.C. § 363(e) ...................................................................................................................12

11 U.S.C. § 363(f) .....................................................................................................................1

15 U.S.C. §§ 1701 *et seq.* .........................................................................................................6

15 U.S.C. § 1702(a)(2) ............................................................................................................6, 7

Bankruptcy Code § 363 ..........................................................................................................1, 4

ii

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION
FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

Bank of America, N.A., individually and as agent for a group of lenders (the "Bank Group")[1], respectfully files this opposition to Debtor Roosevelt Lofts, LLC's (the "Debtor") Motion for Order Authorizing Sale of Certain Condominium Units Pursuant to 11 U.S.C. §363(f) ("Motion"), and represents:

## I.

## **PRELIMINARY STATEMENT**

Through the Motion, the Debtor seeks an immediate order authorizing it to sell less than 10% of the units (18 out of 222) of a building partially reconstructed into a commercial and residential mixed-use project (the "Building"). The Debtor proposes to pay the Bank Group the net proceeds after costs of sale. The Building is collateral for a loan (the "Loan") of approximately $80 million[2] lent to the Debtor by the Bank Group. The proceeds from the Loan were to be used to complete the reconstruction of the Building, and while the Loan has been fully funded, the Debtor admits it will require at least $4 million (and an unknown amount of time) to complete the Building. The Debtor claims that "timing is critical" with respect to the sale of the units because "unless [the Debtor] is able to complete a sale of at least one of the Sold Units by June 20, 2009, it will lose its exemption from otherwise applicable HUD requirements."[3]

As set forth in detail below, contrary to the Debtor's assertions, the Debtor does not have, and never had, any HUD exemption.[4] Therefore, given the lack of analysis and information regarding the impact of the proposed sales on the value of the collateral, and the very real possibility that such sales will negatively impact the value of the Building, there is no need to move blindly into these transactions.

---

[1] The Bank Group consists of Bank of America, N.A., Manufacturers Bank, a California banking corporation, United Commercial Bank, a California banking corporation, and East West Bank, a California banking corporation.

[2] The Motion references the Loan has having an original principal balance of $78,840,375, and the Debtor's schedules list the Bank of America, the administrative agent for the Bank Group, as holding an undisputed, liquidated and noncontingent secured claim of $79,354,669.16. That amount was apparently taken from a declaration of a bank officer in litigation in the State Court, and was the unpaid amount as of March 2009 without taking interest and other charges into account. In any event, according to the Debtor's Schedules, the Bank Group has an undisputed secured claim of approximately $80 million.

[3] Yashouafar Declaration, para. 25-26.

[4] If a developer qualifies for the so-called "HUD exemption," then the developer is exempt from certain reporting, disclosure and registration requirements under the Interstate Land Sales Full Disclosure Act. To qualify, however, the developer must commit, without conditions, to complete construction of the building within two years. The Debtor did not make that commitment.

1

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION
FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

In summary, the Bank Group opposes the Motion for each of the following reasons:

(i) The Debtor's express basis for the need to file the Motion at this time, in order to avoid the loss of a HUD exemption, is without foundation. The Debtor is not now and never was eligible for the HUD exemption because the purchase and sale agreements do not meet the requirements of the statute. Moreover, under the express terms of the statute (and as admitted in the Motion[5]), any HUD exemption was lost when the Debtor failed to complete construction of the Building within two years of the date of the first Sale Contract.

(ii) The Motion is not in the best interest of creditors and the estate because the Motion fails to take into account the fact that if the Debtor sells units under the present circumstances, other alternatives now available to realize the value of the Building will become impractical or uneconomic. As a result, the value the value of the Building and its remaining units will be seriously and negatively affected.

(iii) The Bank Group's security interest in the Building will not be adequately protected if the Motion is granted and the Debtor were to sell units.

The Bank Group is concerned that if the Motion is approved, and the Debtor is allowed to sell the 18 units identified in the Motion (out of the total of 222), the value of the remaining 204 units in the Building will be substantially and irretrievably harmed. The net effect (even after taking into account the payment of the sales proceeds to the Bank Group) will be substantially harmful to the net realizable value of the Building, the value of the remaining units, and the value of the security interest of the Bank Group in the Building.

