1  DANIEL H. SLATE (SBN: 78173)
   RICHARD P. ORMOND (SBN: 207442)
2  BUCHALTER NEMER
   A Professional Corporation
3  1000 Wilshire Boulevard, Suite 1500
   Los Angeles, CA 90017-2457
4  Telephone: (213) 891-0700
   Facsimile: (213) 896-0400
5  Email: dslate@buchalter.com
   Email: rormond@buchalter.com
6
   Attorneys for Bank of America, N.A., individually and as
7  Administrative Agent for a Group of Lenders

8

9                   UNITED STATES BANKRUPTCY COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                  SAN FERNANDO VALLEY DIVISION

12

13  In re                                  Case No. 1:09-bk-14214-GM

14  ROOSEVELT LOFTS, LLC, a Delaware       Chapter: 11
    limited liability company,
15                                         BANK GROUP'S MEMORANDUM OF
                 Debtor.                   POINTS AND AUTHORITIES IN
16                                         OPPOSITION TO DEBTOR'S SECOND
                                           MOTION FOR ORDER AUTHORIZING
17                                         SALE OF CERTAIN CONDOMINIUM
                                           UNITS PURSUANT TO 11 U.S.C. §363(f)
18
                                           Date:   June 16, 2009
19                                         Time:   10:00 a.m.
                                           Place:  Courtroom 303
20                                                 21041 Burbank Blvd.
                                                   Woodland Hills, CA 91367
21

22

23

24

25

26

27

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

# TABLE OF CONTENTS

**PAGE**

I. PRELIMINARY STATEMENT ................................................................................................1

II. STATEMENT OF FACTS ...................................................................................................4

III. LEGAL ARGUMENT .........................................................................................................4

    A.    THE DEBTOR IS NOT ELIGIBLE FOR A HUD EXEMPTION; THERE IS NO NEED TO FORCE THE DEBTOR TO A PIECEMEAL SALE PROCESS ................................................................................................4

    B.    SALE OF THE UNITS IS NOT IN THE BEST INTERESTS OF THE CREDITORS OR THE ESTATE ................................................................................8

        1.    Even the Sale of One Unit Will Lead to the Imposition of Substantial Homeowner's Association Fees ................................................8

        2.    The Debtor Fails to Discuss A Budget, Timeline and Source of Funding for Completion ................................................................................9

    C.    THE BANK GROUP'S SECURITY INTEREST IS ENTITLED TO ADEQUATE PROTECTION ..............................................................................11

IV. CONCLUSION ..................................................................................................................13

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S SECOND MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS**

# TABLE OF AUTHORITIES

Page

**Cases**

*Aboujaoude v. Poinciana Development Company II,*
　509 F.Supp.2d 1266 (S.D. Fla. 2007) ..........................................................5, 6

*In re Bear River Orchards,*
　56 B.R. 976 (Bankr. E.D. Cal. 1986) ..............................................................11

*In re Chevy Devco,*
　78 B.R. 585 (Bankr. C.D. Cal. 1987) ..............................................................12

*In re Havik, Inc.,*
　13 B.R. 294 (Bankr. N.D. Ga. 1981) ..............................................................12

*In re Kenny Kar Leasing, Inc.,*
　5 B.R. 304 (Bankr. C.D. Cal. 1980) ...............................................................11

*In re Magnus,*
　50 B.R. 241 (Bankr. D. ND. 1985) .................................................................12

*In re Mosello,*
　195 B.R. 277 (Bankr. S.D.N.Y. 1996) ............................................................11

*Markowitz v. Northeast Land Company,* 906 F.2d 100 (3rd Cir. 1990) .....................5, 6

*Stein v. Paradigm Mirsol, LLC,*
　551 F.Supp.2d 1323  (M.D. Fla. 2008) ..........................................................5, 6

**Statutes**

11 U.S.C. §363(e) .........................................................................................11
11 U.S.C. §363(f) ...........................................................................................1
15 U.S.C. §§ 1701 *et seq.* ...............................................................................4
15 U.S.C. §1702(a)(2) ...................................................................................4, 5
363 of the Bankruptcy Code ............................................................................1

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S SECOND MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS**

1    Bank of America, N.A., individually and as agent for a group of lenders (the "Bank

2    Group")[1], respectfully files this opposition to Debtor Roosevelt Lofts, LLC's (the "Debtor")

3    Second Motion for Order Authorizing Sale of Certain Condominium Units Pursuant to 11 U.S.C.

4    §363(f) (" Second Motion"), and represents:

