DAVID L. NEALE (SBN 141225)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dln@lnbrb.com, jyo@lnbrb.com

Attorneys for Chapter 11 Debtor and
Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re | ) Case No. 1:09-bk-14214-GM |
| | ) |
| ROOSEVELT LOFTS, LLC, a Delaware | ) Chapter 11 |
| limited liability company, | ) |
| | ) **DEBTOR'S EMERGENCY MOTION** |
| | ) **FOR ENTRY OF AN ORDER, TO** |
| Debtor. | ) **THE EXTENT NECESSARY,** |
| | ) **PURSUANT TO 11 U.S.C. § 363(b)(1)** |
| | ) **AUTHORIZING DEBTOR TO** |
| | ) **ENTER INTO RESIDENTIAL** |
| | ) **LEASES; MEMORANDUM OF** |
| | ) **POINTS AND AUTHORITIES;** |
| | ) **DECLARATIONS OF M. AARON** |
| | ) **YASHOUAFAR, DAVID L. NEALE** |
| | ) **AND JULIET Y. OH IN SUPPORT** |
| | ) **THEREOF** |
| | ) |
| | ) Date: September 2, 2009 |
| | ) Time: 10:00 a.m. |
| | ) Place: Courtroom "303" |
| | ) 21041 Burbank Boulevard |
| | ) Woodland Hills, California |
| | ) |
| | ) |
| | ) |

1

## SUMMARY

2      Pursuant to Local Bankruptcy Rules 2081-1(a)(12) and 9075-1, 11 U.S.C. § 363(b), and

3  Rules 4001(d) and 9014 of the Federal Rules of Bankruptcy Procedure, all to the extent

4  applicable hereto, Roosevelt Lofts, LLC, a Delaware limited liability company (the "Debtor"),

5  the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, hereby

6  moves, on an emergency basis (the "Motion"), for entry of an order authorizing the Debtor to

7  commence a program permitting the Debtor to enter into short-term residential leases, for terms

8  not to exceed one year, as described in the accompanying Declaration of M. Aaron Yashouafar

9  (the "Yashouafar Declaration").

10      The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on April

11  13, 2009 (the "Petition Date"). The Debtor continues to manage its financial affairs and operate

12  its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the

13  Bankruptcy Code.

14      The Debtor is the owner of real property located at 727 West 7th Street in Los Angeles,

15  California, a fifteen-story architecturally significant building located in the heart of the Financial

16  District in downtown Los Angeles (the "Building"). The Building has been substantially

17  converted by the Debtor into 222 upscale condominium residences, plus approximately 17,500

18  square feet of prime commercial retail space and five levels of parking.

19      In or about March 2006, the Debtor entered into a construction loan agreement with Bank

20  of America, N.A., individually and as agent for a group of lenders (the "Bank"), pursuant to

21  which the Debtor obtained a loan from the Bank in the original principal sum of $78,840,375.00

22  (the "Loan"). The obligations of the Debtor in connection with the Loan are secured by a

23  Construction Deed of Trust and a Leasehold Deed of Trust against the Building (collectively, the

24  "Deeds of Trust"). The Bank asserts that it is currently owed approximately $80 million under

25  the Loan, secured by the Building and the Debtor's cash, which is derived from rent received by

26  the Debtor.

27

28

2

1      Pursuant to this Motion, the Debtor seeks Court authority to commence a program for

2  residential leasing of units at the Building for terms not to exceed one (1) year. Although the

3  Debtor believes that its ability to enter into the residential leases contemplated herein falls within

4  the ordinary course of its business and therefore does not require the Court's approval, see 11

5  U.S.C. § 363(c)(1), under the circumstances described below, the Debtor has filed this Motion to

6  ensure that any leases it may execute are not subject to later challenge by the Bank. As the Court

7  will recall, the Bank previously objected to the filing of the Debtor's motions seeking authority

8  to sell certain of the units in the Building, free and clear of all liens, claims, interests and

9  encumbrances, suggesting that if the Building were to be occupied, the Bank would prefer that

10 the project not be fractured by sales of units and, instead, have the units leased to prospective

11 tenants. There are already a number of tenants occupying units in the Building by way of written

12 leases entered into prior to the Debtor's bankruptcy filing.

## ADDITIONAL INFORMATION

14     This Motion is based upon Local Bankruptcy Rules 2081-1(a)(12) and 9075-1, 11 U.S.C.

15 § 363(b), and Rules 4001(d), 6004 and 9014 of the Federal Rules of Bankruptcy Procedure, this

16 Motion, the supporting Memorandum of Points and Authorities, the Yashouafar Declaration, the

17 Declaration of David L. Neale, and the Declaration of Juliet Y. Oh attached hereto, the

18 arguments and statements of counsel to be made at the hearing on the Motion, and other

19 admissible evidence properly brought before the Court. The Debtor submits that the setting of

20 the hearing on this Motion on an emergency basis is warranted given the circumstances. The

21 Debtor has been approached by multiple prospective tenants expressing an interest in entering

22 into a lease for a unit at the Building. Each time the Debtor was approached by a prospective

23 tenant, the Debtor advised the Bank of the prospective tenant's interest in leasing a unit at the

24 Building, and each time the Bank delayed in responding so substantially that all such prospective

25 tenants lost interest in the proposed leases.

26     The Debtor has also tried to implement a leasing program with proposed terms that the

27 Debtor believed would be acceptable to the Bank, but the Debtor's efforts to obtain a clear

28

3

statement of the Bank's position with respect to the proposed leasing program have been fruitless. The delay caused by the Bank as a result of its failure to either approve short-term leases presented to the Bank on an individual basis and/or approve a program for the leasing of units in the Building has resulted in the loss of new income which could be used to pay the operating expenses of the Building.

In order to proceed with the lease up of the Building so that cash flow can be generated to help support the operating expenses associated with the Building, the Debtor needs to be able to represent to prospective tenants that the proposed lease is duly-authorized by the Court in the Debtor's bankruptcy case and enforceable. Prospective tenants generally do not have the luxury of time and need to be in a position to know and evaluate all of their options without delay. The Debtor's leasing program contemplates relatively short-term leases, for terms not to exceed one (1) year, at rates which the Debtor believes are reflective of current market conditions in downtown Los Angeles. A proposed rent schedule for the units to be subject to the Debtor's leasing program is attached to the Yashouafar Declaration as Exhibit "A." The Bank's inability to provide consent to leases in a timely manner has result in the loss of several prospective tenants. In order to avoid losing further prospective tenants as a result of the Debtor's inability to obtain the Bank's express consent to the Debtor's leasing program, the Debtor seeks authority on an emergency basis to proceed with its lease negotiations, enter into leases on terms substantially in accordance with the terms set forth in the Motion, and deliver possession of each leased unit within the Building to the relevant tenant on the terms and conditions set forth in the proposed lease. A true and correct copy of the form of the Debtor's proposed leases is attached to the Yashouafar Declaration as Exhibit "B."

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court (on August 27, 2009), the Debtor has served a copy of this Motion and all supportive papers (including notice of the hearing) upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the Committee members and counsel, and

4

1  other parties in interest via overnight mail. These parties will receive delivery of the Motion and

2  all supportive papers by not later than the morning of Friday, August 28, 2009.

3  **WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on the

4  Motion and issue an order:

5      (1)    affirming the adequacy of the Notice given herein;

6      (2)    granting the Motion in its entirety;

7      (3)    authorizing the Debtor to proceed with its leasing program for units at the

8  Building, for terms not to exceed one (1) year, and upon terms and conditions reflected in the

9  form of lease attached to the Yashouafar Declaration;

10     (4)    waiving the ten-day stay of Bankruptcy Rule 6004(h); and

11     (5)    granting such other and further relief as the Court deems just and proper under the

12 circumstances.

13 Dated: August 27, 2009                    ROOSEVELT LOFTS, LLC

14

15                                          By: _____

16                                              DAVID L. NEALE
                                               JULIET Y. OH
17                                             LEVENE, NEALE, BENDER,
                                                   RANKIN & BRILL L.L.P.
18                                             Attorneys for Chapter 11 Debtor and
                                               Debtor in Possession

19

20

21

22

23

24

25

26

27

28

5

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  STATEMENT OF FACTS

### A.  Case Background.

1.    On April 13, 2009, the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"). The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is the owner of real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "Building").

3.    In approximately January 2006, the Debtor entered into an agreement to lease the Building from the previous owners, with an option to buy the Building.[1] The Debtor intended to address the demands of an evolving Downtown residential market by converting the Building from an office building to a luxury residential project.

4.    Accordingly, in or about March 2006, the Debtor entered into a construction loan agreement with Bank of America, N.A., individually and as agent for a group of lenders (the "Bank"), pursuant to which the Debtor obtained a loan from the Bank in the original principal sum of $78,840,375.00 (the "Loan"). The Loan provided for, among other things, the repayment of the Loan, including accrued and unpaid interest, by March 9, 2009, with two options to extend the term of the Loan for six months each. The obligations of the Debtor in connection with the Loan are secured by a Construction Deed of Trust and a Leasehold Deed of Trust against the Building (collectively, the "Deeds of Trust"). The Loan was obtained by the Debtor for the purpose of converting the Building into 222 individually subdivided, luxury residential condominium units (the "Units"), a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Building.

---

[1] The Debtor exercised its option to purchase the Building in September 2008.

5. On or about December 30, 2008, the Bank issued a notice of default to the Debtor, contending that the Debtor had defaulted on its obligations under the Loan. Even after receiving the notice of default from the Bank, the Debtor continued to invest a considerable amount of time and effort obtaining independent appraisals, conducting market research, and providing the Bank with alternative plans for the completion of the Building and the sale of all Units in the Building. The Bank rejected all of the plans proposed by the Debtor for the completion of the Building and the sale of all Units.

6. Subsequently, on April 3, 2009, the Bank filed a complaint against the Debtor and others in the Superior Court of the State of California, County of Los Angeles ("State Court") for, among other things, specific performance, appointment of a receiver, and judicial foreclosure on its Deeds of Trust. Pursuant to its complaint in the State Court action, the Bank has asserted a claim against the Debtor and others in an amount exceeding $79 million. Days after filing its complaint, the Bank made an *ex parte* application with the State Court for the appointment of a receiver.

7. As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code in order to have the ability and opportunity to close escrow on the units that are under contract, to market and sell the remaining units in the Building, and to complete construction on the Building, all of which will allow the Debtor to repay the Loan and its other debts for the benefit of all creditors.

**B. Current Posture Of The Debtor's Bankruptcy Case.**

8. Shortly after the commencement of the Debtor's bankruptcy case, the Debtor filed two separate motions seeking authority to sell certain of the condominium units in the Building, free and clear of all liens, claims, interests and encumbrances (collectively, the "Sale Motions," and individually a "Sale Motion").[2] A number of parties, including the Bank, filed oppositions to

—  —  —  —  —

[2] The Debtor filed its first Sale Motion [Docket No. 32] on May 20, 2009 (seeking to sell Units subject to pre-petition purchase and sale contracts) and filed its second Sale Motion [Docket No. 39] on May 26, 2009 (seeking to sell Units subject to post-petition purchase and sale contracts).

7

the Debtor's first Sale Motion.[3] At the June 10, 2009 hearing on the Debtor's first Sale Motion, the Court continued the hearings on both Sale Motions to August 4, 2009 at 10:00 a.m. and encouraged the parties, namely, the Debtor, the Bank and the Official Committee of Unsecured Creditors appointed in the Debtor's case (the "Committee"), to discuss the terms of, and formulate, a consensual plan of reorganization. The hearings on the Sale Motions have been continued by stipulation from August 4, 2009 to September 16, 2009 at 10:00 a.m.

9. The Debtor has been, and continues to be, engaged in discussions with the Bank and the Committee in an effort to formulate the terms of a consensual plan of reorganization.

10. In the meantime, regardless of the extent to which the Building is occupied, the Debtor continues to incur operating expenses associated with the maintenance of the Building. At this time, the Debtor has very limited cash flow from commercial leases and a few residential tenants who entered into their leases prior to the Petition Date.

11. The Debtor determined, in the exercise of its sound business judgment and, in part, in response to the objection of the Bank to the proposed sale of units, that renting units at the Building for a short term, for terms not to exceed one (1) year, will allow the Debtor to continue to pursue longer term strategies for the restructuring of its financial affairs, including, without limitation, the sale or further lease of units, a combination thereof, or a sale of the Building, while at the same time generating cash flow to help offset the operating expenses being incurred on a monthly basis.

12. Although the Debtor does not believe the Bank's consent to the Debtor's proposed leasing program is required, since the Debtor is attempting to cooperate with the Bank in formulating a mutually agreeable plan of reorganization, the Debtor first advised the Bank in mid-June 2009 of the interest expressed by prospective tenants in leasing units at the Building on a

---

[3] In opposing the proposed sale of the condominium units, the Bank argued, among other things, "... the sale of even one of the units makes uneconomic other business options that may make better financial sense on an interim basis. In the current real estate market, it frequently makes sense to implement an "interim" best use, *such as renting units as apartments*, while waiting for the market to firm up. That may take several years, but in the interim, *the Building could generate cash sufficient to pay operating expenses and debt service.*" Bank Group's Memorandum of Points and Authorities In Opposition to Debtor's Motion For Order Authorizing Sale of Certain Condominium Units Pursuant to 11 U.S.C. § 363(f) filed on or about May 27, 2009, pp. 10-11.

8

short term basis. Attached to the accompanying Declaration of David L. Neale and the Declaration of Juliet Y. Oh collectively as Exhibit "C" are true and correct copies of correspondence exchanged between counsel for the Debtor and counsel for the Bank beginning on June 14, 2009 concerning the proposed leasing program contemplated by the Debtor. In response to the Debtor's inquiry, counsel for the Bank responded with a request for an explanation of the parameters of the Debtor's proposed leasing program. See Exhibit "C-1" (Email from David L. Neale to Daniel H. Slate, Richard P. Ormond dated June 14, 2009 at 4:38 p.m.) and Exhibit "C-2" (Email from Daniel H. Slate to David L. Neale dated June 14, 2009 at 8:20 p.m).

13. Thereafter, on June 16, 2009, counsel for the Debtor outlined the term of the proposed leasing program and advised the Bank that the proposed leases would (a) be for a term of no more than 12 months; (b) be at rental rates of no less than $2,000 per month (a floor but not a cap on the rent); (c) not be with any affiliates of the principals of the Debtor; and (d) not be with any parties then subject to a current sale contract. See Exhibit "C-3" (Email from David L. Neale to Daniel H. Slate dated June 16, 2009 at 1:11 p.m.).

14. Further emails concerning the proposed leasing program were subsequently exchanged by counsel for the Debtor and counsel for the Bank, and on June 19, 2009, counsel for the Bank advised the Debtor that the Bank was "not inclined to consent to any residential tenants at this time. See Exhibit "C-4" (Email from David L. Neale to Daniel H. Slate, Richard P. Ormond dated June 17, 2009 at 11:38 a.m., and Email from Daniel H. Slate to David L. Neale dated June 17, 2009 at 11:39 a.m.) and Exhibit "C-5" (Email from David L. Neale to Daniel H. Slate, Richard P. Ormond dated June 19, 2009 at 11:11 a.m., and Email from Daniel H. Slate to David L. Neale dated June 19, 2009 at 11:30 a.m.). It seems that the parties are at a decisionpoint, and opening the property to residential tenants would have an inappropriate impact on the decisionmaking process." See Exhibit "C-5."[4]

---

[4] As noted above, the Bank previously opposed the Debtor's efforts to sell units in the Building. The Debtor's efforts to enter into leases for units at the Building was, in part, a response to the Bank's position that a decision on the sale of units also be deferred until a later date.

9

15. Thereafter, on June 29, 2009, counsel for the Bank advised counsel for the Debtor that "the Bank Group is favorably inclined toward short term leasing, but before they would formally consent, they would like to review a proposed summary of the terms of the leases to be considered and the language of such proposed leases, which should include appropriate attornment language." See Exhibit "C-6" to "C-7" (Email from Daniel H. Slate to David L. Neale dated June 29, 2009 at 3:31 p.m.).[5]

16. The parties exchanged emails for the next few days concerning the proposed attornment language requested by the Bank to be included in the proposed leases. See Exhibit "C-6" to "C-11." On July 7, 2009, counsel for the Debtor forwarded to counsel for the Bank a copy of the proposed lease form to be used by the Debtor. See Exhibit "C-12" to "C-17" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond, Joshua L. Mogin dated July 7, 2009 at 4:07 p.m.). At that time, counsel for the Bank was advised that "[t]he Debtor has several tenants who are prepared to sign leases in relatively short order and the Debtor has an opportunity to run an ad in a publication in which Roosevelt Lofts is being voted as a top project (which the Debtor believes will attract new tenants), so time really is of the essence." See Exhibit "C-12."

17. On July 10, 2009, counsel for the Bank advised counsel for the Debtor of the terms under which the Bank would "consider" consenting to leasing of residential units by the Debtor. See Exhibit "C-18" (Email from Daniel H. Slate to David L. Neale, Juliet Y. Oh dated July 10, 2009 at 9:49 a.m.). Within hours of that email, counsel for the Debtor responded to the Bank's proposed terms and advised the Bank that the terms proposed were generally acceptable to the Debtor, and requested only minor adjustments. See Exhibit "C-19" (Email from Juliet Y. Oh to Daniel H. Slate dated July 10, 2009 at 12:01 p.m.). Additional information regarding the proposed rental rates was also provided to the Bank. See Exhibit "C-20" to "C-23" (Email from Juliet Y. Oh to Daniel H. Slate dated July 13, 2009 at 3:46 p.m.).

18. Over the next few days, counsel for the Debtor continued to attempt to obtain confirmation from counsel for the Bank that the Bank was prepared to consent to the terms of the

---

[5] As set forth above, the Debtor had previously advised the Bank of the proposed lease terms on June 16, 2009.

10

Debtor's leasing program. See Exhibit "C-24" (Email from Juliet Y. Oh to Richard P. Ormond dated July 15, 2009 at 10:59 a.m.) and Exhibit "C-25" (Email from Juliet Y. Oh to Daniel H. Slate and Richard P. Ormond dated July 16, 2009 at 11:51 a.m.). Finally, on July 21, 2009, counsel for the Bank responded to the Debtor's inquiry concerning the Bank's consent to the leasing program by asking for additional information from the Debtor regarding the proposed lease rates and the residential leasing agent. See Exhibit "C-26" (Email from Daniel H. Slate to Juliet Y. Oh and David L. Neale dated July 21, 2009 at 8:22 a.m.).

19.     In response to the Bank's additional requests for information, the Debtor provided information concerning, among other things, the proposed residential leasing agent. See Exhibit "C-27" to "C-28" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated July 24, 2009 at 5:24 p.m.). Almost a week went by with no word from counsel for the Bank, prompting counsel for the Debtor to repeatedly inquire "[a]ny word from the Bank regarding ... the residential leasing issue?" See Exhibit "C-29" (Emails from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated July 29, 2009 at 9:43 a.m. and July 30, 2009 at 4:56 p.m.).

20.     Thereafter, Counsel for the Debtor advised counsel for the Bank that there was a tenant ready to sign a lease on Unit 504 in the Building upon the terms and conditions previously described to the Bank and requested that the Bank at least consent to that single lease. The Debtor received no response from the Bank, and, on August 14, 2009, counsel for the Debtor advised counsel for the Bank that "[u]nless we can lock the prospective tenant down today, he is going to walk." See Exhibit "C-30" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated August 14, 2009 at 9:37 a.m.). The following day, counsel for the Bank advised counsel for the Debtor that he was to discuss the lease of Unit 504 with the Bank at 10:30 a.m. on that date and would then respond to the Debtor's inquiry. See Exhibit "C-31" (Email from Richard P. Ormond to Juliet Y. Oh dated August 14, 2009 at 9:48 a.m.)

21.     Although the Bank eventually consented to the lease of Unit 504, the Bank's consent came too late, after the prospective tenant had walked away. Indeed, on August 17, 2009, counsel for the Debtor advised counsel for the Bank that "...the prospective tenant of Unit 504 walked away on Friday [August 14, 2009] before we could get the lease signed." See Exhibit "C-

11

32" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated August 17, 2009 at 3:37 p.m.). At the same time, the Bank's counsel was advised that there were then prospective tenants for units 314 and 616 in the Building that were prepared to sign a lease upon the terms and conditions previously discussed with the Bank. See Exhibit "C-32" and Exhibit "C-33" to "C-34" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated August 17, 2009 at 5:23 p.m., and Emails from Juliet Y. Oh to Daniel H. Slate dated August 18, 2009 at 11:25 a.m. and 11:33 a.m.). Again, counsel for the Bank was advised that "if we don't get back to the prospective tenants today [August 18, 2009], they're going to walk." See Exhibit "C-33."

22. In response to the Debtor's inquiries, counsel for the Bank advised the Debtor that the Bank believed that the "leasing process can be streamlined with a pre-approved set of leasing guidelines..." See Exhibit "C-35" (Email from Joshua L. Mogin to Juliet Y. Oh, David L. Neale, Ian Landsberg dated August 18, 2009 at 1:11 p.m.). The irony of this email is apparent – at that point, the Debtor had been attempting for the prior 2 months to obtain the Bank's consent to a proposed leasing program subject to pre-approved leasing guidelines. The guidelines set forth by counsel for the Bank were: (a) the approved form of a residential lease (previously provided to the Bank on July 7, 2009); (b) a "pricing matrix" reflecting the proposed rents to be charged (previously provided to the Bank on July 13, 2009); (c) a term ending not after June 30, 2010 (previously suggested by the Debtor on July 10, 2009); and (d) a list of services available to each tenant. See Exhibit "C-35." As reflected above, virtually all of the terms, conditions and forms relating to the proposed leasing program had been provided to the Bank more than a month before the "guidelines" were finally suggested by the Bank.

23. In response to the Bank's email, counsel for the Debtor wrote to counsel for the Bank pointing out that the information requested by the Bank had already been provided and that there was a high risk that further delay would jeopardize the Debtor's ability to enter into the proposed leases for units 314 and 616. See Exhibit "C-36" (Email from David L. Neale to Joshua L. Mogin, Juliet Y. Oh, Ian Landsberg dated August 18, 2009 at 1:22 p.m.). Counsel for the Debtor followed up on this by email to counsel for the Bank on August 20, 2009. See Exhibit "C-

12

1    37" (Email from David L. Neale to Daniel H. Slate dated August 20, 2009 at 3:25 p.m.) As of the

2    date hereof, the Debtor has still received no response from the Bank regarding the proposed leases.

