1  DAVID L. NEALE (SBN 141225)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
3  Los Angeles, California 90067
   Telephone: (310) 229-1234
4  Facsimile: (310) 229-1244
5  Email: dln@lnbrb.com, jyo@lnbrb.com

6  Attorneys for Chapter 11 Debtor and
   Debtor in Possession
7

8

9              **UNITED STATES BANKRUPTCY COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11             **SAN FERNANDO VALLEY DIVISION**

12

13 In re                                    ) Case No. 1:09-bk-14214-GM
                                            )
14 ROOSEVELT LOFTS, LLC, a Delaware         ) Chapter 11
   limited liability company,               )
15                                          )
                                            )
16             Debtor.                      ) **DEBTOR'S          DISCLOSURE
                                            ) STATEMENT           DESCRIBING
17                                          ) CHAPTER    11    PLAN    OF
                                            ) REORGANIZATION**
18                                          )
19                                          ) Hearing:
                                            ) Date:    February 2, 2010
20                                          ) Time:    10:00 a.m.
                                            ) Place:   Courtroom "303"
21                                          )          21041 Burbank Boulevard
                                            )          Woodland Hills, California
22                                          )
23                                          )

24        Roosevelt Lofts, LLC, a Delaware limited liability company (the "Debtor"), the debtor

25 and debtor in possession in the above-captioned chapter 11 bankruptcy case, commenced its

26 chapter 11 bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et

27 seq. (as amended, the "Bankruptcy Code"). The Debtor continues to manage its financial affairs

28

                                    1

# TABLE OF CONTENTS

A.    Purpose of this Document ................................................................................. 2

B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing.......... 3

    1.    Time and Place of the Confirmation Hearing.......................................... 3
    2.    Deadline For Voting For or Against the Plan.......................................... 4
    3.    Deadline for Objecting to the Confirmation of the Plan ......................... 4
    4.    Identity of Person to Contact for More Information
        Regarding the Plan ................................................................................. 4
    5.    Disclaimer .............................................................................................. 4

I.    BACKGROUND .......................................................................................................... 5

A.    Description of Debtor's Business ........................................................................ 5

B.    Events Leading to Commencement of the Debtor's Bankruptcy Case ............... 8

C.    Significant Events During the Debtor's Bankruptcy Case ................................... 9

    1.    Formation of the Committee and Employment of Counsel ................... 10
    2.    Administrative Matters.......................................................................... 10
    3.    Employment of Professionals ............................................................... 10
    4.    Post-Petition Financing to Pay Utility Deposits ................................... 11
    5.    The Debtor's Post-Petition Efforts to Sell Units in the Building .......... 11
    6.    Use of Cash Collateral ......................................................................... 13
    7.    The Debtor's Short-Term Residential Leasing Program ....................... 14
    8.    Settlements with Buyers to Cancel Prepetition Purchase Contracts....... 15
    9.    Easement Litigation ............................................................................. 17
    10.    Negotiation and Filing of the Debtor's Plan of Reorganization............. 19
    11.    Bank's Motion to Dismiss or Convert Case........................................... 20
    12.    The Proposed Auction of Certain Units ............................................... 21

II.    SUMMARY OF THE PLAN OF REORGANIZATION ............................................. 24

A.    What Creditors and Interest Holders Will Receive Under The Plan.................. 24

B.    Unclassified Claims........................................................................................... 24

    1.    Administrative Claims ........................................................................... 24
    2.    Priority Tax Claims............................................................................... 26

C.    Classified Claims and Interests ......................................................................... 26

    1.    Classes of Secured Claims .................................................................... 26
    2.    Classes of Priority Claims .................................................................... 31

    3.    Class of Allowed Unsecured Claims ...................................................... 31
    4.    Class of Interest Holders ...................................................................... 33

D.    Means of Effectuating the Plan and Implementation of the Plan ...................... 33

    1.    Funding for the Plan ............................................................................ 33
    2.    Composition of the Reorganized Debtor and Post-Confirmation
          Management ........................................................................................ 34
    3.    Disbursing Agent ................................................................................ 34
    4.    Objections to Claims ........................................................................... 34
    5.    Interest Pending Allowance of Claims .................................................. 35
    6.    Distributions to be Made Pursuant to the Plan ...................................... 35
    7.    Exculpations and Releases ................................................................... 36
    8.    Injunctions .......................................................................................... 37

E.    Other Provisions of the Plan ........................................................................ 38

    1.    Executory Contracts and Unexpired Leases ........................................... 38

          a) Assumptions .................................................................................. 38
          b) Rejections ..................................................................................... 38

    2.    Changes in Rates Subject to Regulatory Commission Approval ............. 38
    3.    Retention of Jurisdiction ..................................................................... 39
    4.    Nonconsensual Confirmation ............................................................... 40

III.    TAX CONSEQUENCES OF THE PLAN ..................................................................... 40

IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES ....................................... 41

A.    Who May Vote or Object .............................................................................. 41

B.    Who May Vote to Accept/Reject the Plan ...................................................... 41

C.    What Is an Allowed Claim/Interest ................................................................ 41

D.    What Is an Impaired Claim/Interest ............................................................... 42

E.    Who Is Not Entitled to Vote .......................................................................... 43

F.    Who Can Vote in More Than One Class ......................................................... 43

G.    Votes Necessary to Confirm the Plan ............................................................ 43

H.    Votes Necessary for a Class to Accept the Plan .............................................. 43

I.    Treatment of Non-Accepting Classes ............................................................. 44

1        J.    Request for Confirmation Despite Nonacceptance by
              Impaired Class(es) ............................................................................... 44

         K.    Liquidation Analysis...................................................................................... 44

         L.    Feasibility..................................................................................................... 48

V.    EFFECT OF CONFIRMATION OF PLAN ............................................................. 49

         A.    Discharge ...................................................................................................... 49

         B.    Revesting of Property in the Reorganized Debtor.......................................... 50

         C.    Default .......................................................................................................... 50

         D.    Modification of Plan...................................................................................... 50

         E.    Post-Confirmation Status Report.................................................................. 50

         F.    Post-Confirmation Conversion/Dismissal ..................................................... 51

         G.    Post Confirmation U.S. Trustee Fees ............................................................ 51

          H.    Final Decree................................................................................................... 52

DECLARATION OF M. AARON YASHOUAFAR
              53

1

2

3

## STATUTES

11 U.S.C. § 101 ..................................................................................................................... 2

11 U.S.C. § 301 ................................................................................................................... 24

11 U.S.C. § 302 ................................................................................................................... 24

11 U.S.C. § 303 ................................................................................................................... 24

11 U.S.C. § 341(a) .............................................................................................................. 13

11 U.S.C. § 502(c) .............................................................................................................. 30

11 U.S.C. § 507(a) .............................................................................................................. 26

11 U.S.C. § 507(a)(1) ............................................................................................... 22, 23, 40

11 U.S.C. § 507(a)(2) .......................................................................................................... 40

11 U.S.C. § 507(a)(3) .......................................................................................................... 26

11 U.S.C. § 507(a)(4) ..................................................................................................... 26, 40

11 U.S.C. § 507(a)(5) .......................................................................................................... 26

11 U.S.C. § 507(a)(6) .......................................................................................................... 26

11 U.S.C. § 507(a)(7) .......................................................................................................... 26

11 U.S.C. § 507(a)(8) ..................................................................................................... 24, 40

11 U.S.C. § 521 ................................................................................................................... 13

11 U.S.C. § 1101(2) ............................................................................................................ 46

11 U.S.C. § 1106 ................................................................................................................. 13

11 U.S.C. § 1107 ............................................................................................................. 2, 13

11 U.S.C. § 1108 ................................................................................................................... 2

11 U.S.C. § 1112(b) ............................................................................................................ 45

11 U.S.C. § 1126(g) ............................................................................................................ 29

11 U.S.C. § 1127 ................................................................................................................. 37

11 U.S.C. § 1129(a)(8) ........................................................................................................ 41

11 U.S.C. § 1129(b)................................................................................................................. 41

11 U.S.C. § 1141 ..................................................................................................................... 45

28 U.S.C. § 1930(a)(6)............................................................................................................ 46

28 U.S.C. § 1961(a)................................................................................................................. 27

RULES

Federal Rules of Bankruptcy Procedure 1000 ....................................................................... 32

1  and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108

2  of the Bankruptcy Code. One Official Committee of Unsecured Creditors (the "Committee")

3  has been formed to represent the interests of all of the unsecured creditors in the Debtor's

4  bankruptcy case.

5      Chapter 11 allows the Debtor, and, under some circumstances, creditors and other parties

6  in interest, to propose a plan of reorganization. A plan may provide for the debtor to reorganize

7  by continuing to operate, to liquidate by selling the assets of its estate, or a combination of both.

8  In this case, the Debtor is the proponent of the Chapter 11 Plan of Reorganization filed on

9  August 31, 2009 (the "Plan") described herein and sent to you in the same envelope as this

10  document, the Disclosure Statement describing the Plan (the "Disclosure Statement").

11      The effective date of the Plan (the "Effective Date") will be the first business day which

12  is at least eleven days following the date of entry of the Court order confirming the Plan (the

13  "Plan Confirmation Order") when and provided that all of the following conditions to the

14  effectiveness of the Plan have been satisfied or waived by the Debtor: (a) there shall not be any

15  stay in effect with respect to the Plan Confirmation Order; (b) the Plan Confirmation Order shall

16  not be subject to any appeal or rehearing; and (c) the Plan and all documents, instruments and

17  agreements to be executed in connection with the Plan shall have been executed and delivered by

18  all parties to such documents, instruments and agreements. The Debtor following the Effective

19  Date shall be referred to as the "Reorganized Debtor."

20      **A.    Purpose Of This Document**

21      This Disclosure Statement summarizes what is in the Plan and tells you certain information

22  relating to the Plan and the process the Court follows in determining whether or not to confirm the

23  Plan. All capitalized terms not specifically defined herein shall have the same meanings ascribed

24  to them in the Plan.

25      **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

26  **KNOW ABOUT:**

27      **(1)    WHO CAN VOTE OR OBJECT**,

28

2

**(2) WHAT THE TREATMENT OF YOUR CLAIM IS (*i.e.*, what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION,**

**(3) THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING ITS BANKRUPTCY CASE,**

**(4) WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**(5) WHAT IS THE EFFECT OF CONFIRMATION, AND**

**(6) WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You are strongly encouraged to consult your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern

The Bankruptcy Code requires a Disclosure Statement to contain "adequate" information concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B. Deadlines For Voting And Objecting; Date Of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**I. Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan (the

3

1    "Plan Confirmation Hearing") will take place on _____, 2010, at ___:___ __m., before

2    the Honorable Geraldine Mund, United States Bankruptcy Judge, in Courtroom "303," located

3    at 21041 Burbank Boulevard, Woodland Hills, California 91367.

4    **2.    Deadline For Voting For or Against the Plan**

5    If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot

6    and return the ballot in the enclosed envelope to Juliet Y. Oh, Esq., Levene, Neale, Bender,

7    Rankin & Brill L.L.P., 10250 Constellation Boulevard, Suite 1700, Los Angeles, California

8    90067.

9    **YOUR BALLOT MUST BE RECEIVED BY CLOSE OF BUSINESS ON**

10    **_____ _____ ___, 2010 OR IT WILL NOT BE COUNTED.**

11    **3.    Deadline for Objecting to the Confirmation of the Plan**

12    Objections to the confirmation of the Plan must, by _____, 2010, be filed with

13    the Court and served by same day service upon Juliet Y. Oh, Esq., Levene, Neale, Bender,

14    Rankin & Brill L.L.P., 10250 Constellation Boulevard, Suite 1700, Los Angeles, California

15    90067, facsimile: (310) 229-1244, email: jyo@lnbrb.com.

16    **4.    Identity of Persons to Contact for More Information Regarding the**

17    **Plan**

18    Any interested party desiring further information about the Plan should contact Juliet Y.

19    Oh, Esq., Levene, Neale, Bender, Rankin & Brill L.L.P., 10250 Constellation Boulevard, Suite

20    1700, Los Angeles, California 90067; phone: (310) 229-1234; facsimile: (310) 229-1244; email:

21    jyo@lnbrb.com.

22    **5.    Disclaimer**

23    The financial data relied upon in formulating the Plan is based on the Debtor's books and

24    records which, unless otherwise indicated, are unaudited.    The information contained in this

25    Disclosure Statement is provided by the Debtor.    The Debtor represents that everything stated in

26    this Disclosure Statement is true to the Debtor's best knowledge.    The Bankruptcy Court has not

27

28

4

yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**I.**

**BACKGROUND**

**A.    Description and History of the Debtor's Business.**

On April 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor is continuing to manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is the owner of real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "Building"). The Building was originally built in 1927 as an office building, designed by Curlett and Beelman, featuring Beaux Arts Classicism and Italian-Renaissance design influences. The unique and prominent architecture of the Building was recognized by the City of Los Angeles and designated as a Historic Cultural Monument in 1988, then recognized as a national landmark and listed on the National Register of Historic Places in 2007.

In approximately 1998, the Debtor's predecessor in interest purchased the Building, which was at that time about 95% vacant, and infused substantial capital to the project in an effort to revitalize the Building. Within approximately two years, they were successful in increasing the Building's occupancy to approximately 65%.

The Debtor was formed on December 23, 2005 in Delaware for the intended purpose of entering into a ground lease to develop the Building. 100% of the membership interests in the Debtor are owned by Roosevelt Lofts, Inc. ("RLI"). M. Aaron Yashouafar is the President of RLI.

In approximately January 2006, the Debtor entered into an agreement to lease the Building from the previous owners, with an option to buy the Building. The Debtor intended to address the

1    demands of an evolving Downtown residential market by converting the Building from an office

2    building to a luxury residential project.

3        Accordingly, in or about March 2006, the Debtor entered into a construction loan

4    agreement (as supplemented and modified, the "Loan Agreement") with the Bank, pursuant to

5    which the Debtor obtained a loan from the Bank in the original principal sum of $78,840,375.00

6    (the "Loan"). The Loan provided for, among other things, the repayment of the Loan, including

7    accrued and unpaid interest, by March 9, 2009, with two options to extend the term of the Loan for

8    six months each. The obligations of the Debtor in connection with the Loan are secured by a

9    Construction Deed of Trust and a Leasehold Deed of Trust against the Building (collectively, the

10   "Deeds of Trust"). The Loan was obtained by the Debtor for the purpose of converting the

11   Building into 222 individually subdivided, luxury residential condominium units, a commercial

12   retail component on the ground floor, and parking areas which are both subterranean and above

13   grade within the Building.

14       The units in the Building feature a variety of single-, split- and tri-level open area floor

15   plans, ranging from 800 to over 2,700 square feet – including two historically preserved lofts and

16   several tri-level penthouses with direct access to the rooftop pool, cabanas and private gardens.

17   The Building provides upscale city living, incorporating the "Manhattan loft" style of multi-level

18   open floor plans, with the charm and appeal of a historical monument within the center of

19   Downtown's Business District. Amenities at the Building include a world-class fitness center,

20   elegant roof top pool and cabana areas with an outdoor fire pit, a rooftop lounge with full kitchen,

21   tanning and hydrotherapy rooms, a business lounge, wireless internet access, and, unlike many

22   other downtown city projects, onsite valet parking for residents and guests. The Building is

23   conveniently located an escalator ride away from a Seventh Street Metro Center (which is a hub

24   for the Red and Blue subway lines, and located directly beneath the Building), across from Macy's

25   Plaza, steps from the Staples Center, and host to restaurants, a convenience store, and all of the best

26   dining and entertainment downtown Los Angeles has to offer.

27

28

6

In September 2008, the Debtor exercised its option to purchase the Building. By that time, the Debtor had already successfully completed much of the renovations, obtained approval from the California Department of Real Estate to sell units in the Building, and succeeded in entering into binding legal contracts for the sale of approximately sixty (60) of the units.

By November 2008, the Debtor had obtained a temporary and partial certificate of occupancy, and begun closing escrow for units already sold under contract. In addition, the guarantors of the Loan obtained a line of credit in the principal sum of $4,000,000 from the Bank, which enabled the Debtor to complete construction on the first eight floors of the Building, including all of the Building's commercial retail space, and obtain a temporary certificate of occupancy by November 2008.

