1  DAVID L. NEALE (State Bar No. 141225)
   JULIET Y. OH (State Bar No. 211414)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5
6  Attorneys for Chapter 11 Debtor and
   Debtor in Possession
7
8                  **UNITED STATES BANKRUPTCY COURT**
9                  **CENTRAL DISTRICT OF CALIFORNIA**
10                 **SAN FERNANDO VALLEY DIVISION**
11
12 In re                              ) Case No. 1:09-bk-14214-GM
                                      )
13 ROOSEVELT LOFTS, LLC, a Delaware   ) Chapter 11
   limited liability company,         )
14                                    ) **OMNIBUS REPLY BY DEBTOR TO**
                                      ) **OPPOSITIONS FILED BY VARIOUS**
15             Debtor.                ) **PARTIES TO DEBTOR'S MOTION**
                                      ) **FOR    ORDER    AUTHORIZING**
16                                    ) **DEBTOR   TO   (A)   CONDUCT   A**
                                      ) **PUBLIC AUCTION OF, AND SELL,**
17                                    ) **CERTAIN   CONDOMINIUM   UNITS,**
                                      ) **FREE AND CLEAR OF ALL LIENS,**
18                                    ) **CLAIMS,    INTERESTS    AND**
                                      ) **ENCUMBRANCES; AND (B) EMPLOY**
19                                    ) **KENNEDY    WILSON    AUCTION**
                                      ) **GROUP   INC.   AS   AUCTIONEER;**
20                                    ) **DECLARATIONS   OF   M.   AARON**
                                      ) **YASHOUAFAR    AND    RICHARD**
21                                    ) **WINCHELL IN SUPPORT THEREOF**
22                                    )
                                      ) Date:  January 7, 2010
23                                    ) Time:  10:00 a.m.
                                      ) Place: Courtroom "303"
24                                    )        21041 Burbank Boulevard
                                      )        Woodland Hills, CA 91367
25                                    )
                                      )
26                                    )
                                      )
27 _____   )
28

                                      1

1

# TABLE OF CONTENTS

I.     INTRODUCTION ……………………………………………………………………………..2

II.    DISCUSSION ………………………………………………………………………………...7

     A.     The Debtor Has Provided Ample Justification To Support The
            Proposed Timing Of The Auction And Sale Of The Units…………………………7

     B.     The Proposed Auction And Sale Of The Units Will Provide Immediate
            And Tangible Benefit To The Debtor's Estate, Reflect The Sound
            Business Judgment Of The Debtor, And Are In The Best Interests
            Of All Creditors ………………………………………………………………………10

            1.     The Proposed Sales of the Units Do Not Foreclose
                 On The Debtor's Ability To Rent The Remaining
                 Units or Sell the Building ………………...………………....……………..11

            2.     The Sales Of The Units On An Individual Basis Were
                 Always Contemplated By The Parties And Were Expressly
                 Consented To By The Bank …………………………………………………12

            3.     The Proposed Auction And Sale Of The Units Reflect The Exercise
                 Of The Debtor's Sound Business Judgment, Will Provide
                 Immediate And Tangible Benefits To The Estate, And Are
                 Clearly In The Best Interests Of All Creditors ……………………………13

            4.     The Bank's Contention That the Debtor Has Failed To
                 Discuss a Budget, Timeline And Source Of Funding For The
                 Completion Of The Building Is Irrelevant and Misleading ……………..15

     C.     Even If The Bank Is Deemed Not to Have Consented to the
            Proposed Auction And Sale Of Units, Which the Debtor Disputes,
            The Units May Still Be Sold Free and Clear of Liens, Claims,
            Interests and Encumbrances ………………………………………………… 17

     D.     The Proposed Auction And Sale Of Units Provide Adequate
            Protection Of Existing Liens, Claims And Interests In The Units…………… 18

     E.     The Proposed Auction And Sale Of Units Are Contemplated By
            The Debtor's Plan And Any Suggestion That The Debtor Has
            Acted In Bad Faith Is Misplaced…………………………………………… 20

III.    CONCLUSION ……………………………………………………………………………… 22

1

## **TABLE OF AUTHORITIES**

2

3 *In re Continental Air Lines, Inc.*,
70 F.2d 1223 (5th Cir. 1986) ...................................................................13

4
*In re Lionel Corp.*,
5 722 F.2d 1063, 1071 (2d Cir. 1983) ...........................................................13

6 *Walter v. Sunwest Bank* (*In Re Walter*),
7 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) ........................................................13

8 11 U.S.C. § 363(b) .................................................................................13
11 U.S.C. § 363(f) ...................................................................................5
9 11 U.S.C. § 363(f)(5) .............................................................................17

10 Rule 6004(h), Federal Rules of Bankruptcy Procedure ......................................23

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1        Roosevelt Lofts, LLC, a Delaware limited liability company, the debtor and debtor in

2  possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), hereby submits

3  this omnibus reply (the "Reply") to the oppositions (each, an "Opposition," and collectively, the

4  "Oppositions") filed by Bank of America, N.A., individually and as agent for a group of lenders

5  (the "Bank"), and various alleged mechanic's lien claimants (collectively, the "Mechanic's Lien

6  Claimants"), including Sidney Alter *dba* Alter Electric Company and Allsale Electric, Inc.

7  ("Alter"), American Gunite, Inc. ("AG"), E.J. Reyes Corporation *dba* EJR Door Division

8  ("EJR"), Glendale Plumbing And Fire Supply, Inc. ("Glendale Plumbing"), SRS Fire Protection,

9  Inc. ("SRS"), Thermalair, Inc. ("Thermalair") and V.G.I. Incorporated ("VGI"), to the motion

10  (the "Auction Motion") filed by the Debtor for an order of the Court (A) authorizing the Debtor

11  to conduct a public auction of approximately sixty five (65) condominium units, but no fewer

12  than fifty (50) units and no more than seventy five (75) units (collectively, the "Units," and each

13  a "Unit") and sell such Units to third party purchasers (collectively, the "Buyers," and each a

14  "Buyer"), free and clear of liens, claims, interests and encumbrances, and (B) authorizing the

15  Debtor to employ Kennedy Wilson Auction Group Inc. ("KW") as the Debtor's auctioneer to

16  publicize, market and offer the Units for sale through a public auction, pursuant to the terms and

17  conditions set forth in that certain *"Residential Marketing Agreement"* entered into by the

18  Debtor and KW (the "Residential Marketing Agreement") which is attached as Exhibit "A" to

19  the Declaration of Richard Winchell ("Winchell Declaration") annexed to the Motion.[1]

20

**I.**

21

**INTRODUCTION**

22        The Oppositions filed by the Mechanic's Lien Claimants are generally limited in nature –

23  while the Mechanic's Lien Claimants do not appear to be opposed to the auction and sale of the

24  Units, free and clear of liens, claims, interests and encumbrances, the Mechanic's Lien Claimants

25  seek adequate protection of their alleged interests by having the proceeds of the sale of the Units

26  be set aside in a trust account or segregated account in an amount sufficient to cover the asserted

27

28      [1] All capitalized terms not specifically defined in this Reply shall have the same meanings ascribed to them in the Auction Motion.

2

1   amounts of their respective mechanic's lien claims, with any distribution of such proceeds to be
2   made only upon further Court order. As the Auction Motion makes clear, all of the net proceeds
3   generated by the sale of the Units (net of the commissions payable to KW and cooperating
4   brokers, advertising and marketing expenses reimbursable to KW, and closing costs), will be
5   segregated, with all liens, claims and interests against such Units to attach to such net proceeds to
6   the same extent, with the same validity and in the same priority, until a determination is made
7   regarding the validity, extent and relative priority of the various liens against the Building or the
8   Court orders otherwise.[2] Any distribution of the net sale proceeds will occur only after the
9   parties' relative priorities are determined pursuant to a further Court order. Accordingly, the
10  Debtor submits that the interests of the Mechanic's Lien Claimants (whatever they may
11  ultimately be determined to be) are adequately protected in connection with the proposed auction
12  and sale of the Units, and that the objections expressed by the Mechanic's Lien Claimants do not
13  present a basis for denying the relief requested by the Debtor in the Auction Motion.

14          The Bank's objections to the Auction Motion, as set forth in the Bank's Opposition, fall
15  into the following general categories:

16          1.      The Auction Motion purportedly fails to provide adequate justification for
17  conducting an auction of the Units on an expedited basis.

18          2.      The proposed auction and sale of the Units will allegedly have a substantial
19  negative impact on the value of the remaining units and on the Building, do not reflect the sound
20  business judgment of the Debtor, and are not in the best interests of the Debtor's creditors or the
21  bankruptcy estate.

22          3.      The Bank does not consent, and should not be deemed to consent, to the proposed
23  sales of the Units because the Debtor is allegedly in default under the terms of the Loan.

24          4.      The proposed sales of the Units allegedly do not provide adequate protection of
25  the existing liens, claims and interests of the Bank in the Units and Building.

26

27          [2] The Debtor does not acknowledge the validity or priority of any of the mechanic's liens that
    have been recorded against the Building and expressly reserves all of its rights, claims and defenses
28  with respect to such liens.

3

5.     The relief requested in the Auction Motion does not comport with the provisions of the Debtor's plan of reorganization and should be denied on that basis.

As summarized below, all of the Bank's objections to the Auction Motion are based on factual and legal inaccuracies or are simply misguided, and should be overruled.

A.     Notwithstanding the Bank's arguments to the contrary, the Debtor has provided ample justification to support the proposed timing of the auction and sale of the Units. As discussed in the Auction Motion, and as further detailed in the Declarations of M. Aaron Yashouafar and Richard Winchell annexed hereto, the number of available luxury condominium units in downtown Los Angeles is expected to increase substantially within the next few months when a number of other residential projects in the area become available for sale. While the Debtor believes that the Units in the Building are highly marketable in and of themselves, there is no question that a substantial increase in the number of available units will dilute the market in downtown Los Angeles and negatively impact the Debtor's ability to sell the Units for the best prices possible. Furthermore, the market is currently supporting auctions in the marketplace, and there is no assurance that the same will remain true in the future.

B.     The Bank's conclusion that the proposed sales of the Units will have a substantial negative impact on the value of the remaining units because other alternatives available to the Debtor to realize the value of the Building will become impractical or uneconomic is based on conjecture and speculation and is not supported by the facts. The proposed sales of the Units have not, and do not, preclude the Debtor from implementing other alternatives, including renting the remaining unsold units or selling the Building in its entirety, to preserve and maximize the value of the Building. The Bank does not provide any evidence to support its contention that an auction of approximately one third of the units in the Building will have a substantial negative impact on the value of the remaining units. To the contrary, the momentum created by the sales of units in the Building, and the leasing of other units in the Building, in order to create a community and project which people would want to live in, will only add to the value of the Building as it relates to the future sales of remaining units. More importantly, the proposed sales of the Units are clearly in the best interests of the Debtor's creditors and estate

1   since they will generate proceeds of approximately $30 to $35 million, which may be applied,

2   among other things, to pay down the Debtor's secured debt. Although the Bank has attempted to

3   distance itself from the fact that individual sales of the Units were contemplated from the very

4   beginning of the project, the Loan documents make clear that the Bank consented from the outset

5   to individual sales of the Units at specific release prices (without any minimum as to how many

6   units are sold at one time or initially), thus evidencing its agreement that individual sales of the

7   Units would realize the most value from the Building. Furthermore, the Bank's contention that

8   the Debtor has failed to discuss a budget, timeline and source of funding for the completion of

9   the Building, which the Debtor disputes, is nothing more than a "red herring" which has no

10   bearing whatsoever on the Debtor's ability to conduct an auction and sale of the Units.

11        C.     Even if the Bank is not deemed to have consented to the proposed auction and

12   sale of the Units, which the Debtor disputes, the proposed sales of the Units, free and clear of

13   liens, claims, interests and encumbrances, may still be approved under 11 U.S.C. § 363(f).

14        D.     In its Opposition, the Bank argues that the proposed auction and sale of the Units

15   do not provide the Bank with adequate protection of its interest in the Building because such

16   sales will negatively affect the value of the remaining unsold units (for all of the reasons

17   reiterated above). The Bank's arguments have little merit for all of the reasons discussed above.

18   Given the foregoing, and further given the significant equity cushion that the Bank has in the

19   Building, the Bank's lien is adequately protected and will not be impaired or subject to increased

20   risk if the proposed auction and sale of the Units are approved.

21        E.     The Bank notes in its Opposition that the proposed auction and sale of the Units

22   do not comport with the provisions of the Debtor's filed Chapter 11 Plan of Reorganization (the

23   "Plan") and should be denied on that basis. Given the Bank's history of opposing virtually all

24   actions taken by the Debtor to move this case forward, there is little doubt that the Bank will

25   oppose confirmation of the Plan as currently proposed by the Debtor. Accordingly, the Bank's

26   reliance on the terms of the Plan, which the Bank has refused to comment on or discuss with the

27   Debtor to date, is disingenuous. Notwithstanding the foregoing, the Plan contemplates the sale

28   of approximately sixty six (66) Units during the first year of the Plan, with proceeds of

1    approximately $31.5 million anticipated to be generated from the sale of such Units. The
2    Auction Motion seeks to sell virtually the same number of Units to generate proceeds in virtually
3    the same dollar range. The only practical changes to the Plan if the Auction Motion is granted
4    will be the acceleration of the timing for such sales and corresponding change to the cash flow
5    projections for the Plan (given that the proposed sales are expected to generate proceeds of $30
6    to $35 million, all prior to the confirmation of the Plan). These changes to the Plan would only
7    serve to **benefit** the estate and creditors. Moreover, the Debtor's disclosure statement describing
8    the Plan (the "Disclosure Statement") states explicitly that, if the Debtor is authorized to conduct
9    a public auction of the Units and offer such Units for sale, the Debtor will amend the Plan and
10   the Disclosure Statement accordingly. The auction of the Units would only serve to accelerate
11   the timeline set forth in the Plan, to the direct benefit of creditors, and certainly does not warrant
12   denial of the Auction Motion.

13          Finally, the Bank suggests in its Opposition that the Debtor has not been negotiating a
14   resolution of this case in good faith with the Bank. To the contrary, the Debtor has attempted –
15   unsuccessfully – to determine what course of action the Bank would like the Debtor to pursue.
16   Not only has the Bank provided no guidance on this issue, it has elected to oppose the Debtor's
17   efforts to make any forward progress in this case. When the Debtor filed the Sale Motions,
18   seeking authority to sell units to individual buyers in accordance with purchase and sale contracts
19   executed by the Debtor and the buyers, the Bank opposed the Sale Motions, presumably because
20   the Bank believed (among other things) that leasing the units would be a better alternative.
21   When the Debtor filed a motion seeking to implement a short-term residential leasing program
22   for the units in the Building, the Bank opposed such motion. After the Debtor filed its Plan, the
23   Bank declined to negotiate or discuss the terms of such Plan and, instead, filed a motion to
24   dismiss or convert the Debtor's case based upon, among other things, the Debtor's failure to file
25   a disclosure statement. The Debtor has now filed its disclosure statement but has yet to receive
26   any comments on the Disclosure Statement or the Plan from the Bank.

27          At every turn, the Bank has opposed the Debtor's efforts to make forward progress in this
28   case and has resisted every attempt made by the Debtor to work towards an amicable resolution

6

1   of the parties' disputes. As the Court has witnessed, the Bank has never agreed to anything

2   proposed by the Debtor and has yet to indicate what it perceives as the best method for

3   proceeding in, or resolving, this case. Any suggestion by the Bank that the Debtor has acted in

4   bad faith during the course of this case is unsupported by any facts or evidence, particularly in

5   light of the Bank's own actions (or lack thereof) throughout this case.

6        For the reasons set forth in this Reply and in the Auction Motion, the Oppositions should

7   be overruled and the Debtor should be authorized to employ KW as auctioneer, conduct a public

8   auction of the Units, and consummate sales of the Units, free and clear of liens, claims, interests

9   or encumbrances.

