DAVID L. NEALE (SBN 141225)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  dln@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtor and
Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>ROOSEVELT LOFTS, LLC, a Delaware limited liability company,<br><br>               Debtor. | Case No. 1:09-bk-14214-GM<br><br>Chapter 11<br><br>**DEBTOR'S THIRD MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL THROUGH JUNE 30, 2011; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF M. AARON YASHOUAFAR IN SUPPORT THEREOF**<br><br>Date:    October 26, 2010<br>Time:    10:00 a.m.<br>Place:   Courtroom "303"<br>          21041 Burbank Boulevard<br>          Woodland Hills, California |

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES………………………………………....4

I.     STATEMENT OF FACTS ……..……………………………………………….4

    A.    Case Background…………………………………………………………4

    B.    Post-Petition Operations and Use of
          Cash Collateral to Date……..……………………………………...……5

    C.    Negotiation and Filing of the Debtor's
          Plan of Reorganization and Status Thereof………………………………9

    D.    The Debtor's General Asset Base
          and Debt Description……….……………………………………………11

    E.    The Need for Use of Cash Collateral
          and Proposed Operating Budget………….……………………………...13

    F.    Compliance with Local Bankruptcy Rule 4001-2(b) …..………………14

II.    DISCUSSION……………………………………………………………………16

    A.    The Debtor Must be Authorized to Use
          Cash Collateral to Operate, Maintain and
          Preserve the Building in Accordance with the Budgets…………………16

    B.    The Bank and Other Creditors with an Interest
          In the Debtor's Cash Collateral are Adequately
          Protected by the Debtors Continued
          Operation of the Building…………………………………………………..17

    C.    The Procedural Requirements Regarding Approval
          of the Motion have Been Satisfied………….…………………………19

III.    CONCLUSION…………………………………………………………………..20

DECLARATION OF M. AARON YASHOUAFAR…………………………………………21

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

In re Dynaco Corporation,
    162 B.R. 389 (Bankr. D.N.H. 1993) ..................................................................17, 18

In re Immenhausen Corp.,
    164 B.R. 347 (Bankr. M.D. Fla. 1994) ..................................................................18

In re McCombs Properties VI, Ltd.,
    88 B.R. 261 (Bankr. C.D. Cal. l988) ("McCombs")..........................................17, 18

In re Mellor,
    734 F.2d 1396 (9th Cir. 1984) ..............................................................................17

In re Newark Airport/Hotel Ltd. Partnership,
    156 B.R. 444 (Bankr. D.N.J. 1993) ......................................................................18

In re O'Connor,
    808 F.2d 1393 (10th Cir. 1987) ..................................................................17, 18, 19

In re Oak Glen R-Vee,
    8 B.R. 213 (Bankr. C.D. Cal. 1981)......................................................................16

In re Stein,
    19 B.R. 458. (Bankr. E.D. Pa. 1982) ............................................................17, 18

In re Triplett,
    87 B.R. 25 (Bankr. W.D.Tex. 1988) ....................................................................18

In re Tucson Industrial Partners,
    129 B.R. 614 (9th Cir. BAP 1991)........................................................................16

Matter of Pursuit Athletic Footwear, Inc.,
    193 B.R. 713 (Bankr. D. Del. 1996) ....................................................................18

United Savings Association v. Timbers of Inwood Forest Associates,
    108 S.Ct. 626 (1988).............................................................................................17

**STATUTES**

11 U.S.C. §§ 361(1) and (2)..........................................................................................17
11 U.S.C. § 363(a) ...................................................................................................16, 17
11 U.S.C. §363(c)(l)......................................................................................................16
11 U.S.C. § 363(c)(2).............................................................................................16, 17
11 U. S.C. § 363(c)(2)(A) and (B) ................................................................................16
11 U.S.C. § 363(c)(2)(B) .........................................................................................15, 16

11 U.S.C. § 506(a) ........................................................................................................17

11 U.S.C. § 506(c) ........................................................................................................15

11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549 .......................................................15

11 U.S.C. §1107(a) .......................................................................................................16

11 U.S.C. §§ 1107 and 1108 ..........................................................................................4

Federal Rules of Bankruptcy Procedure 4001 and 9014 ..............................................2

Federal Rules of Bankruptcy Procedure 4001(b)(1)(A) ..............................................16

Federal Rules of Bankruptcy Procedure 4001(b) and 4001(c) ....................................19

Federal Rules of Bankruptcy Procedure 4001(c)(1)(B) ...............................................14

Federal Rules of Bankruptcy Procedure 4001(c) .........................................................14

Federal Rules of Bankruptcy Procedure 4001-2 .....................................................14, 20

Federal Rules of Bankruptcy Procedure 4001-2(b) and (d) .........................................14

Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9013-1 ...........................................2

1    **PLEASE TAKE NOTICE** that a hearing will be held on October 26, 2010 at 10:00

2    a.m., before the Honorable Geraldine Mund, United States Bankruptcy Judge for the Central

3    District of California, in Courtroom "303" located at 21041 Burbank Boulevard, Woodland

4    Hills, California, for the Court to consider the motion (the "<u>Motion</u>") filed by Roosevelt Lofts,

5    LLC, a Delaware limited liability company (the "<u>Debtor</u>"), the debtor and debtor in possession in

6    the above-captioned chapter 11 bankruptcy case, for the entry of an order, pursuant to 11 U.S.C.

7    § 363, authorizing the Debtor to use cash collateral in accordance with the Debtor's operating

8    budget for the period of November 1, 2010 through and including June 30, 2011 (the "<u>Budget</u>"),

9    a copy of which is attached as Exhibit "1" to the annexed Declaration of M. Aaron Yashouafar

10   ("<u>Yashouafar Declaration</u>").    The full basis for the Motion is described in the attached

11   Memorandum of Points and Authorities and Yashouafar Declaration.

12   The Motion is based upon 11 U.S.C. § 363(c), Rules 4001 and 9014 of the Federal Rules

13   of Bankruptcy Procedure, and Local Bankruptcy Rules 4001-2 and 9013-1, the supporting

14   Memorandum of Points and Authorities and Yashouafar Declaration attached hereto, the

15   arguments and statements of counsel to be made at the hearing on the Motion, and other

16   admissible evidence properly brought before the Court.

17   **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

18   1(f), any opposition to the Motion must be in writing, filed with the Court and served upon the

19   United States Trustee as well as counsel for the Debtors at the address set forth in the upper left-

20   hand corner of the first page of this Notice and Motion by no later than fourteen (14) days before

21   the date of the hearing on the Motion.

22   **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

23   1(h), the failure to file and serve a timely opposition to the Motion may be deemed by the Court

24   to constitute consent to the granting of the relief requested in the Motion.

25   **WHEREFORE**, the Debtor respectfully requests that this Court enter an order:

26   (1)    granting the Motion in its entirety;

27

28

2

1   (2) authorizing the Debtor to use cash collateral to (i) pay all of the expenses set forth

2 in the Budget, with authority to deviate from the line items contained in the Budget by not more

3 than 10%, on both a line item and aggregate basis, and (ii) pay all quarterly fees owing to the

4 Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

5 and

6   (3) granting such other and further relief as the Court deems just and proper under the

7 circumstances.

8 Dated: October 5, 2010   ROOSEVELT LOFTS, LLC

9

10      By: */s/ Juliet Y. Oh*

        DAVID L. NEALE

11       JULIET Y. OH

        LEVENE, NEALE, BENDER, YOO

12        & BRILL L.L.P.

        Attorneys for Chapter 11 Debtor and

13       Debtor in Possession

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

**A.    Case Background.**

1.    On April 13, 2009, the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "<u>Bankruptcy Code</u>").  The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is the owner of real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "<u>Building</u>").

3.    In approximately January 2006, the Debtor entered into an agreement to lease the Building from the previous owners, with an option to buy the Building.[1]  The Debtor intended to address the demands of an evolving Downtown residential market by converting the Building from an office building to a luxury residential project.

4.    Accordingly, in or about March 2006, the Debtor entered into a construction loan agreement with Bank of America, N.A., individually and as agent for a group of lenders (the "<u>Bank</u>"), pursuant to which the Debtor obtained a loan from the Bank in the original principal sum of $78,840,375.00 (the "<u>Loan</u>").  The Loan provided for, among other things, the repayment of the Loan, including accrued and unpaid interest, by March 9, 2009, with two options to extend the term of the Loan for six months each.  The obligations of the Debtor in connection with the Loan are secured by a Construction Deed of Trust and a Leasehold Deed of Trust against the Building (collectively, the "<u>Deeds of Trust</u>").  The Loan was obtained by the Debtor for the purpose of converting the Building into 222 individually subdivided, luxury residential condominium units (the "<u>Units</u>"), a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Building.

---

[1] The Debtor exercised its option to purchase the Building in September 2008.

5.      On or about December 30, 2008, the Bank issued a notice of default to the Debtor, contending that the Debtor had defaulted on its obligations under the Loan.  Even after receiving the notice of default from the Bank, the Debtor continued to invest a considerable amount of time and effort obtaining independent appraisals, conducting market research, and providing the Bank with alternative plans for the completion of the Building and the sale of all Units in the Building. The Bank rejected all of the plans proposed by the Debtor for the completion of the Building and the sale of all Units.

6.      Subsequently, on April 3, 2009, the Bank filed a complaint against the Debtor and others in the Superior Court of the State of California, County of Los Angeles ("State Court") for, among other things, specific performance, appointment of a receiver, and judicial foreclosure on its Deeds of Trust.  Pursuant to its complaint in the State Court action, the Bank has asserted a claim against the Debtor and others in an amount exceeding $79 million.  Days after filing its complaint, the Bank made an *ex parte* application with the State Court for the appointment of a receiver.

7.      As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code in order to have the ability and opportunity to close escrow on the units that are under contract, to market and sell the remaining units in the Building, and to complete construction on the Building, all of which will allow the Debtor to repay the Loan and its other debts for the benefit of all creditors.

**B.      Post-Petition Operations And Use Of Cash Collateral To Date.**

8.      Since the Petition Date, the Debtor has received income derived primarily, if not entirely, from rent received from the Debtor's commercial and residential tenants in the Building. Shortly after the Petition Date, the Debtor requested that the Bank stipulate to the Debtor's use of cash collateral to maintain the Building and to pay the Debtor's operating expenses relating to the Building, including, among other things, insurance, utilities, parking, security services, janitorial services and other operational costs associated with the Building.  The Bank did not consent to the Debtor's use of cash collateral to pay such operating expenses.

