1  DAVID L. NEALE (SBN 141225)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
3  Los Angeles, California 90067
   Telephone:  (310) 229-1234
4  Facsimile:  (310) 229-1244
   Email:  dln@lnbyb.com, jyo@lnbyb.com
5

6  Attorneys for Chapter 11 Debtor
   and Debtor in Possession
7

8                  **UNITED STATES BANKRUPTCY COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10                 **SAN FERNANDO VALLEY DIVISION**

11

12 In re                                    )   Case No. 1:09-bk-14214-GM
                                            )
13 ROOSEVELT LOFTS, LLC, a                  )   Chapter 11
   Delaware limited liability company,      )
14                                          )
                                            )   **NOTICE OF MOTION AND MOTION**
15              Debtor.                      )   **PURSUANT TO FEDERAL RULE OF**
                                            )   **BANKRUPTCY PROCEDURE 9019 FOR**
16                                          )   **AUTHORITY TO COMPROMISE**
                                            )   **CONTROVERSY WITH BANK OF**
17                                          )   **AMERICA, N.A., INDIVIDUALLY AND AS**
                                            )   **ADMINISTRATIVE AGENT FOR A**
18                                          )   **GROUP OF LENDERS; MEMORANDUM**
                                            )   **OF POINTS AND AUTHORITIES;**
19                                          )   **DECLARATION OF M. AARON**
                                            )   **YASHOUAFAR IN SUPPORT THEREOF**
20                                          )
                                            )
21                                          )   [*EX PARTE* APPLICATION FOR ORDER
                                            )   SHORTENING TIME FILED
22                                          )   CONCURRENTLY HEREWITH]
                                            )
23                                          )
                                            )   Date:    [TO BE SET]
24                                          )   Time:    [TO BE SET]
                                            )   Place:   Courtroom "303"
25                                          )            21041 Burbank Boulevard
                                            )            Woodland Hills, CA 91367
26                                          )
                                            )
27 ─────────────────────────────────────── )

28

                              1

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Bankruptcy Procedure 9019 and Local Bankruptcy Rule 9013-1(o), Roosevelt Lofts, LLC, a Delaware limited liability company, the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), hereby submits this motion (the "Motion") for the entry of an order: (A) authorizing the settlement reached by and among the Debtor, M. Aaron Yashouafar, Solyman Yashouafar and Simon Barlava (collectively, the "Guarantors," and together with the Debtor, the "Borrower Parties"), and Bank of America, N.A., individually and as administrative agent for a group of lenders[1] (the "Bank Group"); and (B) approving the terms and conditions of, and authorizing the Debtor to enter into and implement the terms of, that certain *Settlement Agreement* (the "Settlement Agreement") in substantially the form attached as Exhibit "A" to the Declaration of M. Aaron Yashouafar annexed hereto (the "Yashouafar Declaration"). The complete bases of the Motion are set forth in the Memorandum of Points and Authorities annexed hereto.

Briefly, the Settlement Agreement represents a global resolution of all of the disputes among the parties arising from and relating to the state court litigation currently pending between the Bank Group and the Guarantors (the "Guaranty Litigation"), the Debtor's bankruptcy case, and all other claims that the parties may have against each other in any capacity including, without limitation, any affiliate entities involved with the Debtor's real property commonly known as the "Roosevelt Building" and located at 727 West 7th Street, Los Angeles, California (the "Property"). Recognizing the risks, costs and delays associated with further litigation – both in the Guaranty Litigation and the Debtor's bankruptcy case – the parties engaged in good faith, arm's length settlement negotiations which culminated in a sixteen-hour mediation conducted on May 3, 2011 before the Honorable Randall J. Newsome. The negotiations among the parties were ultimately fruitful and resulted in the Settlement Agreement. The Settlement Agreement provides, among other things, for the possible purchase and sale of the Bank Group's interest in

---

[1] The Bank Group is comprised of Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

the loan documents relating to the pre-petition construction loan made by the Bank Group to the Debtor in the original principal sum of $78,840,375 (the "<u>Loan Documents</u>"), and certain rights provided therein, to a purchaser to be arranged by the Borrower Parties.

The Debtor has identified and is currently working with a third party purchaser, Greystar GP, LLC or its designee (the "<u>Purchaser</u>"), which has agreed to acquire the Bank Group's interests in the Loan Documents in accordance with the terms of the Settlement Agreement and to support the Debtor's efforts to consummate a financial restructuring of the Debtor's indebtedness and other obligations through a plan of reorganization jointly sponsored by the Debtor, the Purchaser and Roosevelt Lofts, Inc., the owner of 100% of the membership interests in the Debtor ("<u>RLI</u>").[2]  Accordingly, the Debtor believes that the Settlement Agreement will pave the way for the filing of a plan of reorganization that has the support of most, if not all, of the constituencies in the Debtor's case, and will allow the Debtor to exit from bankruptcy in an expedient and cost-effective manner.  Under these circumstances, the Debtor believes that approval of the Settlement Agreement is in the best interests of its bankruptcy estate.

Under the terms of the Settlement Agreement, the Purchaser is required, among other things, to deposit the sum of $5,000,000 (the "<u>Initial Deposit</u>") with an approved escrow agent by Monday, June 13, 2011 (*i.e.*, within ten calendar days of the Effective Date of the Settlement Agreement).  If the Initial Deposit is not made by June 13, 2011, the Debtor will be in default of the Settlement Agreement and, if such default is not cured within two (2) business days of notice thereof, the Bank Group will immediately have *in rem* relief from the automatic stay on its collateral (including the Property) without further notice, hearing or order of the Bankruptcy Court.  The Purchaser has indicated it is not willing to pay the Initial Deposit until the Debtor first obtains an order of the Bankruptcy Court approving, and authorizing the Debtor to enter into, the Settlement Agreement.  In light of the grave consequences to the Debtor's estate if the

---

[2]  The Debtor has filed concurrently herewith, or will file shortly, a motion for approval of that certain *Plan Support Agreement* entered into by and among the Debtor, RLI, the Purchaser and the Bank Group.

1  Initial Deposit is not timely made, and the indisputable benefits to the estate if the Settlement

2  Agreement is approved and implemented, the Debtor has filed concurrently herewith an *ex parte*

3  application for an order shortening time on notice for hearing on the Motion, pursuant to which

4  **the Debtor is seeking to have the Motion heard as soon as practicable for the Court, but in**

5  **no event later than June 13, 2011**.

6      The Motion is based upon Rules 2002 and 9019 of the Federal Rules of Bankruptcy

7  Procedure and Local Bankruptcy Rules 2081-1(a), 9013-1(o) and 9075-1(b), and is based upon

8  this Notice and Motion, the attached Memorandum of Points and Authorities and Yashouafar

9  Declaration, the entire record in this case, and any other evidence properly presented to the

10 Court.

11     **WHEREFORE**, the Debtor respectfully requests that the Court enter an order (i)

12 finding that notice of the Motion was adequate and appropriate under the circumstances; (ii)

13 granting the Motion in its entirety; (iii) approving the Settlement Agreement and all related

14 documents in substantially the forms attached as Exhibit "A" to the Yashouafar Declaration

15 annexed hereto; (iv) authorizing the Debtor to take all steps necessary to consummate the terms

16 and conditions of the Settlement Agreement; and (v) granting such other and further relief as

17 may be necessary or appropriate under the circumstances.

18 Dated: May ___, 2011                    ROOSEVELT LOFTS, LLC

19

20

21                                        By:_____
22                                             DAVID L. NEALE
                                              JULIET Y. OH
23                                            LEVENE, NEALE, BENDER, YOO
                                                  & BRILL L.L.P.
24                                            Attorneys for Chapter 11 Debtor and
                                              Debtor in Possession
25

26

27

28

4

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

**A.    Background.**

1.    On April 13, 2009 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "<u>Bankruptcy Code</u>").  The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is the owner of real property commonly known as the "Roosevelt Building" and located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "<u>Property</u>").

3.    On or about March 9, 2006, the Debtor entered into a construction loan agreement (the "<u>Loan Agreement</u>") with Bank of America, N.A., individually and as administrative agent for a group of lenders[3] (the "<u>Bank Group</u>"), pursuant to which the Debtor obtained a loan from the Bank Group in the original principal sum of $78,840,375 (the "<u>Loan</u>").  On or about March 9, 2006, the Debtor executed a Deed of Trust Note in the original principal sum of $78,840,375 (the "<u>Note</u>").  The Loan was obtained by the Debtor for the purpose of converting the Property into 222 individually subdivided, luxury residential condominium units, a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Property.

4.    The Loan Agreement and the Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "<u>Fee Deed of Trust</u>") and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest)

---

[3] The Bank Group is comprised of Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

recorded on March 22, 2006 (the "Leasehold Deed of Trust," and together with the Fee Deed of Trust, the "Deeds of Trust").  The Deeds of Trust encumber the Property, including an absolute assignment of all rents, issues and profits generated from the operation of the Property (collectively, the "Collateral").

5.      In further consideration of the Bank Group's Loan and extension of credit, on or about March 9, 2006, M. Aaron Yashouafar, Solyman Yashouafar and Simon Barlava (collectively, the "Guarantors," and together with the Debtor, the "Borrower Parties") each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "Guaranty").  The Loan Agreement, the Note, the Deeds of Trust and the Guaranty, together with all modifications thereto and all other loan and security documents and agreements between the parties related to the Collateral are collectively referred to as the "Loan Documents."

6.      On or about December 30, 2008, the Bank Group issued a notice of default to the Borrower Parties, contending that each of the Borrower Parties had defaulted on their obligations to the Bank Group under the Loan Documents.  On March 23, 20098, the Bank Group caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office.

7.      On or about April 3, 2009, the Bank Group filed a complaint against the Debtor and the Guarantors in the Superior Court of the State of California for the County of Los Angeles ("State Court") for, among other things, breach of the Guaranty, appointment of a receiver and judicial foreclosure on its Deeds of Trust, thereby commencing that certain case bearing the number SC 102472.  The Borrower Parties dispute the Bank Group's contentions.  Thereafter, the Guarantors filed a cross-complaint asserting various counterclaims against the Bank Group.  The litigation in State Court relating to the claims asserted by the Bank Group in its complaint and the counterclaims asserted by the Guarantors in their cross-complaint is collectively referred to herein as the "Guaranty Litigation."

8.      Days after filing its complaint in State Court, the Bank Group filed an *ex parte* application with the State Court for the appointment of a receiver.

