DAVID L. NEALE (SBN 141225)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  dln@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>ROOSEVELT LOFTS, LLC, a<br>Delaware limited liability company,<br><br>        Debtor. | Case No. 1:09-bk-14214-GM<br><br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION PURSUANT TO SECTIONS 105(a), 363(b) AND 1125(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AN ORDER AUTHORIZING THE DEBTOR AND OTHER PARTIES THERETO TO ENTER INTO PLAN SUPPORT AGREEMENT AND RELATED AGREEMENTS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF M. AARON YASHOUAFAR IN SUPPORT THEREOF**<br><br>[*EX PARTE* APPLICATION FOR ORDER SHORTENING TIME FILED CONCURRENTLY HEREWITH]<br><br>Date:    [TO BE SET]<br>Time:    [TO BE SET]<br>Place:   Courtroom "303"<br>          21041 Burbank Boulevard<br>          Woodland Hills, CA 91367 |

**PLEASE TAKE NOTICE** that, pursuant to Sections 105(a), 363(b) and 1125(b) of the Bankruptcy Code and Bankruptcy Rule 6004, Roosevelt Lofts, LLC, a Delaware limited liability company, the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), hereby submits this motion (the "Motion") for the entry of an order authorizing the Debtor and other parties thereto to enter into a plan support agreement (the "Plan Agreement") and related agreements in the forms attached as Exhibit "1" to the Declaration of M. Aaron Yashouafar annexed hereto (the "Yashouafar Declaration"). The complete bases of the Motion are set forth in the Memorandum of Points and Authorities annexed hereto.[1]

Briefly, the Plan Agreement provides the basis upon which the Debtor shall implement the settlement agreement (the "BofA Settlement") negotiated with Bank of America, N.A., individually and as administrative agent for a group of lenders[2] (collectively, "Bank of America"), and proceed with a plan of reorganization that **will pay in full, or otherwise resolve by agreement, all allowed claims in this case**. The Plan Agreement contemplates the filing of a plan of reorganization jointly sponsored by the Debtor, Greystar GP, LLC or its designee (collectively, "Greystar") and Roosevelt Lofts, Inc., the owner of 100% of the membership interests in the Debtor ("RLI," and, together with the Debtor and Greystar, the "Plan Proponents"). The Plan Proponents have agreed upon the material terms of an amended plan of reorganization (the "New Plan"), as evidenced by the Plan Term Sheet attached to the Plan Agreement.[3] The Plan Agreement includes, among other things, the Plan Proponents' agreement to support the New Plan, negotiate in good faith to reach definitive documentation, and not take any actions that will delay or impede consummation of the New Plan. The Plan Agreement also

---

[1] All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Plan Agreement.

[2] Bank of America is comprised of Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank. The motion to approve the BofA Settlement and related agreements under Rule 9019 of the Federal Rules of Bankruptcy Procedure has been separately filed [Docket No. 785] (the "Settlement Motion").

[3] Any terms not specifically defined herein shall have the meanings ascribed to them in the Plan Agreement.

provides that, at Greystar's option, Greystar will (i) acquire (by assignment) all claims held by Bank of America arising out of, relating to and/or secured by the BofA Loan Agreement and all of Bank of America's right, title and interest in and under all documents, agreements and instruments relating thereto (collectively, the "BofA Claim") from Bank of America for a cash payment of $68,000,000 on or before the effective date of the New Plan, or (ii) if Greystar does not previously acquire the BofA Claim prior to the effective date of the New Plan, satisfy the BofA Claim in full by cash payment of $68,000,000 through the New Plan.

If Greystar acquires the BofA Claim prior to August 22, 2011 (as may be extended by written agreement of Greystar, the "Outside Date") and the effective date of the New Plan does not occur by such Outside Date, subject to the terms of the Plan Agreement, Greystar shall have automatic *in rem* relief from the automatic stay to foreclose on the Debtor's Property commencing on the Outside Date using the full par principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees, costs and other charges, to credit bid on the Property (subject only to the Mechanics' Lien Claims) and the foreclosure sale of the Property may be set, at Greystar's option, as early as September 2, 2011 without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief (the "Foreclosure Right"). In addition, if Greystar acquires the BofA Claim and the effective date of the New Plan does not occur by the Outside Date, subject to the terms of the Plan Agreement, Greystar shall have the right to credit bid the full par principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees, costs and other charges (subject only to the Mechanic's Lien Claims) at an auction of the Property to be held pursuant to 11 U.S.C. § 363 (the "363 Auction") and in accordance with the Bidding Procedures described in the Plan Agreement (the "363 Purchase Right"). As set forth in the Plan Agreement, the hearing for approval of the result of the 363 Auction of the Property shall occur on September 2, 2011 or the first hearing date thereafter that is available to the Court, but in no event later than September 16, 2011.

Pursuant to the Plan Agreement, the Debtor is required to obtain entry of a Court order approving the Plan Agreement and related agreements as soon as practicable, but in no event

later than June 20, 2011.  Accordingly, the Debtor has filed concurrently herewith an *ex parte* application for an order shortening time on notice for hearing on this Motion, pursuant to which **the Debtor is seeking to have this Motion heard on June 10, 2011 at 9:00 a.m. (the same date and time as the hearing on the Settlement Motion) or as soon thereafter as is practicable for the Court, but in no event later than June 17, 2011**.  In the event that the Court enters an order shortening time for a hearing on this Motion, the Debtor shall provide further notice of the deadline set by the Court by which objections, if any, to the Motion must be filed.

The Motion is based upon Sections 105(a), 363(b) and 1125(b) of the Bankruptcy Code and Bankruptcy Rule 6004, and is based further upon this Notice and Motion, the attached Memorandum of Points and Authorities and Yashouafar Declaration, the entire record in this case, and any other evidence properly presented to the Court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1)    finding that notice of the Motion was adequate and appropriate under the circumstances;

(2)    granting the Motion in its entirety;

(3)    approving the Plan Agreement and all related documents, including, without limitation, that certain Borrower Parties Designation Agreement which is attached to the Plan Agreement, in the forms attached as Exhibit "1" to the Yashouafar Declaration annexed hereto, in their entirety;

(4)    authorizing and directing the Debtor to take all steps necessary to consummate the terms and conditions of the Plan Agreement, the Borrower Parties Designation Agreement and other related documents including, without limitation, to (i) irrevocably designate Greystar as the Purchaser under the BofA Settlement; and (ii) file the New Plan in accordance with the terms and provisions of the Plan Term Sheet;

(5)    approving and allowing the BofA Claim as of the earlier of (i) the effective date of the New Plan or (ii) the date on which Greystar acquires the BofA Claim, (A) in an amount

reasonably acceptable to Greystar, but in no event less than an amount equal to $78,422,049.33 plus interest at the default rate and all fees, charges and other costs which have accrued under the BofA Loan Agreement from and after September 3, 2009, and (B) as perfected, valid, and duly enforceable (without any defense, counterclaim, right of offset or subordination, or any other claim or challenge by any party in interest) with first priority security against the Property, subject only to the Mechanic's Lien Claims;

(6)     approving as commercially reasonable under applicable law Greystar's exercise of the Foreclosure Right and the scheduling of foreclosure sale with respect to the Property at a time and date of Greystar's choosing on and after September 2, 2011 and directing the Debtor and The Roosevelt Lofts, Inc. and each of their respective affiliates to support and not interfere with the Foreclosure Right;

(7)     setting hearings to consider approval of the disclosure statement describing the New Plan and confirmation of the New Plan so that the effective date of the New Plan can occur by August 22, 2011;

(8)     authorizing and directing the Debtor to take all steps necessary to implement the 363 Purchase Right, including, without limitation, to obtain entry of a Court order approving the Bidding Procedures described in the Plan Agreement;

(9)     setting a hearing to consider approval of the 363 Auction of the Property and the results thereof on September 2, 2011 or the first hearing date thereafter that is available to the Court, but in no event later than September 16, 2011; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1      (10)   granting such other and further relief as may be necessary or appropriate under

2 the circumstances.

3 Dated: June 3, 2011          ROOSEVELT LOFTS, LLC

By:_____
      DAVID L. NEALE
      JULIET Y. OH
      LEVENE, NEALE, BENDER, YOO
        & BRILL L.L.P.
      Attorneys for Chapter 11 Debtor and
      Debtor in Possession

6

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.        INTRODUCTION[4]

After more than two years of hotly contested bankruptcy proceedings, Roosevelt Lofts, LLC, a Delaware limited liability company, the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), is on the cusp of reorganizing under a fully consensual plan of reorganization that provides for full cash payment of all allowed claims and a distribution of residual value to the holders of interests in the Debtor (the "New Plan"). The New Plan is a product of intense negotiations among the Debtor, The Roosevelt Lofts, Inc. ("RLI"), Bank of America, N.A., individually and as administrative agent for a group of lenders (collectively, "Bank of America"), and Greystar, and has as its centerpiece a settlement agreement among Bank of America, the Debtor and RLI (the "BofA Settlement"), on the one hand, and a plan support agreement (the "Plan Agreement") among the Debtor, RLI and Greystar GP, LLC or its designee (collectively, "Greystar"), on the other hand.[5]   Assuming full performance by the Debtor and RLI under the Plan Agreement, and subject to the terms and conditions set forth in the Plan Agreement and the Plan Term Sheet attached thereto, the New Plan contemplates that Greystar will pay $95 million to the Debtor's estate and receive all of the equity interests in the Reorganized Debtor. The Debtor has conducted an exhaustive analysis of plan alternatives, and concluded that the New Plan is in the overwhelming best interests of the Debtor and its estate. Accordingly, the Debtor respectfully requests that this Court enter an order approving the Plan Agreement (and the agreements and documents attached thereto) and ordering other related relief to allow the Debtor to implement the terms of the BofA Settlement and effectively set the Debtor on a clear – and "full pay" – path towards a prompt reorganization.

---

[4] All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Plan Agreement.

[5] In the event of any inconsistency between the description of the Plan Agreement and related agreements (the "Transactional Documents") set forth in this Motion and the terms of such Transaction Documents themselves, the terms of the Transactional Documents shall govern.

## II.    STATEMENT OF FACTS

1.    On April 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").  The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is the owner of real property commonly known as the "Roosevelt Building" and located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "Property").

3.    On or about March 9, 2006, the Debtor entered into a construction loan agreement (the "Loan Agreement") with Bank of America, N.A., individually and as administrative agent for a group of lenders[6] (collectively, "Bank of America"), pursuant to which the Debtor obtained a loan from Bank of America in the original principal sum of $78,840,375 (the "Loan").  On or about March 9, 2006, the Debtor executed a Deed of Trust Note in the original principal sum of $78,840,375 (the "Note").  The Loan was obtained by the Debtor for the purpose of converting the Property into 222 individually subdivided, luxury residential condominium units, a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Property.

4.    The Loan Agreement and the Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "Fee Deed of Trust") and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "Leasehold Deed of Trust," and together with the Fee Deed of Trust, the "Deeds of Trust").  The Deeds of Trust encumber the Property, including an absolute

---

[6] Bank of America is comprised of Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

8

assignment of all rents, issues and profits generated from the operation of the Property (collectively, the "Collateral").

5.      In further consideration of the Loan and extension of credit, on or about March 9, 2006, M. Aaron Yashouafar, Solyman Yashouafar and Simon Barlava (collectively, the "Guarantors," and together with the Debtor, the "Borrower Parties") each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "Guaranty").  The Loan Agreement, Note, Deeds of Trust and Guaranty, together with all modifications thereto and all other ancillary documents or agreements (including, without limitation, title policies, endorsements, etc.), and the rights, claims and remedies associated therewith are collectively referred to as the "BofA Loan Agreement."

6.      On or about December 30, 2008, Bank of America issued a notice of default to the Borrower Parties, contending that each of the Borrower Parties had defaulted on their obligations to Bank of America under the BofA Loan Agreement.  On March 23, 20098, Bank of America caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office.

7.      On or about April 3, 2009, Bank of America filed a complaint against the Debtor and the Guarantors in the Superior Court of the State of California for the County of Los Angeles ("State Court") for, among other things, breach of the Guaranty, appointment of a receiver and judicial foreclosure on its Deeds of Trust, thereby commencing that certain case bearing the number SC 102472.  Thereafter, the Guarantors filed a cross-complaint asserting various claims against Bank of America.  The litigation in State Court relating to the claims asserted by Bank of America in its complaint and the claims asserted by the Guarantors in their cross-complaint is collectively referred to herein as the "Guaranty Litigation."

8.      Days after filing its complaint in State Court, Bank of America filed an *ex parte* application with the State Court for the appointment of a receiver.

9.      As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code to have the ability and opportunity to close escrow on the residential units that were then under contract, to market and sell the remaining residential units in the Property, and

to complete construction on the Property, all of which would provide the Debtor with the ability to restructure and repay the Loan and its other debts for the benefit of all creditors.

10.    Although the Guaranty Litigation was stayed as against the Debtor upon the filing of the Debtor's bankruptcy case, Bank of America and the Guarantors have remained embroiled in litigation in State Court. As noted above, on or about November 16, 2010, the Guarantors filed a cross-complaint asserting various claims against Bank of America.

11.    In the meantime, the Debtor and Bank of America continued to clash throughout the pendency of the Debtor's bankruptcy case.

12.    Shortly after the commencement of the Debtor's bankruptcy case, the Debtor filed two (2) motions seeking Court authority to assume a number of purchase and sale agreements with various buyers for residential units in the Property and to consummate the sales of the units under the terms of such purchase and sale agreements, free and clear of all liens, claims, interests and encumbrances (the "Sale Motions"). Bank of America as well as other parties in interest, including certain buyers, filed oppositions to the Sale Motions. Ultimately, the Debtor withdrew the Sale Motions.

13.    Although the Debtor engaged in discussions with Bank of America and the Official Committee of Unsecured Creditors appointed in the Debtor's case in an effort to formulate the terms of a consensual plan of reorganization, such discussions proved to be unfruitful.

14.    In the meantime, regardless of the extent to which the Property was occupied, the Debtor continued to incur operating expenses associated with the maintenance of the Property. At that time, the Debtor had very limited cash flow from commercial leases and a few residential tenants. In Bank of America's oppositions to the Sale Motions, Bank of America had suggested that renting the residential units in the Property on a short-term basis would be a more prudent solution than selling the units on an individual basis, particularly given the depressed state of the real estate market at that time. The Debtor determined, in the exercise of its sound business judgment and, in part, in response to the objection of Bank of America to the Sale Motions, that renting residential units in the Property for a short term would allow the Debtor to continue to

pursue longer term strategies for the restructuring of its financial affairs, including, without limitation, the sale or further lease of units, a combination thereof, or a sale of the Property, while at the same time generating cash flow to help offset the operating expenses being incurred on a monthly basis.

15.    Although the Debtor did not believe Bank of America's consent to the Debtor's proposed leasing program was required, since the Debtor was attempting to cooperate with Bank of America in formulating a mutually agreeable plan of reorganization, the Debtor approached Bank of America in mid-June 2009 regarding the parameters of the Debtor's proposed short-term leasing program and sought the Bank of America's consent to such program.  When Bank of America's consent to the proposed leasing program was not forthcoming, the Debtor filed an emergency motion on August 27, 2009 seeking authority to commence the program to permit the Debtor to enter into short-term residential leases (the "Leasing Program Motion").  The Court authorized the Debtor to commence its proposed short-term leading program over Bank of America's objection, subject to the terms and conditions described in the order entered by the Court on September 8, 2009.

16.    Subsequently, the Debtor successfully negotiated and entered into residential leases for dozens of the units in the Property in accordance with the Debtor's leasing program.

17.    After Bank of America declined to stipulate to a further continuance of the Section 362(d)(3) time period applicable to the Debtor's case, the Debtor filed its "Chapter 11 Plan of Reorganization" (the "Original Plan") on August 31, 2009.  The Original Plan provided for full payment of all allowed claims over time, with interest.

18.    On November 24, 2009, Bank of America filed a motion seeking to dismiss the Debtor's bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the "Dismissal Motion") based on, among other alleged grounds, the Debtor's failure to file a disclosure statement with respect to the Original Plan.  The hearing on the Dismissal Motion was originally calendared for December 15, 2009, but was subsequently continued by stipulation of the parties to February 2, 2010 at 10:00 a.m.  Pursuant to the foregoing stipulation, the Debtor agreed

1    to file a disclosure statement with respect to the Original Plan, as well as a notice of the hearing on

2    such disclosure statement, by December 28, 2009.

3        19.    On December 28, 2009, the Debtor filed a disclosure statement describing the Plan

4    (the "Original Disclosure Statement").   The hearing on the Disclosure Statement was set for

5    February 2, 2010 at 10:00 a.m., the same date and time as the hearing on the Dismissal Motion.

6        20.    One of the concerns that had been expressed by Bank of America was the potential

7    negative impact that a sale of only a few, but not a substantial number, of the units could have on

8    the value of the Property and the remaining units in the Property.   Based on Bank of America's

9    concerns and Bank of America's unwillingness to negotiate or otherwise discuss the terms of the

10   Plan, among other reasons, the Debtor determined that conducting a public auction of a large

11   proportion of the units in the Property, following an aggressive marketing campaign, would

12   generate substantial interest in the Property and its units within the market, and result in the

13   expeditious closing of sales on such units within a short span of time.

14       21.    Accordingly, on December 24, 2009, the Debtor filed a motion (the "Auction

15   Motion"), on shortened time, seeking authority to employ Kennedy Wilson Auction Group Inc.

16   ("KW"), a highly experienced auctioneer company, to publicize, market and offer approximately

17   sixty five (65) units (but no fewer than fifty units and no more than seventy five units) in the

18   Property for sale through a public auction.   Pursuant to the Auction Motion, the Debtor proposed to

19   sell only those completed units that were located in the first eight floors of the Property.

20       22.    Again, Bank of America opposed the Auction Motion.   Ultimately, the Court

21   authorized the Debtor to conduct the public auction over Bank of America's objection.   During the

22   course of the hearing on the Auction Motion held on January 7, 2010, the Court invited all parties

23   in interest, including the Debtor, Bank of America and alleged holders of mechanics' liens (who

24   had objected to the Auction Motion primarily on the limited grounds of lien priority and

25   segregation of sale proceeds), to negotiate a form of order regarding the Auction Motion.   During

26   such negotiations, at Bank of America's request, the Debtor agreed to include in the order

27   provisions regarding the completion of construction in the Property.   Specifically, the order

28

provided for the completion of construction of the ninth and tenth floors (as well as any work remaining on floors two through eight) of the Property on or before March 31, 2010, and the completion of construction of the remaining floors of the Property (other than the penthouse units in the Property, which would have incomplete finishes to be customized by buyers) on or before June 30, 2010.  The Court entered the order granting the Auction Motion on January 8, 2010. [7]

23.    At the hearings on the Dismissal Motion and the Original Disclosure Statement held on February 2, 2010 at 10 a.m., the Court continued the hearings on both matters to March 16, 2010 at 10:00 a.m. to provide the Debtor with an opportunity to file updated versions of the Original Plan and Original Disclosure Statement.

24.    On February 26, 2010, the Debtor filed amended versions of the Original Plan and Original Disclosure Statement (the "Plan" and "Disclosure Statement") to reflect all of the developments in the Debtor's bankruptcy case since the filing of the Original Plan and to incorporate the impact of the then-anticipated public auction event on the Debtor's cash flow projections for the plan.

25.    At the continued hearings on March 16, 2010, the Court denied Bank of America's Dismissal Motion and approved the Debtor's Disclosure Statement.  The Court also set a hearing to consider confirmation of the Plan for October 14, 2010 at 1:30 p.m. (with such hearing to be continued, to the extent necessary, to October 15, 2010 at 9:00 a.m. and October 21, 2010 at 1:30 p.m.) as well as various deadlines relating thereto.

26.    Objections to confirmation of the Plan were filed by Bank of America and various alleged mechanic's lien creditors.  The objections to confirmation of the Plan asserted by the mechanic's lien creditors revolved primarily around the issue of lien priority.  Specifically, the mechanic's lien creditors alleged that their liens against the Property collectively had priority over

---

[7] Despite the Debtor's efforts, the Debtor was unable to proceed with the auction due to its inability to obtain Fannie Mae approval to offer financing to prospective purchasers of the units in the Property.  Without the ability to offer financing to prospective purchasers, the auction would have had very little chance of success.  Accordingly, the Debtor determined that it was not in the best interests of the estate to go forward with the auction and undertake the expenses associated therewith.

the lien held by Bank of America, and that their claims should be treated accordingly under the Plan.

27.    Subsequently, the Debtor began negotiating with the alleged mechanic's lien creditors (as a group) to address their various concerns about the Plan and to try to reach the terms of a consensual Plan and Disclosure Statement.  In the meantime, there was litigation pending before this Court between Bank of America and a certified class of alleged mechanic's lien creditors to determine the respective priority of their liens (the "Lien Priority Litigation").

28.    Given the Debtor's belief that the resolution of the Lien Priority Litigation would pave the way for confirmation of a consensual (or mostly consensual) form of the Plan, the Debtor requested a continuance of the Plan confirmation hearings scheduled in October 2010 and a corresponding extension of the briefing and discovery deadlines relating thereto.  The mechanic's lien creditors who were involved in the Lien Priority Litigation (many of whom filed objections to confirmation of the Plan) supported the Debtor's request to continue the Plan confirmation hearings.

29.    Ultimately, the Court granted the Debtor's request for a continuance of the confirmation hearings.  Accordingly, on August 3, 2010, the Court entered an order (i) taking the confirmation hearings scheduled in October, 2010 off calendar, (ii) vacating the remaining deadlines for the filing of papers with respect to confirmation of the Plan, and (iii) setting a status conference on December 1, 2010 at 1:30 p.m. to consider the setting of further hearings and other matters pertaining to the Plan.

30.    At the status conference held on December 1, 2010, the parties to the Lien Priority Litigation indicated that they were in the process of completing their discovery and anticipated being ready for trial in February 2011.  The Court scheduled a trial for Phase 1 of the Lien Priority Litigation on February 10 and 11, 2011 and set briefing schedules relating thereto.

31.    Given that the objections to confirmation of the Plan raised by the mechanic's lien creditors revolved primarily around the issue of lien priority, the Debtor requested that the status conference regarding the Plan be continued for an additional approximately 120 days to provide

the Debtor with sufficient time following the trial in the Lien Priority Litigation (scheduled in February, 2011) to formulate and file modified versions of the Plan and Disclosure Statement and, to the extent necessary, obtain approval of the modified Disclosure Statement.  The Court granted the Debtor's request and continued the status conference to March 2, 2011 at 1:30 p.m.

32.    Shortly after the December 1, 2010 status conference, Bank of America filed a motion seeking relief from the automatic stay (the "Stay Relief Motion"), presumably to foreclose against the Property.  The Debtor filed a timely opposition to the Stay Relief Motion.  At the hearing on the Stay Relief Motion, held on February 1, 2011 at 10:00 a.m., the parties to the Lien Priority Litigation advised the Court that the Lien Priority Settlement (at least, in principle) had been reached between Bank of America and the class of mechanic's lien creditors.  At the conclusion of such hearing, the Court continued the hearing on the Stay Relief Motion to May 3, 2011 at 10:00 a.m.[8] and ordered that the Debtor file further amended versions of the Plan and Disclosure Statement within thirty (30) days following the hearing on a motion to approve the Lien Priority Settlement.

33.    The motion for approval of the settlement between Bank of America and the class of mechanic's lien claimants was filed on April 5, 2011 and set for hearing on May 3, 2011, resulting in a June 3, 2011 deadline for the Debtor to file its amended plan and disclosure statement.  The Court entered an order granting the motion for approval of the settlement between Bank of America and the class of mechanic's lien claimants on May 20, 2011.

34.    On April 5, 2011, Bank of America filed a separate motion for an order requiring adequate protection (the "Adequate Protection Motion").  The Debtor filed a timely opposition to the Adequate Protection Motion.  The hearing on the Adequate Protection Motion was set for April 26, 2011 at 10:00 a.m. (the same date and time as the hearing on the Stay Relief Motion).

---

[8]  The hearing on the Stay Relief Motion was subsequently rescheduled by the Court to April 26, 2011 at 10:00 a.m.

35.    At the hearing held on April 26, 2011, the Court denied Bank of America's Adequate Protection Motion and continued the hearing on Bank of America's Stay Relief Motion to June 14, 2011 at 10:00 a.m.  At that time, the Court indicated that the Stay Relief Motion would be granted on June 14, 2011 if the Debtor did not file an amended plan and disclosure statement by June 3, 2011 or if the amended plan filed by the Debtor did not appear to be confirmable.

36.    Recognizing the risks, costs and delays associated with further litigation – both in the Guaranty Litigation and the Debtor's bankruptcy case – the Borrower Parties and Bank of America agreed to participate in mediation before the Honorable Randall J. Newsome on May 3, 2011 so that the parties could meet face to face and attempt to reach a global resolution of their various disputes.  The mediation, which was conducted over an approximately sixteen hour period, was extremely successful and resulted in an agreement set forth in a term sheet signed by all of the parties (the "Term Sheet").

37.    Pursuant to the Term Sheet, Bank of America was required to present a draft settlement agreement, which incorporated the terms of the Term Sheet, to the Borrower Parties by May 17, 2011, and the Borrower Parties, in turn, were required to respond to the draft settlement agreement within five business days (*i.e.*, by May 24, 2011).  All of the parties have complied with the foregoing requirements, and the Settlement Motion was filed on May 27, 2011, with a copy of the BofA Settlement (in substantially final form) attached thereto.  The hearing on the Settlement Motion has been set on an expedited basis on June 10, 2011 at 9:00 a.m.

38.    The BofA Settlement represents a global resolution of all of the disputes among the Debtor, the Guarantors and Bank of America arising from and relating to the Guaranty Litigation, the Debtor's bankruptcy case, and all other claims that such parties may have against each other in any capacity including, without limitation, any affiliate entities involved with the Property.  The salient terms of the BofA Settlement are summarized in the Settlement Motion and are fully set forth in Exhibit "A" to the Declaration of M. Aaron Yashouafar attached to the Settlement Motion. In order to implement the terms of the BofA Settlement, the Debtor engaged in negotiations with multiple parties concerning the terms and conditions upon which such parties would agree to

provide sufficient financing or equity to fund a plan of reorganization consistent with the terms of the BofA Settlement.  After arm's length negotiations with a number of prospective financing sources and investors, ultimately Greystar agreed to fund the New Plan with a contribution of $95 million in exchange for all of the membership interests in the Reorganized Debtor.  As part of the Plan Agreement, Greystar agreed to pay all of the claims held by Bank of America arising out of, relating to and/or secured by the BofA Loan Agreement and all of Bank of America's right, title and interest in and under all documents, agreements and instruments relating thereto (collectively, the "BofA Claim") through the New Plan or acquire the BofA Claim in accordance with the terms of the BofA Settlement and, subject to the terms of the Plan Agreement, to support the Debtor's efforts to consummate a financial restructuring of the Debtor's indebtedness and other obligations through the New Plan which would be jointly sponsored by RLI, the Debtor and Greystar (collectively, the "Plan Proponents").  RLI and Greystar entered into that certain letter of intent dated May 23, 2011 (the "LOI"), pursuant to which RLI committed, among other things, to cause the Debtor to enter into the Plan Agreement with Greystar and seek this Court's approval for its terms.

39.    The Plan Agreement, and the New Plan described therein, contemplates payment in full or other consensual resolution of all allowed claims in this case.  True and correct copies of the Plan Agreement and related agreements are attached as Exhibit "1" to the Declaration of M. Aaron Yashouafar annexed hereto (the "Yashouafar Declaration").  The New Plan shall provide, among other things, that Greystar shall receive 100% of the equity interests on the effective date of the New Plan.  In addition, on the effective date of the New Plan, Greystar shall provide $95 million – an amount of funds determined by the Debtor as sufficient to pay all allowed claims in full or to create a reserve sufficient to pay any disputed claims once allowed.   For example, the New Plan contemplates the creation of a reserve on the effective date in an amount sufficient to pay all allowed claims of the mechanic's lien claimants in full on the later of (a) the effective date of the New Plan, or (b) the date upon which the amount of any mechanic lien claimant's claim is determined by final order of a court of competent jurisdiction; provided, however, that the amount

1    paid to holders of allowed mechanics' lien claims and the amount deposited into the reserve shall

2    not exceed $16 million in the aggregate.

