1    DAVID L. NEALE (SBN 141225)      LATHAM & WATKINS LLP
JULIET Y. OH (SBN 211414)      Robert A. Klyman (SBN 142723)
2    LEVENE, NEALE, BENDER, YOO & BRILL    355 South Grand Avenue
L.L.P.      Los Angeles, California 90071-1560
3    10250 Constellation Boulevard, Suite 1700    Telephone: (213) 485-1234
Los Angeles, California 90067    Facsimile: (213) 891-8763
4    Telephone: (310) 229-1234      Email: robert.klyman@lw.com
5    Facsimile: (310) 229-1244
Email: dln@lnbyb.com, jyo@lnbyb.com
6                               Attorneys for GS Roosevelt, LLC
7    Attorneys for Chapter 11 Debtor and
Debtor in Possession
8

9

10                 **UNITED STATES BANKRUPTCY COURT**

11                  **CENTRAL DISTRICT OF CALIFORNIA**

                 **SAN FERNANDO VALLEY DIVISION**
12

13    In re                   )    Case No. 1:09-bk-14214-GM
                        )
14    ROOSEVELT LOFTS, LLC, a Delaware   )    Chapter 11
limited liability company,       )
15                        )
                        )
16              Debtor.        )    **DISCLOSURE STATEMENT RE**
                        )    **SECOND AMENDED CHAPTER 11**
17                        )    **PLAN OF REORGANIZATION**
                        )    **(DATED JUNE 20, 2011), AS**
18                        )    **MODIFIED**
                        )
19                        )    Disclosure Statement Hearing:
                        )    Date:    July 6, 2011
20                        )    Time:    10:00 a.m.
                        )    Place:    Courtroom "303"
21                        )              21041 Burbank Boulevard
                        )              Woodland Hills, California
22                        )
                        )
23                        )

24

25

26

27

28

# TABLE OF CONTENTS

A.    Purpose Of This Document ................................................................2

B.    Deadlines For Voting And Objecting; Date Of Plan Confirmation Hearing.3

   1.    Time and Place of the Confirmation Hearing ...........................4

   2.    Deadline For Voting For or Against the Plan ...........................4

   3.    Deadline for Objecting to the Confirmation of the Plan ...................4

   4.    Identity of Persons to Contact for More Information Regarding the Plan..........................................................................4

   5.    Disclaimer ...........................................................................5

I. BACKGROUND .......................................................................................5

A.    Description and History of the Debtor's Business. ....................5

B.    Events Leading To Commencement Of The Debtor's Bankruptcy Case. .......8

C.    Significant Events During The Debtor's Bankruptcy Case.........................10

   1.    Formation of the Committee and Employment of Counsel ...............10

   2.    Administrative Matters ..........................................................10

   3.    Employment of Professionals..................................................11

   4.    Post-Petition Financing to Pay Utility Deposits .......................11

   5.    The Debtor's Post-Petition Efforts to Sell Units In The Building .....12

   6.    The Debtor's Leasing Program  .............................................13

   7.    The Debtor's Auction Sale Motion...........................................14

   8.    The Debtor's Use of Cash Collateral.......................................15

   9.    Additional Litigation with the Bank/Prior Efforts to Confirm Plan .. 18

   10.   Settlements with Buyers to Cancel Prepetition Purchase Contracts 22

   11.   Easement Litigation ..............................................................24

   12.   Settlement with the Bank.......................................................26

   13.   Plan Support Agreement with Greystar ..................................28

II. SUMMARY OF THE PLAN OF REORGANIZATION.................................... 29

A.    What Creditors And Interest Holders Will Receive Under The Plan ............ 29

B.    Unclassified Claims ............................................................... 30

C.    Classified Claims and Interests ............................................... 33

D.    Means of Effectuating the Plan and Implementation of the Plan ................... 36

E.    Conditions to Confirmation and the Effective Date...............................41

F.    Provisions Governing Distributions. ...................................................45

G.    Objections to Claims...........................................................................49

H.    Exculpations and Releases. .................................................................51

I.    Executory Contracts and Unexpired Leases. ......................................55

J.    Other Plan Provisions..........................................................................60

III. TAX CONSEQUENCES OF THE PLAN .......................................................67

A.    Withholding Applicable to all Holders of Interests or Claims............68

B.    Tax Consequences to Holders of Allowed General Unsecured Claims.........69

C.    Tax Consequences for Holders of Interests. ........................................69

D.    Tax Consequences for the Debtor. ......................................................69

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES .........................69

A.    Who May Vote or Object .....................................................................70

B.    Who May Vote to Accept/Reject the Plan ..........................................70

C.    What Is an Allowed Claim/Interest .....................................................70

D.    What Is an Impaired Claim/Interest. ...................................................71

E.    Who Is Not Entitled to Vote. ...............................................................72

F.    Who Can Vote in More Than One Class ..............................................72

G.    Votes Necessary to Confirm the Plan..................................................72

H.    Votes Necessary for a Class to Accept the Plan. ................................72

I.    Risk Factors. ........................................................................................73

J.    Treatment of Non-accepting Classes. .................................................75

K.    Request for Confirmation Despite Nonacceptance by Impaired
Class(es). .............................................................................................75

L.    Liquidation Analysis............................................................................76

M.    Feasibility.............................................................................................78

V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ......................................................................................................79

A.    Liquidation under Chapter 7................................................................79

B.    Alternative Plan of Reorganization or Liquidation.............................79

VI. POST-CONFIRMATION MATTERS ............................................................80

A.    Post-Confirmation Status Report.........................................................80

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.**    **Post-Confirmation Conversion/Dismissal.** ........................................................**80**

**C.**    **Post-Confirmation U.S. Trustee Fees** ........................................................**80**

**D.**     **Final Decree**........................................................**81**

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL STATUTES**

11 U.S.C. § 101 .................................................................................................................2

11 U.S.C. § 105(a) ...........................................................................................................61

11 U.S.C. § 327 .........................................................................................................61, 63

11 U.S.C. § 328 .........................................................................................................61, 63

11 U.S.C. § 330 .........................................................................................................61, 63

11 U.S.C. § 331 .........................................................................................................61, 63

11 U.S.C. § 341(a) ...........................................................................................................10

11 U.S.C. § 346 ...............................................................................................................62

11 U.S.C. § 362 ...............................................................................................................79

11 U.S.C. § 363 ...............................................................................................................29

11 U.S.C. § 365 ...........................................................................................55, 56, 57, 59

11 U.S.C. § 365(a) ...........................................................................................................58

11 U.S.C. § 365(b)(1) .......................................................................................................57

11 U.S.C. § 365(d)(4) .................................................................................................59, 60

11 U.S.C. § 366(c) ...........................................................................................................11

11 U.S.C. § 501 ...............................................................................................................52

11 U.S.C. § 502 .........................................................................................................50, 52

11 U.S.C. § 502(c) ...........................................................................................................49

11 U.S.C. § 503(b) .....................................................................................................61, 63

11 U.S.C. § 503(b)(3) .......................................................................................................63

11 U.S.C. § 503(b)(4) .......................................................................................................63

11 U.S.C. § 503(b)(5) .......................................................................................................63

11 U.S.C. § 505 ...............................................................................................................62

11 U.S.C. § 507(a)(2)................................................................................72

11 U.S.C. § 507(a)(3)................................................................................72

11 U.S.C. § 507(a)(8)................................................................................72

11 U.S.C. § 521........................................................................................10

11 U.S.C. § 524........................................................................................53

11 U.S.C. § 1101(2)..............................................................................64, 65

11 U.S.C. § 1103..................................................................................61, 63

11 U.S.C. § 1106........................................................................................10

11 U.S.C. § 1107..............................................................................2, 5, 10

11 U.S.C. § 1108..........................................................................................2, 5

11 U.S.C. § 1112(b)....................................................................................80

11 U.S.C. § 1114........................................................................................58

11 U.S.C. § 1115........................................................................................76

11 U.S.C. § 1123........................................................................................55

11 U.S.C. § 1123(b)....................................................................................39

11 U.S.C. § 1125........................................................................................41

11 U.S.C. § 1127(a)....................................................................................64

11 U.S.C. § 1129....................................................................................74, 76

11 U.S.C. § 1129(a)(4)................................................................................61

11 U.S.C. § 1129(a)(8)................................................................................75

11 U.S.C. § 1129(a)(13)..............................................................................58

11 U.S.C. § 1129(b)................................................................................66, 75

11 U.S.C. § 1141........................................................................................53

11 U.S.C. § 1141(d)(1)(A)..........................................................................52

11 U.S.C. § 1142........................................................................................61

11 U.S.C. § 1146........................................................................................62

11 U.S.C. § 1146(c) ................................................................................................40

15 U.S.C. § 1701 ....................................................................................................23

28 U.S.C. § 1930 ..............................................................................................31, 64

28 U.S.C. § 1930(a)(6) ...........................................................................................81


**STATE STATUTES**

California Civil Code § 1542 ...................................................................................51


**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 23 .........................................................................61

Federal Rule of Bankruptcy Procedure 7023 ..........................................................61

Federal Rule of Bankruptcy Procedure 3022 ..........................................................81

Roosevelt Lofts, LLC, a Delaware limited liability company (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, commenced its chapter 11 bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"). The Debtor continues to manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. An Official Committee of Unsecured Creditors (the "Committee") has been formed to represent the interests of all unsecured creditors in the Debtor's bankruptcy case.

Chapter 11 allows the Debtor, and, under some circumstances, creditors and other parties in interest, to propose a plan of reorganization. A plan may provide for the debtor to reorganize by continuing to operate, to liquidate by selling the assets of its estate, or a combination of both. In this case, the Debtor and GS Roosevelt, LLC are the co-proponents of the Second Amended Chapter 11 Plan of Reorganization (Dated June 20, 2011), As Modified (the "Plan") described herein and sent to you in the same envelope as this Disclosure Statement describing the Plan (the "Disclosure Statement"). Any terms not specifically defined herein have the meanings ascribed to them in the Plan. In addition, to the extent there is any conflict between the Disclosure Statement and the Plan, the terms of the Plan shall govern.

The effective date of the Plan (the "Effective Date") will be the first Business Day upon which all conditions to the consummation of the Plan as set forth in Section 9.2 of the Plan have been satisfied or waived as provided in Section 9.3 of the Plan. One of the conditions to the Effective Date of the Plan is the entry by the Bankruptcy Court of the Confirmation Order by not later than August 8, 2011. The Debtor following the Effective Date shall be referred to as the "Reorganized Debtor."

## A.    Purpose Of This Document

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan. All capitalized terms not specifically defined herein shall have the same meanings ascribed to them in the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

(1)    **WHO CAN VOTE OR OBJECT**,

(2)    **WHAT THE TREATMENT OF YOUR CLAIM IS (***i.e.*, **what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION**,

(3)    **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING ITS BANKRUPTCY CASE,**

(4)    **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

(5)    **WHAT IS THE EFFECT OF CONFIRMATION, AND**

(6)    **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You are strongly encouraged to consult your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

*Be sure to read the Plan as well as this Disclosure Statement.  If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.*

The Bankruptcy Code requires a Disclosure Statement to contain "adequate" information concerning the Plan.  The Bankruptcy Court has approved this document as an adequate Disclosure Statement containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.   Any party can now solicit votes for or against the Plan.

B.      **Deadlines For Voting And Objecting; Date Of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE

PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

### 1.    Time and Place of the Confirmation Hearing

The hearing where the Court will determine whether or not to confirm the Plan (the "Plan Confirmation Hearing") will take place on August 8, 2011, at 9:00 a.m. (and continued as necessary), before the Honorable Geraldine Mund, United States Bankruptcy Judge, in Courtroom "303," located at 21041 Burbank Boulevard, Woodland Hills, California 91367.

### 2.    Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Juliet Y. Oh, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

**YOUR BALLOT MUST BE RECEIVED BY CLOSE OF BUSINESS ON JULY 25, 2011 OR IT WILL NOT BE COUNTED.**

### 3.    Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must, by July 25, 2011, be filed with the Court and served by same day service upon (1) David L. Neale, Esq. and Juliet Y. Oh, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067, facsimile: (310) 229-1244, email: dln@lnbyb.com, jyo@lnbyb.com, and (2) Robert Klyman, Esq., Latham & Watkins LLP, 355 South Grand Avenue, Los Angeles, California 90071-1560, facsimile (213) 891-8763, email: robert.klyman@lw.com.

### 4.    Identity of Persons to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact Juliet Y. Oh, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067; phone: (310) 229-1234; facsimile: (310) 229-1244; email: jyo@lnbyb.com.

**5.    Disclaimer**

The financial data relied upon in formulating the Plan is based on the Debtor's books and records which, unless otherwise indicated, are unaudited.  The information contained in this Disclosure Statement is provided by the Debtor.  The Debtor represents that everything stated in this Disclosure Statement is true to the Debtor's best knowledge.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**I.**

**<u>BACKGROUND</u>**

**E.    Description and History of the Debtor's Business.**

On April 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is continuing to manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is the owner of real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "Building").  The Building was originally built in 1927 as an office building, designed by Curlett and Beelman, featuring Beaux Arts Classicism and Italian-Renaissance design influences.  The unique and prominent architecture of the Building was recognized by the City of Los Angeles and designated as a Historic Cultural Monument in 1988, then recognized as a national landmark and listed on the National Register of Historic Places in 2007.

In approximately 1998, the Debtor's predecessor in interest purchased the Building, which was at that time about 95% vacant, and infused substantial capital to the project in an effort to revitalize the Building.  Within approximately two years, they were successful in increasing the Building's occupancy to approximately 65%.

The Debtor was formed on December 23, 2005 in Delaware for the intended purpose of entering into a ground lease to develop the Building.  100% of the membership interests in the Debtor are owned by Roosevelt Lofts, Inc. ("RLI").  M. Aaron Yashouafar is the President of RLI.

In approximately January 2006, the Debtor entered into an agreement to lease the Building from the previous owners, with an option to buy the Building.  The Debtor intended to address the demands of an evolving Downtown residential market by converting the Building from an office building to a luxury residential project.

Accordingly, in or about March 2006, the Debtor entered into a construction loan agreement (as supplemented and modified, the "Loan Agreement") with Bank of America, N.A. (the "Bank")[1], pursuant to which the Debtor obtained a loan from the Bank in the original principal sum of $78,840,375.00 (the "Loan").  The Loan provided for, among other things, the repayment of the Loan, including accrued and unpaid interest, by March 9, 2009, with two options to extend the term of the Loan for six months each.  The obligations of the Debtor in connection with the Loan are secured by a Construction Deed of Trust and a Leasehold Deed of Trust against the Building (collectively, the "Deeds of Trust").  The Loan was obtained by the Debtor for the purpose of converting the Building into 222 individually subdivided, luxury residential condominium units, a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Building.

The units in the Building feature a variety of single-, split- and tri-level open area floor plans, ranging from 800 to over 2,700 square feet – including two historically preserved lofts and several tri-level penthouses with direct access to the rooftop pool, cabanas and private gardens. The Building provides upscale city living, incorporating the "Manhattan loft" style of multi-level open floor plans, with the charm and appeal of a historical monument within the center of Downtown's Business District.  Amenities at the Building include a world-class fitness center,

---

[1] Bank of America, N.A. asserts a claim against the Debtor on behalf of itself individually and as Agent for a group of Lenders.  Bank of America, N.A. and the group of lenders for which it is acting as Agent are collectively referred to herein as the "Bank."

elegant roof top pool and cabana areas with an outdoor fire pit, a rooftop lounge with full kitchen, tanning and hydrotherapy rooms, a business lounge, wireless internet access, and, unlike many other downtown city projects, onsite valet parking for residents and guests.  The Building is conveniently located an escalator ride away from a Seventh Street Metro Center (which is a hub for the Red and Blue subway lines, and located directly beneath the Building), across from Macy's Plaza, steps from the Staples Center, and host to restaurants, a convenience store, and all of the best dining and entertainment downtown Los Angeles has to offer.

In September 2008, the Debtor exercised its option to purchase the Building.  By that time, the Debtor had already successfully completed much of the renovations, obtained approval from the California Department of Real Estate to sell units in the Building, and succeeded in entering into binding legal contracts for the sale of approximately sixty (60) of the units.

By November 2008, the Debtor had obtained a temporary and partial certificate of occupancy, and begun closing escrow for units already sold under contract.  In addition, the guarantors of the Loan obtained a line of credit in the principal sum of $4,000,000 from the Bank, which enabled the Debtor to complete construction on the first eight floors of the Building, including all of the Building's commercial retail space, and obtain a temporary certificate of occupancy by November 2008.

During the two years prior to the Petition Date, the Debtor spent well over $1 million on an extensive marketing and advertising campaign to attract potential purchasers for the units in the Building.  The Debtor's target demographic is single individual professionals, empty nesters, or married couples without children between the ages of 25-55 who are looking for a multi-function (work/live) residence or a second home for business commuting purposes.  To reach this target demographic, the Debtor hosted or sponsored over fifteen different events and open houses at the Building and off-site to attract interest in, and showcase, the Building and its units.  The Debtor also obtained exposure for the Building by advertising extensively in numerous local and national publications including, among others, Variety, Los Angeles Times, LA Weekly, and The Robb Report.  In addition, the Debtor secured various celebrity endorsements and residents to further

promote the project.  As a result of these extensive marketing efforts, the Debtor successfully entered into binding legal contracts for the sale of certain of the units.

In connection with the anticipated closing of escrow for those units under contract, the Debtor also made arrangements with its title and escrow companies to prepare for the closing of escrow and the issuance of title policies to the buyers in connection therewith.  The Debtor also provided the Bank with notice of the anticipated sales of those units which were under contract as well as estimated closing statements for such units.

**B.    Events Leading To Commencement Of The Debtor's Bankruptcy Case.**

While continuing its marketing and sale of the units in the Building, the Debtor began discussing various options with the Bank regarding the Loan, including the possibility of borrowing an additional approximately $4 million in order to complete work on the Building, which work consisted of straightforward finish work required to complete the units located on the ninth through thirteenth floors.  The Debtor also approached the Bank regarding the exercise of the Debtor's extension rights under the Loan or other extension of the Loan term in order to allow the Debtor to continue selling units within the Building.

Abruptly, the Bank revoked a prior instruction to the Debtor's title and escrow companies regarding the Bank's consent to proceed with the closing of escrow for the units under contract. The Bank instructed the title and escrow companies not to permit the sale of such units indicating that any such sale would have to be pre-approved by the Bank and that no sale of any of the units was being pre-approved by the Bank at that time.

Despite the Debtor's efforts to work constructively with the Bank to come to terms about the repayment of the Loan and the completion of the Building, on or about December 30, 2008, the Bank issued a notice of default to the Debtor, contending that the Debtor had defaulted on its obligations under the Loan.  It is noteworthy that the alleged default had nothing to do with the payment of any financial obligations owed by the Debtor to the Bank.

Even after receiving the notice of default from the Bank, the Debtor continued to invest a considerable amount of time and effort obtaining independent appraisals, conducting market

research, and providing the Bank with alternative plans for the completion of the Building and the sale of all of the units in the Building. All aspects of dealing with the Building were covered in the Debtor's restructuring proposals, including a plan to sell all units, rent all units, or to both sell and rent units through a hybrid plan. In the meantime, given the Bank's lack of cooperation, the Debtor continued to market and sell units within the Building. The Bank rejected all of the plans proposed by the Debtor for the completion of the Building and the sale of units, without any explanation or discussion.

In addition, the Debtor continued to make repeated requests to the Bank to obtain the Bank's consent to begin closing escrow on the units sold under contract. The Debtor's requests were repeatedly denied by the Bank. Meanwhile, the prospective buyers under contract became increasingly nervous, particularly given the current economic and global market crises. Some of these buyers sent letters to and/or filed lawsuits against the Debtor demanding that their sale contracts be cancelled and their deposits paid in connection with the sale contracts be returned.

Subsequently, on April 3, 2009, the Bank filed a complaint against the Debtor and others in the Superior Court of the State of California, County of Los Angeles ("State Court") for, among other things, specific performance, appointment of a receiver, and judicial foreclosure on its Deeds of Trust. Pursuant to its complaint in the State Court action, the Bank has asserted a claim against the Debtor and others in an amount exceeding $79 million. Days after filing its complaint, the Bank made an *ex parte* application with the State Court for the appointment of a receiver notwithstanding the fact that the Building is in excellent condition and repair, secured by 24-hour security and was not generating any meaningful income at the time of the filing of the State Court action.

Despite the Bank's filing of the State Court action, the Debtor continued its efforts to try and work consensually with the Bank towards the goal of completing the construction of the Building, selling the units in the Building, and repaying the Loan in full. However, the Bank rebuffed the Debtor's efforts and instead focused its efforts on proceeding with its foreclosure action and having a receiver appointed.

As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code in order to have the ability and opportunity to close escrow on the units that were then under contract, to market and sell the remaining units in the Building, and to complete construction on the Building, all of which were intended to allow the Debtor to repay the Loan and its other debts for the benefit of all creditors.

### C.    Significant Events During The Debtor's Bankruptcy Case.

The following is a list of significant events which have occurred <u>during</u> the Debtor's chapter 11 case:

1.    <u>Formation of the Committee and Employment of Counsel</u>

The Office of the United States Trustee (the "OUST") appointed an Official Committee of Unsecured Creditors (the "Committee") to represent the interests of the unsecured creditors in the Debtor's bankruptcy case.  There are three members of the Committee consisting of Kultur Flooring USA, Inc., Bontempi USA, and A American Custom Flooring.  The Committee employed the law firm of Landsberg Margulies LLP as bankruptcy counsel, with Ian S. Landsberg, Esq. serving as lead counsel.  Mr. Landsberg's contact information is as follows: Ian S. Landsberg, Esq., Landsberg Margulies LLP, 16030 Ventura Blvd., Suite 470, Encino, California 91436, telephone:    (818) 705-2777; facsimile:    (818) 705-3777; email: ilandsberg@landsberg-law.com.

2.    <u>Administrative Matters</u>

The Debtor was required to address the various administrative matters attendant to the commencement of its bankruptcy case.  These matters included the preparation of the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, and the preparation of materials required by the OUST.  The Debtor has made every effort to comply with its duties under 11 U.S.C. Sections 521, 1106 and 1107 and all applicable OUST guidelines, including the filing of the Debtor's monthly operating reports with the OUST.  The Debtor also attended the meeting of creditors required under 11 U.S.C. § 341(a).

3.    <u>Employment of Professionals</u>

The Debtor has employed Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB") as its bankruptcy counsel.  The Court entered an order approving LNBYB's employment on May 28, 2009.

The Debtor has also employed the Ives, Kirwan & Dibble APC ("IKD") as special litigation counsel in connection with certain state court litigation relating to the respective easement rights of the Debtor, Los Angeles Community College District (the "District") and 700 Wilshire Properties ("700 Wilshire") to use the alley that exists between their properties (the "Easement Litigation").    The Court entered an order approving IKD's employment on November 20, 2009.

4.    <u>Post-Petition Financing to Pay Utility Deposits</u>

Shortly after the Petition Date, on May 7, 2009, the Debtor filed an emergency motion seeking authority to provide adequate assurance of future payment in the form of cash deposits to certain utility companies pursuant to Section 366(c) of the Bankruptcy Code (the "Utility Motion").  Concurrently with the Utility Motion, the Debtor filed an emergency motion seeking authority to obtain financing from the Debtor's affiliate, Milbank Holding Corp. ("Milbank") on an administrative expense priority basis to fund the adequate assurance cash deposits to the Debtor's utility companies (the "Financing Motion").  At a hearing held on May 12, 2009, the Court granted the Utility Motion and authorized the Debtor to provide adequate assurance of payment to the utility companies in the form of cash deposits in the amounts proposed by the Debtor.  The Court deemed the amounts of those deposits to constitute adequate assurance of payment to the utility companies, and the Court prohibited the utilities from altering, refusing, or discontinuing utility services on account of any debts owed by the Debtor to the utility companies for services rendered pre-petition.  Also at the hearing on May 12, 2009, the Court granted the Debtor's Financing Motion and authorized the Debtor to obtain financing from Milbank on an administrative expense priority basis in an amount sufficient to fund the cash deposits to the utility companies approved by the Court.

5.    The Debtor's Post-Petition Efforts to Sell Units In The Building

As noted above, prior to the Petition Date, the Debtor entered into purchase and sale agreements with a number of buyers for certain of the units in the Building (the "Pre-Petition Sale Contracts"). On May 20, 2009, the Debtor filed a motion seeking Court authority to assume eighteen (18) of the Pre-Petition Sale Contracts and to consummate the sales of the units under the terms thereof, free and clear of all liens, claims, interests and encumbrances (the "First Sale Motion"). These eighteen Pre-Petition Contracts were the ones the Debtor believed were most likely to go forward.

Subsequently, on May 26, 2009, the Debtor filed a second motion seeking Court authority to enter into two (2) post-petition purchase and sale contracts (the "Post-Petition Sale Contracts") and to consummate the sales of the units under the terms thereof (the "Second Sale Motion," and together with the First Sale Motion, the "Sale Motions").

Based upon the Debtor's evaluation of appraisals obtained in or around February 2009 of certain units in the Building, the Debtor believed that the proposed sale price for each of the twenty (20) units that were the subject of the Sale Motions represented at least the fair market value of each such unit. In addition, all of the units that were the subject of the Sale Motions were to be sold at prices that exceeded the minimum release prices for such units previously agreed to by the Bank. Specifically, Exhibit "O" to the Loan Agreement is an agreement between the Debtor and the Bank relating to the Construction and Sale of Units (the "Release Price Agreement"), pursuant to which the Debtor agreed, among other things, to take all actions necessary to develop, market and sell the units in the Building pursuant to a pro forma sales agreement approved by the Bank. Subject to certain conditions, in the event that the sale price for any unit was in excess of a specified release price for such unit set forth in Schedule "1" attached to the Release Price Agreement, the Bank consented to the sale of such unit and agreed to issue a partial reconveyance of its deed of trust on such unit to permit the sale to a buyer to close. Subsequently, the Debtor and the Bank entered into a Modification Agreement (the "Loan Modification Agreement") which modified certain terms of the Loan Agreement, including, without limitation, the release prices for

the Units originally set forth in the Release Price Agreement.  The release prices for the Units set forth in Schedule "1" attached to the Release Price Agreement are superseded by the release prices described in the Loan Modification Agreement.

As of the Petition Date, there were numerous mechanic's liens recorded against the Building by various subcontractors.  The Debtor believes that the total amount of the mechanic's liens recorded or otherwise asserted against the Building is approximately $11.8 million.[2]

The Bank, a number of alleged mechanic's lienholders, and certain buyers filed oppositions to one or both of the Sale Motions.  At the June 10, 2009 hearing on the First Sale Motion, the Court continued the hearings on both Sale Motions to August 4, 2009 at 10:00 a.m. and encouraged the parties, namely, the Debtor, the Bank and the Committee to discuss the terms of, and formulate, a consensual plan of reorganization.  The hearings on the Sale Motions were subsequently continued a number of times.  Ultimately, the Debtor withdrew the Sale Motions.

6.    The Debtor's Leasing Program

Regardless of the extent to which the Property was occupied, the Debtor continued to incur operating expenses associated with the maintenance of the Property; however, the Debtor had very limited cash flow from commercial leases and a few residential tenants.  In the Bank's oppositions to the Sale Motions, the Bank had suggested that renting the residential units in the Property on a short-term basis would be a more prudent solution than selling the units on an individual basis, particularly given the depressed state of the real estate market at that time.  The Debtor determined, in the exercise of its sound business judgment and, in part, in response to the objection of the Bank to the Sale Motions, that renting residential units in the Property for a short term would allow the Debtor to continue to pursue longer term strategies for the restructuring of its financial affairs, including, without limitation, the sale or further lease of units, a combination thereof, or a sale of

---

[2]  The Debtor does not acknowledge the validity of any of the mechanic's liens that have been recorded against the Building and expressly reserves all of its rights, claims and defenses with respect to such liens.

the Property, while at the same time generating cash flow to help offset the operating expenses being incurred on a monthly basis.

Although the Debtor did not believe the Bank's consent to the Debtor's proposed leasing program was required, the Debtor was attempting to cooperate with Bank in formulating a mutually agreeable plan of reorganization and so approached the Bank in mid-June 2009 regarding the parameters of the Debtor's proposed short-term leasing program and sought the Bank's consent to such program. When the Bank's consent to the proposed leasing program was not forthcoming, the Debtor filed an emergency motion on August 27, 2009 seeking authority to commence the program to permit the Debtor to enter into short-term residential leases (the "Leasing Program Motion"). The Court authorized the Debtor to commence its proposed short-term leasing program over the Bank's objection, subject to the terms and conditions described in the order entered by the Court on September 8, 2009.

7.    The Debtor's Auction Sale Motion

In furtherance of its reorganization efforts, on December 24, 2009, the Debtor filed a motion (the "Auction Motion"), on shortened time, seeking authority to employ Kennedy Wilson Auction Group Inc. ("KW"), a highly experienced auctioneer company, to publicize, market and offer approximately sixty five (65) units (but no fewer than fifty units and no more than seventy five units) in the Property for sale through a public auction. Pursuant to the Auction Motion, the Debtor proposed to sell only those completed units that were located in the first eight floors of the Property.

Again, the Bank opposed the Auction Motion. Ultimately, the Court authorized the Debtor to conduct the public auction over the Bank's objection. During the course of the hearing on the Auction Motion held on January 7, 2010, the Court invited all parties in interest, including the Debtor, the Bank and alleged holders of mechanics' liens (who had objected to the Auction Motion primarily on the limited grounds of lien priority and segregation of sale proceeds), to negotiate a form of order regarding the Auction Motion. During such negotiations, at the Bank's request, the Debtor agreed to include in the order provisions regarding the completion of construction in the

Property.  Specifically, the order provided for the completion of construction of the ninth and tenth

floors (as well as any work remaining on floors two through eight) of the Property on or before

March 31, 2010, and the completion of construction of the remaining floors of the Property (other

than the penthouse units in the Property, which would have incomplete finishes to be customized

by buyers) on or before June 30, 2010.  The Court entered the order granting the Auction Motion

on January 8, 2010.  Despite the Debtor's efforts, the Debtor was unable to proceed with the

auction due to its inability to obtain Fannie Mae approval to offer financing to prospective

purchasers of the units in the Property.  Without the ability to offer financing to prospective

purchasers, the auction would have had very little chance of success.  Accordingly, the Debtor

determined that it was not in the best interests of the estate to go forward with the auction and

undertake the expenses associated therewith.

8.        The Debtor's Use of Cash Collateral

As noted above, since the Petition Date, the Debtor has received income derived primarily,

if not entirely, from rent received from the Debtor's commercial and residential tenants in the

Building.  Shortly after the Petition Date, the Debtor requested that the Bank stipulate to the

Debtor's use of cash collateral to maintain the Building and to pay the Debtor's operating expenses

relating to the Building, including, among other things, insurance, utilities, parking, security

services, janitorial services and other operational costs associated with the Building.  The Bank did

not consent to the Debtor's use of cash collateral to pay such operating expenses.

Accordingly, on August 27, 2009, the Debtor filed an emergency motion seeking authority

to use its cash collateral in accordance with an operating budget extending through December 31,

2009 (the "First Budget"), and to obtain financing on an administrative expense priority basis from

its affiliate, Milbank Holding Corp. ("Milbank"), to cover the operating shortages set forth in the

First Budget (the "First Cash Collateral Motion").  The Court granted the Debtor's First Cash

Collateral Motion and authorized the Debtor to use cash collateral, subject to the terms and

conditions described in an interim order entered by the Court on September 8, 2009 and a final

order entered by the Court on October 5, 2009.

After the Leasing Motion was granted, the Debtor successfully negotiated and entered into a number of residential leases in accordance with the Debtor's short-term leasing program. At the present time, there are approximately seventy nine (79) residential leases in effect.

Due to the increase in the number of tenants in the Building, certain of the Debtor's operating expenses increased and certain new expenses were required to be added, beginning in November 2009. The Debtor provided the Bank with a revised budget, which extended through February 2010 (the "Revised First Budget"), and requested that the Bank consent to the Debtor's use of cash collateral in accordance with the Revised First Budget. The Revised First Budget also contemplated financing from Milbank to cover operating shortages. The Bank consented to the Debtor's use of cash collateral in accordance with the Revised First Budget and to the Debtor's borrowing of money from Milbank on an administrative expense priority basis to cover the operating shortages set forth in the Revised First Budget. The Debtor and the Bank entered into a stipulation accordingly (the "First Stipulation"), and the Court entered an order approving the First Stipulation on January 11, 2010.

Prior to the expiration of the term of the First Stipulation, the Debtor provided the Bank with an operating budget, which reflected the Debtor's estimated income and expenses for the months of March, April and May 2010 (the "Second Budget"), and requested that the Bank consent to the Debtor's use of cash collateral and borrowing of money from Milbank in accordance with the Second Budget. At that time, the Bank agreed to the use of cash collateral and borrowing of money from Milbank for a period of only fifteen (15) days. Specifically, the Bank agreed to enter into a second stipulation with the Debtor (the "Second Stipulation") authorizing the Debtor to, among other things, use cash collateral and borrow money from Milbank during the period of March 1, 2010 through and including March 15, 2010 to pay the expenses reflected in the Second Budget during such period, provided, however, that the Debtor not use any cash collateral for "model units furniture." The Court entered an order approving the Second Stipulation on March 4, 2010.

Prior to the expiration of the term of the Second Stipulation, the Debtor again approached the Bank to obtain the Bank's consent to the Debtor's use of cash collateral and borrowing of money from Milbank in accordance with the Second Budget.  At that time, the Bank agreed to the use of cash collateral and borrowing of money from Milbank for only an additional sixteen (16) days.  Specifically, the Bank agreed to enter into a third stipulation with the Debtor (the "Third Stipulation") authorizing the Debtor to, among other things, use cash collateral and borrow money from Milbank during the period of March 16, 2010 through and including March 31, 2010 to pay the expenses reflected in the Second Budget during such period, provided, however, that the Debtor not use any cash collateral for "model units furniture."  The Court entered an order approving the Third Stipulation on March 25, 2010.

Prior to the expiration of the term of the Third Stipulation, the Debtor provided the Bank with a revised and expanded operating budget, which reflected the Debtor's estimated income and expenses through October 31, 2010 and requested that the Bank consent to the Debtor's use of cash collateral and borrowing of money from Milbank in accordance with such budget.  The Bank declined to provide such consent.

Accordingly, on April 1, 2010, the Debtor filed a second emergency motion (the "Second Cash Collateral Motion") seeking Court authority to (1) use cash collateral on an emergency interim basis pending a final hearing in accordance with an operating budget extending through October 31, 2010 (the "Expanded Second Budget"), and (2) borrow money on an administrative expense priority basis from Milbank to cover the operating shortages set forth in the Expanded Second Budget.

The Bank filed a limited opposition to the Second Cash Collateral Motion, specifically objecting to the inclusion of an expense for purchasing furniture for certain model units in the Building.  Subsequently, the Debtor and the Bank entered into a fourth stipulation (the "Fourth Stipulation") authorizing the Debtor to, among other things, use cash collateral and borrow money from Milbank through and including October 31, 2010 to pay the expenses reflected in the Expanded Second Budget during such period, provided, however, that the Debtor not use any cash

collateral for "model units furniture." The Court entered an order approving the Fourth Stipulation on April 7, 2010.

Thereafter, prior to the expiration of the Fourth Stipulation, the Debtor approached the Bank regarding a further extension of its consent to the Debtor's use of cash collateral. Unfortunately, the Debtor and the Bank were unable to reach an agreement to extend the Debtor's use of cash collateral on a consensual basis, and the Debtor filed a third motion seeking authority to use cash collateral (the "Third Cash Collateral Motion"). Following a hearing on October 26, 2010, the Court granted the Third Cash Collateral Motion, and approved the Debtor's continued use of cash collateral through June 30, 2011.

9.    Additional Litigation with the Bank/Prior Efforts to Confirm Plan

On August 31, 2009, the Debtor filed its *"Chapter 11 Plan Of Reorganization"* (the "Original Plan"), within its exclusive period for doing so. The Original Plan provided for full payment of allowed claims over time, with interest, by way of the sale of units at the Property in an orderly manner.

On November 24, 2009, the Bank filed a motion seeking to dismiss the Debtor's bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the "Dismissal Motion") based on, among other alleged grounds, the Debtor's failure to file a disclosure statement with respect to the Original Plan. The hearing on the Dismissal Motion was originally calendared for December 15, 2009, but was subsequently continued by stipulation of the parties to February 2, 2010 at 10:00 a.m. Pursuant to the foregoing stipulation, the Debtor agreed to file a disclosure statement with respect to the Original Plan, as well as a notice of the hearing on such disclosure statement, by December 28, 2009.

On December 28, 2009, the Debtor filed a disclosure statement describing the Plan (the "Original Disclosure Statement"). The hearing on the Disclosure Statement was set for February 2, 2010 at 10:00 a.m., the same date and time as the hearing on the Dismissal Motion.

At the hearings on the Dismissal Motion and the Original Disclosure Statement held on February 2, 2010 at 10 a.m., the Court continued the hearings on both matters to March 16, 2010 at

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10:00 a.m. to provide the Debtor with an opportunity to file updated versions of the Original Plan and Original Disclosure Statement.

On February 26, 2010, the Debtor filed amended versions of the Original Plan and Original Disclosure Statement (the "Amended Plan" and "Amended Disclosure Statement") to reflect all of the developments in the Debtor's bankruptcy case since the filing of the Original Plan and to incorporate the impact of the then-anticipated public auction event described in the Auction Motion on the Debtor's cash flow projections for the plan.

At the continued hearings on March 16, 2010, the Court denied the Bank's Dismissal Motion and approved the Amended Disclosure Statement. The Court also set a hearing to consider confirmation of the Amended Plan for October 14, 2010 at 1:30 p.m. (with such hearing to be continued, to the extent necessary, to October 15, 2010 at 9:00 a.m. and October 21, 2010 at 1:30 p.m.) as well as various deadlines relating thereto.

Objections to confirmation of the Amended Plan were filed by the Bank and various alleged mechanic's lien creditors. The objections to confirmation of the Amended Plan asserted by the mechanic's lien creditors revolved primarily around the issue of lien priority. Specifically, the mechanic's lien creditors alleged that their liens against the Property collectively had priority over the lien held by the Bank, and that their claims should be treated accordingly under the Amended Plan.

Subsequently, the Debtor began negotiating with the alleged mechanic's lien creditors (as a group) to address their various concerns about the Amended Plan and to try to reach the terms of a consensual plan and disclosure statement. On January 29, 2010, Muir-Chase Plumbing Co., Inc., ACCO Engineered Systems, Inc., Alter Electric Company, Allsale Electric, Inc., and all others similarly situated (the "Mechanic's Lien Plaintiffs") filed a complaint against the Bank and others in the Bankruptcy Court seeking declaratory relief as to the relative order and priority of the liens asserted against the Building, thereby commencing that certain adversary proceeding bearing the number 1:10-ap-01031-GM (the "Lien Priority Litigation").

The Mechanic's Lien Plaintiffs, who were certified as a class, contended that their respective liens against the Building had priority over the lien of the Bank.

Given the Debtor's belief that the resolution of the Lien Priority Litigation would pave the way for confirmation of a consensual (or mostly consensual) plan, the Debtor requested a continuance of the Amended Plan confirmation hearings scheduled in October 2010 and a corresponding extension of the briefing and discovery deadlines relating thereto. The Mechanic's Lien Plaintiffs (many of whom filed objections to confirmation of the Amended Plan) supported the Debtor's request to continue the Amended Plan confirmation hearings.

Ultimately, the Court granted the Debtor's request for a continuance of the confirmation hearings. Accordingly, on August 3, 2010, the Court entered an order (i) taking the confirmation hearings scheduled in October, 2010 off calendar, (ii) vacating the remaining deadlines for the filing of papers with respect to confirmation of the Amended Plan, and (iii) setting a status conference on December 1, 2010 at 1:30 p.m. to consider the setting of further hearings and other matters pertaining to the Amended Plan.

At the status conference held on December 1, 2010, the parties to the Lien Priority Litigation indicated that they were in the process of completing their discovery and anticipated being ready for trial in February 2011. The Court scheduled a trial for "Phase 1" of the Lien Priority Litigation (to determine the relative priorities of the Bank's lien and the lien of the mechanics' lien creditors) on February 10 and 11, 2011 and set briefing schedules relating thereto.

Given that the objections to confirmation of the Amended Plan raised by the mechanic's lien creditors revolved primarily around the issue of lien priority, the Debtor requested that the status conference regarding the Plan be continued for an additional approximately 120 days to provide the Debtor with sufficient time following the trial in the Lien Priority Litigation (scheduled in February 2011) to formulate and file modified versions of the Amended Plan and Amended Disclosure Statement and, to the extent necessary, obtain approval of a modified disclosure statement. The Court granted the Debtor's request and continued the status conference to March 2, 2011 at 1:30 p.m.

Shortly after the December 1, 2010 status conference, the Bank filed a motion seeking relief from the automatic stay (the "Stay Relief Motion"), presumably to foreclose against the Property. The Debtor filed a timely opposition to the Stay Relief Motion. At the hearing on the Stay Relief Motion, held on February 1, 2011 at 10:00 a.m., the parties to the Lien Priority Litigation advised the Court that the Lien Priority Settlement (at least, in principle) had been reached between the Bank and the class of mechanic's lien creditors. At the conclusion of such hearing, the Court continued the hearing on the Stay Relief Motion to May 3, 2011 at 10:00 a.m.[3] and ordered that the Debtor file further amended versions of the Amended Plan and Amended Disclosure Statement within thirty (30) days following the hearing on a motion to approve the Lien Priority Settlement.

The motion for approval of the settlement between the Bank and the class of mechanic's lien claimants was filed on April 5, 2011 and set for hearing on May 3, 2011, resulting in a June 3, 2011 deadline for the Debtor to file its amended plan and disclosure statement. The Court entered an order granting the motion for approval of the settlement between the Bank and the class of mechanic's lien claimants on May 20, 2011.

On April 5, 2011, the Bank of America filed a separate motion for an order requiring adequate protection (the "Adequate Protection Motion"). The Debtor filed a timely opposition to the Adequate Protection Motion. The hearing on the Adequate Protection Motion was set for April 26, 2011 at 10:00 a.m. (the same date and time as the hearing on the Stay Relief Motion).

At the hearing held on April 26, 2011, the Court denied the Adequate Protection Motion and continued the hearing on the Stay Relief Motion to June 14, 2011 at 10:00 a.m. At that time, the Court indicated that the Stay Relief Motion would be granted on June 14, 2011 if the Debtor did not file an amended plan and disclosure statement by June 3, 2011 or if the amended plan filed by the Debtor did not appear to be confirmable.

---

[3] The hearing on the Stay Relief Motion was subsequently rescheduled by the Court to April 26, 2011 at 10:00 a.m.

1

2          10.    Settlements with Buyers to Cancel Prepetition Purchase Contracts

3          Prior to the Petition Date, the Debtor, on the one hand, and buyers Ryan Anderson, Keith

4    McCarthy-Smith, Eric Spamer, Brian Young, David Shafer, Puya Partow, Patricia Mahaffey,

5    Robert Ni and Michael Ni (collectively, the "Anderson Plaintiffs"), Dennis Stapleton, Susan B.

6    McGee, Laura S. McGee, Yana Lisetsky, Timothy Justin Patwin, Maria Cecelia G. Ramos, Gary

7    Glass, David Tsao, Adrienne Salerno, Joe Salerno, Steven Dornbusch and Sabrina Idroos

8    (collectively, the "Stapleton Plaintiffs"), Ha Bing Kang and Brian Dougherty (collectively, the

9    "Kang Plaintiffs"), and Herbert Mayer (together with the Anderson Plaintiffs, Stapleton

10   Plaintiffs and Kang Plaintiffs, the "Plaintiff Buyers"), on the other hand, entered into purchase

11   agreements (collectively, the "Purchase Agreements," and individually a "Purchase

12   Agreement"), pursuant to which the Plaintiff Buyers agreed to purchase certain units in the

13   Building.  Pursuant to the terms of the Purchase Agreements, the Plaintiff Buyers deposited

14   funds (collectively, the "Buyer Deposits," and individually, a "Buyer Deposit") into escrow

15   accounts in connection with the anticipated purchases of the units, which accounts are

16   maintained by First American Title Insurance Company or Mara Escrow Company.

17         Both prior to and following the Petition Date, the Plaintiff Buyers demanded that their

18   respective Purchase Agreements be terminated and that their respective Deposits be returned in

19   full to them.  The Plaintiff Buyers contended that, under the terms of the Purchase Agreements,

20   they were entitled to unilaterally terminate the Purchase Agreements and to obtain full refunds

21   of their Deposits.  The Debtor disagreed with the Plaintiff Buyers and contended instead that the

22   Plaintiff Buyers had forfeited their respective Deposits under the terms of the Purchase

23   Agreements and that the Purchase Agreements could be legally enforced against the Plaintiff

24   Buyers.

25         Prior to the Petition Date, on March 17, 2009, the Anderson Plaintiffs filed a complaint

26   for (1) Fraud – Intentional Misrepresentation; (2) Deceit – Negligent Misrepresentation; (3)

27   Breach of Contract; (4) Rescission for Violation of the Subdivided Lands Act, Bus. & Prof.

28

Code § 11000 et seq.; (5) Damages For Violation Of The Interstate Land Sales Act, 15 U.S.C. § 1701 et seq.; (6) Rescission for Violation of the Interstate Land Sales Act; (7) Rescission for Fraud; (8) Rescission for Mistake; (9) Rescission for Failure of Consideration; (10) Constructive Trust; and (11) Declaratory Relief against the Debtor, thereby commencing that certain action in the Superior Court of the State of California in and for the County of Los Angeles, bearing case No. BC 409875 (the "Anderson Action").  On July 23, 2009, the Anderson Plaintiffs filed a notice of removal of the Anderson Action to this Court, thereby commencing that certain adversary proceeding bearing the number 1:09-ap-01267-GM.

On June 17, 2009, the Stapleton Plaintiffs filed a complaint against the Debtor in the Bankruptcy Court that was virtually identical to the complaint filed by the Anderson Plaintiffs, thereby commencing that certain adversary proceeding bearing the number 1:09-ap-01190-GM (the "Stapleton Action").

Subsequently, on September 15, 2009, the Kang Plaintiffs filed a complaint against the Debtor in the Bankruptcy Court that was virtually identical to the complaints filed by the Anderson Plaintiffs and the Stapleton Plaintiffs, thereby commencing that certain adversary proceeding in the Bankruptcy Court bearing the number 1:09-ap-01379-GM (the "Kang Action").

Although Herbert Mayer was not a named party to the Anderson Action, the Stapleton Action or the Kang Action, Mr. Mayer was represented by the same law firm that represented the Anderson Plaintiffs, Stapleton Plaintiffs and Kang Plaintiffs and had indicated that he intended to file a similar complaint against the Debtor.

Recognizing the risks, costs and delays associated with further litigation, the Debtor and the Plaintiff Buyers engaged in extensive, good faith settlement negotiations, which were fruitful and ultimately resulted in a settlement agreement which provides for the termination of all of the Purchase Agreements, an allocation of the Deposits between the Plaintiff Buyers and the Debtor, and the dismissal of the Anderson Action, the Stapleton Action and the Kang Action with prejudice.  The Court entered an order approving the settlement agreement between the

Debtor and the Plaintiff Buyers on December 14, 2009.  In accordance with the terms of the parties' settlement agreement, the Anderson Action and Stapleton Action were dismissed pursuant to orders entered by the Court on February 10, 2010.  The Kang Action was dismissed pursuant to an order entered by the Court on February 16, 2010.

In addition to the Plaintiff Buyers, a number of other individual buyers approached the Debtor regarding the termination of their respective purchase agreements and the return of their deposits.  The Debtor and these individual buyers also engaged in good faith settlement negotiations, which were fruitful and ultimately resulted in settlement agreements with individual buyers which provided for the termination of the buyers' respective purchase agreements and an allocation of the deposits between such buyers and the Debtor.  The Court has entered numerous orders approving the Debtor's settlement agreements with these individual buyers.

11.    Easement Litigation

The Los Angeles Community College District (referred to herein as the "District"), 700 Wilshire Properties (referred to herein as "700 Wilshire") and the Debtor each own and operate buildings in downtown Los Angeles that are adjacent to one another, and each of them have an easement right to use the approximately 30 foot wide and approximately 100 feet long alley that is between their properties (the "Alley").

Prior to the Petition Date, on September 4, 2007, 700 Wilshire filed a complaint against the Debtor and others seeking a permanent injunction, declaratory relief and other relief relating to the Debtor's easement right to use the Alley, thereby commencing that certain action in the Superior Court of the State of California for the County of Los Angeles bearing the number BC 377008 (the "Easement Action").  The Easement Action includes two related cross-actions commenced by the Debtor and the District, respectively.

Pursuant to their respective complaints in the Easement Action, 700 Wilshire and the District contend, among other things, that the Debtor is unreasonably burdening the easement on the Alley by attempting to use it for continuous automobile traffic to and from the Building.

On or about February 5, 2009, the District filed a notice of appeal from a temporary restraining order/preliminary injunction issued by the judge presiding over the Easement Action which, among other things, ordered the District to remove obstacles and cease interference with the Debtor's use of the Alley for continuous automobile traffic.  That appeal has remained pending in the Second Appellate District of the California Court of Appeal, Case No. B214024 (the "Easement Appeal").

A jury trial took place in the Easement Action from March 12 through March 25, 2009. At the conclusion of the trial, on March 25, 2009, the jury held that the Debtor's "use of the alley for egress of cars from the Roosevelt Building overburdens the alley easement."  The jury found that the Debtor had not committed trespass and nuisance against 700 Wilshire when the Debtor's general contractor demolished the existing surface of the Alley and replaced it with another one.

On March 25, 2009, the judge in the Easement Action ordered that the Debtor, the District, and 700 Wilshire each file and serve upon the other parties an Opening Memorandum of Points and Authorities presenting their respective positions on how the judge should effectuate the decision of the jury and rule on the remaining issues.  The judge further ordered that the Debtor, the District and 700 Wilshire each file and serve a Reply Memorandum on April 24, 2009, with the hearing on the matters to take place before the judge on April 29, 2009.

Following the Petition Date, on June 19, 2009, the District filed a motion in the Debtor's bankruptcy case seeking relief from the automatic stay to permit the completion of proceedings in both the Easement Action and the Easement Appeal (the "District's Motion for Relief").  The Debtor did not oppose the District's Motion for Relief, and the Court entered an order granting the District's Motion for Relief on August 6, 2009.

Shortly thereafter, the Bank filed a motion in the Easement Action seeking leave to intervene in the Easement Action.  The Bank's motion was ultimately denied by the State Court.

As noted previously, the Debtor has employed IKD to represent the Debtor in connection with the Easement Action and the Easement Appeal.  IKD is also representing the Debtor's co-

defendants in the Easement Action and the Easement Appeal, namely, Alliance Property Investments Inc., Carla Ridge LLC, Maverick Holdings LLC, S&M Yashoua Investments and Desert Field LLC.

After review of the briefs filed, and after hearing oral arguments, the State Court took the matter under submission on November 2, 2009. On December 14, 2009, the State Court judge issued a Tentative Decision, finding in favor of the Debtor, and ruling that there was no overburdening of the Alley by the Debtor. The court further ruled that the Alley is to allow the Debtor an unrestricted easement for of right away permitting the free passage of vehicles in the Alley. The court further held that neither 700 Wilshire nor the District may interfere with Debtor's use of the Alley, and that the Debtor is entitled to a permanent injunction which prohibits either 700 Wilshire or the District from placing any obstructions in the Alley which prevent Debtor's use of the same.

12. <u>Settlement with the Bank</u>

Recognizing the risks, costs and delays associated with further litigation the Debtor and the guarantors of the Bank indebtedness (collectively, the "Borrower Parties") and the Bank agreed to participate in mediation before the Honorable Randall J. Newsome on May 3, 2011 so that the parties could meet face to face and attempt to reach a global resolution of their various disputes. The mediation, which was conducted over an approximately sixteen hour period, was extremely successful and resulted in an agreement set forth in a term sheet signed by all of the parties (the "Term Sheet"). Pursuant to the Term Sheet, the Bank Group was required to present a draft settlement agreement, which incorporated the terms of the Term Sheet, to the Borrower Parties by May 17, 2011, and the Borrower Parties, in turn, were required to respond to the draft settlement agreement within five business days (*i.e.*, by May 24, 2011). All of the parties complied with the foregoing requirements.

Pursuant to the Term Sheet, the parties were required to execute the formal Settlement Agreement (the "Bank Settlement Agreement") by not later than June 3, 2011. The Settlement Agreement therefore has an effective date of June 3, 2011 (the "Bank Settlement Effective Date").

The Bank Settlement Agreement contains a global resolution of all of the disputes among the Borrower Parties and the Bank arising from and relating to the state court litigation against the guarantors (the "Guaranty Litigation"), the Debtor's bankruptcy case, and all other claims that such parties may have against each other in any capacity including, without limitation, any affiliate entities involved with the Property (in all, the "BofA Settlement").  All of the terms and conditions of the BofA Settlement were set forth in the motion filed by the Debtor on June 3, 2011, and the description of the BofA Settlement that follows is not intended to comprise a full recitation of all of the terms and conditions of the Bank Settlement Agreement.  In the event of any inconsistency between the terms of the Bank Settlement Agreement and the description contained herein, the terms of the Bank Settlement Agreement shall govern.

The Bank Settlement Agreement contains terms and conditions upon which the Bank agreed to assign its claims to a purchaser to be arranged by the Borrower Parties (the "Purchaser") for a confidential sum (the "Purchase Price").  The Bank Settlement Agreement requires the satisfaction of its conditions within firm deadlines.  Specifically, the Purchase Price must be paid to the Bank Group on or before the earlier of (i) September 1, 2011, and (ii) the first business day which is at least 90 calendar days after the Bank Settlement Effective Date of the Settlement Agreement (the "Payment Date").  Within ten (10) calendar days of the Bank Settlement Effective Date (*i.e.*, by June 13, 2011), the Purchaser must deposit with a mutually agreeable escrow agent (the "Escrow Agent") the sum of $5,000,000 (the "Initial Deposit") to be applied, on the Payment Date, towards the Purchase Price.  Within forty (40) calendar days of the Effective Date (*i.e.*, by July 13, 2011), the Purchaser must deposit with the Escrow Agent an additional sum of $10,000,000, for a total deposit of $15,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within seventy (70) days of the Effective Date (*i.e.*, by August 12, 2011), the Purchaser must deposit with the Escrow Agent an additional sum of $20,000,000, for a total deposit of $35,000,000 to be applied, on the Payment Date, towards the Purchase Price.  On or before the Payment Date, the Purchaser must deposit additional sums necessary to have the full Purchase Price on deposit with the Escrow Agent.

If any of the deposits required under the Settlement Agreement are not timely deposited with the Escrow Agent, then the Bank may send a notice of default by electronic means to counsel for the Borrower Parties. If any of the required deposits are not made within two (2) business days following the notice of default, then pursuant to a stipulation entered into between the Bank and the Debtor and the Bankruptcy Court order approving the Settlement Agreement, the Bank Group will immediately have *in rem* relief from the automatic stay without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief. In such event, the Debtor has also stipulated to the appointment of a receiver. The Bank Settlement Agreement also contains provisions relating to, among other things, releases by the Borrower Parties of the Bank, a covenant from the Bank not to sue the guarantors, and dismissal of the Bank's litigation against the guarantors.

The Court entered an order approving the Bank Settlement Agreement on June 10, 2011.

13.    Plan Support Agreement with Greystar

In order to implement the terms of the BofA Settlement, the Debtor engaged in negotiations with multiple parties concerning the terms and conditions upon which such parties would agree to provide sufficient financing or equity to fund a plan of reorganization consistent with the terms of the BofA Settlement (the "New Plan"). After arm's length negotiations with a number of prospective financing sources and investors, ultimately Greystar GP, LLC or its designee ("Greystar") agreed to fund the New Plan with a contribution of $95 million in exchange for all of the membership interests in the Reorganized Debtor. As part of the Plan Agreement, Greystar agreed to pay all of the claims held by the Bank arising out of, relating to and/or secured by the Bank's loan documents and all of the Bank's right, title and interest in and under all documents, agreements and instruments relating thereto (collectively, the "Assigned BofA Claim") through the New Plan or acquire the BofA Claim in accordance with the terms of the BofA Settlement and, subject to the terms of a plan support agreement (the "Plan Agreement")[4], to support the Debtor's

---

[4] A true and correct copy of the Plan Agreement and related documents is attached hereto as Exhibit "B."

efforts to consummate a financial restructuring of the Debtor's indebtedness and other obligations through the New Plan which would be jointly sponsored by Roosevelt Lofts, Inc. ("RLI"), the Debtor and Greystar (collectively, the "Plan Proponents").  RLI and Greystar entered into that certain letter of intent dated May 23, 2011 (the "LOI"), pursuant to which RLI committed, among other things, to cause the Debtor to enter into the Plan Agreement with Greystar and seek the Court's approval for its terms.

The Plan Agreement contemplated payment in full or other consensual resolution of all allowed claims in this case, and serves as the basis for the Plan to which this Disclosure Statement relates.  As set forth more fully below, Greystar is to receive 100% of the equity interests on the effective date of the Plan, in exchange for which Greystar shall provide $95 million – an amount of funds determined by the Debtor as sufficient to pay all allowed claims in full or to create a reserve sufficient to pay any disputed claims once allowed.  In the event the Effective Date does not occur by August 22, 2011, Greystar reserves the right to acquire the Property by credit bidding the full amount of the BofA Claim through (at Greystar's option) a sale under Section 363 of the Bankruptcy Code or a state law foreclosure, all as more described in the Plan Agreement. The Plan Agreement is complex and is premised upon a number of related agreements, all of which are attached as Exhibit "B" hereto.  Nothing set forth herein is intended to modify the terms of the Plan Agreement, and in the event of any inconsistency between the description of the Plan Agreement and the Plan Agreement itself, the terms of the Plan Agreement shall control.

## II.

## SUMMARY OF THE PLAN OF REORGANIZATION

### A.    What Creditors And Interest Holders Will Receive Under The Plan

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.  A claim or interest is classified in a particular class only to the extent that it falls within the description of that class.  To the extent that part of a claim or interest falls within a different class

description, the claim or interest is classified in that different class.

**B.      Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Therefore, the Debtor has not placed the following claims in classes:

(1)      <u>Administrative Claims</u>.

a.      *General.*  Except as set forth below, Allowed Administrative Claims, other than Allowed Administrative Claims of insiders,[1] shall be paid in full in Cash on the later of (a) 60 days after such claims are allowed or (b) the Effective Date.  To the extent Allowed Administrative Claims are Allowed or payable after the Effective Date, they shall be paid in full in Cash promptly after such claims are Allowed or payable out of a reserve established under or pursuant to the Plan from the Greystar Contribution.

The following chart lists all of the Debtor's known administrative claims, in the amounts the Debtor estimate will be unpaid on the Effective Date, and their treatment under the Plan.

| **Name** | **Amount Owed** | **Treatment** |
| --- | --- | --- |
| Clerk's Office Fees | $0 | Paid in full on the Effective Date. |
| Office of the U.S. Trustee Fees | $0 | Paid in full on the Effective Date. |
| Levene, Neale, Bender, Yoo & Brill L.L.P., bankruptcy counsel for the Debtor | $900,000 (est.) in excess of any amounts paid pursuant to Court order prior to the Effective Date. | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such fees and expenses. |
| Landsberg Margulies LLP, counsel to the Official Committee of Unsecured Creditors (the "Committee") | $40,000 (est.) | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such fees and expenses. |
| **TOTAL** | **$940,000 (est.)** | |

---

[1]    All claims asserted against the Debtor by insiders of the Debtor, including without limitation RLI and Milbank Holding Corp., will be cancelled and no distribution shall be made under the Plan on account of such claims (including any and all administrative, priority, secured or unsecured claims).  To the extent any distributions must be made to any insiders of the Debtor, such distributions will be made exclusively from the Greystar Contribution.

b.      *Statutory Claims.*  All fees payable pursuant to 28 U.S.C. Section 1930 shall be paid in full in Cash.

c.      *Professional Claims.*  Professionals shall file final fee applications within 60 days after the Effective Date.  Promptly after allowance, professional fees shall be paid in full in Cash.

d.      *Postpetition Ordinary Course Liabilities.*  Allowed Postpetition Ordinary Course Liabilities (other than postpetition tax claims) incurred prior to the Effective Date shall be paid in full in full in Cash on the Effective Date (or if incurred but not yet due as of the Effective Date, then paid when due in the ordinary course out of a reserve established under the Plan from the Greystar Contribution).

e.      *Postpetition Tax Claims.*  Postpetition tax claims shall be filed on the later of (a) 60 days after the Effective Date or (b) 120 days after the filing of a tax return with the applicable governmental unit, and shall be paid in full in Cash promptly after such claims are allowed out of a reserve established under the Plan from the Greystar Contribution.

f.      *Tenant Deposits.*  Funds in an amount equal to all security, pet or other deposits that (i) have been received by the Debtor or its agents, or (ii) are received by Debtor or its agents prior to the Effective Date, in each case from any tenants of the Property (each a "Tenant") shall be placed in a reserve account controlled by the Reorganized Debtor.  No Tenant shall be required to file a proof of claim in order to receive a refund of any such deposit funds which such Tenant is entitled to receive in the ordinary course of business; provided, however, that each Tenant's right to receive a refund of any deposit shall be determined in accordance with the provisions of each Tenant's lease or an estoppel certificate signed by the Tenant, and nothing in the Plan shall waive any of the Debtor's rights to withhold all or any portion of a Tenant's deposit if appropriate to do so under that Tenant's lease.  To the extent the Debtor lacks sufficient Cash to fully fund the foregoing reserve, any deficiency shall be funded from the Greystar Contribution on the Effective Date.

(2).    <u>Priority Tax Claims</u>.

Each holder of an Allowed Priority Tax Claim shall receive Cash on the Effective Date in an amount equal to such allowed Priority Tax Claim.  All Priority Tax Claims which are not due and payable on or before the Effective Date shall be pro rated, so the amount that is due as of the Effective Date shall be paid in Cash on the Effective Date (or paid when due in the ordinary course of business in accordance with the terms thereof out of a reserve established under the Plan from the Greystar Contribution).

The chart below indicates all priority tax claims which were either scheduled by the Debtor as undisputed, liquidated, and non-contingent or asserted by the taxing agencies in filed proofs of claim, and the treatment of such allowed priority tax claims under the Plan:

| **Description** | **Amount Owed** | **Treatment** |
|---|---|---|
| United States Treasury, Internal Revenue Service | $0 | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such claim by a Final Order. |
| California Franchise Tax Board | $4,535.34 | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such claim by a Final Order. |
| City of Los Angeles  Office of Finance | $11,542.63 | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such claim by a Final Order. |
| **Total** | **$16,077.97** | |

<u>Bankruptcy Court Approval of Professional Fees Required</u>

Before they may be paid, the Bankruptcy Court must approve and allow all unpaid fees and expenses of Professionals employed at the expense of the Debtor's bankruptcy estate. For all professional fees and expenses, the Professional in question must file and serve a properly noticed final fee application and the Court must rule on the application. Only the amount of fees and expenses allowed by a final order of the Bankruptcy Court will be paid under the Plan.

By voting to accept the Plan, Creditors are not acknowledging the validity of, or consenting to the amount of, the allowed administrative claim of any professional employed at the expense of the Debtor's bankruptcy estate, and creditors are not waiving any of their rights to object to the allowance of any of the administrative claims asserted by such professionals.

### C.    Classified Claims and Interests

1.    <u>Class 1, Allowed Claim of Bank of America</u>:  On the Effective Date, the holder of the Class 1 Allowed Claim of Bank of America shall receive the Bank of America Payment in full satisfaction of its Class 1 Bank of America Claim. In the event Greystar acquires the Class 1 Bank of America Claim prior to the Effective Date, (i) Greystar will not receive the Bank of America Payment but instead will receive the New Securities on the Effective Date, and (ii) the Greystar Contribution will be reduced by $█████.

2.    <u>Class 2, Allowed Mechanics' Lien Claims</u>:    Each holder of an Allowed Mechanics' Lien Claim shall receive Cash in the full amount of such Claim on the later of (1) the Effective Date and (2) the date upon which such Claim becomes an Allowed Mechanics' Lien Claim by Final Order or agreement with RLI and/or the Debtor. The Class Action Reserve shall be established on the Effective Date; provided, however, that in no event shall the sum of (a) the amount of payments made on the Effective Date to holders of Allowed Mechanics' Lien Claims and (b) the amount of Cash deposited into the foregoing reserve exceed $16,000,000 in the aggregate. The Class Action Reserve shall be in such amount as may be determined by the Bankruptcy Court (prior to or after the Effective Date) as sufficient to provide for payment in full of all Allowed Mechanics' Lien Claims and shall be deposited into segregated interest-bearing

account(s) established and maintained by the law firm of Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB") or such other party that is approved by Class Action Counsel, or into one or more investment accounts mutually acceptable to RLI, the Debtor and Class Action Counsel (on terms and conditions reasonably acceptable to Class Action Counsel); provided, however, that the amount of Cash in the Class Action Reserve shall be equal to the lesser of (i) $16,000,000, or (ii) the remaining balance in the Class Action Reserve after payment of Allowed Mechanics' Lien Claims, not to exceed one hundred fifty percent (150%) of the aggregate amount of the unresolved Mechanics' Lien Claims (as set forth in the proof(s) of such Claims filed by holders of such Claims) (the "Class Action Reserve Threshold Amount"); and provided further that in no event shall any provision in the Plan or the Disclosure Statement cause an increase in the amount of the Greystar Contribution.  Any Cash in the Class Action Reserve which is in excess of the Class Action Reserve Threshold Amount shall be distributed as part of the RLI Payment, or to RLI at any time following the Effective Date so long as the appropriate Class Action Threshold Amount is maintained in the Class Action Reserve.  Any distributions from the Class Action Reserve for, or on account of an Allowed Claim asserted by a member of the class of holders of Mechanics' Lien claims shall be disbursed to Class Action Counsel in accordance with the terms and conditions of the Mechanics Lien Settlement Agreement and the Class Action Settlement Order, as more fully defined in the Plan Support Agreement Order.  RLI and the Debtor shall have the right to object to and/or resolve any Mechanics' Lien Claim that is not allowed by Final Order as of the Effective Date, and nothing contained herein shall constitute an admission or waiver of any rights, claims or defenses regarding the validity of any Mechanics' Lien Claim or the lien asserted by any holder of any Mechanics' Lien Claim.  On the Effective Date, all liens asserted and/or recorded by holders of Mechanics' Lien Claims shall be deemed released and extinguished as to the Property and shall attach to the funds maintained in the Class Action Reserve to the same extent, validity, priority, force and effect as such liens existed as against the Property.  On and after the Effective Date, holders of Mechanics' Lien Claims shall have no rights, claims or interests whatsoever against the Property.  Each holder of a Class 2 Claim shall

deliver to the Debtor a duly-executed release of lien for recordation upon the Effective Date, and in the event a release of lien is not timely delivered to the Debtor, the Debtor and/or Greystar shall be authorized to record a release of lien upon the Effective Date on behalf of each holder of a Class 2 Claim.

3.    Class 3 et seq.; Allowed Other Secured Claims.  Class 3 consists of separate sub-Classes for each Allowed Other Secured Claim.  Each sub-Class is deemed to be a separate Class with respect to the Debtor for all purposes under the Bankruptcy Code.  Each holder of an Allowed Class 3 Allowed Other Secured Claim shall receive Cash in the full amount of such claim on the later of (1) the Effective Date and (2) the date upon which such claim becomes an Allowed Class 3 Allowed Other Secured Claim by Final Order of the Bankruptcy Court.  On the Effective Date, a reserve shall be established under the Plan and funded from the Greystar Contribution for the benefit of members of Class 3 whose claims have not been Allowed as of the Effective Date by Final Order of the Bankruptcy Court.

4.    Class 4, Allowed Priority Non-Tax Claims.  Each holder of an Allowed Class 4 Priority Non-Tax Claim shall receive Cash on the later of (1) the Effective Date and (2) the date upon which such claim becomes an Allowed Class 4 Allowed Priority Non-Tax Claim in an amount equal to such Allowed Class 4 Priority Non-Tax Claim. On the Effective Date, a reserve shall be established under the Plan and funded from the Greystar Contribution for the benefit of members of Class 4 whose claims have not been Allowed as of the Effective Date by Final Order of the Bankruptcy Court.

5.    Class 5, Allowed General Unsecured Claims.  Each holder of an Allowed Class 5 General Unsecured Claim will receive Cash on the later of (1) the Effective Date and (2) the date upon which such claim becomes an Allowed Class 5 Allowed General Unsecured Claim by Final Order of the Bankruptcy Court in an amount equal to such Allowed Class 5 General Unsecured Claim.  On the Effective Date, a reserve shall be established under the Plan and funded from the Greystar Contribution for the benefit of members of Class 5 whose claims have not been Allowed as of the Effective Date by Final Order of the Bankruptcy Court.  Attached hereto as

Exhibit "A" is a list of what the Debtor believes to be the Allowed Class 5 Claims (the "Claims Chart").

6.    Class 6, Old Debtor LLC Interests.  Holders of Old Debtor LLC Interests shall receive their pro rata share of the RLI Payment on the Effective Date.  On the Effective Date, the Old Debtor LLC Interests shall be canceled.

All Allowed Claims in Classes 2 through 5 shall be Unimpaired under the Plan, deemed to accept the Plan and are not entitled to vote on the Plan.  Classes 1 and 6 are Impaired under the Plan and entitled to vote to accept or reject the Plan.  Notwithstanding the foregoing, RLI as holder of the Class 6, Old Debtor LLC Interests, has agreed to vote in favor of the Plan (following receipt of the Disclosure Statement in a form approved by the Bankruptcy Court).  In addition, in the event Greystar acquires the Allowed Class 1 BofA Claim prior to the Voting Deadline, Greystar, as holder of the Class 1 Allowed BofA Claim, has agreed to vote in favor of the Plan (following receipt of the Disclosure Statement in a form approved by the Bankruptcy Court).

**D.    Means of Effectuating the Plan and Implementation of the Plan**

(1)    Corporate Existence

The Reorganized Debtor shall exist after the Effective Date as a separate limited liability entity, in accordance with the applicable laws in the jurisdiction in which it is organized and pursuant to the Reorganized Debtor LLC Agreement.

(2)    New Governing Documents

The Reorganized Debtor LLC Agreement shall be in substantially the form of such document included in the Plan Supplement.

(3)    Revesting of Assets; Releases of Liens

The property of the Debtor's Estate, including all the Property and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities held or asserted by the Debtor, shall revest in the Reorganized Debtor on the Effective Date free and clear of all Liens, Claims, encumbrances and interests.  Although, on the Effective Date, all liens asserted by

holders of Mechanics' Lien Claims shall be released against the Property, such liens shall attach to the funds maintained in the Class Action Reserve to the same extent, validity, priority, force and effect as such liens existed as against the Property.   On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.

    (4)    Cancellation of Pre-Effective Date Claims and Interests

    On the Effective Date, except as otherwise specifically provided for in the Plan, all Claims against and Interests in the Debtor shall be canceled and discharged.

    (5)    The Greystar Contribution

    The Cash necessary to make payments required to be made on the Effective Date shall be obtained from the Greystar Contribution.  The Greystar Contribution will be applied as follows:  (i) the first $▮ for payment to Bank of America in full satisfaction of the BofA Claim; (ii) the next $16,000,000 (or such other amount as may be ordered by the Bankruptcy Court) to fund the Class Action Reserve; (iii) third, to pay or satisfy in full the Creditor Payments other than the Class Action Reserve and (iv) the remainder of the Greystar Contribution to fund the RLI Payment.

    As noted in the Plan, in the event Greystar acquires the Class 1 BofA Claim prior to the Effective Date, (i) Greystar will not receive the Bank of America Payment but instead will receive the New Securities on the Effective Date, and (ii) the Greystar Contribution will be reduced by $▮.

    **Following payment of the Greystar Contribution, Greystar, the Reorganized Debtor and their respective affiliates, successors, subsidiaries, members and assets (including, without limitation, the Property) shall have no liability for, among other things, (a) any Claim or Interest against the Debtor that arose or was asserted or could have arisen or been asserted prior to the Effective Date, (b) any pre-Effective Date act of the Debtor or any of the Debtor's Affiliates or Insiders, (c) the cost and expense of implementing the Plan, (d) any costs or fees related to any objection to, resolution of or payment of any Claims filed against or Interests in the Debtor; (e) any act of the Disbursing Agent including, without limitation, distributions from any reserve established under or pursuant**

**to the Plan or (f) any other person or entity making any distributions or holding any reserve under the Plan.  Except as specifically identified in the Plan or the Confirmation Order, the Debtor shall bear full responsibility for making or arranging for the making of disbursements under the Plan and for the creation and administration of any reserve established under or pursuant to the Plan.**

        (6)   The Claim Reserves

        a.   Class Action Reserve.  The Class Action Reserve shall be established, funded and maintained in accordance with Section II.C.2 herein and Section 3.2(B) of the Plan. Funds held for the Class Action Reserve shall not be commingled with funds for any other reserve.

        b.   Other Claim Reserves.  On the Effective Date, the Debtor shall create reserves other than the Class Action Reserve (collectively, "Reserves," and individually, a "Reserve") in an amount necessary to pay (a) all non-Class 2 Claims incurred on or prior to the Effective Date but (b) not otherwise paid in full on the Effective Date (the "Incurred But Not Paid Claims").  All Reserves shall be funded from the Greystar Contribution with Cash equal to the maximum potential liability of the Debtor under the Incurred But Not Paid Claims.  The Debtor will present evidence at the Confirmation Hearing setting forth the Debtor's reasonable estimate of the amount of Cash necessary to fully fund the Reserves.  Such Reserves shall be placed into one or more segregated accounts maintained by LNBYB or such other party that is designated by the Court.  Funds held for one Reserve shall not be commingled with funds for another Reserve. Payments shall be made to holders of Allowed non-Class 2 Claims once such Claims are Allowed by Final Order within 10 Business Days following receipt by LNBYB (or such other party that is designated by the Court) of such Final Order allowing any such Claims.  Any residual Cash left in the Reserves following the allowance and payment, or disallowance, of the Incurred But Not Paid Claims shall be distributed as part of the RLI Payment.

        (7)   Authorization and Issuance of New Securities

        The Reorganized Debtor shall issue the New Securities on the Effective Date to Greystar Equity Partners VII, LLC or to an intermediary limited liability company or other corporation

(the "Intermediary Entity") identified by Greystar prior to the Confirmation Hearing, in each case pursuant to the terms of the Reorganized Debtor LLC Agreement. On the Effective Date, Greystar Equity Partners VII, LLC, at its option, will own (a) all of the New Securities or (b) all of the membership interests in the Intermediary Entity.

(8)    Members of Reorganized Debtor

As of the Effective Date, the Sole Member of the Reorganized Debtor shall be Greystar Equity Partners VII, LLC, or an Intermediary Entity identified by Greystar prior to the Confirmation Hearing.

(9)    Officers of Reorganized Debtor

The existing officers and managers of the Debtor shall be deemed to have resigned as of the Effective Date.  The proposed senior officers of the Reorganized Debtor shall be identified at or prior to the Disclosure Statement Hearing.

(10)    Indemnification of Reorganized Debtor's Directors, Officers, and Employees

Upon the Effective Date, the Reorganized Debtor LLC Agreement may contain customary indemnification provisions for members, officers, and other key employees serving the Reorganized Debtor.

(11)    Retained Litigation Rights

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, the Reorganized Debtor shall retain all of the Debtor's Retained Litigation Rights that the Debtor may hold against any Person.  The Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Retained Litigation Rights.  The Reorganized Debtor or its successor(s) may pursue such Retained Litigation Rights as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan.

(12)    <u>Effectuating Documents; Further Transactions</u>

Any appropriate officer of the Debtor or the Reorganized Debtor, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of the Debtor or the Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

(13)    <u>Exemption From Certain Transfer Taxes</u>

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtor or any other Person in the United States pursuant to the Plan shall not be taxed under any law imposing a stamp tax or other similar tax.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement, and vesting of the Property in the Reorganized Debtor.

(14)    <u>Corporate Action</u>

On the Effective Date, the adoption of the Reorganized Debtor LLC Agreement and all actions contemplated or necessary to implement the transactions described in the Plan shall be authorized and approved in all respects pursuant to the Plan.  All matters provided for herein involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the members, officers or directors of the Debtor or the Reorganized Debtor.  On the Effective Date, the appropriate officers and members of the Reorganized Debtor are authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor without the need for any required approvals, authorizations or consents except for express consents required under the Plan.

(15)    <u>Approval of Compromises and Settlements Embodied in Plan</u>

The terms of the Plan represent compromises and settlements of certain issues.  To the extent necessary, the Plan is deemed to be a motion for approval of the compromises and settlements and the Confirmation Order shall contain findings supporting and conclusions approving the compromises and settlements as fair and equitable and within the bounds of reasonableness.

**E.    Conditions to Confirmation and the Effective Date.**

(1)    <u>Conditions to Confirmation</u>

The following are conditions precedent to Confirmation, each of which must be satisfied or waived in accordance with Section 9.3 of the Plan:

(a)    the Bankruptcy Court shall have entered the Plan Support Agreement Order and such order shall have become a Final Order and not have been modified, amended or reversed (all in form and substance negotiated by the Debtor, RLI and Greystar); provided that any changes to the Plan Support Agreement Order following the filing of such Plan Support Agreement Order shall be satisfactory to Greystar in Greystar's sole discretion and reasonably acceptable to RLI and the Debtor; and provided further that the Plan Support Agreement Order shall not have been modified, amended or reversed;

(b)    the Disclosure Statement shall have been in form and substance reasonably satisfactory to the Plan Proponents, and an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court, shall have become a Final Order and not have been modified, amended or reversed;

(c)    the Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to Greystar in Greystar's sole discretion and the Confirmation Order shall have become a Final Order and not have been modified, amended or reversed; provided, however, that the Confirmation Order shall be deemed satisfactory to the Debtor and RLI so long as the Confirmation Order does not deviate in any material way from the terms set forth in the Plan

Term Sheet;

        (d)     the Plan, the exhibits thereto and the Plan Supplement (as confirmed or approved by the Confirmation Order) shall be in form and substance satisfactory to Greystar in Greystar's reasonable discretion.  The Plan, the exhibits thereto and the Plan Supplement (as confirmed or approved by the Confirmation Order)  shall be deemed satisfactory to the Debtor and RLI so long as they do not deviate in any material way from the terms set forth in the Plan Term Sheet and

        (e)     the BofA/Debtor Settlement Order shall have become a Final Order and not have been modified, amended or reversed.

    (2)    <u>Conditions to Effective Date</u>

       The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section 9.3 of the Plan:

        (a)     All conditions to confirmation of the Plan shall remain satisfied or waived (with any waiver to be in the sole discretion of the party who has the right to waive such condition or conditions).

Each order of the Bankruptcy Court referred to in Section 9.1 of the Plan shall have become a Final Order and not have been modified, amended or reversed.

        (b)     All documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan (not otherwise specified herein) shall be in form and substance reasonably acceptable to the Plan Proponents.

        (c)     The Plan Proponents shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement the Plan and that is required by law, regulation, or order.

        (d)     The Reorganized Debtor shall have received title insurance from a title insurance company reasonably satisfactory to Greystar and on terms and conditions satisfactory to Greystar in Greystar's sole discretion and reasonably acceptable to the Debtor and RLI, and the Property shall be in compliance with all material restrictions, requirements and encumbrances

applicable to the Property (other than the fact that the parking stalls are non-conforming).

(e)      The New Securities shall have been issued (free and clear of all liens, claims, encumbrances and interests) to Greystar Equity Partners VII, LLC or an Intermediary Entity identified by Greystar prior to the Confirmation Hearing in accordance with the Plan.

(f)      All other actions, documents and agreements necessary to implement the Plan as of the Effective Date shall have been executed and delivered and all conditions precedent thereto shall have been satisfied or waived.

(g)      All corporate and other proceedings to be taken by the Debtor in connection with the Plan and/or the Plan Supplement and the consummation of the transactions contemplated thereby and by the Plan and all documents incident thereto shall have been completed in form and substance reasonably satisfactory to Greystar; provided however that the foregoing proceedings and documents shall be deemed satisfactory to RLI and the Debtor so long as they do not deviate in any material way from the terms set forth in the Plan Term Sheet.

(h)      No event, condition or circumstance shall have occurred or arisen subsequent to June 3, 2011 which has had or could reasonably be expected to have or give rise to a Material Adverse Change.

(i)      Subsequent to June 3, 2011, there shall be no threatened or pending suit, action, investigation, inquiry or other proceeding by or before any court of competent jurisdiction (excluding the bankruptcy case and litigation involving the Mechanics' Lien Claims) which is likely to have a Material Adverse Change.

(j)      The Effective Date shall have occurred on or before August 22, 2011.

(k)      The managing member of the Reorganized Debtor shall have been designated by Greystar as of the Effective Date, and directors' and officers' liability insurance (or comparable insurance) shall be available to the officers of the Reorganized Debtor and such managing member on terms reasonably satisfactory to Greystar.

(l)      All waiting periods imposed by applicable law (including, without limitation, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if

applicable) in connection with the consummation of the Plan and transactions contemplated thereby shall have expired or been terminated without any action having been taken by any court of competent jurisdiction restraining, preventing or imposing materially adverse conditions upon such transactions, and the Plan Proponents shall have received all material regulatory approvals required for the consummation of the Plan and the transactions contemplated thereby and for the Reorganized Debtor to continue to carry on its businesses without material change, each of which approvals shall have become final.

(m)    Subsequent to June 3, 2011, the Debtor shall have operated in a manner consistent with its ordinary course or business prior to the date of the Plan Support Agreement.

(n)    The Reorganized Debtor shall receive good and marketable, fee simple title to the Property.

(o)    The Property shall be free and clear of Liens, Claims, interests and encumbrances, except those specifically permitted by Greystar in Greystar's sole discretion.

(p)    Greystar shall have received an owner's policy of title insurance in form and substance acceptable to Greystar in Greystar's sole discretion, subject only to such exceptions as Greystar approves during the review process.  All existing insurance policies of any kind (including without limitation title insurance and property and casualty insurance) related to the Property shall be maintained in full force and assigned to Greystar.  The Debtor and RLI shall not have done anything to impair coverage under any of the foregoing insurance policies.

(q)    No Termination Event (as defined in the Plan Support Agreement) shall have occurred.

(3)    Waiver of Conditions

Notwithstanding anything contained in the Plan to the contrary, Greystar shall have the exclusive right, in its sole discretion, to deem satisfied or waived any of the conditions set forth in Sections 9.2(b), (f), (i), (j), (k), (m), (n), (o), (p) and (q), and such determination by Greystar shall be binding on all Plan Proponents and other parties in interest. Each of the other conditions may be waived by the party identified as having the applicable consent right, in each case in the reasonable

discretion of such party; *provided*, *however*, that any such waiver shall not be effective without the consent of the Greystar.

### F.    Provisions Governing Distributions.

(1)    <u>Distributions for Claims and Interests Allowed as of Effective Date</u>

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims and Interests as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date.  Distributions on account of Claims and Interests that first become Allowed after the applicable Distribution Date shall be made pursuant to Section 8.4 of the Plan.

(2)    <u>Interest on Claims</u>

To the extent required to render a Claim in Classes 2 through 5 hereof Unimpaired, postpetition interest shall accrue and will be paid on such Claims

(3)    <u>Designation of and Distributions by Disbursing Agent</u>

Except as provided in the Plan, the Debtor shall designate the Person to serve as the Disbursing Agent under the Plan, and shall file a written notice of such designation at least five (5) days prior to the Voting Deadline.

Unless otherwise provided in the Plan, the Disbursing Agent shall make all distributions required to be made on the respective Distribution Dates under the Plan.  Notwithstanding the foregoing, all distributions from the Class Action Reserve shall be made by LNBYB or such other party that is approved by Class Action Counsel in accordance with Sections 3.2(b) and 5.6 of the Plan.

If the Disbursing Agent is an independent third party designated by the Debtor to serve in such capacity, such Disbursing Agent shall receive from the Debtor, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services, on any agreed terms.  No Disbursing Agent shall be required to give any bond, surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Reorganized Debtor, Greystar and each of their respective members, Affiliates, agents, insiders and officers shall have no liability for the Disbursing Agent's actions or inactions, including failure to make any payments under the Plan.

      (4)    <u>Means of Cash Payment</u>

Cash payments made pursuant to the Plan shall be in U.S. funds, by check or wire transfer or by such other commercially reasonable means as may be agreed to by the payor and the payee.

      (5)    <u>Delivery of Distributions</u>

Distributions to holders of Allowed Claims shall be made by the Disbursing Agent or at its direction as applicable, (i) at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Debtor, the claims agent and the Disbursing Agent have been notified of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Debtor and the Disbursing Agent after the date of any related Proof of Claim or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and a written notice of a change of address has not been received by the Debtor and the Disbursing Agent. The foregoing shall not apply to distributions to Class 2 members holding Allowed Mechanics' Lien Claims, which distributions shall be made as specified in Section 3.2 of the Plan.

If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified by the Debtor or such holder of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. If any distribution is made by check and such check is not returned but remains uncashed for six (6) months after the date of such check, the Disbursing Agent may cancel and void such check, and the distribution with respect thereto shall be deemed undeliverable. If any holder is requested to provide a taxpayer identification number or to otherwise satisfy any tax withholding requirements with respect to a distribution and such holder fails to do within six (6) months of the date of such request, such holder's distribution shall be deemed undeliverable.

With respect to distributions to be made by the Disbursing Agent or at its direction,

amounts in respect of returned or otherwise undeliverable or unclaimed distributions made by the Disbursing Agent on behalf of the Debtor shall be returned to the Debtor or returned to the reserve established for the Claim at issue until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (a) on or before the first (1st) anniversary of the Effective Date or (b) with respect to any distribution made later than such date, on or before six (6) months after the date of such later distribution; after which date all undeliverable property shall revert to the RLI free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. The Reorganized Debtor and Greystar shall have no liability for any such claims.  In the event of a timely claim for any returned or otherwise undeliverable or unclaimed distribution, the Debtor shall deliver the applicable distribution amount or property to the Disbursing Agent for distribution pursuant to the Plan.  Nothing contained in the Plan shall require the Debtor, the Reorganized Debtor, RLI or any Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(6)    Application of Distribution Record Date

At the close of business on the Distribution Record Date, the claims register maintained in the Chapter 11 Case shall be closed and there shall be no further changes in the listed holders of the Claims.  The Debtor, the Reorganized Debtor, Greystar, the Disbursing Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims register as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

(7)    Withholding and Reporting Requirements

In connection with the Plan and all distributions hereunder, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions

hereunder shall be subject to any such withholding, payment, and reporting requirements. The Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim or Interest that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations in connection with such distribution. Any Cash or other property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to Section 7.5 of the Plan.

(8)    Prepayment

Except as otherwise provided in the Plan, any ancillary documents entered into in connection herewith, or the Confirmation Order, the Debtor shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; *provided*, *however,* that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

(9)    De Minimis Distributions

Neither the Reorganized Debtor, the Debtor nor the Disbursing Agent shall have any obligation to make a Cash distribution with respect to any Claim if the amount of the distribution is less than $20.00. The Claim of any holder whose distribution is in an amount less than $20.00 shall be discharged, and such holder shall be forever barred from asserting such Claim against the Debtor, the Reorganized Debtor, Greystar or their respective property.

(10)    No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the

Allowed amount of such Claim (including payments on account of interest due and payable through the date of payment of such Claim, as further described in the Plan).

(11)    <u>Allocation of Distributions</u>

All distributions received under the Plan by holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

**G.    Objections to Claims.**

(1)    All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline.  If an objection has not been filed to a Proof of Claim or Request for Payment by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim, or Request for Payment, relates shall be treated as an Allowed Claim if such Claim has not been allowed earlier.  The Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated non-Class 2 Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any non-Class 2 Claim at any time during litigation concerning any objection to any such Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated non-Class 2 Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Non-Class 2 Claims may be estimated and thereafter resolved by any permitted mechanisms.

Authority to Prosecute Objections

(2)    After the Effective Date, only the Debtor shall have the authority to file objections

to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims. The Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Nothing herein shall limit the contractual rights and obligations of any party, including any insurer, with respect to any Claim, under (i) an assumed agreement, including any assumed insurance policy, or (ii) any non-executory agreement, including a non-executory insurance policy, as to which such party has continuing obligations pursuant to Section 6.1(e) of the Plan or applicable law.

(3)    The BofA Claim shall be receive the treatment under the Plan as identified in Article III of the Plan.  Pursuant to that certain Order Authorizing the Debtor and Other Parties Thereto to Enter Into Plan Support Agreement and Related Agreements entered on June 10, 2011 by the  Bankruptcy Court , the BofA Claim is allowed (within the meaning of Section 502 of the Bankruptcy Code) as fully perfected, valid, nonavoidable and duly enforceable (without any defense, counterclaim, right of offset or subordination, or any other claim, surcharge or challenge by any party in interest) with first priority security against the Property subject only to the Mechanics' Lien Claims as described in the BofA/Mechanics' Lien Settlement Order.  The BofA Claim shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Property

(4)    Notwithstanding any other provisions of the Plan, no payments or distributions shall be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim.

(5)    The Disbursing Agent shall, on the applicable Distribution Dates, make or direct distributions on account of any Disputed Claim that has become an Allowed Claim.   Such distributions shall be made pursuant to the provisions of the Plan governing the applicable Class.  Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.  Notwithstanding anything to the contrary herein and in the Plan, all distributions from the Class Action Reserve shall be made by LNBYB or such

other party that is approved by Class Action Counsel in accordance with Sections 3.2(B) and 5.6 of the Plan.

### H.    Exculpations and Releases.

(1)    Debtor Releases

**On the Effective Date, the Debtor shall release all claims, rights and causes of action against (1) the current members, directors, officers and employees of the Debtor (other than for money borrowed from or owed to the Debtor by any such members, directors, officers or employees as set forth in the Debtor's books and records) and the Debtor's agents and advisors (including lawyers), (2) the Creditors' Committee and its advisors (solely in their capacity as such), (3) Greystar, its affiliates, and their respective officers, directors, employees, partners, members, managers and advisors (including lawyers) and (4) RLI and its officers, directors, employees, partners, members, managers and advisors (including lawyers) (the parties described in Section 11.9(a)(1)-(4), collectively, "Released Parties"), so long a such releases do not vitiate or impair coverage under any insurance policies related to the Property.**

(2)    Third Party Releases

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, each holder of any Claim or Interest that votes to accept the Plan (each a "Releasing Party") shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, against the Released Parties arising from or related to the Debtor's pre- and/or post-petition actions, omissions or liabilities with respect to the Property.**

(3)    Waiver of Statutory Limitations on Releases

**THE LAWS OF SOME STATES (FOR EXAMPLE, CALIFORNIA CIVIL CODE §1542) PROVIDE, IN WORDS OR SUBSTANCE THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW**

**OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS DECISION TO RELEASE. THE RELEASING PARTIES IN EACH OF SECTIONS 11.9(a), (b), AND (c) OF THE PLAN ARE DEEMED TO HAVE WAIVED ANY RIGHTS THEY MAY HAVE UNDER SUCH STATE LAWS AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.**

        (4)    <u>Discharge of the Debtor</u>

**Except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Interests of any nature whatsoever against the Debtor or any of its assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims; and upon the Effective Date, except as otherwise provided herein or in the Confirmation Order, (i) the Debtor shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (C) the holder of a Claim based upon such debt accepted the Plan, and (ii) all Interests shall be terminated.**

**As of the Effective Date, except as provided in the Confirmation Order, all Persons shall be precluded from asserting against the Debtor, Greystar or the Reorganized Debtor, or any of their respective officers, directors, members, agents, affiliates or professionals (including lawyers) any other or further Claims, debts, rights, causes of action, liabilities, or Interests relating to the Debtor based upon any act, omission, transaction, or other activity of any nature that occurred prior to the Confirmation Date related to the Debtor or the**

Property.   In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor and termination of all Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

The discharge of the Debtor pursuant to the Plan is not intended to limit in any way the Debtor's insurance coverage or to deprive any third party of any rights to such coverage that may otherwise exist.

(5)    Injunction

Except as provided in the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, Greystar and any of their respective officers, directors, members, agents, affiliates or professionals (including lawyers), subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated interests or rights:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner or in any place any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance in any manner or in any place; or (iv) commencing or continuing any action, in each such case in any manner or in any place or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

As of the Effective Date, all Persons that have held, currently hold, or may hold, a claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Section 11.9 of the Plan or is subject to exculpation pursuant to Section 11.12 of the Plan are permanently enjoined from taking any of the following actions

on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner or in any place any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance in any manner or in any place; or (iv) commencing or continuing any action, in each such case in any manner or in any place or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Without limiting the effect of the foregoing upon any person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 11.11.

(6)    Exculpation and Limitation of Liability

None of (i) the Debtor, (ii) the Reorganized Debtor, (iii) Greystar, (iv) the Creditors' Committee, or (v) any of the respective current or former members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates of the foregoing (but solely in their respective capacities as such), shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, or any of their respective successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct, or willful violation of federal or state securities laws or the Internal Revenue Code (in each case as determined by a Final Order), and in all respects shall be

**entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

**Notwithstanding any other provision of the Plan, no holder of a Claim or an Interest, no other party in interest, none of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, and none of their respective successors or assigns, shall have any right of action against (i) the Debtor, (ii) the Reorganized Debtor, (iii) Greystar, (iv) the Creditors' Committee, or (vi) any of the respective current or former members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates of the foregoing (but solely in their respective capacities as such), for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code (in each case as determined by a Final Order).**

**I.    Executory Contracts and Unexpired Leases.**

(1)    On the Effective Date, all executory contracts and unexpired leases of the Debtor listed on the Contract/Lease Schedules are to be deemed assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.  On or before the day that is ten (10) days before the Voting Deadline, the Debtor shall file the Contract/Lease Schedules; *provided, however*, that Greystar reserves the right to amend the Contract/Lease Schedules at any time prior to the Effective Date.  The Debtor shall provide notice of any amendments to the Contract/Lease Schedules to the parties to the executory contracts and unexpired leases affected thereby.

(2)    To the extent applicable, all executory contracts or unexpired leases of the Debtor assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by

the Plan shall not be a "change of control," however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

(3)    Each executory contract and unexpired lease assumed pursuant to Article VI of the Plan (or pursuant to other Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

(4)    In the event that any license granted to the Debtor by a governmental unit, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtor, such license shall be deemed to be assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

(5)    Continuing obligations of third parties to the Debtor under insurance policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, shall continue and shall be binding on, and enforceable by the Reorganized Debtor against, such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Debtor (with the consent of Greystar, such consent to be granted or withheld in Grestar's sole discretion) or by order of Bankruptcy Court. The deemed rejection provided by Section 6.3 of the Plan shall not apply to any such continuing obligations.

(6)    To the extent any insurance policy under which the insurer has a continuing obligation to pay the Debtor or a third party on behalf of the Debtor is held by the Bankruptcy Court to be an executory contract and is not otherwise assumed upon motion by a Final Order, such insurance policy shall be treated as though it is an executory contract that is assumed pursuant

to Section 365 of the Bankruptcy Code under the Plan.  Any and all Claims (including Cure) arising under or related to any insurance policies or related insurance agreements that are assumed by the Debtor prior to or as of the Effective Date: (i) shall not be discharged; (ii) shall be Allowed Administrative Claims; and (iii) shall be paid on the Effective Date.

(7)     Any monetary Cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the later of (a) the Effective Date (or as soon as practicable thereafter), (b) as due in the ordinary course of business or (c) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.  If not paid on the Effective Date, such payments shall be made out of a reserve established on the Effective Date to ensure payment in full of any cure amount (the "Cure Reserve").  In the event of a dispute regarding: (i) the amount of any Cure payments, (ii) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  The Debtor shall list Cure amounts for executory contracts and unexpired leases on the Contract/Lease Schedules.  **The failure of any non-Debtor party to an executory contract or unexpired lease to file and serve an objection to the Cure amount listed on the Contract/Lease Schedules for such party's contract or lease by the deadline set forth on the Contract/Lease Schedules shall be deemed consent to such Cure amount**; *provided*, *however*, that prior to entry of a Final Order approving the assumption of an executory contract or unexpired lease, the Debtor (at the sole direction of Greystar) shall be authorized to reject any executory contract or unexpired lease to the extent the Debtor, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by the Bankruptcy Court renders assumption of such executory contract or unexpired lease unfavorable to the Estate.

(8)      Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor shall be deemed to have rejected each prepetition executory contract and unexpired lease to which it is a party unless such contract or lease (i) is listed on the Contract/Lease Schedules as of the Confirmation Date, (ii) was previously assumed or rejected upon motion by a Final Order, (iii) previously expired or terminated pursuant to its own terms, or (iv) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the rejection of the prepetition executory contracts and unexpired leases described above, as of the Effective Date.

(9)      **If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim will be classified as a Class 5, General Unsecured Claim but shall be forever barred and shall not be enforceable against the Debtor unless a Proof of Claim is filed and served upon counsel to the Reorganized Debtor and the Debtor within thirty (30) days after entry of the Confirmation Order.** The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease shall have been evidenced by a Proof of Claim filed by earlier applicable bar dates, or shall be otherwise Allowed, and if not shall be barred and unenforceable unless otherwise ordered by the Bankruptcy Court.

(10)      All employee compensation, benefit, and expense reimbursement programs, plans, policies, and agreements of the Debtor in effect during the pendency of the Chapter 11 Case, including all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and all benefits subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and in effect during the pendency of the Chapter 11 Case, shall be deemed to be, and shall be treated as though they are, executory contracts that can be rejected pursuant to Section 365 of the

Bankruptcy Code under the Plan.  All such contracts shall be deemed rejected as of the Effective Date.

As of the Effective Date, any and all stock based incentive plans or stock ownership plans of the Debtor entered into before the Effective Date shall be terminated. To the extent such plans, agreements, or documents are considered to be executory contracts, such plans, agreements, or documents shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan.

(11)    All Indemnification Obligations owed to any person by the Debtor shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order).

(12)    Notwithstanding anything to the contrary in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening), nothing in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing the legal, equitable or contractual rights of the Debtor's insurers, if any, in any respect. The rights of the Debtor's insurers shall be determined under their respective insurance policies and any related agreements with the Debtor, as applicable, subject, however, to the rights, if any, of the Debtor to assume or reject any such policy or agreement (at the direction of Greystar) and the consequences of such assumption or rejection under Section 365 of the Bankruptcy Code.

(13)    Limited Extension of Time to Assume or Reject

(a)    Notwithstanding anything set forth in Article VI of the Plan, and except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed by the lessor), in the event of a dispute as to whether a contract is executory or a lease is unexpired, Debtor's right to move to assume or reject such contract or lease (which shall be exercised at the direction of Greystar) shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the

lease is unexpired.  The deemed rejection provided for in Section 6.3 of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtor following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

(b)    Except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed by the lessor), in the event the Debtor or the Reorganized Debtor become aware after the Confirmation Date of the existence of an executory contract or unexpired lease that was not included in the Contract/Lease Schedules, the right of the Debtor or Reorganized Debtor to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the date on which the Debtor or the Reorganized Debtor become aware of the existence of such contract or lease. The deemed rejection provided for in Section 6.3 of the Plan shall not apply to any such contract or lease unless a motion to assume or reject is not filed within such (30) day period.

(14)    The Debtor shall not be required to assume or reject any contract or lease entered into by the Debtor after the Petition Date. Any such contract or lease shall continue in effect in accordance with its terms after the Effective Date, unless, at the direction of Greystar, the Debtor has obtained a Final Order of the Bankruptcy Court approving rejection of such contract and lease.

(15)    All Allowed Claims arising from the assumption of any executory contract or unexpired lease shall be treated as Administrative Claims pursuant to Section 3.1(1) of the Plan; all Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as General Unsecured Claims pursuant to Section 3.2(E) of the Plan,; and all other Allowed Claims relating to an executory contract or unexpired lease shall have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

**J.    Other Plan Provisions.**

(1)    <u>Changes in Rates Subject to Regulatory Commission Approval</u>

The Debtor is not subject to governmental regulatory commission approval of its rates.

(2)    <u>Retention of Jurisdiction</u>

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including the resolution of any Request for Payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code as well as applications for compensation and reimbursement of expenses of Class Action Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or Rule 7023 of the Bankruptcy Rules; *provided*, *however,* that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Debtor and the Reorganized Debtor shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)    hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(d)    effectuate performance of and payments under the provisions of the Plan;

(e)    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case;

(f)      enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(g)      hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(h)      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(i)      consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(k)      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(l)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(m)      except as otherwise limited herein, recover all assets of the Debtor and property of the Estate, wherever located;

(n)      hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(o)      hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

(p)    hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(q)    enter one or more final decrees closing the Chapter 11 Case.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 10.1 of the Plan, the provisions of Article X of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

(3)    Professional Fee Claims; Expense Reimbursements

All final applications seeking allowance and payment of Professional Fee Claims pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code and Substantial Contribution Claims under Section 503(b)(3), (4), or (5) of the Bankruptcy Code must be filed and served on the Reorganized Debtor, the Debtor, RLI, their counsel, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such applications must be filed and served on the Reorganized Debtor, the Debtor, RLI, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

(4)    Administrative Claims Bar Date

All Requests for Payment of an Administrative Claim (other than as set forth in Sections 3.1(1) and 11.1 and this Section 11.2 of the Plan) must be filed with the Bankruptcy Court and served on counsel for the Debtor, the Reorganized Debtor and RLI no later than forty-five (45) days after the Effective Date.  The Debtor shall provide supplemental notice of such filing deadline by mail with respect to known claimants and by publication with respect to unknown claimants. Unless the Debtor or RLI objects to an Administrative Claim by the applicable Claims Objection Deadline, such Administrative Claim shall be deemed Allowed in the amount requested.  In the

event that the Debtor or RLI object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.  Notwithstanding the foregoing, (a) no Request for Payment need be filed with respect to an undisputed postpetition obligation which was paid or is payable by the Debtor in the ordinary course of business; *provided, however*, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; (b) no Request for Payment need be filed with respect to Cure owing under an executory contract or unexpired lease if (i) the amount of Cure is fixed or proposed to be fixed by the Confirmation Order or other order of the Bankruptcy Court either pursuant to the Plan or pursuant to a motion to assume and fix the amount of Cure filed by the Debtor and (ii) a timely objection asserting an increased amount of Cure has been filed by the non-Debtor party to the subject contract or lease; and (c) no Request for Payment need be filed with respect to fees payable pursuant to Section 1930 of Title 28 of the United States Code.

(5)    Payment of Statutory Fees

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date shall be paid by the Debtor.  The obligation of the Debtor to pay such fees as shall continue only until the Bankruptcy Case is closed, dismissed, or converted.

(6)    Modifications and Amendments

The Plan Proponents may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date, *provided, however*, that any such alteration, amendment, or modification shall not be effective without the consent of (a) Greystar in

Greystar's sole discretion and (b) the Debtor in the Debtor's reasonable discretion.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Plan Proponents may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided*, *however,* that prior notice of such proceedings shall be served to the extent required by the Bankruptcy Rules or order of the Bankruptcy Court.

(7)     Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of Greystar (and subject to the reasonable consent of the Debtor), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

(8)     Successors and Assigns and Binding Effect

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such entity, including, but not limited to, the Reorganized Debtor and all other parties in interest in the Chapter 11 Case and any subsequent bankruptcy involving the Debtor.

(9)     Compromises and Settlements

From and after the Effective Date, the Reorganized Debtor and RLI, as applicable, may compromise and settle various Claims against them and/or Retained Litigation Rights and other

claims that they may have against other Persons without any further approval by the Bankruptcy Court.

(10)    Releases and Satisfaction of Subordination Rights

All Claims against the Debtor and all rights and claims between or among the holders of Claims relating in any manner whatsoever to any alleged subordination rights shall be deemed satisfied by the distributions under, described in, contemplated by, and/or implemented in the Plan. Distributions under, described in, contemplated by, and/or implemented by the Plan to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any alleged subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(11)    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Plan Proponents shall request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.  The Plan Proponents reserve the right to alter, amend, or modify the Plan, the Plan Supplement, or any Exhibit to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary, with such changes to be acceptable to Greystar in Greystar's sole discretion and to the Debtor in the Debtor's reasonable discretion.

(11)    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and its members shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Case.  The Professionals retained by the Creditors' Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered after the Effective Date, except as may be necessary to file applications pursuant to Section 11.1(a) of the Plan.

### III.

### TAX CONSEQUENCES OF THE PLAN

INTERNAL REVENUE SERVICE ("IRS") CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX CONTAINED OR REFERRED TO IN THIS CONFIDENTIAL MEMORANDUM IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "TAX CODE"); (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following disclosure (the "Tax Disclosure") summarizes certain federal income tax consequences of the implementation of the Plan to holders of Allowed General Unsecured Claims and the Debtor.  It does not address the specific federal income tax consequences to those with a unique position with respect to their treatment, such as those holding Secured Claims or other Claims treated under the terms of separate agreements made with the Debtor.  Priority Claims are also not specifically addressed, for they are unimpaired.  General withholding obligations are, however, addressed for all holders of Claims or Interests.

Moreover, the Tax Disclosure summarizes only some of the federal income tax consequences associated with the Plan's implementation; other consequences are not addressed. Certain of the federal income tax consequences described in the Tax Disclosure are complex and are subject to uncertainties.  The Debtor has not requested a ruling from the IRS or an opinion of

counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.

In addition, the Tax Disclosure does not attempt to consider any facts or limitations applicable to any particular holder of a Claim or Interest which may modify or alter the consequences described below, and assumes that all Interests are held as a "capital asset" within the meaning of Section 1221 of the Tax Code (generally, property held for investment). Examples of particular taxpayers who might have special tax treatment include but are not limited to those who hold a Claim as a capital asset, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities.  The Tax Disclosure also does not address state, local, or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

The following summary is based on the Tax Code, the regulations promulgated thereunder by the Department of the Treasury ("Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS in effect on the date hereof. Changes in, or new interpretations of, such rules may have retroactive effect and could significantly affect the federal income tax consequences described below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF AN EQUITY INTEREST OR A CLAIM.  EACH HOLDER OF AN EQUITY INTEREST OR A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.    **Withholding Applicable to all Holders of Interests or Claims.**

All payments transferred under the Plan are subject to applicable tax withholding (including employment tax withholding).

Under federal income tax law, interest and other reportable payments may be subject to "backup withholding," at a rate of 28%. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails to report properly interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding.

**B.    Tax Consequences to Holders of Allowed General Unsecured Claims.**

Holders of General Unsecured Claims should include Cash payments received under the Plan as final payments for Claims, including post-petition interest payments, under their normal method of accounting.

**C.    Tax Consequences for Holders of Interests.**

Under the Plan, all Interests in the Debtor will be canceled, but RLI, as the holder of the Old Debtor LLC Interests, will receive the RLI Payment. While not free from doubt, RLI should be able to deduct its basis in the canceled Old Debtor LLC Interests as a capital loss, which is generally limited to offsetting only capital gains.

**D.    Tax Consequences for the Debtor.**

The Debtor does not believe that there will be any negative tax consequences to the Debtor resulting from the confirmation of the Plan.

**IV.**

**<u>CONFIRMATION REQUIREMENTS AND PROCEDURES</u>**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtor

CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a plan.  Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible.  These requirements are <u>not</u> the only requirements for confirmation.

### A.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

### B.    Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.  Only holders of Allowed Claims in Class 1 and Allowed Interests in Class 6 shall be entitled to vote under the Plan.  All other Claims in Classes 2 through 5 are Unimpaired and deem to accept the Plan, and therefore are not entitled to vote under the Plan. Notwithstanding the foregoing, RLI as holder of the Class 6, Old Debtor LLC Interests, has agreed to vote in favor of the Plan (following receipt of the Disclosure Statement in a form approved by the Bankruptcy Court).  In addition, in the event Greystar acquires the Allowed Class 1 BofA Claim prior to the Voting Deadline, Greystar, as the holder of the Allowed Class 1 BofA Claim, has agreed to vote in favor of the Plan (following receipt of the Disclosure Statement in a form approved by the Bankruptcy Court).

### C.    What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim or interest.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the

Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THESE CASES ON ACCOUNT OF PRE-PETITION CLAIMS WAS SEPTEMBER 15, 2009.  A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

A detailed Claims Chart is attached hereto as Exhibit "A."  The Claims Chart identifies all claims which were scheduled by the Debtor, including the amounts and priorities of the claims and whether the Debtor contends that the claims are disputed, contingent or unliquidated.  The Claims Chart also identifies all proofs of claim which were filed by creditors asserting claims against the Debtor, including the amounts and priorities of the claims asserted.  Finally, the Claims Chart indicates whether the Debtor has disputed or presently disputes any portion of the claims.  The Debtor reserves the right to update and modify the Claims Chart at any time and to file objections to claims even if the Claims Chart does not identify any dispute relating to a particular claim.

> **D.      What Is an Impaired Claim/Interest.**

As noted above, an allowed claim or interest has the right to vote only if it is in a class that is <u>impaired</u> under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.  For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

The Plan Proponents believe that members of Classes 1 and 6 are impaired and entitled to vote to accept or reject the Plan.  Parties who dispute the Debtor's characterization of their

claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the class.

### E.    Who Is Not Entitled to Vote.

The following four types of claims are not entitled to vote:  (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### F.    Who Can Vote in More Than One Class.

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### G.    Votes Necessary to Confirm the Plan.

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed below.

### H.    Votes Necessary for a Class to Accept the Plan.

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted on the plan, voted in favor of the plan.  A class of interests is considered to have "accepted" a plan

when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted on the plan, voted to accept the plan.

## I.    Risk Factors.

HOLDERS OF CLAIMS OR INTERESTS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

The principal risks associated with the Plan are as follows:

(1)    Though the Debtor has made every effort to ensure that Greystar will make the Greystar Contribution to fund the Plan, it is possible that Greystar could default in its obligations with respect thereto.  If Greystar were to fail to make the Greystar Contribution as and when required, the Debtor would be unable to proceed to seek confirmation of the Plan and would be unable to consummate the Plan if it were previously confirmed.

(2)    There are numerous conditions to the confirmation of the Plan and its consummation that are more particularly described herein and in the Plan.  If the Debtor is unable to satisfy those conditions, the Plan may not be confirmed or Greystar's obligation to make the Greystar Contribution could be terminated.  In that event, the Plan could not be consummated, and Bank of America (or Greystar, if Greystar acquires the BofA Claim) would exercise its right under the BofA/Debtor Settlement to foreclose on the Property.  Under such circumstances, Greystar, if Greystar acquires the BofA Claim, would also have the option to exercise its 363 Purchase Right (as defined in the Plan Agreement).

(3)    Though the Debtor believes it to be unlikely, it is possible that the amount of Class 2 Mechanics' Lien Claims could exceed the $16 million reserve.  In that event, Greystar

would not be obligated to proceed with the Plan, and the Property would be lost to foreclosure.

(4)    Many Claims, including, without limitation, many of the Claims of the Class 2 Mechanics' Lien Creditors, remain in dispute.  The Debtor has objected, or will begin objecting, to and/or seeking estimation of the disputed Claims as necessary.  For purposes of the Plan, the Debtor has made every effort to analyze the Claims and provide a reasonable estimate as to whether the Court will allow the claims and in what amount.  There is no guarantee as to how the Court will eventually rule on the Debtor's objections.  The Debtor believes that the Plan can still be confirmed if all of the disputed Claims that are not contingent or unliquidated are allowed.  If, however, the contingent and unliquidated Claims are allowed in significant amounts, the Plan may become infeasible.

(5)    Even if all Classes of Claims that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  The Debtor believes that the Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

(6)    Although the Debtor believes that the Effective Date will occur by the Outside Date, there can be no assurance as to such timing or that such conditions to the Effective Date contained in the Plan will ever occur.

(7)    The Plan provides for the dissolution of the Creditors' Committee on the Effective Date.  Therefore, holders of Allowed General Unsecured Claims individually must monitor the status of the Chapter 11 Case and the Debtor's compliance with the terms of the Plan, including

its distribution of payments to holders of Allowed General Unsecured Claims.  If the Debtor\ defaults on its obligations under the Plan prior to the issuance of a Final Decree and closure of the Case, a Creditor may file a motion with the Bankruptcy Court to convert the case to one under Chapter 7 of the Bankruptcy Code.  If the Debtor defaults on its obligations under the Plan after the issuance of a Final Decree and closure of the Case, then a Creditor may commence a lawsuit.

### J.    Treatment of Non-accepting Classes.

As noted above, even if <u>all</u> impaired classes do not accept the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code.  The process by which non-accepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### K.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).

The Debtor will ask the Court to confirm the Plan by cramdown on any and all impaired classes that do not vote to accept the Plan.

To obtain nonconsensual confirmation of the Plan, the Plan Proponents must demonstrate to the Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code provides that a plan is "fair and equitable" with respect to a class of creditors or equity holders if:

<u>Secured Creditors</u>.  Either (i) each impaired creditor retains its liens securing its secured claim and receives on account of its secured claim cash payments having a present value equal to the amount of its allowed claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and

clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii), above.

<u>Unsecured Creditors</u>.    Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and equity interests that are junior to the claims or interests of the non-accepting class will not receive any property under the Plan, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under Section 1115 of the Bankruptcy Code, subject to the requirements of subsection (a)(14) of Section 1129 of the Bankruptcy Code.

<u>Interests</u>.    Either (i) each impaired equity interest holder receives or retains under the Plan property of a value equal to the amount of its allowed equity interest, or (ii) the holders of equity interests that are junior to the claims or interests of the non-accepting class will not receive any property under the Plan.

Here, only the Class 1 BofA Claim and Class 6 Old Debtor LLC Interests are impaired under the Plan.  The Plan Proponents believe that the holder of the Class 1 BofA Claim will vote to accept its treatment under the Plan, so long as its treatment is consistent with the terms of the BofA/Debtor Settlement.  As such, a cramdown of the Plan on the holder of the Class 1 BofA Claim will not be required.

Holders of Class 6 Old Debtor LLC Interests (i.e., RLI) shall receive the RLI Payment under the Plan, and no class of interests junior to the Interests of RLI exists.  As such, the Plan comports with the requirements of Section 1129(b) with respect to Class 6.  The Plan Proponents also believe that Class 6 will vote to accept its treatment under the Plan.

**L.    Liquidation Analysis.**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than

the amount that such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the debtor's assets are usually sold by a chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims.  Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a chapter 7 liquidation of the Debtor.  The Debtor maintains that this requirement is clearly met since all Classes of Claims under the Plan are to be paid (or reserved for) in full and/or treated in accordance with terms acceptable to such Classes.

As described above, the holder of the Class 1 BofA Claim will be paid the full amount of the Bank of America Payment in satisfaction of the Debtor's obligations under the BofA/Debtor Settlement pursuant to the BofA/Debtor Settlement Order.  The holder of the Class 1 BofA Claim shall be paid according to the terms of the compromise previously approved by the Court.  In the event the case were converted to Chapter 7, Bank of America would have the right to foreclose upon the Property, with no guaranty as to the amount of its recovery.  As such, in a Chapter 7 case, the recovery by Bank of America would be speculative and would be affected by the ability of Bank of America to sell or otherwise dispose of the Property at some point in the future (if ever).  Given the uncertainties of the real estate market generally and the market for the Property in particular, the Plan provides for a recovery by Bank of America that is assured and that has previously been deemed acceptable to Bank of America, provided the terms and conditions of the BofA/Debtor Settlement are satisfied.  In any event, if the holder of the

Class 1 BofA Claim votes to reject the Plan, it is unlikely that the Debtor would proceed with its efforts to seek confirmation of the Plan in its current format.

In the event the Case were to be converted to Chapter 7 and Bank of America were to foreclose upon the Property, unsecured creditors in Class 5 would likely receive no distribution on account of their Allowed Claims. In contrast, the Plan proposes to pay such Claims in full on the Effective Date. Likewise, in the event the Case were converted to Chapter 7, the holders of Class 2 Mechanics' Lien Claims would likely be embroiled in litigation with Bank of America concerning the amount of their potential recovery from any disposition of the Property following foreclosure by Bank of America. Under the Plan, the Plan Proponents shall reserve up to $16 million to pay the Allowed Claims in Class 2. The Debtor believes that this reserve is well in excess of the amount of properly allowable Class 2 Claims, and should be sufficient to pay such Allowed Claims in full.

**M.    Feasibility.**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date to pay all the claims and expenses which are entitled to be paid on such date. The Greystar Contribution of $95 million will provide the Debtor with enough cash on the Effective Date to enable the Debtor to satisfy all of its obligations under the Plan on the Effective Date.

The second aspect considers whether the Reorganized Debtor will have enough cash over the life of the Plan to make the required Plan payments. Since the Plan contemplates a one-time payment to holders of Allowed Claims and Interests from the Greystar Contribution, the Plan Proponents believe that this aspect of the required feasibility analysis is satisfied.

# V.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code, and (ii) an alternative plan of reorganization or a plan of liquidation.

### C.    Liquidation under Chapter 7.

If the Plan is not confirmed, the Debtor's Chapter 11 case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would liquidate the Debtor's assets for distribution in accordance wit the priorities established by Chapter 7 of the Bankruptcy Code.  For the reasons articulated in Article IV.L, above, the Debtor believes that a liquidation under Chapter 7 would result in smaller and riskier distributions being made to Creditors and Interest holders than those provided for in the Plan.

### D.    Alternative Plan of Reorganization or Liquidation.

If the Plan is not confirmed, the Court could confirm a different plan.  However, given the difficulties associated with confirming a plan over the objection of Bank of America, it is unlikely that such a non-consensual plan would be confirmed without extensive additional litigation, delay and expense.  In addition, Bank of America would likely exercise its right to foreclose upon the Property if the Debtor is not able to confirm the Plan within the timeframe contemplated by the BofA/Debtor Settlement.  In addition, if the Debtor were not able to proceed with a the Plan, Greystar and the Debtor have stipulated that Greystar shall have in rem automatic relief from the automatic stay under 11 U.S.C. Section 362 to credit bid the full original par amount of the Bank of America Claim (including default interest and fees) in a foreclosure sale of the Property at a date, time and place in Los Angeles, California of Greystar's choosing (on or after September 2, 2011) without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief.  The Debtor believes that the Plan described herein enables Creditors and Interest holders to realize the highest and best value under the circumstances.  The Debtor believes that any liquidation of the Property or alternative form

of Chapter 11 plan is a much less attractive alternative to Creditors than the Plan because of the far greater returns and certainty provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainties and substantial additional administrative costs.

## VI.

## POST-CONFIRMATION MATTERS

### A.    Post-Confirmation Status Report.

Within 120 days after the entry of the order confirming the Plan, the Debtor shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report must be served on the Office of the United States Trustee, the Committee, the Reorganized Debtor, the 20 largest unsecured creditors and any secured creditors and priority unsecured creditors entitled to receive distributions under the Plan. Further status reports shall be filed every 120 days and served on the same entities.

### B.    Post-Confirmation Conversion/Dismissal.

A creditor or party in interest may bring a motion to convert or dismiss the Debtor's case under § 1112(b) after the Plan is confirmed if there is a default in performing the Plan. If the Court orders the Debtor's case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that the Court did not previously authorize relief from stay during the Debtor's case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

### C.    Post-Confirmation U.S. Trustee Fees

The Debtor shall be responsible for timely payment of all fees incurred after the Effective

Date pursuant to 28 U.S.C. Section 1930(a)(6).

### D.    Final Decree

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Debtor or other party as the Court shall designate in the order confirming the Plan, shall file a motion with the Court to obtain a final decree to close the Case.

Dated:  July 5, 2011

<u>Presented By</u>:

LEVENE, NEALE, BENDER, YOO
       & BRILL L.L.P.

By:    */s/ David L. Neale*
       David L. Neale
       Juliet Y. Oh
       Attorneys for Chapter 11 Debtor
       and Plan Proponent


LATHAM & WATKINS LLP

By:    */s/ Robert A. Klyman*
       Robert A. Klyman
       Attorneys for GS Roosevelt, LLC


ROOSEVELT LOFTS, LLC,
a Delaware limited liability company

By:    */s/ M. Aaron Yashouafar*
       M. Aaron Yashouafar,
       President, Roosevelt Lofts, Inc.
       Manager of Debtor, Roosevelt Lofts, LLC


GS ROOSEVELT, LLC

By:_____
       Name:
       Its:

## DECLARATION OF M. AARON YASHOUAFAR

I, M. Aaron Yashouafar, hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2.      I am the President of Roosevelt Lofts, Inc., which is the Manager of Roosevelt Lofts, LLC, a Delaware limited liability company, debtor and debtor in possession herein (the "Debtor").  Accordingly, I am familiar with virtually all aspects of the Debtor's condominium and commercial space project located at 727 West 7th Street in Los Angeles, California.  Except where otherwise indicated, the statements made herein are of my own personal knowledge, and if called upon, I could and would testify to their truth.

3.      I make this Declaration in support of the Disclosure Statement (the "Disclosure Statement") to which this Declaration is attached.  All capitalized terms not specifically defined herein shall have the same meanings ascribed to them in the Plan and/or Disclosure Statement.

4.      I have reviewed the information contained within the Disclosure Statement, including all financial information.  To the best of my knowledge, information and belief, I believe that all of the information contained in this Disclosure Statement is truthful and accurate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of July 2011, at Los Angeles, California.


        */s/  M. Aaron Yashouafar*
        M. AARON YASHOUAFAR

- 82 -

# EXHIBIT "A"

In re Roosevelt Lofts, LLC (Case No. 1:09-bk-14214-GM)
Claims Chart

| Name | Claim No. | Date Claim Filed | Proof of Claim Secured | Priority | Unsecured | C/U/D | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | Obj? | Estimated Allowed Claim Secured | Priority | Unsecured |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24/7 Fire Services | 29 | 7/31/2009 | | | 1,000.00 | X | | | 1,000.00 | | | | 1,000.00 |
| 700 Wilshire Properties | 80 | 9/15/2009 | | | 66,662.73 | X | | | Unknown | Yes | - | | TBD |
| 944 Media | | | | | | X | | | 13,200.00 | | | | - |
| A Fence Company, Inc. | | | | | | | | | | Yes | 1,025.00 | | - |
| A-American Flooring | 78 | 9/15/2009 | | | 233,181.00 | | | | 233,000.00 | Yes | - | | 233,000.00 |
| AB California Acquisition Corp. | | | | | | X | 3,272.62 | | | | - | | - |
| Accent Refinishing Company | | | | | | X | 85,374.00 | | | | - | | - |
| ACCI Corporation | 91 | 5/25/2010 | 70,211.14 | | | | Unscheduled | | | Yes | - | | - |
| ACCI Corporation | 92 | 6/1/2010 | 70,211.14 | | | | Unscheduled | | | Yes | - | | - |
| ACCO Engineering Systems | 84 | 9/17/2009 | 82,300.00 | | | X | | | 82,300.00 | Yes | - | | - |
| Accoustical Construction, Inc. | | | | | | X | | | 8,629.00 | | - | | - |
| Ace Concrete Cutting, Inc. | | | | | | X | | | 5,191.00 | | - | | - |
| Ace Parking Services | | | | | | | | | 20,140.18 | Yes | - | | - |
| Addison Pools, Inc. | | | | | | X | 148,001.00 | | | Yes | 125,915.25 | | - |
| Allisale Electric Inc. | 4 | 5/8/2009 | 199,725.43 | | | X | 199,725.43 | | | Yes | - | | - |
| Allisale Electric Inc. | 6 | 5/8/2009 | 199,725.43 | | | | see above | | | Yes | - | | - |
| Allisale Electric Inc. | 16 | 7/1/2009 | 237,448.91 | | | | see above | | | Yes | - | | - |
| Alter Electric Company | 15 | 7/1/2009 | 1,159,009.77 | | | X | 388,473.00 | | | Yes | - | | - |
| Amamoto, Allen | 88 | 10/30/2009 | | | 30,000.00 | | Unscheduled | | | | | | - |
| American Demolition/Concrete Cutting, Inc. | 27 | 7/30/2009 | 17,012.00 | | | X | 17,012.00 | | | | 17,012.00 | | - |
| American Gunite, Inc. | 74 | 9/15/2009 | amended | | | X | | | | | | | - |
| American Gunite, Inc. | 90 | 5/18/2010 | 1,238,167.79 | | | X | 891,679.34 | | | Yes | 643,175.00 | | - |
| Anderson, Ryan | 45 | 9/1/2009 | | 2,425.00 | 38,755.40 | | | Unscheduled | Unscheduled | Yes | - | - | - |
| Arrow | | | | | | X | 960.63 | | | | | | - |
| B&N Industries, Inc. | | | | | | X | | | 11,916.35 | | | | - |
| Bank of America, N.A. | 66 | 9/10/2009 | 81,820,597.06 | | | X | 79,354,669.16 | | | | 78,422,049.33 | | - |
| Baz!k Electrical | | | | | | X | | | 3,290.00 | | | | - |
| Bontempi USA | 21 | 7/16/2009 | | | 60,156.45 | X | 49,737.60 | | 57,474.75 | Yes | 49,913.17 | | - |
| Brewster Marble Co., Inc. | | | | | | X | | | 535.09 | | - | | - |
| Cal Systems | | | | | | X | 176,592.90 | | | | | | - |
| Cal-State Steel Corporation | 86 | 9/21/2009 | 176,592.00 | | | X | Unscheduled | | | Yes | 176,592.00 | | - |
| Canon Financial Services, Inc. | 40 | 8/24/2009 | 14,431.58 | | | | | | | Yes | - | | - |
| Century Shower Doors | 1 | 5/4/2009 | | | 160,030.00 | X | | | 11,590.00 | Yes | | | 11,590.00 |
| Chase Construction, Inc. | | | | | | | | | 566,000.00 | | | | - |
| City of Los Angeles Public Works | | | | | | | | | 91.08 | | | | 91.08 |
| City of Los Angeles, Office of Finance | 28 | 6/4/2009 | | 11,542.63 | | X | | | | | | 11,542.63 | - |
| Clark, Alan & Anna | 23 | 7/28/2009 | | | 38,362.10 | | | | Unscheduled | Yes | - | | - |
| Commercial Glass Company | 7 | 5/8/2009 | 184,483.49 | | | X | 175,948.49 | | 70,077.91 | Yes | 70,077.91 | | - |
| Commercial Scaffolding of CA, Inc. | | | | | | X | 38,111.00 | | | | | | - |
| CraneNetics, Inc. | 31 | 8/11/2009 | 49,709.00 | | | X | 49,709.00 | | | Yes | 43,659.00 | | - |

In re Roosevelt Lofts, LLC (Case No. 1:09-bk-14214-GM)
Claims Chart

| Name | Claim No. | Date Claim Filed | Proof of Claim Secured | Proof of Claim Priority | Proof of Claim Unsecured | C/U/D | Scheduled "D" Secured | Scheduled "E" Priority | Schedule "F" Unsecured | Obj? | Est. Secured | Est. Priority | Est. Unsecured |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crenshaw Lumber (a/k/a Beacon Investment Co.) | 75 | 9/15/2009 | 17,186.26 | | | X | | | 17,779.53 | | 17,186.26 | | |
| Davis Langston | | | | | | X | | | 7,500.00 | | | | - |
| Dept. of Water and Power - City of Los Angeles | 9 | 5/14/2009 | | | 87,258.15 | | | | Unscheduled | Yes | | | 87,258.15 |
| Dewey Pest Control | | | | | | | | | 6,310.00 | Yes | | | 2,275.00 |
| Digital Express | | | | | | X | | | 1,515.50 | | | | - |
| DMF Lighting | | | | | | X | | | 8,152.73 | | | | - |
| Donald Dickerson & Associates | 32 | 8/12/2009 | | | 64,121.86 | X | | | 64,520.44 | | | | 64,121.86 |
| Dornbusch, Steven | 46 | 9/1/2009 | | 2,425.00 | 27,104.90 | | | Unscheduled | Unscheduled | Yes | | - | - |
| Dougherty, Brian | 61 | 9/1/2009 | | 2,425.00 | 27,575.00 | | | Unscheduled | Unscheduled | Yes | | - | - |
| Dunn-Edwards Corporation | 5 | 5/12/2009 | 34,036.26 | | | X | 34,036.26 | | 85,482.00 | Yes | - | - | - |
| E.J. Reyes Corp. | 8 | 5/1/2009 | 100,923.62 | | | X | 25,000.00 | | | Yes | - | - | - |
| EFCO Corporation | | | | | | X | | | 15,200.00 | | | | 15,200.00 |
| Encino Corporate Plaza, L.P. | | | | | | | | | 2,575.00 | | | | 2,575.00 |
| Excel Building Services | | | | | | X | | | 43,992.00 | | | | |
| Fathi, Haleh (Holly) | | | | | | X | | | 15,200.00 | | | | 15,200.00 |
| Franchise Tax Board | 17 | 7/2/2009 | | 4,535.34 | 950.09 | X | | - | | | | 2,542.56 | |
| Frank's Disposal | 35 | 8/18/2009 | 7,807.55 | | | X | 7,807.55 | | | Yes | 5,807.55 | | 435.90 |
| General Coating | | | | 2,425.00 | 93,623.40 | X | | | 11,300.00 | | | - | |
| Glass, Gary & Tsao, David | 59 | 9/1/2009 | | 2,425.00 | 27,575.00 | | | Unscheduled | Unscheduled | Yes | | - | - |
| Glendale Plumbing & Fire Supply | 18 | 7/8/2009 | 24,604.25 | | | X | 24,604.25 | | Unscheduled | Yes | | | |
| Gorgeous Magazine | | | | | | X | | | 1,525.00 | | | | |
| GRIF-FAB Corporation | | | | | | X | 16,229.18 | | | | | | |
| H. Joseph Nourmand, PC | 76 | 9/15/2009 | | | 140,597.65 | X | | | 9,182.21 | | | | 9,182.21 |
| HD Supply Construction Supply, Ltd. | 2 | 5/8/2009 | 25,638.27 | | | X | 25,638.57 | | 27,469.40 | | 25,638.27 | | |
| Henri Specialties | | | | | | X | | | | | | | |
| Idross, Sabrina | 47 | 9/1/2009 | | 2,425.00 | 27,575.00 | | | Unscheduled | Unscheduled | Yes | | - | - |
| Infinity Metals, Inc. | 25 | 8/3/2009 | 21,836.50 | | | X | | | 21,896.50 | Yes | 21,836.50 | | |
| Insul-Flow, Inc. | | | | | | X | 20,329.52 | | | Yes | | | |
| Integrity Builders West, Inc. | 87 | 9/25/2009 | 297,181.38 | | | X | 297,181.38 | - | | Yes | | - | |
| Internal Revenue Service | | | | | | | | | 847.74 | | | | |
| Irish Communication Company | | | | | | X | | | 19,138.90 | | | | 19,138.90 |
| Ives, Kirwan & Dibble | | | | | | | | | 1,760.00 | | | | |
| J.W. Kelly Consulting | | | | | | X | | | 189,455.00 | | | | 189,455.00 |
| Kadima Security Services, Inc. | | | | | | X | | | Unscheduled | Yes | | - | |
| Kang, Ha Bin | 48 | 9/1/2009 | | | 35,700.00 | X | | | 847.74 | | | | |
| KenMar Consultants, LLC | 36 | 8/21/2009 | | | 750.00 | X | | | 19,138.90 | | | | 19,138.90 |
| Kessler & Kessler | | | | | | | | | 1,760.00 | | | | |
| Keyboard Concepts, Inc. | | | | | | X | | | 189,455.00 | | | | 189,455.00 |
| Kiefer Flammang Architects | 10 | 6/1/2009 | | | | X | | | Unscheduled | Yes | | | |
| Kultur Flooring USA, Inc. | 81 | 9/15/2009 | 55,853.00 | | | X | 55,853.00 | | 750.00 | | | | 750.00 |
| | | | 920,486.24 | | | | | | 21,644.21 | | 55,863.00 | | 21,644.21 |
| | | | | | | | | | 540.83 | | | | |
| | | | | | | | | | 61,399.42 | Yes | | | |
| | | | | | | | | | 816,388.00 | | | | 356,863.18 |

In re Roosevelt Lofts, LLC (Case No. 1:09-bk-14214-GM)
Claims Chart

| Name | Claim No. | Proof of Claim | | | | Scheduled Claim | | | | | Estimated Allowed Claim | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Date Claim Filed | Secured | Priority | Unsecured | C/U/D | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | Obj? | Secured | Priority | Unsecured |
| Kultur Flooring USA, Inc. | 82 | 9/15/2009 | 920,496.24 | | | | | | 816,388.00 | Yes | - | - | - |
| LA Commercial Group, Inc. dba | | | | | | | 6,261.80 | | 535.00 | Yes | - | - | - |
| Leonard, Gary | | | | | | X | | | | | | | - |
| Lewis & Associates | | | | | | X | | | 8,663.53 | | | | 8,663.53 |
| Lightworks | | | | | | X | | | 60,523.21 | | | | |
| Lisetsky, Yana A. | 49 | 9/1/2009 | | 2,425.00 | 30,305.00 | X | | Unscheduled | Unscheduled | Yes | | - | |
| Los Angeles Community College Dist. | 68 | 9/11/2009 | | | 250,000.00 | X | | | Unknown | Yes | | | TBD |
| Los Angeles Conservancy | 79 | 9/15/2009 | | | 100,000.00 | | | | 100,000.00 | | | | 100,000.00 |
| Los Angeles County Tax Collector | 12 | 5/28/2009 | amended | amended | | | | - | | | | - | - |
| Los Angeles County Tax Collector | 89 | 1/8/2010 | 626,676.91 | | | | | - | | | - | | |
| Los Angeles Dept. of Bldg. & Safety | | | | | | | | | 802.00 | | | | 802.00 |
| Los Angeles Downtown News | | | | | | X | | | 19,300.00 | | | | |
| Los Angeles Fire Department | | | | | | | | | 2,895.00 | | | | 2,895.00 |
| Los Angeles Magazine | | | | | | X | | | 14,107.44 | | | | |
| Lynn Safety, Inc. | | | | | | X | 277,318.46 | | | Yes | 77,318.16 | | - |
| Mahaffey, Patricia | 63 | 9/1/2009 | | 2,425.00 | 47,575.00 | | Unscheduled | Unscheduled | Unscheduled | Yes | | - | |
| Mansoor, Solomon | | | | | | | | | 3,488.76 | | | | 3,488.76 |
| Mayer, Herbert Alfred | 67 | 9/8/2009 | | | 29,590.03 | | | Unscheduled | Unscheduled | Yes | | | |
| Mayer, Herbert Alfred | 70 | 9/11/2009 | | | 29,590.03 | | | Unscheduled | Unscheduled | Yes | | | |
| McDowell Scheduling | | | | | | X | | | 8,300.00 | | | | |
| McGee, Susan & Laura | 50 | 9/1/2009 | | 2,425.00 | 76,503.00 | | | Unscheduled | Unscheduled | Yes | | - | |
| Milbank Holding Corp. | 22 | 7/21/2009 | 2,827,949.00 | | | | 5,011,250.00 | | 5,011,250.00 | Yes | | | 5,011,250.00 |
| Muir-Chase Plumbing Co., Inc. | | | | | | X | | | 788,950.00 | Yes | 852,921.91 | | |
| New World West | | | | | | X | 50,000.00 | | | Yes | - | | |
| Ni, Robert & Michael | 51 | 9/1/2009 | | 2,425.00 | 27,251.60 | | | Unscheduled | Unscheduled | Yes | | - | |
| On Demand Printing | | | | | | X | | | 2,126.24 | | | | 2,126.24 |
| Orco Construction Supply | | | | | | X | 6,205.10 | | | | | | |
| Pacific Property Consultants, Inc. | 83 | 9/17/2009 | | 1,987.50 | | X | | | Unscheduled | Yes | - | | |
| Park Place Signs | | | | | | X | | | 28,700.00 | | | | |
| Parking Automation Systems, Inc. | 44 | 8/31/2009 | | | 17,370.12 | X | | | 31,424.64 | Yes | | | 17,370.12 |
| Partow, Puya | 52 | 9/1/2009 | | 2,425.00 | 24,775.00 | | | Unscheduled | Unscheduled | Yes | | - | |
| Patwin, Justin | 53 | 9/1/2009 | | 2,425.00 | 25,129.00 | | | Unscheduled | Unscheduled | Yes | | - | |
| Pepper Development Services | | | | | | | | | 315,000.00 | Yes | | | 315,000.00 |
| Pinish Koncepts Inc. | 73 | 9/14/2009 | 290,698.97 | | | X | 290,698.97 | | | Yes | 73,038.99 | | |
| Plant Connection | | | | | | X | | | 1,085.00 | | | | |
| Platinum Publications | 30 | 8/6/2009 | | | 4,000.00 | X | | | 4,000.00 | | | | 4,000.00 |
| PM Estrada Roofing | 11 | 5/28/2009 | | | 26,700.00 | | 26,700.00 | | | | | | 26,700.00 |
| Prescott Companies, Inc. | 38 | 8/21/2009 | | 97,980.00 | | X | | | Unscheduled | Yes | | | 15,900.00 |

In re Roosevelt Lofts, LLC (Case No. 1:09-bk-14214-GM)
Claims Chart

| Name | Claim No. | Date Claim Filed | Secured | Priority | Unsecured | C/U/D | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | Obj? | Secured | Priority | Unsecured |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Proof of Claim** | | | | **Scheduled Claim** | | | | **Estimated Allowed Claim** | | |
| Purcell Murray Builder Sales Co., Inc. | 34 | 8/19/2009 | | | 4,594.19 | X | 278,886.07 | | 3,214.48 | Yes | 278,886.07 | | - |
| QualityBuilt.com | 54 | 9/1/2009 | | 2,425.00 | 22,575.00 | | | Unscheduled | Unscheduled | Yes | | - | - |
| Ramos, Maria | | | | | | X | | | 787.60 | | | | - |
| Roycon Construction, Inc. | | | | | | X | | | 49,246.69 | | | | - |
| Robert Smylie & Associates | 19 | 7/7/2009 | | | 21,710.00 | | | Unscheduled | Unscheduled | Yes | | | 10,618.50 |
| Robert Woodcock Plumbing | 13 | 6/9/2009 | 12,850.30 | | | X | 7,463.65 | | | Yes | - | | |
| Robertson's Ready Mix | 41 | 8/27/2009 | 2,839.21 | | | X | see above | | | Yes | 950.00 | | |
| Robertson's Ready Mix | 64 | 8/27/2009 | | | 12,850.30 | X | | | 90,169.00 | Yes | - | | - |
| Rock Marble, The | | | | | | X | | | | | | | - |
| Roosevelt Lofts Homeowners Assn. | | | | | | | | | 119,789.59 | | | | 119,789.59 |
| Ryan Anderson, et al. | | | | | | X | | | Unknown | | | | |
| Salerno, Joe & Adrienne | 55 | 9/1/2009 | | 2,425.00 | 28,422.45 | | | Unscheduled | Unscheduled | Yes | | - | |
| Schafer's Parking Lot Services (a/k/a Asphalt Management Inc.) | 42 | 8/27/2009 | 13,150.00 | | | X | | | 13,150.00 | Yes | 13,150.00 | | - |
| Shafer, David | 62 | 9/1/2009 | | 2,425.00 | 39,345.00 | | | Unscheduled | Unscheduled | Yes | | - | |
| Siemens Building Technologies, Inc. | 39 | 8/18/2009 | 126,563.65 | | | X | 79,563.65 | | | Yes | 68,370.96 | | |
| Simon Media Company | | | | | | X | | | 5,500.00 | | | | |
| Simpson, Gumpertz & Heger | 33 | 8/18/2009 | | | 25,708.42 | X | | | 25,708.42 | | | | 25,708.42 |
| Smith, Keith McCarthy | 56 | 9/1/2009 | | 2,425.00 | 28,365.00 | X | | Unscheduled | Unscheduled | Yes | | - | |
| Southern California Gas Company | 14 | 6/24/2009 | | | 1,889.38 | X | | | Unscheduled | | | | 1,889.38 |
| Southern California Gas Company | 43 | 8/21/2009 | 375,856.31 | | 173,535.99 | X | | | Unscheduled | Yes | - | | 173,535.99 |
| Southland Exterior Building Svcs | 85 | 9/9/2009 | | | 82,744.00 | X | 451,430.00 | Unscheduled | Unscheduled | Yes | | | |
| Spamer, Eric | 57 | 9/1/2009 | | 2,425.00 | | | | Unscheduled | | Yes | | - | |
| Spectra Company | 69 | 9/11/2009 | | | 68,698.60 | X | 63,698.00 | | 13,150.00 | Yes | 198.58 | | |
| SRS Fire Protection, Inc. | 37 | 8/20/2009 | 74,278.34 | | 12,754.39 | X | 74,278.34 | | | Yes | - | | |
| Stapleton, Dennis | 58 | 9/1/2009 | | 2,425.00 | 45,784.20 | | | Unscheduled | Unscheduled | Yes | | - | |
| State Board of Equalization | | | | | | | | - | - | | | - | |
| Stevenson Systems, Inc. | 26 | 8/3/2009 | | | 19,843.17 | X | | | 17,092.16 | | | | 19,843.17 |
| Stuart Dean Company | | | | | | X | | | 17,211.48 | | | | - |
| Thermalair | 72 | 9/14/2009 | 1,045,323.25 | | | X | 1,045,323.25 | | | Yes | 427,639.00 | | |
| Thyssenkrupp Elevator, Inc. | 65 | 9/22/2009 | 173,624.58 | | | X | 173,624.58 | | | Yes | 97,406.58 | | |
| Thyssenkrupp Elevator, Inc. | | | | | | X | 37,066.18 | | | Yes | - | | |
| Tima Winter, Inc. | 24-2 | 6/28/2011 | | | 52,409.00 | X | | | 52,409.00 | | 52,409.00 | | 52,409.00 |
| Trench Plate Services | 3 | 5/8/2009 | 6,261.80 | | | X | | | 6,261.80 | Yes | - | | |
| V.G.I. Corporation | 77 | 9/14/2009 | 2,404,569.55 | | | X | 2,575,569.55 | | | | - | | |
| Viridi Power, Inc. | | | | | | X | | | 3,915.55 | | | | - |
| West Coast Doors | 20 | 7/17/2009 | | | 4,814.75 | X | | | 4,814.75 | | | | 4,814.75 |

In re Roosevelt Lofts, LLC (Case No. 1:09-bk-14214-GM)
Claims Chart

| Name | Claim No. | Date Claim Filed | Proof of Claim Secured | Priority | Unsecured | C/U/D | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | Obj? | Estimated Allowed Claim Secured | Priority | Unsecured |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Westye Group - West, Inc. d/b/a Sub-Zero Wolf | | | | | | X | 399,696.63 | | | | | | |
| Wrightway Construction, Inc. | 71 | 9/11/2009 | 533,852.00 | | | X | 533,852.00 | | | Yes | - | - | - |
| Yashoualfar, M. Aaron | | | | | | | | | 100,796.97 | | | | 100,796.97 |
| Yashoualfar, Raymond | | | | | | | | | 13,863.22 | | | | 13,863.22 |
| Yashoualfar, Rodney | | | | | | | | | 715.85 | | | | 715.85 |
| Young, Brian | 60 | 9/1/2009 | | 2,425.00 | 34,035.00 | | | Unscheduled | Unscheduled | Yes | | | - |
| **Total:** | | | **96,460,158.18** | **59,727.97** | **2,605,238.85** | | **88,288,704.11** | **-** | **10,316,352.24** | | **81,515,707.32** | **14,085.19** | **7,096,674.15** |

# EXHIBIT "B"

# PLAN SUPPORT AGREEMENT

This PLAN SUPP ORT AGRE EMENT (as th e same may be am ended, modified or supplemented from tim e to ti me in accord ance with the term s hereof, this " **Agreement**"), dated as of June 3, 2011, is en tered into by and am ong Roosevelt Lofts, LLC, as debtor and debtor in possession (the " **Debtor**") in case no. 09-14214-GM (the " **Bankruptcy Case** ") pending before the United States B ankruptcy Court for the Centra l District of Ca lifornia (the "**Bankruptcy Court** "), The Roosevelt Lofts, Inc. (" **RLI**") and Greystar GP, LLC (with its designee, as applicab le, " **Greystar**"). Each of the Debtor, RLI and Greystar are referred to herein individually as a "**Party**", and collectively as the "**Parties**".

## RECITALS

WHEREAS, prior to the date hereof, representatives of the Parties have discussed the possibility of consummating a financial restru cturing of the Debtor's indebtedness and other obligations (the " **Restructuring**") as se t forth in th is Agre ement and the Plan Te rm Sheet (as defined below).

WHEREAS, it is anticipated that the Restructuring will be implemented through a plan of reorganization jointly sponsored by the Debtor, RLI a nd Greystar (the "**Plan**") and filed in the Bankruptcy Case.

WHEREAS, each Party desires that the te rms and conditions of the Plan will be substantially consistent with those d escribed in th e plan term sheet attach ed hereto as Exhibit A (the "**Plan Term Sheet**") and incorporated herein by reference.

WHEREAS, Bank of America (as defined below) has agreed that it will assign the BofA Claim (as defined below) to a " **Purchaser**" arran ged by the " **Borrower Parties** " (a s defined below) in accordance with the term s of tha t ce rtain se ttlement agreem ent b etween the Debtor and Bank of America date d as of June 3, 2011 (the " **BofA Settlement**"). The Debtor is one of the Borrower Parties, and together with the other Borrower Parties and RLI, has executed an agreement to d esignate Greystar as Purch aser under the BofA Settlem ent, attached hereto as Exhibit B (the " **Borrower Parties Designation Agreement** ") and incorporated herein by reference.

WHEREAS, the Debtor has entered into th is Agreement in order to, am ong other things, implement the terms and conditions of the BofA Settlement.

WHEREAS, subject to the terms and conditions of this Agreement, the Plan Term Sheet and Plan Support Agreem ent Order (as define d below), the Parties have agreed to support the Restructuring and the Plan.

NOW, THEREFORE, in consideration of the premises and agreem ents set forth herein, and for other good and valuable consid eration, the receip t and sufficiency of which ar e hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

LNBYB000002

1.    Incorporation of Plan Term Sheet and Definitions.  The Plan Term Sheet is expressly incorporated herein by reference an d is made part of th is Agreement.  In the ev ent there is a conflict between the terms and conditions of the Plan Term Sheet, the Letter of Intent (defined below) and this Agreem ent, the term s and conditions of the Plan Term Sheet shall govern.  Capitalized term s used and not define d in this Agreem ent shall have the m eaning ascribed to them in the Plan Term Sheet.  The Parties agree that this Agreem ent constitutes the "Definitive Agreement" for purposes of the Letter of Intent.

2.    Definitions.  The following terms shall have the following definitions:

"363 Auction" means the auction with respect to the Property to be held in accordance with the Bidding Procedures.

"363 Order" means an order in form and substan ce acceptable to Greystar authorizing and directing the Debtor to sell the Property to the winning bidder at the 363 Auction.  The 363 Order shall include, am ong other things, (a) findings that (i) Greystar upon the exercise of the 363 Purchase Right or  (ii) such other bidder that the Bankruptcy Court approves as the winning bidder    at the 363 Auction shall acquire good and marketable fee title to the Property, f ree and clear of  all liens, c laims, interes ts and encumbrances, and (b) other reasonable, usual and customary provisions.

"363 Purchase Right" means Greystar's right to credit bid the full original par amount of the BofA Claim  (including defa ult interest and fees ) at the 363 Auction; provided that if the Plan Eff ective Date shall h ave occurred on or by the Outside Date, Greystar shall not exercise the 363 Purchase Right; and provided further that, pursuant to the BofA/Mechanics' Lien Settlem ent Order,  the BofA Claim shall be subject to the Mechanics' Lien Claims in any 363 Auction, but shall not be subject to any claims of any insider or affiliate of the Debtor or RLI.

"363 Sale Hearing" means the hearing to occur on Septem ber 2, 2011 or such later date set by the Bankruptcy Court    on the first hearing d ate available after September 2, 2011 (but in no event later than    the 363 Sale Outside Date) at which the Bankruptcy Court shall approve the result of the 363 Auction and enter the 363 Order.

"363     Sale Outside Date" means September 16, 2011.

"Agreement" has the meaning set forth in the preamble hereof.

"Bank of Am erica" m eans Bank of Am erica, N.A., individually and as agent for a group of lenders under the BofA Loan Agreement.

"Bankruptcy Code" m eans title 11 of the United States Code, 11 U.S.C. §§101 et seq., as amended from time to time and as applicable to the Bankruptcy Case.

"Bankruptcy Case" has the meaning set forth in the preamble hereof.

"Bankruptcy Court" has the meaning set forth in the preamble hereof.

LNBYB000003

"Bidding Procedures" m eans the bidding procedures, in for m a nd substance reasonably acceptab le to Greystar, th at establish the rules an d procedures for the 363 Sale and 363 Auction. Am ong other provisions, the Bidding Procedures shall (a) require qualified bidders to (i) subm it a written bid for the Property (a " **Bid**") and evidence of their f inancial ab ility to perf orm to the Debtor, Greystar and the Official Committee of Creditors appointed in the Ba nkruptcy Case no later than five business days prior to the 363 A uction, (ii) bid all cash in an am ount equal to at l east the sum of (A) the BofA Claim , (B) the Mechanics' Lien Claim s (in an am ount of at least $16,000,000) and (C) an addition al $1,000,000, (iii) bid for all of th e Property in its entirety, (iv) subm it a Bid that contains no contingencies or conditi ons other than those set forth in the Plan S upport Agreem ent, (v) subm it a Bid that does not contain any condition related to financing or the satisfaction of diligence, and (b) provide for (1) Greystar's exercise of the 363 Purchase Ri ght, (2) increm ental bidding am ounts of at least $250,000 and (3) payment in full and in cash through the Closing of (X) the amount of cash necessary to pay in full the BofA Claim to Greys tar as the ho lder of such claim , and (Y) th e amount of c ash necessary to pay in full the Mechanics' Lien Claims to the holders of such claim s or to fund a reserve fo r the benefit of such holders to the extent such Mechanics' Lien Claims are disputed by the Debtor.

"Bidding Procedures Motion" means the m otion to be filed by the Deb tor in for m and substance reasonably satisfactory to Greystar s eeking entry of the Bidding Procedures Order.

"Bidding Procedures Order " m eans the order in form and substance satisfactory to Greystar ente red by th e Bankruptcy Court approving the Bidding Procedures.

"BofA Claim" means (a) a ll claims held by Ba nk of America arising out of, relating to and/or secured by the BofA Loan Agreem ent and (b) all o f BofA's rig ht, title and interest in and under all documents, agreements and instruments relating thereto or that cons titute the BofA Loan Agreem ent. For avoidan ce of doubt, the BofA Claim for purposes of this Agreem ent shall not incl ude any obligations on th e part of Bank of America to perform under the BofA Loan Agreement.

"BofA Loan Agreement" means, collectively, (a) that certain amended and restated Construction Loan Agreement (the "**Loan Agreement**") with B ank of Am erica as adm inistrative agent for the B ank Group in the original principal am ount of $78,840,375, (b) that certain Deed of Trust Note dated as of on or about March 9, 2006 in the original principal am ount of $78,840,375 (the " **Note**"), (c) those certain (i) Construction Deed of Trust, Assignm ent of Rents and Leases, Secu rity Agreem ent and Fixture F iling recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typogra phical errors (the " **Fee Deed of Trust**"), and (ii) Construction Deed of Trust, Assignment of Rents and L eases, Security Agreem ent and Fixture F iling (California Leasehold Interes t) r ecorded on March 22, 2006 (the " **Leasehold Deed of Trust**," and collec tively, with th e F ee Deed of Trust, the " **Deeds of Trust** "), each of which (x) secure the Lo an Agreement and No te and (y) encum ber the Property (defined

below), including an abso lute assignment of all rents, i ssues and profits generated fro m operation of the Property and (d) all docum ents, agreements and instrum ents relating to any of the foregoing..

"BofA/Mechanics' Lie n Settlem ent Order " m eans that certain order entered by the Bankruptcy Court (1) Granti ng Motion by Class Representatives for Approval o f Settlem ent; (2 ) Approving Settlem ent; (3) Setting C ontinued Status Conference; and (4) Other Ancillary Relief, entered by the Bankruptcy Court on May 20, 2011 in Adv. Action No. 10-01031 [docket no. 83].

"BofA Settlement" has the meaning set forth in the recitals hereof.

"BofA/Debtor Settlem ent Order" h as the m eaning set forth  in Section 6 hereof.

"Borrower Parties Designation Agreem ent" has the m eaning set forth in the recitals hereof.

"Broker" means Charles Sturges and/or CSIV Investments.

"Broker's C ommissions" m eans any and all commissions payable to the Broker in connection with the transactions contemplated by this Agreement.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Claim Assignment" means that certain Assignment of Claims executed or to be executed by Bank  of America in favor of the Purcha ser in the form attached hereto as Exhibit C, or in such other form as is acceptable to Greystar in its sole discretion.

"Confirmation Hearing" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as  such hearing may be adjourned or continued from time to time.

"Confirmation Order" m eans the o rder entered  by th e Ban kruptcy Court confirming t he Plan, including all exhibits, appendices and related docum ents, each in form and substance reasonably acceptable to the Parties.

"Disclosure Statement" means the disclo sure statement in respec t of the Plan which shall be acceptable in form and substance to the Parties.

"Escrow Agreem ent" means an esc row agreem ent in  the form  attached hereto as E_xhibit D , or in such other form as is acceptable to Greystar in its s        ole discretion.

"Final  Order" m eans a n order or judgm ent of the Bankruptcy Court or any other c ourt of competent ju risdiction as to which the tim e to appeal, petitio n f or

4

LNBYB000005

certiorari, or m ove for reargum ent or rehear ing has expired and as  to w hich no appeal, petition for certiorari, or ot her proceedings for reargum ent or reh earing shall th en be pending or as to which any appe al, petition for certiorari, r eargue, or rehear shall have been waived in writing in f orm and substance s atisfactory to the Partie s, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court  or other court of com petent jurisdiction shall h ave b een determined by the h ighest cou rt to which  such order was appeal ed, or certiorari, reargument, or rehearing shall have been deni ed or resulted in no m odification of suc h order and the tim e to take any f urther appe al, petition for certiorari, or m ove for reargument or rehearing shall have expired.

"Foreclosure Right " means Greys tar's in rem autom atic relief from  the automatic stay under 11 U.S.C. Section 362 to  credit bid the full original par am ount of the BofA Claim (including default interest and  fees) in a foreclosure  sale of the Pro perty at a date, tim e and place in Los Angeles, Calif ornia of Greystar's choo sing (on or after September 2, 2011) without further notice, he aring or order of the Bankruptcy Court and with no limitations on  such relief; provided  th at if  the  Pla n Ef fective Date shall h ave occurred on or by the Outside Date, Greystar  shall no t ex ercise the F oreclosure Right; and provided  further th at, pursu ant to the BofA/Mechanics' Lien Settlem ent Order, the BofA Claim shall be subject to the Mechanics' Lien Claims in any foreclosure sale of the Property but shall not be  subject to any claims of any insider or af filiate of the Debtor or RLI.

"Greystar Receivership Stipulation" means that certain s tipulation for th e appointment of a receiver to take control of  the Property in the for m attached hereto as Exhibit E , which stipulation shall be executed  and delivered concurrently with the execution of this Agreement, but shall on ly be enforceable once Greystar has the rig ht to exercise its Foreclosure Right.

"Letter of Intent" and "LOI" means that certain Letter of Intent dated as of May 23, 2011 (attached hereto as Exhibit F and incorporated herein by reference).

"Liquidated  Damages" m eans the $500,000 in dam  ages and related guarantees described in Section 12 of the Letter of Intent.

"Material Adverse Change" means, since the date of this Ag reement, any change, effect, event, o  ccurrence, d evelopment, circum stance or state of facts occurs which has had or would reasonably be expected to have a materially adverse effect on the business, properties, prospects (financial or otherwise), operations, financial condition or results of operations of  the Debtor, taken as  a whole, or w hich would m aterially impair the Debtor's ability to p erform its obliga tions under this Agreement or have a m aterially adverse effect on or prevent or m aterially delay the con summation of the trans actions contemplated by this Agreement.

"Mechanics' Lien Claim  s" m eans all allowed claim  s arising und er or relating to work of i mprovement that arose  prior to, and rem ain unpaid as of, the Plan Effective Date and that are duly perfected.

"Outside Date" means August 22, 2011, unless such date is extended by written agreement of Greystar (such agreement to be granted or withheld in Greystar's sole discretion).

"Parties" has the meaning set forth in the preamble hereof.

"Plan" means a chapter 11 plan of reorganization under the Bankruptcy Code, which shall be substantially consistent with this Agreement, the Plan Term Sheet and the Plan Support Agreement Order, and otherwise acceptable to Greystar in Greystar's sole discretion and reasonably acceptable to the other Parties.

"Plan Definitive Documents" has the meaning set forth in section 3 hereto.

"Plan Effective Date" means the date on which the Plan becomes effective.

"Plan Support Agreement Order" means an order in the form and substance acceptable to Greystar that, among other things, (a) memorializes and implements the terms of this Agreement, (b) approves the Borrower Parties Designation Agreement and, subject to the terms thereof, irrevocably designates Greystar as the Purchaser under the BofA Settlement, (c) requires the Debtor to file a Plan that provides for (i) Greystar to receive 100% of the equity interests of Roosevelt Lofts, LLC as reorganized (or such entity that holds, as of the Plan Effective Date, such equity interests) free and clear of all liens, claims, encumbrances and interests, (ii) approves and allows the BofA Claim as of the earlier of (A) the Effective Date or (B) the date on which Greystar acquires the BofA Claim (x) in an amount reasonably acceptable to Greystar, but in no event less than an amount equal to $78,422,049.33 plus interest at the default rate and all fees, charges and other costs which have accrued under the BofA Loan Agreement from and after September 3, 2009, and (y) as perfected, valid and duly enforceable (without any defense, counterclaim, right of offset or subordination, or any other claim or challenge by any party in interest) with first priority security against the Property subject only to the Mechanics' Lien Claims as described in the BofA/Mechanics' Lien Settlement Order and (iii) if the Plan has not been performed in accordance with its terms by the Outside Date, automatic in rem relief from stay for Greystar (as holder of the BofA Claim) on the Plan Effective Date to foreclose on the Property (pursuant to the Foreclosure Right) on the tenth day following the Outside Date (with such timing held to be commercially reasonable for the exercise of the Foreclosure Right), (d) approves the Greystar Receivership Stipulation and authorizes and directs the Debtor to perform under and in accordance with its terms and (e) (i) approves and authorizes and directs the Debtor to take all steps necessary to implement the 363 Purchase Right, (ii) obtain entry of the Bidding Procedures Order, (iii) obtain approval of the 363 Order on or before the 363 Sale Outside Date and (iv) authorizes Greystar to take all of the foregoing steps if the Debtor fails to timely take such steps.

"Plan Term Sheet" has the meaning set forth in the recitals hereto.

"Purchaser" has the meaning set forth in the recitals hereto.

LNBYB000007

"Property" m eans that certain real property located at 7      27 W est 7th Street, Los Angeles, California, and all      improvements, personal property (including, without limitation, all accounts of    the Debtor , all funds and assets therein, and      all Property described on Exhibit G hereto) and other rights related to or appurtenant to such improvements, personal property and real prope rty and any other collateral securing the BofA Claim.

"Restructuring" has the meaning set forth in the recitals hereto.

"RLI" has the meaning set forth in the preamble hereof.

"Termination Date" has the meaning set forth in section 6 hereto.

"Termination Event" means the occurrence of a ny of the events set forth in section 6 hereto.

"Voting Deadline" m eans the date fixed by th e Bankruptcy Court as the deadline for holders of claims to vote on the Plan.  The record date for voting claims shall be the Voting Deadline.

3.    Obligations of the Par ties.  Subject to the ter ms and conditions of this Agreement and the Plan Term Sheet, each of th e Parties agrees, subject to the Termination Date (as defined below in section 6 hereof), as follows with respect to the Restructuring and the Plan:

a.    to prom ptly negotiate, in good faith, the d      efinitive docu ments implementing, achieving and relating to the Re structuring and the Plan, including, but not limited to, (i) the Dis    closure S tatement and   the Plan an d (ii) all o   ther agreements, documents, exhibits (whether to this Plan    Support Agreem ent or otherwise), annexes, schedules and orders of  the Bankruptcy Court  that are necessary or  app ropriate f or the Restructuring and the prom pt consummation of the Restructuri ng and the Plan (all of the foregoing, collectively with this A    greement, the Plan Term   Sheet, the Plan and the Disclosure Statement, and in each case as am ended, modified or supplemented from time to tim e in acco  rdance with  the term  s hereof or th    ereof, the "  **Plan Defin itive Documents**"); provided  that, in e ach case,  su ch Plan De finitive Docum ents shall not contain terms or conditions which are m aterially inconsistent with th e Plan Term  Sheet and shall otherwise be reasonably acceptab le in form and substance to the Parties (excep t as otherwise provided in this Agreement); and

b.    to promptly execute and deliver  all Plan Definitive Docum ents (to the extent a Party thereto), and otherwis e support the prompt consummation of the transactions contem plated by, th e Plan   Definitive Do cuments, including without limitation, to timely cast an appropriate ballot or ballots in favor of the Plan.

c.    to not object to, or support any  action or proceeding or take any other action that would, or    would reasonably be expected  to, im pede or delay, the consummation of the Restructuring, the appr  oval of  the Disclosur e Statem ent or th e confirmation or consummation of the Plan;

d.      to not vote for, consent to, intentionally induce or participate, directly or indirectly, in the formation,        filing or prosecution of any other plan of reorganization or liquidation (or disclosure stat ement related thereto) with respect to the Debtor that is in consistent with the Plan or the consumm ation of the R estructuring and the Plan;

e.      other than as expressly contem plated herein o r in the Plan Term Sheet, to not directly or indirectly seek, solic it or encourage any other plan, sale, proposal or offer of winding up, liquida tion, reorganization, m erger, consolidation, dissolution or restructuring of the Debtor or any of its assets;

f.      to not comm ence or support any ac tion or proceeding to appoint a trustee, con servator, receiver or ex aminer with expanded powers for the Debtor, or to dismiss the Bankruptcy Case, or to convert  the Bankruptcy Case to  a case under Chapter 7 of the Bankruptcy Code; and

g.      to use its comm ercially reasonabl e efforts to obtain Bankruptcy Court appro val of the Disclosure Statem ent and Plan as prom ptly as possible and to consummate the Restructuring and the Plan on  or before the Plan Effective Date, subject to the term s and conditions  set f orth h erein, the  Plan Term  Sheet, the  Disclosure Statement and Plan.

4.      Obligations of Greystar.

a.      Support of Restructuring and Plan    .  Subject to the term    s and conditions of this Agreem ent and the Plan Term   Sheet ( including entry of the Plan Support Agreem ent Order), Greystar further ag rees that, until this Agreem ent has been terminated in accordan ce with section 6 here    of, it sh all, s ubject to its receipt of   a Disclosure Statem ent and related voting    and solicitation m aterials approved by the Bankruptcy Court, (i) vote a  ny an d all BofA Claim  s it holds to accept th   e Plan in accordance with th e ap plicable p rocedures se t forth in  the Disclosu re Statem ent and accompanying voting and solicitation m aterials, and (ii) return a du ly-executed ballot in connection therewith no  later than the dead line for voting on the Plan, and not (and not seek to) withdraw, ann ul, rescind, m odify or revoke such vote to accept the P      lan; provided, however, Greystar sh all not be obligated to vo te to accept the Plan, and m ay withdraw or revoke its vote w  ith respect to the Plan, upon (A  ) the term ination of this Agreement (provided , that if  Greystar is the te  rminating party, Greys tar is not th en in material breach of its obligations under th      is Agreem ent); or (B) the withdrawal, amendment, modification of, or the filing of a pleading by any of the other Parties hereto seeking to withdraw, a mend or modify, the Plan or the oth er Plan Definitive Documents in a manner that is adverse to Greystar.

b.      Acquisition of BofA Claim.  Subject to the terms and conditions of this Agreement and the Plan Term Sheet (including entry of the Plan Support Agreem ent Order), the Claim    As signment and the Bo     rrower Parties Designation Agreem   ent, Greystar further agrees that, at its option, Gr  eystar will (i) acquire (by assignm ent) the BofA Claim from Bank of Am erica for a  cash payment of ███████ on or before the

LNBYB000009

Plan Effective Date or (ii) if Greystar does not previously acquire the BofA Claim prior to the Plan Effective Date, satisfy the BofA Claim in full by cash payment of ██████████ through the Plan. Notwithstanding anything contained herein to the contrary, following the assignment of the BofA Claim to Greystar (or its designee), the amount of the BofA Claim for voting, distribution, the Foreclosure Right, the 363 Purchase Right and all other purposes shall be the full face amount of the BofA Claim, plus all accrued and unpaid interest (including default interest) and other expenses/costs that constitute the BofA Claim. Greystar shall make the deposits described in Section 9 of the Letter of Intent, and such deposits shall be subject to the terms and conditions set forth in this Agreement, the Plan Term Sheet (including entry of the Plan Support Agreement Order), the Letter of Intent and the Escrow Agreement.

        c.    <u>Payment of Broker's Commission</u>. Greystar believes that no Broker's Commission is due and payable. To the extent the Broker's Commission becomes due and payable, Greystar shall pay the Broker's Commission. Nothing contained herein shall be deemed to make the Broker a third-party beneficiary of this Agreement. Greystar will indemnify and defend Debtor and RLI against, and hold such Parties harmless from, any claim by Broker with respect to compensation in connection with this Agreement, the consummation of the transactions contemplated hereby or in connection with the sale of the Property to Greystar. Debtor and RLI agree that each will indemnify and defend Greystar, and hold Greystar harmless from, the claims of any other broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Debtor or RLI, or otherwise to be entitled to compensation in connection with this Agreement, the consummation of the transactions contemplated hereby or in connection with the sale of the Property to Greystar.

        d.    <u>Right to be Heard</u>. Nothing contained herein shall limit the ability of Greystar, as holder of the BofA Claim or otherwise, to appear and be heard, concerning any matter arising in the Bankruptcy Case so long as such appearance is not materially inconsistent with its obligations under this Agreement, the Plan Term Sheet, the Restructuring or the Plan or is not for the purpose of hindering, delaying or preventing consummation of the Restructuring or the Plan.

        5.    <u>Obligations of the Debtor and RLI</u>.

        a.    To the extent Greystar does not acquire the BofA Claim before the Voting Deadline, the Debtor will use its best efforts to enter into an agreement with Bank of America to ensure that Bank of America shall vote the BofA Claim in favor of the Plan so such vote is timely received on or before the voting deadline

        b.    From and after the date hereof, so long as Greystar is willing to perform hereunder, the Debtor and RLI hereby agree that each will not accept offers with respect to any transaction involving or relating to a potential acquisition of the BofA Claim, the Property, the Debtor, RLI or RLI's membership interests in the Debtor (including, without limitation, through a plan of reorganization).

LNBYB000010

c.      The Debtor and RLI will prov    ide such af fidavits and  other documentation the title company may require to issue the title insurance contemplated by Section VI(Q) of the Plan Term Sheet.

d.      The Debtor and RLI will (i) not amend, modify, terminate or waive any prov ision of  the Bof A Settle ment, and ( ii) caus e G reystar to b  e des ignated the Purchaser f or purposes  of the BofA Settlem    ent and in the Bankruptcy Court o      rder approving the BofA Settlem ent. Subject to    the satisfaction or waiver of Greystar's obligations hereunder, the fo     regoing designations shall be     irrevocable or further encumber or transfer any interest in the Property or any portion thereof.

e.      The Debtor and RLI will (i) pro    mptly negotiate, in goo  d f aith, execute and  deliver all docum    ents necess ary for, and oth  erwise supp ort, the p  rompt consummation of the transactions contemplated by, at the sole discretion of Greystar, the Foreclosure Right and the 363 Purchase Right,  (ii) not object to, or support any action or proceeding or take any   other actio n that w  ould, or would reasonab  ly be expected to, impede or delay, the consummation and Bankr  uptcy Court approval of the Foreclosure Right, the 363 Purchase Right, entry of the  Bidding Procedures Order and the 363 Order, and (iii) use commercially reasonable efforts to obtain Bankruptcy Court approval of the Bidding Procedures Order and the 363 Order as promptly as possible.

f.      Debtor and RLI will pr  ovide Greys tar with co  pies of all of  the documents comprising the BofA Loan Agreem ent that are in the posse ssion or control of Debtor, RLI or their respective agents or cons    ultants, toge ther with a list of   all s uch documents, in each case within fourteen days of the date of this Agreement.

6.      <u>Termination of Obligations</u>.

a.      This Agree ment shall te    rminate, and (exc  ept a s oth  erwise specifically set forth herein) all of the rights and  obligations of the Parties hereunder shall be of no further force o  r effect, in the event   that (i) the Par ties m utually agree to s uch termination in writing   o r ( ii) th is Agreem ent is  te rminated pursuan t to the  rem aining paragraphs of this section 6.

b.      Each Party may terminate this Agreement by written no tice to the other Parties upon the occurrence of any of the following events:

(1)      a m aterial breach by any other Party of its       respectiv e obligations, representations or warran ties under (i) this A   greement, the Plan Term  Sheet, or a  ny other Def inite Docum ent or (ii) the Pla    n Support Order, which m aterial breach  is not cured on or   within three (3) business days after the gi ving of written notice of such breach to the other Parties or, if applicable, on or with   in the cure period provided for under the applicable agreements or documents; and

(2)      the issuance by any governm ental authority, including any regulatory authority or court of comp  etent jurisdiction, of any ruling or order enjoining or restraining the       consummation of the Restructuring

LNBYB000011

and/or the confirmation and consummation of the Plan on the terms and conditions set forth herein and the Plan Term Sheet.

c.      Greystar may terminate this Agreement upon by written notice to the other Parties upon the occurrence of any of the following events:

(1)      the occurrence of a Material Adverse Change;

(2)      the failure of the Plan Effective Date to occur on or before the Outside Date;

(3)      the Debtor fails to file a motion (in form and substance reasonably acceptable to Greystar) seeking Bankruptcy Court Approval of the Plan Support Agreement Order on or before June 3, 2011 (or such later date as may be acceptable to Greystar in Greystar's sole discretion);

(4)      the Bankruptcy Court fails to enter the Plan Support Agreement Order on or before June 20, 2011 (or such later date as may be acceptable to Greystar in Greystar's sole discretion);

(5)      the Debtor fails to file the Bidding Procedures Motion on or before July 8, 2011;

(6)      the Bankruptcy Court fails to enter the Bidding Procedures Order or such order fails to become a Final Order on or before August 5, 2011 (provided, however, that the requirement of a Final Order may be waived by Greystar in its sole discretion);

(7)      the Bankruptcy Court fails, by Final Order entered on or before August 5, 2011, to schedule the 363 Sale Hearing on or before the 363 Outside Sale Date (provided, however, that the requirement of a Final Order may be waived by Greystar in its sole discretion);

(8)      the Bankruptcy Court fails to enter the 363 Sale Order or such order fails to become a Final Order on or before the 363 Outside Sale Date (provided, however, that the requirement of a Final Order may be waived by Greystar in its sole discretion);

(9)      the entry of an order by the Bankruptcy Court invalidating, disallowing or limiting in any respect, as applicable, the amount, enforceability, first priority (subject only to the Mechanics' Lien Claims), or validity of the of the BofA Claim or the liens securing the BofA Claim as described in the Plan Support Order;

(10)      the appointment in the Bankruptcy Case of a trustee or examiner with expanded powers;

(11)    the am ount of allowed Mechanics' Lien Claim    s or any reserve required by the Bankruptcy C ourt under the Plan with respect to the Mechanics' Lien Claims exceeds $16,000,000;

(12)    any of the representations or    war ranties se t f orth in th e Claim Assignm ent is or becom e untr ue or incorrect (provided, however, that the Liquidated Damages shall not be payable to Greystar solely due to a breach of a representation or wa  rranty by Bank of Am erica under the Claim Assignm ent, unless th e facts or circum stances giv ing rise to su ch breach of such representation or warranty also constitute a separate breach or circum stance which would entitle   Greystar to rece ive th e Liquid ated Damages);

(13)    any of the r epresentations or warranties of Debtor or RLI set forth in this Agreement is or become untrue or incorrect;

(14)    any of the representations or warranties of any Debtor Related Party (as defined in the Borr ower Parties Designation Agreem ent) set f orth in  the Bor rower Parties Designation Agreem ent is o r be come untrue or incorrect;

(15)    any Debtor Related Party (as defined in the Borrower Parties Designation Agreem    ent) br eaches any of its covenants or agreements under the Borrower Parties Designation Agreement; or

(16)    the Bankrup tcy Court f ails to en ter an order on or before June 14, 2011 approving the BofA Settlem    ent (in form  and substance reasonably acceptab le to Greystar) that  irrevocably (sub ject to Greys tar's performance hereunder) designates Grey  star as the Purchaser under the BofA Settlement (the "**BofA/Debtor Settlement Order**").

d.    The date o n which this Agreem ent is term inated in a ccordance with this section 6 shall be referred to as the "**Termination Date**".

e.    If this Agre ement is ter minated pursuant to th is section 6, then all further obligations of the Parties hereunder sh  all be term inated without further liability related to th is Agreem ent; provided that Greystar sha ll h ave the righ t to the Liqu idated Damages; and provided  further  that Greystar shall be un    conditionally authorized to exercise the Foreclosure Right  and the 363 Purchase Right a  nd to proceed with the 363 Auction and 363 Sale Hearing, and nothing contained herein sh all prevent Greystar from exercising the Foreclosure Right and the 363 Purchase Right and to proceed with the 363 Auction and 363 Sale Hearing; and provided  further that in the event the  Debtor fails to timely file the Bidding Procedures Motion or any other motion or document related to the exercise by Greystar of the 363 Purchase Right,   Greystar shall be authorized to file any such m otion or docum ent in its sole discre  tion. Notwithstanding an y p rovision in this Agreement to the contr ary, the r ight to term inate this Agreem ent under this s ection 6 shall not be available to any   Party whose failure to f ulfill any material obligation under

this Agreement has been the cause of, or resulted in, the occurrence of the applicable Termination Event.  The provisions of this Section 6(e) shall survive any termination of this Agreement.

7.    Representations of the Debtor.  The Debtor hereby represents and warrants to each other Party as follows as of the date hereof:

a.    Corporate Power and Authority.  It has all requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement and the Plan Term Sheet, subject only to entry of appropriate orders by the Bankruptcy Court.

b.    Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part, other than the requisite approvals of the Bankruptcy Court.

c.    No Conflicts.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than as a result of the commencement of the Bankruptcy Case.

d.    Governmental Consents.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Bankruptcy Case.

e.    No Litigation.  No litigation or proceeding before any court, arbitrator or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder (other than the Bankruptcy Case).

f.    Binding Obligation.  Subject to entry of the Plan Support Agreement Order, this Agreement is the legally valid and binding obligation of the Debtor, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

g.    Debtor owns all of the Property, and no other person or entity has any ownership interest in the Property or any portion thereof.  To Debtor's knowledge, there are no liens, encumbrances or title defects of any kind affecting the Property, except those described in that certain Preliminary Report prepared by First American Title Insurance Company, May 24, 2011 Update, Order No. NCS-383344-LA2.

LNBYB000014

h.      [Intentionally Omitted.]

i.      As of the date hereof, a m inimum of $78,422,049.33 plus interest at th e defau lt rate and all fees, charges a nd other costs w hich have accrued under the BofA Loan Agreem ent from and after Sept ember 3, 2009 is owed by Debtor under the BofA Claim.

j.      Attached hereto as <u>Exhibit I</u> is a description of all bank accounts of the Debtor, and the amount of the deposits therein as of the date hereof.

k.      Attached hereto as <u>Exhibit J</u> is a true, correct, complete and current rent roll for the Property that describes all l eases, subleases and other occupancy agreem ents affecting the Property, and all security deposits received by Debtor in connection therewith.

8.      <u>Representations of RLI and Greystar</u>.  Each of RLI and Greystar severally (but not jointly) represents and warrants to the other Parties as follows with respect to itself only and as of the date hereof:

a.      <u>Corporate P ower and Authority</u> .  It has all requi site co rporate, partnership or limited liability company power and authority to enter into this Agreem ent and to carry out th e transactions contemplated by, and perform its obligations under, this Agreement.

b.      <u>Authorization</u>.  The execution and delivery of this Agreem ent and the performance of its obliga tions hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

c.      <u>No Conf licts</u>.  The execution, delivery and perform ance by it of this Agreement do not and shal l not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiar ies or its certificate of incorporation or bylaws or other organizational docum ents or those of any of its subs idiaries o r ( ii) conf lict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

d.      <u>Governmental Consents</u>.  The execution, delivery and perform ance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action       to, with or by, any fe deral, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Bankruptcy Case.

e.      <u>No Litigation</u> .  No litigation or proceed ing before any court, arbitrator or adm inistrative or governm ental body is pending against it that would adversely a ffect its ab ility to enter in to this Agreem ent or pe rform its oblig ations hereunder (other than the Bankruptcy Case).

f.      <u>Binding Obligation</u> .  Subject to entry of the P lan Support Agreement Order, this Agreem ent is the leg ally valid an d binding obliga tion o f it, enforceable against it in accordance with its terms, except a s such enforceability may be

LNBYB000015

limited by bankruptcy, insolvency, fraudulen    t conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

9.      Entire Agreement; Prior Negotiations. This Agreem ent, the LOI and the Plan Term Sheet and the Borrower Parties Designation Agreement, including any exhibits to any of the foregoing, set forth in full the term  s of agreement between and among the Parties and is intended as the f ull, co mplete and exclus ive  contract governing the re  lationship between and among the Parties with respect to    the transactions contemplated  herein, superseding all other discussions, prom ises, representations, warran  ties, agreem ents and understandings, whether written or oral, between or among the Parties with respect to the subject matter hereof; provided, that any confidentiality agreement between or among any of the Parties shall remain in full force and effect in accordance with its term s.  No repr esentations, oral or written, other th an those set forth herein, may be relied on by any Party in connection with the subject matter hereof.

10.      Amendment or W aiver.  No waiver, m  odification or am endment of any term or pro vision of this Agreem ent, the LOI o r the Plan Term Sheet s hall be v alid unless such waiver, modification or am endment is in writin g and has been signed by the Party affected by such waiver, modification or amendment.  No waiver of any of the provisions of this Agreement, the LOI or the Plan Term  Sheet shall be d eemed or constitute a waiver of any other provision of this Agreement, the LOI or the Pl an Term Sheet, whether or not si milar, nor shall any waiver be deemed a continuing waiver.  Any m    odification  of this  se ction 10 sh all requ ire the writte n consent of all Parties.

11.      Miscellaneous.

a.      Governing Law .  This Agreem    ent shall be governed by, and construed in accordance with, the laws of the Stat e of Calif ornia, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreemen    t, each of the Parties   hereby irre vocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or  proceeding, may be brought in th e United States Ba nkruptcy Court f or the Ce ntral Distric t of Califo rnia, a nd by e xecution and delivery of this Agreement, each of the Part ies hereby irrevocably accepts and submits itself to the exclusive jurisdiction of    such court, generally and unc  onditionally, with respect to any such action, suit or proceeding, but only for such action, suit or proceeding.

b.      Specific Performance.  It is understood and agreed by the P  arties that money damages would not be a sufficient rem edy for any breach of this Agreem ent by any Party and each non-breaching Party shall be entit  led to specific perform ance and injunctive or other equitable relief as a rem edy of any such breach, incl uding, without lim itation, an order of the Bankruptcy Court or other court of com    petent jurisdiction requiring any Party to com    ply promptly with any of its obligations hereunder.

c.      Reservation of Rights   .  Except as expressly provided in this Agreement or in the Plan Term    Sheet, noth ing he rein is in tended to, o r does, in any m  anner, waive, lim it, im pair or r estrict the a bility of RL I or Greystar to protect   and preserve its rights,

remedies and interests, including its claim    s, against the Debtor.  If the Restructuring contemplated here in an d in th e Pla n Term Sheet is  not co nsummated, or if  th is Agreem ent is terminated for any reaso n, the Pa rties hereto fully reserve any and all of   their respective rights and remedies.

        d.    <u>Headings</u>.  The section heading    s of this    Agreem ent are for convenience of reference only and shall not, for        any purpose, be deem ed a part of thi    s Agreement.

        e.    <u>Notice</u>.  All notices, requests and  other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile or electronic transm ission or m ailed (first class postage prepaid) to the parties at th  e following addresses, email addresses, or facsimile numbers:

If to the Debtor:

Roosevelt Lofts, LLC
c/o Milbank Real Estate Services, Inc.
Attention:  M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

*with a copy (which shall not constitute notice) to*:

David L. Neale, Esq.
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Fax:  (310) 229-1234
Email:  DLN@LNBYB.COM

If to RLI:

The Roosevelt Lofts, Inc.
c/o Milbank Real Estate Services, Inc.
Attention:  M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

*with a copy (which shall not constitute notice) to*:

Homan Taghdiri, Esq.

16

LNBYB000017

General Counsel
Milbank Real Estate Services, Inc.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax: (213) 403-1440
Email: htaghdiri@milbankre.com

If to Greystar:

Greystar GP, LLC
Attention: A. Joshua Carper
3rd Floor
18 Broad Street
Charleston, NC 29401
United States of America
Fax: (843) 579-9420
Email: jcarper@greystar.com
*with a copy (which shall not constitute notice) to*:

Robert A. Klyman, Esq.
Latham & Watkins LLP
355 S. Grand Ave.
Los Angeles, CA 90071
Fax: (213) 891-8763
Email: robert.klyman@lw.com

f.      <u>Successors and Assigns, No Third-Party Beneficiaries</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives, including, without limitation, any chapter 11 or chapter 7 trustee appointed in the Bankruptcy Case. For avoidance of doubt, Greystar reserves the right to assign this agreement to a designee or affiliate but, notwithstanding such assignment, shall remain liable for all of the obligations of Greystar under this Agreement, the LOI and the Plan Term Sheet. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Person or entity shall, or shall be deemed to, be a third party beneficiary hereof.

g.      <u>Severability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

h.      <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this agreement may be delivered by facsimile or electronic mail which shall be deemed to be an original for the purposes of this Agreement.

i.    <u>Acknowledgement</u>.  This Agreem ent is not, and shall not be deemed to be, an offer    for the purchase, sale   , exchange, hypothecation, or other transfer of securities for any purpose or a so licitation for consents to or vot es on the Plan.  The vote of any holder of any claim  against or interest in the Debtor on or with re spect to the P lan shall not be solicited until it has received (or concurrently with the delivery of) the Disclosure Statem ent and the Plan.

j.    <u>Public Disclosure</u>.  Each of the Debtor and RLI will use its best efforts to (and will caus e each of their respective affiliates and insiders to) submit to Greystar in advance for approval all press releases and public    filings re lating to this Agreem ent, the Term Sheets, o r the transactions contem plated here by and thereby and any am    endments thereof. Except as re quired by applicable law, the Debtor and RLI (and each of t heir respective affiliates and insiders) shall not use the nam e of any Party  in any press release without such Party's prior written consent.

k.    <u>No Strict C onstruction</u>.  This Agreem ent and all other agreem ents and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties her eto or there to.  Neither the provisions  of this Agreem ent or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that su ch Party or such Party's counsel drafted this Agreement or such o ther ag reements and do cuments, or based on any ot    her rule of strict construction.

l.    <u>Representation</u>.  Each P arty has been represented by counsel of its choosing in connection with this Agree      ment  and the transactions contem    plated by this Agreement, the LOI and Plan Term Sheet.

m.    <u>WAIVER OF JURY TRIAL   </u>.  EA CH O F TH E PA RTIES TO THIS AGREEMENT HEREBY I RREVOCABLY WAIVES ALL RIGHT TO A TRIAL   BY JURY IN ANY ACTI ON, P ROCEEDING OR  COUNTERCLAIM ARISING OUT OF O   R RELATING TO THIS AGREEM     ENT OR TH  E TRANSACTIONS CONTEMPLATED HEREBY.

n.    <u>Time Periods</u>.  If any time period or other deadline provided in this Agreement expires on a day that is not a Busine ss Day, then such tim e period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

*[Remainder of page intentionally left blank; signature pages follow]*

IN W ITNESS W HEREOF, the Parties he   reto have caused this Plan Support
Agreement to be duly executed and delivered by their respective duly authorized officers,
all as of the date and year first above written.

GREYSTAR GP, LLC,
a Delaware limited liability company


By: _____
Na        me:
Title         :


ROOSEVELT LOFTS, LLC,
a California limited liability company

By:  The Roosevelt Lofts, Inc.
     Its:  Managing Member

     By: _____
         M. AARON YASHOUAFAR
Presiden          t


THE ROOSEVELT LOFTS, INC.,
a California corporation

By: _____
     M. AARON YASHOUAFAR
     President


M. AARON YASHOUAFAR

_____


SOLYMON YASHOUAFAR

_____


SIMON BARLAVA

_____

LNBYB000020

**<u>Exhibit A</u>**

**Plan Term Sheet**

**(see attached)**

LNBYB000021

**CONFIDENTIAL AND PRELIMINARY**

**ROOSEVELT LOFTS LLC (THE "DEBTOR")**
**TERM SHEET FOR PLAN OF REORGANIZATION**
**PROPOSED BY THE DEBTOR, ROOSEVELT LOFTS, INC. ("RLI") AND GREYSTAR**
**GP, LLC OR ITS DESIGNEE (COLLECTIVELY, "GREYSTAR")**

This term sheet is p repared for the pur pose of facilitating di scussion of a possible restructuring of the Debtor, whose chapter    11 case, case no. 09-14214 GM (the "Bankruptcy Case") is pending before the Unit    ed States Bankruptcy Court fo    r the Central District of California (the "Bankruptcy Court").  The term sheet sets forth certain major terms of a possible restructuring, but additio nal terms a nd conditio ns, m aterial to the trans action, are not set forth herein.  This term sheet is not , and should not be deem ed, a soli citation for votes on a plan of reorganization contain ing the ter ms outlined herein.  Subject to a    pplicable or ders of the Bankruptcy Court and satisfaction of conditions        described herein and    in the Plan Support Agreement, nothing contained herein shall in part   or in whole constitute an offer suscepti ble of acceptance of a legally binding obliga tion.  Th is Term Sheet is not an offer with respect to an y securities or solicitation of accep tances of a chapter 11 plan.  Su ch offer or solici tation only will be made in com pliance with all app licable securities laws and/or provi sions of the Bankruptcy Code.  This Term She et is part of, and will   be attach ed to, the Plan Support Agreem ent (the "Plan Support Agreement ") am ong the Debtor, RLI and Greystar and is subject to the term    s thereof.  Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan Support Agreem ent.  For purposes   of this term sheet, the Debtor , R LI and Greystar shall be referred to as the "Plan Proponents ."  Roosevelt Lofts, LLC, as de btor and debtor in possession in the Bankruptcy Case  shall be ref erred to he rein as the " Debtor," and as reorganized on and after the Effective Date (as defined below) as the "Reorganized Debtor."

The Plan will be funded by a cash paym ent of $95,000,000 by Greystar (the "Greystar Contribution").  Greystar will apply the Greystar    Contribution as fo llows: ▮▮▮▮▮▮▮▮▮       (the "Bank of Am erica Payment") for paym ent to Bank of Am erica (for itself, and as agent for the bank group) (colle ctively, "BofA ") for its allowed secure d claim (the "BofA Claim   "), the amount necessary to pay (or create a reserve for paym ent of) all other allowed claim s in full and render such claim s unimpaired (the "Creditor Paym ents") as of the Effective Date (defined below), and the rem ainder of the Greystar Cont ribution (net of the B ank of Am erica Payment and the Cre ditor Payments) shall be  paid on the E ffective Date to RLI, as  holder of all of the membership and equity  inter ests in the Debtor   (the "RLI Paym ent").  In exchan ge for the Greystar Contribution, on the Effective Date (def ined below), and (i) after Greystar has acquired the BofA Claim  or (ii)  concurrently with su ch tim e as the BofA Claim has otherwise been satisfied through the Plan, Greystar will receive all of the interests in the Reorganized Debtor or, at Greystar's option, all of the interests in an          entity th at holds all of the interests in the Reorganized Debtor, free and clear of all lien     s, claim s, encum brances and interests (th e "Reorganized Debtor Interests").  For the avoidance of doubt, the  Property shall be transferred to the Reorganized Debtor free and clear of all liens, claims, encumbrances and interests.

The proposed plan of    reorganiza tion for the Debtor (the "Plan___") will con tain the following classes of claim s and treatm ent for credito rs in tho se classes.  Except as expressly s et

forth below, all distributions will be made on the effective date of the plan of reorganization or as soon as practicable thereafter (the "Effective Date"). At Greystar's election, the structure of the transaction described herein (but not the consideration delivered by Greystar under the Plan) may be modified to reflect tax, accounting and other considerations. The Plan will establish a reserve to ensure payment of any claims allowed and payable after the Effective Date.

## I. UNCLASSIFIED CLAIMS

    A. Allowed Administrative Claims[1].

  1.        *General*. Except as set forth below, Allowed Administrative Claims, other than Allowed Administrative Claims of Insiders,[2] shall be paid in full in cash on the later of (a) 60 days after such claims are allowed or (b) the Effective Date.

  2.        *Statutory Claims*. All fees payable pursuant to 28 U.S.C. Section 1930 shall be paid in full in cash.

  3.        *Professional Claims*. Professionals shall file final fee applications within 60 days after the Effective Date. Promptly after allowance, professional fees shall be paid in full in cash.

  4.        *Postpetition Ordinary Course Liabilities*. Allowed Postpetition Ordinary Course Liabilities (other than tax claims) incurred prior to the Effective Date shall be paid in full in full in cash on the Effective Date (or if incurred but not yet due as of the Effective Date, then paid when due in the ordinary course out of a reserve established under the Plan from the Greystar Contribution).[3]

---

[1] To the extent such claims are allowed after the Effective Date, they shall be paid in full in cash promptly after such claims are allowed out of a reserve established under the Plan from the Greystar Contribution.

[2] All claims asserted against the Debtor by insiders of the Debtor, including without limitation RLI and Milbank Holding Corp., will be cancelled and no distribution shall be made under the Plan on account of such claims (including any and all administrative, priority, secured or unsecured claims).

[3] Funds in an amount equal to all security, pet or other deposits that (i) have been received by Debtor or its agents, or (ii) are hereafter received by Debtor or its agents prior to the Effective Date, in each case from any tenants of the Property (each a "Tenant") shall be placed in a reserve account controlled by the Reorganized Debtor. No Tenant shall be required to file a proof of claim in order to receive a refund of any such deposit funds which such Tenant is entitled to receive in the ordinary course of business; provided, however, that each Tenant's right to receive a refund of any deposit shall be determined in accordance with the provisions of each Tenant's lease or an estoppel certificate signed by the Tenant, and nothing in the Plan shall waive any of the Debtor's rights to withhold all or any portion of a Tenant's deposit if appropriate to do so under that Tenant's lease.

2

LNBYB000023

5.                *Postpetition Tax Claims.*  Postpetition tax claims shall be filed on the later of (a) 60 days after the   Effective Date or  (b) 1 20 days af ter the f iling of a tax r eturn with the applicable g overnmental unit, and s hall be pa id in f ull in c ash prom ptly af ter such claim s are allowed out of a reserve established under the Plan from the Greystar Contribution.

B. Priority Tax Claim s.  Each holder of an allo wed priority tax claim shall receiv e cash on the Effective Date in an amount equal to such allowed priority tax claim.  All allowed priority tax claims which are not due and payable on or be fore the Effective Date shall b e pro ra ted, so the amount that is due as of the Effec tive Date shall be paid on the Effective Date (or paid when due in the ordinary course of business in acco     rdance with the term s thereof out of a reserv e established under the Plan from the Greystar Contribution).

II.    CLASSIFIED CLAIMS AND INTERESTS

A.    Class 1, BofA Claim  :  On the Eff ective Date, the holder o f the Class 1 BofA Claim shall receive the Bank of America Paym ent in full satisfaction of its Class 1 BofA Clai m. In the event Greystar acquires the C lass 1 BofA Claim prior to the Eff ective Date, (i) Greystar will not re ceive the Ba nk of America Payment but instead will rec eive the Reorgan ized Debtor Interests on  the  Ef fective Date, a nd (ii)  th e Greystar Contributio n wi ll be re duced by ▇▇▇▇▇▇▇▇.

B.    Class 2, Allowed Mechanics' Lien Claims:  On the Effective Date, each holder of an Allowed Class 2 Mechanics ' Lien Claim shall receive cash on th e later of (1) th e Effective Date and (2) the date upon which such claim      becomes an Allowed Class 2 Mechanics' Lien Claim by Final Order of the Bankruptcy Court.      On the Ef fective Date , a reserve shall be established under the Plan from the Greystar Contribution for the benefit of m embers of Class 2 whose claim have not been allowed by Final Or der of the Bankruptcy Court; provided, however, that in no event shall the am ount of payments made on the E ffective Date to holders of Allowe d Class 2 M echanics' Lien Claim s and the fore going reserve exceed the s um of $16 m illion.  It shall be the responsibility of      RLI and the Debtor to object to      and/or resolve any Class 2 Mechanics' Lien Claim that is not allowed by  Final Order of the Bankruptcy Court as of the Effective Date.

C.    Class 3 et seq.; Allowed Other Secured Claim s.  Each secured credito r shall be in a Class by itself.  Each holder of  an Allowed Class 3A, 3B, et  seq. Secured Claim shall receive cash on the Effective Date in an amount equal to such Allowed Class 3 et seq.

D.    Class 4, Allowed Priority Non-Tax Claim  s.  Each holder of a Class 4 Priority Non-Tax Claim shall receive cash on the Effectiv e Date in an am ount equa l to s uch Allowe d Class 4 Priority Non-Tax Claim.

E.    Class 5, Allowed General Unsecured Claim  s.  Each holder of an Allowed Class General Un secured Claim will receive cash on the    Effective Date in an am ount e qual to su ch Allowed Class 5 General Unsecured Claim.

3

F.    Class 6, Allowed Equity Interests in Roosevelt. Holders of equity inter ests in the Debtor ( including witho ut lim itation m embership interests, stock, warran ts and options) shall receive the their pro rata shar e of the RLI Paym ent and, on the Effective Date, such equity interests shall be canceled.

All Allowed Claim s in Classes 2 through 5 shall be un impaired under the Pl an and deem ed to accept the Plan.

III.    MEANS FOR IMPLEMENTATION OF PLAN

A.    Sources of Cash for Distribution. The cash necessary for the Reorganized Debtor to make payments under the Plan shall be obtained from the Greystar Contribution.

B.    New Managing Member. The Managing Member of the Reorganized Debtor shall be selected by Greystar an d such m anaging member's identity shall be d isclosed on or prior to the date of the hearing on the approval of the Disclo sure Statem ent with respect to th e Plan. The remaining m embers of senio r m anagement will continue to s erve until the Ef fective Da te pursuant to their respective existing terms of compensation.

C.    Executory Contracts and No nresidential Real Property Leases: All exe cutory contracts and unexpired leases not specifically assumed or rejected prior to the date on which the Plan is confirmed, or set forth on a schedule of cont racts to be assum ed and/or rejected as of the Effective Date purs uant to the o rder conf irming the Plan (the "Confirm ation Order"), shall be rejected on and as of th e Effective Date. From and after the date hereof, Greystar shall have the sole right to determine, no later th an ten days prior to the h earing on co nfirmation of the Plan, which executory contracts and unexpired leases sh all be assum ed and which shall be rejected, including, w ithout lim itation, any contracts for sale of any condo minium units at the Property, and any contracts relating to the portions of the Property to be devoted to retail use.[4]

IV.    DISCHARGE AND RELEASES

A.    Discharge. On the Effective Date, all claim s against and equity inter ests in the Debtor shall be discharged and all persons and e ntities shall be precluded from asserting against the Debtor, the Reorganized Debt or or Greys tar any claim s ba sed on any act or om ission that occurred in whole or in part on or prior to the Effective Date.

B.    Release by the Debtor and Reorganized Debtor. On the Eff ective Date, the Debtor and Reorganized Debtor shall release all clai ms, rights and causes of action ag ainst (1) the current m embers, directors, officers and em ployees of the Debtor (other than for m oney borrowed from or owed to the Debtor by any such members, directors, officers or employees as

---

[4] Greystar assum es that all such contracts are of the type th at can be rejected, and intends to reject all of them . However, to th e extent tha t any such con tracts a re not executory contracts, Greystar intends that the Reorga nized Debtor shall not be a part y to such contracts following the Effective Date, and that all related damages will be paid as set forth above in Sections I and II of this Agreement.

4

LNBYB000025

set forth in the Debtor's books and records) an d the Debtor's agents and advisors (including lawyers), (2 ) the creditors' comm ittee and its a dvisors (so lely in their capacity as such), (3 ) Greystar, its af filiates, a nd their re spective of ficers, dir ectors, em ployees, partne rs, m embers, managers and advisors (includi ng lawyers) and (4) RLI an d its officers, directo rs, em ployees, partners, members, managers and advisors (including lawyers) (th e "Released Parties"), so long a such releases do not vitiate or impair coverage under any insu rance policies related to the Property.

C. <u>Release by Holders of Claims and Interests</u>. To the fullest extent permissible by law, on the Effective Date, all holders of claims against and inte rests in the D ebtor, in co nsideration for the obligations of Greystar, RLI, the Debto r and the Reorganized Debt or under the Plan, and the cash, stock of the Reorganize d Debtor and other docum ents delivered in connection with the Plan, shall be deemed to release each of the Released Parties from all claims, rights and causes of action again st the Relea sed Parties aris ing f rom or re lated to the Deb tor's pre- and/or post-petition actions, omissions or liabilities with respect to the Property.

## V. CONDITIONS TO CONFIRMATION

The conditions to confirm ation of the Plan sh all include those custom ary for c omparable transactions, including, without limitation:

A. The Bankruptcy Court shall have entered a Final Order approving the Plan Support Agreement (the "<u>Plan Support Agreem ent Order</u>") in form and substance negotiated by the Debtor, RLI and Greystar; provi ded that any changes to the Plan Support Agreem ent Order following the filing of such Plan Support Agreem ent Order shall be satisfactory to Greystar in Greystar's sole discretion and reasonably acceptable to RLI and the Debtor; and prov ided further that the Plan Support Agreem ent Order shall ha ve becom e a Final Order and not have been modified, amended or reversed;

B. The Bankruptcy Court shall have entere d an order approving the disclosure statem ent with respect to the Plan (the "<u>Dis closure S tatement Order</u>") in form and substance that is reasonably acceptable to the Plan Proponents, and the Disclosure Statem ent Order shall have become a Final Order and not have been modified, amended or reversed.

C. The Bankruptcy Court shall have entere d an order confirming the Plan and approving associated findings of fact and conclusions of law (coll ectively, the "<u>Confirm ation Order</u>") in form and substance satisfactory to Greystar in Greystar's s ole disc retion and the Conf irmation Order shall have becom e a Fina l Order and not have been m odified, am ended or reversed; provided, however, that the Confirm ation Order sh all be deem ed satisfactory to the Debtor and RLI so long as the Confirm ation Order does not de viate in any m aterial way from the term s set forth in this term sheet.

D. The Plan, the exhibits thereto and any Plan supplem ent (as confirmed or approved by the Conf irmation Orde r) shall b e in f orm and s ubstance satisfactory to Greystar in Greystar's reasonable discretion. The Plan, the exhibits th ereto and any Plan supplem ent (as confirm ed or approved by the Confirm ation Order) shall be de emed satisfactory to the Debtor and RLI so long as they do not deviate in any material way from the terms set forth in this term sheet.

LNBYB000026

E.  The Bof A/Debtor Settlement Order sh all have becom e a Final Order and not have been modified, amended or reversed.

## VI.  CONDITIONS TO EFFECTIVENESS

The conditions precedent to the    Effective Date shall in clude those custom ary for com parable transactions, including, without limitation:

A.  All conditions to confirmation of the Plan shall remain satisfied or waived in the sole discretion of the party who has the right to waive such condition or conditions.

B.  Each order of the Bankruptcy Court refe rred to in Section V above shall have become a Final Order and not have been modified, amended or reversed.

C.  All d ocuments and agreem ents to b e ex ecuted on the Ef fective Date or oth erwise necessary to implement the Plan (no t otherwise specified herein) shall be in for m and substance reasonably acceptable to the Plan Proponents.

D.  The Plan Proponents     shall have receiv ed any authorization, consent, regulatory approval, ru ling, letter, opinion, or docum ent that may be necessary to  implement the Plan and that is required by law, regulation, or order.

E.  The Reorganized D ebtor shall have r eceived title insu rance fr om a title  insurance company reasonably satisfactory to Greystar and on terms and conditions satisfactory to Greystar in Greystar's sole discretion and reasonably acceptable to the De btor and RLI, and the Property shall be in c ompliance with all m aterial restrictions, requirements and e ncumbrances applicable to the Property (other than the fact that the parking stalls are non-conforming).

F.  The Reorganized Debtor Interests shall ha ve been issued (free and clear of all liens, claims, encumbrances and interests) to Greystar in accordance with the Plan.

G.  All other actions, docum ents and agreem ents necessary to im plement the Plan as  of the Effective Date shall have been delivered and  all conditions precedent th ereto shall have been satisfied or waived.

H.  All corporate and other proceed ings to be taken by the Debtor in connection with the Plan and/or plan supplement and the consummation of the transactions contemplated thereby and by the Plan and all docum ents incident thereto shall have been co mpleted in form and substance reasonably satisfactory to Grey star; provided however that     the foregoing proceedings and documents shall be deem ed satisfactory to RLI a nd the Debtor so long as they do not deviate in any material way from the terms set forth in this term sheet.

I.  No event, condition or circum stance shall have occurred or aris en subsequent to the date of the Plan Support Agreem ent which has had  or could reasonably be expected to have or give rise to a Material Adverse Change.

J.  Subsequent to the date of the Plan S upport Agreement, there shall be no threatened or pending suit, action, investigati on, inquiry or other proceeding by or before any court of

6

LNBYB000027

competent jurisdiction (excluding the   bankruptcy case prior to the date of the Plan Support Agreement) which is likely to have a Material Adverse Change.

K  The Effective Date shall have occurred on or before August 22, 2011.

L.  The  managing m ember of the Reorgani  zed Debtor shall have been designated by Greystar as of the Effective Date, and the d irectors' and o fficers' liability insu rance sha ll b e available to the officers of the    Reorganized Debtor and such m    anaging m ember on term s reasonably satisfactory to Greystar.

M.  All waiting periods im posed by applic able law (including, without lim itation, under the Hart-Scott-Rodino Antitrus t Improvem ents Ac t of 1976, as amended, if applicab      le) in connection with the consummation of the Plan and transactions con templated thereby shall have expired or been term inated without any action  having been taken by  any court of com petent jurisdiction restraining, preventing or im      posing m aterially adverse conditions upon such transactions, and the Plan Proponents shall have       received all m aterial  regulatory approvals required for the consummation of the Plan and th   e trans actions contem plated th ereby and f or the Reorganized Debtor to continue to carry on  its businesses without m aterial change, each of which approvals shall have become final.

N.  Subsequent to the date of the Plan Support Agreement, the Debtor shall have operated in a m anner consistent with its or dinary course or business prior  to the date of the Plan Support Agreement.

O.  Greystar shall receive good and marketable title to the Property.

P.  The P roperty shall be free and   clear  of liens, claim s, interes ts and encum brances, except those specifically permitted by Greystar in Greystar's sole discretion.

Q.  Greystar shall ha   ve receiv ed an ow  ner's policy of title insura   nce in form and substance acceptable to Greystar in Greystar's s ole discretion, subject only to such exceptions as Greystar approves during the revi    ew process.  All existing in    surance policies of any kind (including without lim itation title insurance and property and casualty  insurance) related to the Property sha ll be m aintained in f ull force and  assigned to Greystar.  The Debtor and RLI shall not have done anything to impair coverage under any of the foregoing insurance policies.

R.  No Term   ination E vent (as defined in    the Plan Support Agreem   ent) shall have occurred.

Notwithstanding anything contained   herein to the con trary, Greyst ar s hall have th e exclusive right, in its sole dis cretion, to d eem satisfied o r waived any of the conditions set forth above in Sections VI.B, F, I, K, N, O, P and Q, and such determination by Greystar shall be binding on all Plan Proponents and other parties in interest.

* * * * *

06-03-2011

## Exhibit B

**Borrower Parties Designation Agreement**

**(see attached)**

LA\2263445.11

LNBYB000029

## **BORROWER PARTIES DESIGNATION AGREEMENT**

This Borrower Parties Designation Agreement (this "**Agreement**") is made as of June 3, 2011 by and among (i) Greystar GP, LLC ("**Greystar**"), (ii) The Roosevelt Lofts, Inc. ("**RLI**"), (iii) Roosevelt Lofts, LLC as debtor and debtor in possession (the "**Debtor**") in case no. 09-14214-GM (the "**Bankruptcy Case**") pending before the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), (iv) M. Aaron Yashouafar ("**M.A. Yashouafar**"), (v) Solymon Yashouafar ("**S. Yashouafar**") and (vi) and Simon Barlava ("**Barlava,**" and together with M.A. Yashouafar and S. Yashouafar, the "**Bank Guarantors,**" and with the Debtor and RLI, the "**Debtor Related Parties**"). Each of Greystar, RLI, the Debtor, M.A. Yashouafar, S. Yashouafar and Barlava are referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## **RECITALS**

WHEREAS, the Debtor and the Bank Guarantors have entered into that certain Settlement Agreement dated as of June 3, 2011 (the "**Bank Settlement Agreement**") with Bank of America, N.A., individually and as administrative agent for a group of lenders (as described more fully in the Settlement Agreement, the "**Bank Group**"). A true and correct copy of the Bank Settlement Agreement is attached hereto as <u>Exhibit A</u>. Capitalized terms not defined herein shall have the meaning ascribed to them in the Bank Settlement Agreement.

WHEREAS, pursuant to the Bank Settlement Agreement, the Debtor and the Bank Guarantors agreed to identify and cause a Purchaser other than the Debtor and the Bank Guarantors to purchase the Bank Group's interest in certain obligations, loan and security documents and agreements described in the Bank Settlement Agreement.

WHEREAS, Section 2 of the Bank Settlement Agreement calls for the Purchaser to make certain deposits of funds (the "**Deposits**") and to make timely payment of the Purchase Price on the Payment Date.

WHEREAS, the Debtor and the Bank Guarantors have requested that Greystar or Greystar's designee serve as the Purchaser.

WHEREAS, RLI as the holder of all of the membership interests of the Debtor will benefit from Greystar or its designee serving as the Purchaser, and has requested that Greystar or Greystar's designee serve as the Purchaser.

WHEREAS, the Debtor Related Parties have entered into this Agreement in order to, among other things, implement the terms and conditions of the Bank Settlement Agreement.

WHEREAS, Greystar, RLI and the Debtor have entered into that certain Plan Support Agreement dated as of June 3, 2011 (the "**Plan Support Agreement**"), pursuant to which and subject to the terms and conditions set forth therein, Greystar has agreed, among other things, to serve or have its designee serve as the Purchaser. It is a condition to the Plan Support Agreement that the Parties hereto execute this Agreement.

LNBYB000030

NOW, THEREFORE, in consideration of the recitals, covenants and conditions in this Agreement, and for valuable consideration, the Parties agree and follows:

1.    <u>Designation of Greystar or Greystar's Designee as Purchaser</u>.   Greystar or, at Greystar's option, Greystar's designee, is hereby designated as Purchaser under the Bank Settlement Agreement.   This designation is irrevocable as long as Greystar makes the Deposits into Escrow described in Section 2 of the Bank Settlement Agreement.

2.    <u>No Modification/Waiver/Amendment of the Bank Settlement Agreement</u>. None of the Debtor Related Parties (a) shall consent to or make any modification, waiver, amendment or termination of the Bank Settlement Agreement, any exhibits thereto, or any existing or future court orders approving the Bank Settlement Agreement or any exhibits thereto, or (b) shall permit any of their affiliates or direct or indirect subsidiaries to make any modification, waiver, amendment or termination of the Bank Settlement Agreement, any exhibits thereto, or any existing or future court orders approving the Bank Settlement Agreement or any exhibits thereto, in each case without the prior written consent of Greystar, which consent may be granted or withheld in Greystar's sole discretion.

3.    <u>Binding Nature of this Agreement</u>.   By signing below, each Party shall be bound to this Agreement as of the date hereof; provided, however, that the Debtor's obligations hereunder shall be subject only to entry  by the Bankruptcy Court of the Plan Support Agreement Order (as defined in the Plan Support Agreement).   The Parties shall use their respective reasonable best efforts to obtain entry of the Plan Support Agreement on an expedited basis, and in no event later than one (1) business day before the first Deposit is due under the Bank Settlement Agreement.

4.    <u>The Deposits</u>.   The Deposits shall be and remain property solely of Greystar.   In no event shall any of the Debtor Related Parties, or any other party other than Greystar,  have any legal or equitable right to any of the Deposits.   No holder of a claim against or interest in any of the Debtor Related Parties shall have any right to attach or claim to payment from any Deposit or Escrow.   If for any reason the Sale is not consummated on or before the Outside Date (as defined in the Plan Support Agreement), or if a Termination Event (as defined in the Plan Support Agreement) occurs, then in each case all Deposits shall be promptly returned to Greystar without need for further order of any court or approval of any party; provided, however, that if (i) such failure to consummate the Sale on or before the Outside Date (as defined in the Plan Support Agreement) occurs as a direct result of a default by Greystar of its obligations under the Plan Support Agreement (after satisfaction of the conditions to such obligations), and (ii) after receipt by Greystar of written notice of such default from any Debtor Related Party, Greystar failed to cure such default within ten (10) days after Greystar's receipt of such notice (provided that (a) such cure period shall in no event extend beyond such day as is one day prior to the Payment Date (as defined in the Bank Settlement Agreement), and (b) with regard to any such default relating to the making of Deposits pursuant to the Bank Settlement Agreement, such cure period shall be two business days commencing upon Debtor's transmittal of notice of such default to Greystar by facsimile or electronic transmission), then the Deposit

2

LNBYB000031

funds which have theretofore been placed in escrow by Greystar shall become non-refundable to Greystar.  The terms and conditions of this Section 4 shall be included in the Escrow Agreement.

5.     <u>Cooperation of Debtor Related Parties</u>.  The Debtor Related Parties waive all objections and will not oppose or cause any person or entity to oppose (a) any exercise by Greystar or its designee of the Foreclosure Right (as defined in the Plan Support Agreement), (b) any exercise by Greystar or its designee of the 363 Purchase Right (as defined in the Plan Support Agreement), or (c) the appointment of any receiver pursuant to the Greystar Receivership Stipulation (as defined in the Plan Support Agreement).  The Debtor Related Parties agree that they will reasonably cooperate with (i) any receiver in connection with the exercise of the  Foreclosure Right (as defined in the Plan Support Agreement), and (ii) Greystar or its designee in the exercise of any of their remedies hereunder or under the Plan Support Agreement (including, without limitation, the Foreclosure Right (as defined in the Plan Support Agreement)).

6.     <u>Representations</u>.

a.     Each Party severally (but not jointly) represents and warrants to the other Parties as follows with respect to itself only and as of the date hereof:

(i)     <u>Corporate Power and Authority</u>.  It has all requisite authority (whether corporate, partnership, limited liability company or individual power and authority) to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement, other than, with respect to the Debtor, the requisite approvals of the Bankruptcy Court.

(ii)     <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part, other than, with respect to the Debtor, the requisite approvals of the Bankruptcy Court.

(iii)     <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries, (ii) violate its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries, or (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it or any of its subsidiaries is a party.

(iv)     <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Bankruptcy Case.

(v)     <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

3

LNBYB000032

(vi)                              *Enforceability*.  This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

b.      Each Debtor Related Party severally (but not jointly) (i) represents and warrants to Greystar that the Debtor owns all of the Property (as defined in the Plan Support Agreement), and that no Debtor Related Party other than the Debtor has any right, title or interest in or to the Property (as defined in the Plan Support Agreement) or any portion thereof, and (ii) covenants not to, and not to cause any other person or entity to, take, remove or transfer any Property (as defined in the Plan Support Agreement) from the property located at 727 West 7th Street, Los Angeles, CA or from any accounts of Debtor.

7.      Entire Agreement; Prior Negotiations.  This Agreement, the Plan Support Agreement, Plan Term Sheet (as defined in the Plan Support Agreement) and the LOI (as defined in the Plan Support Agreement), including any exhibits to any of the foregoing, sets forth in full the terms of agreement between and among the Parties and is intended as the full, complete and exclusive contract governing the relationship between and among the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect to the subject matter hereof; provided, that any confidentiality agreement between or among any of the Parties shall remain in full force and effect in accordance with its terms.  No representations, oral or written, other than those set forth herein, may be relied on by any Party in connection with the subject matter hereof.

8.      Amendment or Waiver.  No waiver, modification or amendment of any term or provision of this Agreement shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Party affected by such waiver, modification or amendment.  No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.  Any modification of this section 8 shall require the written consent of all Parties.

9.      Miscellaneous.

a.      Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States Bankruptcy Court for the Central District of California, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, but only for such action, suit or proceeding.

4

LNBYB000033

        b.      <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

        c.      <u>Headings</u>.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

        d.      <u>Notice</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile or electronic transmission or mailed (first class postage prepaid) to the parties at the following addresses, email addresses, or facsimile numbers:

If to the Debtor:

Roosevelt Lofts, LLC
c/o Milbank Real Estate Services, Inc.
Attention:  M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

with a copy (which shall not constitute notice) to:

David L. Neale, Esq.
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Fax:  (310) 229-1234
Email:  DLN@LNBYB.COM

If to RLI:

The Roosevelt Lofts, Inc.
c/o Milbank Real Estate Services, Inc.
Attention:  M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

LA\2265146.7  borrower parties designation agreemetn

LNBYB000034

with a copy (which shall not constitute notice) to:

Homan Taghdiri, Esq.
General Counsel
Milbank Real Estate Services, Inc.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

If to the Bank Guarantors:

M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

with a copy (which shall not constitute notice) to:

Homan Taghdiri, Esq.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

Solyman Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email: syashoua@milbankre.com

with a copy (which shall not constitute notice) to:

Homan Taghdiri, Esq.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

Simon Barlava
2209 South Santa Avenue
Los Angeles, Ca, 90058
Fax:  (323) 277-1717
Email:  simon@designcollection.com

6

LNBYB000035

If to Greystar:

Greystar GP, LLC
Attention: Josh Carper
3rd Floor
18 Broad Street
Charleston, NC 29401
United States of America
Fax: (843) 579-9420
Email:  jcarper@greystar.com

with a copy (which shall not constitute notice) to:

Robert A. Klyman, Esq.
Latham & Watkins LLP
355 S. Grand Ave.
Los Angeles, CA  90071
Fax:  (213) 891-8763
Email:  robert.klyman@lw.com

   e. <u>Successors and Assigns, No Third-Party Beneficiaries</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives, including, without limitation, any chapter 11 or chapter 7 trustee appointed in the Bankruptcy Case.  For avoidance of doubt, Greystar reserves the right to assign this agreement to a designee or affiliate but, notwithstanding such assignment, shall remain liable for all of the obligations of Greystar under this Agreement.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Person or entity shall, or shall be deemed to, be a third party beneficiary hereof.

   f. <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

   g. <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this agreement may be delivered by facsimile or electronic mail, which shall be deemed to be an original for the purposes of this Agreement.

   h. <u>Public Disclosure</u>.  Each of the Debtor Related Parties shall use their respective best efforts to (and will cause each of their respective affiliates and insiders to) submit to Greystar in advance for approval all press releases and public filings relating to this Agreement, the Plan Support Agreement, the Plan Term Sheet (as defined in the Plan Support

LNBYB000036

Agreement), or the transactions contemplated hereby and thereby and any amendments thereof. Except as required by applicable law, the Debtor Related Parties (and each of their respective affiliates and insiders) shall not use the name of any Party in any press release without such Party's prior written consent.

       i.    <u>No Strict Construction</u>.  This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties hereto or thereto.  Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that such Party or such Party's counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.

       j.    <u>Representation</u>.  Each Party has been represented by counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement.

       k.    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

       l.    <u>Time Periods</u>.  If any time period or other deadline provided in this Agreement expires on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

***[Remainder of page intentionally left blank; signature pages follow]***

LA\2265146.7  borrower parties designation agreemetn

LNBYB000037

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers, all as of the date and year first above written.

GREYSTAR GP, LLC,
a Delaware limited liability company

By: _____
Na          me:
Title        :


ROOSEVELT LOFTS, LLC,
a California limited liability company

By:  The Roosevelt Lofts, Inc.
     Its:  Managing Member


     By: _____
         M. AARON YASHOUAFAR
Presiden          t


THE ROOSEVELT LOFTS, INC.,
a California corporation


By: _____
    M. AARON YASHOUAFAR
    President


M. AARON YASHOUAFAR

_____


SOLYMON YASHOUAFAR

_____


SIMON BARLAVA

_____


9

<u>Exhibit A</u>

Bank Settlement Agreement

(See Attached)

LNBYB000039

## SETTLEMENT AGREEMENT

This settlement agreement (the "**Settlement Agreement**") is entered into as of June 3, 2011 (the "**Effective Date**"), by and between the following entities:  (i) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ("**S. Yashouafar**"), and Simon Barlava ( "**Barlava**" and together with M.A. Yashouafar and S. Yashouafar, the "**Guarantors**"); (ii) Roosevelt Lofts, LLC, debtor and debtor in possession (the "**Debtor**" and together with the Guarantors, the "**Borrower Parties**"); and (iii) Bank of America, N.A., individually and as administrative agent for a group of lenders[1] (collectively, the "**Bank Group**").  The Borrower Parties and the Bank Group are referred to collectively as the "**Parties**" and each individually as a  "**Party**."  This Settlement Agreement is based upon the following facts, which each of the Parties confirms is entirely true and accurate in every material respect:

## RECITALS

A.      On or about March 9, 2006, the Debtor executed a Construction Loan Agreement (the "**Loan Agreement**") with the Bank of America N.A., as administrative agent for the Bank Group in the amount of $78,840,375.  On or about March 9, 2006, Debtor executed a Deed of Trust Note in the original principal amount of $78,840,375 (the "**Note**").  The Loan Agreement and Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "**Fee Deed of Trust** "), and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "**Leasehold Deed of Trust**," and collectively, with the Fee Deed of Trust, the "**Deeds of Trust** ").  The Deeds of Trust encumber the property commonly known as the "Roosevelt Building, " located at 727 West 7th Street, Los Angeles, California (the "**Property**"), including an absolute assignment of all rents, issues and profits generated from operation of the Property (collectively, the "**Collateral**").

B.      In further consideration of the Bank Group's loan and extension of credit, on or about March 9, 2006, the Guarantors each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "**Guaranty**").  The Loan Agreement, the Note, the Deeds of Trust and the Guaranty, together with all modifications thereto and all other loan and security documents and agreements between the Parties related to the Collateral are collectively referred to as the "**Loan Documents**. "

C.      The Borrower Parties failed to pay the obligations under the Loan Documents in full at maturity, March 9, 2009.  As a result, the Bank Group delivered a default notice dated December 30, 2008.  On March 23, 2009, the Bank Group caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office.  On or about April 3, 2009, the Bank Group filed a complaint for breach of the Guaranty, appointment of a receiver

---

[1]      The Bank Group is comprised of the Bank of America N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

LNBYB000040

and judicial foreclosure on the Deeds of Trust in the Superior Court of the State of California for the County of Los Angeles, bearing case no. SC 102472 and including all claims raised in the cross complaint filed by the Guarantors (the "**Guaranty Litigation**").  The Borrower Parties dispute the Bank Group's contentions.  The Guarantors asserted counterclaims in the Guaranty Litigation.

D.      On April 13, 2009, the Debtor filed a voluntary petition commencing a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), bearing case no. 1:09-bk-14214-GM (the "**Bankruptcy Case** ").

E.      The Parties desire to settle their disputes relating to the Guaranty Litigation (including all claims raised in the cross complaint) and the Bankruptcy Case, and therefore, enter into this Settlement Agreement which provides, among other provisions, for the purchase and sale of the Bank Group's interest in the Loan Documents, and certain rights provided therein, to a purchaser other than the Borrower Parties, but arranged by the Debtor who has been qualified (no less than 30 days before the Payment Date) under applicable banking regulations (the "**Purchaser**").

NOW, THEREFORE, in consideration of the recitals, covenants and conditions in this Settlement Agreement, and for valuable consideration, the Parties agree as follows:

## AGREEMENT

1.      Note Purchase and Sale.

a.      Pursuant to the assignment of claims (the "**Assignment of Claims** ") in the form attached hereto as Exhibit "1", and according to the terms and conditions of this Settlement Agreement, the Bank Group agrees to sell and assign the Loan Documents to the Purchaser, "as is," and with no representation or warranties other than as may be set forth in the Assignment of Claims (the "**Sale**").  If the Sale is to be consummated, the Purchaser shall pay the Bank Group the total sum of ▮▮▮▮▮▮ by wire transfer in immediately available federal funds (the "**Purchase Price**").  The Sale must close and the Purchase Price must be paid to the Bank Group on or before the "**Payment Date,**" which is the earlier of:  (i) September 1, 2011; and (ii) the first business day which is at least 90 calendar days after the Effective Date.

b.      Conditions to the Closing of the Sale.

The closing of the Sale is conditioned upon the occurrence of each of the following:

i.      The timely deposit by the Purchaser of the funds as set forth in paragraph 2;

ii.     Bankruptcy Court Approval as defined in paragraph 10;

iii.    The timely payment of the Purchase Price on the Payment Date;

iv.     The Purchaser has provided the Bank Group with sufficient representations, covenants and evidence (including evidence of ownership) so as to qualify under applicable

banking regulations and demonstrate that it is not otherwise violative of U.S. banking laws; and

v.    The delivery by the Bank Group of the documents set forth in paragraph 4(b).

c.    The closing of the Sale will be facilitated through the services of an escrow agent approved by both the Purchaser and the Bank Group (the "**Escrow Agent**"). The terms of escrow shall be governed by an escrow agreement (the "**Escrow Agreement**") in the form not materially at variance from the form of escrow agreement attached hereto as Exhibit "2."

d.    With at least five business days' notice, the Purchaser shall advise the Bank Group of its intention to close the Sale on a particular Payment Date. The Assignment of Claims shall be released to the Purchaser at the closing of the Sale on the Payment Date, and returned to the Bank Group if the conditions to the Sale do not occur. The Assignment of Claims is to effectuate the transfer of certain claims against the Borrower Parties to the Purchaser on the terms and conditions set forth therein. The Assignment of Claims shall specifically include all claims, if any, related to any deposit and other accounts held in the name of the Debtor. Notwithstanding the foregoing, the Assignment of Claims shall not affect any rights the Bank of America N.A. may have against Milbank Holding Corp. ("**Milbank**") to the extent related to or arising from the judgment entered against Milbank in the state court action as case no. BC415625 in the Los Angeles Superior Court. The Assignment of Claims shall also provide, among other things, that pursuant to and to the extent permitted by applicable law and the terms of any such policies, the Purchaser will acquire the rights of the Bank Group, if any, to any policies of title insurance covering the Deeds of Trust and the Property. The Bank Group makes no representations or warranties regarding its claims against the Borrower Parties or any coverage it may have as a beneficiary under any policy of title of insurance covering the Deeds of Trust and the Property.

e.    On the Payment Date, and on condition that the Sale closes, the Escrow Agent shall deliver to the Borrower Parties for filing in the Guaranty Litigation, a request for dismissal, without prejudice, of the entire Guaranty Litigation in the form attached hereto as Exhibit "3" (the "**Bank Group's Request for Dismissal of Guaranty Litigation Without Prejudice**").

f.    As long as Greystar GP, LLC or its designee (collectively, "**Greystar**") satisfies the conditions set forth in Section 1(b) hereof on or before the Payment Date, Greystar shall be designated the Purchaser under this Agreement.

2.    <u>Purchaser Deposits into Escrow</u>.

a.    Within 10 calendar days of the Effective Date, the Purchaser must deposit with the Escrow Agent $5,000,000 to be applied, on the Payment Date, towards the Purchase Price. Within 40 calendar days of the Effective Date, the Purchaser must deposit with the Escrow Agent an additional $10,000,000 for a total deposit of $15,000,000 to be applied, on the Payment Date, towards the Purchase Price. Within 70 days of the Effective Date, the

LNBYB000042

Purchaser must deposit with the Escrow Agent an additional $20,000,000 for a total deposit of $35,000,000 to be applied, on the Payment Date, towards the Purchase Price. On or before the Payment Date, the Purchaser must deposit additional sums necessary to have the full Purchase Price on deposit with the Escrow Agent.

    b. All such deposits must be in immediately available federal funds. In any event, the Escrow Agent will immediately advise the Bank Group when funds are deposited. If any of the funds are not timely deposited with the Escrow Agent, then the Bank Group may send a notice of default by electronic means to counsel for the Borrower Parties. If any of the required deposits are not made within two (2) business days following the transmittal of the notice of default, then pursuant to the 362 Stipulation and the Bankruptcy Court Order described below, the Bank Group will immediately have *in rem* relief from the automatic stay on the Collateral without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief. If, for any reason, the Sale is not consummated on or before the Payment Date, all deposited funds will be refunded to the Purchaser.

    3. <u>If Sale is not Consummated</u>. If, for any reason, either the Purchaser fails to make any deposit timely, or the Sale is not consummated timely, and conditioned upon Bankruptcy Court Approval (as defined below), then each of the following shall occur:

    a. <u>Return of Assignment of Claims</u>. The Assignment of Claims shall be returned immediately to the Bank Group.

    b. <u>Stipulation for Relief From Stay</u>. Pursuant to (i) the stipulation entered into between the Bank Group and the Borrower in the form attached hereto as Exhibit "4" (the "**362 Stipulation**"); and (ii) the Bankruptcy Court Order, the Bank Group will immediately have *in rem* relief from the automatic stay on the Collateral without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief.

    c. <u>Dismissal of Guarantors from Guaranty Litigation</u>. The Escrow Agent shall deliver to the Guarantors for filing in the Guaranty Litigation, a request for dismissal, without prejudice, of all causes of action against the Guarantors in the form attached hereto as Exhibit "5" (the "**Bank Group's Request for Dismissal of Guarantors Without Prejudice**").

    d. <u>Covenant Not to Sue</u>. The Escrow Agent shall deliver to the Borrower Parties the covenant not to sue in the form attached hereto as Exhibit "6" (the "**Covenant**").

    e. <u>Stipulation for Appointment of a Receiver</u>. The stipulation for the appointment of a receiver to take control of the Property (the "**Receivership Stipulation**") in the form attached hereto as Exhibit "7" shall be filed, *ex parte*, in the Guaranty Litigation, and a receiver shall be appointed, *ex parte*, immediately. The receiver shall take possession and control over the Collateral (other than deposit or other accounts with the Bank of America N.A.) pursuant to the terms of the Receivership Stipulation. Each of the Borrower Parties agrees to cooperate with the receiver and the Bank Group on all matters, including matters concerning mechanic's liens, title of the Property and the prompt and orderly transition of management of the Property to the receiver including the turnover of all Collateral accounts and tenant deposits.

BN 9150681v2

LNBYB000043

4.      <u>Deliveries on the Effective Date</u>.

        a.      On the Effective Date, the Borrower Parties shall deliver to the Bank Group fully executed originals of each of the following:

        i.      Releases from each of the Guarantors in the form attached as Exhibit "8;"

        ii.      the Receivership Stipulation;

        iii.      the 362 Stipulation;

        iv.      the request for dismissal with prejudice of the cross-complaint filed in the Guaranty Litigation by the Guarantors against the Bank Group (the "**Guarantors' Request for Dismissal**") in the form attached as Exhibit "9," which then may be filed immediately in the Guaranty Litigation by the Bank Group; and

        v.      the Insider Lien Releases described below, each signed by an authorized representative of each of those entities described in paragraph 7 of this Settlement Agreement.

        b.      On the Effective Date, the Bank Group shall deliver to the Escrow Agent fully executed originals of each of the following:

        i.      the Assignment of Claims;

        ii.      the Covenant;

        iii.      the Bank Group's Request for Dismissal of Guaranty Litigation Without Prejudice; and

        iv.      the Bank Group's Request for Dismissal of Guarantors Without Prejudice.

5.      <u>Deadline to File Plan</u>.  The Parties agree that the time within which the Debtor is required to file its Chapter 11 plan is extended to no later than August 31, 2011, or subject, however, to further extension, if any, by mutual agreement of the Parties.

6.      <u>Stay of Litigation</u>.  Conditioned upon there being no default under the terms of this Settlement Agreement, for 90 days after the execution of the Settlement Agreement, a stay shall be effective as to the following:  (i) the Guaranty Litigation in its entirety; and (ii) any scheduled judgment debtor exams of Milbank.  Except as provided in this paragraph, nothing in this Settlement Agreement shall affect any rights, obligations or remedies available to Bank of America N.A., with respect to any credit extended to Milbank pursuant to the loan documents related to that credit.

7.    <u>Mechanic's Liens</u>.  On the Effective Date, all of the insiders and affiliates of the Debtor set forth on the attached Exhibit "10," shall deliver to the Bank Group fully executed lien releases in the form attached hereto as Exhibit "11" (the "**Insider Lien Release**") evidencing that none shall assert a mechanic's lien against the Property.  On and after the Effective Date, if no Sale is consummated timely, then the Borrower Parties will cooperate in resolving any issues regarding the remaining mechanic's lien claims asserted by third parties.

8.    <u>Release by the Debtor</u>.  The Debtor, on its behalf and on behalf of its respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, owners, members, managers, affiliates, professionals, trustees, and representatives hereby release and forever discharge all claims, rights, demands, damages, actions, causes of action, costs, expenses, and suits of law or in equity which they have held, now hold or hereafter may hold against the Bank Group, including Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank and each of their respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, owners, shareholders, members, managers, affiliates, professionals, attorneys, trustees, and representatives that arise in or are related to the Loan Documents or were or could have been alleged in the Guaranty Litigation.

9.    <u>Scope of Release by the Debtor</u>.  The Debtor understands that the release of claims set forth in this Settlement Agreement covers claims within the areas specified which the Debtor has knowledge of and those which it may not know about.  The Debtor expressly waives all rights under Section 1542 of the California Civil Code, which section the Debtor has read and understands, and which provides as follows:

> Section 1542.  A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Notwithstanding the foregoing, the release set forth herein shall not apply to the obligations under this Settlement Agreement, and shall have no effect upon any documents or acts necessary to accomplish the terms and intent of this Settlement Agreement.

10.    <u>Bankruptcy Court Approval</u>.

a.    The Debtor is not bound to perform under this Settlement Agreement until "**Bankruptcy Court Approval**," which shall mean both (i) entry of an order after hearing on approval of the Settlement Agreement in the form attached hereto as Exhibit "12" (the "**Bankruptcy Court Order**"), and (ii) the Bankruptcy Court Order is fully enforceable on its terms and has not been stayed, modified or altered by any court of competent jurisdiction.

b.    This Settlement Agreement is binding and fully enforceable as to each Party other than the Debtor on the Effective Date.  Notwithstanding the foregoing, no Party is obligated to perform under paragraph 3 of this Settlement Agreement without Bankruptcy Court Approval.

c.      The Bankruptcy Court Order shall also approve the 362 Stipulation.

d.      The Debtor will file a motion for approval of this Settlement Agreement and the 362 Stipulation within 5 business days following the Effective Date and will seek to have the motion heard and approved on June 14, 2011 or as soon before or after as the Bankruptcy Court may set.  The Bank Group will reasonably assist the Debtor in obtaining Bankruptcy Court approval of this Settlement Agreement and the 362 Stipulation.  Subject to its review and approval, the Bank Group will support the motion, and will not oppose it.

11.    <u>Confidentiality</u>.  The Parties agree to keep the Purchase Price (and such other terms as may be expressly agreed upon in writing) confidential, and, if necessary, the Bank Group will support a motion by the Debtor in the Bankruptcy Case to seal the record and maintain the confidentiality of the Purchase Price.

12.    <u>Further Assurances</u>.  The Parties agree to perform such acts and to prepare, execute, deliver, file, and record any documents or agreements reasonably required to perform under and satisfy the conditions in this Settlement Agreement, or to give full force and effect to this Settlement Agreement.

13.    <u>Attorneys' Fees and Costs</u>.  If any action or proceeding is brought to enforce this Settlement Agreement, the prevailing Party shall be entitled to recover all of its costs in bringing and prosecuting such action to enforce the Settlement Agreement, including reasonable attorneys' fees, from the losing Party.

14.    <u>Complete Agreement</u>.  This Settlement Agreement supersedes any and all other agreements, understandings, negotiations or discussions, either oral or in writing, express or implied between the Parties concerning settlement.  The Parties to this Settlement Agreement each acknowledge that no representations, inducements, promises, agreements or warranties, oral or otherwise, have been made by them or any of them, or anyone acting on their behalf which are not embodied in this Settlement Agreement, that they have not executed this Settlement Agreement in reliance on a representation, inducement, promise, agreement or warranty, and that no representation, inducement, promise, agreement or warranty not contained in this Settlement Agreement including any purported supplements, modifications, waivers or terminations of this Settlement Agreement shall be valid or binding, unless executed in writing by all of the Parties to this Settlement Agreement.

15.    <u>Terms Read and Understood</u>.  Each of the Parties hereby certifies that he or it (i) has read the entire Settlement Agreement, (ii) has conferred with legal counsel pertaining to this Settlement Agreement, (iii) fully understands all of the terms of this Settlement Agreement, and (iv) acknowledges and represents that he or it enters into this Settlement Agreement and all other contemplated documents of their own free will and not due to any oral representation, commitment, promise, pressure, or duress from any other Party.

16.    <u>Successors and Third Parties</u>.    Each covenant in this Settlement Agreement shall inure to the benefit of and be binding upon the Parties and their respective owners, managers, heirs, successors, assigns, agents, employees, representatives (past and present), trustees, and legal and personal representatives.  Further, the releases of any entities

7

LNBYB000046

who are not signatories to this Settlement Agreement are made expressly for their benefit and they shall be deemed third party beneficiaries of this Settlement Agreement.  Except as set forth in this paragraph, there shall be no third party beneficiaries under this Settlement Agreement.

17.    <u>Construction</u>.  As used in this Settlement Agreement, the masculine and feminine gender, in the singular or plural, shall be deemed to include the others whenever the text so requires.  The term "including" in any form shall not be limiting and shall be construed to mean "including, but not limited to."  Captions and paragraph headings are inserted solely for convenience and shall not be deemed to restrict or limit the meaning of text.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against any of the Parties.

18.    <u>Governing Law</u>.  This Settlement Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of California, without giving effect to the principles of conflicts of law thereof, and applicable bankruptcy law.  Each of the Parties agrees that as long as the Bankruptcy Case remains open, any dispute, claim or controversy arising out of or relating to this Settlement Agreement shall be heard in the Bankruptcy Court and that the Bankruptcy Court has exclusive jurisdiction thereof.  If the Bankruptcy Case is closed, then any court of competent jurisdiction may resolve any dispute, claim or controversy arising out of or relating to this Settlement Agreement.

19.    <u>Severability</u>.  If any provision of this Settlement Agreement is determined to be invalid, void, or illegal, such provision shall be construed and amended in a manner which would permit its enforcement, but in no event shall such provision affect, impair, or invalidate any other provision of this Settlement Agreement.

20.    <u>No Waiver</u>.  Failure to insist on compliance with any term, covenant or condition contained in this Settlement Agreement shall not be deemed a waiver of that term, covenant or condition, nor should any waiver or relinquishment of any right or power contained in this Settlement Agreement, at any one time or more times, be deemed a waiver or relinquishment of any right or power at any other time or times.

21.    <u>Warranty of Authority</u>.  Each Party whose signature is affixed hereto in a representative capacity represents and warrants that she/he is authorized to execute this Settlement Agreement on behalf of and to bind the entity on whose behalf her/his signature is affixed.

22.    <u>Time of the Essence</u>.  Time is of the essence in the performance of all obligations set forth in this Settlement Agreement.

23.    <u>Counterparts</u>.  This Settlement Agreement may be executed in separate counterparts which, together shall constitute one and the same fully executed Settlement Agreement.  Signed counterparts transmitted by facsimile or email shall be deemed originals.

[signatures follow on next page]

LNBYB000047

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date first listed above.

BANK OF AMERICA, N.A.,
As administrative agent for the Bank Group

By: _____
     David R. Kegaries, Senior Vice President

ROOSEVELT LOFTS, LLC
By:  Its manager The Roosevelt Lofts, Inc.

By: _____
     M. Aaron Yashouafar, President

_____
     M. Aaron Yashouafar, individually

_____
     Solyman Yashouafar, individually

_____
     Simon Barlava, individually

9

LNBYB000048

<u>Exhibits</u>

1.      Assignment of Claims from the Bank Group to the Purchaser. (para. 1a.)

2.      Escrow Instructions (para. 1c)

3.      Bank Group's Request for Dismissal of Guaranty Litigation Without Prejudice (para. 1e)

4.      362 Stipulation (para. 3b)

5.      Bank Group's Request for Dismissal of Guarantors Without Prejudice (para. 3c)

6.      Covenant Not to Sue (para. 3d)

7.      Receivership Stipulation (para. 3e)

8.      Releases from the Guarantors (para. 4a.i)

9.      Guarantors' Request for Dismissal with prejudice of the Cross Complaint in the Guaranty Litigation (para. 4a.iv)

10.     List of Insiders (para. 7)

11.     Insider Lien Release (para. 7)

12.     Bankruptcy Court Order (para. 10)

BN 9150681v2

LNBYB000049

## Exhibit C

**Assignment of Claims**

**(see attached)**

## ASSIGNMENT OF CLAIMS

This Assignment of Claims is made this ___ day of June, 2011 pursuant to the Settlement Agreement dated as of June __, 2011 ( the "**Settlement Agreement**") among the following:  (i) the Bank of America, N.A., individually and as administrative agent for a group of lenders [1] (collectively, including Bank of America, N.A. and all such lenders, the "**Bank Group**"); (ii) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ( "**S. Yashouafar**"), and Simon Barlava ("**Barlava**" and together with M.A. Yashouafar and S. Yashouafar the "**Guarantors**"); and (iii) Roosevelt Lofts, LLC, debtor and debtor in possession in the bankruptcy case no. 1:09-14214-GM (the "**Debtor**" and together with the Guarantors, the "**Borrower Parties**").  A true copy of the Settlement Agreement is attached as an Exhibit to the "Order Approving Motion to Compromise with Bank Group" (the "**Order**") entered June __, 2011 as docket no. ___ in the Debtor's bankruptcy case.  Unless otherwise defined herein, the words and phrases used in this Assignment of Claims and defined in the Settlement Agreement shall have those defined meanings.  Under the terms of the Order, the Bank Group does hereby covenant and agree as follows:

The Bank Group hereby assigns to _____ (the "**Purchaser**") the following:

(i) to the extent permitted by applicable law and the terms of any such policies, any and all claims the Bank Group may have against First American Title Insurance Company arising under or related to the issuance of Policy No. NCS-213559 LA1 dated March 22, 2006 with respect to the real and personal property located at 727 West Seventh Street, Los Angeles, CA and commonly known as the "Roosevelt Lofts" Building (collectively, the "**Property**"), as well as the rights of the Bank Group, if any, to any other policies of title insurance covering the Loan Documents or the Property; and

(ii) any and all claims the Bank Group may have against the Borrower Parties that exist, arise in or relate to the Loan Documents, together with any and all right, title and interest of the Bank Group in, to and under the Loan Documents (collectively, the "**Loan Document Claims**").

Except as expressly provided herein, this Assignment of Claims is made without recourse, representation or warranty, express or implied, by the Bank Group, including but not limited to the terms, existence or validity of any claims under any title insurance policy, or the terms, existence or validity of any claims against the Borrower Parties. Notwithstanding the foregoing, however, the Bank Group represents and warrants to the Purchaser that:  (i) the Bank Group has all right, title and interest to the Loan Document Claims; (ii) the Bank Group has not transferred, assigned, pledged, hypothecated or otherwise encumbered the Loan Document Claims; (iii) the Loan Document Claims are assigned to the Purchaser free and clear of any lien, pledge, security interest or encumbrance; (iv) the Bank of America N.A. has all necessary authority to (a) enter into this Assignment of Claims, (b) provide the representations and warranties set forth

---

[1] The Bank Group is comprised of the Bank of America N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

herein, and (c) perform the obligations described herein, in each case on behalf of the Bank Group; (v) the Loan Documents include those scheduled on Exhibit "2" hereto; and (vi) Exhibit "2" describes the Loan Agreement, the Note, such additional promissory notes evidencing the debt secured by the Deeds of Trust (collectively, with the Note, the "**Bank Group Notes**"), the Deeds of Trust and the Guaranty.

The Bank of America N.A. will cause the originals of each of the following to be deposited into the escrow established pursuant to the Escrow Agreement no later than 2 days before the Payment Date: (i) each of the Bank Group Notes, with a duly executed allonge attached thereto, assigning each of the Bank Group Notes to the Purchaser; and (ii) an assignment of each of the Deeds of Trust duly executed and acknowledged by the Bank of America N.A., as agent for the Bank Group, in a recordable form  In addition, the Bank Group will submit a copy of the Deeds of Trust and of the Guaranty, each acknowledged by the Borrower Parties as accurate and complete and enforceable as if an originally executed counterpart.

Without limiting the foregoing, the Bank Group has entered into a stipulation (the "**Mechanic's Lien Stipulation**") with certain mechanic's lien claimants that has been filed in adversary proceeding called Muir-Chase Plumbing *et al*. v. Bank of America N.A., as adv. case no. 1:10-01031 (the "**Mechanic's Lien Litigation**").  The Mechanic's Lien Stipulation was approved by the Bankruptcy judge at a court hearing on May 4, 2011.  An order approving the Mechanic's Lien Stipulation was entered on the docket in the Mechanic's Lien Litigation on May 20, 2011 as docket entry no. 83.  This assignment is expressly subject to the terms of the Mechanic's Lien Stipulation.

BANK OF AMERICA, N.A.
As administrative agent for the Bank Group

By: _____
        David R. Kegaries
        Senior Vice President

Exhibit 2

Certain Loan Documents

1.      a Construction Loan Agreement dated March 6, 2006 between the Debtor and the Bank of America, N.A., as administrative agent for the Bank Group.

2.      a Deed of Trust Note executed on or about March 7, 2006 in the original principal amount of $78,840,375 payable to Bank of America N.A., a national banking corporation.

3.      a Deed of Trust Note executed on or about June 16, 2006 in the original principal amount of $10,000,000 payable to Manufacturers Bank, a California banking corporation.

4.      a Deed of Trust Note executed on or about June 16, 2006 in the original principal amount of $15,000,000 payable to East West Bank, a California banking corporation.

5.      a Deed of Trust Note executed on or about August 24, 2006 in the original principal amount of $15,000,000 payable to United Commercial Bank, a California banking corporation.

6.      an Amended and Restated Deed of Trust Note executed on or about August 24, 2006 in the original principal amount of $38,840,375 payable to Bank of America, N.A. a national banking corporation.

7.      a Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 as Instrument No. 0610284 of Official Records, and re-recorded on November 17, 2006 as Instrument No. 2553685 of Official Records.

8.      a Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 as Instrument No. 0610286.

9.      a Guaranty Agreement made as of March 6, 2006 by M. Aaron Yashouafar Solyman Yashouafar and Simon Barlava

## **Exhibit D**

## **Escrow Agreement**

## **(see attached)**

LNBYB000054

# COMMERCE ESCROW COMPANY

1545 WILSHIRE BLVD., 6th FLOOR, LOS ANGELES, CA 90017
TEL.: (213) 484-0855 / (310) 284-5700 / (888) 732-6723 / FAX: (213) 484-0417

COMMERCE ESCROW COMPANY IS LICENSED BY THE DEPARTMENT OF CORPORATIONS
STATE OF CALIFORNIA, LICENSE # 963 0884

GP 2009

## General Provisions

1) Time is of the essence in these instructions. In the event that the conditions of this escrow have not been complied with at the expiration of the time provided for herein, you are instructed to complete the same at the earliest possible date thereafter, unless we or either of us have made written demand upon you for the return of the money and/or instruments deposited by either of us, in which case you may withhold and stop all further proceedings in this escrow, without liability for interest on funds held or for damages, until mutual cancellation instructions by all parties shall have been deposited in this escrow. Whereupon you are then instructed to disburse the escrowed funds and instruments accordingly, less your proper charges, or you may return all funds and/or instruments, less your proper charges to the respective parties hereto, and this escrow shall without further action, be considered terminated.

2) All prorations and adjustments are to be made on a basis of a 30 day month and "close of escrow" with reference to said prorations and adjustments shall be the day the instruments of conveyance called for herein are recorded or filed.

3) Unless otherwise instructed in writing prior thereof, all disbursements of funds and/or instruments of this escrow shall be by united states mail to the designated parties in accordance with these escrow instructions, at their respective address shown herein.

4) Escrow holder shall make no physical inspection and/or representation of the real and/or personal property described in any instrument deposited herein.

5) Escrow holder is authorized and directed to deposit any and all funds placed in this escrow in an "escrow trust account" with any state or national bank in the name of your company pending the completion of this escrow. All disbursements shall be made by check of your company on said account.

6) Escrow holder is not held responsible for any personal property tax which may be assessed against any former or present owner of the property described in these instructions, nor for the corporation or license tax of any corporation as a former or present owner.

7) Escrow holder is authorized to destroy or otherwise dispose of any and all documents, papers, instructions, correspondence and other material pertaining to this escrow at the expiration of five years from the date of the close of escrow or the cancellation of this escrow, without liability and without further notice to the parties hereto.

8) Execute on behalf of the parties hereto, form assignments of interest in any insurance policies (other than title insurance policies) called for herein and forward them upon the close of escrow to the agent with request first that insurer consent to such transfer or attach loss payable clause and/or make such other additions or corrections as may have been specifically required herein, and second, that agent thereafter, forward such policies to the parties entitled to them. You are authorized and instructed to consider the premiums on any insurance policies which are handed you are caused to be handed you in this escrow are paid in full and that said policies have not been hypothecated and are in full force and effect.

9) The parties hereto jointly and severally agree that in the event of cancellation they shall pay you a sum sufficient to pay for any expenses which you may have incurred pursuant to these instructions and a reasonable cancellation fee for services rendered by you. Said expenses and fees shall be deposited in escrow before cancellation is effective they further agree that said charges may be apportioned to them in a manner which you consider equitable and that your decision in that regard will be binding and conclusive upon them. Unless otherwise instructed in writing by third parties depositing funds into this escrow for the benefit of the parties hereto, such funds deposited by said third parties shall be returned to the party depositing same in the event of such cancellation.

LNBYB000055

## General Provisions - continued

10) If conflicting demands are made on you or notice is served upon you in connection herewith or any legal action is taken in connection with this escrow, you shall not be required to determine the same or take any action in the premises, but may withhold and stop all further proceedings without liability therefore or you may file suit in interpleader or for declaratory relief.  If you are required to respond to any legal summons or proceedings or if any action in interpleader or declaratory relief is brought by you, we jointly and severally agree to pay all costs, expenses and reasonable attorney's fees expended or incurred by you and a lien is hereby created in your company's favor to cover said items.  We agree to save you harmless as escrow holder hereunder from all loss and expense, including reasonable attorney's fees and court costs by reason of any action, legal or otherwise which may in any way arise out of this escrow, before or after closing or cancellation, notwithstanding anything in these instructions to the contrary.

11) If this escrow is not consummated, unless specifically instructed in writing to the contrary by the party depositing same, you are further authorized and instructed to remit all the funds by your check to the parties depositing same in this escrow.

12) In the event it may be necessary or proper for the consummation of this escrow, you are authorized to deposit or have deposited funds or documents, or both, with any bank, trust company, title company, savings and loan association, building and loan association, industrial loan company, credit union, admitted insurer, or licensed escrow agent, subject to your order pursuant to closing this escrow and such deposit shall be deemed a deposit in accordance with the terms of these instructions.

13) My signature on all instruments and instructions pertaining to this escrow indicates my unconditional acceptance and approval of same.

14) The parties to this escrow hereby authorize the recordation of any instrument delivered through this escrow if necessary or proper in the issuance of the policy of title insurance called for, and in connection therewith funds and/or instruments received in this escrow may be delivered to, or deposited with any title company for the purpose of complying with the terms and conditions of this escrow.

15) If any party to these instructions obtains a loan on the land involved or is represented by a broker or any attorney during the pendency of this escrow, you are authorized to furnish the lender, broker and/or attorney or anyone operating on their behalf, any information concerning this escrow, including but not limited to a copy or a certified copy of the escrow instructions and any amendments thereto, upon request.

16) In the event that part of the total consideration in this escrow be paid by "one party" to the other in the form of a note secured by a deed of trust in favor of "the other party" and as a result thereof this transaction falls under the purview of the provisions of the real estate settlement procedures act of 1974, the other party agrees to comply with the provisions of said act outside of escrow and you as escrow holder are not to be concerned therewith.

17) These instructions may be executed in counterparts, all of which when taken together shall be deemed to be the instrument.

18) **Next Business Day:** in the event that the calculation of any of the various time periods provided for in the agreement result in the obligation becoming due on a Saturday, Sunday, or legal holiday, the due date of such obligation, or scheduled time of occurrence of such event, shall be delayed until the next business day, unless instructed to the contrary.

19) California Income Tax Notification to Buyers and Sellers:
Seller hereby acknowledges receipt of California Franchise Tax Board general information booklet relative to 2005 tax law changes, along with relevant forms for completion (California form 593-c w/instructions).

Seller and/or buyer hereby agree to comply with **California Revenue and Taxation Code Section 18662**, as expanded by **assembly bill 2065,** for sales of California real property that close **on or after January 01, 2003**, and shall cause to be deposited into escrow such forms that may be necessary for the parties hereto to be in compliance with said tax code, as expanded.

LNBYB000056

## General Provisions - continued

20) Parties hereto are aware that a preliminary change of ownership report, in accordance with section 480.3 of the revenue and taxation code is to be completed by any transferee for each and every recorded document pertaining to the change of title and filed with the county recorder at the time the document is recorded for property located in the state of California.  Such form will be handed to buyer during the course of this escrow.  Buyer (and/or seller if a document is recorded for the benefit of same) is aware that transferee is liable for any and all fees/penalties in connection with same (including surcharge) if said report is not completed and filed at the close of escrow.  Escrow holder is hereby relieved of any liability or responsibility in the event that the form submitted by buyer (or seller) is not acceptable or if buyer (or seller) fails to submit the form.

21) The signatures of any party hereto shall be deemed delivered to Commerce Escrow Company when escrow holder receives a signed fax or an electronic signature from the signatory.  The party sending such fax or electronic transmittal shall within a reasonable period of time thereafter follow up said signature by sending an originally executed copy of the faxed or electronic material to escrow holder.  Escrow holder shall have no liability and/or responsibility to obtain said original executed document of the faxed or electronically transmitted material should same not have been received by escrow holder prior to the close of escrow. Provided that the principals to this escrow have placed the escrow holder otherwise in a position to close this escrow, the principals hereby further instruct and authorize the escrow to proceed with the closing of this escrow. Escrow holder is further relieved of any responsibility and/or liability of receiving the original executed fax and/or electronic material subsequent to the closing of this escrow. The parties are aware that the county recorder's office and that certain lenders require ink signed original documentation for recordation and may have paper quality and size requirements.

22) The buyer is aware that under certain circumstances, if the seller is a foreign person or entity as defined in the foreign investors real property tax act section 1445 of internal revenue code, buyer will be required to withhold ten per cent of the purchase price.

Each seller/transferor will either deposit: a) seller's affidavit that seller is not foreign or b) a qualifying statement issued by the IRS. Absent the seller's affidavit or the qualifying statement prior to the close of escrow, both the buyer and seller will deliver to escrow holder in writing joint mutual instructions setting forth escrow holder's duties in connection with the withhold, if any.

23) As a condition to acting as escrow agent in the within transaction, certain information must be provided by sellers/transferors to escrow holder prior to the date of closing.  Under the tax reform act of 1986, escrow holder is required to report the gross proceeds of an ownership interest in reportable real estate to the internal revenue service ("IRS") the seller/transferor is required by law to furnish a correct taxpayer identification number ("TIN") or social security number to escrow holder and seller/transferor may be subject to civil or criminal penalties for failure to do so. Each seller/transferor must provide a permanent address to which escrow agent can mail I.R.S. form 1099-s following the closing of the escrow.

If there is more than one seller/transferor, an allocation of the gross proceeds from the within transaction must be received by escrow holder prior to the date of closing.  If escrow holder fails to receive a complete allocation or receives no allocation as to any seller/transferor, escrow holder must report the entire unallocated gross proceeds to that seller/transferor.  If conflicting allocations are received, escrow holder must report the entire gross proceeds on each seller/transferor's 1099-s to the irs.  Sellers/transferors who are married on the closing date and who hold title to the subject property as tenants in common, joint tenancy or community property are treated for reporting purposes as a single seller/transferor.

24) The buyer and seller acknowledge that depending on the type (commercial, residential) and location (city) of real property involved in this escrow, there may be disclosure(s) as well as civil ordinance requirement(s) that would affect the transfer of the real property.  Escrow holder urges both the buyer and the seller to seek appropriate counsel to ascertain what disclosure and/or civil ordinances if any need to be complied with prior to the close of escrow, outside of escrow as between buyer and seller.  The buyer and seller's signature upon these instructions shall be deemed evidence by escrow holder that buyer and seller have obtained counsel, are aware of any disclosures/civil ordinance requirements and will comply with same outside of this escrow.  Unless otherwise instructed in writing to the contrary within the body of the escrow instructions, escrow holder shall have no responsibilities or liabilities in connection herewith.

LNBYB000057

## General Provisions - continued

25) In the event the terms of the escrow transaction as contained in attached escrow instructions, contract, or agreement, call for the investment of deposited funds, it is hereby understood, by and between the principals hereto, that such investment shall be in the form of a money market interest bearing account at City National Bank, located in Commerce, California, after bank clearance of check and after receipt of form W-9, unless specifically provided for in writing to the contrary. The name of the account will be Commerce Escrow Co. as trustee for this escrow for the benefit of depositing party. All interest accrued thereon shall be credited to the account of depositing party at close of escrow. In the event the escrow fails to close, the interest shall be credited to the account of the depositing party at cancellation. The funds will not be withdrawn except for redeposit into the "trust" or "escrow" account. In compliance with this instruction, the depositing party hands you herewith form w-9 as required by city national bank. The depositing party is aware that the account will not be opened until escrow holder is in receipt of fully completed and executed form W-9 from depositing party. Furthermore, in the event the depositing party fails to furnish or does not have a tax payer identification number, then a certain portion of the interest accrued on the account may be paid by the bank to the I.R.S. as back-up withholding. (note: in the event the depositing party is not a us citizen or resident or is a foreign corporation, partnership, estate or trust, then the depositing party should request from escrow holder and complete form w-8 in lieu of form w-9.)

All parties to this transaction hereby acknowledge their understanding that all investments made through this escrow transaction by commerce escrow company must be made pursuant to FDIC guidelines and limitations, as more particularly mandated by the department of corporations code section 1737 (CCR) special accounts. In addition, all parties to this transaction acknowledge their familiarity with the limitation on payments for insured deposits in excess of $250,000.00, as mandated by the federal insuring governmental agency, and the cumulative effect of other accounts held or owned by the depositing party in the named depository. The total liability or responsibility of the escrow holder is to make the deposit as instructed, which shall be held in accordance with the rules and regulations of the depository.

The parties hereto have satisfied themselves to the extent that all necessary federal, state, local and administrative laws and regulations, which may pertain to and/or affect the real (and personal) property which is the subject of this escrow transaction, including, but not limited to, certificate of compliance-water conservation ordinance (which ordinance effects residential and commercial/industrial and apartment buildings) have been met. The parties hereto acknowledge that escrow holder is not responsible, nor liable, for providing information as to such laws and regulations or of causing documentation relative to same, to be prepared and/or filed. In addition all parties are hereby aware and amend the fact as needed that Commerce Escrow shall be governed by the laws of the state of California.

26) This notification is in compliance with our obligations to comply with federal (and state) law to safeguard your nonpublic personal information.

   We collect nonpublic personal information about you from the following sources:
   A) Information we receive from you on applications or other forms;
   B) Information about your transactions with us, our affiliates, or others involved in the processing of your transaction, and
   C) Information we receive from a consumer reporting agency.

We do not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law.

We restrict access to nonpublic information about you to those employees who need to know that information to provide products or services to you. We maintain physical, electronic and procedural safeguards that comply with federal and state regulations to guard your non-public personal information.

28) I have received a copy of these instructions as evidenced by my signature herein.

Page 4

# ADDENDUM TO GENERAL PROVISIONS
## JOINT ESCROW INSTRUCTIONS

These Joint Escrow Instructions ("**Instructions**") are made as of June __, 2011 by and among (i) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ("**S. Yashouafar**"), and Simon Barlava ("**Barlava**" and together with M.A. Yashouafar and S. Yashouafar, the "**Guarantors**"); (ii) Roosevelt Lofts, LLC (the "**Borrower**" and together with the Guarantors, the "**Borrower Parties**"); (iii) Greystar GP, LLC (the "**Purchaser**"); (iv) Bank of America, N.A., individually and as administrative agent for a group of lenders (collectively, the "**Bank Group**"); and (v) Commerce Escrow Company ("**Escrow Agent**").

These Instructions amend and supplement those certain General Provisions dated June ___, 2011 (the "**General Provisions**") entered into by the Borrower Parties, the Purchaser, the Bank Group and Escrow Agent. All references to the General Provisions shall be construed to mean the General Provisions and all exhibits and addenda attached thereto (including these Instructions). In the case of a conflict between the terms of the General Provisions and the terms of these Instructions, the terms of these Instructions shall control.

These Instructions are based on the following facts:

A.    The Borrower Parties and Bank Group are parties to that certain Settlement Agreement (the "**Settlement Agreement**") dated ~~of even date herewith~~ June 3, 2011, which provides for the possible purchase and sale of those certain rights under the Loan Documents (as defined in the Settlement Agreement) to Purchaser or another entity as may be designated by the Borrower and approved by the Bank Group; and

B.    The Borrower Parties, the Purchaser and the Bank Group desire that Escrow Agent act in accordance with the instructions set forth in these Instructions.

**NOW, THEREFORE,** in consideration of the terms, conditions, and covenants hereinafter set forth, the parties hereto mutually agree as follows:

## AGREEMENT:

1.    **Delivery of Escrow Documents to Escrow Agent.**

(a)    The Bank Group has executed and delivered to Escrow Agent, and Escrow Agent acknowledges receipt of, the following documents (the "**Initial Escrow Documents**"):

(1)    Assignment of Claims from the Bank Group to the Purchaser in the form attached hereto as <u>Exhibit A</u> (the "**Assignment of Claims**");

(2)    Covenant Not to Sue in the form attached hereto as <u>Exhibit B</u> (the "**Covenant**"); and

LNBYB000059

(3)    Bank Group's Request for Dismissal of Guarantors without prejudice in the form attached hereto as <u>Exhibit C</u> (the "**Request for Dismissal of Guarantors**").

(4)    Bank Group's Request for Dismissal of the entire Guaranty Litigation without prejudice in the form attached hereto as <u>Exhibit D</u> (the "**Request for Dismissal of Guaranty Litigation**").

(b)    At least two (2) days prior to the Payment Date (as defined in the Settlement Agreement), the Bank Group shall cause to be delivered to Escrow Agent the documentation specified in the Assignment of Claims (the "**Supplemental Escrow Documents**," and collectively with the Initial Escrow Documents, the "**Escrow Documents**"). Escrow Agent will immediately notify Purchaser upon receipt of the Supplemental Escrow Documents.

(c)    Escrow Agent acknowledges that the Escrow Documents are to be held in escrow subject to the terms contained in these Instructions.

**2.    Delivery of Funds to Escrow Agent**.

(a)    Escrow Agent shall receive funds from the Purchaser as follows (collectively, the "<u>Funds</u>"):

(1)    On or before June 13, 2011, an initial installment of $5,000,000;

(2)    On or before July 13, 2011, a second installment of $10,000,000;

(3)    On or before August 12, 2011, a third installment of $20,000,000; and

(4)    On or before September 1, 2011, a fourth and final installment of $33,000,000 plus an amount sufficient to pay all costs and expenses due to the Escrow Agent in connection with the transactions contemplated in these Instructions.

(b)    Escrow Agent shall immediately notify the Bank Group upon receipt of the Funds as set forth above. If Escrow Agent does not timely receive the Funds in the manner and amounts set forth above, Escrow Agent shall immediately provide notice to the Bank Group of such failure to receive the Funds.

(c)    The Funds shall be and remain property solely of Purchaser. Escrow Agent will place all of the Funds received by Escrow Agent into a separate interest bearing deposit account at City National Bank located in Los Angeles, California, after bank clearance of check and after receipt of a completed W-9 form. In no event shall any of the Borrower Parties, the Bank Group, or any other person or party have any legal or equitable right to any of the Funds. No holder of a claim against or interest in any of the Borrower Parties shall have any right to attach or claim to payment from any Funds. If for any reason the closing of the transaction contemplated hereby is not consummated on or before August 22, 2011, then notwithstanding any provision in these Instructions to the contrary, all Funds shall be promptly returned to Purchaser without need for further order of any court or approval of any party.

2

LNBYB000060

(d)     Escrow Agent shall immediately return all funds to Purchaser in the event that (i) the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") fails to enter the Plan Support Agreement Order (as defined in that certain Plan Support Agreement among Borrower, The Roosevelt Lofts, Inc. and Purchaser dated on or about the date hereof (the "**Plan Support Agreement**")) on or before June 20, 2011, or (ii) the Bankruptcy Court fails to enter the BofA/Debtor Settlement Order (as defined in the Plan Support Agreement) on or before June 14, 2011..

**3.     Conditions Precedent to Closing**.

Notwithstanding anything herein to the contrary, Escrow Agent is authorized to close the transaction as instructed in <u>Section 4</u> below when and only when:

(a)     The Bank Group has delivered the Escrow Documents to Escrow Agent;

(b)     The Purchaser has delivered all of the Funds to Escrow Agent;

(c)     The Bank Group has approved the Purchaser as being in compliance with the USA PATRIOT Act and the United States Treasury Department's Office of Foreign Asset Control 's Specially Designated Nationals and Blocked Persons List) in a manner as described in Exhibit "E" hereto; and

(d)     Bankruptcy Court Approval of the Settlement Agreement as defined in paragraph 10 of the Settlement Agreement.

(e)     Escrow Agent has received telephonic or email authorization from David R. Kegaries of the Bank Group to proceed with the closing of the transaction.

(f)     Escrow Agent has received telephonic or email authorization from A. Joshua Carper or Kevin Kaberna, of Purchaser, to proceed with the closing of the transaction.

**4.     Closing of Transaction**.

Upon satisfaction of <u>all</u> conditions set forth in <u>Section 3</u> above, Escrow Agent shall:

(a)     Disburse ▮▮▮▮▮▮ of the Funds to the Bank Group by wire transfer at the Bank Group's wire address set forth on <u>Schedule 1</u>;

(b)     Deliver the executed Assignment of Claims to the Purchaser;

(c)     Return the executed Covenant to the Bank Group;

(d)     Return the executed Request for Dismissal of Guarantors to the Bank Group;

(e)     Deliver the executed Request for Dismissal of Guaranty Litigation to the Borrower Parties; and

(f)     Deliver all of the Supplemental Escrow Documents to the Purchaser.

LNBYB000061

5.      <u>**Failure to Close Transaction**</u>.

If any of the conditions set forth in <u>Section 3</u> above are <u>not</u> satisfied and the Escrow Agent receives notice from the Bank Group or Purchaser that the transaction will not be consummated, Escrow Agent shall:

(a)      Pay all Escrow Agent's costs and expenses incurred in connection with the transaction;

(b)      Promptly disburse all of the Funds (minus any amounts used to pay Escrow Agent's costs and expenses pursuant to paragraph 5(a) above) to the Purchaser in the manner requested by the Purchaser;

(c)      Return the executed Assignment of Claims to the Bank Group;

(d)      Return all of the Supplemental Escrow Documents to the Bank Group;

(e)      Return the executed Request for Dismissal of Guaranty Litigation to the Bank Group;

(f)      Deliver the executed Covenant to the Borrower Parties; and

(g)      Deliver the executed Request for Dismissal of Guarantors to the Guarantors.

6.      <u>**Costs and Expenses**</u>.

All costs and expenses of the Escrow Agent incurred in connection with the transactions contemplated in these Instructions shall be paid for by the Purchaser.

7.      <u>**Escrow Agent Matters**</u>.

(a)      Escrow Agent shall have no duties or responsibilities except those set forth in these Instructions and shall incur no liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper or document believed by Escrow Agent to be genuine.

(b)      The Borrower Parties, the Purchaser and the Bank Group hereby jointly and severally agree to indemnify and save Escrow Agent harmless from and against any and all loss, damage, claims, liabilities, judgments and other costs and expenses which may be incurred by Escrow Agent by reason of its acceptance of, and its performance under, these Instructions unless caused by the negligence or intentional act or omission of Escrow Agent.

(c)      Escrow Agent may act or refrain from acting with respect to any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

8.      <u>**Notices**</u>.

Notices and other communications required to be given hereunder, or which may be given pursuant or relative to the provisions hereof, shall be in writing and shall be deemed to

SD\790687.2

LNBYB000062

have been given when delivered in hand or mailed, postage prepaid, by first class United States mail, certified return receipt requested or by facsimile as follows:

|  |  |
|---|---|
| If to the Bank Group: | Bank of America, N.A.<br>333 South Hope St., 11th Floor<br>Los Angeles, CA 90071<br>Attention:  David R. Kegaries<br>Facsimile:  (213) 621-4868 |
| With a copy to: | Buchalter Nemer, P.C.<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, CA 90017<br>Attention: Daniel Slate, Esq.<br>Facsimile: (213) 630-5640<br>dslate@buchalter.com |
| If to the Borrower Parties: | Roosevelt Lofts, LLC<br>c/o Milbank Real Estate Services, Inc.<br>660 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>Attention:  M. Aaron Yashouafar<br>Facsimile:  (213) 403-1440 |
| With a copy to: | Levene, Neale, Bender, Yoo & Brill L.L.P.<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, CA 90067<br>Attention:  David L. Neale, Esq.<br>Facsimile:  (310) 229-1234<br>Email:  dln@lnbyb.com |
| If to the Guarantors: | M. Aaron Yashouafar<br>660 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>Facsimile:  (213) 403-1440<br><br>Solyman Yashouafar<br>660 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>Fax:  (213) 403-1440<br><br>Simon Barlava<br>2209 South Santa Avenue<br>Los Angeles, Ca, 90058<br>Fax:  (323) 277-1717 |
| With a copy to: | Homan Taghdiri, Esq.<br>660 S. Figueroa Street, 24th Floor |

5

LNBYB000063

Los Angeles, CA 90017
Facsimile:  (213) 403-1440

If to the Purchaser:        Greystar GP, LLC
Attention: A. Joshua Carper
3rd Floor
18 Broad Street
Charleston, NC 29401
United States of America
Fax: (843) 579-9420
Email:  jcarper@greystar.com

With a copy to:        Robert A. Klyman, Esq.
Latham & Watkins LLP
355 S. Grand Ave.
Los Angeles, CA  90071
Fax:  (213) 891-8763
Email:  robert.klyman@lw.com

If to Escrow Agent:        Commerce Escrow Company
1545 Wilshire Boulevard, Suite 600
Los Angeles, CA 90017
Attention:  Luisa Chi
Facsimile:  213-201-5192
Email:  lchi@comescrow.com

**9.**    **Successors and Assigns Bound; Captions**

These Instructions shall not be assigned by a party without the prior written consent of the other parties, except that Purchaser may assign its rights hereunder without the need for any such consent, so long as (i) the assignee (a) is an affiliate of Greystar GP, LLC, and (b) complies with the provisions of paragraph 3(c) of these instructions, and (ii) the day-to-day operations of the assignee are controlled, directly or indirectly, by Greystar Real Estate Partners, LLC.  Except as limited by the preceding sentence, the covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of the Bank Group, the Purchaser, the Borrower Parties and Escrow Agent.  The captions and headings of the paragraphs in these Instructions are for convenience only and are not to be used to interpret or define any provisions hereof.

**10.**    **Governing Law; Venue; Severability**.

These Instructions shall be governed by the laws of California.  Any dispute between the parties that rises to litigation shall be conducted in the United States District Court for the Central District of California.  If any provision or clause of these Instructions conflicts with applicable law, such conflict shall not affect other provisions of these Instructions which can be given effect without the conflicting provision, and to this end the provisions of these Instructions are declared to be severable.

6

LNBYB000064

**11.**    **No Third Party Beneficiary**.

    The terms and provisions of these Instructions shall not create any right in any person, firm, corporation or entity other than the parties hereto and their respective successors and permitted assigns, and no third party shall have the right to enforce or benefit from the terms hereof.

**12.**    **Interpretation**.

    No provision of these Instructions shall be construed against or interpreted to the disadvantage of any party by reason of such party having or being deemed to have requested, drafted, required or structured such provision.

**13.**    **Counterparts**.

    These Instructions (and any amendments, modifications or extensions hereof) may be executed in several counterparts and, after execution and as executed, shall constitute an agreement binding on all of the parties, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

**14.**    **Facsimile**.

    Execution copies of these Instructions may be delivered by facsimile or electronic mail, which shall be deemed to be an original for the purposes of these Instructions.

*[Signature Page(s) To Follow]*

SD\790687.2

LNBYB000065

**IN WITNESS WHEREOF**, the parties hereunto have executed these Instructions as of the date first written above.

**BORROWER PARTIES:**

**ROOSEVELT LOFTS, LLC**
By:  Its manager The Roosevelt Lofts, Inc.


By:  _____
            M. Aaron Yashouafar, President



_____

**M. Aaron Yashouafar**, individually



_____

**Solyman Yashouafar**, individually



_____

**Simon Barlava**, individually



**PURCHASER:**


**GREYSTAR GP, LLC,**
**a Delaware limited liability company**


By:  _____
Name:
Its:


Joint Escrow Instructions                                    S-1

LNBYB000066

**BANK GROUP:**

**BANK OF AMERICA, N.A.,**
as administrative agent for the Bank Group

By:    _____

      David R. Kegaries, Senior Vice President

**ESCROW AGENT:**

**COMMERCE ESCROW COMPANY**

By:    _____
Name:
Its:

**<u>Schedule 1</u>**

**Wire Instructions – Bank Group**

**[INSERT BANK GROUP WIRE INSTRUCTIONS]**

SD\790687.2

LNBYB000068

## Exhibits A – D

Exhibits A – D are attached to the *Supplement To Notice Of Motion And Motion Pursuant To Federal Rule Of Bankruptcy Procedure 9019 For Authority To Compromise Controversy With Bank Of America, N.A., Individually And As Administrative Agent For A Group Of Lenders* filed on June 8, 2011 as Docket No. 793.

LNBYB000069

## Exhibit E

## USA PATRIOT ACT; OFAC

Purchaser and its designee (i) are, and shall remain, in compliance with all applicable anti-money laundering laws, including without limitation, the USA PATRIOT Act and the laws administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), including, without limitation, Executive Order 13224 (as amended or modified from time to time, (ii) are not, and shall not be, on the OFAC Specially Designated Nationals and Blocked Persons Lists, which, as of the date hereof, may be accessed through the following Internet address:  http://www.treas.gov/offices/enforcement/ofac, and (iii) are not, and shall not be otherwise identified by government or legal authority as a person with whom a U.S. Person (as defined below) is prohibited from transacting business.  Purchaser covenants and agrees to deliver to the Bank of America N.A. any certification or other evidence requested from time to time by Bank of America N.A. in it reasonable discretion confirming Purchaser's compliance with this section.  As used herein, "U.S. Person" shall mean any United States citizen, any permanent resident alien, any entity organized under the laws of the United States (including foreign branched) or its political subdivisions, or any person in the United States.

**<u>Exhibit E</u>**

**Greystar Receivership Stipulation**

**The Greys tar Receiv ership Stip ulation sha ll be in a    form   acceptable to Greystar, and substantially in the form of, and comparable to, the Receivership Stipulation (as defined in the BofA Settlement).**

LNBYB000071

1  LATHAM & WATKINS LLP
2  Robert A. Klyman (State Bar No. 142723)
   355 S. Grand Ave.
3  Los Angeles, CA  90071
   Telephone:  (213) 485-1234
4  Facsimile:  (213) 891-8763

5  Attorneys for Plaintiff
   Greystar GP, LLC
6

7          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                **FOR THE COUNTY OF LOS ANGELES**
8

9  GREYSTAR GP, LLC , a Delaware Limited        **CASE NO.**
   Liability Company,
10                                               **STIPULATION FOR APPOINTMENT OF
                                                 RECEIVER; [PROPOSED] ORDER**
11                     Plaintiff,

12         vs.

13 ROOSEVELT LOFTS, LLC (aka THE
   ROOSEVELT LOFTS, LLC), a Delaware
14 limited liability company, *et al.*

15 Defendants, Inclusive,

16                     Defendants.

17

18

19         The parties to this Stipulation for Appointment of Receiver ("Stipulation") are, Plaintiff,

20 Greystar GP, LLC ("Greystar"), as successor to and assignee of claims and rights of Bank of

21 America, N.A., a national banking association, individually and as the Administrative Agent on

22 behalf of Bank of America, N.A., Manufacturers Bank, a California banking corporation, United

23 Commercial Bank, a California banking corporation, and East West Bank, a California banking

24 corporation, ("Lender"), as further described below in Section F hereof, below, and Defendant,

25 Roosevelt Lofts, LLC (aka The Roosevelt Lofts, LLC), a Delaware limited liability company

26 ("Roosevelt"), by and through the parties' undersigned counsel.

                              **RECITALS**

27

28         A.      On or about March 9, 2006, the Debtor executed a Construction Loan Agreement

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LA\2268489.2                                                    LNBYB000072

(the "Loan Agreement") with the Bank of America N.A., as administrative agent for the Bank Group in the amount of $78,840,375. On or about March 9, 2006, Debtor executed a Deed of Trust Note in the original principal amount of $78,840,375 (the "Note"). The Loan Agreement and Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and rerecorded on November 17, 2006 to correct certain typographical errors (the "Fee Deed of Trust"), and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "Leasehold Deed of Trust," and collectively, with the Fee Deed of Trust, the "Deeds of Trust"). The Deeds of Trust encumber the property commonly known as the "Roosevelt Building," located at 727 West 7th Street, Los Angeles, California (the "Property"), including an absolute assignment of all rents, issues and profits generated from operation of the Property (collectively, the "Collateral").

B.    In further consideration of the Bank Group's loan and extension of credit, on or about March 9, 2006, the Guarantors each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "Guaranty"). The Loan Agreement, Note, Deeds of Trust and the Guaranty, together with all modifications thereto and all other ancillary documents are collectively referred to as the "Loan Documents."

C.    That certain Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 as Instrument No. 06 0610284, and re-recorded on November 17, 2006 as Instrument No. 20062553685 to correct certain typographical errors (collectively, the "Fee Deed of Trust"), and that certain Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 as Instrument No. 06 0610286 (the "Leasehold Deed of Trust"), encumbering the Property, and by which Roosevelt is bound, provide for the *ex parte* appointment of a receiver in the event of Roosevelt's default.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LA\2268489.2

LNBYB000073

Specifically, Section 5.1 – Remedies, of each of the Fee Deed of Trust and the Leasehold Deed of Trust, provide that Lender shall be entitled to *ex parte* appointment of a receiver in the event of Roosevelt's default:

> (g) <u>Receiver</u>.  Holder [a defined term  under the Fee Deed of Trust that includes Lender and any subsequent beneficiary under the Fee Deed of Trust], on behalf of itself and Lenders, shall as a m atter of ri ght be entitled to the appointment of a receiver or receivers for all or any part of the Propert y, whether such receivership is incident to a proposed sale (or sales) of such property or otherwise, and without regard to the value of the Property or th e solvency of any person or persons liable for the paym ent of the Secured Indebtedness, and Borrower does hereby irrevocably consent to the appo intment of such receiver or receiv ers, waives notice of such appointm ent, of any reque st therefor or hearing in connection therewith, and any and all defenses to such appointment, agrees not to oppose any application therefor by  Holder, an d agre es th at such app ointment sh all in no manner impair, prejudice or otherwise affect the rights of H older and L enders to application of Rents as provide d in this De ed of Trust.  Nothing he rein is to  be construed to deprive Holder or Lenders    of any other right, rem edy or privilege they may have under the law to have a receiver appointed.  A ny money advanced by Holder or Lenders in connection with a ny such receivership shall be a dem and obligation (which obligation Borrower hereby prom     ises to pay) owing by Borrower to Holder (for its own acco unt or the account of Lenders, as ap plicable) pursuant to this Deed of Trust.

D.      The Borrower Parties each defaulted on their obligations to the Bank Group.  As a result, the Bank Group delivered a default notice dated December 30, 2008.  On March 23, 2009, the Bank Group caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office.  On or about April 3, 2009, the Bank Group filed a complaint for breach of the Guaranty, appointment of a receiver and judicial foreclosure on the Deeds of Trust in the Superior Court of the State of California for the County of Los Angeles, bearing case no. SC 102472 (the "Guaranty Litigation").

E.      On April 13, 2009, the Debtor filed a voluntary petition commencing a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), bearing case no. l:09-bk-14214-GM (the "Bankruptcy Case").

F.      Greystar has acquired all of Lender's and the Bank Group's respective rights, title and interest in the Loan Agreement, Note, Deeds of Trust, Guaranty and Collateral, and

3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000074

Greystar and Roosevelt have agreed that Greystar shall have the right to exercise all of Lender's and the Bank Group's respective rights thereunder.

G.    Greystar and Roosevelt have agreed that this Court may enter the attached Stipulated Order Appointing Receiver Ex Parte; Temporary Restraining Order In Aid Of the Receiver ("Stipulated Receivership Order"); a copy of which is attached as Exhibit "A."  For avoidance of doubt, for purposes of this Stipulation and the Stipulated Receivership Order, the term Greystar shall include Greystar and any designee of Greystar.

G.    Greystar and Roosevelt have further agreed that Greystar shall post a bond in the amount of $20,000.00, pursuant to Code of Civil Procedure Section 567(b), and a bond in the amount of $10,000.00, pursuant to Code of Civil Procedure Section 529, and that such amounts shall be considered sufficient.  Both bonds shall be from an admitted surety insurer.  The bonds shall be filed with this Court no later than five court days after the issuance of this Court's Order..

## <u>AGREEMENT</u>

Greystar and Roosevelt hereby stipulate that this Court should enter the accompanying Stipulated Receivership Order attached hereto as Exhibit "A."

DATED:                                            LATHAM & WATKINS LLP

By_____
    ROBERT A. KLYMAN
    Attorneys for Plaintiff
    GREYSTAR GP, LLP


DATED:

By_____
    Attorneys For Defendant
    ROOSEVELT LOFTS, LLC (aka THE
    ROOSEVELT LOFTS, LLC), a Delaware
    limited liability company

DATED:                                            THE ROOSEVELT LOFTS, INC.
                                                  THE A/K/A THE ROOSEVELT LOFTS,
                                                  INC.

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000075

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

By /s/ _____

Its /s/ _____

5

**LATHAM&WATKINS**LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

# EXHIBIT A

## [PROPOSED] STIPULATED ORDER APPOINTING RECEIVER EX PARTE AND TEMPORARY RESTRAINING ORDER IN AID OF THE RECEIVER

**GOOD CAUSE APPEARING, IT IS ORDERED** that, [          ] [1] (the "Receiver") is appointed as receiver to take possession, custody and control of all of the assets of Defendant Roosevelt Lofts, LLC (aka The Roosevelt Lofts, LLC, and hereinafter "Defendant") including the property commonly known as the "Roosevelt Building," located at 727 West 7th Street, Los Angeles, California, which secure its obligations to Lender [2] (the "Receivership Property").

1.     **Receiver's Appointment**.  The Receiver is to immediately take possession, custody and control of the Receivership Property and to maintain and conserve said Receivership Property pending further order of this Court.  The powers of the Receiver shall be all the usual and customary powers of a receiver to take control of and operate the Receivership Property, including the duties and powers enumerated below.

2.     **Receiver's Oath and Bond**.  Before performing his duties, the Receiver shall execute a receiver's oath and file a bond in the sum of $25,000, conditioned upon the faithful performance of the Receiver's duties.  The bond shall be from a surety approved by the Court and shall be filed in Department _____, by no later than 4:00 p.m., on _____, 20__.

3.     **Receiver's Duties and Powers**.  The Receiver shall be vested with the authority to do the following:

a.     Take possession, custody and control of, and operate, manage, control and conduct the Receivership Property;

b.     Collect all rents, issues, profits, and income resulting from the operation of the Receivership Property;

---

[1] Greystar GP, LLC or its designee (collectively, "Greystar") shall have the right to designate the identity of the person who will serve as the Receiver.

[2] For purposes of this Stipulated Order, the terms "Lender" and "Plaintiff" shall mean Greystar.

6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

LNBYB000077

c.      Care for, preserve, operate and maintain the Receivership Property and incur the expenses necessary for such care, preservation and maintenance of the Receivership Property;

d.      Hire and fire employees, including a manager or management company;

e.      The Receiver may, without further order of this court, terminate all contractor, subcontractor rental, property management sales agency and security company agreements in place related to the Receivership Property deemed by him to be burdensome to the Receivership Property subject to any restrictions within the OCIP insurance (if applicable);

f.      Enter into contracts as the Receiver reasonably believes necessary for the operation or completion of the Receivership Property;

g.      Rent or lease any part of the Receivership Property (including, individual units in the Receivership Property);

h.      Institute and prosecute all suits that the Receiver, upon obtaining permission of the Court, may reasonably believe to be necessary in connection with the operation of the Receivership Property, and defend all such suits and actions as may be instituted against the Receivership Property or the Receiver;

i.      Obtain and pay for any licenses or permits that the Receiver reasonably believes to be necessary for the operation of the Receivership Property;

j.      Obtain and pay for any insurance that the Receiver reasonably believes to be necessary for the operation of the Receivership Property;

k.      Issue subpoenas, conduct and participate in discovery, take depositions, pursue contempt actions, and otherwise pursue all remedies available by law to ensure compliance with the Receiver's authority granted herein; and

l.      Tender any suits or claims against the Receivership Property to any appropriate insurance company.

4.      **Operation of Receivership Property**.  The Receiver shall operate and manage the Receivership Property and may employ agents, employees, clerks, accountants, and property

7

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000078

managers to administer the Receivership Property, purchase materials, supplies and services, and pay for them at the ordinary and usual rates out of the funds which shall come into the Receiver's possession and shall do all things and incur the risks and obligations ordinarily incurred by owners, managers and operators of similar businesses and enterprises.  No risk, obligation or expense so incurred shall be the personal risk or obligation of the Receiver, but shall be the risk, obligation and expense of the receivership estate established herein.

5.    **Completion of Construction and Obtaining Permits**.

a.    The Receiver is authorized to negotiate with government agencies regarding, among other things, completion of the construction on the Receivership Property and the satisfaction of the conditions and obligations related to the issuance of certificates of occupancy for the Receivership Property.  The Receiver may also enter into agreements with the City of Los Angeles or the County of Los Angeles to extend the permits currently in place on the project, if possible.

b.    The Receiver is further authorized to apply for, obtain and pay for any lawful license, permit, variance or other governmental approval or fee that the Receiver reasonably believes to be necessary for the subdivision, construction, operation, maintenance and preservation of the Receivership Property; to confirm the existence of, and to the extent permitted by law, exercise the privileges of any existing license, permit, variance or governmental approval relating to the Receivership Property; and to do all things necessary to protect and maintain those licenses, permits, variances and approvals, including, but not limited to, Department of Real Estate and county and city permits and approvals.

6.    **Equipment**.  The Receiver will take control of any modular units or trailers, equipment, inventory supplies and general intangibles pertaining to or related to the Property.

7.    **Utilities.**

a.    The Receiver is authorized to enter into agreements and negotiate with utility providers including but not limited to the LADWP or Southern California Edison for and

8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000079

on behalf of the Receivership Property including the control and right to any and all deposits in possession of such utility providers.

b.    The Receiver shall not be responsible for payment of any utility bills, unpaid payroll expenses or other unpaid invoices for services or utilities incurred by, or for the benefit of the Defendant or the Receivership Property prior to the Receiver's taking possession of the Receivership Property.  No utility (including LADWP and Southern California Edison) or other vendor may terminate service or the provision of other goods or services to the Receiver as a result of the non-payment of pre-receivership obligations, without prior order of this Court.

8.    **Receiver Certificates**.

a.    The Receiver may issue Receivership Certificates in increments of at least $50,000 bearing interest at 10 percent (10%) per annum for up to $1,000,000 to be funded by the Plaintiff herein, and if Plaintiff is unable to fund, to any third person(s) or party(ies).  All monies generated by the Receivership Property will remain in the Receivership to be used to carry out the duties and obligations of the Receiver as set forth herein.

b.    Funds loaned to the Receiver pursuant to Receivership Certificates are deemed liens of first priority, and, except as provided in the following sentence, shall be repaid prior to all other encumbrances and claims, other than costs of administration

9.    **Use of Funds**.  All monies coming into the Receiver's possession shall only be expended for the purposes herein authorized, and the balance of funds shall be held by the Receiver pending further order of this Court.

10.    **Receivership Fees and Costs**.  The Receiver may charge as interim fees his standard hourly billing rate, plus reimbursement of costs for the Receiver's services.  The Receiver's staff's billing rate varies between $50 and $225 per hour based on experience and skill set.  Where appropriate, the Receiver will have an appropriate staff member handle certain aspects of the Receivership as a cost saving measure.  The Receiver is also authorized to employ the services of accountants and attorneys without further Court order and pay for those services in the amount of the normal fees charged by those professionals.

9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000080

11.    **Monthly Statements**.  The Receiver shall prepare and serve monthly statements reflecting the Receiver's fees and administrative expenses, including fees and costs of accountants and attorneys and other professionals authorized by the Court, incurred for each monthly period in the operation and administration of the Receivership Property.  Upon service of each statement, the Receiver may disburse from estate funds, if any, the amount of each statement.  Notwithstanding periodic payment of fees and expenses, all fees and expenses shall be submitted to the Court for its approval and confirmation, in the form of either a properly noticed interim request for fees, a stipulation of all parties, or in the Receiver's Final Account and Report.

12.    **Inventory**.  Within thirty (30) days after qualification hereunder, the Receiver shall file an inventory of all of the property of which he has taken possession pursuant to this Order.

13.    **Opening of Bank Accounts**.  The Receiver is empowered to establish bank accounts for the deposit of monies and funds collected and received in connection with the Receivership Property, at federally insured banking institutions or savings associations which are not parties to this case.  Monies coming into the possession of the Receiver and not expended for any purposes herein authorized shall be held by the Receiver in interest-bearing accounts.

14.    **Insurance**.  The Receiver shall determine upon taking possession of the Receivership Property whether in the Receiver's judgment there is sufficient insurance coverage.  With respect to any insurance coverage, the Receiver shall be named as an additional insured on the policies for the period that the Receiver shall be in possession of the Receivership Property.  If sufficient insurance coverage does not exist, the Receiver shall immediately notify the parties to this lawsuit and shall have thirty (30) calendar days to procure sufficient all risk and liability insurance for the Receivership Property; provided, however, that if the Receiver does not have sufficient funds to do so, the Receiver shall seek instructions from the Court with regard to whether insurance shall be obtained and how it is to be paid for.  If consistent with existing law,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LA\2268489.2

LNBYB000081

the Receiver shall not be responsible for claims arising from the lack of procurement or inability to obtain insurance.

15.    **Entry to Property**.  The Receiver shall further be entitled to engage a locksmith for the purposes of gaining entry to any property that is the subject of this receivership and through any security system, in order to obtain any property or documents to which the Receiver is entitled pursuant to this Order, as well as giving any notices which may be required in performing the Receiver's duties.  The Receiver may have locks or security codes changed, or have keys created that will work for the existing locks for doors, cabinets or other throughways.

16.    **Tax Identification**.  Defendants herein shall provide the Receiver with all tax identification numbers utilized in connection with the operation of the Receivership Property. The Receiver shall also be entitled to utilize the tax identification numbers during his operation of the Receivership Property or at the Receiver's discretion; the Receiver may obtain new tax identification numbers.

17.    **Mail**.  The Receiver is authorized to have all mail addressed to the Receivership Property forwarded to an address to be designated by him.

18.    **Turnover of Bank Accounts**.  All banks and financial institutions which hold any Receivership Property accounts shall turn over all such funds in any such accounts to the Receiver upon presentation of a copy of this Order, and shall provide copies of any requested records regarding any such accounts to the Receiver:

19.    **Delivery of Revenues**.  Defendants, on receipt of a copy of this Order, shall deliver to the Receiver immediate possession of all revenues and income generated from the business of the Receivership Property in Defendants' possession, custody or control.  This delivery to the Receiver shall be completed within forty-eight (48) hours of receipt of the above-described documents.

20.    **Documents in Receiver's Possession**.  The parties to this action shall be entitled to have access to, and make copies of, documents in the Receiver's possession—including electronic records.

11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

LNBYB000082

21.   **Trustee's Sale**.  If applicable, in the event of a non judicial sale of the Receivership Property by the trustee under the Deed of Trust, the Receiver shall turn over possession, custody and control of the Receivership Property to the successful purchaser at such a sale, after which the Receiver shall prepare and file with the Court the Receiver's final account.

22.   **Further Instructions**.  The Receiver and the parties to this case may at any time apply to this Court for further or other instructions or orders and for further powers necessary to enable the Receiver to perform the Receiver's duties.

23.   **Discharge**.  Discharge of the Receiver shall require a court order after a properly noticed motion approving the Receiver's Final Report and Account.

24.   **Plaintiff's Notice to Receiver**.  Plaintiff shall promptly notify the Receiver in writing of the names, addresses, and telephone numbers of all parties who appear in the action and their counsel.  The parties to this action shall give notice to the Receiver and of all events that affect the receivership, including all court proceedings in this action.

25.   **Bankruptcy – Plaintiff's Duty to Give Notice**.  If any of the Defendants file a bankruptcy case during the receivership, Plaintiff shall give notice of the bankruptcy case to the Court, to all parties, and to the Receiver by the close of the next business day after the day on which Plaintiff receives notice of the bankruptcy filing.

26.   **Bankruptcy – Receiver's Duties**.  If the Receiver receives notice that a bankruptcy has been filed and part of the bankruptcy estate includes property that is the subject of this order, the Receiver shall have the following duties:

a.    The Receiver shall immediately contact the party who obtained the appointment of the Receiver and determine whether that party intends to move in the bankruptcy court for an order for (1) relief from the automatic stay, and (2) relief from the Receiver's obligation to turn over the property (11 U.S.C. §543).  If the party has no intention to make such a motion, the Receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession – and otherwise comply with Title 11 of the United States Code, section 543.

12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000083

b.      If the party who obtained the receivership intends to seek relief immediately from both the automatic stay and the Receiver's obligation to turn over the property, the Receiver may remain in possession and preserve the property pending the ruling on those motions (11 U.S.C. § 543(a)).  The Receiver's authority to preserve the property shall be limited as follows:

i.      The Receiver may continue to collect rents and other income;

ii.      The Receiver may make only those disbursements necessary to preserve and protect the property;

iii.      The Receiver shall not execute any new leases or other long-term contracts; and

iv.      The Receiver shall do nothing that would effect a material change in the circumstances of the property.

c.      If the party who obtained the receivership fails to file a motion within 10 court days after his or her receipt of notice of the bankruptcy filing, the Receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession and otherwise comply with 11 United States Code section 543,

d.      The Receiver may retain legal counsel to assist the Receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

## **STIPULATED INJUNCTIVE RELIEF AGAINST DEFENDANTS**

27.      **Turn Over and Cooperation by Defendants and Related Parties**.  Defendants, and their respective officers, directors, members, managers, agents, partners, property managers, employees, assignees, successors, attorneys, representatives, and all persons acting under, in concert with, or for them:

a.      Shall relinquish and turn over possession of the Receivership Property, including but not limited to all of its assets (including any cash) to the Receiver forthwith upon his appointment becoming effective;

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000084

b.      Shall turn over to the Receiver and direct all other third parties in possession thereof to turn over all keys, leases, books, records, rent rolls, books of account, ledgers, operating statements, control and passwords to website(s) and/or web domains, budgets, tenant lease deposits, and all other Receivership Property records relating to the Receivership Property, wherever located, and in whatever mode maintained, including information contained on computers and any and all software relating thereto as well as all banking records, statements and cancelled checks;

c.      Shall turn over to the Receiver all documents which pertain to all licenses, permits, or government approvals relating to the Receivership Property and shall immediately advise the Receiver of any social security or taxpayer identification numbers used in connection with the operation of the Receivership Property;

d.      Shall turn over to the Receiver all contracts involving the Receivership Property;

e.      Shall immediately advise the Receiver as to the nature and extent of insurance coverage on the Receivership Property.  The parties shall immediately name the Receiver as an additional insured on the insurance policy(ies) for the period that the Receiver shall be in possession of the Receivership Property.  The parties and their agents and representatives are prohibited from canceling, reducing or modifying any and all insurance coverage currently in existence with respect to the Receivership Property;

f.      Shall cooperate with and reasonably assist the Receiver with respect to his operation of the Receivership Property, including but not limited to promptly responding to any inquiry by the Receiver for information.

28.      Pending further Order of this Court, Defendants and their respective officers, directors, members, managers, agents, partners, property managers and employees, and all other persons acting under, in concert with, or for them who have actual or constructive knowledge of this Order, and their agents and employees shall not in any manner, directly or indirectly:

14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

LNBYB000085

a.      Commit or permit any waste of the Receivership Property or any part thereof, or suffer or commit or permit any act on the Receivership Property or any part thereof in violation of law, or remove, transfer, encumber or otherwise dispose of any of the property or of the Receivership Property or any part thereof;

b.      Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order or the Receiver's possession of and operation or management of the Receivership Property;

c.      Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage, create a security interest in, encumber, conceal or in any manner whatsoever deal in or dispose of the whole or any part of the Receivership Property without prior specific Court Order;

d.      Withhold any Receivership Property assets, books, records, or funds from the Receiver;

e.      Destroy or conceal any records, documents, electronic data, electronic equipment or software, or any other medium that contains information related to the Receivership Property; and

f.      Do any act which will, or which will tend to impair, defeat, divert, prevent or prejudice the preservation of the Receivership Property.

**IT IS SO ORDERED**

Dated: _____, 2011

_____
JUDGE OF THE SUPERIOR COURT

---

15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LA\2268489.2

LNBYB000086

## **Exhibit F**

**Letter of Intent**

**(see attached)**

# GREYSTAR

May 23, 2011

M. Aaron Yashouafar
*Via email attachment*

Re: Roosevelt Lofts, LLC

Mr. Yashouafar:

This letter sets forth our current mutual intentions with respect to the acquisition by an affiliate of Greystar GP, LLC ("**Purchaser**") of the property ("**Property**") herein described. The Roosevelt Lofts, Inc., a California corporation owns one hundred percent of all of the membership interests of Roosevelt Lofts, LLC and serves as managing member of Roosevelt Lofts, LLC (the "**Seller**"). It is contemplated that Purchaser's acquisition of the Property shall be implemented through a plan of reorganization (the "**Plan**") in the bankruptcy case of *In re Roosevelt Lofts, LLC*, case no. 09-14214 GM, pending before the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Case**"). The Plan will be co-sponsored by Purchaser, Seller and Roosevelt Lofts, LLC. This is a letter of intent only and, except as provided in Sections 11, 12 and 14 below, does not constitute a binding agreement of the parties. The parties will be bound only at such time, if ever, as they execute a definitive purchase and sale agreement (as defined more fully below, the "**Definitive Agreement**"), either encompassed within or incorporated into the Plan, in each case evidencing all of the terms, provisions and conditions of the transaction generally outlined in this letter.

1.   PROPERTY DESCRIPTION.

727 West 7th Street, Los Angeles, California

Purchaser understands Property to contain 222 individually subdivided residential condominium units, a commercial retail component on the ground floor (the "Retail Component") and parking areas.

2.   PURCHASE PRICE AND PAYMENT TERMS.

- Option A:  $ 89,000,000 for the Property, excluding the Retail Component

- Option B:  $ 95,000,000 for the entirety of the Property

- Purchaser shall select whether to pursue Option A or Option B on or before June 2, 2011.

- Under either Option A or Option B:

    a.  Purchase is for 100%, fee simple, ownership interest in the Property, free and clear of all liens, claims, interests and encumbrances.

    b.  Purchase price will be reduced by any proceeds of insurance with respect to the Property received by Seller or Roosevelt Lofts, LLC on or prior to the effective date of the Plan (the "**Effective Date**") or as otherwise agreed to among Purchaser and Seller. In addition, Seller will cause any insurance claims and other of Roosevelt Lofts, LLC's claims and causes of action with respect to or involving the Property

L.A\2260780.6

to be transferred to Purchaser (excluding any causes of action against Purchaser, BofA or Seller, which shall be released under the Plan). Purchaser understands and agrees that any and all proceeds paid by the Title Company to Roosevelt Lofts, LLC, prior to the Effective Date as a result of pending claims for the mechanic's liens recorded against the Property, shall be used toward settlement and removal of recorded mechanic's liens (the "**Mechanics' Lien Insurance Payment**").

c.  Purchaser shall pay purchase price in cash to the estate of Roosevelt Lofts, LLC on the Effective Date; provided however that that for purposes of this offer only and as a compromise under FRE 408, the Purchase Price shall be reduced by (i) the amount of consideration paid by Purchaser for the senior secured bank claim held by Bank of America (the "**BofA Claim**") and (ii) the Mechanics' Lien Insurance Payment.

3.  TITLE/NOTICE OF COMPLETION.

- On the Effective Date, Purchaser shall receive good and marketable title to the Property, the associated improvements, all related personal property owned by Roosevelt Lofts, LLC, and any leases for space in the improvements at closing.

- The Property shall be free and clear of liens, claims, interests and encumbrances, except those specifically permitted by Purchaser.

- On the Effective Date, Seller shall cause Purchaser to receive an owner's policy of title insurance in form and substance acceptable to Purchaser, subject only to such exceptions as Purchaser approves during the review process. All existing insurance policies of any kind (including without limitation title insurance and property and casualty insurance) related to the Property shall be maintained in full force and assigned to Purchaser, except as provided in Section 2.b, above. Seller shall not do anything to impair coverage under any of the foregoing insurance policies.

- Promptly after the date hereof, Seller shall cause a notice of completion to be filed in the appropriate public records with respect to all work done on the Property to date, and shall cause all such work to stop prior to the filing date of the notice of completion.

- Conveyance of the Property shall be through the Plan and appropriate court order and instrument of conveyance.

4.  REPRESENTATIONS AND WARRANTIES; CONDITIONS.  The Plan shall contain representations and warranties customary for real estate and bankruptcy transactions of this size and type, including, without limitation, authorization and power to convey, no knowledge of material defects in the improvements, accuracy of rent roll and other information provided, and no knowledge of failure of the property to comply with applicable laws. Purchaser is aware that the roof of the Property needs repair to eliminate leaking and that the parking stalls are non-conforming. Representations and warranties shall not survive the Effective Date, except for those that were incorrect as a result of intentional misrepresentations. The Plan shall also contain conditions customary for real estate and bankruptcy transactions of this size and type.

5.. TREATMENT OF CLAIMS AND INTERESTS IN THE PLAN. Purchaser and Seller shall cooperate in the drafting of the Plan and related disclosure statement, and shall mutually agree on the treatment of claims and interests under the Plan.

6. DELIVERY OF INFORMATION. Promptly following the date hereof, Seller shall cause Purchaser to receive copies all policies of title insurance and all plans, specifications, surveys, reports, financial records and invoices relative to the Property and any other information reasonably requested by Purchaser to the extent any of the foregoing information and documentation is within the custody, possession or control of Seller, Roosevelt Lofts, LLC or any of their respective affiliates, employees, members, agents, officers, consultants or professionals.

7. INSPECTION PERIOD. Purchaser shall have the right to review the information delivered by Seller and all books and records pertaining to the ownership and operation of the Property, to conduct a phase I environmental audit of the Property, and to enter upon and inspect the Property.

8. CLOSING DATE. The Effective Date shall be defined as 90 days after the date hereof.

9. BINDING AGREEMENT.

(A) By no later than June 2, 2011, (i) Seller and Purchaser shall enter into a definitive written agreement which memorializes the terms and conditions set forth herein with specificity (the "**Definitive Agreement**") and (ii) Seller and Purchaser shall enter into a definitive agreement with the holder of the BofA Claim ("BofA") to assign such claim to Purchasers for ▮▮▮▮▮▮ in cash (the "**BofA Assignment Agreement**"), subject to the terms herein and in the Definitive Agreement and the BofA Assignment Agreement. In the event that the Definitive Agreement and the BofA Assignment Agreement are not entered into by such date for any reason, neither Purchaser nor Seller shall have any obligation to proceed with the transaction contemplated by this letter of intent (and the liquidated damages described in Section 12, below, shall not be applicable). In the event that the Definitive Agreement and the BofA Assignment Agreement are entered into by June 2, 2011, then Purchaser shall have the exclusive right to acquire the BofA Claim for ▮▮▮▮▮▮.

(B) By no later than June 10, 2011, Purchaser will deposit $5 million into a third party escrow (the "**Escrow**") toward its acquisition of the BofA Claim (the "**$5 Million Deposit**"). The $5 Million Deposit will become irrevocable on the later of the date (the "**Irrevocable Escrow Date**") that the Bankruptcy Court enters a final order:

(i) approving Purchaser as a sponsor of the Plan (the "**Plan Sponsor Order**") that, among other things, (a) memorializes and implements the terms of the Definitive Agreement, (b) provides for either (x) payment in full in cash on the Effective Date of the BofA Claim in an amount equal to the face amount of the BofA Claim plus default interest and outstanding fees and expenses or (y) conversion of the BofA Claim into 100% of the equity interests of Roosevelt Lofts, LLC as reorganized (or such entity that holds, as of the Effective Date, such equity interests), (c) approves the BofA Claim as allowed, perfected, valid and duly enforceable (without any defense, counterclaim and right of offset) with first priority security against the Property subject only to any existing court approved settlement with holders of mechanics' liens against the Property and (d) provide for automatic relief from stay for Purchaser (as holder of the BofA Claim) on the Effective Date to foreclose on the Property on the tenth day following the Effective Date unless the Plan is performed according to its terms; and

LNBYB000090

(ii) approving the BofA Assignment Agreement (the "**BofA Assignment Order**").

(C)  On the date that is (x) 35 days after the execution and delivery of the "**Final Agreement**" referenced in that certain term sheet for Settlement Agreement Between the Bank Group, Roosevelt Lofts, LLC and Affiliates and Bank Guarantors (attached hereto as Exhibit 1), Purchaser will deposit another $10 million in the Escrow towards the consideration for the assignment of the BofA Claim to Purchaser (the "**$10 Million Deposit**") and (y) 65 days after the execution and delivery of the Final Agreement, Purchaser will deposit another $20 million into the Escrow towards the consideration for the assignment of the BofA Claim to Purchaser (collectively with the $5 Million Deposit and the $10 Million Deposit, the "**Escrow Deposits**").

(D)  the Escrow Deposits shall be (A) in immediately available funds and (B) non-refundable following the Irrevocable Escrow Date; provided however that upon the Effective Date (or earlier in the sole discretion of the Purchaser) the Escrow Deposits shall be applied to fund the consideration for the assignment of the BofA Claim to Purchaser.

10. CLOSING COSTS.  Each of the Purchaser and Seller shall be responsible for its fees and costs (including attorneys' fees) incurred in connection with the transactions contemplated by this agreement. Rents, taxes, and approved operating expenses will be prorated as of the Effective Date.  Purchaser shall have the right to terminate and/or reject any management and other service agreements affecting the Property concurrently with the confirmation of the Plan.

11. CONFIDENTIALITY.  Purchaser and Seller shall not disclose any of the terms, provisions, or conditions of this letter to any other person without the express written consent of the other party, except that Purchaser may disclose such information to its principals, counsel, accountants and potential financing sources in connection with evaluating the potential acquisition of the property by Purchaser. Purchaser agrees that, in any discussion with BofA concerning the BofA Assignment Agreement, Purchaser shall not disclose the terms of this letter set forth in Paragraph 2, above.

12. EXCLUSIVITY.  From and after the date hereof, so long as Purchaser is willing to purchase the Property for the Purchase Price, Seller hereby agrees that it will not accept offers with respect to any transaction involving or relating to a potential acquisition of the BofA Claim, the Property, Roosevelt Lofts, LLC or the Seller (including, without limitation, through a plan of reorganization). Seller and Purchaser recognize that this agreement is not a solicitation of votes on the Plan or any other plan.  In the event Purchaser is willing to purchase the Property for the Purchase Price under the terms set forth herein and in the Definitive Agreement and the BofA Assignment Agreement and is not then in material breach of the Definitive Agreement or the BofA Assignment Agreement, but Seller does not agree to sell the Property to the Purchaser for the Purchase Price under the terms and conditions set forth herein and in the Definitive Agreement and the BofA Assignment Agreement (the "**Sale Breach**"), Seller promptly shall pay Purchaser the sum of $500,000 in cash as liquidated damages to compensate Purchaser for the Sale Breach.   Purchaser and Seller agree that it would be impracticable and difficult to estimate the actual damages which Purchaser may suffer as a result of the Sale Breach. Therefore, Purchaser and Seller agree that a reasonable estimate of the foregoing damages which Purchaser would suffer as a result of the Sale Breach is and shall be limited to the foregoing amount of liquidated damages.  All other remedies for the Sale Breach shall be waived by Purchaser. The Purchaser and Seller acknowledge that the payment of such

LNBYB000091

liquidated damages is not intended as a forfeiture or penalty but is intended to constitute liquidated damages. The Liquidated Damages described herein shall be personally guaranteed by M. Aaron Yashouafora and Simon Barlava. Notwithstanding the foregoing, nothing contained herein shall impair or restrict Purchaser's right to foreclose on the Property as described in Section 9 hereof and the Plan Sponsor Order or the exercise of any remedies set forth in the Definitive Agreement and the BofA Assignment Agreement.

13. <u>ASSIGNMENT/NOMINATION</u>. An affiliate or other designee of Purchaser may take title the Property on the Effective Date.

14. <u>CORPORATE AUTHORITY</u>. By signing below, each signatory below represents and warrants that he has full corporate authority to enter into this letter and bind his respective party to the terms of Sections 11, 12 and 14 hereof. In addition, by signing in the signature block below under "Accepted Effective As _____", the signatory represents that the entity set forth in such signature block owns all of the membership interests of and serves as managing member of Roosevelt Lofts, LLC. The foregoing representations shall survive indefinitely. Seller covenants that it will (a) not pledge, transfer, hypothecate, encumber or assign such membership interests unless such pledge, transfer, hypothecation, encumbrance or assignment is made expressly subject in writing to the terms and conditions set forth herein and (b) shall provide Purchaser with prompt notice of any of the actions described in Section 14(a) hereof.

LNBYB000092

Seller and Purchaser stipulate that the agreements set forth in Sections 11, 12 and 14 are supported by good and sufficient consideration, including Purchaser's undertaking activities with regard to evaluating the viability of the transaction herein described. Each party reserves the right to negotiate with respect to the transactions herein described in their own sole interest.

The parties again stipulate and acknowledge that this is a non-binding letter of intent only, and that except for the confidentiality agreements set forth in Section 11, the exclusivity agreements set forth in Section 12, and the representations and warranties and covenants in set forth in Section 14, this letter does not create any binding agreements between the parties hereto. No party shall be bound (except as set forth in Sections 11, 12 and 14), until such time as a Definitive Agreement is duly executed by all parties. If this proposal is not accepted by May 23, 2011, Purchaser's offer will become null and void.

If the foregoing sets forth your current understanding of our current mutual intent, please so indicate by signing one copy where indicated below.

Yours very truly,

GREYSTAR GP, LLC

By:_____
Name:__Kevin Kaberna_____
Title:___Investment Principal_____

ACCEPTED EFFECTIVE AS OF _5/23/11_

By:_____
Name:_M. Aaron Yashouafar_
Title:_CEO_
On Behalf of: _The Roosevelt lofts, INC._

LNBYB000093

**Exhibit G**


**Inventory**


Due to its voluminous nature, this exhibit has not been attached hereto.  A copy of this exhibit is attached to the *Notice of Supplement To Motion Pursuant To Sections 105(a), 363(b) and 1125(b) of the Bankruptcy Code and Bankruptcy Rule 6004 For An Order Authorizing The Debtor and Other Parties Thereto To Enter Into Plan Support Agreement and Related Agreements* filed on June 9, 2011 as Docket No. 795, and will be provided upon written request.

LNBYB000094

## Exhibit H

**[Intentionally Omitted]**

LNBYB000095

## **Exhibit I**

### **Debtor Bank Accounts**

City National Bank
Debtor In Possession Account
Account No. 210092560
Balance as of June 2, 2011:   $189,237.25

Bank of America
Litigation Reserve Account
Account No. 14590-60688
Balance as of June 2, 2011:   $1,500,000.00

LNBYB000096

**<u>Exhibit J</u>**

**Rent Roll**

**(see attached)**

LNBYB000097

The Roosevelt Residences
Seventh Street
Los Angeles, CA

Rent Roll
as of
June 2011

| SUITE | NAME | AREA | COMM DATE | EXP. DATE | MONTHLY RENT | CAM CHARGES | TOTAL | SECURITY DEPOSIT |
|-------|------|------|-----------|-----------|--------------|-------------|-------|------------------|
| **Residential Tenants** | | | | | | | | |
| RVLTR-310 | Occupied | 814 | 2/10/11 | 1/31/2012 | 1,950.00 | | | 2,925.00 |
| RVLTR-417 | Occupied | 1,310 | 5/15/11 | 4/30/2012 | 3,100.00 | | | 3,100.00 |
| RVLTR-419 | Occupied | 795 | 10/01/10 | 9/01/2011 | 2,000.00 | | | 3,500.00 |
| RVLTR-508 | Occupied | 940 | 4/01/11 | 3/31/2012 | 2,450.00 | | | 2,450.00 |
| RVLTR-313 | Occupied | 804 | 2/01/11 | 1/31/2012 | 1,850.00 | | | 2,000.00 |
| RVLTR-704 | Occupied | 1,366 | 7/01/10 | 6/30/2011 | 3,278.00 | | | 3,278.00 |
| RVLTR-509 | Occupied | 893 | 5/07/11 | 4/30/2012 | 2,400.00 | | | 2,400.00 |
| RVLTR-711 | Occupied | 1,332 | 2/10/11 | 1/31/2012 | 2,750.00 | | | 4,125.00 |
| RVLTR-816 | Occupied | 1,248 | 11/01/10 | 10/31/2011 | 2,775.00 | | | 2,775.00 |
| RVLTR-503 | Occupied | 1,328 | 6/29/10 | 5/31/2011 | 3,187.00 | | | 2,223.00 |
| RVLTR-712 | Occupied | 944 | 12/01/10 | 11/30/2011 | 2,250.00 | | | 2,250.00 |
| RVLTR-611 | Occupied | 1,332 | 12/01/10 | 11/30/2011 | 3,197.00 | | | 6,894.00 |
| RVLTR-312 | Occupied | 785 | 10/01/10 | 9/30/2011 | 1,900.00 | | | 1,900.00 |
| RVLTR-707 | Occupied | 950 | 4/15/11 | 3/31/2012 | 2,518.00 | | | 3,777.00 |
| RVLTR-305 | Occupied | 1,037 | 11/01/10 | 10/31/2011 | 2,400.00 | | | 2,900.00 |
| RVLTR-719 | Occupied | 1,532 | 11/01/09 | MTM | 3,165.00 | | | 3,165.00 |
| RVLTR-815 | Occupied | 883 | 2/01/11 | 1/31/2012 | 2,200.00 | | | 2,350.00 |
| RVLTR-525 | Occupied | 1,217 | 2/15/11 | 1/31/2012 | 2,600.00 | | | 3,000.00 |
| RVLTR-513 | Occupied | 934 | 6/07/11 | 5/31/2012 | 2,080.00 | | | 3,000.00 |
| RVLTR-708 | Occupied | 919 | 11/01/10 | 10/31/2011 | 2,150.00 | | | 2,150.00 |
| RVLTR-811 | Occupied | 1,332 | 4/08/11 | 3/31/2012 | 3,250.00 | | | 3,400.00 |
| RVLTR-505 | Occupied | 1,290 | 4/01/11 | 1/19/2012 | 2,825.00 | | | 2,800.00 |
| RVLTR-514 | Occupied | 942 | 8/01/10 | 7/31/2011 | 2,300.00 | | | 2,300.00 |
| RVLTR-810 | Occupied | 1,305 | 8/01/10 | 7/31/2011 | 3,000.00 | | | 3,000.00 |
| RVLTR-506 | Occupied | 863 | 5/01/11 | 4/30/2012 | 2,050.00 | | | 4,100.00 |
| RVLTR-823 | Occupied | 931 | 5/15/11 | 4/30/2012 | 2,400.00 | | | 2,400.00 |
| RVLTR-518 | Occupied | 1,453 | 1/08/11 | 12/31/2011 | 2,800.00 | | | 2,800.00 |
| RVLTR-410 | Occupied | 1,096 | 5/01/11 | 4/30/2012 | 2,750.00 | | | 3,500.00 |
| RVLTR-808 | Occupied | 932 | 12/01/10 | 11/30/2011 | 2,435.00 | | | 3,750.00 |
| RVLTR-607 | Occupied | 874 | 11/01/10 | 10/31/2011 | 2,150.00 | | | 2,150.00 |
| RVLTR-501 | Occupied | 940 | 3/26/11 | 2/29/2012 | 2,250.00 | | | 2,250.00 |
| RVLTR-415 | Occupied | 863 | 5/15/11 | 4/30/2012 | 1,950.00 | | | 1,950.00 |
| RVLTR-715 | Occupied | 1,030 | 5/15/11 | 4/30/2012 | 2,300.00 | | | 2,300.00 |
| RVLTR-616 | Occupied | 1,248 | 11/16/10 | 10/31/2011 | 2,500.00 | | | 2,500.00 |
| RVLTR-713 | Occupied | 958 | 6/01/11 | 11/30/2011 | 2,550.00 | | | 2,550.00 |
| RVLTR-510 | Occupied | 1,093 | 5/10/11 | 4/30/2012 | 2,650.00 | | | 2,650.00 |
| RVLTR-519 | Occupied | 1,532 | 2/01/11 | 1/31/2012 | 2,950.00 | | | 2,950.00 |
| RVLTR-302 | Occupied | 1,363 | 12/01/10 | 11/30/2011 | 2,975.00 | | | 3,475.00 |
| RVLTR-610 | Occupied | 1,090 | 1/01/11 | 12/31/2011 | 2,180.00 | | | 0.00 |
| RVLTR-716 | Occupied | 1,012 | 1/01/11 | 12/31/2011 | 2,275.00 | | | 2,425.00 |
| RVLTR-726 | Occupied | 1,115 | 4/09/11 | 3/31/2012 | 2,500.00 | | | 4,250.00 |
| RVLTR-423 | Occupied | 910 | 9/19/09 | 8/31/2010 | 2,350.00 | | | 0.00 |
| RVLTR-425 | Occupied | 1,219 | 4/01/09 | 3/31/2011 | 550.00 | | | 0.00 |
| RVLTR-822 | Occupied | 864 | 4/07/11 | 3/31/2012 | 2,150.00 | | | 2,150.00 |
| RVLTR-612 | Occupied | 921 | 4/01/11 | 3/31/2012 | 2,175.00 | | | 4,000.00 |
| RVLTR-426 | Occupied | 1,125 | 3/01/11 | 2/28/2012 | 2,550.00 | | | 2,550.00 |
| RVLTR-314 | Occupied | 1,619 | 10/01/10 | 8/31/2011 | 2,750.00 | | | 2,750.00 |
| RVLTR-613 | Occupied | 947 | 2/17/11 | 1/31/2012 | 2,225.00 | | | 2,225.00 |
| RVLTR-720 | Occupied | 875 | 3/01/11 | 2/29/2012 | 1,995.00 | | | 3,000.00 |
| RVLTR-309 | Occupied | 839 | 10/15/10 | 9/30/2011 | 1,950.00 | | | 1,950.00 |
| RVLTR-522 | Occupied | 868 | 2/20/11 | 1/31/2012 | 2,050.00 | | | 2,050.00 |
| RVLTR-307 | Occupied | 732 | 7/26/10 | 6/30/2011 | 2,000.00 | | | 2,000.00 |
| RVLTR-609 | Occupied | 885 | 6/01/10 | 5/31/2011 | 2,345.00 | | | 3,150.00 |
| RVLTR-412 | Occupied | 913 | 3/13/09 | MTM | 2,650.00 | | | 0.00 |
| RVLTR-812 | Occupied | 944 | 3/01/11 | 2/29/2012 | 2,400.00 | | | 2,400.00 |
| RVLTR-511 | Occupied | 1,332 | 10/15/10 | 9/30/2011 | 2,557.00 | | | 2,557.00 |

*Confidential and Privileged Information*

LNBYB000098

The Roosevelt Residences
1221 West Seventh Street
Los Angeles, CA

Rent Roll
as of
June 2011

| SUITE | NAME | AREA | COMM DATE | EXP. DATE | MONTHLY RENT | CAM CHARGES | TOTAL | SECURITY DEPOSIT |
|---|---|---|---|---|---|---|---|---|
| **Residential Tenants** | | | | | | | | |
| RVLTR-825 | Occupied | 1,226 | 5/01/11 | 4/30/2012 | 2,650.00 | | | 2,650.00 |
| RVLTR-304 | Occupied | 1,024 | 6/01/10 | MTM | 2,200.00 | | | 2,200.00 |
| RVLTR-813 | Occupied | 956 | 11/01/10 | 10/31/2011 | 2,350.00 | | | 2,350.00 |
| RVLTR-303 | Occupied | 1,042 | 2/25/11 | 1/31/2012 | 2,400.00 | | | 3,600.00 |
| RVLTR-701 | Occupied | 940 | 3/19/11 | 9/30/2011 | 2,600.00 | | | 2,600.00 |
| RVLTR-622 | Occupied | 875 | 6/02/11 | 5/31/2012 | 2,100.00 | | | 2,500.00 |
| RVLTR-723 | Occupied | 930 | 5/15/11 | 5/31/2012 | 2,400.00 | | | 0.00 |
| RVLTR-814 | Occupied | 951 | 4/01/11 | 3/31/2012 | 2,400.00 | | | 4,800.00 |
| RVLTR-714 | Occupied | 950 | 6/01/10 | MTM | 2,400.00 | | | 2,400.00 |
| RVLTR-722 | Occupied | 868 | 6/01/11 | 5/31/2012 | 1,950.00 | | | 3,500.00 |
| RVLTR-411 | Occupied | 1,265 | 4/15/09 | 3/14/2011 | 550.00 | | | 0.00 |
| RVLTR-516 | Occupied | 1,012 | 12/01/10 | 11/30/2011 | 2,250.00 | | | 3,375.00 |
| RVLTR-724 | Occupied | 808 | 5/01/11 | 4/30/2012 | 1,995.00 | | | 1,995.00 |
| RVLTR-706 | Occupied | 888 | 8/15/10 | 7/31/2011 | 2,200.00 | | | 2,200.00 |
| RVLTR-413 | Occupied | 931 | 3/07/11 | 2/29/2012 | 2,400.00 | | | 4,100.00 |
| RVLTR-623 | Occupied | 931 | 5/15/11 | 4/30/2012 | 2,200.00 | | | 2,200.00 |
| RVLTR-718 | Occupied | 1,453 | 3/15/11 | MTM | 2,790.00 | | | 0.00 |
| RVLTR-702 | Occupied | 1,462 | 2/01/11 | 1/31/2012 | 3,000.00 | | | 3,000.00 |
| RVLTR-705 | Occupied | 1,288 | 8/01/10 | 7/31/2011 | 3,136.00 | | | 3,136.00 |
| RVLTR-409 | Occupied | 884 | 2/01/11 | 1/31/2012 | 2,000.00 | | | 2,000.00 |
| RVLTR-709 | Occupied | 910 | 12/01/10 | 11/30/2011 | 2,300.00 | | | 2,500.00 |
| RVLTR-512 | Occupied | 918 | 5/09/11 | 4/30/2012 | 2,600.00 | | | 3,900.00 |
| RVLTR-614 | Occupied | 938 | 9/01/10 | 8/31/2011 | 2,496.00 | | | 2,500.00 |
| Total 83,068 | | | | | 189,304.00 | | | 205,950.00 |
| **Retail Tenants** | | | | | | | | |
| RVLTR-G723 | 727 WEST SEVENTH, LLC (SALVA | 2,750 | 06/01/11 | 05/31/11 | 7,975.00 | 2,639.29 | 10,614.29 | 0 |
| RVLTR-G729 | JANG ENTERPRISES, INC. | 4,276 | 3/01/09 | 4/30/2019 | 15,191.43 | 3,228.00 | 18,419.43 | 8,655.00 |
| RVLTR-G733 | HAO LAM | 1,505 | 10/01/09 | 9/30/2019 | 6,358.35 | 1,136.00 | 7,494.35 | 5,200.00 |
| RVLTR-G735 | FAMIMA CORPORATION | 1,633 | 3/24/09 | 6/30/2014 | 9,887.90 | 1,233.00 | 11,120.90 | 6,355.78 |
| Total | | | | | 31,437.68 | 5,597.00 | 37,034.68 | 20,210.78 |

*"The information in this rent roll is subject to verification and/or change at the time of closing, based on the actual in place tenancies and amounts paid by the tenants."*

*Confidential and Privileged Information*

LNBYB000099

| | |
|---|---|
| In re:  ROOSEVELT LOFTS, LLC, Debtor | CHAPTER   11<br>CASE NO 1:09-bk-14214-GM |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as **DISCLOSURE STATEMENT RE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION (DATED JUNE 20, 2011), AS MODIFIED** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On *July 1, 2011*, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

* John B Acierno    ecfcacb@piteduncan.com
* Jess R Bressi    jbressi@luce.com
* Carleton R Burch    crb@amclaw.com,
amc@amclaw.com;jsh@amclaw.com;awh@amclaw.com;mav@amclaw.com;esf@amclaw.com;slc@amclaw.com;csh@amclaw.com
* Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
* L Dominic Chacon    ldominicchacon@yahoo.com
* Cynthia M Cohen    cynthiacohen@paulhastings.com
* Ryan M Craig    rcraig@trachtmanlaw.com
* Travis W Feuerbacher    tfeuerbacher@gglts.com
* Steven R Fox    emails@foxlaw.com
* Helen R Frazer    hfrazer@aalrr.com
* Varand Gourjian    vg@gourjianlaw.com,
lucy@gourjianlaw.com;naz@gourjianlaw.com;art@gourjianlaw.com
* Jeffrey H Grant    jgrant@lathropgage.com
* Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com
* Herbert Hayden    herbert@ntlg.us
* Brian L Holman    b.holman@mpglaw.com
* Alexandra Kazhokin    akazhokin@buchalter.com,
salarcon@buchalter.com;ifs_filing@buchalter.com
* Mark J Krone    crb@amclaw.com, crs@amclaw.com;amc@amclaw.com
* Ian Landsberg    ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;ssaad@landsberg-law.com
* Wendy A Loo    wendy.loo@lacity.org
* David L. Neale    dln@lnbrb.com
* Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
* Russell H Rapoport    rrapoport@prllplaw.com, lgillis@prllplaw.com
* Ronald N Richards    ron@ronaldrichards.com
* S Margaux Ross    margaux.ross@usdoj.gov
* Bruce D Rudman    bdr@agrlaw.net
* William D Schuster    bills@allieschuster.org
* Marian K Selvaggio    selvaggio@huntortmann.com
* Daniel H Slate    dslate@buchalter.com, rreeder@buchalter.com;ifs_filing@buchalter.com
* Lindsey L Smith    lls@lnbyb.com
* David A Tilem    davidtilem@tilemlaw.com,
malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com

1    * United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov
     * Barry R Wegman     barrywegman@tilemlaw.com,
2    malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
     * Marc Weinberg     marcweinberg@att.net
3    * Gilbert B Weisman     notices@becket-lee.com
     * Brandon J Witkow     bwitkow@lockelord.com
4    * Aimee Y Wong     aywong@mckennalong.com

5                                      ☐  Service information continued on attached page

6    **II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
     On ***July 1, 2011,*** I served the following person(s) and/or entity(ies) at the last known address(es) in this
7    bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed
     envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service
8    addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be
     completed no later than 24 hours after the document is filed.

9
     None.
10                                     ☐  Service information continued on attached page

11   **III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method
     for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***July 1, 2011,*** I
12   served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in
     writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here
13   constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours
     after the document is filed.

14
     **VIA E-MAIL:** margaux.ross@usdoj.gov; dslate@buchalter.com; ilandsberg@landsberg-law.com;
15   davidtilem@tilemlaw.com; bdr@agrlaw.com; gmouzis@mouzislaw.com; ROBERT.KLYMAN@lw.com;
     Robert.Frances@LW.com; dln@lnbyb.com; jyo@lnbyb.com; mayashoua@milbankre.com;
16   simon@designcollection.com; Hjnourmand@aol.com; htaghdiri@milbankre.com; hfathi@milbankre.com

17   **VIA ATTORNEY MESSENGER DELIVERY**
     Hon. Geraldine Mund
18   United States Bankruptcy Court
     21041 Burbank Blvd., Ctrm 303
19   Woodland Hills, CA 91367          ☐  Service information continued on attached page

20   I declare under penalty of perjury under the laws of the United States of America that the foregoing is
     true and correct.

21
      July 1, 2011            Angela Antonio                    /s/ Angela Antonio
22    Date                    Type Name                         Signature

23

24

25

26

27

28