As set forth in greater detail below and in the Declaration of Deborah Haskell accompanying this opposition,[6] the sale of even one unit will necessarily impose substantial fees on the Debtor as the owner of each of the remaining units to be paid monthly to the newly formed Homeowner's Association ("HOA"). Under the Conditions, Covenants and Restrictions ("CC&R's") applicable to the Building, the obligation to pay the HOA fees is secured with a priority lien ahead of the Bank Group. This cost alone will endanger any protection the Bank Group has in its Loan and its collateral, particularly since the construction remains unfinished. The imposition of the HOA fees will, in and of itself, cause a substantial loss in value for the

---

[5] Paragraph 23 of the Motion.
[6] The "Haskell Declaration."

2

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

remaining units.[7] Further, as described in the Haskell Declaration, the sale of a few units will make it substantially more difficult to defer unit sales and rent unsold units until the market firms up. Such "interim uses" will become impractical.

As the Bank Group has not been granted access to the Building, the Bank Group does not have the ability to assess whether its collateral is maximized through (i) individual sale of the units; (ii) bulk sale of the units; or (iii) an "interim use" as a rental property. However, once one unit is sold as the Debtor proposes, the last two options become practical impossibilities, thus limiting the options available to maximize the asset.

Finally, the fact that the construction of the Building is not complete, and there is no funding, budget or timetable for completion of construction of the Building will also have a substantial negative impact on the realizable value of (i) the remaining units and (ii) the Building as a whole. The Court should not grant the Motion until there has been a full explanation of the economics of all of the options available and an assessment of which option best protects the value of the asset.

## II.

## STATEMENT OF FACTS

In March 2006 the Debtor entered into the Loan Agreement[8] with the Bank Group. The Loan was for three years and matured on March 6, 2009. According to the Loan Agreement, the $80 million in loan proceeds were to be used to pay the cost of the renovation, rehabilitation and construction of the on-site and off-site improvements to the Building for the redevelopment of the Building into a mixed-use condominium building.[9] Originally, the terms of the Loan provided for 18 months (until September 2007) to complete construction activity on the Building, and an additional 18 months to sell the completed units.

The Bank Group fully funded the amounts committed under the Loan Agreement and extended for a year the time to complete, but the Debtor still has not completed the construction

---

[7] Additionally, the sale of even one unit will trigger reassessments from the County Tax Collector, and the obligation to pay 222 property tax bills in amounts substantially in excess of the current tax burden.
[8] For the Court's convenience, the Bank Group will use the definitions set forth in the Motion when referencing certain of the documents attached to the Motion.
[9] Paragraph 1.2 of the Loan Agreement.

3

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION
FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

of the Building. The Motion acknowledges that construction has been completed on only the first eight floors of the Building,[10] and that construction has not been completed on floors nine through thirteen.[11] The Debtor acknowledges that at least several millions of dollars are necessary to complete the construction on the top five floors.[12] Further, the Debtor admits that there are mechanic's liens totaling approximately $7.2 million.[13]

In late 2006 and early 2007, when the real estate market was overheated, the Debtor apparently took deposits from a number of people interested in buying homes in this new and "edgy" downtown area. Unfortunately, it now appears that because they could not complete construction, the Debtor missed the market. The Debtor acknowledges in the Motion that at least "some" of those people have now filed lawsuits seeking the return of their deposits and cancellation of the sale contracts.[14]

After the Loan matured on March 1, 2009 and the Debtor failed to pay the sums due and owing, the Bank Group asked whether the Debtor would consent to the appointment of a State Court Receiver. The Debtor consented, and then the principals apparently had a change of heart, and commenced this bankruptcy case before the receiver could take possession.

In the meantime the Debtor apparently entered into a number of residential leases all in direct violation of the express terms of the Loan Agreement.[15] The terms and circumstances make the residential tenants suspect at best. One tenant is living in a unit rent-free for nine months.[16] To compound the error, the Debtor has used what little cash is generated from these tenants without bothering to comply with section 363 of the Bankruptcy Code.