## I.

## PRELIMINARY STATEMENT

The Debtor brings the Second Motion, having already requested that the Court approve the sale of 18 out of 222 condominium units of a building partially reconstructed into a commercial and residential mixed-use project (the "Building")[2] in a prior motion set for hearing on June 10, 2009 (the "Prior Motion"). In the Prior Motion, the Debtor asked the Court to approve the sale of less than 10% of the units, pursuant to contracts the Debtor allegedly entered into prior to filing its bankruptcy petition. Through this Second Motion, the Debtor now seeks approval for the sale of two additional units, which sales contracts were allegedly entered into post-petition (the "Post Petition Sales Contracts").[3] However, one of these alleged Post Petition Sales Contracts is undated and unsigned, making it unclear if it is even an actual sale (let alone whether it was entered into post-petition).[4] The Debtor fails to explain why the Post Petition Sales Contracts that are the subject of this Second Motion were not included in the Prior Motion. The Debtor further fails to explain why the Second Motion had to be filed before the Court rules on the Prior Motion.

Nevertheless, the Debtor now seeks approval for these Post Petition Sales Contracts, claiming that, like the proposed sales that are the subject of the Prior Motion, good business reasons exist to allow the sales to occur, and time is of the essence because unless a sale is allegedly completed by June 20, 2009, the Debtor will lose a claimed HUD exemption.[5] The

---

[1]  The Bank Group consists of Bank of America, N.A., Manufacturers Bank, a California banking corporation, United Commercial Bank, a California banking corporation, and East West Bank, a California banking corporation.

[2]  The Building is collateral for a loan (the "Loan") of approximately $80 million lent to the Debtor by the Bank Group. The proceeds from the Loan were to be used to complete the reconstruction of the Building, and while the Loan has been fully funded, the Debtor admits it will require at least $4 million (and an unknown amount of time) to complete the Building.

[3]  Yashouafar Declaration, para. 23.

[4]  The Debtor offers no explanation for the lack of a date and signatures.

[5]  Yashouafar Declaration, para. 26-27.

1

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

Debtor proposes to pay the Bank Group the net proceeds after costs of sale.

As set forth in detail below, contrary to the Debtor's assertions, the Debtor does not have, and never had, any HUD exemption.[6] Moreover, the Second Motion suffers from the same defects as the Prior Motion in that the Debtor fails to provide analysis and information regarding the impact of the proposed sales on the value of the collateral. Given the very real possibility that such sales will negatively impact the value of the Building,[7] there is no need to move blindly into these transactions.

In summary, the Bank Group opposes the Second Motion for each of the following reasons:

> (i)     The Debtor's express basis for the need to file the Second Motion at this time, in order to avoid the loss of a HUD exemption, is without foundation. The Debtor is not now and never was eligible for the HUD exemption because the purchase and sale agreements do not meet the requirements of the statute. Moreover, under the express terms of the statute (and as admitted in the Second Motion[8]), any HUD exemption was lost when the Debtor failed to complete construction of the Building within two years of the date of the first Sale Contract.

> (ii)     The Second Motion is not in the best interest of creditors and the estate because the Second Motion fails to take into account the fact that if the Debtor sells units under the present circumstances, other alternatives now available to realize the value of the Building will become impractical or uneconomic. As a result, the value the value of the Building and its remaining units will be seriously and negatively affected.

> (iii)     The Bank Group's security interest in the Building will not be adequately protected if the Second Motion is granted and the Debtor were to sell units.

The Bank Group is concerned that if the Second Motion is approved, and the Debtor is allowed to sell the two additional units identified in the Second Motion (bringing the total from the Prior Motion and the Second Motion to 20 out of the total of 222), the value of the remaining units in the Building will be substantially and irretrievably harmed. The net effect (even after

---

[6] If a developer qualifies for the so-called "HUD exemption," then the developer is exempt from certain reporting, disclosure and registration requirements under the Interstate Land Sales Full Disclosure Act. To qualify, however, the developer must commit, without conditions, to complete construction of the building within two years. The Debtor did not make that commitment.

[7] *See* Declaration of Deborah Haskell ("Haskell Declaration").

[8] Paragraph 24 of the Second Motion.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

taking into account the payment of the sales proceeds to the Bank Group) will be substantially harmful to the net realizable value of the Building, the value of the remaining units, and the value of the security interest of the Bank Group in the Building.

As set forth in greater detail below and in the Declaration of Deborah Haskell accompanying this opposition, the sale of even one unit will necessarily impose substantial fees on the Debtor as the owner of each of the remaining units to be paid monthly to the newly formed Homeowner's Association ("HOA"). Under the Conditions, Covenants and Restrictions ("CC&R's") applicable to the Building, the obligation to pay the HOA fees is secured with a priority lien ahead of the Bank Group. This cost alone will endanger any protection the Bank Group has in its Loan and its collateral, particularly since the construction remains unfinished. The imposition of the HOA fees will, in and of itself, cause a substantial loss in value for the remaining units.[9] Further, as described in the Haskell Declaration, the sale of a few units will make it substantially more difficult to defer unit sales and rent unsold units until the market firms up. Such "interim uses" will become impractical.