3       24.    The Debtor is now in the position of having "no good deed go unpunished." By

4    attempting to work with the Bank and obtain the Bank's prior approval of the Debtor's proposed

5    leasing program, the Debtor has lost over 2 months within which it could have been actively

6    engaged in finding tenants to begin occupying the Building and generating cash flow. The Debtor

7    has already lost several prospective tenants as a result of the Bank's delays in responding and

8    providing its unequivocal consent to the proposed leases. The Debtor cannot afford any further

9    delays and was thus required to bring this Motion.

## II. DISCUSSION

**A. The Proposed Leasing Program Is Within the Ordinary Course of the Debtor's Business and Can Proceed Under 11 U.S.C. § 363(c)(1).**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.§ 363(c)(l). A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. See 11 U.S.C. §1107(a).

To determine whether an activity is "in the ordinary course of business," Courts have generally applied two tests referred to as (1) the horizontal dimension test; and (2) the vertical dimension (also known as the reasonable expectations) test. See, e.g., In re Roth Am., Inc., 975 F.2d 949 (3d Cir. 1992); In re Dant & Russell, Inc., 853 F.2d 700 (9th Cir. 1988). The horizontal dimension test looks to similarly situated businesses and determines whether the transaction at issue is one that would normally be entered into by similar businesses. Dant & Russell, supra.

13

The vertical dimension test "reviews the transaction from the perspective of creditors, asking whether the transaction is one that creditors would reasonably expect the debtor ... to enter into." 3 Collier on Bankruptcy ¶ 363.03[1][b] at 363-23 (15th Ed. Rev. 2009); citing In re Watford, 159 B.R. 597 (M.D. Ga. 1993).

Under both the horizontal and vertical dimension tests, the Debtor's proposed leasing program constitutes activity within the ordinary course of the Debtor's business. The Debtor owns and operates a mixed-use Building comprised of both commercial and residential space. It is hardly unusual for owners of properties such as the Building to enter into leases such as those contemplated by the Debtor, particularly since that was the case pre-petition as well. Similarly, from the perspective of creditors, the Debtor believes that the leases are transactions that creditors would reasonably expect the Debtor to enter into. Since the Debtor's efforts to consummate sales of units in the Building have thus far proved unsuccessful, it would be unreasonable to expect that the Debtor would simply continue to accrue operating expenses without seeking to generate revenue to cover such expenses. As such, the Court should find that the proposed leasing program constitutes an activity within the ordinary course of the Debtor's business and the Debtor should be permitted to enter into leases on the terms and conditions outlined herein.

**B. Even If the Proposed Leasing Program Is Not An Activity Within the Ordinary Course of the Debtor's Business, the Court Should Approve the Proposed Leasing Program.**

Section 363(b)(1) provides in relevant part:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...

As set forth above, leasing residential units in the Building should be deemed by the Court to constitute an activity within the ordinary course of the Debtor's business. However, should the Court deem the proposed leasing program to constitute an activity outside the ordinary course of the Debtor's business, the Motion should still be granted for the economic reasons stated above.

14

1     In addition, the Debtor requests that the Court waive the 10-day stay of Bankruptcy Rule

2     6004(h), to ensure that the Debtor can promptly proceed to execute leases with prospective

3     tenants, avoid losing further leasing opportunities and begin generating cash flow to help offset

4     the operating expenses with respect to the Building.[6]

5     **C.**     **The Debtor Has Satisfied The Procedural Requirements Regarding Approval of the**

6               **Proposed Leasing Program.**

7     Bankruptcy Rule 4001(d) sets forth procedural requirements for obtaining approval for an

8     agreement relating to the lease of property of the estate. There are three general provisions of

9     Bankruptcy Rule 4001(d). First, the Motion must contain a copy of the proposed form of order,

10     which has been done by attaching the proposed order as Exhibit "D" to the annexed Yashouafar

11     Declaration. Second, the Motion must provide a concise statement of the relief requested, which

12     was done above. Third, the Motion is required to be served on a creditors committee or on the

13     twenty largest unsecured creditors if there is no committee and on such other parties as the Court

14     directs. Here, the Debtor has served the Motion on the Committee and its counsel, the Office of

15     the United States Trustee, all known parties who assert a lien upon the Building, and those

16     parties who have requested special notice. Accordingly, the Motion complies with the

17     requirements of Bankruptcy Rule 4001(d).

18                                     **III.**     **CONCLUSION**

19     **WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

20          (1)     affirming the adequacy of the Notice given herein;

21          (2)     granting the Motion in its entirety;

22          (3)     authorizing the Debtor to proceed with its leasing program for units at the

23                  Building, for terms not to exceed one (1) year, and upon terms and conditions

24                  reflected in the form of lease attached to the Yashouafar Declaration;

25

26     [6] In previous testimony by Mr. Yashouafar in connection with the motions to sell units at the Building, the Debtor
showed that the expenses associated with maintaining the Building were not significantly different whether or not

27     the Building was occupied. See Exhibit "B" to Declaration of M. Aaron Yashouafar dated June 9, 2009 which is
incorporated herein by this reference. There is simply no business justification for the Debtor to forego otherwise

28     available rental income that would help cover the costs of maintenance of the Building.

15

(4)     waiving the ten-day stay of Bankruptcy Rule 6004(h); and

(5)     granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: August 27, 2009                          ROOSEVELT LOFTS, LLC

                                                By: _____
                                                     DAVID L. NEALE
                                                     JULIET Y. OH
                                                     LEVENE, NEALE, BENDER,
                                                       RANKIN & BRILL L.L.P.
                                                     Attorneys for Chapter 11 Debtor and
                                                     Debtor in Possession

16

# DECLARATION OF M. AARON YASHOUAFAR

I, M. Aaron Yashouafar, hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I am the President of Roosevelt Lofts, Inc., which is the Manager of Roosevelt Lofts, LLC, a Delaware limited liability company, debtor and debtor in possession herein (the "Debtor").

3.      On April 13, 2009, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its financial affairs and operating its bankruptcy estate as a debtor in possession.

4.      The Debtor is the owner of real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "Building").

5.      In approximately January 2006, the Debtor entered into an agreement to lease the Building from the previous owners, with an option to buy the Building. The Debtor intended to address the demands of an evolving Downtown residential market by converting the Building from an office building to a luxury residential project. The Debtor exercised its option to purchase the Building in September 2008.

6.      Accordingly, in or about March 2006, the Debtor entered into a construction loan agreement with Bank of America, N.A., individually and as agent for a group of lenders (the "Bank"), pursuant to which the Debtor obtained a loan from the Bank in the original principal sum of $78,840,375.00 (the "Loan"). The Loan provided for, among other things, the repayment of the Loan, including accrued and unpaid interest, by March 9, 2009, with two options to extend the term of the Loan for six months each. The obligations of the Debtor in connection with the Loan are secured by a Construction Deed of Trust and a Leasehold Deed of Trust against the Building (collectively, the "Deeds of Trust"). The Loan was obtained by the Debtor for the purpose of converting the Building into 222 individually subdivided, luxury residential

17

condominium units (the "Units"), a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Building.

7. On or about December 30, 2008, the Bank issued a notice of default to the Debtor, contending that the Debtor had defaulted on its obligations under the Loan. Even after receiving the notice of default from the Bank, the Debtor continued to invest a considerable amount of time and effort obtaining independent appraisals, conducting market research, and providing the Bank with alternative plans for the completion of the Building and the sale of all Units in the Building. The Bank rejected all of the plans proposed by the Debtor for the completion of the Building and the sale of all Units.

8. Subsequently, on April 3, 2009, the Bank filed a complaint against the Debtor and others in the Superior Court of the State of California, County of Los Angeles ("State Court") for, among other things, specific performance, appointment of a receiver, and judicial foreclosure on its Deeds of Trust. Pursuant to its complaint in the State Court action, the Bank has asserted a claim against the Debtor and others in an amount exceeding $79 million. Days after filing its complaint, the Bank made an *ex parte* application with the State Court for the appointment of a receiver.

9. As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code in order to have the ability and opportunity to close escrow on the units that are under contract, to market and sell the remaining units in the Building, and to complete construction on the Building, all of which will allow the Debtor to repay the Loan and its other debts for the benefit of all creditors.

10. Shortly after the commencement of the Debtor's bankruptcy case, the Debtor filed two separate motions seeking authority to sell certain of the condominium units in the Building, free and clear of all liens, claims, interests and encumbrances (collectively, the "Sale Motions," and individually a "Sale Motion"). The Debtor filed its first Sale Motion on May 20, 2009, pursuant to which the Debtor sought authority to sell Units subject to pre-petition purchase and

18

1 sale contracts, and filed its second Sale Motion on May 26, 2009, pursuant to which the Debtor
2 sought authority to sell Units subject to post-petition purchase and sale contracts.

3     11.     A number of parties, including the Bank, filed oppositions to the Debtor's first
4 Sale Motion.[7] At the June 10, 2009 hearing on the Debtor's first Sale Motion, which I attended,
5 the Court continued the hearings on both Sale Motions to August 4, 2009 at 10:00 a.m. and
6 encouraged the parties, namely, the Debtor, the Bank and the Official Committee of Unsecured
7 Creditors appointed in the Debtor's case (the "Committee"), to discuss the terms of, and
8 formulate, a consensual plan of reorganization. The hearings on the Sale Motions have been
9 continued by stipulation from August 4, 2009 to September 16, 2009 at 10:00 a.m.

10     12.     The Debtor has been, and continues to be, engaged in discussions with the Bank
11 and the Committee in an effort to formulate the terms of a consensual plan of reorganization.

12     13.     In the meantime, regardless of the extent to which the Building is occupied, the
13 Debtor continues to incur operating expenses associated with the maintenance of the Building.
14 At this time, the Debtor has very limited cash flow from commercial leases and a few residential
15 tenants who entered into their leases prior to the Petition Date.

16     14.     On behalf of the Debtor, I have determined, in the exercise of my sound business
17 judgment and, in part, in response to the objection of the Bank to the proposed sale of units, that
18 renting units at the Building for a short term, for terms not to exceed one (1) year, will allow the
19 Debtor to continue to pursue longer term strategies for the restructuring of its financial affairs,
20 including, without limitation, the sale or further lease of units, a combination thereof, or a sale of
21 the Building, while at the same time generating cash flow to help offset the operating expenses
22 being incurred on a monthly basis.

23

24

---

25 [7] In opposing the proposed sale of the condominium units, the Bank argued, among other things, "... the sale of even one of the units makes uneconomic other business options that may make better financial sense on an interim
26 basis. In the current real estate market, it frequently makes sense to implement an "interim" best use, *such as renting units as apartments*, while waiting for the market to firm up. That may take several years, but in the
27 interim, *the Building could generate cash sufficient to pay operating expenses and debt service.*" Bank Group's Memorandum of Points and Authorities In Opposition to Debtor's Motion For Order Authorizing Sale of Certain
28 Condominium Units Pursuant to 11 U.S.C. § 363(f) filed on or about May 27, 2009 [Docket No. 43], pp. 10-11.

15. The Debtor's leasing program contemplates relatively short-term leases, for terms not to exceed one (1) year, at rates which the Debtor believes are reflective of current market conditions in downtown Los Angeles. A proposed rent schedule for the units to be subject to the Debtor's leasing program is attached as Exhibit "A" hereto. A true and correct copy of the form of the Debtor's proposed leases is attached as Exhibit "B" hereto.

16. Although I believe that the Debtor's proposed leasing program falls within the ordinary course of the Debtor's business, since the Debtor is attempting to cooperate with the Bank in formulating a mutually agreeable plan of reorganization, the Debtor approached the Bank beginning in mid-June 2009 regarding the interest expressed by prospective tenants in leasing units at the Building on a short term basis.

17. Since mid-June 2009, the Debtor has continued to provide information and documentation in response to the Bank's requests for information regarding and/or relating to the Debtor's proposed leasing program.

18. During the intervening period, during which the Debtor continued to seek the Bank's approval for the proposed leasing program, the Debtor was approached by several prospective tenants regarding leasing units at the Building. Each time the Debtor was approached by a prospective tenant, the Debtor advised the Bank of the prospective tenant's interest in leasing a Unit at the Building, and each time the Bank delayed so substantially that all such prospective tenants lost interest in the proposed leases. The Debtor's efforts to obtain a clear statement of the Bank's position with respect to the proposed leasing program have been fruitless; in order to proceed with the lease up of the Building in order to generate cash flow which will help support the operating expenses associated with the Building, the Debtor needs to be able to represent to prospective tenants that the proposed lease is duly-authorized by the Court in the Debtor's bankruptcy case and enforceable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of August, 2009, at Los Angeles, California.

/s/ M. Aaron Yashouafar
M. Aaron Yashouafar, Declarant

20



**EXHIBIT A**

## THE ROOSEVELT RESIDENCES - RENTAL RATES

| Unit | Bed | Bath | Levels | Total SF | Market $/Mo. | Minimum $/Mo. |
|------|-----|------|--------|----------|--------------|---------------|
| 301 | 1.0 | 1.5 | 2 | 1,179 | $2,947.50 | $2,000.00 |
| 302 | 1.0 | 1.0 | 1 | 1,363 | $2,957.50 | $2,000.00 |
| 303 | 1.0 | 1.5 | 2 | 1,042 | $2,605.00 | $2,000.00 |
| 304 | 1.0 | 1.5 | 2 | 1,024 | $2,560.00 | $2,000.00 |
| 305 | 1.0 | 1.5 | 2 | 1,037 | $2,592.50 | $2,000.00 |
| 307 | 1.0 | 1.0 | 1 | 732 | $1,939.80 | $2,000.00 |
| 309 | 1.0 | 1.5 | 1 | 839 | $2,223.35 | $2,000.00 |
| 310 | 1.0 | 1.5 | 1 | 814 | $2,157.10 | $2,000.00 |
| 312 | 1.0 | 1.5 | 1 | 785 | $2,080.25 | $2,000.00 |
| 313 | 1.0 | 1.5 | 1 | 804 | $2,130.60 | $2,000.00 |
| 314 | 1.0 | 1.5 | 1 | 1,619 | $3,394.20 | $2,100.00 |
| 407 | 1.0 | 1.0 | 1 | 970 | $2,570.50 | $2,000.00 |
| 409 | 1.0 | 1.0 | 1 | 884 | $2,342.60 | $2,000.00 |
| 410 | 1.0 | 2.0 | 1 | 1,096 | $2,740.00 | $2,000.00 |
| 411 | 2.0 | 1.5 | 1 | 1,265 | $3,036.00 | $2,100.00 |
| 412 | 1.0 | 1.0 | 1 | 913 | $2,419.45 | $2,000.00 |
| 413 | 1.0 | 1.0 | 1 | 931 | $2,467.15 | $2,000.00 |
| 414 | 1.0 | 1.0 | 1 | 943 | $2,498.95 | $2,000.00 |
| 415 | 1.0 | 1.0 | 1 | 863 | $2,286.95 | $2,000.00 |
| 416 | 1.0 | 1.0 | 1 | 932 | $2,469.80 | $2,000.00 |
| 417 | 2.0 | 1.5 | 1 | 1,310 | $3,144.00 | $2,100.00 |
| 419 | 1.0 | 1.0 | 1 | 795 | $2,106.75 | $2,000.00 |
| 420 | 1.0 | 1.0 | 1 | 922 | $2,443.30 | $2,000.00 |
| 423 | 1.0 | 1.0 | 1 | 910 | $2,411.50 | $2,000.00 |
| 425 | 1.0 | 2.0 | 1 | 1,219 | $2,925.60 | $2,100.00 |
| 426 | 1.0 | 1.0 | 1 | 1,125 | $2,812.50 | $2,000.00 |
| 501 | 1.0 | 1.0 | 2 | 940 | $2,491.00 | $2,000.00 |
| 502 | 2.0 | 1.5 | 2 | 1,498 | $3,595.20 | $2,100.00 |
| 503 | 1.0 | 1.0 | 2 | 1,328 | $3,187.20 | $2,100.00 |
| 504 | 1.0 | 1.0 | 2 | 1,355 | $3,252.00 | $2,100.00 |
| 505 | 1.0 | 1.0 | 2 | 1,290 | $3,096.00 | $2,100.00 |
| 506 | 1.0 | 1.0 | 1 | 863 | $2,286.95 | $2,000.00 |
| 507 | 1.0 | 1.0 | 1 | 928 | $2,459.20 | $2,000.00 |
| 508 | 1.0 | 1.0 | 1 | 940 | $2,491.00 | $2,000.00 |
| 509 | 1.0 | 1.0 | 1 | 893 | $2,366.45 | $2,000.00 |
| 510 | 1.0 | 2.0 | 1 | 1,093 | $2,732.50 | $2,000.00 |
| 511 | 2.0 | 1.5 | 1 | 1,332 | $3,196.80 | $2,100.00 |
| 512 | 1.0 | 1.0 | 1 | 918 | $2,432.70 | $2,000.00 |
| 513 | 1.0 | 1.0 | 1 | 934 | $2,475.10 | $2,000.00 |
| 514 | 1.0 | 1.0 | 1 | 942 | $2,496.30 | $2,000.00 |
| 515 | 1.0 | 1.0 | 1 | 1,030 | $2,427.40 | $2,000.00 |
| 516 | 1.0 | 1.0 | 1 | 1,012 | $2,530.00 | $2,000.00 |
| 517 | 2.0 | 1.5 | 2 | 1,399 | $3,357.60 | $2,100.00 |
| 518 | 2.0 | 2.0 | 2 | 1,453 | $3,487.20 | $2,100.00 |
| 519 | 2.0 | 2.0 | 2 | 1,532 | $3,515.94 | $2,250.00 |
| 520 | 1.0 | 1.0 | 1 | 875 | $2,318.75 | $2,000.00 |
| 521 | 1.0 | 1.0 | 2 | 1,092 | $2,730.00 | $2,000.00 |
| 522 | 1.0 | 1.0 | 1 | 868 | $2,300.20 | $2,000.00 |
| 523 | 1.0 | 1.0 | 1 | 930 | $2,464.50 | $2,000.00 |
| 524 | 1.0 | 1.0 | 1 | 802 | $2,125.30 | $2,000.00 |
| 525 | 1.0 | 2.0 | 1 | 1,217 | $2,920.80 | $2,100.00 |

*Confidential and Privileged Communication*  July 13, 2009

# THE ROOSEVELT RESIDENCES - RENTAL RATES

| Unit | Bed | Bath | Levels | Total SF | Market $/Mo. | Minimum $/Mo. |
|------|-----|------|--------|----------|--------------|---------------|
| 526 | 1.0 | 1.0 | 1 | 1,110 | $2,775.00 | $2,000.00 |
| 606 | 1.0 | 1.5 | 1 | 1,143 | $2,857.50 | $2,000.00 |
| 607 | 1.0 | 1.0 | 1 | 874 | $2,316.10 | $2,000.00 |
| 608 | 1.0 | 1.0 | 1 | 924 | $2,448.60 | $2,000.00 |
| 609 | 1.0 | 1.0 | 1 | 885 | $2,345.25 | $2,000.00 |
| 610 | 1.0 | 2.0 | 1 | 1,090 | $2,725.00 | $2,000.00 |
| 611 | 2.0 | 1.5 | 1 | 1,332 | $3,196.80 | $2,100.00 |
| 612 | 1.0 | 1.0 | 1 | 921 | $2,440.65 | $2,000.00 |
| 613 | 1.0 | 1.0 | 1 | 947 | $2,509.55 | $2,000.00 |
| 614 | 1.0 | 1.0 | 1 | 938 | $2,485.70 | $2,000.00 |
| 615 | 1.0 | 1.0 | 1 | 894 | $2,369.10 | $2,000.00 |
| 616 | 1.0 | 1.0 | 1 | 1,248 | $2,995.20 | $2,100.00 |
| 622 | 1.0 | 1.0 | 1 | 875 | $2,318.75 | $2,000.00 |
| 623 | 1.0 | 1.0 | 1 | 931 | $2,467.15 | $2,000.00 |
| 624 | 1.0 | 1.0 | 1 | 808 | $2,141.20 | $2,000.00 |
| 625 | 1.0 | 2.0 | 1 | 1,226 | $2,942.40 | $2,100.00 |
| 626 | 1.0 | 1.0 | 1 | 1,110 | $2,775.00 | $2,000.00 |
| 701 | 1.0 | 1.0 | 2 | 940 | $2,491.00 | $2,000.00 |
| 702 | 1.0 | 1.0 | 2 | 1,462 | $3,508.80 | $2,100.00 |
| 703 | 1.0 | 1.5 | 2 | 1,362 | $3,268.80 | $2,100.00 |
| 704 | 1.0 | 1.5 | 2 | 1,366 | $3,278.40 | $2,100.00 |
| 705 | 1.0 | 1.5 | 2 | 1,288 | $3,091.20 | $2,100.00 |
| 706 | 1.0 | 1.0 | 1 | 888 | $2,353.20 | $2,000.00 |
| 707 | 1.0 | 1.0 | 1 | 950 | $2,517.50 | $2,000.00 |
| 708 | 1.0 | 1.0 | 1 | 919 | $2,435.35 | $2,000.00 |
| 709 | 1.0 | 1.0 | 1 | 910 | $2,411.50 | $2,000.00 |
| 710 | 1.0 | 2.0 | 1 | 1,120 | $2,800.00 | $2,000.00 |
| 711 | 1.0 | 1.5 | 1 | 1,332 | $3,196.80 | $2,100.00 |
| 712 | 1.0 | 1.0 | 1 | 944 | $2,501.60 | $2,000.00 |
| 713 | 1.0 | 1.0 | 1 | 958 | $2,538.70 | $2,000.00 |
| 714 | 1.0 | 1.0 | 1 | 950 | $2,517.50 | $2,000.00 |
| 715 | 1.0 | 1.0 | 1 | 1,030 | $2,427.40 | $2,000.00 |
| 716 | 1.0 | 1.0 | 1 | 1,012 | $2,530.00 | $2,000.00 |
| 717 | 2.0 | 1.5 | 2 | 1,399 | $3,357.60 | $2,100.00 |
| 718 | 2.0 | 2.0 | 2 | 1,453 | $3,487.20 | $2,100.00 |
| 719 | 2.0 | 2.0 | 2 | 1,532 | $3,515.94 | $2,250.00 |
| 720 | 1.0 | 1.0 | 1 | 875 | $2,318.75 | $2,000.00 |
| 721 | 1.0 | 1.0 | 2 | 1,092 | $2,730.00 | $2,000.00 |
| 722 | 1.0 | 1.0 | 1 | 868 | $2,300.20 | $2,000.00 |
| 723 | 1.0 | 1.0 | 1 | 930 | $2,464.50 | $2,000.00 |
| 724 | 1.0 | 1.0 | 1 | 808 | $2,141.20 | $2,000.00 |
| 725 | 1.0 | 2.0 | 1 | 1,217 | $2,920.80 | $2,100.00 |
| 726 | 1.0 | 1.0 | 1 | 1,115 | $2,787.50 | $2,000.00 |
| 806 | 1.0 | 1.0 | 1 | 1,755 | $4,027.73 | $2,250.00 |
| 808 | 1.0 | 1.0 | 1 | 932 | $2,469.80 | $2,000.00 |
| 809 | 1.0 | 1.0 | 1 | 945 | $2,504.25 | $2,000.00 |
| 810 | 1.0 | 2.0 | 1 | 1,305 | $3,132.00 | $2,100.00 |
| 811 | 2.0 | 1.5 | 1 | 1,332 | $3,196.80 | $2,100.00 |
| 812 | 1.0 | 1.0 | 1 | 944 | $2,501.60 | $2,000.00 |
| 813 | 1.0 | 1.0 | 1 | 956 | $2,533.40 | $2,000.00 |
| 814 | 1.0 | 1.0 | 1 | 951 | $2,520.15 | $2,000.00 |

*Confidential and Privileged Communication*

July 13, 2009

## THE ROOSEVELT RESIDENCES - RENTAL RATES

| Unit | Bed | Bath | Levels | Total SF | Market $/Mo. | Minimum $/Mo. |
|------|-----|------|--------|----------|--------------|---------------|
| 815 | 1.0 | 1.0 | 1 | 883 | $2,339.95 | $2,000.00 |
| 816 | 1.0 | 1.5 | 1 | 1,248 | $2,995.20 | $2,100.00 |
| 822 | 1.0 | 1.0 | 1 | 864 | $2,289.60 | $2,000.00 |
| 823 | 1.0 | 1.0 | 1 | 931 | $2,467.15 | $2,000.00 |
| 824 | 1.0 | 1.0 | 1 | 807 | $2,138.55 | $2,000.00 |
| 825 | 1.0 | 2.0 | 1 | 1,226 | $2,942.40 | $2,100.00 |
| 826 | 1.0 | 1.0 | 1 | 1,110 | $2,775.00 | $2,000.00 |

*Confidential and Privileged Communication* July 13, 2009

# EXHIBIT B

# Residential Lease Agreement

This RESIDENTIAL LEASE AGREEMENT (hereinafter referred to as the "Agreement"), is dated, (for reference purposes), as of _____ --- Date --- _____ by and between _____ --- ROOSEVELT LOFTS, LLC, a Delaware limited liability company, through MILBANK REAL ESTATE SERVICES, INC., its authorized agent and property manager --- (the "Landlord"), and _____ --- Name Information --- (the ""Tenant").