During the two years prior to the Petition Date, the Debtor spent well over $1 million on an extensive marketing and advertising campaign to attract potential purchasers for the units in the Building. The Debtor's target demographic is single individual professionals, empty nesters, or married couples without children between the ages of 25-55 who are looking for a multi-function (work/live) residence or a second home for business commuting purposes. To reach this target demographic, the Debtor hosted or sponsored over fifteen different events and open houses at the Building and off-site to attract interest in, and showcase, the Building and its units. The Debtor also obtained exposure for the Building by advertising extensively in numerous local and national publications including, among others, Variety, Los Angeles Times, LA Weekly, and The Robb Report. In addition, the Debtor secured various celebrity endorsements and residents to further promote the project. As a result of these extensive marketing efforts, the Debtor successfully entered into binding legal contracts for the sale of certain of the units.

In connection with the anticipated closing of escrow for those units under contract, the Debtor also made arrangements with its title and escrow companies to prepare for the closing of escrow and the issuance of title policies to the buyers in connection therewith. The Debtor also provided the Bank with notice of the anticipated sales of those units which were under contract as well as estimated closing statements for such units.

7

1    **B.      Events Leading To Commencement Of The Debtor's Bankruptcy Case.**

2           While continuing its marketing and sale of the units in the Building, the Debtor began

3    discussing various options with the Bank regarding the Loan, including the possibility of

4    borrowing an additional approximately $4 million in order to complete work on the Building,

5    which work consisted of straightforward finish work required to complete the units located on the

6    ninth through thirteenth floors.  The Debtor also approached the Bank regarding the exercise of the

7    Debtor's extension rights under the Loan or other extension of the Loan term in order to allow the

8    Debtor to continue selling units within the Building.

9           Abruptly, the Bank revoked a prior instruction to the Debtor's title and escrow companies

10   regarding the Bank's consent to proceed with the closing of escrow for the units under contract.

11   The Bank instructed the title and escrow companies not to permit the sale of such units indicating

12   that any such sale would have to be pre-approved by the Bank and that no sale of any of the units

13   was being pre-approved by the Bank at that time.

14          Despite the Debtor's efforts to work constructively with the Bank to come to terms about

15   the repayment of the Loan and the completion of the Building, on or about December 30, 2008, the

16   Bank issued a notice of default to the Debtor, contending that the Debtor had defaulted on its

17   obligations under the Loan.  It is noteworthy that the alleged default had nothing to do with the

18   payment of any financial obligations owed by the Debtor to the Bank.

19          Even after receiving the notice of default from the Bank, the Debtor continued to invest a

20   considerable amount of time and effort obtaining independent appraisals, conducting market

21   research, and providing the Bank with alternative plans for the completion of the Building and the

22   sale of all of the units in the Building.  All aspects of dealing with the Building were covered in the

23   Debtor's restructuring proposals, including a plan to sell all units, rent all units, or to both sell and

24   rent units through a hybrid plan.  In the meantime, given the Bank's lack of cooperation, the

25   Debtor continued to market and sell units within the Building.  The Bank rejected all of the plans

26   proposed by the Debtor for the completion of the Building and the sale of units, without any

27   explanation or discussion.

28

8

In addition, the Debtor continued to make repeated requests to the Bank to obtain the Bank's consent to begin closing escrow on the units sold under contract. The Debtor's requests were repeatedly denied by the Bank. Meanwhile, the prospective buyers under contract became increasingly nervous, particularly given the current economic and global market crises. Some of these buyers sent letters to and/or filed lawsuits against the Debtor demanding that their sale contracts be cancelled and their deposits paid in connection with the sale contracts be returned.

Subsequently, on April 3, 2009, the Bank filed a complaint against the Debtor and others in the Superior Court of the State of California, County of Los Angeles ("State Court") for, among other things, specific performance, appointment of a receiver, and judicial foreclosure on its Deeds of Trust. Pursuant to its complaint in the State Court action, the Bank has asserted a claim against the Debtor and others in an amount exceeding $79 million. Days after filing its complaint, the Bank made an *ex parte* application with the State Court for the appointment of a receiver notwithstanding the fact that the Building is in excellent condition and repair, secured by 24-hour security and was not generating any meaningful income at the time of the filing of the State Court action.

Despite the Bank's filing of the State Court action, the Debtor continued its efforts to try and work consensually with the Bank towards the goal of completing the construction of the Building, selling the units in the Building, and repaying the Loan in full. However, the Bank rebuffed the Debtor's efforts and instead focused its efforts on proceeding with its foreclosure action and having a receiver appointed.

As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code in order to have the ability and opportunity to close escrow on the units that were then under contract, to market and sell the remaining units in the Building, and to complete construction on the Building, all of which will allow the Debtor to repay the Loan and its other debts for the benefit of all creditors.

## C.    Significant Events During The Debtor's Bankruptcy Case.

The following is a list of significant events which have occurred during the Debtor's

9

1    chapter 11 case:

2         1.    Formation of the Committee and Employment of Counsel

3         The Office of the United States Trustee (the "OUST") appointed an Official Committee
4    of Unsecured Creditors (the "Committee") to represent the interests of the unsecured creditors in
5    the Debtor's bankruptcy case. There are three members of the Committee consisting of Kultur
6    Flooring USA, Inc., Bontempi USA, and A American Custom Flooring. The Committee
7    employed the law firm of Landsberg Margulies LLP as bankruptcy counsel, with Ian S
8    Landsberg, Esq. serving as lead counsel. Mr. Landsberg's contact information is as follows
9    Ian S. Landsberg, Esq., Landsberg Margulies LLP, 16030 Ventura Blvd., Suite 470, Encino.
10   California 91436, telephone:    (818) 705-2777; facsimile:    (818) 705-3777; email
11   ilandsberg@landsberg-law.com.

12        2.    Administrative Matters

13        The Debtor was required to address the various administrative matters attendant to the
14   commencement of its bankruptcy case. These matters included the preparation of the Debtor's
15   Schedules of Assets and Liabilities and Statement of Financial Affairs, and the preparation of
16   materials required by the OUST. The Debtor has made every effort to comply with its duties
17   under 11 U.S.C. Sections 521, 1106 and 1107 and all applicable OUST guidelines, including the
18   filing of the Debtor's monthly operating reports with the OUST. The Debtor also attended the
19   meeting of creditors required under 11 U.S.C. § 341(a).

20        3.    Employment of Professionals

21        The Debtor has employed Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB") as
22   its bankruptcy counsel. The Court entered an order approving LNBRB's employment on May
23   28, 2009.

24        The Debtor has also employed the Ives, Kirwan & Dibble APC ("IKD") as special
25   litigation counsel in connection with certain state court litigation relating to the respective
26   easement rights of the Debtor, Los Angeles Community College District (the "District") and 700
27   Wilshire Properties ("700 Wilshire") to use the alley that exists between their properties (the

28

10

"Easement Litigation").    The Court entered an order approving IKD's employment on November 20, 2009.

### 4.    Post-Petition Financing to Pay Utility Deposits

Shortly after the Petition Date, on May 7, 2009, the Debtor filed an emergency motion seeking authority to provide adequate assurance of future payment in the form of cash deposits to certain utility companies pursuant to Section 366(c) of the Bankruptcy Code (the "Utility Motion"). Concurrently with the Utility Motion, the Debtor filed an emergency motion seeking authority to obtain financing from the Debtor's affiliate, Milbank Holding Corp. ("Milbank") on an administrative expense priority basis to fund the adequate assurance cash deposits to the Debtor's utility companies (the "Financing Motion"). At a hearing held on May 12, 2009, the Court granted the Utility Motion and authorized the Debtor to provide adequate assurance of payment to the utility companies in the form of cash deposits in the amounts proposed by the Debtor. The Court deemed the amounts of those deposits to constitute adequate assurance of payment to the utility companies, and the Court prohibited the utilities from altering, refusing, or discontinuing utility services on account of any debts owed by the Debtor to the utility companies for services rendered pre-petition. Also at the hearing on May 12, 2009, the Court granted the Debtor's Financing Motion and authorized the Debtor to obtain financing from Milbank on an administrative expense priority basis in an amount sufficient to fund the cash deposits to the utility companies approved by the Court.

### 5.    The Debtor's Post-Petition Efforts to Sell Units In The Building

As noted above, prior to the Petition Date, the Debtor entered into purchase and sale agreements with a number of buyers for certain of the units in the Building (the "Pre-Petition Sale Contracts"). On May 20, 2009, the Debtor filed a motion seeking Court authority to assume eighteen (18) of the Pre-Petition Sale Contracts and to consummate the sales of the units under the terms thereof, free and clear of all liens, claims, interests and encumbrances (the "First Sale Motion"). These eighteen Pre-Petition Contracts were the ones the Debtor believed were most likely to go forward.

11

Subsequently, on May 26, 2009, the Debtor filed a second motion seeking Court authority to enter into two (2) post-petition purchase and sale contracts (the "Post-Petition Sale Contracts") and to consummate the sales of the units under the terms thereof (the "Second Sale Motion," and together with the First Sale Motion, the "Sale Motions").

Based upon the Debtor's evaluation of appraisals obtained in or around February 2009 of certain units in the Building, the Debtor believed that the proposed sale price for each of the twenty (20) units that were the subject of the Sale Motions represented at least the fair market value of each such unit. In addition, all of the units that were the subject of the Sale Motions were to be sold at prices that exceeded the minimum release prices for such units previously agreed to by the Bank. Specifically, Exhibit "O" to the Loan Agreement is an agreement between the Debtor and the Bank relating to the Construction and Sale of Units (the "Release Price Agreement"), pursuant to which the Debtor agreed, among other things, to take all actions necessary to develop, market and sell the units in the Building pursuant to a pro forma sales agreement approved by the Bank. Subject to certain conditions, in the event that the sale price for any unit was in excess of a specified release price for such unit set forth in Schedule "1" attached to the Release Price Agreement, the Bank consented to the sale of such unit and agreed to issue a partial reconveyance of its deed of trust on such unit to permit the sale to a buyer to close. Subsequently, the Debtor and the Bank entered into a Modification Agreement (the "Loan Modification Agreement") which modified certain terms of the Loan Agreement, including, without limitation, the release prices for the Units originally set forth in the Release Price Agreement. The release prices for the Units set forth in Schedule "1" attached to the Release Price Agreement are superseded by the release prices described in the Loan Modification Agreement.

As of the Petition Date, there were numerous mechanic's liens recorded against the Building by various subcontractors. The Debtor believes that the total amount of the mechanic's liens recorded or otherwise asserted against the Building is approximately $11.8 million.[1]

---

[1] The Debtor does not acknowledge the validity of any of the mechanic's liens that have been recorded against the Building and expressly reserves all of its rights, claims and defenses with respect to such liens.

1    The Bank, a number of alleged mechanic's lienholders, and certain buyers filed oppositions
2  to one or both of the Sale Motions. At the June 10, 2009 hearing on the First Sale Motion, the
3  Court continued the hearings on both Sale Motions to August 4, 2009 at 10:00 a.m. and
4  encouraged the parties, namely, the Debtor, the Bank and the Committee to discuss the terms of,
5  and formulate, a consensual plan of reorganization. The hearings on the Sale Motions have been
6  continued numerous times since the initial hearing on June 10, 2009, and are currently scheduled to
7  go forward on February 2, 2010 at 10:00 a.m. (the same date and time as the hearing on this
8  Disclosure Statement)

9        6.    Use of Cash Collateral

10   Since the Petition Date, the Debtor has received income derived primarily, if not entirely,
11  from rent received from the Debtor's commercial and residential tenants in the Building. As of
12  August, 2009, the Debtor estimated that it would generate rent revenue of approximately $40,000
13  per month, and possibly more if the Debtor was authorized to lease additional units in the
14  Building. The Debtor requested that the Bank stipulate to the Debtor's use of cash collateral to
15  maintain the Building and to pay the Debtor's operating expenses relating to the Building,
16  including, among other things, insurance, utilities, parking, security services, janitorial services
17  and other operational costs associated with the Building, as well as to pay a post-petition balance
18  of $49,689.47 owed to the Los Angeles Department of Water and Power ("DWP"). DWP had
19  advised the Debtor that the foregoing amount needed to be paid by August 30, 2009 or that it
20  would terminate electricity and other utility services to the Building.

21   Although the Bank eventually consented to the Debtor's use of cash collateral to pay the
22  post-petition balance of $49,689.47 to DWP, the Bank did not consent to the Debtor's use of
23  cash collateral to pay the Debtor's other operating expenses. Accordingly, on August 27, 2009,
24  the Debtor filed an emergency motion seeking authority to use its cash collateral in accordance
25  with an operating budget extending through December 31, 2009, and to obtain financing on an
26  administrative expense priority basis from Milbank (its affiliate) to cover the operating shortages
27  set forth in such budget. The Court granted the Debtor's cash collateral motion and authorized
28

13

1    the Debtor to use its cash collateral, subject to the terms and conditions described in an interim
2    order entered by the Court on September 8, 2009 and a final order entered by the Court on
3    October 5, 2009.

4    7.    The Debtor's Short-Term Residential Leasing Program

5    In the Bank's oppositions to the Sale Motions, the Bank suggested that renting the
6    residential units in the Building on a short-term basis would be a more prudent solution than selling
7    the units on an individual basis, particularly given the currently depressed state of the real estate
8    market. The Debtor determined, in the exercise of its sound business judgment and, in part, in
9    response to the objection of the Bank to the Sale Motions, that renting residential units in the
10    Building for a short term would allow the Debtor to continue to pursue longer term strategies for
11    the restructuring of its financial affairs, including, without limitation, the sale or further lease of
12    units, a combination thereof, or a sale of the Building, while at the same time generating cash flow
13    to help offset the operating expenses being incurred on a monthly basis.

14    Although the Debtor did not believe the Bank's consent to the Debtor's proposed leasing
15    program was required, since the Debtor was attempting to cooperate with the Bank in formulating
16    a mutually agreeable plan of reorganization, the Debtor first approached the Bank in mid-June
17    2009 regarding the parameters of the Debtor's proposed short-term leasing program and sought the
18    Bank's consent to such program. When the Bank's consent to the Debtor's proposed leasing
19    program was not forthcoming, the Debtor filed an emergency motion on August 27, 2009 seeking
20    authority to commence the program to permit the Debtor to enter into short-term residential leases.
21    Although the Bank had previously suggested that a leasing program would be acceptable, the Bank
22    objected to the Debtor's motion seeking authority to enter into short-term residential leases. The
23    Court ultimately authorized the Debtor to commence its proposed short-term leasing program,
24    subject to the terms and conditions described in the order entered by the Court on September 8,
25    2009.

26    Subsequently, the Debtor successfully negotiated and entered into numerous residential
27    leases in accordance with the Debtor's short-term leasing program. Currently, approximately
28

14

1  twenty eight (28) of the units in the Building are being leased, with leases for a number of
2  additional units pending.

3          8.      Settlements with Buyers to Cancel Prepetition Purchase Contracts

4          Prior to the Petition Date, the Debtor, on the one hand, and buyers Ryan Anderson, Keith
5  McCarthy-Smith, Eric Spamer, Brian Young, David Shafer, Puya Partow, Patricia Mahaffey,
6  Robert Ni and Michael Ni (collectively, the "Anderson Plaintiffs"), Dennis Stapleton, Susan B
7  McGee, Laura S. McGee, Yana Lisetsky, Timothy Justin Patwin, Maria Cecelia G. Ramos, Gary
8  Glass, David Tsao, Adrienne Salerno, Joe Salerno, Steven Dornbusch and Sabrina Idroos
9  (collectively, the "Stapleton Plaintiffs"), Ha Bing Kang and Brian Dougherty (collectively, the
10  "Kang Plaintiffs"), and Herbert Mayer (together with the Anderson Plaintiffs, Stapleton
11  Plaintiffs and Kang Plaintiffs, the "Plaintiff Buyers"), on the other hand, entered into purchase
12  agreements (collectively, the "Purchase Agreements," and individually a "Purchase
13  Agreement"), pursuant to which the Plaintiff Buyers agreed to purchase certain units in the
14  Building.  Pursuant to the terms of the Purchase Agreements, the Plaintiff Buyers deposited
15  funds (collectively, the "Deposits," and individually, a "Deposit") into escrow accounts in
16  connection with the anticipated purchases of the units, which accounts are maintained by First
17  American Title Insurance Company or Mara Escrow Company (as applicable, the "Escrow
18  Holder").