10                                            **II.**

11                                      **DISCUSSION**

12   **A.    The Debtor Has Provided Ample Justification To Support The Proposed Timing Of
         The Auction And Sale Of The Units.**

13

14        Notwithstanding the Bank's arguments to the contrary, the Debtor has provided ample

15   justification to support the proposed timing of the auction and sale of the Units. In connection

16   with the Auction Motion, the Debtor has provided testimony from both M. Aaron Yashouafar

17   and Richard Winchell indicating that the number of available luxury condominium units in

18   downtown Los Angeles is expected to increase substantially within the next few months when a

19   number of other residential projects in the area become available for sale. Both Mr. Yashouafar

20   and Mr. Winchell have provided testimony that they believe it is critical for the Debtor to

21   capitalize on the current downtown Los Angeles market conditions and conduct a public auction

22   of the Units as soon as possible in order to obtain the highest prices possible for the Units, and

23   have the least amount of competition with other projects. Mr. Winchell has also provided

24   testimony that KW requires a lead time of approximately forty five (45) days prior to the auction

25   date in order to properly advertise, market and publicize the auction. The Bank has submitted no

26   evidence or testimony whatsoever to dispute the accuracy of the foregoing testimony.

27        Rather, the Bank does what it has historically done throughout this case, which is to

28   respond to information provided by the Debtor with questions and requests for further

                                            7

1  information. In its Opposition, the Bank notes that neither Mr. Yashouafar nor Mr. Winchell has

2  provided any specific information on (i) the current number of available units in downtown Los

3  Angeles, (ii) what residential projects will become available for sale, (iii) when exactly each of

4  the projects will become available, (iv) the number of additional units that will become available

5  for sale, (v) how those additional units will compare to the Building's units (e.g., square footage,

6  fixtures, amenities, location, etc.), (vi) whether these additional units will be in the same price

7  ranges as the projected price ranges for the units in the Building, and (vii) whether it is in the

8  best interest of creditors and the estate to first complete construction of the units, as

9  contemplated by the Debtor's Plan, and then market the units, and what impact conducting an

10  auction sale of a few of the units may have on the fair market value of the remaining units.[3] The

11  foregoing information is provided in the Declaration of Richard Winchell annexed hereto

12  ("Winchell Declaration") and summarized below:

13  • There are currently approximately three hundred fifty (350) available residential

14  condominium units in downtown Los Angeles.

15  • There are three (3) residential projects in downtown Los Angeles, with an

16  aggregate total of approximately three hundred five (305) units, that have

17  completed construction, are currently "ready to sell" and are expected to hit the

18  market (with marketing campaigns) by March 2010 (collectively, the "Immediate

19  Projects"): (i) 705 W. 9th Street (approximately 214 units); (ii) 655 Hope

20  (approximately 80 units); and (iii) Santee Lofts (approximately 117 units). While

21  the exact timing cannot be ascertained, given the current status of the Immediate

22  Projects and condition of their respective units, the Immediate Projects are

23  expected to hit the market very shortly.

24  • 705 W. 9th Street is a new construction high-rise building, with a comparable

25  location to Roosevelt. 655 Hope is an adaptive re-use project (like the Debtor's

26  Building), with a seventeen (17) story tower and a comparable location to

27

28  [3] See, Bank's Opposition, p. 5, lines 8-17.

8

Roosevelt.   Santee Lofts is also an adaptive re-use project, with an inferior location to Roosevelt.  While there are clear differences between the Debtor's project and the Immediate Projects, all four projects are comparable in price and other aspects, and are likely to be marketed to the same buyer base.

- In addition to the Immediate Projects, there are five (5) additional residential projects in downtown Los Angeles, with an aggregate total of approximately two hundred sixty nine (269) units that have finished construction and have obtained final permits, or are nearly finished doing so, and are expected to hit the market sometime in 2010:  (i) El Dorado (65 units); (ii) Barn Lofts (38 units); (iii) Hewitt First Lofts (31 units); (iv) Brownstone Lofts (55 units); and (v) Brockman (approximately 80 units).  While the exact timing cannot be ascertained, given the current status of the projects and the condition of the units, the foregoing projects are expected to hit the market after the Immediate Projects discussed above but still sometime in 2010.

- As set forth in the Winchell Declaration, Mr. Winchell believes that the downtown Los Angeles real estate market is significantly more favorable to developer-sellers than it was six (6) months ago, as evidenced by the recent successful auctions of units in the Concerto and Market Lofts projects.  Mr. Winchell believes that capitalizing on the momentum generated by such recent auctions, particularly now when the market is not overly saturated with available units, would result in a successful auction for the Debtor's Units.

- As set forth in the Winchell Declaration, Mr. Winchell does not believe that the auction of the Units will have a negative impact on the fair market value of the remaining units.

As noted above, the Immediate Projects, once available, will result in the near doubling of the number of available condominium units in downtown Los Angeles, and the corresponding dilution of the market in that area.  While the Units in the Building are highly marketable in and of themselves, a substantial increase in the number of available units will dilute the market in

1    downtown Los Angeles and negatively impact the Debtor's ability to sell the Units for the best

2    prices possible.  Given that the Immediate Projects are expected to hit the market by March

3    2010, a public auction and sale of the Debtor's Units in February 2010 (before the Immediate

4    Projects hit the market) is in the best interests of the Debtor and its creditors.  In addition, given

5    that KW requires lead time of approximately forty five (45) days to effectively conduct a pre-

6    auction marketing campaign, the Auction Motion must be approved at this time for the Debtor to

7    be able to conduct an auction in February 2010.

8        Based on all of the foregoing, the Debtor respectfully submits that it has provided ample

9    justification to support the proposed timing of the auction and sale of the Units, and that the

10   Auction Motion should be approved at this time.

11   **B.    The Proposed Auction And Sale Of The Units Will Provide Immediate And
         Tangible Benefit To The Debtor's Estate, Reflect The Sound Business Judgment Of
12       The Debtor, And Are In The Best Interests Of All Creditors.**

13

14       In its Opposition, the Bank concludes, based on little more than conjecture[4], that the

15   proposed sales of the Units will have a substantial negative impact on the value of the remaining

16   units and on the Building and are therefore not in the best interests of the Debtor's creditors or

17   bankruptcy estate.  The Bank's conclusions are based on the Bank's unsupported belief that, if

18   the Debtor sells the Units now, other alternatives available to the Debtor to realize the value of

19   the Building will become impractical or uneconomic.  As discussed in detail below, the Bank's

20   conclusions are simply inaccurate, and unsupported by any credible testimony.  In addition, the

21   Bank ignores the fact that individual sales of the Units were contemplated from the very

22   beginning of the construction project and that the Bank expressly consented to individual sales of

23

---

24       [4] The conclusions of the Bank's "expert," Deborah B. Haskell are based entirely on hearsay
     and speculation.  In fact, throughout her declaration in support of the Bank's opposition to the Debtor's
25   first Sale Motion (the "Haskell Declaration"), which is attached as Exhibit "A" to the Bank's
     Opposition to the Auction Motion, Ms. Haskell admits that she has not had an opportunity to complete
26   her investigation, visit the Building or quantify any of the financial concerns that she raises.
     Accordingly, the Debtor submits that all of the "expert" testimony proffered by Ms. Haskell in the
27   Haskell Declaration is inadmissible and should be excluded from the Court's consideration.  The
     Debtor previously filed evidentiary objections to the Haskell Declaration [Doc. No. 62].  A copy of the
28   Debtor's evidentiary objections to the Haskell Declaration is attached as Exhibit "1" hereto.

1    the Units (at specific release prices) as part of the Loan.  The Bank's contentions that the Debtor

2    has failed to discuss a budget, timeline and source of funding for the completion of the Building,

3    all of which the Debtor disputes, are nothing more than a "red herring" which has no bearing

4    whatsoever on the Debtor's ability to conduct an auction and sale of the Units.

5          1.     The Proposed Sales of the Units Do Not Foreclose On The Debtor's Ability to

6              Rent the Remaining Units or Sell the Building.

7         The Bank's conclusion that the proposed sales of the Units will have a substantial

8    negative impact on the value of the remaining Units and on the Building appear to be based on

9    the Bank's unsupported belief that, if the Debtor sells the Units now, other alternatives available

10   to the Debtor to realize the value of the Building will become impractical or uneconomic.  The

11   only two "alternatives" that the Bank discusses in its Opposition is for the Debtor to rent the

12   units in the Building as apartments[5] or to sell the Building as a whole.  However, the proposed

13   sales of the Units do not preclude the Debtor from renting the remaining unsold units or selling

14   the Building in its entirety to a buyer.  The Bank has provided no evidence or explanation to the

15   contrary.  Rather, the Bank focuses on the requirement of the Debtor to fund HOA fees to reach

16   the conclusion that the "alternatives" of renting the units as apartments or selling the Building in

17   its entirety will become impractical or uneconomic.  As the Bank noted in its Opposition, the sale

18   of one or more of the Units will require the Debtor to fund the HOA fees for the remaining

19   unsold Units, which the Bank claims will result in a substantial cash drain for the Debtor.

20   However, what the Bank fails to recognize is the fact that the HOA fees essentially reflect the

21   costs of maintaining and operating the Building (*e.g.*, security, trash removal, window washing,

22   common area utilities, pool service, gardening, parking operation, management fees,

23   preventative maintenance, etc.).  As set forth in the analysis attached as Exhibit "2" to the

24   Declaration of M. Aaron Yashouafar annexed hereto (the "Yashouafar Declaration"), these costs

25   are already being incurred by the Debtor in order to maintain and operate the Building,

26   particularly now since the Debtor has a number of tenants leasing residential and commercial

27

28        [5] Ironically, when the Debtor sought to implement a short-term residential leasing program for
     the units in the Building, the Bank resisted the Debtor's efforts to do so.

1  units within the Building. Moreover, these costs are substantially similar to the costs that will be
2  incurred by the Debtor (or a buyer of the Building, for that matter) if the units in the Building are
3  rented as apartments. In fact, as reflected in Exhibit "2" to the Yashouafar Declaration, the sale
4  of the Units will lower the Debtor's cost of operating the Building (including any amounts
5  required to be contributed by the Debtor towards the HOA fees) because the purchasers of the
6  Units will contribute to the costs through their payment of monthly HOA fees.

7       Since the maintenance and operating costs required to be expended by the Debtor will be
8  virtually the same whether it sells the Units or rents the Units in the Building as apartments, the
9  proposed sales of the Units will not significantly increase the obligations of the Debtor and the
10  cash drain to the estate.

11       2.    The Sales of the Units on an Individual Basis Were Always Contemplated by the
                Parties And Were Expressly Consented to by the Bank.
12

13       The Bank conveniently ignores the fact that individual sales of the Units in the Building
14  were contemplated from the outset of the parties' relationship and are a critical component of the
15  strategy agreed to by the parties to maximize the value of the Building and Units. The Loan
16  documents clearly reflect this strategy and the Bank's express consent to the release of its deed
17  of trust to allow for the individual sales of the Units at specified release prices. The Loan
18  documents also do not require the Debtor to sell a certain minimum number of units and do not
19  place any other restrictions on the sale of individual units. All of the Units are being proposed to
20  be sold at prices that are at or above the release prices the Bank expressly agreed to accept under
21  the Loan. To provide further assurance to the Bank and other parties in interest, the Debtor is
22  proposing the sale of a bulk of the units in the Building, so that a large proportion of the units
23  can be sold within a short period of time. Given the foregoing, the Bank should be deemed to
24  have consented to the proposed sales of the Units to the Buyers.

25  ///
26  ///
27  ///
28

12

3.    The Proposed Auction and Sale of the Units Reflect the Exercise of the Debtor's
Sound Business Judgment, Will Provide Immediate and Tangible Benefits to the
Estate, and Are Clearly in the Best Interests of All Creditors.

The Debtor has determined, in an exercise of its sound business judgment, that the proposed sales of the Units (all of which are being sold at or above the releases prices agreed to by the Bank, subject to bidding at public auction) are in the best interests of the Debtor's creditors and estate as a whole.    The Ninth Circuit Bankruptcy Appellate Panel in Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).    In Walter, the Bankruptcy Appellate Panel, adopting the reasoning of the Fifth Circuit in In re Continental Air Lines, Inc., 70 F.2d 1223 (5th Cir. 1986) and the Second Circuit in In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983), articulated the standard to be applied under Section 363(b) as follows:

> "Whether the proffered business justification is sufficient depends on the
> case.  As the Second Circuit held in Lionel, the bankruptcy judge should
> consider all salient factors pertaining to the proceeding and, accordingly,
> act to further the diverse interests of the Debtor, creditors and equity
> holders, alike."    In re Walter, supra, 83 B.R at 19-20, *citing* In re
> Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986).

There is no question that the proposed sales of the Units will provide immediate and tangible benefit to the Debtor's estate.  The proposed sales of the Units are estimated to generate proceeds of approximately $30 to $35 million, which may potentially be used to pay down the Debtor's secured debt (including the principal and accruing interest on the Bank Loan) and to fund the Debtor's Plan, for the benefit of all creditors.

As noted above, the Bank essentially conceded that the most value would be realized from the Building by selling units on an individual basis when it provided its consent to the sale of individual units at the release prices set forth in the Loan documents.  Although the Bank argues now that the rental of the units as apartments and/or the sale of the Building as a whole may make better financial sense than selling units on an individual basis at this time, the Bank

13

1    provides no admissible evidence to support such conclusion. Even assuming that the rental of

2    the units as apartments and/or sale of the Building as a whole makes better financial sense, there

3    is no evidence to indicate that, in the current real estate market, all of the units can, in fact, be

4    rented and generate cash sufficient to pay the Debtor's operating expenses and debt service, or

5    that there will be any interest by prospective buyers to purchase the Building in an amount that is

6    sufficient to satisfy all of the liens, claims and interests asserted against it. In fact, despite the

7    Bank's resistance, the Debtor obtained Court authority to enter into short-term residential leases

8    for units in the Building with individual tenants. Although the Debtor has been successful in

9    negotiating and entering into leases for approximately twenty eight (28) of the units in the

10    Building, the Debtor is not confident that, in the current real estate market, all of the units can be

11    rented.

12        An appraisal of the Building obtained by the Bank in November 2005[6] clearly shows that

13    individual sales of the units will result in the best and highest price for the Building.

14    Specifically, the Bank's own appraisal shows that the prospective bulk market value of the

15    Building (to a single buyer) upon completion of construction would be $115,800,000 as of

16    March 31, 2007. On the other hand, the appraisal shows that the prospective aggregate retail

17    value of the Units (to individual buyers) was $142,500,000 as of November 9, 2005. Even if the

18    fair market values of the Building have decreased over the last three years, there is no evidence

19    to suggest that the proportionate difference between the market value of the Building as a whole

20    versus the aggregate retail value of the units has changed, and the Bank has not provided any

21    current appraisal or evidence to the contrary. This very difference between the market value of

22    the Building and the aggregate retail value of the individual units may very well determine

23    whether or not unsecured creditors of the Debtor's estate receive distributions on account of their

24    allowed claims in this case.

25

26

27        [6] A true and correct copy of the Bank's appraisal from November 2005 is attached as Exhibit
"C" to the Declaration of M. Aaron Yashouafar in support of the Debtor's omnibus reply to various

28    oppositions to the second Sale Motion [Doc. No. 74]. The Debtor respectfully requests that the Court
take judicial notice of the foregoing document.

14

1   Given the immediate and tangible benefit to be received by the estate from the proposed

2   sales of the units, and the Debtor's determination that the best way to realize the most value from

3   the Building (so that all creditors, not just the Bank, benefit) is by selling the units on an

4   individual basis rather than renting the units as apartments or selling the Building as a whole, the

5   Debtor submits that sufficient business justification exists to approve the proposed sales of the

6   Units.   The proposed sales of the Units are clearly in the best interests of all of the Debtor's

7   creditors (rather than just the Bank) and should be approved.

8           4.      The Bank's Contention That the Debtor Has Failed to Discuss a Budget, Timeline
9                   and Source of Funding for the Completion of the Building is Irrelevant and
                    Misleading.
10

11          The Bank's contention that the Debtor has failed to discuss a budget, time frame and

12   source of funding for the completion of the Building, which the Debtor disputes, is nothing more

13   than a "red herring," since the proposed auction and sale of the Units triggers no obligation on

14   the part of the Debtor to complete construction on the remaining floors of the Building.   The

15   Debtor will complete construction on the remaining floors of the Building in an organized

16   fashion, with the funding for the completion of construction to be obtained, in accordance with

17   the terms of the Debtor's Plan.