9.     Accordingly, on August 27, 2009, the Debtor filed an emergency motion seeking authority to use its cash collateral in accordance with an operating budget extending through December 31, 2009 (the "First Budget"), and to obtain financing on an administrative expense priority basis from its affiliate, Milbank Holding Corp. ("Milbank"), to cover the operating shortages set forth in the First Budget (the "First Cash Collateral Motion").  The Court granted the Debtor's First Cash Collateral Motion and authorized the Debtor to use cash collateral, subject to the terms and conditions described in an interim order entered by the Court on September 8, 2009 and a final order entered by the Court on October 5, 2009.

10.     Concurrently with the First Cash Collateral Motion, the Debtor filed a motion seeking authority to commence a program to permit the Debtor to enter into short-term residential leases, for terms not to exceed one (1) year (the "Leasing Motion").  The Debtor had determined, in the exercise of its sound business judgment, that renting residential units in the Building for a short term would allow the Debtor to continue to pursue longer term strategies for the restructuring of its financial affairs, including, without limitation, the sale or further lease of units, a combination thereof, or a sale of the Building, while at the same time generating cash flow to help offset the operating expenses being incurred on a monthly basis.  Although the Debtor sought the Bank's consent to the Debtor's proposed short-term leasing program, such consent was not forthcoming. Accordingly, the Debtor filed the Leasing Motion on an emergency basis on August 27, 2009. Although the Bank had previously suggested that a leasing program would be acceptable, the Bank objected to the Leasing Motion.  The Court ultimately granted the Leasing Motion and authorized the Debtor to commence its proposed short-term leasing program, subject to the terms and conditions described in the order entered by the Court on September 8, 2009.

11.     Subsequently, the Debtor successfully negotiated and entered into a number of residential leases in accordance with the Debtor's short-term leasing program.  At the present time, there are approximately forty six (46) residential leases in effect, and additional residential leases are anticipated to be entered into by the Debtor in the next several months.  A detailed rent roll, which lists the Debtor's residential (and commercial) leases as of October 1, 2010, is attached as

1   Exhibit "2" to the Declaration of M. Aaron Yashouafar annexed hereto (the "<u>Yashouafar</u>

2   <u>Declaration</u>").

3        12.     Due to the increase in the number of tenants in the Building, certain of the Debtor's

4   operating expenses increased and certain new expenses were required to be added, beginning in

5   November 2009.  The Debtor provided the Bank with a revised budget, which extended through

6   February 2010 (the "<u>Revised First Budget</u>"), and requested that the Bank consent to the Debtor's

7   use of cash collateral in accordance with the Revised First Budget.  The Revised First Budget also

8   contemplated financing from Milbank to cover operating shortages.  The Bank consented to the

9   Debtor's use of cash collateral in accordance with the Revised First Budget and to the Debtor's

10   borrowing of money from Milbank on an administrative expense priority basis to cover the

11   operating shortages set forth in the Revised First Budget.  The Debtor and the Bank entered into a

12   stipulation accordingly (the "<u>First Stipulation</u>"), and the Court entered an order approving the First

13   Stipulation on January 11, 2010.

14        13.     Prior to the expiration of the term of the First Stipulation, the Debtor provided the

15   Bank with an operating budget, which reflected the Debtor's estimated income and expenses for

16   the months of March, April and May 2010 (the "<u>Second Budget</u>"), and requested that the Bank

17   consent to the Debtor's use of cash collateral and borrowing of money from Milbank in accordance

18   with the Second Budget.  At that time, the Bank agreed to the use of cash collateral and borrowing

19   of money from Milbank for a period of only fifteen (15) days.  Specifically, the Bank agreed to

20   enter into a second stipulation with the Debtor (the "<u>Second Stipulation</u>") authorizing the Debtor

21   to, among other things, use cash collateral and borrow money from Milbank during the period of

22   March 1, 2010 through and including March 15, 2010 to pay the expenses reflected in the Second

23   Budget during such period, provided, however, that the Debtor not use any cash collateral for

24   "model units furniture."  A true and correct copy of the Second Budget was attached as an exhibit

25   to the Second Stipulation.  The Court entered an order approving the Second Stipulation on March

26   4, 2010.

27

28

14. Prior to the expiration of the term of the Second Stipulation, the Debtor again approached the Bank to obtain the Bank's consent to the Debtor's use of cash collateral and borrowing of money from Milbank in accordance with the Second Budget. At that time, the Bank agreed to the use of cash collateral and borrowing of money from Milbank for only an additional sixteen (16) days. Specifically, the Bank agreed to enter into a third stipulation with the Debtor (the "Third Stipulation") authorizing the Debtor to, among other things, use cash collateral and borrow money from Milbank during the period of March 16, 2010 through and including March 31, 2010 to pay the expenses reflected in the Second Budget during such period, provided, however, that the Debtor not use any cash collateral for "model units furniture." The Court entered an order approving the Third Stipulation on March 25, 2010.

15. Prior to the expiration of the term of the Third Stipulation, the Debtor provided the Bank with a revised and expanded operating budget, which reflected the Debtor's estimated income and expenses through October 31, 2010 and requested that the Bank consent to the Debtor's use of cash collateral and borrowing of money from Milbank in accordance with such budget. The Bank declined to provide such consent.

16. Accordingly, on April 1, 2010, the Debtor filed a second emergency motion (the "Second Cash Collateral Motion") seeking Court authority to (1) use cash collateral on an emergency interim basis pending a final hearing in accordance with an operating budget extending through October 31, 2010 (the "Expanded Second Budget"), a copy of which was attached to the Second Cash Collateral Motion, and (2) borrow money on an administrative expense priority basis from Milbank to cover the operating shortages set forth in the Expanded Second Budget.

17. The Bank filed a limited opposition to the Second Cash Collateral Motion, specifically objecting to the inclusion of an expense for purchasing furniture for certain model units in the Building. Subsequently, the Debtor and the Bank entered into a fourth stipulation (the "Fourth Stipulation") authorizing the Debtor to, among other things, use cash collateral and borrow money from Milbank through and including October 31, 2010 to pay the expenses reflected in the Expanded Second Budget during such period, provided, however, that the Debtor not use any cash

8

collateral for "model units furniture."  The Court entered an order approving the Fourth Stipulation on April 7, 2010.

**C.**      **Negotiation And Filing Of The Debtor's Plan Of Reorganization And Status Thereof.**

18.      On August 31, 2009, the Debtor filed its *"Chapter 11 Plan Of Reorganization"* (the "<u>Original Plan</u>"), within its exclusive period for doing so.  The Original Plan provided for full payment of allowed claims over time, with interest.

19.      On November 24, 2009, the Bank filed a motion seeking to dismiss the Debtor's bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the "<u>Dismissal Motion</u>") based on, among other alleged grounds, the Debtor's failure to file a disclosure statement with respect to the Original Plan.  The hearing on the Dismissal Motion was originally calendared for December 15, 2009, but was subsequently continued by stipulation of the parties to February 2, 2010 at 10:00 a.m.  Pursuant to the foregoing stipulation, the Debtor agreed to file a disclosure statement with respect to the Original Plan, as well as a notice of the hearing on such disclosure statement, by December 28, 2009.

20.      On December 28, 2009, the Debtor filed a disclosure statement describing the Plan (the "<u>Original Disclosure Statement</u>").  The hearing on the Disclosure Statement was set for February 2, 2010 at 10:00 a.m., the same date and time as the hearing on the Dismissal Motion.

21.      At the hearings on the Dismissal Motion and the Original Disclosure Statement held on February 2, 2010 at 10 a.m., the Court continued the hearings on both matters to March 16, 2010 at 10:00 a.m. to provide the Debtors with an opportunity to file updated versions of the Original Plan and Original Disclosure Statement.

22.      On February 26, 2010, the Debtor filed amended versions of the Original Plan and Original Disclosure Statement (the "<u>Amended Plan</u>" and "<u>Amended Disclosure Statement</u>") to reflect all of the developments in the Debtor's bankruptcy case since the filing of the Original Plan and to incorporate the impact of the public auction event on the Debtor's cash flow projections for the plan.

23.     At the hearing on March 16, 2010, the Court denied the Bank's Dismissal Motion and approved the Debtor's Amended Disclosure Statement.  In accordance with the Court's ruling at the March 16, 2010 hearing, the Court entered and order on April 9, 2010 approving the Amended Disclosure Statement and setting a hearing to consider confirmation of the Amended Plan on October 14, 2010 at 1:30 p.m. (with such hearing to be continued, to the extent necessary, to October 15, 2010 at 9:00 a.m. and October 21, 2010 at 1:30 p.m.) as well as various deadlines relating thereto (the "Disclosure Statement Order").

24.     Following the entry of the Disclosure Statement Order, the Debtor distributed copies of the Amended Plan and the Amended Disclosure Statement, with ballots, to all creditors. A number of parties, including the Bank and various alleged mechanic's lien creditors, filed objections to confirmation of the Amended Plan.  The objections to plan confirmation revolved primarily around the issue of lien priority.  Specifically, the mechanic's lien creditors alleged that their liens against the Building collectively had priority over the lien held by the Bank, and that their claims should be treated accordingly under the Amended Plan.

25.     The Debtor has engaged in negotiations with the alleged mechanic's lien creditors (as a group) to address their various concerns about the Amended Plan and to try to reach the terms of a consensual plan and disclosure statement.  In the meantime, there is litigation pending before this Court between the Bank and a class of alleged mechanic's lien creditors to determine the respective priority of their liens (the "Lien Priority Litigation").  Certification of a class of alleged mechanic's lien creditors was ordered by the Court in connection with the Lien Priority Litigation, and a trial in the Lien Priority Litigation is anticipated to take place no later than early December, 2010.