9.      As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code to have the ability and opportunity to close escrow on the residential units that were then under contract, to market and sell the remaining residential units in the Property, and to complete construction on the Property, all of which would provide the Debtor with the ability to restructure and repay the Loan and its other debts for the benefit of all creditors.

**B.      Summary Of The Disputes Among The Debtor, Guarantors And Bank Group.**

10.     Although the Guaranty Litigation was stayed as against the Debtor upon the filing of the Debtor's bankruptcy case, the Bank Group and the Guarantors have remained embroiled in litigation in State Court.  As noted above, on or about November 16, 2010, the Guarantors filed a cross-complaint asserting various claims against the Bank Group.

11.     In the meantime, the Debtor and the Bank Group continued to clash throughout the pendency of the Debtor's bankruptcy case.

12.     Shortly after the commencement of the Debtor's bankruptcy case, the Debtor filed two (2) motions seeking Court authority to assume a number of purchase and sale agreements with various buyers for residential units in the Property and to consummate the sales of the units under the terms of such purchase and sale agreements, free and clear of all liens, claims, interests and encumbrances (the "Sale Motions").  The Bank Group as well as other parties in interest, including certain buyers, filed oppositions to the Sale Motions.  Ultimately, the Debtors withdrew the Sale Motions.

13.     Although the Debtor engaged in discussions with the Bank Group and the Official Committee of Unsecured Creditors appointed in the Debtor's case in an effort to formulate the terms of a consensual plan of reorganization, such discussions proved to be unfruitful.

14.     In the meantime, regardless of the extent to which the Property was occupied, the Debtor continued to incur operating expenses associated with the maintenance of the Property.  At that time, the Debtor had very limited cash flow from commercial leases and a few residential tenants.  In the Bank Group's oppositions to the Sale Motions, the Bank Group had suggested that renting the residential units in the Property on a short-term basis would be a more prudent solution

than selling the units on an individual basis, particularly given the depressed state of the real estate market at that time.  The Debtor determined, in the exercise of its sound business judgment and, in part, in response to the objection of the Bank Group to the Sale Motions, that renting residential units in the Property for a short term would allow the Debtor to continue to pursue longer term strategies for the restructuring of its financial affairs, including, without limitation, the sale or further lease of units, a combination thereof, or a sale of the Property, while at the same time generating cash flow to help offset the operating expenses being incurred on a monthly basis.

15.    Although the Debtor did not believe the Bank Group's consent to the Debtor's proposed leasing program was required, since the Debtor was attempting to cooperate with the Bank Group in formulating a mutually agreeable plan of reorganization, the Debtor approached the Bank Group in mid-June 2009 regarding the parameters of the Debtor's proposed short-term leasing program and sought the Bank Group's consent to such program.  When the Bank Group's consent to the proposed leasing program was not forthcoming, the Debtor filed an emergency motion on August 27, 2009 seeking authority to commence the program to permit the Debtor to enter into short-term residential leases (the "Leasing Program Motion").  The Court authorized the Debtor to commence its proposed short-term leading program over the Bank Group's objection, subject to the terms and conditions described in the order entered by the Court on September 8, 2009.

16.    Subsequently, the Debtor successfully negotiated and entered into residential leases for dozens of the units in the Property in accordance with the Debtor's leasing program.

17.    After the Bank Group declined to stipulate to a further continuance of the Section 362(d)(3) time period applicable to the Debtor's case, the Debtor filed its *"Chapter 11 Plan of Reorganization"* (the "Original Plan") on August 31, 2009.  The Original Plan provided for full payment of all allowed claims over time, with interest.

18.    On November 24, 2009, the Bank Group filed a motion seeking to dismiss the Debtor's bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the "Dismissal Motion") based on, among other alleged grounds, the Debtor's failure to file a

disclosure statement with respect to the Original Plan.  The hearing on the Dismissal Motion was originally calendared for December 15, 2009, but was subsequently continued by stipulation of the parties to February 2, 2010 at 10:00 a.m.  Pursuant to the foregoing stipulation, the Debtor agreed to file a disclosure statement with respect to the Original Plan, as well as a notice of the hearing on such disclosure statement, by December 28, 2009.

19.    On December 28, 2009, the Debtor filed a disclosure statement describing the Plan (the "Original Disclosure Statement").  The hearing on the Disclosure Statement was set for February 2, 2010 at 10:00 a.m., the same date and time as the hearing on the Dismissal Motion.

20.    One of the concerns that had been expressed by the Bank Group was the potential negative impact that a sale of only a few, but not a substantial number, of the units could have on the value of the Property and the remaining units in the Property.  Based on the Bank Group's concerns and the Bank Group's unwillingness to negotiate or otherwise discuss the terms of the Plan, among other reasons, the Debtor determined that conducting a public auction of a large proportion of the units in the Property, following an aggressive marketing campaign, would generate substantial interest in the Property and its units within the market, and result in the expeditious closing of sales on such units within a short span of time.

21.    Accordingly, on December 24, 2009, the Debtor filed a motion (the "Auction Motion"), on shortened time, seeking authority to employ Kennedy Wilson Auction Group Inc. ("KW"), a highly experienced auctioneer company, to publicize, market and offer approximately sixty five (65) units (but no fewer than fifty units and no more than seventy five units) in the Property for sale through a public auction.  Pursuant to the Auction Motion, the Debtor proposed to sell only those completed units that were located in the first eight floors of the Property.

22.    Again, the Bank Group opposed the Auction Motion.  Ultimately, the Court authorized the Debtor to conduct the public auction over the Bank Group's objection.  During the course of the hearing on the Auction Motion held on January 7, 2010, the Court invited all parties in interest, including the Debtor, the Bank Group and alleged holders of mechanics' liens (who had objected to the Auction Motion primarily on the limited grounds of lien priority and segregation of

sale proceeds), to negotiate a form of order regarding the Auction Motion.  During such negotiations, at the Bank Group's request, the Debtor agreed to include in the order provisions regarding the completion of construction in the Property.  Specifically, the order provided for the completion of construction of the ninth and tenth floors (as well as any work remaining on floors two through eight) of the Property on or before March 31, 2010, and the completion of construction of the remaining floors of the Property (other than the penthouse units in the Property, which would have incomplete finishes to be customized by buyers) on or before June 30, 2010. The Court entered the order granting the Auction Motion on January 8, 2010. [4]

23.     At the hearings on the Dismissal Motion and the Original Disclosure Statement held on February 2, 2010 at 10 a.m., the Court continued the hearings on both matters to March 16, 2010 at 10:00 a.m. to provide the Debtors with an opportunity to file updated versions of the Original Plan and Original Disclosure Statement.

24.     On February 26, 2010, the Debtor filed amended versions of the Original Plan and Original Disclosure Statement (the "Plan" and "Disclosure Statement") to reflect all of the developments in the Debtor's bankruptcy case since the filing of the Original Plan and to incorporate the impact of the then-anticipated public auction event on the Debtor's cash flow projections for the plan.

25.     At the continued hearings on March 16, 2010, the Court denied the Bank Group's Dismissal Motion and approved the Debtor's Disclosure Statement.  The Court also set a hearing to consider confirmation of the Plan for October 14, 2010 at 1:30 p.m. (with such hearing to be continued, to the extent necessary, to October 15, 2010 at 9:00 a.m. and October 21, 2010 at 1:30 p.m.) as well as various deadlines relating thereto.

---

[4] Despite the Debtor's efforts, the Debtor was unable to proceed with the auction due to its inability to obtain Fannie Mae approval to offer financing to prospective purchasers of the units in the Property.  Without the ability to offer financing to prospective purchasers, the auction would have had very little chance of success.  Accordingly, the Debtor determined that it was not in the best interests of the estate to go forward with the auction and undertake the expenses associated therewith.

26.     Objections to confirmation of the Plan were filed by the Bank Group and various alleged mechanic's lien creditors.  The objections to confirmation of the Plan asserted by the mechanic's lien creditors revolved primarily around the issue of lien priority.  Specifically, the mechanic's lien creditors alleged that their liens against the Property collectively had priority over the lien held by the Bank Group, and that their claims should be treated accordingly under the Plan.

27.     Subsequently, the Debtor began negotiating with the alleged mechanic's lien creditors (as a group) to address their various concerns about the Plan and to try to reach the terms of a consensual Plan and Disclosure Statement.  In the meantime, there was litigation pending before this Court between the Bank Group and a certified class of alleged mechanic's lien creditors to determine the respective priority of their liens (the "Lien Priority Litigation").

28.     Given the Debtor's belief that the resolution of the Lien Priority Litigation would pave the way for confirmation of a consensual (or mostly consensual) form of the Plan, the Debtor requested a continuance of the Plan confirmation hearings scheduled in October 2010 and a corresponding extension of the briefing and discovery deadlines relating thereto.  The mechanic's lien creditors who were involved in the Lien Priority Litigation (many of whom filed objections to confirmation of the Plan) supported the Debtor's request to continue the Plan confirmation hearings.

29.     Ultimately, the Court granted the Debtor's request for a continuance of the confirmation hearings.  Accordingly, on August 3, 2010, the Court entered an order (i) taking the confirmation hearings scheduled in October, 2010 off calendar, (ii) vacating the remaining deadlines for the filing of papers with respect to confirmation of the Plan, and (iii) setting a status conference on December 1, 2010 at 1:30 p.m. to consider the setting of further hearings and other matters pertaining to the Plan.

30.     At the status conference held on December 1, 2010, the parties to the Lien Priority Litigation indicated that they were in the process of completing their discovery and anticipated being ready for trial in February 2011.  The Court scheduled a trial for Phase 1 of the Lien Priority Litigation on February 10 and 11, 2011 and set briefing schedules relating thereto.

31.     Given that the objections to confirmation of the Plan raised by the mechanic's lien creditors revolved primarily around the issue of lien priority, the Debtor requested that the status conference regarding the Plan be continued for an additional approximately 120 days to provide the Debtor with sufficient time following the trial in the Lien Priority Litigation (scheduled in February, 2011) to formulate and file modified versions of the Plan and Disclosure Statement and, to the extent necessary, obtain approval of the modified Disclosure Statement.  The Court granted the Debtor's request and continued the status conference to March 2, 2011 at 1:30 p.m.