3    40.    The Plan Agreement sets forth the obligations to be undertaken by the Debtor in

4    support of confirmation of the New Plan, including, but not limited to, the following:

5        •    To file this Motion as soon as reasonably practicable after the execution of the

6            Plan Agreement by the parties;

7        •    To file the New Plan and an amended disclosure statement with this Court as soon

8            as reasonably practicable after the entry of the Order requested by this Motion,

9            and to use commercially reasonable efforts to obtain approval of the disclosure

10           statement describing the New Plan; and

11       •    To use commercially reasonable efforts to obtain confirmation of the New Plan as

12           soon as reasonably practicable, in accordance with the Bankruptcy Code and on

13           terms consistent with the Plan Agreement and Plan Term Sheet, but in any event

14           so that the effective date of the New Plan occurs by not later than August 22,

15           2011 (as may be extended by written agreement of Greystar, the "Outside Date").

16   41.    The Plan Agreement also provides that, at Greystar's option, Greystar will (i)

17   acquire (by assignment) the BofA Claim from Bank of America for a cash payment of

18   $68,000,000, as the designated "Purchaser" under the BofA Settlement[9], on or before the effective

19   date of the New Plan, or (ii) if Greystar does not previously acquire the BofA Claim prior to the

20   effective date of the New Plan, satisfy the BofA Claim in full by cash payment of $68,000,000

21   through the New Plan.

22   42.    The Plan Agreement requires, among other things, that the BofA Claim be

23   approved and allowed as of the earlier of (i) the effective date of the New Plan or (ii) the date on

24   which Greystar acquires the BofA Claim, (A) in an amount reasonably acceptable to Greystar, but

25

26       [9] The Borrower Parties and RLI executed that certain Borrower Parties Designation Agreement
     dated as of June 3, 2011, pursuant to which they agreed to designate Greystar as the designated
27   "Purchaser" under the BofA Settlement.  A true and correct copy of the Borrower Parties Designation
     Agreement is attached as Exhibit "B" to the Plan Agreement.

28

18

1   in no event less than an amount equal to $78,422,049.33 plus interest at the default rate and all

2   fees, charges and other costs which have accrued under the BofA Loan Agreement from and after

3   September 3, 2009, and (B) as perfected, valid, and duly enforceable (without any defense,

4   counterclaim, right of offset or subordination, or any other claim or challenge by any party in

5   interest) with first priority security against the Property, subject only to the Mechanic's Lien

6   Claims (as defined in the Plan Agreement).

7          43.    The Plan Agreement provides that, if Greystar acquires the BofA Claim by the

8   Outside Date and the effective date of the New Plan does not occur by such Outside Date, subject

9   to the terms of the Plan Agreement, Greystar shall have automatic *in rem* relief from the automatic

10  stay to foreclose on the Debtor's Property commencing on the Outside Date using the full par

11  principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees, costs and

12  other charges, to credit bid on the Property (subject only to the Mechanics' Lien Claims) (the

13  "Foreclosure Right").[10]  Such *in rem*  relief will apply to the Property in the instant bankruptcy

14  case and any other bankruptcy cases currently pending or commenced in the future by any party,

15  including without limitation any affiliate of the Debtor or any holder of a claim against or interest

16  in the Debtor or against the Property.  The foreclosure sale shall be set, at Greystar's option, as

17  early as September 2, 2011 without further notice, hearing or order of the Bankruptcy Court and

18  with no limitations on such relief.  Since, among other reasons, (a) the Property has been heavily

19  marketed and previously subject to a judicial foreclosure proceeding, (b) the Mechanics' Lien

20  Claims will be satisfied or assumed in any foreclosure sale, (c) no other secured creditors other

21  than Bank of America and the Mechanics' Lien Claimants hold allowed, perfected and duly

22  enforceable secured claims against the Property and (d) RLI, as sole holder of interests of the

23  Debtor, was directly involved in the negotiations over the Plan Agreement and the Foreclosure

24  Right, the Debtor believes that the foregoing timing for the foreclosure sale and the exercise of the

25

26        [10]  For avoidance of doubt, Greystar may acquire the BofA Claim for $68 million but will be able to, among other things, credit bid the full par (and undiscounted) BofA Claim (plus accrued and

27  unpaid default interest, fees, and other charges) in any foreclosure sale or to vote the BofA Claim in the foregoing undiscounted amount in connection with any plan of reorganization.

28

Foreclosure Right is commercially reasonable under applicable law.  The Debtor believes that the Foreclosure Right is comparable to the right to foreclose provided to Bank of America under the BofA Settlement as a remedy for the Debtor's non-performance.

44.    The Plan Agreement further provides that, if Greystar acquires the BofA Claim and the effective date of the New Plan does not occur by the Outside Date, subject to the terms of the Plan Agreement, Greystar shall also have the right to credit bid the full par principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees, costs and other charges (subject only to the Mechanic's Lien Claims) at an auction of the Property to be held pursuant to 11 U.S.C. § 363 (the "363 Auction") and in accordance with the Bidding Procedures described in the Plan Agreement (the "363 Purchase Right").  As set forth in the Plan Agreement, the Debtor shall file the appropriate motions to approve the Bidding Procedures and 363 Auction so that the hearing for approval of the result of the 363 Auction of the Property can occur on September 2, 2011 or the first hearing date thereafter that is available to the Court, but in no event later than September 16, 2011.

45.    Pursuant to the Plan Agreement, the Debtor is required to obtain entry of a Court order approving the Plan Agreement and related agreements as soon as practicable, but in no event later than June 20, 2011.  Accordingly, the Debtor has filed concurrently herewith an *ex parte* application for an order shortening time on notice for hearing on this Motion, pursuant to which **the Debtor is seeking to have this Motion heard on June 10, 2011 at 9:00 a.m. (the same date and time as the hearing on the Settlement Motion) or as soon thereafter as is practicable for the Court, but in no event later than June 17, 2011**.

## III.    DISCUSSION

**A.    The Plan Agreement Reflects The Sound Business Judgment Of The Debtor, Is Fair, Reasonable And Beneficial To The Estate, And Should Be Approved.**

Section 105(a) of the Bankruptcy Code provides, in relevant part, that "(t)he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b)(1) of the Bankruptcy Code, in turn, provides, in

relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Courts have required a proposed transaction not in the ordinary course be supported by the sound business judgment of the debtor considered in the context of the facts of each particular case. *See, e.g., In re Walter*, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988) ("… to satisfy [a debtor's] fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.... Whether the proffered business justification is sufficient depends on the case."); *In re America West Airlines, Inc.*, 166 B.R. 908, 911 (Bankr. D. Ariz. 1994) ("When a transaction is out of the ordinary course of business, after notice and a hearing, it falls to the Bankruptcy Court to determine whether to approve the transaction based on the facts and history of the case"); *In re Chateaugay Corp.*, 973 F.2d 141, 145 (2d Cir. 1992) (holding that a good business reason must exist to authorize a use of property outside of the ordinary course under section 363); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722* F.2d 1063, *1071* (2d Cir. 1983) (same); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991) (same).

Once a debtor articulates a valid business justification under section 363 of the Bankruptcy Code, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. *See Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.), 147* B.R. 650, 656 (S.D.N.Y. 1992). Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. ofAsbestos-Related Litigants v. Johns-Manville Corp (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The protection of the business judgment rule continues to operate to shield a debtor's management from judicial second-guessing. *See In re Integrated Res. Inc., 147* B.R. at 656; *In re Johns-Manville,* 60 B.R. at 615-16 ("[T]he Code favors the

continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.")  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

Here, it cannot reasonably be argued that the Debtor's decision to enter into the Plan Agreement is anything but a sound exercise of its reasonable business judgment.  The Plan Agreement paves the way to a rapid exit from bankruptcy, by way of a plan that pays in full, or otherwise consensually resolves, all of the claims against the Debtor and provides for a potential recovery by the Debtor's equity interest holders.  Given the history of this case, this type of result would have been inconceivable absent the Plan Agreement and the BofA Settlement with Bank of America.  The resolution of this case comes after more than 2 years of extended and hard-fought litigation, substantial legal fees incurred by all parties, and multiple efforts to negotiate a plan of reorganization that would be supported by all claimants.  By any standard, the Plan Agreement benefits the estate and should be approved.

**B.    The Plan Agreement Complies With Section 1125 Of The Bankruptcy Code.**

The Debtor submits that the Plan Agreement complies with the requirements of Section 1125 of the Bankruptcy Code.  Section 1125(b) provides, in relevant part, that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title ... unless, at the time of or before such solicitation, there is transmitted ... a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).

Courts have long recognized that the scope of impermissible postpetition "solicitation" under Section 1125(b) should be interpreted narrowly, and that Section 1125(b) should not be used to inhibit negotiations among the parties in interest. *See Century Glove, Inc. v. First American Bank of New York,* 860 F.2d 94, 101 (3d Cir. 1988); *see also Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 81 B.R 813, 814-16 (Bankr. S.D.N.Y. 1988). Accordingly, courts have approved postpetition plan support agreements reached among

debtors and their creditors. *See, e.g., In re Tronox Inc.,* Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Dec. 23, 2009) [Docket No. 1030] (approving postpetition plan support agreement); *In re Visteon Corp.,* Case No. 09-11786 (CSS) (Bankr. D. Del. June 17, 2010) [Docket No. 3427] (same); *In re Owens Corning,* Case No. 00-03837 (JKF) (Bankr. D. Del. June 29, 2006) [Docket No. 18208] (same).[11]

The Plan Agreement is the product of extensive negotiations among the parties. The Plan Agreement does not dispense, or purport to dispense, with the solicitation and voting requirements of the Bankruptcy Code. In particular, the Plan Agreement does not absolutely commit any of the parties thereto to support or vote for a particular plan of reorganization with no consideration of the disclosures set forth in an approved disclosure statement. The Plan Agreement thus contemplates that the Debtor would file and receive court approval for a disclosure statement with respect to the New Plan, and that only thereafter, and after review of the approved Disclosure Statement and its attachments, would the parties to the Plan Agreement be obligated to exercise their chapter 11 voting rights.

Given that the Plan Agreement is the product of the very plan negotiations that are so critical to the Chapter 11 process and that should, as a policy matter, be strongly encouraged, and the flexibility afforded to the parties to the Plan Agreement, the Debtor submits that its entry into the Plan Agreement does not constitute a "solicitation" of the votes of any creditor that would violate either the letter or the spirit of section 1125(b) of the Bankruptcy Code.

## IV.    CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1)    finding that notice of the Motion was adequate and appropriate under the circumstances;

(2)    granting the Motion in its entirety;

---

[11] The Debtor has not annexed copies of the unreported orders cited herein. Copies of these orders are available upon request to the Debtor's counsel.

(3)    approving the Plan Agreement and all related documents, including, without limitation, that certain Borrower Parties Designation Agreement which is attached to the Plan Agreement, in the forms attached as Exhibit "1" to the Yashouafar Declaration annexed hereto, in their entirety;

(4)    authorizing and directing the Debtor to take all steps necessary to consummate the terms and conditions of the Plan Agreement, the Borrower Parties Designation Agreement and other related documents including, without limitation, to (i) irrevocably designate Greystar as the Purchaser under the BofA Settlement; and (ii) file the New Plan in accordance with the terms and provisions of the Plan Term Sheet;

(5)    approving and allowing the BofA Claim as of the earlier of (i) the effective date of the New Plan or (ii) the date on which Greystar acquires the BofA Claim, (A) in an amount reasonably acceptable to Greystar, but in no event less than an amount equal to $78,422,049.33 plus interest at the default rate and all fees, charges and other costs which have accrued under the BofA Loan Agreement from and after September 3, 2009, and (B) as perfected, valid, and duly enforceable (without any defense, counterclaim, right of offset or subordination, or any other claim or challenge by any party in interest) with first priority security against the Property, subject only to the Mechanic's Lien Claims;

(6)    approving as commercially reasonable under applicable law Greystar's exercise of the Foreclosure Right and the scheduling of foreclosure sale with respect to the Property at a time and date of Greystar's choosing on and after September 2, 2011 and directing the Debtor and The Roosevelt Lofts, Inc. and each of their respective affiliates to support and not interfere with the Foreclosure Right;

(7)    setting hearings to consider approval of the disclosure statement describing the New Plan and confirmation of the New Plan so that the effective date of the New Plan can occur by August 22, 2011;

1      (8)    authorizing and directing the Debtor to take all steps necessary to implement the

2  363 Purchase Right, including, without limitation, to obtain entry of a Court order approving the

3  Bidding Procedures described in the Plan Agreement;

4      (9)    setting a hearing to consider approval of the 363 Auction of the Property and the

5  results thereof on September 2, 2011 or the first hearing date thereafter that is available to the

6  Court, but in no event later than September 16, 2011; and

7      (10)    granting such other and further relief as may be necessary or appropriate under

8  the circumstances.

9  Dated: June 3, 2011          ROOSEVELT LOFTS, LLC

By:_____
          DAVID L. NEALE
          JULIET Y. OH
          LEVENE, NEALE, BENDER, YOO
             & BRILL L.L.P.
          Attorneys for Chapter 11 Debtor and
          Debtor in Possession

**DECLARATION OF M. AARON YASHOUAFAR**

I, M. Aaron Yashouafar, hereby declare as follows:

1.      I am over 18 years of age.  I am the President of The Roosevelt Lofts, Inc. ("RLI") which is the Manager of Roosevelt Lofts, LLC, a Delaware limited liability company, debtor and debtor in possession herein (the "Debtor").  Accordingly, I am familiar with virtually all aspects of the Debtor's real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles which was converted by the Debtor into 222 upscale condominium residences plus commercial retail space and parking (the "Property").  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I submit this declaration in support of the Debtor's motion (the "Motion") for the entry of an order authorizing the Debtor and other parties thereto to enter into a plan support agreement (the "Plan Agreement") and related agreements in the forms attached as Exhibit "1" hereto.  Any terms not defined herein have the meanings ascribed to them in the Motion.

3.      On April 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession.

4.      The Debtor is the owner of the Property.

5.      On or about March 9, 2006, the Debtor entered into a construction loan agreement (the "Loan Agreement") with Bank of America, N.A., individually and as administrative agent for a group of lenders[12] ("Bank of America"), pursuant to which the Debtor obtained a loan from Bank of America in the original principal sum of $78,840,375 (the "Loan").  On or about March 9, 2006, the Debtor executed a Deed of Trust Note in the original principal sum of $78,840,375 (the "Note").  The Loan was obtained by the Debtor for the purpose of converting the Property

---

[12] Bank of America is comprised of Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

into 222 individually subdivided, luxury residential condominium units, a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Property.

6.      The Loan Agreement and the Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "Fee Deed of Trust") and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "Leasehold Deed of Trust," and together with the Fee Deed of Trust, the "Deeds of Trust"). The Deeds of Trust encumber the Property, including an absolute assignment of all rents, issues and profits generated from the operation of the Property (collectively, the "Collateral").

7.      In further consideration of the Loan and extension of credit, on or about March 9, 2006, each of the Guarantors agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "Guaranty"). The Loan Agreement, Note, Deeds of Trust and Guaranty, together with all modifications thereto and all other ancillary documents or agreements (including, without limitation, title policies, endorsements, etc.), and the rights, claims and remedies associated therewith are collectively referred to as the "BofA Loan Agreement."

8.      On or about December 30, 2008, Bank of America issued a notice of default to the Borrower Parties, contending that each of the Borrower Parties had defaulted on their obligations to Bank of America under the BofA Loan Agreement. On March 23, 20098, Bank of America caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office.

9.      On or about April 3, 2009, Bank of America filed a complaint against the Debtor and the Guarantors in the Superior Court of the State of California for the County of Los Angeles ("State Court") for, among other things, breach of the Guaranty, appointment of a receiver and

judicial foreclosure on its Deeds of Trust, thereby commencing that certain case bearing the number SC 102472. Thereafter, the Guarantors filed a cross-complaint asserting various claims against Bank of America. The litigation in State Court relating to the claims asserted by Bank of America in its complaint and the claims asserted by the Guarantors in their cross-complaint is collectively referred to herein as the "Guaranty Litigation."

10.    Days after filing its complaint in State Court, Bank of America filed an *ex parte* application with the State Court for the appointment of a receiver.

11.    As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code to have the ability and opportunity to close escrow on the residential units that were then under contract, to market and sell the remaining residential units in the Property, and to complete construction on the Property, all of which would provide the Debtor with the ability to restructure and repay the Loan and its other debts for the benefit of all creditors.

12.    Although the Guaranty Litigation was stayed as against the Debtor upon the filing of the Debtor's bankruptcy case, Bank of America and the Guarantors have remained embroiled in litigation in State Court. As noted above, on or about November 16, 2010, the Guarantors filed a cross-complaint asserting various claims against Bank of America.

13.    In the meantime, the Debtor and Bank of America continued to clash throughout the pendency of the Debtor's bankruptcy case.

14.    Shortly after the commencement of the Debtor's bankruptcy case, the Debtor filed two (2) motions seeking Court authority to assume a number of purchase and sale agreements with various buyers for residential units in the Property and to consummate the sales of the units under the terms of such purchase and sale agreements, free and clear of all liens, claims, interests and encumbrances (the "Sale Motions"). Bank of America as well as other parties in interest, including certain buyers, filed oppositions to the Sale Motions. Ultimately, the Debtor withdrew the Sale Motions.

15.    Although the Debtor engaged in discussions with Bank of America and the Official Committee of Unsecured Creditors appointed in the Debtor's case in an effort to

1   formulate the terms of a consensual plan of reorganization, such discussions proved to be

2   unfruitful.

3          16.    In the meantime, regardless of the extent to which the Property was occupied, the

4   Debtor continued to incur operating expenses associated with the maintenance of the Property.

5   At that time, the Debtor had very limited cash flow from commercial leases and a few residential

6   tenants.  In Bank of America's oppositions to the Sale Motions, Bank of America had suggested

7   that renting the residential units in the Property on a short-term basis would be a more prudent

8   solution than selling the units on an individual basis, particularly given the depressed state of the

9   real estate market at that time.  The Debtor determined, in the exercise of its sound business

10  judgment and, in part, in response to the objection of Bank of America to the Sale Motions, that

11  renting residential units in the Property for a short term would allow the Debtor to continue to

12  pursue longer term strategies for the restructuring of its financial affairs, including, without

13  limitation, the sale or further lease of units, a combination thereof, or a sale of the Property,

14  while at the same time generating cash flow to help offset the operating expenses being incurred

15  on a monthly basis.

16         17.    Although the Debtor did not believe Bank of America's consent to the Debtor's

17  proposed leasing program was required, since the Debtor was attempting to cooperate with Bank

18  of America in formulating a mutually agreeable plan of reorganization, the Debtor approached

19  Bank of America in mid-June 2009 regarding the parameters of the Debtor's proposed short-term

20  leasing program and sought Bank of America's consent to such program.  When Bank of

21  America's consent to the proposed leasing program was not forthcoming, the Debtor filed an

22  emergency motion on August 27, 2009 seeking authority to commence the program to permit the

23  Debtor to enter into short-term residential leases (the "Leasing Program Motion").  The Court

24  authorized the Debtor to commence its proposed short-term leading program over Bank of

25  America's objection, subject to the terms and conditions described in the order entered by the

26  Court on September 8, 2009.

27

28

18.    Subsequently, the Debtor successfully negotiated and entered into residential leases for dozens of the units in the Property in accordance with the Debtor's leasing program.

19.    After Bank of America declined to stipulate to a further continuance of the Section 362(d)(3) time period applicable to the Debtor's case, the Debtor filed its *"Chapter 11 Plan of Reorganization"* (the "Original Plan") on August 31, 2009.  The Original Plan provided for full payment of all allowed claims over time, with interest.

20.    On November 24, 2009, Bank of America filed a motion seeking to dismiss the Debtor's bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the "Dismissal Motion") based on, among other alleged grounds, the Debtor's failure to file a disclosure statement with respect to the Original Plan.  The hearing on the Dismissal Motion was originally calendared for December 15, 2009, but was subsequently continued by stipulation of the parties to February 2, 2010 at 10:00 a.m.  Pursuant to the foregoing stipulation, the Debtor agreed to file a disclosure statement with respect to the Original Plan, as well as a notice of the hearing on such disclosure statement, by December 28, 2009.

21.    On December 28, 2009, the Debtor filed a disclosure statement describing the Plan (the "Original Disclosure Statement").  The hearing on the Disclosure Statement was set for February 2, 2010 at 10:00 a.m., the same date and time as the hearing on the Dismissal Motion.

22.    One of the concerns that had been expressed by Bank of America was the potential negative impact that a sale of only a few, but not a substantial number, of the units could have on the value of the Property and the remaining units in the Property.  Based on Bank of America's concerns and Bank of America's unwillingness to negotiate or otherwise discuss the terms of the Plan, among other reasons, the Debtor determined that conducting a public auction of a large proportion of the units in the Property, following an aggressive marketing campaign, would generate substantial interest in the Property and its units within the market, and result in the expeditious closing of sales on such units within a short span of time.

23.    Accordingly, on December 24, 2009, the Debtor filed a motion (the "Auction Motion"), on shortened time, seeking authority to employ Kennedy Wilson Auction Group Inc.

("KW"), a highly experienced auctioneer company, to publicize, market and offer approximately sixty five (65) units (but no fewer than fifty units and no more than seventy five units) in the Property for sale through a public auction.  Pursuant to the Auction Motion, the Debtor proposed to sell only those completed units that were located in the first eight floors of the Property.

24.    Again, Bank of America opposed the Auction Motion.  Ultimately, the Court authorized the Debtor to conduct the public auction over Bank of America's objection.  During the course of the hearing on the Auction Motion held on January 7, 2010, which I participated in, the Court invited all parties in interest, including the Debtor, Bank of America and alleged holders of mechanics' liens (who had objected to the Auction Motion primarily on the limited grounds of lien priority and segregation of sale proceeds), to negotiate a form of order regarding the Auction Motion.  During such negotiations, at Bank of America's request, the Debtor agreed to include in the order provisions regarding the completion of construction in the Property.  Specifically, the order provided for the completion of construction of the ninth and tenth floors (as well as any work remaining on floors two through eight) of the Property on or before March 31, 2010, and the completion of construction of the remaining floors of the Property (other than the penthouse units in the Property, which would have incomplete finishes to be customized by buyers) on or before June 30, 2010.  The Court entered the order granting the Auction Motion on January 8, 2010. [13]

25.    At the hearings on the Dismissal Motion and the Original Disclosure Statement held on February 2, 2010 at 10 a.m., which I personally attended, the Court continued the hearings on both matters to March 16, 2010 at 10:00 a.m. to provide the Debtor with an opportunity to file updated versions of the Original Plan and Original Disclosure Statement.

---

[13] Despite the Debtor's efforts, the Debtor was unable to proceed with the auction due to its inability to obtain Fannie Mae approval to offer financing to prospective purchasers of the units in the Property.  Without the ability to offer financing to prospective purchasers, the auction would have had very little chance of success.  Accordingly, the Debtor determined that it was not in the best interests of the estate to go forward with the auction and undertake the expenses associated therewith.

26.    On February 26, 2010, the Debtor filed amended versions of the Original Plan and Original Disclosure Statement (the "Plan" and "Disclosure Statement") to reflect all of the developments in the Debtor's bankruptcy case since the filing of the Original Plan and to incorporate the impact of the then-anticipated public auction event on the Debtor's cash flow projections for the plan.

27.    At the continued hearings on March 16, 2010, which I attended, the Court denied Bank of America's Dismissal Motion and approved the Debtor's Disclosure Statement. The Court also set a hearing to consider confirmation of the Plan for October 14, 2010 at 1:30 p.m. (with such hearing to be continued, to the extent necessary, to October 15, 2010 at 9:00 a.m. and October 21, 2010 at 1:30 p.m.) as well as various deadlines relating thereto.

28.    Objections to confirmation of the Plan were filed by Bank of America and various alleged mechanic's lien creditors. The objections to confirmation of the Plan asserted by the mechanic's lien creditors revolved primarily around the issue of lien priority. Specifically, the mechanic's lien creditors alleged that their liens against the Property collectively had priority over the lien held by Bank of America, and that their claims should be treated accordingly under the Plan.

29.    Subsequently, the Debtor began negotiating with the alleged mechanic's lien creditors (as a group) to address their various concerns about the Plan and to try to reach the terms of a consensual Plan and Disclosure Statement. In the meantime, there was litigation pending before this Court between Bank of America and a certified class of alleged mechanic's lien creditors to determine the respective priority of their liens (the "Lien Priority Litigation").

30.    Given the Debtor's belief that the resolution of the Lien Priority Litigation would pave the way for confirmation of a consensual (or mostly consensual) form of the Plan, the Debtor requested a continuance of the Plan confirmation hearings scheduled in October 2010 and a corresponding extension of the briefing and discovery deadlines relating thereto. The mechanic's lien creditors who were involved in the Lien Priority Litigation (many of whom filed

objections to confirmation of the Plan) supported the Debtor's request to continue the Plan confirmation hearings.

31.    Ultimately, the Court granted the Debtor's request for a continuance of the confirmation hearings.  Accordingly, on August 3, 2010, the Court entered an order (i) taking the confirmation hearings scheduled in October, 2010 off calendar, (ii) vacating the remaining deadlines for the filing of papers with respect to confirmation of the Plan, and (iii) setting a status conference on December 1, 2010 at 1:30 p.m. to consider the setting of further hearings and other matters pertaining to the Plan.

32.    At the status conference held on December 1, 2010, the parties to the Lien Priority Litigation indicated that they were in the process of completing their discovery and anticipated being ready for trial in February 2011.  The Court scheduled a trial for Phase 1 of the Lien Priority Litigation on February 10 and 11, 2011 and set briefing schedules relating thereto.

33.    Given that the objections to confirmation of the Plan raised by the mechanic's lien creditors revolved primarily around the issue of lien priority, the Debtor requested that the status conference regarding the Plan be continued for an additional approximately 120 days to provide the Debtor with sufficient time following the trial in the Lien Priority Litigation (scheduled in February, 2011) to formulate and file modified versions of the Plan and Disclosure Statement and, to the extent necessary, obtain approval of the modified Disclosure Statement.  The Court granted the Debtor's request and continued the status conference to March 2, 2011 at 1:30 p.m.

34.    Shortly after the December 1, 2010 status conference, Bank of America filed a motion seeking relief from the automatic stay (the "Stay Relief Motion"), presumably to foreclose against the Property.  The Debtor filed a timely opposition to the Stay Relief Motion. At the hearing on the Stay Relief Motion, held on February 1, 2011 at 10:00 a.m., the parties to the Lien Priority Litigation advised the Court that the Lien Priority Settlement (at least, in principle) had been reached between Bank of America and the class of mechanic's lien creditors. At the conclusion of such hearing, the Court continued the hearing on the Stay Relief Motion to

May 3, 2011 at 10:00 a.m.[14] and ordered that the Debtor file further amended versions of the Plan and Disclosure Statement within thirty (30) days following the hearing on a motion to approve the Lien Priority Settlement.

35.    The motion for approval of the settlement between Bank of America and the class of mechanic's lien claimants was filed on April 5, 2011 and set for hearing on May 3, 2011, resulting in a June 3, 2011 deadline for the Debtor to file its amended plan and disclosure statement.    The Court entered an order granting the motion for approval of the settlement between Bank of America and the class of mechanic's lien claimants on May 20, 2011.