The challenges presented by the Building are indeed daunting. There is no easy, reliable way to develop truly "hard" estimates for the costs to complete new construction, much less the

---

[10] Paragraph 8 of the Motion.
[11] Paragraph 11 of the Motion.
[12] The Debtor says, in paragraph 11 of the Motion, that "an additional approximately $4 million" is needed in order to complete "work on the Building." This estimate does not appear to include marketing and carrying costs or other "soft" costs. The Bank Group does not agree with the Debtor's estimates, and reserves its rights to dispute the Debtor's underlying assumptions.
[13] Yashouafar Declaration, para. 21.
[14] Paragraph 15 of Motion.
[15] See Exhibit "G" to Debtor's Schedules.
[16] See Exhibit "G" to Debtor's Schedules.

4

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION
FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

costs associated with rehabilitation of an eighty year old building of historic note. The fact is that the Building is only partly reconstructed; five floors remain unfinished. The Bank Group is concerned that the mess and discomfort attendant to the completion of the construction will discourage potential buyers at this time. And since there is no timeline, no budget and no source of the funds to complete, market forces may be at play to encourage potential buyers to discount the price at which they are willing to buy units in order to account for the risks associated with buying into a Building that is not complete.

Finally, there is the challenge presented by the imposition of the HOA fees and property taxes for each unsold unit. If they don't know already, potential buyers will be told by sales representatives for competing buildings that the Debtor, in bankruptcy, will not have the ability to pay those fees and taxes. The Debtor projects the HOA fees alone will add $125,000 per month to the Debtor's monthly costs of maintaining the Building.[17]

In the Motion, the Debtor states that the bankruptcy was commenced in order to "have the ability and opportunity to close escrow on the units that are under contract, market and sell the remaining units in the Building, and to complete construction on the Building . . ."[18] Those are certainly admirable goals, but unfortunately the Debtor has failed to take the steps necessary to consider, much less resolve the problems associated with working to achieve these goals. The Debtor has failed to address the following cash flow challenges: (i) the soon to be accruing HOA fees (projected at approximately $125,000 per month); (ii) the costs to complete the construction (estimated by the Debtor at $4 million); (iii) the several millions in marketing costs; and (iv) the accruing interest on the Loan. Each month in which the Debtor fails to address the larger issues, the challenges grow.

And the Debtor continues to ignore the larger issues. The Motion is written as if the Debtor were seeking authority to sell widgets off the shelf, with each sale entirely unaffected by the previous sale or the remaining inventory of widgets. As is set forth above, however, and as more particularly described in the Haskell Declaration, the value of the remaining units in the

---

[17] *See* Condominium Conversion Final Subdivision Public Report, at p. 6; Exhibit "2" to Request for Judicial Notice.
[18] Paragraph 20 of the Declaration of M. Aaron Yashouafar filed in support of the Motion.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION
FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

Building, and the value of the Building itself are dramatically affected by a sale of just a few of the 222 units "on the shelf." The Bank Group's collateral is not adequately protected. If the Motion is granted, and the Debtor allowed to sell less than 10% of the units in the project, overnight, the Building, the Bank Group's collateral, will be saddled with substantial HOA fees and dramatically increased property taxes. It is also likely that a sale of a few units will impose marketing and other constraints on other options the Debtor may otherwise consider. If the Debtor is wrong on the market, the sale of units may actually prevent the Debtor (or perhaps, the Bank Group) from realizing the Building's highest and best use, by preventing its interim use as an apartment building or through a bulk sale, or otherwise.

## III.

## LEGAL ARGUMENT

**A.    THE DEBTOR IS NOT ELIGIBLE FOR A HUD EXEMPTION; THERE IS NO NEED TO FORCE THE DEBTOR TO A PIECEMEAL SALE PROCESS**

The Debtor argues that it must have approval for the sales immediately or it will lose a claimed HUD exemption under 15 U.S.C. §1702(a)(2), and thereby run the risk that the buyers will cancel their sales contracts. However, it is clear that the Debtor does not qualify for any HUD exemption.