As the Bank Group has not been granted access to the Building, the Bank Group does not have the ability to assess whether its collateral is maximized through (i) individual sale of the units; (ii) bulk sale of the units; or (iii) an "interim use" as a rental property. However, once one unit is sold, as the Debtor proposes, the last two options become practical impossibilities, thus limiting the options available to maximize the asset.

Finally, the fact that the construction of the Building is not complete, and there is no funding, budget or timetable for completion of construction of the Building will also have a substantial negative impact on the realizable value of (i) the remaining units and (ii) the Building as a whole. The Court should not grant the Second Motion until there has been a full explanation of the economics of all of the options available and an assessment of which option best protects the value of the asset.

---

[9] Additionally, the sale of even one unit will trigger reassessments from the County Tax Collector, and the obligation to pay 222 property tax bills in amounts substantially in excess of the current tax burden.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

## II.

## STATEMENT OF FACTS

For its Statement of Facts, the Bank Group references the Statement of Facts set forth in its Opposition to the Prior Motion, and incorporates that Statement of Facts herein by reference as though set forth in full.

## III.

## LEGAL ARGUMENT

**A.  THE DEBTOR IS NOT ELIGIBLE FOR A HUD EXEMPTION; THERE IS NO NEED TO FORCE THE DEBTOR TO A PIECEMEAL SALE PROCESS**

The Debtor argues that it must have approval for the sales immediately or it will lose a claimed HUD exemption under 15 U.S.C. §1702(a)(2), and thereby run the risk that the buyers will cancel their sales contracts. However, it is clear that the Debtor does not qualify for any HUD exemption.

The Interstate Land Sale Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* ("ILSFDA") sets forth certain reporting, registration and disclosure requirements for sellers of lots (including condominiums) unless such sellers qualify for an exemption under the Act. The sale of a condominium will be exempt from the ILSFDA requirements, however, if the sale is under a contract that unconditionally obligates the seller to complete construction thereon within a period of two years. 15 U.S.C. §1702(a)(2). Pursuant to 15 U.S.C. §1702(a)(2), the exemption applies to:

> "the sale or lease of any improved land on which there is a residential, commercial, condominium or industrial building, or the sale or lease of land under a contract obligating the sellor or lessor to erect such a building thereon within a period of two years."

In order to qualify for the exemption under 15 U.S.C. §1702(a)(2), "the seller must have an unconditional commitment to complete construction within two years." *Aboujaoude v. Poinciana Development Company II*, 509 F.Supp.2d 1266, 1271 (S.D. Fla. 2007); *Stein v. Paradigm Mirsol, LLC*, 551 F.Supp.2d 1323, 1328 (M.D. Fla. 2008) (a contract only obligates the completion of a condominium within two years when that commitment to do so is real and not illusory); *Markowitz v. Northeast Land Company*, 906 F.2d 100, 106 (3rd Cir. 1990) (Court found that even though the contract scheduled settlement within two years of the sale and settlement occurred within that time, the developer was not eligible for the HUD exemption because the sales contract limited the buyer's remedy to a liquidated amount equal to her deposit plus interest).

The HUD promulgated guidelines make it clear that the commitment to complete construction within two years must be unconditional in order to qualify for the exemption. The Department of Housing and Urban Development's Office of Interstate Land Sales Registration's guidelines state:

> "Contracts that permit the seller to breach virtually at will are viewed as unenforceable because the construction obligation is not an obligation in reality. Thus, for example a clause that provides for a refund of the buyer's deposit if the seller is unable to close for any reason within the seller's control is not acceptable for use under this exemption. Similarly, contracts that directly or indirectly waive the buyer's right to specific performance are treated as lacking a realistic obligation to construct." *Aboujaoude*, 509 F.Supp.2d at 1271; *See also Stein v. Paradigm Mirsol, LLC*, 551 F.Supp.2d 1323, 1328 (M.D. Fla. 2008).

Accordingly, any contract provision limiting the purchaser's right to affirm the contract and seek damages or specific performance is fatal to the exemption. For example, in *Aboujaoude*, the sales contract limited the buyers' remedy to return of their deposit. *Id.* at 1271. The Court found that the developer did not qualify for the exemption because the sales contracts precluded damages or specific performance. *Id.* at 1272. Similarly, in *Markowitz*, the sales contract stated that "Buyer's sole remedy against Seller . . . in the event that Seller has not substantially completed the Property . . . on or before the date of settlement hereunder, shall be the termination of this Agreement . . . and the return of the Deposit, together will all interest earned thereon."