1.    **Property.** By this Agreement, Landlord agrees to rent to Tenant, and Tenant agrees to rent from Landlord, that certain real and improved residential property commonly known as and located at:

        --- **727 West Seventh Street, Unit #, Los Angeles, California 90017** --- _____ (the "Premises").

2.    **Rent / Term.** In consideration of Tenant's lease of the Premises from the Landlord, Tenant agrees to pay rent in the monthly amount of _____ --- $ [amount] --- _____ per month, which is due to the Landlord in advance, on the _____ --- First --- day of each calendar month during the term of this Agreement (the "Rent"). The term of the lease provided by for this Agreement shall be on a month to month basis (the "Term"), commencing as of _____ --- Date --- _____ (the "Commencement Date"), and automatically terminate after thirty (30) days advance written notice by Landlord or Tenant to the other (the Termination Date"). The Rent must be received by Landlord on the day of the month as indicated herein, and may be in the form of a personal check, provided that no personal check is returned by the bank for insufficient funds, no stop payment is placed on any check, or any other reason other than a bank error verified by the bank in writing, which would not allow for the negotiation of such funds on the date received by the Landlord. Rent for the first month shall be prorated, and payable in the sum of _____ --- $ [amount] --- _____ upon execution of this Agreement.

3.    **Additional Rent:** Tenant acknowledges that the late payment of Rent or any other amount due as required under this Agreement, will cause the Landlord to incur costs and expenses, the exact amount of which will be extremely difficult and impractical to determine. Such costs may include, but are not limited to, processing and accounting fees, charges which may be imposed upon the Landlord by the terms of other loans or other obligations, and costs for attempts to collect the rent. As a result, if Tenant fails to timely pay the Rent on the first day of each month in which it is due, and such Rent is not received by Landlord within _____ -- Three (3) -- _____ calendar days thereafter, Tenant shall be obligated to pay to Landlord the additional sum of _____ -- $ [amount] -- _____, which shall be considered as additional rent owed under this Agreement. If any personal check of the Tenant is returned by the bank for insufficient funds, there is a stop payment placed on the check, or any other reason other than a bank error verified by the bank in writing, which would not allow for the negotiation of the funds otherwise due on the date received by the Landlord, then Tenant shall in addition to all other actual charges or expenses incurred by the Landlord, also be obligated to pay a returned check fee of _____ -- $25.00 -- _____. Tenant shall also be obligated to replace the returned check (or payment which is not fully negotiable by the Landlord), and make all subsequent payments, only by either cash, cashier's check, or bank-certified check. The returned check fee, or any other charges incurred by the Landlord, shall be considered as additional rent owed under this Agreement. All additional rent and Rent shall collectively be referred to as "Rent" and collectible by Landlord as a part of the total Rent due under this Agreement.

4.    **Security Deposit.** Upon execution of this Agreement by Tenant, Tenant shall concurrently herewith deliver the additional sum of _____ -- $ [amount] -- _____ to the Landlord as a security for any damages to the Premises, or to secure the obligations owed by Tenant to Landlord under this Agreement (the "Security Deposit"). Landlord may use all or any portion of the Security Deposit, as Landlord deems reasonably necessary in its sole discretion, in order to (at minimum): (a) cure any default by Tenant with respect to the payment of Rent (including any late charges, attorneys' fees, etc.) or other amounts due under or pursuant to the Agreement; (b) repair any damages to the Premises caused or related to the Tenant's (or Tenant's guest(s), licensee(s), or invitee(s)) use of the Premises; (c) clean the Premises or make alterations or repairs requested by Tenant which are not otherwise the responsibility of the Landlord; (d) pay any fines imposed by the homeowner's association in connection with Tenant's (or Tenant's guest(s), licensee(s), or invitee(s)) use of the Premises or community areas; (e) pay for the cost of repair or replacement of any appurtenances, keys, controls, or other items which have been delivered to Tenant in connection with the use and occupancy of the Premises, mailbox, or other common areas within the community; or (f) make any repairs, clean, or otherwise compensate Landlord for any costs or expenses incurred by Landlord in order to bring the Premises to at least the same condition as it was when originally delivered to Tenant at the Commencement Date. The Security Deposit may not be used by unilaterally by Tenant for any purpose, including without limitation, the payment of Rent, (including the last month's Rent). Landlord shall return the Security Deposit to Tenant after Tenant has vacated the Premises, provided that Landlord is not otherwise entitled to make any deductions from the Security Deposit based upon the condition of the Premises at such time, or other necessary deduction(s) for amounts which Tenant owes under this Agreement.

5.    **Permitted Use of Premises.** The Premises shall only be used and occupied by the Tenant(s) named herein, exclusively, as a private single family dwelling. Tenant agrees and acknowledges that no part of the Premises shall be used at any time by Tenant for the purpose of carrying on any business, profession, trade of any kind, unlawful activity, or for any purpose other than as a private single family dwelling. Tenant shall not allow any other person(s), other than Tenant's immediate family or transient relative(s) or friend(s) who are temporary guests of Tenant, to use or occupy the Premises or any of the common areas of the community, without first obtaining Landlord's advance written consent to such use. Tenant shall comply with any and all local, state, and federal laws, ordinances, rules and orders of any and all governmental or quasi-governmental authorities affecting the cleanliness, use, occupancy and preservation of the Premises, including without

limitation, any rules or regulations set forth by the homeowner's association for the community, or other programs affecting the neighborhood. Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other neighbors, residents, patrons, guests, invitees or licensees of the Premises, neighborhood, or community, or otherwise injure or annoy them, or use or allow the Premises to be used, for any improper, immoral, unlawful or objectionable purpose. Tenant shall not cause, maintain, or permit any form of objectionable or intolerable noise, smell, odor, act, obstruction, or any other form of nuisance in, on, or about the Premises. Tenant shall not commit or suffer to be committed any waste in or upon the Premises and shall keep the Premises in first class repair and appearance.

6. **Items Provided to Tenant by Landlord.** Concurrent with the execution of this Agreement by both Landlord and Tenant, Tenant acknowledges the receipt of the following items:

    **2** key(s) to the Premises;

    **2** key(s) to the mailbox;

    **0** key(s) to the common areas of the community (i.e., pool, etc).; and

    **0** remote control device(s) for the garage door to the Premises.

If any of the foregoing items are lost, damaged, or not returned to the Landlord upon the termination of the Agreement, and need to be replaced by the Landlord, Tenant shall be charged $25.00 for each key to the Premises or mailbox, $75.00 for each key to the common areas of the community (i.e., pool, etc.), and $85.00 for each remote control. Tenant shall also bear the cost of any locksmith, technician, or similar services which may be needed in order to repair or replace any of the foregoing items. Tenant does not have the right to install any form of additional locking device upon the Premises without the Landlord's advance written consent, which may withheld at Landlord's sole discretion (but if such consent is given, shall at minimum require that Tenant provide Landlord with at least one complete set of all keys relating to such locking device). Tenant may not change the locks or keys to any of the doors or access points to the Premises without: (a) first obtaining the Landlord's advance written consent; and (b) providing the Landlord with at least one complete set of all keys relating to all such locks to the Premises.

7. **Condition of Premises.** Tenant acknowledges and represents that Tenant has had the opportunity, and has in fact, fully and completely examined the Premises, and that the Premises and all appurtenances are in good order, repair, and working condition as of the execution of this Agreement. Tenant further acknowledges that the Premises is part of a newly constructed development and that all items are brand new, including the appliances, paint, carpet, tiles, and other fixtures throughout. Tenant further acknowledges that as a result of the Premises being part of a newly built project, certain aspects of the Premises, building, and/or common areas may not be functioning at optimal performance, or at all, and that in connection with such conditions, Tenant has been advised of the same and has nonetheless agreed to accept the Premises in its AS-IS condition, which is also reflected in the Rent payable by Tenant. Tenant shall maintain, and keep in good working order, all appliances, fixtures, and other appurtenances throughout the Premises, during Tenant's use and occupancy of the Premises under this Agreement. Tenant shall be responsible to bear the cost of maintenance and repair(s) for any appurtenance or other item related to the Premises, up to the first $250.00 per occurrence. Provided that the cause of any disrepair is not a result of Tenant's (or Tenant's guest(s), licensee(s), or invitee(s)) negligence, Landlord shall pay for the cost of repair or maintenance of such item in excess of $250.00.

8. **Alterations and Improvements.** Tenant shall not make any alterations or improvements to the Premises or building, or engage in any form of construction in, on, or about the Premises or the building without the prior written consent of Landlord, which may be withheld at Landlord's sole discretion. Any and all alterations, changes, or improvements built, constructed, or placed on the Premises or building by Tenant, shall, unless otherwise provided by written agreement between Landlord and Tenant, be and become a part of the Premises, the property of Landlord, and remain on the Premises at the expiration or earlier termination of this Agreement, regardless of whether such alterations, changes, or improvements are permanent, removable, or performed without the Landlord's consent.

9. **Utilities.** Tenant shall be responsible for arranging for and paying for all utility services required on the Premises, including without limitation, electricity, water, gas, telephone, cable, and internet services (the "Utility Services"). All Utility Services shall be in the name of the Tenant only, and Landlord shall have no responsibility to provide, service, or pay for any Utility Services. In the event that some utilities of the building are billed to Landlord, then Tenant shall promptly reimburse Landlord for the cost of the same within five (5) days after demand therefor.

10. **Maintenance and Repair.** Tenant shall properly use, operate, maintain, and safeguard the Premises, all appliances, fixtures, and appurtenances in a good and sanitary condition, and make the repairs required under this Agreement. Tenant shall immediately notify the Landlord of any damage, and shall pay for all repairs or replacements caused by Tenant (or Tenant's guest(s), licensee(s), or invitee(s)), excluding items of ordinary wear and tear. Without limiting the generality of the foregoing, Tenant shall:

    (a)    Not obstruct the driveways, sidewalks, courts, entry ways, stairs or halls, which shall be used for the purposes of ingress and egress only, or otherwise cause or create any form of safety hazard;

(b)     Keep all windows, glass, window coverings, doors, locks and hardware in good, clean order and repair;

(c)     Not obstruct or cover the windows, doors, or balcony;

(d)     Not leave windows or doors in an open position during any inclement weather, and to keep them locked and closed when Tenant is not physically present within the Premises;

(e)     Not hang any laundry, clothing, sheets, etc. from any window, rail, porch or balcony nor air or dry any of same within any yard area or space;

(f)     Not cause or permit any locks or hooks to be placed upon any door or window without the prior written consent of Landlord, which may be withheld by Landlord at its sole discretion;

(g)     Keep all lavatories, sinks, toilets, and all other water and plumbing apparatus in good order and repair and shall use same only for the purposes for which they were constructed. Tenant shall not allow any oil, sweepings, rubbish, sand, rags, ashes or other substances to be thrown or deposited therein. Any damage to any such apparatus and the cost of clearing stopped plumbing resulting from misuse shall be borne by Tenant;

(h)     Tenant's family and guests shall at all times maintain order in the Premises and at all places on the Premises and the common community areas, and shall not make or permit any loud or improper noises, or otherwise disturb other residents, the neighbors, or other members of the community;

(i)     Keep all radios, television sets, stereos, phonographs, computers, etc., turned down to a level of sound that does not annoy or interfere with other residents, neighbors, or other members of the community;

(j)     Deposit all trash, garbage, rubbish or refuse in the locations provided therefor, and not allow any trash, garbage, rubbish or refuse to be deposited or permitted to stand within the Premises, on the exterior of any building, or within any common areas of the community, for any period of time longer than what would be deemed as sanitary or otherwise cause intolerable odors to be emitted therefrom;

(k)     Abide by and be bound by any and all rules and regulations affecting the Premises or the common area appurtenant thereto which may be adopted or promulgated by the Condominium or Homeowners' Association having control over them.

11.     **Insurance.** Tenant shall, upon its own discretion, pay for and maintain any and all types of insurance coverage which Tenant shall deem necessary to cover the replacement value (as if new, and without any deduction for use or wear) of any and all personal property or other items which Tenant may keep, store, or use in, about, or within the Premises and surrounding community, which may be damaged for any reason whatsoever, including without limitation, earthquake, fire, wind, rain, flooding, leakage, seepage, plumbing problems, electrical problems, vandalism, riot, acts of God, war, terrorist activity, or otherwise, regardless of whether the cause of such damages is attributable to the Landlord, Landlord's negligence, possible defect(s), or the acts of any of Landlord's agents, representatives, or other third party, person, or entity. TENANT HEREBY EXPRESSLY ACKNOWLEDGES AND UNDERSTANDS THAT LANDLORD SHALL NOT BE LIABLE FOR ANY DAMAGE OR INJURY CAUSED OR SUFFERED BY TENANT OR TENANT'S GUEST(S), LICENSEE(S), OR INVITEE(S), REGARDLESS OF NATURE, CAUSE, OR ORIGIN, IN, ON, OR ABOUT THE PREMISES, NEIGHBORHOOD, OR COMMON AREAS OF THE COMMUNITY. IT IS TENANT'S SOLE RESPONSIBILITY AND OBLIGATION TO ENSURE THAT ANY AND ALL DAMAGES WHICH TENANT (OR TENANT'S GUEST(S), LICENSEE(S), OR INVITEE(S)) MAY CAUSE OR SUFFER IS COVERED UNDER AN APPROPRIATE INSURANCE POLICY.

12.     **Indemnification.** Without limiting the generality of any other provision in this Agreement, Tenant agrees and acknowledges that Landlord shall not be liable for any damage or injury of or to the Tenant, Tenant's family, guests, invitees, agents or employees or to any person entering or leaving the Premises, the building of which the Premises are a part, or the common areas of the community, or to goods or equipment, or in the structure or equipment of the structure of which the Premises are a part, and that Tenant shall indemnify, defend and hold Landlord harmless from any and all claims or assertions of every kind and nature which may be asserted against the Landlord.

13.     **Inspection of the Premises.** Landlord and Landlord's agents shall have the right, at all reasonable times, or as otherwise specifically requested by Tenant, during the term of this Agreement and any renewal thereof, to enter the Premises for the purpose of inspecting the Premises and all appurtenances, buildings, or improvements thereon. Landlord shall also have the right, at all reasonable times, or as otherwise specifically requested by Tenant, (or on an emergency basis, at any time), to enter the Premises for the purposes of making any repairs, additions or alterations as may be deemed appropriate by Landlord for the preservation of the Premises or the building. At least three hours notice by Landlord to Tenant, (from the time of any telephone call, facsimile, or email), shall be deemed reasonable for the purposes of this section. Tenant acknowledges and agrees that Landlord's entry upon the Premises in connection with the foregoing reasons, even if Tenant refuses to give Landlord access or Tenant is not present at the time of Landlord's entry, shall not be

deemed as a forceable entry, interference with Tenant's right to quiet enjoyment, or violative of any law, rule, regulation, or other civil right which Tenant may otherwise have. Landlord and its agents shall further have the right to exhibit the Premises and to display the usual "for sale", "for rent" or "vacancy" signs on the Premises. Landlord's right of entry upon the Premises shall likewise exist for the purpose of showing the Premises to prospective renters or buyers, removing placards, signs, fixtures, alterations or additions that do not conform to terms of this Agreement, or to any restrictions, rules, or regulations affecting the Premises or otherwise enforceable under this Agreement.

14.     **Assignment / Subletting / Occupants.** Tenant shall not have the right to, and agrees not to, assign this Agreement or the rights and obligations created hereby, or to sub-let or grant any license to use the Premises or any part thereof without the prior written consent of Landlord, which may be withheld by Landlord at Landlord's sole discretion. If Landlord agrees to giving Tenant consent to one such assignment, sub-letting, or license, such consent shall not be deemed to be a consent to any subsequent assignment, sub-letting, or license. An assignment, sub-letting, or license without the prior written consent of Landlord or an assignment (or sub-letting by operation of law) shall be absolutely null and void and shall, and at Landlord's option, Landlord may terminate this Agreement and require that Tenant, sub-tenant, assignee, licensee, or other person(s), to vacate the Premises after 30 days notice. Any assignment or sub-letting permitted by the Landlord shall only be effectual if in a writing signed by the Landlord, Tenant, and assignee or sub-lettee, in which case, the Tenant shall remain jointly and severally liable for the terms, conditions, and obligations created by this Agreement along with such assignee or sub-lettee. The occupants of the Premises shall be limited to the named Tenant, who shall use the Premises and its amenities solely for housing accommodations and for no other purpose. No other person shall have any right to access, residence, or use of the Premises or building amenities without the Landlord's advance written consent, which may be refused or conditioned, in Landlord's sole and absolute discretion. Tenant acknowledges that the HOA, CC&Rs and applicable Rules and Regulations affecting the Premises have substantial restrictions related to the Premises and building, and in connection therewith, Tenant has read and understands all such restrictions, agreeing to comply with them at all times during the term of this Lease. Tenant shall be personally responsible and liable for any and all activity resulting from use of the Premises or building by any guest, invitee, or licensee of Tenant

15.     **Abandonment.** If at any time during the term of this Agreement or any renewal thereof, Tenant abandons or vacates the Premises prior to the full completion of the Term of the Agreement or any subsequent renewal, Landlord may, at Landlord's option, regain legal possession of the Premises by no later than five days of providing Tenant with written notice that Landlord believes that Tenant has abandoned or vacated the Premises. Tenant's failure to respond to the notice to be provided by Landlord within the five days, by addressing all questions or concerns contained in the notice, (which must be done in writing and sent to the Landlord via personal delivery or certified U.S. Mail), shall serve as conclusive evidence of the fact that Tenant has abandoned and vacated the property. The remaining balance of rent due under this Agreement shall then become immediately due. Landlord may, at Landlord's discretion, as agent for Tenant, enter upon the Premises, change the locks, begin cleaning or repairs, and proceed with whatever steps may be necessary in order to relet the Premises. Landlord shall be entitled to collect all rent payable by virtue of such reletting, and, at Landlord's option, hold Tenant liable for any difference between the rent that would have been payable under this Agreement during the balance of the unexpired term, if this Agreement had continued in force, and the net rent for such period realized by Landlord by means of such reletting. If Landlord's right of reentry is exercised following abandonment of the Premises by Tenant, then Landlord shall consider any personal property belonging to Tenant or left upon or within the Premises to also have been abandoned, in which case Landlord may dispose of all such personal property in any manner Landlord shall deem proper, regardless of actual or estimated value thereof. Tenant hereby expressly agrees that in such an event, Landlord will be released and relieved of any and all liability for taking such actions, and that Tenant waives any rights which may otherwise be provided to Tenant by law or equity with respect to Landlord's proposed actions, time constraints, or otherwise.

16.     **Holdover.** If Tenant remains in possession of the Premises after the Termination Date, without the advance written consent of the Landlord, then Tenant shall be deemed a tenant-at-sufferance. Tenant acknowledges that Landlord has no obligation to renew the lease contemplated by this Agreement with Tenant, and that Landlord is not required to give Tenant any form of advance notice advising Tenant of the termination of the Term of this Agreement, or that if Tenant remains in possession of the Premises after the Termination Date, that Tenant will be required to pay the holdover rent. Tenant agrees to pay to Landlord, holdover rent at the rate of ▓▓▓▓▓▓▓▓▓ per month (the "Holdover Rent"). TENANT EXPRESSLY ACKNOWLEDGES THAT THE ACCEPTANCE BY THE LANDLORD OF ANY LESSER AMOUNT FOR RENT DURING THE PERIOD THAT TENANT IS A TENANT-AT-SUFFERANCE, SHALL NOT AFFECT THE FACT THAT TENANT SHALL REMAIN A TENANT-AT-SUFFERANCE, AND THAT LANDLORD EXPRESSLY RESERVES THE RIGHT TO COLLECT THE BALANCE OF THE HOLDOVER RENT PROVIDED FOR IN THIS AGREEMENT, CANCEL THE AGREEMENT AT ANY TIME AFTER PROPER NOTICE, AND SHALL NOT BE CONSTRUED AS CREATING AN ACCOUNT STATED BETWEEN LANDLORD AND TENANT AS TO THE AMOUNT OF THE LESSER AMOUNT OF RENT DUE AND OWING DURING THE HOLDOVER PERIOD. The foregoing provisions of this Paragraph are in addition to and do not affect Landlord's rights to cancel this Agreement after the Termination Date, or any other legal or equitable rights of the Landlord hereunder, or as otherwise provided by law.