19          Both prior to and following the Petition Date, the Plaintiff Buyers demanded that their
20  respective Purchase Agreements be terminated and that their respective Deposits be returned in
21  full to them.  The Plaintiff Buyers contended that, under the terms of the Purchase Agreements,
22  they were entitled to unilaterally terminate the Purchase Agreements and to obtain full refunds
23  of their Deposits.  The Debtor disagreed with the Plaintiff Buyers and contended instead that the
24  Plaintiff Buyers had forfeited their respective Deposits under the terms of the Purchase
25  Agreements and that the Purchase Agreements could be legally enforced against the Plaintiff
26  Buyers.

27

28

                                            15

1        Prior to the Petition Date, on March 17, 2009, the Anderson Plaintiffs filed a complaint

2    for (1) Fraud – Intentional Misrepresentation; (2) Deceit – Negligent Misrepresentation; (3)

3    Breach of Contract; (4) Rescission for Violation of the Subdivided Lands Act, Bus. & Prof.

4    Code § 11000 et seq.; (5) Damages For Violation Of The Interstate Land Sales Act, 15 U.S.C. §

5    1701 et seq.; (6) Rescission for Violation of the Interstate Land Sales Act; (7) Rescission for

6    Fraud; (8) Rescission for Mistake; (9) Rescission for Failure of Consideration; (10) Constructive

7    Trust; and (11) Declaratory Relief against the Debtor, thereby commencing that certain action in

8    the Superior Court of the State of California in and for the County of Los Angeles, bearing case

9    No. BC 409875 (the "Anderson Action"). On July 23, 2009, the Anderson Plaintiffs filed a

10   notice of removal of the Anderson Action to this Court, thereby commencing that certain

11   adversary proceeding bearing the number 1:09-ap-01267-GM.

12       On June 17, 2009, the Stapleton Plaintiffs filed a complaint against the Debtor in the

13   Bankruptcy Court that was virtually identical to the complaint filed by the Anderson Plaintiffs,

14   thereby commencing that certain adversary proceeding bearing the number 1:09-ap-01190-GM

15   (the "Stapleton Action").

16       Subsequently, on September 15, 2009, the Kang Plaintiffs filed a complaint against the

17   Debtor in the Bankruptcy Court that was virtually identical to the complaints filed by the

18   Anderson Plaintiffs and the Stapleton Plaintiffs, thereby commencing that certain adversary

19   proceeding in the Bankruptcy Court bearing the number 1:09-ap-01379-GM (the "Kang

20   Action").

21       Although Herbert Mayer was not a named party to the Anderson Action, the Stapleton

22   Action or the Kang Action, Mr. Mayer was represented by the same law firm that represented

23   the Anderson Plaintiffs, Stapleton Plaintiffs and Kang Plaintiffs and had indicated that he

24   intended to file a similar complaint against the Debtor.

25       Recognizing the risks, costs and delays associated with further litigation, the Debtor and

26   the Plaintiff Buyers engaged in extensive, good faith settlement negotiations, which were

27   fruitful and ultimately resulted in a settlement agreement which provides for the termination of

28

1    all of the Purchase Agreements, an allocation of the Deposits between the Plaintiff Buyers and

2    the Debtor, and the dismissal of the Anderson Action, the Stapleton Action and the Kang Action

3    with prejudice. The Court entered an order approving the settlement agreement between the

4    Debtor and the Plaintiff Buyers on December 14, 2009.

5          In addition to the Plaintiff Buyers, a number of other individual buyers approached the

6    Debtor regarding the termination of their respective purchase agreements and the return of their

7    deposits. The Debtor and these individual buyers also engaged in good faith settlement

8    negotiations, which were fruitful and ultimately resulted in settlement agreements with

9    individual buyers which provided for the termination of the buyers' respective purchase

10   agreements and an allocation of the deposits between such buyers and the Debtor. The Court

11   has entered numerous orders approving the Debtor's settlement agreements with these

12   individual buyers.

13         9.    Easement Litigation

14         The Los Angeles Community College District (referred to herein as the "District"), 700

15   Wilshire Properties (referred to herein as "700 Wilshire") and the Debtor each own and operate

16   buildings in downtown Los Angeles that are adjacent to one another, and each of them have an

17   easement right to use the approximately 30 foot wide and approximately 100 feet long alley that

18   is between their properties (the "Alley").

19         Prior to the Petition Date, on September 4, 2007, 700 Wilshire filed a complaint against

20   the Debtor and others seeking a permanent injunction, declaratory relief and other relief relating

21   to the Debtor's easement right to use the Alley, thereby commencing that certain action in the

22   Superior Court of the State of California for the County of Los Angeles bearing the number BC

23   377008 (the "Easement Action"). The Easement Action includes two related cross-actions

24   commenced by the Debtor and the District, respectively.

25         Pursuant to their respective complaints in the Easement Action, 700 Wilshire and the

26   District contend, among other things, that the Debtor is unreasonably burdening the easement on

27   the Alley by attempting to use it for continuous automobile traffic to and from the Building.

28

17

On or about February 5, 2009, the District filed a notice of appeal from a temporary restraining order/preliminary injunction issued by the judge presiding over the Easement Action which, among other things, ordered the District to remove obstacles and cease interference with the Debtor's use of the Alley for continuous automobile traffic. That appeal has remained pending in the Second Appellate District of the California Court of Appeal, Case No. B214024 (the "Easement Appeal").

A jury trial took place in the Easement Action from March 12 through March 25, 2009. At the conclusion of the trial, on March 25, 2009, the jury held that the Debtor's "use of the alley for egress of cars from the Roosevelt Building overburdens the alley easement." The jury found that the Debtor had not committed trespass and nuisance against 700 Wilshire when the Debtor's general contractor demolished the existing surface of the Alley and replaced it with another one.

On March 25, 2009, the judge in the Easement Action ordered that the Debtor, the District, and 700 Wilshire each file and serve upon the other parties an Opening Memorandum of Points and Authorities presenting their respective positions on how the judge should effectuate the decision of the jury and rule on the remaining issues. The judge further ordered that the Debtor, the District and 700 Wilshire each file and serve a Reply Memorandum on April 24, 2009, with the hearing on the matters to take place before the judge on April 29, 2009.

Following the Petition Date, on June 19, 2009, the District filed a motion in the Debtor's bankruptcy case seeking relief from the automatic stay to permit the completion of proceedings in both the Easement Action and the Easement Appeal (the "District's Motion for Relief"). The Debtor did not oppose the District's Motion for Relief, and the Court entered an order granting the District's Motion for Relief on August 6, 2009.

Shortly thereafter, the Bank filed a motion in the Easement Action seeking leave to intervene in the Easement Action. The Bank's motion was ultimately denied by the State Court.

As noted previously, the Debtor has employed IKD to represent the Debtor in connection with the Easement Action and the Easement Appeal. IKD is also representing the Debtor's co-

18

1    defendants in the Easement Action and the Easement Appeal, namely, Alliance Property

2    Investments Inc., Carla Ridge LLC, Maverick Holdings LLC, S&M Yashoua Investments and

3    Desert Field LLC.

4        After review of the briefs filed, and after hearing oral arguments, the State Court took the

5    matter under submission on November 2, 2009. On December 14, 2009, the State Court judge

6    issued a Tentative Decision, finding in favor of the Debtor, and ruling that there was no

7    overburdening of the Alley by the Debtor. The court further ruled that the Alley is to allow the

8    Debtor an unrestricted easement for of right away permitting the free passage of vehicles in the

9    Alley. The court further held that neither 700 Wilshire nor the District may interfere with

10   Debtor's use of the Alley, and that the Debtor is entitled to a permanent injunction which

11   prohibits either 700 Wilshire or the District from placing any obstructions in the Alley which

12   prevent Debtor's use of the same.

13       10.    Negotiation and Filing of the Debtor's Plan of Reorganization

14       Following the June 10, 2009 hearing on the First Sale Motion, and at the Court's

15   suggestion, the Debtor engaged in discussions with the Bank and the Committee in an effort to

16   formulate the terms of a consensual plan of reorganization. The Debtor and the Bank, with the

17   participation of the Committee, exchanged a number of proposals and counterproposals

18   regarding the terms of a plan of reorganization, and had extensive discussions, through counsel,

19   regarding such proposals and counterproposals.

20       On August 5, 2009, while the Debtor was continuing to engage in discussions with the

21   Bank and the Committee regarding the potential terms of a plan of reorganization, the Debtor

22   filed a motion seeking an order extending its exclusivity periods to file a plan of reorganization

23   and obtain acceptance thereof for ninety (90) days, from August 11, 2009 and October 10, 2009,

24   respectively, through and including November 9, 2009 and January 8, 2010, respectively. The

25   Court entered an order granting the Debtor's motion and extending the Debtor's plan exclusivity

26   period as requested on August 28, 2009.

27

28

19

In light of the ongoing discussions among the Debtor, the Bank and the Committee regarding the terms of a consensual plan of reorganization, the parties entered into a number of stipulations which provided for the Bank to refrain from exercising any of its rights to seek relief from stay under Section 362(d)(3) and provided for the extension of the Section 362(d)(3) time period applicable to the Debtor's case to and including August 31, 2009.[2] However, after the Bank refused to stipulate to a further continuance of the Section 362(d)(3) time period applicable to the Debtor's case, the Debtor filed the Plan on August 31, 2009.

After filing the Plan, the Debtor reached out to various subcontractors who had recorded or otherwise asserted mechanic's liens against the Building (collectively, the "Alleged Mechanic's Lienholders") and arranged an "all hands" meeting to discuss the terms of the Debtor's Plan and to resolve any disputes relating to the Plan. The Debtor's representatives and approximately twenty of the Alleged Mechanic's Lienholders attended the "all hands" meeting, which was conducted on October 29, 2009. At the meeting, the Debtor agreed, within two weeks, to provide to each of the Alleged Mechanic's Lienholders who attended the meeting a note that contains (1) the Debtor's computation of its claim, (2) a brief explanation of any dispute concerning the amount of its claim, and (3) a proposed date and time for a meeting or telephone conference to discuss the resolution of any disputes concerning its claim. The Debtor has provided the foregoing information to each of the Alleged Mechanic's Lienholders who attended the meeting and has begun engaging in discussions with such Alleged Mechanic's Lienholders, on an individual basis, in an effort to resolve any disputes relating to the calculation of their respective claims.

11.    Bank's Motion to Dismiss or Convert Case

On November 24, 2009, the Bank filed a motion seeking to dismiss the Debtor's bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the "Dismissal Motion"). The hearing on the Dismissal Motion was originally calendared for

---

[2] Section 362(d)(3) of the Bankruptcy Code provides, among other things, that the Bank may obtain relief from the automatic stay unless, within 90 days after the Petition Date (or such later date as the Court may determine for cause by an order entered within that 90-day period), the Debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time or the Debtor has commenced monthly interest payments to the Bank.

20

1    December 15, 2009. Pursuant to a stipulation entered into by the Debtor and the Bank, and
2    approved by the Court, the hearing on the Dismissal Motion has been continued to February 2,
3    2010 at 10:00 a.m. In addition, pursuant to the foregoing stipulation, the Debtor agreed to file a
4    disclosure statement with respect to the Plan, as well as a notice of the hearing on such disclosure
5    statement, by December 28, 2009.

6    12.    The Proposed Auction of Certain Units

7    One of the concerns expressed by the Bank in its oppositions to the Sale Motions was the
8    potential negative impact that a sale of only a few, but not a substantial number, of the units
9    could have on the value of the Building and the remaining units in the Building. Based on the
10   Bank's concerns, among other things, the Debtor has determined that conducting a public
11   auction of a large proportion of the units in the Building, following an aggressive marketing
12   campaign, will generate substantial interest in the Building and its units within the market, and
13   result in the expeditious closing of sales on such units within a short span of time.

14   Accordingly, on December 24, 2009, the filed a motion (the "Auction Motion") seeking
15   authority to employ Kennedy Wilson Auction Group Inc. ("KW"), a highly experienced
16   auctioneer company, to publicize, market and offer approximately sixty five (65) condominium
17   units in the Building for sale through a public auction, pursuant to the terms and conditions set
18   forth in that certain *"Residential Marketing Agreement"* entered into by the Debtor and KW (the
19   "Residential Marketing Agreement"). The principal terms of the Residential Marketing
20   Agreement are summarized below:

21           a.    *The Units to be Included at Auction.* Approximately sixty five (65) Units,
22   but no fewer than fifty (50) Units and no more than seventy five (75) units (collectively, the
23   "Units," and each, a "Unit"), will be offered and sold at the auction. The Units that will be
24   considered by the Debtor and KW for inclusion in the public auction are those units in the
25   Building that have been completed and are not currently being leased to tenants under the
26   Debtor's residential leasing program, as more particularly described in the Residential
27   Marketing Agreement and the exhibits thereto.

28

b. *Proposed Auction Date.* The proposed auction date is February 14, 2010, subject to the approval of the Bankruptcy Court and the timing of such approval.

c. *Reserve Prices and Bidding for Units.* Each of the Units will be offered for sale subject to an unpublished reserve amount that will be unknown to prospective buyers ("Prospective Buyers"). The reserve amount for each of the Units will be at least the minimum release price for each such Unit as previously agreed to by the Bank under the Loan Modification Agreement. The Debtor will accept and execute a purchase agreement with each Prospective Buyer who submits a winning bid equal to or greater than the unpublished reserve for each Unit. The Debtor will offer a special incentive (*i.e.,* credit of no less than \$2,500 towards non-recurring closing costs at the close of escrow) for auction day Prospective Buyers who close escrow within 45 days of the auction with financing arranged by the Debtor.

d. *Exclusive Listing Authority.* KW will have exclusive authorization and right to sell the Units for a period of sixty (60) days following the auction (the "Listing Period"). During the Listing Period, KW shall provide personnel, as KW reasonably determines sufficient and at KW's own cost, for the marketing of the Units.

e. *Proposed Compensation to KW.* As compensation for its services, KW will receive a commission equal to 4.0% of the final purchase price for each Unit, which commission will be paid at the close of escrow. All out-of-pocket costs incurred by KW in connection with the marketing, promotion and management of the auction, as set forth in the Marketing Budget described in the Residential Marketing Agreement, shall be reimbursed to KW through the first ten (10) escrow closings at a rate of \$25,000 per closing.

f. *Other Broker Commissions.* Registered cooperating brokers who represent successful bidders and meet the requirements set forth in Section 5 of the Residential Marketing Agreement shall be paid an additional 2.0% cooperating broker commission, which commission shall be paid at the close of escrow.

g.     *Financing and Prequalification of Buyers.*   KW will research and coordinate the use of a preferred lender for the auction so that Prospective Buyers can take advantage of financing options.   KW will also prequalify all Prospective Buyers, so as to insure that bidders on auction day will have the financial capability to perform at closing.

The Debtor is seeking the relief requested in the Auction Motion on an expedited basis so that the estate can capitalize on current market conditions and sell the Units while the supply for comparable residential units in the downtown Los Angeles market is limited.  The Debtor and KW believe that, while the number of luxury condominium units in downtown Los Angeles that are currently available for sale is low, that number will increase substantially in February or March 2010 when a number of other residential projects in downtown Los Angeles are expected to become available for sale.  The Debtor and KW believe that it is critical to capitalize on the current downtown Los Angeles market conditions and conduct a public auction of the Units as soon as possible, but no later than mid-February 2010 in order to obtain the highest prices possible for such Units, and have the least amount of competition with other projects.   However, in order to effectively and aggressively market the Units for auction, KW requires a lead time of approximately forty five (45) days prior to the auction date (*i.e.*, beginning in early January 2010) in order to properly advertise, market and publicize the auction.  Since KW is not willing to provide any services until the Court has approved the Auction Motion, the Debtor has filed an *ex parte* motion for an order shortening time on notice for hearing on the Auction Motion, pursuant to which the Debtor is seeking to have the Auction Motion heard as soon as practicable for the Court, but in no event later than January 8, 2010.

If the Auction Motion is granted and the Debtor is authorized to conduct a public auction of the Units and offer such Units for sale, the Debtor will amend the Plan and this Disclosure Statement accordingly.