18          The issue of completion of the Building has no bearing on the Debtor's ability to sell the

19   Units at auction.   All of the Units proposed to be sold are complete with proper permits and

20   certificates of occupancy in place (including common areas to be used by such prospective

21   residents).   Furthermore, contrary to the Bank's statements, the Debtor has previously provided

22   the Bank with its estimated construction budget, a true and correct copy of which is attached as

23   Exhibit "3" to the Yashouafar Declaration annexed hereto[7], and has had discussions in

24   significant detail with the Bank regarding the Debtor's plans with respect to the Building and the

25   anticipated timelines related to the Building.   Following the Petition Date, the Debtor also

26

27          [7] In fact, a copy of the Debtor's estimated construction budget was not only provided to the
     Bank previously, it was attached as an exhibit to the Debtor's replies in connection with both Sale
28   Motions.

15

1    consented to the Bank's retention of a construction estimator to evaluate the costs to complete

2    construction of the Building.  The Debtor provided the Bank's construction estimator with full

3    access to the Building and individual units, and provided all information and documentation

4    requested by the construction estimator.  Although the Debtor has requested copies of the

5    report(s) prepared by the Bank's construction estimator, the Bank has declined to share such

6    reports with the Debtor to date. To the extent that there has been "no" discussion of the budget,

7    time frame and source of funding for the completion of the Building, it has been due solely to the

8    Bank's apparent resistance to share information or have any meaningful discussion with

9    representatives of the Debtor.  Instead, the Bank has refused to cooperate with the Debtor and

10   has resisted every attempt made by the Debtor to work towards an amicable resolution of the

11   parties' disputes.

12          The Bank argues that, until the Building and all of its units are completed, prospective

13   homeowners run a "substantial risk" which will "materially impact" the price at which a

14   prospective buyer will purchase a Unit.[8]  However, as the Bank is aware, the construction of the

15   Building is more than 95% complete. All that remains to be done in the unfinished areas of the

16   Building are finishing touches such as painting, completion of the installation of floor coverings,

17   and installation of cabinets and railings inside of certain units.  Common areas, such as the pool,

18   gym, and rooftop are fully complete, accessible and are currently being used by tenants as they

19   wish.    The Debtor estimates that it will cost approximately $3 million over a period of

20   approximately three months to complete construction in the unfinished areas.  As noted above,

21   the Debtor will complete construction in an organized fashion, with the funding for the

22   completion of construction to be obtained, in accordance with the terms of the Debtor's Plan.

23   Since the unfinished areas are not connected to any of the Units proposed to be sold at auction,

24   none of the prospective buyers will be negatively impacted by the minimal finish work which

25   remains to be completed in the unfinished areas of the Building.  Given all of the foregoing, the

26

27

28          [8] See, Bank's Opposition, p. 9, lines 10-11.

1  Debtor believes that any "risk" to prospective homeowners that the Building will not be

2  completed is negligible.

3  **C.    Even If The Bank Is Deemed Not To Have Consented To The Proposed Auction
   And Sale Of Units, Which The Debtor Disputes, The Units May Still Be Sold Free**

4  **And Clear Of Liens, Claims, Interests And Encumbrances.**

5

6      The Bank contends in its Opposition that it does not consent, and should not be deemed

7  to consent, to the proposed sales of the Units because the Debtor is in default under the terms of

8  the Loan.  This certainly presents a quandary for the Debtor.  On the one hand, the Bank refuses

9  to consent to the proposed sales of the Units based on the Debtor's default under the terms of the

10 Loan -- namely, the Debtor's failure to pay the sums due at maturity.  On the other hand, the

11 Debtor cannot repay the sums due under the Loan until the Debtor is able to sell units in the

12 Building.  It is precisely the Bank's refusal to consent to the proposed sales of the Units that is

13 preventing the Debtor from repaying the sums due under the Loan to the Bank.  This continuous

14 refusal by the Bank to allow sales to qualified buyers is precisely what has placed the Debtor in

15 its current position.  Furthermore, it is worth noting again that, from the outset of the parties'

16 relationship, individual sales of the units in the Building were contemplated by both the Debtor

17 and the Bank and are critical to the strategy agreed to by the parties to maximize the value of the

18 Building and units.  By refusing to provide its consent and issue partial reconveyances in

19 accordance with the express terms of the Loan, the Bank is essentially attempting to rewrite the

20 terms of the Loan.

21     Even if the Bank is deemed not to have consented to the proposed sales of the Units, the

22 Units may be sold, free and clear of liens, claims, interests and encumbrances, under 11 U.S.C. §

23 363(f)(5) for all of the reasons noted in the Auction Motion.  Notably, the Bank does not address

24 this alternative basis for approving the proposed sales of the Units anywhere in its Opposition.

25 ///

26 ///

27 ///

28 ///

17

**D.      The Proposed Auction And Sale Of Units Provide Adequate Protection Of Existing
Liens, Claims And Interests In The Units.**

Notwithstanding their arguments to the contrary, the proposed sales of the Units provide adequate protection of the existing liens, claims and interests asserted by the Bank and the Mechanic's Lien Claimants in the Units and Building.

The Oppositions filed by the Mechanic's Lien Claimants are generally limited in nature – while the Mechanic's Lien Claimants do not appear to be opposed to the auction and sale of the Units, free and clear of liens, claims, interests and encumbrances, the Mechanic's Lien Claimants seek to have the proceeds of the sale of the Units be set aside in a trust account or segregated account in an amount sufficient to cover the asserted amounts of their respective mechanic's lien claims, with any distribution of such proceeds to be made only upon further Court order. As the Auction Motion makes clear, all of the net proceeds generated by the sale of the Units (net of the commissions payable to KW and cooperating brokers, advertising and marketing expenses reimbursable to KW, and closing costs), will be segregated, with all liens, claims and interests against such Units to attach to such net proceeds to the same extent, with the same validity and in the same priority, until a determination is made regarding the validity, extent and relative priority of the various liens against the Building or the Court orders otherwise. Any distribution of the net sale proceeds will occur only after the parties' relative priorities are determined pursuant to a further Court order. As noted in the Auction Motion, the Debtor anticipates that the auction of the Units will generate approximately $30 to $35 million in sales, which far exceeds the total aggregate amount of the claims asserted by the Mechanic's Lien Claimants.[9] Accordingly, the Debtor submits that the interests of the Mechanic's Lien Claimants (whatever they may ultimately be determined to be) are adequately protected in connection with the proposed auction and sale of the Units, and that the objections expressed by the Mechanic's Lien Claimants do not present a basis for denying the relief requested by the Debtor in the Auction Motion.

---

[9] The Debtor does not acknowledge the validity or priority of any of the mechanic's liens that have been recorded against the Building and expressly reserves all of its rights, claims and defenses with respect to such liens.

1    The Bank argues in its Opposition that the proposed sales of the Units do not provide the
2  Bank with adequate protection of its interest in the Building because such sales will negatively
3  affect the value of the remaining unsold units.  In purported support of its conclusion regarding
4  lack of adequate protection, the Bank simply reiterates all of its previous arguments, namely, that
5  the imposition of HOA fees will render the "alternatives" of renting the Units as apartments or
6  selling the Building as a whole impractical or uneconomic, and that the Debtor has failed to
7  discuss a budget, timeline and source of funding for the completion of the Building, preventing
8  the Bank from evaluating which alternative makes the best business sense.    The Bank's
9  arguments have no merit for all of the reasons discussed above.  The Bank has already consented
10 to the individual sales of the Units, and such individual sales were always intended from the
11 inception of the Loan.

12   Although the Bank appears to have adopted a "wait-and-see" approach in this case,
13 without providing any viable alternative options for moving forward in the case, the Debtor and
14 its creditors do not have the luxury of adopting such an approach, particularly given the fact that
15 the Debtor is incurring costs on a daily basis to maintain and operate the Building.[10]  The Bank
16 has provided no actual evidence to support its belief that the proposed sales of the Units will
17 impair the Bank's interest in the Building or subject such interest to increased risk.  To the
18 contrary, the Debtor believes that the sales of the Units (all of which are proposed to be sold at or
19 above the release prices agreed to by the Bank, subject to bidding at public auction) will only
20 serve to increase buyer interest in the Building, and assist the Debtor in negotiating and
21 consummating sales of the remaining units.  The Debtor's ability to increase the "velocity" of the
22 sales of the units is directly dependent upon the Debtor's ability to sell and deliver the Units to
23 prospective buyers and close escrows.

24

25

26      [10]  At the June 2009 hearing regarding the Debtor's first Sale Motion, the Court inquired about
    the Bank's approach (and goal) in the Debtor's case.  Counsel for the Bank responded at that time
    indicated that the Bank wanted to adopt a wait-and-see approach in the case.  Now that the Debtor's
27  case has been pending for nearly nine (9) months, the time to simply wait and see, and do nothing, has
    passed.  The Debtor is simply attempting to make some progress and pursue an exit strategy in this case
28  for the benefit of all creditors.

1    Notwithstanding the foregoing, even if the Bank's interest in the Building is impaired or

2   subjected to increased risk because of the sales of the Units, which the Debtor disputes, the Bank

3   is still adequately protected by the attachment of its lien to the proceeds of the sales as well as a

4   sizeable equity cushion in the Building.   Even if the values reflected in the November 2005

5   appraisal obtained by the Bank are discounted to reflect the recent decline in the real estate

6   market generally, the value of the Building (even at the lower bulk market value) is still

7   substantially higher than the amount owed to the Bank.[11]   The Bank has not provided any

8   evidence to suggest the value of the Building would be any different. Given the Bank's express

9   consent to individual sales of the Units under the Loan, the significant equity cushion that the

10   Bank has in the Building, and all of the other reasons discussed above, the Bank's lien is

11   adequately protected and will not be impaired or subject to increased risk if the proposed auction

12   and sales of the Units are approved.

13   **E.      The Proposed Auction And Sale Of Units Are Contemplated By The Debtor's Plan
14            And Any Suggestion That The Debtor Has Acted In Bad Faith Is Misplaced.**

15    The Bank argues in its Opposition that the proposed auction and sale of the Units are

16   "completely contrary to the strategy for reorganization and proposed timeframes set forth in the

17   Plan"[12] and should be denied on that basis. The Bank's statement adopts an extremely literal

18   view of the terms of the Plan and has little merit. The Debtor's Plan contemplates the sales of

19   approximately sixty six (66) Units during the first year of the Plan, with proceeds of

20   approximately $31.5 million anticipated to be generated from such sales.    The cash flow

21   projections filed in support of the Plan, which reflects the foregoing terms, is attached as Exhibit

22   "4" to the Yashouafar Declaration annexed hereto.    The Auction Motion seeks to sell

23   approximately sixty five (65) Units to generate proceeds in the range of $30 to $35 million. The

24

25      [11]   The Debtor is informed that the Bank recently commissioned an appraisal of the Building
which is substantially complete.  Despite the Debtor's repeated requests for a copy of this appraisal
26   report, the Bank has refused to provide a copy of such report or any valuation information to the
Debtor. The Debtor believes that the Bank's refusal to share the results of its appraisal may be due to
27   the fact that the appraisal confirms the value of the Building to be well in excess of the amount of the
Bank's lien.

28      [12]   See, Bank's Opposition, p. 3, lines 10-11.

1  figures projected in the first year of the Plan and the figures set forth in the Auction Motion are
2  virtually identical. The only practical changes to the Plan if the Auction Motion is granted will
3  be the acceleration of the timing for such sales and corresponding change to the cash flow
4  projections for the Plan (given that the proposed sales are expected to generate proceeds of $30
5  to $35 million, all prior to the confirmation of the Plan). These changes to the Plan would only
6  serve to **benefit** the estate and creditors.

7      Moreover, the Disclosure Statement describing the Plan states explicitly that, if the
8  Debtor is authorized to conduct a public auction of the Units and offer such Units for sale, the
9  Debtor will amend the Plan and the Disclosure Statement accordingly. The Debtor certainly has
10  the right – and ability – to make such amendments if appropriate. The relief sought in the
11  Auction Motion has always been contemplated by the Plan and will not materially impact terms
12  of the Plan if granted. In fact, the auction of the Units would only serve to accelerate the
13  timeline set forth in the Plan, to the direct benefit of creditors.

14      The Bank also suggests in its Opposition that the Debtor has not been negotiating a
15  resolution of this case in good faith with the Bank. To the contrary, the Debtor has attempted –
16  unsuccessfully – to determine what course of action the Bank would like the Debtor to pursue.
17  Not only has the Bank provided no guidance on this issue, it has elected to oppose all of the
18  Debtor's efforts to make any forward progress in this case. When the Debtor filed the Sale
19  Motions, seeking authority to sell units to individual buyers in accordance with purchase and sale
20  contracts executed by the Debtor and the buyers, the Bank opposed the Sale Motions,
21  presumably because the Bank believed (among other things) that leasing the units would be a
22  better alternative. When the Debtor filed a motion seeking to implement a short-term residential
23  leasing program for the units in the Building, the Bank opposed such motion. After the Debtor
24  filed its Plan, the Bank declined to negotiate or discuss the terms of such Plan and, instead, filed
25  a motion to dismiss or convert the Debtor's case based upon, among other things, the Debtor's
26  failure to file a disclosure statement. The Debtor has now filed its disclosure statement but has
27  yet to receive any comments on the Disclosure Statement or the Plan from the Bank. Given the
28  Bank's history of opposing virtually all actions taken by the Debtor in connection with this case,

1   there is little doubt that the Bank will oppose confirmation of the Plan as currently proposed by

2   the Debtor.  Accordingly, the Bank's reliance on the terms of the Plan, which the Bank has

3   refused to comment on or discuss with the Debtor to date, to oppose the relief requested in the

4   Auction Motion is simply disingenuous.

5        At every turn, the Bank has opposed the Debtor's efforts to make forward progress in this

6   case and has resisted every attempt made by the Debtor to work towards an amicable resolution

7   of the parties' disputes.  Any suggestion by the Bank that the Debtor has acted in bad faith

8   during the course of this case is unsupported by any facts or evidence, particularly in light of the

9   Bank's own actions (or lack thereof) throughout this case.

10                                    **III.**

11                              **CONCLUSION**

12       For all of the reasons set forth above, the Debtor respectfully requests that the Court enter

13  an order:

14       (1)     finding that notice of the Auction Motion was adequate and appropriate under the

15  circumstances;

16       (2)     overruling all Oppositions to the Auction Motion and granting the Auction

17  Motion in its entirety;

18       (3)     authorizing the Debtor to conduct a public auction and sale of the Units;

19       (4)     approving the sale of each of the Units to the applicable Buyer, free and clear of

20  liens, claims, interests and encumbrances;

21       (5)     authorizing the Debtor to employ KW as its auctioneer pursuant to the terms and

22  conditions set forth in the Residential Marketing Agreement;

23       (6)     providing for the reservation of the proceeds of the sale of the Units (net of the

24  commissions payable to KW and cooperating brokers, advertising and marketing expenses

25  reimbursable to KW, and closing costs) upon the close of escrow, with all liens and interests to

26  attach to such net sale proceeds to the same extent and priority, and for the distribution of the net

27  sale proceeds after the parties' relative priorities are determined pursuant to a further Court

28  order;

1    (7)    waiving the 10-day stay periods set forth in Bankruptcy Rule 6004(h);

2    (8)    authorizing the Debtor to take all necessary and reasonable steps to consummate

3    the sale of each of the Units to each respective Buyer; and

4    (9)    granting such other and further relief as may be necessary or appropriate under

5    the circumstances.