26.     Given that the objections to plan confirmation raised by the mechanic's lien creditors revolve primarily around the unresolved issue of lien priority, the Debtor believed that the resolution of the Lien Priority Litigation would immediately pave the way for the Debtor to file and confirm a modified version of the Amended Plan which would have the full support of at least the mechanic's lien creditors.  Accordingly, the Debtor filed a motion seeking a continuance of the

hearing on confirmation of the Amended Plan and briefing deadlines associated therewith to provide the Debtor with the time necessary to (i) obtain a Court determination regarding the respective priority of the liens held by the Bank and mechanic's lien creditors, thereby obtaining certainty on that issue, (ii) formulate and file modified versions of the Amended Plan and Amended Disclosure Statement which have the full support of at least the mechanic's lien creditors, and (iii) obtain approval of the modified version of the Amended Disclosure Statement, to the extent necessary (the "<u>Continuance Motion</u>").

27.     On August 3, 2010, the Court entered an order granting the Continuance Motion, taking the hearing(s) to consider confirmation of the Amended Plan off calendar, vacating the briefing deadlines associated with plan confirmation, and scheduling a status conference on December 1, 2010 at 1:30 p.m. to consider the setting of further hearings and other matters pertaining to the Amended Plan.

**D.     The Debtor's General Asset Base And Debt Description.**

28.     The primary assets of the Debtor's bankruptcy estate consist of the following:

a.     <u>Building</u>.  Based on information provided by CB Richard Ellis ("<u>CBRE</u>"), the Debtor believes that the amount of cash that will be generated from the leasing and sales of units in the Building over a period of less than three years will exceed the amounts owed to the Bank and holders of mechanic's liens against the Building

b.     <u>Cash</u>.  The Debtor estimates that, as of October 31, 2010, it will be holding cash in the approximate sum of $150,000 in its debtor in possession bank account.  The Debtor's cash is derived primarily, if not entirely, from rent received from the Debtor's commercial and residential tenants in the Building.[2]

---

[2]  Prior to the Petition Date, the Debtor established a litigation reserve account, which currently contains the sum of approximately $1.5 million.  This reserve account was established under an agreement between the Debtor and the Bank to indemnify the Bank in connection with litigation commenced by V.G.I. Corporation against the Debtor and others.  Although the Debtor does not currently have access to the funds in the reserve account, any remaining funds in the account following the resolution of the litigation are to be returned to the Debtor.

c.    Other Assets.    The Debtor has certain other assets as identified in its bankruptcy schedules including an accounts receivable in the amount of $21,000 and miscellaneous office and showroom equipment, furnishings and supplies, which the Debtor estimates to have a total liquidation value of approximately $15,000.

29.    Bank Debt.    The Debtor's primary creditor is the Bank.    The Bank asserts that it is currently owed in excess of $80 million under the Loan.    As noted above, the obligations of the Debtor in connection with the Loan are secured by the Deeds of Trust.[3]    Pursuant to the Deeds of Trust, the Bank asserts liens against the Building as well as the Debtor's cash, which is derived primarily from rent received by the Debtor from its commercial and residential tenants.

30.    Mechanic's Liens.    There are a number of subcontractors who have recorded mechanic's liens against the Building.    The Debtor believes that the total amount of the mechanic's liens recorded against the Building is approximately $11.8 million.[4]    Certain holders of mechanic's liens have asserted that their liens have priority over the Deeds of Trust recorded by the Bank.    As noted above, the Bank and a class of alleged mechanic's lien creditors are currently involved in the Lien Priority Litigation, pursuant to which the parties are seeking a determination regarding the relative order and priority of their liens against the Building.    Even if the mechanic's liens are valid and enforceable (which the Debtor does not concede), and even if one or more of the mechanic's liens have priority over the Deeds of Trust recorded by the Bank (which the Debtor also does not concede), the mechanic's liens against the Building do not result in a security interest against the Debtor's cash and rent revenue.    Accordingly, the Debtor believes that the Bank is the only party who can assert a security interest against the Debtor's cash and rent revenue.

---

[3]    The Debtor requests that the Court take judicial notice of the Loan agreement, a copy of which was attached as Exhibit "2" to the Debtor's first motion to sell units on an individual basis (the "First Sale Motion") [Docket No. 32].    The Debtor also requests that the Court take judicial notice of the Modification Agreement relating to the Loan, a copy of which was attached as Exhibit "2" to the Bank's opposition to the First Sale Motion [Docket No. 43].    Finally, the Debtor requests that the Court take judicial notice of the Deeds of Trust, copies of which were attached as Exhibit "2" to the Debtor's First Cash Collateral Motion [Docket No. 158].

[4]    The Debtor does not acknowledge the validity of any of the mechanic's liens that have been recorded against the Building and expressly reserves all of its rights, claims and defenses with respect to such liens.

31.     In addition to the debts described above, the Debtor has a total of approximately $9.4 million of unsecured debt.  Approximately $5.1 million of the Debtor's total unsecured debt is owed to affiliates of the Debtor.

**E.      The Need For Use Of Cash Collateral And Proposed Operating Budget.**

32.     A copy of the Debtor's operating budget for the period of November 1, 2010 through and including June 30, 2011 (the "Budget") is attached as Exhibit "1" to the Yashouafar Declaration annexed hereto.  The Budget reflects the Debtor's expected rent revenue and the expenses to be incurred on a monthly basis by the Debtor to maintain and operate the Building.

33.     Pursuant to the Expanded Second Budget, the Debtor estimated that it would generate rent revenue of approximately $88,000 during the months of September and October 2010.  In fact, the Debtor has far exceeded its projections and earned rent revenue of approximately $130,000 during the month of September 2010 and expects to earn rent revenue of approximately $139,000 during the month of October 2010.  As reflected in the Budget, the Debtor estimates it will generate rent revenue of approximately $150,800 during the month of November 2010, with the amount of rent revenue to steadily increase in the subsequent months as the Debtor enters into additional residential leases.

34.     The Budget reflects typical expenses associated with the maintenance and operation of the Building, including, among other things, insurance, utilities, elevator service costs, security service fees, janitorial service fees, repair and maintenance costs, and other operational costs associated with the Building.  The amount of the following expenses have increased from the Debtor's previous budget due to the higher number of leased units in the Building and corresponding increase in tenant/guest traffic:

a.      Security services – increased by $6,526 per month to provide for two full-time security guards (currently, there is one full-time security guard and one part-time security guard at the Building);

b.      Trash services – increased by $500 per month;

c.      Punch list repair for inside of units – increased by $500 per month; and

d.  <u>Repair and maintenance</u> – increased by $1,000 per month.

35.  In addition, the Budget reflects the following two new expense items: – (i) property taxes (totaling $600,000) and (ii) reproduction labor and printing costs (totaling $9,147.96).  The property taxes relate to the Building and are for the upcoming tax period.  The reproduction labor and printing costs reflect the Debtor's out-of-pocket costs to establish, deposit documents into, and maintain the document depository ordered by the Court in connection with the Lien Priority Litigation.

36.  The Debtor has Court authority to use cash collateral, in accordance with the Expanded Second Budget, only through October 31, 2010.  Pursuant to the Motion, the Debtor seeks Court authority to use its cash collateral through June 30, 2011 in order to pay the expenses of maintaining and operating the Building, in accordance with the Budget.  In addition, the Debtor seeks authority to use cash collateral to pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.  The Debtor also seeks authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis.

**F.     Compliance With  Local Bankruptcy Rule 4001-2(b).**

37.  Pursuant to Local Bankruptcy Rule 4001-2(b), the Debtor submits that the relief requested by the Debtor pertaining to the Debtor's use of cash collateral do not contain any of the following provisions:

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the | No |

| **Provision** | |
|---|---|
| estate or to limit access to the court to seek any relief under other applicable provision of law. | |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the Debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

38.    In accordance with Rule 4001(b)(1)(A) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), a copy of the Debtor's proposed form of order granting this Motion is attached as Exhibit "3" to the Yashouafar Declaration.

## II.    DISCUSSION

**A.    The Debtor Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve The Building In Accordance With The Budgets.**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.§ 363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  <u>See</u> 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

<u>See</u> 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); <u>In re Oak Glen R-Vee</u>, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); <u>In re Tucson Industrial Partners</u>, 129 B.R. 614

1    (9th Cir. BAP 1991).   In addition, where the debtor is operating a business, it is extremely

2    important that the access to cash collateral be allowed in order to facilitate the goal of

3    reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

4    collateral is necessary to operate a business."   In re Dynaco Corporation, 162 B.R. 389 (Bankr.

5    D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

6           The only current source of revenue available to the Debtor to use to maintain and operate

7    the Building is the rent revenue being generated from the lease of residential and commercial

8    units in the Building.  If the Debtor is not permitted to use its cash collateral to maintain and

9    operate the Building, it is all but certain that the Debtor's existing tenants will leave, taking with

10   them all of the revenue that the Debtor is currently generating.  There is no question that the

11   value of the Building will drop dramatically if the Debtor is unable to continue maintaining and

12   operating the Building.  Such a result will make it difficult, if not impossible, for the Debtor to

13   preserve the value of the Building (the primary asset of its bankruptcy estate) and successfully

14   reorganize.

15   **B.     The Bank And Other Creditors With An Interest In The Debtor's Cash Collateral
16          Are Adequately Protected By The Debtor's Continued Operation Of The Building.**

17          To the extent that an entity has a valid security interest in the revenues generated by

18   property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

19   Code.   Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured

20   creditor's cash collateral if the secured creditor is adequately protected.  In re Mellor, 734 F.2d

21   1396, 1400 (9th Cir. 1984).  See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In

22   re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

23          Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood

24   Forest Associates, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a

25   debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is

26   only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.  See also McCombs,

27   Id., at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's

28

17

1  claim) to the lesser of the [allowed amount of the] claim or the value of the collateral."

2  McCombs, Id., at 266.

3      The preservation of the value of a secured creditor's lien is sufficient to provide adequate

4  protection to a secured creditor when a debtor seeks to use cash collateral.  In re Triplett, 87 B.R.

5  25 (Bankr. W.D.Tex. 1988).  See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982).  The Stein

6  Court determined that the use of cash collateral was necessary to the continued operations of the

7  debtor, and that the creditor's secured position could only be enhanced by the continued

8  operation of the debtor's business.  See also, In re McCombs, supra, where the court determined

9  that the debtor's use of cash collateral for needed repairs, renovations and operating expenses

10  eliminated the risk of diminution in the creditor's interest in the cash collateral and such use

11  would more likely increase cash collateral.