32.     Shortly after the December 1, 2010 status conference, the Bank Group filed a motion seeking relief from the automatic stay (the "Stay Relief Motion"), presumably to foreclose against the Property.  The Debtor filed a timely opposition to the Stay Relief Motion.  At the hearing on the Stay Relief Motion, held on February 1, 2011 at 10:00 a.m., the parties to the Lien Priority Litigation advised the Court that the Lien Priority Settlement (at least, in principle) had been reached between the Bank Group and the class of mechanic's lien creditors.  At the conclusion of such hearing, the Court continued the hearing on the Stay Relief Motion to May 3, 2011 at 10:00 a.m.[5] and ordered that the Debtor file further amended versions of the Plan and Disclosure Statement within thirty (30) days following the hearing on a motion to approve the Lien Priority Settlement.

33.     The motion for approval of the settlement between the Bank Group and the class of mechanic's lien claimants was filed on April 5, 2011 and set for hearing on May 3, 2011, resulting in a June 3, 2011 deadline for the Debtor to file its amended plan and disclosure statement.

34.     On April 5, 2011, the Bank Group filed a separate motion for an order requiring adequate protection (the "Adequate Protection Motion").  The Debtor filed a timely opposition to the Adequate Protection Motion.  The hearing on the Adequate Protection Motion was set for April 26, 2011 at 10:00 a.m. (the same date and time as the hearing on the Stay Relief Motion).

---

[5]  The hearing on the Stay Relief Motion was subsequently rescheduled by the Court to April 26, 2011 at 10:00 a.m.

35.     At the hearing held on April 26, 2011, the Court denied the Bank Group's Adequate Protection Motion and continued the hearing on the Bank Group's Stay Relief Motion to June 14, 2011 at 10:00 a.m.  At that time, the Court indicated that the Stay Relief Motion would be granted on June 14, 2011 if the Debtor did not file an amended plan and disclosure statement by June 3, 2011 or if the amended plan filed by the Debtor did not appear to be confirmable.

36.     Recognizing the risks, costs and delays associated with further litigation – both in the Guaranty Litigation and the Debtor's bankruptcy case – the Borrower Parties and the Bank Group agreed to participate in mediation before the Honorable Randall J. Newsome on May 3, 2011 so that the parties could meet face to face and attempt to reach a global resolution of their various disputes.  The mediation, which was conducted over an approximately sixteen hour period, was extremely successful and resulted in an agreement set forth in a term sheet signed by all of the parties (the "Term Sheet").

37.     Pursuant to the Term Sheet, the Bank Group was required to present a draft settlement agreement, which incorporated the terms of the Term Sheet, to the Borrower Parties by May 17, 2011, and the Borrower Parties, in turn, were required to respond to the draft settlement agreement within five business days (*i.e.*, by May 24, 2011).  All of the parties have complied with the foregoing requirements.  Attached as Exhibit "A" to the Declaration of M. Aaron Yashouafar annexed hereto (the "Yashouafar Declaration") is the *Settlement Agreement* by and among the Debtor, the Guarantors and the Bank Group, in substantially final form (the "Settlement Agreement").

38.     Pursuant to the Term Sheet, the parties are required to execute the Settlement Agreement by not later than June 3, 2011.  The Settlement Agreement therefore has an Effective Date of June 3, 2011.

**C.      Summary Of The Terms Of The Settlement Agreement.**

39.     The Settlement Agreement represents a global resolution of all of the disputes among the Debtor, the Guarantors and the Bank Group arising from and relating to the Guaranty Litigation, the Debtor's bankruptcy case, and all other claims that such parties may have against

each other in any capacity including, without limitation, any affiliate entities involved with the Property.  The salient terms of the Settlement Agreement are summarized below:[6]

a.  *Purchase and Sale of Loan Documents*.  The Bank Group agrees to sell and assign (the "Sale") the Loan Documents and the rights, claims and remedies associated therewith to a purchaser to be arranged by the Borrower Parties (the "Purchaser"), "as is," and with no representations or warranties other than as may be set forth in the Assignment of Claims (defined below), for a confidential sum agreed to by the Borrower Parties and the Bank Group (the "Purchase Price").

b.  *Closing of Sale*.  Subject to the approval of the Court, the Sale must close and the Purchase Price must be paid to the Bank Group on or before the earlier of (i) September 1, 2011, and (ii) the first business day which is at least 90 calendar days after the Effective Date of the Settlement Agreement (the "Payment Date").

c.  *Assignment of Claims*.  No later than two (2) business days before the Payment Date identified by the Purchaser, the Bank Group shall deliver to an escrow agent approved by both the Bank Group and the Purchaser (the "Escrow Agent") an assignment of claims in the form to be attached as an exhibit to the Settlement Agreement (the "Assignment of Claims").  The Assignment of Claims shall be released to the Purchaser at the closing of the Sale on the Payment Date, and returned to the Bank Group if the conditions to the Sale do not occur.  The Assignment of Claims is to effectuate the transfer of certain claims against the Borrower Parties to the Purchaser on the terms and conditions set forth therein.  The Assignment of Claims shall specifically include any claims related to that certain Litigation Indemnity Agreement dated July 25, 2008, together with any deposit and other accounts at Bank of America N.A., or any other member of the Bank Group, in the name of Milbank Holding Corp. ("Milbank") for the benefit of the Debtor, or any of the Borrower Parties for the benefit of the Debtor, including, without limitation, any debtor in

---

[6] In the event of any inconsistency between the description of the Settlement Agreement and the terms of the Settlement Agreement itself, the terms of the Settlement Agreement shall govern

1    possession accounts in the name of the Debtor.  The Assignment of Claims shall also

2    provide, among other things, that pursuant to and to the extent permitted by applicable law

3    and the terms of any such policies, the Purchaser will acquire the rights of the Bank Group,

4    if any, to any policies of title insurance covering the Deeds of Trust and the Property.

5        d.        *Purchaser Deposits Into Escrow*.  Within ten (10) calendar days of the

6    Effective Date (so assuming an Effective Date of June 3, 2011, by June 13, 2011), the

7    Purchaser must deposit with the Escrow Agent the sum of $5,000,000 (the "Initial

8    Deposit") to be applied, on the Payment Date, towards the Purchase Price.  Within forty

9    (40) calendar days of the Effective Date (so assuming an Effective Date of June 3, 2011, by

10   July 13, 2011), the Purchaser must deposit with the Escrow Agent an additional sum of

11   $10,000,000, for a total deposit of $15,000,000 to be applied, on the Payment Date,

12   towards the Purchase Price.  Within seventy (70) days of the Effective Date (so assuming

13   an Effective Date of June 3, 2011, by August 12, 2011), the Purchaser must deposit with

14   the Escrow Agent an additional sum of $20,000,000, for a total deposit of $35,000,000 to

15   be applied, on the Payment Date, towards the Purchase Price.  On or before the Payment

16   Date, the Purchaser must deposit additional sums necessary to have the full Purchase Price

17   on deposit with the Escrow Agent.

18       e.        *Consequences Upon Default in Payment of Deposits*.  If any of the deposits

19   required under the Settlement Agreement are not timely deposited with the Escrow Agent,

20   then the Bank Group may send a notice of default by electronic means to counsel for the

21   Borrower Parties.  If any of the required deposits are not made within two (2) business days

22   following the notice of default, then pursuant to a stipulation entered into between the Bank

23   Group and the Debtor in the form to be attached as an exhibit to the Settlement Agreement

24   (the "362 Stipulation") and the Bankruptcy Court order approving the Settlement

25   Agreement, the Bank Group will immediately have *in rem* relief from the automatic stay on

26   its Collateral without further notice, hearing or order of the Bankruptcy Court and with no

27

28

limitations on such relief.  If, for any reason, the Sale is not consummated on or before the Payment Date, all deposited funds will be refunded to the Purchaser.

f.    *If Sale Is Not Consummated*.  If, for any reason, either the Purchaser fails to make any deposit timely, or the Sale is not consummated timely, and conditioned upon Bankruptcy Court Approval (as defined in the Settlement Agreement), then each of the following shall occur:

(i)    **Return of Assignment of Claims.**  The Assignment of Claims shall be returned immediately to the Bank Group.

(ii)    **Stipulation for Relief From Stay.**  Pursuant to the 362 Stipulation and the Bankruptcy Court order approving the Settlement Agreement, the Bank Group will immediately have *in rem* relief from the automatic stay on its Collateral without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief.

(iii)    **Dismissal of Guarantors from Guaranty Litigation**.  The Escrow Agent shall file in the Guaranty Litigation, a request for dismissal without prejudice of all causes of action against the Guarantors in the form to be attached as an exhibit to the Settlement Agreement.

(iv)    **Covenant Not to Sue**.  The Escrow Agent shall deliver to the Borrower Parties the covenant not to sue in the form to be attached as an exhibit to the Settlement Agreement.

(v)    **Stipulation for Appointment of a Receiver**.  The stipulation for the appointment of a receiver to take control of the Property (the "Receivership Stipulation") in the form to be attached as an exhibit to the Settlement Agreement shall be filed, *ex parte*, in the Guaranty Litigation, and a receiver shall be appointed, *ex parte*, immediately.  The receiver shall take possession and control over the Collateral (other than deposit or other accounts with Bank of America N.A.) pursuant to the terms of the Receivership Stipulation. Each of the Borrower Parties

agrees to cooperate with the receiver and the Bank Group on all matters, including matters concerning mechanic's liens, title of the Property and the prompt and orderly transition of management of the Property to the receiver, including the turnover of all Collateral accounts and tenant deposits.

g.      *Extension of Deadline for Debtor to File Plan*.  The time within which the Debtor is required to file its amended Plan is extended to no later than August 31, 2011, subject, however, to further extensions, if any, by mutual agreement of the parties to the Settlement Agreement.

h.      *Stay of Litigation*.  Conditioned upon there being no default under the terms of the Settlement Agreement, for ninety (90) days after the execution of the Settlement Agreement, a stay shall be effective as to the following:  (i) the Guaranty Litigation in its entirety;  and (ii) any scheduled judgment debtor exams of Milbank Holding Corp. ("Milbank") or enforcement of the judgment against Milbank.  Except as provided in paragraph 6 of the Settlement Agreement, nothing in the Settlement Agreement shall affect any rights, obligations or remedies available to Bank of America N.A., with respect to any credit extended to Milbank pursuant to the loan documents related to that credit.

i.      *Mechanic's Liens*.  On the Effective Date of the Settlement Agreement, all of the insiders and affiliates of the Debtor set forth on an exhibit to be attached to the Settlement Agreement shall deliver to the Bank Group fully executed lien releases in the form to be attached as an exhibit to the Settlement Agreement, evidencing that none shall assert a mechanic's lien against the Property.  On and after the Effective Date, if no Sale is consummated timely, then the Borrower Parties will cooperate in resolving any issues regarding the remaining mechanic's lien claims asserted by third parties.

j.      *Dismissal of Guaranty Litigation*.  On the Payment Date, and on condition that the Sale closes, the Bank Group shall execute and file in the Guaranty Litigation a request for dismissal, without prejudice, of the entire Guaranty Litigation.

k.    *Release by Debtor*.  The Debtor, on its behalf and on behalf of its respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, owners, members, managers, affiliates, professionals, trustees, and representatives will release and forever discharge all claims, rights, demands, damages, actions, causes of action, costs, expenses, and suits of law or in equity which they have held, now hold or hereafter may hold against the Bank Group members and each of their respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, owners, shareholders, members, managers, affiliates, professionals, attorneys, trustees, and representatives that arise in or are related to the Loan Documents or were or could have been alleged in the Guaranty Litigation (other than obligations arising under the Settlement Agreement).

l.    *Bankruptcy Court Approval*.  The Debtor is required to file a motion for approval of the Settlement Agreement (including the 362 Stipulation) within five business days following the Effective Date.