36.    On April 5, 2011, Bank of America filed a separate motion for an order requiring adequate protection (the "Adequate Protection Motion").    The Debtor filed a timely opposition to the Adequate Protection Motion.    The hearing on the Adequate Protection Motion was set for April 26, 2011 at 10:00 a.m. (the same date and time as the hearing on the Stay Relief Motion).

37.    At the hearing held on April 26, 2011, which I attended, the Court denied Bank of America's Adequate Protection Motion and continued the hearing on Bank of America's Stay Relief Motion to June 14, 2011 at 10:00 a.m.    At that time, the Court indicated that the Stay Relief Motion would be granted on June 14, 2011 if the Debtor did not file an amended plan and disclosure statement by June 3, 2011 or if the amended plan filed by the Debtor did not appear to be confirmable.

38.    Recognizing the risks, costs and delays associated with further litigation – both in the Guaranty Litigation and the Debtor's bankruptcy case – the Borrower Parties and Bank of America agreed to participate in mediation before the Honorable Randall J. Newsome on May 3, 2011 so that the parties could meet face to face and attempt to reach a global resolution of their various disputes.    The mediation, which I participated in and which was conducted over an

---

[14]    The hearing on the Stay Relief Motion was subsequently rescheduled by the Court to April 26, 2011 at 10:00 a.m.

approximately sixteen hour period, was extremely successful and resulted in an agreement set forth in a term sheet signed by all of the parties (the "Term Sheet").

39. Pursuant to the Term Sheet, Bank of America was required to present a draft settlement agreement, which incorporated the terms of the Term Sheet, to the Borrower Parties by May 17, 2011, and the Borrower Parties, in turn, were required to respond to the draft settlement agreement within five business days (i.e., by May 24, 2011). All of the parties have complied with the foregoing requirements, and the Settlement Motion was filed on May 27, 2011, with a copy of the settlement agreement reached among Bank of America, the Debtor and RLI (the "BofA Settlement") attached thereto in substantially final form. The hearing on the Settlement Motion has been set on an expedited basis on June 10, 2011 at 9:00 a.m.

40. I believe the BofA Settlement represents a global resolution of all of the disputes among the Debtor, the Guarantors and Bank of America arising from and relating to the Guaranty Litigation, the Debtor's bankruptcy case, and all other claims that such parties may have against each other in any capacity including, without limitation, any affiliate entities involved with the Property. The salient terms of the BofA Settlement are summarized in the Settlement Motion and are fully set forth in Exhibit "A" to the Declaration of M. Aaron Yashouafar attached to the Settlement Motion. In order to implement the terms of the BofA Settlement, the Debtor engaged in negotiations (in which I was actively involved) with multiple parties concerning the terms and conditions upon which such parties would agree to provide sufficient financing or equity to fund a plan of reorganization consistent with the terms of the BofA Settlement.

41. After arm's length negotiations with a number of prospective financing sources and investors, ultimately Greystar GP, LLC (and/or its designee, "Greystar") agreed to fund a fully consensual plan of reorganization that provides for full cash payment of all allowed claims and a distribution of residual value to the holders of interests in the Debtor (the "New Plan") with a contribution of $95 million in exchange for all of the membership interests in the Reorganized Debtor. As part of a plan support agreement and related agreements (collectively,

the "Plan Agreement") entered into by Greystar, the Debtor and RLI, Greystar agreed to pay all of the claims held by Bank of America arising out of, relating to and/or secured by the BofA Loan Agreement and all of Bank of America's right, title and interest in and under all documents, agreements and instruments relating thereto (collectively, the "BofA Claim") through the New Plan or acquire the BofA Claim in accordance with the terms of the BofA Settlement and, subject to the terms of the Plan Agreement, to support the Debtor's efforts to consummate a financial restructuring of the Debtor's indebtedness and other obligations through the New Plan which would be jointly sponsored by RLI, the Debtor and Greystar (collectively, the "Plan Proponents"). RLI and Greystar entered into that certain letter of intent dated May 23, 2011 (the "LOI"), pursuant to which RLI committed, among other things, to cause the Debtor to enter into the Plan Agreement with Greystar and seek this Court's approval for its terms.

42.    The Plan Agreement, and the New Plan described therein, contemplates payment in full or other consensual resolution of all allowed claims in this case. True and correct copies of the Plan Agreement and related agreements are attached as Exhibit "1" hereto. The New Plan shall provide, among other things, that Greystar shall receive 100% of the equity interests on the effective date of the New Plan. In addition, on the effective date of the New Plan, Greystar shall provide $95 million – an amount of funds determined by the Debtor as sufficient to pay all allowed claims in full or to create a reserve sufficient to pay any disputed claims once allowed. For example, the New Plan contemplates the creation of a reserve on the effective date in an amount sufficient to pay all allowed claims of the mechanic's lien claimants in full on the later of (a) the effective date of the New Plan, or (b) the date upon which the amount of any mechanic lien claimant's claim is determined by final order of a court of competent jurisdiction; provided, however, that the amount paid to holders of allowed mechanics' lien claims and the amount deposited into the reserve shall not exceed $16 million in the aggregate.

43.    The Plan Agreement sets forth the obligations to be undertaken by the Debtor in support of confirmation of the New Plan, including, but not limited to, the following:

•    To file the Motion to which this declaration is attached as soon as reasonably

practicable after the execution of the Plan Agreement by the parties;

- • To file the New Plan and an amended disclosure statement with this Court as soon as reasonably practicable after the entry of the Order requested by this Motion, and to use commercially reasonable efforts to obtain approval of the disclosure statement describing the New Plan; and

- • To use commercially reasonable efforts to obtain confirmation of the New Plan as soon as reasonably practicable, in accordance with the Bankruptcy Code and on terms consistent with the Plan Agreement and Plan Term Sheet, but in any event so that the effective date of the New Plan occurs by not later than August 22, 2011 (as may be extended by written agreement of Greystar, the "Outside Date").

44.    The Plan Agreement also provides that, at Greystar's option, Greystar will (i) acquire (by assignment) the BofA Claim from Bank of America for a cash payment of $68,000,000, as the designated "Purchaser" under the BofA Settlement[15], on or before the effective date of the New Plan, or (ii) if Greystar does not previously acquire the BofA Claim prior to the effective date of the New Plan, satisfy the BofA Claim in full by cash payment of $68,000,000 through the New Plan.

45.    The Plan Agreement requires, among other things, that the BofA Claim be approved and allowed as of the earlier of (i) the effective date of the New Plan or (ii) the date on which Greystar acquires the BofA Claim, (A) in an amount reasonably acceptable to Greystar, but in no event less than an amount equal to $78,422,049.33 plus interest at the default rate and all fees, charges and other costs which have accrued under the BofA Loan Agreement from and after September 3, 2009, and (B) as perfected, valid, and duly enforceable (without any defense, counterclaim, right of offset or subordination, or any other claim or challenge by any party in

---

[15] The Borrower Parties and RLI executed that certain Borrower Parties Designation Agreement dated as of June 3, 2011, pursuant to which they agreed to designate Greystar as the designated "Purchaser" under the BofA Settlement.  A true and correct copy of the Borrower Parties Designation Agreement is attached as Exhibit "B" to the Plan Agreement.

1    interest) with first priority security against the Property, subject only to the Mechanic's Lien

2    Claims (as defined in the Plan Agreement).

3         46.    The Plan Agreement provides that, if Greystar acquires the BofA Claim by the

4    Outside Date and the effective date of the New Plan does not occur by such Outside Date,

5    subject to the terms of the Plan Agreement, Greystar shall have automatic *in rem* relief from the

6    automatic stay to foreclose on the Debtor's Property commencing on the Outside Date using the

7    full par principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees,

8    costs and other charges, to credit bid on the Property (subject only to the Mechanics' Lien

9    Claims) (the "Foreclosure Right").[16] Such *in rem* relief will apply to the Property in the instant

10   bankruptcy case and any other bankruptcy cases currently pending or commenced in the future

11   by any party, including without limitation any affiliate of the Debtor or any holder of a claim

12   against or interest in the Debtor or against the Property.  The foreclosure sale shall be set, at

13   Greystar's option, as early as September 2, 2011 without further notice, hearing or order of the

14   Bankruptcy Court and with no limitations on such relief.  Since, among other reasons, (a) the

15   Property has been heavily marketed and previously subject to a judicial foreclosure proceeding,

16   (b) the Mechanics' Lien Claims will be satisfied or assumed in any foreclosure sale, (c) no other

17   secured creditors other than Bank of America and the Mechanics' Lien Claimants hold allowed,

18   perfected and duly enforceable secured claims against the Property and (d) RLI, as sole holder of

19   interests of the Debtor, was directly involved in the negotiations over the Plan Agreement and

20   the Foreclosure Right, the Debtor believes that the foregoing timing for the foreclosure sale and

21   the exercise of the Foreclosure Right is commercially reasonable under applicable law.  The

22   Debtor believes that the Foreclosure Right is comparable to the right to foreclose provided to

23   Bank of America under the BofA Settlement as a remedy for the Debtor's non-performance.

24

25

---

26   [16]   For avoidance of doubt, Greystar may acquire the BofA Claim for $68 million but will be
     able to, among other things, credit bid the full par (and undiscounted) BofA Claim (plus accrued and
27   unpaid default interest, fees, and other charges) in any foreclosure sale or to vote the BofA Claim in the
     foregoing undiscounted amount in connection with any plan of reorganization.

28

47.     The Plan Agreement further provides that, if Greystar acquires the BofA Claim and the effective date of the New Plan does not occur by the Outside Date, subject to the terms of the Plan Agreement, Greystar shall also have the right to credit bid the full par principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees, costs and other charges (subject only to the Mechanic's Lien Claims) at an auction of the Property to be held pursuant to 11 U.S.C. § 363 (the "363 Auction") and in accordance with the Bidding Procedures described in the Plan Agreement (the "363 Purchase Right").  As set forth in the Plan Agreement, the Debtor shall file the appropriate motions to approve the Bidding Procedures and 363 Auction so that the hearing for approval of the result of the 363 Auction of the Property can occur on September 2, 2011 or the first hearing date thereafter that is available to the Court, but in no event later than September 16, 2011.

48.     Pursuant to the Plan Agreement, the Debtor is required to obtain entry of a Court order approving the Plan Agreement and related agreements as soon as practicable, but in no event later than June 20, 2011.  Accordingly, the Debtor has filed concurrently herewith an *ex parte* application for an order shortening time on notice for hearing on the Motion, pursuant to which **the Debtor is seeking to have the Motion heard on June 10, 2011 at 9:00 a.m. (the same date and time as the hearing on the Settlement Motion) or as soon thereafter as is practicable for the Court, but in no event later than June 17, 2011**.

49.     On behalf of the Debtor, I believe that the Plan Agreement is the product of an exercise of sound business judgment.  Without the Plan Agreement, this case would likely drag on and require further extensive and complex litigation.  Under the circumstances, I believe that the Plan Agreement, and the New Plan contemplated therein, is of extreme benefit to the Debtor and all creditors of this estate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of June 2011, at Los Angeles, California.


/s/ M. Aaron Yashouafar
M. Aaron Yashouafar, Declarant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "1"

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of June 3, 2011, is entered into by and among Roosevelt Lofts, LLC, as debtor and debtor in possession (the "**Debtor**") in case no. 09-14214-GM (the "**Bankruptcy Case**") pending before the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), The Roosevelt Lofts, Inc. ("**RLI**") and Greystar GP, LLC (with its designee, as applicable, "**Greystar**").  Each of the Debtor, RLI and Greystar are referred to herein individually as a "**Party**", and collectively as the "**Parties**".

## RECITALS

WHEREAS, prior to the date hereof, representatives of the Parties have discussed the possibility of consummating a financial restructuring of the Debtor's indebtedness and other obligations (the "**Restructuring**") as set forth in this Agreement and the Plan Term Sheet (as defined below).

WHEREAS, it is anticipated that the Restructuring will be implemented through a plan of reorganization jointly sponsored by the Debtor, RLI and Greystar (the "**Plan**") and filed in the Bankruptcy Case.

WHEREAS, each Party desires that the terms and conditions of the Plan will be substantially consistent with those described in the plan term sheet attached hereto as Exhibit A (the "**Plan Term Sheet**") and incorporated herein by reference.

WHEREAS, Bank of America (as defined below) has agreed that it will assign the BofA Claim (as defined below) to a "**Purchaser**" arranged by the "**Borrower Parties**" (as defined below) in accordance with the terms of that certain settlement agreement between the Debtor and Bank of America dated as of June 3, 2011 (the "**BofA Settlement**").  The Debtor is one of the Borrower Parties, and together with the other Borrower Parties and RLI, has executed an agreement to designate Greystar as Purchaser under the BofA Settlement, attached hereto as Exhibit B (the "**Borrower Parties Designation Agreement**") and incorporated herein by reference.

WHEREAS, the Debtor has entered into this Agreement in order to, among other things, implement the terms and conditions of the BofA Settlement.

WHEREAS, subject to the terms and conditions of this Agreement, the Plan Term Sheet and Plan Support Agreement Order (as defined below), the Parties have agreed to support the Restructuring and the Plan.

NOW, THEREFORE, in consideration of the premises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

LA\2263445.11

1.     <u>Incorporation of Plan Term Sheet and Definitions</u>.  The Plan Term Sheet is expressly incorporated herein by reference and is made part of this Agreement.  In the event there is a conflict between the terms and conditions of the Plan Term Sheet, the Letter of Intent (defined below) and this Agreement, the terms and conditions of the Plan Term Sheet shall govern.  Capitalized terms used and not defined in this Agreement shall have the meaning ascribed to them in the Plan Term Sheet.  The Parties agree that this Agreement constitutes the "Definitive Agreement" for purposes of the Letter of Intent.

2.     <u>Definitions</u>.  The following terms shall have the following definitions:

"<u>363 Auction</u>" means the auction with respect to the Property to be held in accordance with the Bidding Procedures.

"<u>363 Order</u>" means an order in form and substance acceptable to Greystar authorizing and directing the Debtor to sell the Property to the winning bidder at the 363 Auction.  The 363 Order shall include, among other things, (a) findings that (i) Greystar upon the exercise of the 363 Purchase Right or (ii) such other bidder that the Bankruptcy Court approves as the winning bidder at the 363 Auction shall acquire good and marketable fee title to the Property, free and clear of all liens, claims, interests and encumbrances, and (b) other reasonable, usual and customary provisions.

"<u>363 Purchase Right</u>" means Greystar's right to credit bid the full original par amount of the BofA Claim (including default interest and fees) at the 363 Auction; <u>provided</u> that if the Plan Effective Date shall have occurred on or by the Outside Date, Greystar shall not exercise the 363 Purchase Right; and <u>provided</u> <u>further</u> that, pursuant to the BofA/Mechanics' Lien Settlement Order, the BofA Claim shall be subject to the Mechanics' Lien Claims in any 363 Auction, but shall not be subject to any claims of any insider or affiliate of the Debtor or RLI.

"<u>363 Sale Hearing</u>" means the hearing to occur on September 2, 2011 or such later date set by the Bankruptcy Court on the first hearing date available after September 2, 2011 (but in no event later than the 363 Sale Outside Date) at which the Bankruptcy Court shall approve the result of the 363 Auction and enter the 363 Order.

"<u>363 Sale Outside Date</u>" means September 16, 2011.

"<u>Agreement</u>" has the meaning set forth in the preamble hereof.

"<u>Bank of America</u>" means Bank of America, N.A., individually and as agent for a group of lenders under the BofA Loan Agreement.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§101 <em>et seq</em>., as amended from time to time and as applicable to the Bankruptcy Case.

"<u>Bankruptcy Case</u>" has the meaning set forth in the preamble hereof.

"<u>Bankruptcy Court</u>" has the meaning set forth in the preamble hereof.

"Bidding Procedures" means the bidding procedures, in form and substance reasonably acceptable to Greystar, that establish the rules and procedures for the 363 Sale and 363 Auction.  Among other provisions, the Bidding Procedures shall (a) require qualified bidders to (i) submit a written bid for the Property (a "**Bid**") and evidence of their financial ability to perform to the Debtor, Greystar and the Official Committee of Creditors appointed in the Bankruptcy Case no later than five business days prior to the 363 Auction, (ii) bid all cash in an amount equal to at least the sum of (A) the BofA Claim, (B) the Mechanics' Lien Claims (in an amount of at least $16,000,000) and (C) an additional $1,000,000, (iii) bid for all of the Property in its entirety, (iv) submit a Bid that contains no contingencies or conditions other than those set forth in the Plan Support Agreement, (v) submit a Bid that does not contain any condition related to financing or the satisfaction of diligence, and (b) provide for (1) Greystar's exercise of the 363 Purchase Right, (2) incremental bidding amounts of at least $250,000 and (3) payment in full and in cash through the Closing of (X) the amount of cash necessary to pay in full the BofA Claim to Greystar as the holder of such claim, and (Y) the amount of cash necessary to pay in full the Mechanics' Lien Claims to the holders of such claims or to fund a reserve for the benefit of such holders to the extent such Mechanics' Lien Claims are disputed by the Debtor.

"Bidding Procedures Motion" means the motion to be filed by the Debtor in form and substance reasonably satisfactory to Greystar seeking entry of the Bidding Procedures Order.

"Bidding Procedures Order" means the order in form and substance satisfactory to Greystar entered by the Bankruptcy Court approving the Bidding Procedures.

"BofA Claim" means (a) all claims held by Bank of America arising out of, relating to and/or secured by the BofA Loan Agreement and (b) all of BofA's right, title and interest in and under all documents, agreements and instruments relating thereto or that constitute the BofA Loan Agreement.  For avoidance of doubt, the BofA Claim for purposes of this Agreement shall not include any obligations on the part of Bank of America to perform under the BofA Loan Agreement.

"BofA Loan Agreement" means, collectively, (a) that certain amended and restated Construction Loan Agreement (the "**Loan Agreement**") with Bank of America as administrative agent for the Bank Group in the original principal amount of $78,840,375, (b) that certain Deed of Trust Note dated as of on or about March 9, 2006 in the original principal amount of $78,840,375 (the "**Note**"), (c) those certain (i) Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "**Fee Deed of Trust**"), and (ii) Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "**Leasehold Deed of Trust**," and collectively, with the Fee Deed of Trust, the "**Deeds of Trust**"), each of which (x) secure the Loan Agreement and Note and (y) encumber the Property (defined

3

below), including an absolute assignment of all rents, issues and profits generated from operation of the Property and (d) all documents, agreements and instruments relating to any of the foregoing..

"BofA/Mechanics' Lien Settlement Order"  means that certain order entered by the Bankruptcy Court (1) Granting Motion by Class Representatives for Approval of Settlement; (2) Approving Settlement; (3) Setting Continued Status Conference; and (4) Other Ancillary Relief, entered by the Bankruptcy Court on May 20, 2011 in Adv. Action No. 10-01031 [docket no. 83].

"BofA Settlement" has the meaning set forth in the recitals hereof.

"BofA/Debtor Settlement Order" has the meaning set forth in Section 6 hereof.

"Borrower Parties Designation Agreement" has the meaning set forth in the recitals hereof.

"Broker" means Charles Sturges and/or CSIV Investments.

"Broker's Commissions" means any and all commissions payable to the Broker in connection with the transactions contemplated by this Agreement.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Claim Assignment" means that certain Assignment of Claims executed or to be executed by Bank of America in favor of the Purchaser in the form attached hereto as Exhibit C, or in such other form as is acceptable to Greystar in its sole discretion.

"Confirmation Hearing" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan, including all exhibits, appendices and related documents, each in form and substance reasonably acceptable to the Parties.

"Disclosure Statement" means the disclosure statement in respect of the Plan which shall be acceptable in form and substance to the Parties.

"Escrow Agreement" means an escrow agreement in the form attached hereto as Exhibit D, or in such other form as is acceptable to Greystar in its sole discretion.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for

certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Parties, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired.

"<u>Foreclosure Right</u>" means Greystar's in rem automatic relief from the automatic stay under 11 U.S.C. Section 362 to credit bid the full original par amount of the BofA Claim (including default interest and fees) in a foreclosure sale of the Property at a date, time and place in Los Angeles, California of Greystar's choosing (on or after September 2, 2011) without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief; <u>provided</u> that if the Plan Effective Date shall have occurred on or by the Outside Date, Greystar shall not exercise the Foreclosure Right; and <u>provided</u> <u>further</u> that, pursuant to the BofA/Mechanics' Lien Settlement Order, the BofA Claim shall be subject to the Mechanics' Lien Claims in any foreclosure sale of the Property but shall not be subject to any claims of any insider or affiliate of the Debtor or RLI.

"<u>Greystar Receivership Stipulation</u>" means that certain stipulation for the appointment of a receiver to take control of the Property in the form attached hereto as <u>Exhibit E</u>, which stipulation shall be executed and delivered concurrently with the execution of this Agreement, but shall only be enforceable once Greystar has the right to exercise its Foreclosure Right.

"<u>Letter of Intent</u>" and "<u>LOI</u>" means that certain Letter of Intent dated as of May 23, 2011 (attached hereto as <u>Exhibit F</u> and incorporated herein by reference).

"<u>Liquidated Damages</u>" means the $500,000 in damages and related guarantees described in Section 12 of the Letter of Intent.

"<u>Material Adverse Change</u>" means, since the date of this Agreement, any change, effect, event, occurrence, development, circumstance or state of facts occurs which has had or would reasonably be expected to have a materially adverse effect on the business, properties, prospects (financial or otherwise), operations, financial condition or results of operations of the Debtor, taken as a whole, or which would materially impair the Debtor's ability to perform its obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the transactions contemplated by this Agreement.

"<u>Mechanics' Lien Claims</u>" means all allowed claims arising under or relating to work of improvement that arose prior to, and remain unpaid as of, the Plan Effective Date and that are duly perfected.

5

"Outside Date" means August 22, 2011, unless such date is extended by written agreement of Greystar (such agreement to be granted or withheld in Greystar's sole discretion).

"Parties" has the meaning set forth in the preamble hereof.

"Plan" means a chapter 11 plan of reorganization under the Bankruptcy Code, which shall be substantially consistent with this Agreement, the Plan Term Sheet and the Plan Support Agreement Order, and otherwise acceptable to Greystar in Greystar's sole discretion and reasonably acceptable to the other Parties.

"Plan Definitive Documents" has the meaning set forth in section 3 hereto.

"Plan Effective Date" means the date on which the Plan becomes effective.

"Plan Support Agreement Order" means an order in the form and substance acceptable to Greystar that, among other things, (a) memorializes and implements the terms of this Agreement, (b) approves the Borrower Parties Designation Agreement and, subject to the terms thereof, irrevocably designates Greystar as the Purchaser under the BofA Settlement, (c) requires the Debtor to file a Plan that provides for (i) Greystar to receive 100% of the equity interests of Roosevelt Lofts, LLC as reorganized (or such entity that holds, as of the Plan Effective Date, such equity interests) free and clear of all liens, claims, encumbrances and interests, (ii) approves and allows the BofA Claim as of the earlier of (A) the Effective Date or (B) the date on which Greystar acquires the BofA Claim (x) in an amount reasonably acceptable to Greystar, but in no event less than an amount equal to $78,422,049.33 plus interest at the default rate and all fees, charges and other costs which have accrued under the BofA Loan Agreement from and after September 3, 2009, and (y) as perfected, valid and duly enforceable (without any defense, counterclaim, right of offset or subordination, or any other claim or challenge by any party in interest) with first priority security against the Property subject only to the Mechanics' Lien Claims as described in the BofA/Mechanics' Lien Settlement Order and (iii) if the Plan has not been performed in accordance with its terms by the Outside Date, automatic in rem relief from stay for Greystar (as holder of the BofA Claim) on the Plan Effective Date to foreclose on the Property (pursuant to the Foreclosure Right) on the tenth day following the Outside Date (with such timing held to be commercially reasonable for the exercise of the Foreclosure Right), (d) approves the Greystar Receivership Stipulation and authorizes and directs the Debtor to perform under and in accordance with its terms and (e) (i) approves and authorizes and directs the Debtor to take all steps necessary to implement the 363 Purchase Right, (ii) obtain entry of the Bidding Procedures Order, (iii) obtain approval of the 363 Order on or before the 363 Sale Outside Date and (iv) authorizes Greystar to take all of the foregoing steps if the Debtor fails to timely take such steps.

"Plan Term Sheet" has the meaning set forth in the recitals hereto.

"Purchaser" has the meaning set forth in the recitals hereto.

6

"Property" means that certain real property located at 727 West 7th Street, Los Angeles, California, and all improvements, personal property (including, without limitation, all accounts of the Debtor, all funds and assets therein, and all Property described on Exhibit G hereto) and other rights related to or appurtenant to such improvements, personal property and real property and any other collateral securing the BofA Claim.

"Restructuring" has the meaning set forth in the recitals hereto.

 "RLI" has the meaning set forth in the preamble hereof.

"Termination Date" has the meaning set forth in section 6 hereto.

 "Termination Event" means the occurrence of any of the events set forth in section 6 hereto.

"Voting Deadline" means the date fixed by the Bankruptcy Court as the deadline for holders of claims to vote on the Plan.  The record date for voting claims shall be the Voting Deadline.

3.    Obligations of the Parties.  Subject to the terms and conditions of this Agreement and the Plan Term Sheet, each of the Parties agrees, subject to the Termination Date (as defined below in section 6 hereof), as follows with respect to the Restructuring and the Plan:

a.    to promptly negotiate, in good faith, the definitive documents implementing, achieving and relating to the Restructuring and the Plan, including, but not limited to, (i) the Disclosure Statement and the Plan and (ii) all other agreements, documents, exhibits (whether to this Plan Support Agreement or otherwise), annexes, schedules and orders of the Bankruptcy Court that are necessary or appropriate for the Restructuring and the prompt consummation of the Restructuring and the Plan (all of the foregoing, collectively with this Agreement, the Plan Term Sheet, the Plan and the Disclosure Statement, and in each case as amended, modified or supplemented from time to time in accordance with the terms hereof or thereof, the "**Plan Definitive Documents**"); provided that, in each case, such Plan Definitive Documents shall not contain terms or conditions which are materially inconsistent with the Plan Term Sheet and shall otherwise be reasonably acceptable in form and substance to the Parties (except as otherwise provided in this Agreement); and

b.    to promptly execute and deliver all Plan Definitive Documents (to the extent a Party thereto), and otherwise support the prompt consummation of the transactions contemplated by, the Plan Definitive Documents, including without limitation, to timely cast an appropriate ballot or ballots in favor of the Plan.

c.    to not object to, or support any action or proceeding or take any other action that would, or would reasonably be expected to, impede or delay, the consummation of the Restructuring, the approval of the Disclosure Statement or the confirmation or consummation of the Plan;

7

d.    to not vote for, consent to, intentionally induce or participate, directly or indirectly, in the formation, filing or prosecution of any other plan of reorganization or liquidation (or disclosure statement related thereto) with respect to the Debtor that is inconsistent with the Plan or the consummation of the Restructuring and the Plan;

e.    other than as expressly contemplated herein or in the Plan Term Sheet, to not directly or indirectly seek, solicit or encourage any other plan, sale, proposal or offer of winding up, liquidation, reorganization, merger, consolidation, dissolution or restructuring of the Debtor or any of its assets;

f.    to not commence or support any action or proceeding to appoint a trustee, conservator, receiver or examiner with expanded powers for the Debtor, or to dismiss the Bankruptcy Case, or to convert the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; and

g.    to use its commercially reasonable efforts to obtain Bankruptcy Court approval of the Disclosure Statement and Plan as promptly as possible and to consummate the Restructuring and the Plan on or before the Plan Effective Date, subject to the terms and conditions set forth herein, the Plan Term Sheet, the Disclosure Statement and Plan.