The Interstate Land Sale Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* ("ILSFDA") sets forth certain reporting, registration and disclosure requirements for sellers of lots (including condominiums) unless such sellers qualify for an exemption under the Act. The sale of a condominium will be exempt from the ILSFDA requirements, however, if the sale is under a contract that unconditionally obligates the seller to complete construction thereon within a period of two years. 15 U.S.C. §1702(a)(2). Pursuant to 15 U.S.C. §1702(a)(2), the exemption applies to:

> "the sale or lease of any improved land on which there is a residential, commercial, condominium or industrial building, or the sale or lease of land under a contract obligating the sellor or lessor to erect such a building thereon within a period of two years."

6

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

In order to qualify for the exemption under 15 U.S.C. §1702(a)(2), "the seller must have an unconditional commitment to complete construction within two years." *Aboujaoude v. Poinciana Development Company II*, 509 F.Supp.2d 1266, 1271 (S.D. Fla. 2007); *Stein v. Paradigm Mirsol, LLC*, 551 F.Supp.2d 1323, 1328 (M.D. Fla. 2008) (a contract only obligates the completion of a condominium within two years when that commitment to do so is real and not illusory); *Markowitz v. Northeast Land Company*, 906 F.2d 100, 106 (3rd Cir. 1990) (Court found that even though the contract scheduled settlement within two years of the sale and settlement occurred within that time, the developer was not eligible for the HUD exemption because the sales contract limited the buyer's remedy to a liquidated amount equal to her deposit plus interest).

The HUD promulgated guidelines make it clear that the commitment to complete construction within two years must be unconditional in order to qualify for the exemption. The Department of Housing and Urban Development's Office of Interstate Land Sales Registration's guidelines state:

> "Contracts that permit the seller to breach virtually at will are viewed as unenforceable because the construction obligation is not an obligation in reality. Thus, for example a clause that provides for a refund of the buyer's deposit if the seller is unable to close for any reason within the seller's control is not acceptable for use under this exemption. Similarly, contracts that directly or indirectly waive the buyer's right to specific performance are treated as lacking a realistic obligation to construct." *Aboujaoude*, 509 F.Supp.2d at 1271; *See also Stein v. Paradigm Mirsol, LLC*, 551 F.Supp.2d 1323, 1328 (M.D. Fla. 2008).

Accordingly, any contract provision limiting the purchaser's right to affirm the contract and seek damages or specific performance is fatal to the exemption. For example, in *Aboujaoude*, the sales contract limited the buyers' remedy to return of their deposit. *Id.* at 1271. The Court found that the developer did not qualify for the exemption because the sales contracts precluded damages or specific performance. *Id.* at 1272. Similarly, in *Markowitz*, the sales contract stated that "Buyer's sole remedy against Seller . . . in the event that Seller has not substantially completed the Property . . . on or before the date of settlement hereunder, shall be the termination of this Agreement . . . and the return of the Deposit, together will all interest earned thereon."

7

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION
FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

*Markowitz*, 906 F.2d at 104. The Court found that the seller was not eligible for the HUD exemption where the contract limited the buyer's remedy to refund of her deposit plus interest. In *Stein*, the Court found that provisions in the sales contract indefinitely extending the completion period for "other delays beyond the control of the Seller" rendered the obligation to complete the condominium within two years illusory. *Stein*, 551 F.Supp.2d at 1330.

In the instant case, the Purchase and Sales Agreements ("PSA") attached collectively as Exhibit "3" to the Motion all contain language that, like the contracts in *Aboujaoude, Stein and Markowitz*, render illusory the commitment to complete construction within two years. Paragraph 7 of the PSA (like the contract provisions in *Aboujaoude* and *Markowitz*) provides:

> "By execution of this Agreement, BUYER agrees that, should SELLER fail to complete, or choose not to complete, the Property within two (2) years from the date of this Agreement, BUYER'S remedies will be limited to termination of this Agreement and demand to Escrow of a refund of such amounts deposited into Escrow by BUYER, without deduction, within fifteen (15) calendar days." SELLER MAKES NO REPRESENTATION AS TO THE ACTUAL DATE OF COMPLETION OF RENOVATION AND REHABILITATION, AND SELLER WILL NOT BE RESPONSIBLE FOR ANY INCONVENIENCE, LOSS OR EXPENSE TO BUYER RESULTING FROM DELAYS IN COMPLETION OF SUCH RENOVATION AND REHABILITATION. BUYER ACKNOWLEDGES THAT, PRIOR TO THE CLOSE OF ESCROW, SELLER MAY MAKE CERTAIN MATERIAL CHANGES IN THE LEGAL DOCUMENTS DESCRIBED BELOW IN PARAGRAPH 17 AND CHANGES IN PLANS FOR DEVELOPMENT OF THE PROJECT, OR CHANGE THE MANNER OR CONTENT OF THE OFFERING OF UNITS IN THE PROJECT. IF PRIOR TO THE CLOSE OF ESCROW ANY OF THE DESCRIBED MATERIAL CHANGES OCCUR, SELLER WILL PROVIDE BUYER WITH WRITTEN NOTICE OF THE SAME, AND BUYER AGREES THAT BUYER'S SOLE REMEDY AT THAT TIME WILL BE TO TERMINATE THIS AGREEMENT, REQUEST CANCELLATION OF ESCROW AND RECEIVE A FULL REFUND OF ALL AMOUNTS DEPOSITED HEREUNDER." [*See* Exhibit "3" to Motion, emphasis in original].

At paragraph 7(b), the PSA states:

> "Accordingly, any failure to complete the Unit or Condominium Project by the estimated Closing Date, or Buyer's desired or anticipated completion date, shall not excuse Buyer from full performance of all the terms and conditions of this Agreement, allow for any further delays by Buyer, or give Buyer the right to terminate this Agreement and Seller shall not be liable to Buyer for any damages whatsoever, including without limitation, those

8

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

resulting from Seller's inability or failure to complete the Unit except for those provided for in this Agreement." [*See* Exhibit "3" to Motion].

Further, at paragraph 40, the PSA states:

> "<u>SELLER DEFAULT</u>. IN THE EVENT OF SELLER'S DEFAULT UNDER THIS AGREEMENT, BUYER'S REMEDY IS LIMITED TO LIQUIDATED DAMAGES PURSUANT TO PARAGRAPH 11 HEREIN. BY SIGNING BELOW, BUYER WAIVES THE RIGHT TO PURSUE ANY OTHER REMEDY AT LAW OR IN EQUITY." [*See* Exhibit "3" to Motion, emphasis in original].

Paragraph 11 of the PSA provides for liquidated damages solely in the amount equal to buyer's purchase money deposit.[19] [*See* Exhibit "3" to Motion].

The Debtor limited the buyer's remedy under the PSA to return of the deposit plus interest. Further, the Debtor has indefinitely extended the completion date by stating that it "makes no representation as to the actual date of completion," [PSA, paragraph 7]. Therefore, the Debtor does not qualify for the HUD exemption, and there is no immediate need to sell the units.

Moreover, even if the Debtor were somehow eligible for the exemption, as a practical matter the Debtor will not complete the construction within two years, and would therefore lose its claimed HUD exemption. The Debtor claims that "the Sale Contracts expressly provide that the Debtor is obligated to complete construction of the Building within two years from the date of each such Sale Contract," and that "the first Sale Contract with the Debtor was dated June 20, 2007."[20] Accordingly, even under Debtor's flawed analysis, it must complete a sale prior to June 20, 2009 or risk losing the HUD exemption. Yet, the Debtor admits that construction on the Building is not complete as only 8 of the 15 stories have been reconstructed.[21] At the risk of stating the obvious, there is no possible way that the construction on the remaining stories will be completed by June 20, 2009 deadline.

---

[19] Paragraph 11 of the PSA discusses liquidated damages solely in the context of the seller's remedy if the buyer defaults. However, given the language of paragraph 40 that the paragraph 11 liquidated damages provision applies, one must assume that in the event the seller defaults, the buyer's remedy is limited to return of the buyer's deposit. This remedy is confirmed by the language of paragraph 7 cited above.
[20] Motion, p. 11.
[21] Yashouafar Declaration, paras. 10, 20.