5

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS**

1   *Markowitz,* 906 F.2d at 104. The Court found that the seller was not eligible for the HUD

2   exemption where the contract limited the buyer's remedy to refund of her deposit plus interest. In

3   *Stein*, the Court found that provisions in the sales contract indefinitely extending the completion

4   period for "other delays beyond the control of the Seller" rendered the obligation to complete the

5   condominium within two years illusory. *Stein,* 551 F.Supp.2d at 1330.

6           In the instant case, the Post Petition Sales Contracts attached collectively as Exhibit "2" to

7   the Second Motion all contain language that, like the contracts in *Aboujaoude, Stein and*

8   *Markowitz,* render illusory the commitment to complete construction within two years. Paragraph

9   7 of the Post Petition Sales Contracts (like the contract provisions in *Aboujaoude* and *Markowitz*)

10  provides:

11              "By execution of this Agreement, BUYER agrees that, should
                SELLER fail to complete, or choose not to complete, the Property
12              within two (2) years from the date of this Agreement, BUYER'S
                remedies will be limited to termination of this Agreement and
13              demand to Escrow of a refund of such amounts deposited into
                Escrow by BUYER, without deduction, within fifteen (15) calendar
14              days." SELLER MAKES NO REPRESENTATION AS TO THE
                ACTUAL DATE OF COMPLETION OF RENOVATION AND
15              REHABILITATION, AND SELLER WILL NOT BE
                RESPONSIBLE FOR ANY INCONVENIENCE, LOSS OR
16              EXPENSE TO BUYER RESULTING FROM DELAYS IN
                COMPLETION OF SUCH RENOVATION AND
17              REHABILITATION. BUYER ACKNOWLEDGES THAT,
                PRIOR TO THE CLOSE OF ESCROW, SELLER MAY MAKE
18              CERTAIN MATERIAL CHANGES IN THE LEGAL
                DOCUMENTS DESCRIBED BELOW IN PARAGRAPH 17 AND
19              CHANGES IN PLANS FOR DEVELOPMENT OF THE
                PROJECT, OR CHANGE THE MANNER OR CONTENT OF
20              THE OFFERING OF UNITS IN THE PROJECT. IF PRIOR TO
                THE CLOSE OF ESCROW ANY OF THE DESCRIBED
21              MATERIAL CHANGES OCCUR, SELLER WILL PROVIDE
                BUYER WITH WRITTEN NOTICE OF THE SAME, AND
22              BUYER AGREES THAT BUYER'S SOLE REMEDY AT THAT
                TIME WILL BE TO TERMINATE THIS AGREEMENT,
23              REQUEST CANCELLATION OF ESCROW AND RECEIVE A
                FULL REFUND OF ALL AMOUNTS DEPOSITED
24              HEREUNDER." [*See* Exhibit "2" to Second Motion, emphasis in
                original].
25
        At paragraph 7(b), the Post Petitions Sales Contracts state:
26
                "Accordingly, any failure to complete the Unit or Condominium
27              Project by the estimated Closing Date, or Buyer's desired or
                anticipated completion date, shall not excuse Buyer from full
28              performance of all the terms and conditions of this Agreement,

6

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

allow for any further delays by Buyer, or give Buyer the right to terminate this Agreement and Seller shall not be liable to Buyer for any damages whatsoever, including without limitation, those resulting from Seller's inability or failure to complete the Unit except for those provided for in this Agreement." [*See* Exhibit "2" to Second Motion].

Further, at paragraph 40, the Post Petition Sales Contracts state:

"SELLER DEFAULT. IN THE EVENT OF SELLER'S DEFAULT UNDER THIS AGREEMENT, BUYER'S REMEDY IS LIMITED TO LIQUIDATED DAMAGES PURSUANT TO PARAGRAPH 11 HEREIN. BY SIGNING BELOW, BUYER WAIVES THE RIGHT TO PURSUE ANY OTHER REMEDY AT LAW OR IN EQUITY." [*See* Exhibit "2" to Second Motion, emphasis in original].

Paragraph 11 of the Post Petition Sales Contracts provides for liquidated damages solely in the amount equal to buyer's purchase money deposit. [10] [*See* Exhibit "2" to Second Motion].

The Debtor limited the buyer's remedy under the Post Petition Sales Contracts to return of the deposit plus interest. Further, the Debtor has indefinitely extended the completion date by stating that it "makes no representation as to the actual date of completion," [Post Petition Sales Contracts, paragraph 7]. Therefore, the Debtor does not qualify for the HUD exemption, and there is no immediate need to sell the units.