17.     **Waiver of Rights.** Without limiting any provision contained herein, Tenant expressly agrees that it has and will waive any rights it may have in accordance with any law or statute which would provide for remedies to the contrary of what is provided in this Agreement. Landlord's failure or reluctance to enforce or observe a default, or any of the specific terms and conditions of this Agreement, shall not serve as a waiver or continuing waiver of the Landlord's right to enforce or implement any term or condition of this Agreement, or to later declare a default hereunder.

18.     **Subordination / Attornment.** Tenant acknowledges that Landlord has obtained a construction loan in connection with the development of the building located at 727 W. 7th Street, Los Angeles, California (the "Building") from Bank of

America, N.A., as (the "Lender"), and that this Agreement (and all estates, options and rights created under this Agreement) is intended to be subordinate to the Lender's interest in the Building and Premises. Tenant agrees that, in the event that Lender acquires legal title to the Building or Premises by foreclosure, whether judicial or nonjudicial, or by acceptance of a deed in lieu of foreclosure (a "Foreclosure Event"), then Tenant's rights under this Agreement shall terminate, and this Agreement shall be deemed to be null and void. After termination of this Agreement due to a Foreclosure Event, Tenant shall vacate the Premises within thirty (30) days after receipt of written notice from the Lender (with proof of the same) that a Foreclosure Event has occurred. Tenant agrees that this Agreement, and all estates, options and rights created under this Agreement, are hereby subordinated and made subject to the lien held by Lender in connection with the construction loan. In connection with the Loan provided by the Lender, the Landlord has filed for protection under Chapter 11 of the Bankruptcy Code, and as a result, this Agreement shall be subject to the approval of the same by the bankruptcy court. In the event that the bankruptcy court does not approve of this Agreement, Tenant hereby acknowledges that the Agreement may be terminated, and Tenant shall be required to vacate the Premises within thirty (30) days after receipt of written notice that this Agreement has been terminated because it was not approved by the bankruptcy court.

19.     **Attorneys' Fees**. If it become necessary for Landlord to use an attorney to enforce any of the conditions or covenants hereof, including the collection of rentals, or to gain lawful possession of the Premises, Tenant agrees to pay all reasonable fees, costs, and expenses so incurred. Tenant acknowledges and understands that the filing of a lawsuit is not a prerequisite to the Landlord's collection of attorneys' fees and costs, and that Tenant shall be responsible for all reasonable legal fees and costs incurred by Landlord, which may include, without limitation, preparation and issuance of a 3-Day Notice to Pay Rent or Quit, Notice of Default, etc. All attorneys' fees and costs shall become due and payable by Tenant on the first day of the month following the date which Landlord provides Tenant with a copy of the invoice pertaining to the legal services rendered or costs incurred. In the event that a lawsuit is filed in order to enforce any of the conditions or covenants of this Agreement, the prevailing party shall be awarded its reasonable attorneys' fees and costs.

20.     **Severability**. If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Agreement nor the application of the remaining portion of the provision, shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

21.     **Descriptive Headings / Construction**. The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations of the Landlord or Tenant. Any pronouns used herein shall include, where appropriate, either gender or both, as well as the singular and plural.

22.     **Prior Agreements / Modification**. This Agreement contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in connection with the lease contemplated by this Agreement, and no prior oral (or written, as the case may be), discussions, agreements, arrangements, or understanding pertaining to any such matters shall be effective for any purpose. All previous discussions, agreements, arrangements, and understandings between the Landlord and Tenant have been integrated into the terms of this Agreement. This Agreement shall not be modified, changed, altered, or amended in any way except through a written amendment signed by all of the parties hereto.

23.     **Notices**. Any notice required or permitted under this Agreement shall be in accordance with the specific provision detailing such notice, or if no method is provided, then either by personal delivery, or by certified U.S. Mail, addressed as follows:

> If to Landlord to:   MILBANK REAL ESTATE SERVICES, INC.
> Attention: Homan Taghdiri, Esq.
> 660 S. Figueroa Street, 24th Floor
> Los Angeles, California 90017

> If to Tenant to:

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

24.     **Additional Provisions**. --- [As applicable]. --- .

25.     **Tenant Representations and Authorizations**. Tenant warrants that no broker, agent, or other finder will seek contribution from Landlord with respect to Tenant's intention to enter into this Agreement, and to indemnify and hold Landlord harmless from any and all such claims. Tenant warrants and represents that all of the statements contained in Tenant's rental application are true, correct, and accurate at the time made, and that there has been no change thereof since such time and the execution of this Agreement. Tenant understands and acknowledges that a negative credit report may be submitted to a credit reporting agency if Tenant does not fully and timely comply with the terms and conditions of this Agreement. Tenant further authorizes Landlord to obtain updated credit reports with respect to Tenant's creditworthiness both during the Term of this Agreement, and at any time thereafter if Tenant is in breach of any of the terms hereof or owes any monetary obligation to Landlord in connection herewith.

Each of the undersigned, having read and fully understanding the terms and legal implications of the conditions and covenants set forth in this Agreement, hereby agree to all of its terms.

LANDLORD:                              TENANT:

ROOSEVELT LOFTS, LLC
By: MILBANK REAL ESTATE SERVICES, INC.
Its: Authorized Agent


By: _____     By: _____
        M. Aaron Yashouafar                 [Name]
Its:    Chief Executive Officer

**EXHIBIT D**

DAVID L. NEALE (SBN 141225)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dln@lnbrb.com, jyo@lnbrb.com

Attorneys for Chapter 11 Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>ROOSEVELT LOFTS, LLC, a Delaware limited liability company,<br><br>Debtor. | Case No. 1:09-bk-14214-GM<br><br>Chapter 11<br><br>**ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER, TO THE EXTENT NECESSARY, PURSUANT TO 11 U.S.C. § 363(b)(1) AUTHORIZING DEBTOR TO ENTER INTO RESIDENTIAL LEASES**<br><br>Date: September 2, 2009<br>Time: 10:00 a.m.<br>Place: Courtroom "303"<br>21041 Burbank Boulevard<br>Woodland Hills, California |

A hearing was held on September 2, 2009, at 10:00 a.m., before the Honorable Geraldine Mund, United States Bankruptcy Judge for the Central District of California, in Courtroom "303" located at 21041 Burbank Boulevard, Woodland Hills, California, to consider the

1

1  emergency motion (the "Motion") filed by Roosevelt Lofts, LLC, a Delaware limited liability

2  company (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11

3  bankruptcy case, for the entry of an order, pursuant to 11 U.S.C. § 363(b), authorizing the Debtor

4  to commence a program permitting the Debtor to enter into short-term residential leases under

5  the terms and conditions described in the Motion. Appearances at the hearing on the Motion

6  were made as set forth on the record of the Court.

7       The Court, having considered the Motion and all papers filed by the Debtor in support of

8  the Motion, and the oral arguments and statements of counsel made at the hearing on the Motion,

9  proper notice of the Motion and the hearing on the Motion having been provided, and good cause

10 appearing therefor,

11      IT IS HEREBY ORDERED AS FOLLOWS:

12      A.    The Motion is hereby granted in its entirety.

13      B.    The Debtor is hereby authorized to proceed with its leasing program for

14 residential units at the building located at 727 West 7th Street in Los Angeles, California , for

15 terms not to exceed one (1) year, and upon the terms and conditions set forth in the Motion.

16      C.    The ten-day stay of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure is

17 hereby waived.

18      IT IS SO ORDERED.

19                                 ###

20

21

22

23

24

25

26

27

28

2

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:10250 Constellation Blvd., Ste. 1700, Los Angeles, CA 90067

A true and correct of the foregoing document described as **ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER, TO THE EXTENT NECESSARY, PURSUANT TO 11 U.S.C. § 363(b)(1) AUTHORIZING DEBTOR TO ENTER INTO RESIDENTIAL LEASES** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On_____ _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served): On _____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September** ____, **2009** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

Hon. Geraldine Mund
United States Bankruptcy Court
21041 Burbank Blvd.
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September | , 2009 | Marguerite Hardin | /S/ Marguerite Hardin |
|-----------|--------|-------------------|-----------------------|
| *Date* | | *Type Name* | *Signature* |

3

| In re ROOSEVELT LOFTS, LLC | Chapter 11 |
| | Case No. 1:09-bk-14214-GM |
| Debtor(s). | |

### NOTE TO USERS OF THIS FORM:

**1)** Attach this form to the last page of a proposed Order or Judgment. Do not file as a separate document.

**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.

**3) Category I.** below: The United States trustee and case trustee (if any) will always be in this category.

**4) Category II.** below: List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. DO NOT list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled **ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER, TO THE EXTENT NECESSARY, PURSUANT TO 11 U.S.C. § 363(b)(1) AUTHORIZING DEBTOR TO ENTER INTO RESIDENTIAL LEASES** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **September _____, 2009** the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
- Helen R Frazer    hfrazer@aalrr.com
- Varand Gourjian    vg@gourjianlaw.com, lala@gourjianlaw.com
- Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com
- Herbert Hayden    herbert@ntlg.us
- Ian Landsberg    ilandsberg@lm-lawyers.com
- David L. Neale    dln@lnbrb.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- S Margaux Ross    margaux.ross@usdoj.gov
- Bruce D Rudman    bdr@agrlaw.net
- William D Schuster    bills@allieschuster.org
- Daniel H Slate    dslate@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;marcycarman@tilemlaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Marc Weinberg    marcweinberg@att.net
- Aimee Y Wong    aywong@mckennalong.com

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

None

4

III. **TO BE SERVED BY THE LODGING PARTY:** Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

None.

## DECLARATION OF DAVID L. NEALE, ESQ.

I, David L. Neale, Esq., hereby declare as follows:

1.     I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.     I am a partner of the law firm of Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB"). I am an attorney licensed to practice law in the State of California, in the United States District Court and the Bankruptcy Courts for the Southern, Central, Northern and Eastern Districts of California, and in the United States Court of Appeals for the Ninth Circuit.

3.     LNBRB is bankruptcy counsel for Roosevelt Lofts, LLC, debtor and debtor in possession herein (the "Debtor").

4.     I submit this declaration in support of the Debtor's motion for entry of an order authorizing the Debtor to commence a program permitting the Debtor to enter into short-term residential leases (the "Motion"), to which this declaration is attached. All capitalized terms not specifically defined herein shall have the same meanings ascribed to them in the Motion.

5.     LNBRB advised the Bank in mid-June 2009 of the interest expressed by prospective tenants in leasing units at the Building on a short term basis. Attached collectively as Exhibit "C" hereto are true and correct copies of correspondence exchanged between LNBRB and counsel for the Bank beginning on June 14, 2009 concerning the proposed leasing program contemplated by the Debtor. In response to my inquiry on June 14, 2009, counsel for the Bank responded with a request for an explanation of the parameters of the Debtor's proposed leasing program. See Exhibit "C-1" (Email from David L. Neale to Daniel H. Slate, Richard P. Ormond dated June 14, 2009 at 4:38 p.m.) and Exhibit "C-2" (Email from Daniel H. Slate to David L. Neale dated June 14, 2009 at 8:20 p.m).

6.     Thereafter, on June 16, 2009, I outlined the term of the proposed leasing program and advised counsel for the Bank that the proposed leases would (a) be for a term of no more than 12 months; (b) be at rental rates of no less than $2,000 per month (a floor but not a cap on the rent); (c) not be with any affiliates of the principals of the Debtor; and (d) not be with any

parties then subject to a current sale contract. See Exhibit "C-3" (Email from David L. Neale to Daniel H. Slate dated June 16, 2009 at 1:11 p.m.).

7.      Further emails concerning the proposed leasing program were subsequently exchanged by LNBRB and counsel for the Bank, and on June 19, 2009, counsel for the Bank advised me that the Bank was "not inclined to consent to any residential tenants at this time. See Exhibit "C-4" (Email from David L. Neale to Daniel H. Slate, Richard P. Ormond dated June 17, 2009 at 11:38 a.m., and Email from Daniel H. Slate to David L. Neale dated June 17, 2009 at 11:39 a.m.) and Exhibit "C-5" (Email from David L. Neale to Daniel H. Slate, Richard P. Ormond dated June 19, 2009 at 11:11 a.m., and Email from Daniel H. Slate to David L. Neale dated June 19, 2009 at 11:30 a.m.). It seems that the parties are at a decisionpoint, and opening the property to residential tenants would have an inappropriate impact on the decisionmaking process."[8] See Exhibit "C-5."

8.      Thereafter, on June 29, 2009, counsel for the Bank advised me that "the Bank Group is favorably inclined toward short term leasing, but before they would formally consent, they would like to review a proposed summary of the terms of the leases to be considered and the language of such proposed leases, which should include appropriate attornment language." See Exhibit "C-6" to "C-7" (Email from Daniel H. Slate to David L. Neale dated June 29, 2009 at 3:31 p.m.).[9]

9.      LNBRB and counsel for the Bank exchanged emails for the next few days concerning the proposed attornment language requested by the Bank to be included in the proposed leases. See Exhibit "C-6" to "C-11." On July 7, 2009, Ms. Oh forwarded to counsel for the Bank a copy of the proposed lease form to be used by the Debtor. See Exhibit "C-12" to "C-17" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond, Joshua L. Mogin dated July 7, 2009 at 4:07 p.m.). At that time, counsel for the Bank was advised that "[t]he Debtor has

---

[8] As noted above, the Bank previously opposed the Debtor's efforts to sell units in the Building. The Debtor's efforts to enter into leases for units at the Building was, in part, a response to the Bank's position that a decision on the sale of units also be deferred until a later date.

[9] As set forth above, the Debtor had previously advised the Bank of the proposed lease terms on June 16, 2009.

22

several tenants who are prepared to sign leases in relatively short order and the Debtor has an opportunity to run an ad in a publication in which Roosevelt Lofts is being voted as a top project (which the Debtor believes will attract new tenants), so time really is of the essence." See Exhibit "C-12."

10. On July 10, 2009, counsel for the Bank advised LNBRB of the terms under which the Bank would "consider" consenting to leasing of residential units by the Debtor. See Exhibit "C-18" (Email from Daniel H. Slate to David L. Neale, Juliet Y. Oh dated July 10, 2009 at 9:49 a.m.). Within hours of that email, Ms. Oh responded to the Bank's proposed terms and advised the Bank that the terms proposed were generally acceptable to the Debtor, and requested only minor adjustments. See Exhibit "C-19" (Email from Juliet Y. Oh to Daniel H. Slate dated July 10, 2009 at 12:01 p.m.). Additional information regarding the proposed rental rates was also provided to the Bank. See Exhibit "C-20" to "C-23" (Email from Juliet Y. Oh to Daniel H. Slate dated July 13, 2009 at 3:46 p.m.).

11. Over the next few days, Ms. Oh continued to attempt to obtain confirmation from counsel for the Bank that the Bank was prepared to consent to the terms of the Debtor's leasing program. See Exhibit "C-24" (Email from Juliet Y. Oh to Richard P. Ormond dated July 15, 2009 at 10:59 a.m.) and Exhibit "C-25" (Email from Juliet Y. Oh to Daniel H. Slate and Richard P. Ormond dated July 16, 2009 at 11:51 a.m.). Finally, on July 21, 2009, counsel for the Bank responded to the Debtor's inquiry concerning the Bank's consent to the leasing program by asking for additional information from the Debtor regarding the proposed lease rates and the residential leasing agent. See Exhibit "C-26" (Email from Daniel H. Slate to Juliet Y. Oh and David L. Neale dated July 21, 2009 at 8:22 a.m.).

///
///
///
///
///

23

1    12.    On August 20, 2009, I sent an email to counsel for the Bank to follow up on the

2    Debtor's proposed leases for 2 of the Units. See Exhibit "C-37" (Email from David L. Neale to

3    Daniel H. Slate dated August 20, 2009 at 3:25 p.m.)  As of the date and time I executed this

4    declaration, I have still received no response from counsel for the Bank regarding the proposed

5    leases.

6        I declare under penalty of perjury that the foregoing is true and correct.

7        Executed this 27th day of August, 2009, at Los Angeles, California.

8

9                                    David L. Neale, Esq., Declarant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

**DECLARATION OF JULIET Y. OH, ESQ.**

I, Juliet Y. Oh, Esq., hereby declare as follows:

1.     I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.     I am an attorney employed by the law firm of Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB"). I am an attorney licensed to practice law in the State of California, in the United States District Court and the Bankruptcy Courts for the Southern, Central, Northern and Eastern Districts of California, and in the United States Court of Appeals for the Ninth Circuit.

3.     LNBRB is bankruptcy counsel for Roosevelt Lofts, LLC, debtor and debtor in possession herein (the "Debtor").

4.     I submit this declaration in support of the Debtor's motion for entry of an order authorizing the Debtor to commence a program permitting the Debtor to enter into short-term residential leases (the "Motion"), to which this declaration is attached. All capitalized terms not specifically defined herein shall have the same meanings ascribed to them in the Motion.

5.     Attached collectively as Exhibit "C" hereto are true and correct copies of correspondence exchanged between LNBRB and counsel for the Bank beginning on June 14, 2009 concerning the proposed leasing program contemplated by the Debtor.

6.     Between June 29, 2009 and July 7, 2009, LNBRB and counsel for the Bank exchanged emails concerning the proposed attornment language requested by the Bank to be included in the proposed leases. See Exhibit "C-6" to "C-11." On July 7, 2009, I forwarded to counsel for the Bank a copy of the proposed lease form to be used by the Debtor. See Exhibit "C-12" to "C-17" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond, Joshua L. Mogin dated July 7, 2009 at 4:07 p.m.). At that time, counsel for the Bank was advised that "[t]he Debtor has several tenants who are prepared to sign leases in relatively short order and the Debtor has an opportunity to run an ad in a publication in which Roosevelt Lofts is being voted

1    as a top project (which the Debtor believes will attract new tenants), so time really is of the
2    essence." See Exhibit "C-12."

3        7.    On July 10, 2009, counsel for the Bank advised LNBRB of the terms under which
4    the Bank would "consider" consenting to leasing of residential units by the Debtor. See Exhibit
5    "C-18" (Email from Daniel H. Slate to David L. Neale, Juliet Y. Oh dated July 10, 2009 at 9:49
6    a.m.). Within hours of that email, 1 responded to the Bank's proposed terms and advised the
7    Bank that the terms proposed were generally acceptable to the Debtor, and requested only minor
8    adjustments. See Exhibit "C-19" (Email from Juliet Y. Oh to Daniel H. Slate dated July 10,
9    2009 at 12:01 p.m.). I also provided additional information regarding the proposed rental rates to
10   counsel for the Bank. See Exhibit "C-20" to "C-23" (Email from Juliet Y. Oh to Daniel H. Slate
11   dated July 13, 2009 at 3:46 p.m.).

12       8.    Over the next few days, I continued to attempt to obtain confirmation from
13   counsel for the Bank that the Bank was prepared to consent to the terms of the Debtor's leasing
14   program. See Exhibit "C-24" (Email from Juliet Y. Oh to Richard P. Ormond dated July 15,
15   2009 at 10:59 a.m.) and Exhibit "C-25" (Email from Juliet Y. Oh to Daniel H. Slate and Richard
16   P. Ormond dated July 16, 2009 at 11:51 a.m.). Finally, on July 21, 2009, counsel for the Bank
17   responded to the Debtor's inquiry concerning the Bank's consent to the leasing program by
18   asking for additional information from the Debtor regarding the proposed lease rates and the
19   residential leasing agent. See Exhibit "C-26" (Email from Daniel H. Slate to Juliet Y. Oh and
20   David L. Neale dated July 21, 2009 at 8:22 a.m.).

21       9.    In response to the Bank's additional requests for information, I provided
22   information concerning, among other things, the proposed residential leasing agent. See Exhibit
23   "C-27" to "C-28" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated July 24,
24   2009 at 5:24 p.m.). Almost a week went by with no word from counsel for the Bank, prompting
25   me to repeatedly inquire "[a]ny word from the Bank regarding … the residential leasing issue?"
26   See Exhibit "C-29" (Emails from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated July
27   29, 2009 at 9:43 a.m. and July 30, 2009 at 4:56 p.m.).

28

26

1    10.    Thereafter, I advised counsel for the Bank that there was a tenant ready to sign a
2    lease on Unit 504 in the Building upon the terms and conditions previously described to the Bank
3    and requested that the Bank at least consent to that single lease. I received no response from
4    counsel for the Bank, and, on August 14, 2009, I advised counsel for the Bank that "[u]nless we
5    can lock the prospective tenant down today, he is going to walk." See Exhibit "C-30" (Email
6    from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated August 14, 2009 at 9:37 a.m.).
7    The following day, counsel for the Bank advised me that he was to discuss the lease of Unit 504
8    with the Bank at 10:30 a.m. on that date and would then respond to the Debtor's inquiry. See
9    Exhibit "C-31" (Email from Richard P. Ormond to Juliet Y. Oh dated August 14, 2009 at 9:48
10   a.m.).

11   11.    Although counsel for the Bank eventually relayed the Bank's consent to the lease
12   of Unit 504, the Bank's consent came too late, after the prospective tenant had walked away.
13   Indeed, on August 17, 2009, I advised counsel for the Bank that "…the prospective tenant of
14   Unit 504 walked away on Friday [August 14, 2009] before we could get the lease signed." See
15   Exhibit "C-32" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated August
16   17, 2009 at 3:37 p.m.). At the same time, the Bank's counsel was advised that there were then
17   prospective tenants for units 314 and 616 in the Building that were prepared to sign a lease upon
18   the terms and conditions previously discussed with the Bank. See Exhibit "C-32" and Exhibit
19   "C-33" to "C-34" (Email from Juliet Y. Oh to Daniel H. Slate, Richard P. Ormond dated August
20   17, 2009 at 5:23 p.m., and Emails from Juliet Y. Oh to Daniel H. Slate dated August 18, 2009 at
21   11:25 a.m. and 11:33 a.m.). Again, counsel for the Bank was advised that "if we don't get back
22   to the prospective tenants today [August 18, 2009], they're going to walk." See Exhibit "C-33."