/ / /

/ / /

/ / /

23

## II.

## SUMMARY OF THE PLAN OF REORGANIZATION

### A.    What Creditors And Interest Holders Will Receive Under The Plan

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive. A claim or interest is classified in a particular class only to the extent that it falls within the description of that class. To the extent that part of a claim or interest falls within a different class description, the claim or interest is classified in that different class.

### B.    Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Therefore, the Debtor has not placed the following claims in classes:

#### 1.    Administrative Claims

Administrative claims are claims for costs or expenses of administering the Debtor's chapter 11 case which are entitled to priority under Bankruptcy Code Section 507(a)(2). The Bankruptcy Code requires that all allowed administrative claims be paid on the Effective Date, unless a particular holder of an allowed administrative claim agrees to a different treatment.

The following chart lists all of the Debtor's known administrative claims, in the amounts the Debtor estimate will be unpaid on the Effective Date, and their treatment under the Plan.

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| Clerk's Office Fees | $0 | Paid in full on the Effective Date |
| Office of the U.S. Trustee Fees | $0 | Paid in full on the Effective Date |
| Levene, Neale, Bender, Rankin & Brill L.L.P., | $350,000 (est.) in excess of any amounts paid | Paid in full on the later of (1) the Effective Date, or (2) the date the |

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| bankruptcy counsel for the Debtor | pursuant to Court order prior to the Effective Date. | Court allows such fees and expenses pursuant to a final order. |
| Landsberg Margulies LLP, counsel to the Official Committee of Unsecured Creditors (the "Committee") | $30,000 (est.) | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such fees and expenses pursuant to a final order. |
| Milbank Holding Corp. (referred to herein as "Milbank") | $500,000 (est.) | To be assigned to Roosevelt Lofts. Inc. (referred to herein as "RLI") and thereafter converted to equity upon confirmation of the Plan as a component of the new value contributed by RLI in exchange for new equity interests in the Reorganized Debtor. |
| TOTAL | $880,000 (est.) | |

The administrative claim amounts set forth above represent only the Debtor's best estimate as to the amount of allowed administrative claims in the Debtor's case, based upon information provided by the administrative claimants and information in the possession or control of the Debtor. The actual amount of allowed administrative claims may be higher or lower.

Bankruptcy Court Approval of Professional Fees Required

Before they may be paid, the Bankruptcy Court must approve and allow all unpaid fees and expenses of professionals employed at the expense of the Debtor's bankruptcy estate. For all professional fees and expenses, the professional in question must file and serve a properly noticed final fee application and the Court must rule on the application. Only the amount of fees and expenses allowed by a final order of the Bankruptcy Court will be paid under the Plan.

By voting to accept the Plan, Creditors are not acknowledging the validity of, or consenting to the amount of, the allowed administrative claim of any professional employed at the expense of the Debtor's bankruptcy estate, and creditors are not waiving any of their rights to object to the allowance of any of the administrative claims asserted by such professionals.

## 2. Priority Tax Claims

Except to the extent the holder of a particular claim has agreed to different treatment, the Bankruptcy Code requires that the holder of an allowed priority tax claim receive on account of such claim either (i) payment in full on the Effective Date, or (ii) regular installment payments in cash (x) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; (y) over a period ending not later than five (5) years after the commencement of a Debtor's case; and (z) in a manner not less favorable than the most favored non-priority unsecured claim provided for under the Plan.

The chart below indicates all priority tax claims which were either scheduled by the Debtor as undisputed, liquidated, and non-contingent or asserted by the taxing agencies in filed proofs of claim, and the treatment of such allowed priority tax claims under the Plan:

| Description | Amount Owed | Treatment |
|---|---|---|
| United States Treasury, Internal Revenue Service | $0 | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such claim by a final order. |
| California Franchise Tax Board | $4,535.34 | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such claim by a final order. |
| City of Los Angeles Office of Finance | $11,542.63 | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such claim by a final order. |
| **Total** | **$16,077.97** | |

## C. Classified Claims and Interests

### 1. Classes of Secured Claims

The following chart lists all of the secured claims which were either scheduled by the Debtor as undisputed, liquidated and non-contingent or asserted by the creditor in filed proofs of claim, and the treatment of such allowed secured claims under the Plan:

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1-A | Secured claim of: Los Angeles County Treasurer and Tax Collector<br><br>Collateral: Real property located at 727 West 7th Street in Los Angeles, California (the "Building")<br><br>Priority of Security Interest: First priority (statutory)<br><br>Collateral value: Approx. $110,000,000, subject to completion of the final valuation of the Building<br><br>Amount of Claim: $726,000 (est.) | N | N<br><br>Not impaired; not entitled to vote on the Plan. | Paid in full on the later of (1) the Effective Date, (2) the date the Court allows such claim by a final order, or (3) the date(s) by which the claim is due and payable. |
| 1-B | Secured Claim of: Bank of America, N.A., individually and as agent for a group of lenders (the "Bank")<br><br>Collateral: The Building, all fixtures located in the Building, and all rents and revenue derived from the sale of units, and use and/or lease of the Building (collectively, the "Bank Collateral") | N | Y | Upon the Effective Date, the Reorganized Debtor shall deliver to the Bank a new note (the "Restructured Note"), subject to the terms and conditions generally described herein. To the extent inconsistent herewith, the Debtor's existing loan from the Bank (the "Existing Loan") shall be modified as set forth below.<br><br>The principal terms and conditions of the Restructured Note, as reflected in the projections attached hereto as Exhibit |

27

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|----------------|-----------|
|  | Priority of Security Interest: Disputed

Collateral value: Approx. $110,000,000, subject to completion of the final valuation of the Building

Amount of Claim: $80,000,000 (est.) |  |  | "1," are:

(1)   The Restructured Note shall mature and all unpaid principal and accrued but unpaid interest shall be fully due and payable on the thirtieth (30th) month following the Effective Date (the "New Maturity Date").

(2)   The Restructured Note shall bear interest at a per annum rate equal to the prevailing 3-month London Interbank Offering Rate ("LIBOR"), plus a margin of three hundred (300) basis points.

(3)   All interest, late fees, attorneys' fees and other costs due and payable as of the Effective Date on the Existing Loan shall be added to the principal balance of the Restructured Note and paid in accordance with the terms thereof.  To the extent the Bank has accrued interest on the Existing Loan at the default rate of interest provided for under the Existing Loan documents through and including the Effective Date, the amount due and payable from and after the Effective Date on the Restructured Note shall be based upon the amount of principal, interest and other charges accrued at the non-default rates provided |

28

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|----------------|-----------|
|         |             |                |                | for under the Existing Loan Documents.<br><br>(4)     Interest   on   the outstanding       principal balance of the Restructured Note   shall   be   due   and payable  on  the  fifteenth (15th) day of each month following   the   Effective Date,  commencing  in  the month which is the second (2nd)  month  following  the Effective Date through and including the New Maturity Date.<br><br>(5)  The Restructured Note shall   be   secured   by   a security interest in and lien upon  the  Bank  Collateral, all  to  the  same  extent  and with  the  same  priority  as was the case with respect to the Bank's security interest in and lien upon the Bank Collateral  prior  to  the Petition Date.<br><br>(6)     The  Bank  shall  be deemed  to  have  consented to  the  sale  of  individual units  at  the  Building  at  the release  prices  set  forth  in the      Existing      Loan documents,     and     the Reorganized  Debtor  shall be permitted to convey title to each unit sold to a third party  purchaser  free  and clear  of  the  Bank's  lien  and security interest<br><br>The  treatment  described  in the  Plan  shall  be  in  full |

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|----------------|-----------|
| | | | | settlement and satisfaction of the Bank's Class 1-B claim. |
| 1-C | Alleged Secured Claims of: Holders of mechanic's liens Collateral: The Building and all fixtures located in the Building Priority of Security Interest: Disputed Collateral value: Approx. $110,000,000, subject to completion of the final valuation of the Building Aggregate Amount of Class 1-C Allowed Secured Claims: $8,900,000 (est.) (disputed)[3] | N | Y | To the extent there are any Class 1-C claims and any such claims are determined by a final order of the Court to be allowed secured claims, each such Class 1-C claim will be deemed to have been placed in a separate subclass within Class 1-C, and each such Class 1-C claim will be paid in cash, beginning one (1) year following the Effective Date, but in any event by the later of (i) two (2) years following the Effective Date, or (ii) the date upon which the Court enters a final order determining the allowed amount, if any, of such claim. Interest shall accrue on all Class 1-C allowed claims at the rate of 2.5% per annum until such allowed Class 1-C claims are satisfied and paid. |

[3] Prior to the Petition Date, V.G.I. Corporation ("VGI") recorded a mechanic's lien against the Building for the sum of $2,575,569.55, and is therefore included herein as an alleged holder of a Class 1-C claim. The Debtor disputes the validity and amount of VGI's asserted claim.

Prior to the Petition Date, the Debtor and the Bank entered into an agreement to establish a litigation reserve account (with $1.5 million) to indemnify the Bank in connection with litigation commenced by VGI against the Debtor and others. Any funds remaining in the litigation reserve account upon the resolution of the litigation is to be returned to the Debtor. Based on the cash available in the foregoing litigation reserve account, and the amounts proposed to be paid to holders of Class 1-C allowed claims, as reflected in Exhibit "I" hereto, holders of allowed Class 1-C claims will be paid in full, with interest, through the Plan.

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | | | | The treatment of holders of allowed Class 1-C claims described in the Plan shall be in full settlement and satisfaction of all allowed Class 1-C claims. |

### 2.   Classes of Priority Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. Allowed priority claims are entitled to treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

The following chart lists all of the priority claims which were either scheduled by the Debtor as undisputed, liquidated and non-contingent or asserted by the creditor in filed proofs of claim, and the treatment of such allowed priority claims under the Plan:

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 2 | Allowed Priority Claims against the Debtor<br><br>Estimated Amount of Priority Claims: $0 | N | N<br><br>Not impaired; not entitled to vote on the Plan. | To the extent there are any allowed priority claims, the holder of each such Class 2 claim will be paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such claim by a final order. |

### 3.   Classes of Allowed Unsecured Claims

The following chart describes the Plan's treatment of the classes containing the Debtor's

31

allowed unsecured claims:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 3 | All General Unsecured Claims, other than the General Unsecured Claim of Milbank<br><br>Aggregate Amount of Class 3 Allowed General Unsecured Claims: $4,300,000 (est.)<br><br>A detailed claims chart showing all claims which were scheduled by the Debtor and all proofs of claim which have been filed against the Debtor is attached hereto as Exhibit "2" (the "Claims Chart"). It is the Debtor's intention to update the Claims Chart prior to the Disclosure Statement hearing to indicate which claims in the Claims Chart are objectionable to the Debtor, even if the Debtor has not yet filed formal objections to those claims. The Debtor estimates that, after the objection to claims process has been completed, there will likely be a total of approximately $4.3 million of class 3 allowed claims against the Debtor to be paid by the Reorganized Debtor pursuant to the terms of the Plan. | Y<br><br>Impaired; Allowed claims in this class are entitled to vote on the Plan. | Holders of Class 3 allowed claims will be paid in full, with interest, from cash generated from the leasing and sales of units in the Building, in accordance with the projections set forth in Exhibit "1" hereto.<br><br>Interest shall accrue on all Class 3 allowed claims at the rate of 1.5% per annum until such Class 3 claims are satisfied and paid.<br><br>The treatment of holders of Class 3 allowed claims described in the Plan shall be in full settlement and satisfaction of all Class 3 allowed claims. |
| 4 | All General Unsecured Claims of Milbank<br><br>Aggregate Amount of Class | Y<br><br>Impaired; Allowed | On the Effective Date, in full and final satisfaction of Milbank's allowed Class 4 Claim, Milbank shall assign its allowed Class 4 claim to RLI, and RLI shall |

| 4    Allowed    General Unsecured Claims: $5,100,000 (est.) | claims in this class are entitled to vote on the Plan. | thereafter waive any right to recovery on account of such Claim, and shall instead be entitled to receive an equity interest in the Reorganized Debtor, subject to the other terms and conditions of the Plan. |

### 4.    Classes of Interest Holders

Interest holders are the entities that hold an ownership interest (*i.e.*, equity interest) in the Debtor. The following chart describes the Plan's treatment of the classes of interests:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 5 | Equity interests in the Debtor | Y<br><br>Impaired; holders of Class 5 interests are not entitled to vote on the Plan because they are deemed to have not accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code. | On the Effective Date, all Class 5 interests will be deemed canceled and extinguished. Holders of Class 5 interests will not receive any distribution or retain any property under the Plan on account of their interests. |

### D.    Means of Effectuating the Plan and Implementation of the Plan

#### 1.    Funding for the Plan

The Plan will be funded with cash from: (i) in addition to the waiver of Milbank's allowed administrative claim and allowed Class 4 claim by RLI, new equity contributions from RLI totaling up to $3.5 million over the duration of the Plan, with $1.5 million of the foregoing amount to be contributed on or before the Effective Date (collectively, the "New Equity Contribution"), (ii) rent revenue generated by the leasing of commercial units in the Building, (ii)

rent revenue generated by the short-term leasing of up to seventy five (75) residential units in the Building, and (iii) proceeds generated by the sales of residential units in the Building, as provided in Exhibit "1" hereto.

## 2.    Composition of the Reorganized Debtor and Post-Confirmation Management

In consideration of the New Equity Contribution, RLI shall receive on the Effective Date 100% of the equity interests in the Reorganized Debtor, free and clear of all liens and adverse claims.

Following the Effective Date, the Debtor shall be referred to as the "Reorganized Debtor." RLI will continue to act as the Managing Member of the Reorganized Debtor, and will have the authority to make all decisions on behalf of the Reorganized Debtor that are required in order to effectuate the terms of the Plan.

### 3.    Disbursing Agent

The Reorganized Debtor shall act as the disbursing agent (the "Disbursing Agent") for purposes of making all distributions provided for under the Plan. The Disbursing Agent shall serve without bond and shall receive no compensation for distribution services rendered and expenses incurred pursuant to the Plan.

### 4.    Objections to Claims

The Debtor or the Reorganized Debtor, as the case may be, and any party in interest may review all claims filed or deemed filed and may object to or seek subordination of any claim filed or scheduled in this case. The deadline to file objections to claims shall be 180 days after the Effective Date. As provided by Section 502(c) of the Bankruptcy Code, the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan. The Court shall retain jurisdiction over the Debtor, the Reorganized Debtor and this case to resolve such objections to claims following the confirmation of the Plan, if necessary.

Nothing contained in the Plan shall constitute a waiver or release by the Debtor of any rights of setoff or recoupment, or of any defense, it may have with respect to any claim. The Disbursing Agent will withhold from property to be distributed under the Plan and will place in reserve a sufficient amount of cash to be distributed on account of claims that are disputed and have not been allowed as of the date of distribution to creditors ("Disputed Claims") of any particular class as if such claims were allowed in full.

### 5.    Interest Pending Allowance of Claims

Except as specifically provided for in the Plan, in the order confirming the Plan, or in some other order of the Court, interest shall not accrue on claims and no holder of a claim shall be entitled to interest accruing on or after the Petition Date on any claim.

To the extent the Debtor or any other party in interest objects to the allowance of any claim, nothing in the Plan or herein shall be deemed to imply or create for the holders of any Disputed Claims any entitlement to receive interest upon the allowed amount of any such Disputed Claims as a result, *inter alia*, of the delay in payment of such claims.

### 6.    Distributions to be Made Pursuant to the Plan

Distributions to be made by the Reorganized Debtor on the Effective Date on account of any claim shall be made on the Effective Date or as promptly thereafter as practicable. Distributions to be made by the Disbursing Agent under the Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole election of the Disbursing Agent.

Except as otherwise agreed to by the Disbursing Agent in writing, distributions to be made to holders of allowed claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtor's schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1009, or, if a different address is stated in a proof of claim duly filed with the Court, to such address.

Checks issued by the Reorganized Debtor or the Disbursing Agent to pay allowed claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Reorganized Debtor by the holder of

35

1 the allowed claim to whom such check originally was issued, prior to the expiration of the

2 Claiming Period. After such date, (i) the holder of any such claim who has failed to make a

3 timely request for reissuance of such a voided check or such claim and (ii) the unclaimed

4 property held on account of such voided check or such claim shall revest in the Reorganized

5 Debtor free and clear of all claims and interests.

6     In connection with the Plan and any instruments issued in connection therewith, the

7 Reorganized Debtor shall comply with all applicable withholding and reporting requirements

8 imposed by any federal, state or local taxing authority, and all distributions under the Plan shall

9 be subject to any such withholding or reporting requirements.