6    Dated: January 6, 2010                      ROOSEVELT LOFTS, LLC

7

8                                               By: _____
                                                      DAVID L. NEALE
9                                                     JULIET Y. OH
                                                      LEVENE, NEALE, BENDER, RANKIN
10                                                    & BRILL L.L.P.
                                                      Attorneys for Chapter 11 Debtor and
11                                                    Debtor in Possession

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

1    DAVID L. NEALE (State Bar No. 141225)
     JULIET Y. OH (State Bar No. 211414)
2    LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
     10250 Constellation Boulevard, Suite 1700
3    Los Angeles, California 90067
     Telephone:  (310) 229-1234
4    Facsimile:  (310) 229-1244

5
     Attorneys for Chapter 11 Debtor and Debtor in Possession
6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **SAN FERNANDO VALLEY DIVISION**

11

12   In re                              )   Case No. 1:09-bk-14214-GM
                                        )
13   ROOSEVELT LOFTS, LLC, a Delaware   )   Chapter 11
     limited liability company,         )
14                                      )
                                        )
15              Debtor.                 )   **EVIDENTIARY   OBJECTIONS   TO**
                                        )   **DECLARATION   OF   DEBORAH   B.**
16                                      )   **HASKELL IN SUPPORT OF BANK'S**
                                        )   **OPPOSITION      TO      DEBTOR'S**
17                                      )   **MOTION    TO    SELL    CERTAIN**
                                        )   **CONDOMINIUM UNITS**
18                                      )
                                        )   Date:  June 10, 2009
19                                      )   Time:  10:00 a.m.
                                        )   Place:  Courtroom "303"
20                                      )          21041 Burbank Boulevard
                                        )          Woodland Hills, CA 91367
21                                      )
                                        )
22                                      )
                                        )
23                                      )

24        Roosevelt Lofts, LLC, a Delaware limited liability company, the debtor and debtor in

25   possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), hereby submits its

26   evidentiary objections to the declaration of Deborah B. Haskell (the "Declaration") submitted in

27   support of the opposition (the "Opposition") filed by Bank of America, N.A. (the "Bank") to the

28   motion (the "Sale Motion") filed by the Debtor seeking an order of the Court authorizing the


EXHIBIT __/__

1    Debtor to assume certain pre-petition purchase and sale agreements and sell certain

2    condominium units (collectively, the "<u>Units</u>," and each a "<u>Unit</u>") to third party purchasers

3    (collectively, the "<u>Buyers</u>," and each a "<u>Buyer</u>"), free and clear of liens, claims, interests and

4    encumbrances, under the terms and conditions set forth in the Sale Motion.

5    <center>**I.    GENERAL OBJECTION**</center>

6        The Declaration provides what is purported to be expert testimony, based on Ms.

7    Haskell's alleged knowledge and expertise in the real estate industry, but is being provided

8    without foundation or actual knowledge of the facts that are relevant to the Sale Motion. In fact,

9    Ms. Haskell admits in the Declaration that she has not visited the Building[1] or had sufficient

10   information and/or opportunity to quantify the speculative financial concerns that she raises. In

11   addition, to the extent the Declaration is being offered to prove the truth of the matters asserted

12   therein, many, if not all, of the statements made by Ms. Haskell in the Declaration, including

13   those statements derived from information presumably provided to her by the Bank's

14   representatives, constitute inappropriate hearsay not subject to any available exception. Since

15   the "expert" testimony proffered by Ms. Haskell in the Declaration is based entirely on

16   speculation and hearsay, it is objectionable and inadmissible under the Federal Rules of

17   Evidence.    The Debtor therefore respectfully requests that the Declaration be stricken in its

18   entirety.

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27

---

28   [1] All capitalized terms not specifically defined herein shall have the same meanings ascribed to
them in the Declaration.

<center>2</center>

## II.  SPECIFIC OBJECTIONS TO STATEMENTS IN THE DECLARATION

In the alternative, the Debtor respectfully requests that the Court sustain the specific evidentiary objections set forth below and refuse to consider statements contained in the Declaration that are subject to such objections.

| Statement | Evidentiary Objection(s) |
|---|---|
| **¶ 2, Page 2, lines 12-18:**<br><br>I am informed that the Bank Group loaned the Debtor approximately $80 million (the "Loan") to fund the construction project and pay for the costs of construction related to the conversion of the building to residences. I am also informed that under the Loan, construction was originally to be completed by September 1, 2007, and that pursuant to a Modification Agreement, the completion deadline was extended to September 1, 2008. I am further informed that the Loan has matured, but that the Debtor has not paid the Bank Group what is due and owing on the Loan." | Hearsay. Fed. R. Evid. 801-804. To the extent Ms. Haskell's statements are premised upon the representations of third parties or the contents of documents not produced or authenticated by Ms. Haskell, such statements constitute inappropriate hearsay not subject to any available exception.<br><br>Lack of foundation. Fed. R. Evid. 602. No foundation has been laid as to Ms. Haskell's personal knowledge regarding the terms and conditions of the Loan and/or any actions taken by the Debtor or Bank Group in connection therewith.<br><br>Violation of the best evidence rule. Fed. R. Evid. 1002. The Loan agreement and related documents speak for themselves – Ms. Haskell's representations of their contents violate the best evidence rule and are inadmissible. |
| **¶ 2, Page 2, lines 18-21:**<br><br>I have reviewed the Motion and certain of the documents filed by the Debtor in support. [...] As set forth below, I have identified the following problems with Debtor's proposed plan to sell certain of the units, and reached the following conclusions. | Lack of foundation. Fed. R. Evid. 702-703. Although Ms. Haskell appears to be attempting to provide opinion testimony as an expert witness, insufficient information or evidence has been provided to demonstrate her expertise or to otherwise qualify Ms. Haskell as an expert regarding the matters to which she testifies. Furthermore, insufficient information or evidence has been provided regarding the facts or data (other than the Sale Motion and "certain of the documents filed by the Debtor in support") upon which Ms. Haskell's testimony is based. |

| Statement | Evidentiary Objection(s) |
|---|---|
| **¶ 3, Page 2, lines 22-27:**<br><br>If the Debtor sells the 18 (of 222) units it proposes to sell, the value and marketability of the Building will be seriously and negatively affected. Because of current economic conditions, it is unlikely that the remaining 204 units will sell in the near term unless they are sold in bulk at a substantial discount. Conversely, if the building remains in single ownership, the value will be maximized because a potential buyer will be buying the fee interest rather than a partial interest. | Lack of foundation. Fed. R. Evid. 702-703. To the extent that Ms. Haskell is attempting to provide opinion testimony as an expert witness, insufficient information or evidence has been provided to demonstrate her expertise or to otherwise qualify Ms. Haskell as an expert regarding the matters to which she testifies. Furthermore, no information or evidence has been provided regarding the facts or data upon which Ms. Haskell's testimony is based or the reliability of the principles and methods utilized by Ms. Haskell in connection with her testimony. Moreover, the statements made by Ms. Haskell, including, without limitation, that the Building will be "seriously negatively affected" or that it is "unlikely" that Units will sell "in the near term" are hopelessly vague and ambiguous. |
| **¶ 4, Page 2, line 28 – Page 3, line 6**<br><br>Under the Conditions, Covenants and Restrictions ("CC&R's") applicable to the Building, the sale of even one unit will necessarily impose substantial fees on the owner of each of the remaining units to be paid monthly to the newly formed Homeowner's Association (the "HOA"). As owner of the unsold units, the Debtor is required to fund the HOA fees. The CC&R's also provide that the obligation to make the payment of the HOA fees is secured with a lien over the unit, in priority senior to the lien of the Bank Group. Even if only one unit is sold, HOA fees are immediately assessed against each of the 222 units. | Hearsay. Fed. R. Evid. 801-804. To the extent Ms. Haskell's statements are premised upon the representations of third parties or the contents of documents not produced or authenticated by Ms. Haskell, such statements constitute inappropriate hearsay not subject to any available exception.<br><br>Violation of the best evidence rule. Fed. R. Evid. 1002. The CC&R's speak for themselves – Ms. Haskell's representations of their contents violate the best evidence rule and are inadmissible.<br><br>Lack of foundation. Fed. R. Evid. 602, 701. Ms. Haskell's interpretations of the CC&R's constitute inappropriate legal conclusions. |

| Statement | Evidentiary Objection(s) |
|---|---|
| **¶ 4, Page 3, lines 6-14**<br><br>The HOA fees assessed against the unsold units would be a substantial cash drain on the Building, further lowering the value of the collateral of the Bank Group. I have not had time sufficient to quantify, with a high degree of comfort, the magnitude of the loss in value of the Building that would arise from the assessment of HOA fees, but with projected HOA fees ranging from $478-710 per residential unit (roughly $125,000 per month or $1.5 million per year), even using a conservative capitalization rate of 10%, the loss in value could approximate $15 million. Even if one were to assume that half the HOA fees would be used to fund operating expenses and maintenance of an apartment building the loss in value could approximate $7.5 million. | Hearsay. Fed. R. Evid. 801-804. To the extent Ms. Haskell's statements are premised upon the representations of third parties or the contents of documents not produced or authenticated by Ms. Haskell, such statements constitute inappropriate hearsay not subject to any available exception.<br><br>Lack of foundation. Fed. R. Evid. 702-703. Although Ms. Haskell appears to be attempting to provide opinion testimony as an expert witness, insufficient information or evidence has been provided to demonstrate her expertise or to otherwise qualify Ms. Haskell as an expert regarding the matters to which she testifies. Furthermore, no information or evidence has been provided regarding the facts or data upon which Ms. Haskell's testimony is based or the reliability of the principles and methods utilized by Ms. Haskell in connection with her testimony. In fact, it is unclear how Ms. Haskell reaches her conclusions regarding an alleged loss in value of the Building arising from the assessment of HOA fees – her statements present an incomplete and unsupported hypothetical.<br><br>Lack of probative value. Fed. R. Evid. 403. Ms. Haskell's conclusions regarding the assessment of HOA fees and its impact upon the value of the Building are speculation, are unsupported by any admissible evidence and are prejudicial and misleading. In fact, Ms. Haskell admits that she has "not had time sufficient to quantify, with a high degree of comfort" her conclusions regarding any potential loss in value of the Building. Accordingly, Ms. Haskell's testimony has little to no probative value and should be excluded. |

Case 1:09-bk-14214-GM    Doc 62    Filed 06/04/09    Entered 06/04/09 17:58:03    Desc
Main Document        Page 6 of 13

| Statement | Evidentiary Objection(s) |
|---|---|
| **¶ 5, Page 3, lines 15-19:**<br><br>I do not see where in the Motion the Debtor addresses the deterioration in cash flow presented by the imposition of HOA fees. It would seem reasonable to surmise that these fees will make it more difficult for the Debtor to generate the cash necessary to complete construction of the Building, and to market the vacant units. The Motion does not disclose how the HOA fees for the unsold units will be paid. | Lack of foundation. Fed. R. Evid. 701. To the extent that Ms. Haskell is offering her opinion testimony as a <u>lay</u> witness, no foundation has been laid as to Ms. Haskell's personal knowledge regarding the matters to which she testifies.<br><br>Lack of foundation. Fed. R. Evid. 702-703. To the extent that Ms. Haskell is attempting to provide opinion testimony as an <u>expert</u> witness, insufficient information or evidence has been provided to demonstrate her expertise or to otherwise qualify Ms. Haskell as an expert regarding the matters to which she testifies. Furthermore, no information or evidence has been provided regarding the facts or data upon which Ms. Haskell's testimony is based or the reliability of the principles and methods utilized by Ms. Haskell in connection with her testimony.<br><br>Lack of probative value. Fed. R. Evid. 403. Ms. Haskell's conclusions are speculation, are unsupported by any admissible evidence and are prejudicial and misleading. Since Ms. Haskell's testimony has little to no probative value, it should be excluded. |

Case 1:09-bk-14214-GM    Doc 62    Filed 06/04/09    Entered 06/04/09 17:58:03    Desc
Main Document      Page 7 of 13

| Statement | Evidentiary Objection(s) |
|---|---|
| **¶ 6, Page 3, lines 20-27:**<br><br>There are also "real life" practical implications that arise from the Debtor's selling only 18 of the 222 units in the Building. The imposition of the HOA fees makes the "interim" solution unavailable. On a practical basis, the sale of even one of the units makes uneconomic other business options that may make better financial sense on an interim basis. In a real estate market such as the one we are currently experiencing, it frequently makes sense to find and implement an "interim" highest and best use, such as renting the units as apartments, while waiting for the market to firm up. That may take several years, of course, but in the interim, the Building could generate cash sufficient to pay operating expenses, and debt service. | Lack of foundation. Fed. R. Evid. 701. To the extent that Ms. Haskell is offering opinion testimony as a <u>lay</u> witness, no foundation has been laid as to Ms. Haskell's personal knowledge regarding the matters to which she testifies.<br><br>Lack of foundation. Fed. R. Evid. 702-703. To the extent that Ms. Haskell is attempting to provide opinion testimony as an <u>expert</u> witness, insufficient information or evidence has been provided to demonstrate her expertise or to otherwise qualify Ms. Haskell as an expert regarding the matters to which she testifies. Furthermore, no information or evidence has been provided regarding the facts or data upon which Ms. Haskell's testimony is based or the reliability of the principles and methods utilized by Ms. Haskell in connection with her testimony.<br><br>Lack of probative value. Fed. R. Evid. 403. Ms. Haskell's conclusions are speculation, are unsupported by any admissible evidence and are prejudicial and misleading. Since Ms. Haskell's testimony has little to no probative value, it should be excluded. Moreover, the statements made by Ms. Haskell, including, without limitation, her references to "real life practical implications" and "other business options that may make better financial sense" are hopeless vague and ambiguous. |

| Statement | Evidentiary Objection(s) |
|---|---|
| ¶ 7, Page 3, line 28 – Page 4, line 10: | Lack of foundation. Fed. R. Evid. 701. To the extent that Ms. Haskell is offering opinion testimony as a _lay_ witness, no foundation has been laid as to Ms. Haskell's personal knowledge regarding the matters to which she testifies. |
| If it were in the best interest to sell the Building as a whole and to have the buyer of the Building operate the Building as an apartment building, the sale of a few of the units will make that option more difficult, if not impossible. If a few of the units are sold now, there is no longer an option to lease out the units as apartments in the short term, and convert them to condominiums later when the market improves. Similarly, the significant HOA fees that must be paid for any unsold unit will discourage potential buyers from purchasing the Building as a whole, because if a buyer purchases the whole Building, it will then be burdened with the obligation to fund the HOA fees. Again, I have not had time sufficient to quantify the loss in value associated with this consequence of the Motion, but I am confident that the price at which a prospective buyer will acquire a partial interest in the Building will be less by a significant amount. | Lack of foundation. Fed. R. Evid. 702-703. To the extent that Ms. Haskell is attempting to provide opinion testimony as an _expert_ witness, insufficient information or evidence has been provided to demonstrate her expertise or to otherwise qualify Ms. Haskell as an expert regarding the matters to which she testifies. Furthermore, no information or evidence has been provided regarding the facts or data upon which Ms. Haskell's testimony is based or the reliability of the principles and methods utilized by Ms. Haskell in connection with her testimony. |
|  | Lack of probative value. Fed. R. Evid. 403. Ms. Haskell's conclusions are speculation, are unsupported by any admissible evidence and are prejudicial and misleading. In fact, Ms. Haskell admits that she has "not had time sufficient to quantify" her conclusions regarding any loss in value in the Building. Accordingly, Ms. Haskell's testimony has little to no probative value and should be excluded. |

| Statement | Evidentiary Objection(s) |
|---|---|
| **¶ 8, Page 4, lines 11-18**<br><br>In addition, the fact that the Building is not complete, and the fact that the Debtor admits that approximately $4 million[fn] is needed in order to fund the remaining construction costs will, in and of itself, negatively affect the price at which a willing buyer will purchase a unit. Prospective buyers will understand that each of the homeowners run a substantial risk until the Building and all of its units are completed.  That risk includes, but is not limited to, the risk that the units on the five unfinished floors will not be finished by the Debtor, the risk that the level of finish will not be compatible with the original plan and that the costs of the HOA will not be borne by 222 owners, but perhaps with only 100 or 150 or so. | Lack of foundation.  Fed. R. Evid. 702-703. Although Ms. Haskell appears to be attempting to provide opinion testimony as an expert witness, insufficient information or evidence has been provided to demonstrate her expertise or to otherwise qualify Ms. Haskell as an expert regarding the matters to which she testifies. Furthermore, no information or evidence has been provided regarding the facts or data upon which Ms. Haskell's testimony is based or the reliability of the principles and methods utilized by Ms. Haskell in connection with her testimony.<br><br>Lack of probative value.  Fed. R. Evid. 403.  Ms. Haskell's conclusions are speculation, are unsupported by any admissible evidence and are prejudicial and misleading.  Since Ms. Haskell's testimony has little to no probative value, it should be excluded. |