12      As reflected in the Budget, the Debtor's continued operation and maintenance of the

13  Building will adequately protect the Bank (and any other secured creditors) as the Debtor will

14  continue to generate revenue and preserve the value of the Building.   Other Courts have

15  determined that the Debtor's continued business operations can constitute the adequate

16  protection of a secured creditor.  See Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713

17  (Bankr. D. Del. 1996); In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr.

18  D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen

19  Corp., 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

20      Additionally, in determining adequate protection, Courts have stressed the importance of

21  promoting a debtor's reorganization.  In In re O'Connor, supra, the Tenth Circuit stated:

22      "In this case, Debtors, in the midst of a Chapter ll proceeding, have proposed to
deal with cash collateral for the purpose of enhancing the prospects of
23  reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the
Debtor's efforts are not only to be encouraged, but also their efforts during the
24  administration of the proceeding are to be measured in light of that quest.
Because the ultimate benefit to be achieved by a successful reorganization
25  inures to all the creditors of the estate, a fair opportunity must be given to the
Debtors to achieve that end.  Thus, while interests of the secured creditor whose
26  property rights are of concern to the court, the interests of all other creditors
27  also have bearing upon the question of whether use of cash collateral shall be

28

18

permitted during the early stages of administration."

808 F.2d at 1937.

The use of cash collateral is critical to the Debtor's ability to implement an effective reorganization strategy for the benefit of all creditors.  As demonstrated herein, the use of the Debtor's cash collateral, in accordance with the Budget, will preserve and maximize the Debtor's assets (in particular, the Building) for the benefit of the estate and all creditors.  If the Debtor is not permitted to use its cash collateral to maintain and operate the Building, the Debtor will lose its existing tenants.  The very source of the Debtor's cash collateral – namely, the rent generated by the lease of Units in the Building – will evaporate, and the Debtor will be left with only an empty Building.  On the other hand, if the Debtor is authorized to use its cash collateral, the Debtor will be able to continue maintaining the Building and generating cash flow so that the Debtor can pursue its longer term strategy for the restructuring of its financial affairs and pursue confirmation of its Amended Plan (or a modified version thereof).  Clearly, the use of cash collateral will only enhance the prospect of the Debtor's reorganization.

**C.    The Procedural Requirements Regarding Approval Of The Motion Have Been Satisfied.**

Bankruptcy Rule 4001(b) sets forth procedural requirements for obtaining use of cash collateral.  There are three general procedural requirements.  First, the Motion must contain a copy of the proposed form of order, which has been done by attaching the proposed order as Exhibit "3" to the annexed Yashouafar Declaration.  Second, the Motion must provide a concise statement of the relief requested, which was done above.  Third, the Motion is required to be served on any entity with an interest in the Debtor's cash collateral, any committee appointed or the twenty largest unsecured creditors if there is no committee, and on such other parties as the Court directs.  Here, the Debtor has served a copy of the Motion upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the Committee and its counsel, and parties requesting special notice.  Accordingly, the Motion complies with the requirements of Bankruptcy Rule 4001(b).

In addition, the Debtor has complied with Local Bankruptcy Rule 4001-2(b) by confirming that the proposed use of cash collateral contains none of the provisions set forth therein.

**III.**    **CONCLUSION**

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order:

(1)    granting the Motion in its entirety;

(2)    authorizing the Debtor to use cash collateral to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court; and

(3)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  October 5, 2010                    ROOSEVELT LOFTS, LLC


By:    */s/ Juliet Y. Oh*
                 DAVID L. NEALE
                 JULIET Y. OH
                 LEVENE, NEALE, BENDER, YOO
                   & BRILL L.L.P.
                 Attorneys for Chapter 11 Debtor and
                 Debtor in Possession

### **DECLARATION OF M. AARON YASHOUAFAR**

I, M. Aaron Yashouafar, hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I am the President of Roosevelt Lofts, Inc., which is the Manager of Roosevelt Lofts, LLC, a Delaware limited liability company, debtor and debtor in possession herein (the "Debtor").  As such, I am familiar with the Debtor's books and records and operations.

3.      I submit this declaration in support of that certain *"Debtor's Third Motion For Entry Of An Order Authorizing Debtor To Use Cash Collateral Through June 30, 2011"* (the "Motion"), to which this declaration is attached.

4.      On April 13, 2009, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its financial affairs and operating its bankruptcy estate as a debtor in possession.

5.      The Debtor is the owner of real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "Building").

6.      In approximately January 2006, the Debtor entered into an agreement to lease the Building from the previous owners, with an option to buy the Building.[5]  The Debtor intended to address the demands of an evolving Downtown residential market by converting the Building from an office building to a luxury residential project.

7.      Accordingly, in or about March 2006, the Debtor entered into a construction loan agreement with Bank of America, N.A., individually and as agent for a group of lenders (the "Bank"), pursuant to which the Debtor obtained a loan from the Bank in the original principal sum of $78,840,375.00 (the "Loan").  The Loan provided for, among other things, the repayment of the Loan, including accrued and unpaid interest, by March 9, 2009, with two options to extend the term of the Loan for six months each.  The obligations of the Debtor in connection with the

---

[5]  The Debtor exercised its option to purchase the Building in September 2008.

Loan are secured by a Construction Deed of Trust and a Leasehold Deed of Trust against the Building (collectively, the "Deeds of Trust").  The Loan was obtained by the Debtor for the purpose of converting the Building into 222 individually subdivided, luxury residential condominium units (the "Units"), a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Building.

8.    On or about December 30, 2008, the Bank issued a notice of default to the Debtor, contending that the Debtor had defaulted on its obligations under the Loan.  Even after receiving the notice of default from the Bank, the Debtor continued to invest a considerable amount of time and effort obtaining independent appraisals, conducting market research, and providing the Bank with alternative plans for the completion of the Building and the sale of all Units in the Building.  The Bank rejected all of the plans proposed by the Debtor for the completion of the Building and the sale of all Units.

9.    Subsequently, on April 3, 2009, the Bank filed a complaint against the Debtor and others in the Superior Court of the State of California, County of Los Angeles ("State Court") for, among other things, specific performance, appointment of a receiver, and judicial foreclosure on its Deeds of Trust.  Pursuant to its complaint in the State Court action, the Bank has asserted a claim against the Debtor and others in an amount exceeding $79 million.  Days after filing its complaint, the Bank made an *ex parte* application with the State Court for the appointment of a receiver.

10.    As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code in order to have the ability and opportunity to close escrow on the units that are under contract, to market and sell the remaining units in the Building, and to complete construction on the Building, all of which will allow the Debtor to repay the Loan and its other debts for the benefit of all creditors.

11.    Since the Petition Date, the Debtor has received income derived primarily, if not entirely, from rent received from the Debtor's commercial and residential tenants in the Building.  Shortly after the Petition Date, the Debtor requested that the Bank stipulate to the

Debtor's use of cash collateral to maintain the Building and to pay the Debtor's operating expenses relating to the Building, including, among other things, insurance, utilities, parking, security services, janitorial services and other operational costs associated with the Building. The Bank did not consent to the Debtor's use of cash collateral to pay such operating expenses.

12.    Accordingly, on August 27, 2009, the Debtor filed an emergency motion seeking authority to use its cash collateral in accordance with an operating budget extending through December 31, 2009 (the "<u>First Budget</u>"), and to obtain financing on an administrative expense priority basis from its affiliate, Milbank Holding Corp. ("<u>Milbank</u>"), to cover the operating shortages set forth in the First Budget (the "<u>First Cash Collateral Motion</u>").  The Court granted the Debtor's First Cash Collateral Motion and authorized the Debtor to use cash collateral, subject to the terms and conditions described in an interim order that I am advised was entered by the Court on September 8, 2009 and a final order that I am advised was entered by the Court on October 5, 2009.

13.    Concurrently with the First Cash Collateral Motion, the Debtor filed a motion seeking authority to commence a program to permit the Debtor to enter into short-term residential leases, for terms not to exceed one (1) year (the "<u>Leasing Motion</u>").  The Debtor had determined, in the exercise of its sound business judgment, that renting residential units in the Building for a short term would allow the Debtor to continue to pursue longer term strategies for the restructuring of its financial affairs, including, without limitation, the sale or further lease of units, a combination thereof, or a sale of the Building, while at the same time generating cash flow to help offset the operating expenses being incurred on a monthly basis.  Although the Debtor sought the Bank's consent to the Debtor's proposed short-term leasing program, such consent was not forthcoming.   Accordingly, the Debtor filed the Leasing Motion on an emergency basis on August 27, 2009.  Although the Bank had previously suggested that a leasing program would be acceptable, the Bank objected to the Leasing Motion.  The Court ultimately granted the Leasing Motion and authorized the Debtor to commence its proposed

short-term leasing program, subject to the terms and conditions described in the order that I am advised was entered by the Court on September 8, 2009.

14.    Subsequently, the Debtor successfully negotiated and entered into a number of residential leases in accordance with the Debtor's short-term leasing program.  At the present time, there are approximately forty six (46) residential leases in effect, and additional residential leases are anticipated to be entered into by the Debtor in the next several months.  A detailed rent roll, which lists the Debtor's residential (and commercial) leases as of October 1, 2010, is attached as Exhibit "2" hereto.

15.    Due to the increase in the number of tenants in the Building, certain of the Debtor's operating expenses increased and certain new expenses were required to be added, beginning in November 2009.  The Debtor provided the Bank with a revised budget, which extended through February 2010 (the "Revised First Budget"), and requested that the Bank consent to the Debtor's use of cash collateral in accordance with the Revised First Budget.  The Revised First Budget also contemplated financing from Milbank to cover operating shortages.  The Bank consented to the Debtor's use of cash collateral in accordance with the Revised First Budget and to the Debtor's borrowing of money from Milbank on an administrative expense priority basis to cover the operating shortages set forth in the Revised First Budget.  The Debtor and the Bank entered into a stipulation accordingly (the "First Stipulation"), and I am advised that the Court entered an order approving the First Stipulation on January 11, 2010.