40.    The Debtor has identified and is currently working with a third party purchaser, Greystar GP, LLC or its designee ("Greystar" or the "Purchaser"), which has agreed to acquire the Bank Group's interests in the Loan Documents in accordance with the terms of the Settlement Agreement and to support the Debtor's efforts to consummate a financial restructuring of the Debtor's indebtedness and other obligations through a plan of reorganization jointly sponsored by the Debtor, the Purchaser and Roosevelt Lofts, Inc., the owner of 100% of the membership interests in the Debtor ("RLI").[7]

41.    As noted above, if the Purchaser does not make the Initial Deposit of $5,000,000 by Monday, June 13, 2011, the Debtor will be in default of the Settlement Agreement and, if such default is not cured within two (2) business days of notice thereof, the Bank Group will

_____

[7]  The Debtor has filed concurrently herewith, or will file shortly, a motion for approval of that certain *Plan Support Agreement* entered into by and among the Debtor, RLI, the Purchaser and the Bank Group.

immediately have *in rem* relief from the automatic stay on the Collateral. The Purchaser has indicated it is not willing to pay the Initial Deposit until the Debtor first obtains an order of the Bankruptcy Court approving, and authorizing the Debtor to enter into, the Settlement Agreement. In light of the grave consequences to the Debtor's estate if the Initial Deposit is not timely made, and the indisputable benefits to the estate if the Settlement Agreement is approved and implemented, the Debtor has filed concurrently herewith an *ex parte* application for an order shortening time on notice for hearing on the Motion, pursuant to which **the Debtor is seeking to have the Motion heard as soon as practicable for the Court, but in no event later than June 13, 2011**.

## II.    DISCUSSION

**A.    The Agreement Reflects The Sound Business Judgment Of The Debtor, Is Fair, Reasonable And Beneficial To The Estate, And Should Be Approved.**

The authority granting a debtor in possession the ability to compromise a controversy or agree to a settlement is set forth in the Federal Rules of Bankruptcy Procedure 9019(a), which provides in pertinent part that "[o]n motion by the [debtor in possession] and after hearing on notice to creditors . . ., the court may approve a compromise or settlement." The decision of whether a compromise should be accepted or rejected lies within the sound discretion of the court. *In re Carson*, 82 B.R. 847, 852 (Bankr. S.D. Ohio 1987); *In re Hydronic Enterprise, Inc.*, 58 B.R. 363, 365 (Bankr. D.R.I. 1986); *In re Mobile Air Drilling Co., Inc.*, 53 B.R. 605, 607 (Bankr. N.D. Ohio 1985); *Knowles v. Putterbaugh (In re Hallet)*, 33 B.R. 564, 565 (Bankr. D.Me. 1983).

The Ninth Circuit Court of Appeals has determined that, in considering a proposed compromise, the court must evaluate (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant to it; and (iv) the paramount interests of creditors and a deference to their views. *In re A & C Properties*, 764 F.2d 1377, 1381 (9th Cir. 1986). *See also In re Lion Capital Group*, 49 B.R. 163 (Bankr. S.D.

1   N.Y. 1985); *Matter of Marshall*, 33 B.R. 42 (Bankr. D. Conn. 1983).

2          A court should not substitute its own judgment for the judgment of the trustee or the

3   debtor in possession.  *Matter of Carla Leather, Inc.,* 44 B.R. 457, 465 (Bankr. S.D. N.Y. 1984).

4   "It is sufficient that, after apprising itself of all facts necessary for an intelligent and objective

5   opinion concerning the claim's validity, the court determines that either (1) the claim has a

6   'substantial foundation' and is not 'clearly invalid as a matter of law,' or (2) the outcome of the

7   claim's litigation is 'doubtful'."  *Matter of Walsh Const., Inc.*, 669 F.2d 1325, 1328 (9th Cir.

8   1982).  A court, in reviewing a proposed settlement, "is not to decide the numerous questions of

9   law and fact but rather to canvass the issues and see whether the settlement 'fall[s] below the

10  lowest point in the range of reasonableness.'"  *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2nd

11  Cir. 1983), *accord, Newman v. Stein*, 464 F.2d 689, 693 (2nd Cir. 1972).  The court should not

12  conduct a "mini-trial" on the merits of the underlying cause of action.  *Matter of Walsh Const.,*

13  *Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1982) ; *In re Blairu*, 538 F.2d 849 (9th Cir. 1976).

14         The Debtor submits that the Settlement Agreement comports with the *A & C Properties*

15  standards set forth above and is in the best interests of the Debtor's bankruptcy estate and all of

16  its creditors.  The four factors, pursuant to *A & C Properties,* to be considered in reaching the

17  aforementioned conclusion, are as follows:

18         1.      The probability of success in the litigation.

19         The proposed Settlement Agreement resolves numerous disputes and litigation among the

20  Debtor, the Guarantors and the Bank Group that have been going on for at least the last 2 years,

21  and paves the way for the filing of a plan of reorganization that will provide for full payment of

22  allowed claims (or other treatment acceptable to the claimant), and should have the support of

23  most, if not all, of the constituencies in the Debtor's case.  This will allow the Debtor to exit

24  from bankruptcy in an expedient and cost-effective manner.  The terms and conditions of the

25  Settlement Agreement were vigorously negotiated, at arms' length, during the course of a sixteen

26  hour mediation, and represent what the Debtor believes is a fair and reasonable compromise of

27  the parties' various disputes (both in the bankruptcy case and in the Guaranty Litigation).  Given

28

their history in this bankruptcy case, there is no question that, without the Settlement Agreement, the Debtor and the Bank Group will continue battling with each other, particularly with respect to the confirmation of any amended plan of reorganization that the Debtor may file.  While the Debtor is confident that it can formulate and confirm an amended plan of reorganization (and get past the Bank Group's Stay Relief Motion), even over the objections of the Bank Group, the confirmation of a "cramdown" plan is by no means certain and could be extremely time-consuming and costly to achieve.

2.      The difficulties in collection.

Since the Debtor is not seeking a recovery against the Bank Group, this consideration does not factor into the decision to enter into the Settlement Agreement.

3.      The complexity of the litigation involved and the expense, inconvenience and delay attendant to it.

Any further litigation of the Debtor's disputes with the Bank Group, particularly as they relate to the Stay Relief Motion and confirmation of an amended plan of reorganization (especially a "cramdown" plan), is certain to be costly and time-consuming, and would quickly deplete the estate's limited resources with no guaranteed benefit to creditors.  Similarly, the continuance of the Guaranty Litigation will force the Guarantors (as well as the Bank Group) to spend significant time and resources litigating their disputes in State Court, which would provide no benefit to the Debtor's estate and would instead, divert the attention of the Guarantors and the Bank Group away from the Debtor's reorganization efforts.  The Settlement Agreement will halt all ongoing litigation among the parties (and the expense and delay associated with such litigation), will essentially take the Bank Group out of the Debtor's bankruptcy case, thereby eliminating a significant obstacle to the confirmation of a plan of reorganization in the Debtor's case, will allow the Debtor to formulate and pursue confirmation of a plan of reorganization with the full support and backing of the Purchaser (as the primary secured creditor in the Debtor's case) and potentially other creditors and parties in interest in the case, and will allow the Debtor to successfully emerge from its bankruptcy case quickly and cost-effectively.

4.    The interests of creditors.

As noted above, the Settlement Agreement will result in the halt of all litigation involving the Debtor, the Guarantors and the Bank Group, will eliminate the immediate threat of foreclosure against the Property, and will potentially pave the way for a successful and efficient reorganization in the Debtor's bankruptcy case.  Under the circumstances, the Debtor believes that the benefit to its estate is significant, and the interests of creditors are best served by the approval of the Settlement Agreement.

Based on the foregoing, the Debtor respectfully submits that the Settlement Agreement is in the best interests of the estate, and requests that the Court approve the Motion.

### III.    CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order (i) finding that notice of the Motion was adequate and appropriate under the circumstances; (ii) granting the Motion in its entirety; (iii) approving the Settlement Agreement and all related documents in substantially the forms attached as Exhibit "A" to the Yashouafar Declaration annexed hereto; (iv) authorizing the Debtor to take all steps necessary to consummate the terms and conditions of the Settlement Agreement; and (v) granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated:  May 27, 2011                    ROOSEVELT LOFTS, LLC


By:_____
          DAVID L. NEALE
          JULIET Y. OH
          LEVENE, NEALE, BENDER, YOO
              & BRILL L.L.P.
          Attorneys for Chapter 11 Debtor and
          Debtor in Possession

### DECLARATION OF M. AARON YASHOUAFAR

I, M. Aaron Yashouafar, hereby declare as follows:

1.     I am over 18 years of age. I am the President of Roosevelt Lofts, Inc., which is the Manager of Roosevelt Lofts, LLC, a Delaware limited liability company, debtor and debtor in possession herein (the "Debtor"). Accordingly, I am familiar with virtually all aspects of the Debtor's real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles which was converted by the Debtor into 222 upscale condominium residences plus commercial retail space and parking (the "Property"). I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.     I submit this declaration in support of the Debtor's motion (the "Motion") for the entry of an order (A) authorizing the settlement reached by and among the Debtor, Solyman Yashouafar, Simon Barlava and me (collectively, the "Guarantors," and together with the Debtor, the "Borrower Parties"), and Bank of America, N.A., individually and as administrative agent for a group of lenders[8] (the "Bank Group"); and (B) approving the terms and conditions of, and authorizing the Debtor to enter into and implement the terms of, that certain *Settlement Agreement* (the "Settlement Agreement") attached as Exhibit "A" hereto.