4.    <u>Obligations of Greystar</u>.

a.    <u>Support of Restructuring and Plan</u>.    Subject to the terms and conditions of this Agreement and the Plan Term Sheet (including entry of the Plan Support Agreement Order), Greystar further agrees that, until this Agreement has been terminated in accordance with section 6 hereof, it shall, subject to its receipt of a Disclosure Statement and related voting and solicitation materials approved by the Bankruptcy Court, (i) vote any and all BofA Claims it holds to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying voting and solicitation materials, and (ii) return a duly-executed ballot in connection therewith no later than the deadline for voting on the Plan, and not (and not seek to) withdraw, annul, rescind, modify or revoke such vote to accept the Plan; <u>provided</u>, <u>however</u>, Greystar shall not be obligated to vote to accept the Plan, and may withdraw or revoke its vote with respect to the Plan, upon (A) the termination of this Agreement (<u>provided</u>, that if Greystar is the terminating party, Greystar is not then in material breach of its obligations under this Agreement); or (B) the withdrawal, amendment, modification of, or the filing of a pleading by any of the other Parties hereto seeking to withdraw, amend or modify, the Plan or the other Plan Definitive Documents in a manner that is adverse to Greystar.

b.    <u>Acquisition of BofA Claim</u>.    Subject to the terms and conditions of this Agreement and the Plan Term Sheet (including entry of the Plan Support Agreement Order), the Claim Assignment and the Borrower Parties Designation Agreement, Greystar further agrees that, at its option, Greystar will (i) acquire (by assignment) the BofA Claim from Bank of America for a cash payment of $68,000,000 on or before the

Plan Effective Date or (ii) if Greystar does not previously acquire the BofA Claim prior to the Plan Effective Date, satisfy the BofA Claim in full by cash payment of $68,000,000 through the Plan. Notwithstanding anything contained herein to the contrary, following the assignment of the BofA Claim to Greystar (or its designee), the amount of the BofA Claim for voting, distribution, the Foreclosure Right, the 363 Purchase Right and all other purposes shall be the full face amount of the BofA Claim, plus all accrued and unpaid interest (including default interest) and other expenses/costs that constitute the BofA Claim. Greystar shall make the deposits described in Section 9 of the Letter of Intent, and such deposits shall be subject to the terms and conditions set forth in this Agreement, the Plan Term Sheet (including entry of the Plan Support Agreement Order), the Letter of Intent and the Escrow Agreement.

c.    <u>Payment of Broker's Commission</u>.    Greystar believes that no Broker's Commission is due and payable. To the extent the Broker's Commission becomes due and payable, Greystar shall pay the Broker's Commission. Nothing contained herein shall be deemed to make the Broker a third-party beneficiary of this Agreement. Greystar will indemnify and defend Debtor and RLI against, and hold such Parties harmless from, any claim by Broker with respect to compensation in connection with this Agreement, the consummation of the transactions contemplated hereby or in connection with the sale of the Property to Greystar. Debtor and RLI agree that each will indemnify and defend Greystar, and hold Greystar harmless from, the claims of any other broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Debtor or RLI, or otherwise to be entitled to compensation in connection with this Agreement, the consummation of the transactions contemplated hereby or in connection with the sale of the Property to Greystar.

d.    <u>Right to be Heard</u>.    Nothing contained herein shall limit the ability of Greystar, as holder of the BofA Claim or otherwise, to appear and be heard, concerning any matter arising in the Bankruptcy Case so long as such appearance is not materially inconsistent with its obligations under this Agreement, the Plan Term Sheet, the Restructuring or the Plan or is not for the purpose of hindering, delaying or preventing consummation of the Restructuring or the Plan.

5.    <u>Obligations of the Debtor and RLI</u>.

a.    To the extent Greystar does not acquire the BofA Claim before the Voting Deadline, the Debtor will use its best efforts to enter into an agreement with Bank of America to ensure that Bank of America shall vote the BofA Claim in favor of the Plan so such vote is timely received on or before the voting deadline

b.    From and after the date hereof, so long as Greystar is willing to perform hereunder, the Debtor and RLI hereby agree that each will not accept offers with respect to any transaction involving or relating to a potential acquisition of the BofA Claim, the Property, the Debtor, RLI or RLI's membership interests in the Debtor (including, without limitation, through a plan of reorganization).

c.     The Debtor and RLI will provide such affidavits and other documentation the title company may require to issue the title insurance contemplated by Section VI(Q) of the Plan Term Sheet.

d.     The Debtor and RLI will (i) not amend, modify, terminate or waive any provision of the BofA Settlement, and (ii) cause Greystar to be designated the Purchaser for purposes of the BofA Settlement and in the Bankruptcy Court order approving the BofA Settlement.  Subject to the satisfaction or waiver of Greystar's obligations hereunder, the foregoing designations shall be irrevocable or further encumber or transfer any interest in the Property or any portion thereof.

e.     The Debtor and RLI will (i) promptly negotiate, in good faith, execute and deliver all documents necessary for, and otherwise support, the prompt consummation of the transactions contemplated by, at the sole discretion of Greystar, the Foreclosure Right and the 363 Purchase Right,  (ii) not object to, or support any action or proceeding or take any other action that would, or would reasonably be expected to, impede or delay, the consummation and Bankruptcy Court approval of the Foreclosure Right, the 363 Purchase Right, entry of the Bidding Procedures Order and the 363 Order, and (iii) use commercially reasonable efforts to obtain Bankruptcy Court approval of the Bidding Procedures Order and the 363 Order as promptly as possible.

f.     Debtor and RLI will provide Greystar with copies of all of the documents comprising the BofA Loan Agreement that are in the possession or control of Debtor, RLI or their respective agents or consultants, together with a list of all such documents, in each case within fourteen days of the date of this Agreement.

6.     Termination of Obligations.

a.     This Agreement shall terminate, and (except as otherwise specifically set forth herein) all of the rights and obligations of the Parties hereunder shall be of no further force or effect, in the event that (i) the Parties mutually agree to such termination in writing or (ii) this Agreement is terminated pursuant to the remaining paragraphs of this section 6.

b.     Each Party may terminate this Agreement by written notice to the other Parties upon the occurrence of any of the following events:

(1)     a material breach by any other Party of its respective obligations, representations or warranties under (i) this Agreement, the Plan Term Sheet, or any other Definitive Document or (ii) the Plan Support Order, which material breach is not cured on or within three (3) business days after the giving of written notice of such breach to the other Parties or, if applicable, on or within the cure period provided for under the applicable agreements or documents; and

(2)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining or restraining the consummation of the Restructuring

and/or the confirmation and consummation of the Plan on the terms and conditions set forth herein and the Plan Term Sheet.

c.      Greystar may terminate this Agreement upon by written notice to the other Parties upon the occurrence of any of the following events:

(1)      the occurrence of a Material Adverse Change;

(2)      the failure of the Plan Effective Date to occur on or before the Outside Date;

(3)      the Debtor fails to file a motion (in form and substance reasonably acceptable to Greystar) seeking Bankruptcy Court Approval of the Plan Support Agreement Order on or before June 3, 2011 (or such later date as may be acceptable to Greystar in Greystar's sole discretion);

(4)      the Bankruptcy Court fails to enter the Plan Support Agreement Order on or before June 20, 2011 (or such later date as may be acceptable to Greystar in Greystar's sole discretion);

(5)      the Debtor fails to file the Bidding Procedures Motion on or before July 8, 2011;

(6)      the Bankruptcy Court fails to enter the Bidding Procedures Order or such order fails to become a Final Order on or before August 5, 2011 (provided, however, that the requirement of a Final Order may be waived by Greystar in its sole discretion);

(7)      the Bankruptcy Court fails, by Final Order entered on or before August 5, 2011, to schedule the 363 Sale Hearing on or before the 363 Outside Sale Date (provided, however, that the requirement of a Final Order may be waived by Greystar in its sole discretion);

(8)      the Bankruptcy Court fails to enter the 363 Sale Order or such order fails to become a Final Order on or before the 363 Outside Sale Date (provided, however, that the requirement of a Final Order may be waived by Greystar in its sole discretion);

(9)      the entry of an order by the Bankruptcy Court invalidating, disallowing or limiting in any respect, as applicable, the amount, enforceability, first priority (subject only to the Mechanics' Lien Claims), or validity of the of the BofA Claim or the liens securing the BofA Claim as described in the Plan Support Order;

(10)      the appointment in the Bankruptcy Case of a trustee or examiner with expanded powers;

11

(11)    the amount of allowed Mechanics' Lien Claims or any reserve required by the Bankruptcy Court under the Plan with respect to the Mechanics' Lien Claims exceeds $16,000,000;

(12)    any of the representations or warranties set forth in the Claim Assignment is or become untrue or incorrect (provided, however, that the Liquidated Damages shall not be payable to Greystar solely due to a breach of a representation or warranty by Bank of America under the Claim Assignment, unless the facts or circumstances giving rise to such breach of such representation or warranty also constitute a separate breach or circumstance which would entitle Greystar to receive the Liquidated Damages);

(13)    any of the representations or warranties of Debtor or RLI set forth in this Agreement is or become untrue or incorrect;

(14)    any of the representations or warranties of any Debtor Related Party (as defined in the Borrower Parties Designation Agreement) set forth in the Borrower Parties Designation Agreement is or become untrue or incorrect;

(15)    any Debtor Related Party (as defined in the Borrower Parties Designation Agreement) breaches any of its covenants or agreements under the Borrower Parties Designation Agreement; or

(16)    the Bankruptcy Court fails to enter an order on or before June 14, 2011 approving the BofA Settlement (in form and substance reasonably acceptable to Greystar) that irrevocably (subject to Greystar's performance hereunder) designates Greystar as the Purchaser under the BofA Settlement (the "**BofA/Debtor Settlement Order**").

d.    The date on which this Agreement is terminated in accordance with this section 6 shall be referred to as the "**Termination Date**".

e.    If this Agreement is terminated pursuant to this section 6, then all further obligations of the Parties hereunder shall be terminated without further liability related to this Agreement; provided that Greystar shall have the right to the Liquidated Damages; and provided further that Greystar shall be unconditionally authorized to exercise the Foreclosure Right and the 363 Purchase Right and to proceed with the 363 Auction and 363 Sale Hearing, and nothing contained herein shall prevent Greystar from exercising the Foreclosure Right and the 363 Purchase Right and to proceed with the 363 Auction and 363 Sale Hearing; and provided further that in the event the Debtor fails to timely file the Bidding Procedures Motion or any other motion or document related to the exercise by Greystar of the 363 Purchase Right, Greystar shall be authorized to file any such motion or document in its sole discretion. Notwithstanding any provision in this Agreement to the contrary, the right to terminate this Agreement under this section 6 shall not be available to any Party whose failure to fulfill any material obligation under

this Agreement has been the cause of, or resulted in, the occurrence of the applicable Termination Event.  The provisions of this Section 6(e) shall survive any termination of this Agreement.

       7.     <u>Representations of the Debtor</u>.  The Debtor hereby represents and warrants to each other Party as follows as of the date hereof:

       a.     <u>Corporate Power and Authority</u>.  It has all requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement and the Plan Term Sheet, subject only to entry of appropriate orders by the Bankruptcy Court.

       b.     <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part, other than the requisite approvals of the Bankruptcy Court.

       c.     <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than as a result of the commencement of the Bankruptcy Case.

       d.     <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Bankruptcy Case.

       e.     <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder (other than the Bankruptcy Case).

       f.     <u>Binding Obligation</u>.  Subject to entry of the Plan Support Agreement Order, this Agreement is the legally valid and binding obligation of the Debtor, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

       g.     Debtor owns all of the Property, and no other person or entity has any ownership interest in the Property or any portion thereof.  To Debtor's knowledge, there are no liens, encumbrances or title defects of any kind affecting the Property, except those described in that certain Preliminary Report prepared by First American Title Insurance Company, May 24, 2011 Update, Order No. NCS-383344-LA2.

h.      [Intentionally Omitted.]

i.      As of the date hereof, a minimum of $78,422,049.33 plus interest at the default rate and all fees, charges and other costs which have accrued under the BofA Loan Agreement from and after September 3, 2009 is owed by Debtor under the BofA Claim.

j.      Attached hereto as <u>Exhibit I</u> is a description of all bank accounts of the Debtor, and the amount of the deposits therein as of the date hereof.

k.      Attached hereto as <u>Exhibit J</u> is a true, correct, complete and current rent roll for the Property that describes all leases, subleases and other occupancy agreements affecting the Property, and all security deposits received by Debtor in connection therewith.

8.      <u>Representations of RLI and Greystar</u>.  Each of RLI and Greystar severally (but not jointly) represents and warrants to the other Parties as follows with respect to itself only and as of the date hereof:

a.      <u>Corporate Power and Authority</u>.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

b.      <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

c.      <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

d.      <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Bankruptcy Case.

e.      <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder (other than the Bankruptcy Case).

f.      <u>Binding Obligation</u>.  Subject to entry of the Plan Support Agreement Order, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as such enforceability may be

limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

9.    <u>Entire Agreement; Prior Negotiations</u>.  This Agreement, the LOI and the Plan Term Sheet and the Borrower Parties Designation Agreement, including any exhibits to any of the foregoing, set forth in full the terms of agreement between and among the Parties and is intended as the full, complete and exclusive contract governing the relationship between and among the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect to the subject matter hereof; <u>provided</u>, that any confidentiality agreement between or among any of the Parties shall remain in full force and effect in accordance with its terms.  No representations, oral or written, other than those set forth herein, may be relied on by any Party in connection with the subject matter hereof.

10.    <u>Amendment or Waiver</u>.  No waiver, modification or amendment of any term or provision of this Agreement, the LOI or the Plan Term Sheet shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Party affected by such waiver, modification or amendment.  No waiver of any of the provisions of this Agreement, the LOI or the Plan Term Sheet shall be deemed or constitute a waiver of any other provision of this Agreement, the LOI or the Plan Term Sheet, whether or not similar, nor shall any waiver be deemed a continuing waiver.  Any modification of this section 10 shall require the written consent of all Parties.

11.    <u>Miscellaneous</u>.

a.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States Bankruptcy Court for the Central District of California, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, but only for such action, suit or proceeding.

b.    <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

c.    <u>Reservation of Rights</u>.  Except as expressly provided in this Agreement or in the Plan Term Sheet, nothing herein is intended to, or does, in any manner, waive, limit, impair or restrict the ability of RLI or Greystar to protect and preserve its rights,

remedies and interests, including its claims, against the Debtor. If the Restructuring contemplated herein and in the Plan Term Sheet is not consummated, or if this Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their respective rights and remedies.

        d.    <u>Headings</u>. The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

        e.    <u>Notice</u>. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile or electronic transmission or mailed (first class postage prepaid) to the parties at the following addresses, email addresses, or facsimile numbers:

        If to the Debtor:

        Roosevelt Lofts, LLC
        c/o Milbank Real Estate Services, Inc.
        Attention:  M. Aaron Yashouafar
        660 S. Figueroa Street, 24th Floor
        Los Angeles, CA 90017
        Fax:  (213) 403-1440
        Email:  mayashoua@milbankre.com

        *with a copy (which shall not constitute notice) to*:

        David L. Neale, Esq.
        Levene, Neale, Bender, Yoo & Brill L.L.P.
        10250 Constellation Boulevard, Suite 1700
        Los Angeles, CA 90067
        Fax:  (310) 229-1234
        Email:  DLN@LNBYB.COM

        If to RLI:

        The Roosevelt Lofts, Inc.
        c/o Milbank Real Estate Services, Inc.
        Attention:  M. Aaron Yashouafar
        660 S. Figueroa Street, 24th Floor
        Los Angeles, CA 90017
        Fax:  (213) 403-1440
        Email:  mayashoua@milbankre.com

        *with a copy (which shall not constitute notice) to*:

        Homan Taghdiri, Esq.

General Counsel
Milbank Real Estate Services, Inc.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

If to Greystar:

Greystar GP, LLC
Attention: A. Joshua Carper
3rd Floor
18 Broad Street
Charleston, NC 29401
United States of America
Fax: (843) 579-9420
Email:  jcarper@greystar.com
*with a copy (which shall not constitute notice) to*:

Robert A. Klyman, Esq.
Latham & Watkins LLP
355 S. Grand Ave.
Los Angeles, CA  90071
Fax:  (213) 891-8763
Email:  robert.klyman@lw.com

f.    Successors and Assigns, No Third-Party Beneficiaries.    This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives, including, without limitation, any chapter 11 or chapter 7 trustee appointed in the Bankruptcy Case.  For avoidance of doubt, Greystar reserves the right to assign this agreement to a designee or affiliate but, notwithstanding such assignment, shall remain liable for all of the obligations of Greystar under this Agreement, the LOI and the Plan Term Sheet.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Person or entity shall, or shall be deemed to, be a third party beneficiary hereof.

g.    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

h.    Counterparts.    This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this agreement may be delivered by facsimile or electronic mail which shall be deemed to be an original for the purposes of this Agreement.

i.      Acknowledgement.    This Agreement is not, and shall not be deemed to be, an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for any purpose or a solicitation for consents to or votes on the Plan.  The vote of any holder of any claim against or interest in the Debtor on or with respect to the Plan shall not be solicited until it has received (or concurrently with the delivery of) the Disclosure Statement and the Plan.

j.      Public Disclosure.  Each of the Debtor and RLI will use its best efforts to (and will cause each of their respective affiliates and insiders to) submit to Greystar in advance for approval all press releases and public filings relating to this Agreement, the Term Sheets, or the transactions contemplated hereby and thereby and any amendments thereof. Except as required by applicable law, the Debtor and RLI (and each of their respective affiliates and insiders) shall not use the name of any Party in any press release without such Party's prior written consent.

k.      No Strict Construction.  This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties hereto or thereto.  Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that such Party or such Party's counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.

l.      Representation.  Each Party has been represented by counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, the LOI and Plan Term Sheet.

m.      WAIVER OF JURY TRIAL.    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

n.      Time Periods.  If any time period or other deadline provided in this Agreement expires on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

*[Remainder of page intentionally left blank; signature pages follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Plan Support Agreement to be duly executed and delivered by their respective duly authorized officers, all as of the date and year first above written.

GREYSTAR GP, LLC,
a Delaware limited liability company


By: _____
    Name:
    Title:


ROOSEVELT LOFTS, LLC,
a California limited liability company

By:  The Roosevelt Lofts, Inc.
    Its:  Managing Member

    By: _____
        M. AARON YASHOUAFAR
        President


THE ROOSEVELT LOFTS, INC.,
a California corporation

By: _____
    M. AARON YASHOUAFAR
    President


M. AARON YASHOUAFAR


_____


SOLYMON YASHOUAFAR


_____


SIMON BARLAVA


_____

**<u>Exhibit A</u>**

**Plan Term Sheet**

**(see attached)**

**CONFIDENTIAL AND PRELIMINARY**

**ROOSEVELT LOFTS LLC (THE "DEBTOR")
TERM SHEET FOR PLAN OF REORGANIZATION
PROPOSED BY THE DEBTOR, ROOSEVELT LOFTS, INC. ("RLI") AND GREYSTAR
GP, LLC OR ITS DESIGNEE (COLLECTIVELY, "GREYSTAR")**

This term sheet is prepared for the purpose of facilitating discussion of a possible restructuring of the Debtor, whose chapter 11 case, case no. 09-14214 GM (the "Bankruptcy Case") is pending before the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"). The term sheet sets forth certain major terms of a possible restructuring, but additional terms and conditions, material to the transaction, are not set forth herein. This term sheet is not, and should not be deemed, a solicitation for votes on a plan of reorganization containing the terms outlined herein. Subject to applicable orders of the Bankruptcy Court and satisfaction of conditions described herein and in the Plan Support Agreement, nothing contained herein shall in part or in whole constitute an offer susceptible of acceptance of a legally binding obligation. This Term Sheet is not an offer with respect to any securities or solicitation of acceptances of a chapter 11 plan. Such offer or solicitation only will be made in compliance with all applicable securities laws and/or provisions of the Bankruptcy Code. This Term Sheet is part of, and will be attached to, the Plan Support Agreement (the "Plan Support Agreement") among the Debtor, RLI and Greystar and is subject to the terms thereof. Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan Support Agreement. For purposes of this term sheet, the Debtor, RLI and Greystar shall be referred to as the "Plan Proponents." Roosevelt Lofts, LLC, as debtor and debtor in possession in the Bankruptcy Case shall be referred to herein as the "Debtor," and as reorganized on and after the Effective Date (as defined below) as the "Reorganized Debtor."

The Plan will be funded by a cash payment of $95,000,000 by Greystar (the "Greystar Contribution"). Greystar will apply the Greystar Contribution as follows: $68,000,000 (the "Bank of America Payment") for payment to Bank of America (for itself, and as agent for the bank group) (collectively, "BofA") for its allowed secured claim (the "BofA Claim"), the amount necessary to pay (or create a reserve for payment of) all other allowed claims in full and render such claims unimpaired (the "Creditor Payments") as of the Effective Date (defined below), and the remainder of the Greystar Contribution (net of the Bank of America Payment and the Creditor Payments) shall be paid on the Effective Date to RLI, as holder of all of the membership and equity interests in the Debtor (the "RLI Payment"). In exchange for the Greystar Contribution, on the Effective Date (defined below), and (i) after Greystar has acquired the BofA Claim or (ii) concurrently with such time as the BofA Claim has otherwise been satisfied through the Plan, Greystar will receive all of the interests in the Reorganized Debtor or, at Greystar's option, all of the interests in an entity that holds all of the interests in the Reorganized Debtor, free and clear of all liens, claims, encumbrances and interests (the "Reorganized Debtor Interests"). For the avoidance of doubt, the Property shall be transferred to the Reorganized Debtor free and clear of all liens, claims, encumbrances and interests.

The proposed plan of reorganization for the Debtor (the "Plan") will contain the following classes of claims and treatment for creditors in those classes. Except as expressly set

forth below, all distributions will be made on the effective date of the plan of reorganization or as soon as practicable thereafter (the "Effective Date"). At Greystar's election, the structure of the transaction described herein (but not the consideration delivered by Greystar under the Plan) may be modified to reflect tax, accounting and other considerations. The Plan will establish a reserve to ensure payment of any claims allowed and payable after the Effective Date.

I.  UNCLASSIFIED CLAIMS

    A.  Allowed Administrative Claims[1].

       1.  *General.*  Except as set forth below, Allowed Administrative Claims, other than Allowed Administrative Claims of Insiders,[2] shall be paid in full in cash on the later of (a) 60 days after such claims are allowed or (b) the Effective Date.

       2.  *Statutory Claims.*  All fees payable pursuant to 28 U.S.C. Section 1930 shall be paid in full in cash.

       3.  *Professional Claims.*  Professionals shall file final fee applications within 60 days after the Effective Date.  Promptly after allowance, professional fees shall be paid in full in cash.

       4.  *Postpetition Ordinary Course Liabilities.*  Allowed Postpetition Ordinary Course Liabilities (other than tax claims) incurred prior to the Effective Date shall be paid in full in full in cash on the Effective Date (or if incurred but not yet due as of the Effective Date, then paid when due in the ordinary course out of a reserve established under the Plan from the Greystar Contribution).[3]

---

[1] To the extent such claims are allowed after the Effective Date, they shall be paid in full in cash promptly after such claims are allowed out of a reserve established under the Plan from the Greystar Contribution.

[2] All claims asserted against the Debtor by insiders of the Debtor, including without limitation RLI and Milbank Holding Corp., will be cancelled and no distribution shall be made under the Plan on account of such claims (including any and all administrative, priority, secured or unsecured claims).

[3] Funds in an amount equal to all security, pet or other deposits that (i) have been received by Debtor or its agents, or (ii) are hereafter received by Debtor or its agents prior to the Effective Date, in each case from any tenants of the Property (each a "Tenant") shall be placed in a reserve account controlled by the Reorganized Debtor.  No Tenant shall be required to file a proof of claim in order to receive a refund of any such deposit funds which such Tenant is entitled to receive in the ordinary course of business; provided, however, that each Tenant's right to receive a refund of any deposit shall be determined in accordance with the provisions of each Tenant's lease or an estoppel certificate signed by the Tenant, and nothing in the Plan shall waive any of the Debtor's rights to withhold all or any portion of a Tenant's deposit if appropriate to do so under that Tenant's lease.

5.  *Postpetition Tax Claims.*  Postpetition tax claims shall be filed on the later of (a) 60 days after the Effective Date or (b) 120 days after the filing of a tax return with the applicable governmental unit, and shall be paid in full in cash promptly after such claims are allowed out of a reserve established under the Plan from the Greystar Contribution.

B.  Priority Tax Claims.  Each holder of an allowed priority tax claim shall receive cash on the Effective Date in an amount equal to such allowed priority tax claim.  All allowed priority tax claims which are not due and payable on or before the Effective Date shall be pro rated, so the amount that is due as of the Effective Date shall be paid on the Effective Date (or paid when due in the ordinary course of business in accordance with the terms thereof out of a reserve established under the Plan from the Greystar Contribution).

II.    CLASSIFIED CLAIMS AND INTERESTS

A.    Class 1, BofA Claim:  On the Effective Date, the holder of the Class 1 BofA Claim shall receive the Bank of America Payment in full satisfaction of its Class 1 BofA Claim. In the event Greystar acquires the Class 1 BofA Claim prior to the Effective Date, (i) Greystar will not receive the Bank of America Payment but instead will receive the Reorganized Debtor Interests on the Effective Date, and (ii) the Greystar Contribution will be reduced by $68,000,000.

B.    Class 2, Allowed Mechanics' Lien Claims:  On the Effective Date, each holder of an Allowed Class 2 Mechanics' Lien Claim shall receive cash on the later of (1) the Effective Date and (2) the date upon which such claim becomes an Allowed Class 2 Mechanics' Lien Claim by Final Order of the Bankruptcy Court.  On the Effective Date, a reserve shall be established under the Plan from the Greystar Contribution for the benefit of members of Class 2 whose claim have not been allowed by Final Order of the Bankruptcy Court; provided, however, that in no event shall the amount of payments made on the Effective Date to holders of Allowed Class 2 Mechanics' Lien Claims and the foregoing reserve exceed the sum of $16 million.  It shall be the responsibility of RLI and the Debtor to object to and/or resolve any Class 2 Mechanics' Lien Claim that is not allowed by Final Order of the Bankruptcy Court as of the Effective Date.

C.    Class 3 et seq.; Allowed Other Secured Claims.  Each secured creditor shall be in a Class by itself.  Each holder of an Allowed Class 3A, 3B, et seq. Secured Claim shall receive cash on the Effective Date in an amount equal to such Allowed Class 3 et seq.

D.    Class 4, Allowed Priority Non-Tax Claims.  Each holder of a Class 4 Priority Non-Tax Claim shall receive cash on the Effective Date in an amount equal to such Allowed Class 4 Priority Non-Tax Claim.

E.    Class 5, Allowed General Unsecured Claims.  Each holder of an Allowed Class General Unsecured Claim will receive cash on the Effective Date in an amount equal to such Allowed Class 5 General Unsecured Claim.

3

F.    Class 6, Allowed Equity Interests in Roosevelt.  Holders of equity interests in the Debtor (including without limitation membership interests, stock, warrants and options) shall receive the their pro rata share of the RLI Payment and, on the Effective Date, such equity interests shall be canceled.

All Allowed Claims in Classes 2 through 5 shall be unimpaired under the Plan and deemed to accept the Plan.

III.    MEANS FOR IMPLEMENTATION OF PLAN

A.    Sources of Cash for Distribution.  The cash necessary for the Reorganized Debtor to make payments under the Plan shall be obtained from the Greystar Contribution.

B.    New Managing Member.  The Managing Member of the Reorganized Debtor shall be selected by Greystar and such managing member's identity shall be disclosed on or prior to the date of the hearing on the approval of the Disclosure Statement with respect to the Plan.  The remaining members of senior management will continue to serve until the Effective Date pursuant to their respective existing terms of compensation.