9

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

### B. SALE OF THE UNITS IS NOT IN THE BEST INTERESTS OF THE CREDITORS OR THE ESTATE

In order to approve a sale motion, the court must find that it is in the best interest of the creditors and the estate. The Court cannot make that finding on these facts. Indeed, exactly the contrary; a sale of 18 of the 222 units will have a substantial negative impact on the value of the remaining units and on the Building. This negative impact manifests itself in the following ways:

#### 1. Even One Sale Will Lead to the Imposition of Substantial Homeowner's Association Fees

As set forth in the Haskell Declaration, the sale of even one unit will necessarily impose substantial fees on the owner of each of the remaining units to be paid monthly to the newly formed HOA. Under the CC&R's applicable to the Building, the sale of even one unit will necessarily impose substantial fees on the owner of each of the remaining units to be paid monthly to the newly formed HOA. [CC&R's at section 7.1; Condominium Conversion Final Subdivision Public Report at p. 6; Request for Judicial Notice, Exhibits "1" and "2"]. As owner of the unsold units, the Debtor is required to fund the HOA fees. The CC&R's also provide that the obligation to make payment of the HOA fees is secured with a lien over the unit, in priority senior to the lien of the Bank Group. [CC&R's at section 7.1; Exhibit "1" to Request for Judicial Notice]. Even if only one unit is sold, HOA fees are immediately assessed against each of the 222 units. The HOA fees assessed against the unsold units would be a substantial cash drain on the Building, further lowering the value of the collateral of the Bank Group.

Further, as described in the Haskell Declaration, there are also "real life" practical implications that arise from the Debtor's selling only 18 of the 222 units in the Building. The imposition of the HOA fees makes unavailable "interim" solutions such as "landbanking" or operating the Building as an apartment or comparable uses. On a practical basis, the sale of even one of the units makes uneconomic other business options that may make better financial sense on an interim basis. In the current real estate market, it frequently makes sense to implement an "interim" best use, such as renting units as apartments, while waiting for the market to firm up.

10

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

That may take several years, but in the interim, the Building could generate cash sufficient to pay operating expenses and debt service.

If it were in the best interest to sell the Building as a whole and to have the buyer of the Building operate the Building as an apartment building, the sale of a few of the units will make that option more difficult, if not impossible. If a few of the units are sold now, there is no longer an option to lease out the units as apartments in the short term, and when the market improves, convert them back to condominiums. Similarly, the significant HOA fees that must be paid for any unsold unit will discourage potential buyers from purchasing the Building as a whole, because if a buyer purchases the whole Building, it will then be burdened with the obligation to fund the HOA fees.

It is surprising that the Debtor does not mention the HOA fees in the Motion, let alone explain how these fees will be paid. Indeed, Mr. Yashouafar, at his deposition, admitted that although he is the one in charge of making sure there are funds to pay the HOA fees, he does not currently know the source of such funds.[22] The Debtor projected the HOA fees for the remaining units which are not sold at approximately $125,000 per month. [*See* Exhibit "2" to Request for Judicial Notice; Condominium Conversion Final Subdivision Public Report at p. 6] The cash flow burden will have a substantial negative impact on the value of the Building.

2. **The Debtor Fails to Discuss A Budget, Timeline and Source of Funding for Completion**

As set forth in the Haskell Declaration, the fact that the Building is not complete, and the fact that the Debtor admits that approximately $4 million is needed in order to fund the remaining construction costs will, in and of itself, negatively affect the price at which a willing buyer will purchase a unit. Prospective buyers will understand that each of the homeowners run a substantial risk until the Building and all of its units are completed. That risk includes, but is not limited to, the risk that construction of the units on the five unfinished floors will not be

---

[22] Yashouafar Deposition, pp. 53, ln. 5 through pp. 56. ln. 21. The relevant pages from the Rough Transcript of Yashouafar's deposition are attached hereto as Exhibit "1." At present, the Bank Group can only provide the Rough Transcript as the deposition was taken the day before this opposition was due. The Bank Group will provide the actual pages of the Transcript once it receives the official version.