Moreover, even if the Debtor were somehow eligible for the exemption, as a practical matter the Debtor will not complete the construction within two years, and would therefore lose its claimed HUD exemption. The Debtor claims that "the Sale Contracts expressly provide that the Debtor is obligated to complete construction of the Building within two years from the date of each such Sale Contract," and that "the first Sale Contract with the Debtor was dated June 20, 2007."[11] Accordingly, even under Debtor's flawed analysis, it must complete a sale prior to June 20, 2009 or risk losing the HUD exemption. Yet, the Debtor admits that construction on the Building is not complete as only 8 of the 15 stories have been reconstructed.[12] At the risk of

---

[10] Paragraph 11 of the Post Petition Sales Contracts discusses liquidated damages solely in the context of the seller's remedy if the buyer defaults. However, given the language of paragraph 40 that the paragraph 11 liquidated damages provision applies, one must assume that in the event the seller defaults, the buyer's remedy is limited to return of the buyer's deposit. This remedy is confirmed by the language of paragraph 7 cited above.

[11] Second Motion, p. 11,para. 24.

[12] Yashouafar Declaration, paras. 10, 20.

7

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

1  stating the obvious, there is no possible way that the construction on the remaining stories will be

2  completed by June 20, 2009 deadline.

3  **B.    SALE OF THE UNITS IS NOT IN THE BEST INTERESTS OF THE CREDITORS OR THE ESTATE**

4

5      In order to approve a sale motion, the court must find that it is in the best interest of the

6  creditors and the estate, and that there is sound business justification for the sale. The Court

7  cannot make that finding on these facts. Indeed, exactly the contrary; the sale of the two units

8  that are the subject of the Second Motion (like the sale of the 18 units that are the subject of the

9  Prior Motion) will have a substantial negative impact on the value of the remaining units and on

10  the Building. This negative impact manifests itself in the following ways:

11      **1.    Even the Sale of One Unit Will Lead to the Imposition of Substantial Homeowner's Association Fees**

12

13      As set forth in the Haskell Declaration, the sale of even one unit will necessarily impose

14  substantial fees on the owner of each of the remaining units to be paid monthly to the newly

15  formed HOA. Under the CC&R's applicable to the Building, the sale of even one unit will

16  necessarily impose substantial fees on the owner of each of the remaining units to be paid

17  monthly to the newly formed HOA. [CC&R's at section 7.1; Condominium Conversion Final

18  Subdivision Public Report at p. 6; Request for Judicial Notice, Exhibits "1" and "2"]. As owner

19  of the unsold units, the Debtor is required to fund the HOA fees. The CC&R's also provide that

20  the obligation to make payment of the HOA fees is secured with a lien over the unit, in priority

21  senior to the lien of the Bank Group. [CC&R's at section 7.1; Exhibit "1" to Request for Judicial

22  Notice]. Even if only one unit is sold, HOA fees are immediately assessed against each of the

23  222 units. The HOA fees assessed against the unsold units would be a substantial cash drain on

24  the Building, further lowering the value of the collateral of the Bank Group.

25      Further, as described in the Haskell Declaration, there are also "real life" practical

26  implications that arise from the Debtor's selling only a few of the units in the Building. The

27  imposition of the HOA fees makes unavailable "interim" solutions such as "landbanking" or

28  operating the Building as an apartment or comparable uses. On a practical basis, the sale of even

8

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS**

one of the units makes uneconomic other business options that may make better financial sense on an interim basis. In the current real estate market, it frequently makes sense to implement an "interim" best use, such as renting units as apartments, while waiting for the market to firm up. That may take several years, but in the interim, the Building could generate cash sufficient to pay operating expenses and debt service.

If it were in the best interest to sell the Building as a whole and to have the buyer of the Building operate the Building as an apartment building, the sale of a few of the units will make that option more difficult, if not impossible. If a few of the units are sold now, there is no longer an option to lease out the units as apartments in the short term, and when the market improves, convert them back to condominiums. Similarly, the significant HOA fees that must be paid for any unsold unit will discourage potential buyers from purchasing the Building as a whole, because if a buyer purchases the whole Building, it will then be burdened with the obligation to fund the HOA fees.

It is surprising that the Debtor does not mention the HOA fees in the Second Motion, let alone explain how these fees will be paid. Indeed, Mr. Yashouafar, at his deposition, admitted that although he is the one in charge of making sure there are funds to pay the HOA fees, he does not currently know the source of such funds.[13] The Debtor projected the HOA fees for the remaining units which are not sold at approximately $125,000 per month. [*See* Exhibit "2" to Request for Judicial Notice; Condominium Conversion Final Subdivision Public Report at p. 6] The cash flow burden will have a substantial negative impact on the value of the Building.

2.    **The Debtor Fails to Discuss A Budget, Timeline and Source of Funding for Completion**

As set forth in the Haskell Declaration, the fact that the Building is not complete, and the fact that the Debtor admits that approximately $4 million is needed in order to fund the remaining construction costs will, in and of itself, negatively affect the price at which a willing buyer will purchase a unit. Prospective buyers will understand that each of the homeowners run a

---

[13]  Yashouafar Deposition, pp. 55 ln. 5 through pp. 57. ln. 22. The relevant pages from the Transcript of Yashouafar's deposition are attached hereto as Exhibit "1."