23   12.    In response to my inquiries, counsel for the Bank advised LNBRB that the Bank
24   believed that the "leasing process can be streamlined with a pre-approved set of leasing
25   guidelines…" See Exhibit "C-35" (Email from Joshua L. Mogin to Juliet Y. Oh, David L.
26   Neale, Ian Landsberg dated August 18, 2009 at 1:11 p.m.). The guidelines set forth by counsel
27   for the Bank were: (a) the approved form of a residential lease (previously provided to the Bank

28

27

1 on July 7, 2009); (b) a "pricing matrix" reflecting the proposed rents to be charged (previously
2 provided to the Bank on July 13, 2009); (c) a term ending not after June 30, 2010 (previously
3 suggested by the Debtor on July 10, 2009); and (d) a list of services available to each tenant. See
4 Exhibit "C-35."

5     13.     In response to the Bank's email, Mr. Neale wrote to counsel for the Bank pointing
6 out that the information requested by the Bank had already been provided and that there was a
7 high risk that further delay would jeopardize the Debtor's ability to enter into the proposed leases
8 for units 314 and 616. See Exhibit "C-36" (Email from David L. Neale to Joshua L. Mogin,
9 Juliet Y. Oh, Ian Landsberg dated August 18, 2009 at 1:22 p.m.). Mr. Neale followed up on this
10 by email to counsel for the Bank on August 20, 2009. See Exhibit "C-37" (Email from David L.
11 Neale to Daniel H. Slate dated August 20, 2009 at 3:25 p.m.) As of the date hereof, LNBRB has
12 still received no response from counsel for the Bank regarding the proposed leases.

13      I declare under penalty of perjury that the foregoing is true and correct.

14      Executed this 27th day of August, 2009, at Los Angeles, California.

15

16                                 Juliet Y. Oh, Esq., Declarant

17

18

19

20

21

22

23

24

25

26

27

28

28

# EXHIBIT C

## Juliet Y. Oh

| | |
|---|---|
| **From:** | DLN |
| **Sent:** | Sunday, June 14, 2009 4:38 PM |
| **To:** | 'dslate@buchalter.com'; 'rormond@buchalter.com' |
| **Subject:** | Residential Leases |
| **Importance:** | High |

Gentlemen: My client has been approached by potential residential tenants looking to enter into short term (i.e., 6 months or so) leases. Does the bank have any opposition to these leasing opportunities?

Please advise as soon as possible.

Thanks,

David

**DAVID L. NEALE**

**LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone No. (310) 229-1234
Telecopier No. (310) 229-1244

Email: dln@lnbrb.com

www.lnbrb.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The preceding E-mail message is subject to Levene, Neale, Bender, Rankin
& Brill L.L.P.'s email policies which may be found at http:/www.lnbrb.com/disclaimers.htm.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Slate, Daniel H. [mailto:dslate@buchalter.com]
**Sent:** Sunday, June 14, 2009 8:20 PM
**To:** DLN
**Cc:** Ormond, Richard P.
**Subject:** RE: Residential Leases

We will get back to you, but I am confident that the Bank Group will want additional information. Can you confirm under what parameters the Debtor would propose to rent? Are any of the potential residential tenants parties to the purchase and sale agreements or otherwise a likely potential buyer? Any of them at all affiliated with the Debtor? Can you provide a rent schedule?

---

**From:** DLN [mailto:DLN@lnbrb.com]
**Sent:** Sunday, June 14, 2009 4:38 PM
**To:** Slate, Daniel H.; Ormond, Richard P.
**Subject:** Residential Leases

Gentlemen: My client has been approached by potential residential tenants looking to enter into short term (i.e., 6 months or so) leases. Does the bank have any opposition to these leasing opportunities?

Please advise as soon as possible.

Thanks,

David

**DAVID L. NEALE**

**LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone No. (310) 229-1234
Telecopier No. (310) 229-1244

Email: dln@lnbrb.com

www.lnbrb.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The preceding E-mail message is subject to Levene, Neale, Bender, Rankin & Brill L.L.P.'s email policies which may be found at http://www.lnbrb.com/disclaimers.htm.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Juliet Y. Oh

**From:** DLN

**Sent:** Tuesday, June 16, 2009 1:11 PM

**To:** 'Slate, Daniel H.'

**Cc:** Ormond, Richard P.

**Subject:** RE: Residential Leases

I wanted to get back to you about the residential leases. The basic terms my client would be offering would be:

(1)     a term of no more than 12 months

(2)     rent of not less than $2,000 per month

(3)     none of the renters would be affiliates of any of the principals of the Debtor

(4)     none of the proposed renters would currently be parties to a sale contract

Please let us know whether the bank will consent to additional residential leases on these material terms. We have previously provided the existing residential rent roll, and we can get you an updated one if these leases are approved.

We look forward to the bank's prompt response.

Regards,

David

David L. Neale

Levene, Neale, Bender, Rankin & Brill L.L.P.

=====================================

The preceding email message is subject to Levene, Neale, Bender, Rankin & Brill L.L.P.'s email policies which can be found at http://www.lnbrb.com/disclaimers.htm

(♻) Please consider the environment before printing this email

## Juliet Y. Oh

**From:** Slate, Daniel H. [dslate@buchalter.com]

**Sent:** Wednesday, June 17, 2009 11:39 AM

**To:** DLN; Ormond, Richard P.

**Cc:** Juliet Y. Oh

**Subject:** RE: Residential Leases

Client contact is out until tomorrow, so I will respond then

---

**From:** DLN [mailto:DLN@lnbrb.com]
**Sent:** Wednesday, June 17, 2009 11:38 AM
**To:** Slate, Daniel H.; Ormond, Richard P.
**Cc:** Juliet Y. Oh
**Subject:** Residential Leases

Dan and Richard – any word from the bank on the residential leases I inquired about? The renters are very interested in going forward.

Regards,

David

**DAVID L. NEALE**
**LEVENE, NEALE, BENDER, RANKIN & BRILL. L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone No. (310) 229-1234
Telecopier No. (310) 229-1244
Email: dln@lnbrb.com
www.lnbrb.com
**************************************************
The preceding E-mail message is subject to Levene, Neale, Bender, Rankin & Brill L.L.P.'s
email policies which can be found at http://www.lnbrb.com/disclaimers.htm.
**************************************************

 Please consider the environment before printing this email

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php? option=com_content&task=view&id=151&Itemid=129.

## Juliet Y. Oh

**From:** Slate, Daniel H. [dslate@buchalter.com]

**Sent:** Friday, June 19, 2009 11:30 AM

**To:** DLN; Ormond, Richard P.

**Cc:** Juliet Y. Oh; Landsberg, Ian

**Subject:** RE: Leases

The Bank has determined it is not inclined to consent to any residential tenants at this time. It seems that the parties are at a decisionpoint, and opening the property to residential tenants would have an inappropriate impact on the decisionmaking process. The decision might be different if next week's meeting had occurred, we had all decided on a course for maximizing asset value, and opening the property to residential tenants was consistent with that course.

**From:** DLN [mailto:DLN@lnbrb.com]
**Sent:** Friday, June 19, 2009 11:11 AM
**To:** Ormond, Richard P.; Slate, Daniel H.
**Cc:** Juliet Y. Oh; Landsberg, Ian
**Subject:** Leases

Richard and Dan – you had said that the person with decision-making authority concerning the proposed short term leases for the property was out of the office until yesterday. Has that person returned, and do you have an answer for us about the leases? Obviously, we would like not to lose any prospective tenants and need to proceed as quickly as possible.

Regards,

David

**DAVID L. NEALE**
**LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone No. (310) 229-1234
Telecopier No. (310) 229-1244
Email: dln@lnbrb.com
www.lnbrb.com
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The preceding E-mail message is subject to Levene, Neale, Bender, Rankin & Brill L.L.P.'s email policies which can be found at http://www.lnbrb.com/disclaimers.htm.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please consider the environment before printing this email

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review,

C-5

## Juliet Y. Oh

**From:** DLN

**Sent:** Monday, June 29, 2009 4:48 PM

**To:** 'Slate, Daniel H.'

**Cc:** Ormond, Richard P.; Mogin, Joshua L.; Landsberg, Ian

**Subject:** RE: Roosevelt

Dan – can you send the attornment language the bank would want us to include in the leases? In terms of control of cash, I assume you're referring to a cash collateral stipulation, correct?

At this point, since we are coming up on the holiday weekend, would the bank be amenable to a stipulation that you will refrain from proceeding under § 362(d)(3) for 60 days? If so, we can prepare a stipulation to that effect and try to have it on file before the 90 days expires.

Regards,
David

```
David L. Neale
Levene, Neale, Bender, Rankin & Brill L.L.P.
=====================================
The preceding email message is subject to Levene, Neale, Bender,
Rankin & Brill L.L.P.'s email policies which can be found at
http://www.lnbrb.com/disclaimers.htm
```
⟳ Please consider the environment before printing this email

**From:** Slate, Daniel H. [mailto:dslate@buchalter.com]
**Sent:** Monday, June 29, 2009 3:31 PM
**To:** DLN
**Cc:** Jackson, Margaret J; Swenson, Ken -Legal; Ormond, Richard P.; Mogin, Joshua L.; Landsberg, Ian
**Subject:** Roosevelt

David:

This responds to your requests in Friday's meeting for the following: (i) the Bank Group's sense of leasing those units that the Debtor says are complete; (ii) to what extent the Bank Group is willing to consider lending funds to the Debtor to fund the projected costs to complete; and (iii) whether the Bank Group will consent to extending the time period under section 362(d)(3).

As to the first issue, the Bank Group is favorably inclined toward short term leasing, but before they would formally consent, they would like to review a proposed summary of the terms of the leases to be considered and the language of such proposed leases, which should include appropriate attornment language. Let me know if you want to review the language the Bank Group would require. In addition, the Bank Group would require careful controls over the cash.

As to the second issue, as I advised you in our meeting, any additional loan to the Debtor would have to meet the underwriting requirements of the members of the Bank Group. Before the Bank Group can say one way or another on this issue, they will need updated, and detailed financial statements, confirmation of

C-6

title, substantiation of valuations, and an understanding of the scope and nature of any current debt. Attached are financial affidavits along the lines the Bank Group would require. Let me know when that information is available.

As to the third issue, assuming that the parties continue to work to resolve the first two issues in relatively short order, the Bank Group would not object to a short extension.

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php? option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.**

## Juliet Y. Oh

**From:** Slate, Daniel H. [dslate@buchalter.com]
**Sent:** Wednesday, July 01, 2009 5:11 PM
**To:** DLN; Juliet Y. Oh
**Cc:** Mogin, Joshua L.; Ormond, Richard P.
**Subject:** Roosevelt

Proposed non-attornment language:

Tenant acknowledges that Bank of America, N.A., is the administrative agent ("BANA") in connection with a loan (the "Loan") made to The Roosevelt Lofts, LLC ("Borrower") for the construction of a mixed use commercial/residential project at 727 W. 7th Street, Los Angeles, California (the "Property"). Tenant agrees that the Lease, and all estates, options and rights created under the Lease, hereby are subordinated and made subject to the lien of the security instrument (the Security Instrument") made by Borrower in favor of BANA in connection with the Loan.

Tenant acknowledges that BANA may acquire legal title to the Property by foreclosure (whether judicial or nonjudicial) of the Security Instrument.

Tenant agrees that, in the event of a foreclosure of the Security Instrument by BANA or the acceptance of a deed in lieu of foreclosure by BANA or any other succession of BANA, its designees, successors or assigns, to fee ownership (a "Foreclosure Event"), Tenant's rights under the Lease shall terminate and, as of the date of any Foreclosure Event, the Lease shall be null and void.

Tenant shall vacate the [Premises] not later than seven (7) days after receipt of notice that a Foreclosure Event has occurred.

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.**

### Juliet Y. ~~Oh~~

**From:** Juliet Y. Oh
**Sent:** Tuesday, July 07, 2009 12:31 PM
**To:** 'Slate, Daniel H.'
**Cc:** Mogin, Joshua L.; Ormond, Richard P.; DLN
**Subject:** RE: Roosevelt

Dan,

The Debtors propose the following changes to the non-attornment language (redlined and clean versions of the proposed revised language are set forth below).

Redlined version
Tenant acknowledges that Roosevelt Lofts, LLC (the "Landlord") has obtained a construction loan in connection with the development of the building located at 727 W. 7th Street, Los Angeles, California (the "Building") from Bank of America, N.A., as ~~is the~~ administrative agent ~~("BANA")~~ (the "Lender"), ~~in connection with a loan (the "Loan") made to The Roosevelt Lofts, LLC ("Borrower") for the construction of a mixed-use commercial/residential project at 727 W. 7th Street, Los Angeles, California (the "Property"),~~ and that this

~~Tenant agrees that the~~ Lease (~~,~~ and all estates, options and rights created under the Lease) is intended to be subordinate to the Lender's interest in the Building. ~~, hereby are subordinated and made subject to the lien of the security instrument (the "Security Instrument") made by Borrower in favor of BANA in connection with the Loan.~~

~~Tenant acknowledges that BANA may acquire legal title to the Property by foreclosure (whether judicial or nonjudicial) of the Security Instrument.~~

Tenant agrees that, in the event that Lender acquires legal title to the Property by ~~of a~~ foreclosure ~~of the Security Instrument by BANA,~~ whether judicial or nonjudicial, or by ~~the~~ acceptance of a deed in lieu of foreclosure ~~by BANA or any other succession of BANA, its designees, successors or assigns, to fee ownership~~ (a "Foreclosure Event"), then Tenant's rights under the Lease shall terminate, and~~, as of the date of any Foreclosure Event, the~~ this Lease shall be deemed to be null and void. After termination of this Lease due to a Foreclosure Event,

Tenant shall vacate the ~~[Premises]~~ within thirty (30) days ~~not later than seven (7) days~~ after receipt of written notice from the Lender (with proof of the same) that a Foreclosure Event has occurred.

Clean version:

Tenant acknowledges that Roosevelt Lofts, LLC (the "Landlord") has obtained a construction loan in connection with the development of the building located at 727 W. 7th Street, Los Angeles, California (the "Building") from Bank of America, N.A., as (the "Lender"), and that this Lease (and all estates,

C-9

options and rights created under the Lease) is intended to be subordinate to the Lender's interest in the Building. Tenant agrees that, in the event that Lender acquires legal title to the Property by foreclosure, whether judicial or nonjudicial, or by acceptance of a deed in lieu of foreclosure (a "Foreclosure Event"), then Tenant's rights under the Lease shall terminate, and this Lease shall be deemed to be null and void. After termination of this Lease due to a Foreclosure Event, Tenant shall vacate the Premises within thirty (30) days after receipt of written notice from the Lender (with proof of the same) that a Foreclosure Event has occurred.

Please let us know if the foregoing changes are acceptable to the Bank. Thanks.

## Juliet Y. Oh

**From:** Mogin, Joshua L. [jmogin@buchalter.com]

**Sent:** Tuesday, July 07, 2009 1:39 PM

**To:** Juliet Y. Oh; Slate, Daniel H.

**Cc:** Ormond, Richard P.; DLN

**Subject:** RE: Roosevelt

Juliet:

The changes are fine except for the change to the subordination language. The lease is subordinate in priority and, in the event there is any question, the tenant is agreeing to subordinate the lease. The "intention" language is ambiguous and not really standard for leases.

Please let me know if you have any questions.

*Joshua Mogin*
*Shareholder*
**BuchalterNemer**, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500 | Los Angeles, CA 90017-2457
Direct Dial: (213) 891-5045 | Cell Phone: (323) 376-3012 | Direct Fax: (213) 630-5707 | Switchboard: (213) 891-0700
Email: jmogin@buchalter.com | www.buchalter.com

## Juliet Y. Oh

| | |
|---|---|
| **From:** | Juliet Y. Oh |
| **Sent:** | Tuesday, July 07, 2009 4:07 PM |
| **To:** | 'Slate, Daniel H.'; Ormond, Richard P.; Mogin, Joshua L. |
| **Cc:** | DLN |
| **Subject:** | Roosevelt - Short-Term Residential Leasing |
| **Attachments:** | Lease (Residential) - Roosevelt (form).pdf |

Dan, Richard and Joshua,

Please find attached the form lease agreement that the Debtor intends to use in connection with any new short-term residential leases. As you will see, the attornment language we discussed is incorporated in section 17 of the lease agreement. The basic terms that the Debtor would be offering to new tenants would be (A) a term of no more than 12 months, and (B) rent of not less than $2,000 per month. Please let us know whether the Bank will consent to short-term residential leases on the foregoing terms.

Dan had previously indicated that the Bank would require careful controls over the cash generated by the rental of the units. If the Bank is agreeable, perhaps the best way to document the parties' agreement is by way of a stipulation which provides the Debtor with authority to enter into short-term residential leases (under the terms set forth above) and provides for controls over the rent proceeds. If you let me know what controls the Bank is looking for, I can go ahead and prepare a short stipulation, or you can prepare the stipulation if that's what you'd prefer.

In the meantime, we would appreciate a prompt response from the Bank about whether it will consent to the short-term residential leases. The Debtor has several tenants who are prepared to sign leases in relatively short order and the Debtor has an opportunity to run an ad in a publication in which Roosevelt Lofts is being voted as a top project (which the Debtor believes will attract new tenants), so time really is of the essence. Thanks.

Regards,
Juliet

Juliet Y. Oh
Levene, Neale, Bender, Rankin & Brill L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Direct Dial No. (310) 229-3348
Main Tel. No. (310) 229-1234
Telecopier No. (310) 229-1244
Email: JYO@LNBRB.com

The preceding e-mail message is subject to Levene, Neale, Bender, Rankin & Brill L.L.P.'s e-mail policies which can be found at http://www/lnbrb.com/disclaimers.html.

# Residential Lease Agreement

This RESIDENTIAL LEASE AGREEMENT (hereinafter referred to as the "Agreement"), is dated, (for reference purposes), as of _____ --- **Date** --- _____ by and between _____ --- **ROOSEVELT LOFTS, LLC, a Delaware limited liability company, through MILBANK REAL ESTATE SERVICES, INC. as its authorized agent and manager** --- _____ (the "Landlord"), and _____ --- **Name Information** --- (the ""Tenant").

1.    **Property.** By this Agreement, Landlord agrees to rent to Tenant, and Tenant agrees to rent from Landlord, that certain real and improved residential property commonly known as and located at:

        --- **727 West Seventh Street, Unit 图, Los Angeles, California 90017** --- _____ (the "Premises").

2.    **Rent / Term.** In consideration of Tenant's lease of the Premises from the Landlord, Tenant agrees to pay rent in the monthly amount of _-- **$ [amount]** -- _ per month, which is due to the Landlord in advance, on the _____ --- **First** --- day of each calendar month during the term of this Agreement. The term of the lease provided by for by this Agreement shall be on a month to month basis (the "Term"), commencing as of _____ --- **Date** --- _____ (the "Commencement Date"), and automatically terminate after thirty (30) days advance written notice by Landlord or Tenant to the other (the Termination Date").  The Rent must be received by Landlord on the day of the month as indicated herein, and may be in the form of a personal check, provided that no personal check is returned by the bank for insufficient funds, no stop payment is placed on any check, or any other reason other than a bank error verified by the bank in writing, which would not allow for the negotiation of such funds on the date received by the Landlord. Rent for the first month shall be prorated, and payable in the sum of _ --- **$ [amount]** --- _____ upon execution of this Agreement.

3.    **Security Deposit.** Upon execution of this Agreement by Tenant, Tenant shall concurrently herewith deliver the additional sum of _____ --- **$ [amount]** --- _ to the Landlord as a security for any damages to the Premises, or to secure the obligations owed by Tenant to Landlord under this Agreement (the "Security Deposit").  Landlord may use all or any portion of the Security Deposit, as Landlord deems reasonably necessary in its sole discretion, in order to (at minimum):  (a) cure any default by Tenant with respect to the payment of Rent (including any late charges, attorneys' fees, etc.) or other amounts due under or pursuant to the Agreement;  (b) repair any damages to the Premises caused or related to the Tenant's (or Tenant's guest(s), licensee(s), or invitee(s)) use of the Premises;  (c) clean the Premises or make alterations or repairs requested by Tenant which are not otherwise the responsibility of the Landlord;  (d) pay any fines imposed by the homeowner's association in connection with Tenant's (or Tenant's guest(s), licensee(s), or invitee(s)) use of the Premises or community areas;  (e) pay for the cost of repair or replacement of any appurtenances, keys, controls, or other items which have been delivered to Tenant in connection with the use and occupancy of the Premises, mailbox, or other common areas within the community;  or (f) make any repairs, clean, or otherwise compensate Landlord for any costs or expenses incurred by Landlord in order to bring the Premises to at least the same condition as it was when originally delivered to Tenant at the Commencement Date.  The Security Deposit may not be used by unilaterally by Tenant for any purpose, including without limitation, the payment of Rent, (including the last month's Rent).  Landlord shall return the Security Deposit to Tenant after Tenant has vacated the Premises, provided that Landlord is not otherwise entitled to make any deductions from the Security Deposit based upon the condition of the Premises at such time, or other necessary deduction(s) for amounts which Tenant owes under this Agreement.

4.    **Permitted Use of Premises.** The Premises shall only be used and occupied by the Tenant(s) named herein, exclusively, as a private single family dwelling.  Tenant agrees and acknowledges that no part of the Premises shall be used at any time by Tenant for the purpose of carrying on any business, profession, trade of any kind, unlawful activity, or for any purpose other than as a private single family dwelling.  Tenant shall not allow any other person(s), other than Tenant's immediate family or transient relative(s) or friend(s) who are temporary guests of Tenant, to use or occupy the Premises or any of the common areas of the community, without first obtaining Landlord's advance written consent to such use.  Tenant shall comply with any and all local, state, and federal laws, ordinances, rules and orders of any and all governmental or quasi-governmental authorities affecting the cleanliness, use, occupancy and preservation of the Premises, including without limitation, any rules or regulations set forth by the homeowner's association for the community, or other programs affecting the neighborhood. Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other neighbors, residents, patrons, guests, invitees or licensees of the Premises, neighborhood, or community, or otherwise injure or annoy them, or use or allow the Premises to be used, for any improper, immoral, unlawful or objectionable purpose.  Tenant shall not cause, maintain, or permit any form of objectionable or intolerable noise, smell, odor, act, obstruction, or any other form of nuisance in, on, or about the Premises. Tenant shall not commit or suffer to be committed any waste in or upon the Premises and shall keep the Premises in first class repair and appearance.

5.    **Items Provided to Tenant by Landlord.** Concurrent with the execution of this Agreement by both Landlord and Tenant, Tenant acknowledges the receipt of the following items:

     __**2**___ key(s) to the Premises;

     __**2**___ key(s) to the mailbox;

_0_ key(s) to the common areas of the community (i.e., pool, etc).; and

_0_ remote control device(s) for the garage door to the Premises.