## 7. Exculpations and Releases

11     To the maximum extent permitted by law, none of the Debtor, the Debtor's estate, nor

12 any of their employees, agents, representatives, or the professionals employed or retained by any

13 of them, whether or not by Bankruptcy Court order (each, an "Indemnified Person"), shall have

14 or incur liability to any person or entity for an act taken or omission made in good faith in

15 connection with or related to the formulation of the Plan, the Disclosure Statement, or a contract,

16 instrument, release, or other agreement or document created in connection therewith, the

17 solicitation of acceptances for or confirmation of the Plan, or the consummation and

18 implementation of the Plan and the transactions contemplated therein. Each Indemnified Person

19 shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its

20 duties and responsibilities under the Plan.

21     The Debtor and the Debtor's estate will be deemed to be forever released and discharged

22 from all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action

23 and liabilities whatsoever in connection with or related to the Debtor and the Debtor's estate, or

24 the Plan (other than the rights of the Debtor to enforce the Plan and the contracts, instruments,

25 releases, indentures, and other agreements or documents delivered thereunder) whether

26 liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown,

27 foreseen or unforseen, then existing or thereafter a rising, in law, equity or otherwise that are

28

36

based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Debtor's estate, or the Plan, and that may be asserted by or on behalf of the Debtor or its bankruptcy Estate.

**8.    Injunctions**

**THE CONFIRMATION ORDER SHALL ENJOIN THE PROSECUTION, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSE OF ACTION, LIABILITY OR INTEREST RELEASED, DISCHARGED OR TERMINATED PURSUANT TO THE PLAN.**

**EXCEPT AS PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A CLAIM OR OTHER DEBT OR LIABILITY THAT IS DISCHARGED OR AN INTEREST OR OTHER RIGHT OF AN EQUITY SECURITY HOLDER THAT IS TERMINATED PURSUANT TO THE TERMS OF THE PLAN ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, OR THEIR PROPERTY ON ACCOUNT OF ANY SUCH DISCHARGED CLAIMS, DEBTS OR LIABILITIES OR TERMINATED INTERESTS OR RIGHTS: (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; (III) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO THE DEBTOR; AND (V) COMMENCING OR CONTINUING ANY ACTION IN ANY MANNER, IN ANY PLACE THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN.**

1   **BY ACCEPTING DISTRIBUTION PURSUANT TO THE PLAN, EACH**
2   **HOLDER OF AN ALLOWED CLAIM OR ALLOWED INTEREST RECEIVING**
3   **DISTRIBUTIONS PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE**
4   **SPECIFICALLY CONSENTED TO THE INJUNCTIONS SET FORTH IN THIS**
5   **SECTION.**

6        **E.**    **Other Provisions of the Plan**

7            **1.**    **Executory Contracts and Unexpired Leases**

8            **a)**    **Assumptions**

9   In the ordinary course of business, the Debtor is a party to a number of commercial and
10  residential real property leases for units in the Building. A schedule of leases to be assumed
11  under the Plan is attached to the Disclosure Statement as Exhibit "___". On the Effective Date,
12  the Debtor intends to assume all such lease agreements. Based on the Debtor's books and
13  records, the Debtor is not in default of any of the foregoing agreements and, therefore, no cure
14  payments are due and owing to parties to such lease agreements.

15           **b)**    **Rejections**

16  **To the extent that leases or contracts, other than the ones discussed above, exist, on**
17  **the Effective Date, such executory contracts and unexpired leases shall be deemed rejected.**
18  **The Confirmation Order shall constitute an Order approving the Debtor's rejection of all**
19  **such executory contracts and unexpired leases.**

20  **THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM**
21  **ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR**
22  **UNEXPIRED LEASE WILL BE 30 DAYS AFTER DATE OF ENTRY OF THE**
23  **CONFIRMATION ORDER. Any claim based on the rejection of an executory contract or**
24  **unexpired lease will be barred if the proof of claim is not timely filed, unless the Court**
25  **orders otherwise.**

26           **2.**    **Changes in Rates Subject to Regulatory Commission Approval**

27  The Debtor is not subject to governmental regulatory commission approval of its rates.

28

**3.    Retention of Jurisdiction**

After confirmation of the Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the following purposes:

a.    To resolve any and all disputes regarding the operation and interpretation of the Plan and the Confirmation Order;

b.    To determine the allowability, classification, or priority of claims and interests upon objection by the Debtor, the Reorganized Debtor, or by other parties in interest with standing to bring such objection or proceeding;

c.    To determine the extent, validity and priority of any lien asserted against property of the Debtor or property of the Debtor's estate.

d.    To construe and take any action to enforce the Plan, the Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Confirmation Order, and all matters referred to in the Plan, the Confirmation Order, and to determine all matters that may be pending before the Court in this case on or before the Effective Date with respect to any person or entity related thereto;

e.    To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

f.    To determine any request for payment of administrative expenses;

g.    To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this case whether before, on, or after the Effective Date;

h.    To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

i.    To modify the Plan under Section 1127 of the Bankruptcy Code in order to

39

1  remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan

2  so as to carry out its intent and purpose;

3     j.     Except as otherwise provided in the Plan or the Confirmation Order, to issue

4  injunctions to take such other actions or make such other orders as may be necessary or

5  appropriate to restrain interference with the Plan or the Confirmation Order, or the execution or

6  implementation by any person or entity of the Plan or the Confirmation Order;

7     k.     To issue such orders in aid of consummation of the Plan or the Confirmation

8  Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person

9  or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

10    l.     To enter a final decree closing this Case.

11        **4.     Nonconsensual Confirmation**

12      To the extent necessary, the Debtor requests the Court to confirm the Plan under Section

13  1129(b) of the Bankruptcy Code.

14                                **III.**

15                **TAX CONSEQUENCES OF THE PLAN**

16      CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN

17  MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN

18  ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.    The following disclosure of

19  possible tax consequences is intended solely for the purpose of alerting readers about possible

20  tax issues the Plan may present to the Debtor.  The Debtor CANNOT and DOES NOT represent

21  that the tax consequences contained below are the only tax consequences of the Plan because the

22  Tax Code embodies many complicated rules which make it difficult to state completely and

23  accurately all of the tax implications of any action.  The Debtor does not believe that there will

24  be any negative tax consequences to the Debtor resulting from the confirmation of the Plan.

25

26

27

28

## IV.

## **CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues. which they may wish to consider, as well as certain deadlines for filing claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a plan. Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan. whether the plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible. These requirements are not the only requirements for confirmation.

### A.    **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan, but, as explained below. not everyone is entitled to vote to accept or reject the Plan.

### B.    **Who May Vote to Accept/Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

### C.    **What Is an Allowed Claim/Interest**

As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim or interest. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the

1  Court, after notice and hearing, either overrules the objection or allows the claim or interest for
2  voting purposes.

3      THE BAR DATE FOR FILING A PROOF OF CLAIM IN THESE CASES ON
4  ACCOUNT OF PRE-PETITION CLAIMS WAS SEPTEMBER 15, 2009. A creditor or interest
5  holder may have an allowed claim or interest even if a proof of claim or interest was not timely
6  filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim
7  is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has
8  objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest
9  has objected to the interest.

10      A detailed Claims Chart is attached hereto as Exhibit "2." The Claims Chart identifies
11  all claims which were scheduled by the Debtor, including the amounts and priorities of the
12  claims and whether the Debtor contends that the claims are disputed, contingent or unliquidated.
13  The Claims Chart also identifies all proofs of claim which were filed by creditors asserting
14  claims against the Debtor, including the amounts and priorities of the claims asserted. Finally,
15  the Claims Chart indicates whether the Debtor has disputed or presently disputes any portion of
16  the claims. The Debtor reserves the right to update and modify the Claims Chart at any time and
17  to file objections to claims even if the Claims Chart does not identify any dispute relating to a
18  particular claim.

19      **D.    What Is an Impaired Claim/Interest.**

20      As noted above, an allowed claim or interest has the right to vote only if it is in a class
21  that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or
22  contractual rights of the members of that class. For example, a class comprised of general
23  unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what
24  they are owed.

25      The Debtor believes that members of classes 1-B, 1-C, 3 and 4 are impaired and entitled
26  to vote to accept or reject the Plan. Parties who dispute the Debtor's characterization of their
27
28

42

1  claim or interest as being impaired or unimpaired may file an objection to the Plan contending

2  that the Debtor has incorrectly characterized the class.

3  **E.    Who Is Not Entitled to Vote.**

4  The following four types of claims are not entitled to vote:  (1) claims that have been

5  disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to

6  Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not

7  receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote

8  because such classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant

9  to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such

10 claims are not placed in classes and they are required to receive certain treatment specified by

11 the Bankruptcy Code.  Claims in classes that do not receive or retain any value under the Plan

12 do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR

13 CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO

14 OBJECT TO THE CONFIRMATION OF THE PLAN.

15 **F.    Who Can Vote in More Than One Class.**

16 A creditor whose claim has been allowed in part as a secured claim and in part as an

17 unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot

18 for the secured part of the claim and another ballot for the unsecured claim.

19 **G.    Votes Necessary to Confirm the Plan.**

20 If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one

21 impaired class has accepted the Plan without counting the votes of any insiders within that class,

22 and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be

23 confirmed by "cramdown" on non-accepting classes, as discussed below.

24 **H.    Votes Necessary for a Class to Accept the Plan.**

25 A class of claims is considered to have accepted the Plan when more than one-half (1/2)

26 in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted on

27 the plan, voted in favor of the plan.  A class of interests is considered to have "accepted" a plan

28

43

1    when at least two-thirds (2/3) in amount of the interest-holders of such class which actually

2    voted on the plan, voted to accept the plan.

3          **I.      Treatment of Non-accepting Classes.**

4          As noted above, even if all impaired classes do not accept the Plan, the Court may

5    nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by

6    the Bankruptcy Code.  The process by which non-accepting classes are forced to be bound by

7    the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the

8    Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all

9    consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not

10   "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted

11   to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

12         **J.      Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

13         The Debtor will ask the Court to confirm the Plan by cramdown on any and all impaired

14   classes that do not vote to accept the Plan.

15         **K.      Liquidation Analysis.**

16         Another confirmation requirement is the "Best Interest Test", which requires a

17   liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an

18   impaired class and that claimant or interest holder does not vote to accept the Plan, then that

19   claimant or interest holder must receive or retain under the Plan property of a value not less than

20   the amount that such holder would receive or retain if the Debtor was liquidated under chapter 7

21   of the Bankruptcy Code.

22         In a chapter 7 case, the debtor's assets are usually sold by a chapter 7 trustee.  Secured

23   creditors are paid first from the sales proceeds of properties on which the secured creditor has a

24   lien.   Administrative claims are paid next.   Next, unsecured creditors are paid from any

25   remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the

26   same priority share in proportion to the amount of their allowed claim in relationship to the

27

28

1    amount of total allowed unsecured claims. Finally, interest holders receive the balance that

2    remains after all creditors are paid, if any.

3    For the Court to be able to confirm the Plan, the Court must find that all creditors and

4    interest holders who do not accept the Plan will receive at least as much under the Plan as such

5    holders would receive under a chapter 7 liquidation of the Debtor. The Debtor maintains that

6    this requirement is clearly met.

7    The impaired classes under the Plan consist of class 1-B (the Bank's allowed claim).

8    class 1-C (the allowed claims of holders of mechanic's liens), class 3 (allowed general

9    unsecured claims, other than the general unsecured claim of Milbank), class 4 (allowed general

10    unsecured claim of Milbank) and class 5 (equity interests). The Debtor must therefore satisfy

11    the "best interest of creditors test" with respect to members of classes 1-B, 1-C, 3 and 4 who do

12    not vote to accept the Plan and with respect to class 5 (which is deemed to have rejected the

13    Plan).

14    As described above, class 1-B, 1-C and 3 claims will be paid the full amount of their

15    allowed claims under the Plan, either in cash or over time with market terms which will result in

16    all such claim holders receiving the full amount of the present value of their allowed claims.

17    Since all such claim holders would be paid the full amount of their allowed claims under the

18    terms of the Plan, all holders of such allowed claims will receive *not less* under the Plan than

19    they would receive in a chapter 7 liquidation of the Debtor.

20    Furthermore, given that the primary asset of this estate is the Building, in a Chapter 7

21    liquidation of the Debtor, either the Bank would foreclose on the Property or the Chapter 7

22    trustee would sell the Property. Even if a Chapter 7 trustee could sell the Property for the same

23    value that the Property is worth, the Chapter 7 trustee would then be entitled to be paid a

24    substantial fee as dictated by Section 326 of the Bankruptcy Code. Since it is the value of the

25    Property and the priority of their liens that is dictating the value of the distribution to members

26    of classes 1-B and 1-C under the Plan, those two facts would be unchanged in a Chapter 7

27    liquidation of the Debtor except that in a Chapter 7 liquidation there would be less money for

28

45

1    creditors because the Chapter 7 trustee and his/her professionals would be paid out of the sale

2    proceeds. As a result, by definition, holders of claims in classes 1-B and 1-C would receive in a

3    Chapter 7 liquidation of the Debtor the same or less value than they will receive under the Plan.

4    While the Debtor does not yet have a completed, formal appraisal of the Building, based

5    on information provided by CB Richard Ellis ("CBRE") (who is in the process of finalizing such

6    appraisal), the Debtor believes that the amount of cash that will be generated from the leasing

7    and sales of units in the Building over a period of three years, as set forth in Exhibit "1" hereto

8    will exceed the total amount of allowed class 1-B, class 1-C claims and class 3 claims.

9    However, if the Building is sold in its entirety by a Chapter 7 trustee, the realizable value

10   of the Building will certainly be lower than the total amount of the class 1-B, class 1-C and class

11   3 claims, particularly given the fact that construction of the Building and the units has not yet

12   been completed. The Debtor believes that the incomplete nature of the Building will materially

13   and negatively impact its current value. As summarized below, the Debtor estimates that

14   holders of class 3 allowed claims would receive 0% of the amount of their class 3 allowed

15   claims (*i.e.*, nothing) in a chapter 7 liquidation of the Debtor. In contrast, holders of class 3

16   allowed claims of the Debtor will receive 100% of the amount of their class 3 allowed claim

17   over a period of three years with interest under the terms of the Plan. It is therefore clear that all

18   holders of class 3 allowed claims will receive substantially more under the Plan than they would

19   receive in a chapter 7 liquidation of the Debtor.

20   The Debtor has therefore satisfied the "best interests of creditors test" with respect to any

21   class 1-B, class 1-C or class 3 claim holder who votes against the Plan and with respect to class

22   5 interests. The Debtor contends that the Plan provides fair and equitable treatment of all

23   classes of creditors and the greatest feasible recovery to all creditors.

24   Below is a demonstration, in balance sheet format, that all holders of class 3 claims will

25   receive more under the Plan than they would receive under a chapter 7 liquidation of the Debtor.

26   This information is provided by the Debtor.

27

28

**Liquidation Analysis:**

| | |
|---|---:|
| Building (est.) (if construction is completed) | $ 85,000,000[4] |
| Cash | $ 0 |
| Other Assets | $ 15,000 |
| Total Assets | $ 85,015,000 |

**Less:**

Secured Claims:

| | |
|---|---:|
| Los Angeles County Treasurer | $ 726,000 |
| Bank of America | $ 80,000,000 |
| Mechanic's Liens | $ 8,900,000 |

Administrative Claims:

| | |
|---|---:|
| Chapter 7 Trustee Fees and the Fees/Expenses of the Professionals Employed By the Trustee | $ 250,000 |
| Broker commission and closing costs (est. at 4%) | $ 339,200 |
| Professionals Fees/Expenses Incurred During Chapter 11 | $ 380,000 |
| Advances by Milbank (on administrative expense priority basis) | $ 500,000 |
| Pre-Petition Priority Tax Claims: | $ 16,078 |
| Balance Available to be Paid To Pre-Petition General Unsecured Creditors | $ 0 |

**% OF THEIR CLAIMS WHICH GENERAL UNSECURED CREDITORS (HOLDERS OF CLASS 3 ALLOWED CLAIMS) OF THE DEBTOR WOULD RECEIVE OR RETAIN IN A CH. 7 LIQUIDATION = 0%.**

---

[4] This figure assumes that the construction of the Building is completed and that the units are sold on an individual basis over a period of approximately thirty (30) months. The liquidation value of the Building in its current condition ("as is") is expected to be substantially lower than the value reflected herein.