| Statement | Evidentiary Objection(s) |
|---|---|
| **¶ 8, Page 4, lines 18-24**<br><br>Again, I have not had time sufficient to quantify the market value change associated with the purchase of a condominium project that has millions of dollars in unfunded costs to complete. In any event, I believe that the incremental increase in costs associated with the fact that the Building is not complete will be substantial; perhaps in the neighborhood of $500 per month or more. As a result, I believe that the price at which a prospective buyer will purchase a unit will be discounted by a material amount in order to reflect the assumption of those risks. | Lack of foundation. Fed. R. Evid. 702-703. Although Ms. Haskell appears to be attempting to provide opinion testimony as an expert witness, insufficient information or evidence has been provided to demonstrate her expertise or to otherwise qualify Ms. Haskell as an expert regarding the matters to which she testifies. Furthermore, no information or evidence has been provided regarding the facts or data upon which Ms. Haskell's testimony is based or the reliability of the principles and methods utilized by Ms. Haskell in connection with her testimony.<br><br>Lack of probative value. Fed. R. Evid. 403. Ms. Haskell's conclusions are speculation, are unsupported by any admissible evidence and are prejudicial and misleading. In fact, Ms. Haskell admits that she has "not had time sufficient to quantify" her conclusions regarding any market value change associated with the Building. Accordingly, Ms. Haskell's testimony has little to no probative value and should be excluded. Moreover, the statements made by Ms. Haskell, including, without limitation, that the price at which a prospective buyer will purchase a unit will be discounted "by a material amount" are hopeless vague and ambiguous. |

| Statement | Evidentiary Objection(s) |
|---|---|
| **¶ 9, Page 4, line 25 – Page 5, line 2:**<br><br>Further, it is reasonable to conclude that the price a prospective buyer will be willing to offer for a unit will be discounted to reflect the mess and discomfort of the process required to complete construction on the remaining five floors of the Building, and the uncertainty associated with the current condition of the Building. | Lack of foundation.  Fed. R. Evid. 701.  To the extent that Ms. Haskell is offering opinion testimony as a <u>lay</u> witness, no foundation has been laid as to Ms. Haskell's personal knowledge regarding the matters to which she testifies.<br><br>Lack of foundation.  Fed. R. Evid. 702-703.  To the extent that Ms. Haskell is attempting to provide opinion testimony as an <u>expert</u> witness, insufficient information or evidence has been provided to demonstrate her expertise or to otherwise qualify Ms. Haskell as an expert regarding the matters to which she testifies.  Furthermore, no information or evidence has been provided regarding the facts or data upon which Ms. Haskell's testimony is based or the reliability of the principles and methods utilized by Ms. Haskell in connection with her testimony.<br><br>Lack of probative value.  Fed. R. Evid. 403.  Ms. Haskell's conclusions are speculation, are unsupported by any admissible evidence and are prejudicial and misleading.  Since Ms. Haskell's testimony has little to no probative value, it should be excluded. |
| **¶ 10, Page 5, lines 3-8:**<br><br>The Motion does not contain information I believe necessary in order to fairly assess the construction costs and the extent to which the fact that the Building is under construction will affect the net realizable value of the Building.  In order to better understand that concern, I believe at least the following should be provided:  (i) a detailed construction budget, (ii) a detailed estimate of the soft costs associated with the construction, (iii) a timetable for completion, and (iv) the source of funding. | Lack of probative value.  Fed. R. Evid. 401-403.  Ms. Haskell's statements regarding the construction costs and the extent to which the fact that the Building is under construction will affect the net realizable value of the Building is irrelevant to the issues raised and relief requested in the Sale Motion, and is prejudicial and misleading.  Accordingly, Ms. Haskell's testimony has little to no probative value and should be excluded. |

| In re:<br>ROOSEVELT LOFTS, LLC | Chapter 11<br>1:09-bk-14214-GM |
|---|---|
| Debtor(s). | |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA 90067

The foregoing document described as **EVIDENTIARY OBJECTIONS TO DECLARATION OF DEBORAH B. HASKELL IN SUPPORT OF BANK'S OPPOSITION TO DEBTOR'S MOTION TO SELL CERTAIN CONDOMINIUM UNITS** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 4, 2009** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
- Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com
- David L. Neale    dln@lnbrb.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- S Margaux Ross    margaux.ross@usdoj.gov
- William D Schuster    bills@allieschuster.org
- Daniel H Slate    dslate@buchalter.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

                                       - ☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On ------------------ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

                                       ☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 4, 2009** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

---

| In re:                | Chapter 11         |
| ROOSEVELT LOFTS, LLC  | 1:09-bk-14214-GM   |
|              Debtor(s). |                  |

**By e-mail:**
Daniel H Slate    dslate@buchalter.com

**By attorney service**
Hon. Geraldine Mund
United States Bankruptcy Court
21041 Burbank Blvd.
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 4, 2009 | Marguerite Hardin | *Marguerite Hardin* |
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                    **F 9013-3.1**

## DECLARATION OF M. AARON YASHOUAFAR

M. Aaron Yashouafar hereby declares as follows:

1.    I am over 18 years of age. I am the President of Roosevelt Lofts, Inc., which is the Manager of Roosevelt Lofts, LLC, a Delaware limited liability company, debtor and debtor in possession herein (the "Debtor"). Accordingly, I am familiar with virtually all aspects of the Debtor's condominium and commercial space project located at 727 West 7th Street in Los Angeles, California. I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I submit this declaration in support of the *"Omnibus Reply By Debtor To Oppositions Filed By Various Parties To Debtor's Motion For Order Authorizing Debtor To (A) Conduct A Public Auction Of, And Sell, Certain Condominium Units, Free And Clear Of All Liens, Claims, Interests and Encumbrances; And (B) Employ Kennedy Wilson Auction Group Inc. As Auctioneer"* (the "Auction Motion") filed by Roosevelt Lofts, LLC, the debtor and debtor in possession herein (the "Debtor"). Unless otherwise stated, all capitalized terms herein have the same meanings as in the Auction Motion.

3.    I do not believe that the proposed sales of the Units preclude the Debtor from renting the remaining unsold units or selling the Building in its entirety to a buyer.

4.    The homeowners' association ("HOA") fees essentially reflect the costs of maintaining and operating the Building (*e.g.*, security, trash removal, window washing, common area utilities, pool service, gardening, parking operation, management fees, preventative maintenance, etc.). As set forth in the analysis attached as Exhibit "2" hereto, these costs are already being incurred by the Debtor in order to maintain and operate the Building, particularly now since the Debtor has a number of tenants leasing residential and commercial units within the Building. Moreover, I believe these costs are substantially similar to the costs that will be incurred by the Debtor (or a buyer of the Building, for that matter) if the units in the Building are rented as apartments. I believe that the sale of the Units will ultimately lower the Debtor's cost of operating the Building (including any amounts required to be contributed by the Debtor

24

towards the HOA fees) because the purchasers of the Units will contribute to the costs through their payment of monthly HOA fees.

5.    Individual sales of the Units in the Building were contemplated from the outset of the parties' relationship and are a critical component of the strategy agreed to by the parties to maximize the value of the Building and Units.    Based on my understanding of the Loan documents, the Debtor is not required to sell a certain minimum number of units and there are no other restrictions placed on the sale of individual units.

6.    All of the Units are being proposed to be sold at prices that are at or above the release prices the Bank expressly agreed to accept under the Loan.

7.    I estimate that the proposed auction and sales of the Units will generate proceeds of approximately $30 to $35 million.

8.    I believe that the sales of the Units (all of which are proposed to be sold at or above the release prices agreed to by the Bank, subject to bidding at public auction) will only serve to increase buyer interest in the Building, and assist the Debtor in negotiating and consummating sales of the remaining units.    I believe that the Debtor's ability to increase the "velocity" of the sales of the units is directly dependent upon the Debtor's ability to sell and deliver the Units to prospective buyers and close escrows.

9.    Based on the exercise of my business judgment, I believe that the proposed sales of the Units (all of which are being sold at or above the releases prices agreed to by the Bank, subject to bidding at public auction) are in the best interests of the Debtor's creditors and estate as a whole.

10.    Although the Debtor has been successful in negotiating and entering into leases for approximately twenty eight (28) of the units in the Building, I am not confident that, in the current real estate market, all of the units can be rented.

11.    To the best of my knowledge, the proposed auction and sale of the Units triggers no obligation on the part of the Debtor to complete construction on the remaining floors of the Building.    The Debtor intends to complete construction in an organized fashion, with the funding

1   for the completion of construction to be obtained, in accordance with the terms of the Debtor's

2   Plan.

3       12.     Furthermore, the issue of completion of the Building has no bearing on the

4   Debtor's ability to sell the Units. All of the Units proposed to be sold are complete with proper

5   permits and certificates of occupancy in place.

6       13.     Notwithstanding the statements of the Bank to the contrary, the Debtor has

7   previously provided the Bank with its estimated construction budget, a true and correct copy of

8   which is attached as Exhibit "3" hereto, and has had discussions in significant detail with the

9   Bank regarding the Debtor's plans with respect to the Building and the anticipated timelines

10  related to the Building. Following the Petition Date, the Debtor also consented to the Bank's

11  retention of a construction estimator to evaluate the costs to complete construction of the

12  Building.   The Debtor provided the Bank's construction estimator with full access to the

13  Building and individual units, and provided all information and documentation requested by the

14  construction estimator. Although the Debtor has requested copies of the report(s) prepared by

15  the Bank's construction estimator, the Bank has declined to share such reports with the Debtor to

16  date. To the extent that there has been "no" discussion of the budget, time frame and source of

17  funding for the completion of the Building, I believe it has been due solely to the Bank's

18  apparent resistance to share information or have any meaningful discussion with representatives

19  of the Debtor.

20      14.     As the Bank is aware, the construction of the Building is more than 95%

21  complete. All that remains to be done in the unfinished areas of the Building are finishing

22  touches such as painting, completion of the installation of floor coverings, and installation of

23  cabinets and railings inside certain units. Common areas, such as the pool, gym, and rooftop are

24  fully complete, accessible and are currently being used by tenants as they wish. I estimate that it

25  will cost approximately $3 million over a period of approximately three months to complete

26  construction in the unfinished areas. Since the unfinished areas are not connected to any of the

27  Units proposed to be sold at auction, I do not believe any of the prospective buyers will be

28

1   negatively impacted by the minimal finish work which remains to be completed in the unfinished
2   areas of the Building.

3       15.    The Debtor's Plan contemplates the sales of approximately sixty six (66) Units
4   during the first year of the Plan, with proceeds of approximately $31.5 million anticipated to be
5   generated from such sales. The cash flow projections filed in support of the Plan, which reflects
6   the foregoing terms, is attached as Exhibit "4" hereto.  The Auction Motion seeks to sell
7   approximately sixty five (65) Units to generate proceeds in the range of $30 to $35 million. The
8   figures projected in the first year of the Plan and the figures set forth in the Auction Motion are
9   virtually identical. The only practical changes to the Plan if the Auction Motion is granted will
10  be the acceleration of the timing for such sales and corresponding change to the cash flow
11  projections for the Plan (given that the proposed sales are expected to generate proceeds of $30
12  to $35 million, all prior to the confirmation of the Plan). I believe that these changes to the Plan
13  would only serve to benefit the estate and creditors.

14      16.    Moreover, the Disclosure Statement describing the Plan states explicitly that, if
15  the Debtor is authorized to conduct a public auction of the Units and offer such Units for sale,
16  the Debtor will amend the Plan and the Disclosure Statement accordingly.

17      17.    The Debtor has attempted – unsuccessfully – to determine what course of action
18  the Bank would like the Debtor to pursue. Not only has the Bank provided no guidance on this
19  issue, it has elected to oppose the Debtor's efforts to make any forward progress in this case.
20  When the Debtor filed the Sale Motions, seeking authority to sell units to individual buyers in
21  accordance with purchase and sale contracts executed by the Debtor and the buyers, the Bank
22  opposed the Sale Motions, presumably because the Bank believed (among other things) that
23  leasing the units would be a better alternative. When the Debtor filed a motion seeking to
24  implement a short-term residential leasing program for the units in the Building, the Bank
25  opposed such motion. After the Debtor filed its Plan, the Bank declined to negotiate or discuss
26  the terms of such Plan and, instead, filed a motion to dismiss or convert the Debtor's case based
27  upon, among other things, the Debtor's failure to file a disclosure statement. The Debtor has
28  now filed its disclosure statement but has yet to receive any comments on the Disclosure

1   Statement or the Plan from the Bank. Given the Bank's history of opposing virtually all actions

2   taken by the Debtor in connection with this case, there is little doubt that the Bank will oppose

3   confirmation of the Plan as currently proposed by the Debtor.

4       I declare under penalty of perjury under the laws of the United States of America that the

5   foregoing is true and correct to the best of my knowledge.