16.    Prior to the expiration of the term of the First Stipulation, the Debtor provided the Bank with an operating budget, which reflected the Debtor's estimated income and expenses for the months of March, April and May 2010 (the "Second Budget"), and requested that the Bank consent to the Debtor's use of cash collateral and borrowing of money from Milbank in accordance with the Second Budget.  At that time, the Bank agreed to the use of cash collateral and borrowing of money from Milbank for a period of only fifteen (15) days.  Specifically, the Bank agreed to enter into a second stipulation with the Debtor (the "Second Stipulation") authorizing the Debtor to, among other things, use cash collateral and borrow money from

24

Milbank during the period of March 1, 2010 through and including March 15, 2010 to pay the

expenses reflected in the Second Budget during such period, provided, however, that the Debtor

not use any cash collateral for "model units furniture."  A true and correct copy of the Second

Budget was attached as an exhibit to the Second Stipulation.  I am advised that the Court entered

an order approving the Second Stipulation on March 4, 2010.

17.    Prior to the expiration of the term of the Second Stipulation, the Debtor again

approached the Bank to obtain the Bank's consent to the Debtor's use of cash collateral and

borrowing of money from Milbank in accordance with the Second Budget.  At that time, the

Bank agreed to the use of cash collateral and borrowing of money from Milbank for only an

additional sixteen (16) days.  Specifically, the Bank agreed to enter into a third stipulation with

the Debtor (the "Third Stipulation") authorizing the Debtor to, among other things, use cash

collateral and borrow money from Milbank during the period of March 16, 2010 through and

including March 31, 2010 to pay the expenses reflected in the Second Budget during such

period, provided, however, that the Debtor not use any cash collateral for "model units

furniture."  I am advised that the Court entered an order approving the Third Stipulation on

March 25, 2010.

18.    Prior to the expiration of the term of the Third Stipulation, the Debtor provided

the Bank with a revised and expanded operating budget, which reflected the Debtor's estimated

income and expenses through October 31, 2010 and requested that the Bank consent to the

Debtor's use of cash collateral and borrowing of money from Milbank in accordance with such

budget.  The Bank declined to provide such consent.

19.    Accordingly, on April 1, 2010, the Debtor filed a second emergency motion (the

"Second Cash Collateral Motion") seeking Court authority to (1) use cash collateral on an

emergency interim basis pending a final hearing in accordance with an operating budget

extending through October 31, 2010 (the "Expanded Second Budget"), a copy of which was

attached to the Second Cash Collateral Motion, and (2) borrow money on an administrative

1    expense priority basis from Milbank to cover the operating shortages set forth in the Expanded

2    Second Budget.

3        20.    The Bank filed a limited opposition to the Second Cash Collateral Motion,

4    specifically objecting to the inclusion of an expense for purchasing furniture for certain model

5    units in the Building.  Subsequently, the Debtor and the Bank entered into a fourth stipulation

6    (the "<u>Fourth Stipulation</u>") authorizing the Debtor to, among other things, use cash collateral and

7    borrow money from Milbank through and including October 31, 2010 to pay the expenses

8    reflected in the Expanded Second Budget during such period, provided, however, that the Debtor

9    not use any cash collateral for "model units furniture."  I am advised that the Court entered an

10   order approving the Fourth Stipulation on April 7, 2010.

11       21.    On August 31, 2009, the Debtor filed its *"Chapter 11 Plan Of Reorganization"*

12   (the "<u>Original Plan</u>"), within its exclusive period for doing so.  The Original Plan provided for

13   full payment of allowed claims over time, with interest.

14       22.    On November 24, 2009, the Bank filed a motion seeking to dismiss the Debtor's

15   bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the

16   "<u>Dismissal Motion</u>") based on, among other alleged grounds, the Debtor's failure to file a

17   disclosure statement with respect to the Original Plan.  The hearing on the Dismissal Motion was

18   originally calendared for December 15, 2009, but was subsequently continued by stipulation of

19   the parties to February 2, 2010 at 10:00 a.m.  Pursuant to the foregoing stipulation, the Debtor

20   agreed to file a disclosure statement with respect to the Original Plan, as well as a notice of the

21   hearing on such disclosure statement, by December 28, 2009.

22       23.    On December 28, 2009, the Debtor filed a disclosure statement describing the

23   Plan (the "<u>Original Disclosure Statement</u>").  The hearing on the Disclosure Statement was set for

24   February 2, 2010 at 10:00 a.m., the same date and time as the hearing on the Dismissal Motion.

25       24.    At the hearings on the Dismissal Motion and the Original Disclosure Statement

26   held on February 2, 2010 at 10 a.m., which I attended, the Court continued the hearings on both

27

28

matters to March 16, 2010 at 10:00 a.m. to provide the Debtors with an opportunity to file updated versions of the Original Plan and Original Disclosure Statement.

25.    On February 26, 2010, the Debtor filed amended versions of the Original Plan and Original Disclosure Statement (the "Amended Plan" and "Amended Disclosure Statement") to reflect all of the developments in the Debtor's bankruptcy case since the filing of the Original Plan and to incorporate the impact of the public auction event on the Debtor's cash flow projections for the plan.

26.    At the hearing on March 16, 2010, which I attended, the Court denied the Bank's Dismissal Motion and approved the Debtor's Amended Disclosure Statement.  In accordance with the Court's ruling at the March 16, 2010 hearing, the Court entered and order on April 9, 2010 approving the Amended Disclosure Statement and setting a hearing to consider confirmation of the Amended Plan on October 14, 2010 at 1:30 p.m. (with such hearing to be continued, to the extent necessary, to October 15, 2010 at 9:00 a.m. and October 21, 2010 at 1:30 p.m.) as well as various deadlines relating thereto (the "Disclosure Statement Order").

27.    Following the entry of the Disclosure Statement Order, counsel for the Debtor distributed copies of the Amended Plan and the Amended Disclosure Statement, with ballots, to all creditors.  A number of parties, including the Bank and various alleged mechanic's lien creditors, filed objections to confirmation of the Amended Plan.  The objections to plan confirmation (which I reviewed) revolved primarily around the issue of lien priority. Specifically, the mechanic's lien creditors alleged that their liens against the Building collectively had priority over the lien held by the Bank, and that their claims should be treated accordingly under the Amended Plan.

28.    The Debtor has engaged in negotiations with the alleged mechanic's lien creditors (as a group) to address their various concerns about the Amended Plan and to try to reach the terms of a consensual plan and disclosure statement.  In the meantime, there is litigation pending before this Court between the Bank and a class of alleged mechanic's lien creditors to determine the respective priority of their liens (the "Lien Priority Litigation").  I am informed and believe

that the Court ordered the certification of a class of alleged mechanic's lien creditors in connection with the Lien Priority Litigation, and that a trial in the Lien Priority Litigation is anticipated to take place no later than early December, 2010.

29.    Given that the objections to plan confirmation raised by the mechanic's lien creditors revolve primarily around the unresolved issue of lien priority, the Debtor believed that the resolution of the Lien Priority Litigation would immediately pave the way for the Debtor to file and confirm a modified version of the Amended Plan which would have the full support of at least the mechanic's lien creditors.    Accordingly, the Debtor filed a motion seeking a continuance of the hearing on confirmation of the Amended Plan and briefing deadlines associated therewith to provide the Debtor with the time necessary to (i) obtain a Court determination regarding the respective priority of the liens held by the Bank and mechanic's lien creditors, thereby obtaining certainty on that issue, (ii) formulate and file modified versions of the Amended Plan and Amended Disclosure Statement which have the full support of at least the mechanic's lien creditors, and (iii) obtain approval of the modified version of the Amended Disclosure Statement, to the extent necessary (the "Continuance Motion").

30.    On August 3, 2010, the Court entered an order granting the Continuance Motion, taking the hearing(s) to consider confirmation of the Amended Plan off calendar, vacating the briefing deadlines associated with plan confirmation, and scheduling a status conference on December 1, 2010 at 1:30 p.m. to consider the setting of further hearings and other matters pertaining to the Amended Plan.

31.    The primary assets of the Debtor's bankruptcy estate consist of the following:

a.    Building.  Based on information provided by CB Richard Ellis ("CBRE"), I believe that the amount of cash that will be generated from the leasing and sales of units in the Building over a period of less than three years will exceed the amounts owed to the Bank and holders of mechanic's liens against the Building

b.    Cash.  I estimate that, as of October 31, 2010, the Debtor will be holding cash in the approximate sum of $150,000 in its debtor in possession bank account.  The

Debtor's cash is derived primarily, if not entirely, from rent received from the Debtor's commercial and residential tenants in the Building.[6]

c.    <u>Other Assets</u>.    The Debtor has certain other assets as identified in its bankruptcy schedules including an accounts receivable in the amount of $21,000 and miscellaneous office and showroom equipment, furnishings and supplies, which I estimate to have a total liquidation value of approximately $15,000.

32.    <u>Bank Debt</u>.  The Debtor's primary creditor is the Bank.  The Bank asserts that it is currently owed in excess of $80 million under the Loan.  As noted above, the obligations of the Debtor in connection with the Loan are secured by the Deeds of Trust.  Pursuant to the Deeds of Trust, the Bank asserts liens against the Building as well as the Debtor's cash, which is derived primarily from rent received by the Debtor from its commercial and residential tenants.

33.    <u>Mechanic's Liens</u>.   There are a number of subcontractors who have recorded mechanic's liens against the Building.  I believe that the total amount of the mechanic's liens recorded against the Building is approximately $11.8 million.[7]  Certain holders of mechanic's liens have asserted that their liens have priority over the Deeds of Trust recorded by the Bank. As noted above, the Bank and a class of alleged mechanic's lien creditors are currently involved in the Lien Priority Litigation, pursuant to which the parties are seeking a determination regarding the relative order and priority of their liens against the Building.   Even if the mechanic's liens are valid and enforceable (which the Debtor does not concede), and even if one or more of the mechanic's liens have priority over the Deeds of Trust recorded by the Bank (which the Debtor also does not concede), the mechanic's liens against the Building do not result in a security interest against the Debtor's cash and rent revenue.   Accordingly, the Debtor

---

[6]  Prior to the Petition Date, the Debtor established a litigation reserve account, which currently contains the sum of approximately $1.5 million.  This reserve account was established under an agreement between the Debtor and the Bank to indemnify the Bank in connection with litigation commenced by V.G.I. Corporation against the Debtor and others.  Although the Debtor does not currently have access to the funds in the reserve account, any remaining funds in the account following the resolution of the litigation are to be returned to the Debtor.