3.     On April 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession.

4.     The Debtor is the owner of the Property.

5.     On or about March 9, 2006, the Debtor entered into a construction loan agreement (the "Loan Agreement") with Bank of America, N.A., individually and as administrative agent for a group of lenders[9] (the "Bank Group"), pursuant to which the Debtor obtained a loan from

---

[8] The Bank Group is comprised of Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

[9] The Bank Group is comprised of Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

the Bank Group in the original principal sum of $78,840,375 (the "Loan").  On or about March 9, 2006, the Debtor executed a Deed of Trust Note in the original principal sum of $78,840,375 (the "Note").  The Loan was obtained by the Debtor for the purpose of converting the Property into 222 individually subdivided, luxury residential condominium units, a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Property.

6.    The Loan Agreement and the Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "Fee Deed of Trust") and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "Leasehold Deed of Trust," and together with the Fee Deed of Trust, the "Deeds of Trust").  The Deeds of Trust encumber the Property, including an absolute assignment of all rents, issues and profits generated from the operation of the Property (collectively, the "Collateral").

7.    In further consideration of the Bank Group's Loan and extension of credit, on or about March 9, 2006, each of the Guarantors agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "Guaranty").  The Loan Agreement, the Note, the Deeds of Trust and the Guaranty, together with all modifications thereto and all other loan and security documents and agreements between the parties related to the Collateral are collectively referred to as the "Loan Documents."

8.    On or about December 30, 2008, the Bank Group issued a notice of default to the Borrower Parties, contending that each of the Borrower Parties had defaulted on their obligations to the Bank Group under the Loan Documents.  On March 23, 20098, the Bank Group caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office.

24

9.      On or about April 3, 2009, the Bank Group filed a complaint against the Debtor and the Guarantors in the Superior Court of the State of California for the County of Los Angeles ("State Court") for, among other things, breach of the Guaranty, appointment of a receiver and judicial foreclosure on its Deeds of Trust, thereby commencing that certain case bearing the number SC 102472.  The Borrower Parties dispute the Bank Group's contentions.  Thereafter, the Guarantors filed a cross-complaint asserting various counterclaims against the Bank Group. The litigation in State Court relating to the claims asserted by the Bank Group in its complaint and the counterclaims asserted by the Guarantors in their cross-complaint is collectively referred to herein as the "Guaranty Litigation."

10.      Days after filing its complaint in State Court, the Bank Group filed an *ex parte* application with the State Court for the appointment of a receiver.

11.      As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code to have the ability and opportunity to close escrow on the residential units that were then under contract, to market and sell the remaining residential units in the Property, and to complete construction on the Property, all of which would provide the Debtor with the ability to restructure and repay the Loan and its other debts for the benefit of all creditors.

12.      Although the Guaranty Litigation was stayed as against the Debtor upon the filing of the Debtor's bankruptcy case, the Bank Group and the Guarantors have remained embroiled in litigation in State Court.  As noted above, on or about November 16, 2010, the Guarantors filed a cross-complaint asserting various claims against the Bank Group.

13.      In the meantime, the Debtor and the Bank Group continued to clash throughout the pendency of the Debtor's bankruptcy case.

14.      Shortly after the commencement of the Debtor's bankruptcy case, the Debtor filed two (2) motions seeking Court authority to assume a number of purchase and sale agreements with various buyers for residential units in the Property and to consummate the sales of the units under the terms of such purchase and sale agreements, free and clear of all liens, claims, interests and encumbrances (the "Sale Motions").  The Bank Group as well as other parties in interest,

including certain buyers, filed oppositions to the Sale Motions.    Ultimately, the Debtors withdrew the Sale Motions.

15.    Although the Debtor engaged in discussions with the Bank Group and the Official Committee of Unsecured Creditors appointed in the Debtor's case in an effort to formulate the terms of a consensual plan of reorganization, such discussions proved to be unfruitful.

16.    In the meantime, regardless of the extent to which the Property was occupied, the Debtor continued to incur operating expenses associated with the maintenance of the Property. At that time, the Debtor had very limited cash flow from commercial leases and a few residential tenants.    In the Bank Group's oppositions to the Sale Motions, the Bank Group had suggested that renting the residential units in the Property on a short-term basis would be a more prudent solution than selling the units on an individual basis, particularly given the depressed state of the real estate market at that time.    The Debtor determined, in the exercise of its sound business judgment and, in part, in response to the objection of the Bank Group to the Sale Motions, that renting residential units in the Property for a short term would allow the Debtor to continue to pursue longer term strategies for the restructuring of its financial affairs, including, without limitation, the sale or further lease of units, a combination thereof, or a sale of the Property, while at the same time generating cash flow to help offset the operating expenses being incurred on a monthly basis.

17.    Although the Debtor did not believe the Bank Group's consent to the Debtor's proposed leasing program was required, since the Debtor was attempting to cooperate with the Bank Group in formulating a mutually agreeable plan of reorganization, the Debtor approached the Bank Group in mid-June 2009 regarding the parameters of the Debtor's proposed short-term leasing program and sought the Bank Group's consent to such program.    When the Bank Group's consent to the proposed leasing program was not forthcoming, the Debtor filed an emergency motion on August 27, 2009 seeking authority to commence the program to permit the Debtor to enter into short-term residential leases (the "Leasing Program Motion").    The Court authorized the Debtor to commence its proposed short-term leading program over the Bank Group's

objection, subject to the terms and conditions described in the order entered by the Court on September 8, 2009.

18.     Subsequently, the Debtor successfully negotiated and entered into residential leases for dozens of the units in the Property in accordance with the Debtor's leasing program.

19.     After the Bank Group declined to stipulate to a further continuance of the Section 362(d)(3) time period applicable to the Debtor's case, the Debtor filed its *"Chapter 11 Plan of Reorganization"* (the "Original Plan") on August 31, 2009.  The Original Plan provided for full payment of all allowed claims over time, with interest.

20.     On November 24, 2009, the Bank Group filed a motion seeking to dismiss the Debtor's bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the "Dismissal Motion") based on, among other alleged grounds, the Debtor's failure to file a disclosure statement with respect to the Original Plan.  The hearing on the Dismissal Motion was originally calendared for December 15, 2009, but was subsequently continued by stipulation of the parties to February 2, 2010 at 10:00 a.m.  Pursuant to the foregoing stipulation, the Debtor agreed to file a disclosure statement with respect to the Original Plan, as well as a notice of the hearing on such disclosure statement, by December 28, 2009.

21.     On December 28, 2009, the Debtor filed a disclosure statement describing the Plan (the "Original Disclosure Statement").  The hearing on the Disclosure Statement was set for February 2, 2010 at 10:00 a.m., the same date and time as the hearing on the Dismissal Motion.

22.     One of the concerns that had been expressed by the Bank Group was the potential negative impact that a sale of only a few, but not a substantial number, of the units could have on the value of the Property and the remaining units in the Property.  Based on the Bank Group's concerns and the Bank Group's unwillingness to negotiate or otherwise discuss the terms of the Plan, among other reasons, the Debtor determined that conducting a public auction of a large proportion of the units in the Property, following an aggressive marketing campaign, would generate substantial interest in the Property and its units within the market, and result in the expeditious closing of sales on such units within a short span of time.

23.     Accordingly, on December 24, 2009, the Debtor filed a motion (the "Auction Motion"), on shortened time, seeking authority to employ Kennedy Wilson Auction Group Inc. ("KW"), a highly experienced auctioneer company, to publicize, market and offer approximately sixty five (65) units (but no fewer than fifty units and no more than seventy five units) in the Property for sale through a public auction.  Pursuant to the Auction Motion, the Debtor proposed to sell only those completed units that were located in the first eight floors of the Property.

24.     Again, the Bank Group opposed the Auction Motion.  Ultimately, the Court authorized the Debtor to conduct the public auction over the Bank Group's objection.  During the course of the hearing on the Auction Motion held on January 7, 2010, which I participated in, the Court invited all parties in interest, including the Debtor, the Bank Group and alleged holders of mechanics' liens (who had objected to the Auction Motion primarily on the limited grounds of lien priority and segregation of sale proceeds), to negotiate a form of order regarding the Auction Motion.  During such negotiations, at the Bank Group's request, the Debtor agreed to include in the order provisions regarding the completion of construction in the Property.  Specifically, the order provided for the completion of construction of the ninth and tenth floors (as well as any work remaining on floors two through eight) of the Property on or before March 31, 2010, and the completion of construction of the remaining floors of the Property (other than the penthouse units in the Property, which would have incomplete finishes to be customized by buyers) on or before June 30, 2010.  The Court entered the order granting the Auction Motion on January 8, 2010. [10]

25.     At the hearings on the Dismissal Motion and the Original Disclosure Statement held on February 2, 2010 at 10 a.m., which I personally attended, the Court continued the

---

[10] Despite the Debtor's efforts, the Debtor was unable to proceed with the auction due to its inability to obtain Fannie Mae approval to offer financing to prospective purchasers of the units in the Property.  Without the ability to offer financing to prospective purchasers, the auction would have had very little chance of success.  Accordingly, the Debtor determined that it was not in the best interests of the estate to go forward with the auction and undertake the expenses associated therewith.

28

hearings on both matters to March 16, 2010 at 10:00 a.m. to provide the Debtors with an opportunity to file updated versions of the Original Plan and Original Disclosure Statement.

26.    On  February 26, 2010, the Debtor filed amended versions of the Original Plan and Original Disclosure Statement (the "Plan" and "Disclosure Statement") to reflect all of the developments in the Debtor's bankruptcy case since the filing of the Original Plan and to incorporate the impact of the then-anticipated public auction event on the Debtor's cash flow projections for the plan.

27.    At the continued hearings on March 16, 2010, which I attended, the Court denied the Bank Group's Dismissal Motion and approved the Debtor's Disclosure Statement.  The Court also set a hearing to consider confirmation of the Plan for October 14, 2010 at 1:30 p.m. (with such hearing to be continued, to the extent necessary, to October 15, 2010 at 9:00 a.m. and October 21, 2010 at 1:30 p.m.) as well as various deadlines relating thereto.