C.    Executory Contracts and Nonresidential Real Property Leases:    All executory contracts and unexpired leases not specifically assumed or rejected prior to the date on which the Plan is confirmed, or set forth on a schedule of contracts to be assumed and/or rejected as of the Effective Date pursuant to the order confirming the Plan (the "Confirmation Order"), shall be rejected on and as of the Effective Date.  From and after the date hereof, Greystar shall have the sole right to determine, no later than ten days prior to the hearing on confirmation of the Plan, which executory contracts and unexpired leases shall be assumed and which shall be rejected, including, without limitation, any contracts for sale of any condominium units at the Property, and any contracts relating to the portions of the Property to be devoted to retail use.[4]

IV.  DISCHARGE AND RELEASES

A.    Discharge.  On the Effective Date, all claims against and equity interests in the Debtor shall be discharged and all persons and entities shall be precluded from asserting against the Debtor, the Reorganized Debtor or Greystar any claims based on any act or omission that occurred in whole or in part on or prior to the Effective Date.

B.    Release by the Debtor and Reorganized Debtor.  On the Effective Date, the Debtor and Reorganized Debtor shall release all claims, rights and causes of action against (1) the current members, directors, officers and employees of the Debtor (other than for money borrowed from or owed to the Debtor by any such members, directors, officers or employees as

_____

[4] Greystar assumes that all such contracts are of the type that can be rejected, and intends to reject all of them.  However, to the extent that any such contracts are not executory contracts, Greystar intends that the Reorganized Debtor shall not be a party to such contracts following the Effective Date, and that all related damages will be paid as set forth above in Sections I and II of this Agreement.

4

set forth in the Debtor's books and records) and the Debtor's agents and advisors (including lawyers), (2) the creditors' committee and its advisors (solely in their capacity as such), (3) Greystar, its affiliates, and their respective officers, directors, employees, partners, members, managers and advisors (including lawyers) and (4) RLI and its officers, directors, employees, partners, members, managers and advisors (including lawyers) (the "Released Parties"), so long a such releases do not vitiate or impair coverage under any insurance policies related to the Property.

C.    Release by Holders of Claims and Interests.  To the fullest extent permissible by law, on the Effective Date, all holders of claims against and interests in the Debtor, in consideration for the obligations of Greystar, RLI, the Debtor and the Reorganized Debtor under the Plan, and the cash, stock of the Reorganized Debtor and other documents delivered in connection with the Plan, shall be deemed to release each of the Released Parties from all claims, rights and causes of action against the Released Parties arising from or related to the Debtor's pre- and/or post-petition actions, omissions or liabilities with respect to the Property.

## V.  CONDITIONS TO CONFIRMATION

The conditions to confirmation of the Plan shall include those customary for comparable transactions, including, without limitation:

A.    The Bankruptcy Court shall have entered a Final Order approving the Plan Support Agreement (the "Plan Support Agreement Order") in form and substance negotiated by the Debtor, RLI and Greystar; provided that any changes to the Plan Support Agreement Order following the filing of such Plan Support Agreement Order shall be satisfactory to Greystar in Greystar's sole discretion and reasonably acceptable to RLI and the Debtor; and provided further that the Plan Support Agreement Order shall have become a Final Order and not have been modified, amended or reversed;

B.    The Bankruptcy Court shall have entered an order approving the disclosure statement with respect to the Plan (the "Disclosure Statement Order") in form and substance that is reasonably acceptable to the Plan Proponents, and the Disclosure Statement Order shall have become a Final Order and not have been modified, amended or reversed.

C.    The Bankruptcy Court shall have entered an order confirming the Plan and approving associated findings of fact and conclusions of law (collectively, the "Confirmation Order") in form and substance satisfactory to Greystar in Greystar's sole discretion and the Confirmation Order shall have become a Final Order and not have been modified, amended or reversed; provided, however, that the Confirmation Order shall be deemed satisfactory to the Debtor and RLI so long as the Confirmation Order does not deviate in any material way from the terms set forth in this term sheet.

D.    The Plan, the exhibits thereto and any Plan supplement (as confirmed or approved by the Confirmation Order) shall be in form and substance satisfactory to Greystar in Greystar's reasonable discretion.  The Plan, the exhibits thereto and any Plan supplement (as confirmed or approved by the Confirmation Order)  shall be deemed satisfactory to the Debtor and RLI so long as they do not deviate in any material way from the terms set forth in this term sheet.

E.  The BofA/Debtor Settlement Order shall have become a Final Order and not have been modified, amended or reversed.

## VI.  CONDITIONS TO EFFECTIVENESS

The conditions precedent to the Effective Date shall include those customary for comparable transactions, including, without limitation:

A.  All conditions to confirmation of the Plan shall remain satisfied or waived in the sole discretion of the party who has the right to waive such condition or conditions.

B.  Each order of the Bankruptcy Court referred to in Section V above shall have become a Final Order and not have been modified, amended or reversed.

C.  All documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan (not otherwise specified herein) shall be in form and substance reasonably acceptable to the Plan Proponents.

D.  The Plan Proponents shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement the Plan and that is required by law, regulation, or order.

E.  The Reorganized Debtor shall have received title insurance from a title insurance company reasonably satisfactory to Greystar and on terms and conditions satisfactory to Greystar in Greystar's sole discretion and reasonably acceptable to the Debtor and RLI, and the Property shall be in compliance with all material restrictions, requirements and encumbrances applicable to the Property (other than the fact that the parking stalls are non-conforming).

F.  The Reorganized Debtor Interests shall have been issued (free and clear of all liens, claims, encumbrances and interests) to Greystar in accordance with the Plan.

G.  All other actions, documents and agreements necessary to implement the Plan as of the Effective Date shall have been delivered and all conditions precedent thereto shall have been satisfied or waived.

H.  All corporate and other proceedings to be taken by the Debtor in connection with the Plan and/or plan supplement and the consummation of the transactions contemplated thereby and by the Plan and all documents incident thereto shall have been completed in form and substance reasonably satisfactory to Greystar; provided however that the foregoing proceedings and documents shall be deemed satisfactory to RLI and the Debtor so long as they do not deviate in any material way from the terms set forth in this term sheet.

I.  No event, condition or circumstance shall have occurred or arisen subsequent to the date of the Plan Support Agreement which has had or could reasonably be expected to have or give rise to a Material Adverse Change.

J.  Subsequent to the date of the Plan Support Agreement, there shall be no threatened or pending suit, action, investigation, inquiry or other proceeding by or before any court of

6

competent jurisdiction (excluding the bankruptcy case prior to the date of the Plan Support Agreement) which is likely to have a Material Adverse Change.

K  The Effective Date shall have occurred on or before August 22, 2011.

L.   The managing member of the Reorganized Debtor shall have been designated by Greystar as of the Effective Date, and the directors' and officers' liability insurance shall be available to the officers of the Reorganized Debtor and such managing member on terms reasonably satisfactory to Greystar.

M.   All waiting periods imposed by applicable law (including, without limitation, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable) in connection with the consummation of the Plan and transactions contemplated thereby shall have expired or been terminated without any action having been taken by any court of competent jurisdiction restraining, preventing or imposing materially adverse conditions upon such transactions, and the Plan Proponents shall have received all material regulatory approvals required for the consummation of the Plan and the transactions contemplated thereby and for the Reorganized Debtor to continue to carry on its businesses without material change, each of which approvals shall have become final.

N.   Subsequent to the date of the Plan Support Agreement, the Debtor shall have operated in a manner consistent with its ordinary course or business prior to the date of the Plan Support Agreement.

O.   Greystar shall receive good and marketable title to the Property.

P.   The Property shall be free and clear of liens, claims, interests and encumbrances, except those specifically permitted by Greystar in Greystar's sole discretion.

Q.   Greystar shall have received an owner's policy of title insurance in form and substance acceptable to Greystar in Greystar's sole discretion, subject only to such exceptions as Greystar approves during the review process.   All existing insurance policies of any kind (including without limitation title insurance and property and casualty insurance) related to the Property shall be maintained in full force and assigned to Greystar.  The Debtor and RLI shall not have done anything to impair coverage under any of the foregoing insurance policies.

R.   No Termination Event (as defined in the Plan Support Agreement) shall have occurred.

Notwithstanding anything contained herein to the contrary, Greystar shall have the exclusive right, in its sole discretion, to deem satisfied or waived any of the conditions set forth above in Sections VI.B, F, I, K, N, O, P and Q, and such determination by Greystar shall be binding on all Plan Proponents and other parties in interest.

* * * * *

LA\2259903.9                                                                                                    06-03-2011

## Exhibit B

**Borrower Parties Designation Agreement**

**(see attached)**

## BORROWER PARTIES DESIGNATION AGREEMENT

This Borrower Parties Designation Agreement (this "**Agreement**") is made as of June 3, 2011 by and among (i) Greystar GP, LLC ("**Greystar**"), (ii) The Roosevelt Lofts, Inc. ("**RLI**"), (iii) Roosevelt Lofts, LLC as debtor and debtor in possession (the "**Debtor**") in case no. 09-14214-GM (the "**Bankruptcy Case**") pending before the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), (iv) M. Aaron Yashouafar ("**M.A. Yashouafar**"), (v) Solymon Yashouafar ("**S. Yashouafar**") and (vi) and Simon Barlava ("**Barlava,**" and together with M.A. Yashouafar and S. Yashouafar, the "**Bank Guarantors,**" and with the Debtor and RLI, the "**Debtor Related Parties**"). Each of Greystar, RLI, the Debtor, M.A. Yashouafar, S. Yashouafar and Barlava are referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, the Debtor and the Bank Guarantors have entered into that certain Settlement Agreement dated as of June 3, 2011 (the "**Bank Settlement Agreement**") with Bank of America, N.A., individually and as administrative agent for a group of lenders (as described more fully in the Settlement Agreement, the "**Bank Group**"). A true and correct copy of the Bank Settlement Agreement is attached hereto as <u>Exhibit A</u>. Capitalized terms not defined herein shall have the meaning ascribed to them in the Bank Settlement Agreement.

WHEREAS, pursuant to the Bank Settlement Agreement, the Debtor and the Bank Guarantors agreed to identify and cause a Purchaser other than the Debtor and the Bank Guarantors to purchase the Bank Group's interest in certain obligations, loan and security documents and agreements described in the Bank Settlement Agreement.

WHEREAS, Section 2 of the Bank Settlement Agreement calls for the Purchaser to make certain deposits of funds (the "**Deposits**") and to make timely payment of the Purchase Price on the Payment Date.

WHEREAS, the Debtor and the Bank Guarantors have requested that Greystar or Greystar's designee serve as the Purchaser.

WHEREAS, RLI as the holder of all of the membership interests of the Debtor will benefit from Greystar or its designee serving as the Purchaser, and has requested that Greystar or Greystar's designee serve as the Purchaser.

WHEREAS, the Debtor Related Parties have entered into this Agreement in order to, among other things, implement the terms and conditions of the Bank Settlement Agreement.

WHEREAS, Greystar, RLI and the Debtor have entered into that certain Plan Support Agreement dated as of June 3, 2011 (the "**Plan Support Agreement**"), pursuant to which and subject to the terms and conditions set forth therein, Greystar has agreed, among other things, to serve or have its designee serve as the Purchaser. It is a condition to the Plan Support Agreement that the Parties hereto execute this Agreement.

NOW, THEREFORE, in consideration of the recitals, covenants and conditions in this Agreement, and for valuable consideration, the Parties agree and follows:

1.    <u>Designation of Greystar or Greystar's Designee as Purchaser</u>.  Greystar or, at Greystar's option, Greystar's designee, is hereby designated as Purchaser under the Bank Settlement Agreement.  This designation is irrevocable as long as Greystar makes the Deposits into Escrow described in Section 2 of the Bank Settlement Agreement.

2.    <u>No Modification/Waiver/Amendment of the Bank Settlement Agreement</u>. None of the Debtor Related Parties (a) shall consent to or make any modification, waiver, amendment or termination of the Bank Settlement Agreement, any exhibits thereto, or any existing or future court orders approving the Bank Settlement Agreement or any exhibits thereto, or (b) shall permit any of their affiliates or direct or indirect subsidiaries to make any modification, waiver, amendment or termination of the Bank Settlement Agreement, any exhibits thereto, or any existing or future court orders approving the Bank Settlement Agreement or any exhibits thereto, in each case without the prior written consent of Greystar, which consent may be granted or withheld in Greystar's sole discretion.

3.    <u>Binding Nature of this Agreement</u>.  By signing below, each Party shall be bound to this Agreement as of the date hereof; provided, however, that the Debtor's obligations hereunder shall be subject only to entry  by the Bankruptcy Court of the Plan Support Agreement Order (as defined in the Plan Support Agreement).  The Parties shall use their respective reasonable best efforts to obtain entry of the Plan Support Agreement on an expedited basis, and in no event later than one (1) business day before the first Deposit is due under the Bank Settlement Agreement.

4.    <u>The Deposits</u>.  The Deposits shall be and remain property solely of Greystar.  In no event shall any of the Debtor Related Parties, or any other party other than Greystar,  have any legal or equitable right to any of the Deposits.  No holder of a claim against or interest in any of the Debtor Related Parties shall have any right to attach or claim to payment from any Deposit or Escrow.  If for any reason the Sale is not consummated on or before the Outside Date (as defined in the Plan Support Agreement), or if a Termination Event (as defined in the Plan Support Agreement) occurs, then in each case all Deposits shall be promptly returned to Greystar without need for further order of any court or approval of any party; provided, however, that if (i) such failure to consummate the Sale on or before the Outside Date (as defined in the Plan Support Agreement) occurs as a direct result of a default by Greystar of its obligations under the Plan Support Agreement (after satisfaction of the conditions to such obligations), and (ii) after receipt by Greystar of written notice of such default from any Debtor Related Party, Greystar failed to cure such default within ten (10) days after Greystar's receipt of such notice (provided that (a) such cure period shall in no event extend beyond such day as is one day prior to the Payment Date (as defined in the Bank Settlement Agreement), and (b) with regard to any such default relating to the making of Deposits pursuant to the Bank Settlement Agreement, such cure period shall be two business days commencing upon Debtor's transmittal of notice of such default to Greystar by facsimile or electronic transmission), then the Deposit

2

funds which have theretofore been placed in escrow by Greystar shall become non-refundable to Greystar.  The terms and conditions of this Section 4 shall be included in the Escrow Agreement.

        5.    <u>Cooperation of Debtor Related Parties</u>.  The Debtor Related Parties waive all objections and will not oppose or cause any person or entity to oppose (a) any exercise by Greystar or its designee of the Foreclosure Right (as defined in the Plan Support Agreement), (b) any exercise by Greystar or its designee of the 363 Purchase Right (as defined in the Plan Support Agreement), or (c) the appointment of any receiver pursuant to the Greystar Receivership Stipulation (as defined in the Plan Support Agreement).  The Debtor Related Parties agree that they will reasonably cooperate with (i) any receiver in connection with the exercise of the  Foreclosure Right (as defined in the Plan Support Agreement), and (ii) Greystar or its designee in the exercise of any of their remedies hereunder or under the Plan Support Agreement (including, without limitation, the Foreclosure Right (as defined in the Plan Support Agreement)).

        6.    <u>Representations</u>.

        a.    Each Party severally (but not jointly) represents and warrants to the other Parties as follows with respect to itself only and as of the date hereof:

        (i)    <u>Corporate Power and Authority</u>.  It has all requisite authority (whether corporate, partnership, limited liability company or individual power and authority) to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement, other than, with respect to the Debtor, the requisite approvals of the Bankruptcy Court.

        (ii)    <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part, other than, with respect to the Debtor, the requisite approvals of the Bankruptcy Court.

        (iii)    <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries, (ii) violate its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries, or (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it or any of its subsidiaries is a party.

        (iv)    <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Bankruptcy Case.

        (v)    <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

(vi)  <u>Enforceability</u>.  This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

b.  Each Debtor Related Party severally (but not jointly) (i) represents and warrants to Greystar that the Debtor owns all of the Property (as defined in the Plan Support Agreement), and that no Debtor Related Party other than the Debtor has any right, title or interest in or to the Property (as defined in the Plan Support Agreement) or any portion thereof, and (ii) covenants not to, and not to cause any other person or entity to, take, remove or transfer any Property (as defined in the Plan Support Agreement) from the property located at 727 West 7th Street, Los Angeles, CA or from any accounts of Debtor.

7.  <u>Entire Agreement; Prior Negotiations</u>.  This Agreement, the Plan Support Agreement, Plan Term Sheet (as defined in the Plan Support Agreement) and the LOI (as defined in the Plan Support Agreement), including any exhibits to any of the foregoing, sets forth in full the terms of agreement between and among the Parties and is intended as the full, complete and exclusive contract governing the relationship between and among the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect to the subject matter hereof; provided, that any confidentiality agreement between or among any of the Parties shall remain in full force and effect in accordance with its terms.  No representations, oral or written, other than those set forth herein, may be relied on by any Party in connection with the subject matter hereof.

8.  <u>Amendment or Waiver</u>.  No waiver, modification or amendment of any term or provision of this Agreement shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Party affected by such waiver, modification or amendment.  No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.  Any modification of this section 8 shall require the written consent of all Parties.

9.  <u>Miscellaneous</u>.

a.  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States Bankruptcy Court for the Central District of California, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, but only for such action, suit or proceeding.

4

        b.      <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

        c.      <u>Headings</u>.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

        d.      <u>Notice</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile or electronic transmission or mailed (first class postage prepaid) to the parties at the following addresses, email addresses, or facsimile numbers:

If to the Debtor:

Roosevelt Lofts, LLC
c/o Milbank Real Estate Services, Inc.
Attention:  M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

with a copy (which shall not constitute notice) to:

David L. Neale, Esq.
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Fax:  (310) 229-1234
Email:  DLN@LNBYB.COM

If to RLI:

The Roosevelt Lofts, Inc.
c/o Milbank Real Estate Services, Inc.
Attention:  M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

with a copy (which shall not constitute notice) to:

Homan Taghdiri, Esq.
General Counsel
Milbank Real Estate Services, Inc.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

If to the Bank Guarantors:

M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

with a copy (which shall not constitute notice) to:

Homan Taghdiri, Esq.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

Solyman Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email: syashoua@milbankre.com

with a copy (which shall not constitute notice) to:

Homan Taghdiri, Esq.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

Simon Barlava
2209 South Santa Avenue
Los Angeles, Ca, 90058
Fax:  (323) 277-1717
Email:  simon@designcollection.com

6

If to Greystar:

Greystar GP, LLC
Attention: Josh Carper
3rd Floor
18 Broad Street
Charleston, NC 29401
United States of America
Fax: (843) 579-9420
Email:  jcarper@greystar.com

with a copy (which shall not constitute notice) to:

Robert A. Klyman, Esq.
Latham & Watkins LLP
355 S. Grand Ave.
Los Angeles, CA  90071
Fax:  (213) 891-8763
Email:  robert.klyman@lw.com

        e.      <u>Successors and Assigns, No Third-Party Beneficiaries</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives, including, without limitation, any chapter 11 or chapter 7 trustee appointed in the Bankruptcy Case.  For avoidance of doubt, Greystar reserves the right to assign this agreement to a designee or affiliate but, notwithstanding such assignment, shall remain liable for all of the obligations of Greystar under this Agreement.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Person or entity shall, or shall be deemed to, be a third party beneficiary hereof.

        f.      <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

        g.      <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this agreement may be delivered by facsimile or electronic mail, which shall be deemed to be an original for the purposes of this Agreement.

        h.      <u>Public Disclosure</u>.  Each of the Debtor Related Parties shall use their respective best efforts to (and will cause each of their respective affiliates and insiders to) submit to Greystar in advance for approval all press releases and public filings relating to this Agreement, the Plan Support Agreement, the Plan Term Sheet (as defined in the Plan Support

LA\2265146.7  borrower parties designation agreemetn

Agreement), or the transactions contemplated hereby and thereby and any amendments thereof. Except as required by applicable law, the Debtor Related Parties (and each of their respective affiliates and insiders) shall not use the name of any Party in any press release without such Party's prior written consent.

        i.      No Strict Construction.  This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties hereto or thereto.  Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that such Party or such Party's counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.

        j.      Representation.  Each Party has been represented by counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement.

        k.      WAIVER OF JURY TRIAL.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

        l.      Time Periods.  If any time period or other deadline provided in this Agreement expires on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

*[Remainder of page intentionally left blank; signature pages follow]*

8

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers, all as of the date and year first above written.

GREYSTAR GP, LLC,
a Delaware limited liability company

By: _____
     Name:
     Title:


ROOSEVELT LOFTS, LLC,
a California limited liability company

By:  The Roosevelt Lofts, Inc.
    Its:  Managing Member


    By: _____
       M. AARON YASHOUAFAR
       President


THE ROOSEVELT LOFTS, INC.,
a California corporation


By: _____
     M. AARON YASHOUAFAR
     President



M. AARON YASHOUAFAR

_____


SOLYMON YASHOUAFAR

_____


SIMON BARLAVA

_____

<u>Exhibit A</u>

Bank Settlement Agreement

(See Attached)

# SETTLEMENT AGREEMENT

This settlement agreement (the "**Settlement Agreement**") is entered into as of June 3, 2011 (the "**Effective Date**"), by and between the following entities: (i) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ("**S. Yashouafar**"), and Simon Barlava ("**Barlava**" and together with M.A. Yashouafar and S. Yashouafar, the "**Guarantors**"); (ii) Roosevelt Lofts, LLC, debtor and debtor in possession (the "**Debtor**" and together with the Guarantors, the "**Borrower Parties**"); and (iii) Bank of America, N.A., individually and as administrative agent for a group of lenders[1] (collectively, the "**Bank Group**"). The Borrower Parties and the Bank Group are referred to collectively as the "**Parties**" and each individually as a "**Party**." This Settlement Agreement is based upon the following facts, which each of the Parties confirms is entirely true and accurate in every material respect:

## RECITALS

A.    On or about March 9, 2006, the Debtor executed a Construction Loan Agreement (the "**Loan Agreement**") with the Bank of America N.A., as administrative agent for the Bank Group in the amount of $78,840,375. On or about March 9, 2006, Debtor executed a Deed of Trust Note in the original principal amount of $78,840,375 (the "**Note**"). The Loan Agreement and Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "**Fee Deed of Trust**"), and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "**Leasehold Deed of Trust**," and collectively, with the Fee Deed of Trust, the "**Deeds of Trust**"). The Deeds of Trust encumber the property commonly known as the "Roosevelt Building," located at 727 West 7th Street, Los Angeles, California (the "**Property**"), including an absolute assignment of all rents, issues and profits generated from operation of the Property (collectively, the "**Collateral**").

B.    In further consideration of the Bank Group's loan and extension of credit, on or about March 9, 2006, the Guarantors each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "**Guaranty**"). The Loan Agreement, the Note, the Deeds of Trust and the Guaranty, together with all modifications thereto and all other loan and security documents and agreements between the Parties related to the Collateral are collectively referred to as the "**Loan Documents**."

C.    The Borrower Parties failed to pay the obligations under the Loan Documents in full at maturity, March 9, 2009. As a result, the Bank Group delivered a default notice dated December 30, 2008. On March 23, 2009, the Bank Group caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office. On or about April 3, 2009, the Bank Group filed a complaint for breach of the Guaranty, appointment of a receiver

---

[1]    The Bank Group is comprised of the Bank of America N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

and judicial foreclosure on the Deeds of Trust in the Superior Court of the State of California for the County of Los Angeles, bearing case no. SC 102472 and including all claims raised in the cross complaint filed by the Guarantors (the "**Guaranty Litigation**").  The Borrower Parties dispute the Bank Group's contentions.  The Guarantors asserted counterclaims in the Guaranty Litigation.

D.    On April 13, 2009, the Debtor filed a voluntary petition commencing a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), bearing case no. 1:09-bk-14214-GM (the "**Bankruptcy Case** ").

E.    The Parties desire to settle their disputes relating to the Guaranty Litigation (including all claims raised in the cross complaint) and the Bankruptcy Case, and therefore, enter into this Settlement Agreement which provides, among other provisions, for the purchase and sale of the Bank Group's interest in the Loan Documents, and certain rights provided therein, to a purchaser other than the Borrower Parties, but arranged by the Debtor who has been qualified (no less than 30 days before the Payment Date) under applicable banking regulations (the "**Purchaser**").

NOW, THEREFORE, in consideration of the recitals, covenants and conditions in this Settlement Agreement, and for valuable consideration, the Parties agree as follows:

## AGREEMENT

1.    <u>Note Purchase and Sale</u>.

a.    Pursuant to the assignment of claims (the "**Assignment of Claims** ") in the form attached hereto as Exhibit "1", and according to the terms and conditions of this Settlement Agreement, the Bank Group agrees to sell and assign the Loan Documents to the Purchaser, "as is," and with no representation or warranties other than as may be set forth in the Assignment of Claims (the "**Sale**").  If the Sale is to be consummated, the Purchaser shall pay the Bank Group the total sum of $68,000,000 by wire transfer in immediately available federal funds (the "**Purchase Price**").  The Sale must close and the Purchase Price must be paid to the Bank Group on or before the "**Payment Date,**" which is the earlier of:  (i) September 1, 2011; and (ii) the first business day which is at least 90 calendar days after the Effective Date.

b.    Conditions to the Closing of the Sale.

The closing of the Sale is conditioned upon the occurrence of each of the following:

i.    The timely deposit by the Purchaser of the funds as set forth in paragraph 2;

ii.    Bankruptcy Court Approval as defined in paragraph 10;

iii.    The timely payment of the Purchase Price on the Payment Date;

iv.    The Purchaser has provided the Bank Group with sufficient representations, covenants and evidence (including evidence of ownership) so as to qualify under applicable

BN 9150681v2

banking regulations and demonstrate that it is not otherwise violative of U.S. banking laws; and

v.    The delivery by the Bank Group of the documents set forth in paragraph 4(b).

c.    The closing of the Sale will be facilitated through the services of an escrow agent approved by both the Purchaser and the Bank Group (the "**Escrow Agent**"). The terms of escrow shall be governed by an escrow agreement (the "**Escrow Agreement**") in the form not materially at variance from the form of escrow agreement attached hereto as Exhibit "2."

d.    With at least five business days' notice, the Purchaser shall advise the Bank Group of its intention to close the Sale on a particular Payment Date.  The Assignment of Claims shall be released to the Purchaser at the closing of the Sale on the Payment Date, and returned to the Bank Group if the conditions to the Sale do not occur.  The Assignment of Claims is to effectuate the transfer of certain claims against the Borrower Parties to the Purchaser on the terms and conditions set forth therein.  The Assignment of Claims shall specifically include all claims, if any, related to any deposit and other accounts held in the name of the Debtor. Notwithstanding the foregoing, the Assignment of Claims shall not affect any rights the Bank of America N.A. may have against Milbank Holding Corp. ("**Milbank**") to the extent related to or arising from the judgment entered against Milbank in the state court action as case no. BC415625 in the Los Angeles Superior Court.  The Assignment of Claims shall also provide, among other things, that pursuant to and to the extent permitted by applicable law and the terms of any such policies, the Purchaser will acquire the rights of the Bank Group, if any, to any policies of title insurance covering the Deeds of Trust and the Property.  The Bank Group makes no representations or warranties regarding its claims against the Borrower Parties or any coverage it may have as a beneficiary under any policy of title of insurance covering the Deeds of Trust and the Property.

e.    On the Payment Date, and on condition that the Sale closes, the Escrow Agent shall deliver to the Borrower Parties for filing in the Guaranty Litigation, a request for dismissal, without prejudice, of the entire Guaranty Litigation in the form attached hereto as Exhibit "3" (the "**Bank Group's Request for Dismissal of Guaranty Litigation Without Prejudice**").

f.    As long as Greystar GP, LLC or its designee (collectively, "**Greystar**") satisfies the conditions set forth in Section 1(b) hereof on or before the Payment Date, Greystar shall be designated the Purchaser under this Agreement.