11

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

completed by the Debtor, and that the costs of the HOA will not be borne by 222 owners, but only 75 or 100 or so. This likely will materially impact the price at which a prospective buyer will purchase a unit. Further, it is reasonable to conclude that the price a prospective buyer will be willing to offer for a unit will be discounted to reflect the mess and discomfort of the process required to complete construction on the remaining five floors of the Building, and the uncertainty associated with the current condition of the Building.

Moreover, the Motion does not contain information necessary to fairly assess the construction costs and the extent to which the fact that the Building is under construction will affect the net realizable value of the Building. In order to better understand that concern, the Debtor should provide: (i) a detailed construction budget; (ii) a detailed estimate of the soft costs associated with the construction; (iii) a timetable for completion; and (iv) the source of funding. The Debtor does not even discuss this information in the Motion. Without an understanding of the budget, estimated costs, timetable and source of funding for the project, it is impossible to say whether the sales the Debtor proposes through the Motion are in the best interests of the estate or creditors.

C. **THE BANK GROUP'S SECURITY INTEREST IS ENTITLED TO ADEQUATE PROTECTION**

The Bankruptcy Code carefully protects the claims held by a creditor secured with collateral if a debtor seeks to use, sell or lease collateral. Section 11 U.S.C. §363(e) provides that the Court:

". . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." *See also In re Kenny Kar Leasing, Inc.*, 5 B.R. 304, 307 (Bankr. C.D. Cal. 1980) (rights to use, sale or lease collateral in which the secured creditor and the debtor have an interest are conditioned upon providing adequate protection of the interest of the secured creditor).

Adequate protection in the context of a sale of some but not all of the collateral requires, at a minimum that the Debtor show that the value of the remaining units will not be negatively affected by the sale of 18 units. *In re Bear River Orchards*, 56 B.R. 976, 978 (Bankr. E.D. Cal.

12

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

1986) (court must identify secured creditor's value and the risks thereto, and determine if, under the debtor's proposal, the secured creditor is adequately protected); *In re* Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (the purpose of adequate protection for a creditor is to insure that the creditor receives the value for which it bargained prebankruptcy); *In re Magnus,* 50 B.R. 241, 243 (Bankr. D. ND. 1985) (adequate protection requires that a creditor's interest in property cannot be in any respect impaired or subjected to increased risk without assurance that the creditor will realize the benefit of its bargain); *In re Havik, Inc.*, 13 B.R. 294, 295 (Bankr. N.D. Ga. 1981) (debtor seeking to sell condominiums must provide adequate protection for defendants' interests). The Debtor cannot make that showing. As set forth above, and in the Haskell Declaration, the Debtor has failed to explain how the HOA fees triggered for all of the units by the proposed sale of some of the units will be paid, let alone address the impact of the significant negative cash flow this will create on the project.

Moreover, the Debtor has failed to provide the budget, time frame or source of funds to complete construction. At present, this project is significantly past the deadline for completion, and there is no indication of how completion will be financed.[23] Without such information, Debtor's claim that "the sales of the remaining units at the Building will more likely yield proceeds sufficient to generate a recovery for other creditors in this case . . ." is, at best, suspect.[24] There is no way to know if the Bank Group will be adequately protected under Debtor's proposed plan to sell the units and complete construction, and as set forth in the Haskell Declaration, once the sales of some of the units commence, other alternatives business alternatives are foreclosed. The Court should not allow the sale of units when such sale would significantly limit the options for use of the Building without at least allowing evaluation to see which option makes the best business sense.

The *In re Chevy Devco*, 78 B.R. 585 (Bankr. C.D. Cal. 1987) is instructive. In *Chevy Devco,* the debtor sought an order approving a construction loan with a first lien on the property,

---

[23] The original completion deadline was September 1, 2007 (Loan, Exhibit "B," p. B-3), which was later extended to September 1, 2008 (Modification, para. E). A copy of the Modification is attached hereto as Exhibit "2" for the court's convenience.
[24] Motion, p. 24.