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

substantial risk until the Building and all of its units are completed. That risk includes, but is not limited to, the risk that construction of the units on the five unfinished floors will not be completed by the Debtor, and that the costs of the HOA will not be borne by 222 owners, but only 75 or 100 or so. This likely will materially impact the price at which a prospective buyer will purchase a unit. Further, it is reasonable to conclude that the price a prospective buyer will be willing to offer for a unit will be discounted to reflect the mess and discomfort of the process required to complete construction on the remaining five floors of the Building, and the uncertainty associated with the current condition of the Building.

Moreover, the Second Motion does not contain information necessary to fairly assess the construction costs and the extent to which the fact that the Building is under construction will affect the net realizable value of the Building. In order to better understand that concern, the Debtor should provide: (i) a detailed construction budget; (ii) a detailed estimate of the soft costs associated with the construction; (iii) a timetable for completion; and (iv) the source of funding. The Debtor does not even discuss this information in the Second Motion. Without an understanding of the budget, estimated costs, timetable and source of funding for the project, it is impossible to say whether the sales the Debtor proposes through the Second Motion are in the best interests of the estate or creditors.

### 3.     The Bank Group Has Not Consented to the Sales

The Debtor incorrectly asserts that the Bank Group should be deemed to have consented to the Post Petition Sales Contracts because the release prices of the units satisfy the requirements of Exhibit "O" to the Loan, as modified by the Modification Agreement.[14] Contrary to the Debtor's assertions, the Bank Group cannot be deemed to have consented to the sales. As set forth in paragraph 3(m) of the Modification Agreement (which expressly modifies Exhibit "O" to the Loan):

Section 1.6(b) of Exhibit "O" is hereby amended in its entirety to read as follows:

(b) Administrative Agent shall have no obligation to release any Unit, or to deposit any instrument or notice in any escrow for any such release, unless Borrower has up to that time

---

[14] Second Motion, pp. 19-21.

10

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

fully performed all of its obligations under this Agreement. The execution of a Sales Agreement (or a permanent loan commitment for a Retail Unit) shall not by itself satisfy the conditions for release of the Unit which is being sold; those conditions must be satisfied in full at the time the Unit is to be released."[15]

Pursuant to paragraph 2 of the Modification Agreement, the Debtor reaffirmed all of its obligations under the Loan Documents. Since the Debtor has defaulted under the terms of the Loan (and the Modification Agreement) by, among other things, failing to pay the sums due at maturity, the Debtor cannot contend that it has fully performed all of its obligations under the Loan and Modification Agreement such that the Bank Group would have any obligation to release any unit.

## C.   THE BANK GROUP'S SECURITY INTEREST IS ENTITLED TO ADEQUATE PROTECTION

The Bankruptcy Code carefully protects the claims held by a creditor secured with collateral if a debtor seeks to use, sell or lease collateral. Section 11 U.S.C. §363(e) provides that the Court:

". . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." *See also In re Kenny Kar Leasing, Inc.*, 5 B.R. 304, 307 (Bankr. C.D. Cal. 1980) (rights to use, sale or lease collateral in which the secured creditor and the debtor have an interest are conditioned upon providing adequate protection of the interest of the secured creditor).

Adequate protection in the context of a sale of some but not all of the collateral requires, at a minimum that the Debtor show that the value of the remaining units will not be negatively affected by the sale of a few of the units. *In re Bear River Orchards*, 56 B.R. 976, 978 (Bankr. E.D. Cal. 1986) (court must identify secured creditor's value and the risks thereto, and determine if, under the debtor's proposal, the secured creditor is adequately protected); *In re* Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (the purpose of adequate protection for a creditor is to

---

[15]   Exhibit "2" to the Second Motion.

11

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

insure that the creditor receives the value for which it bargained prebankruptcy); *In re Magnus,* 50 B.R. 241, 243 (Bankr. D. ND. 1985) (adequate protection requires that a creditor's interest in property cannot be in any respect impaired or subjected to increased risk without assurance that the creditor will realize the benefit of its bargain); *In re Havik, Inc.*, 13 B.R. 294, 295 (Bankr. N.D. Ga. 1981) (debtor seeking to sell condominiums must provide adequate protection for defendants' interests). The Debtor cannot make that showing. As set forth above, and in the Haskell Declaration, the Debtor has failed to explain how the HOA fees triggered for all of the units by the proposed sale of some of the units will be paid, let alone address the impact of the significant negative cash flow this will create on the project.