If any of the foregoing items are lost, damaged, or not returned to the Landlord upon the termination of the Agreement, and need to be replaced by the Landlord, Tenant shall be charged $25.00 for each key to the Premises or mailbox, $75.00 for each key to the common areas of the community (i.e., pool, etc.), and $85.00 for each remote control. Tenant shall also bear the cost of any locksmith, technician, or similar services which may be needed in order to repair or replace any of the foregoing items. Tenant does not have the right to install any form of additional locking device upon the Premises without the Landlord's advance written consent, which may withheld at Landlord's sole discretion (but if such consent is given, shall at minimum require that Tenant provide Landlord with at least one complete set of all keys relating to such locking device). Tenant may not change the locks or keys to any of the doors or access points to the Premises without: (a) first obtaining the Landlord's advance written consent; and (b) providing the Landlord with at least one complete set of all keys relating to all such locks to the Premises.

6. **Condition of Premises**. Tenant acknowledges and represents that Tenant has had the opportunity, and has in fact, fully and completely examined the Premises, and that the Premises and all appurtenances are in good order, repair, and working condition as of the execution of this Agreement. Tenant further acknowledges that the Premises is part of a newly constructed development and that all items are brand new, including the appliances, paint, carpet, tiles, and other fixtures throughout. Tenant further acknowledges that as a result of the Premises being part of a newly built project, certain aspects of the Premises, building, and/or common areas may not be functioning at optimal performance, or at all, and that in connection with such conditions, Tenant has been advised of the same and has nonetheless agreed to accept the Premises in its AS-IS condition, which is also reflected in the Rent payable by Tenant. Tenant shall maintain, and keep in good working order, all appliances, fixtures, and other appurtenances throughout the Premises, during Tenant's use and occupancy of the Premises under this Agreement. Tenant shall be responsible to bear the cost of maintenance and repair(s) for any appurtenance or other item related to the Premises, up to the first $250.00 per occurrence. Provided that the cause of any disrepair is not a result of Tenant's (or Tenant's guest(s), licensee(s), or invitee(s)) negligence, Landlord shall pay for the cost of repair or maintenance of such item in excess of $250.00.

7. **Alterations and Improvements**. Tenant shall not make any alterations or improvements to the Premises or building, or engage in any form of construction in, on, or about the Premises or the building without the prior written consent of Landlord, which may be withheld at Landlord's sole discretion. Any and all alterations, changes, or improvements built, constructed, or placed on the Premises or building by Tenant, shall, unless otherwise provided by written agreement between Landlord and Tenant, be and become a part of the Premises, the property of Landlord, and remain on the Premises at the expiration or earlier termination of this Agreement, regardless of whether such alterations, changes, or improvements are permanent, removable, or performed without the Landlord's consent.

8. **Utilities**. Tenant shall be responsible for arranging for and paying for all utility services required on the Premises, including without limitation, electricity, water, gas, telephone, cable, and internet services (the "Utility Services"). All Utility Services shall be in the name of the Tenant only, and Landlord shall have no responsibility to provide, service, or pay for any Utility Services. In the event that some utilities of the building are billed to Landlord, then Tenant shall promptly reimburse Landlord for the cost of the same within five (5) days after demand therefor.

9. **Maintenance and Repair**. Tenant shall properly use, operate, maintain, and safeguard the Premises, all appliances, fixtures, and appurtenances in a good and sanitary condition, and make the repairs required under this Agreement. Tenant shall immediately notify the Landlord of any damage, and shall pay for all repairs or replacements caused by Tenant (or Tenant's guest(s), licensee(s), or invitee(s)), excluding items of ordinary wear and tear. Without limiting the generality of the foregoing, Tenant shall:

(a) Not obstruct the driveways, sidewalks, courts, entry ways, stairs or halls, which shall be used for the purposes of ingress and egress only, or otherwise cause or create any form of safety hazard;

(b) Keep all windows, glass, window coverings, doors, locks and hardware in good, clean order and repair;

(c) Not obstruct or cover the windows, doors, or balcony;

(d) Not leave windows or doors in an open position during any inclement weather, and to keep them locked and closed when Tenant is not physically present within the Premises;

(e) Not hang any laundry, clothing, sheets, etc. from any window, rail, porch or balcony nor air or dry any of same within any yard area or space;

(f) Not cause or permit any locks or hooks to be placed upon any door or window without the prior written consent of Landlord, which may be withheld by Landlord at its sole discretion;

(g) Keep all lavatories, sinks, toilets, and all other water and plumbing apparatus in good order and repair and shall use same only for the purposes for which they were constructed. Tenant shall

not allow any oil, sweepings, rubbish, sand, rags, ashes or other substances to be thrown or deposited therein. Any damage to any such apparatus and the cost of clearing stopped plumbing resulting from misuse shall be borne by Tenant;

(h)     Tenant's family and guests shall at all times maintain order in the Premises and at all places on the Premises and the common community areas, and shall not make or permit any loud or improper noises, or otherwise disturb other residents, the neighbors, or other members of the community;

(i)     Keep all radios, television sets, stereos, phonographs, computers, etc., turned down to a level of sound that does not annoy or interfere with other residents, neighbors, or other members of the community;

(j)     Deposit all trash, garbage, rubbish or refuse in the locations provided therefor, and not allow any trash, garbage, rubbish or refuse to be deposited or permitted to stand within the Premises, on the exterior of any building, or within any common areas of the community, for any period of time longer than what would be deemed as sanitary or otherwise cause intolerable odors to be emitted therefrom;

(k)     Abide by and be bound by any and all rules and regulations affecting the Premises or the common area appurtenant thereto which may be adopted or promulgated by the Condominium or Homeowners' Association having control over them.

10.     **Insurance.** Tenant shall, upon its own discretion, pay for and maintain any and all types of insurance coverage which Tenant shall deem necessary to cover the replacement value (as if new, and without any deduction for use or wear) of any and all personal property or other items which Tenant may keep, store, or use in, about, or within the Premises and surrounding community, which may be damaged for any reason whatsoever, including without limitation, earthquake, fire, wind, rain, flooding, leakage, seepage, plumbing problems, electrical problems, vandalism, riot, acts of God, war, terrorist activity, or otherwise, regardless of whether the cause of such damages is attributable to the Landlord, Landlord's negligence, possible defect(s), or the acts of any of Landlord's agents, representatives, or other third party, person, or entity. TENANT HEREBY EXPRESSLY ACKNOWLEDGES AND UNDERSTANDS THAT LANDLORD SHALL NOT BE LIABLE FOR ANY DAMAGE OR INJURY CAUSED OR SUFFERED BY TENANT OR TENANT'S GUEST(S), LICENSEE(S), OR INVITEE(S), REGARDLESS OF NATURE, CAUSE, OR ORIGIN, IN, ON, OR ABOUT THE PREMISES, NEIGHBORHOOD, OR COMMON AREAS OF THE COMMUNITY. IT IS TENANT'S SOLE RESPONSIBILITY AND OBLIGATION TO ENSURE THAT ANY AND ALL DAMAGES WHICH TENANT (OR TENANT'S GUEST(S), LICENSEE(S), OR INVITEE(S)) MAY CAUSE OR SUFFER IS COVERED UNDER AN APPROPRIATE INSURANCE POLICY.

11.     **Indemnification.** Without limiting the generality of any other provision in this Agreement, Tenant agrees and acknowledges that Landlord shall not be liable for any damage or injury of or to the Tenant, Tenant's family, guests, invitees, agents or employees or to any person entering or leaving the Premises, the building of which the Premises are a part, or the common areas of the community, or to goods or equipment, or in the structure or equipment of the structure of which the Premises are a part, and that Tenant shall indemnify, defend and hold Landlord harmless from any and all claims or assertions of every kind and nature which may be asserted against the Landlord.

12.     **Inspection of the Premises.** Landlord and Landlord's agents shall have the right, at all reasonable times, or as otherwise specifically requested by Tenant, during the term of this Agreement and any renewal thereof, to enter the Premises for the purpose of inspecting the Premises and all appurtenances, buildings, or improvements thereon. Landlord shall also have the right, at all reasonable times, or as otherwise specifically requested by Tenant, (or on an emergency basis, at any time), to enter the Premises for the purposes of making any repairs, additions or alterations as may be deemed appropriate by Landlord for the preservation of the Premises or the building. At least three hours notice by Landlord to Tenant, (from the time of any telephone call, facsimile, or email), shall be deemed reasonable for the purposes of this section. Tenant acknowledges and agrees that Landlord's entry upon the Premises in connection with the foregoing reasons, even if Tenant refuses to give Landlord access or Tenant is not present at the time of Landlord's entry, shall not be deemed as a forceable entry, interference with Tenant's right to quiet enjoyment, or violative of any law, rule, regulation, or other civil right which Tenant may otherwise have. Landlord and its agents shall further have the right to exhibit the Premises and to display the usual "for sale", "for rent" or "vacancy" signs on the Premises. Landlord's right of entry upon the Premises shall likewise exist for the purpose of showing the Premises to prospective renters or buyers, removing placards, signs, fixtures, alterations or additions that do not conform to terms of this Agreement, or to any restrictions, rules, or regulations affecting the Premises or otherwise enforceable under this Agreement.

13.     **Assignment / Subletting / Occupants.** Tenant shall not have the right to, and agrees not to, assign this Agreement or the rights and obligations created hereby, or to sub-let or grant any license to use the Premises or any part thereof without the prior written consent of Landlord, which may be withheld by Landlord at Landlord's sole discretion. If Landlord agrees to giving Tenant consent to one such assignment, sub-letting, or license, such consent shall not be deemed to be a consent to any subsequent assignment, sub-letting, or license. An assignment, sub-letting, or license without the prior written consent of Landlord or an assignment (or sub-letting by operation of law) shall be absolutely null and void and shall, and at Landlord's option, Landlord may terminate this Agreement and require that Tenant, sub-tenant, assignee, licensee, or other person(s), to vacate the Premises after 30 days notice. Any assignment or sub-letting permitted by the Landlord shall only be effectual if in a writing signed by the Landlord, Tenant, and assignee or sub-lettee, in which case, the

Tenant shall remain jointly and severally liable for the terms, conditions, and obligations created by this Agreement along with such assignee or sub-lettee. The occupants of the Premises shall be limited to the named Tenant, who shall use the Premises and its amenities solely for housing accommodations and for no other purpose. No other person shall have any right to access, residence, or use of the Premises or building amenities without the Landlord's advance written consent, which may be refused or conditioned, in Landlord's sole and absolute discretion. Tenant acknowledges that the HOA, CC&Rs and applicable Rules and Regulations affecting the Premises have substantial restrictions related to the Premises and building, and in connection therewith, Tenant has read and understands all such restrictions, agreeing to comply with them at all times during the term of this Lease. Tenant shall be personally responsible and liable for any and all activity resulting from use of the Premises or building by any guest, invitee, or licensee of Tenant

14.     **Abandonment**. If at any time during the term of this Agreement or any renewal thereof, Tenant abandons or vacates the Premises prior to the full completion of the Term of the Agreement or any subsequent renewal, Landlord may, at Landlord's option, regain legal possession of the Premises by no later than five days of providing Tenant with written notice that Landlord believes that Tenant has abandoned or vacated the Premises. Tenant's failure to respond to the notice to be provided by Landlord within the five days, by addressing all questions or concerns contained in the notice, (which must be done in writing and sent to the Landlord via personal delivery or certified U.S. Mail), shall serve as conclusive evidence of the fact that Tenant has abandoned and vacated the property. The remaining balance of rent due under this Agreement shall then become immediately due. Landlord may, at Landlord's discretion, as agent for Tenant, enter upon the Premises, change the locks, begin cleaning or repairs, and proceed with whatever steps may be necessary in order to relet the Premises. Landlord shall be entitled to collect all rent payable by virtue of such reletting, and, at Landlord's option, hold Tenant liable for any difference between the rent that would have been payable under this Agreement during the balance of the unexpired term, if this Agreement had continued in force, and the net rent for such period realized by Landlord by means of such reletting. If Landlord's right of reentry is exercised following abandonment of the Premises by Tenant, then Landlord shall consider any personal property belonging to Tenant or left upon or within the Premises to also have been abandoned, in which case Landlord may dispose of all such personal property in any manner Landlord shall deem proper, regardless of actual or estimated value thereof. Tenant hereby expressly agrees that in such an event, Landlord will be released and relieved of any and all liability for taking such actions, and that Tenant waives any rights which may otherwise be provided to Tenant by law or equity with respect to Landlord's proposed actions, time constraints, or otherwise.

15.     **Holdover**. If Tenant remains in possession of the Premises after the Termination Date, without the advance written consent of the Landlord, then Tenant shall be deemed a tenant-at-sufferance. Tenant acknowledges that Landlord has no obligation to renew the lease contemplated by this Agreement with Tenant, and that Landlord is not required to give Tenant any form of advance notice advising Tenant of the termination of the Term of this Agreement, or that if Tenant remains in possession of the Premises after the Termination Date, that Tenant will be required to pay the holdover rent. Tenant agrees to pay to Landlord, holdover rent at the rate of $▓▓▓▓▓▓▓▓ per month (the "Holdover Rent"). TENANT EXPRESSLY ACKNOWLEDGES THAT THE ACCEPTANCE BY THE LANDLORD OF ANY LESSER AMOUNT FOR RENT DURING THE PERIOD THAT TENANT IS A TENANT-AT-SUFFERANCE, SHALL NOT AFFECT THE FACT THAT TENANT SHALL REMAIN A TENANT-AT-SUFFERANCE, AND THAT LANDLORD EXPRESSLY RESERVES THE RIGHT TO COLLECT THE BALANCE OF THE HOLDOVER RENT PROVIDED FOR IN THIS AGREEMENT, CANCEL THE AGREEMENT AT ANY TIME AFTER PROPER NOTICE, AND SHALL NOT BE CONSTRUED AS CREATING AN ACCOUNT STATED BETWEEN LANDLORD AND TENANT AS TO THE AMOUNT OF THE LESSER AMOUNT OF RENT DUE AND OWING DURING THE HOLDOVER PERIOD. The foregoing provisions of this Paragraph are in addition to and do not affect Landlord's rights to cancel this Agreement after the Termination Date, or any other legal or equitable rights of the Landlord hereunder, or as otherwise provided by law.

16.     **Waiver of Rights**. Without limiting any provision contained herein, Tenant expressly agrees that it has and will waive any rights it may have in accordance with any law or statute which would provide for remedies to the contrary of what is provided in this Agreement. Landlord's failure or reluctance to enforce or observe a default, or any of the specific terms and conditions of this Agreement, shall not serve as a waiver or continuing waiver of the Landlord's right to enforce or implement any term or condition of this Agreement, or to later declare a default hereunder.

17.     **Subordination / Attornment**. Tenant acknowledges that Landlord has obtained a construction loan in connection with the development of the building located at 727 W. 7th Street, Los Angeles, California (the "Building") from Bank of America, N.A., as (the "Lender"), and that this Agreement (and all estates, options and rights created under this Agreement) is intended to be subordinate to the Lender's interest in the Building and Premises. Tenant agrees that, in the event that Lender acquires legal title to the Building or Premises by foreclosure, whether judicial or nonjudicial, or by acceptance of a deed in lieu of foreclosure (a "Foreclosure Event"), then Tenant's rights under this Agreement shall terminate, and this Agreement shall be deemed to be null and void. After termination of this Agreement due to a Foreclosure Event, Tenant shall vacate the Premises within thirty (30) days after receipt of written notice from the Lender (with proof of the same) that a Foreclosure Event has occurred. Tenant agrees that this Agreement, and all estates, options and rights created under this Agreement, are hereby subordinated and made subject to the lien held by Lender in connection with the construction loan.

18.     **Attorneys' Fees**. If it become necessary for Landlord to use an attorney to enforce any of the conditions or covenants hereof, including the collection of rentals, or to gain lawful possession of the Premises, Tenant agrees to pay all reasonable fees, costs, and expenses so incurred. Tenant acknowledges and understands that the filing of a lawsuit is not a prerequisite to the Landlord's collection of attorneys' fees and costs, and that Tenant shall be responsible for all reasonable legal fees and costs incurred by Landlord, which may include, without limitation, preparation and issuance of a 3-Day Notice to Pay Rent or Quit, Notice of Default, etc. All attorneys' fees and costs shall become due and payable by Tenant on the first day of the month following the date which Landlord provides Tenant with a copy of the invoice pertaining to the legal

Page 4 of 5

C-16

services rendered or costs incurred. In the event that a lawsuit is filed in order to enforce any of the conditions or covenants of this Agreement, the prevailing party shall be awarded its reasonable attorneys' fees and costs.

19.     **Severability**. If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Agreement nor the application of the remaining portion of the provision, shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

20.     **Descriptive Headings / Construction**. The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations of the Landlord or Tenant. Any pronouns used herein shall include, where appropriate, either gender or both, as well as the singular and plural.

21.     **Prior Agreements / Modification**. This Agreement contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in connection with the lease contemplated by this Agreement, and no prior oral (or written, as the case may be), discussions, agreements, arrangements, or understanding pertaining to any such matters shall be effective for any purpose. All previous discussions, agreements, arrangements, and understandings between the Landlord and Tenant have been integrated into the terms of this Agreement. This Agreement shall not be modified, changed, altered, or amended in any way except through a written amendment signed by all of the parties hereto.

22.     **Notices**. Any notice required or permitted under this Agreement shall be in accordance with the specific provision detailing such notice, or if no method is provided, then either by personal delivery, or by certified U.S. Mail, addressed as follows:

If to Landlord to:     MILBANK REAL ESTATE SERVICES, INC.
Attention: Homan Taghdiri, Esq.
660 S. Figueroa Street, 24th Floor
Los Angeles, California 90017

If to Tenant to:     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

23.     **Additional Provisions**.     ---     [As applicable].     --- .

24.     **Tenant Representations and Authorizations**. Tenant warrants that no broker, agent, or other finder will seek contribution from Landlord with respect to Tenant's intention to enter into this Agreement, and to indemnify and hold Landlord harmless from any and all such claims. Tenant warrants and represents that all of the statements contained in Tenant's rental application are true, correct, and accurate at the time made, and that there has been no change thereof since such time and the execution of this Agreement. Tenant understands and acknowledges that a negative credit report may be submitted to a credit reporting agency if Tenant does not fully and timely comply with the terms and conditions of this Agreement. Tenant further authorizes Landlord to obtain updated credit reports with respect to Tenant's creditworthiness both during the Term of this Agreement, and at any time thereafter if Tenant is in breach of any of the terms hereof or owes any monetary obligation to Landlord in connection herewith.

Each of the undersigned, having read and fully understanding the terms and legal implications of the conditions and covenants set forth in this Agreement, hereby agree to all of its terms.

LANDLORD:     TENANT:

ROOSEVELT LOFTS, LLC
By: MILBANK REAL ESTATE SERVICES, INC.
Its: Authorized Agent

By: _____

M. Aaron Yashouafar
Its:     Chief Executive Officer

By: _____
[Name]

## Juliet Y. Oh

**From:** Slate, Daniel H. [dslate@buchalter.com]

**Sent:** Friday, July 10, 2009 9:49 AM

**To:** DLN; Juliet Y. Oh

**Cc:** Mogin, Joshua L.; Ormond, Richard P.; Jackson, Margaret J

**Subject:** Roosevelt: Residential Lease Terms

David: Here is an outline of the terms under which the Bank Group would consider consenting to leasing of residential units.

The Bank Group will consent to the Debtor's leasing of residential units on the following conditions:

1. Under no circumstance, whether by original term or after the exercise of any options or extensions, may any lease of a residential unit provide for occupancy beyond May 31, 2010.

2. The effective rent for each unit shall be no less than as set forth on a schedule itemizing, on a per unit basis, the minimum effective rent, and the Bank Group must review and approve that schedule.

3. The Debtor's leasing agent must be a recognized real estate brokerage company, and the individuals acting as leasing representatives must be skilled in leasing residential units comparable to those in the Roosevelt.

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.**

## Juliet Y. Oh

**From:** Juliet Y. Oh

**Sent:** Friday, July 10, 2009 12:01 PM

**To:** 'Slate, Daniel H.'; DLN

**Cc:** Mogin, Joshua L.; Ormond, Richard P.

**Subject:** RE: Roosevelt: Residential Lease Terms

Dan,

The Bank's terms are generally acceptable to the Debtor, subject to the following:

1. Given that many of the tenants may be students at local schools, the Debtor would like to push the May 31, 2010 occupancy deadline to June 30, 2010 to accommodate the school year (so student tenants don't have to move out before the end of the school year).

2. The Debtor is prepared to provide the Bank with a schedule of minimum effective rent for the Bank's review and approval.

3. The Debtor intends to employ Milbank Real Estate as its agent to lease the residential units.

Please confirm if the foregoing is acceptable to the Bank.

Thanks,
Juliet

**From:** Slate, Daniel H. [mailto:dslate@buchalter.com]
**Sent:** Friday, July 10, 2009 9:49 AM
**To:** DLN; Juliet Y. Oh
**Cc:** Mogin, Joshua L.; Ormond, Richard P.; Jackson, Margaret J
**Subject:** Roosevelt: Residential Lease Terms

David: Here is an outline of the terms under which the Bank Group would consider consenting to leasing of residential units.

The Bank Group will consent to the Debtor's leasing of residential units on the following conditions:

1. Under no circumstance, whether by original term or after the exercise of any options or extensions, may any lease of a residential unit provide for occupancy beyond May 31, 2010.

2. The effective rent for each unit shall be no less than as set forth on a schedule itemizing, on a per unit basis, the minimum effective rent, and the Bank Group must review and approve that schedule.

3. The Debtor's leasing agent must be a recognized real estate brokerage company, and the individuals acting as leasing representatives must be skilled in leasing residential units comparable to those in the Roosevelt.

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and

## Juliet Y. Oh

| | |
|---|---|
| **From:** | Juliet Y. Oh |
| **Sent:** | Monday, July 13, 2009 3:46 PM |
| **To:** | 'dslate@buchalter.com' |
| **Cc:** | 'jmogin@buchalter.com'; 'rormond@buchalter.com'; DLN |
| **Subject:** | FW: Roosevelt: Residential Lease Terms |
| **Attachments:** | RSVLT - Residential Price List (BofA Minimums) - 2009-07-13.pdf |

Dan,

Please find attached the schedule of minimum effective rent (for the residential units) for the Bank's review and approval. I haven't yet received a response to my email below – please confirm whether the terms set forth in my email (*i.e.*, occupancy deadline of June 30, 2010, Milbank Real Estate as leasing agent) are acceptable to the Bank. Thank you.