47

**% OF THEIR CLAIMS WHICH GENERAL UNSECURED CREDITORS (HOLDERS OF CLASS 3 ALLOWED CLAIMS) OF THE DEBTOR WILL RECEIVE OR RETAIN UNDER THE PLAN = 100% (PLUS INTEREST) OVER THREE YEARS**

### L.    Feasibility.

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Plan Effective Date to pay all the claims and expenses which are entitled to be paid on such date. The New Equity Contribution of $1.5 million that RLI will be contributing to the Reorganized Debtor on the Plan Effective Date will provide the Reorganized Debtor with enough cash on the Plan Effective Date to enable the Reorganized Debtor to pay all the claims and expenses which are entitled to be paid on such date, enabling the Debtor to satisfy the first aspect of the feasibility analysis. Prior to the Plan confirmation hearing, RLI will deposit $1.5 million of the New Equity Contribution (the amount necessary to make all Plan Effective Date payments) into a segregated trust account maintained by LNBRB.

The second aspect considers whether the Reorganized Debtor will have enough cash over the life of the Plan to make the required Plan payments. Attached as Exhibit "1" to this Disclosure Statement are cash flow projections prepared on a monthly basis for a period of three years, which demonstrate the ability of the Reorganized Debtor to make all of the Plan payments which are required to be made over time.

The cash flow projections attached as Exhibit "1" hereto are supported by an analysis prepared by CBRE, a national real estate company, with specialization in appraisals on all types of real estate projects throughout the country. CBRE has extensive experience in the Downtown Los Angeles real estate market, and has worked on numerous projects in the Downtown Los Angeles area. The assumptions underlying the Plan are much more conservative than the

1    assumptions underlying CBRE's analysis, including, among others, the assumptions described
2    below:

3        • CBRE believes that, with proper advertising and marketing, approximately 10
4            units in the Building can be sold per month. The Debtor's projections in support
5            of the Plan contemplate an even more conservative sale rate of approximately 6
6            units per month.

7        • CBRE estimates current sale prices for the units at approximately $475 per
8            square foot. The Debtor's projections in support of the Plan contemplate more
9            conservative figures. As set forth in the Debtor's projections, the Debtor
10           anticipates accumulating sales of 30 units over the course of five months, with a
11           group closing of all 30 units at an aggregate sale price of $12.75 million in month
12           6. These sales figures are based on an average unit price of $425,000 (which,
13           based on selling smaller units within the Project with an average size of
14           approximately 1,000 square feet, translates to approximately $425 per square
15           foot). Over the course of the Plan, the average sale price of the units is gradually
16           increased to take into account larger unit sizes and better locations within the
17           Building (most of the larger and more expensive units in the Building are located
18           on the upper floors which are currently incomplete).

19                                              **V.**

20                          **EFFECT OF CONFIRMATION OF PLAN**

21    **A.    Discharge**

22        The Plan provides that upon completion of payments from the Effective Date in
23    accordance with the projections attached hereto and to the Disclosure Statement, the Debtor shall
24    be discharged of liabilities for debts incurred before confirmation of the Plan, to the extent
25    provided in 11 U.S.C. § 1141.

26        Confirmation shall bind the Debtor, all creditors, and other parties in interest to the
27    provisions of the Plan whether or not the claim of such creditor is impaired under the Plan and
28

1   whether or not such creditor has accepted the Plan.

2   **B.    Revesting of Property in the Reorganized Debtor**

3   Except as provided elsewhere herein, the confirmation of the Plan revests all of the

4   property of the estate in the Reorganized Debtor.

5   In addition, on the Effective Date, all of the claims against and/or interests in third parties

6   that constitute property of the estate shall be revested in the Reorganized Debtor. Following the

7   Effective Date, the Reorganized Debtor shall have absolute authority to prosecute, waive, adjust

8   or settle any claims without the need for approval by the Court. Following the Effective Date,

9   the Reorganized Debtor shall have the authority to employ such professionals as it deems

10  necessary to prosecute or defend such claims asserted without the need for Court approval.

11  **C.    Default**

12  Except as otherwise provided herein or in the Confirmation Order, in the event that the

13  Reorganized Debtor or the Disbursing Agent shall default in the performance of any of its

14  obligations under the Plan and shall not have cured such a default within thirty (30) days after

15  receipt of written notice of default from the creditor to whom the performance is due, then the

16  entity or individual to whom the performance is due may pursue such remedies as are available

17  at law or in equity. An event of default occurring with respect to one claim shall not be any

18  event of default with respect to any other claim.

19  **D.    Modification of Plan**

20  The Debtor may withdraw or modify the Plan at any time before confirmation. The

21  Court may require a new disclosure statement and/or re-voting on the Plan if the Debtor modifies

22  the Plan before confirmation. Modification of the Plan shall be in accordance, and the Plan as

23  modified shall comply, with the requirements of Section 1127 of the Bankruptcy Code.

24  **E.    Post-Confirmation Status Report**

25  Within 120 days of the entry of the order confirming the Plan, the Debtor shall file a

26  status report with the Court explaining what progress has been made toward consummation of

27  the confirmed Plan. The status report must be served on the Office of the United States Trustee,

28

1  the Committee, the 20 largest unsecured creditors and any secured creditors and priority
2  unsecured creditors entitled to receive distributions under the Plan. Further status reports shall
3  be filed every 120 days and served on the same entities.

4      **F.**    **Post-Confirmation Conversion/Dismissal**

5      A creditor or party in interest may bring a motion to convert or dismiss the Debtor's case
6  under § 1112(b) after the Plan is confirmed if there is a default in performing the Plan. If the
7  Court orders the Debtor's case converted to Chapter 7 after the Plan is confirmed, then all
8  property that had been property of the Chapter 11 estate, and that has not been disbursed
9  pursuant to the Plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed
10  upon the revested property, but only to the extent that the Court did not previously authorize
11  relief from stay during the Debtor's case.

12      The order confirming the Plan may also be revoked under very limited circumstances.
13  The Court may revoke the order if the order of confirmation was procured by fraud and if the
14  party in interest brings an adversary proceeding to revoke confirmation within 180 days after the
15  entry of the order of confirmation.

16      **G.**    **Post-Confirmation U.S. Trustee Fees**

17      The Debtor shall be responsible for timely payment of all fees incurred after the Effective
18  Date pursuant to 28 U.S.C. Section 1930(a)(6).

19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28

51

**H.    Final Decree**

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the

Debtor or other party as the Court shall designate in the order confirming the Plan, shall file a

motion with the Court to obtain a final decree to close the Case.

Dated: December 28, 2009

Presented By:

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.


By:    */s/ David L. Neale*
     David L. Neale
     Juliet Y. Oh
     Attorneys for Chapter 11 Debtor
     and Plan Proponent


ROOSEVELT LOFTS, LLC,
a Delaware limited liability company


By:    */s/ M. Aaron Yashouafar*
     M. Aaron Yashouafar,
     President, Roosevelt Lofts, Inc.
     Manager of Debtor, Roosevelt Lofts, LLC

## DECLARATION OF M. AARON YASHOUAFAR

I, M. Aaron Yashouafar, hereby declare as follows:

1.     I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2.     I am the President of Roosevelt Lofts, Inc., which is the Manager of Roosevelt Lofts, LLC, a Delaware limited liability company, debtor and debtor in possession herein (the "Debtor"). Accordingly, I am familiar with virtually all aspects of the Debtor's condominium and commercial space project located at 727 West 7th Street in Los Angeles, California. Except where otherwise indicated, the statements made herein are of my own personal knowledge, and if called upon, I could and would testify to their truth.

3.     I make this Declaration in support of the Disclosure Statement to which this Declaration is attached.

4.     I have reviewed the information contained within the Disclosure Statement, including all financial information. To the best of my knowledge, information and belief, I believe that all of the information contained in this Disclosure Statement is truthful and accurate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 28th day of December 2009, at Los Angeles, California.