6       Executed on this 6th day of January 2010, at Los Angeles, California.

7

8                                      _____*/s/ M. Aaron Yashouafar*_____
                                        M. AARON YASHOUAFAR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | Original DRE HOA Budget 100% Occupancy | Revised HOA Budget 100% Occupancy | Rental 100% Occupancy | Empty | Present Occupancy as of Jan 2010 | Cost to Developer after sale of 75 units | Cost to Developer after sale of 65 units | Cost to Developer after sale of 50 units |
|---|---|---|---|---|---|---|---|---|
| **Budget Summary-Residential Expense** | | | | | | | | |
| 104 Local License & Inspection | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 993.24 | 1,060.81 | 1,162.16 |
| 105 Estimated Income taxes | 1,110.00 | 1,110.00 | 1,110.00 | 1,110.00 | 1,110.00 | 735.00 | 785.00 | 860.00 |
| 201 Electricity | 112,896.00 | 112,896.00 | 155,000.00 | 55,000.00 | 138,600.00 | 74,755.46 | 79,840.86 | 87,468.97 |
| 202 Gas | 82,836.00 | 75,880.00 | 75,880.00 | 5,000.00 | 9,000.00 | 50,244.86 | 53,662.88 | 58,789.91 |
| 203 Water | 134,952.00 | 88,765.00 | 88,765.00 | 4,500.00 | 14,400.00 | 58,776.82 | 62,775.25 | 68,772.88 |
| 205 Cable TV/Master Antenna Telephone | 16,200.00 | 6,000.00 | 6,000.00 | 6,000.00 | 9,000.00 | 3,972.97 | 4,243.24 | 4,648.65 |
| 207 Custodial Area-Supplies | 4,160.00 | 4,160.00 | 4,160.00 | 1,500.00 | 2,500.00 | 2,754.59 | 2,941.98 | 3,223.06 |
| 207 Custodial Area-2 Full-time Janitors | 41,600.00 | 41,600.00 | 41,600.00 | 10,400.00 | 18,774.00 | 27,545.95 | 29,419.82 | 32,230.63 |
| 208 Landscaper area | 3,278.00 | 3,278.00 | 3,278.00 | 3,278.00 | 3,278.00 | 2,170.57 | 2,318.23 | 2,539.71 |
| 209 Refused Disposal (3 3yrd Bins 3 times/week) | 14,042.00 | 14,042.00 | 14,042.00 | - | 13,200.00 | 9,298.08 | 9,930.60 | 10,879.39 |
| 210 Elevator (3 high speed) | 21,600.00 | 21,600.00 | 21,600.00 | 10,800.00 | 14,400.00 | 14,302.70 | 15,275.68 | 16,735.14 |
| 213 Swimming Pool & Spa - Supplies | 1,800.00 | 1,800.00 | 1,800.00 | 900.00 | 1,200.00 | 1,191.89 | 1,272.97 | 1,394.59 |
| 213 Swimming Pool & Spa-Maint | 10,200.00 | 10,200.00 | 10,200.00 | 10,200.00 | 10,200.00 | 6,754.05 | 7,213.51 | 7,902.70 |
| 217 Concierge | 62,400.00 | - | - | - | - | - | - | - |
| 217 Garage Fee | 81,000.00 | 81,000.00 | 81,000.00 | 81,000.00 | 81,000.00 | 53,635.14 | 57,283.78 | 62,756.76 |
| 217 Window Washing | 20,000.00 | 20,000.00 | 20,000.00 | - | 20,000.00 | 13,243.24 | 14,144.14 | 15,495.50 |
| 217 Fire Extinguishers | 460.00 | 460.00 | 460.00 | 460.00 | 460.00 | 304.59 | 325.32 | 356.40 |
| 217 Fitness Equipment Maint | 1,500.00 | 1,500.00 | 1,500.00 | - | 1,500.00 | 993.24 | 1,060.81 | 1,162.16 |
| 217 Trash Chute Cleaning | 1,500.00 | 1,500.00 | 1,500.00 | 750.00 | 750.00 | 993.24 | 1,060.81 | 1,162.16 |
| 300 Reserve | 69,352.00 | 69,352.00 | 39,000.00 | 25,000.00 | 30,000.00 | 45,922.27 | 49,046.23 | 53,732.18 |
| 502 Contingency-Conversions | 68,239.00 | 68,239.00 | 68,239.00 | 34,119.00 | 50,000.00 | 45,185.28 | 48,259.11 | 52,869.86 |
| | 750,625.00 | 624,882.00 | 636,634.00 | 251,517.00 | 420,872.00 | 413,773.22 | 441,921.05 | 484,142.81 |
| | | | | | | | | |
| **Budget Summary-Joint Expenses** | | | | | | | | |
| 102 Corporation Franchise taxes | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 33.11 | 35.36 | 38.74 |
| 103 Insurance | 161,000.00 | 99,000.00 | 99,000.00 | 99,000.00 | 86,431.68 | 65,554.05 | 70,013.51 | 76,702.70 |
| 105 Estimated Income taxes | 441.00 | 441.00 | 441.00 | 441.00 | 441.00 | 292.01 | 311.88 | 341.68 |
| 201 Electricity | 54,852.00 | 54,852.00 | 54,852.00 | 24,000.00 | 40,800.00 | 36,320.92 | 38,791.73 | 42,497.95 |
| 202 Gas | 27,828.00 | 15,652.00 | 15,652.00 | 3,000.00 | - | 10,364.16 | 11,069.21 | 12,126.77 |
| 215 Access Control-Security Guard | 131,040.00 | 131,040.00 | 221,952.00 | 131,040.00 | 221,952.00 | 86,769.73 | 92,672.43 | 101,526.49 |
| 216 Reserve study | 1,200.00 | 1,200.00 | - | - | - | 794.59 | 848.65 | 929.73 |
| 217 Minor Repair | 27,360.00 | 27,360.00 | 27,360.00 | 7,500.00 | 15,000.00 | 18,116.76 | 19,349.19 | 21,197.84 |
| 217 Pest Control | 5,472.00 | 5,472.00 | 5,472.00 | 5,472.00 | 5,472.00 | 3,623.35 | 3,869.84 | 4,239.57 |
| 217 Common Area Inspections | 3,500.00 | 3,500.00 | - | - | - | 2,317.57 | 2,475.23 | 2,711.71 |
| 217 Fire Safety System & Phones | 14,820.00 | 14,820.00 | 14,820.00 | 14,820.00 | 10,200.00 | 9,813.24 | 10,480.81 | 11,482.16 |
| 217 Equipment Maint/Inspections/Supplies | 82,500.00 | 65,000.00 | 65,000.00 | 6,000.00 | 60,600.00 | 43,040.54 | 45,968.47 | 50,360.36 |
| 300 Reserve | 27,586.00 | 27,586.00 | 13,793.00 | 10,000.00 | 13,793.00 | 18,266.41 | 19,509.02 | 21,372.94 |
| 401 Management | 82,080.00 | 82,080.00 | 87,000.00 | 87,000.00 | 87,000.00 | 54,350.27 | 58,047.57 | 63,593.51 |
| 402 Legal Services | 2,280.00 | 2,280.00 | 2,280.00 | 2,280.00 | 2,280.00 | 1,509.73 | 1,612.43 | 1,766.49 |
| 403 Accounting | 2,400.00 | 2,400.00 | 2,400.00 | 2,400.00 | 2,400.00 | 1,589.19 | 1,697.30 | 1,859.46 |
| 404 Education | 2,500.00 | 2,500.00 | 2,500.00 | - | - | 1,655.41 | 1,768.02 | 1,936.94 |
| 405 Misc. Office Expense | 9,576.00 | 9,576.00 | 9,576.00 | 9,576.00 | 5,490.00 | 6,340.86 | 6,772.22 | 7,419.24 |
| 502 Contingency-Conversions | 63,649.00 | 63,649.00 | 63,649.00 | - | 50,000.00 | 42,145.96 | 45,013.03 | 49,313.64 |
| | 700,134.00 | 608,458.00 | 685,797.00 | 337,827.00 | 601,909.68 | 402,897.86 | 430,305.88 | 471,417.91 |
| TOTAL | 1,450,759.00 | 1,233,340.00 | 1,322,431.00 | 589,344.00 | 1,022,781.68 | 816,671.08 | 872,226.94 | 955,560.72 |



EXHIBIT 2

**Roosevelt Lofts**

*Request For Payment Detail*

DRAFT

30-Nov-08

| Item ID | Description | Budget Original Contract Sum | Budget Contract Change Orders | Pending Change Orders | Final Project Cost to Complete | Total Comp. & Paid to Date | Amount Owed To date | Balance To Complete |
|---|---|---|---|---|---|---|---|---|
| 01-0901 | General Conditions | $ 721,000.00 | $ 202,569.05 | $ 762,058.72 | $ 1,685,627.77 | $ 1,670,627.77 | $ - | $ 15,000.00 |
| 01-4126 | Permits Allowance | $ - | $ 15,405.79 | $ 39,549.36 | $ 54,955.15 | $ 54,955.15 | $ - | $ - |
| 01-3101 | Project Management | $ 247,500.00 | $ 12,750.00 | $ 241,679.01 | $ 501,429.01 | $ 471,429.01 | $ - | $ 30,000.00 |
| 01-3108 | Project Engineer | $ 42,500.00 | $ | $ 244,646.58 | $ 287,146.58 | $ 287,146.58 | $ - | $ - |
| 01-1105 | Superintendent | $ 375,000.00 | $ | $ 737,091.12 | $ 1,112,091.12 | $ 1,082,091.12 | $ - | $ 30,000.00 |
| 01-5214 | Site Office, Equip. Sup | $ 31,000.00 | $ | $ 87,976.13 | $ 118,976.13 | $ 106,976.13 | $ - | $ 12,000.00 |
| 01-5000 | Temp. Utilities | $ 85,000.00 | $ | $ 124,665.56 | $ 209,665.56 | $ 209,665.56 | $ - | $ - |
| 01-7419 | Hauling and Dumping | $ 158,625.00 | $ 100,000.00 | $ 117,692.17 | $ 376,317.17 | $ 376,317.17 | $ - | $ - |
| 01-7413 | Clean-up On Going | $ 223,000.00 | $ | $ 472,588.78 | $ 695,588.78 | $ 690,088.78 | $ - | $ 5,500.00 |
| 01-7423 | Cleaning Final | $ 56,750.00 | $ | $ (41,407.99) | $ 15,342.01 | $ 342.01 | $ - | $ 15,000.00 |
| 02-4113 | Selective Demolition | $ 256,750.00 | $ 431,443.24 | $ 114,353.47 | $ 802,546.71 | $ 802,546.71 | $ - | $ - |
| 02-4116 | Demolition Hard | $ 860,000.00 | $ 26,780.00 | $ 104,567.59 | $ 991,347.59 | $ 991,347.59 | $ - | $ - |
| 01-5413 | Construction Elevator | $ 162,500.00 | $ 100,000.00 | $ 106,902.57 | $ 369,402.57 | $ 369,402.57 | $ - | $ - |
| 32-9000 | Landscaping Allowance | $ 50,000.00 | $ | $ (49,367.73) | $ 632.27 | $ 632.27 | $ - | $ - |
| 03-3000 | Seismic Concrete | $ 3,700,000.00 | $ 899,089.62 | $ 2,029,330.73 | $ 6,628,420.35 | $ 5,629,453.35 | $ 998,967.00 | $ - |
| 03-1113 | Concrete | $ 619,000.00 | $ 1,236,260.00 | $ (175,770.26) | $ 1,699,489.74 | $ 1,679,159.74 | $ 20,330.00 | $ - |
| 03-3500 | Finish Unit Floors A | $ 2,733,588.00 | $ (400,000.00) | $ (163,295.66) | $ 2,170,292.34 | $ 702,419.34 | $ 517,873.00 | $ 950,000.00 |
| 05-4100 | Structural Steel | $ 1,012,000.00 | $ 772,000.00 | $ (365,446.76) | $ 1,418,553.24 | $ 1,200,149.24 | $ 218,404.00 | $ - |
| 05-5100 | Stairs | $ 404,500.00 | $ | $ 1,814,748.30 | $ 2,219,248.30 | $ 2,174,248.30 | $ 45,000.00 | $ - |
| 06-2023 | Carpentry | $ 289,280.00 | $ 12,810.00 | $ 1,124,736.04 | $ 1,426,826.04 | $ 1,426,826.04 | $ - | $ - |
| 11-3100 | Appliances | $ 1,296,976.00 | $ (400,000.00) | $ (525,945.00) | $ 371,031.00 | $ | $ 371,031.00 | $ - |
| 07-1000 | Waterproofing | $ 306,000.00 | $ | $ 195,844.42 | $ 501,844.42 | $ 325,486.42 | $ 176,358.00 | $ - |
| 07-2100 | Building Insulation | $ 365,840.00 | $ | $ (198,584.00) | $ 167,256.00 | $ 167,256.00 | $ - | $ - |
| 07-5100 | Built-Up Roofing | $ 231,500.00 | $ | $ (81,648.27) | $ 149,851.73 | $ 112,528.73 | $ 37,323.00 | $ - |
| 07-7600 | Roof Deck Paver Syst | $ 296,425.00 | $ 63,307.00 | $ (342,493.37) | $ 17,238.63 | $ 17,238.63 | $ - | $ - |
| 07-6000 | Sheet Metal | $ 206,310.00 | $ | $ (203,292.77) | $ 3,017.23 | $ 3,017.23 | $ - | $ - |
| 08-1100 | Metal Doors and Fram | $ 264,000.00 | $ | $ 124,292.96 | $ 388,292.96 | $ 381,080.96 | $ 7,212.00 | $ - |
| 08-1113 | Interior Doors and Fra | $ 174,352.00 | $ | $ (128,963.62) | $ 45,388.38 | $ 45,388.38 | $ - | $ - |
| 08-1400 | Wood Doors and Fram | $ 64,000.00 | $ 104,365.00 | $ 538,114.65 | $ 706,479.65 | $ 605,447.65 | $ 101,032.00 | $ - |
| 08-3100 | Access Doors | $ 38,000.00 | $ | $ (20,338.19) | $ 17,661.81 | $ 17,661.81 | $ - | $ - |
| 10-2819 | Shower Doors | $ 86,000.00 | $ | $ 156,910.00 | $ 242,910.00 | $ 91,330.00 | $ 51,905.00 | $ 99,675.00 |
| 08-5113 | Exterior Windows R/R | $ 1,500,000.00 | $ 1,014,467.50 | $ (123,744.36) | $ 2,390,723.14 | $ 2,189,292.14 | $ 201,431.00 | $ - |
| 08-7100 | Finish Hardware | $ 163,900.00 | $ | $ 181,426.41 | $ 345,326.41 | $ 345,326.41 | $ - | $ - |
| 08-4313 | Glazing | $ 53,600.00 | $ 23,940.00 | $ (38,841.00) | $ 38,699.00 | $ | $ 38,699.00 | $ - |
| 09-2400 | Cement Plaster | $ 200,000.00 | $ | $ 3,748.59 | $ 203,748.59 | $ 203,748.59 | $ - | $ - |
| 09-2900 | Framing and Drywall | $ 2,922,000.00 | $ 1,383,467.00 | $ 575,366.91 | $ 4,880,833.91 | $ 4,071,840.91 | $ 753,993.00 | $ 55,000.00 |
| 09-2910 | 1st Floor Lobby Allow | $ 100,000.00 | $ 23,756.25 | $ 98,207.64 | $ 221,963.89 | $ 204,752.89 | $ 17,211.00 | $ - |
| 09-2920 | Valet Area Allowance | $ 60,000.00 | $ 152,721.91 | $ 213,267.94 | $ 455,989.85 | $ 455,989.85 | $ - | $ - |
| 09-3930 | Light Wells Allowance | $ 190,000.00 | $ (105,877.50) | $ (128,666.69) | $ 77,160.81 | $ 53,160.81 | $ 24,000.00 | $ - |
| 09-7940 | Healing Coatings at H | $ 204,000.00 | $ | $ (170,110.46) | $ 33,889.54 | $ 33,889.54 | $ - | $ - |
| 09-3000 | Tile | $ 663,000.00 | $ 230,000.00 | $ 1,686,247.30 | $ 2,580,147.30 | $ 1,908,362.18 | $ 546,785.12 | $ 125,000.00 |





EXHIBIT 3

*Roosevelt Lofts*                    *Request For Payment Detail*                    30-Nov-08