[7]  The Debtor does not acknowledge the validity of any of the mechanic's liens that have been recorded against the Building and expressly reserves all of its rights, claims and defenses with respect to such liens.

believes that the Bank is the only party who can assert a security interest against the Debtor's cash and rent revenue.

34.    In addition to the debts described above, the Debtor has a total of approximately $9.4 million of unsecured debt.  Approximately $5.1 million of the Debtor's total unsecured debt is owed to affiliates of the Debtor.

35.    A copy of the Debtor's operating budget for the period of November 1, 2010 through and including June 30, 2011 (the "Budget") is attached as Exhibit "1" hereto.  The Budget reflects the Debtor's expected rent revenue and the expenses to be incurred on a monthly basis by the Debtor to maintain and operate the Building.

36.    Pursuant to the Expanded Second Budget, the Debtor estimated that it would generate rent revenue of approximately $88,000 during the months of September and October 2010.   In fact, the Debtor has far exceeded its projections and earned rent revenue of approximately $130,000 during the month of September 2010, and I expect the Debtor will earn rent revenue of approximately $139,000 during the month of October 2010.  As reflected in the Budget, I estimate that the Debtor will generate rent revenue of approximately $150,800 during the month of November 2010, with the amount of rent revenue to steadily increase in the subsequent months as the Debtor enters into additional residential leases.

37.    The Budget reflects typical expenses associated with the maintenance and operation of the Building, including, among other things, insurance, utilities, elevator service costs, security service fees, janitorial service fees, repair and maintenance costs, and other operational costs associated with the Building.  The amount of the following expenses have increased from the Debtor's previous budget due to the higher number of leased units in the Building and corresponding increase in tenant/guest traffic:

> e.    Security services – increased by $6,526 per month to provide for two full-time security guards (currently, there is one full-time security guard and one part-time security guard at the Building);
>
> f.    Trash services – increased by $500 per month;

g.    <u>Punch list repair for inside of units</u> – increased by $500 per month; and

h.    <u>Repair and maintenance</u> – increased by $1,000 per month.

38.    In addition, the Budget reflects the following two new expense items: – (i) property taxes (totaling $600,000) and (ii) reproduction labor and printing costs (totaling $9,147.96).  The property taxes relate to the Building and are for the upcoming tax period.  The reproduction labor and printing costs reflect the Debtor's out-of-pocket costs to establish, deposit documents into, and maintain the document depository ordered by the Court in connection with the Lien Priority Litigation.

39.    It is my understanding and belief that the Debtor has Court authority to use cash collateral, in accordance with the Expanded Second Budget, only through October 31, 2010. Pursuant to the Motion, the Debtor seeks Court authority to use its cash collateral through June 30, 2011 in order to pay the expenses of maintaining and operating the Building, in accordance with the Budget.  In addition, the Debtor seeks authority to use cash collateral to pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.  The Debtor also seeks authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis.

40.    A proposed form of the order granting the Motion is attached as Exhibit "3" hereto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of October, 2010, at Los Angeles, California.


*/s/ M. Aaron Yashouafar*_____
M. Aaron Yashouafar, Declarant

31

# EXHIBIT "1"

**The Roosevelt Residences**

**Estimated Budget of Expenses to be Paid***

| | November | December | January | February | March | April | May | June |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| Gross Rental Income** | $ 150,800.00 | $ 159,600.00 | $ 165,600.00 | $ 171,600.00 | $ 177,600.00 | $ 182,100.00 | $ 186,600.00 | $ 191,100.00 |
| Ace Parking (received income) | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 |
| Total Collection | $ 162,000.00 | $ 170,800.00 | $ 176,800.00 | $ 182,800.00 | $ 188,800.00 | $ 193,300.00 | $ 197,800.00 | $ 202,300.00 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Insurance | $ 7,720.08 | $ 7,720.08 | $ 7,720.08 | $ 7,720.08 | $ 7,720.08 | $ 6,227.75 | $ 6,228.75 | $ 6,227.75 |
| Property taxes | | 225,000.00 | 50,000.00 | 25,000.00 | | 190,000.00 | 75,000.00 | 35,000.00 |
| DWP - Utilities | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 |
| DWP - Water | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 |
| DWP - Fire Service | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| Ace Parking (service fees) | 11,800.00 | 11,800.00 | 11,800.00 | 11,800.00 | 11,800.00 | 11,800.00 | 11,800.00 | 11,800.00 |
| Security Services | 24,752.00 | 24,752.00 | 24,752.00 | 24,752.00 | 24,752.00 | 24,752.00 | 24,752.00 | 24,752.00 |
| Janitorial Services | 5,440.00 | 5,440.00 | 5,440.00 | 5,440.00 | 5,440.00 | 5,440.00 | 5,440.00 | 5,440.00 |
| Building Engineer | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 |
| Telephone Services | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 |
| Cable/Internet for Common Areas | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 |
| Trash Services | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| Property/Sales Manager | 7,250.00 | 7,250.00 | 7,250.00 | 7,250.00 | 7,250.00 | 7,250.00 | 7,250.00 | 7,250.00 |
| Sales/Leasing Agent | 12,750.00 | 12,750.00 | 12,750.00 | 12,750.00 | 12,750.00 | 12,750.00 | 12,750.00 | 12,750.00 |
| Administrative Assistant | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 |
| Marketing and Advertising | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 |
| Concierge Service | 2,800.00 | 2,800.00 | 2,800.00 | 2,800.00 | 2,800.00 | 2,800.00 | 2,800.00 | 2,800.00 |
| Punch list repair for inside of units | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 |
| Repair and Maintenance | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 |
| (Pool Services, gardening Supplies, wear and tear) | | | | | | | | |
| Elevator | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Miscellaneous (Bank Charges) | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| Reproduction Labor and Printing per court orc | 9,147.96 | | | | | | | |
| | | | | | | | | |
| Beginning Cash Balance | $ 150,000.00 | $ 182,289.96 | $ 7,527.88 | $ 13,765.80 | $ 51,003.72 | $ 119,241.64 | $ 3,471.89 | $ 7,201.14 |
| Total Collection | 162,000.00 | 170,800.00 | 176,800.00 | 182,800.00 | 188,800.00 | 193,300.00 | 197,800.00 | 202,300.00 |
| Less: Total Expenses* | 129,710.04 | 345,562.08 | 170,562.08 | 145,562.08 | 120,562.08 | 309,069.75 | 194,070.75 | 154,069.75 |
| Ending Cash Balance | $ 182,289.96 | $ 7,527.88 | $ 13,765.80 | $ 51,003.72 | $ 119,241.64 | $ 3,471.89 | $ 7,201.14 | $ 55,431.39 |

\* Expenses included are not intended to represent all expenses associated with the management, operation, and maintenance of the project.

\*\* Income does not include anticipated rents to be received from ready to move in tenants, additional leasing efforts, or collection loss.

# EXHIBIT "2"

The Roosevelt Residences
The Ninth and Seventh
Los Angeles, CA

Rent Roll
as of
October 1, 2010

| SUITE | NAME | AREA | COMM DATE | EXP. DATE | MONTHLY RENT | CAM CHARGES | TOTAL |
|-------|------|------|-----------|-----------|--------------|-------------|-------|
| **Residential Tenants** | | | | | | | |
| RVLTR-301 | Occupied | 1,179 | 1/25/10 | 1/24/2011 | 2,600.00 | | |
| RVLTR-303 | Occupied | 1,042 | 11/01/09 | 10/31/2010 | 2,300.00 | | |
| RVLTR-304 | Occupied | 1,024 | 11/10/09 | 5/31/2010 | 2,200.00 | | |
| RVLTR-305 | Occupied | 1,037 | 11/1/2010 | 10/31/2011 | 2,400.00 | | |
| RVLTR-307 | Occupied | 732 | 7/26/10 | 6/30/2011 | 2,000.00 | | |
| RVLTR-309 | Occupied | 1,179 | 10/15/10 | 9/30/2011 | 1,950.00 | | |
| RVLTR-312 | Occupied | 1,179 | 10/01/10 | 9/30/2011 | 1,900.00 | | |
| RVLTR-313 | Occupied | 804 | 1/01/10 | 1/31/2011 | 1,850.00 | | |
| RVLTR-314 | Occupied | 1,619 | 10/01/09 | 9/30/2010 | 2,750.00 | | |
| RVLTR-409 | Occupied | 884 | 2/01/10 | 1/31/2011 | 2,000.00 | | |
| RVLTR-411 | Occupied | 1,265 | 4/15/09 | 3/14/2011 | 550.00 | | |
| RVLTR-412 | Occupied | 913 | 3/13/09 | M-T-M | 2,650.00 | | |
| RVLTR-414 | Occupied | 943 | 11/19/09 | 11/18/2010 | 2,200.00 | | |
| RVLTR-415 | Occupied | 1,042 | 10/01/10 | 9/30/2011 | 2,000.00 | | |
| RVLTR-417 | Occupied | 1,310 | 4/01/10 | 9/30/2011 | 2,800.00 | | |
| RVLTR-419 | Occupied | 795 | 10/01/10 | 9/01/2011 | 2,000.00 | | |
| RVLTR-423 | Occupied | 910 | 9/19/09 | 8/31/2010 | 2,350.00 | | |
| RVLTR-425 | Occupied | 1,219 | 4/01/09 | 3/31/2011 | 550.00 | | |
| RVLTR-503 | Occupied | 928 | 6/29/10 | 5/31/2011 | 3,187.00 | | |
| RVLTR-505 | Occupied | 1,290 | 1/20/10 | 2/19/2011 | 2,650.00 | | |
| RVLTR-506 | Occupied | 863 | 12/26/09 | 12/25/2010 | 1,900.00 | | |
| RVLTR-514 | Occupied | 942 | 8/01/10 | 7/31/2011 | 2,250.00 | | |
| RVLTR-517 | Occupied | 1,179 | 10/01/10 | 9/30/2011 | 2,975.00 | | |
| RVLTR-524 | Occupied | 875 | 7/15/10 | 1/31/2011 | 2,125.00 | | |
| RVLTR-606 | Occupied | 1,179 | 9/15/10 | 3/31/2011 | 2,450.00 | | |
| RVLTR-607 | Occupied | 1,179 | 11/01/10 | 10/31/2011 | 2,150.00 | | |
| RVLTR-609 | Occupied | 924 | 6/01/10 | 5/31/2011 | 2,345.00 | | |
| RVLTR-610 | Occupied | 1,090 | 1/01/10 | 12/31/2010 | 2,180.00 | | |
| RVLTR-614 | Occupied | 938 | 8/15/10 | 7/31/2011 | 2,496.00 | | |
| RVLTR-616 | Occupied | 1,179 | 11/16/2010 | 10/31/2011 | 2,500.00 | | |
| RVLTR-703 | Occupied | 1,362 | 2/01/10 | 1/31/2011 | 2,750.00 | | |
| RVLTR-704 | Occupied | 1,362 | 7/01/10 | 6/30/2011 | 3,278.00 | | |
| RVLTR-705 | Occupied | 1,288 | 8/01/10 | 7/31/2011 | 3,136.00 | | |
| RVLTR-706 | Occupied | 888 | 8/15/10 | 7/31/2011 | 2,200.00 | | |
| RVLTR-708 | Occupied | 1,179 | 11/01/10 | 10/31/2011 | 2,150.00 | | |
| RVLTR-709 | Occupied | 910 | 12/01/09 | 11/30/2010 | 2,150.00 | | |
| RVLTR-712 | Occupied | 944 | 4/01/10 | M-T-M | 2,100.00 | | |
| RVLTR-714 | Occupied | 950 | 6/01/10 | M-T-M | 2,400.00 | | |
| RVLTR-718 | Occupied | 1,453 | 9/15/09 | 3/14/2010 | 3,000.00 | | |
| RVLTR-719 | Occupied | 1,532 | 11/01/09 | M-T-M | 2,900.00 | | |
| RVLTR-722 | Occupied | 868 | 1/01/10 | 12/31/2010 | 1,900.00 | | |
| RVLTR-725 | Occupied | 1,217 | 10/01/10 | 9/30/2011 | 2,500.00 | | |
| RVLTR-809 | Occupied | 945 | 1/15/10 | 3/14/2011 | 7,000.00 | | |
| RVLTR-810 | Occupied | 1,305 | 8/01/10 | 7/31/2011 | 3,000.00 | | |
| RVLTR-814 | Occupied | 1,179 | 11/1/2010 | 10/31/2011 | 2,350.00 | | |
| RVLTR-816 | Occupied | 1,305 | 11/1/2010 | 10/31/2010 | 2,775.00 | | |
| Total | | 50,329 | | | 111,847.00 | | |
| **Retail Tenants** | | | | | | | |
| RVLTR-G729 | JANG ENTERPRISES, INC | 4,276 | 3/01/09 | 4/30/2019 | 15,191.43 | 3,228.00 | 18,419.43 |
| RVLTR-G733 | HAO LAM | 1,505 | 10/01/09 | 9/30/2019 | 6,358.35 | 1,136.00 | 7,494.35 |
| RVLTR-G735 | FAMIMA CORPORATION | 1,633 | 3/24/09 | 6/30/2014 | 9,887.90 | 1,233.00 | 11,120.90 |
| Total | | | | | 31,437.68 | 5,597.00 | 37,034.68 |