28.    Objections to confirmation of the Plan were filed by the Bank Group and various alleged mechanic's lien creditors.  The objections to confirmation of the Plan asserted by the mechanic's lien creditors revolved primarily around the issue of lien priority.  Specifically, the mechanic's lien creditors alleged that their liens against the Property collectively had priority over the lien held by the Bank Group, and that their claims should be treated accordingly under the Plan.

29.    Subsequently, the Debtor began negotiating with the alleged mechanic's lien creditors (as a group) to address their various concerns about the Plan and to try to reach the terms of a consensual Plan and Disclosure Statement.  In the meantime, there was litigation pending before this Court between the Bank Group and a certified class of alleged mechanic's lien creditors to determine the respective priority of their liens (the "Lien Priority Litigation").

30.    Given the Debtor's belief that the resolution of the Lien Priority Litigation would pave the way for confirmation of a consensual (or mostly consensual) form of the Plan, the Debtor requested a continuance of the Plan confirmation hearings scheduled in October 2010 and a corresponding extension of the briefing and discovery deadlines relating thereto.    The

mechanic's lien creditors who were involved in the Lien Priority Litigation (many of whom filed objections to confirmation of the Plan) supported the Debtor's request to continue the Plan confirmation hearings.

31.    Ultimately, the Court granted the Debtor's request for a continuance of the confirmation hearings.  Accordingly, on August 3, 2010, the Court entered an order (i) taking the confirmation hearings scheduled in October, 2010 off calendar, (ii) vacating the remaining deadlines for the filing of papers with respect to confirmation of the Plan, and (iii) setting a status conference on December 1, 2010 at 1:30 p.m. to consider the setting of further hearings and other matters pertaining to the Plan.

32.    At the status conference held on December 1, 2010, the parties to the Lien Priority Litigation indicated that they were in the process of completing their discovery and anticipated being ready for trial in February 2011.  The Court scheduled a trial for Phase 1 of the Lien Priority Litigation on February 10 and 11, 2011 and set briefing schedules relating thereto.

33.    Given that the objections to confirmation of the Plan raised by the mechanic's lien creditors revolved primarily around the issue of lien priority, the Debtor requested that the status conference regarding the Plan be continued for an additional approximately 120 days to provide the Debtor with sufficient time following the trial in the Lien Priority Litigation (scheduled in February, 2011) to formulate and file modified versions of the Plan and Disclosure Statement and, to the extent necessary, obtain approval of the modified Disclosure Statement.  The Court granted the Debtor's request and continued the status conference to March 2, 2011 at 1:30 p.m.

34.    Shortly after the December 1, 2010 status conference, the Bank Group filed a motion seeking relief from the automatic stay (the "Stay Relief Motion"), presumably to foreclose against the Property.  The Debtor filed a timely opposition to the Stay Relief Motion. At the hearing on the Stay Relief Motion, held on February 1, 2011 at 10:00 a.m., the parties to the Lien Priority Litigation advised the Court that the Lien Priority Settlement (at least, in principle) had been reached between the Bank Group and the class of mechanic's lien creditors. At the conclusion of such hearing, the Court continued the hearing on the Stay Relief Motion to

May 3, 2011 at 10:00 a.m.[11] and ordered that the Debtor file further amended versions of the Plan and Disclosure Statement within thirty (30) days following the hearing on a motion to approve the Lien Priority Settlement.

35.    The motion for approval of the settlement between the Bank Group and the class of mechanic's lien claimants was filed on April 5, 2011 and set for hearing on May 3, 2011, resulting in a June 3, 2011 deadline for the Debtor to file its amended plan and disclosure statement.

36.    On April 5, 2011, the Bank Group filed a separate motion for an order requiring adequate protection (the "Adequate Protection Motion").  The Debtor filed a timely opposition to the Adequate Protection Motion.  The hearing on the Adequate Protection Motion was set for April 26, 2011 at 10:00 a.m. (the same date and time as the hearing on the Stay Relief Motion).

37.    At the hearing held on April 26, 2011, which I attended, the Court denied the Bank Group's Adequate Protection Motion and continued the hearing on the Bank Group's Stay Relief Motion to June 14, 2011 at 10:00 a.m.  At that time, the Court indicated that the Stay Relief Motion would be granted on June 14, 2011 if the Debtor did not file an amended plan and disclosure statement by June 3, 2011 or if the amended plan filed by the Debtor did not appear to be confirmable.

38.    Recognizing the risks, costs and delays associated with further litigation – both in the Guaranty Litigation and the Debtor's bankruptcy case – the Borrower Parties and the Bank Group agreed to participate in mediation before the Honorable Randall J. Newsome on May 3, 2011 so that the parties could meet face to face and attempt to reach a global resolution of their various disputes.  The mediation, which I participated in and which was conducted over an approximately sixteen hour period, was extremely successful and resulted in an agreement set forth in a term sheet signed by all of the parties (the "Term Sheet").

---

[11]  The hearing on the Stay Relief Motion was subsequently rescheduled by the Court to April 26, 2011 at 10:00 a.m.

39.     Pursuant to the Term Sheet, the Bank Group was required to present a draft settlement agreement, which incorporated the terms of the Term Sheet, to the Borrower Parties by May 17, 2011, and the Borrower Parties, in turn, were required to respond to the draft settlement agreement within five business days (*i.e.*, by May 24, 2011).  All of the parties have complied with the foregoing requirements.  Attached as Exhibit "A" hereto is the *Settlement Agreement* by and among the Debtor, the Guarantors and the Bank Group, in substantially final form (the "Settlement Agreement").

40.     Pursuant to the Term Sheet, the parties are required to execute the Settlement Agreement by not later than June 3, 2011.  The Settlement Agreement therefore has an Effective Date of June 3, 2011.

41.     I believe that the Settlement Agreement represents a global resolution of all of the disputes among the Debtor, the Guarantors and the Bank Group arising from and relating to the Guaranty Litigation, the Debtor's bankruptcy case, and all other claims that such parties may have against each other in any capacity including, without limitation, any affiliate entities involved with the Property.  The Settlement Agreement provides for, among other things, the possible purchase and sale of the Loan Documents and the rights, claims and remedies associated therewith (the "Sale") to a purchaser to be arranged by the Borrower Parties (the "Purchaser") for a confidential sum agreed to by the Borrower Parties and the Bank Group (the "Purchase Price").

42.     The Debtor has identified and is currently working with a third party purchaser, Greystar GP, LLC or its designee ("Greystar" or the "Purchaser"), which has agreed to acquire the Bank Group's interests in the Loan Documents in accordance with the terms of the Settlement Agreement and to support the Debtor's efforts to consummate a financial restructuring of the Debtor's indebtedness and other obligations through a plan of reorganization jointly sponsored by the Debtor, the Purchaser and Roosevelt Lofts, Inc., the owner of 100% of the membership interests in the Debtor ("RLI").

43.     I believe that the Settlement Agreement resolves numerous disputes and litigation among the Debtor, the Guarantors and the Bank Group that have been going on for at least the last 2 years, and paves the way for the filing of a plan of reorganization that will provide for full payment of allowed claims (or other treatment acceptable to the claimant), and should have the support of most, if not all, of the constituencies in the Debtor's case.  This will allow the Debtor to exit from bankruptcy in an expedient and cost-effective manner.  The terms and conditions of the Settlement Agreement were vigorously negotiated, at arms' length, during the course of a sixteen hour mediation, and represent what I believe is a fair and reasonable compromise of the parties' various disputes (both in the bankruptcy case and in the Guaranty Litigation).

44.     Given their history in this bankruptcy case, there is no question that, without the Settlement Agreement, the Debtor and the Bank Group will continue battling with each other, particularly with respect to the confirmation of any amended plan of reorganization that the Debtor may file.  While I am confident that the Debtor can formulate and confirm an amended plan of reorganization (and get past the Bank Group's Stay Relief Motion), even over the objections of the Bank Group, the confirmation of a "cramdown" plan is by no means certain. Moreover, any further litigation of the Debtor's disputes with the Bank Group, particularly as they relate to the Stay Relief Motion and confirmation of an amended plan of reorganization (especially a "cramdown" plan), is certain to be costly and time-consuming, and would quickly deplete the estate's limited resources with no guaranteed benefit to creditors.

45.     Similarly, the continuance of the Guaranty Litigation will force the Guarantors (as well as the Bank Group) to spend significant time and resources litigating their disputes in State Court, which would provide no benefit to the Debtor's estate and would instead, divert the attention of the Guarantors and the Bank Group away from the Debtor's reorganization efforts.

46.     On the other hand, the Settlement Agreement will halt all ongoing litigation among the parties (and the expense and delay associated with such litigation), will essentially take the Bank Group out of the Debtor's bankruptcy case, thereby eliminating a significant obstacle to the confirmation of a plan of reorganization in the Debtor's case, will allow the

Debtor to formulate and pursue confirmation of a plan of reorganization with the full support and backing of the Purchaser (as the primary secured creditor in the Debtor's case) and potentially other creditors and parties in interest in the case, and will allow the Debtor to successfully emerge from its bankruptcy case quickly and cost-effectively.   Under the circumstances, I believe that the benefit to the Debtor's estate is significant, and the interests of creditors are best served by the approval of the Settlement Agreement.

47.     Under the terms of the Settlement Agreement, the Purchaser is required, among other things, to deposit the sum of $5,000,000 (the "Initial Deposit") with an approved escrow agent by Monday, June 13, 2011 (*i.e.*, within ten calendar days of the Effective Date of the Settlement Agreement).  If the Initial Deposit is not made by June 13, 2011, the Debtor will be in default of the Settlement Agreement and, if such default is not cured within two (2) business days of notice thereof, the Bank Group will immediately have *in rem* relief from the automatic stay on its collateral (including the Property) without further notice, hearing or order of the Bankruptcy Court.

48.     The Purchaser has indicated it is not willing to pay the Initial Deposit until the Debtor first obtains an order of the Bankruptcy Court approving, and authorizing the Debtor to enter into, the Settlement Agreement.  In light of what I believe will be grave consequences to the Debtor's estate if the Initial Deposit is not timely made, and the indisputable benefits to the estate if the Settlement Agreement is approved and implemented, the Debtor has filed concurrently herewith an *ex parte* application for an order shortening time on notice for hearing on the Motion, pursuant to which the Debtor is seeking to have the Motion heard as soon as practicable for the Court, but in no event later than June 13, 2011.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of May 2011, at Los Angeles, California.