2.    <u>Purchaser Deposits into Escrow</u>.

a.    Within 10 calendar days of the Effective Date, the Purchaser must deposit with the Escrow Agent $5,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within 40 calendar days of the Effective Date, the Purchaser must deposit with the Escrow Agent an additional $10,000,000 for a total deposit of $15,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within 70 days of the Effective Date, the

Purchaser must deposit with the Escrow Agent an additional $20,000,000 for a total deposit of $35,000,000 to be applied, on the Payment Date, towards the Purchase Price.  On or before the Payment Date, the Purchaser must deposit additional sums necessary to have the full Purchase Price on deposit with the Escrow Agent.

          b.      All such deposits must be in immediately available federal funds. In any event, the Escrow Agent will immediately advise the Bank Group when funds are deposited.  If any of the funds are not timely deposited with the Escrow Agent, then the Bank Group may send a notice of default by electronic means to counsel for the Borrower Parties.  If any of the required deposits are not made within two (2) business days following the transmittal of the notice of default, then pursuant to the 362 Stipulation and the Bankruptcy Court Order described below, the Bank Group will immediately have *in rem* relief from the automatic stay on the Collateral without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief.  If, for any reason, the Sale is not consummated on or before the Payment Date, all deposited funds will be refunded to the Purchaser.

          3.      <u>If Sale is not Consummated</u>.  If, for any reason, either the Purchaser fails to make any deposit timely, or the Sale is not consummated timely, and conditioned upon Bankruptcy Court Approval (as defined below), then each of the following shall occur:

          a.      <u>Return of Assignment of Claims</u>.  The Assignment of Claims shall be returned immediately to the Bank Group.

          b.      <u>Stipulation for Relief From Stay</u>.  Pursuant to (i) the stipulation entered into between the Bank Group and the Borrower in the form attached hereto as Exhibit "4" (the "**362 Stipulation**"); and (ii) the Bankruptcy Court Order, the Bank Group will immediately have *in rem* relief from the automatic stay on the Collateral without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief.

          c.      <u>Dismissal of Guarantors from Guaranty Litigation</u>.  The Escrow Agent shall deliver to the Guarantors for filing in the Guaranty Litigation, a request for dismissal, without prejudice, of all causes of action against the Guarantors in the form attached hereto as Exhibit "5"  (the "**Bank Group's Request for Dismissal of Guarantors Without Prejudice**").

          d.      <u>Covenant Not to Sue</u>.  The Escrow Agent shall deliver to the Borrower Parties the covenant not to sue in the form attached hereto as Exhibit "6" (the "**Covenant**").

          e.      <u>Stipulation for Appointment of a Receiver</u>.  The stipulation for the appointment of a receiver to take control of the Property (the "**Receivership Stipulation**") in the form attached hereto as Exhibit "7" shall be filed, *ex parte*, in the Guaranty Litigation, and a receiver shall be appointed, *ex parte*, immediately.  The receiver shall take possession and control over the Collateral (other than deposit or other accounts with the Bank of America N.A.) pursuant to the terms of the Receivership Stipulation.  Each of the Borrower Parties agrees to cooperate with the receiver and the Bank Group on all matters, including matters concerning mechanic's liens, title of the Property and the prompt and orderly transition of management of the Property to the receiver including the turnover of all Collateral accounts and tenant deposits.

4

4.    <u>Deliveries on the Effective Date</u>.

a.    On the Effective Date, the Borrower Parties shall deliver to the Bank Group fully executed originals of each of the following:

i.    Releases from each of the Guarantors in the form attached as Exhibit "8;"

ii.    the Receivership Stipulation;

iii.    the 362 Stipulation;

iv.    the request for dismissal with prejudice of the cross-complaint filed in the Guaranty Litigation by the Guarantors against the Bank Group (the "**Guarantors' Request for Dismissal**") in the form attached as Exhibit "9," which then may be filed immediately in the Guaranty Litigation by the Bank Group; and

v.    the Insider Lien Releases described below, each signed by an authorized representative of each of those entities described in paragraph 7 of this Settlement Agreement.

b.    On the Effective Date, the Bank Group shall deliver to the Escrow Agent fully executed originals of each of the following:

i.    the Assignment of Claims;

ii.    the Covenant;

iii.    the Bank Group's Request for Dismissal of Guaranty Litigation Without Prejudice; and

iv.    the Bank Group's Request for Dismissal of Guarantors Without Prejudice.

5.    <u>Deadline to File Plan</u>.  The Parties agree that the time within which the Debtor is required to file its Chapter 11 plan is extended to no later than August 31, 2011, or subject, however, to further extension, if any, by mutual agreement of the Parties.

6.    <u>Stay of Litigation</u>.  Conditioned upon there being no default under the terms of this Settlement Agreement, for 90 days after the execution of the Settlement Agreement, a stay shall be effective as to the following:  (i) the Guaranty Litigation in its entirety; and (ii) any scheduled judgment debtor exams of Milbank.  Except as provided in this paragraph, nothing in this Settlement Agreement shall affect any rights, obligations or remedies available to Bank of America N.A., with respect to any credit extended to Milbank pursuant to the loan documents related to that credit.

7.     Mechanic's Liens.  On the Effective Date, all of the insiders and affiliates of the Debtor set forth on the attached Exhibit "10," shall deliver to the Bank Group fully executed lien releases in the form attached hereto as Exhibit "11" (the "**Insider Lien Release**") evidencing that none shall assert a mechanic's lien against the Property.  On and after the Effective Date, if no Sale is consummated timely, then the Borrower Parties will cooperate in resolving any issues regarding the remaining mechanic's lien claims asserted by third parties.

8.     Release by the Debtor.  The Debtor, on its behalf and on behalf of its respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, owners, members, managers, affiliates, professionals, trustees, and representatives hereby release and forever discharge all claims, rights, demands, damages, actions, causes of action, costs, expenses, and suits of law or in equity which they have held, now hold or hereafter may hold against the Bank Group, including Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank and each of their respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, owners, shareholders, members, managers, affiliates, professionals, attorneys, trustees, and representatives that arise in or are related to the Loan Documents or were or could have been alleged in the Guaranty Litigation.

9.     Scope of Release by the Debtor.  The Debtor understands that the release of claims set forth in this Settlement Agreement covers claims within the areas specified which the Debtor has knowledge of and those which it may not know about.  The Debtor expressly waives all rights under Section 1542 of the California Civil Code, which section the Debtor has read and understands, and which provides as follows:

> Section 1542.  A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Notwithstanding the foregoing, the release set forth herein shall not apply to the obligations under this Settlement Agreement, and shall have no effect upon any documents or acts necessary to accomplish the terms and intent of this Settlement Agreement.

10.     Bankruptcy Court Approval.

a.     The Debtor is not bound to perform under this Settlement Agreement until "**Bankruptcy Court Approval**," which shall mean both (i) entry of an order after hearing on approval of the Settlement Agreement in the form attached hereto as Exhibit "12" (the "**Bankruptcy Court Order**"), and (ii) the Bankruptcy Court Order is fully enforceable on its terms and has not been stayed, modified or altered by any court of competent jurisdiction.

b.     This Settlement Agreement is binding and fully enforceable as to each Party other than the Debtor on the Effective Date.  Notwithstanding the foregoing, no Party is obligated to perform under paragraph 3 of this Settlement Agreement without Bankruptcy Court Approval.

c.    The Bankruptcy Court Order shall also approve the 362 Stipulation.

d.    The Debtor will file a motion for approval of this Settlement Agreement and the 362 Stipulation within 5 business days following the Effective Date and will seek to have the motion heard and approved on June 14, 2011 or as soon before or after as the Bankruptcy Court may set.  The Bank Group will reasonably assist the Debtor in obtaining Bankruptcy Court approval of this Settlement Agreement and the 362 Stipulation.  Subject to its review and approval, the Bank Group will support the motion, and will not oppose it.

11.    Confidentiality.  The Parties agree to keep the Purchase Price (and such other terms as may be expressly agreed upon in writing) confidential, and, if necessary, the Bank Group will support a motion by the Debtor in the Bankruptcy Case to seal the record and maintain the confidentiality of the Purchase Price.

12.    Further Assurances.  The Parties agree to perform such acts and to prepare, execute, deliver, file, and record any documents or agreements reasonably required to perform under and satisfy the conditions in this Settlement Agreement, or to give full force and effect to this Settlement Agreement.

13.    Attorneys' Fees and Costs.  If any action or proceeding is brought to enforce this Settlement Agreement, the prevailing Party shall be entitled to recover all of its costs in bringing and prosecuting such action to enforce the Settlement Agreement, including reasonable attorneys' fees, from the losing Party.

14.    Complete Agreement.  This Settlement Agreement supersedes any and all other agreements, understandings, negotiations or discussions, either oral or in writing, express or implied between the Parties concerning settlement.  The Parties to this Settlement Agreement each acknowledge that no representations, inducements, promises, agreements or warranties, oral or otherwise, have been made by them or any of them, or anyone acting on their behalf which are not embodied in this Settlement Agreement, that they have not executed this Settlement Agreement in reliance on a representation, inducement, promise, agreement or warranty, and that no representation, inducement, promise, agreement or warranty not contained in this Settlement Agreement including any purported supplements, modifications, waivers or terminations of this Settlement Agreement shall be valid or binding, unless executed in writing by all of the Parties to this Settlement Agreement.

15.    Terms Read and Understood.  Each of the Parties hereby certifies that he or it (i) has read the entire Settlement Agreement, (ii) has conferred with legal counsel pertaining to this Settlement Agreement, (iii) fully understands all of the terms of this Settlement Agreement, and (iv) acknowledges and represents that he or it enters into this Settlement Agreement and all other contemplated documents of their own free will and not due to any oral representation, commitment, promise, pressure, or duress from any other Party.

16.    Successors and Third Parties.  Each covenant in this Settlement Agreement shall inure to the benefit of and be binding upon the Parties and their respective owners, managers, heirs, successors, assigns, agents, employees, representatives (past and present), trustees, and legal and personal representatives.  Further, the releases of any entities

7

who are not signatories to this Settlement Agreement are made expressly for their benefit and they shall be deemed third party beneficiaries of this Settlement Agreement.  Except as set forth in this paragraph, there shall be no third party beneficiaries under this Settlement Agreement.

17.    Construction.  As used in this Settlement Agreement, the masculine and feminine gender, in the singular or plural, shall be deemed to include the others whenever the text so requires.  The term "including" in any form shall not be limiting and shall be construed to mean "including, but not limited to."  Captions and paragraph headings are inserted solely for convenience and shall not be deemed to restrict or limit the meaning of text.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against any of the Parties.

18.    Governing Law.  This Settlement Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of California, without giving effect to the principles of conflicts of law thereof, and applicable bankruptcy law.  Each of the Parties agrees that as long as the Bankruptcy Case remains open, any dispute, claim or controversy arising out of or relating to this Settlement Agreement shall be heard in the Bankruptcy Court and that the Bankruptcy Court has exclusive jurisdiction thereof.  If the Bankruptcy Case is closed, then any court of competent jurisdiction may resolve any dispute, claim or controversy arising out of or relating to this Settlement Agreement.

19.    Severability.  If any provision of this Settlement Agreement is determined to be invalid, void, or illegal, such provision shall be construed and amended in a manner which would permit its enforcement, but in no event shall such provision affect, impair, or invalidate any other provision of this Settlement Agreement.

20.    No Waiver.  Failure to insist on compliance with any term, covenant or condition contained in this Settlement Agreement shall not be deemed a waiver of that term, covenant or condition, nor should any waiver or relinquishment of any right or power contained in this Settlement Agreement, at any one time or more times, be deemed a waiver or relinquishment of any right or power at any other time or times.

21.    Warranty of Authority.  Each Party whose signature is affixed hereto in a representative capacity represents and warrants that she/he is authorized to execute this Settlement Agreement on behalf of and to bind the entity on whose behalf her/his signature is affixed.

22.    Time of the Essence.  Time is of the essence in the performance of all obligations set forth in this Settlement Agreement.

23.    Counterparts.  This Settlement Agreement may be executed in separate counterparts which, together shall constitute one and the same fully executed Settlement Agreement.  Signed counterparts transmitted by facsimile or email shall be deemed originals.

[signatures follow on next page]

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date first listed above.

BANK OF AMERICA, N.A.,
As administrative agent for the Bank Group

By: _____
     David R. Kegaries, Senior Vice President

ROOSEVELT LOFTS, LLC
By:  Its manager The Roosevelt Lofts, Inc.

By: _____
     M. Aaron Yashouafar, President

_____
     M. Aaron Yashouafar, individually

_____
     Solyman Yashouafar, individually

_____
     Simon Barlava, individually

BN 9150681v2

<u>Exhibits</u>

1.      Assignment of Claims from the Bank Group to the Purchaser. (para. 1a.)

2.      Escrow Instructions (para. 1c)

3.      Bank Group's Request for Dismissal of Guaranty Litigation Without Prejudice (para. 1e)

4.      362 Stipulation (para. 3b)

5.      Bank Group's Request for Dismissal of Guarantors Without Prejudice (para. 3c)

6.      Covenant Not to Sue (para. 3d)

7.      Receivership Stipulation (para. 3e)

8.      Releases from the Guarantors (para. 4a.i)

9.      Guarantors' Request for Dismissal with prejudice of the Cross Complaint in the Guaranty Litigation (para. 4a.iv)

10.     List of Insiders (para. 7)

11.     Insider Lien Release (para. 7)

12.     Bankruptcy Court Order (para. 10)

BN 9150681v2

## Exhibit C

**Assignment of Claims**

**(see attached)**

## ASSIGNMENT OF CLAIMS

This Assignment of Claims is made this ___ day of June, 2011 pursuant to the Settlement Agreement dated as of June __, 2011 ( the "**Settlement Agreement**") among the following:  (i) the Bank of America, N.A., individually and as administrative agent for a group of lenders [1] (collectively, including Bank of America, N.A. and all such lenders, the "**Bank Group**"); (ii) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ( "**S. Yashouafar**"), and Simon Barlava ("**Barlava**" and together with M.A. Yashouafar and S. Yashouafar the "**Guarantors**"); and (iii) Roosevelt Lofts, LLC, debtor and debtor in possession in the bankruptcy case no. 1:09-14214-GM (the "**Debtor**" and together with the Guarantors, the "**Borrower Parties**").  A true copy of the Settlement Agreement is attached as an Exhibit to the "Order Approving Motion to Compromise with Bank Group" (the "**Order**") entered June __, 2011 as docket no. ___ in the Debtor's bankruptcy case.  Unless otherwise defined herein, the words and phrases used in this Assignment of Claims and defined in the Settlement Agreement shall have those defined meanings.  Under the terms of the Order, the Bank Group does hereby covenant and agree as follows:

The Bank Group hereby assigns to _____ (the "**Purchaser**") the following:

(i)       to the extent permitted by applicable law and the terms of any such policies, any and all claims the Bank Group may have against First American Title Insurance Company arising under or related to the issuance of Policy No. NCS-213559 LA1 dated March 22, 2006 with respect to the real and personal property located at 727 West Seventh Street, Los Angeles, CA and commonly known as the "Roosevelt Lofts" Building (collectively, the "**Property**"), as well as the rights of the Bank Group, if any, to any other policies of title insurance covering the Loan Documents or the Property; and

(ii)      any and all claims the Bank Group may have against the Borrower Parties that exist, arise in or relate to the Loan Documents, together with any and all right, title and interest of the Bank Group in, to and under the Loan Documents (collectively, the "**Loan Document Claims**").

Except as expressly provided herein, this Assignment of Claims is made without recourse, representation or warranty, express or implied, by the Bank Group, including but not limited to the terms, existence or validity of any claims under any title insurance policy, or the terms, existence or validity of any claims against the Borrower Parties. Notwithstanding the foregoing, however, the Bank Group represents and warrants to the Purchaser that: (i) the Bank Group has all right, title and interest to the Loan Document Claims; (ii) the Bank Group has not transferred, assigned, pledged, hypothecated or otherwise encumbered the Loan Document Claims; (iii) the Loan Document Claims are assigned to the Purchaser free and clear of any lien, pledge, security interest or encumbrance; (iv) the Bank of America N.A. has all necessary authority to (a) enter into this Assignment of Claims, (b) provide the representations and warranties set forth

---

[1]       The Bank Group is comprised of the Bank of America N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

herein, and (c) perform the obligations described herein, in each case on behalf of the Bank Group; (v) the Loan Documents include those scheduled on Exhibit "2" hereto; and (vi) Exhibit "2" describes the Loan Agreement, the Note, such additional promissory notes evidencing the debt secured by the Deeds of Trust (collectively, with the Note, the "**Bank Group Notes**"), the Deeds of Trust and the Guaranty.

The Bank of America N.A. will cause the originals of each of the following to be deposited into the escrow established pursuant to the Escrow Agreement no later than 2 days before the Payment Date:  (i) each of the Bank Group Notes, with a duly executed allonge attached thereto, assigning each of the Bank Group Notes to the Purchaser; and (ii) an assignment of each of the Deeds of Trust duly executed and acknowledged by the Bank of America N.A., as agent for the Bank Group, in a recordable form  In addition, the Bank Group will submit a copy of the Deeds of Trust and of the Guaranty, each acknowledged by the Borrower Parties as accurate and complete and enforceable as if an originally executed counterpart.

Without limiting the foregoing, the Bank Group has entered into a stipulation (the "**Mechanic's Lien Stipulation**") with certain mechanic's lien claimants that has been filed in adversary proceeding called Muir-Chase Plumbing *et al*. v. Bank of America N.A., as adv. case no. 1:10-01031 (the "**Mechanic's Lien Litigation**").  The Mechanic's Lien Stipulation was approved by the Bankruptcy judge at a court hearing on May 4, 2011.  An order approving the Mechanic's Lien Stipulation was entered on the docket in the Mechanic's Lien Litigation on May 20, 2011 as docket entry no. 83.  This assignment is expressly subject to the terms of the Mechanic's Lien Stipulation.

BANK OF AMERICA, N.A.
As administrative agent for the Bank Group

By:    _____
       David R. Kegaries
       Senior Vice President

Exhibit 2

Certain Loan Documents

1.      a Construction Loan Agreement dated March 6, 2006 between the Debtor and the Bank of America, N.A., as administrative agent for the Bank Group.

2.      a Deed of Trust Note executed on or about March 7, 2006 in the original principal amount of $78,840,375 payable to Bank of America N.A., a national banking corporation.

3.      a Deed of Trust Note executed on or about June 16, 2006 in the original principal amount of $10,000,000 payable to Manufacturers Bank, a California banking corporation.

4.      a Deed of Trust Note executed on or about June 16, 2006 in the original principal amount of $15,000,000 payable to East West Bank, a California banking corporation.

5.      a Deed of Trust Note executed on or about August 24, 2006 in the original principal amount of $15,000,000 payable to United Commercial Bank, a California banking corporation.

6.      an Amended and Restated Deed of Trust Note executed on or about August 24, 2006 in the original principal amount of $38,840,375 payable to Bank of America, N.A. a national banking corporation.

7.      a Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 as Instrument No. 0610284 of Official Records, and re-recorded on November 17, 2006 as Instrument No. 2553685 of Official Records.

8.      a Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 as Instrument No. 0610286.

9.      a Guaranty Agreement made as of March 6, 2006 by M. Aaron Yashouafar Solyman Yashouafar and Simon Barlava

# **Exhibit D**

## **Escrow Agreement**

### **(see attached)**

## ADDENDUM TO GENERAL PROVISIONS
## JOINT ESCROW INSTRUCTIONS

These Joint Escrow Instructions ("**Instructions**") are made as of June __, 2011 by and among (i) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ("**S. Yashouafar**"), and Simon Barlava ("**Barlava**" and together with M.A. Yashouafar and S. Yashouafar, the "**Guarantors**"); (ii) Roosevelt Lofts, LLC (the "**Borrower**" and together with the Guarantors, the "**Borrower Parties**"); (iii) an entity associated with Greystar GP, LLC (the "**Purchaser**"); (iv) Bank of America, N.A., individually and as administrative agent for a group of lenders (collectively, the "**Bank Group**"); and (v) [Commerce Escrow Company] ("**Escrow Agent**").

These Instructions amend and supplement those certain General Provisions dated June ___, 2011 (the "**General Provisions**") entered into by the Borrower Parties, the Purchaser, the Bank Group and Escrow Agent.  All references to the General Provisions shall be construed to mean the General Provisions and all exhibits and addenda attached thereto (including these Instructions).  In the case of a conflict between the terms of the General Provisions and the terms of these Instructions, the terms of these Instructions shall control.

These Instructions are based on the following facts:

A.    The Borrower Parties and Bank Group are parties to that certain Settlement Agreement (the "**Settlement Agreement**") dated of even date herewith, which provides for the possible purchase and sale of those certain rights under the Loan Documents (as defined in the Settlement Agreement) to Purchaser or another entity as may be designated by the Borrower and approved by the Bank Group; and

B.    The Borrower Parties, the Purchaser and the Bank Group desire that Escrow Agent act in accordance with the instructions set forth in these Instructions.

**NOW, THEREFORE,** in consideration of the terms, conditions, and covenants hereinafter set forth, the parties hereto mutually agree as follows:

## AGREEMENT:

1.    **Delivery of Escrow Documents to Escrow Agent**.

(a)    The Bank Group has executed and delivered to Escrow Agent, and Escrow Agent acknowledges receipt of, the following documents (the "**Initial Escrow Documents**"):

(1)    Assignment of Claims from the Bank Group to the Purchaser in the form attached hereto as Exhibit A (the "**Assignment of Claims**");

(2)    Covenant Not to Sue in the form attached hereto as Exhibit B (the "**Covenant**"); and

(3)     Bank Group's Request for Dismissal of Guarantors without prejudice in the form attached hereto as <u>Exhibit C</u> (the "**Request for Dismissal of Guarantors**").

(4)     Bank Group's Request for Dismissal of the entire Guaranty Litigation without prejudice in the form attached hereto as <u>Exhibit D</u> (the "**Request for Dismissal of Guaranty Litigation**").

(b)     At least two (2) days prior to the Payment Date (as defined in the Settlement Agreement), the Bank Group shall cause to be delivered to Escrow Agent the documentation specified in the Assignment of Claims (the "**Supplemental Escrow Documents**," and collectively with the Initial Escrow Documents, the "**Escrow Documents**").  Escrow Agent will immediately notify Purchaser upon receipt of the Supplemental Escrow Documents.

(c)     Escrow Agent acknowledges that the Escrow Documents are to be held in escrow subject to the terms contained in these Instructions.

**2.    <u>Delivery of Funds to Escrow Agent</u>.**

(a)     Escrow Agent shall receive funds from the Purchaser as follows (collectively, the "<u>Funds</u>"):

(1)     On or before June 13, 2011, an initial installment of $5,000,000; **[10 days from effective date of Settlement Agreement]**

(2)     On or before July 13, 2011, a second installment of $10,000,000; **[40 days from effective date of Settlement Agreement]**

(3)     On or before August 12, 2011, a third installment of $20,000,000; and **[70 days from effective date of Settlement Agreement]**

(4)     On or before September 1, 2011, a fourth and final installment of $33,000,000 plus an amount sufficient to pay all costs and expenses due to the Escrow Agent in connection with the transactions contemplated in these Instructions.

(b)     Escrow Agent shall immediately notify the Bank Group upon receipt of the Funds as set forth above.  If Escrow Agent does not timely receive the Funds in the manner and amounts set forth above, Escrow Agent shall immediately provide notice to the Bank Group of such failure to receive the Funds.

(c)     The Funds shall be and remain property solely of Purchaser.  In no event shall any of the Borrower Parties, the Bank Group, or any other person or party have any legal or equitable right to any of the Funds.  No holder of a claim against or interest in any of the Borrower Parties shall have any right to attach or claim to payment from any Funds.  If for any reason the closing of the transaction contemplated hereby is not consummated on or before August 22, 2011, all Funds shall be promptly returned to Purchaser without need for further order of any court or approval of any party.

SD\790687.4

(d)    Escrow Agent shall immediately return all funds to Purchaser in the event that (i) the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") fails to enter the Plan Support Agreement Order (as defined in that certain Plan Support Agreement among Borrower, The Roosevelt Lofts, Inc. and Purchaser dated on or about the date hereof (the "**Plan Support Agreement**")) on or before June 20, 2011, or (ii) the Bankruptcy Court fails to enter the BofA/Debtor Settlement Order (as defined in the Plan Support Agreement) on or before June 14, 2011.

**3.    Conditions Precedent to Closing**.

Notwithstanding anything herein to the contrary, Escrow Agent is authorized to close the transaction as instructed in <u>Section 4</u> below when and only when:

(a)    The Bank Group has delivered the Escrow Documents to Escrow Agent;

(b)    The Purchaser has delivered all of the Funds to Escrow Agent;

(c)    The Bank Group has approved the Purchaser as being in compliance with the USA PATRIOT Act and the United States Treasury Department's Office of Foreign Asset Control's Specially Designated Nationals and Blocked Persons List); provided, however, that the Bank Group may not withhold or delay such approval if Purchaser (or Purchaser's designee) is able to represent and warrant to the Bank Group that it is in compliance with the representations and warranties set forth on Exhibit "D" hereto; and

(d)    Bankruptcy Court Approval of the Settlement Agreement as defined in paragraph 10 of the Settlement Agreement.

(e)    Escrow Agent has received telephonic or email authorization from David R. Kegaries of the Bank Group to proceed with the closing of the transaction.

(f)    Escrow Agent has received telephonic or email authorization from A. Joshua Carper or Kevin Kaberna, of Purchaser, to proceed with the closing of the transaction.

**4.    Closing of Transaction**.

Upon satisfaction of <u>all</u> conditions set forth in <u>Section 3</u> above, Escrow Agent shall:

(a)    Disburse $68,000,000 of the Funds to the Bank Group by wire transfer at the Bank Group's wire address set forth on <u>Schedule 1</u>;

(b)    Deliver the executed Assignment of Claims to the Purchaser;

(c)    Return the executed Covenant and Request for Dismissal to the Bank Group;

(d)    Return the executed Request for Dismissal of Guarantors to the Bank Group;

(e)    Deliver the executed Request for Dismissal of Guaranty Litigation to the Borrower Parties; and

3

(f)     Deliver all of the Supplemental Escrow Documents to the Purchaser.

**5.     <u>Failure to Close Transaction</u>.**

If any of the conditions set forth in <u>Section 3</u> above are <u>not</u> satisfied and the Escrow Agent receives notice from the Bank Group or Purchaser that the transaction will not be consummated, Escrow Agent shall:

(a)     Pay all Escrow Agent's costs and expenses incurred in connection with the transaction;

(b)     Promptly disburse all of the Funds (minus any amounts used to pay Escrow Agent's costs and expenses pursuant to paragraph 5(a) above) to the Purchaser in the manner requested by the Purchaser;

(c)     Return the executed Assignment of Claims to the Bank Group;

(d)     Return all of the Supplemental Escrow Documents to the Bank Group;

(e)     Return the executed Request for Dismissal of Guaranty Litigation to the Bank Group;

(f)     Deliver the executed Covenant to the Borrower Parties; and

(g)     Deliver the executed Request for Dismissal of Guarantors to the Guarantors.

**6.     <u>Costs and Expenses</u>.**

All costs and expenses of the Escrow Agent incurred in connection with the transactions contemplated in these Instructions shall be paid for by the Purchaser.

**7.     <u>Escrow Agent Matters</u>.**

(a)     Escrow Agent shall have no duties or responsibilities except those set forth in these Instructions and shall incur no liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper or document believed by Escrow Agent to be genuine.

(b)     The Borrower Parties, the Purchaser and the Bank Group hereby jointly and severally agree to indemnify and save Escrow Agent harmless from and against any and all loss, damage, claims, liabilities, judgments and other costs and expenses which may be incurred by Escrow Agent by reason of its acceptance of, and its performance under, these Instructions unless caused by the negligence or intentional act or omission of Escrow Agent.

(c)     Escrow Agent may act or refrain from acting with respect to any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

SD\790687.4

8.   **Notices**.