13

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION
FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

the granting of which would require subordination of a tax lien and two existing deeds of trust. Debtor argued that the new construction lien would create equity in the property. The court denied the request, finding that the lienholder was not adequately protected because the prospect of success was "more fantasy than expectation." *Id.* at 588-589. Similarly, in our case at hand, the Debtor's claim that completing the proposed sales and generating "approximately $13 million" is in the best interest of the estate and its creditors is "more fantasy than expectation" given the Debtor's failure to provide information or present evidence on whether these sales make financial sense from the point of view of the value of the remaining units.

## IV.

## CONCLUSION

In conclusion, the Debtor's claim that it needs to sell the units immediately or lose its HUD exemption is unsupported by the facts and the law. Moreover, Debtor has failed to establish that good business reasons exist to justify the sale of 18 out of the total of 222 units. On the contrary, the Debtor's Motion fails to address substantial concerns regarding how the sales and corresponding imposition of HOA fees will impact the value of the collateral, and has failed to provide details regarding the budget, estimated costs, timetable and source of funding to complete the project, thereby making it impossible to determine whether the sales the Debtor proposes are in the best interests of the estate and creditors, and whether the Bank Group is adequately protected. Accordingly, for the foregoing reasons and authorities, the Debtor's Motion should be denied.

DATED: May 27, 2009

BUCHALTER NEMER
A Professional Corporation


By:  /S/ DANIEL H. SLATE
DANIEL H. SLATE
Attorneys for Bank of America, N.A.,
individually and as Administrative Agent for a
Group of Lenders

BN 3669911v1

14

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION
FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS

EXHIBIT 1

05-26-09.txt
UNEDITED ROUGH DRAFT

1  In re ROSSEVLET LOFTS, LLC, Debtor
2  DEPOSITION OF MASSOUD AARON YASHOUAFAR
3  TUESDAY, MAY 26, 2009
4
5
6  DISCLAIMER NOTICE
7
8      The Reporter has, at the direction and
9  instruction of counsel, prepared the following draft,
10 unproofed (or partially proofed), an uncorrected
11 transcript of the deposition of the named witness, taken
12 on the date indicated, which transcript has also not been
13 reviewed, corrected, and approved and/or signed by the
14 witness (the "Draft Transcript").
15      Reporter has advised counsel at the conclusion
16 of the deposition of Reporter's recommendation against
17 the preparation and release of a Draft Transcript in that
18 it may and will contain transcription errors, name and
19 word choice mistakes, typing and editing problems, and
20 other inaccuracies, and should not be relied upon by
21 counsel or any party much less available for any citation
22 to the Court, Arbitrator, or the decisionmaker.
23      Requesting counsel have indicated a priority or
24 other need for release of the Draft Transcript, and
25 instructed Reporter to prepare and release one for

1

CENTURY COURT REPORTERS 1-800-555-0014
UNEDITED ROUGH DRAFT

05-26-09.txt

1  review. By this notice and a separate Disclaimer and
2  Agreement, Reporter continues to advise against issuance
3  of, or reliance upon, a Draft Transcript for any purpose.
4       Reporter specifically advises all requesting
5  counsel, and any party or other reader of the Draft
6  Transcript, of the significant risk of word,
7  transcription, proofing and other errors in an "expedited
8  draft" of a transcript, and continue to recommend against
9  use of the Draft Transcript for any purpose.
10      Reporter expressly disclaims any warranty,
11 whether expressed or implied, as to the accuracy or
12 completeness of the Draft Transcript.
13                          * * *
14
15      THE VIDEOGRAPHER: Good morning. This begins video
16 disk one, Volume I in the video deposition testimony of
17 air on {KWRARB/} far in the case of {RAOS/} felt lofts
18 LLC, a Delaware limited liability company, in U.S.
19 Bankruptcy court, central district of California, San
20 Fernando Valley division. The case number is 1:09-B
21 K-1421 4- GM.
22      Today's date is May 26 {T-GT/}, 2009, the time
23 is approximately 10:01 a.m.
24      This deposition is being taken at 1000 Wilshire
25 Boulevard in Los Angeles, California, and was made at the

2

CENTURY COURT REPORTERS 1-800-555-0014
UNEDITED ROUGH DRAFT