Moreover, the Debtor has failed to provide the budget, time frame or source of funds to complete construction. At present, this project is significantly past the deadline for completion, and there is no indication of how completion will be financed.[16] Without such information, Debtor's claim that "the sales of the remaining units at the Building will more likely yield proceeds sufficient to generate a recovery for other creditors in this case . . ." is, at best, suspect.[17] There is no way to know if the Bank Group will be adequately protected under Debtor's proposed plan to sell the units and complete construction, and as set forth in the Haskell Declaration, once the sales of some of the units commence, other alternatives business alternatives are foreclosed. The Court should not allow the sale of units when such sale would significantly limit the options for use of the Building without at least allowing evaluation to see which option makes the best business sense.

The *In re Chevy Devco*, 78 B.R. 585 (Bankr. C.D. Cal. 1987) is instructive. In *Chevy Devco,* the debtor sought an order approving a construction loan with a first lien on the property, the granting of which would require subordination of a tax lien and two existing deeds of trust. Debtor argued that the new construction lien would create equity in the property. The court denied the request, finding that the lienholder was not adequately protected because the prospect of success was "more fantasy than expectation." *Id.* at 588-589. Similarly, in our case at hand,

---

[16]  The original completion deadline was September 1, 2007 (Loan, Exhibit "B," p. B-3), which was later extended to September 1, 2008 (Modification, para. E).
[17] Second Motion, p. 25.

12

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

the Debtor's claim that completing the proposed sales and generating "approximately $900,000" is in the best interest of the estate and its creditors is "more fantasy than expectation" given the Debtor's failure to provide information or present evidence on whether these sales make financial sense from the point of view of the value of the remaining units.

## IV.

## CONCLUSION

In conclusion, the Debtor's claim that it needs to sell the units immediately or lose its HUD exemption is unsupported by the facts and the law. Moreover, the Debtor has failed to establish that good business reasons exist to justify the sale of the two units which are the subject of the Second Motion. On the contrary, the Debtor's Second Motion fails to address substantial concerns regarding how the sales and corresponding imposition of HOA fees will impact the value of the collateral, and has failed to provide details regarding the budget, estimated costs, timetable and source of funding to complete the project, thereby making it impossible to determine whether the sales the Debtor proposes are in the best interests of the estate and creditors, and whether the Bank Group is adequately protected. Accordingly, for the foregoing reasons and authorities, the Debtor's Second Motion should be denied.

DATED: June 2, 2009

BUCHALTER NEMER
A Professional Corporation


By:_____/S/ DANIEL H. SLATE_____
DANIEL H. SLATE
Attorneys for Bank of America, N.A.,
individually and as Administrative Agent for a
Group of Lenders

BN 3700813v1

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

# EXHIBIT 1

1

2

3          UNITED STATES BANKRUPTCY COURT

4          CENTRAL DISTRICT OF CALIFORNIA

5          SAN FERNANDO VALLEY DIVISION

6

7   In re                    )
                             )
8   ROOSEVELT LOFTS, LLC, a  )
    Delaware limited liability )
9   company,                 )    Case No. 1:09-bk-14214-GM
                             )
10              Debtor.       )
    _____)

11

12

13

14

15     DEPOSITION OF MASSOUD AARON YASHOUAFAR

16            MAY 26, 2009

17

18

19

20

21  REPORTED BY GRISELDA R. CABANGON-OLSON, CSR NO. 8585

22

23

24

25

1

Exhibit 1, Page 000015

1    Deposition of MASSOUD AARON YASHOUAFAR,

2    taken on behalf of Bank of America,

3    N.A., at 1000 Wilshire Boulevard,

4    Suite 1500, Los Angeles, California

5    90017-2457, commencing at 10:01 a.m.,

6    Tuesday, May 26, 2009, before

7    Griselda R. Cabangon-Olson, C.S.R. No. 8585.

8                         * * *

9  APPEARANCES OF COUNSEL:

10     For Debtor:

11         LEVENE, NEALE, BENDER, RANKIN & BRILL, L.L.P.
           BY:   DAVID L. NEALE
12         10250 Constellation Boulevard
           Suite 1700
13         Los Angeles, California 90067-6200
           (310) 229-1234
14
       For Bank of America, N.A.:
15
           BUCHALTER NEMER
16         BY:   RICHARD P. ORMOND
                 JOSHUA L. MOGIN
17         1000 Wilshire Boulevard
           Suite 1500
18         Los Angeles, California 90017-2457
           (213) 891-0700
19
20     Also Present:

21         HOMAN TAGHDIRI
           LUCAS CHEADLE, Videographer
22

23

24

25

                           2

▯

1                      I N D E X

2  WITNESS              EXAMINATION              PAGE

Exhibit 1, Page 000016

18    A    Yes.

19    Q    Okay.  So the D.R.E. makes a determination as to

20  what the reserves need to be and what the monthly budget

21  needs to be for a building of this size and scope?

22    A    It is prepared by the developer, and then

23  Department of Real Estate approves them -- reviews and

24  approves them.