# THE ROOSEVELT RESIDENCES - RENTAL RATES

| Unit | Bed | Bath | Levels | Total SF | Market $/Mo. | Minimum $/Mo. |
|------|-----|------|--------|----------|--------------|---------------|
| 301 | 1.0 | 1.5 | 2 | 1,179 | $2,947.50 | $2,000.00 |
| 302 | 1.0 | 1.0 | 1 | 1,363 | $2,957.50 | $2,000.00 |
| 303 | 1.0 | 1.5 | 2 | 1,042 | $2,605.00 | $2,000.00 |
| 304 | 1.0 | 1.5 | 2 | 1,024 | $2,560.00 | $2,000.00 |
| 305 | 1.0 | 1.5 | 2 | 1,037 | $2,592.50 | $2,000.00 |
| 307 | 1.0 | 1.0 | 1 | 732 | $1,939.80 | $2,000.00 |
| 309 | 1.0 | 1.5 | 1 | 839 | $2,223.35 | $2,000.00 |
| 310 | 1.0 | 1.5 | 1 | 814 | $2,157.10 | $2,000.00 |
| 312 | 1.0 | 1.5 | 1 | 785 | $2,080.25 | $2,000.00 |
| 313 | 1.0 | 1.5 | 1 | 804 | $2,130.60 | $2,000.00 |
| 314 | 1.0 | 1.5 | 1 | 1,619 | $3,394.20 | $2,100.00 |
| 407 | 1.0 | 1.0 | 1 | 970 | $2,570.50 | $2,000.00 |
| 409 | 1.0 | 1.0 | 1 | 884 | $2,342.60 | $2,000.00 |
| 410 | 1.0 | 2.0 | 1 | 1,096 | $2,740.00 | $2,000.00 |
| 411 | 2.0 | 1.5 | 1 | 1,265 | $3,036.00 | $2,100.00 |
| 412 | 1.0 | 1.0 | 1 | 913 | $2,419.45 | $2,000.00 |
| 413 | 1.0 | 1.0 | 1 | 931 | $2,467.15 | $2,000.00 |
| 414 | 1.0 | 1.0 | 1 | 943 | $2,498.95 | $2,000.00 |
| 415 | 1.0 | 1.0 | 1 | 863 | $2,286.95 | $2,000.00 |
| 416 | 1.0 | 1.0 | 1 | 932 | $2,469.80 | $2,000.00 |
| 417 | 2.0 | 1.5 | 1 | 1,310 | $3,144.00 | $2,100.00 |
| 419 | 1.0 | 1.0 | 1 | 795 | $2,106.75 | $2,000.00 |
| 420 | 1.0 | 1.0 | 1 | 922 | $2,443.30 | $2,000.00 |
| 423 | 1.0 | 1.0 | 1 | 910 | $2,411.50 | $2,000.00 |
| 425 | 1.0 | 2.0 | 1 | 1,219 | $2,925.60 | $2,100.00 |
| 426 | 1.0 | 1.0 | 1 | 1,125 | $2,812.50 | $2,000.00 |
| 501 | 1.0 | 1.0 | 2 | 940 | $2,491.00 | $2,000.00 |
| 502 | 2.0 | 1.5 | 2 | 1,498 | $3,595.20 | $2,100.00 |
| 503 | 1.0 | 1.0 | 2 | 1,328 | $3,187.20 | $2,100.00 |
| 504 | 1.0 | 1.0 | 2 | 1,355 | $3,252.00 | $2,100.00 |
| 505 | 1.0 | 1.0 | 2 | 1,290 | $3,096.00 | $2,100.00 |
| 506 | 1.0 | 1.0 | 1 | 863 | $2,286.95 | $2,000.00 |
| 507 | 1.0 | 1.0 | 1 | 928 | $2,459.20 | $2,000.00 |
| 508 | 1.0 | 1.0 | 1 | 940 | $2,491.00 | $2,000.00 |
| 509 | 1.0 | 1.0 | 1 | 893 | $2,366.45 | $2,000.00 |
| 510 | 1.0 | 2.0 | 1 | 1,093 | $2,732.50 | $2,000.00 |
| 511 | 2.0 | 1.5 | 1 | 1,332 | $3,196.80 | $2,100.00 |
| 512 | 1.0 | 1.0 | 1 | 918 | $2,432.70 | $2,000.00 |
| 513 | 1.0 | 1.0 | 1 | 934 | $2,475.10 | $2,000.00 |
| 514 | 1.0 | 1.0 | 1 | 942 | $2,496.30 | $2,000.00 |
| 515 | 1.0 | 1.0 | 1 | 1,030 | $2,427.40 | $2,000.00 |
| 516 | 1.0 | 1.0 | 1 | 1,012 | $2,530.00 | $2,000.00 |
| 517 | 2.0 | 1.5 | 2 | 1,399 | $3,357.60 | $2,100.00 |
| 518 | 2.0 | 2.0 | 2 | 1,453 | $3,487.20 | $2,100.00 |
| 519 | 2.0 | 2.0 | 2 | 1,532 | $3,515.94 | $2,250.00 |
| 520 | 1.0 | 1.0 | 1 | 875 | $2,318.75 | $2,000.00 |
| 521 | 1.0 | 1.0 | 2 | 1,092 | $2,730.00 | $2,000.00 |
| 522 | 1.0 | 1.0 | 1 | 868 | $2,300.20 | $2,000.00 |
| 523 | 1.0 | 1.0 | 1 | 930 | $2,464.50 | $2,000.00 |
| 524 | 1.0 | 1.0 | 1 | 802 | $2,125.30 | $2,000.00 |
| 525 | 1.0 | 2.0 | 1 | 1,217 | $2,920.80 | $2,100.00 |

*Confidential and Privileged Communication*    July 13, 2009

# THE ROOSEVELT RESIDENCES - RENTAL RATES

| Unit | Bed | Bath | Levels | Total SF | Market $/Mo. | Minimum $/Mo. |
|------|-----|------|--------|----------|--------------|---------------|
| 526 | 1.0 | 1.0 | 1 | 1,110 | $2,775.00 | $2,000.00 |
| 606 | 1.0 | 1.5 | 1 | 1,143 | $2,857.50 | $2,000.00 |
| 607 | 1.0 | 1.0 | 1 | 874 | $2,316.10 | $2,000.00 |
| 608 | 1.0 | 1.0 | 1 | 924 | $2,448.60 | $2,000.00 |
| 609 | 1.0 | 1.0 | 1 | 885 | $2,345.25 | $2,000.00 |
| 610 | 1.0 | 2.0 | 1 | 1,090 | $2,725.00 | $2,000.00 |
| 611 | 2.0 | 1.5 | 1 | 1,332 | $3,196.80 | $2,100.00 |
| 612 | 1.0 | 1.0 | 1 | 921 | $2,440.65 | $2,000.00 |
| 613 | 1.0 | 1.0 | 1 | 947 | $2,509.55 | $2,000.00 |
| 614 | 1.0 | 1.0 | 1 | 938 | $2,485.70 | $2,000.00 |
| 615 | 1.0 | 1.0 | 1 | 894 | $2,369.10 | $2,000.00 |
| 616 | 1.0 | 1.0 | 1 | 1,248 | $2,995.20 | $2,100.00 |
| 622 | 1.0 | 1.0 | 1 | 875 | $2,318.75 | $2,000.00 |
| 623 | 1.0 | 1.0 | 1 | 931 | $2,467.15 | $2,000.00 |
| 624 | 1.0 | 1.0 | 1 | 808 | $2,141.20 | $2,000.00 |
| 625 | 1.0 | 2.0 | 1 | 1,226 | $2,942.40 | $2,100.00 |
| 626 | 1.0 | 1.0 | 1 | 1,110 | $2,775.00 | $2,000.00 |
| 701 | 1.0 | 1.0 | 2 | 940 | $2,491.00 | $2,000.00 |
| 702 | 1.0 | 1.0 | 2 | 1,462 | $3,508.80 | $2,100.00 |
| 703 | 1.0 | 1.5 | 2 | 1,362 | $3,268.80 | $2,100.00 |
| 704 | 1.0 | 1.5 | 2 | 1,366 | $3,278.40 | $2,100.00 |
| 705 | 1.0 | 1.5 | 2 | 1,288 | $3,091.20 | $2,100.00 |
| 706 | 1.0 | 1.0 | 1 | 888 | $2,353.20 | $2,000.00 |
| 707 | 1.0 | 1.0 | 1 | 950 | $2,517.50 | $2,000.00 |
| 708 | 1.0 | 1.0 | 1 | 919 | $2,435.35 | $2,000.00 |
| 709 | 1.0 | 1.0 | 1 | 910 | $2,411.50 | $2,000.00 |
| 710 | 1.0 | 2.0 | 1 | 1,120 | $2,800.00 | $2,000.00 |
| 711 | 1.0 | 1.5 | 1 | 1,332 | $3,196.80 | $2,100.00 |
| 712 | 1.0 | 1.0 | 1 | 944 | $2,501.60 | $2,000.00 |
| 713 | 1.0 | 1.0 | 1 | 958 | $2,538.70 | $2,000.00 |
| 714 | 1.0 | 1.0 | 1 | 950 | $2,517.50 | $2,000.00 |
| 715 | 1.0 | 1.0 | 1 | 1,030 | $2,427.40 | $2,000.00 |
| 716 | 1.0 | 1.0 | 1 | 1,012 | $2,530.00 | $2,000.00 |
| 717 | 2.0 | 1.5 | 2 | 1,399 | $3,357.60 | $2,100.00 |
| 718 | 2.0 | 2.0 | 2 | 1,453 | $3,487.20 | $2,100.00 |
| 719 | 2.0 | 2.0 | 2 | 1,532 | $3,515.94 | $2,250.00 |
| 720 | 1.0 | 1.0 | 1 | 875 | $2,318.75 | $2,000.00 |
| 721 | 1.0 | 1.0 | 2 | 1,092 | $2,730.00 | $2,000.00 |
| 722 | 1.0 | 1.0 | 1 | 868 | $2,300.20 | $2,000.00 |
| 723 | 1.0 | 1.0 | 1 | 930 | $2,464.50 | $2,000.00 |
| 724 | 1.0 | 1.0 | 1 | 808 | $2,141.20 | $2,000.00 |
| 725 | 1.0 | 2.0 | 1 | 1,217 | $2,920.80 | $2,100.00 |
| 726 | 1.0 | 1.0 | 1 | 1,115 | $2,787.50 | $2,000.00 |
| 806 | 1.0 | 1.0 | 1 | 1,755 | $4,027.73 | $2,250.00 |
| 808 | 1.0 | 1.0 | 1 | 932 | $2,469.80 | $2,000.00 |
| 809 | 1.0 | 1.0 | 1 | 945 | $2,504.25 | $2,000.00 |
| 810 | 1.0 | 2.0 | 1 | 1,305 | $3,132.00 | $2,100.00 |
| 811 | 2.0 | 1.5 | 1 | 1,332 | $3,196.80 | $2,100.00 |
| 812 | 1.0 | 1.0 | 1 | 944 | $2,501.60 | $2,000.00 |
| 813 | 1.0 | 1.0 | 1 | 956 | $2,533.40 | $2,000.00 |
| 814 | 1.0 | 1.0 | 1 | 951 | $2,520.15 | $2,000.00 |

*Confidential and Privileged Communication*  July 13, 2009

# THE ROOSEVELT RESIDENCES - RENTAL RATES

| Unit | Bed | Bath | Levels | Total SF | Market $/Mo. | Minimum $/Mo. |
|------|-----|------|--------|----------|--------------|---------------|
| 815 | 1.0 | 1.0 | 1 | 883 | $2,339.95 | $2,000.00 |
| 816 | 1.0 | 1.5 | 1 | 1,248 | $2,995.20 | $2,100.00 |
| 822 | 1.0 | 1.0 | 1 | 864 | $2,289.60 | $2,000.00 |
| 823 | 1.0 | 1.0 | 1 | 931 | $2,467.15 | $2,000.00 |
| 824 | 1.0 | 1.0 | 1 | 807 | $2,138.55 | $2,000.00 |
| 825 | 1.0 | 2.0 | 1 | 1,226 | $2,942.40 | $2,100.00 |
| 826 | 1.0 | 1.0 | 1 | 1,110 | $2,775.00 | $2,000.00 |

*Confidential and Privileged Communication*

## Juliet Y. Oh

| | |
|---|---|
| **From:** | Juliet Y. Oh |
| **Sent:** | Wednesday, July 15, 2009 10:59 AM |
| **To:** | 'rormond@buchalter.com' |
| **Subject:** | FW: Roosevelt: Residential Lease Terms |
| **Attachments:** | RSVLT - Residential Price List (BofA Minimums) - 2009-07-13.pdf |

Richard, we still haven't received a response from the Bank regarding the residential leasing issue either. Is this something the Bank can get back to us on following your call/meeting with the Bank today?

---

**From:** Juliet Y. Oh
**Sent:** Monday, July 13, 2009 3:46 PM
**To:** 'dslate@buchalter.com'
**Cc:** 'jmogin@buchalter.com'; 'rormond@buchalter.com'; DLN
**Subject:** FW: Roosevelt: Residential Lease Terms

Dan,

Please find attached the schedule of minimum effective rent (for the residential units) for the Bank's review and approval. I haven't yet received a response to my email below – please confirm whether the terms set forth in my email (*i.e.,* occupancy deadline of June 30, 2010, Milbank Real Estate as leasing agent) are acceptable to the Bank. Thank you.

..

## Juliet Y. Oh

| | |
|---|---|
| **From:** | Juliet Y. Oh |
| **Sent:** | Thursday, July 16, 2009 11:51 AM |
| **To:** | 'dslate@buchalter.com'; 'rormond@buchalter.com' |
| **Cc:** | DLN |
| **Subject:** | FW: Roosevelt: Residential Lease Terms |
| **Attachments:** | RSVLT - Residential Price List (BofA Minimums) - 2009-07-13.pdf |

Dan and Richard, when do you expect to have a response from the Bank regarding the residential leasing issue?

**From:** Juliet Y. Oh
**Sent:** Wednesday, July 15, 2009 10:59 AM
**To:** 'rormond@buchalter.com'
**Subject:** FW: Roosevelt: Residential Lease Terms

Richard, we still haven't received a response from the Bank regarding the residential leasing issue either. Is this something the Bank can get back to us on following your call/meeting with the Bank today?

**From:** Juliet Y. Oh
**Sent:** Monday, July 13, 2009 3:46 PM
**To:** 'dslate@buchalter.com'
**Cc:** 'jmogin@buchalter.com'; 'rormond@buchalter.com'; DLN
**Subject:** FW: Roosevelt: Residential Lease Terms

Dan,

Please find attached the schedule of minimum effective rent (for the residential units) for the Bank's review and approval. I haven't yet received a response to my email below – please confirm whether the terms set forth in my email (*i.e.,* occupancy deadline of June 30, 2010, Milbank Real Estate as leasing agent) are acceptable to the Bank. Thank you.

# Juliet Y. Oh

| | |
|---|---|
| **From:** | Slate, Daniel H. [dslate@buchalter.com] |
| **Sent:** | Tuesday, July 21, 2009 8:22 AM |
| **To:** | Juliet Y. Oh; DLN |
| **Cc:** | Ormond, Richard P.; Mogin, Joshua L. |
| **Subject:** | Roosevelt Leasing |

Juliet: I got information back on the leasing.

1.  We need to better understand where the proposed lease rates come from. For example, why does the Debtor propose to lease unit 606, with 1,143 sf for the same rent as unit 307, with 732 sf?

2.  The 6.30 lease termination is probably fine, assuming we reach an understanding on the other lease-related issues.

3.  The concern about leasing agent is: the Bank Group wants to make sure that the people representing the property are well experienced in residential leasing. Specifically, just because Milbank is affiliated, does not make them suitable for the Roosevelt. The Bank Group is also concerned that any commission to be paid to the agent actually be earned, and that the commissions are not doubled because of Milbank's involvement.

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.**

## Juliet Y. Oh

| | |
|---|---|
| **From:** | Juliet Y. Oh |
| **Sent:** | Friday, July 24, 2009 5:24 PM |
| **To:** | 'dslate@buchalter.com'; 'rormond@buchalter.com' |
| **Cc:** | DLN |
| **Subject:** | Roosevelt - resume of leasing agent |
| **Attachments:** | Randelle Green Resume.doc |

Dan and Richard,

Per our discussion with Dan yesterday afternoon, please find attached the resume for Randelle Green, who the Debtor proposes to act as the leasing agent for the short-term residential leases of the Building units. Please let us know whether the Bank is agreeable to Mr. Green's employment in this regard.

Thanks,
Juliet

Juliet Y. Oh
Levene, Neale, Bender, Rankin & Brill L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Direct Dial No. (310) 229-3348
Main Tel. No. (310) 229-1234
Telecopier No. (310) 229-1244
Email: JYO@LNBRB.com

The preceding e-mail message is subject to Levene, Neale, Bender, Rankin & Brill L.L.P.'s e-mail policies which can be found at http://www/lnbrb.com/disclaimers.html.

# RANDELLE GREEN
## 213-254-7627
## randellegreen@yahoo.com

**CAREER OBJECTIVE SUMMARY**

Specializing in the downtown Los Angeles condominium market in both sales and leasing, I have excelled in both new construction as well as historic adaptive re-use conversions working side by side with a variety of reputable Developers and Sales & Marketing companies gaining a great deal of experience. I have become extremely well aquaited with this markets buyer/leasee and they're Brokers, establishing solid relationships with key community players in the Los Angeles area. I am seeking a position with a prominent developer where I can feature my expertise in utilizing my unique, successful and aggressive people skills as well as my project management abilities and contributions.

| | |
|---|---|
| **8/07--Present** | **Director of Sales & Marketing/Bldg Mgr., *Milbank Real Estate*** <br> **THE ROOSEVELT LUXURY RESIDENCES** |

- Running daily sales operations for the 222-unit adaptive reuse conversion of the 1926 Historic Building in Downtown Los Angeles, a $190million mixed use, live/work project with exclusive retail.
- Playing a vital role in Marketing participating in creative daily application

| | |
|---|---|
| **5/06--8/07** | **Sales Manager, The Ryness Company, *The South Group*** <br> **ELLEVEN/LUMA/EVO** |

- Selling Downtowns first "Green" community, 3 towers, 725 homes, downtowns first new residential buildings in over 25 years, full customer service and knowledge of PSA, from the opening of escrow to move-ins
- Established and maintained excellent communications with a broad understanding of the developers needs throughout the project cycle

| | |
|---|---|
| **1/06--5/06** | **Director of Sales, Doma Properties, *Urban Pacific Builders*** <br> **PAN-AMERICAN LOFTS** |

- Selling the $95 million dollar adaptive reuse project in the Historic core, oldest building in downtown LA. A 50 unit mixed use, Live/Work project.
- Overall office mgr. of daily operations, reports, contracts.
- Credited with thinking "outside the box" while implementing a neighborhood building tour while builder waited for TCO

| | |
|---|---|
| **2/04--1/06** | **Sr. Leasing Specialist, *The Kor Group*** <br> **The PEGASUS** |

- Daily operations handling one of the pioneers of downtown residential living, lease negotiations, full customer service.
- Became very familiar with the "downtown" lifestyle
- Played a vital role in developing the "urban" lease structure
- Advocated a broker outreach increasing traffic by 50% in first year.

| | |
|---|---|
| **Training** | **The Mark Company Management Training SF, CA.** <br> **The Ryness Company Management Training LA, CA.** <br> **Keller-Williams and Coldwell-Banker Real Estate** |
| **Education** | **University of Nebraska-Hotel Management** |
| **Membership** | **BHGLAAR, CAR, NAR \*DRE LIC #01717315** |

## Juliet Y. Oh

Dan and Richard,

Any word from the Bank regarding new examination dates and the residential leasing issue?

-------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Juliet Y. Oh
To: 'dslate@buchalter.com' <dslate@buchalter.com>; 'rormond@buchalter.com' <rormond@buchalter.com>
CC: DLN
Sent: Wed Jul 29 09:43:29 2009
Subject: FW: Confirmation

Dan and Richard,

Please provide us with the dates that the Bank's PMK can sit for the Rule 2004 examination so we can reschedule the examination and prepare a revised subpoena. Also, can you please let us know where the Bank is with respect to the residential leasing issue?

Thanks,
Juliet

## Juliet Y. Oh

**From:** Juliet Y. Oh
**Sent:** Friday, August 14, 2009 9:37 AM
**To:** 'dslate@buchalter.com'; 'rormond@buchalter.com'
**Cc:** DLN; 'ilandsberg@lm-lawyers.com'
**Subject:** Re: Roosevelt Lease Question

Dan and Richard,

Any word from the Bank regarding the lease of Unit 504? Unless we can lock the prospective tenant down today, he is going to walk.

Please let me know. Thanks.

Juliet

--------------------------

Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Ormond, Richard P. <rormond@buchalter.com>
To: Juliet Y. Oh
CC: Slate, Daniel H. <dslate@buchalter.com>
Sent: Thu Aug 13 18:03:09 2009
Subject: Roosevelt Lease Question

I have not heard back from the Bank yet. I am leaving now for physical therapy but will try them again first thing in the morning.

Have a good night,

Richard

Richard Ormond | Shareholder | BuchalterNemer, A Professional Corporation | 1000 Wilshire Boulevard, Suite 1500 | Los Angeles, CA 90017-2457 | Direct Dial: (213) 891-5217 | Direct Fax: (213) 630-5748 | Switchboard: (213) 891-0700 | rormond@buchalter.com | www.buchalter.com <http://www.buchalter.com/>

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?option=com_content&task=view&id=151&Itemid=129.

1

## Juliet Y. Oh

**From:** Ormond, Richard P. [rormond@buchalter.com]

**Sent:** Friday, August 14, 2009 9:48 AM

**To:** Juliet Y. Oh; Slate, Daniel H.

**Subject:** Re: Roosevelt Lease Question

I have a call with the bank scheduled for 10:30 about this unit.

Any word on the counter offer? Bank wanted it wednesday and still doesn't have it. Bank is skeptical it is coming at all.
Richard Ormond (blackberry)

**From:** Juliet Y. Oh <JYO@lnbrb.com>
**To:** Slate, Daniel H.; Ormond, Richard P.
**Cc:** DLN <DLN@lnbrb.com>; ilandsberg@lm-lawyers.com <ilandsberg@lm-lawyers.com>
**Sent:** Fri Aug 14 09:37:05 2009
**Subject:** Re: Roosevelt Lease Question

Dan and Richard,

Any word from the Bank regarding the lease of Unit 504? Unless we can lock the prospective tenant down today, he is going to walk.