_____/s/ M. Aaron Yashouafar_____
M. AARON YASHOUAFAR

# EXHIBIT 1

| | Jan-10 Month 1 | Feb-10 Month 2 | Mar-10 Month 3 | Apr-10 Month 4 | May-10 Month 5 | Jun-10 Month 6 | Jul-10 Month 7 | Aug-10 Month 8 | Sep-10 Month 9 | Oct-10 Month 10 | Nov-10 Month 11 | Dec-10 Month 12 | Jan-11 Month 13 | Feb-11 Month 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activity Assumptions** | | | | | | | | | | | | | | |
| Total Units Available | 222 | 210 | 205 | 199 | 193 | 187 | 150 | 137 | 124 | 113 | 102 | 91 | 81 | 75 |
| Units Leased/mo | 12 | 5 | 6 | 6 | 6 | 7 | 7 | 6 | 5 | 5 | 5 | 4 | 0 | 0 |
| Units Sold/mo | 0 | 0 | 0 | 0 | 0 | 30 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Total Leased Units | 12 | 17 | 23 | 29 | 35 | 42 | 49 | 56 | 61 | 66 | 71 | 75 | 75 | 75 |
| Total Sold Units | 0 | 0 | 0 | 0 | 0 | 30 | 36 | 42 | 48 | 54 | 60 | 66 | 72 | 78 |
| Units Remaining | 210 | 205 | 199 | 193 | 187 | 150 | 137 | 124 | 113 | 102 | 91 | 81 | 75 | 69 |
| Accumulated Sales | | | | | | 12,750,000 | 15,750,000 | 18,900,000 | 22,050,000 | 25,200,000 | 28,350,000 | 31,500,000 | 34,800,000 | 38,100,000 |
| Average Rent/unit | 2,100 | 2,100 | 2,125 | 2,150 | 2,150 | 2,150 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 |
| Average Sale/unit | 425,000 | 425,000 | 425,000 | 425,000 | 425,000 | 425,000 | 500,000 | 525,000 | 525,000 | 525,000 | 525,000 | 525,000 | 550,000 | 550,000 |
| Average Parking Rate | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| **Financing** | | | | | | | | | | | | | | |
| Exstg Bank Group's loan | 80,000,000 | 80,000,000 | 80,000,000 | 80,000,000 | 80,000,000 | 80,000,000 | 71,192,701 | 69,241,411 | 67,354,941 | 65,457,338 | 62,933,378 | 60,389,731 | 58,329,249 | 55,583,318 |
| Interest Rate | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.75% | 3.75% |
| **New Equity** | | | | | | | | | | | | | | |
| Accumulated Cash Contribution | 1,500,000 | 1,581,467 | 1,930,767 | 2,266,892 | 2,950,042 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 |
| Debt Conversion | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 |
| Total equity Contribution | 7,050,000 | 7,131,467 | 7,480,767 | 7,816,892 | 8,500,042 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 |
| **Rental Income** | | | | | | | | | | | | | | |
| Commercial | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 62,000 | 62,000 |
| Residential | 25,200 | 35,700 | 48,875 | 62,350 | 75,250 | 90,300 | 107,800 | 123,200 | 134,200 | 145,200 | 156,200 | 165,000 | 165,000 | 165,000 |
| Parking | 10,000 | 10,000 | 10,000 | 12,000 | 12,000 | 12,000 | 15,000 | 10,000 | 10,000 | 17,500 | 17,500 | 17,500 | 21,000 | 21,000 |
| Total Rental Income | 63,200 | 73,700 | 86,875 | 102,350 | 115,250 | 130,300 | 150,800 | 161,200 | 172,200 | 190,700 | 201,700 | 210,500 | 248,000 | 248,000 |
| **Sales Proceeds** | | | | | | | | | | | | | | |
| Gross Sale | | | | | | 12,750,000 | 3,000,000 | 3,150,000 | 3,150,000 | 3,150,000 | 3,150,000 | 3,150,000 | 3,300,000 | 3,300,000 |
| Sales Cost | | | | | | 765,000 | 180,000 | 189,000 | 189,000 | 189,000 | 189,000 | 189,000 | 198,000 | 198,000 |
| Net Sales Proceed | | | | | | 11,985,000 | 2,820,000 | 2,961,000 | 2,961,000 | 2,961,000 | 2,961,000 | 2,961,000 | 3,102,000 | 3,102,000 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Property Tax | | | | 362,500 | | | | | | | | 302,481 | | |
| HOA Fees | 116,667 | 116,667 | 116,667 | 116,667 | 116,667 | 100,901 | 97,748 | 94,595 | 91,441 | 88,288 | 85,135 | 81,982 | 78,829 | 75,676 |
| Leasing/Sales | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Marketing | 5,000 | 50,000 | 50,000 | 50,000 | 50,000 | 15,000 | 15,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 21,000 | 21,000 |
| Parking Expense | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
| Total Operating Exp. | 144,667 | 189,667 | 189,667 | 552,167 | 189,667 | 138,901 | 135,748 | 132,595 | 134,441 | 131,288 | 128,135 | 427,463 | 122,829 | 119,676 |
| Net Proceeds from Operation | (81,467) | (115,967) | (102,792) | (449,817) | (74,417) | 11,976,399 | 2,835,052 | 2,989,605 | 2,998,759 | 3,020,412 | 3,034,565 | 2,744,037 | 3,227,171 | 3,230,324 |
| **Interest Expense** | | | | | | | | | | | | | | |
| Exstg Bank Group Loan | 0 | 233,333 | 233,333 | 233,333 | 233,333 | 233,333 | 233,333 | 207,645 | 201,954 | 196,452 | 190,917 | 183,556 | 176,137 | 182,279 |
| Total Interest Expense | 0 | 233,333 | 233,333 | 233,333 | 233,333 | 233,333 | 233,333 | 207,645 | 201,954 | 196,452 | 190,917 | 183,556 | 176,137 | 182,279 |
| Monthly Net Cash Flow after Interest | (81,467) | (349,300) | (336,125) | (683,150) | (307,750) | 11,743,066 | 2,601,719 | 2,781,960 | 2,796,804 | 2,823,960 | 2,843,648 | 2,560,481 | 3,051,034 | 3,048,045 |
| Pymt to Holders of Valid Mechanic's Liens w/interest @ 2.5% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 305,103 | 304,805 |
| Pymt to Unsecured Creditors w/interest @ 1.5% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pymt for Completion of Construction | 0 | 0 | 0 | 0 | 0 | 2,935,766 | 650,430 | 695,490 | 699,201 | 0 | 0 | 0 | 0 | 0 |
| Payment for Retail T.I. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 300,000 | 300,000 | 500,000 | 0 | 0 |
| Exstg Bank's Group Loan | 0 | 0 | 0 | 0 | 0 | 8,807,299 | 1,951,290 | 1,886,470 | 1,897,603 | 2,523,960 | 2,543,648 | 2,060,481 | 2,745,931 | 2,743,241 |
| Total Cash Flow After all Disbursement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 | Apr-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Month 25 | Month 26 | Month 27 | Month 28 |
| **Activity Assumptions** | | | | | | | | | | | | | | |
| Total Units Available | 69 | 63 | 57 | 51 | 45 | 39 | 33 | 27 | 21 | 15 | 9 | 13 | 17 | 21 |
| Units Leased/mo | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (10) | (10) | (10) | (10) |
| Units Sold/mo | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 3 |
| Total Leased Units | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 65 | 55 | 45 | 35 |
| Total Sold Units | 84 | 90 | 96 | 102 | 108 | 114 | 120 | 126 | 132 | 138 | 144 | 150 | 156 | 159 |
| Units Remaining | 63 | 57 | 51 | 45 | 39 | 33 | 27 | 21 | 15 | 9 | 13 | 17 | 21 | 28 |
| Accumulated Sales | 41,400,000 | 44,850,000 | 48,300,000 | 51,750,000 | 55,350,000 | 58,950,000 | 62,550,000 | 66,300,000 | 70,050,000 | 73,800,000 | 77,550,000 | 81,300,000 | 85,050,000 | 87,000,000 |
| Average Rent/unit | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,225 | 2,225 | 2,225 | 2,225 |
| Average Sale/unit | 550,000 | 575,000 | 575,000 | 575,000 | 600,000 | 600,000 | 600,000 | 625,000 | 625,000 | 625,000 | 625,000 | 625,000 | 625,000 | 650,000 |
| Average Parking Rate | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| **Financing** | | | | | | | | | | | | | | |
| Extg Bank Group's Loan | 52,840,078 | 50,086,276 | 47,431,215 | 44,527,577 | 41,613,634 | 38,559,987 | 35,495,307 | 32,419,200 | 29,204,736 | 25,978,782 | 22,910,467 | 20,029,306 | 17,087,828 | 14,186,114 |
| Interest Rate | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 4.00% | 4.00% | 4.00% | 4.00% |
| **New Equity** | | | | | | | | | | | | | | |
| Accumulated Cash Contribution | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 |
| Debt Conversion | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 |
| Total equity Contribution | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 |
| **Rental Income** | | | | | | | | | | | | | | |
| Commercial | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 64,000 | 64,000 | 64,000 | 64,000 |
| Residential | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 144,625 | 122,375 | 100,125 | 77,875 |
| Parking | 21,000 | 23,000 | 23,000 | 23,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 26,000 | 26,000 |
| Total Rental Income | 248,000 | 250,000 | 250,000 | 250,000 | 252,000 | 252,000 | 252,000 | 252,000 | 252,000 | 252,000 | 233,625 | 211,375 | 190,125 | 167,875 |
| **Sales Proceeds** | | | | | | | | | | | | | | |
| Gross Sale | 3,300,000 | 3,450,000 | 3,450,000 | 3,450,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 | 1,950,000 |
| Sales Cost | 198,000 | 207,000 | 207,000 | 207,000 | 216,000 | 216,000 | 216,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 117,000 |
| Net Sales Proceed | 3,102,000 | 3,243,000 | 3,243,000 | 3,243,000 | 3,384,000 | 3,384,000 | 3,384,000 | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 | 1,833,000 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Property Tax | | 264,438 | | | | | | | | 188,351 | | | | 155,064 |
| HOA Fees | 72,523 | 69,369 | 66,216 | 63,063 | 59,910 | 56,757 | 53,604 | 50,450 | 47,297 | 44,144 | 40,991 | 37,838 | 34,685 | 33,108 |
| Leasing/Sales | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Marketing | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 10,000 | 10,000 | 50,000 | 50,000 |
| Parking Expense | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Total Operating Exp. | 116,523 | 377,807 | 110,216 | 107,063 | 103,910 | 100,757 | 97,604 | 94,450 | 91,297 | 276,495 | 75,991 | 72,838 | 109,685 | 263,172 |
| Net Proceeds from Operation | 3,233,477 | 3,115,193 | 3,382,784 | 3,385,937 | 3,532,090 | 3,535,243 | 3,538,396 | 3,682,550 | 3,685,703 | 3,500,505 | 3,682,634 | 3,663,537 | 3,605,440 | 1,737,703 |
| **Interest Expense** | | | | | | | | | | | | | | |
| Extg Bank Group Loan | 173,698 | 165,125 | 156,520 | 148,223 | 139,149 | 130,043 | 120,500 | 110,923 | 101,310 | 91,265 | 81,184 | 76,368 | 66,764 | 56,959 |
| Total Interest Expense | 173,698 | 165,125 | 156,520 | 148,223 | 139,149 | 130,043 | 120,500 | 110,923 | 101,310 | 91,265 | 81,184 | 76,368 | 66,764 | 56,959 |
| Monthly Net Cash Flow after Interest | 3,059,780 | 2,950,068 | 3,226,264 | 3,237,714 | 3,392,941 | 3,405,201 | 3,417,896 | 3,571,627 | 3,584,393 | 3,409,240 | 3,601,450 | 3,587,169 | 3,538,676 | 1,680,744 |
| Pymt to Holders of Valid Mechanic's Liens w/Interest @ 2.5% | 305,978 | 295,007 | 322,626 | 323,771 | 339,294 | 340,520 | 341,790 | 357,163 | 358,439 | 340,924 | 360,145 | 358,717 | 353,868 | 168,074 |
| Pymt to Unsecured Creditors w/Interest @ 1.5% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 360,145 | 286,750 | 283,094 | 134,460 |
| Pymt for Completion of Construction | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payment for T.I. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Extg Bank's Group Loan | 2,753,802 | 2,655,061 | 2,903,638 | 2,913,943 | 3,053,647 | 3,064,681 | 3,076,107 | 3,214,464 | 3,225,953 | 3,068,316 | 2,881,160 | 2,941,419 | 2,901,714 | 1,378,210 |
| Total Cash Flow After all Disbursement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| | May-12 Month 29 | Jun-12 Month 30 | Jul-12 Month 31 | Aug-12 Month 32 | Sep-12 Month 33 | Oct-12 Month 34 | Nov-12 Month 35 | Dec-12 Month 36 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Activity Assumptions** | | | | | | | | | |
| Total Units Available | 28 | 35 | 18 | 20 | 23 | 17 | 11 | 5 | |
| Units Leased/mo | (10) | (8) | (8) | (9) | 0 | 0 | 0 | 0 | |
| Units Sold/mo | 3 | 25 | 6 | 6 | 6 | 6 | 6 | 5 | |
| Total Leased Units | 25 | 17 | 9 | 6 | 0 | 0 | 0 | 0 | |
| Total Sold Units | 162 | 187 | 193 | 199 | 205 | 211 | 217 | 222 | |
| Units Remaining | 35 | 18 | 20 | 23 | 17 | 11 | 5 | 0 | |
| | | | | | | | | | |
| Accumulated Sales | 88,950,000 | 104,575,000 | 108,625,000 | 112,675,000 | 116,725,000 | 120,925,000 | 125,125,000 | 128,625,000 | 128,675,000 |
| Average Rent/Unit | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 |
| Average Sale/Unit | 650,000 | 625,000 | 675,000 | 675,000 | 675,000 | 700,000 | 700,000 | 700,000 | |
| Average Parking Rate | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| | | | | | | | | | |
| **Financing** | | | | | | | | | |
| Extg Bank Group's Loan | 12,807,903 | 11,311,562 | | | | | | | |
| Interest Rate | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| | | | | | | | | | |
| **New Equity** | | | | | | | | | |
| Accumulated Cash Contribution | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 |
| Debt Conversion | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 |
| **Total equity Contribution** | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 |
| | | | | | | | | | |
| **Rental Income** | | | | | | | | | |
| Commercial | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 1,848,000 |
| Residential | 55,625 | 37,825 | 20,025 | 0 | 0 | 0 | 0 | 0 | 3,707,750 |
| Parking | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 27,500 | 27,500 | 27,500 | 750,000 |
| **Total Rental Income** | 145,625 | 127,825 | 110,025 | 90,000 | 90,000 | 91,500 | 91,500 | 91,500 | 6,305,750 |
| | | | | | | | | | |
| **Sales Proceeds** | | | | | | | | | |
| Gross Sale | 1,950,000 | 15,625,000 | 4,050,000 | 4,050,000 | 4,050,000 | 4,200,000 | 4,200,000 | 3,500,000 | 128,675,000 |
| Sales Cost | 117,000 | 937,500 | 243,000 | 243,000 | 243,000 | 252,000 | 252,000 | 210,000 | 7,717,500 |
| **Net Sales Proceed** | 1,833,000 | 14,687,500 | 3,807,000 | 3,807,000 | 3,807,000 | 3,948,000 | 3,948,000 | 3,290,000 | 120,907,500 |
| | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | |
| Property Tax | 31,532 | 18,393 | 15,240 | 12,087 | 8,934 | 5,781 | 2,628 | 55,200 | 1,328,034 |
| HOA Fees | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 0 | 2,202,477 |
| Leasing/Sales | 50,000 | 10,000 | 10,000 | 25,000 | 25,000 | 20,000 | 20,000 | 15,000 | 540,000 |
| Marketing | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 850,000 |
| Parking Expense | | | | | | | | | 324,000 |
| **Total Operating Exp.** | 106,532 | 53,393 | 50,240 | 62,087 | 58,934 | 50,781 | 47,628 | 80,200 | 5,244,511 |
| | | | | | | | | | |
| **Net Proceeds from Operation** | 1,872,093 | 14,761,932 | 3,866,785 | 3,834,913 | 3,838,066 | 3,988,719 | 3,991,872 | 3,301,300 | 4,484,655 |
| | | | | | | | | | |
| **Interest Expense** | | | | | | | | | |
| Extg Bank Group Loan | 47,287 | 42,693 | 37,705 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | | |
| **Total Interest Expense** | 47,287 | 42,693 | 37,705 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | | |
| **Monthly Net Cash Flow after Interest** | 1,824,806 | 14,719,239 | 3,829,080 | 3,834,913 | 3,838,066 | 3,988,719 | 3,991,872 | 3,301,300 | |
| | | | | | | | | | |
| Pymt to Holders of Valid Mechanic's Liens w/Interest @ 2.5% | 182,481 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,358,705 |
| Pymt to Unsecured Creditors w/Interest @ 1.5% | 145,985 | 1,703,838 | 1,505,505 | 0 | 0 | 0 | 0 | 0 | 4,420,000 |
| Pymt for Completion of Construction | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,980,887 |
| Payment for Retail T.I. | | | | | | | | | 1,500,000 |
| Extg Bank's Group Loan | 1,496,341 | 11,311,562 | 0 | 0 | 0 | 0 | 0 | 0 | 80,000,000 |
| | | | | | | | | | |
| **Total Cash Flow After all Disbursement** | 0 | 1,703,838 | 2,323,574 | 3,834,913 | 3,838,066 | 3,988,719 | 3,991,872 | 3,301,300 | 72,982,283 |

# EXHIBIT 2

Roosevelt Lofts, LLC - Analysis of Claims

| Name | Claim No. | Date Claim Filed | Proof of Claim Secured | Priority | Unsecured | C/U/D | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | Obj? |
|---|---|---|---|---|---|---|---|---|---|---|
| **Secured Claims** | | | | | | | | | | |
| AB California Acquisition Corp. | | | | | | | 3,272.62 | | | |
| ACCO Engineering Systems | 84 | 9/17/2009 | 82,300.00 | | | X | | | 82,300.00 | Yes |
| Addison Pools, Inc. | | | | | | X | 148,001.00 | | | |
| A Fence Company, Inc. | | | | | | X | 4,460.00 | | | |
| Allsafe Electric Inc. | 4 | 5/8/2009 | 199,725.43 | | | X | 199,725.43 | | | Yes |
| Allsafe Electric Inc. | 6 | 5/8/2009 | 199,725.43 | | | | see above | | | Yes |
| Allsafe Electric Inc. | 16 | 7/1/2009 | 237,448.91 | | | | | | | Yes |
| Alter Electric Company | 15 | 7/1/2009 | 1,159,009.77 | | | X | 388,473.00 | | | Yes |
| American Demolition/Concrete Cutting, Inc. | 27 | 7/30/2009 | 17,012.00 | | | X | 17,012.00 | | | Yes |
| American Gunite, Inc. | 74 | 9/15/2009 | 891,679.34 | | | X | 891,679.34 | | | |
| Arrow | | | | | | X | 960.63 | | | |
| Bank of America, N.A. | 66 | 9/10/2009 | 81,820,597.06 | | | | 79,354,669.16 | | | Yes |
| Brewster Marble Co., Inc. | | | | | | X | 49,737.60 | | | |
| Cal-State Steel Corporation | 86 | 9/21/2009 | 176,592.00 | | | X | 176,592.90 | | | |
| Canon Financial Services, Inc. A11 | 40 | 8/24/2009 | 14,431.58 | | | | Unscheduled | | | Yes |
| Commercial Glass Company | 7 | 5/8/2009 | 184,483.49 | | | X | 175,948.49 | | | Yes |
| CraneNetics, Inc. | 31 | 8/11/2009 | 49,709.00 | | | X | 49,709.00 | | | |
| Crenshaw Lumber (a/k/a Beacon Investment Co.) | 75 | 9/15/2009 | 17,186.26 | | | X | | | 17,779.53 | Yes |
| Dunn-Edwards Corporation | 5 | 5/12/2009 | 34,036.26 | | | X | 34,036.26 | | | |
| E.J. Reyes Corp. | 8 | 5/1/2009 | 100,923.62 | | | X | 25,000.00 | | | Yes |
| Frank's Disposal | 35 | 8/18/2009 | 7,807.55 | | | X | 7,807.55 | | | |
| Glendale Plumbing & Fire Supply | 18 | 7/8/2009 | 24,604.25 | | | X | 24,604.25 | | | |
| GRIF-FAB Corporation | | | | | | X | 16,229.18 | | | |
| HD Supply Construction Supply, Ltd. | 2 | 5/8/2009 | 25,638.27 | | | X | 25,638.57 | | | |
| Infinity Metals, Inc. | 25 | 8/3/2009 | 21,836.50 | | | X | | | 21,896.50 | Yes |
| Insul-Flow, Inc. | | | | | | X | 20,329.52 | | | |
| Integrity Builders West, Inc. | 87 | 9/25/2009 | 297,181.38 | | | X | 297,181.38 | | | |
| Killefer Flammang Architects | 10 | 6/1/2009 | 55,853.00 | | | | | | 61,399.42 | Yes |
| Kultur Flooring USA, Inc. | 81 | 9/15/2009 | 920,486.24 | | | | | | 816,388.00 | Yes |

Roosevelt Lofts, LLC - Analysis of Claims

| Name | Claim No. | Date Claim Filed | Proof of Claim Secured | Proof of Claim Priority | Proof of Claim Unsecured | C/U/D | Scheduled Claim Schedule "D" Secured | Scheduled Claim Schedule "E" Priority | Scheduled Claim Schedule "F" Unsecured | Obj? |
|---|---|---|---|---|---|---|---|---|---|---|
| Kultur Flooring USA, Inc. | 82 | 9/15/2009 | 920,486.24 | | | | | | 816,388.00 | Yes |
| LA Commercial Group, Inc. dba | | | | | | X | 6,261.80 | | | |
| Los Angeles County Tax Collector | 12 | 5/28/2009 | 725,563.78 | | | | | - | | |
| Lynn Safety, Inc. | | | | | | X | 277,318.46 | | | |
| New World West | | | | | | X | 50,000.00 | | | |
| Orco Construction Supply | | | | | | X | 6,205.10 | | | |
| Pfinish Koncepts Inc. | 73 | 9/14/2009 | 290,698.97 | | | X | 290,698.97 | | | |
| PM Estrada Roofing | 11 | 5/28/2009 | | | 26,700.00 | X | 26,700.00 | | | |
| Purcell Murray Builder Sales Co., Inc. | | | | | | X | 278,886.07 | | | |
| Robertson's Ready Mix | 13 | 6/9/2009 | 12,850.30 | | | X | 7,463.65 | | | |
| Robertson's Ready Mix | 41 | 8/27/2009 | 2,839.21 | | | X | see above | | | Yes |
| Schafer's Parking Lot Services (a/k/a Asphalt Management Inc.) | 42 | 8/27/2009 | 13,150.00 | | | | | | 13,150.00 | Yes |
| Siemens Building Technologies, Inc. | 39 | 8/18/2009 | 126,563.65 | | | X | 79,563.65 | | | Yes |
| Southland Exterior Building Svcs | 85 | 9/9/2009 | 375,856.31 | | | X | 451,430.00 | | | Yes |
| Spectra Company | 69 | 9/11/2009 | | | 68,698.60 | X | 63,698.00 | | | |
| SRS Fire Protection, Inc. | 37 | 8/20/2009 | 74,278.34 | | | X | 74,278.34 | | | |
| Thermalair | 72 | 9/14/2009 | 1,045,323.25 | | | X | 1,045,323.25 | | | |
| Thyssenkrupp Elevator, Inc. | 65 | 9/2/2009 | 173,624.58 | | | X | 173,624.58 | | | |
| Thyssenkrupp Elevator, Inc. | | | | | | X | 37,066.18 | | | |
| Trench Plate Services | 3 | 5/8/2009 | 6,261.80 | | | | | | 6,261.80 | Yes |
| V.G.I. Corporation | 77 | 9/14/2009 | 2,404,569.55 | | 12,754.39 | X | 2,575,569.55 | | | |
| Westye Group - West, Inc. d/b/a Sub-Zero Wolf | | | | | | X | 399,696.63 | | | |
| Wrightway Construction, Inc. | 71 | 9/11/2009 | 533,852.00 | | | X | 533,852.00 | | | Yes |