### Budget

| Item ID | Description | Original Contract Sum | Contract Change Orders | Pending Change Orders | Final Project Cost to Complete | Total Comp. & Paid to Date | Amount Owed To date | Balance To Complete |
|---|---|---|---|---|---|---|---|---|
| 09-6800 | Carpet Corridor/Prep | $576,000.00 | $(400,000.00) | $71,627.65 | $247,627.65 | $172,017.65 | $75,610.00 | $- |
| 12-3040 | Stone Counter-Tops | $385,400.00 | $- | $434,898.79 | $820,298.79 | $489,405.79 | $142,893.00 | $188,000.00 |
| 09-4100 | Building Restoration | $356,419.00 | $291,149.05 | $159,800.48 | $807,368.53 | $807,368.53 | $- | $- |
| 21-3316 | Terracotta Coating | | $615,270.00 | $1,382.50 | $616,652.50 | $504,652.50 | $112,000.00 | $- |
| 09-9123 | Painting | $1,079,620.00 | $(300,000.00) | $931,934.94 | $1,711,554.94 | $712,554.94 | $604,000.00 | $395,000.00 |
| 11-2600 | Kitchen Cabinets | $864,500.00 | $294,164.00 | $(41,439.70) | $1,117,224.30 | $1,061,811.30 | $49,913.00 | $5,500.00 |
| 11-2650 | Custom Cabinets | $271,426.00 | $23,280.23 | $(110,678.34) | $184,027.89 | $184,027.89 | $- | $- |
| 10-1400 | Exterior Signs | $6,450.00 | | $(6,450.00) | $- | | | $- |
| 10-1400 | Interior Signs | $28,460.00 | | $6,981.96 | $35,441.96 | $35,441.96 | $- | $- |
| 10-4400 | Fire Protection Spec. | $23,840.00 | | $19,525.50 | $43,365.50 | $43,365.50 | $- | $- |
| 10-5500 | Postal Specialties | $8,400.00 | | $1,949.73 | $10,349.73 | $10,349.73 | $- | $- |
| 10-2816 | Res. Bath Accessories | $36,810.00 | | $8,847.19 | $45,657.19 | $45,657.19 | $- | $- |
| 13-1100 | Swimming Pool @ Sp | $192,480.00 | $240,033.00 | $(94,806.41) | $337,706.59 | $187,505.95 | $150,200.64 | $- |
| 21-1300 | Fire Sprinklers | $1,020,555.00 | $559,498.33 | $(87,598.72) | $1,492,454.61 | $1,413,954.61 | $78,500.00 | $- |
| 21-3315 | Fire Pumps | $145,000.00 | | $68,987.87 | $213,987.87 | $213,987.87 | $- | $- |
| 21-4100 | Fire Storage Tank | $60,000.00 | | $17,123.20 | $77,123.20 | $77,123.20 | $- | $- |
| 14-2000 | Elevators | $785,000.00 | $55,321.00 | $455,833.81 | $1,296,154.81 | $1,093,874.81 | $202,280.00 | $- |
| 14-2713 | Elev. Cab Upgrades A | $30,000.00 | | $(30,000.00) | $- | | | $- |
| 14-1000 | Trash Chute | $47,231.00 | $23,625.00 | $(7,141.41) | $63,714.59 | $39,711.59 | $24,003.00 | $- |
| 22-1000 | Plumbing | $4,544,311.00 | $668,167.00 | $798,135.00 | $6,010,613.00 | $4,868,828.41 | $766,784.00 | $375,000.00 |
| 22-4000 | Finish Plumbing Fixtu | $753,760.00 | $232,546.00 | $(181,054.71) | $805,251.29 | $788,996.29 | $16,255.00 | $- |
| 23-5000 | Mechanical (HVAC) | $3,225,000.00 | $79,749.00 | $179,313.12 | $3,484,062.12 | $2,796,923.12 | $592,139.00 | $95,000.00 |
| 26-5000 | Electrical | $3,014,476.00 | $694,651.39 | $1,763,578.87 | $5,472,706.26 | $4,868,310.26 | $579,396.00 | $25,000.00 |
| 26-5513 | Light Fixtures Allowa | $331,000.00 | $84,500.00 | $82,043.73 | $497,543.73 | $434,798.73 | $62,745.00 | $- |
| 28-3100 | Life Safety System | $340,316.00 | | $9,165.49 | $349,481.49 | $240,407.49 | $109,074.00 | $- |
| 28-1000 | Building Security Alla | $75,000.00 | $43,299.00 | $(27,301.13) | $90,997.87 | $18,078.87 | $72,919.00 | $- |
| 26-4000 | DWP Power Vault Alk | $40,000.00 | $105,005.66 | $49,379.31 | $194,384.97 | $147,675.97 | $46,709.00 | $- |
| 26-5500 | Building Façade Lighti | $50,000.00 | $39,723.75 | $(89,723.75) | $- | | | $- |
| 26-9000 | Parking Control Allow | $8,000.00 | | $11,572.27 | $19,572.27 | $6,422.27 | $13,150.00 | $- |
| 31-4100 | Shoring | | $14,260.00 | $25,836.40 | $40,096.40 | $882.40 | $39,214.00 | $- |
| 90-0002 | Contingency | $2,012,500.00 | $(2,010,000.00) | $(2,500.00) | $- | | | $- |
| 90-0001 | Contractor Fee | $1,100,000.00 | | $(908,500.00) | $191,500.00 | $191,500.00 | $- | $- |
| 02-8213 | Asbestos Abatement | $243,250.00 | $34,938.00 | $(42,938.00) | $235,250.00 | $235,250.00 | $- | $- |
| 11-3123 | Washers/Dryers | $334,125.00 | | $(170,925.99) | $163,199.01 | $163,199.01 | $- | $- |
| 11-3100 | Refrigerators | $850,500.00 | | $904,530.14 | $1,755,030.14 | $1,355,334.14 | $399,696.00 | $- |
| 09-9150 | Ceiling Restoration | | $416,067.33 | $(151,892.08) | $264,175.25 | $264,175.25 | $- | $- |
| 22-1000 | Storm Drains | | $309,826.00 | | $309,826.00 | | $309,826.00 | $- |
| 14-5000 | Window Washing System | | $300,960.00 | $59,008.46 | $359,968.46 | | $82,650.00 | $277,318.46 |
| 14-2250 | Cart Lifts | | $330,371.00 | $(16,087.64) | $314,283.36 | $298,946.36 | $15,337.00 | $- |
| | Proj Cost Total | $44,184,625.00 | $8,956,864.60 | $13,260,515.35 | $66,302,004.95 | $55,013,813.16 | $8,590,197.76 | $2,697,993.46 |

| | Jan-10 Month 1 | Feb-10 Month 2 | Mar-10 Month 3 | Apr-10 Month 4 | May-10 Month 5 | Jun-10 Month 6 | Jul-10 Month 7 | Aug-10 Month 8 | Sep-10 Month 9 | Oct-10 Month 10 | Nov-10 Month 11 | Dec-10 Month 12 | Jan-11 Month 13 | Feb-11 Month 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activity Assumptions** | | | | | | | | | | | | | | |
| Total Units Available | 222 | 210 | 205 | 199 | 193 | 187 | 150 | 137 | 124 | 113 | 102 | 91 | 81 | 75 |
| Units Leased/mo | 12 | 5 | 6 | 6 | 6 | 7 | 7 | 7 | 5 | 5 | 5 | 4 | 0 | 0 |
| Units Sold/mo | 0 | 0 | 0 | 0 | 0 | 30 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Total Leased Units | 12 | 17 | 23 | 29 | 35 | 42 | 49 | 56 | 61 | 66 | 71 | 75 | 75 | 75 |
| Total Sold Units | 0 | 0 | 0 | 0 | 0 | 30 | 36 | 42 | 48 | 54 | 60 | 66 | 72 | 78 |
| Units Remaining | 210 | 205 | 199 | 193 | 187 | 150 | 137 | 124 | 113 | 102 | 91 | 81 | 75 | 69 |
| | | | | | | | | | | | | | | |
| Accumulated Sales | 0 | 0 | 0 | 0 | 0 | 12,750,000 | 15,750,000 | 18,900,000 | 22,050,000 | 25,200,000 | 28,350,000 | 31,500,000 | 34,800,000 | 38,100,000 |
| Average Rent/unit | 2,100 | 2,100 | 2,125 | 2,150 | 2,150 | 2,150 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 |
| Average Sale/unit | 425,000 | 425,000 | 425,000 | 425,000 | 425,000 | 425,000 | 500,000 | 525,000 | 525,000 | 525,000 | 525,000 | 525,000 | 550,000 | 550,000 |
| Average Parking Rate | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| **Financing** | | | | | | | | | | | | | | |
| Exstg Bank Group's loan | 80,000,000 | 80,000,000 | 80,000,000 | 80,000,000 | 80,000,000 | 80,000,000 | 71,192,701 | 69,241,411 | 67,354,941 | 65,457,338 | 62,933,378 | 60,389,731 | 58,329,249 | 55,583,318 |
| Interest Rate | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.75% | 3.75% |
| **New Equity** | | | | | | | | | | | | | | |
| Accumulated Cash Contribution | 1,500,000 | 1,581,467 | 1,930,767 | 2,066,892 | 2,950,042 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 |
| Debt Conversion | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 |
| Total equity Contribution | 7,050,000 | 7,131,467 | 7,480,767 | 7,816,892 | 8,500,042 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 |
| | | | | | | | | | | | | | | |
| **Rental Income** | | | | | | | | | | | | | | |
| Commercial | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 62,000 | 62,000 |
| Residential | 25,200 | 35,700 | 48,875 | 62,350 | 75,250 | 90,300 | 107,800 | 123,200 | 134,200 | 145,200 | 156,200 | 165,000 | 165,000 | 165,000 |
| Parking | 10,000 | 10,000 | 10,000 | 12,000 | 12,000 | 12,000 | 15,000 | 10,000 | 10,000 | 17,500 | 17,500 | 17,500 | 21,000 | 21,000 |
| Total Rental Income | 63,200 | 73,700 | 86,875 | 102,350 | 115,250 | 130,300 | 150,800 | 161,200 | 172,200 | 190,700 | 201,700 | 210,500 | 248,000 | 248,000 |
| | | | | | | | | | | | | | | |
| **Sales Proceeds** | | | | | | | | | | | | | | |
| Gross Sale | 0 | 0 | 0 | 0 | 0 | 12,750,000 | 3,000,000 | 3,150,000 | 3,150,000 | 3,150,000 | 3,150,000 | 3,150,000 | 3,300,000 | 3,300,000 |
| Sales Cost | 0 | 0 | 0 | 0 | 0 | 765,000 | 180,000 | 189,000 | 189,000 | 189,000 | 189,000 | 189,000 | 198,000 | 198,000 |
| Net Sales Proceed | 0 | 0 | 0 | 0 | 0 | 11,985,000 | 2,820,000 | 2,961,000 | 2,961,000 | 2,961,000 | 2,961,000 | 2,961,000 | 3,102,000 | 3,102,000 |
| | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Property Tax | | | | 362,500 | | | | | | | | 302,481 | | |
| HOA Fees | 116,667 | 116,667 | 116,667 | 116,667 | 116,667 | 100,901 | 97,748 | 94,595 | 91,441 | 88,288 | 85,135 | 81,982 | 78,829 | 75,676 |
| Leasing/Sales | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Marketing | 5,000 | 50,000 | 50,000 | 50,000 | 50,000 | 15,000 | 15,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Parking Expense | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 9,000 | 9,000 |
| Total Operating Exp. | 144,667 | 189,667 | 189,667 | 552,167 | 189,667 | 138,901 | 135,748 | 132,595 | 134,441 | 131,288 | 128,135 | 427,463 | 122,829 | 119,676 |
| | | | | | | | | | | | | | | |
| Net Proceeds from Operation | (81,467) | (115,967) | (102,792) | (449,817) | (74,417) | 11,976,399 | 2,835,052 | 2,989,605 | 2,998,759 | 3,020,412 | 3,034,565 | 2,744,037 | 3,227,171 | 3,230,324 |
| | | | | | | | | | | | | | | |
| **Interest Expense** | | | | | | | | | | | | | | |
| Exstg Bank Group Loan | 0 | 233,333 | 233,333 | 233,333 | 233,333 | 233,333 | 233,333 | 207,645 | 201,954 | 196,452 | 190,917 | 183,556 | 176,137 | 182,279 |
| Total Interest Expense | 0 | 233,333 | 233,333 | 233,333 | 233,333 | 233,333 | 233,333 | 207,645 | 201,954 | 196,452 | 190,917 | 183,556 | 176,137 | 182,279 |
| | | | | | | | | | | | | | | |
| Monthly Net Cash Flow after Interest | (81,467) | (349,300) | (336,125) | (683,150) | (307,750) | 11,743,066 | 2,601,719 | 2,781,960 | 2,796,804 | 2,823,960 | 2,843,648 | 2,560,481 | 3,051,034 | 3,048,045 |
| | | | | | | | | | | | | | | |
| Pymt to Holders of Valid Mechanic's Liens w/Interest @ 2.5% | 0 | 0 | 0 | 0 | 0 | 2,935,766 | 0 | 0 | 0 | 0 | 0 | 0 | 305,103 | 304,805 |
| Pymt to Unsecured Creditors w/Interest @ 1.5% | 0 | 0 | 0 | 0 | 0 | 0 | 650,430 | 695,490 | 699,201 | 0 | 0 | 0 | 0 | 0 |
| Pymt for Completion of Construction | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 200,000 | 200,000 | 300,000 | 300,000 | 500,000 | 0 | 0 |
| Payment for Retail T.I. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exstg Bank's Group Loan | 0 | 0 | 0 | 0 | 0 | 8,807,299 | 1,951,289 | 1,886,470 | 1,897,603 | 2,523,960 | 2,543,648 | 2,060,481 | 2,745,931 | 2,743,241 |
| | | | | | | | | | | | | | | |
| Total Cash Flow After all Disbursement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