**EXHIBIT "3"**

1  DAVID L. NEALE (SBN 141225)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email:  dln@lnbyb.com, jyo@lnbyb.com

6
   Attorneys for Chapter 11 Debtor and
7  Debtor in Possession

8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11            SAN FERNANDO VALLEY DIVISION

12

13  In re                               )  Case No. 1:09-bk-14214-GM
                                        )
14  ROOSEVELT LOFTS, LLC, a Delaware    )  Chapter 11
    limited liability company,          )
15                                      )
                                        )  **ORDER GRANTING DEBTOR'S**
16                                      )  **THIRD MOTION FOR ENTRY OF**
            Debtor.                     )  **AN ORDER AUTHORIZING**
17                                      )  **DEBTOR TO USE CASH**
                                        )  **COLLATERAL THROUGH JUNE**
18                                      )  **30, 2011**
                                        )
19                                      )
                                        )  Date:     October 26, 2010
20                                      )  Time:     10:00 a.m.
                                        )  Place:    Courtroom "303"
21                                      )            21041 Burbank Boulevard
                                        )            Woodland Hills, California
22                                      )
                                        )
23  _____)

24

25          A hearing was held on October 26, 2010, at 10:00 a.m., before the Honorable Geraldine

26  Mund, United States Bankruptcy Judge for the Central District of California, in Courtroom

27  "303" located at 21041 Burbank Boulevard, Woodland Hills, California, to consider the motion

28

                                        1

(the "<u>Motion</u>") filed by Roosevelt Lofts, LLC, a Delaware limited liability company (the "<u>Debtor</u>"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, for the entry of an order, pursuant to 11 U.S.C. § 363(c), authorizing the Debtor to use cash collateral in accordance with the Debtor's operating budget for the period of November 1, 2010 through and including June 30, 2011 (the "<u>Budget</u>"), a copy of which is attached as Exhibit "1" to the Declaration of M. Aaron Yashouafar annexed to the Motion.  Appearances at the hearing on the Motion were made as set forth on the record of the Court.

The Court, having considered the Motion and all papers filed by the Debtor in support of the Motion, and the oral arguments and statements of counsel made at the hearing on the Motion, proper notice of the Motion and the hearing on the Motion having been provided, and good cause appearing therefor,

IT IS HEREBY ORDERED AS FOLLOWS:

A.    The Motion is granted in its entirety.

B.    The Debtor is authorized to use cash collateral to pay all of the expenses set forth in the Budget.  The Debtor is authorized to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis.

C.    The Debtor is further authorized to use cash collateral to pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.


<u>IT IS SO ORDERED.</u>

###

| In re: | CHAPTER 11 |
|---|---|
| **ROOSEVELT LOFTS, LLC,** | |
| Debtor(s). | CASE NO. 1:09-bk-14214-GM |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.  Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  10250 Constellation Blvd., Suite 1700, Los Angeles, CA  90067.

A true and correct copy of the foregoing document described as: **DEBTOR'S THIRD MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL THROUGH JUNE 30, 2011; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF M. AARON YASHOUAFAR IN SUPPORT THEREOF**, will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **October 5, 2010**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- John B Acierno    ecfcacb@piteduncan.com
- Carleton R Burch    crb@amclaw.com, amc@amclaw.com;jsh@amclaw.com;awh@amclaw.com;mav@amclaw.com;esf@amclaw.com;slc@amclaw.com;csh@amclaw.com
- Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
- L Dominic Chacon    chacondominic@yahoo.com
- Cynthia M Cohen    cynthiacohen@paulhastings.com
- Travis W Feuerbacher    tfeuerbacher@gglts.com
- Steven R Fox    emails@foxlaw.com
- Helen R Frazer    hfrazer@aalrr.com
- Varand Gourjian    vg@gourjianlaw.com, lala@gourjianlaw.com;naz@gourjianlaw.com
- Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com
- Herbert Hayden    herbert@ntlg.us
- Brian L Holman    b.holman@mpglaw.com
- Alexandra Kazhokin    akazhokin@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- Mark J Krone    crb@amclaw.com, crs@amclaw.com;amc@amclaw.com
- Ian Landsberg    ilandsberg@lm-lawyers.com, bgomelsky@landsberg-law.com;rbenitez@landsberg-law.com
- David L. Neale    dln@lnbrb.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Russell H Rapoport    rrapoport@prllplaw.com, lgillis@prllplaw.com
- S Margaux Ross    margaux.ross@usdoj.gov
- Bruce D Rudman    bdr@agrlaw.net
- William D Schuster    bills@allieschuster.org
- Marian K Selvaggio    selvaggio@huntortmann.com
- Daniel H Slate    dslate@buchalter.com, rreeder@buchalter.com;ifs_filing@buchalter.com
- Lindsey L Smith    lls@lnbrb.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com

- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Marc Weinberg    marcweinberg@att.net
- Brandon J Witkow    bwitkow@lockelord.com
- Aimee Y Wong    aywong@mckennalong.com

Service information on attached page []

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL AND/OR BY ATTORNEY SERVICE** (indicate method for each person or entity served)**:**  On **October 5, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service and/or by attorney service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

PLEASE SEE ATTACHED SERVICE LISTS

Service information on attached page [X]

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 5, 2010**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Via Personal Delivery by Attorney Service
Hon. Geraldine Mund
United States Bankruptcy Court
San Fernando Valley Division
21041 Burbank Blvd., Suite 342
Woodland Hills, CA 91367

Service information on attached page [   ]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 5, 2010 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| Date | Type Name | Signature |

4374

Roosevelt Lofts
RSN

Roosevelt Lofts, LLC
c/o Mr. M. Aaron Yashouafar, President
16661 Ventura Blvd., #600
Encino, CA 91436

U.S. Trustee
Attn:  S Margaux Ross, Esq.
21051 Warner Ctr Ln Ste 115
Woodland Hills, CA 91367

**Counsel for Ryan Anderson, et al.**
Gary Owen Caris, Esq.
McKenna, Long & Aldridge LLP
444 South Flower St., 8th Floor
Los Angeles, CA 90071

**Counsel for HD Supply Construction**
William D. Schuster, Esq.
Allie & Schuster PC
2122 N Broadway
Santa Ana, CA 92706-2614

Homan Taghdiri, Esq.
**Milbank**
660 S. Figueroa St., 24th Floor
Los Angeles, CA 90017

**Counsel for Siemens Bldg Tech., Inc.**
Benjamin R. Trachtman, Esq.
Trachtman & Trachtman
27401 Los Altos, Suite 300
Mission Viejo, Ca 92691

**Counsel for Bank of America**
Daniel H. Slate, Esq.
Buchalter, Nemer
1000 Wilshire Blvd., Ste 1500
Los Angeles, CA 90017

**Counsel for Sidney Alter dba Alter Electric**
Bruce D. Rudman, Esq.
Abdulaziz, Grossbart & Rudman
PO Box 15458
North Hollywood, CA 91615

Herbert Alfred Mayer
5360 Willow Oak Street
Simi Valley, CA 93063-4591

L.A. County Treasurer and Tax Collector
PO Box 54110
Los Angeles, CA 90054-0110

**Counsel for Infiniti Metals**
Law Ofcs Theodore A. Anderson
690 S. Brea Blvd.
Brea, CA 92821

**Counsel for VGI**
Patrick J. Duffy III
Andrew W Hawthorne
Monteleone & McCrory
725 S. Figueroa St., Ste. 3200
Los Angeles, CA 90017