/s/ M. Aaron Yashouafar
M. Aaron Yashouafar, Declarant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

# SETTLEMENT AGREEMENT

This settlement agreement (the "**Settlement Agreement**") is entered into as of June 3, 2011 (the "**Effective Date**"), by and between the following entities:  (i) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ("**S. Yashouafar**"), Simon Barlava ("**Barlava**" and together with M.A. Yashouafar and S. Yashouafar, the "**Guarantors**"); (ii) Roosevelt Lofts, LLC, debtor and debtor in possession (the "**Debtor**" and together with the Guarantors, the "**Borrower Parties**"); and (iii) Bank of America, N.A., individually and as administrative agent for a group of lenders[1] (collectively, the "**Bank Group**").  The Borrower Parties and the Bank Group are referred to collectively as the "**Parties**" and each individually as a "**Party**."  This Settlement Agreement is based upon the following facts, which each of the Parties confirms is entirely true and accurate in every material respect:

## RECITALS

A.     On or about March 9, 2006, the Debtor executed a Construction Loan Agreement (the "**Loan Agreement**") with the Bank of America N.A., as administrative agent for the Bank Group in the amount of $78,840,375.  On or about March 9, 2006, Debtor executed a Deed of Trust Note in the original principal amount of $78,840,375 (the "**Note**").  The Loan Agreement and Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "**Fee Deed of Trust**"), and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "**Leasehold Deed of Trust**," and collectively, with the Fee Deed of Trust, the "**Deeds of Trust**").  The Deeds of Trust encumber the property commonly known as the "Roosevelt Building," located at 727 West 7th Street, Los Angeles, California (the "**Property**"), including an absolute assignment of all rents, issues and profits generated from operation of the Property (collectively, the "**Collateral**").

B.     In further consideration of the Bank Group's loan and extension of credit, on or about March 9, 2006, the Guarantors each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "**Guaranty**").  The Loan Agreement, the Note, the Deeds of Trust and the Guaranty, together with all modifications thereto and all other loan and security documents and agreements between the Parties related to the Collateral are collectively referred to as the "**Loan Documents**."

C.     The Borrower Parties failed to make the pay the Loan in full at maturity, March 9, 2009.  As a result, the Bank Group delivered a default notice dated December 30, 2008.  On March 23, 2009, the Bank Group caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office.  On or about April 3, 2009, the Bank Group filed a complaint for breach of the Guaranty, appointment of a receiver and judicial foreclosure on the

---

[1]     The Bank Group is comprised of the Bank of America N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

Deeds of Trust in the Superior Court of the State of California for the County of Los Angeles, bearing case no. SC 102472 and including all claims raised in the cross complaint filed by the Guarantors (the "**Guaranty Litigation**").  The Borrower Parties dispute the Bank Group's contentions.  The Guarantors asserted counterclaims in the Guaranty Litigation.

        D.    On April 13, 2009, the Debtor filed a voluntary petition commencing a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), bearing case no. 1:09-bk-14214-GM (the "**Bankruptcy Case**").

        E.    The Parties desire to settle their disputes relating to the Guaranty Litigation (including all claims raised in the cross complaint) and the Bankruptcy Case, and therefore, enter into this Settlement Agreement which provides, among other provisions, for the purchase and sale of the Bank Group's interest in the Loan Documents, and certain rights provided therein, to a purchaser other than the Borrower Parties, but arranged by the Debtor who has been qualified (no less than 30 days before the Payment Date) under applicable banking regulations (the "**Purchaser**").

    NOW, THEREFORE, in consideration of the recitals, covenants and conditions in this Settlement Agreement, and for valuable consideration, the Parties agree as follows:

<u>**AGREEMENT**</u>

      1.    <u>Note Purchase and Sale.</u>

        a.    Pursuant to the Assignment of Claims (as defined below), and according to the terms and conditions of this Settlement Agreement, the Bank Group agrees to sell and assign the Loan Documents to the Purchaser, "as is," and with no representation or warranties other than as may be set forth in the Assignment of Claims (the "**Sale**").  If the Sale is to be consummated, the Purchaser shall pay the Bank Group the total sum of $XXXXXXXX by wire transfer in immediately available federal funds (the "**Purchase Price**").  The Sale must close and the Purchase Price must be paid to the Bank Group on or before the "**Payment Date,**" which is the earlier of:  (i) September 1, 2011; and (ii) the first business day which is at least 90 calendar days after the Effective Date.

        b.    Conditions to the Closing of the Sale.

        The closing of the Sale is conditioned upon the occurrence of each of the following:

      i.    The timely deposit by the Purchaser of the funds as set forth in paragraph 2;

      ii.    Bankruptcy Court Approval as defined in paragraph 10;

      iii.    The timely payment of the Purchase Price on the Payment Date;

      iv.    The Purchaser has provided the Bank Group with sufficient representations, covenants and evidence (including evidence of ownership) so as to qualify under applicable banking regulations and demonstrate that it is not otherwise

violative of U.S. banking laws; and

    v.    The delivery by the Bank Group of the documents set forth in paragraph 4(b).

    c.    The closing of the Sale will be facilitated through the services of an escrow agent approved by both the Purchaser and the Bank Group (the "**Escrow Agent**"). The terms of escrow shall be governed by an escrow agreement (the "**Escrow Agreement**") in the form not materially at variance from the form of escrow agreement attached hereto as Exhibit "__."

    d.    The Purchaser shall advise the Bank Group of its intention to close the Sale on a particular Payment Date.  No later than two business days before the identified Payment Date, the Bank Group shall deliver to the Escrow Agent an assignment of claims (the "**Assignment of Claims**") in the form attached hereto as Exhibit "__."  The Assignment of Claims shall be released to the Purchaser at the closing of the Sale on the Payment Date, and returned to the Bank Group if the conditions to the Sale do not occur.  The Assignment of Claims is to effectuate the transfer of certain claims against the Borrower Parties to the Purchaser on the terms and conditions set forth therein.  **[The Assignment of Claims shall specifically include any claims related to that certain Litigation Indemnity Agreement dated July 25, 2008, together with any deposit and other accounts at Bank of America N.A., or any other member of the Bank Group, in the name of Milbank Holding Corp. ("Milbank") for the benefit of the Debtor, or any of the Borrower Parties for the benefit of the Debtor, including, without limitation, any debtor in possession accounts in the name of the Debtor.  The Assignment of Claims shall also provide, among other things, that pursuant to and to the extent permitted by applicable law and the terms of any such policies, the Purchaser will acquire the rights of the Bank Group, if any, to any policies of title insurance covering the Deeds of Trust and the Property.]**  The Bank Group makes no representations or warranties regarding its claims against the Borrower Parties or any coverage it may have as a beneficiary under any policy of title of insurance covering the Deeds of Trust and the Property.

    e.    On the Payment Date, and on condition that the Sale closes, the Bank Group shall execute and file in the Guaranty Litigation a request for dismissal, without prejudice, of the entire Guaranty Litigation.

    f.    As long as Greystar GP, LLC or its designee (collectively, "**Greystar**") satisfies the conditions set forth in Section 1(b) hereof on or before the Payment Date, Greystar shall be designated the Purchaser under this Agreement.

    2.    <u>Purchaser Deposits into Escrow</u>.

    a.    Within 10 calendar days of the Effective Date, the Purchaser must deposit with the Escrow Agent $5,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within 40 calendar days of the Effective Date, the Purchaser must deposit with the Escrow Agent an additional $10,000,000 for a total deposit of $15,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within 70 days of the Effective Date, the Purchaser must deposit with the Escrow Agent an additional $20,000,000 for a total deposit of

$35,000,000 to be applied, on the Payment Date, towards the Purchase Price.  On or before the Payment Date, the Purchaser must deposit additional sums necessary to have the full Purchase Price on deposit with the Escrow Agent.

        b.     All such deposits must be in immediately available federal funds. In any event, the Escrow Agent will immediately advise the Bank Group when funds are deposited.  If any of the funds are not timely deposited with the Escrow Agent, then the Bank Group may send a notice of default by electronic means to counsel for the Borrower Parties.  If any of the required deposits are not made within two (2) business days following the transmittal of the notice of default, then pursuant to the 362 Stipulation and the Bankruptcy Court Order described below, the Bank Group will immediately have *in rem* relief from the automatic stay on the Collateral without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief.  If, for any reason, the Sale is not consummated on or before the Payment Date, all deposited funds will be refunded to the Purchaser.

        3.     <u>If Sale is not Consummated</u>.  If, for any reason, either the Purchaser fails to make any deposit timely, or the Sale is not consummated timely, and conditioned upon Bankruptcy Court Approval (as defined below), then each of the following shall occur:

        a.     <u>Return of Assignment of Claims</u>.  The Assignment of Claims shall be returned immediately to the Bank Group.

        b.     <u>Stipulation for Relief From Stay</u>.  Pursuant to (i) the stipulation entered into between the Bank Group and the Borrower in the form attached hereto as Exhibit "__" (the "**362 Stipulation**"); and (ii) the Bankruptcy Court Order, the Bank Group will immediately have *in rem* relief from the automatic stay on the Collateral without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief.

        c.     <u>Dismissal of Guarantors from Guaranty Litigation</u>.  The Escrow Agent shall deliver to counsel for the Guarantors for filing in the Guaranty Litigation, a request for dismissal, without prejudice, of all causes of action against the Guarantors in the form attached hereto as Exhibit "__" (the "**Bank Group's Request for Dismissal Without Prejudice**").

        d.     <u>Covenant Not to Sue</u>.  The Escrow Agent shall deliver to the Borrower Parties the covenant not to sue in the form attached hereto as Exhibit "__" (the "**Covenant**").

        e.     <u>Stipulation for Appointment of a Receiver</u>.  The stipulation for the appointment of a receiver to take control of the Property (the "**Receivership Stipulation**") in the form attached hereto as Exhibit "__" shall be filed, *ex parte*, in the Guaranty Litigation, and a receiver shall be appointed, *ex parte*, immediately.  The receiver shall take possession and control over the Collateral (other than deposit or other accounts with the Bank of America N.A.) pursuant to the terms of the Receivership Stipulation.  Each of the Borrower Parties agrees to cooperate with the receiver and the Bank Group on all matters, including matters concerning mechanic's liens, title of the Property and the prompt and orderly transition of management of the Property to the receiver including the turnover of all Collateral accounts and tenant deposits.