Notices and other communications required to be given hereunder, or which may be given pursuant or relative to the provisions hereof, shall be in writing and shall be deemed to have been given when delivered in hand or mailed, postage prepaid, by first class United States mail, certified return receipt requested or by facsimile as follows:

<table>
<tr><td>If to the Bank Group:</td><td>Bank of America, N.A.<br>333 South Hope St, 11th Floor<br>Los Angeles, CA 90071<br>Attention:  David R. Kegaries<br>Facsimile:  (213) 621-4868</td></tr>
<tr><td>With a copy to:</td><td>Buchalter Nemer, P.C.<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, CA 90017<br>Attention: Daniel Slate, Esq.<br>Facsimile: (213) 630-5640</td></tr>
<tr><td>If to the Borrower Parties:</td><td>Roosevelt Lofts, LLC<br>c/o Milbank Real Estate Services, Inc.<br>660 S. Figueroa Street, 24th Flr.<br>Los Angeles, CA 90017<br>Attention:  M. Aaron Yashouafar<br>Facsimile:  (213) 403-1440</td></tr>
<tr><td>With a copy to:</td><td>Levene, Neale, Bender, Yoo & Brill L.L.P.<br>10250 Constellation Blvd., Suite 1700<br>Los Angeles, CA 90067<br>Attention: David L. Neale, Esq.<br>Facsimile:  (310) 229-1234</td></tr>
<tr><td>If to the Guarantors:</td><td>M. Aaron Yashouafar<br>660 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>Facsimile:  (213) 403-1440<br><br>Solyman Yashouafar<br>660 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>Facsimile:  (213) 403-1440<br><br>Simon Barlava<br>2209 South Santa Avenue<br>Los Angeles, Ca, 90058<br>Facsimile:  (323) 277-1717</td></tr>
</table>

SD\790687.4

|                      |                                          |
|----------------------|------------------------------------------|
| With a copy to:      | Homan Taghdiri, Esq. |
|                      | 660 S. Figueroa Street, 24th Floor |
|                      | Los Angeles, CA 90017 |
|                      | Facsimile:  (213) 403-1440 |
|                      | |
| If to the Purchaser: | Greystar GP, LLC |
|                      | Attention: A. Joshua Carper |
|                      | 3rd Floor |
|                      | 18 Broad Street |
|                      | Charleston, NC 29401 |
|                      | United States of America |
|                      | Fax: (843) 579-9420 |
|                      | Email: jcarper@greystar.com |
|                      | |
| With a copy to:      | Robert A. Klyman, Esq. |
|                      | Latham & Watkins LLP |
|                      | 355 S. Grand Ave. |
|                      | Los Angeles, CA  90071 |
|                      | Fax:  (213) 891-8763 |
|                      | Email:  robert.klyman@lw.com |
|                      | |
| If to Escrow Agent:  | [Commerce Escrow Company] |
|                      | [INSERT ADDRESS] |
|                      | [CITY, STATE ZIP] |
|                      | Attention:  [INSERT] |
|                      | Facsimile:  [INSERT] |

## 9.    Successors and Assigns Bound; Captions.

These Instructions shall not be assigned by a party without the prior written consent of the other parties, except that Purchaser may assign its rights hereunder without the need for any such consent.  Except as limited by the preceding sentence, the covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of the Bank Group, the Purchaser, the Borrower Parties and Escrow Agent.  The captions and headings of the paragraphs in these Instructions are for convenience only and are not to be used to interpret or define any provisions hereof.

## 10.    Governing Law; Venue; Severability.

These Instructions shall be governed by the laws of California.  Any dispute between the parties that rises to litigation shall be conducted in the Southern District Court for the State of California.  If any provision or clause of these Instructions conflicts with applicable law, such conflict shall not affect other provisions of these Instructions which can be given effect without the conflicting provision, and to this end the provisions of these Instructions are declared to be severable.

## 11.    No Third Party Beneficiary.

SD\790687.4

The terms and provisions of these Instructions shall not create any right in any person, firm, corporation or entity other than the parties hereto and their respective successors and permitted assigns, and no third party shall have the right to enforce or benefit from the terms hereof.

**12.    <u>Interpretation</u>.**

No provision of these Instructions shall be construed against or interpreted to the disadvantage of any party by reason of such party having or being deemed to have requested, drafted, required or structured such provision.

**13.    <u>Counterparts</u>.**

These Instructions (and any amendments, modifications or extensions hereof) may be executed in several counterparts and, after execution and as executed, shall constitute an agreement binding on all of the parties, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

**14.    <u>Facsimile</u>.**

Execution copies of these Instructions may be delivered by facsimile or electronic mail, which shall be deemed to be an original for the purposes of these Instructions.

***[Signature Page(s) To Follow]***

7

SD\790687.4

**IN WITNESS WHEREOF**, the parties hereunto have executed these Instructions as of the date first written above.

**BORROWER PARTIES:**

**ROOSEVELT LOFTS, LLC**
By:  Its manager The Roosevelt Lofts, Inc.


By:    _____
         M. Aaron Yashouafar, President



_____

**M. Aaron Yashouafar**, individually



_____

**Solyman Yashouafar**, individually



_____

**Simon Barlava**, individually




**PURCHASER:**


**GREYSTAR GP, LLC,**
**a Delaware limited liability company**


By:    _____
Name:
Its:

Joint Escrow Instructions                    S-1
SD\790687.4

**BANK GROUP:**

**BANK OF AMERICA, N.A.,**
as administrative agent for the Bank Group

By: _____
　　　David R. Kegaries, Senior Vice President

**ESCROW AGENT:**

**[COMMERCE ESCROW COMPANY]**

By: _____
Name:
Its:

## Schedule 1

**Wire Instructions – Bank Group**

**[INSERT BANK GROUP WIRE INSTRUCTIONS]**

SD\790687.4

## **Exhibit A**

**Form of Assignment of Claims from the Bank Group to the Purchaser**

[Attached]

## **Exhibit B**

**Form of Covenant Not to Sue**

[Attached]

Exhibit B
Form of Covenant Not to Sue

## Exhibit C

**Form of Bank Group's Request for Dismissal without Prejudice**

[Attached]

# Exhibit D

## USA PATRIOT ACT; OFAC

      Purchaser and its designee (i) are, and shall remain, in compliance with all applicable anti-money laundering laws, including without limitation, the USA PATRIOT Act and the laws administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), including, without limitation, Executive Order 13224 (as amended or modified from time to time, (ii) are not, and shall not be, on the OFAC Specially Designated Nationals and Blocked Persons Lists, which, as of the date hereof, may be accessed through the following Internet address:  http://www.treas.gov/offices/enforcement/ofac, and (iii) are not, and shall not be otherwise identified by government or legal authority as a person with whom a U.S. Person (as defined below) is prohibited from transacting business.  Purchaser covenants and agrees to deliver to the Bank of America N.A. any certification or other evidence requested from time to time by Bank of America N.A. in it reasonable discretion confirming Purchaser's compliance with this section.  As used herein, "U.S. Person" shall mean any United States citizen, any permanent resident alien, any entity organized under the laws of the United States (including foreign branched) or its political subdivisions, or any person in the United States.

**<u>Exhibit E</u>**

**Greystar Receivership Stipulation**

**The Greystar Receivership Stipulation shall be in a form acceptable to Greystar, and substantially in the form of, and comparable to, the Receivership Stipulation (as defined in the BofA Settlement).**

## **Exhibit F**

### **Letter of Intent**

### **(see attached)**

# GREYSTAR

May 23, 2011

M. Aaron Yashouafar
*Via email attachment*

Re:  Roosevelt Lofts, LLC

Mr. Yashouafar:

      This letter sets forth our current mutual intentions with respect to the acquisition by an affiliate of Greystar GP, LLC ("**Purchaser**") of the property ("**Property**") herein described. The Roosevelt Lofts, Inc., a California corporation owns one hundred percent of all of the membership interests of Roosevelt Lofts, LLC and serves as managing member of Roosevelt Lofts, LLC (the "**Seller**"). It is contemplated that Purchaser's acquisition of the Property shall be implemented through a plan of reorganization (the "**Plan**") in the bankruptcy case of *In re Roosevelt Lofts, LLC*, case no. 09-14214 GM, pending before the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Case**"). The Plan will be co-sponsored by Purchaser, Seller and Roosevelt Lofts, LLC. This is a letter of intent only and, except as provided in Sections 11, 12 and 14 below, does not constitute a binding agreement of the parties. The parties will be bound only at such time, if ever, as they execute a definitive purchase and sale agreement (as defined more fully below, the "**Definitive Agreement**"), either encompassed within or incorporated into the Plan, in each case evidencing all of the terms, provisions and conditions of the transaction generally outlined in this letter.

1.   PROPERTY DESCRIPTION.

             727 West 7th Street, Los Angeles, California

             Purchaser understands Property to contain 222 individually subdivided residential condominium units, a commercial retail component on the ground floor (the "Retail Component") and parking areas.

2.   PURCHASE PRICE AND PAYMENT TERMS.

- Option A:  $ 89,000,000 for the Property, excluding the Retail Component

- Option B:  $ 95,000,000 for the entirety of the Property

- Purchaser shall select whether to pursue Option A or Option B on or before June 2, 2011.

- Under either Option A or Option B:

    a.   Purchase is for 100%, fee simple, ownership interest in the Property, free and clear of all liens, claims, interests and encumbrances.

    b.   Purchase price will be reduced by any proceeds of insurance with respect to the Property received by Seller or Roosevelt Lofts, LLC on or prior to the effective date of the Plan (the "**Effective Date**") or as otherwise agreed to among Purchaser and Seller. In addition, Seller will cause any insurance claims and other of Roosevelt Lofts, LLC's claims and causes of action with respect to or involving the Property

to be transferred to Purchaser (excluding any causes of action against Purchaser, BofA or Seller, which shall be released under the Plan).  Purchaser understands and agrees that any and all proceeds paid by the Title Company to Roosevelt Lofts, LLC, prior to the Effective Date as a result of pending claims for the mechanic's liens recorded against the Property, shall be used toward settlement and removal of recorded mechanic's liens (the "**Mechanics' Lien Insurance Payment**").

c.  Purchaser shall pay purchase price in cash to the estate of Roosevelt Lofts, LLC on the Effective Date; provided however that that for purposes of this offer only and as a compromise under FRE 408, the Purchase Price shall be reduced by (i) the amount of consideration paid by Purchaser for the senior secured bank claim held by Bank of America (the "**BofA Claim**") and (ii) the Mechanics' Lien Insurance Payment.

3.  TITLE/NOTICE OF COMPLETION.

- On the Effective Date, Purchaser shall receive good and marketable title to the Property, the associated improvements, all related personal property owned by Roosevelt Lofts, LLC, and any leases for space in the improvements at closing.

- The Property shall be free and clear of liens, claims, interests and encumbrances, except those specifically permitted by Purchaser.

- On the Effective Date, Seller shall cause Purchaser to receive an owner's policy of title insurance in form and substance acceptable to Purchaser, subject only to such exceptions as Purchaser approves during the review process.  All existing insurance policies of any kind (including without limitation title insurance and property and casualty insurance) related to the Property shall be maintained in full force and assigned to Purchaser, except as provided in Section 2.b, above.  Seller shall not do anything to impair coverage under any of the foregoing insurance policies.

- Promptly after the date hereof, Seller shall cause a notice of completion to be filed in the appropriate public records with respect to all work done on the Property to date, and shall cause all such work to stop prior to the filing date of the notice of completion.

- Conveyance of the Property shall be through the Plan and appropriate court order and instrument of conveyance.

4.  REPRESENTATIONS AND WARRANTIES; CONDITIONS.  The Plan shall contain representations and warranties customary for real estate and bankruptcy transactions of this size and type, including, without limitation, authorization and power to convey, no knowledge of material defects in the improvements, accuracy of rent roll and other information provided, and no knowledge of failure of the property to comply with applicable laws. Purchaser is aware that the roof of the Property needs repair to eliminate leaking and that the parking stalls are non-conforming.  Representations and warranties shall not survive the Effective Date, except for those that were incorrect as a result of intentional misrepresentations.  The Plan shall also contain conditions customary for real estate and bankruptcy transactions of this size and type.

5.. TREATMENT OF CLAIMS AND INTERESTS IN THE PLAN. Purchaser and Seller shall cooperate in the drafting of the Plan and related disclosure statement, and shall mutually agree on the treatment of claims and interests under the Plan.

6. DELIVERY OF INFORMATION. Promptly following the date hereof, Seller shall cause Purchaser to receive copies all policies of title insurance and all plans, specifications, surveys, reports, financial records and invoices relative to the Property and any other information reasonably requested by Purchaser to the extent any of the foregoing information and documentation is within the custody, possession or control of Seller, Roosevelt Lofts, LLC or any of their respective affiliates, employees, members, agents, officers, consultants or professionals.

7. INSPECTION PERIOD. Purchaser shall have the right to review the information delivered by Seller and all books and records pertaining to the ownership and operation of the Property, to conduct a phase I environmental audit of the Property, and to enter upon and inspect the Property.

8. CLOSING DATE. The Effective Date shall be defined as 90 days after the date hereof.

9. BINDING AGREEMENT.

(A) By no later than June 2, 2011, (i) Seller and Purchaser shall enter into a definitive written agreement which memorializes the terms and conditions set forth herein with specificity (the "**Definitive Agreement**") and (ii) Seller and Purchaser shall enter into a definitive agreement with the holder of the BofA Claim ("BofA") to assign such claim to Purchasers for $68 million in cash (the "**BofA Assignment Agreement**"), subject to the terms herein and in the Definitive Agreement and the BofA Assignment Agreement. In the event that the Definitive Agreement and the BofA Assignment Agreement are not entered into by such date for any reason, neither Purchaser nor Seller shall have any obligation to proceed with the transaction contemplated by this letter of intent (and the liquidated damages described in Section 12, below, shall not be applicable). In the event that the Definitive Agreement and the BofA Assignment Agreement are entered into by June 2, 2011, then Purchaser shall have the exclusive right to acquire the BofA Claim for $68 million.

(B) By no later than June 10, 2011, Purchaser will deposit $5 million into a third party escrow (the "**Escrow**") toward its acquisition of the BofA Claim (the "**$5 Million Deposit**"). The $5 Million Deposit will become irrevocable on the later of the date (the "**Irrevocable Escrow Date**") that the Bankruptcy Court enters a final order:

(i) approving Purchaser as a sponsor of the Plan (the "**Plan Sponsor Order**") that, among other things, (a) memorializes and implements the terms of the Definitive Agreement, (b) provides for either (x) payment in full in cash on the Effective Date of the BofA Claim in an amount equal to the face amount of the BofA Claim plus default interest and outstanding fees and expenses or (y) conversion of the BofA Claim into 100% of the equity interests of Roosevelt Lofts, LLC as reorganized (or such entity that holds, as of the Effective Date, such equity interests), (c) approves the BofA Claim as allowed, perfected, valid and duly enforceable (without any defense, counterclaim and right of offset) with first priority security against the Property subject only to any existing court approved settlement with holders of mechanics' liens against the Property and (d) provide for automatic relief from stay for Purchaser (as holder of the BofA Claim) on the Effective Date to foreclose on the Property on the tenth day following the Effective Date unless the Plan is performed according to its terms; and

(ii) approving the BofA Assignment Agreement (the "**BofA Assignment Order**").

(C)  On the date that is (x) 35 days after the execution and delivery of the "**Final Agreement**" referenced in that certain term sheet for Settlement Agreement Between the Bank Group, Roosevelt Lofts, LLC and Affiliates and Bank Guarantors (attached hereto as Exhibit 1), Purchaser will deposit another $10 million in the Escrow towards the consideration for the assignment of the BofA Claim to Purchaser (the "**$10 Million Deposit**") and (y) 65 days after the execution and delivery of the Final Agreement, Purchaser will deposit another $20 million into the Escrow towards the consideration for the assignment of the BofA Claim to Purchaser (collectively with the $5 Million Deposit and the $10 Million Deposit, the "**Escrow Deposits**").

(D)  the Escrow Deposits shall be (A) in immediately available funds and (B) non-refundable following the Irrevocable Escrow Date; provided however that upon the Effective Date (or earlier in the sole discretion of the Purchaser) the Escrow Deposits shall be applied to fund the consideration for the assignment of the BofA Claim to Purchaser.

10.  CLOSING COSTS.  Each of the Purchaser and Seller shall be responsible for its fees and costs (including attorneys' fees) incurred in connection with the transactions contemplated by this agreement. Rents, taxes, and approved operating expenses will be prorated as of the Effective Date.  Purchaser shall have the right to terminate and/or reject any management and other service agreements affecting the Property concurrently with the confirmation of the Plan.

11.  CONFIDENTIALITY.  Purchaser and Seller shall not disclose any of the terms, provisions, or conditions of this letter to any other person without the express written consent of the other party, except that Purchaser may disclose such information to its principals, counsel, accountants and potential financing sources in connection with evaluating the potential acquisition of the property by Purchaser.  Purchaser agrees that, in any discussion with BofA concerning the BofA Assignment Agreement, Purchaser shall not disclose the terms of this letter set forth in Paragraph 2, above.

12.  EXCLUSIVITY.  From and after the date hereof, so long as Purchaser is willing to purchase the Property for the Purchase Price, Seller hereby agrees that it will not accept offers with respect to any transaction involving or relating to a potential acquisition of the BofA Claim, the Property, Roosevelt Lofts, LLC or the Seller (including, without limitation, through a plan of reorganization). Seller and Purchaser recognize that this agreement is not a solicitation of votes on the Plan or any other plan. In the event Purchaser is willing to purchase the Property for the Purchase Price under the terms set forth herein and in the Definitive Agreement and the BofA Assignment Agreement and is not then in material breach of the Definitive Agreement or the BofA Assignment Agreement, but Seller does not agree to sell the Property to the Purchaser for the Purchase Price under the terms and conditions set forth herein and in the Definitive Agreement and the BofA Assignment Agreement (the "**Sale Breach**"), Seller promptly shall pay Purchaser the sum of $500,000 in cash as liquidated damages to compensate Purchaser for the Sale Breach.   Purchaser and Seller agree that it would be impracticable and difficult to estimate the actual damages which Purchaser may suffer as a result of the Sale Breach. Therefore, Purchaser and Seller agree that a reasonable estimate of the foregoing damages which Purchaser would suffer as a result of the Sale Breach is and shall be limited to the foregoing amount of liquidated damages.  All other remedies for the Sale Breach shall be waived by Purchaser. The Purchaser and Seller acknowledge that the payment of such

liquidated damages is not intended as a forfeiture or penalty but is intended to constitute liquidated damages. The Liquidated Damages described herein shall be personally guaranteed by M. Aaron Yashouafora and Simon Barlava. Notwithstanding the foregoing, nothing contained herein shall impair or restrict Purchaser's right to foreclose on the Property as described in Section 9 hereof and the Plan Sponsor Order or the exercise of any remedies set forth in the Definitive Agreement and the BofA Assignment Agreement.

13. <u>ASSIGNMENT/NOMINATION</u>. An affiliate or other designee of Purchaser may take title the Property on the Effective Date.

14. <u>CORPORATE AUTHORITY</u>. By signing below, each signatory below represents and warrants that he has full corporate authority to enter into this letter and bind his respective party to the terms of Sections 11, 12 and 14 hereof. In addition, by signing in the signature block below under "Accepted Effective As _____", the signatory represents that the entity set forth in such signature block owns all of the membership interests of and serves as managing member of Roosevelt Lofts, LLC. The foregoing representations shall survive indefinitely. Seller covenants that it will (a) not pledge, transfer, hypothecate, encumber or assign such membership interests unless such pledge, transfer, hypothecation, encumbrance or assignment is made expressly subject in writing to the terms and conditions set forth herein and (b) shall provide Purchaser with prompt notice of any of the actions described in Section 14(a) hereof.

Seller and Purchaser stipulate that the agreements set forth in Sections 11, 12 and 14 are supported by good and sufficient consideration, including Purchaser's undertaking activities with regard to evaluating the viability of the transaction herein described. Each party reserves the right to negotiate with respect to the transactions herein described in their own sole interest.

The parties again stipulate and acknowledge that this is a non-binding letter of intent only, and that except for the confidentiality agreements set forth in Section 11, the exclusivity agreements set forth in Section 12, and the representations and warranties and covenants in set forth in Section 14, this letter does not create any binding agreements between the parties hereto. No party shall be bound (except as set forth in Sections 11, 12 and 14), until such time as a Definitive Agreement is duly executed by all parties. If this proposal is not accepted by May 23, 2011, Purchaser's offer will become null and void.

If the foregoing sets forth your current understanding of our current mutual intent, please so indicate by signing one copy where indicated below.

Yours very truly,

GREYSTAR GP, LLC

By:_____

Name:__Kevin Kaberna_____

Title:___Investment Principal_____

ACCEPTED EFFECTIVE AS OF _5/23/11_

By:_____

Name:_M. Aaron Yashouafar_

Title:_CEO_

On Behalf of:_The Roosevelt lofts, INC._

**<u>Exhibit G</u>**


**Inventory**



**[To Be Submitted]**

## Exhibit H

**[Intentionally Omitted]**

## Exhibit I

**Debtor Bank Accounts**

City National Bank
Debtor In Possession Account
Account No. 210092560
Balance as of June 2, 2011:   $189,237.25

Bank of America
Litigation Reserve Account
Account No. 14590-60688
Balance as of June 2, 2011:   $1,500,000.00

## Exhibit J

**Rent Roll**

**(see attached)**

The Roosevelt Residences
... Seventh Street
Los Angeles, CA

Rent Roll
as of
June 2011

| SUITE | NAME | AREA | COMM DATE | EXP. DATE | MONTHLY RENT | CAM CHARGES | TOTAL | SECURITY DEPOSIT |
|---|---|---|---|---|---|---|---|---|
| **Residential Tenants** | | | | | | | | |
| RVLTR-310 | Occupied | 814 | 2/10/11 | 1/31/2012 | 1,950.00 | | | 2,925.00 |
| RVLTR-417 | Occupied | 1,310 | 5/15/11 | 4/30/2012 | 3,100.00 | | | 3,100.00 |
| RVLTR-419 | Occupied | 795 | 10/01/10 | 9/01/2011 | 2,000.00 | | | 3,500.00 |
| RVLTR-508 | Occupied | 940 | 4/01/11 | 3/31/2012 | 2,450.00 | | | 2,450.00 |
| RVLTR-313 | Occupied | 804 | 2/01/11 | 1/31/2012 | 1,850.00 | | | 2,000.00 |
| RVLTR-704 | Occupied | 1,366 | 7/01/10 | 6/30/2011 | 3,278.00 | | | 3,278.00 |
| RVLTR-509 | Occupied | 893 | 5/07/11 | 4/30/2012 | 2,400.00 | | | 2,400.00 |
| RVLTR-711 | Occupied | 1,332 | 2/10/11 | 1/31/2012 | 2,750.00 | | | 4,125.00 |
| RVLTR-816 | Occupied | 1,248 | 11/01/10 | 10/31/2011 | 2,775.00 | | | 2,775.00 |
| RVLTR-503 | Occupied | 1,328 | 6/29/10 | 5/31/2011 | 3,187.00 | | | 2,223.00 |
| RVLTR-712 | Occupied | 944 | 12/01/10 | 11/30/2011 | 2,250.00 | | | 2,250.00 |
| RVLTR-611 | Occupied | 1,332 | 12/01/10 | 11/30/2011 | 3,197.00 | | | 6,894.00 |
| RVLTR-312 | Occupied | 785 | 10/01/10 | 9/30/2011 | 1,900.00 | | | 1,900.00 |
| RVLTR-707 | Occupied | 950 | 4/15/11 | 3/31/2012 | 2,518.00 | | | 3,777.00 |
| RVLTR-305 | Occupied | 1,037 | 11/01/10 | 10/31/2011 | 2,400.00 | | | 2,900.00 |
| RVLTR-719 | Occupied | 1,532 | 11/01/09 | MTM | 3,165.00 | | | 3,165.00 |
| RVLTR-815 | Occupied | 883 | 2/01/11 | 1/31/2012 | 2,200.00 | | | 2,350.00 |
| RVLTR-525 | Occupied | 1,217 | 2/15/11 | 1/31/2012 | 2,600.00 | | | 3,000.00 |
| RVLTR-513 | Occupied | 934 | 6/07/11 | 5/31/2012 | 2,080.00 | | | 3,000.00 |
| RVLTR-708 | Occupied | 919 | 11/01/10 | 10/31/2011 | 2,150.00 | | | 2,150.00 |
| RVLTR-811 | Occupied | 1,332 | 4/08/11 | 3/31/2012 | 3,250.00 | | | 3,400.00 |
| RVLTR-505 | Occupied | 1,290 | 4/01/11 | 1/19/2012 | 2,825.00 | | | 2,800.00 |
| RVLTR-514 | Occupied | 942 | 8/01/10 | 7/31/2011 | 2,300.00 | | | 2,300.00 |
| RVLTR-810 | Occupied | 1,305 | 8/01/10 | 7/31/2011 | 3,000.00 | | | 3,000.00 |
| RVLTR-506 | Occupied | 863 | 5/01/11 | 4/30/2012 | 2,050.00 | | | 4,100.00 |
| RVLTR-823 | Occupied | 931 | 5/15/11 | 4/30/2012 | 2,400.00 | | | 2,400.00 |
| RVLTR-518 | Occupied | 1,453 | 1/08/11 | 12/31/2011 | 2,800.00 | | | 2,800.00 |
| RVLTR-410 | Occupied | 1,096 | 5/01/11 | 4/30/2012 | 2,750.00 | | | 3,500.00 |
| RVLTR-808 | Occupied | 932 | 12/01/10 | 11/30/2011 | 2,435.00 | | | 3,750.00 |
| RVLTR-607 | Occupied | 874 | 11/01/10 | 10/31/2011 | 2,150.00 | | | 2,150.00 |
| RVLTR-501 | Occupied | 940 | 3/26/11 | 2/29/2012 | 2,250.00 | | | 2,250.00 |
| RVLTR-415 | Occupied | 863 | 5/15/11 | 4/30/2012 | 1,950.00 | | | 1,950.00 |
| RVLTR-715 | Occupied | 1,030 | 5/15/11 | 4/30/2012 | 2,300.00 | | | 2,300.00 |
| RVLTR-616 | Occupied | 1,248 | 11/16/10 | 10/31/2011 | 2,500.00 | | | 2,500.00 |
| RVLTR-713 | Occupied | 958 | 6/01/11 | 11/30/2011 | 2,550.00 | | | 2,550.00 |
| RVLTR-510 | Occupied | 1,093 | 5/10/11 | 4/30/2012 | 2,650.00 | | | 2,650.00 |
| RVLTR-519 | Occupied | 1,532 | 2/01/11 | 1/31/2012 | 2,950.00 | | | 2,950.00 |
| RVLTR-302 | Occupied | 1,363 | 12/01/10 | 11/30/2011 | 2,975.00 | | | 3,475.00 |
| RVLTR-610 | Occupied | 1,090 | 1/01/11 | 12/31/2011 | 2,180.00 | | | 0.00 |
| RVLTR-716 | Occupied | 1,012 | 1/01/11 | 12/31/2011 | 2,275.00 | | | 2,425.00 |
| RVLTR-726 | Occupied | 1,115 | 4/09/11 | 3/31/2012 | 2,500.00 | | | 4,250.00 |
| RVLTR-423 | Occupied | 910 | 9/19/09 | 8/31/2010 | 2,350.00 | | | 0.00 |
| RVLTR-425 | Occupied | 1,219 | 4/01/09 | 3/31/2011 | 550.00 | | | 0.00 |
| RVLTR-822 | Occupied | 864 | 4/07/11 | 3/31/2012 | 2,150.00 | | | 2,150.00 |
| RVLTR-612 | Occupied | 921 | 4/01/11 | 3/31/2012 | 2,175.00 | | | 4,000.00 |
| RVLTR-426 | Occupied | 1,125 | 3/01/11 | 2/28/2012 | 2,550.00 | | | 2,550.00 |
| RVLTR-314 | Occupied | 1,619 | 10/01/10 | 8/31/2011 | 2,750.00 | | | 2,750.00 |
| RVLTR-613 | Occupied | 947 | 2/17/11 | 1/31/2012 | 2,225.00 | | | 2,225.00 |
| RVLTR-720 | Occupied | 875 | 3/01/11 | 2/29/2012 | 1,995.00 | | | 3,000.00 |
| RVLTR-309 | Occupied | 839 | 10/15/10 | 9/30/2011 | 1,950.00 | | | 1,950.00 |
| RVLTR-522 | Occupied | 868 | 2/20/11 | 1/31/2012 | 2,050.00 | | | 2,050.00 |
| RVLTR-307 | Occupied | 732 | 7/26/10 | 6/30/2011 | 2,000.00 | | | 2,000.00 |
| RVLTR-609 | Occupied | 885 | 6/01/10 | 5/31/2011 | 2,345.00 | | | 3,150.00 |
| RVLTR-412 | Occupied | 913 | 3/13/09 | MTM | 2,650.00 | | | 0.00 |
| RVLTR-812 | Occupied | 944 | 3/01/11 | 2/29/2012 | 2,400.00 | | | 2,400.00 |
| RVLTR-511 | Occupied | 1,332 | 10/15/10 | 9/30/2011 | 2,557.00 | | | 2,557.00 |