25    Q    I'm assuming that you probably had Bob Smylie

55

☐

1  prepare the applications --

2    A    I believe so.

3    Q    -- to the D.R.E.?

4    A    I believe so.

5    Q    Okay.  Are the reserves already funded?

6    A    No.

7    Q    Okay.  Is there a concern that Roosevelt might

8  not have enough money to fund the -- the homeowners

9  association after the units that are proposed to be sold

10  actually close?

11    A    Not that I'm aware of.

12    Q    Okay.  Is -- is there a source of funding

13  available for Roosevelt to fund that homeowners

14  association?

15    A    That would be all part of the plan of the

16  organization that you will be receiving.

17    Q    Okay.  In -- in your motion, are you asking for

18  the sales to close simultaneously with the approval of --

19  of a plan, or are they being requested that they be

Page 53

Exhibit 1, Page 000017

20   closed sooner?

21      MR. NEALE:   Objection.   Calls for a legal conclusion.

22   The motion speaks for itself.

23      Q    BY MR. ORMOND:   If you know.

24      A    My understanding is sooner.

25      Q    Okay.   So at that point would the homeowners

56

☐

1   association have to be funded at the time of closing?

2      A    Correct.

3      Q    Okay.   So for that gap between the time of this

4   closing and the time that the plan is approved, is there

5   funding available to fund the homeowners association by

6   Roosevelt?

7      A    It will be.

8      Q    Okay.   Would that be through equity

9   contributions or loans or -- do you know?

10     A    Either equity participation -- by contribution

11   or DIP financing and subject to court approval.

12     Q    Have you already sought DIP financing for

13   Roosevelt Lofts?

14     A    We are talking to a few people.

15     Q    Okay.   Who are you talking to?

16     A    I don't have the names.

17     Q    Okay.   Lenders?   Private lenders?   Financial

18   institutions?

19     A    Both kinds.

20     Q    Okay.   Do you recall which financial

Page 54

21  institutions?

22      A    No.

23      Q    Is Roosevelt Lofts also actively seeking new

24  investors?

25      A    Yes.


57

0


1       Q    Okay.  And who have you potentially approached

2   as a new investor?

3       A    Again, I don't have the names.

4       Q    Who's in charge of seeking out the DIP financing

5   for Roosevelt Lofts?

6       A    It's under my direction.

7       Q    Okay.  And what about regard to finding new

8   investors?

9       A    Same.  I'm in charge of it.

10      Q    Okay.  Do you make -- do you make the calls

11  yourself, or do you have someone do it for you and then

12  you set up a meeting, or how does the process work

13  internally?

14      A    There are more than one person in the office.

15  So the -- I can't tell you which one I make and which one

16  someone else makes, but I'm in charge.

17      Q    And you can't recall any of the names of the

18  potential investors?

19      A    I don't -- I'm -- I'm terrible with names.

20  So --

21      Q    Okay.  What's my name?

22      A    Honestly, I forgot.  He's Joshua.  I remember.

                        Page 55

| In re: ROOSEVELT LOFTS, LLC | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-14214-GM |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate a NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 1000 Wilshire Blvd., Suite 1500, Los Angeles, CA 90017

The foregoing document described as **BANK GROUP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S SECOND MOTION FOR ORDER AUTHORIZING SALE OF CERTAIN CONDOMINIUM UNITS PURSUANT TO 11 U.S.C.** will be served or was served in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On June 2, 2009 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Gary O. Caris on behalf of Creditor Ryan Anderson - gcaris@mckennalong.com, pcoates@mckennalong.com
Brian T. Harvey on behalf of Interested Party Courtesy NEF - bharvey@buchalter.com, IFS_filing@buchalter.com
David L. Neale on behalf of Debtor Roosevelt Lofts, LLC - dln@lnbrb.com
Juliet Y. Oh on behalf of Debtor Roosevelt Lofts, LLC - jyo@lnbrb.com
S. Margaux Ross on behalf of U.S. Trustee United States Trustee (SV) margaux.ross@usdoj.gov
William D. Schuster on behalf of Creditor HD Supply Construction Supply LTD - bills@allieschuster.org
Daniel H. Slate on behalf of Creditor BANK OF AMERICA, N.A. - dslate@buchalter.com
United States Trustee (SV) - ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On June 2, 2009 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope with postage thereon fully prepaid in the United States Mail and/or with an overnight mail service addressed as follows:

Debtor
Roosevelt Lofts, LLC
860 S Figueroa St 24th Fl
Los Angeles, CA 90017

Honorable Geraldine Mund
United States Bankruptcy Court - Central District of California
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☐ Service information continued on attached page

**III. SERVED BY FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to Fed. R. Civ. Proc. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies), who consented in writing to such service method, by facsimile transmission and/or email as follows:

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 6/2/2009 | SANDRA I. ALARCON | |
|---|---|---|
| Date | Type Name | Signature |