Please let me know. Thanks.

Juliet

--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Ormond, Richard P. <rormond@buchalter.com>
To: Juliet Y. Oh
CC: Slate, Daniel H. <dslate@buchalter.com>
Sent: Thu Aug 13 18:03:09 2009
Subject: Roosevelt Lease Question

I have not heard back from the Bank yet. I am leaving now for physical therapy but will try them again first thing in the morning.

Have a good night,

Richard

Richard Ormond | Shareholder | BuchalterNemer, A Professional Corporation | 1000 Wilshire Boulevard, Suite 1500 | Los Angeles, CA 90017-2457 | Direct Dial: (213) 891-5217 | Direct Fax: (213) 630-5748 | Switchboard: (213) 891-0700 | rormond@buchalter.com | www.buchalter.com <http://www.buchalter.com/>

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail

## Juliet Y. Oh

**From:** Juliet Y. Oh
**Sent:** Monday, August 17, 2009 3:37 PM
**To:** 'dslate@buchalter.com'; 'rormond@buchalter.com'
**Cc:** DLN; 'ilandsberg@lm-lawyers.com'
**Subject:** Rental of Unit 616

Dan and Richard,

Unfortunately, the prospective tenant of Unit 504 walked away on Friday before we could get the lease signed. However, Roosevelt has another prospective tenant who is willing to lease Unit 616 at a rate of $2,250 per month, with a lease expiration date of June 30, 2009. Can we get the Bank's consent to rent Unit 616? The tenant has asked us to let him know by tomorrow.

Thanks,
Juliet

--------------------------

Sent from my BlackBerry Wireless Handheld

1

## Juliet Y. Oh

**From:** Juliet Y. Oh

**Sent:** Tuesday, August 18, 2009 11:33 AM

**To:** 'Slate, Daniel H.'

**Cc:** DLN; 'Landsberg, Ian'

**Subject:** RE: Rental of Unit 616

We can address the rent schedule with the Bank when you're back in the office, but in the meantime, can we get the Bank's consent to the rental of these 2 units? Just as a reminder, the 2 units are Unit 314 at $2,750 per month, and Unit 616 at $2,250 per month – both leases will expire on June 30, 2010. I understand you and Richard are out of the office today, but if we don't get back to the prospective tenants today, they're going to walk. Please let me know if there is any way we can get the Bank's consent on these 2 units today. Thanks.

**From:** Slate, Daniel H. [mailto:dslate@buchalter.com]
**Sent:** Tuesday, August 18, 2009 11:25 AM
**To:** Juliet Y. Oh
**Subject:** Re: Rental of Unit 616

I am not in the office but will be in tomorrow. I understand the Bank Group is still trying to understand how the rent schedule hangs together.
Daniel Slate, by Blackberry

----- Original Message -----
From: Juliet Y. Oh <JYO@lnbrb.com>
To: Slate, Daniel H.
Cc: DLN <DLN@lnbrb.com>; Landsberg, Ian <ilandsberg@lm-lawyers.com>
Sent: Tue Aug 18 10:53:37 2009
Subject: FW: Rental of Unit 616

Dan,

Do you think we will be able to get a response today from the Bank regarding the leasing of Units 314 and 616?

Thanks in advance,
Juliet

-----Original Message-----
From: Juliet Y. Oh
Sent: Monday, August 17, 2009 5:23 PM
To: 'dslate@buchalter.com'; 'rormond@buchalter.com'
Cc: DLN; 'ilandsberg@lm-lawyers.com'
Subject: Fw: Rental of Unit 616

Dan and Richard,

In addition to Unit 616, Roosevelt would like to lease Unit 314, at a

8/26/2009

C-33

rate of $2,750, with a lease expiration date of June 30, 2010.  Please
let us know if the Bank will consent to the lease of these two units.
Thanks.

--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Juliet Y. Oh
To: 'dslate@buchalter.com' <dslate@buchalter.com>;
'rormond@buchalter.com' <rormond@buchalter.com>
CC: DLN; 'ilandsberg@lm-lawyers.com' <ilandsberg@lm-lawyers.com>
Sent: Mon Aug 17 15:37:02 2009
Subject: Rental of Unit 616

Dan and Richard,

Unfortunately, the prospective tenant of Unit 504 walked away on Friday
before we could get the lease signed.  However, Roosevelt has another
prospective tenant who is willing to lease Unit 616 at a rate of $2,250
per month, with a lease expiration date of June 30, 2009.  Can we get
the Bank's consent to rent Unit 616?  The tenant has asked us to let him
know by tomorrow.

Thanks,
Juliet

--------------------------
Sent from my BlackBerry Wireless Handheld

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and
may be a communication privileged by law. If you received this e-mail in error, any review, use,
dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us
immediately of the error by return e-mail and please delete this message and any and all
duplicates of this message from your system. Thank you in advance for your cooperation. For
additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?
option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure: In order to comply with requirements imposed by the
Internal Revenue Service, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing, or recommending to another party any transaction or matter
addressed herein.**

## Juliet Y. Oh

**From:** Mogin, Joshua L. [jmogin@buchalter.com]

**Sent:** Tuesday, August 18, 2009 1:11 PM

**To:** Juliet Y. Oh; DLN; ilandsberg@lm-lawyers.com

**Cc:** Slate, Daniel H.; Ormond, Richard P.; Jackson, Margaret J; Tateishi, Dean

**Subject:** Roosevelt Lofts

Juliet:

In connection with Borrowers recent requests to rent Units #616 and #314 at the Roosevelt, BANA must obtain the consent and approval of the bank group. In general, this leasing approval "process" is inefficient for all parties and unlikely to provide Borrower's with the timely responses necessary to facilitate quick leasing of the building.

We feel that the leasing process can be streamlined with a pre-approved set of leasing guidelines which would include the following:

1. The approved form of residential lease (with an additional proviso that the tenant is not an affiliate of Borrower, guarantor, etc.);

2. A pricing matrix, with an explanation for the various prices - this can be by floor, unit type, rent per square foot, etc  Pleases provide (with stacked plates) for all of the units on each floor so that we have an idea exactly where the unit is and what it is facing, etc - the stacked plate and location of unit might also shed some light on the usable sq. ft. to explain differences in asking rents.   We realize that you submitted a proposed minimum rental schedule, but we were unable to determine how the rental rates were derived (e.g. - a market rent loft with 1,143 s.f. (#606) costs the same as a unit with 732 s.f. (#307) at $2,000 a month).

3. A term ending not after June 30, 2010.

4. A list of services available to each tenant.

We could then submit the guidelines for approval, raise any questions at that time, and avoid the necessity of numerous bank group approvals.

Obviously, this would not preclude requests for approval an residential lease which did not fall within the leasing guidelines.

Please let me know your thoughts, as soon as possible.

Thank you

*Joshua Mogin*
*Shareholder*
**BuchalterNemer**, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500 | Los Angeles, CA 90017-2457
Direct Dial: (213) 891-5045 | Cell Phone: (323) 376-3012 | Direct Fax: (213) 630-5707 | Switchboard: (213) 891-0700
Email: jmogin@buchalter.com | www.buchalter.com

## DLN

| From: | DLN |
|---|---|
| Sent: | Tuesday, August 18, 2009 1:22 PM |
| To: | 'Mogin, Joshua L.'; Juliet Y. Oh; ilandsberg@lm-lawyers.com |
| Cc: | Slate, Daniel H.; Ormond, Richard P. |
| Subject: | RE: Roosevelt Lofts |

**Importance:** High

Josh – I realize that our communications have thus far been primarily with Dan and Richard, but your email seems to set us back several steps. We had previously supplied the rent schedule because we did not want to get into developing the kind of pricing matrix you reference in your email with respect to such short term leases. We were previously told that the only remaining issue of concern to the bank group was the identity of the leasing broker. In response to that concern, we supplied the resume of the leasing broker and offered to let a representative of the bank group (or an attorney from your office) speak to him. We believed that the bank group had everything it needed at this point. We will have already lost a prospective lessee because of the bank group's delay and requests for additional information. In order to avoid losing the 2 prospective tenants the Debtor is now negotiating with, we suggest that the bank group consent to these leases and we can try to address some of the new concerns later. Otherwise, we will have lost 3 prospective tenants which would have generated some cash flow for the Debtor.

Please let us know what the bank group's position is on my suggestion as soon as possible.

Regards,
David

```
David L. Neale
Levene, Neale, Bender, Rankin & Brill L.L.P.
====================================
The preceding email message is subject to Levene, Neale, Bender,
Rankin & Brill L.L.P.'s email policies which can be found at
http://www.lnbrb.com/disclaimers.htm
```
Ⓨ Please consider the environment before printing this email

**From:** Mogin, Joshua L. [mailto:jmogin@buchalter.com]
**Sent:** Tuesday, August 18, 2009 1:11 PM
**To:** Juliet Y. Oh; DLN; ilandsberg@lm-lawyers.com
**Cc:** Slate, Daniel H.; Ormond, Richard P.; Jackson, Margaret J; Tateishi, Dean
**Subject:** Roosevelt Lofts

Juliet:

In connection with Borrowers recent requests to rent Units #616 and #314 at the Roosevelt, BANA must obtain the consent and approval of the bank group. In general, this leasing approval "process" is inefficient for all parties and unlikely to provide Borrower's with the timely responses necessary to facilitate quick leasing of the building.

We feel that the leasing process can be streamlined with a pre-approved set of leasing guidelines which would include the following:

C-36

## DLN

**From:** DLN

**Sent:** Thursday, August 20, 2009 3:25 PM

**To:** Slate, Daniel H.

**Cc:** Juliet Y. Oh

**Subject:** Leases

Dan – I'm hoping you're back in the office. Any word on the 2 leases we asked about? I know Josh suggested a more comprehensive programmatic approach, but we're dealing with 2 prospective tenants we are going to lose if we don't move quickly. Also, is it too soon to hope for a reaction to the restructuring proposal?

Regards,

David

**DAVID L. NEALE**
**LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone No. (310) 229-1234
Telecopier No. (310) 229-1244
Email: dln@lnbrb.com
www.lnbrb.com
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The preceding E-mail message is subject to Levene, Neale, Bender, Rankin & Brill L.L.P.'s email policies which can be found at http://www.lnbrb.com/disclaimers.htm.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

 Please consider the environment before printing this email

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER, TO THE EXTENT NECESSARY, PURSUANT TO 11 U.S.C. § 363(b)(1) AUTHORIZING DEBTOR TO ENTER INTO RESIDENTIAL LEASES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF M. AARON YASHOUAFAR, DAVID L. NEALE AND JULIET Y. OH IN SUPPORT THEREOF**

will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 27, 2009** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
- Helen R Frazer    hfrazer@aalrr.com
- Varand Gourjian    vg@gourjianlaw.com, lala@gourjianlaw.com
- Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com
- Herbert Hayden    herbert@ntlg.us
- Ian Landsberg    ilandsberg@lm-lawyers.com
- David L. Neale    dln@lnbrb.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- S Margaux Ross    margaux.ross@usdoj.gov
- Bruce D Rudman    bdr@agrlaw.net
- William D Schuster    bills@allieschuster.org
- Daniel H Slate    dslate@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;marcycarman@tilemlaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Marc Weinberg    marcweinberg@att.net
- Aimee Y Wong    aywong@mckennalong.com

                                  ■   ☐   Service information continued on attached page

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*    **F 9013-3.1**

| In re:<br>ROOSEVELT LOFTS, LLC | Chapter 11<br>1:09-bk-14214-GM |
|---|---|
| Debtor(s). | |

## II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL (indicate method for each person or entity served):

On **August 27, 2009** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

**By overnight mail (Federal Express)**
*Office of the U.S. Trustee*
*Creditors' Committee and its counsel*
*Secured creditors and counsel*
*Parties requesting special notice*
*(See attached)*

## III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 27, 2009** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**By attorney service**
Hon. Geraldine Mund
United States Bankruptcy Court
21041 Burbank Blvd.
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 27, 2009 | Marguerite Hardin | *Marguerite Hardin* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

Roosevelt Lofts
RSN

Roosevelt Lofts, LLC
c/o Mr. M. Aaron Yashouafar, President
Roosevelt Lofts, Inc.
16661 Ventura Blvd., #600
Encino, CA 91436

U.S. Trustee
Attn: S Margaux Ross, Esq.
21051 Warner Ctr Ln Ste 115
Woodland Hills, CA 91367

**Counsel for Ryan Anderson, et al.**
Gary Owen Caris, Esq.
McKenna, Long & Aldridge LLP
444 South Flower St., 8th Floor
Los Angeles, CA 90071

**Counsel for HD Supply Construction**
William D. Schuster, Esq.
Allie & Schuster PC
2122 N Broadway
Santa Ana, CA 92706-2614

Homan Taghdiri, Esq.
**Milbank**
660 S. Figueroa St., 24th Floor
Los Angeles, CA 90017

**Counsel for Siemens Bldg Tech., Inc.**
Benjamin R. Trachtman, Esq.
Trachtman & Trachtman
27401 Los Altos, Suite 300
Mission Viejo, Ca 92691

**Counsel for Bank of America**
Daniel H. Slate, Esq.
Buchalter, Nemer
1000 Wilshire Blvd., Ste 1500
Los Angeles, CA 90017

**Counsel for Sidney Alter dba Alter Electric**
Bruce D. Rudman, Esq.
Abdulaziz, Grossbart & Rudman
PO Box 15458
North Hollywood, CA 91615

Herbert Alfred Mayer
5360 Willow Oak Street
Simi Valley, CA 93063-4591

L.A. County Treasurer and Tax Collector
PO Box 54110
Los Angeles, CA 90054-0110

**Counsel for Infiniti Metals**
Law Ofcs Theodore A. Anderson
690 S. Brea Blvd.
Brea, CA 92821

**Counsel for VGI**
Patrick J. Duffy III
Andrew W Hawthorne
Monteleone & McCrory
725 S. Figueroa St., Ste. 3200
Los Angeles, CA 90017

Ian Landsberg, Esq.
Landsberg Margulies LLP
16030 Ventura Blvd., Ste. 470
Encino, CA 91436

**Counsel for ThyssenKrupp Elevator**
William C. Hernquist II
Wallace H. Sweet
2404 Broadway, 2nd Floor
San Diego, CA 92102

**Committee Member**
Kuetar Flooring
Attn: Joseph Kember/Ed Sheats
2 Innovation Drive
Renfrew
Ontario, **CANADA** K7V4B1

**Committee Member**
Bontempi USA
Attn: Yeujye Chen
8919 Beverly Blvd.
West Hollywood, CA 90048

**Committee Member**
A American Custom Flooring
Attn: Richard S. Lauter
311 S. Wacker Drive
Chicago, IL 60066

**Counsel for American Gunite, Inc.**
Varand Gourjian, Esq.
Gourjian Law Group
100 N. Brank Blvd., Sixth Floor
Glendale, CA 91203

David Sherwood
CEO
Daniel's Jewelers
PO Box 3750
Culver City, CA 90231

Alan B. Clark
355 S. Grand Ave
Los Angeles, CA 90071

**Counsel to Bank of America**
Seyfarth Shaw LLP
T. Larry Watts, Eric B. von Zeipel
2029 Century Park East, Suite 3500
Los Angeles, CA 90067-3021

Attorney for Canon Financial Svcs
Scott H. Marcus & Associates
121 Johnson Road
Turnersville, NJ 08012

Roosevelt Lofts
**CREDITORS COMMITTEE**

**Counsel**
Ian Landsberg, Esq.
Landsberg Margulies LLP
16030 Ventura Blvd., Ste. 470
Encino, CA 91436

**Committee Member**
A American Custom Flooring
Attn: Richard S. Lauter
311 S. Wacker Drive
Chicago, IL 60066

**Committee Member**
Kuetar Flooring
Attn: Joseph Kember/Ed Sheats
2 Innovation Drive
Renfrew
Ontario, **CANADA** K7V4B1

**Committee Member**
Bontempi USA
Attn: Yeujye Chen
8919 Beverly Blvd.
West Hollywood, CA 90048

Roosevelt Lofts
Secured Creditors and their agents


Bank of America, N.A.
333 S. Hope St.
11th Floor
Los Angeles, CA 90071

V.G.I. Corporation
5508 S. Santa Fe Avenue
Vernon, CA 90058

Alter Electric Company
5443 Donna Avenue
Tarzana, CA 91356
**Represented by counsel; see below**


Thermalair
1140 Red Gum Street
Anaheim, CA 92806

American Gunite, Inc.
5042 Wilshire Blvd.
Suite 496
Los Angeles, CA 90036

Wrightway Construction, Inc.
1070 E. Dominguez St.
Suite A
Carson, CA 90746


Southland Exterior Building Services, Inc.
9582 Hamilton Ave.
#166
Huntington Beach, CA 92646
**Address change; see below**

Westye Group - West, Inc.
dba Sub-Zero Wolf
145 W. 134th Street
Los Angeles, CA 90061

Integrity Builders West, Inc.
25942 Via Marejada
Mission Viejo, CA 92691


Pfinish Koncepts Inc.
dba Stonecraft Enterprise
2820 N. San Fernando Blvd.
Burbank, CA 91504

Purcell Murray Builder Sales Company, Inc.
2341 Jefferson Street
Suite 200
San Diego, CA 92110

Lynn Safety, Inc.
367 Civic Drive
Suite 8
Pleasant Hill, CA 94523


Thyssenkrupp Elevator, Inc.
6087 Triangle Drive
Los Angeles, CA 90040

Allsale Electric Inc.
7950 Deering Avenue
Canoga Park, CA 91304

Cal-State Steel Corporation
1801 W. Compton Boulevard
Compton, CA 90220


Commercial Glass Company
1577 Tierra Rejada Road
Simi Valley, CA 93065

Addison Pools, Inc.
10835 Magnolia Boulevard
North Hollywood, CA 91601

EJ Reyes Corp.
6328 Roundhill Drive
Whittier, CA 90601


EFCO Corporation
1290 Carbide Drive
Corona, CA 92881

Siemens Building Technologies, Inc.
10775 Business Center Drive
Cypress, CA 90630

SRS Fire Protection, Inc.
6829 Canoga Avenue #2
Canoga Park, CA 91303


Spectra Company
2510 Supply Street
Pomona, CA 91767-2113
**Address change per post ofc; see below**

New World West
940 Challenger Street
Brea, CA 92821

Brewster Marble Co., Inc.
11818 Glenoaks Boulevard
San Fernando, CA 91340


CraneNetics, Inc.
4780 Cheyenne Way
Chino, CA 91710

Dunn-Edwards Corporation
4885 E. 52nd Place
Los Angeles, CA 90040

PM Estrada Roofing
4257 W. 101st Street
Inglewood, CA 90304

HD Supply / White Cap Construction Supply
P.O. Box 1770
Costa Mesa, CA 92626

Glendale Plumbing & Fire Supply
11120 Sherman Way
Sun Valley, CA 91352

Insul-Flow, Inc.
1911 N. Fine
Fresno, CA 93727

American Concrete Cutting Inc.
dba American Demolition/Concrete Cutting
620 Poinsettia Street
Santa Ana, CA 92701

GRIF-FAB Corporation
5350 Newport Street
Commerce City, CO 80022

Frank's Disposal
PO Box 4271
Sunland, CA 91041

Robertson's Ready Mix
PO Box 3600
Corona, CA 92878

Orco Construction Supply
477 N. Canyons Parkway, #A
Livermore, CA 94551

A Fence Company, Inc.
15205 Carretera Drive
Whittier, CA 90605

AB California Acquisition Corp.
dba Acoustical Material Services
10200 S. Pioneer Boulevard,
Suite 500
Santa Fe Springs, CA 90670

Arrow
7635 Burnet Avenue
Van Nuys, CA 91405

**Counsel for Bank of America**
Daniel H. Slate, Esq.
Buchalter, Nemer
1000 Wilshire Blvd., Ste 1500
Los Angeles, CA 90017

Agent for Bank of America
T. Larry Watts, Esq.
2029 Century Park East, Suite 3300
Los Angeles, CA 90067

Agent for V.G.I. Corporation
Patrick J. Duffy, Esq.
725 S. Figueroa St., Suite 3200
Los Angeles, CA 90017

Agent for American Gunite
Bradley A. Raisin, Esq.
16055 Ventura Blvd., Suite 601
Encino, CA 91436

Agent for Wrightway Construction
E. Leonard Fruchter, Esq.
1609 Cravens Avenue
Torrance, CA90501

Agent for Southland Exterior Building Svcs
Fred S. Pardes, Esq.
34211 Pacific Coast Hwy, Suite 103
Dana Point, CA 92629

Agent for Westye Group – West, Inc.
Denise H Field, Esq.
333 Market Street, 25th Floor
San Francisco, CA 94105

Agent for Pfinish Koncepts, Inc.
Alan J. Carnegie, Esq.
23975 Park Sorrento, Suite 227
Calabasas, CA 91302

Agent for Purcell Murray Builder Sales
David J. Barnier, Esq.
2341 Jefferson Street, Suite 200
San Diego, CA 92110

Agent for Lynn Safety
·Herbert Hayden, Esq.
40931 Fremont Boulevard
Fremont, CA 94538

Agent for Cal State Steel Corp
Heather M. Kadeg, Esq.
30423 Canwood Street, Suite 131
Agoura Hills, CA 91301

Agent for EJ Reyes
Meyer S. Levitt, Esq.
10880 Wilshire Blvd., Suite 1101
Los Angeles, CA 90024

Agent for EFCOCorp
Michael C. Brown, Esq.
23230 Chagrin Blvd., Suite 940
Cleveland, OH 44122

Agent for Spectra Company
Beard Hobbs, Esq.
7844 La Mesa Boulevard
La Mesa, CA 91941

Agent for PM Estrada Roofing
J.J. Little, Esq.
1516 S. Bundy Dr., Suite 312
Los Angeles, CA 90025

Agent for American Concrete Cutting
Ryan K. Hirota, Esq.
PO Box 19694
Irvine, CA 92623

Agent for Robertson's Ready Mix
Robert M. Binam, Esq.
200 S. Main Street, Suite 200
Corona, CA 92882

Agent for HD Supply
William D. Schuster, Esq.
2122 N. Broadway
Santa Ana, CA 92706

Southland Exterior Bldg Svcs
27881 La Paz Rd., Ste G
Laguna Niguel, CA 92677

**Counsel for Sidney Alter dba Alter Electric**
Bruce D. Rudman, Esq.
Abdulaziz, Grossbart & Rudman
PO Box 15458
North Hollywood, CA 91615

Spectra Company
2510 Supply Street
Pomona, CA 91767-2113