**Priority Claims**

| Name | Claim No. | Date Claim Filed | Secured | Priority | Unsecured | | Schedule "D" | Schedule "E" Priority | Schedule "F" Unsecured | Obj? |
|---|---|---|---|---|---|---|---|---|---|---|
| City of Los Angeles, Office of Finance | 28 | 6/4/2009 | | 11,542.63 | | | | - | | Yes |
| Franchise Tax Board | 17 | 7/2/2009 | | 4,535.34 | 950.09 | | | - | | Yes |
| Anderson, Ryan | 45 | 9/1/2009 | | 2,425.00 | 38,755.40 | | | Unscheduled | Unscheduled | Yes |
| Dornbusch, Steven | 46 | 9/1/2009 | | 2,425.00 | 27,104.90 | | | Unscheduled | Unscheduled | Yes |

Roosevelt Lofts, LLC - Analysis of Claims

| Name | Claim No. | Date Claim Filed | Proof of Claim Secured | Proof of Claim Priority | Proof of Claim Unsecured | C U/D | Scheduled Claim Schedule "D" Secured | Scheduled Claim Schedule "E" Priority | Scheduled Claim Schedule "F" Unsecured | Obj? |
|---|---|---|---|---|---|---|---|---|---|---|
| Dougherty, Brian | 61 | 9/1/2009 | | 2,425.00 | 27,575.00 | | | Unscheduled | Unscheduled | Yes |
| Glass, Gary & Tsao, David | 59 | 9/1/2009 | | 2,425.00 | 93,623.40 | | | Unscheduled | Unscheduled | Yes |
| Idroos, Sabrina | 47 | 9/1/2009 | | 2,425.00 | 27,575.00 | | | Unscheduled | Unscheduled | Yes |
| Lisetsky, Yana A. | 49 | 9/1/2009 | | 2,425.00 | 30,305.00 | | | Unscheduled | Unscheduled | Yes |
| Mahaffey, Patricia | 63 | 9/1/2009 | | 2,425.00 | 47,575.00 | | | Unscheduled | Unscheduled | Yes |
| McGee, Susan & Laura | 50 | 9/1/2009 | | 2,425.00 | 76,503.00 | | | Unscheduled | Unscheduled | Yes |
| Ni, Robert & Michael | 51 | 9/1/2009 | | 2,425.00 | 27,251.60 | | | Unscheduled | Unscheduled | Yes |
| Partow, Puya | 52 | 9/1/2009 | | 2,425.00 | 24,775.00 | | | Unscheduled | Unscheduled | Yes |
| Patwin, Justin | 53 | 9/1/2009 | | 2,425.00 | 25,129.00 | | | Unscheduled | Unscheduled | Yes |
| Ramos, Maria | 54 | 9/1/2009 | | 2,425.00 | 22,575.00 | | | Unscheduled | Unscheduled | Yes |
| Salerno, Joe & Adrienne | 55 | 9/1/2009 | | 2,425.00 | 28,422.45 | | | Unscheduled | Unscheduled | Yes |
| Shafer, David | 62 | 9/1/2009 | | 2,425.00 | 39,345.00 | | | Unscheduled | Unscheduled | Yes |
| Smith, Keith McCarthy | 56 | 9/1/2009 | | 2,425.00 | 28,365.00 | | | Unscheduled | Unscheduled | Yes |
| Spamer, Eric | 57 | 9/1/2009 | | 2,425.00 | 82,744.00 | | | Unscheduled | Unscheduled | Yes |
| Stapleton, Dennis | 58 | 9/1/2009 | | 2,425.00 | 45,784.20 | | | Unscheduled | Unscheduled | Yes |
| Young, Brian | 60 | 9/1/2009 | | 2,425.00 | 34,035.00 | | | Unscheduled | Unscheduled | Yes |

**Unsecured Claims**

| Name | Claim No. | Date Claim Filed | Secured | Priority | Unsecured | C U/D | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | Obj? |
|---|---|---|---|---|---|---|---|---|---|---|
| 2417 Fire Services | 29 | 7/31/2009 | | | 1,000.00 | X | | | 1,000.00 | |
| 700 Wilshire Properties | 80 | 9/15/2009 | | | 68,662.73 | X | | | Unknown | Yes |
| 944 Media | | | | | | X | | | 13,200.00 | |
| A-American Flooring | 78 | 9/15/2009 | | | 233,181.00 | | | | 233,000.00 | |
| Accent Refinishing Company | | | | | | X | | | 85,374.00 | |
| Accoustical Construction, Inc. | | | | | | X | | | 8,629.00 | |
| Ace Concrete Cutting, Inc. | | | | | | X | | | 5,191.00 | |
| Ace Parking Services | | | | | | | | | 20,140.18 | |
| Amamoto, Allen | 88 | 10/30/2009 | | | 30,000.00 | | | | Unscheduled | Yes |
| B&N Industries, Inc. | | | | | | X | | | 11,916.35 | |
| Bazik Electrical | | | | | | X | | | 3,290.00 | |
| Bontempi USA | 21 | 7/16/2009 | | | 60,156.45 | X | | | 57,474.75 | Yes |
| Cal Systems | | | | | | X | | | 535.09 | |

Roosevelt Lofts, LLC - Analysis of Claims

| Name | Claim No. | Date Claim Filed | Proof of Claim Secured | Priority | Unsecured | C/U/D | Scheduled Claim Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | Obj? |
|---|---|---|---|---|---|---|---|---|---|---|
| Century Shower Doors | 1 | 5/4/2009 | | | 160,030.00 | X | | | 11,590.00 | Yes |
| Chase Construction, Inc. | | | | | | X | | | 566,000.00 | |
| City of Los Angeles Public Works | | | | | | | | | 91.08 | |
| Clark, Alan & Anna | 23 | 7/28/2009 | | | 39,362.10 | | | | Unscheduled | Yes |
| Commercial Scaffolding of CA, Inc. | | | | | | X | | | 38,111.00 | |
| Davis Langdon | | | | | | X | | | 7,500.00 | |
| Dept of Water and Power - City of Los Angeles | 9 | 5/14/2009 | | | 87,258.15 | | | | Unscheduled | Yes |
| Dewey Pest Control | | | | | | X | | | 6,310.00 | |
| Digital Express | | | | | | X | | | 1,515.50 | |
| DMF Lighting | | | | | | X | | | 8,152.73 | |
| Donald Dickerson & Associates | 32 | 8/12/2009 | | | 64,121.86 | X | | | 64,520.44 | |
| EFCO Corporation | | | | | | X | | | 85,482.00 | |
| Encino Corporate Plaza, L.P. | | | | | | | | | 2,575.00 | |
| Excel Building Services | | | | | | X | | | 43,992.00 | |
| Fathi, Haleh (Holly) | | | | | | | | | 15,200.00 | |
| General Coating | | | | | | X | | | 11,300.00 | |
| Gorgeous Magazine | | | | | | X | | | 1,525.00 | |
| H. Joseph Nourmand, PC | 76 | 9/15/2009 | | | 140,597.65 | | | | 9,182.21 | |
| Henri Specialties | | | | | | X | | | 27,469.40 | |
| Internal Revenue Service | | | | | | | | — | | |
| Irish Communication Company | | | | | | X | | | 847.74 | |
| Ives, Kirwan & Dibble | | | | | | | | | 19,138.90 | |
| J.W. Kelly Consulting | | | | | | | | | 1,760.00 | |
| Kadima Security Services, Inc. | | | | | | X | | | 189,455.00 | |
| Kang, Ha Bin | 48 | 9/1/2009 | | | 35,700.00 | | | | Unscheduled | Yes |
| KenMar Consultants, LLC | 36 | 8/21/2009 | | | 750.00 | X | | | 750.00 | |
| Kessler & Kessler | | | | | | | | | 21,644.21 | |
| Keyboard Concepts, Inc. | | | | | | X | | | 540.83 | |
| Leonard, Gary | | | | | | X | | | 535.00 | |
| Lewis & Associates | | | | | | | | | 8,663.53 | |
| Lightworks | | | | | | X | | | 60,523.21 | |
| Los Angeles Community College Dist. | 68 | 9/11/2009 | | | 250,000.00 | X | | | Unk | Yes |

Roosevelt Lofts, LLC - Analysis of Claims

| Name | Claim No. | Date Claim Filed | Proof of Claim Secured | Priority | Unsecured | CU D | Scheduled Claim Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | Obj? |
|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles Conservancy | 79 | 9/15/2009 | | | 100,000.00 | | | | 100,000.00 | |
| Los Angeles Dept. of Bldg. & Safety | | | | | | | | | 802.00 | |
| Los Angeles Downtown News | | | | | | X | | | 19,300.00 | |
| Los Angeles Fire Department | | | | | | | | | 2,895.00 | |
| Los Angeles Magazine | | | | | | X | | | 14,107.44 | |
| Mansoor, Solomon | | | | | | | | | 3,488.76 | |
| Mayer, Herbert Alfred | 67 | 9/8/2009 | | | 29,590.03 | | | | Unscheduled | Yes |
| Mayer, Herbert Alfred | 70 | 9/11/2009 | | | 29,590.03 | | | | Unscheduled | Yes |
| McDowell Scheduling | | | | | | X | | | 8,300.00 | |
| Milbank Holding Corp. | | | | | | | | | 5,011,250.00 | |
| Muir-Chase Plumbing Co., Inc. | 22 | 7/21/2009 | | | 2,827,949.00 | X | | | 788,950.00 | Yes |
| On Demand Printing | | | | | | | | | 2,126.24 | |
| Pacific Property Consultants, Inc. | 83 | 9/17/2009 | | | 1,987.50 | X | | | Unscheduled | Yes |
| Park Place Signs | | | | | | X | | | 28,700.00 | |
| Parking Automation Systems, Inc. | 44 | 8/31/2009 | | | 17,370.12 | X | | | 31,424.64 | |
| Pepper Development Services | | | | | | | | | 315,000.00 | |
| Plant Connection | | | | | | X | | | 1,085.00 | |
| Platinum Publications | 30 | 8/6/2009 | | | 4,000.00 | X | | | 4,000.00 | |
| Prescott Companies, Inc. | 38 | 8/21/2009 | | | 97,980.00 | | | | Unscheduled | Yes |
| QualityBuilt.com | 34 | 8/19/2009 | | | 4,594.19 | X | | | 3,214.48 | |
| Reycon Construction, Inc. | | | | | | X | | | 787.60 | |
| Robert Smylie & Associates | | | | | | X | | | 49,246.69 | |
| Robert Woodcock Plumbing | 19 | 7/7/2009 | | | 21,710.00 | X | | | Unscheduled | Yes |
| Robertson's Ready Mix | 64 | 8/27/2009 | | | 12,850.30 | X | | | 90,169.00 | Yes |
| Rock Marble, The | | | | | | X | | | 119,789.59 | |
| Roosevelt Lofts Homeowners Assn. | | | | | | | | | Unk | |
| Ryan Anderson, et al. | | | | | | X | | | 5,500.00 | |
| Simon Media Company | | | | | | X | | | | |
| Simpson, Gumpertz & Heger | 33 | 8/18/2009 | | | 25,708.42 | X | | | 25,708.42 | |
| Southern California Gas Company | 14 | 6/24/2009 | | | 1,889.38 | | | | Unscheduled | Yes |
| Southern California Gas Company | 43 | 8/21/2009 | | | 173,535.99 | | | | Unscheduled | Yes |
| State Board of Equalization | | | | | | | | | | |
| Stevenson Systems, Inc. | 26 | 8/3/2009 | | | 19,843.17 | X | | | 17,092.16 | |

Roosevelt Lofts, LLC - Analysis of Claims

| Name | Claim No. | Date Claim Filed | Proof of Claim | | | | C/U/D | Scheduled Claim | | | Obj? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Secured | Priority | Unsecured | | | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | |
| Stuart Dean Company | | | | | | | X | | | 17,211.48 | |
| Tima Winter, Inc. | 24 | 7/28/2009 | | | 86,183.68 | | X | | | 52,409.00 | Yes |
| Virdi Power, Inc. | | | | | | | X | | | 3,915.55 | |
| West Coast Doors | 20 | 7/17/2009 | | | 4,814.75 | | X | | | 4,814.75 | |
| Yashouafar, M. Aaron | | | | | | | | | | 100,796.97 | |
| Yashouafar, Raymond | | | | | | | | | | 13,863.22 | |
| Yashouafar, Rodney | | | | | | | | | | 715.85 | |
| Total: | | | 93,244,185.32 | 59,727.97 | 5,466,962.53 | | | 88,288,704.11 | - | 10,316,352.24 | |

| In re | ROOSEVELT LOFTS, LLC | Debtor(s). | Chapter 11 |
|-------|----------------------|------------|------------|
|       |                      |            | 1:09-14214-GM |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as **DEBTOR'S DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 28, 2009** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

    John B Acierno   ecfcacb@piteduncan.com
    Gary O Caris   gcaris@mckennalong.com, pcoates@mckennalong.com
- Steven R Fox   emails@foxlaw.com
- Helen R Frazer   hfrazer@aalrr.com
- Varand Gourjian   vg@gourjianlaw.com, lala@gourjianlaw.com
- Brian T Harvey   bharvey@buchalter.com, IFS_filing@buchalter.com
- Herbert Hayden   herbert@ntlg.us
- Ian Landsberg   ilandsberg@lm-lawyers.com
- David L. Neale   dln@lnbrb.com
- Juliet Y Oh   jyo@lnbrb.com, jyo@lnbrb.com
- S Margaux Ross   margaux.ross@usdoj.gov
- Bruce D Rudman   bdr@agrlaw.net
- William D Schuster   bills@allieschuster.org
- Daniel H Slate   dslate@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- David A Tilem   davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;marcycarman@tilemlaw.com;ldiaz@tilemlaw.com;dianachau@tilemlaw.com
- United States Trustee (SV)   ustpregion16.wh.ecf@usdoj.gov
- Marc Weinberg   marcweinberg@att.net
- Brandon J Witkow   bwitkow@lockelord.com
- Aimee Y Wong   aywong@mckennalong.com

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On **December 28, 2009** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

**By U.S. mail:**
**Office of the U.S. Trustee**
**Members of the Creditors' Committee and its counsel**
**Counsel for Bank of America**
**S.E.C.**
**(See attached)**

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*              **F 9013-3.1**

| In re | ROOSEVELT LOFTS, LLC | Debtor(s). | Chapter 11 1:09-14214-GM |
|-------|----------------------|------------|--------------------------|

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on December 28, 2009 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**By attorney service:**
Honorable Geraldine Mund
21041 Burbank Blvd.
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| December 28, 2009 | Marguerite Hardin | /s/ Marguerite Hardin |
|-------------------|-------------------|------------------------|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                    **F 9013-3.1**

Roosevelt Lofts
**CREDITORS COMMITTEE**

**Counsel**
Ian Landsberg, Esq.
Landsberg Margulies LLP
16030 Ventura Blvd., Ste. 470
Encino, CA 91436

**Committee Member**
A American Custom Flooring
Attn: Richard S. Lauter
311 S. Wacker Drive
Chicago, IL 60066

**Committee Member**
Kuetar Flooring
Attn: Joseph Kember/Ed Sheats
2 Innovation Drive
Renfrew
Ontario, **CANADA** K7V4B1

**Committee Member**
Bontempi USA
Attn: Yeujye Chen
8919 Beverly Blvd.
West Hollywood, CA 90048

U.S. Trustee
Attn: S Margaux Ross, Esq.
21051 Warner Ctr Ln Ste 115
Woodland Hills, CA 91367

Homan Taghdiri, Esq.
**Milbank**
660 S. Figueroa St., 24th Floor
Los Angeles, CA 90017

**Counsel for Bank of America**
Daniel H. Slate, Esq.
Buchalter, Nemer
1000 Wilshire Blvd., Ste 1500
Los Angeles, CA 90017

S.E.C.
5670 Wilshire Blvd., Ste. 1100
Los Angeles, CA 90036