EXHIBIT 4

| | Mar-11 Month 15 | Apr-11 Month 16 | May-11 Month 17 | Jun-11 Month 18 | Jul-11 Month 19 | Aug-11 Month 20 | Sep-11 Month 21 | Oct-11 Month 22 | Nov-11 Month 23 | Dec-11 Month 24 | Jan-12 Month 25 | Feb-12 Month 26 | Mar-12 Month 27 | Apr-12 Month 28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activity Assumptions** | | | | | | | | | | | | | | |
| Total Units Available | 69 | 63 | 57 | 51 | 45 | 39 | 33 | 27 | 21 | 15 | 9 | 13 | 17 | 21 |
| Units Leased/mo | 0 | 6 | 6 | 6 | 0 | 0 | 6 | 6 | 6 | 0 | (10) | (10) | (10) | (10) |
| Units Sold/mo | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 3 |
| Total Leased Units | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 65 | 55 | 45 | 35 |
| Total Sold Units | 84 | 90 | 96 | 102 | 108 | 114 | 120 | 126 | 132 | 138 | 144 | 150 | 156 | 159 |
| Units Remaining | 63 | 57 | 51 | 45 | 39 | 33 | 27 | 21 | 15 | 9 | 13 | 17 | 21 | 28 |
| | | | | | | | | | | | | | | |
| Accumulated Sales | 41,400,000 | 44,850,000 | 48,300,000 | 51,750,000 | 55,350,000 | 58,950,000 | 62,550,000 | 66,300,000 | 70,050,000 | 73,800,000 | 77,550,000 | 81,300,000 | 85,050,000 | 87,000,000 |
| Average Rent/unit | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,225 | 2,225 | 2,225 |
| Average Sale/unit | 550,000 | 575,000 | 575,000 | 575,000 | 600,000 | 600,000 | 600,000 | 625,000 | 625,000 | 625,000 | 625,000 | 625,000 | 625,000 | 650,000 |
| Average Parking Rate | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| **Financing** | | | | | | | | | | | | | | |
| Exstg Bank Group's Loan | 52,840,078 | 50,086,276 | 47,431,215 | 44,527,577 | 41,613,634 | 38,559,987 | 35,495,307 | 32,419,200 | 29,204,736 | 25,978,782 | 22,910,467 | 20,029,306 | 17,087,828 | 14,186,114 |
| Interest Rate | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 4.00% | 4.00% | 4.00% | 4.00% |
| **New Equity** | | | | | | | | | | | | | | |
| Accumulated Cash Contribution | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 |
| Debt Conversion | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 |
| **Total equity Contribution** | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 |
| **Rental Income** | | | | | | | | | | | | | | |
| Commercial | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 64,000 | 64,000 | 64,000 | 64,000 |
| Residential | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 144,625 | 122,375 | 100,125 | 77,875 |
| Parking | 21,000 | 23,000 | 23,000 | 23,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 26,000 | 26,000 |
| **Total Rental Income** | 248,000 | 250,000 | 250,000 | 250,000 | 252,000 | 252,000 | 252,000 | 252,000 | 252,000 | 252,000 | 233,625 | 211,375 | 190,125 | 167,875 |
| **Sales Proceeds** | | | | | | | | | | | | | | |
| Gross Sale | 3,300,000 | 3,450,000 | 3,450,000 | 3,450,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 | 3,750,000 | 1,950,000 |
| Sales Cost | 198,000 | 207,000 | 207,000 | 207,000 | 216,000 | 216,000 | 216,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 117,000 |
| **Net Sales Proceed** | 3,102,000 | 3,243,000 | 3,243,000 | 3,243,000 | 3,384,000 | 3,384,000 | 3,384,000 | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 | 1,833,000 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Property Tax | | 264,438 | | | | | | | | 188,351 | | | | 155,064 |
| HOA Fees | 72,523 | 69,369 | 66,216 | 63,063 | 59,910 | 56,757 | 53,604 | 50,450 | 47,297 | 44,144 | 40,991 | 37,838 | 34,685 | 33,108 |
| Leasing/Sales | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Marketing | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 10,000 | 10,000 | 50,000 | 50,000 |
| Parking Expense | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| **Total Operating Exp.** | 116,523 | 377,807 | 110,216 | 107,063 | 103,910 | 100,757 | 97,604 | 94,450 | 91,297 | 276,495 | 75,991 | 72,838 | 109,685 | 263,172 |
| **Net Proceeds from Operation** | 3,233,477 | 3,115,193 | 3,382,784 | 3,385,937 | 3,532,090 | 3,535,243 | 3,538,396 | 3,682,550 | 3,685,703 | 3,500,505 | 3,682,634 | 3,663,537 | 3,605,440 | 1,737,703 |
| **Interest Expense** | | | | | | | | | | | | | | |
| Exstg Bank Group Loan | 173,698 | 165,125 | 156,520 | 148,223 | 139,149 | 130,043 | 120,500 | 110,923 | 101,310 | 91,265 | 81,184 | 76,368 | 66,764 | 56,959 |
| **Total Interest Expense** | 173,698 | 165,125 | 156,520 | 148,223 | 139,149 | 130,043 | 120,500 | 110,923 | 101,310 | 91,265 | 81,184 | 76,368 | 66,764 | 56,959 |
| **Monthly Net Cash Flow after Interest** | 3,059,780 | 2,950,068 | 3,226,264 | 3,237,714 | 3,392,941 | 3,405,201 | 3,417,896 | 3,571,627 | 3,584,393 | 3,409,240 | 3,601,450 | 3,587,169 | 3,538,676 | 1,680,744 |
| Pymt to Holders of Valid Mechanic's Liens w/Interest @ 2.5% | 305,978 | 295,007 | 322,626 | 323,771 | 339,294 | 340,520 | 341,790 | 357,163 | 358,439 | 340,924 | 360,145 | 358,717 | 353,868 | 168,074 |
| Pymt to Unsecured Creditors w/Interest @ 1.5% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 360,145 | 286,974 | 283,094 | 134,460 |
| Pymt for Completion of Construction | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payment for Retail T.I. | | | | | | | | | | | | | | |
| Exstg Bank's Group Loan | 2,753,802 | 2,655,061 | 2,903,638 | 2,913,943 | 3,053,647 | 3,064,681 | 3,076,107 | 3,214,464 | 3,225,953 | 3,068,316 | 2,881,160 | 2,941,479 | 2,901,714 | 1,378,210 |
| **Total Cash Flow After all Disbursement** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| | May-12 Month 29 | Jun-12 Month 30 | Jul-12 Month 31 | Aug-12 Month 32 | Sep-12 Month 33 | Oct-12 Month 34 | Nov-12 Month 35 | Dec-12 Month 36 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Activity Assumptions** | | | | | | | | | |
| Total Units Available | 28 | 35 | 18 | 20 | 23 | 17 | 11 | 5 | |
| Units Leased/mo | (10) | (8) | (8) | (9) | 0 | 0 | 0 | 0 | |
| Units Sold/mo | 3 | 25 | 6 | 6 | 6 | 6 | 6 | 5 | |
| Total Leased Units | 25 | 17 | 9 | 0 | 0 | 0 | 0 | 0 | |
| Total Sold Units | 162 | 187 | 193 | 199 | 205 | 211 | 217 | 222 | |
| Units Remaining | 35 | 18 | 20 | 23 | 17 | 11 | 5 | 0 | |
| | | | | | | | | | |
| Accumulated Sales | 88,950,000 | 104,575,000 | 108,625,000 | 112,675,000 | 116,725,000 | 120,925,000 | 125,125,000 | 128,625,000 | 128,625,000 |
| Average Rent/unit | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 |
| Average Sale/unit | 650,000 | 625,000 | 675,000 | 675,000 | 675,000 | 700,000 | 700,000 | 700,000 | |
| Average Parking Rate | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| | | | | | | | | | |
| **Financing** | | | | | | | | | |
| Exstg Bank Group's Loan | 12,807,903 | 11,311,562 | | | | | | | |
| Interest Rate | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| | | | | | | | | | |
| **New Equity** | | | | | | | | | |
| Accumulated Cash Contribution | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 | 3,257,792 |
| Debt Conversion | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 | 5,550,000 |
| **Total equity Contribution** | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 | 8,807,792 |
| | | | | | | | | | |
| **Rental Income** | | | | | | | | | |
| Commercial | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 1,848,000 |
| Residential | 55,625 | 37,825 | 20,025 | 0 | 0 | 0 | 0 | 0 | 3,707,750 |
| Parking | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 27,500 | 27,500 | 27,500 | 750,000 |
| **Total Rental Income** | 145,625 | 127,825 | 110,025 | 90,000 | 90,000 | 91,500 | 91,500 | 91,500 | 6,305,750 |
| | | | | | | | | | |
| **Sales Proceeds** | | | | | | | | | |
| Gross Sale | 1,950,000 | 15,625,000 | 4,050,000 | 4,050,000 | 4,050,000 | 4,200,000 | 4,200,000 | 3,500,000 | 128,625,000 |
| Sales Cost | 117,000 | 937,500 | 243,000 | 243,000 | 243,000 | 252,000 | 252,000 | 210,000 | 7,717,500 |
| **Net Sales Proceed** | 1,833,000 | 14,687,500 | 3,807,000 | 3,807,000 | 3,807,000 | 3,948,000 | 3,948,000 | 3,290,000 | 120,907,500 |
| | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | |
| Property Tax | 31,532 | 18,393 | 15,240 | 12,087 | 8,934 | 5,781 | 2,628 | 55,200 | 1,328,034 |
| HOA Fees | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 2,202,477 |
| Leasing/Sales | | | | | | | | | 540,000 |
| Marketing | 50,000 | 10,000 | 10,000 | 25,000 | 25,000 | 20,000 | 20,000 | | 850,000 |
| Parking Expense | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 324,000 |
| **Total Operating Exp.** | 106,532 | 53,393 | 50,240 | 62,087 | 58,934 | 50,781 | 47,628 | 80,200 | 5,244,511 |
| | | | | | | | | | |
| **Net Proceeds from Operation** | 1,872,093 | 14,761,932 | 3,866,785 | 3,834,913 | 3,838,066 | 3,988,719 | 3,991,872 | 3,301,300 | 4,484,655 |
| | | | | | | | | | |
| **Interest Expense** | | | | | | | | | |
| Exstg Bank Group Loan | 47,287 | 42,693 | 37,705 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | | |
| **Total Interest Expense** | 47,287 | 42,693 | 37,705 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | | |
| **Monthly Net Cash Flow after Interest** | 1,824,806 | 14,719,239 | 3,829,080 | 3,834,913 | 3,838,066 | 3,988,719 | 3,991,872 | 3,301,300 | |
| | | | | | | | | | |
| Pymt to Holders of Valid Mechanic's Liens w/Interest @ 2.5% | 182,481 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,358,705 |
| Pymt to Unsecured Creditors w/Interest @ 1.5% | 145,985 | 1,703,838 | 1,505,505 | 0 | 0 | 0 | 0 | 0 | 4,420,000 |
| Pymt for Completion of Construction | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,980,887 |
| Payment for Retail T.I. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,500,000 |
| Exstg Bank's Group Loan | 1,496,341 | 11,311,562 | 0 | 0 | 0 | 0 | 0 | 0 | 80,000,000 |
| | | | | | | | | | |
| **Total Cash Flow After all Disbursement** | 0 | 1,703,838 | 2,323,574 | 3,834,913 | 3,838,066 | 3,988,719 | 3,991,872 | 3,301,300 | 22,982,283 |

1    **DECLARATION OF RICHARD WINCHELL**

2    I, Richard Winchell, hereby declares as follows:

3    1.    I am over 18 years of age. I have personal knowledge of the facts set forth below

4    and, if called to testify, would and could competently testify thereto.

5    2.    I am the President of Kennedy Wilson Auction Group Inc. ("KW"), which

6    maintains an office located at 9701 Wilshire Boulevard, Suite 700, Beverly Hills, California

7    90212. I have 26 years of experience in the execution, analysis and administration of all phases

8    of KW's auction business. I am responsible for the oversight of all KW auction transactions.

9    Based on my 26 years of experience in real estate sales, KW's and my recent experience in the

10    sale of condominium units in the downtown Los Angeles market, and my regular review and

11    knowledge of closed and pending sales information for the downtown Los Angeles area, I am

12    familiar with and knowledgeable about the condominium units available for sale in the

13    downtown Los Angeles market. My professional certifications, licenses and memberships

14    include: Licensed Real Estate Broker, CA License No. 00867471, Certified Estate Specialist

15    (CES), Member of Council of Residential Specialists (CRS), Licensed Realtor, Member of Los

16    Angeles, Beverly Hills and Southland Regional Association of Realtors (MLS).

17    3.    Since 1977, KW has sold over $5 billion of residential, resort, investment and

18    commercial real estate through innovative and proprietary auction marketing programs. These

19    marketing strategies have been successfully applied in all regions of the United States in every

20    market condition throughout the economic cycle. KW has led the industry with dynamic sales

21    programs since 1977. KW organizes and executes accelerated marketing programs through

22    promotional strategies for new home developments, such as grand-openings and builder close-

23    outs, estate properties, court ordered sales and land.

24    4.    KW's experience with mid-high rise condominium projects and recent local

25    auction results include:

26        a.    Market Lofts (November 14, 2009, Los Angeles, California) – 7 story

27        downtown condominium project. KW offered 55 units and sold all 55 units on auction

28        day at expected value.

1

b.     The Dalton (August 16, 2009, Pasadena, CA) – 4 story contemporary loft and condominium project.  KW offered 34 units and sold all 34 units on auction day at expected value.

c.     Independence and Hansen Villas (November 15, 2009, Chatsworth and Pacoima, California) – Townhouse-style single family residences.  KW offered 26 units and sold all 26 units on auction day at expected value.

d.     Oxnard Garden (August 30, 2009, North Hollywood, California) – Townhouse-style single family residences.  KW offered 11 units and sold all 11 units on auction day at expected value.

e.     Brazos Place Condominiums (2009, Austin, Texas) – 14 story downtown condominium project.  KW offered 19 units and sold all 19 units on auction day at expected value.

5.     I submit this declaration in support of that certain *"Omnibus Reply By Debtor To Oppositions Filed By Various Parties To Debtor's Motion For Order Authorizing Debtor To (A) Conduct A Public Auction Of, And Sell, Certain Condominium Units, Free And Clear Of All Liens, Claims, Interests and Encumbrances; And (B) Employ Kennedy Wilson Auction Group Inc. As Auctioneer"* (the "Auction Motion") filed by Roosevelt Lofts, LLC, the debtor and debtor in possession herein (the "Debtor").  All capitalized terms not specifically defined herein shall have the same meanings ascribed to them in the Auction Motion.

6.     Based on information that I believe to be reliable as of today, to the best of my knowledge, there are at least three hundred fifty (350) available residential condominium units in downtown Los Angeles, including those identified below:

- Evo – 111 units
- Rowan – 80 units
- Barker Block – 114 units
- Little Tokyo Lofts – 25 units
- Luma – 7 units
- 1100 Wilshire – 15 units

2

1    7.    Based on information that I believe to be reliable, to the best of my knowledge,

2  there are three (3) residential projects in downtown Los Angeles, with an aggregate total of

3  approximately three hundred five (305) units, that have completed construction, are currently

4  "ready to sell" and are expected to hit the market (with marketing campaigns) by March 2010

5  (collectively, the "Immediate Projects"):

6          •    705 W. 9th Street – approximately 214 units

7          •    655 Hope – approximately 80 units

8          •    Santee Lofts – approximately 117 units

9    8.    While the exact timing cannot be ascertained, given the current status of the

10 Immediate Projects and condition of their respective units, I expect the Immediate Projects to hit

11 the market very shortly.

12   9.    I believe that the Immediate Projects, once available, will result in the near

13 doubling of the number of available condominium units in downtown Los Angeles, and the

14 corresponding dilution of the market in that area.

15   10.    While there are clear differences between the Debtor's project and the Immediate

16 Projects, I believe that each of the four projects will pose another option for downtown Los

17 Angeles buyers.  The following is a brief comparison of the Immediate Projects to the Debtor's

18 project:

19          •    705 W. 9th Street is a new construction high-rise building, with a
20               comparable location to Roosevelt.

21          •    655 Hope is an adaptive re-use project (like the Debtor's Building), with a
22               seventeen (17) story tower and a comparable location to Roosevelt.

23          •    Santee Lofts is also an adaptive re-use project, with an inferior location to
24               Roosevelt.

25   11.    Based on information that I believe to be reliable, to the best of my knowledge, in

26 addition to the Immediate Projects, there are five (5) additional residential projects in downtown

27 Los Angeles, with an aggregate total of approximately two hundred sixty nine (269) units, that I

28 understand may be close to finishing construction and may hit the market sometime in 2010:

3

1    • El Dorado – 65 units

2    • Barn Lofts – 38 units

3    • Hewitt First Lofts – 31 units

4    • Brownstone Lofts – 55 units

5    • Brockman – approximately 80 units

6    12.    While the exact timing cannot be ascertained, given the current status of the

7    projects and the condition of the units, I expect the foregoing projects to hit the market after the

8    Immediate Projects discussed above but still sometime in 2010.

9    13.    Based on information that I believe to be reliable, I believe that the downtown

10   Los Angeles real estate market is significantly more favorable to developer-sellers than it was six

11   (6) months ago, as evidenced by the recent successful auctions of units in the Concerto and

12   Market Lofts projects. I believe that capitalizing on the momentum generated by such recent

13   auctions, particularly now when the market is not overly saturated with available units, would

14   result in a successful auction for the Units in the Debtor's Building.

15   14.    In my opinion, the Units in the Debtor's Building have high quality finishes and

16   good floor plans, and that the Building is a high-profile building in a prime location in downtown

17   Los Angeles. While I believe that the Units in the Debtor's Building are highly marketable in

18   and of themselves, I believe that a substantial increase in the number of available units will dilute

19   the market in downtown Los Angeles and negatively impact the Debtor's ability to sell the Units

20   for the best prices possible.

21   15.    Based on my experience and knowledge of the downtown Los Angeles real estate

22   market, I do not believe that the auction of the Units will have a negative impact on the fair

23   market value of the remaining units in the Building.

24   I declare under penalty of perjury under the laws of the United States of America that the

25   foregoing is true and correct to the best of my knowledge.

26   Executed on this 6th day of January 2010, at Los Angeles, California.

27

28   RICHARD WINCHELL

4

| In re:<br>ROOSEVELT LOFTS, LLC | Chapter 11<br>1:09-bk-14214-GM |
|---|---|
| Debtor(s). | |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as

OMNIBUS REPLY BY DEBTOR TO OPPOSITIONS FILED BY VARIOUS PARTIES TO DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO (A) CONDUCT A PUBLIC AUCTION OF, AND SELL, CERTAIN CONDOMINIUM UNITS, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; AND (B) EMPLOY KENNEDY WILSON AUCTION GROUP INC. AS AUCTIONEER; DECLARATIONS OF M. AARON YASHOUAFAR AND RICHARD WINCHELL IN SUPPORT THEREOF (Proof Of Service Attached)

will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 6, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- John B Acierno    ecfcacb@piteduncan.com
- Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
- Cynthia M Cohen    cynthiacohen@paulhastings.com
- Steven R Fox    emails@foxlaw.com
- Helen R Frazer    hfrazer@aalrr.com
- Varand Gourjian    vg@gourjianlaw.com, lala@gourjianlaw.com
- Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com
- Herbert Hayden    herbert@ntlg.us
- Ian Landsberg    ilandsberg@lm-lawyers.com
- David L. Neale    dln@lnbrb.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- S Margaux Ross    margaux.ross@usdoj.gov
- Bruce D Rudman    bdr@agrlaw.net
- William D Schuster    bills@allieschuster.org
- Daniel H Slate    dslate@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;marcycarman@tilemlaw.com;ldiaz@tilemlaw.com;dianachau@tilemlaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Marc Weinberg    marcweinberg@att.net
- Brandon J Witkow    bwitkow@lockelord.com
- Aimee Y Wong    aywong@mckennalong.com

☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On January 6, 2010 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re:<br>ROOSEVELT LOFTS, LLC | Chapter 11<br>1:09-bk-14214-GM |
|---|---|
| Debtor(s). | |

class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 6, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**By attorney service (January 7, 2010)**
Hon. Geraldine Mund
United States Bankruptcy Court
21041 Burbank Blvd.
Woodland Hills, CA 91367

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 6, 2010 | Jason Klassi | /s/ Jason Klassi |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                          **F 9013-3.1**

Service via e-mail

margaux.ross@usdoj.gov; Jennifer.l.braun@usdoj.gov; ilandsberg@landsberg-law.com;
dslate@buchalter.com; rormond@buchalter.com; bharvey@buchalter.com;
msl@mlmllp.com; bdr@agrlaw.net; vg@gourjianlaw.com; lala@gourjianlaw.com;
gschwartz@spile-siegal.com; marcweinberg@att.net; gmouzis@mouzislaw.com;
davidtilem@tilemlaw.com; hawthorne@mmlawyers.com