**COMMITTEE COUNSEL**
Ian Landsberg, Esq.
Landsberg Margulies LLP
16030 Ventura Blvd., Ste. 470
Encino, CA 91436

**Counsel for ThyssenKrupp Elevator**
William C. Hernquist II
Wallace H. Sweet
8407 La Mesa Blvd.
La Mesa, CA 91942

**Committee Member**
Kuetar Flooring
Attn:  Joseph Kember/Ed Sheats
2 Innovation Drive
Renfrew
Ontario, **CANADA** K7V4B1

**Committee Member**
Bontempi USA
Attn:  Yeujye Chen
8919 Beverly Blvd.
West Hollywood, CA 90048

**Committee Member**
A American Custom Flooring
Attn:  Richard S. Lauter
311 S. Wacker Drive
Chicago, IL 60066

**Counsel for American Gunite, Inc.**
Varand Gourjian, Esq.
Gourjian Law Group
100 N. Brank Blvd., Sixth Floor
Glendale, CA 91203

David Sherwood
CEO
Daniel's Jewelers
PO Box 3750
Culver City, CA 90231

~~Alan B. Clark~~
~~Latham & Watkins LLP~~
~~355 S. Grand Ave~~
~~Los Angeles, CA 90071~~
**Withdrawal of RSN filed 11-10-09**

**Counsel to Bank of America**
Seyfarth Shaw LLP
T. Larry Watts, Eric B. von Zeipel
2029 Century Park East, Suite 3500
Los Angeles, CA 90067-3021

Attorney for Canon Financial Svcs
Scott H. Marcus & Associates
121 Johnson Road
Turnersville, NJ 08012

Fred S. Pardes, Esq.
LAW OFFICES OF FRED S. PARDES
A Professional Corporation
34211 Pacific Coast Highway, Suite 103
Dana Point, Ca. 92629

~~Maria Stark~~
~~Hypothesis~~
~~811 West 7th St., Ste. 600~~
~~Los Angeles, CA 90017~~
*Remove per e-mail dtd 12-29-09*

~~Greg Sinderbrand, Esq.~~
~~Borba, Inc.~~
~~21700 Oxnard St Ste 1850~~
~~Woodland Hills, CA 91367~~
*Remove per e-mail dtd 12-29-09*

PM Estrada Roofing
4257 W. 101st Street
Inglewood, CA 90304

S.E.C.
5670 Wilshire Blvd., Ste. 1100
Los Angeles, CA 90036

Roosevelt Lofts
Secured Creditors and their agents

Bank of America, N.A.
333 S. Hope St.
11th Floor
Los Angeles, CA 90071

V.G.I. Corporation
5508 S. Santa Fe Avenue
Vernon, CA 90058

~~Alter Electric Company~~
~~5443 Donna Avenue~~
~~Tarzana, CA 91356~~
**Represented by counsel; see below**

Thermalair
1140 Red Gum Street
Anaheim, CA 92806

American Gunite, Inc.
5042 Wilshire Blvd.
Suite 496
Los Angeles, CA 90036

Wrightway Construction, Inc.
1070 E. Dominguez St.
Suite A
Carson, CA 90746

~~Southland Exterior Building Services, Inc.~~
~~9582 Hamilton Ave.~~
~~#166~~
~~Huntington Beach, CA 92646~~
**Address change; see below**

Westye Group - West, Inc.
dba Sub-Zero Wolf
145 W. 134th Street
Los Angeles, CA 90061

Integrity Builders West, Inc.
25942 Via Marejada
Mission Viejo, CA 92691

Pfinish Koncepts Inc.
dba Stonecraft Enterprise
2820 N. San Fernando Blvd.
Burbank, CA 91504

Purcell Murray Builder Sales Company, Inc.
2341 Jefferson Street
Suite 200
San Diego, CA 92110

Lynn Safety, Inc.
367 Civic Drive
Suite 8
Pleasant Hill, CA 94523

Thyssenkrupp Elevator, Inc.
6087 Triangle Drive
Los Angeles, CA 90040

Allsale Electric Inc.
7950 Deering Avenue
Canoga Park, CA 91304

Cal-State Steel Corporation
1801 W. Compton Boulevard
Compton, CA 90220

Commercial Glass Company
1577 Tierra Rejada Road
Simi Valley, CA 93065

Addison Pools, Inc.
10835 Magnolia Boulevard
North Hollywood, CA 91601

EJ Reyes Corp.
6328 Roundhill Drive
Whittier, CA 90601

EFCO Corporation
1290 Carbide Drive
Corona, CA 92881

Siemens Building Technologies, Inc.
10775 Business Center Drive
Cypress, CA 90630

SRS Fire Protection, Inc.
6829 Canoga Avenue #2
Canoga Park, CA 91303

~~Spectra Company~~
~~2510 Supply Street~~
~~Pomona, CA 91767-2113~~
**Address change per post ofc; see below**

New World West
940 Challenger Street
Brea, CA 92821

Brewster Marble Co., Inc.
11818 Glenoaks Boulevard
San Fernando, CA 91340

CraneNetics, Inc.
4780 Cheyenne Way
Chino, CA 91710

Dunn-Edwards Corporation
4885 E. 52nd Place
Los Angeles, CA 90040

PM Estrada Roofing
4257 W. 101st Street
Inglewood, CA 90304

HD Supply / White Cap Construction Supply
P.O. Box 1770
Costa Mesa, CA 92626

Glendale Plumbing & Fire Supply
c/o Kirk s. MacDonald, Esq.
Gill and Baldwin, P.C.
130 N. Brand Blvd., #405
Glendale, CA 91205

Insul-Flow, Inc.
1911 N. Fine
Fresno, CA 93727

American Concrete Cutting Inc.
dba American Demolition/Concrete Cutting
620 Poinsettia Street
Santa Ana, CA 92701

William F. McVey Sr.
Grif-Fab Corp.
1 Westlake Village
Council Bluffs, LA  51501

Frank's Disposal
PO Box 4271
Sunland, CA 91041

Robertson's Ready Mix
PO Box 3600
Corona, CA 92878

Orco Construction Supply
477 N. Canyons Parkway, #A
Livermore, CA 94551

A Fence Company, Inc.
15205 Carretera Drive
Whittier, CA 90605

AB California Acquisition Corp.
dba Acoustical Material Services
10200 S. Pioneer Boulevard,
Suite 500
Santa Fe Springs, CA 90670

Arrow
7635 Burnet Avenue
Van Nuys, CA 91405

**Counsel for Bank of America**
Daniel H. Slate, Esq.
Buchalter, Nemer
1000 Wilshire Blvd., Ste 1500
Los Angeles, CA 90017

Agent for Bank of America
T. Larry Watts, Esq.
2029 Century Park East, Suite 3300
Los Angeles, CA 90067

Agent for V.G.I. Corporation
Patrick J. Duffy, Esq.
725 S. Figueroa St., Suite 3200
Los Angeles, CA 90017

Agent for American Gunite
Bradley A. Raisin, Esq.
16055 Ventura Blvd., Suite 601
Encino, CA 91436

Agent for Wrightway Construction
E. Leonard Fruchter, Esq.
1609 Cravens Avenue
Torrance, CA90501

Agent for Southland Exterior Building Svcs
Fred S. Pardes, Esq.
34211 Pacific Coast Hwy, Suite 103
Dana Point, CA 92629

Agent for Westye Group – West, Inc.
Christopher W. Bayuk, Esq.
Bayuk & Associates
401 W. 'A' Street, Ste. 1400
San Diego, CA 92101

Agent for Pfinish Koncepts, Inc.
Alan J. Carnegie, Esq.
23975 Park Sorrento, Suite 227
Calabasas, CA 91302

Agent for Purcell Murray Builder Sales
David J. Barnier, Esq.
2341 Jefferson Street, Suite 200
San Diego, CA 92110

Agent for Lynn Safety
Herbert Hayden, Esq.
40931 Fremont Boulevard
Fremont, CA 94538

Agent for Cal State Steel Corp
Heather M. Kadeg, Esq.
30423 Canwood Street, Suite 131
Agoura Hills, CA 91301

Agent for EJ Reyes
Meyer S. Levitt, Esq.
10880 Wilshire Blvd., Suite 1101
Los Angeles, CA 90024

Agent for EFCOCorp
Michael C. Brown, Esq.
23230 Chagrin Blvd., Suite 940
Cleveland, OH 44122

Agent for Spectra Company
Beard Hobbs, Esq.
7844 La Mesa Boulevard
La Mesa, CA 91941

Agent for PM Estrada Roofing
J.J. Little, Esq.
1516 S. Bundy Dr., Suite 312
Los Angeles, CA 90025

Agent for American Concrete Cutting
Ryan K. Hirota, Esq.
PO Box 19694
Irvine, CA 92623

Agent for Robertson's Ready Mix
Robert M. Binam, Esq.
200 S. Main Street, Suite 200
Corona, CA 92882

Agent for HD Supply
William D. Schuster, Esq.
2122 N. Broadway
Santa Ana, CA 92706

Southland Exterior Bldg Svcs
27881 La Paz Rd., Ste G
Laguna Niguel, CA 92677

**Counsel for Sidney Alter dba Alter Electric**
Bruce D. Rudman, Esq.
Abdulaziz, Grossbart & Rudman
PO Box 15458
North Hollywood, CA 91615

Spectra Company
2510 Supply Street
Pomona, CA 91767-2113

Roosevelt Lofts
**CREDITORS COMMITTEE**

**Counsel**
Ian Landsberg, Esq.
Landsberg Margulies LLP
16030 Ventura Blvd., Ste. 470
Encino, CA 91436

**Committee Member**
A American Custom Flooring
Attn:  Richard S. Lauter
311 S. Wacker Drive
Chicago, IL 60066

**Committee Member**
Kuetar Flooring
Attn:  Joseph Kember/Ed Sheats
2 Innovation Drive
Renfrew
Ontario, **CANADA** K7V4B1

**Committee Member**
Bontempi USA
Attn:  Yeujye Chen
8919 Beverly Blvd.
West Hollywood, CA 90048