4.      Deliveries on the Effective Date.

a.      On the Effective Date, the Borrower Parties shall deliver to the Bank Group fully executed originals of each of the following:

i.      Releases from each of the Guarantors in the form attached as Exhibit "__;"

ii.     the Receivership Stipulation;

iii.    the 362 Stipulation;

iv.     the request for dismissal with prejudice of the cross-complaint filed in the Guaranty Litigation by the Guarantors against the Bank Group (the "**Guarantors' Request for Dismissal**") in the form attached as Exhibit "__," which then may be filed immediately in the Guaranty Litigation by the Bank Group; and

v.      the Insider Lien Releases described below, each signed by an authorized representative of each of those entities described in paragraph 7 of this Settlement Agreement.

b.      On the Effective Date, the Bank Group shall deliver to the Escrow Agent fully executed originals of each of the following:

i.      the Assignment of Claims;

ii.     the Covenant; and

iii.    the Bank Group's Request for Dismissal Without Prejudice.

5.      Deadline to File Plan.  The Parties agree that the time within which the Debtor is required to file its Chapter 11 plan is extended to no later than August 31, 2011, or subject, however, to further extension, if any, by mutual agreement of the Parties.

6.      Stay of Litigation.  Conditioned upon there being no default under the terms of this Settlement Agreement, for 90 days after the execution of the Settlement Agreement, a stay shall be effective as to the following:  (i) the Guaranty Litigation in its entirety; and (ii) any scheduled judgment debtor exams of Milbank.  Except as provided in this paragraph, nothing in this Settlement Agreement shall affect any rights, obligations or remedies available to Bank of America N.A., with respect to any credit extended to Milbank pursuant to the loan documents related to that credit.

7.      Mechanic's Liens.  On the Effective Date, all of the insiders and affiliates of the Debtor set forth on the attached Exhibit "__," shall deliver to the Bank Group fully executed lien releases in the form attached hereto as Exhibit "__" (the "**Insider Lien Release**") evidencing that none shall assert a mechanic's lien against the Property.  On and after the Effective Date, if no Sale is consummated timely, then the Borrower Parties will cooperate in resolving any issues regarding the remaining mechanic's lien claims asserted by third parties.

8.      Release by the Debtor.  The Debtor, on its behalf and on behalf of its respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers,

5

directors, employees, owners, members, managers, affiliates, professionals, trustees, and representatives hereby release and forever discharge all claims, rights, demands, damages, actions, causes of action, costs, expenses, and suits of law or in equity which they have held, now hold or hereafter may hold against the Bank Group, including Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank and each of their respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, owners, shareholders, members, managers, affiliates, professionals, attorneys, trustees, and representatives that arise in or are related to the Loan Documents or were or could have been alleged in the Guaranty Litigation.

9.    <u>Scope of Release by the Debtor</u>.  The Debtor understands that the release of claims set forth in this Settlement Agreement covers claims within the areas specified which the Debtor has knowledge of and those which it may not know about.  The Debtor expressly waives all rights under Section 1542 of the California Civil Code, which section the Debtor has read and understands, and which provides as follows:

> <u>Section 1542</u>.  A general release does not extend to claims which
> the creditor does not know or suspect to exist in his or her favor at the
> time of executing the release, which if known by him or her
> must have materially affected his or her settlement with the debtor.

Notwithstanding the foregoing, the release set forth herein shall not apply to the obligations under this Settlement Agreement, and shall have no effect upon any documents or acts necessary to accomplish the terms and intent of this Settlement Agreement.

10.    <u>Bankruptcy Court Approval</u>.

a.    The Debtor is not bound to perform under this Settlement Agreement until "**Bankruptcy Court Approval**," which shall mean both (i) entry of an order after hearing on approval of the Settlement Agreement in the form attached hereto as Exhibit "__" (the "**Bankruptcy Court Order**"), and (ii) the Bankruptcy Court Order is fully enforceable on its terms and has not been stayed, modified or altered by any court of competent jurisdiction.

b.    This Settlement Agreement is binding and fully enforceable as to each Party other than the Debtor on the Effective Date.  Notwithstanding the foregoing, no Party is obligated to perform under paragraph 3 of this Settlement Agreement without Bankruptcy Court Approval.

c.    The Bankruptcy Court Order shall also approve the 362 Stipulation.

d.    The Debtor will file a motion for approval of this Settlement Agreement and the 362 Stipulation within 5 business days following the Effective Date and will seek to have the motion heard and approved on June 14, 2011 or as soon before or after as the Bankruptcy Court may set.  The Bank Group will reasonably assist the Debtor in obtaining Bankruptcy Court approval of this Settlement Agreement and the 362 Stipulation.  Subject to its review and approval, the Bank Group will support the motion, and will not oppose it.

11.    Confidentiality.  The Parties agree to keep the Purchase Price (and such other terms as may be expressly agreed upon in writing) confidential, and, if necessary, the Bank Group will support a motion by the Debtor in the Bankruptcy Case to seal the record and maintain the confidentiality of the Purchase Price.

12.    Further Assurances.    The Parties agree to perform such acts and to prepare, execute, deliver, file, and record any documents or agreements reasonably required to perform under and satisfy the conditions in this Settlement Agreement, or to give full force and effect to this Settlement Agreement.

13.    Attorneys' Fees and Costs.  If any action or proceeding is brought to enforce this Settlement Agreement, the prevailing Party shall be entitled to recover all of its costs in bringing and prosecuting such action to enforce the Settlement Agreement, including reasonable attorneys' fees, from the losing Party.

14.    Complete Agreement.  This Settlement Agreement supersedes any and all other agreements, understandings, negotiations or discussions, either oral or in writing, express or implied between the Parties concerning settlement.  The Parties to this Settlement Agreement each acknowledge that no representations, inducements, promises, agreements or warranties, oral or otherwise, have been made by them or any of them, or anyone acting on their behalf which are not embodied in this Settlement Agreement, that they have not executed this Settlement Agreement in reliance on a representation, inducement, promise, agreement or warranty, and that no representation, inducement, promise, agreement or warranty not contained in this Settlement Agreement including any purported supplements, modifications, waivers or terminations of this Settlement Agreement shall be valid or binding, unless executed in writing by all of the Parties to this Settlement Agreement.

15.    Terms Read and Understood.  Each of the Parties hereby certifies that he or it (i) has read the entire Settlement Agreement, (ii) has conferred with legal counsel pertaining to this Settlement Agreement, (iii) fully understands all of the terms of this Settlement Agreement, and (iv) acknowledges and represents that he or it enters into this Settlement Agreement and all other contemplated documents of their own free will and not due to any oral representation, commitment, promise, pressure, or duress from any other Party.

16.    Successors and Third Parties.    Each covenant in this Settlement Agreement shall inure to the benefit of and be binding upon the Parties and their respective owners, managers, heirs, successors, assigns, agents, employees, representatives (past and present), trustees, and legal and personal representatives.  Further, the releases of any entities who are not signatories to this Settlement Agreement are made expressly for their benefit and they shall be deemed third party beneficiaries of this Settlement Agreement.  Except as set forth in this paragraph, there shall be no third party beneficiaries under this Settlement Agreement.

17.    Construction.  As used in this Settlement Agreement, the masculine and feminine gender, in the singular or plural, shall be deemed to include the others whenever the text so requires.  The term "including" in any form shall not be limiting and shall be construed to mean "including, but not limited to."  Captions and paragraph headings are inserted solely for convenience and shall not be deemed to restrict or limit the meaning of text.  The language of all

parts of this Settlement Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against any of the Parties.

18.     Governing Law.  This Settlement Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of California, without giving effect to the principles of conflicts of law thereof, and applicable bankruptcy law.  Each of the Parties agrees that as long as the Bankruptcy Case remains open, any dispute, claim or controversy arising out of or relating to this Settlement Agreement shall be heard in the Bankruptcy Court and that the Bankruptcy Court has exclusive jurisdiction thereof.  If the Bankruptcy Case is closed, then any court of competent jurisdiction may resolve any dispute, claim or controversy arising out of or relating to this Settlement Agreement.

19.     Severability.  If any provision of this Settlement Agreement is determined to be invalid, void, or illegal, such provision shall be construed and amended in a manner which would permit its enforcement, but in no event shall such provision affect, impair, or invalidate any other provision of this Settlement Agreement.

20.     No Waiver.  Failure to insist on compliance with any term, covenant or condition contained in this Settlement Agreement shall not be deemed a waiver of that term, covenant or condition, nor should any waiver or relinquishment of any right or power contained in this Settlement Agreement, at any one time or more times, be deemed a waiver or relinquishment of any right or power at any other time or times.

21.     Warranty of Authority.  Each Party whose signature is affixed hereto in a representative capacity represents and warrants that she/he is authorized to execute this Settlement Agreement on behalf of and to bind the entity on whose behalf her/his signature is affixed.

22.     Time of the Essence.  Time is of the essence in the performance of all obligations set forth in this Settlement Agreement.

23.     Counterparts.  This Settlement Agreement may be executed in separate counterparts which, together shall constitute one and the same fully executed Settlement Agreement.  Signed counterparts transmitted by facsimile or email shall be deemed originals.

[signatures follow on next page]

    IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date first listed above.

BANK OF AMERICA, N.A.,
As administrative agent for the Bank Group


By: _____
   David R. Kegaries, Senior Vice President




ROOSEVELT LOFTS, LLC
By:  Its manager The Roosevelt Lofts, Inc.

By: _____
   M. Aaron Yashouafar, President


_____
   M. Aaron Yashouafar, individually


_____
   Solyman Yashouafar, individually


_____
   Simon Barlava, individually

<u>Exhibits</u>

1.      Escrow Instructions (para. 1c)

2.      Assignment of Claims from the Bank Group to the Purchaser. (para. 1d.)

3.      362 Stipulation (para. 3b)

4.      Bank Group's Request for Dismissal without prejudice (para. 3c)

5.      Covenant Not to Sue (para. 3d)

6.      Receivership Stipulation (para. 3e)

7.      Releases from the Guarantors (para. 4a.i)

8.      Guarantors' Request for Dismissal with prejudice of the Cross Complaint in the Guaranty Litigation (para. 4a.iv)

9.      List of Insiders (para. 7)

10.     Insider Lien Release (para. 7)

11.     Bankruptcy Court Order (para. 10)