The Reserve Residences
1234 Seventh Street
Los Angeles, CA

Rent Roll
as of
June 2011

| SUITE | NAME | AREA | COMM DATE | EXP. DATE | MONTHLY RENT | CAM CHARGES | TOTAL | SECURITY DEPOSIT |
|---|---|---|---|---|---|---|---|---|
| **Residential Tenants** | | | | | | | | |
| RVLTR-825 | Occupied | 1,226 | 5/01/11 | 4/30/2012 | 2,650.00 | | | 2,650.00 |
| RVLTR-304 | Occupied | 1,024 | 6/01/10 | MTM | 2,200.00 | | | 2,200.00 |
| RVLTR-813 | Occupied | 956 | 11/01/10 | 10/31/2011 | 2,350.00 | | | 2,350.00 |
| RVLTR-303 | Occupied | 1,042 | 2/25/11 | 1/31/2012 | 2,400.00 | | | 3,600.00 |
| RVLTR-701 | Occupied | 940 | 3/19/11 | 9/30/2011 | 2,600.00 | | | 2,600.00 |
| RVLTR-622 | Occupied | 875 | 6/02/11 | 5/31/2012 | 2,100.00 | | | 2,500.00 |
| RVLTR-723 | Occupied | 930 | 5/15/11 | 5/31/2012 | 2,400.00 | | | 0.00 |
| RVLTR-814 | Occupied | 951 | 4/01/11 | 3/31/2012 | 2,400.00 | | | 4,800.00 |
| RVLTR-714 | Occupied | 950 | 6/01/10 | MTM | 2,400.00 | | | 2,400.00 |
| RVLTR-722 | Occupied | 868 | 6/01/11 | 5/31/2012 | 1,950.00 | | | 3,500.00 |
| RVLTR-411 | Occupied | 1,265 | 4/15/09 | 3/14/2011 | 550.00 | | | 0.00 |
| RVLTR-516 | Occupied | 1,012 | 12/01/10 | 11/30/2011 | 2,250.00 | | | 3,375.00 |
| RVLTR-724 | Occupied | 808 | 5/01/11 | 4/30/2012 | 1,995.00 | | | 1,995.00 |
| RVLTR-706 | Occupied | 888 | 8/15/10 | 7/31/2011 | 2,200.00 | | | 2,200.00 |
| RVLTR-413 | Occupied | 931 | 3/07/11 | 2/29/2012 | 2,400.00 | | | 4,100.00 |
| RVLTR-623 | Occupied | 931 | 5/15/11 | 4/30/2012 | 2,200.00 | | | 2,200.00 |
| RVLTR-718 | Occupied | 1,453 | 3/15/11 | MTM | 2,790.00 | | | 0.00 |
| RVLTR-702 | Occupied | 1,462 | 2/01/11 | 1/31/2012 | 3,000.00 | | | 3,000.00 |
| RVLTR-705 | Occupied | 1,288 | 8/01/10 | 7/31/2011 | 3,136.00 | | | 3,136.00 |
| RVLTR-409 | Occupied | 884 | 2/01/11 | 1/31/2012 | 2,000.00 | | | 2,000.00 |
| RVLTR-709 | Occupied | 910 | 12/01/10 | 11/30/2011 | 2,300.00 | | | 2,500.00 |
| RVLTR-512 | Occupied | 918 | 5/09/11 | 4/30/2012 | 2,600.00 | | | 3,900.00 |
| RVLTR-614 | Occupied | 938 | 9/01/10 | 8/31/2011 | 2,496.00 | | | 2,500.00 |
| Total | | 83,068 | | | 189,304.00 | | | 205,950.00 |
| **Retail Tenants** | | | | | | | | |
| RVLTR-G723 | 727 WEST SEVENTH, LLC (SALVA | 2,750 | 06/01/11 | 05/31/11 | 7,975.00 | 2,639.29 | 10,614.29 | 0 |
| RVLTR-G729 | JANG ENTERPRISES, INC. | 4,276 | 3/01/09 | 4/30/2019 | 15,191.43 | 3,228.00 | 18,419.43 | 6,355.88 |
| RVLTR-G733 | HAO LAM | 1,505 | 10/01/09 | 9/30/2019 | 6,358.35 | 1,136.00 | 7,494.35 | 5,200.00 |
| RVLTR-G735 | FAMIMA CORPORATION | 1,633 | 3/24/09 | 6/30/2014 | 9,887.90 | 1,233.00 | 11,120.90 | 8,654.90 |
| Total | | | | | 31,437.68 | 5,597.00 | 37,034.68 | 20,210.78 |

*"The information in this rent roll is subject to verification and/or change at the time of closing, based on the actual in place tenancies and amounts paid by the tenants."*

*Confidential and Privileged Information*

| In re:                          | CHAPTER  11                          |
|                                 | CASE NUMBER  1:09-bk-14214-GM        |
|          ROOSEVELT LOFTS, LLC,  |                                      |
|                     Debtor(s).  |                                      |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

A true and correct copy of the foregoing documents described as **NOTICE OF MOTION AND MOTION PURSUANT TO SECTIONS 105(a), 363(b) AND 1125(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AN ORDER AUTHORIZING THE DEBTOR AND OTHER PARTIES THERETO TO ENTER INTO PLAN SUPPORT AGREEMENT AND RELATED AGREEMENTS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF M. AARON YASHOUAFAR IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **June 3, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- John B Acierno    ecfcacb@piteduncan.com
- Carleton R Burch    crb@amclaw.com, amc@amclaw.com;jsh@amclaw.com;awh@amclaw.com;mav@amclaw.com;esf@amclaw.com;slc@amclaw.com;csh@amclaw.com
- Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
- L Dominic Chacon    ldominicchacon@yahoo.com
- Cynthia M Cohen    cynthiacohen@paulhastings.com
- Travis W Feuerbacher    tfeuerbacher@gglts.com
- Steven R Fox    emails@foxlaw.com
- Helen R Frazer    hfrazer@aalrr.com
- Varand Gourjian    vg@gourjianlaw.com, lucy@gourjianlaw.com;naz@gourjianlaw.com;art@gourjianlaw.com
- Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com
- Herbert Hayden    herbert@ntlg.us
- Brian L Holman    b.holman@mpglaw.com
- Alexandra Kazhokin    akazhokin@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- Mark J Krone    crb@amclaw.com, crs@amclaw.com;amc@amclaw.com
- Ian Landsberg    ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;rbenitez@landsberg-law.com
- David L. Neale    dln@lnbrb.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Russell H Rapoport    rrapoport@prllplaw.com, lgillis@prllplaw.com
- Ronald N Richards    ron@ronaldrichards.com
- S Margaux Ross    margaux.ross@usdoj.gov
- Bruce D Rudman    bdr@agrlaw.net
- William D Schuster    bills@allieschuster.org
- Marian K Selvaggio    selvaggio@huntortmann.com
- Daniel H Slate    dslate@buchalter.com, rreeder@buchalter.com;ifs_filing@buchalter.com
- Lindsey L Smith    lls@lnbyb.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Marc Weinberg    marcweinberg@att.net
- Brandon J Witkow    bwitkow@lockelord.com
- Aimee Y Wong    aywong@mckennalong.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*April 2010*                                                                    **F 9013-3.1**

| In re:<br><br>                     ROOSEVELT LOFTS, LLC,<br><br>                                                    Debtor(s). | CHAPTER  11<br>CASE NUMBER  1:09-bk-14214-GM |
|---|---|

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **June 3, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

*[X] Service list served by Overnight Mail attached*

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 3, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

***Served via Attorney Service***
Hon. Geraldine Mund
United States Bankruptcy Court
21041 Burbank Blvd., Ctrm 303
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| **June 3, 2011** | Stephanie Reichert | */s/ Stephanie Reichert* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*April 2010*                                                                                                      **F 9013-3.1**

**II. SERVED BY OVERNIGHT MAIL:**

U.S. Trustee
Attn:  S Margaux Ross, Esq.
21051 Warner Ctr Ln Ste 115
Woodland Hills, CA 91367

_Counsel for Siemens Bldg Tech., Inc._
Benjamin R. Trachtman, Esq.
Trachtman & Trachtman
27401 Los Altos, Suite 300
Mission Viejo, Ca 92691

Roosevelt Lofts, LLC
c/o Mr. M. Aaron Yashouafar, President
16661 Ventura Blvd., #600
Encino, CA 91436

Homan Taghdiri, Esq.
Milbank
660 S. Figueroa St., 24th Floor
Los Angeles, CA 90017

Herbert Alfred Mayer
5360 Willow Oak Street
Simi Valley, CA 93063-4591

_Counsel for HD Supply Construction_
William D. Schuster, Esq.
Allie & Schuster PC
2122 N Broadway
Santa Ana, CA 92706-2614

_Counsel for Sidney Alter dba Alter Electric_
Bruce D. Rudman, Esq.
Abdulaziz, Grossbart & Rudman
PO Box 15458
North Hollywood, CA 91615

_Counsel for VGI_
Patrick J. Duffy III
Andrew W Hawthorne
Monteleone & McCrory
725 S. Figueroa St., Ste. 3200
Los Angeles, CA 90017

_Counsel for Bank of America_
Daniel H. Slate, Esq.
Buchalter, Nemer
1000 Wilshire Blvd., Ste 1500
Los Angeles, CA 90017

_Counsel for Infiniti Metals_
Law Ofcs Theodore A. Anderson
690 S. Brea Blvd.
Brea, CA 92821

_Committee Member_
Kuetar Flooring
Attn:  Joseph Kember/Ed Sheats
2 Innovation Drive
Renfrew
Ontario, **CANADA** K7V4B1

L.A. County Treasurer and Tax Collector
PO Box 54110
Los Angeles, CA 90054-0110

_Counsel for ThyssenKrupp Elevator_
William C. Hernquist II
Wallace H. Sweet
8407 La Mesa Blvd.
La Mesa, CA 91942

_Counsel for American Gunite, Inc._
Varand Gourjian, Esq.
Gourjian Law Group
101 N. Brand Blvd., Suite 1220
Glendale, CA 91203

_Committee Counsel_
Ian Landsberg, Esq.
Landsberg Margulies LLP
16030 Ventura Blvd., Ste. 470
Encino, CA 91436

_Committee Member_
A American Custom Flooring
Attn:  Richard S. Lauter
311 S. Wacker Drive
Chicago, IL 60066

Counsel to Bank of America
Seyfarth Shaw LLP
T. Larry Watts, Eric B. von Zeipel
2029 Century Park East, Suite 3500
Los Angeles, CA 90067-3021

_Committee Member_
Bontempi USA
Attn:  Yeujye Chen
8919 Beverly Blvd.
West Hollywood, CA 90048

Fred S. Pardes, Esq.
LAW OFFICES OF FRED S. PARDES
A Professional Corporation
34211 Pacific Coast Highway, Suite 103
Dana Point, Ca. 92629

S.E.C.
5670 Wilshire Blvd., Ste. 1100
Los Angeles, CA 90036

David Sherwood
CEO
Daniel's Jewelers
PO Box 3750
Culver City, CA 90231

PM Estrada Roofing
4257 W. 101st Street
Inglewood, CA 90304

Gerald W. Mouzis
The Mouzis Law Firm
_Counsel for Thermalair Inc._
13681 Newport Avenue, Suite 8-605
Tustin, CA  92780

_Attorney for Canon Financial Svcs_
Scott H. Marcus & Associates
121 Johnson Road
Turnersville, NJ 08012

Roosevelt Lofts, LLC
660 S. Figueroa Street
24th Floor
Los Angeles, CA 90017

944 Media
4253 N. Scottsdale Road
Scottsdale, AZ 85251

U.S. Trustee
Ernst & Young Plaza
21041 Burbank Blvd.
Woodland Hills, CA  91367

24/7 Fire Services
12540 E. Slauson Avenue, Unit C
Santa Fe Springs, CA 90670

AB California Acquisition Corp.
dba Acoustical Material Services
10200 S. Pioneer Blvd., #500
Santa Fe Springs, CA 90670

A Fence Company, Inc.
15205 Carretera Drive
Whittier, CA 90605

Ace Parking Services
645 Ash Street
San Diego, CA 92101

Accoustical Construction, Inc.
10121 Stonehurst Avenue
Sun Valley, CA 91352

Accent Refinishing Company
PO Box 2494
Sun City, AZ 85374

American Gunite, Inc.
5042 Wilshire Blvd., Suite 496
Los Angeles, CA 90036

Addison Pools, Inc.
10835 Magnolia Boulevard
North Hollywood, CA 91601

Alan J. Carnegie, Esq.
23975 Park Sorrento, #227
Calabasas, CA 91302

Brewster Marble Co., Inc.
11818 Glenoaks Blvd.
San Fernando, CA 91340

Arrow
7635 Burnet Avenue
Van Nuys, CA 91405

American Demolition/Concrete
Cutting, Inc.
620 Poinsettia Street
Santa Ana, CA 92701

Cal-State Steel Corporation
1801 W. Compton Blvd.
Compton, CA 90220

Barlava, Simon
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017

B&N Industries, Inc.
1409 Chapin Avenue, 2nd Floor
Burlingame, CA 94010

City of Los Angeles Public Works
200 N. Spring Street, Room 967
Los Angeles, CA 90012

Century Shower Doors
20100 S. Normandie Avenue
Torrance, CA 90502

Bazik Electrical
714 N. Howard Stret, Unit G
Glendale, CA 91206

CraneNetics, Inc.
4780 Cheyenne Way
Chino, CA 91710

Commercial Glass Company
1577 Tierra Rejada Rd.
Simi Valley, CA 93065

Bradley A. Raisin
16055 Ventura Blvd., #601
Encino, CA 91436

Davis Langdon
301 Arizona Avenue
Santa Monica, CA 90401

Crenshaw Lumber
424 Pico Boulevard
Santa Monica, CA 90405

Chase Construction, Inc.
1825 Pandora Avenue
Los Angeles, CA 90025

Digital Express
6404 Wilshire Blvd., Suite 105
Los Angeles, CA 90048

Denise H. Field, Esq.
333 Market Street, 25th Floor
San Francisco, CA 94105

Commercial Scaffolding of CA, Inc.
14732 S. Maple Avenue
Gardena, CA 90248

Dunn-Edwards Corporation
4885 E. 52nd Place
Los Angeles, CA 90040

E. Leonard Fruchter
1609 Cravens Avenue
Torrance, CA 90501

David J. Barnier, Esq.
2341 Jefferson St., #200
San Diego, CA 92110

Fathi, Haleh  Holly
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017

Encino Corporate Plaza, L.P.
c/o Milbank Real Estate Services
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017

Dewey Pest Control
3711 Beverly Blvd.
Los Angeles, CA 90004

Gorgeous Magazine
11684 Ventura Blvd.
Studio City, CA 91604

Franchise Tax Board
Bankruptcy Unit
P.O. Box 2952
Sacramento, CA 95812-2952

Donald Dickerson & Associates
6840 Havenhurst Avenue
Van Nuys, CA 91406

Heather M. Kadeg, Esq.
30423 Canwood St., #131
Agoura Hills, CA 91301

General Coating
9349 Feron Blvd.
Alhambra, CA 91801

EFCO Corporation
1290 Carbide Drive
Corona, CA 92881

Herbert Hayden, Esq.
40931 Fremont Blvd
Fremont, CA 94538

William F. McVey Sr.
Grif-Fab Corp.
1 Westlake Village
Council Bluffs, LA  51501

Excel Building Services
P.O. Box 1089
San Jose, CA 95108

Integrity Builders West, Inc.
25942 Via Marejada
Mission Viejo, CA 92691

Henri Specialties
4225 Prado Road
Unit 102
Corona, CA 92880

Frank's Disposal
PO Box 4271
Sunland, CA 91041

Ives, Kirwan & Dibble
660 S. Figueroa Street, Suite 1990
Los Angeles, CA 90017

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

Glendale Plumbing & Fire Supply
11120 Sherman Way
Sun Valley, CA 91352

Kadima Security Services, Inc.
660 S. Figueroa St.
Suite 1880
Los Angeles, CA 90017

Ken Mar Consultants
5966 La Place Court, Suite 180
Carlsbad, CA 92008

Henry Worth LLC
421 Broadway
Attn: Curtis Fentress
Denver, CO 80203

Keyboard Concepts, Inc.
5600 Van Nuys Blvd.
Van Nuys, CA 91401

Law Offices of H. Joseph Nourmand
660 S. Figueroa Street, Suite 2400
Los Angeles, CA 90017

Insul-Flow, Inc.
1911 N. Fine
Fresno, CA 93727

LA Commercial Group, Inc. dba
Continental Commercial Group
317 S. Brand Blvd.
Glendale, CA 91204

Lightworks
3911 E. La Palma Ave.
Suite G
Anaheim, CA 92807

Irish Communication Company
2649 Stingle Avenue
Rosemead, CA 91770

Lewis & Associates
3440 Wilshire Blvd., Suite 1215
Los Angeles, CA 90010

Los Angeles Dept. of Bldg. & Safety
201 N. Figueroa Street
Los Angeles, CA 90012

J.W. Kelly Consulting
1373 Keniston Avenue
Los Angeles, CA 90019

Mansoor, Solomon
727 W. 7th Street, Unit 502
Los Angeles, CA 90017

Los Angeles Magazine
5900 Wilshire Blvd., 10th Floor
Los Angeles, CA 90036

Kessler & Kessler
1800 Avenue of the Stars, Suite 400
Los Angeles, CA 90067

Milbank Holding Corp.
dba Milbank Real Estate Services
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017

McDowell Scheduling
23232 Peralta Drive
Laguna Hills, CA 92653

Leonard, Gary
1539 Curran Street
Los Angeles, CA 90026

Night, Allan & Leyva, Michael L.
2632 W. Beverly Blvd.
Montebello, CA 90640

On Demand Printing
1888 S. Sepulveda Blvd.
Los Angeles, CA 90025

Los Angeles Conservancy
Attn:  Mike Buhler Esq.
523 West 6th Street, Suite 826
Los Angeles, CA 90014

Park Place Signs
21024 Ladeene Avenue
Torrance, CA 90503

Parking Automation Systems, Inc.
1010 Arlee Place
Anaheim, CA 92805

Los Angeles Downtown News
1264 W. First Street
Los Angeles, CA 90026

Quality Built
15330 Avenue of Science
San Diego, CA 92128

Pfinish Koncepts Inc.
dba Stonecraft Enterprise
2820 N. San Fernando Blvd.
Burbank, CA 91504

Lynn Safety, Inc.
367 Civic Drive, Suite 8
Pleasant Hill, CA 94523

Robert Smylie & Associates
2049 Century Park East, Suite 4250
Los Angeles, CA 90067

PM Estrada Roofing
4257 W. 101st Street
Inglewood, CA 90304

Meyer S. Levitt, Esq.
10880 Wilshire Blvd., Suite 1101
Los Angeles, CA 90024

Ryan K. Hirota, Esq.
PO Box 19694
Irvine, CA 92623

Reycon Construction, Inc.
1795 Lemonwood Drive
Santa Paula, CA 93061

New World West
940 Challenger Street
Brea, CA 92821

Simon Media Company
420 Beirut Avenue
Pacific Palisades, CA 90272

Schafer's Parking Lot Services
7237 Somerset Boulevard
Paramount, CA 90273

Orco Construction Supply
477 N. Canyons Parkway, #A
Livermore, CA 94551

Stevenson Systems, Inc.
27822 El Lazo Road
Laguna Niguel, CA 92677

Simpson, Gumpertz & Heger
41 Seyon St., Bdg. 1
Ste. 500
Waltham, MA 02453

Patrick Duffy
725 S. Figueroa St., #3200
Los Angeles, CA 90017

Thermalair
1140 Red Gum Street
Anaheim, CA 92806

Stuart Dean Company
204 Stonehinge Ln
PO Box 363
Carle Place, NY 11514

Plant Connection
5767 Hillview Park Avenue
Van Nuys, CA 91401

Trench Plate Services
13217 Laureldale Avenue
Downey, CA 90242

V.G.I. Corporation
5508 S. Santa Fe Avenue
Vernon, CA 90058

Purcell Murray Builder Sales Co.
2341 Jefferson Street, Suite 200
San Diego, CA 92110

Yashouafar, Rodney
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017

Weste Group - West, Inc.
dba Sub-Zero Wolf
145 W. 134th Street
Los Angeles, CA 90061

Robert M. Binam, Esq.
200 S. Main Street, #200
Corona, CA 92882

DMF Lighting
1118 E 223rd Street
Carson, CA 90745-4210

Yashouafar, M. Aaron
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017

Roosevelt Lofts Homeowners Assn.
727 W. 7th Street
Los Angeles, CA 90017

Allsale Electric
c/o Abdulaziz, Grossbart & Rudman
Attn: Kenneth S. Grossbart
PO. Box 15458
North Hollywood, CA 91615-5458

Yashouafar, Solyman
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017

State Board of Equalization
P.O. Box 942879
Sacramento, CA 94279-0001

Brandon Witkow
Locke Lord Bissell & Liddell LLP
300 S. Grand Ave., Ste. 2600
Los Angeles, CA 90071

EJ Reyes Corp dba EJR Door Div
Meyer S. Levitt Esq
10880 Wilshire Blvd., Ste 1101
Los Angeles, CA 90024-4112.

T. Larry Watts, Esq.
2029 Century Park East, #3300
Los Angeles, CA 90067

The Gas Company
Mass Markets Credit & Collections
PO Box 30337
Los Angeles, CA 90030-0337

Prescott Companies
Attn: Bill Beasley
5966 La Place Court, Suite 170
Carlsbad, CA 92008

Tima Winter, Inc.
900 E. First Street
Unit 314
Los Angeles, CA 90012

Muir Chase Plumbing Co.
c/o Law Ofcs of David A. Tilem
206 N. Jackson Street, Ste 201
Glendale, CA 91206

J.J. Little, Esq.
11500 West Olympic Blvd.
Ste. 360
Los Angeles, CA 90064

Virdi Power, Inc.
965 Decatur Avenue
Ventura, CA 93004

Thyssenkrupp Elevator Corp.
c/o William C. Hernquiset II
2404 Broadway, 2nd Floor
San Diego, CA 92102

Robert Woodcock Plumbing
18968 Hattaras St
Tarzana, CA 91356

William D. Schuster, Esq.
2122 N. Broadway
Santa Ana, CA 92706

Canon Financial Services
Scott H. Marcus & Associates
121 Johnson Rd.
Turnersville, NJ 08012

Cal Systems
19559 Los Alimos Street
Porter Ranch, CA 91326-2220

Yashouafar, Raymond
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017

SRS Fire Protection
c/o Marc Weinberg, Esq.
6320 Canoga Ave., Ste. 1500
Woodland Hills, CA 91367

Spectra Company
c/o Attorney Beard Hobbs
7844 La Mesa Blvd.
La Mesa, CA 91942

Ace Concrete Cutting
7200 Vineland Ave., Unit 22
Sun Valley, CA 91352-5079

Los Angeles Community College Dist
c/o Morton Rosen, Esq.
Haight, Brown & Bonesteel
6080 Center Drive, Ste. 800
Los Angeles, CA 90045

Robertson's Ready Mx Ltd
c/o Law Ofcs Robert M. Binam
200 S. Main Street, Ste. 200
Corona, CA 92878

HD Supply Construction Supply
c/o Allie & Schuster PC
2122 N Broadway
Santa Ana, CA 92706

Kultur Flooring USA Inc
Sheets & Associates
9650 Brewerton Rd.
PO Box 820
Brewerton, NY 13029

Pacific Property Consultants
15330 Avenue of Science
San Diego, CA 92128

City of Los Angeles,
Dept of Water & Power
Attn:  Bankruptcy
PO Box 51111
Los Angeles, CA 90051-5700

Killefer Flamming Architects
c/o Brandon Witkow, Esq.
Locke, Lord, et al.
300 S. Grand Ave., Ste. 2600
Los Angeles, CA 90071

Los Angeles City Attorney's Office
Attn:  Wendy Loo, Esq.
200 North Main St., Ste. 920
Los Angeles, CA 90012

LA County Treasurer &
Tax Collector
PO Box 54110
Los Angeles, CA 90054-0110

Pepper Development Svcs
2013 Skyelar Ct
Highland Park, IL 60035

Infinity Metals
c/o Theodore A. Anderson
690 S. Brea Blvd.
Brea, CA 92821

West Coast Doors
9086 Rosecrans Ave
Bellflower, CA 90706

City of Los
Office of Finance, Tax/permit Div
Bankruptcy Unit
201 North Main Street, Room 101-City Hall
Los Angeles, CA 90012

Asphalt Management
Law Ofcs Howard Goodman
18321 Ventura Blvd., Ste 915
Tarzana, CA 91356

Wrightway Construction, Inc.
c/o W. Randall Sgro, Esq.
1609 Cravens Ave.
Torrance, CA 90501

Robertson Ready Mix, Ltd.
Law office of Robert Binam
PO box 3600
Corona, CA 92878

Integrity Builders West, LLC
Atkinson, Andelson, Loya, Ruud & Romo
12800 Center Court Drive, Suite 300
Cerritos, CA 90703
Attn: Helen R. Frazier

Southland Exterior Building Svcs, Inc.
34211 Pacific Coast Highway
Suite 103
Dana Point, CA 92629

ACCO Engineered Systems
c/o Dale A. Ortmann, Esq.
Hunt, Ortmann et al.
301 North Lake Ave., 7th Floor
Pasadena, CA 91101

Commercial Glass Company
1577 Teirra Rejada Road
Simi Valley, CA 93065

Siemens Bldg Technologies
c/o Benjamin Trachtman
27401 Los Altos, #300
Mission Viejo, CA 92691

700 Wilshire Properties
c/o Jeffrey L. Licht Esq
Jeffrey Licht & Associates
1875 Century Park East, Ste. 600
Los Angeles, CA 90067

Sidney Alter, dba Alter Electric
Bruce D. Rudman
Abulaziz Grossbart & Rudman
6454 Coldwater Canyon Ave
North Hollywood, CA 91606

Platinum Publications
654 N. Sepulveda Blvd., Ste. 5
Los Angeles, CA 90049

Beacon Investment Co
C/o Paris and Paris
Attn:  Murray A. Zeffren
424 Pico Blvd.
Santa Monica, CA 90405

PM Estrada Roofer, Inc.
11500 West Olympic Blvd., Suite 360
Los Angeles, Ca 90064

Kenmore Consultants LLC
William Beasley CFO
5966 La Place Court, Ste. 180
Carlsbad, CA 92008