DAVID L. NEALE (SBN 141225)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  dln@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtor
and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>ROOSEVELT LOFTS, LLC, a<br>Delaware limited liability company,<br><br>     Debtor. | Case No. 1:09-bk-14214-GM<br><br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER ESTABLISHING BIDDING PROCEDURES FOR SALE OF DEBTOR'S PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO 11 U.S.C. §§ 105 AND 363; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF M. AARON YASHOUAFAR IN SUPPORT THEREOF**<br><br>Hearing:<br>Date: July 12, 2011<br>Time: 10:00 a.m.<br>Place: Courtroom "303"<br>    21041 Burbank Boulevard<br>    Woodland Hills, California 91367 |

1

**PLEASE TAKE NOTICE** that a hearing will be held on July 12, 2011, at 10:00 a.m., before the Honorable Geraldine Mund, United States Bankruptcy Judge, in Courtroom "303" in the United States Bankruptcy Court located at 21041 Burbank Boulevard, Woodland Hills, California 91367, for the Court to consider the motion filed by Roosevelt Lofts, LLC, a Delaware limited liability company, the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), for an order establishing bidding procedures (the "Bidding Procedures") for the sale of the Debtor's real property commonly known as the "Roosevelt Building" and located at 727 West 7th Street in Los Angeles, California, and all improvements, personal property and other rights related to or appurtenant to such real property, improvements, personal property and rights (collectively, the "Property"), free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. §§ 105 and 363 and Local Bankruptcy Rule 6004-1(b) (the "Motion").  The complete bases of the Motion are set forth in the Memorandum of Points and Authorities annexed hereto.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities and Declaration of M. Aaron Yashouafar, Local Bankruptcy Rule 6004-1(b), the entire record in the Debtor's case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 6004-1(b)(4), any party wishing to respond to the Motion must file with the Court and serve on counsel for the Debtor and Greystar (Latham & Watkins LLP, 355 S. Grand Avenue, Los Angeles, CA 90004, Attn:  Robert A. Klyman [Robert.klyman@lw.com]) a written response at least one (1) day prior to the hearing on the Motion.  Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve a response to the Motion may be deemed by the Court to be consent to the granting of the relief requested in the Motion.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1)    finding that notice of the Motion was adequate and appropriate;

2

1       (2)      granting the Motion in its entirety;

2       (3)      approving the Bidding Procedures as set forth in the Motion;

3       (4)      authorizing the Debtor to conduct an auction sale of the Property in accordance

4 with the terms and conditions set forth in the Motion;

5       (5)      setting a hearing to consider approval of the results of the auction sale of the

6 Property on August 30, 2011 at 10:00 a.m. or the first hearing date thereafter that is available to

7 the Court, but in no event later than September 16, 2011; and

8       (6)      granting such other and further relief as may be necessary or appropriate under

9 the circumstances.

10 Dated:  July 5, 2011            ROOSEVELT LOFTS, LLC

11

12

13                  By:_____

14                      DAVID L. NEALE
                         JULIET Y. OH

15                      LEVENE, NEALE, BENDER, YOO
                          & BRILL L.L.P.

16                      Attorneys for Chapter 11 Debtor and
                      Debtor in Possession

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

**A.      Background And Events Leading To Bankruptcy Filing.**

1.      On April 13, 2009 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "<u>Bankruptcy Code</u>").  The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.      The Debtor is the owner of real property commonly known as the "Roosevelt Building" and located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "<u>Property</u>").

3.      On or about March 9, 2006, the Debtor entered into a construction loan agreement (the "<u>Loan Agreement</u>") with Bank of America, N.A., individually and as administrative agent for a group of lenders[1] (collectively, "<u>Bank of America</u>"), pursuant to which the Debtor obtained a loan from Bank of America in the original principal sum of $78,840,375 (the "<u>Loan</u>").  On or about March 9, 2006, the Debtor executed a Deed of Trust Note in the original principal sum of $78,840,375 (the "<u>Note</u>").  The Loan was obtained by the Debtor for the purpose of converting the Property into 222 individually subdivided, luxury residential condominium units, a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Property.

4.      The Loan Agreement and the Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "<u>Fee Deed of Trust</u>") and (ii) the Construction Deed of Trust, Assignment

---

[1] Bank of America is comprised of Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

4

of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "Leasehold Deed of Trust," and together with the Fee Deed of Trust, the "Deeds of Trust"). The Deeds of Trust encumber the Property, including an absolute assignment of all rents, issues and profits generated from the operation of the Property (collectively, the "Collateral").

5.    In further consideration of the Loan and extension of credit, on or about March 9, 2006, M. Aaron Yashouafar, Solyman Yashouafar and Simon Barlava (collectively, the "Guarantors," and together with the Debtor, the "Borrower Parties") each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "Guaranty"). The Loan Agreement, Note, Deeds of Trust and Guaranty, together with all modifications thereto and all other ancillary documents or agreements (including, without limitation, title policies, endorsements, etc.), and the rights, claims and remedies associated therewith are collectively referred to as the "BofA Loan Agreement."

6.    On or about December 30, 2008, Bank of America issued a notice of default to the Borrower Parties, contending that each of the Borrower Parties had defaulted on their obligations to Bank of America under the BofA Loan Agreement. On March 23, 20098, Bank of America caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office.

7.    On or about April 3, 2009, Bank of America filed a complaint against the Debtor and the Guarantors in the Superior Court of the State of California for the County of Los Angeles ("State Court") for, among other things, breach of the Guaranty, appointment of a receiver and judicial foreclosure on its Deeds of Trust, thereby commencing that certain case bearing the number SC 102472. Thereafter, the Guarantors filed a cross-complaint asserting various claims against Bank of America. The litigation in State Court relating to the claims asserted by Bank of America in its complaint and the claims asserted by the Guarantors in their cross-complaint is collectively referred to herein as the "Guaranty Litigation."

8.    Days after filing its complaint in State Court, Bank of America filed an *ex parte* application with the State Court for the appointment of a receiver.

9.      As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code to have the ability and opportunity to close escrow on the residential units that were then under contract, to market and sell the remaining residential units in the Property, and to complete construction on the Property, all of which would provide the Debtor with the ability to restructure and repay the Loan and its other debts for the benefit of all creditors.

**B.      Significant Events During The Debtor's Bankruptcy Case.**

10.      Although the Guaranty Litigation was stayed as against the Debtor upon the filing of the Debtor's bankruptcy case, Bank of America and the Guarantors have remained embroiled in litigation in State Court.  As noted above, on or about November 16, 2010, the Guarantors filed a cross-complaint asserting various claims against Bank of America.

11.      In the meantime, the Debtor and Bank of America continued to clash throughout the pendency of the Debtor's bankruptcy case regarding numerous matters including, among others, use of cash collateral, the Debtor's proposed sales of individual condominium units within the Property, the Debtor's proposed residential leasing program, and the Debtor's proposed sale of approximately sixty five (65) units in the Property for sale through a public auction.[2]

12.      Although the Debtor engaged in discussions with Bank of America and the Official Committee of Unsecured Creditors appointed in the Debtor's case (the "Committee") in the early part of the Debtor's case in an effort to formulate the terms of a consensual plan of reorganization, such discussions proved to be unfruitful.

13.      After Bank of America declined to stipulate to a further continuance of the Section 362(d)(3) time period applicable to the Debtor's case, the Debtor filed its *"Chapter 11 Plan of*

---

[2] Although the Debtor obtained authority to conduct a public auction of approximately 65 units within the Property, over Bank of America's objection, the Debtor was ultimately unable to proceed with the auction due to its inability to obtain Fannie Mae approval to offer financing to prospective purchasers of the units in the Property.  Without the ability to offer financing to prospective purchasers, the auction would have had very little chance of success.  Accordingly, the Debtor determined that it was not in the best interests of the estate to go forward with the auction and undertake the expenses associated therewith.

*Reorganization*" (the "Original Plan") on August 31, 2009.  The Original Plan provided for full payment of all allowed claims over time, with interest.

14.    On November 24, 2009, Bank of America filed a motion seeking to dismiss the Debtor's bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the "Dismissal Motion") based on, among other alleged grounds, the Debtor's failure to file a disclosure statement with respect to the Original Plan.  The hearing on the Dismissal Motion was originally calendared for December 15, 2009, but was subsequently continued by stipulation of the parties to February 2, 2010 at 10:00 a.m.  Pursuant to the foregoing stipulation, the Debtor agreed to file a disclosure statement with respect to the Original Plan, as well as a notice of the hearing on such disclosure statement, by December 28, 2009.

15.    On December 28, 2009, the Debtor filed a disclosure statement describing the Plan (the "Original Disclosure Statement").  The hearing on the Disclosure Statement was set for February 2, 2010 at 10:00 a.m., the same date and time as the hearing on the Dismissal Motion.

16.    At the hearings on the Dismissal Motion and the Original Disclosure Statement held on February 2, 2010 at 10 a.m., the Court continued the hearings on both matters to March 16, 2010 at 10:00 a.m. to provide the Debtor with an opportunity to file updated versions of the Original Plan and Original Disclosure Statement.

17.    On February 26, 2010, the Debtor filed amended versions of the Original Plan and Original Disclosure Statement (the "Amended Plan" and "Amended Disclosure Statement") to reflect all of the developments in the Debtor's bankruptcy case since the filing of the Original Plan and to incorporate the impact of the then-anticipated public auction event on the Debtor's cash flow projections for the plan.

18.    At the continued hearings on March 16, 2010, the Court denied Bank of America's Dismissal Motion and approved the Debtor's Amended Disclosure Statement.  The Court also set a hearing to consider confirmation of the Amended Plan for October 14, 2010 at 1:30 p.m. (with such hearing to be continued, to the extent necessary, to October 15, 2010 at 9:00 a.m. and October 21, 2010 at 1:30 p.m.) as well as various deadlines relating thereto.

19.     Objections to confirmation of the Amended Plan were filed by Bank of America and various alleged mechanic's lien creditors.  The objections to confirmation of the Amended Plan asserted by the mechanic's lien creditors revolved primarily around the issue of lien priority.  Specifically, the mechanic's lien creditors alleged that their liens against the Property collectively had priority over the lien held by Bank of America, and that their claims should be treated accordingly under the Amended Plan.

20.     Subsequently, the Debtor began negotiating with the alleged mechanic's lien creditors (as a group) to address their various concerns about the Amended Plan and to try to reach the terms of a consensual plan and disclosure statement.  In the meantime, there was litigation pending before this Court between Bank of America and a certified class of alleged mechanic's lien creditors to determine the respective priority of their liens (the "Lien Priority Litigation").

21.     Given the Debtor's belief that the resolution of the Lien Priority Litigation would pave the way for confirmation of a consensual (or mostly consensual) form of the Amended Plan, the Debtor requested a continuance of the confirmation hearings for the Amended Plan scheduled in October 2010 and a corresponding extension of the briefing and discovery deadlines relating thereto.  The mechanic's lien creditors who were involved in the Lien Priority Litigation (many of whom filed objections to confirmation of the Amended Plan) supported the Debtor's request to continue such confirmation hearings.

22.     Ultimately, the Court granted the Debtor's request for a continuance of the confirmation hearings.  Accordingly, on August 3, 2010, the Court entered an order (i) taking the confirmation hearings scheduled in October, 2010 off calendar, (ii) vacating the remaining deadlines for the filing of papers with respect to confirmation of the Amended Plan, and (iii) setting a status conference on December 1, 2010 at 1:30 p.m. to consider the setting of further hearings and other matters pertaining to the Amended Plan.

23.     At the status conference held on December 1, 2010, the parties to the Lien Priority Litigation indicated that they were in the process of completing their discovery and anticipated

being ready for trial in February 2011.  The Court scheduled a trial for Phase 1 of the Lien Priority Litigation on February 10 and 11, 2011 and set briefing schedules relating thereto.

24.    Given that the objections to confirmation of the Amended Plan raised by the mechanic's lien creditors revolved primarily around the issue of lien priority, the Debtor requested that the status conference regarding the Amended Plan be continued for an additional approximately 120 days to provide the Debtor with sufficient time following the trial in the Lien Priority Litigation (scheduled in February, 2011) to formulate and file modified versions of the Amended Plan and Amended Disclosure Statement and, to the extent necessary, obtain approval of the modified Amended Disclosure Statement.  The Court granted the Debtor's request and continued the status conference to March 2, 2011 at 1:30 p.m.

25.    Shortly after the December 1, 2010 status conference, Bank of America filed a motion seeking relief from the automatic stay (the "Stay Relief Motion"), presumably to foreclose against the Property.  The Debtor filed a timely opposition to the Stay Relief Motion.  At the hearing on the Stay Relief Motion, held on February 1, 2011 at 10:00 a.m., the parties to the Lien Priority Litigation advised the Court that the Lien Priority Settlement (at least, in principle) had been reached between Bank of America and the class of mechanic's lien creditors.  At the conclusion of such hearing, the Court continued the hearing on the Stay Relief Motion to May 3, 2011 at 10:00 a.m.[3] and ordered that the Debtor file further amended versions of the Amended Plan and Amended Disclosure Statement within thirty (30) days following the hearing on a motion to approve the Lien Priority Settlement.

26.    The motion for approval of the settlement between Bank of America and the class of mechanic's lien claimants (the "BofA/Mechanics' Lien Settlement") was filed on April 5, 2011 and set for hearing on May 3, 2011, resulting in a June 3, 2011 deadline for the Debtor to file its modified plan and disclosure statement.  The Court entered an order granting the motion for

---

[3] The hearing on the Stay Relief Motion was subsequently rescheduled by the Court to April 26, 2011 at 10:00 a.m.

approval of the BofA/Mechanics' Lien Settlement on May 20, 2011 (the "<u>BofA/Mechanics' Lien</u> <u>Settlement Order</u>").

27.    On April 5, 2011, Bank of America filed a separate motion for an order requiring adequate protection (the "<u>Adequate Protection Motion</u>").  The Debtor filed a timely opposition to the Adequate Protection Motion.  The hearing on the Adequate Protection Motion was set for April 26, 2011 at 10:00 a.m. (the same date and time as the hearing on the Stay Relief Motion).

28.    At the hearing held on April 26, 2011, the Court denied Bank of America's Adequate Protection Motion and continued the hearing on Bank of America's Stay Relief Motion to June 14, 2011 at 10:00 a.m.  At that time, the Court indicated that the Stay Relief Motion would be granted on June 14, 2011 if the Debtor did not file modified versions of the Amended Plan and Amended Disclosure Statement by June 3, 2011 or if the further Amended Plan filed by the Debtor did not appear to be confirmable.

**C.    Settlement With Bank Of America.**

29.    Recognizing the risks, costs and delays associated with further litigation – both in the Guaranty Litigation and the Debtor's bankruptcy case – the Borrower Parties and Bank of America agreed to participate in mediation before the Honorable Randall J. Newsome on May 3, 2011 so that the parties could meet face to face and attempt to reach a global resolution of their various disputes.  The mediation, which was conducted over an approximately sixteen hour period, was extremely successful and resulted in an agreement set forth in a term sheet signed by all of the parties (the "<u>Term Sheet</u>").

30.    Pursuant to the Term Sheet, the parties were required to execute the formal settlement agreement by not later than June 3, 2011.  The settlement agreement therefore has an effective date of June 3, 2011 (the "<u>BofA Settlement Effective Date</u>").  The settlement represents a global resolution of all of the disputes among the Borrower Parties and Bank of America arising from and relating to the Guaranty Litigation, the Debtor's bankruptcy case, and all other claims that such parties may have against each other in any capacity including, without limitation, any affiliate entities involved with the Property (in all, the "<u>BofA Settlement</u>").  All of the terms and

1    conditions of the BofA Settlement were set forth in a motion filed by the Debtor on June 3, 2011

2    [Docket No. 785].

3            31.    The BofA Settlement[4] contains terms and conditions upon which Bank of America

4    agreed to assign its claims to a purchaser to be arranged by the Borrower Parties (the "Purchaser")

5    for a confidential sum (the "Purchase Price").  The BofA Settlement requires the satisfaction of its

6    conditions within firm deadlines.  Specifically, the Purchase Price must be paid to Bank of

7    America on or before the earlier of (i) September 1, 2011, and (ii) the first business day which is at

8    least 90 calendar days after the BofA Settlement Effective Date (the "Payment Date").  Within ten

9    (10) calendar days of the BofA Settlement Effective Date (*i.e.*, by June 13, 2011), the Purchaser

10   was required to deposit with a mutually agreeable escrow agent (the "Escrow Agent") the sum of

11   $5,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within forty (40)

12   calendar days of the BofA Settlement Effective Date (*i.e.*, by July 13, 2011), the Purchaser must

13   deposit with the Escrow Agent an additional sum of $10,000,000, for a total deposit of

14   $15,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within seventy (70)

15   days of the BofA Settlement Effective Date (*i.e.*, by August 12, 2011), the Purchaser must deposit

16   with the Escrow Agent an additional sum of $20,000,000, for a total deposit of $35,000,000 to be

17   applied, on the Payment Date, towards the Purchase Price.  On or before the Payment Date, the

18   Purchaser must deposit additional sums necessary to have the full Purchase Price on deposit with

19   the Escrow Agent.

20           32.    If any of the deposits required under the BofA Settlement are not timely deposited

21   with the Escrow Agent, then Bank of America may send a notice of default by electronic means to

22   counsel for the Borrower Parties.  If any of the required deposits are not made within two (2)

23   business days following the notice of default, then pursuant to a stipulation entered into between

24   Bank of America and the Debtor, and the Court order approving the BofA Settlement, Bank of

25

26           4   The description of the BofA Settlement set forth herein is not intended to comprise a full
     recitation of all of the terms and conditions of the BofA Settlement.  In the event of any inconsistency
27   between the terms of the BofA Settlement and the description contained herein, the terms of the BofA
     Settlement shall govern.

28

1   America will immediately have *in rem* relief from the automatic stay without further notice,

2   hearing or order of the Court and with no limitations on such relief.  In such event, the Debtor has

3   also stipulated to the appointment of a receiver.  The BofA Settlement also contains provisions

4   relating to, among other things, releases by the Borrower Parties of Bank of America, a covenant

5   from Bank of America not to sue the guarantors, and dismissal of Bank of America's litigation

6   against the Guarantors.

7       33.    The Court entered an order approving the BofA Settlement on June 10, 2011

8   [Docket No. 799].

9   **D.    Plan Support Agreement With Greystar.**

10      34.    In order to implement the terms of the BofA Settlement, the Debtor engaged in

11  negotiations with multiple parties concerning the terms and conditions upon which such parties

12  would agree to provide sufficient financing or equity to fund a new plan of reorganization

13  consistent with the terms of the BofA Settlement.  After arm's length negotiations with a number

14  of prospective financing sources and investors, ultimately Greystar GP, LLC or its designee

15  ("Greystar") agreed to fund a new plan of reorganization with a contribution of $95 million in

16  exchange for all of the membership interests in the Reorganized Debtor.  Accordingly, the Debtor,

17  The Roosevelt Lofts, Inc. ("RLI"), which owns all of the membership interests in the Debtor, and

18  Greystar entered into a plan support agreement (the "Plan Agreement") and related agreements,

19  which provide the basis upon which the Debtor will implement the BofA Settlement with Bank of

20  America (by, among other things, designating Greystar as the Purchaser under the BofA

21  Settlement) and proceed with a plan of reorganization that will pay in full or consensually satisfy

22  all allowed claims in this case.  A true and correct copy of the Plan Agreement is attached as

23  Exhibit "1" to the Declaration of M. Aaron Yashouafar annexed hereto.

24

25

26

27

28

35.    The Plan Agreement[5] includes, among other things, an agreement by the Debtor, RLI and Greystar to support a new plan of reorganization, negotiate in good faith to reach definitive documentation, and not take any actions that will delay or impede consummation of the new plan of reorganization.  In accordance with the terms of the Plan Agreement, on June 20, 2011, the Debtor and Greystar filed that certain *Second Amended Chapter 11 Plan of Reorganization (Dated June 20, 2011)* [Docket No. 806] (the "Plan") and a disclosure statement describing the Plan (the "Disclosure Statement").  The hearing for the Court to consider approval of the Disclosure Statement is set for July 6, 2011 at 10:00 a.m.

36.    The Plan Agreement also provides that, at Greystar's option, Greystar will (i) acquire by assignment all claims held by Bank of America arising out of, relating to and/or secured by the BofA Loan Agreement and all of Bank of America's right, title and interest in and under all documents, agreements and instruments relating thereto (collectively, the "BofA Claim") from Bank of America for a cash payment in an amount agreed to by the parties on or before the effective date of the Plan, or (ii) if Greystar does not previously acquire the BofA Claim prior to the effective date of the Plan, satisfy the BofA Claim in full by cash payment of an amount agreed to by the parties through the Plan.  If Greystar acquires the BofA Claim prior to August 22, 2011 (as may be extended by written agreement of Greystar, the "Outside Date") and the effective date of the Plan does not occur by such Outside Date, subject to the terms of the Plan Agreement, Greystar will have automatic *in rem* relief from the automatic stay to foreclose on the Property commencing on the Outside Date using the full par principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees, costs and other charges, to credit bid on the Property, subject only to the allowed Mechanics' Lien Claims (as defined in the Plan Agreement) and the foreclosure sale of the Property may be set, at Greystar's option, as early as September 2, 2011

---

[5]  Nothing set forth herein is intended to modify the terms of the Plan Agreement, and in the event of any inconsistency between the description of the Plan Agreement set forth herein and the Plan Agreement itself, the terms of the Plan Agreement shall control.

without further notice, hearing or order of the Court and with no limitations on such relief (the "Foreclosure Right").

37.    In addition to the Foreclosure Right, if Greystar acquires the BofA Claim and the effective date of the Plan does not occur by the Outside Date, subject to the terms of the Plan Agreement, Greystar will have the right to credit bid the full par principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees, costs and other charges, subject only to the Mechanic's Lien Claims, at an auction of the Property to be held pursuant to 11 U.S.C. § 363 (the "Auction") and in accordance with the Bidding Procedures as described in the Plan Agreement (the "363 Purchase Right").    Under the Plan Agreement, the Debtor is required, among other things, to file a motion seeking Court approval of the Bidding Procedures on or before July 8, 2011 and to obtain a final order approving the Bidding Procedures on or before August 5, 2011.

38.    The Court approved the Plan Agreement pursuant to an order entered on June 10, 2011 [Docket No. 798] (the "Plan Agreement Order").    The Plan Agreement Order provides, among other things, that the BofA Claim is allowed (within the meaning of Section 502 of the Bankruptcy Code) in the amount of $78,422,049.33 as of September 3, 2009, plus (a) interest accruing at the default rate and (b) fees, charges and other expenses that accrued on and after September 3, 2009.    The Plan Agreement Order further provides that the BofA Claim is fully perfected, valid, nonavoidable and duly enforceable (without any defense, counterclaim, right of offset or subordination, or any other claim, surcharge or challenge by any party in interest) with first priority security against the Property subject only to the Mechanics' Lien Claims as described in the BofA/Mechanics' Lien Settlement Order.

## II.

## PROPOSED BIDDING PROCEDURES

In accordance with the terms of the Plan Agreement, the Debtor has filed this Motion seeking to establish the rules and procedures for the Auction and to approve the following Bidding Procedures:

1.    <u>Auction</u>.  The Property will be offered at an Auction to be conducted on August 29, 2011, commencing at 10:00 a.m. Pacific Standard Time, at the offices of Levene, Neale, Bender, Yoo & Brill L.L.P. located at 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.  In the event of a change in the time or location of the Auction, the Debtor will use its reasonable best efforts to notify all Qualifying Bidders who have submitted Qualifying Bids by the Bid Deadline (as all such terms are defined below).

2.    <u>Greystar's 363 Purchase Right</u>.  Greystar shall have the right to credit bid the full original par amount of the BofA Claim, including default interest and fees at the Auction (the "<u>Credit Bid</u>"), provided that if the Plan effective date occurs on or by the Outside Date, Greystar shall not exercise the 363 Purchase Right; and provided further that, pursuant to the BofA Settlement and the order approving the BofA Settlement, the BofA Claim shall be subject to the Mechanics' Lien Claims in the Auction, but shall not be subject to any claims of any insider or affiliate of the Debtor or RLI.  For avoidance of doubt, Greystar also shall have the right in an Auction to raise its offer beyond the Credit Bid in connection with the Auction.

3.    <u>Bidding Process</u>.  The Debtor shall consider qualified bids for the Property (collectively, "<u>Qualifying Bids</u>," and individually, a "<u>Qualifying Bid</u>") at the Auction but shall not consider any bids for the Property that is not a Qualifying Bid.  In order for a bid to be deemed a Qualifying Bid, a bid must meet each of the criteria set forth in the following subparagraphs:

a.    <u>Timing</u>.  Bids are due and must actually be received by the Debtor, Greystar and the Committee no later than 5:00 p.m. (Pacific Standard Time) five (5) business days prior to the date of the Auction (the "<u>Bid Deadline</u>").  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

b.    <u>Form and Content of Bid and Related Requirements</u>.  Each potential bidder must deliver to the Debtor, Greystar and the Committee a written bid for the Property which complies with the terms set forth herein, and evidence of financial ability to perform reasonably acceptable to the Debtor, Greystar and the Committee.  To be

deemed a Qualifying Bid, a bid must (i) be for all of the Property in its entirety; (ii) provide for payment of the proposed purchase price in full and in cash at closing, and in an amount equal to at least the sum of (x) the BofA Claim, (y) the Mechanics' Lien Claims (in an amount of at least $16,000,000) (the "Mechanics' Lien Payment") and (z) an additional $1,000,000; (iii) contain a markup of the Greystar Agreement (defined below) that reflects the bidder's proposed changes thereto and contain no contingencies or conditions other than those set forth in the Plan Agreement; (iv) contain no conditions related to financing or the satisfaction of diligence; (v) identify the potential bidder and the officer(s) or authorized agent(s) who will appear at the Auction on behalf of such bidder; (vi) include a Good Faith Deposit (defined below); (vii) contain the form of order that the bidder would request the Debtor to seek Court approval of at the Sale Approval Hearing (defined below); (viii) if the bidder requires the assumption and assignment of any contracts or permits, include evidence of its ability to provide adequate assurance of future performance of such contracts and permits; (ix) not request or entitle the bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment and (x) provide that cash in an amount equal to (A) the BofA Claim will be paid to Greystar directly through the closing of the Sale and (B) the Mechanics' Lien Payment will be paid into an escrow reasonably acceptable to Class Counsel and the Successful Bidder (defined below).  To facilitate the Auction and to assist the Debtor and other interested parties in assessing the terms of each bid, prospective bidders must utilize the asset purchase agreement executed between the Debtor and Greystar (the "Greystar Agreement") to prepare their bids and mark all proposed changes to such agreement as part of their bid.  The Greystar Agreement will be attached to the order approving these Bidding Procedures and will be made available from Debtor's counsel and on the main docket of this case.

c.    The Good Faith Deposit.  Bidders (other than Greystar) will be required to submit good faith deposits (the "Good Faith Deposits") with the Debtor on or before the

16

Bid Deadline. Such Good Faith Deposits shall be equal to $5,000,000. The Good Faith Deposits of all Qualified Bidders shall be held in a separate interest-bearing account for the Debtor's benefit until consummation of a transaction involving the successful bidder for the Property (a "Successful Bidder"). If a Successful Bidder fails to consummate an approved sale of the Property because of a breach or failure to perform on the part of such Successful Bidder, the Debtor will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Debtor without affecting or reducing any of the Debtor's other rights or claims against such party. All other deposits will be returned to the respective bidders within eleven (11) days following the Sale Approval Hearing.

d.    Qualified Bidders. A "Qualified Bidder" is a bidder that submits a Qualified Bid and, in the reasonable discretion of the Debtor, Greystar and the Committee, is determined to have demonstrated the financial capability to consummate the purchase of the Property. Greystar is a Qualified Bidder and may credit bid the full original par amount of the BofA Claim (including default interest and fees) at the Auction under the terms and conditions set forth in paragraph 2 above. Any Qualified Bidder that wants to conduct diligence must first sign and deliver a confidentiality agreement in form and substance reasonably satisfactory to the Debtor and Greystar.

4.    Auction If Qualifying Bids Are Received. If there are one or more Qualifying Bids, the Debtor shall hold the Auction. Only Qualified Bidders are eligible to participate in the Auction. At the Auction, bidding will begin at the highest amount offered among the Qualified Bids from the Qualified Bidders. All subsequent bidding amounts must be in increments of at least $250,000. All subsequent bids must also comply with the terms and conditions for "Qualifying Bids" set forth in paragraph 3b above. Bidding at the Auction shall continue until such time as the highest and best bid is determined by the Debtor, Greystar and the Committee.

5.    Sale Approval Hearing. The hearing for approval of the results of the Auction of the Property (the "Sale Approval Hearing") shall be set held on August 30, 2011 at 10:00 a.m. or

the first hearing date thereafter that is available to the Court, but in no event later than September 16, 2011.

      6.      <u>Treatment of Mechanics' Lien Claims</u>.  The Successful Bidder shall have standing and the exclusive right to evaluate, contest, challenge and settle the Mechanics' Lien Claims.  To the extent the amount of Mechanics' Lien Claims is determined to be less than the Mechanics' Lien Payment, the differential shall be returned promptly to the Successful Bidder.

      7.      <u>No Additional Marketing</u>.  During the course of the Debtor's bankruptcy case, which has been pending for over two years, the Debtor has engaged in discussions and negotiations with multiple parties concerning the terms and conditions upon which such parties would agree to either purchase the Property or provide sufficient funding or equity to fund a plan of reorganization in the case.  As noted above, the Borrower Parties entered into the Plan Agreement with Greystar after extensive, arm's length negotiations with a number of prospective purchasers, financing sources and investors.  The Plan Agreement, which provides for the contribution by Greystar of $95 million to fund a plan of reorganization which pays in full or otherwise consensually resolves all of the claims against the Debtor, has been approved by the Court and provides for the best possible outcome for the estate under the circumstances.  Based on the foregoing, the Debtor submits that no additional marketing of the Property is warranted or required.

## III.

## <u>DISCUSSION</u>

      Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under 11 U.S.C. § 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale.  Fed. R. Bankr. Proc. 6004(f).

Neither the Bankruptcy Code nor the Bankruptcy Rules contains specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale. However, the Bankruptcy Court has the power to establish reasonable sale procedures. *See, e.g., Doehring v. Crown Corp. (In re Crown Corporation)*, 679 F.2d 774 (9th Cir. 1982). As one Court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Additionally, courts have long recognized the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is 'to maximize bidding, not restrict it.'" *Id.*

A corollary to these principles is that the court should not "cherry-pick" among contractual provisions, objecting to select individual portions, if the agreement as a whole is supported by an articulated business judgment. At least one bankruptcy court has expressly applied this corollary to a transaction including breakup and overbid provisions in the sale of the debtor's business. In *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the court approved a transaction including provisions relating to a breakup fee and a requirement that overbids be at least $500,000. In responding to objections to other provisions of the agreement, the court held that:

> The Court is not to second guess the inclusion of some provisions as long as the Agreement as a whole is within reasonable business judgment, and the subject provisions do not distort the balance Congress struck in Chapter 11. *Cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.*, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some contractual provisions may be justified by the need to attract a prospective investor.).

114 B.R. at 886.

The Debtor believes that the Auction of the Property (if appropriate) and the Bidding Procedures proposed in connection therewith will result in obtaining the highest purchase price

possible for the Property.  As discussed above, it is the intention of the Debtor and Greystar to pursue confirmation of the Plan as its ultimate exit strategy for this case.  However, in the event that the Plan is not confirmed and/or does not go effective by the Outside Date, and assuming that Greystar has acquired the BofA Claim prior to the Outside Date, Greystar will have the option of exercising either the Foreclosure Right or the 363 Purchase Right, subject to the terms set forth in the Plan Agreement.  If Greystar elects to exercise its Foreclosure Right, it can do so without further order of this Court.  However, if Greystar elects not to exercise its Foreclosure Right under those circumstances, the sale of the Property (subject to overbid) will maximize the value of the Property for the benefit of the estate and creditors.

Greystar's willingness to enter into the Plan Agreement, which provides indisputable benefits to the Debtor's estate, was expressly conditioned upon all of the terms of the Plan Agreement being approved by the Court, including the approval of the Bidding Procedures set forth therein.  The Bidding Procedures are not only a critical component of the Plan Agreement entered into by the Borrower Parties and Greystar (and approved by this Court), they will also provide structure for the Auction of the Property, with the level of certainty that will be required by potential bidders and other parties in interest.  Greystar's ability to credit bid up to the full original par amount of the BofA Claim, including default interest and fees (which claim has already been allowed pursuant to the Plan Agreement Order entered by the Court) is supported by 11 U.S.C. § 363(k) and should be approved.  As a whole, the Bidding Procedures will (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration potential purchasers who do not have the financial ability to consummate the transaction in an expeditious manner; and (iii) ensure that the highest possible purchase price is obtained for the Property.  In the event that a sale process for the Property is necessary (due to the failure to confirm the Plan) and actually possible (due to Greystar's acquisition of the BofA Claim and election not to exercise its Foreclosure Right), an Auction of the Property in accordance with the Bidding Procedures is in the best interests of the Debtor's estate and its creditors.

## IV.    CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1)    finding notice of the Motion was adequate and appropriate;

(2)    granting the Motion in its entirety;

(3)    approving the Bidding Procedures as set forth in the Motion;

(4)    authorizing the Debtor to conduct an Auction of the Property in accordance with the terms and conditions set forth in the Motion;

(5)    setting a hearing to consider approval of the results of the Auction of the Property on August 30, 2011 at 10:00 a.m. or the first hearing date thereafter that is available to the Court, but in no event later than September 16, 2011; and

(6)    granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated:  July 5, 2011                                ROOSEVELT LOFTS, LLC

By:_____
                                                        DAVID L. NEALE
                                                        JULIET Y. OH
                                                        LEVENE, NEALE, BENDER, YOO
                                                            & BRILL L.L.P.
                                                        Attorneys for Chapter 11 Debtor and
                                                        Debtor in Possession

## DECLARATION OF M. AARON YASHOUAFAR

I, M. Aaron Yashouafar, hereby declare as follows:

1.     I am over 18 years of age. I am the President of The Roosevelt Lofts, Inc. ("RLI") which is the Manager of Roosevelt Lofts, LLC, a Delaware limited liability company, debtor and debtor in possession herein (the "Debtor"). Accordingly, I am familiar with virtually all aspects of the Debtor's real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles which was converted by the Debtor into 222 upscale condominium residences plus commercial retail space and parking (the "Property"). I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.     I submit this declaration in support of the Debtor's motion for an order establishing bidding procedures (the "Bidding Procedures") for the sale of the Debtor's real property commonly known as the "Roosevelt Building" and located at 727 West 7th Street in Los Angeles, California, and all improvements, personal property and other rights related to or appurtenant to such real property, improvements, personal property and rights (collectively, the "Property"), free and clear of all liens, claims, encumbrances and other interests (the "Motion"), to which this declaration is attached. Any terms not defined herein have the meanings ascribed to them in the Motion.

### Background And Events Leading To The Bankruptcy Filing

3.     On April 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"). The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession.

4.     The Debtor is the owner of the Property.

5.     On or about March 9, 2006, the Debtor entered into a construction loan agreement (the "Loan Agreement") with Bank of America, N.A., individually and as administrative agent

for a group of lenders[6] (collectively, "Bank of America"), pursuant to which the Debtor obtained a loan from Bank of America in the original principal sum of $78,840,375 (the "Loan"). On or about March 9, 2006, the Debtor executed a Deed of Trust Note in the original principal sum of $78,840,375 (the "Note"). The Loan was obtained by the Debtor for the purpose of converting the Property into 222 individually subdivided, luxury residential condominium units, a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Property.

6. The Loan Agreement and the Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "Fee Deed of Trust") and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "Leasehold Deed of Trust," and together with the Fee Deed of Trust, the "Deeds of Trust"). The Deeds of Trust encumber the Property, including an absolute assignment of all rents, issues and profits generated from the operation of the Property (collectively the "Collateral").

7. In further consideration of the Loan and extension of credit, on or about March 9, 2006, Solyman Yashouafar, Simon Barlava and I (collectively, the "Guarantors," and together with the Debtor, the "Borrower Parties") each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "Guaranty"). The Loan Agreement, Note, Deeds of Trust and Guaranty, together with all modifications thereto and all other ancillary documents or agreements (including, without limitation, title policies, endorsements, etc.), and the rights, claims and remedies associated therewith are collectively referred to as the "BofA Loan Agreement."

---

[6] Bank of America is comprised of Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

8.     On or about December 30, 2008, Bank of America issued a notice of default to the Borrower Parties, contending that each of the Borrower Parties had defaulted on their obligations to Bank of America under the BofA Loan Agreement.  On March 23, 20098, Bank of America caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office.

9.     On or about April 3, 2009, Bank of America filed a complaint against the Debtor and the Guarantors in the Superior Court of the State of California for the County of Los Angeles ("State Court") for, among other things, breach of the Guaranty, appointment of a receiver and judicial foreclosure on its Deeds of Trust, thereby commencing that certain case bearing the number SC 102472.  Thereafter, the Guarantors filed a cross-complaint asserting various claims against Bank of America.  The litigation in State Court relating to the claims asserted by Bank of America in its complaint and the claims asserted by the Guarantors in their cross-complaint is collectively referred to herein as the "Guaranty Litigation."

10.     Days after filing its complaint in State Court, Bank of America filed an *ex parte* application with the State Court for the appointment of a receiver.

11.     As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code to have the ability and opportunity to close escrow on the residential units that were then under contract, to market and sell the remaining residential units in the Property, and to complete construction on the Property, all of which would provide the Debtor with the ability to restructure and repay the Loan and its other debts for the benefit of all creditors.

### Significant Events During The Debtor's Bankruptcy Case

12.     Although the Guaranty Litigation was stayed as against the Debtor upon the filing of the Debtor's bankruptcy case, Bank of America and the Guarantors have remained embroiled in litigation in State Court.  As noted above, on or about November 16, 2010, the Guarantors filed a cross-complaint asserting various claims against Bank of America.

13.     In the meantime, the Debtor and Bank of America continued to clash throughout the pendency of the Debtor's bankruptcy case regarding numerous matters including, among

others, use of cash collateral, the Debtor's proposed sales of individual condominium units within the Property, the Debtor's proposed residential leasing program, and the Debtor's proposed sale of approximately sixty five (65) units in the Property for sale through a public auction.[7]

14.    Although the Debtor engaged in discussions with Bank of America and the Official Committee of Unsecured Creditors appointed in the Debtor's case (the "Committee") in the early part of the Debtor's case in an effort to formulate the terms of a consensual plan of reorganization, such discussions proved to be unfruitful.

15.    After Bank of America declined to stipulate to a further continuance of the Section 362(d)(3) time period applicable to the Debtor's case, the Debtor filed its *"Chapter 11 Plan of Reorganization"* (the "Original Plan") on August 31, 2009.  The Original Plan provided for full payment of all allowed claims over time, with interest.

16.    On November 24, 2009, Bank of America filed a motion seeking to dismiss the Debtor's bankruptcy case or, in the alternative, convert the Debtor's case to one under Chapter 7 (the "Dismissal Motion") based on, among other alleged grounds, the Debtor's failure to file a disclosure statement with respect to the Original Plan.  The hearing on the Dismissal Motion was originally calendared for December 15, 2009, but was subsequently continued by stipulation of the parties to February 2, 2010 at 10:00 a.m.  Pursuant to the foregoing stipulation, the Debtor agreed to file a disclosure statement with respect to the Original Plan, as well as a notice of the hearing on such disclosure statement, by December 28, 2009.

---

[7] Although the Debtor obtained authority to conduct a public auction of approximately 65 units within the Property, over Bank of America's objection, the Debtor was ultimately unable to proceed with the auction due to its inability to obtain Fannie Mae approval to offer financing to prospective purchasers of the units in the Property.  Without the ability to offer financing to prospective purchasers, the auction would have had very little chance of success.  Accordingly, the Debtor determined that it was not in the best interests of the estate to go forward with the auction and undertake the expenses associated therewith.

17.     On December 28, 2009, the Debtor filed a disclosure statement describing the Plan (the "Original Disclosure Statement").  The hearing on the Disclosure Statement was set for February 2, 2010 at 10:00 a.m., the same date and time as the hearing on the Dismissal Motion.

18.     At the hearings on the Dismissal Motion and the Original Disclosure Statement held on February 2, 2010 at 10 a.m., which I attended, the Court continued the hearings on both matters to March 16, 2010 at 10:00 a.m. to provide the Debtor with an opportunity to file updated versions of the Original Plan and Original Disclosure Statement.

19.     On February 26, 2010, the Debtor filed amended versions of the Original Plan and Original Disclosure Statement (the "Amended Plan" and "Amended Disclosure Statement") to reflect all of the developments in the Debtor's bankruptcy case since the filing of the Original Plan and to incorporate the impact of the then-anticipated public auction event on the Debtor's cash flow projections for the plan.

20.     At the continued hearings on March 16, 2010, which I attended, the Court denied Bank of America's Dismissal Motion and approved the Debtor's Amended Disclosure Statement.  The Court also set a hearing to consider confirmation of the Amended Plan for October 14, 2010 at 1:30 p.m. (with such hearing to be continued, to the extent necessary, to October 15, 2010 at 9:00 a.m. and October 21, 2010 at 1:30 p.m.) as well as various deadlines relating thereto.

21.     Objections to confirmation of the Amended Plan were filed by Bank of America and various alleged mechanic's lien creditors.  The objections to confirmation of the Amended Plan asserted by the mechanic's lien creditors revolved primarily around the issue of lien priority.  Specifically, the mechanic's lien creditors alleged that their liens against the Property collectively had priority over the lien held by Bank of America, and that their claims should be treated accordingly under the Amended Plan.

22.     Subsequently, the Debtor began negotiating with the alleged mechanic's lien creditors (as a group) to address their various concerns about the Amended Plan and to try to reach the terms of a consensual plan and disclosure statement.  In the meantime, there was

litigation pending before this Court between Bank of America and a certified class of alleged mechanic's lien creditors to determine the respective priority of their liens (the "Lien Priority Litigation").

23.    Given the Debtor's belief that the resolution of the Lien Priority Litigation would pave the way for confirmation of a consensual (or mostly consensual) form of the Amended Plan, the Debtor requested a continuance of the confirmation hearings for the Amended Plan scheduled in October 2010 and a corresponding extension of the briefing and discovery deadlines relating thereto.  The mechanic's lien creditors who were involved in the Lien Priority Litigation (many of whom filed objections to confirmation of the Amended Plan) supported the Debtor's request to continue such confirmation hearings.

24.    Ultimately, the Court granted the Debtor's request for a continuance of the confirmation hearings.  Accordingly, on August 3, 2010, the Court entered an order (i) taking the confirmation hearings scheduled in October, 2010 off calendar, (ii) vacating the remaining deadlines for the filing of papers with respect to confirmation of the Amended Plan, and (iii) setting a status conference on December 1, 2010 at 1:30 p.m. to consider the setting of further hearings and other matters pertaining to the Amended Plan.

25.    It is my understanding and belief that, at the status conference held on December 1, 2010, the parties to the Lien Priority Litigation indicated that they were in the process of completing their discovery and anticipated being ready for trial in February 2011.  The Court scheduled a trial for Phase 1 of the Lien Priority Litigation on February 10 and 11, 2011 and set briefing schedules relating thereto.

26.    Given that the objections to confirmation of the Amended Plan raised by the mechanic's lien creditors revolved primarily around the issue of lien priority, the Debtor requested that the status conference regarding the Amended Plan be continued for an additional approximately 120 days to provide the Debtor with sufficient time following the trial in the Lien Priority Litigation (scheduled in February, 2011) to formulate and file modified versions of the Amended Plan and Amended Disclosure Statement and, to the extent necessary, obtain approval

of the modified Amended Disclosure Statement.  The Court granted the Debtor's request and continued the status conference to March 2, 2011 at 1:30 p.m.

27.    Shortly after the December 1, 2010 status conference, Bank of America filed a motion seeking relief from the automatic stay (the "Stay Relief Motion"), presumably to foreclose against the Property.  The Debtor filed a timely opposition to the Stay Relief Motion. At the hearing on the Stay Relief Motion, held on February 1, 2011 at 10:00 a.m., the parties to the Lien Priority Litigation advised the Court that the Lien Priority Settlement (at least, in principle) had been reached between Bank of America and the class of mechanic's lien creditors. It is my understanding and belief that , at the conclusion of such hearing, the Court continued the hearing on the Stay Relief Motion to May 3, 2011 at 10:00 a.m.[8] and ordered that the Debtor file further amended versions of the Amended Plan and Amended Disclosure Statement within thirty (30) days following the hearing on a motion to approve the Lien Priority Settlement.

28.    The motion for approval of the settlement between Bank of America and the class of mechanic's lien claimants (the "BofA/Mechanics' Lien Settlement") was filed on April 5, 2011 and set for hearing on May 3, 2011, resulting in a June 3, 2011 deadline for the Debtor to file its modified plan and disclosure statement.  I am advised and believe that the Court entered an order granting the motion for approval of the BofA/Mechanics' Lien Settlement on May 20, 2011 (the "BofA/Mechanics' Lien Settlement Order").

29.    On April 5, 2011, Bank of America filed a separate motion for an order requiring adequate protection (the "Adequate Protection Motion").  The Debtor filed a timely opposition to the Adequate Protection Motion.  The hearing on the Adequate Protection Motion was set for April 26, 2011 at 10:00 a.m. (the same date and time as the hearing on the Stay Relief Motion).

30.    At the hearing held on April 26, 2011, which I attended, the Court denied Bank of America's Adequate Protection Motion and continued the hearing on Bank of America's Stay

---

[8]  The hearing on the Stay Relief Motion was subsequently rescheduled by the Court to April 26, 2011 at 10:00 a.m.

28

Relief Motion to June 14, 2011 at 10:00 a.m. At that time, the Court indicated that the Stay Relief Motion would be granted on June 14, 2011 if the Debtor did not file modified versions of the Amended Plan and Amended Disclosure Statement by June 3, 2011 or if the further Amended Plan filed by the Debtor did not appear to be confirmable.

### Settlement With Bank Of America

31.     Recognizing the risks, costs and delays associated with further litigation – both in the Guaranty Litigation and the Debtor's bankruptcy case – the Borrower Parties and Bank of America agreed to participate in mediation before the Honorable Randall J. Newsome on May 3, 2011 so that the parties could meet face to face and attempt to reach a global resolution of their various disputes. The mediation, which was conducted over an approximately sixteen hour period, was extremely successful and resulted in an agreement set forth in a term sheet signed by all of the parties (the "Term Sheet").

32.     Pursuant to the Term Sheet, the parties were required to execute the formal settlement agreement by not later than June 3, 2011. The settlement agreement therefore has an effective date of June 3, 2011 (the "BofA Settlement Effective Date"). I believe the settlement represents a global resolution of all of the disputes among the Borrower Parties and Bank of America arising from and relating to the Guaranty Litigation, the Debtor's bankruptcy case, and all other claims that such parties may have against each other in any capacity including, without limitation, any affiliate entities involved with the Property (in all, the "BofA Settlement"). All of the terms and conditions of the BofA Settlement were set forth in a motion filed by the Debtor on June 3, 2011.

33.     The BofA Settlement[9] contains terms and conditions upon which Bank of America agreed to assign its claims to a purchaser to be arranged by the Borrower Parties (the "Purchaser") for a confidential sum (the "Purchase Price"). The BofA Settlement requires the

---

[9]   The description of the BofA Settlement set forth herein is not intended to comprise a full recitation of all of the terms and conditions of the BofA Settlement. In the event of any inconsistency between the terms of the BofA Settlement and the description contained herein, the terms of the BofA Settlement shall govern.

satisfaction of its conditions within firm deadlines.  Specifically, the Purchase Price must be paid to Bank of America on or before the earlier of (i) September 1, 2011, and (ii) the first business day which is at least 90 calendar days after the BofA Settlement Effective Date (the "Payment Date").  Within ten (10) calendar days of the BofA Settlement Effective Date (*i.e.*, by June 13, 2011), the Purchaser was required to deposit with a mutually agreeable escrow agent (the "Escrow Agent") the sum of $5,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within forty (40) calendar days of the BofA Settlement Effective Date (*i.e.*, by July 13, 2011), the Purchaser must deposit with the Escrow Agent an additional sum of $10,000,000, for a total deposit of $15,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within seventy (70) days of the BofA Settlement Effective Date (*i.e.*, by August 12, 2011), the Purchaser must deposit with the Escrow Agent an additional sum of $20,000,000, for a total deposit of $35,000,000 to be applied, on the Payment Date, towards the Purchase Price.  On or before the Payment Date, the Purchaser must deposit additional sums necessary to have the full Purchase Price on deposit with the Escrow Agent.

34.    If any of the deposits required under the BofA Settlement are not timely deposited with the Escrow Agent, then Bank of America may send a notice of default by electronic means to counsel for the Borrower Parties.  If any of the required deposits are not made within two (2) business days following the notice of default, then pursuant to a stipulation entered into between Bank of America and the Debtor, and the Court order approving the BofA Settlement, Bank of America will immediately have *in rem* relief from the automatic stay without further notice, hearing or order of the Court and with no limitations on such relief.  In such event, the Debtor has also stipulated to the appointment of a receiver.  The BofA Settlement also contains provisions relating to, among other things, releases by the Borrower Parties of Bank of America, a covenant from Bank of America not to sue the guarantors, and dismissal of Bank of America's litigation against the Guarantors.

35.    The Court entered an order approving the BofA Settlement on June 10, 2011.

**Plan Support Agreement With Greystar**

36.    In order to implement the terms of the BofA Settlement, the Debtor engaged in negotiations with multiple parties concerning the terms and conditions upon which such parties would agree to provide sufficient financing or equity to fund a new plan of reorganization consistent with the terms of the BofA Settlement.  After arm's length negotiations with a number of prospective financing sources and investors, ultimately Greystar GP, LLC or its designee ("Greystar") agreed to fund a new plan of reorganization with a contribution of $95 million in exchange for all of the membership interests in the Reorganized Debtor.  Accordingly, the Debtor, The Roosevelt Lofts, Inc. ("RLI"), which owns all of the membership interests in the Debtor, and Greystar entered into a plan support agreement (the "Plan Agreement") and related agreements, which provide the basis upon which the Debtor will implement the BofA Settlement with Bank of America (by, among other things, designating Greystar as the Purchaser under the BofA Settlement) and proceed with a plan of reorganization that will pay in full or consensually satisfy all allowed claims in this case.  A true and correct copy of the Plan Agreement is attached as Exhibit "1" hereto.

37.    The Plan Agreement[10] includes, among other things, an agreement by the Debtor, RLI and Greystar to support a new plan of reorganization, negotiate in good faith to reach definitive documentation, and not take any actions that will delay or impede consummation of the new plan of reorganization.  In accordance with the terms of the Plan Agreement, on June 20, 2011, the Debtor and Greystar filed that certain *Second Amended Chapter 11 Plan of Reorganization (Dated June 20, 2011)* [Docket No. 806] (the "Plan") and a disclosure statement describing the Plan (the "Disclosure Statement").  The hearing for the Court to consider approval of the Disclosure Statement is set for July 6, 2011 at 10:00 a.m.

---

[10]  Nothing set forth herein is intended to modify the terms of the Plan Agreement, and in the event of any inconsistency between the description of the Plan Agreement set forth herein and the Plan Agreement itself, the terms of the Plan Agreement shall control.

38.    The Plan Agreement also provides that, at Greystar's option, Greystar will (i) acquire by assignment all claims held by Bank of America arising out of, relating to and/or secured by the BofA Loan Agreement and all of Bank of America's right, title and interest in and under all documents, agreements and instruments relating thereto (collectively, the "<u>BofA Claim</u>") from Bank of America for a cash payment in an amount agreed to by the parties on or before the effective date of the Plan, or (ii) if Greystar does not previously acquire the BofA Claim prior to the effective date of the Plan, satisfy the BofA Claim in full by cash payment of an amount agreed to by the parties through the Plan.  If Greystar acquires the BofA Claim prior to August 22, 2011 (as may be extended by written agreement of Greystar, the "<u>Outside Date</u>") and the effective date of the Plan does not occur by such Outside Date, subject to the terms of the Plan Agreement, Greystar will have automatic *in rem* relief from the automatic stay to foreclose on the Property commencing on the Outside Date using the full par principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees, costs and other charges, to credit bid on the Property, subject only to the allowed Mechanics' Lien Claims (as defined in the Plan Agreement) and the foreclosure sale of the Property may be set, at Greystar's option, as early as September 2, 2011 without further notice, hearing or order of the Court and with no limitations on such relief (the "<u>Foreclosure Right</u>").

39.    In addition to the Foreclosure Right, if Greystar acquires the BofA Claim and the effective date of the Plan does not occur by the Outside Date, subject to the terms of the Plan Agreement, Greystar will have the right to credit bid the full par principal amount of the BofA Claim, plus all accrued and unpaid default interest, fees, costs and other charges, subject only to the Mechanic's Lien Claims, at an auction of the Property to be held pursuant to 11 U.S.C. § 363 (the "<u>Auction</u>") and in accordance with the Bidding Procedures as described in the Plan Agreement (the "<u>363 Purchase Right</u>").  Under the Plan Agreement, the Debtor is required, among other things, to file a motion seeking Court approval of the Bidding Procedures on or before July 8, 2011 and to obtain a final order approving the Bidding Procedures on or before August 5, 2011.

40.     The Court approved the Plan Agreement pursuant to an order entered on June 10, 2011 (the "Plan Agreement Order").  The Plan Agreement Order provides, among other things, that the BofA Claim is allowed (within the meaning of Section 502 of the Bankruptcy Code) in the amount of $78,422,049.33 as of September 3, 2009, plus (a) interest accruing at the default rate and (b) fees, charges and other expenses that accrued on and after September 3, 2009.  The Plan Agreement Order further provides that the BofA Claim is fully perfected, valid, nonavoidable and duly enforceable (without any defense, counterclaim, right of offset or subordination, or any other claim, surcharge or challenge by any party in interest) with first priority security against the Property subject only to the Mechanics' Lien Claims as described in the BofA/Mechanics' Lien Settlement Order.

**Proposed Bidding Procedures**

41.     In accordance with the terms of the Plan Agreement, the Debtor has filed the Motion seeking to establish the rules and procedures for the Auction and to approve the following Bidding Procedures:

(1)     Auction.  The Property will be offered at an Auction to be conducted on August 29, 2011, commencing at 10:00 a.m. Pacific Standard Time, at the offices of Levene, Neale, Bender, Yoo & Brill L.L.P. located at 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.  In the event of a change in the time or location of the Auction, the Debtor will use its reasonable best efforts to notify all Qualifying Bidders who have submitted Qualifying Bids by the Bid Deadline (as all such terms are defined below).

(2)     Greystar's 363 Purchase Right.  Greystar shall have the right to credit bid the full original par amount of the BofA Claim, including default interest and fees at the Auction (the "Credit Bid"), provided that if the Plan effective date occurs on or by the Outside Date, Greystar shall not exercise the 363 Purchase Right; and provided further that, pursuant to the BofA Settlement and the order approving the BofA Settlement, the BofA Claim shall be subject to the Mechanics' Lien Claims in the Auction, but shall not

be subject to any claims of any insider or affiliate of the Debtor or RLI.  For avoidance of doubt, Greystar also shall have the right in an Auction to raise its offer beyond the Credit Bid in connection with the Auction.

(3)    Bidding Process.  The Debtor shall consider qualified bids for the Property (collectively, "Qualifying Bids," and individually, a "Qualifying Bid") at the Auction but shall not consider any bids for the Property that is not a Qualifying Bid.  In order for a bid to be deemed a Qualifying Bid, a bid must meet each of the criteria set forth in the following subparagraphs:

a.    Timing.  Bids are due and must actually be received by the Debtor, Greystar and the Committee no later than 5:00 p.m. (Pacific Standard Time) five (5) business days prior to the date of the Auction (the "Bid Deadline").  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

b.    Form and Content of Bid and Related Requirements.  Each potential bidder must deliver to the Debtor, Greystar and the Committee a written bid for the Property which complies with the terms set forth herein, and evidence of financial ability to perform reasonably acceptable to the Debtor, Greystar and the Committee.  To be deemed a Qualifying Bid, a bid must (i) be for all of the Property in its entirety; (ii) provide for payment of the proposed purchase price in full and in cash at closing, and in an amount equal to at least the sum of (x) the BofA Claim, (y) the Mechanics' Lien Claims (in an amount of at least $16,000,000) (the "Mechanics' Lien Payment") and (z) an additional $1,000,000; (iii) contain a markup of the Greystar Agreement (defined below) that reflects the bidder's proposed changes thereto and contain no contingencies or conditions other than those set forth in the Plan Agreement; (iv) contain no conditions related to financing or the satisfaction of diligence; (v) identify the potential bidder and the officer(s) or authorized agent(s) who will appear at the Auction on behalf of such bidder; (vi) include a Good Faith Deposit (defined below); (vii) contain the

form of order that the bidder would request the Debtor to seek Court approval of at the Sale Approval Hearing (defined below); (viii) if the bidder requires the assumption and assignment of any contracts or permits, include evidence of its ability to provide adequate assurance of future performance of such contracts and permits; (ix) not request or entitle the bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment and (x) provide that cash in an amount equal to (A) the BofA Claim will be paid to Greystar directly through the closing of the Sale and (B) the Mechanics' Lien Payment will be paid into an escrow reasonably acceptable to Class Counsel and the Successful Bidder (defined below).  To facilitate the Auction and to assist the Debtor and other interested parties in assessing the terms of each bid, prospective bidders must utilize the asset purchase agreement executed between the Debtor and Greystar (the "Greystar Agreement") to prepare their bids and mark all proposed changes to such agreement as part of their bid.  The Greystar Agreement will be attached to the order approving these Bidding Procedures and will be made available from Debtor's counsel and on the main docket of this case.

        c.       The Good Faith Deposit.  Bidders (other than Greystar) will be required to submit good faith deposits (the "Good Faith Deposits") with the Debtor on or before the Bid Deadline.  Such Good Faith Deposits shall be equal to $5,000,000.  The Good Faith Deposits of all Qualified Bidders shall be held in a separate interest-bearing account for the Debtor's benefit until consummation of a transaction involving the successful bidder for the Property (a "Successful Bidder").  If a Successful Bidder fails to consummate an approved sale of the Property because of a breach or failure to perform on the part of such Successful Bidder, the Debtor will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Debtor without affecting or reducing any of

the Debtor's other rights or claims against such party.  All other deposits will be returned to the respective bidders within eleven (11) days following the Sale Approval Hearing.

d.     Qualified Bidders.  A "Qualified Bidder" is a bidder that submits a Qualified Bid and, in the reasonable discretion of the Debtor, Greystar and the Committee, is determined to have demonstrated the financial capability to consummate the purchase of the Property.  Greystar is a Qualified Bidder and may credit bid the full original par amount of the BofA Claim (including default interest and fees) at the Auction under the terms and conditions set forth in paragraph 2 above.  Any Qualified Bidder that wants to conduct diligence must first sign and deliver a confidentiality agreement in form and substance reasonably satisfactory to the Debtor and Greystar.

(4)     Auction If Qualifying Bids Are Received.  If there are one or more Qualifying Bids, the Debtor shall hold the Auction.  Only Qualified Bidders are eligible to participate in the Auction.  At the Auction, bidding will begin at the highest amount offered among the Qualified Bids from the Qualified Bidders.  All subsequent bidding amounts must be in increments of at least $250,000.  All subsequent bids must also comply with the terms and conditions for "Qualifying Bids" set forth in paragraph 3b above.  Bidding at the Auction shall continue until such time as the highest and best bid is determined by the Debtor, Greystar and the Committee.

(5)     Sale Approval Hearing.  The hearing for approval of the results of the Auction of the Property (the "Sale Approval Hearing") shall be set held on August 30, 2011 at 10:00 a.m. or the first hearing date thereafter that is available to the Court, but in no event later than September 16, 2011.

(6)     Treatment of Mechanics' Lien Claims.  The Successful Bidder shall have standing and the exclusive right to evaluate, contest, challenge and settle the Mechanics' Lien Claims.  To the extent the amount of Mechanics' Lien Claims is determined to be

less than the Mechanics' Lien Payment, the differential shall be returned promptly to the Successful Bidder.

(7)    <u>No Additional Marketing</u>.  During the course of the Debtor's bankruptcy case, which has been pending for over two years, the Debtor has engaged in discussions and negotiations with multiple parties concerning the terms and conditions upon which such parties would agree to either purchase the Property or provide sufficient funding or equity to fund a plan of reorganization in the case.  As noted above, the Borrower Parties entered into the Plan Agreement with Greystar after extensive, arm's length negotiations with a number of prospective purchasers, financing sources and investors.  The Plan Agreement, which provides for the contribution by Greystar of $95 million to fund a plan of reorganization which pays in full or otherwise consensually resolves all of the claims against the Debtor, has been approved by the Court and provides for the best possible outcome for the estate under the circumstances.  Based on the foregoing, I do not believe that any additional marketing of the Property is warranted or required.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of July 2011, at Los Angeles, California.


/s/ M. Aaron Yashouafar
M. Aaron Yashouafar, Declarant

# EXHIBIT "1"

LNBYB000001

# PLAN SUPPORT AGREEMENT

      This PLAN SUPP ORT AGRE EMENT (as th e same may be am ended, modified or supplem ented from tim e to ti me in accord ance with the term s hereof, this " **Agreement**"), dated as of June 3, 2011, is en tered into by and am ong Roosevelt Lofts, LLC, as debtor and debtor in possession (the " **Debtor**") in case no. 09-14214-GM (the " **Bankruptcy Case** ") pending bef ore the United States B ankruptcy Court for the Centra l District of Ca lifornia (the "**Bankruptcy Court** "), The Roosevelt Lofts, Inc. (" **RLI** ") and Greystar GP, LLC (with its designee, as applicab le, " **Greystar**"). Each of the Debtor, RLI and Greystar are referred to herein individually as a "**Party**", and collectively as the "**Parties**".

# RECITALS

      WHEREAS, prior to the date hereof, representatives of the Parties have discussed the possibility of consummating a financial restru cturing of the Debtor's indebtedness and other obligations (the " **Restructuring**") as se t forth in th is Agre ement and the Plan Te rm Sheet (as defined below).

      WHEREAS, it is anticipated that the Restructuring will be implemented through a plan of reorganization jointly sponsored by the Debtor, RLI a nd Greystar (the "**Plan**") and filed in the Bankruptcy Case.

      WHEREAS, each Party desires that the te rms and conditions of the Plan will be substantially consistent with those d escribed in th e plan term sheet attach ed hereto as Exhibit A (the "**Plan Term Sheet**") and incorporated herein by reference.

      WHEREAS, Bank of America (as defined below) has agreed that it will assign the BofA Claim (as defined below) to a " **Purchaser**" arran ged by the " **Borrower Parties** " (a s defined below) in accordance with the term s of tha t ce rtain se ttlement agreem ent b etween the Debtor and Bank of America date d as of June 3, 2011 (the " **BofA Settlement**"). The Debtor is one of the Borrower Parties, and together with the other Borrower Parties and RLI, has executed an agreement to d esignate Greystar as Purch aser under the BofA Settlem ent, attached hereto as Exhibit B (the " **Borrower Parties Designation Agreement** ") and incorporated herein by reference.

      WHEREAS, the Debtor has entered into th is Agreement in order to, am ong other things, implement the terms and conditions of the BofA Settlement.

      WHEREAS, subject to the terms and conditions of this Agreement, the Plan Term Sheet and Plan Support Agreem ent Order (as define d below), the Parties have agreed to support the Restructuring and the Plan.

      NOW, THEREFORE, in consideration of the prem ises and agreem ents set forth herein, and for other good and valuable consid eration, the receip t and sufficiency of which ar e hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

LNBYB000002

1.      Incorporation of Plan Term Sheet and Definitions.  The Plan Term Sheet is expressly incorporated herein by reference and is made part of this Agreement.  In the event there is a conflict between the terms and conditions of the Plan Term Sheet, the Letter of Intent (defined below) and this Agreement, the terms and conditions of the Plan Term Sheet shall govern.  Capitalized terms used and not defined in this Agreement shall have the meaning ascribed to them in the Plan Term Sheet.  The Parties agree that this Agreement constitutes the "Definitive Agreement" for purposes of the Letter of Intent.

2.      Definitions.  The following terms shall have the following definitions:

"363 Auction" means the auction with respect to the Property to be held in accordance with the Bidding Procedures.

"363 Order" means an order in form and substance acceptable to Greystar authorizing and directing the Debtor to sell the Property to the winning bidder at the 363 Auction.  The 363 Order shall include, among other things, (a) findings that (i) Greystar upon the exercise of the 363 Purchase Right or (ii) such other bidder that the Bankruptcy Court approves as the winning bidder at the 363 Auction shall acquire good and marketable fee title to the Property, free and clear of all liens, claims, interests and encumbrances, and (b) other reasonable, usual and customary provisions.

"363 Purchase Right" means Greystar's right to credit bid the full original par amount of the BofA Claim (including default interest and fees) at the 363 Auction; provided that if the Plan Effective Date shall have occurred on or by the Outside Date, Greystar shall not exercise the 363 Purchase Right; and provided further that, pursuant to the BofA/Mechanics' Lien Settlement Order, the BofA Claim shall be subject to the Mechanics' Lien Claims in any 363 Auction, but shall not be subject to any claims of any insider or affiliate of the Debtor or RLI.

"363 Sale Hearing" means the hearing to occur on September 2, 2011 or such later date set by the Bankruptcy Court on the first hearing date available after September 2, 2011 (but in no event later than the 363 Sale Outside Date) at which the Bankruptcy Court shall approve the result of the 363 Auction and enter the 363 Order.

"363 Sale Outside Date" means September 16, 2011.

"Agreement" has the meaning set forth in the preamble hereof.

"Bank of America" means Bank of America, N.A., individually and as agent for a group of lenders under the BofA Loan Agreement.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§101 et seq., as amended from time to time and as applicable to the Bankruptcy Case.

"Bankruptcy Case" has the meaning set forth in the preamble hereof.

"Bankruptcy Court" has the meaning set forth in the preamble hereof.

LA\2263445.11

LNBYB000003

"Bidding Procedures" m eans the bidding procedures, in for m a nd substance reasonably acceptab le to Greystar, th at estab lish the rules an d procedures for the 363 Sale and 363 Auction. Am ong other provisions, the Bidding Procedures shall (a) require qualified bidders to (i) subm it a written bid for the Property (a " **Bid**") and evidence of their f inancial ab ility to perf orm to the Debtor, Greystar and the Official Committee of Creditors appointed in the Ba nkruptcy Case no later than five business days prior to the 363 A uction, (ii) bid all cash in an am ount equal to at l east the sum of (A) the BofA Claim , (B) the Mechanics' Lien Claim s (in an am ount of at least $16,000,000) and (C) an addition al $1,000,000, (iii) bid for all of th e Property in its entirety, (iv) subm it a Bid that contains no contingencies or conditi ons other than those set forth in the Plan S upport Agreem ent, (v) subm it a Bid that does not contain any condition related to financing or the satisfaction of diligence, and (b) provide for (1) Greystar's exercise of the 363 Purchase Ri ght, (2) increm ental bidding am ounts of at least $250,000 and (3) payment in full and in cash through the Closing of (X) the amount of cash necessary to pay in full the BofA Claim to Greys tar as the ho lder of such claim , and (Y) th e amount of c ash necessary to pay in full the Mechanics' Lien Claims to the holders of such claim s or to fund a reserve fo r the benefit of such holders to the extent such Mechanics' Lien Claims are disputed by the Debtor.

"Bidding Procedures Motion" means the m otion to be filed by the Deb tor in form and substance reasonably satisfactory to Greystar s eeking entry of the Bidding Procedures Order.

"Bidding Procedures Order " m eans the order in form and substance satisfactory to Greystar ente red by th e Bankruptcy Court approving the Bidding Procedures.

"BofA Claim" means (a) a ll claims held by Ba nk of America arising out of, relating to and/or secured by the BofA Loan Agreem ent and (b) all o f BofA's rig ht, title and interest in and under all documents, agreements and instruments relating thereto or that cons titute the BofA Loan Agreem ent. For avoidan ce of doubt, the BofA Claim for purposes of this Agreem ent shall not incl ude any obligations on th e part of Bank of America to perform under the BofA Loan Agreement.

"BofA Loan Agreement" means, collectively, (a) that certain amended and restated Co nstruction Lo an Agreement (the "**Loan Agreement**") with B ank of Am erica as adm inistrative agent for the B ank Group in the original principal am ount of $78,840,375, (b) that certain Deed of Trust Note dated as of on or about March 9, 2006 in the original principal am ount of $78,840,375 (the " **Note**"), (c) those certain (i) Construction Deed of Trust, Assignm ent of Rents and Leases, Secu rity Agreem ent and Fixture F iling recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typogra phical errors (the " **Fee Deed of Trust** "), and (ii) Construction Deed of Trust, Assignment of Rents and L eases, Security Agreem ent and Fixture F iling (California Leasehold Interes t) r ecorded on March 22, 2006 (the " **Leasehold Deed of Trust**," and collec tively, with th e F ee Deed of Trust, the " **Deeds of Trust** "), each of which (x) secure the Lo an Agreement and No te and (y) encum ber the Property (defined

3

below), including an abso lute assignment of all rents, i ssues and profits generated fro m operation of the Property and (d) all docum ents, agreements and instrum ents relating to any of the foregoing..

"BofA/Mechanics' Lie n Settlem ent Order " m eans that certain order entered by the Bankruptcy Court (1) Granti    ng Motion by Class Representatives for Approval o f Settlem ent; (2 ) Approving Settlem    ent; (3)  Setting C   ontinued Status Conference; and (4) Other Ancillary Relief, entered by the Bankruptcy Court on May 20, 2011 in Adv. Action No. 10-01031 [docket no. 83].

"BofA Settlement" has the meaning set forth in the recitals hereof.

"BofA/Debtor Settlem ent Order" h as the m eaning set forth  in Section 6 hereof.

"Borrower Parties Designation Agreem ent" has the m eaning set forth in the recitals hereof.

"Broker" means Charles Sturges and/or CSIV Investments.

"Broker's Commissions" m eans any and all commissions payable to the Broker in connection with the transactions contemplated by this Agreement.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Claim Assignment" means that certain Assignment of Claims executed or to be executed by Bank  of America in favor of the Purcha ser in the form attached hereto as Exhibit C, or in such other form as is acceptable to Greystar in its sole discretion.

"Confirmation Hearing" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as  such hearing may be adjourned or continued from time to time.

"Confirmation Order" m eans the o rder entered  by th e Ban kruptcy Court confirming t he Plan, including all exhibits, appendices and related docum    ents, each in form and substance reasonably acceptable to the Parties.

"Disclosure Statement" means the disclo sure s tatement in respec t of the Plan which shall be acceptable in form and substance to the Parties.

"Escrow Agreem ent" means an esc  row agreem ent in  the form   attached hereto as E_xhibit D , or in such other form as is acceptable to Greystar in its s          ole discretion.

"Final  Order" m eans a n order or judgm ent of the Bankruptcy Court or any other c ourt of competent ju risdiction as to which the tim  e to appeal, petitio n f or

LNBYB000005

certiorari, or m ove for reargum ent or rehear ing has expired and as   to w hich no appeal, petition for certiorari, or ot  her proceedings for reargum ent or reh earing shall th en be pending or as to which any appe  al, petition for certiorari, r  eargue, or rehear shall have been waived in writing in f orm and substance s atisfactory to the Partie s, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court   or other court of com petent jurisdiction shall h ave b een determined by the h  ighest cou rt to which    such order was appeal  ed, or certiorari, reargument, or rehearing shall have been deni  ed or resulted in no m  odification of suc h order and the tim  e to take any f  urther appe al, petition for certiorari, or m      ove for reargument or rehearing shall have expired.

"Foreclosure Right " means Greys tar's in rem autom atic relief from  the automatic stay under 11 U.S.C. Section 362 to   credit bid the full original par am ount of the BofA Claim (including default interest and  fees) in a foreclosure sale of the Pro perty at a date, tim e and place in Los Angeles, Calif ornia of Greystar's choo sing (on or after September 2, 2011) without further notice, he aring or order of the Bankruptcy Court and with no limitations on   such relief; provided  th at if  the Pla n Ef fective Date shall h ave occurred on or by the Outside Date, Greystar   shall no t ex ercise the F oreclosure Right; and provided  further th at, pursu ant to the BofA/Mechanics' Lien Settlem ent Order, the BofA Claim shall be subject to the Mechanics' Lien Claims in any foreclosure sale of the Property but shall not be  subject to any claims of any insider or affiliate of the Debtor or RLI.

"Greystar Receivership Stipulation" means that certain s tipulation for th e appointment of a receiver to take control of   the Property in the for m attached hereto as Exhibit E , which stipulation shall be executed        and delivered concurrently with the execution of this Agreement, but shall on ly be enforceable once Greystar has the rig ht to exercise its Foreclosure Right.

"Letter of Intent" and "LOI" means that certain Letter of Intent dated as of May 23, 2011 (attached hereto as Exhibit F and incorporated herein by reference).

"Liquidated  Damages" m eans the $500,000 in dam    ages and related guarantees described in Section 12 of the Letter of Intent.

"Material Adverse Change" means, since the date of this Ag reement, any change, effect, event, o  ccurrence, d evelopment, circum stance or state of facts occurs which has had or would reasonably be expected to have a materially adverse effect on the business, properties, prospects (financial or otherwise), operations, financial condition or results of operations of  the Debtor, taken as  a whole, or w hich would m aterially impair the Debtor's ability to p erform its obliga tions under this Agreement or have a m aterially adverse effect on or prevent or m    aterially delay the con summation of the trans actions contemplated by this Agreement.

"Mechanics' Lien Claim  s" m eans all allowed claim   s arising und er or relating to work of i mprovement that arose   prior to, and rem ain unpaid as of, the Plan Effective Date and that are duly perfected.

"Outside Date" means August 22, 2011, unless such date is extended by written agreement of Greystar (such agreement to be granted or withheld in Greystar's sole discretion).

"Parties" has the meaning set forth in the preamble hereof.

"Plan" means a chapter 11 plan of reorganization under the Bankruptcy Code, which shall be substantially consistent with this Agreement, the Plan Term Sheet and the Plan Support Agreement Order, and otherwise acceptable to Greystar in Greystar's sole discretion and reasonably acceptable to the other Parties.

"Plan Definitive Documents" has the meaning set forth in section 3 hereto.

"Plan Effective Date" means the date on which the Plan becomes effective.

"Plan Support Agreement Order" means an order in the form and substance acceptable to Greystar that, among other things, (a) memorializes and implements the terms of this Agreement, (b) approves the Borrower Parties Designation Agreement and, subject to the terms thereof, irrevocably designates Greystar as the Purchaser under the BofA Settlement, (c) requires the Debtor to file a Plan that provides for (i) Greystar to receive 100% of the equity interests of Roosevelt Lofts, LLC as reorganized (or such entity that holds, as of the Plan Effective Date, such equity interests) free and clear of all liens, claims, encumbrances and interests, (ii) approves and allows the BofA Claim as of the earlier of (A) the Effective Date or (B) the date on which Greystar acquires the BofA Claim (x) in an amount reasonably acceptable to Greystar, but in no event less than an amount equal to $78,422,049.33 plus interest at the default rate and all fees, charges and other costs which have accrued under the BofA Loan Agreement from and after September 3, 2009, and (y) as perfected, valid and duly enforceable (without any defense, counterclaim, right of offset or subordination, or any other claim or challenge by any party in interest) with first priority security against the Property subject only to the Mechanics' Lien Claims as described in the BofA/Mechanics' Lien Settlement Order and (iii) if the Plan has not been performed in accordance with its terms by the Outside Date, automatic in rem relief from stay for Greystar (as holder of the BofA Claim) on the Plan Effective Date to foreclose on the Property (pursuant to the Foreclosure Right) on the tenth day following the Outside Date (with such timing held to be commercially reasonable for the exercise of the Foreclosure Right), (d) approves the Greystar Receivership Stipulation and authorizes and directs the Debtor to perform under and in accordance with its terms and (e) (i) approves and authorizes and directs the Debtor to take all steps necessary to implement the 363 Purchase Right, (ii) obtain entry of the Bidding Procedures Order, (iii) obtain approval of the 363 Order on or before the 363 Sale Outside Date and (iv) authorizes Greystar to take all of the foregoing steps if the Debtor fails to timely take such steps.

"Plan Term Sheet" has the meaning set forth in the recitals hereto.

"Purchaser" has the meaning set forth in the recitals hereto.

6

LNBYB000007

"Property" m eans that certain real property located at 7     27 W est 7th
Street, Los Angeles, California, and all      improvements, personal property (including,
without limitation, all accounts of     the Debtor , all funds and assets therein, and      all
Property described on Exhibit G hereto) and other rights related to or appurtenant to such
improvements, personal property and real prope rty and any other collateral securing the
BofA Claim.

"Restructuring" has the meaning set forth in the recitals hereto.

"RLI" has the meaning set forth in the preamble hereof.

"Termination Date" has the meaning set forth in section 6 hereto.

"Termination Event" means the occurrence of a ny of the events set forth
in section 6 hereto.

"Voting De adline" m eans the date fixed by th e Bankruptcy Court as the
deadline for holders of claims to vote on the Plan.  The record date for voting claims shall
be the Voting Deadline.

3.    Obligations of the Par ties.  Subject to the ter ms and conditions of this
Agreement and the Plan Term Sheet, each of th e Parties agrees, subject to the Termination Date
(as defined below in section 6 hereof), as follows with respect to the Restructuring and the Plan:

a.    to prom ptly negotiate, in good faith, the d      efinitive docu ments
implementing, achieving and relating to the Re structuring and the Plan, including, but not
limited to, (i) the Dis    closure S tatement and   the Plan an d (ii) all o  ther agreements,
documents, exhibits (whether to this Plan     Support Agreem ent or otherwise), annexes,
schedules and orders of  the Bankruptcy Court   that are necessary or  app ropriate f or the
Restructuring and the prom pt consummation of the Restructuri ng and the Plan (all of the
foregoing, collectively with this A    greement, the Plan Term   Sheet, the Plan and the
Disclosure Statement, and in each case as am ended, modified or supplemented from time
to tim e in acco  rdance with  the term  s hereof or th     ereof, the " **Plan Defin itive
Documents**"); provided that,  in e ach case,  su ch Plan De finitive Docum ents shall not
contain terms or conditions which are m aterially inconsistent with th e Plan Term  Sheet
and shall otherwise be reasonably acceptab le in form and substance to the Parties (excep t
as otherwise provided in this Agreement); and

b.    to promptly execute and deliver  all Plan Definitive Docum ents (to
the extent a Party thereto), and otherwis e support the prompt consummation of the
transactions contem plated by, th e Plan  Definitive Do cuments, including without
limitation, to timely cast an appropriate ballot or ballots in favor of the Plan.

c.    to not object to, or support any   action or proceeding or take any
other action that would, or   would reasonably be expected  to, im pede or delay, the
consummation of the Restructuring, the appr   oval of  the Disclosur e Statem ent or th e
confirmation or consummation of the Plan;

LNBYB000008

d.    to not vote for, consent to, intentionally induce or participate, directly or indirectly, in the formation,    filing or prosecution of any other plan of reorganization or liquidation (or disclosure stat ement related thereto) with respect to the Debtor that is in consistent with the Plan or the consumm ation of the R estructuring and the Plan;

e.    other than as expressly contem plated herein o r in the Plan Term Sheet, to not directly or indirectly seek, solic it or encourage any other plan, sale, proposal or offer of winding up, liquida tion, reorganization, m erger, consolidation, dissolution or restructuring of the Debtor or any of its assets;

f.    to not comm ence or support any ac tion or proceeding to appoint a trustee, con servator, receiver or ex aminer with expanded powers for the Debtor, or to dismiss the Bankruptcy Case, or to convert  the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; and

g.    to use its comm ercially reasonabl e efforts to obtain Bankruptcy Court appro val of the Disclosure Statem ent and Plan as prom ptly as possible and to consummate the Restructuring and the Plan on  or before the Plan Effective Date, subject to the term s and conditions  set f orth h erein, the Plan Term Sheet, the Disclosure Statement and Plan.

4.    <u>Obligations of Greystar</u>.

a.    <u>Support of Restructuring and Plan</u>. Subject to the term s and conditions of this Agreem ent and the Plan Term Sheet ( including entry of the Plan Support Agreem ent Order), Greystar further ag rees that, until this Agreem ent has been terminated in accordan ce with section 6 here of, it sh all, s ubject to its receipt of a Disclosure Statem ent and related voting    and solicitation m aterials approved by the Bankruptcy Court, (i) vote a ny an d all BofA Claim s it holds to accept th e Plan in accordance with th e ap plicable p rocedures se t forth in  the Disclosu re Statem ent and accompanying voting and solicitation m aterials, and (ii) return a du ly-executed ballot in connection therewith no later than the dead line for voting on the Plan, and not (and not seek to) withdraw, ann ul, rescind, m odify or revoke such vote to accept the P    lan; <u>provided</u>, <u>however</u>, Greystar sh all not be obligated to vo te to accept the Plan, and m ay withdraw or revoke its vote w ith respect to the Plan, upon (A  ) the term ination of this Agreement (<u>provided</u>, that if  Greystar is the te rminating party, Greys tar is not th en in material breach of its obligations under th    is Agreem ent); or (B) the withdrawal, amendment, modification of, or the filing of a pleading by any of the other Parties hereto seeking to withdraw, a mend or m odify, the Plan or the oth er Plan Definitive Documents in a manner that is adverse to Greystar.

b.    <u>Acquisition of BofA Claim</u>. Subject to the terms and conditions of this Agreement and the Plan Term Sheet (including entry of the Plan Support Agreem ent Order), the Claim    As signment and the Bo    rrower Parties Designation Agreem    ent, Greystar further agrees that, at its option, Gr  eystar will (i) acquire (by assignm ent) the BofA Claim from Bank of Am erica for a cash payment of ███████ on or before the

LNBYB000009

Plan Effective Date or (ii) if Greystar doe s not previously acquire the BofA Claim prior to the Plan   Ef fective Date, satisf y the Bof A Claim in f ull by cash paym ent of ▮▮▮▮▮ through the Plan.  Notwithstanding a        nything contained herein to the contrary, following the assignm ent of the BofA Claim to Gr eystar (or its designee), the amount of the BofA Claim    for voting, dist ribution, the Foreclosure Right, the 363 Purchase Right and all other pu rposes shall be the full face am ount of t he BofA Claim, plus all accrued and unpaid interest (includi ng default interest) and other expenses/costs that constitute the BofA Claim . Greystar shall make the deposits described in Section 9 of the Letter of Intent, a nd such deposits sha ll be subject to the te rms and condition s set forth in this Agreem ent, the Plan Term    Sheet (including entry of the Plan Support Agreement Order), the Letter of Intent and the Escrow Agreement.

    c.    Payment of Broker's Comm ission.  Greystar believes that no Broker's C ommission is due and payable.        T o the exten t the Broke r's Comm ission becomes due and payable, Greystar shal l pay the Broker's Commi ssion.  Nothing contained herein shall be deem ed to m ake the Broker a third-party beneficiary of this Agreement.  Greystar will indem nify and de fend Debtor and RLI against, and hold such Parties harmless from, any claim by Broker wi th respect to com pensation in connection with this Agreem ent, the consumm ation of th e tran sactions contem plated h ereby or in connection with the sale of the Property to Greystar.  Debtor and RLI agree that each will indemnify and defend Greystar, and hold Greystar harmless from, the claims of any other broker(s), representative(s), em ployee(s), agent(s) or other intermediary(ies) claiming to have represented Debtor or RLI, or othe        rwise to be entitled to com        pensation in connection with this A greement, the consum mation of t he transactions contemplated hereby or in connection with the sale of the Property to Greystar.

    d.    Right to be Heard .  Nothing conta ined herein shall limit the ability of Greystar, as holder of the BofA Clai        m or otherwise, to a ppear and be heard, concerning any m atter arising in the Bankruptcy Case so long as such appearance is not materially inconsistent with its obligations und er this Agre ement, the Plan Term  Sheet, the Restructuring or the Plan or is not        for the purpose of hindering, delaying or preventing consummation of the Restructuring or the Plan.

    5.    Obligations of the Debtor and RLI.

    a.    To the extent Greystar does not acquire the BofA Claim before the Voting Deadline, the Debtor will use its best efforts to enter into an agreement with Bank of America to ensure th at Bank of Am erica shall vo te the Bof A Claim in f avor of the Plan so such vote is timely received on or before the voting deadline

    b.    From and a fter the date hereof, so   long as Greystar is willing to perform hereunder, the Debtor and RLI hereby agree that each wi ll not accept offers with respect to any transaction i nvolving or relating to a poten tial acquisition of the BofA Claim, the Property, the Debtor, RLI or RL        I's m embership in terests in the De btor (including, without limitation, through a plan of reorganization).

c.    The Debtor and RLI will prov    ide such af    fidavits and  other documentation the title company may require to issue the title insurance contemplated by Section VI(Q) of the Plan Term Sheet.

d.    The Debtor and RLI will (i) not amend, modify, terminate or waive any prov ision of  the Bof A Settle ment, and ( ii) caus e G reystar to b e des ignated the Purchaser f or purposes  of  the BofA Settlem    ent and in the Bankruptcy Court o      rder approving the BofA Settlem ent. Subject to    the satisfaction or waiver of Greystar's obligations hereunder, the fo    regoing designations shall be    irrevocable or further encumber or transfer any interest in the Property or any portion thereof.

e.    The Debtor and RLI will (i) pro    mptly negotiate, in goo  d f aith, execute and  deliver all docum    ents necess ary  for, and oth  erwise supp ort, the p  rompt consummation of the transactions contemplated by, at the sole discretion of Greystar, the Foreclosure Right and the 363 Purchase Right,  (ii) not object to, or support any action or proceeding or take any   other actio n that w  ould, or would reasonab  ly be expected to, impede or delay, the consummation and Bankr  uptcy Court approval of the Foreclosure Right, the 363 Purchase Right, entry of the  Bidding Procedures Order and the 363 Order, and (iii) use commercially reasonable efforts to obtain Bankruptcy Court approval of the Bidding Procedures Order and the 363 Order as promptly as possible.

f.    Debtor and RLI will pr   ovide Greys tar with co  pies of  all of  the documents comprising the BofA Loan Agreement that are in the posse ssion or control of Debtor, RLI or their respective agents or cons    ultants, toge ther with a list of   all s uch documents, in each case within fourteen days of the date of this Agreement.

6.    Termination of Obligations.

a.    This Agree ment shall te    rminate, and (exc  ept a s oth  erwise specifically set forth herein) all of the rights and obligations of the Parties hereunder shall be of no further force o  r effect, in the event   that (i) the Par ties m utually agree to s uch termination in writing   o r ( ii) th is Agreem ent is  te rminated pursuan t to the  rem aining paragraphs of this section 6.

b.    Each Party may terminate this Agreement by written no tice to the other Parties upon the occurrence of any of the following events:

(1)    a m aterial breach by any other Party of its    respectiv e obligations, representations or warran ties under (i) this A   greement, the Plan Term  Sheet, or a  ny other Def  initive Docum ent or (ii) the Pla    n Support Order, which m aterial breach  is not cured on or  within three (3) business days after the g iving of written notice of such breach to the other Parties or, if applicable, on or with   in the cure period provided for under the applicable agreements or documents; and

(2)    the issuance by any governm ental authority, including any regulatory authority or court of comp   etent jurisdiction, of any ruling or order enjoining or restraining the    consummation of the Restructuring

and/or the confirmation and consummation of the Plan on the terms and conditions set forth herein and the Plan Term Sheet.

   c. Greystar may terminate this Agreement upon by written notice to the other Parties upon the occurrence of any of the following events:

     (1) the occurrence of a Material Adverse Change;

     (2) the failure of the Plan Effective Date to occur on or before the Outside Date;

     (3) the Debtor fails to file a motion (in form and substance reasonably acceptable to Greystar) seeking Bankruptcy Court Approval of the Plan Support Agreement Order on or before June 3, 2011 (or such later date as may be acceptable to Greystar in Greystar's sole discretion);

     (4) the Bankruptcy Court fails to enter the Plan Support Agreement Order on or before June 20, 2011 (or such later date as may be acceptable to Greystar in Greystar's sole discretion);

     (5) the Debtor fails to file the Bidding Procedures Motion on or before July 8, 2011;

     (6) the Bankruptcy Court fails to enter the Bidding Procedures Order or such order fails to become a Final Order on or before August 5, 2011 (provided, however, that the requirement of a Final Order may be waived by Greystar in its sole discretion);

     (7) the Bankruptcy Court fails, by Final Order entered on or before August 5, 2011, to schedule the 363 Sale Hearing on or before the 363 Outside Sale Date (provided, however, that the requirement of a Final Order may be waived by Greystar in its sole discretion);

     (8) the Bankruptcy Court fails to enter the 363 Sale Order or such order fails to become a Final Order on or before the 363 Outside Sale Date (provided, however, that the requirement of a Final Order may be waived by Greystar in its sole discretion);

     (9) the entry of an order by the Bankruptcy Court invalidating, disallowing or limiting in any respect, as applicable, the amount, enforceability, first priority (subject only to the Mechanics' Lien Claims), or validity of the of the BofA Claim or the liens securing the BofA Claim as described in the Plan Support Order;

     (10) the appointment in the Bankruptcy Case of a trustee or examiner with expanded powers;

11

LNBYB000012

(11) the am ount of allowed Mechanics' Lien Claim    s or any reserve required by the Bankruptcy C ourt under the Plan with respect to the Mechanics' Lien Claims exceeds $16,000,000;

(12) any of the representations or    war ranties se t f orth in th e Claim Assignm ent is or becom e untr ue or incorrect (provided, however, that the Liquidated Damages shall not be payable to Greystar solely due to a breach of a representation or wa  rranty by Bank of Am erica under the Claim Assignm ent, unless th e facts or circum stances giv ing rise to su ch breach of such representation or warranty also constitute a separate breach or circum stance which would entitle  Greystar to rece ive th e Liquid ated Damages);

(13) any of the r epresentations or warranties of Debtor or RLI set forth in this Agreement is or become untrue or incorrect;

(14) any of the representations or warranties of any Debtor Related Party (as defined in the Borr ower Parties Designation Agreem ent) set f orth in  the Bor rower Parties  Designation  Agreem ent is o r be come untrue or incorrect;

(15) any Debtor Related Party (as defined in the Borrower Parties Designation Agreem    ent) br eaches any of its covenants or agreements under the Borrower Parties Designation Agreement; or

(16) the Bankrup tcy Court f ails to en ter an order on or before June 14, 2011 approving the BofA Settlem    ent (in form  and substance reasonably acceptab le to Greystar) that  irrevocably (sub ject to Greys tar's performance hereunder) designates Grey  star as the Purchaser under the BofA Settlement (the "**BofA/Debtor Settlement Order**").

d.     The date o n which this Agreem ent is term inated in a ccordance with this section 6 shall be referred to as the "**Termination Date**".

e.     If this Agre ement is ter minated pursuant to th is section 6, then all further obligations of the Parties hereunder sh  all be term inated without further liability related to th is Agreement; provided that Greystar sha ll h ave the righ t to the Liqu idated Damages; and provided  further  that Greystar shall be un    conditionally authorized to exercise the Foreclosure Right  and the 363 Purchase Right a nd to proceed with the 363 Auction and 363 Sale Hearing, and nothing contained herein sh all prevent Greystar from exercising the Foreclosure Right and the 363 Purchase Right  and to proceed with the 363 Auction and 363 Sale Hearing; and provided  further that in the event the  Debtor fails to timely file the Bidding Procedures Motion or any other motion or document related to the exercise by Greystar of the 363 Purchase Right,   Greystar shall be authorized to file any such m otion or docum ent in its sole discre  tion. Notwithstanding an y p rovision in this Agreement to the contr ary, the r ight to term inate this Agreem ent under this s ection 6 shall not be available to any   Party whose failure to f ulfill any material obligation under

this Agreement has been the cause of, or resulted in, the occurrence of the applicable Termination Event.  The provisions of this Section 6(e) shall survive any termination of this Agreement.

   7. <u>Representations of the Debtor</u>.  The Debtor hereby represents and warrants to each other Party as follows as of the date hereof:

     a. <u>Corporate Power and Authority</u>.  It has all requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement and the Plan Term Sheet, subject only to entry of appropriate orders by the Bankruptcy Court.

     b. <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part, other than the requisite approvals of the Bankruptcy Court.

     c. <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than as a result of the commencement of the Bankruptcy Case.

     d. <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Bankruptcy Case.

     e. <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder (other than the Bankruptcy Case).

     f. <u>Binding Obligation</u>.  Subject to entry of the Plan Support Agreement Order, this Agreement is the legally valid and binding obligation of the Debtor, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

     g. Debtor owns all of the Property, and no other person or entity has any ownership interest in the Property or any portion thereof.  To Debtor's knowledge, there are no liens, encumbrances or title defects of any kind affecting the Property, except those described in that certain Preliminary Report prepared by First American Title Insurance Company, May 24, 2011 Update, Order No. NCS-383344-LA2.

LNBYB000014

h.      [Intentionally Omitted.]

i.      As of the date hereof, a m inimum of $78,422,049.33 plus interest at th e defau lt rate and all fees, charges a nd other costs w hich have accrued under the BofA Loan Agreem ent from and after Sept ember 3, 2009 is owed by Debtor under the BofA Claim.

j.      Attached hereto as <u>Exhibit I</u> is a description of all bank accounts of the Debtor, and the amount of the deposits therein as of the date hereof.

k.      Attached hereto as <u>Exhibit J</u> is a true, correct, complete and current rent roll for the Property that describes all l eases, subleases and other occupancy agreem ents affecting the Property, and all security deposits received by Debtor in connection therewith.

8.      <u>Representations of RLI and Greystar</u>.  Each of RLI and Greystar severally (but not jointly) represents and warrants to the other Parties as follows with respect to itself only and as of the date hereof:

a.      <u>Corporate P ower and Authority</u> .  It has all requi site co rporate, partnership or limited liability company power and authority to enter into this Agreem ent and to carry out th e transactions contemplated by, and perform its obligations under, this Agreement.

b.      <u>Authorization</u>.  The execution and delivery of this Agreem ent and the performance of its obliga tions hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

c.      <u>No Conflicts</u>.  The execution, delivery and perform ance by it of this Agreement do not and shal l not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiar ies or its certificate of incorporation or bylaws or other organizational docum ents or those of any of its subs idiaries o r ( ii) conf lict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

d.      <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any fe deral, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Bankruptcy Case.

e.      <u>No Litigation</u> .  No litigation or proceed ing before any court, arbitrator or adm inistrative or governm ental body is pending against it that would adversely a ffect its ab ility to enter in to this Agreem ent or pe rform its oblig ations hereunder (other than the Bankruptcy Case).

f.      <u>Binding Obligation</u> .  Subject to entry of the P lan Support Agreement Order, this Agreem ent is the leg ally valid an d binding obliga tion o f it, enforceable against it in accordance with its terms, except a s such enforceability may be

LNBYB000015

limited by bankruptcy, insolvency, fraudulen t conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

9.    <u>Entire Agreement; Prior Negotiations</u>. This Agreem ent, the LOI and the Plan Term Sheet and the Borrower Parties Designation Agreement, including any exhibits to any of the foregoing, set forth in full the term s of agreement between and among the Parties and is intended as the f ull, co mplete and exclus ive contract governing the re lationship between and among the Parties with respect to  the transactions contemplated  herein, superseding all other discussions, prom ises, representations, warran ties, agreem ents and understandings, whether written or oral, between or among the Parties with respect to the subject matter hereof; <u>provided</u>, that any confidentiality agreement between or among any of the Parties shall remain in full force and effect in accordance with its term s. No repr esentations, oral or written, other th an those set forth herein, may be relied on by any Party in connection with the subject matter hereof.

10.    <u>Amendment or W aiver</u>. No waiver, m odification or am endment of any term or pro vision of this Agreem ent, the LOI o r the Plan Term Sheet s hall be v alid unless such waiver, modification or am endment is in writin g and has been signed by the Party affected by such waiver, modification or amendment.  No waiver of any of the provisions of this Agreement, the LOI or the Plan Term Sheet shall be d eemed or constitute a waiver of any other provision of this Agreement, the LOI or the Pl an Term Sheet, whether or not si milar, nor shall any waiver be deemed a continuing waiver. Any m    odification of this  se ction 10 sh  all requ ire the writte  n consent of all Parties.

11.    <u>Miscellaneous</u>.

a.    <u>Governing Law</u> .  This Agreem    ent shall be governed by, and construed in accordance with, the laws of the Stat e of Calif ornia, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreemen    t, each of the Parties   hereby irre vocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or  proceeding, may be brought in th e Unite d States Ba nkruptcy Court f or the Ce ntral Distric t of Califo rnia, a nd by e xecution and delivery of this Agreement, each of the Part ies hereby irrevocably accepts and submits itself to the exclusive jurisdiction of   such court, generally and unc  onditionally, with respect to any such action, suit or proceeding, but only for such action, suit or proceeding.

b.    <u>Specific Performance</u>. It is understood and agreed by the P  arties that money damages would not be  a sufficient rem edy for any breach of this Agreem ent by any Party and each non-breaching Party shall be entit  led to specific perform ance and injunctive or other equitable relief as a rem edy of any such breach, incl uding, without lim itation, an order of the Bankruptcy Court or other court of com    petent jurisdiction requiring any Party to com    ply promptly with any of its obligations hereunder.

c.    <u>Reservation of Rights</u> .  Except as expressly provided in this Agreement or in the Plan Term   Sheet, noth ing he rein is in tended to, o r does, in any m  anner, waive, limit, im pair or r estrict the a bility of RL I or Greystar to protect  and preserve its rights,

LNBYB000016

remedies and interests, including its claim       s, against the Debtor.  If the Restructuring contemplated here in an d in th e Pla n Term Sheet is  not co nsummated, or if  th is Agreem ent is terminated for any reaso n, the Pa rties here to fully reserve any and all of   their respective rights and remedies.

        d.   <u>Headings</u>.  The section heading       s of this    Agreem ent are for convenience of reference only and shall not, for         any purpose, be deem ed a part of thi    s Agreement.

        e.   <u>Notice</u>.  All notices, requests and  other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile or electronic transm ission or m ailed (first class postage prepaid) to the parties at th  e following addresses, email addresses, or facsimile numbers:

        If to the Debtor:

        Roosevelt Lofts, LLC
        c/o Milbank Real Estate Services, Inc.
        Attention:  M. Aaron Yashouafar
        660 S. Figueroa Street, 24th Floor
        Los Angeles, CA 90017
        Fax:  (213) 403-1440
        Email:  mayashoua@milbankre.com

        *with a copy (which shall not constitute notice) to*:

        David L. Neale, Esq.
        Levene, Neale, Bender, Yoo & Brill L.L.P.
        10250 Constellation Boulevard, Suite 1700
        Los Angeles, CA 90067
        Fax:  (310) 229-1234
        Email:  DLN@LNBYB.COM

        If to RLI:

        The Roosevelt Lofts, Inc.
        c/o Milbank Real Estate Services, Inc.
        Attention:  M. Aaron Yashouafar
        660 S. Figueroa Street, 24th Floor
        Los Angeles, CA 90017
        Fax:  (213) 403-1440
        Email:  mayashoua@milbankre.com

        *with a copy (which shall not constitute notice) to*:

        Homan Taghdiri, Esq.

LNBYB000017

General Counsel
Milbank Real Estate Services, Inc.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

If to Greystar:

Greystar GP, LLC
Attention: A. Joshua Carper
3rd Floor
18 Broad Street
Charleston, NC 29401
United States of America
Fax: (843) 579-9420
Email:  jcarper@greystar.com
*with a copy (which shall not constitute notice) to*:

Robert A. Klyman, Esq.
Latham & Watkins LLP
355 S. Grand Ave.
Los Angeles, CA  90071
Fax:  (213) 891-8763
Email:  robert.klyman@lw.com

     f.    <u>Successors and Assigns, No Third-Party Beneficiaries</u>.  This Agreement is intended to bind and inure to the    benefit of the Parties and their respective successors, perm itted a ssigns, he irs, executo rs, adm inistrators and re presentatives, includ ing, without lim itation, any chapter 11 or chapter 7 tr ustee appointed in the Bankruptcy Case.  For avoidance of doubt, Greystar reserves the righ t to assign this agreement to a designee or affiliate but, notwithstanding such assignm ent, shall rem ain liable for all of the obliga tions of Greystar under this Agreem ent, the LOI and the Plan T erm Sheet.  Unless expressl y stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Person or entity shall, or shall be deemed to, be a third party beneficiary hereof.

     g.    <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such a m anner as to be ef fective and valid under app licable law, but if any provision of this Agreem ent shall be prohibite d by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalid ity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

     h.    <u>Counterparts</u>.  This Agreem   ent m ay be executed in several counterparts, each of wh ich shall be deem ed to be  an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this agreement may be delivered by facsimile or elec tronic mail which shall be deemed to be  an o riginal for the pu rposes of this Agreement.

LNBYB000018

i.  <u>Acknowledgement</u>.  This Agreem ent is not, and shall not be deemed to be, an offer    for the purchase, sale   , exchange, hypothecation, or other transfer of securities for any purpose or a so licitation for consents to or vot es on the Plan.  The vote of any holder of any claim  against or interest in the De btor on or with re spect to  the P lan shall not be solicited until it has received (or concurrently with the delivery of) the Disclosure Statem ent and the Plan.

j.  <u>Public Disclosure</u>.  Each of the Debtor and RLI will use its best efforts to (and will caus e each of th eir respective affiliates and insiders to) submit to Greystar in advance for approval all press releases and public    filings re lating to this Agreem ent, the Term Sheets, o r the transactions contem  plated here by and thereby and any am    endments thereof. Except as re quired by applicable law, the Debtor and RLI (and each of t heir respective affiliates and insiders) shall not use the nam e of any Party  in any press release without such Party's prior written consent.

k.  <u>No Strict C onstruction</u>.  This Agreem ent and all other agreem ents and documents executed and/or delivered in connection herewith have been prepared through the joint ef forts of all of  the Parties her eto or there to.  Neither the provisions  of this Agreem ent or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that su  ch Party or such Party's counsel drafted this Agreement or such o   ther ag reements and do  cuments, or based on any ot    her rule of strict construction.

l.  <u>Representation</u>.  Each P arty has been represented by counsel of its choosing in connection with this Agree        ment  and the transactions contem     plated by this Agreement, the LOI and Plan Term Sheet.

m.  <u>WAIVER OF JURY TRIAL   </u>.  EA  CH O F TH E PA RTIES TO THIS AGREEMENT HEREBY I RREVOCABLY WAIVES ALL RIGHT TO A TRIAL  BY JURY IN ANY ACTI ON, P ROCEEDING OR  COUNTERCLAIM ARISING OUT OF O   R RELATING TO THIS AGREEM     ENT OR TH  E TRANSACTIONS CONTEMPLATED HEREBY.

n.  <u>Time Periods</u>.  If any time period or other deadline provided in this Agreement expires on a day that is not a Busine ss Day, then such tim e period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

*[Remainder of page intentionally left blank; signature pages follow]*

IN W ITNESS W HEREOF, the Parties he   reto have caused this Plan Support
Agreement to be duly executed and delivered by their respective duly authorized officers,
all as of the date and year first above written.

GREYSTAR GP, LLC,
a Delaware limited liability company


By: _____
Na        me:
Title        :


ROOSEVELT LOFTS, LLC,
a California limited liability company

By:  The Roosevelt Lofts, Inc.
      Its:  Managing Member

      By: _____
            M. AARON YASHOUAFAR
Presiden            t


THE ROOSEVELT LOFTS, INC.,
a California corporation

By: _____
      M. AARON YASHOUAFAR
      President



M. AARON YASHOUAFAR


_____


SOLYMON YASHOUAFAR


_____


SIMON BARLAVA


_____

**<u>Exhibit A</u>**

**Plan Term Sheet**

**(see attached)**

LNBYB000021

**CONFIDENTIAL AND PRELIMINARY**

**ROOSEVELT LOFTS LLC (THE "DEBTOR")**
**TERM SHEET FOR PLAN OF REORGANIZATION**
**PROPOSED BY THE DEBTOR, ROOSEVELT LOFTS, INC. ("RLI") AND GREYSTAR**
**GP, LLC OR ITS DESIGNEE (COLLECTIVELY, "GREYSTAR")**

This term sheet is p repared for the pur pose of facilitating di scussion of a possible restructuring of the Debtor, whose chapter   11 case, case no. 09-14214 GM (the "Bankruptcy Case") is pending before the Unit      ed States Bankruptcy Court fo    r the Central District of California (the "Bankruptcy Court").  The term sheet sets forth certain major terms of a possible restructuring, but additio nal term s a nd conditio ns, m aterial to the trans action, are not set forth herein.  This term  sheet is not , and should not be deem ed, a soli citation for votes on a plan of reorganization contain ing the ter  ms outlined  herein.  Subject to a      pplicable or ders of the Bankruptcy Court and satisfaction of conditions       described herein and   in the Plan Support Agreement, nothing contained herein shall in part   or in whole constitute  an offer suscept ib le of acceptance of a legally binding obliga tion.  Th is Term Sheet is not an offer with respect to an  y securities or solicitation of accep tances of a chapter 11 plan.  Su ch offer or solic itation only will be m ade in com pliance with all app licable securities laws and/or provi sions of the Bankruptcy Code.  This Term She et is part of, and will  be attach ed to, the Plan Support Agreem ent (the "Plan Support Agreement ") am ong the Debtor, RLI and Greystar and is subject to the term        s thereof.  Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan Support Agreem ent.  For purposes  of this term  sheet, the Debtor , R LI and Greystar shall be referred to as the "Plan Proponents ."  Roosevelt Lofts, LLC, as de btor and debtor in possession in the Bankruptcy Case  shall be ref erred to he rein as the " Debtor," and as reorganized on and after the Effective Date (as defined below) as the "Reorganized Debtor."

The Plan will be funded by a cash paym ent of $95,000,000 by Greystar (the "Greystar Contribution").  Greystar will apply the Greystar    Contribution as fo llows: ███████████ (the "Bank of Am erica Payment") for paym ent to Bank of Am erica (for itself, and as agent for the bank group) (colle ctively, "BofA ") for its allowed secure  d claim (the "BofA Claim   "), the amount necessary to pay (or create a reserve for paym ent of) all other allowed claim s in full and render such claim s unimpaired (the "Creditor Paym   ents") as of the Effective Date (defined below), and the rem ainder of the Greystar Cont ribution (net of the B ank of Am erica Payment and the Cre ditor Payments) shall be  paid on  the E ffective Date to RLI, as  holder of  all of the membership and equity  inter ests in the Debtor  (the "RLI Paym ent").  In exchan ge for the Greystar Contribution, on the Effective Date (def ined below), and (i) after Greystar has acquired the Bof A Claim  or (ii)  concurrently with su  ch tim e as the BofA Claim has otherwise been satisfied through the Plan, Greystar will receive all of the interests in the Reorganized Debtor or, at Greystar's option, all of the interests in an       entity th  at holds all of the interests in the Reorganized Debtor, free and clear of all lien       s, claim s, encum brances and interests (th  e "Reorganized Debtor Interests").  For the avoidance of doubt, the Property shall be transferred to the Reorganized Debtor free and clear of all liens, claims, encumbrances and interests.

The proposed plan of    reorganiza tion for the Debtor (the "Plan___") will con tain the following classes of claim s and treatm ent for credito rs in tho se classes.  Except as expressly s et

forth below, all distributions will be made on the effective date of the plan of reorganization or as soon as practicable thereafter (the "Effective Date"). At Greystar's election, the structure of the transaction described herein (but not the consideration delivered by Greystar under the Plan) may be modified to reflect tax, accounting and other considerations. The Plan will establish a reserve to ensure payment of any claims allowed and payable after the Effective Date.

## I. UNCLASSIFIED CLAIMS

   A. Allowed Administrative Claims[1].

   1.         *General*. Except as set forth below, Allowed Administrative Claims, other than Allowed Administrative Claims of Insiders,[2] shall be paid in full in cash on the later of (a) 60 days after such claims are allowed or (b) the Effective Date.

   2.         *Statutory Claims*. All fees payable pursuant to 28 U.S.C. Section 1930 shall be paid in full in cash.

   3.         *Professional Claims*. Professionals shall file final fee applications within 60 days after the Effective Date. Promptly after allowance, professional fees shall be paid in full in cash.

   4.         *Postpetition Ordinary Course Liabilities*. Allowed Postpetition Ordinary Course Liabilities (other than tax claims) incurred prior to the Effective Date shall be paid in full in full in cash on the Effective Date (or if incurred but not yet due as of the Effective Date, then paid when due in the ordinary course out of a reserve established under the Plan from the Greystar Contribution).[3]

---

[1] To the extent such claims are allowed after the Effective Date, they shall be paid in full in cash promptly after such claims are allowed out of a reserve established under the Plan from the Greystar Contribution.

[2] All claims asserted against the Debtor by insiders of the Debtor, including without limitation RLI and Milbank Holding Corp., will be cancelled and no distribution shall be made under the Plan on account of such claims (including any and all administrative, priority, secured or unsecured claims).

[3] Funds in an amount equal to all security, pet or other deposits that (i) have been received by Debtor or its agents, or (ii) are hereafter received by Debtor or its agents prior to the Effective Date, in each case from any tenants of the Property (each a "Tenant") shall be placed in a reserve account controlled by the Reorganized Debtor. No Tenant shall be required to file a proof of claim in order to receive a refund of any such deposit funds which such Tenant is entitled to receive in the ordinary course of business; provided, however, that each Tenant's right to receive a refund of any deposit shall be determined in accordance with the provisions of each Tenant's lease or an estoppel certificate signed by the Tenant, and nothing in the Plan shall waive any of the Debtor's rights to withhold all or any portion of a Tenant's deposit if appropriate to do so under that Tenant's lease.

2

LNBYB000023

5.            *Postpetition Tax Claims*.  Postpetition tax claims shall be filed on the later of (a) 60 days after the   Effective Date or  (b) 120 days af ter the f iling of a tax r eturn with the applicable g overnmental unit, and s hall be pa id in f ull in c ash prom ptly af ter such claim s are allowed out of a reserve established under the Plan from the Greystar Contribution.

B. Priority Tax Claim s.  Each holder of an allo wed priority tax claim shall receiv e cash on the Effective Date in an amount equal to such allowed priority tax claim.  All allowed priority tax claims which are not due and payable on or be fore the Effective Date shall b e pro ra ted, so the amount that is due as of the Effec tive Date shall be paid on the Effective Date (or paid when due in the ordinary course of business in acco    rdance with the term s thereof out of a reserv e established under the Plan from the Greystar Contribution).

## II.    CLASSIFIED CLAIMS AND INTERESTS

A.    Class 1, BofA Claim  :  On the Eff ective Date, the holder o f the Class 1 BofA Claim shall receive the Bank of America Paym ent in full satisfaction of its Class 1 BofA Clai m. In the event Greystar acquires the C  lass 1 BofA  Claim prior to the Eff ective Date, ( i) Greystar will not re ceive the Ba nk of America Payment but instead will rec eive the Reorgan ized Debtor Interests on  the  Ef fective Date, a  nd (ii)  th e Greystar Contributio n wi ll be re  duced by ███████████.

B.    Class 2, Allowed Mechanics' Lien Claims:  On the Effective Date, each holder of an Allowed Class 2 Mechanics ' Lien Claim shall receive cash on th e later of (1) th e Effective Date and (2) the date upon which such claim      becomes an Allowed Class 2 Mechanics' Lien Claim by Final Order of the Bankruptcy Court.      On the Ef fective Date , a reserve shall be established under the Plan from  the Greystar Contribution for  the benefit of m embers of Class 2 whose claim have not been allowed by Final Or der of the Bankruptcy Court; provided, however, that in no event shall the am ount of payments made on the E ffective Date to holders of Allowe d Class 2 M echanics' Lien Claim s and the fore going reserve exceed the s um of $16 m illion.  It shall be the responsibility of     RLI and the Debtor to object to      and/or resolve any Class 2 Mechanics' Lien Claim  that is not allowed by  Final Order of the Bankruptcy Court as of the Effective Date.

C.    Class 3 et seq.; Allowed Other Secured Claim s.  Each secured credito r shall be in a Class by itself.  Each holder of  an Allowed Class 3A, 3B, et  seq. Secured Claim shall receive cash on the Effective Date in an amount equal to such Allowed Class 3 et seq.

D.    Class 4, Allowed Priority Non-Tax Claim   s.  Each holder of a Class 4 Priority Non-Tax Claim shall receive cash on the Effectiv e Date in an am ount equa l to s uch Allowe d Class 4 Priority Non-Tax Claim.

E.    Class 5, Allowed General Unsecured Claim  s.  Each holder of an Allowed Class General Un secured Claim will receive cash on the   Effective Date in an am ount e qual to su ch Allowed Class 5 General Unsecured Claim.

3

LNBYB000024

F.      Class 6, Allowed Equity Interests in Roosevelt . Holders of equity inter ests in the Debtor ( including witho ut lim itation m embership interests, stock, warran ts and options) shall receive the their pro rata shar e of the RLI Paym ent and, on the Effective Date, such equity interests shall be canceled.

All Allowed Claim s in Classes 2 through 5 shall be un impaired under the Pl an and deem ed to accept the Plan.

## III.   MEANS FOR IMPLEMENTATION OF PLAN

A. Sources of Cash for Distribution . The cash necessary for the Reorganized Debtor to make payments under the Plan shall be obtained from the Greystar Contribution.

B. New Managing Member. The Managing Member of the Reorganized Debtor shall be selected by Greystar an d such m anaging member's identity shall be d isclosed on or prior to the date of the hearing on the approval of the Disclo sure Statem ent with respect to th e Plan. The remaining m embers of senio r m anagement will continue to s erve until the Ef fective Da te pursuant to their respective existing terms of compensation.

C. Executory Contracts and No nresidential Real Property Leases : All exe cutory contracts and unexpired leases not specifically assumed or rejected prior to the date on which the Plan is confirmed, or set forth on a schedule of cont racts to be assum ed and/or rejected as of the Effective Date purs uant to the o rder conf irming the Plan (the "Confirm ation Order"), shall be rejected on and as of th e Effective Date. From and after the date hereof, Greystar shall have the sole right to determine, no later th an ten days prior to the h earing on co nfirmation of the Plan, which executory contracts and unexpired leases sh all be assum ed and which shall be rejected, including, w ithout lim itation, any contracts for sale of any condo minium units at the Property, and any contracts relating to the portions of the Property to be devoted to retail use.[4]

## IV.  DISCHARGE AND RELEASES

A. Discharge . On the Effective Date, all claim s against and equity inter ests in the Debtor shall be discharged and all persons and e ntities shall be precluded from asserting against the Debtor, the Reorganized Debt or or Greys tar any claim s ba sed on any act or om ission that occurred in whole or in part on or prior to the Effective Date.

B. Release by the Debtor and Reorganized Debtor . On the Eff ective Date, the Debtor and Reorganized Debtor shall release all clai ms, rights and causes of action ag ainst (1) the current m embers, directors, officers and em ployees of the Debtor (other than for m oney borrowed from or owed to the Debtor by any such members, directors, officers or employees as

---

[4] Greystar assum es that all such contracts are of the type th at can be rejected, and intends to reject all of them . However, to th e extent tha t any such con tracts a re not executory contracts, Greystar intends that the Reorga nized Debtor shall not be a part y to such contracts following the Effective Date, and that all related damages will be paid as set forth above in Sections I and II of this Agreement.

4

LNBYB000025

set forth in the Debtor's books and records) an d the Debtor's agents and advisors (including lawyers), (2 ) the creditors' comm ittee and its a dvisors (so lely in their capacity as such), (3 ) Greystar, its af filiates, a nd their re spective of ficers, dir ectors, em ployees, partne rs, m embers, managers and advisors (includi ng lawyers) and (4 ) RLI an d its officers, directo rs, em ployees, partners, members, managers and advisors (including lawyers) (the "Released Parties"), so long a such releases do not vitiate or impair coverage under any insu rance policies related to the Property.

C. Release by Holders of Claims and Interests. To the fullest extent permissible by law, on the Effective Date, all holders of claims against and inte rests in the D ebtor, in co nsideration for the obligations of Greystar, RLI, the Debtor and the Reorganized Debt or under the Plan, and the cash, stock of the Reorganize d Debtor and other docum ents delivered in connection with the Plan, shall be deemed to release each of the Released Parties from all claims, rights and causes of action again st the Relea sed Parties aris ing f rom or re lated to the Deb tor's pre- and/or post-petition actions, omissions or liabilities with respect to the Property.

## V. CONDITIONS TO CONFIRMATION

The conditions to confirm ation of the Plan sh all include those custom ary for c omparable transactions, including, without limitation:

A. The Bankruptcy Court shall have entered a Final Order approving the Plan Support Agreement (the "Plan Support Agreem ent Order") in form and substance negotiated by the Debtor, RLI and Greystar; provi ded that any changes to the Plan Support Agreem ent Order following the filing of such Plan Support Agreem ent Order shall be satisfactory to Greystar in Greystar's sole discretion and reasonably acceptable to RLI and the Debtor; and provided further that the Plan Support Agreem ent Order shall ha ve becom e a Final Order and not have been modified, amended or reversed;

B. The Bankruptcy Court shall have entere d an order approving the disclosure statem ent with respect to the Plan (the "Dis closure S tatement Order") in form and substance that is reasonably acceptable to the Plan Proponents, and the Disclosure Statem ent Order shall have become a Final Order and not have been modified, amended or reversed.

C. The Bankruptcy Court shall have entere d an order confirming the Plan and approving associated findings of fact and conclusions of law (coll ectively, the "Confirm ation Order") in form and substance satisfactory to Greystar in Greystar's s ole disc retion and the Conf irmation Order shall have becom e a Fina l Order and not have been m odified, am ended or reversed; provided, however, that the Confirm ation Order sh all be deem ed satisfactory to the Debtor and RLI so long as the Confirm ation Order does not de viate in any m aterial way from the term s set forth in this term sheet.

D. The Plan, the exhibits thereto and any Plan supplem ent (as confirmed or approved by the Conf irmation Orde r) shall b e in f orm and s ubstance satisfactory to Greystar in Greystar's reasonable discretion. The Plan, the exhibits th ereto and any Plan supplem ent (as confirm ed or approved by the Confirm ation Order) shall be de emed satisfactory to the Debtor and RLI so long as they do not deviate in any material way from the terms set forth in this term sheet.

5

E.  The Bof A/Debtor Settlement Order shall have become a Final Order and not have been modified, amended or reversed.

## VI.  CONDITIONS TO EFFECTIVENESS

The conditions precedent to the Effective Date shall include those customary for comparable transactions, including, without limitation:

A.  All conditions to confirmation of the Plan shall remain satisfied or waived in the sole discretion of the party who has the right to waive such condition or conditions.

B.  Each order of the Bankruptcy Court referred to in Section V above shall have become a Final Order and not have been modified, amended or reversed.

C.  All documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan (not otherwise specified herein) shall be in form and substance reasonably acceptable to the Plan Proponents.

D.  The Plan Proponents shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement the Plan and that is required by law, regulation, or order.

E.  The Reorganized Debtor shall have received title insurance from a title insurance company reasonably satisfactory to Greystar and on terms and conditions satisfactory to Greystar in Greystar's sole discretion and reasonably acceptable to the Debtor and RLI, and the Property shall be in compliance with all material restrictions, requirements and encumbrances applicable to the Property (other than the fact that the parking stalls are non-conforming).

F.  The Reorganized Debtor Interests shall have been issued (free and clear of all liens, claims, encumbrances and interests) to Greystar in accordance with the Plan.

G.  All other actions, documents and agreements necessary to implement the Plan as of the Effective Date shall have been delivered and all conditions precedent thereto shall have been satisfied or waived.

H.  All corporate and other proceedings to be taken by the Debtor in connection with the Plan and/or plan supplement and the consummation of the transactions contemplated thereby and by the Plan and all documents incident thereto shall have been completed in form and substance reasonably satisfactory to Greystar; provided however that the foregoing proceedings and documents shall be deemed satisfactory to RLI and the Debtor so long as they do not deviate in any material way from the terms set forth in this term sheet.

I.  No event, condition or circumstance shall have occurred or arisen subsequent to the date of the Plan Support Agreement which has had or could reasonably be expected to have or give rise to a Material Adverse Change.

J.  Subsequent to the date of the Plan Support Agreement, there shall be no threatened or pending suit, action, investigation, inquiry or other proceeding by or before any court of

6

competent jurisdiction (excluding the bankruptcy case prior to the date of the Plan Support Agreement) which is likely to have a Material Adverse Change.

K  The Effective Date shall have occurred on or before August 22, 2011.

L.  The managing m ember of the Reorgani zed Debtor shall have been designated by Greystar as of the Effective Date, and the d irectors' and o fficers' liability insu rance sha ll b e available to the officers of the Reorganized Debtor and such m anaging m ember on term s reasonably satisfactory to Greystar.

M.  All waiting periods im posed by applic able law (including, without lim itation, under the Hart-Scott-Rodino Antitrus t Improvem ents Ac t of 1976, as amended, if applicab le) in connection with the consummation of the Plan and transactions con templated thereby shall have expired or been term inated without any action having been taken by any court of com petent jurisdiction restraining, preventing or im posing m aterially adverse conditions upon such transactions, and the Plan Proponents shall have received all m aterial regulatory approvals required for the consummation of the Plan and th e trans actions contem plated th ereby and f or the Reorganized Debtor to continue to carry on its businesses without m aterial change, each of which approvals shall have become final.

N.  Subsequent to the date of the Plan Support Agreement, the Debtor shall have operated in a m anner consistent with its or dinary course or business prior to the date of the Plan Support Agreement.

O.  Greystar shall receive good and marketable title to the Property.

P.  The P roperty shall be free and clear of liens, claim s, interes ts and encum brances, except those specifically permitted by Greystar in Greystar's sole discretion.

Q.  Greystar shall ha ve receiv ed an ow ner's policy of title insura nce in form and substance acceptable to Greystar in Greystar's s ole discretion, subject only to such exceptions as Greystar approves during the revi ew process. All existing in surance policies of any kind (including without lim itation title insurance and property and casualty insurance) related to the Property sha ll be m aintained in f ull force and assigned to Greystar. The Debtor and RLI shall not have done anything to impair coverage under any of the foregoing insurance policies.

R.  No Term ination E vent (as defined in the Plan Support Agreem ent) shall have occurred.

Notwithstanding anything contained herein to the con trary, Greyst ar s hall have th e exclusive right, in its sole dis cretion, to d eem satisfied o r waived any of the conditions set forth above in Sections VI.B, F, I, K, N, O, P and Q, and such determination by Greystar shall be binding on all Plan Proponents and other parties in interest.

*  *  *  *  *

7

## Exhibit B

**Borrower Parties Designation Agreement**

**(see attached)**

LNBYB000029

**BORROWER PARTIES DESIGNATION AGREEMENT**

This Borrower Parties Designation Agreement (this "**Agreement**") is made as of June 3, 2011 by and among (i) Greystar GP, LLC ("**Greystar**"), (ii) The Roosevelt Lofts, Inc. ("**RLI**"), (iii) Roosevelt Lofts, LLC as debtor and debtor in possession (the "**Debtor**") in case no. 09-14214-GM (the "**Bankruptcy Case**") pending before the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), (iv) M. Aaron Yashouafar ("**M.A. Yashouafar**"), (v) Solymon Yashouafar ("**S. Yashouafar**") and (vi) and Simon Barlava ("**Barlava,**" and together with M.A. Yashouafar and S. Yashouafar, the "**Bank Guarantors,**" and with the Debtor and RLI, the "**Debtor Related Parties**"). Each of Greystar, RLI, the Debtor, M.A. Yashouafar, S. Yashouafar and Barlava are referred to herein individually as a "**Party**" and collectively as the "**Parties.**"

**RECITALS**

WHEREAS, the Debtor and the Bank Guarantors have entered into that certain Settlement Agreement dated as of June 3, 2011 (the "**Bank Settlement Agreement**") with Bank of America, N.A., individually and as administrative agent for a group of lenders (as described more fully in the Settlement Agreement, the "**Bank Group**"). A true and correct copy of the Bank Settlement Agreement is attached hereto as Exhibit A. Capitalized terms not defined herein shall have the meaning ascribed to them in the Bank Settlement Agreement.

WHEREAS, pursuant to the Bank Settlement Agreement, the Debtor and the Bank Guarantors agreed to identify and cause a Purchaser other than the Debtor and the Bank Guarantors to purchase the Bank Group's interest in certain obligations, loan and security documents and agreements described in the Bank Settlement Agreement.

WHEREAS, Section 2 of the Bank Settlement Agreement calls for the Purchaser to make certain deposits of funds (the "**Deposits**") and to make timely payment of the Purchase Price on the Payment Date.

WHEREAS, the Debtor and the Bank Guarantors have requested that Greystar or Greystar's designee serve as the Purchaser.

WHEREAS, RLI as the holder of all of the membership interests of the Debtor will benefit from Greystar or its designee serving as the Purchaser, and has requested that Greystar or Greystar's designee serve as the Purchaser.

WHEREAS, the Debtor Related Parties have entered into this Agreement in order to, among other things, implement the terms and conditions of the Bank Settlement Agreement.

WHEREAS, Greystar, RLI and the Debtor have entered into that certain Plan Support Agreement dated as of June 3, 2011 (the "**Plan Support Agreement**"), pursuant to which and subject to the terms and conditions set forth therein, Greystar has agreed, among other things, to serve or have its designee serve as the Purchaser. It is a condition to the Plan Support Agreement that the Parties hereto execute this Agreement.

LNBYB000030

NOW, THEREFORE, in consideration of the recitals, covenants and conditions in this Agreement, and for valuable consideration, the Parties agree and follows:

1.      Designation of Greystar or Greystar's Designee as Purchaser.   Greystar or, at Greystar's option, Greystar's designee, is hereby designated as Purchaser under the Bank Settlement Agreement.   This designation is irrevocable as long as Greystar makes the Deposits into Escrow described in Section 2 of the Bank Settlement Agreement.

2.      No Modification/Waiver/Amendment of the Bank Settlement Agreement. None of the Debtor Related Parties (a) shall consent to or make any modification, waiver, amendment or termination of the Bank Settlement Agreement, any exhibits thereto, or any existing or future court orders approving the Bank Settlement Agreement or any exhibits thereto, or (b) shall permit any of their affiliates or direct or indirect subsidiaries to make any modification, waiver, amendment or termination of the Bank Settlement Agreement, any exhibits thereto, or any existing or future court orders approving the Bank Settlement Agreement or any exhibits thereto, in each case without the prior written consent of Greystar, which consent may be granted or withheld in Greystar's sole discretion.

3.      Binding Nature of this Agreement.   By signing below, each Party shall be bound to this Agreement as of the date hereof; provided, however, that the Debtor's obligations hereunder shall be subject only to entry  by the Bankruptcy Court of the Plan Support Agreement Order (as defined in the Plan Support Agreement).  The Parties shall use their respective reasonable best efforts to obtain entry of the Plan Support Agreement on an expedited basis, and in no event later than one (1) business day before the first Deposit is due under the Bank Settlement Agreement.

4.      The Deposits.  The Deposits shall be and remain property solely of Greystar.  In no event shall any of the Debtor Related Parties, or any other party other than Greystar,  have any legal or equitable right to any of the Deposits.  No holder of a claim against or interest in any of the Debtor Related Parties shall have any right to attach or claim to payment from any Deposit or Escrow.  If for any reason the Sale is not consummated on or before the Outside Date (as defined in the Plan Support Agreement), or if a Termination Event (as defined in the Plan Support Agreement) occurs, then in each case all Deposits shall be promptly returned to Greystar without need for further order of any court or approval of any party; provided, however, that if (i) such failure to consummate the Sale on or before the Outside Date (as defined in the Plan Support Agreement) occurs as a direct result of a default by Greystar of its obligations under the Plan Support Agreement (after satisfaction of the conditions to such obligations), and (ii) after receipt by Greystar of written notice of such default from any Debtor Related Party, Greystar failed to cure such default within ten (10) days after Greystar's receipt of such notice (provided that (a) such cure period shall in no event extend beyond such day as is one day prior to the Payment Date (as defined in the Bank Settlement Agreement), and (b) with regard to any such default relating to the making of Deposits pursuant to the Bank Settlement Agreement, such cure period shall be two business days commencing upon Debtor's transmittal of notice of such default to Greystar by facsimile or electronic transmission), then the Deposit

2

LNBYB000031

funds which have theretofore been placed in escrow by Greystar shall become non-refundable to Greystar.  The terms and conditions of this Section 4 shall be included in the Escrow Agreement.

     5.    <u>Cooperation of Debtor Related Parties</u>.  The Debtor Related Parties waive all objections and will not oppose or cause any person or entity to oppose (a) any exercise by Greystar or its designee of the Foreclosure Right (as defined in the Plan Support Agreement), (b) any exercise by Greystar or its designee of the 363 Purchase Right (as defined in the Plan Support Agreement), or (c) the appointment of any receiver pursuant to the Greystar Receivership Stipulation (as defined in the Plan Support Agreement).  The Debtor Related Parties agree that they will reasonably cooperate with (i) any receiver in connection with the exercise of the  Foreclosure Right (as defined in the Plan Support Agreement), and (ii) Greystar or its designee in the exercise of any of their remedies hereunder or under the Plan Support Agreement (including, without limitation, the Foreclosure Right (as defined in the Plan Support Agreement)).

     6.    <u>Representations</u>.

     a.    Each Party severally (but not jointly) represents and warrants to the other Parties as follows with respect to itself only and as of the date hereof:

     (i)    <u>Corporate Power and Authority</u>.  It has all requisite authority (whether corporate, partnership, limited liability company or individual power and authority) to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement, other than, with respect to the Debtor, the requisite approvals of the Bankruptcy Court.

     (ii)    <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part, other than, with respect to the Debtor, the requisite approvals of the Bankruptcy Court.

     (iii)    <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries, (ii) violate its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries, or (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it or any of its subsidiaries is a party.

     (iv)    <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Bankruptcy Case.

     (v)    <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

LA\2265146.7   borrower parties designation agreemetn

LNBYB000032

(vi)                    Enforceability.  This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

b.        Each Debtor Related Party severally (but not jointly) (i) represents and warrants to Greystar that the Debtor owns all of the Property (as defined in the Plan Support Agreement), and that no Debtor Related Party other than the Debtor has any right, title or interest in or to the Property (as defined in the Plan Support Agreement) or any portion thereof, and (ii) covenants not to, and not to cause any other person or entity to, take, remove or transfer any Property (as defined in the Plan Support Agreement) from the property located at 727 West 7th Street, Los Angeles, CA or from any accounts of Debtor.

7.        Entire Agreement; Prior Negotiations.  This Agreement, the Plan Support Agreement, Plan Term Sheet (as defined in the Plan Support Agreement) and the LOI (as defined in the Plan Support Agreement), including any exhibits to any of the foregoing, sets forth in full the terms of agreement between and among the Parties and is intended as the full, complete and exclusive contract governing the relationship between and among the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect to the subject matter hereof; provided, that any confidentiality agreement between or among any of the Parties shall remain in full force and effect in accordance with its terms.  No representations, oral or written, other than those set forth herein, may be relied on by any Party in connection with the subject matter hereof.

8.        Amendment or Waiver.  No waiver, modification or amendment of any term or provision of this Agreement shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Party affected by such waiver, modification or amendment.  No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.  Any modification of this section 8 shall require the written consent of all Parties.

9.        Miscellaneous.

a.        Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States Bankruptcy Court for the Central District of California, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, but only for such action, suit or proceeding.

4

LNBYB000033

b.    Specific Performance.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

c.    Headings.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

d.    Notice.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile or electronic transmission or mailed (first class postage prepaid) to the parties at the following addresses, email addresses, or facsimile numbers:

If to the Debtor:

Roosevelt Lofts, LLC
c/o Milbank Real Estate Services, Inc.
Attention:  M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

with a copy (which shall not constitute notice) to:

David L. Neale, Esq.
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Fax:  (310) 229-1234
Email:  DLN@LNBYB.COM

If to RLI:

The Roosevelt Lofts, Inc.
c/o Milbank Real Estate Services, Inc.
Attention:  M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

LA\2265146.7  borrower parties designation agreemetn

LNBYB000034

with a copy (which shall not constitute notice) to:

Homan Taghdiri, Esq.
General Counsel
Milbank Real Estate Services, Inc.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

If to the Bank Guarantors:

M. Aaron Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  mayashoua@milbankre.com

with a copy (which shall not constitute notice) to:

Homan Taghdiri, Esq.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

Solyman Yashouafar
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email: syashoua@milbankre.com

with a copy (which shall not constitute notice) to:

Homan Taghdiri, Esq.
660 S. Figueroa Street, 24th Floor
Los Angeles, CA 90017
Fax:  (213) 403-1440
Email:  htaghdiri@milbankre.com

Simon Barlava
2209 South Santa Avenue
Los Angeles, Ca, 90058
Fax:  (323) 277-1717
Email:  simon@designcollection.com

LNBYB000035

If to Greystar:

Greystar GP, LLC
Attention: Josh Carper
3rd Floor
18 Broad Street
Charleston, NC 29401
United States of America
Fax: (843) 579-9420
Email: jcarper@greystar.com

with a copy (which shall not constitute notice) to:

Robert A. Klyman, Esq.
Latham & Watkins LLP
355 S. Grand Ave.
Los Angeles, CA 90071
Fax: (213) 891-8763
Email: robert.klyman@lw.com

   e.  Successors and Assigns, No Third-Party Beneficiaries.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives, including, without limitation, any chapter 11 or chapter 7 trustee appointed in the Bankruptcy Case.  For avoidance of doubt, Greystar reserves the right to assign this agreement to a designee or affiliate but, notwithstanding such assignment, shall remain liable for all of the obligations of Greystar under this Agreement.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Person or entity shall, or shall be deemed to, be a third party beneficiary hereof.

   f.  Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

   g.  Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this agreement may be delivered by facsimile or electronic mail, which shall be deemed to be an original for the purposes of this Agreement.

   h.  Public Disclosure.  Each of the Debtor Related Parties shall use their respective best efforts to (and will cause each of their respective affiliates and insiders to) submit to Greystar in advance for approval all press releases and public filings relating to this Agreement, the Plan Support Agreement, the Plan Term Sheet (as defined in the Plan Support

LA\2265146.7  borrower parties designation agreemetn

LNBYB000036

Agreement), or the transactions contemplated hereby and thereby and any amendments thereof. Except as required by applicable law, the Debtor Related Parties (and each of their respective affiliates and insiders) shall not use the name of any Party in any press release without such Party's prior written consent.

        i.      No Strict Construction.  This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties hereto or thereto.  Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that such Party or such Party's counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.

        j.      Representation.  Each Party has been represented by counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement.

        k.      WAIVER OF JURY TRIAL.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

        l.      Time Periods.  If any time period or other deadline provided in this Agreement expires on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

*[Remainder of page intentionally left blank; signature pages follow]*

LA\2265146.7  borrower parties designation agreemetn

LNBYB000037

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers, all as of the date and year first above written.

GREYSTAR GP, LLC,
a Delaware limited liability company

By: _____
Na          me:
Title          :


ROOSEVELT LOFTS, LLC,
a California limited liability company

By:  The Roosevelt Lofts, Inc.
     Its:  Managing Member


     By: _____
          M. AARON YASHOUAFAR
Presiden          t


THE ROOSEVELT LOFTS, INC.,
a California corporation


By: _____
     M. AARON YASHOUAFAR
     President


M. AARON YASHOUAFAR

_____

SOLYMON YASHOUAFAR

_____

SIMON BARLAVA

_____

9

<u>Exhibit A</u>

Bank Settlement Agreement

(See Attached)

# SETTLEMENT AGREEMENT

This settlement agreement (the "**Settlement Agreement**") is entered into as of June 3, 2011 (the "**Effective Date**"), by and between the following entities: (i) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ("**S. Yashouafar**"), and Simon Barlava ("**Barlava**" and together with M.A. Yashouafar and S. Yashouafar, the "**Guarantors**"); (ii) Roosevelt Lofts, LLC, debtor and debtor in possession (the "**Debtor**" and together with the Guarantors, the "**Borrower Parties**"); and (iii) Bank of America, N.A., individually and as administrative agent for a group of lenders[1] (collectively, the "**Bank Group**"). The Borrower Parties and the Bank Group are referred to collectively as the "**Parties**" and each individually as a "**Party**." This Settlement Agreement is based upon the following facts, which each of the Parties confirms is entirely true and accurate in every material respect:

## RECITALS

A.    On or about March 9, 2006, the Debtor executed a Construction Loan Agreement (the "**Loan Agreement**") with the Bank of America N.A., as administrative agent for the Bank Group in the amount of $78,840,375. On or about March 9, 2006, Debtor executed a Deed of Trust Note in the original principal amount of $78,840,375 (the "**Note**"). The Loan Agreement and Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and re-recorded on November 17, 2006 to correct certain typographical errors (the "**Fee Deed of Trust**"), and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "**Leasehold Deed of Trust**," and collectively, with the Fee Deed of Trust, the "**Deeds of Trust**"). The Deeds of Trust encumber the property commonly known as the "Roosevelt Building, " located at 727 West 7th Street, Los Angeles, California (the "**Property**"), including an absolute assignment of all rents, issues and profits generated from operation of the Property (collectively, the "**Collateral**").

B.    In further consideration of the Bank Group's loan and extension of credit, on or about March 9, 2006, the Guarantors each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "**Guaranty**"). The Loan Agreement, the Note, the Deeds of Trust and the Guaranty, together with all modifications thereto and all other loan and security documents and agreements between the Parties related to the Collateral are collectively referred to as the "**Loan Documents**. "

C.    The Borrower Parties failed to pay the obligations under the Loan Documents in full at maturity, March 9, 2009. As a result, the Bank Group delivered a default notice dated December 30, 2008. On March 23, 2009, the Bank Group caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office. On or about April 3, 2009, the Bank Group filed a complaint for breach of the Guaranty, appointment of a receiver

---

[1]    The Bank Group is comprised of the Bank of America N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

BN 9150681v2

LNBYB000040

and judicial foreclosure on the Deeds of Trust in the Superior Court of the State of California for the County of Los Angeles, bearing case no. SC 102472 and including all claims raised in the cross complaint filed by the Guarantors (the "**Guaranty Litigation**").  The Borrower Parties dispute the Bank Group's contentions.  The Guarantors asserted counterclaims in the Guaranty Litigation.

D.     On April 13, 2009, the Debtor filed a voluntary petition commencing a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), bearing case no. 1:09-bk-14214-GM (the "**Bankruptcy Case**").

E.     The Parties desire to settle their disputes relating to the Guaranty Litigation (including all claims raised in the cross complaint) and the Bankruptcy Case, and therefore, enter into this Settlement Agreement which provides, among other provisions, for the purchase and sale of the Bank Group's interest in the Loan Documents, and certain rights provided therein, to a purchaser other than the Borrower Parties, but arranged by the Debtor who has been qualified (no less than 30 days before the Payment Date) under applicable banking regulations (the "**Purchaser**").

NOW, THEREFORE, in consideration of the recitals, covenants and conditions in this Settlement Agreement, and for valuable consideration, the Parties agree as follows:

<u>AGREEMENT</u>

1.     <u>Note Purchase and Sale</u>.

a.     Pursuant to the assignment of claims (the "**Assignment of Claims**") in the form attached hereto as Exhibit "1", and according to the terms and conditions of this Settlement Agreement, the Bank Group agrees to sell and assign the Loan Documents to the Purchaser, "as is," and with no representation or warranties other than as may be set forth in the Assignment of Claims (the "**Sale**").  If the Sale is to be consummated, the Purchaser shall pay the Bank Group the total sum of ████ by wire transfer in immediately available federal funds (the "**Purchase Price**").  The Sale must close and the Purchase Price must be paid to the Bank Group on or before the "**Payment Date,**" which is the earlier of:  (i) September 1, 2011; and (ii) the first business day which is at least 90 calendar days after the Effective Date.

b.     Conditions to the Closing of the Sale.

The closing of the Sale is conditioned upon the occurrence of each of the following:

i.     The timely deposit by the Purchaser of the funds as set forth in paragraph 2;

ii.     Bankruptcy Court Approval as defined in paragraph 10;

iii.     The timely payment of the Purchase Price on the Payment Date;

iv.     The Purchaser has provided the Bank Group with sufficient representations, covenants and evidence (including evidence of ownership) so as to qualify under applicable

2

LNBYB000041

banking regulations and demonstrate that it is not otherwise violative of U.S. banking laws; and

v.    The delivery by the Bank Group of the documents set forth in paragraph 4(b).

c.    The closing of the Sale will be facilitated through the services of an escrow agent approved by both the Purchaser and the Bank Group (the "**Escrow Agent**"). The terms of escrow shall be governed by an escrow agreement (the "**Escrow Agreement**") in the form not materially at variance from the form of escrow agreement attached hereto as Exhibit "2."

d.    With at least five business days' notice, the Purchaser shall advise the Bank Group of its intention to close the Sale on a particular Payment Date.  The Assignment of Claims shall be released to the Purchaser at the closing of the Sale on the Payment Date, and returned to the Bank Group if the conditions to the Sale do not occur.  The Assignment of Claims is to effectuate the transfer of certain claims against the Borrower Parties to the Purchaser on the terms and conditions set forth therein.  The Assignment of Claims shall specifically include all claims, if any, related to any deposit and other accounts held in the name of the Debtor. Notwithstanding the foregoing, the Assignment of Claims shall not affect any rights the Bank of America N.A. may have against Milbank Holding Corp. ("**Milbank**") to the extent related to or arising from the judgment entered against Milbank in the state court action as case no. BC415625 in the Los Angeles Superior Court.  The Assignment of Claims shall also provide, among other things, that pursuant to and to the extent permitted by applicable law and the terms of any such policies, the Purchaser will acquire the rights of the Bank Group, if any, to any policies of title insurance covering the Deeds of Trust and the Property.  The Bank Group makes no representations or warranties regarding its claims against the Borrower Parties or any coverage it may have as a beneficiary under any policy of title of insurance covering the Deeds of Trust and the Property.

e.    On the Payment Date, and on condition that the Sale closes, the Escrow Agent shall deliver to the Borrower Parties for filing in the Guaranty Litigation, a request for dismissal, without prejudice, of the entire Guaranty Litigation in the form attached hereto as Exhibit "3" (the "**Bank Group's Request for Dismissal of Guaranty Litigation Without Prejudice**").

f.    As long as Greystar GP, LLC or its designee (collectively, "**Greystar**") satisfies the conditions set forth in Section 1(b) hereof on or before the Payment Date, Greystar shall be designated the Purchaser under this Agreement.

2.    <u>Purchaser Deposits into Escrow</u>.

a.    Within 10 calendar days of the Effective Date, the Purchaser must deposit with the Escrow Agent $5,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within 40 calendar days of the Effective Date, the Purchaser must deposit with the Escrow Agent an additional $10,000,000 for a total deposit of $15,000,000 to be applied, on the Payment Date, towards the Purchase Price.  Within 70 days of the Effective Date, the

BN 9150681v2

LNBYB000042

Purchaser must deposit with the Escrow Agent an additional $20,000,000 for a total deposit of $35,000,000 to be applied, on the Payment Date, towards the Purchase Price.  On or before the Payment Date, the Purchaser must deposit additional sums necessary to have the full Purchase Price on deposit with the Escrow Agent.

        b.     All such deposits must be in immediately available federal funds.  In any event, the Escrow Agent will immediately advise the Bank Group when funds are deposited.  If any of the funds are not timely deposited with the Escrow Agent, then the Bank Group may send a notice of default by electronic means to counsel for the Borrower Parties.  If any of the required deposits are not made within two (2) business days following the transmittal of the notice of default, then pursuant to the 362 Stipulation and the Bankruptcy Court Order described below, the Bank Group will immediately have *in rem* relief from the automatic stay on the Collateral without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief.  If, for any reason, the Sale is not consummated on or before the Payment Date, all deposited funds will be refunded to the Purchaser.

        3.     <u>If Sale is not Consummated</u>.  If, for any reason, either the Purchaser fails to make any deposit timely, or the Sale is not consummated timely, and conditioned upon Bankruptcy Court Approval (as defined below), then each of the following shall occur:

        a.     <u>Return of Assignment of Claims</u>.  The Assignment of Claims shall be returned immediately to the Bank Group.

        b.     <u>Stipulation for Relief From Stay</u>.  Pursuant to (i) the stipulation entered into between the Bank Group and the Borrower in the form attached hereto as Exhibit "4" (the "**362 Stipulation**"); and (ii) the Bankruptcy Court Order, the Bank Group will immediately have *in rem* relief from the automatic stay on the Collateral without further notice, hearing or order of the Bankruptcy Court and with no limitations on such relief.

        c.     <u>Dismissal of Guarantors from Guaranty Litigation</u>  The Escrow Agent shall deliver to the Guarantors for filing in the Guaranty Litigation, a request for dismissal, without prejudice, of all causes of action against the Guarantors in the form attached hereto as Exhibit "5"  (the "**Bank Group's Request for Dismissal of Guarantors Without Prejudice**").

        d.     <u>Covenant Not to Sue</u>.  The Escrow Agent shall deliver to the Borrower Parties the covenant not to sue in the form attached hereto as Exhibit "6" (the "**Covenant**").

        e.     <u>Stipulation for Appointment of a Receiver</u>.  The stipulation for the appointment of a receiver to take control of the Property (the "**Receivership Stipulation**") in the form attached hereto as Exhibit "7" shall be filed, *ex parte*, in the Guaranty Litigation, and a receiver shall be appointed, *ex parte*, immediately.  The receiver shall take possession and control over the Collateral (other than deposit or other accounts with the Bank of America N.A.) pursuant to the terms of the Receivership Stipulation.  Each of the Borrower Parties agrees to cooperate with the receiver and the Bank Group on all matters, including matters concerning mechanic's liens, title of the Property and the prompt and orderly transition of management of the Property to the receiver including the turnover of all Collateral accounts and tenant deposits.

4

LNBYB000043

4.      Deliveries on the Effective Date.

a.      On the Effective Date, the Borrower Parties shall deliver to the Bank Group fully executed originals of each of the following:

i.      Releases from each of the Guarantors in the form attached as Exhibit "8;"

ii.     the Receivership Stipulation;

iii.    the 362 Stipulation;

iv.     the request for dismissal with prejudice of the cross-complaint filed in the Guaranty Litigation by the Guarantors against the Bank Group (the "**Guarantors' Request for Dismissal**") in the form attached as Exhibit "9," which then may be filed immediately in the Guaranty Litigation by the Bank Group; and

v.      the Insider Lien Releases described below, each signed by an authorized representative of each of those entities described in paragraph 7 of this Settlement Agreement.

b.      On the Effective Date, the Bank Group shall deliver to the Escrow Agent fully executed originals of each of the following:

i.      the Assignment of Claims;

ii.     the Covenant;

iii.    the Bank Group's Request for Dismissal of Guaranty Litigation Without Prejudice; and

iv.     the Bank Group's Request for Dismissal of Guarantors Without Prejudice.

5.      Deadline to File Plan.  The Parties agree that the time within which the Debtor is required to file its Chapter 11 plan is extended to no later than August 31, 2011, or subject, however, to further extension, if any, by mutual agreement of the Parties.

6.      Stay of Litigation.  Conditioned upon there being no default under the terms of this Settlement Agreement, for 90 days after the execution of the Settlement Agreement, a stay shall be effective as to the following:  (i) the Guaranty Litigation in its entirety; and (ii) any scheduled judgment debtor exams of Milbank.  Except as provided in this paragraph, nothing in this Settlement Agreement shall affect any rights, obligations or remedies available to Bank of America N.A., with respect to any credit extended to Milbank pursuant to the loan documents related to that credit.

LNBYB000044

7.    Mechanic's Liens.  On the Effective Date, all of the insiders and affiliates of the Debtor set forth on the attached Exhibit "10," shall deliver to the Bank Group fully executed lien releases in the form attached hereto as Exhibit "11" (the "**Insider Lien Release**") evidencing that none shall assert a mechanic's lien against the Property.  On and after the Effective Date, if no Sale is consummated timely, then the Borrower Parties will cooperate in resolving any issues regarding the remaining mechanic's lien claims asserted by third parties.

8.    Release by the Debtor.  The Debtor, on its behalf and on behalf of its respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, owners, members, managers, affiliates, professionals, trustees, and representatives hereby release and forever discharge all claims, rights, demands, damages, actions, causes of action, costs, expenses, and suits of law or in equity which they have held, now hold or hereafter may hold against the Bank Group, including Bank of America, N.A., East West Bank, Manufacturers Bank and United Commercial Bank and each of their respective assigns, successors, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, owners, shareholders, members, managers, affiliates, professionals, attorneys, trustees, and representatives that arise in or are related to the Loan Documents or were or could have been alleged in the Guaranty Litigation.

9.    Scope of Release by the Debtor.  The Debtor understands that the release of claims set forth in this Settlement Agreement covers claims within the areas specified which the Debtor has knowledge of and those which it may not know about.  The Debtor expressly waives all rights under Section 1542 of the California Civil Code, which section the Debtor has read and understands, and which provides as follows:

> Section 1542.  A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Notwithstanding the foregoing, the release set forth herein shall not apply to the obligations under this Settlement Agreement, and shall have no effect upon any documents or acts necessary to accomplish the terms and intent of this Settlement Agreement.

10.    Bankruptcy Court Approval.

a.    The Debtor is not bound to perform under this Settlement Agreement until "**Bankruptcy Court Approval**," which shall mean both (i) entry of an order after hearing on approval of the Settlement Agreement in the form attached hereto as Exhibit "12" (the "**Bankruptcy Court Order**"), and (ii) the Bankruptcy Court Order is fully enforceable on its terms and has not been stayed, modified or altered by any court of competent jurisdiction.

b.    This Settlement Agreement is binding and fully enforceable as to each Party other than the Debtor on the Effective Date.  Notwithstanding the foregoing, no Party is obligated to perform under paragraph 3 of this Settlement Agreement without Bankruptcy Court Approval.

BN 9150681v2

LNBYB000045

      c.    The Bankruptcy Court Order shall also approve the 362 Stipulation.

      d.    The Debtor will file a motion for approval of this Settlement Agreement and the 362 Stipulation within 5 business days following the Effective Date and will seek to have the motion heard and approved on June 14, 2011 or as soon before or after as the Bankruptcy Court may set.  The Bank Group will reasonably assist the Debtor in obtaining Bankruptcy Court approval of this Settlement Agreement and the 362 Stipulation.  Subject to its review and approval, the Bank Group will support the motion, and will not oppose it.

      11.    <u>Confidentiality</u>.  The Parties agree to keep the Purchase Price (and such other terms as may be expressly agreed upon in writing) confidential, and, if necessary, the Bank Group will support a motion by the Debtor in the Bankruptcy Case to seal the record and maintain the confidentiality of the Purchase Price.

      12.    <u>Further Assurances</u>.  The Parties agree to perform such acts and to prepare, execute, deliver, file, and record any documents or agreements reasonably required to perform under and satisfy the conditions in this Settlement Agreement, or to give full force and effect to this Settlement Agreement.

      13.    <u>Attorneys' Fees and Costs</u>.  If any action or proceeding is brought to enforce this Settlement Agreement, the prevailing Party shall be entitled to recover all of its costs in bringing and prosecuting such action to enforce the Settlement Agreement, including reasonable attorneys' fees, from the losing Party.

      14.    <u>Complete Agreement</u>.  This Settlement Agreement supersedes any and all other agreements, understandings, negotiations or discussions, either oral or in writing, express or implied between the Parties concerning settlement.  The Parties to this Settlement Agreement each acknowledge that no representations, inducements, promises, agreements or warranties, oral or otherwise, have been made by them or any of them, or anyone acting on their behalf which are not embodied in this Settlement Agreement, that they have not executed this Settlement Agreement in reliance on a representation, inducement, promise, agreement or warranty, and that no representation, inducement, promise, agreement or warranty not contained in this Settlement Agreement including any purported supplements, modifications, waivers or terminations of this Settlement Agreement shall be valid or binding, unless executed in writing by all of the Parties to this Settlement Agreement.

      15.    <u>Terms Read and Understood</u>.  Each of the Parties hereby certifies that he or it (i) has read the entire Settlement Agreement, (ii) has conferred with legal counsel pertaining to this Settlement Agreement, (iii) fully understands all of the terms of this Settlement Agreement, and (iv) acknowledges and represents that he or it enters into this Settlement Agreement and all other contemplated documents of their own free will and not due to any oral representation, commitment, promise, pressure, or duress from any other Party.

      16.    <u>Successors and Third Parties</u>.  Each covenant in this Settlement Agreement shall inure to the benefit of and be binding upon the Parties and their respective owners, managers, heirs, successors, assigns, agents, employees, representatives (past and present), trustees, and legal and personal representatives.  Further, the releases of any entities

LNBYB000046

who are not signatories to this Settlement Agreement are made expressly for their benefit and they shall be deemed third party beneficiaries of this Settlement Agreement.  Except as set forth in this paragraph, there shall be no third party beneficiaries under this Settlement Agreement.

17.    Construction.  As used in this Settlement Agreement, the masculine and feminine gender, in the singular or plural, shall be deemed to include the others whenever the text so requires.  The term "including" in any form shall not be limiting and shall be construed to mean "including, but not limited to."  Captions and paragraph headings are inserted solely for convenience and shall not be deemed to restrict or limit the meaning of text.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against any of the Parties.

18.    Governing Law.  This Settlement Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of California, without giving effect to the principles of conflicts of law thereof, and applicable bankruptcy law.  Each of the Parties agrees that as long as the Bankruptcy Case remains open, any dispute, claim or controversy arising out of or relating to this Settlement Agreement shall be heard in the Bankruptcy Court and that the Bankruptcy Court has exclusive jurisdiction thereof.  If the Bankruptcy Case is closed, then any court of competent jurisdiction may resolve any dispute, claim or controversy arising out of or relating to this Settlement Agreement.

19.    Severability.  If any provision of this Settlement Agreement is determined to be invalid, void, or illegal, such provision shall be construed and amended in a manner which would permit its enforcement, but in no event shall such provision affect, impair, or invalidate any other provision of this Settlement Agreement.

20.    No Waiver.  Failure to insist on compliance with any term, covenant or condition contained in this Settlement Agreement shall not be deemed a waiver of that term, covenant or condition, nor should any waiver or relinquishment of any right or power contained in this Settlement Agreement, at any one time or more times, be deemed a waiver or relinquishment of any right or power at any other time or times.

21.    Warranty of Authority.  Each Party whose signature is affixed hereto in a representative capacity represents and warrants that she/he is authorized to execute this Settlement Agreement on behalf of and to bind the entity on whose behalf her/his signature is affixed.

22.    Time of the Essence.  Time is of the essence in the performance of all obligations set forth in this Settlement Agreement.

23.    Counterparts.  This Settlement Agreement may be executed in separate counterparts which, together shall constitute one and the same fully executed Settlement Agreement.  Signed counterparts transmitted by facsimile or email shall be deemed originals.

[signatures follow on next page]

LNBYB000047

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date first listed above.

BANK OF AMERICA, N.A.,
As administrative agent for the Bank Group


By: _____
      David R. Kegaries, Senior Vice President




ROOSEVELT LOFTS, LLC
By:  Its manager The Roosevelt Lofts, Inc.

By: _____
      M. Aaron Yashouafar, President


_____
      M. Aaron Yashouafar, individually


_____
      Solyman Yashouafar, individually


_____
      Simon Barlava, individually

BN 9150681v2

LNBYB000048

<u>Exhibits</u>

1.     Assignment of Claims from the Bank Group to the Purchaser. (para. 1a.)

2.     Escrow Instructions (para. 1c)

3.     Bank Group's Request for Dismissal of Guaranty Litigation Without Prejudice (para. 1e)

4.     362 Stipulation (para. 3b)

5.     Bank Group's Request for Dismissal of Guarantors Without Prejudice (para. 3c)

6.     Covenant Not to Sue (para. 3d)

7.     Receivership Stipulation (para. 3e)

8.     Releases from the Guarantors (para. 4a.i)

9.     Guarantors' Request for Dismissal with prejudice of the Cross Complaint in the Guaranty Litigation (para. 4a.iv)

10.    List of Insiders (para. 7)

11.    Insider Lien Release (para. 7)

12.    Bankruptcy Court Order (para. 10)

BN 9150681v2

LNBYB000049

## Exhibit C

**Assignment of Claims**

**(see attached)**

LNBYB000050

## ASSIGNMENT OF CLAIMS

This Assignment of Claims is made this ___ day of June, 2011 pursuant to the Settlement Agreement dated as of June __, 2011 ( the "**Settlement Agreement**") among the following:  (i) the Bank of America, N.A., individually and as administrative agent for a group of lenders [1] (collectively, including Bank of America, N.A. and all such lenders, the "**Bank Group**"); (ii) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ( "**S. Yashouafar**"), and Simon Barlava ("**Barlava**" and together with M.A. Yashouafar and S. Yashouafar the "**Guarantors**"); and (iii) Roosevelt Lofts, LLC, debtor and debtor in possession in the bankruptcy case no. 1:09-14214-GM (the "**Debtor**" and together with the Guarantors, the "**Borrower Parties**").  A true copy of the Settlement Agreement is attached as an Exhibit to the "Order Approving Motion to Compromise with Bank Group" (the "**Order**") entered June __, 2011 as docket no. ___ in the Debtor's bankruptcy case.  Unless otherwise defined herein, the words and phrases used in this Assignment of Claims and defined in the Settlement Agreement shall have those defined meanings.  Under the terms of the Order, the Bank Group does hereby covenant and agree as follows:

The Bank Group hereby assigns to _____ (the "**Purchaser**") the following:

(i)    to the extent permitted by applicable law and the terms of any such policies, any and all claims the Bank Group may have against First American Title Insurance Company arising under or related to the issuance of Policy No. NCS-213559 LA1 dated March 22, 2006 with respect to the real and personal property located at 727 West Seventh Street, Los Angeles, CA and commonly known as the "Roosevelt Lofts" Building (collectively, the "**Property**"), as well as the rights of the Bank Group, if any, to any other policies of title insurance covering the Loan Documents or the Property; and

(ii)    any and all claims the Bank Group may have against the Borrower Parties that exist, arise in or relate to the Loan Documents, together with any and all right, title and interest of the Bank Group in, to and under the Loan Documents (collectively, the "**Loan Document Claims**").

Except as expressly provided herein, this Assignment of Claims is made without recourse, representation or warranty, express or implied, by the Bank Group, including but not limited to the terms, existence or validity of any claims under any title insurance policy, or the terms, existence or validity of any claims against the Borrower Parties. Notwithstanding the foregoing, however, the Bank Group represents and warrants to the Purchaser that: (i) the Bank Group has all right, title and interest to the Loan Document Claims; (ii) the Bank Group has not transferred, assigned, pledged, hypothecated or otherwise encumbered the Loan Document Claims; (iii) the Loan Document Claims are assigned to the Purchaser free and clear of any lien, pledge, security interest or encumbrance; (iv) the Bank of America N.A. has all necessary authority to (a) enter into this Assignment of Claims, (b) provide the representations and warranties set forth

---

[1]    The Bank Group is comprised of the Bank of America N.A., East West Bank, Manufacturers Bank and United Commercial Bank.

herein, and (c) perform the obligations described herein, in each case on behalf of the Bank Group; (v) the Loan Documents include those scheduled on Exhibit"2" hereto; and (vi) Exhibit "2" describes the Loan Agreement, the Note, such additional promissory notes evidencing the debt secured by the Deeds of Trust (collectively, with the Note, the "**Bank Group Notes**"), the Deeds of Trust and the Guaranty.

The Bank of America N.A. will cause the originals of each of the following to be deposited into the escrow established pursuant to the Escrow Agreement no later than 2 days before the Payment Date: (i) each of the Bank Group Notes, with a duly executed allonge attached thereto, assigning each of the Bank Group Notes to the Purchaser; and (ii) an assignment of each of the Deeds of Trust duly executed and acknowledged by the Bank of America N.A., as agent for the Bank Group, in a recordable form  In addition, the Bank Group will submit a copy of the Deeds of Trust and of the Guaranty, each acknowledged by the Borrower Parties as accurate and complete and enforceable as if an originally executed counterpart.

Without limiting the foregoing, the Bank Group has entered into a stipulation (the "**Mechanic's Lien Stipulation**") with certain mechanic's lien claimants that has been filed in adversary proceeding called Muir-Chase Plumbing *et al*. v. Bank of America N.A., as adv. case no. 1:10-01031 (the "**Mechanic's Lien Litigation**").  The Mechanic's Lien Stipulation was approved by the Bankruptcy judge at a court hearing on May 4, 2011.  An order approving the Mechanic's Lien Stipulation was entered on the docket in the Mechanic's Lien Litigation on May 20, 2011 as docket entry no. 83.  This assignment is expressly subject to the terms of the Mechanic's Lien Stipulation.

BANK OF AMERICA, N.A.
As administrative agent for the Bank Group

By: _____

David R. Kegaries
Senior Vice President

Exhibit 2

Certain Loan Documents

1.      a Construction Loan Agreement dated March 6, 2006 between the Debtor and the Bank of America, N.A., as administrative agent for the Bank Group.

2.      a Deed of Trust Note executed on or about March 7, 2006 in the original principal amount of $78,840,375 payable to Bank of America N.A., a national banking corporation.

3.      a Deed of Trust Note executed on or about June 16, 2006 in the original principal amount of $10,000,000 payable to Manufacturers Bank, a California banking corporation.

4.      a Deed of Trust Note executed on or about June 16, 2006 in the original principal amount of $15,000,000 payable to East West Bank, a California banking corporation.

5.      a Deed of Trust Note executed on or about August 24, 2006 in the original principal amount of $15,000,000 payable to United Commercial Bank, a California banking corporation.

6.      an Amended and Restated Deed of Trust Note executed on or about August 24, 2006 in the original principal amount of $38,840,375 payable to Bank of America, N.A. a national banking corporation.

7.      a Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 as Instrument No. 0610284 of Official Records, and re-recorded on November 17, 2006 as Instrument No. 2553685 of Official Records.

8.      a Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 as Instrument No. 0610286.

9.      a Guaranty Agreement made as of March 6, 2006 by M. Aaron Yashouafar Solyman Yashouafar and Simon Barlava

## Exhibit D

**Escrow Agreement**

**(see attached)**

LA\2263445.11

LNBYB000054

# COMMERCE ESCROW COMPANY

1545 WILSHIRE BLVD., 6th FLOOR, LOS ANGELES, CA 90017
TEL.: (213) 484-0855 / (310) 284-5700 / (888) 732-6723 / FAX: (213) 484-0417

COMMERCE ESCROW COMPANY IS LICENSED BY THE DEPARTMENT OF CORPORATIONS
STATE OF CALIFORNIA, LICENSE # 963 0884

GP 2009

## General Provisions

1) Time is of the essence in these instructions.  In the event that the conditions of this escrow have not been complied with at the expiration of the time provided for herein, you are instructed to complete the same at the earliest possible date thereafter, unless we or either of us have made written demand upon you for the return of the money and/or instruments deposited by either of us, in which case you may withhold and stop all further proceedings in this escrow, without liability for interest on funds held or for damages, until mutual cancellation instructions by all parties shall have been deposited in this escrow.  Whereupon you are then instructed to disburse the escrowed funds and instruments accordingly, less your proper charges, or you may return all funds and/or instruments, less your proper charges to the respective parties hereto, and this escrow shall without further notice, be considered terminated.

2) All prorations and adjustments are to be made on a basis of a 30 day month and "close of escrow" with reference to said prorations and adjustments shall be the day the instruments of conveyance called for herein are recorded or filed.

3) Unless otherwise instructed in writing prior thereof, all disbursements of funds and/or instruments of this escrow shall be by united states mail to the designated parties in accordance with these escrow instructions, at their respective address shown herein.

4) Escrow holder shall make no physical inspection and/or representation of the real and/or personal property described in any instrument deposited herein.

5) Escrow holder is authorized and directed to deposit any and all funds placed in this escrow in an "escrow trust account" with any state or national bank in the name of your company pending the completion of this escrow.  All disbursements shall be made by check of your company on said account.

6) Escrow holder is not held responsible for any personal property tax which may be assessed against any former or present owner of the property described in these instructions, nor for the corporation or license tax of any corporation as a former or present owner.

7) Escrow holder is authorized to destroy or otherwise dispose of any and all documents, papers, instructions, correspondence and other material pertaining to this escrow at the expiration of five years from the date of the close of escrow or the cancellation of this escrow, without liability and without further notice to the parties hereto.

8) Execute on behalf of the parties hereto, form assignments of interest in any insurance policies (other than title insurance policies) called for herein and forward them upon the close of escrow to the agent with request first that insurer consent to such transfer or attach loss payable clause and/or make such other additions or corrections as may have been specifically required herein, and second, that agent thereafter, forward such policies to the parties entitled to them.  You are authorized and instructed to consider the premiums on any insurance policies which are handed you are caused to be handed you in this escrow are paid in full and that said policies have not been hypothecated and are in full force and effect.

9) The parties hereto jointly and severally agree that in the event of cancellation they shall pay you a sum sufficient to pay for any expenses which you may have incurred pursuant to these instructions and a reasonable cancellation fee for services rendered by you.  Said expenses and fees shall be deposited in escrow before cancellation is effective they further agree that said charges may be apportioned to them in a manner which you consider equitable and that your decision in that regard will be binding and conclusive upon them.  Unless otherwise instructed in writing by third parties depositing funds into this escrow for the benefit of the parties hereto, such funds deposited by said third parties shall be returned to the party depositing same in the event of such cancellation.

LNBYB000055

## General Provisions - continued

10) If conflicting demands are made on you or notice is served upon you in connection herewith or any legal action is taken in connection with this escrow, you shall not be required to determine the same or take any action in the premises, but may withhold and stop all further proceedings without liability therefore or you may file suit in interpleader or for declaratory relief.  If you are required to respond to any legal summons or proceedings or if any action in interpleader or declaratory relief is brought by you, we jointly and severally agree to pay all costs, expenses and reasonable attorney's fees expended or incurred by you and a lien is hereby created in your company's favor to cover said items.  We agree to save you harmless as escrow holder hereunder from all loss and expense, including reasonable attorney's fees and court costs by reason of any action, legal or otherwise which may in any way arise out of this escrow, before or after closing or cancellation, notwithstanding anything in these instructions to the contrary.

11) If this escrow is not consummated, unless specifically instructed in writing to the contrary by the party depositing same, you are further authorized and instructed to remit all the funds by your check to the parties depositing same in this escrow.

12) In the event it may be necessary or proper for the consummation of this escrow, you are authorized to deposit or have deposited funds or documents, or both, with any bank, trust company, title company, savings and loan association, building and loan association, industrial loan company, credit union, admitted insurer, or licensed escrow agent, subject to your order pursuant to closing this escrow and such deposit shall be deemed a deposit in accordance with the terms of these instructions.

13) My signature on all instruments and instructions pertaining to this escrow indicates my unconditional acceptance and approval of same.

14) The parties to this escrow hereby authorize the recordation of any instrument delivered through this escrow if necessary or proper in the issuance of the policy of title insurance called for, and in connection therewith funds and/or instruments received in this escrow may be delivered to, or deposited with any title company for the purpose of complying with the terms and conditions of this escrow.

15) If any party to these instructions obtains a loan on the land involved or is represented by a broker or any attorney during the pendency of this escrow, you are authorized to furnish the lender, broker and/or attorney or anyone operating on their behalf, any information concerning this escrow, including but not limited to a copy or a certified copy of the escrow instructions and any amendments thereto, upon request.

16) In the event that part of the total consideration in this escrow be paid by "one party" to the other in the form of a note secured by a deed of trust in favor of "the other party" and as a result thereof this transaction falls under the purview of the provisions of the real estate settlement procedures act of 1974, the other party agrees to comply with the provisions of said act outside of escrow and you as escrow holder are not to be concerned therewith.

17) These instructions may be executed in counterparts, all of which when taken together shall be deemed to be the instrument.

18) **Next Business Day:** in the event that the calculation of any of the various time periods provided for in the agreement result in the obligation becoming due on a Saturday, Sunday, or legal holiday, the due date of such obligation, or scheduled time of occurrence of such event, shall be delayed until the next business day, unless instructed to the contrary.

19) California Income Tax Notification to Buyers and Sellers:
Seller hereby acknowledges receipt of California Franchise Tax Board general information booklet relative to 2005 tax law changes, along with relevant forms for completion (California form 593-c w/instructions).

Seller and/or buyer hereby agree to comply with **California Revenue and Taxation Code Section 18662**, as expanded by **assembly bill 2065,** for sales of California real property that close **on or after January 01, 2003**, and shall cause to be deposited into escrow such forms that may be necessary for the parties hereto to be in compliance with said tax code, as expanded.

Page 2
Continued on Page 3

LNBYB000056

## General Provisions - continued

20) Parties hereto are aware that a preliminary change of ownership report, in accordance with section 480.3 of the revenue and taxation code is to be completed by any transferee for each and every recorded document pertaining to the change of title and filed with the county recorder at the time the document is recorded for property located in the state of California.  Such form will be handed to buyer during the course of this escrow.  Buyer (and/or seller if a document is recorded for the benefit of same) is aware that transferee is liable for any and all fees/penalties in connection with same (including surcharge) if said report is not completed and filed at the close of escrow.  Escrow holder is hereby relieved of any liability or responsibility in the event that the form submitted by buyer (or seller) is not acceptable or if buyer (or seller) fails to submit the form.

21) The signatures of any party hereto shall be deemed delivered to Commerce Escrow Company when escrow holder receives a signed fax or an electronic signature from the signatory.  The party sending such fax or electronic transmittal shall within a reasonable period of time thereafter follow up said signature by sending an originally executed copy of the faxed or electronic material to escrow holder.  Escrow holder shall have no liability and/or responsibility to obtain said original executed document of the faxed or electronically transmitted material should same not have been received by escrow holder prior to the close of escrow. Provided that the principals to this escrow have placed the escrow holder otherwise in a position to close this escrow, the principals hereby further instruct and authorize the escrow to proceed with the closing of this escrow. Escrow holder is further relieved of any responsibility and/or liability of receiving the original executed fax and/or electronic material subsequent to the closing of this escrow. The parties are aware that the county recorder's office and that certain lenders require ink signed original documentation for recordation and may have paper quality and size requirements.

22) The buyer is aware that under certain circumstances, if the seller is a foreign person or entity as defined in the foreign investors real property tax act section 1445 of internal revenue code, buyer will be required to withhold ten per cent of the purchase price.

Each seller/transferor will either deposit: a) seller's affidavit that seller is not foreign or b) a qualifying statement issued by the IRS. Absent the seller's affidavit or the qualifying statement prior to the close of escrow, both the buyer and seller will deliver to escrow holder in writing joint mutual instructions setting forth escrow holder's duties in connection with the withhold, if any.

23) As a condition to acting as escrow agent in the within transaction, certain information must be provided by sellers/transferors to escrow holder prior to the date of closing.  Under the tax reform act of 1986, escrow holder is required to report the gross proceeds of an ownership interest in reportable real estate to the internal revenue service ("IRS") the seller/transferor is required by law to furnish a correct taxpayer identification number ("TIN") or social security number to escrow holder and seller/transferor may be subject to civil or criminal penalties for failure to do so. Each seller/transferor must provide a permanent address to which escrow agent can mail I.R.S. form 1099-s following the closing of the escrow.

If there is more than one seller/transferor, an allocation of the gross proceeds from the within transaction must be received by escrow holder prior to the date of closing.  If escrow holder fails to receive a complete allocation or receives no allocation as to any seller/transferor, escrow holder must report the entire unallocated gross proceeds to that seller/transferor.  If conflicting allocations are received, escrow holder must report the entire gross proceeds on each seller/transferor's 1099-s to the irs.  Sellers/transferors who are married on the closing date and who hold title to the subject property as tenants in common, joint tenancy or community property are treated for reporting purposes as a single seller/transferor.

24) The buyer and seller acknowledge that depending on the type (commercial, residential) and location (city) of real property involved in this escrow, there may be disclosure(s) as well as civil ordinance requirement(s) that would affect the transfer of the real property.  Escrow holder urges both the buyer and the seller to seek appropriate counsel to ascertain what disclosure and/or civil ordinances if any need to be complied with prior to the close of escrow, outside of escrow as between buyer and seller.  The buyer and seller's signature upon these instructions shall be deemed evidence by escrow holder that buyer and seller have obtained counsel, are aware of any disclosures/civil ordinance requirements and will comply with same outside of this escrow.  Unless otherwise instructed in writing to the contrary within the body of the escrow instructions, escrow holder shall have no responsibilities or liabilities in connection herewith.

LNBYB000057

### General Provisions - continued

25) In the event the terms of the escrow transaction as contained in attached escrow instructions, contract, or agreement, call for the investment of deposited funds, it is hereby understood, by and between the principals hereto, that such investment shall be in the form of a money market interest bearing account at City National Bank, located in Commerce, California, after bank clearance of check and after receipt of form W-9, unless specifically provided for in writing to the contrary.  The name of the account will be Commerce Escrow Co. as trustee for this escrow for the benefit of depositing party.  All interest accrued thereon shall be credited to the account of depositing party at close of escrow.  In the event the escrow fails to close, the interest shall be credited to the account of the depositing party at cancellation.  The funds will not be withdrawn except for redeposit into the "trust" or "escrow" account.  In compliance with this instruction, the depositing party hands you herewith form w-9 as required by city national bank.  The depositing party is aware that the account will not be opened until escrow holder is in receipt of fully completed and executed form W-9 from depositing party.  Furthermore, in the event the depositing party fails to furnish or does not have a tax payer identification number, then a certain portion of the interest accrued on the account may be paid by the bank to the I.R.S. as back-up withholding. (note: in the event the depositing party is not a us citizen or resident or is a foreign corporation, partnership, estate or trust, then the depositing party should request from escrow holder and complete form w-8 in lieu of form w-9.)

All parties to this transaction hereby acknowledge their understanding that all investments made through this escrow transaction by commerce escrow company must be made pursuant to FDIC guidelines and limitations, as more particularly mandated by the department of corporations code section 1737 (CCR) special accounts.  In addition, all parties to this transaction acknowledge their familiarity with the limitation on payments for insured deposits in excess of $250,000.00, as mandated by the federal insuring governmental agency, and the cumulative effect of other accounts held or owned by the depositing party in the named depository.  The total liability or responsibility of the escrow holder is to make the deposit as instructed, which shall be held in accordance with the rules and regulations of the depository.

The parties hereto have satisfied themselves to the extent that all necessary federal, state, local and administrative laws and regulations, which may pertain to and/or affect the real (and personal) property which is the subject of this escrow transaction, including, but not limited to, certificate of compliance-water conservation ordinance (which ordinance effects residential and commercial/industrial and apartment buildings) have been met.  The parties hereto acknowledge that escrow holder is not responsible, nor liable, for providing information as to such laws and regulations or of causing documentation relative to same, to be prepared and/or filed. In addition all parties are hereby aware and amend the fact as needed that Commerce Escrow shall be governed by the laws of the state of California.

26) This notification is in compliance with our obligations to comply with federal (and state) law to safeguard your nonpublic personal information.

  We collect nonpublic personal information about you from the following sources:
  A) Information we receive from you on applications or other forms;
  B) Information about your transactions with us, our affiliates, or others involved in the processing of  your transaction, and
  C) Information we receive from a consumer reporting agency.

We do not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law.

We restrict access to nonpublic information about you to those employees who need to know that information to provide products or services to you.  We maintain physical, electronic and procedural safeguards that comply with federal and state regulations to guard your non-public personal information.

28) I have received a copy of these instructions as evidenced by my signature herein.

LNBYB000058

## ADDENDUM TO GENERAL PROVISIONS
## JOINT ESCROW INSTRUCTIONS

These Joint Escrow Instructions ("**Instructions**") are made as of June __, 2011 by and among (i) M. Aaron Yashouafar ("**M.A. Yashouafar**"), Solyman Yashouafar ("**S. Yashouafar**"), and Simon Barlava ("**Barlava**" and together with M.A. Yashouafar and S. Yashouafar, the "**Guarantors**"); (ii) Roosevelt Lofts, LLC (the "**Borrower**" and together with the Guarantors, the "**Borrower Parties**"); (iii) Greystar GP, LLC (the "**Purchaser**"); (iv) Bank of America, N.A., individually and as administrative agent for a group of lenders (collectively, the "**Bank Group**"); and (v) Commerce Escrow Company ("**Escrow Agent**").

These Instructions amend and supplement those certain General Provisions dated June ___, 2011 (the "**General Provisions**") entered into by the Borrower Parties, the Purchaser, the Bank Group and Escrow Agent. All references to the General Provisions shall be construed to mean the General Provisions and all exhibits and addenda attached thereto (including these Instructions). In the case of a conflict between the terms of the General Provisions and the terms of these Instructions, the terms of these Instructions shall control.

These Instructions are based on the following facts:

A.    The Borrower Parties and Bank Group are parties to that certain Settlement Agreement (the "**Settlement Agreement**") dated ~~of even date herewith~~ June 3, 2011, which provides for the possible purchase and sale of those certain rights under the Loan Documents (as defined in the Settlement Agreement) to Purchaser or another entity as may be designated by the Borrower and approved by the Bank Group; and

B.    The Borrower Parties, the Purchaser and the Bank Group desire that Escrow Agent act in accordance with the instructions set forth in these Instructions.

**NOW, THEREFORE,** in consideration of the terms, conditions, and covenants hereinafter set forth, the parties hereto mutually agree as follows:

## AGREEMENT:

1.    <u>**Delivery of Escrow Documents to Escrow Agent**</u>.

(a)    The Bank Group has executed and delivered to Escrow Agent, and Escrow Agent acknowledges receipt of, the following documents (the "**Initial Escrow Documents**"):

(1)    Assignment of Claims from the Bank Group to the Purchaser in the form attached hereto as <u>Exhibit A</u> (the "**Assignment of Claims**");

(2)    Covenant Not to Sue in the form attached hereto as <u>Exhibit B</u> (the "**Covenant**"); and

LNBYB000059

(3)  Bank Group's Request for Dismissal of Guarantors without prejudice in the form attached hereto as <u>Exhibit C</u> (the "**Request for Dismissal of Guarantors**").

(4)  Bank Group's Request for Dismissal of the entire Guaranty Litigation without prejudice in the form attached hereto as <u>Exhibit D</u> (the "**Request for Dismissal of Guaranty Litigation**").

(b) At least two (2) days prior to the Payment Date (as defined in the Settlement Agreement), the Bank Group shall cause to be delivered to Escrow Agent the documentation specified in the Assignment of Claims (the "**Supplemental Escrow Documents**," and collectively with the Initial Escrow Documents, the "**Escrow Documents**"). Escrow Agent will immediately notify Purchaser upon receipt of the Supplemental Escrow Documents.

(c) Escrow Agent acknowledges that the Escrow Documents are to be held in escrow subject to the terms contained in these Instructions.

**2.** **<u>Delivery of Funds to Escrow Agent</u>**.

(a) Escrow Agent shall receive funds from the Purchaser as follows (collectively, the "<u>Funds</u>"):

(1)  On or before June 13, 2011, an initial installment of $5,000,000;

(2)  On or before July 13, 2011, a second installment of $10,000,000;

(3)  On or before August 12, 2011, a third installment of $20,000,000; and

(4)  On or before September 1, 2011, a fourth and final installment of $33,000,000 plus an amount sufficient to pay all costs and expenses due to the Escrow Agent in connection with the transactions contemplated in these Instructions.

(b) Escrow Agent shall immediately notify the Bank Group upon receipt of the Funds as set forth above. If Escrow Agent does not timely receive the Funds in the manner and amounts set forth above, Escrow Agent shall immediately provide notice to the Bank Group of such failure to receive the Funds.

(c) The Funds shall be and remain property solely of Purchaser. Escrow Agent will place all of the Funds received by Escrow Agent into a separate interest bearing deposit account at City National Bank located in Los Angeles, California, after bank clearance of check and after receipt of a completed W-9 form. In no event shall any of the Borrower Parties, the Bank Group, or any other person or party have any legal or equitable right to any of the Funds. No holder of a claim against or interest in any of the Borrower Parties shall have any right to attach or claim to payment from any Funds. If for any reason the closing of the transaction contemplated hereby is not consummated on or before August 22, 2011, then notwithstanding any provision in these Instructions to the contrary, all Funds shall be promptly returned to Purchaser without need for further order of any court or approval of any party.

2

LNBYB000060

(d)    Escrow Agent shall immediately return all funds to Purchaser in the event that (i) the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") fails to enter the Plan Support Agreement Order (as defined in that certain Plan Support Agreement among Borrower, The Roosevelt Lofts, Inc. and Purchaser dated on or about the date hereof (the "**Plan Support Agreement**")) on or before June 20, 2011, or (ii) the Bankruptcy Court fails to enter the BofA/Debtor Settlement Order (as defined in the Plan Support Agreement) on or before June 14, 2011..

**3.    Conditions Precedent to Closing**.

Notwithstanding anything herein to the contrary, Escrow Agent is authorized to close the transaction as instructed in <u>Section 4</u> below when and only when:

(a)    The Bank Group has delivered the Escrow Documents to Escrow Agent;

(b)    The Purchaser has delivered all of the Funds to Escrow Agent;

(c)    The Bank Group has approved the Purchaser as being in compliance with the USA PATRIOT Act and the United States Treasury Department's Office of Foreign Asset Control 's Specially Designated Nationals and Blocked Persons List) in a manner as described in Exhibit "E" hereto; and

(d)    Bankruptcy Court Approval of the Settlement Agreement as defined in paragraph 10 of the Settlement Agreement.

(e)    Escrow Agent has received telephonic or email authorization from David R. Kegaries of the Bank Group to proceed with the closing of the transaction.

(f)    Escrow Agent has received telephonic or email authorization from A. Joshua Carper or Kevin Kaberna, of Purchaser, to proceed with the closing of the transaction.

**4.    Closing of Transaction**.

Upon satisfaction of <u>all</u> conditions set forth in <u>Section 3</u> above, Escrow Agent shall:

(a)    Disburse ████████ of the Funds to the Bank Group by wire transfer at the Bank Group 's wire address set forth on <u>Schedule 1</u>;

(b)    Deliver the executed Assignment of Claims to the Purchaser;

(c)    Return the executed Covenant to the Bank Group;

(d)    Return the executed Request for Dismissal of Guarantors to the Bank Group;

(e)    Deliver the executed Request for Dismissal of Guaranty Litigation to the Borrower Parties; and

(f)    Deliver all of the Supplemental Escrow Documents to the Purchaser.

SD\790687.2                                                                                         LNBYB000061

5.     **Failure to Close Transaction**.

      If any of the conditions set forth in <u>Section 3</u> above are <u>not</u> satisfied and the Escrow Agent receives notice from the Bank Group or Purchaser that the transaction will not be consummated, Escrow Agent shall:

      (a)     Pay all Escrow Agent's costs and expenses incurred in connection with the transaction;

      (b)     Promptly disburse all of the Funds (minus any amounts used to pay Escrow Agent's costs and expenses pursuant to paragraph 5(a) above) to the Purchaser in the manner requested by the Purchaser;

      (c)     Return the executed Assignment of Claims to the Bank Group;

      (d)     Return all of the Supplemental Escrow Documents to the Bank Group;

      (e)     Return the executed Request for Dismissal of Guaranty Litigation to the Bank Group;

      (f)     Deliver the executed Covenant to the Borrower Parties; and

      (g)     Deliver the executed Request for Dismissal of Guarantors to the Guarantors.

6.     **Costs and Expenses**.

      All costs and expenses of the Escrow Agent incurred in connection with the transactions contemplated in these Instructions shall be paid for by the Purchaser.

7.     **Escrow Agent Matters**.

      (a)     Escrow Agent shall have no duties or responsibilities except those set forth in these Instructions and shall incur no liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper or document believed by Escrow Agent to be genuine.

      (b)     The Borrower Parties, the Purchaser and the Bank Group hereby jointly and severally agree to indemnify and save Escrow Agent harmless from and against any and all loss, damage, claims, liabilities, judgments and other costs and expenses which may be incurred by Escrow Agent by reason of its acceptance of, and its performance under, these Instructions unless caused by the negligence or intentional act or omission of Escrow Agent.

      (c)     Escrow Agent may act or refrain from acting with respect to any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

8.     **Notices**.

      Notices and other communications required to be given hereunder, or which may be given pursuant or relative to the provisions hereof, shall be in writing and shall be deemed to

SD\790687.2

LNBYB000062

have been given when delivered in hand or mailed, postage prepaid, by first class United States mail, certified return receipt requested or by facsimile as follows:

|  |  |
|---|---|
| If to the Bank Group: | Bank of America, N.A.<br>333 South Hope St., 11th Floor<br>Los Angeles, CA 90071<br>Attention:  David R. Kegaries<br>Facsimile:  (213) 621-4868 |
| With a copy to: | Buchalter Nemer, P.C.<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, CA 90017<br>Attention: Daniel Slate, Esq.<br>Facsimile: (213) 630-5640<br>dslate@buchalter.com |
| If to the Borrower Parties: | Roosevelt Lofts, LLC<br>c/o Milbank Real Estate Services, Inc.<br>660 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>Attention:  M. Aaron Yashouafar<br>Facsimile:  (213) 403-1440 |
| With a copy to: | Levene, Neale, Bender, Yoo & Brill L.L.P.<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, CA 90067<br>Attention:  David L. Neale, Esq.<br>Facsimile:  (310) 229-1234<br>Email:  dln@lnbyb.com |
| If to the Guarantors: | M. Aaron Yashouafar<br>660 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>Facsimile:  (213) 403-1440 |
|  | Solyman Yashouafar<br>660 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>Fax:  (213) 403-1440 |
|  | Simon Barlava<br>2209 South Santa Avenue<br>Los Angeles, Ca, 90058<br>Fax:  (323) 277-1717 |
| With a copy to: | Homan Taghdiri, Esq.<br>660 S. Figueroa Street, 24th Floor |

SD\790687.2

LNBYB000063

Los Angeles, CA 90017
Facsimile:  (213) 403-1440

If to the Purchaser:          Greystar GP, LLC
                              Attention: A. Joshua Carper
                              3rd Floor
                              18 Broad Street
                              Charleston, NC 29401
                              United States of America
                              Fax: (843) 579-9420
                              Email:  jcarper@greystar.com

With a copy to:               Robert A. Klyman, Esq.
                              Latham & Watkins LLP
                              355 S. Grand Ave.
                              Los Angeles, CA  90071
                              Fax:  (213) 891-8763
                              Email:  robert.klyman@lw.com

If to Escrow Agent:           Commerce Escrow Company
                              1545 Wilshire Boulevard, Suite 600
                              Los Angeles, CA 90017
                              Attention:  Luisa Chi
                              Facsimile:  213-201-5192
                              Email:  lchi@comescrow.com

**9.    Successors and Assigns Bound; Captions**

These Instructions shall not be assigned by a party without the prior written consent of the other parties, except that Purchaser may assign its rights hereunder without the need for any such consent, so long as (i) the assignee (a) is an affiliate of Greystar GP, LLC, and (b) complies with the provisions of paragraph 3(c) of these instructions, and (ii) the day-to-day operations of the assignee are controlled, directly or indirectly, by Greystar Real Estate Partners, LLC.  Except as limited by the preceding sentence, the covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of the Bank Group, the Purchaser, the Borrower Parties and Escrow Agent.  The captions and headings of the paragraphs in these Instructions are for convenience only and are not to be used to interpret or define any provisions hereof.

**10.    Governing Law; Venue; Severability.**

These Instructions shall be governed by the laws of California.  Any dispute between the parties that rises to litigation shall be conducted in the United States District Court for the Central District of California.  If any provision or clause of these Instructions conflicts with applicable law, such conflict shall not affect other provisions of these Instructions which can be given effect without the conflicting provision, and to this end the provisions of these Instructions are declared to be severable.

SD\790687.2

LNBYB000064

**11.**   <u>**No Third Party Beneficiary**</u>.

The terms and provisions of these Instructions shall not create any right in any person, firm, corporation or entity other than the parties hereto and their respective successors and permitted assigns, and no third party shall have the right to enforce or benefit from the terms hereof.

**12.**   <u>**Interpretation**</u>.

No provision of these Instructions shall be construed against or interpreted to the disadvantage of any party by reason of such party having or being deemed to have requested, drafted, required or structured such provision.

**13.**   <u>**Counterparts**</u>.

These Instructions (and any amendments, modifications or extensions hereof) may be executed in several counterparts and, after execution and as executed, shall constitute an agreement binding on all of the parties, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

**14.**   <u>**Facsimile**</u>.

Execution copies of these Instructions may be delivered by facsimile or electronic mail, which shall be deemed to be an original for the purposes of these Instructions.

*[Signature Page(s) To Follow]*

7

LNBYB000065

**IN WITNESS WHEREOF**, the parties hereunto have executed these Instructions as of the date first written above.


**BORROWER PARTIES:**

**ROOSEVELT LOFTS, LLC**
By:  Its manager The Roosevelt Lofts, Inc.


By:    _____
              M. Aaron Yashouafar, President



_____

**M. Aaron Yashouafar**, individually



_____

**Solyman Yashouafar**, individually



_____

**Simon Barlava**, individually




**PURCHASER:**


**GREYSTAR GP, LLC,**
**a Delaware limited liability company**


By:    _____
Name:
Its:




Joint Escrow Instructions                                S-1
LNBYB000066

**BANK GROUP:**

**BANK OF AMERICA, N.A.,**
as administrative agent for the Bank Group


By:    _____
          David R. Kegaries, Senior Vice President




**ESCROW AGENT:**


**COMMERCE ESCROW COMPANY**


By:    _____
Name:
Its:

LNBYB000067

**<u>Schedule 1</u>**

**Wire Instructions – Bank Group**


**[INSERT BANK GROUP WIRE INSTRUCTIONS]**

SD\790687.2

LNBYB000068

## Exhibits A – D

Exhibits A – D are attached to the *Supplement To Notice Of Motion And Motion Pursuant To Federal Rule Of Bankruptcy Procedure 9019 For Authority To Compromise Controversy With Bank Of America, N.A., Individually And As Administrative Agent For A Group Of Lenders* filed on June 8, 2011 as Docket No. 793.

LNBYB000069

**Exhibit E**

**USA PATRIOT ACT; OFAC**

Purchaser and its designee (i) are, and shall remain, in compliance with all applicable anti-money laundering laws, including without limitation, the USA PATRIOT Act and the laws administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), including, without limitation, Executive Order 13224 (as amended or modified from time to time, (ii) are not, and shall not be, on the OFAC Specially Designated Nationals and Blocked Persons Lists, which, as of the date hereof, may be accessed through the following Internet address: http://www.treas.gov/offices/enforcement/ofac, and (iii) are not, and shall not be otherwise identified by government or legal authority as a person with whom a U.S. Person (as defined below) is prohibited from transacting business. Purchaser covenants and agrees to deliver to the Bank of America N.A. any certification or other evidence requested from time to time by Bank of America N.A. in it reasonable discretion confirming Purchaser's compliance with this section. As used herein, "U.S. Person" shall mean any United States citizen, any permanent resident alien, any entity organized under the laws of the United States (including foreign branched) or its political subdivisions, or any person in the United States.

Exhibit D
USA Patriot Act; OFAC

LNBYB000070

**<u>Exhibit E</u>**

**Greystar Receivership Stipulation**

**The Greys tar Receiv ership Stip ulation sha ll be in a    form   acceptable to Greystar, and substantially in the form of, and comparable to, the Receivership Stipulation (as defined in the BofA Settlement).**

LA\2263445.11

LNBYB000071

1   LATHAM & WATKINS LLP
    Robert A. Klyman (State Bar No. 142723)
2   355 S. Grand Ave.
3   Los Angeles, CA 90071
    Telephone: (213) 485-1234
4   Facsimile: (213) 891-8763

5   Attorneys for Plaintiff
    Greystar GP, LLC
6

7               SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    FOR THE COUNTY OF LOS ANGELES
8

9   GREYSTAR GP, LLC , a Delaware Limited        CASE NO.
    Liability Company,
10                                               STIPULATION FOR APPOINTMENT OF
11                  Plaintiff,                   RECEIVER; [PROPOSED] ORDER

12      vs.

13  ROOSEVELT LOFTS, LLC (aka THE
    ROOSEVELT LOFTS, LLC), a Delaware
14  limited liability company, *et al.*

15  Defendants, Inclusive,

16                  Defendants.

17

18

19          The parties to this Stipulation for Appointment of Receiver ("Stipulation") are, Plaintiff,

20  Greystar GP, LLC ("Greystar"), as successor to and assignee of claims and rights of Bank of

21  America, N.A., a national banking association, individually and as the Administrative Agent on

22  behalf of Bank of America, N.A., Manufacturers Bank, a California banking corporation, United

23  Commercial Bank, a California banking corporation, and East West Bank, a California banking

24  corporation, ("Lender"), as further described below in Section F hereof, below, and Defendant,

25  Roosevelt Lofts, LLC (aka The Roosevelt Lofts, LLC), a Delaware limited liability company

26  ("Roosevelt"), by and through the parties' undersigned counsel.
                                        **RECITALS**
27

28          A.      On or about March 9, 2006, the Debtor executed a Construction Loan Agreement

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LA\2268489.2

LNBYB000072

(the "Loan Agreement") with the Bank of America N.A., as administrative agent for the Bank Group in the amount of $78,840,375. On or about March 9, 2006, Debtor executed a Deed of Trust Note in the original principal amount of $78,840,375 (the "Note"). The Loan Agreement and Note are secured by two deeds of trust: (i) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 and rerecorded on November 17, 2006 to correct certain typographical errors (the "Fee Deed of Trust"), and (ii) the Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 (the "Leasehold Deed of Trust," and collectively, with the Fee Deed of Trust, the "Deeds of Trust"). The Deeds of Trust encumber the property commonly known as the "Roosevelt Building," located at 727 West 7th Street, Los Angeles, California (the "Property"), including an absolute assignment of all rents, issues and profits generated from operation of the Property (collectively, the "Collateral").

B.      In further consideration of the Bank Group's loan and extension of credit, on or about March 9, 2006, the Guarantors each agreed to guarantee certain of the Debtor's obligations under the Loan Agreement and Note pursuant to the terms of a written Guaranty Agreement (the "Guaranty"). The Loan Agreement, Note, Deeds of Trust and the Guaranty, together with all modifications thereto and all other ancillary documents are collectively referred to as the "Loan Documents."

C.      That certain Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on March 22, 2006 as Instrument No. 06 0610284, and re-recorded on November 17, 2006 as Instrument No. 20062553685 to correct certain typographical errors (collectively, the "Fee Deed of Trust"), and that certain Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (California Leasehold Interest) recorded on March 22, 2006 as Instrument No. 06 0610286 (the "Leasehold Deed of Trust"), encumbering the Property, and by which Roosevelt is bound, provide for the *ex parte* appointment of a receiver in the event of Roosevelt's default.

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LA\2268489.2

LNBYB000073

Specifically, Section 5.1 – Remedies, of each of the Fee Deed of Trust and the Leasehold Deed of Trust, provide that Lender shall be entitled to *ex parte* appointment of a receiver in the event of Roosevelt's default:

> (g) <u>Receiver</u>. Holder [a defined term  under th e Fee Deed of Trust that includes Lender and any subsequent beneficiary under the Fee Deed of Trust], on behalf of itself and Lenders, shall as a m atter of ri ght be entitled to the appointment of a receiver or receivers for a ll or any part of the Propert y, whether such receivership is incident to a proposed sale (or sales) of such property or otherwise, and without regard to the value of the Property or th e solvency of any person or persons liable for the paym ent of the Secured Indebtedness, and Borrower does hereby irrevocably consent to the appo intment of such receiver or receiv ers, waives notice of such appointm ent, of any reque st therefor or hearing in connection therewith, and any and all defenses to such appointment, agrees not to oppose any application therefor by  Holder, an d agre es th at such app ointment sh all in no manner im pair, prejudice or otherwise affect the rights of H older and L enders to application of Rents as provide d in this De ed of Trust. Nothing he rein is to be construed to deprive Holder or Lenders of any other right, rem edy or privilege they may have under the law to have a receiver appointed. A ny money advanced by Holder or Lenders in connection with a ny such receivership shall be a dem and obligation (which obligation Borrower hereby prom      ises to pay) owing by Borrower to Holder (for its own acco unt or the account of Lenders, as ap plicable) pursuant to this Deed of Trust.

D.     The Borrower Parties each defaulted on their obligations to the Bank Group. As a result, the Bank Group delivered a default notice dated December 30, 2008. On March 23, 2009, the Bank Group caused notices of default to be recorded in the Los Angeles County Registrar-Recorder's Office. On or about April 3, 2009, the Bank Group filed a complaint for breach of the Guaranty, appointment of a receiver and judicial foreclosure on the Deeds of Trust in the Superior Court of the State of California for the County of Los Angeles, bearing case no. SC 102472 (the "Guaranty Litigation").

E.     On April 13, 2009, the Debtor filed a voluntary petition commencing a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), bearing case no. l:09-bk-14214-GM (the "Bankruptcy Case").

F.     Greystar has acquired all of Lender's and the Bank Group's respective rights, title and interest in the Loan Agreement, Note, Deeds of Trust, Guaranty and Collateral, and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LA\2268489.2

LNBYB000074

Greystar and Roosevelt have agreed that Greystar shall have the right to exercise all of Lender's and the Bank Group's respective rights thereunder.

G.      Greystar and Roosevelt have agreed that this Court may enter the attached Stipulated Order Appointing Receiver Ex Parte; Temporary Restraining Order In Aid Of the Receiver ("Stipulated Receivership Order"); a copy of which is attached as Exhibit "A."  For avoidance of doubt, for purposes of this Stipulation and the Stipulated Receivership Order, the term Greystar shall include Greystar and any designee of Greystar.

G.      Greystar and Roosevelt have further agreed that Greystar shall post a bond in the amount of $20,000.00, pursuant to Code of Civil Procedure Section 567(b), and a bond in the amount of $10,000.00, pursuant to Code of Civil Procedure Section 529, and that such amounts shall be considered sufficient.  Both bonds shall be from an admitted surety insurer.  The bonds shall be filed with this Court no later than five court days after the issuance of this Court's Order..

## AGREEMENT

Greystar and Roosevelt hereby stipulate that this Court should enter the accompanying Stipulated Receivership Order attached hereto as Exhibit "A."

DATED:                                            LATHAM & WATKINS LLP

                                                  By_____
                                                        ROBERT A. KLYMAN
                                                        Attorneys for Plaintiff
                                                  GREYSTAR GP, LLP


DATED:

                                                  By_____
                                                        Attorneys For Defendant
                                                  ROOSEVELT LOFTS, LLC (aka THE
                                                  ROOSEVELT LOFTS, LLC), a Delaware
                                                  limited liability company

DATED:                                            THE ROOSEVELT LOFTS, INC.
                                                  THE A/K/A THE ROOSEVELT LOFTS,
                                                  INC.

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000075

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By /s/ _____

Its /s/ _____

5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000076

# EXHIBIT A

## [PROPOSED] STIPULATED ORDER APPOINTING RECEIVER EX PARTE AND TEMPORARY RESTRAINING ORDER IN AID OF THE RECEIVER

**GOOD CAUSE APPEARING, IT IS ORDERED** that, [                    ][1] (the "Receiver") is appointed as receiver to take possession, custody and control of all of the assets of Defendant Roosevelt Lofts, LLC (aka The Roosevelt Lofts, LLC, and hereinafter "Defendant") including the property commonly known as the "Roosevelt Building," located at 727 West 7th Street, Los Angeles, California, which secure its obligations to Lender[2] (the "Receivership Property").

1.    **Receiver's Appointment**.  The Receiver is to immediately take possession, custody and control of the Receivership Property and to maintain and conserve said Receivership Property pending further order of this Court.  The powers of the Receiver shall be all the usual and customary powers of a receiver to take control of and operate the Receivership Property, including the duties and powers enumerated below.

2.    **Receiver's Oath and Bond**.  Before performing his duties, the Receiver shall execute a receiver's oath and file a bond in the sum of $25,000, conditioned upon the faithful performance of the Receiver's duties.  The bond shall be from a surety approved by the Court and shall be filed in Department _____, by no later than 4:00 p.m., on _____, 20__.

3.    **Receiver's Duties and Powers**.  The Receiver shall be vested with the authority to do the following:

a.    Take possession, custody and control of, and operate, manage, control and conduct the Receivership Property;

b.    Collect all rents, issues, profits, and income resulting from the operation of the Receivership Property;

---

[1] Greystar GP, LLC or its designee (collectively, "Greystar") shall have the right to designate the identity of the person who will serve as the Receiver.

[2] For purposes of this Stipulated Order, the terms "Lender" and "Plaintiff" shall mean Greystar.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LA\2268489.2

LNBYB000077

c.    Care for, preserve, operate and maintain the Receivership Property and incur the expenses necessary for such care, preservation and maintenance of the Receivership Property;

d.    Hire and fire employees, including a manager or management company;

e.    The Receiver may, without further order of this court, terminate all contractor, subcontractor rental, property management sales agency and security company agreements in place related to the Receivership Property deemed by him to be burdensome to the Receivership Property subject to any restrictions within the OCIP insurance (if applicable);

f.    Enter into contracts as the Receiver reasonably believes necessary for the operation or completion of the Receivership Property;

g.    Rent or lease any part of the Receivership Property (including, individual units in the Receivership Property);

h.    Institute and prosecute all suits that the Receiver, upon obtaining permission of the Court, may reasonably believe to be necessary in connection with the operation of the Receivership Property, and defend all such suits and actions as may be instituted against the Receivership Property or the Receiver;

i.    Obtain and pay for any licenses or permits that the Receiver reasonably believes to be necessary for the operation of the Receivership Property;

j.    Obtain and pay for any insurance that the Receiver reasonably believes to be necessary for the operation of the Receivership Property;

k.    Issue subpoenas, conduct and participate in discovery, take depositions, pursue contempt actions, and otherwise pursue all remedies available by law to ensure compliance with the Receiver's authority granted herein; and

l.    Tender any suits or claims against the Receivership Property to any appropriate insurance company.

4.    **Operation of Receivership Property**.  The Receiver shall operate and manage the Receivership Property and may employ agents, employees, clerks, accountants, and property

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000078

managers to administer the Receivership Property, purchase materials, supplies and services, and pay for them at the ordinary and usual rates out of the funds which shall come into the Receiver's possession and shall do all things and incur the risks and obligations ordinarily incurred by owners, managers and operators of similar businesses and enterprises.  No risk, obligation or expense so incurred shall be the personal risk or obligation of the Receiver, but shall be the risk, obligation and expense of the receivership estate established herein.

5.    **Completion of Construction and Obtaining Permits**.

a.    The Receiver is authorized to negotiate with government agencies regarding, among other things, completion of the construction on the Receivership Property and the satisfaction of the conditions and obligations related to the issuance of certificates of occupancy for the Receivership Property.  The Receiver may also enter into agreements with the City of Los Angeles or the County of Los Angeles to extend the permits currently in place on the project, if possible.

b.    The Receiver is further authorized to apply for, obtain and pay for any lawful license, permit, variance or other governmental approval or fee that the Receiver reasonably believes to be necessary for the subdivision, construction, operation, maintenance and preservation of the Receivership Property; to confirm the existence of, and to the extent permitted by law, exercise the privileges of any existing license, permit, variance or governmental approval relating to the Receivership Property; and to do all things necessary to protect and maintain those licenses, permits, variances and approvals, including, but not limited to, Department of Real Estate and county and city permits and approvals.

6.    **Equipment**.  The Receiver will take control of any modular units or trailers, equipment, inventory supplies and general intangibles pertaining to or related to the Property.

7.    **Utilities.**

a.    The Receiver is authorized to enter into agreements and negotiate with utility providers including but not limited to the LADWP or Southern California Edison for and

8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000079

on behalf of the Receivership Property including the control and right to any and all deposits in possession of such utility providers.

b.    The Receiver shall not be responsible for payment of any utility bills, unpaid payroll expenses or other unpaid invoices for services or utilities incurred by, or for the benefit of the Defendant or the Receivership Property prior to the Receiver's taking possession of the Receivership Property.  No utility (including LADWP and Southern California Edison) or other vendor may terminate service or the provision of other goods or services to the Receiver as a result of the non-payment of pre-receivership obligations, without prior order of this Court.

8.    **Receiver Certificates**.

a.    The Receiver may issue Receivership Certificates in increments of at least $50,000 bearing interest at 10 percent (10%) per annum for up to $1,000,000 to be funded by the Plaintiff herein, and if Plaintiff is unable to fund, to any third person(s) or party(ies).  All monies generated by the Receivership Property will remain in the Receivership to be used to carry out the duties and obligations of the Receiver as set forth herein.

b.    Funds loaned to the Receiver pursuant to Receivership Certificates are deemed liens of first priority, and, except as provided in the following sentence, shall be repaid prior to all other encumbrances and claims, other than costs of administration

9.    **Use of Funds**.  All monies coming into the Receiver's possession shall only be expended for the purposes herein authorized, and the balance of funds shall be held by the Receiver pending further order of this Court.

10.    **Receivership Fees and Costs**.  The Receiver may charge as interim fees his standard hourly billing rate, plus reimbursement of costs for the Receiver's services.  The Receiver's staff's billing rate varies between $50 and $225 per hour based on experience and skill set.  Where appropriate, the Receiver will have an appropriate staff member handle certain aspects of the Receivership as a cost saving measure.  The Receiver is also authorized to employ the services of accountants and attorneys without further Court order and pay for those services in the amount of the normal fees charged by those professionals.

9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000080

11.    **Monthly Statements**.  The Receiver shall prepare and serve monthly statements reflecting the Receiver's fees and administrative expenses, including fees and costs of accountants and attorneys and other professionals authorized by the Court, incurred for each monthly period in the operation and administration of the Receivership Property.  Upon service of each statement, the Receiver may disburse from estate funds, if any, the amount of each statement.  Notwithstanding periodic payment of fees and expenses, all fees and expenses shall be submitted to the Court for its approval and confirmation, in the form of either a properly noticed interim request for fees, a stipulation of all parties, or in the Receiver's Final Account and Report.

12.    **Inventory**.  Within thirty (30) days after qualification hereunder, the Receiver shall file an inventory of all of the property of which he has taken possession pursuant to this Order.

13.    **Opening of Bank Accounts**.  The Receiver is empowered to establish bank accounts for the deposit of monies and funds collected and received in connection with the Receivership Property, at federally insured banking institutions or savings associations which are not parties to this case.  Monies coming into the possession of the Receiver and not expended for any purposes herein authorized shall be held by the Receiver in interest-bearing accounts.

14.    **Insurance**.  The Receiver shall determine upon taking possession of the Receivership Property whether in the Receiver's judgment there is sufficient insurance coverage. With respect to any insurance coverage, the Receiver shall be named as an additional insured on the policies for the period that the Receiver shall be in possession of the Receivership Property. If sufficient insurance coverage does not exist, the Receiver shall immediately notify the parties to this lawsuit and shall have thirty (30) calendar days to procure sufficient all risk and liability insurance for the Receivership Property; provided, however, that if the Receiver does not have sufficient funds to do so, the Receiver shall seek instructions from the Court with regard to whether insurance shall be obtained and how it is to be paid for.  If consistent with existing law,

10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000081

the Receiver shall not be responsible for claims arising from the lack of procurement or inability to obtain insurance.

15.     **Entry to Property**.  The Receiver shall further be entitled to engage a locksmith for the purposes of gaining entry to any property that is the subject of this receivership and through any security system, in order to obtain any property or documents to which the Receiver is entitled pursuant to this Order, as well as giving any notices which may be required in performing the Receiver's duties.  The Receiver may have locks or security codes changed, or have keys created that will work for the existing locks for doors, cabinets or other throughways.

16.     **Tax Identification**.  Defendants herein shall provide the Receiver with all tax identification numbers utilized in connection with the operation of the Receivership Property. The Receiver shall also be entitled to utilize the tax identification numbers during his operation of the Receivership Property or at the Receiver's discretion; the Receiver may obtain new tax identification numbers.

17.     **Mail**.  The Receiver is authorized to have all mail addressed to the Receivership Property forwarded to an address to be designated by him.

18.     **Turnover of Bank Accounts**.  All banks and financial institutions which hold any Receivership Property accounts shall turn over all such funds in any such accounts to the Receiver upon presentation of a copy of this Order, and shall provide copies of any requested records regarding any such accounts to the Receiver:

19.     **Delivery of Revenues**.  Defendants, on receipt of a copy of this Order, shall deliver to the Receiver immediate possession of all revenues and income generated from the business of the Receivership Property in Defendants' possession, custody or control.  This delivery to the Receiver shall be completed within forty-eight (48) hours of receipt of the above-described documents.

20.     **Documents in Receiver's Possession**.  The parties to this action shall be entitled to have access to, and make copies of, documents in the Receiver's possession—including electronic records.

11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

LNBYB000082

21.    **Trustee's Sale**.  If applicable, in the event of a non judicial sale of the Receivership Property by the trustee under the Deed of Trust, the Receiver shall turn over possession, custody and control of the Receivership Property to the successful purchaser at such a sale, after which the Receiver shall prepare and file with the Court the Receiver's final account.

22.    **Further Instructions**.  The Receiver and the parties to this case may at any time apply to this Court for further or other instructions or orders and for further powers necessary to enable the Receiver to perform the Receiver's duties.

23.    **Discharge**.  Discharge of the Receiver shall require a court order after a properly noticed motion approving the Receiver's Final Report and Account.

24.    **Plaintiff's Notice to Receiver**.  Plaintiff shall promptly notify the Receiver in writing of the names, addresses, and telephone numbers of all parties who appear in the action and their counsel.  The parties to this action shall give notice to the Receiver and of all events that affect the receivership, including all court proceedings in this action.

25.    **Bankruptcy – Plaintiff's Duty to Give Notice**.  If any of the Defendants file a bankruptcy case during the receivership, Plaintiff shall give notice of the bankruptcy case to the Court, to all parties, and to the Receiver by the close of the next business day after the day on which Plaintiff receives notice of the bankruptcy filing.

26.    **Bankruptcy – Receiver's Duties**.  If the Receiver receives notice that a bankruptcy has been filed and part of the bankruptcy estate includes property that is the subject of this order, the Receiver shall have the following duties:

a.    The Receiver shall immediately contact the party who obtained the appointment of the Receiver and determine whether that party intends to move in the bankruptcy court for an order for (1) relief from the automatic stay, and (2) relief from the Receiver's obligation to turn over the property (11 U.S.C. §543).  If the party has no intention to make such a motion, the Receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession – and otherwise comply with Title 11 of the United States Code, section 543.

12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000083

b.      If the party who obtained the receivership intends to seek relief immediately from both the automatic stay and the Receiver's obligation to turn over the property, the Receiver may remain in possession and preserve the property pending the ruling on those motions (11 U.S.C. § 543(a)).  The Receiver's authority to preserve the property shall be limited as follows:

i.      The Receiver may continue to collect rents and other income;

ii.      The Receiver may make only those disbursements necessary to preserve and protect the property;

iii.      The Receiver shall not execute any new leases or other long-term contracts; and

iv.      The Receiver shall do nothing that would effect a material change in the circumstances of the property.

c.      If the party who obtained the receivership fails to file a motion within 10 court days after his or her receipt of notice of the bankruptcy filing, the Receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession and otherwise comply with 11 United States Code section 543,

d.      The Receiver may retain legal counsel to assist the Receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

## STIPULATED INJUNCTIVE RELIEF AGAINST DEFENDANTS

27.      **Turn Over and Cooperation by Defendants and Related Parties**.  Defendants, and their respective officers, directors, members, managers, agents, partners, property managers, employees, assignees, successors, attorneys, representatives, and all persons acting under, in concert with, or for them:

a.      Shall relinquish and turn over possession of the Receivership Property, including but not limited to all of its assets (including any cash) to the Receiver forthwith upon his appointment becoming effective;

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

b.    Shall turn over to the Receiver and direct all other third parties in possession thereof to turn over all keys, leases, books, records, rent rolls, books of account, ledgers, operating statements, control and passwords to website(s) and/or web domains, budgets, tenant lease deposits, and all other Receivership Property records relating to the Receivership Property, wherever located, and in whatever mode maintained, including information contained on computers and any and all software relating thereto as well as all banking records, statements and cancelled checks;

c.    Shall turn over to the Receiver all documents which pertain to all licenses, permits, or government approvals relating to the Receivership Property and shall immediately advise the Receiver of any social security or taxpayer identification numbers used in connection with the operation of the Receivership Property;

d.    Shall turn over to the Receiver all contracts involving the Receivership Property;

e.    Shall immediately advise the Receiver as to the nature and extent of insurance coverage on the Receivership Property.  The parties shall immediately name the Receiver as an additional insured on the insurance policy(ies) for the period that the Receiver shall be in possession of the Receivership Property.  The parties and their agents and representatives are prohibited from canceling, reducing or modifying any and all insurance coverage currently in existence with respect to the Receivership Property;

f.    Shall cooperate with and reasonably assist the Receiver with respect to his operation of the Receivership Property, including but not limited to promptly responding to any inquiry by the Receiver for information.

28.    Pending further Order of this Court, Defendants and their respective officers, directors, members, managers, agents, partners, property managers and employees, and all other persons acting under, in concert with, or for them who have actual or constructive knowledge of this Order, and their agents and employees shall not in any manner, directly or indirectly:

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LA\2268489.2

LNBYB000085

a.       Commit or permit any waste of the Receivership Property or any part thereof, or suffer or commit or permit any act on the Receivership Property or any part thereof in violation of law, or remove, transfer, encumber or otherwise dispose of any of the property or of the Receivership Property or any part thereof;

b.       Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order or the Receiver's possession of and operation or management of the Receivership Property;

c.       Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage, create a security interest in, encumber, conceal or in any manner whatsoever deal in or dispose of the whole or any part of the Receivership Property without prior specific Court Order;

d.       Withhold any Receivership Property assets, books, records, or funds from the Receiver;

e.       Destroy or conceal any records, documents, electronic data, electronic equipment or software, or any other medium that contains information related to the Receivership Property; and

f.       Do any act which will, or which will tend to impair, defeat, divert, prevent or prejudice the preservation of the Receivership Property.

**IT IS SO ORDERED**

Dated: _____, 2011

_____
JUDGE OF THE SUPERIOR COURT

15

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2268489.2

STIPULATION FOR APPOINTMENT OF RECEIVER; AND
[PROPOSED] ORDER

LNBYB000086

# **Exhibit F**

## **Letter of Intent**

## **(see attached)**

LNBYB000087

# GREYSTAR

May 23, 2011

M. Aaron Yashouafar
*Via email attachment*

Re:  Roosevelt Lofts, LLC

Mr. Yashouafar:

     This letter sets forth our current mutual intentions with respect to the acquisition by an affiliate of Greystar GP, LLC ("**Purchaser**") of the property ("**Property**") herein described. The Roosevelt Lofts, Inc., a California corporation owns one hundred percent of all of the membership interests of Roosevelt Lofts, LLC and serves as managing member of Roosevelt Lofts, LLC (the "**Seller**"). It is contemplated that Purchaser's acquisition of the Property shall be implemented through a plan of reorganization (the "**Plan**") in the bankruptcy case of *In re Roosevelt Lofts, LLC*, case no. 09-14214 GM, pending before the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Case**"). The Plan will be co-sponsored by Purchaser, Seller and Roosevelt Lofts, LLC. This is a letter of intent only and, except as provided in Sections 11, 12 and 14 below, does not constitute a binding agreement of the parties. The parties will be bound only at such time, if ever, as they execute a definitive purchase and sale agreement (as defined more fully below, the "**Definitive Agreement**"), either encompassed within or incorporated into the Plan, in each case evidencing all of the terms, provisions and conditions of the transaction generally outlined in this letter.

1.   PROPERTY DESCRIPTION.

     727 West 7th Street. Los Angeles, California

     Purchaser understands Property to contain 222 individually subdivided residential condominium units, a commercial retail component on the ground floor (the "Retail Component") and parking areas.

2.   PURCHASE PRICE AND PAYMENT TERMS.

- Option A:  $ 89,000,000 for the Property, excluding the Retail Component

- Option B:  $ 95,000,000 for the entirety of the Property

- Purchaser shall select whether to pursue Option A or Option B on or before June 2, 2011.

- Under either Option A or Option B:

   a.   Purchase is for 100%, fee simple, ownership interest in the Property, free and clear of all liens, claims, interests and encumbrances.

   b.   Purchase price will be reduced by any proceeds of insurance with respect to the Property received by Seller or Roosevelt Lofts, LLC on or prior to the effective date of the Plan (the "**Effective Date**") or as otherwise agreed to among Purchaser and Seller. In addition, Seller will cause any insurance claims and other of Roosevelt Lofts, LLC's claims and causes of action with respect to or involving the Property

LA\2260780.6

to be transferred to Purchaser (excluding any causes of action against Purchaser, BofA or Seller, which shall be released under the Plan). Purchaser understands and agrees that any and all proceeds paid by the Title Company to Roosevelt Lofts, LLC, prior to the Effective Date as a result of pending claims for the mechanic's liens recorded against the Property, shall be used toward settlement and removal of recorded mechanic's liens (the "**Mechanics' Lien Insurance Payment**").

c.  Purchaser shall pay purchase price in cash to the estate of Roosevelt Lofts, LLC on the Effective Date; provided however that that for purposes of this offer only and as a compromise under FRE 408, the Purchase Price shall be reduced by (i) the amount of consideration paid by Purchaser for the senior secured bank claim held by Bank of America (the "**BofA Claim**") and (ii) the Mechanics' Lien Insurance Payment.

3.  TITLE/NOTICE OF COMPLETION.

- On the Effective Date, Purchaser shall receive good and marketable title to the Property, the associated improvements, all related personal property owned by Roosevelt Lofts, LLC, and any leases for space in the improvements at closing.

- The Property shall be free and clear of liens, claims, interests and encumbrances, except those specifically permitted by Purchaser.

- On the Effective Date, Seller shall cause Purchaser to receive an owner's policy of title insurance in form and substance acceptable to Purchaser, subject only to such exceptions as Purchaser approves during the review process. All existing insurance policies of any kind (including without limitation title insurance and property and casualty insurance) related to the Property shall be maintained in full force and assigned to Purchaser, except as provided in Section 2.b, above. Seller shall not do anything to impair coverage under any of the foregoing insurance policies.

- Promptly after the date hereof, Seller shall cause a notice of completion to be filed in the appropriate public records with respect to all work done on the Property to date, and shall cause all such work to stop prior to the filing date of the notice of completion.

- Conveyance of the Property shall be through the Plan and appropriate court order and instrument of conveyance.

4.  REPRESENTATIONS AND WARRANTIES; CONDITIONS.    The Plan shall contain representations and warranties customary for real estate and bankruptcy transactions of this size and type, including, without limitation, authorization and power to convey, no knowledge of material defects in the improvements, accuracy of rent roll and other information provided, and no knowledge of failure of the property to comply with applicable laws. Purchaser is aware that the roof of the Property needs repair to eliminate leaking and that the parking stalls are non-conforming.    Representations and warranties shall not survive the Effective Date, except for those that were incorrect as a result of intentional misrepresentations. The Plan shall also contain conditions customary for real estate and bankruptcy transactions of this size and type.

LNBYB000089

5.. <u>TREATMENT OF CLAIMS AND INTERESTS IN THE PLAN</u>. Purchaser and Seller shall cooperate in the drafting of the Plan and related disclosure statement, and shall mutually agree on the treatment of claims and interests under the Plan.

6. <u>DELIVERY OF INFORMATION.</u> Promptly following the date hereof, Seller shall cause Purchaser to receive copies all policies of title insurance and all plans, specifications, surveys, reports, financial records and invoices relative to the Property and any other information reasonably requested by Purchaser to the extent any of the foregoing information and documentation is within the custody, possession or control of Seller, Roosevelt Lofts, LLC or any of their respective affiliates, employees, members, agents, officers, consultants or professionals.

7. <u>INSPECTION PERIOD</u>. Purchaser shall have the right to review the information delivered by Seller and all books and records pertaining to the ownership and operation of the Property, to conduct a phase I environmental audit of the Property, and to enter upon and inspect the Property.

8. <u>CLOSING DATE</u>. The Effective Date shall be defined as 90 days after the date hereof.

9. <u>BINDING AGREEMENT</u>.

(A) By no later than June 2, 2011, (i) Seller and Purchaser shall enter into a definitive written agreement which memorializes the terms and conditions set forth herein with specificity (the "**Definitive Agreement**") and (ii) Seller and Purchaser shall enter into a definitive agreement with the holder of the BofA Claim ("BofA") to assign such claim to Purchasers for ▮▮▮▮▮▮▮ in cash (the "**BofA Assignment Agreement**"), subject to the terms herein and in the Definitive Agreement and the BofA Assignment Agreement. In the event that the Definitive Agreement and the BofA Assignment Agreement are not entered into by such date for any reason, neither Purchaser nor Seller shall have any obligation to proceed with the transaction contemplated by this letter of intent (and the liquidated damages described in Section 12, below, shall not be applicable). In the event that the Definitive Agreement and the BofA Assignment Agreement are entered into by June 2, 2011, then Purchaser shall have the exclusive right to acquire the BofA Claim for ▮▮▮▮▮▮▮ .

(B) By no later than June 10, 2011, Purchaser will deposit $5 million into a third party escrow (the "**Escrow**") toward its acquisition of the BofA Claim (the "**$5 Million Deposit**"). The $5 Million Deposit will become irrevocable on the later of the date (the "**Irrevocable Escrow Date**") that the Bankruptcy Court enters a final order:

(i) approving Purchaser as a sponsor of the Plan (the "**Plan Sponsor Order**") that, among other things, (a) memorializes and implements the terms of the Definitive Agreement, (b) provides for either (x) payment in full in cash on the Effective Date of the BofA Claim in an amount equal to the face amount of the BofA Claim plus default interest and outstanding fees and expenses or (y) conversion of the BofA Claim into 100% of the equity interests of Roosevelt Lofts, LLC as reorganized (or such entity that holds, as of the Effective Date, such equity interests), (c) approves the BofA Claim as allowed, perfected, valid and duly enforceable (without any defense, counterclaim and right of offset) with first priority security against the Property subject only to any existing court approved settlement with holders of mechanics' liens against the Property and (d) provide for automatic relief from stay for Purchaser (as holder of the BofA Claim) on the Effective Date to foreclose on the Property on the tenth day following the Effective Date unless the Plan is performed according to its terms; and

LNBYB000090

(ii) approving the BofA Assignment Agreement (the "**BofA Assignment Order**").

(C)  On the date that is (x) 35 days after the execution and delivery of the "**Final Agreement**" referenced in that certain term sheet for Settlement Agreement Between the Bank Group, Roosevelt Lofts, LLC and Affiliates and Bank Guarantors (attached hereto as Exhibit 1), Purchaser will deposit another $10 million in the Escrow towards the consideration for the assignment of the BofA Claim to Purchaser (the "**$10 Million Deposit**") and (y) 65 days after the execution and delivery of the Final Agreement, Purchaser will deposit another $20 million into the Escrow towards the consideration for the assignment of the BofA Claim to Purchaser (collectively with the $5 Million Deposit and the $10 Million Deposit, the "**Escrow Deposits**").

(D) the Escrow Deposits shall be (A) in immediately available funds and (B) non-refundable following the Irrevocable Escrow Date; provided however that upon the Effective Date (or earlier in the sole discretion of the Purchaser) the Escrow Deposits shall be applied to fund the consideration for the assignment of the BofA Claim to Purchaser.

10.  CLOSING COSTS.  Each of the Purchaser and Seller shall be responsible for its fees and costs (including attorneys' fees) incurred in connection with the transactions contemplated by this agreement. Rents, taxes, and approved operating expenses will be prorated as of the Effective Date.  Purchaser shall have the right to terminate and/or reject any management and other service agreements affecting the Property concurrently with the confirmation of the Plan.

11.  CONFIDENTIALITY.  Purchaser and Seller shall not disclose any of the terms, provisions, or conditions of this letter to any other person without the express written consent of the other party, except that Purchaser may disclose such information to its principals, counsel, accountants and potential financing sources in connection with evaluating the potential acquisition of the property by Purchaser. Purchaser agrees that, in any discussion with BofA concerning the BofA Assignment Agreement, Purchaser shall not disclose the terms of this letter set forth in Paragraph 2, above.

12.  EXCLUSIVITY.  From and after the date hereof, so long as Purchaser is willing to purchase the Property for the Purchase Price, Seller hereby agrees that it will not accept offers with respect to any transaction involving or relating to a potential acquisition of the BofA Claim, the Property, Roosevelt Lofts, LLC or the Seller (including, without limitation, through a plan of reorganization). Seller and Purchaser recognize that this agreement is not a solicitation of votes on the Plan or any other plan. In the event Purchaser is willing to purchase the Property for the Purchase Price under the terms set forth herein and in the Definitive Agreement and the BofA Assignment Agreement and is not then in material breach of the Definitive Agreement or the BofA Assignment Agreement, but Seller does not agree to sell the Property to the Purchaser for the Purchase Price under the terms and conditions set forth herein and in the Definitive Agreement and the BofA Assignment Agreement (the "**Sale Breach**"), Seller promptly shall pay Purchaser the sum of $500,000 in cash as liquidated damages to compensate Purchaser for the Sale Breach.  Purchaser and Seller agree that it would be impracticable and difficult to estimate the actual damages which Purchaser may suffer as a result of the Sale Breach. Therefore, Purchaser and Seller agree that a reasonable estimate of the foregoing damages which Purchaser would suffer as a result of the Sale Breach is and shall be limited to the foregoing amount of liquidated damages. All other remedies for the Sale Breach shall be waived by Purchaser. The Purchaser and Seller acknowledge that the payment of such

LNBYB000091

liquidated damages is not intended as a forfeiture or penalty but is intended to constitute liquidated damages. The Liquidated Damages described herein shall be personally guaranteed by M. Aaron Yashouafora and Simon Barlava. Notwithstanding the foregoing, nothing contained herein shall impair or restrict Purchaser's right to foreclose on the Property as described in Section 9 hereof and the Plan Sponsor Order or the exercise of any remedies set forth in the Definitive Agreement and the BofA Assignment Agreement.

13. <u>ASSIGNMENT/NOMINATION</u>. An affiliate or other designee of Purchaser may take title the Property on the Effective Date.

14. <u>CORPORATE AUTHORITY</u>. By signing below, each signatory below represents and warrants that he has full corporate authority to enter into this letter and bind his respective party to the terms of Sections 11, 12 and 14 hereof. In addition, by signing in the signature block below under "Accepted Effective As _____", the signatory represents that the entity set forth in such signature block owns all of the membership interests of and serves as managing member of Roosevelt Lofts, LLC. The foregoing representations shall survive indefinitely. Seller covenants that it will (a) not pledge, transfer, hypothecate, encumber or assign such membership interests unless such pledge, transfer, hypothecation, encumbrance or assignment is made expressly subject in writing to the terms and conditions set forth herein and (b) shall provide Purchaser with prompt notice of any of the actions described in Section 14(a) hereof.

LNBYB000092

Seller and Purchaser stipulate that the agreements set forth in Sections 11, 12 and 14 are supported by good and sufficient consideration, including Purchaser's undertaking activities with regard to evaluating the viability of the transaction herein described. Each party reserves the right to negotiate with respect to the transactions herein described in their own sole interest.

The parties again stipulate and acknowledge that this is a non-binding letter of intent only, and that except for the confidentiality agreements set forth in Section 11, the exclusivity agreements set forth in Section 12, and the representations and warranties and covenants in set forth in Section 14, this letter does not create any binding agreements between the parties hereto. No party shall be bound (except as set forth in Sections 11, 12 and 14), until such time as a Definitive Agreement is duly executed by all parties. If this proposal is not accepted by May 23, 2011, Purchaser's offer will become null and void.

If the foregoing sets forth your current understanding of our current mutual intent, please so indicate by signing one copy where indicated below.

Yours very truly,

GREYSTAR GP, LLC

By:_____
Name:__Kevin Kaberna_____
Title:___Investment Principal_____

ACCEPTED EFFECTIVE AS OF _5/23/11_

By:_____
Name:_M. Aaron Yashouafar_
Title:_CEO_
On Behalf of:_The Roosevelt lofts, INC._

LNBYB000093

**Exhibit G**


**Inventory**


Due to its voluminous nature, this exhibit has not been attached hereto.  A copy of this exhibit is attached to the *Notice of Supplement To Motion Pursuant To Sections 105(a), 363(b) and 1125(b) of the Bankruptcy Code and Bankruptcy Rule 6004 For An Order Authorizing The Debtor and Other Parties Thereto To Enter Into Plan Support Agreement and Related Agreements* filed on June 9, 2011 as Docket No. 795, and will be provided upon written request.

LNBYB000094

## Exhibit H

**[Intentionally Omitted]**

LNBYB000095

# **Exhibit I**

## **Debtor Bank Accounts**

City National Bank
Debtor In Possession Account
Account No. 210092560
Balance as of June 2, 2011:   $189,237.25

Bank of America
Litigation Reserve Account
Account No. 14590-60688
Balance as of June 2, 2011:   $1,500,000.00

LNBYB000096

## Exhibit J

## Rent Roll

**(see attached)**

LNBYB000097

The Residences at Seventh Street
Los Angeles, CA

Rent Roll
as of
June 2011

| SUITE | NAME | AREA | COMM DATE | EXP. DATE | MONTHLY RENT | CAM CHARGES | TOTAL | SECURITY DEPOSIT |
|---|---|---|---|---|---|---|---|---|
| **Residential Tenants** | | | | | | | | |
| RVLTR-310 | Occupied | 814 | 2/10/11 | 1/31/2012 | 1,950.00 | | | 2,925.00 |
| RVLTR-417 | Occupied | 1,310 | 5/15/11 | 4/30/2012 | 3,100.00 | | | 3,100.00 |
| RVLTR-419 | Occupied | 795 | 10/01/10 | 9/01/2011 | 2,000.00 | | | 3,500.00 |
| RVLTR-508 | Occupied | 940 | 4/01/11 | 3/31/2012 | 2,450.00 | | | 2,450.00 |
| RVLTR-313 | Occupied | 804 | 2/01/11 | 1/31/2012 | 1,850.00 | | | 2,000.00 |
| RVLTR-704 | Occupied | 1,366 | 7/01/10 | 6/30/2011 | 3,278.00 | | | 3,278.00 |
| RVLTR-509 | Occupied | 893 | 5/07/11 | 4/30/2012 | 2,400.00 | | | 2,400.00 |
| RVLTR-711 | Occupied | 1,332 | 2/10/11 | 1/31/2012 | 2,750.00 | | | 4,125.00 |
| RVLTR-816 | Occupied | 1,248 | 11/01/10 | 10/31/2011 | 2,775.00 | | | 2,775.00 |
| RVLTR-503 | Occupied | 1,328 | 6/29/10 | 5/31/2011 | 3,187.00 | | | 2,223.00 |
| RVLTR-712 | Occupied | 944 | 12/01/10 | 11/30/2011 | 2,250.00 | | | 2,250.00 |
| RVLTR-611 | Occupied | 1,332 | 12/01/10 | 11/30/2011 | 3,197.00 | | | 6,894.00 |
| RVLTR-312 | Occupied | 785 | 10/01/10 | 9/30/2011 | 1,900.00 | | | 1,900.00 |
| RVLTR-707 | Occupied | 950 | 4/15/11 | 3/31/2012 | 2,518.00 | | | 3,777.00 |
| RVLTR-305 | Occupied | 1,037 | 11/01/10 | 10/31/2011 | 2,400.00 | | | 2,900.00 |
| RVLTR-719 | Occupied | 1,532 | 11/01/09 | MTM | 3,165.00 | | | 3,165.00 |
| RVLTR-815 | Occupied | 883 | 2/01/11 | 1/31/2012 | 2,200.00 | | | 2,350.00 |
| RVLTR-525 | Occupied | 1,217 | 2/15/11 | 1/31/2012 | 2,600.00 | | | 3,000.00 |
| RVLTR-513 | Occupied | 934 | 6/07/11 | 5/31/2012 | 2,080.00 | | | 3,000.00 |
| RVLTR-708 | Occupied | 919 | 11/01/10 | 10/31/2011 | 2,150.00 | | | 2,150.00 |
| RVLTR-811 | Occupied | 1,332 | 4/08/11 | 3/31/2012 | 3,250.00 | | | 3,400.00 |
| RVLTR-505 | Occupied | 1,290 | 4/01/11 | 1/19/2012 | 2,825.00 | | | 2,800.00 |
| RVLTR-514 | Occupied | 942 | 8/01/10 | 7/31/2011 | 2,300.00 | | | 2,300.00 |
| RVLTR-810 | Occupied | 1,305 | 8/01/10 | 7/31/2011 | 3,000.00 | | | 3,000.00 |
| RVLTR-506 | Occupied | 863 | 5/01/11 | 4/30/2012 | 2,050.00 | | | 4,100.00 |
| RVLTR-823 | Occupied | 931 | 5/15/11 | 4/30/2012 | 2,400.00 | | | 2,400.00 |
| RVLTR-518 | Occupied | 1,453 | 1/08/11 | 12/31/2011 | 2,800.00 | | | 2,800.00 |
| RVLTR-410 | Occupied | 1,096 | 5/01/11 | 4/30/2012 | 2,750.00 | | | 3,500.00 |
| RVLTR-808 | Occupied | 932 | 12/01/10 | 11/30/2011 | 2,435.00 | | | 3,750.00 |
| RVLTR-607 | Occupied | 874 | 11/01/10 | 10/31/2011 | 2,150.00 | | | 2,150.00 |
| RVLTR-501 | Occupied | 940 | 3/26/11 | 2/29/2012 | 2,250.00 | | | 2,250.00 |
| RVLTR-415 | Occupied | 863 | 5/15/11 | 4/30/2012 | 1,950.00 | | | 1,950.00 |
| RVLTR-715 | Occupied | 1,030 | 5/15/11 | 4/30/2012 | 2,300.00 | | | 2,300.00 |
| RVLTR-616 | Occupied | 1,248 | 11/16/10 | 10/31/2011 | 2,500.00 | | | 2,500.00 |
| RVLTR-713 | Occupied | 958 | 6/01/11 | 11/30/2011 | 2,550.00 | | | 2,550.00 |
| RVLTR-510 | Occupied | 1,093 | 5/10/11 | 4/30/2012 | 2,650.00 | | | 2,650.00 |
| RVLTR-519 | Occupied | 1,532 | 2/01/11 | 1/31/2012 | 2,950.00 | | | 2,950.00 |
| RVLTR-302 | Occupied | 1,363 | 12/01/10 | 11/30/2011 | 2,975.00 | | | 3,475.00 |
| RVLTR-610 | Occupied | 1,090 | 1/01/11 | 12/31/2011 | 2,180.00 | | | 0.00 |
| RVLTR-716 | Occupied | 1,012 | 1/01/11 | 12/31/2011 | 2,275.00 | | | 2,425.00 |
| RVLTR-726 | Occupied | 1,115 | 4/09/11 | 3/31/2012 | 2,500.00 | | | 4,250.00 |
| RVLTR-423 | Occupied | 910 | 9/19/09 | 8/31/2010 | 2,350.00 | | | 0.00 |
| RVLTR-425 | Occupied | 1,219 | 4/01/09 | 3/31/2011 | 550.00 | | | 0.00 |
| RVLTR-822 | Occupied | 864 | 4/07/11 | 3/31/2012 | 2,150.00 | | | 2,150.00 |
| RVLTR-612 | Occupied | 921 | 4/01/11 | 3/31/2012 | 2,175.00 | | | 4,000.00 |
| RVLTR-426 | Occupied | 1,125 | 3/01/11 | 2/28/2012 | 2,550.00 | | | 2,550.00 |
| RVLTR-314 | Occupied | 1,619 | 10/01/10 | 8/31/2011 | 2,750.00 | | | 2,750.00 |
| RVLTR-613 | Occupied | 947 | 2/17/11 | 1/31/2012 | 2,225.00 | | | 2,225.00 |
| RVLTR-720 | Occupied | 875 | 3/01/11 | 2/29/2012 | 1,995.00 | | | 3,000.00 |
| RVLTR-309 | Occupied | 839 | 10/15/10 | 9/30/2011 | 1,950.00 | | | 1,950.00 |
| RVLTR-522 | Occupied | 868 | 2/20/11 | 1/31/2012 | 2,050.00 | | | 2,050.00 |
| RVLTR-307 | Occupied | 732 | 7/26/10 | 6/30/2011 | 2,000.00 | | | 2,000.00 |
| RVLTR-609 | Occupied | 885 | 6/01/10 | 5/31/2011 | 2,345.00 | | | 3,150.00 |
| RVLTR-412 | Occupied | 913 | 3/13/09 | MTM | 2,650.00 | | | 0.00 |
| RVLTR-812 | Occupied | 944 | 3/01/11 | 2/29/2012 | 2,400.00 | | | 2,400.00 |
| RVLTR-511 | Occupied | 1,332 | 10/15/10 | 9/30/2011 | 2,557.00 | | | 2,557.00 |

*Confidential and Privileged Information*

LNBYB000098

The Roosevelt Residences
1212 South Seventh Street
Los Angeles, CA

Rent Roll
as of
June 2011

| SUITE | NAME | AREA | COMM DATE | EXP. DATE | MONTHLY RENT | CAM CHARGES | TOTAL | SECURITY DEPOSIT |
|---|---|---|---|---|---|---|---|---|
| **Residential Tenants** | | | | | | | | |
| RVLTR-825 | Occupied | 1,226 | 5/01/11 | 4/30/2012 | 2,650.00 | | | 2,650.00 |
| RVLTR-304 | Occupied | 1,024 | 6/01/10 | MTM | 2,200.00 | | | 2,200.00 |
| RVLTR-813 | Occupied | 956 | 11/01/10 | 10/31/2011 | 2,350.00 | | | 2,350.00 |
| RVLTR-303 | Occupied | 1,042 | 2/25/11 | 1/31/2012 | 2,400.00 | | | 3,600.00 |
| RVLTR-701 | Occupied | 940 | 3/19/11 | 9/30/2011 | 2,600.00 | | | 2,600.00 |
| RVLTR-622 | Occupied | 875 | 6/02/11 | 5/31/2012 | 2,100.00 | | | 2,500.00 |
| RVLTR-723 | Occupied | 930 | 5/15/11 | 5/31/2012 | 2,400.00 | | | 0.00 |
| RVLTR-814 | Occupied | 951 | 4/01/11 | 3/31/2012 | 2,400.00 | | | 4,800.00 |
| RVLTR-714 | Occupied | 950 | 6/01/10 | MTM | 2,400.00 | | | 2,400.00 |
| RVLTR-722 | Occupied | 868 | 6/01/11 | 5/31/2012 | 1,950.00 | | | 3,500.00 |
| RVLTR-411 | Occupied | 1,265 | 4/15/09 | 3/14/2011 | 550.00 | | | 0.00 |
| RVLTR-516 | Occupied | 1,012 | 12/01/10 | 11/30/2011 | 2,250.00 | | | 3,375.00 |
| RVLTR-724 | Occupied | 808 | 5/01/11 | 4/30/2012 | 1,995.00 | | | 1,995.00 |
| RVLTR-706 | Occupied | 888 | 8/15/10 | 7/31/2011 | 2,200.00 | | | 2,200.00 |
| RVLTR-413 | Occupied | 931 | 3/07/11 | 2/29/2012 | 2,400.00 | | | 4,100.00 |
| RVLTR-623 | Occupied | 931 | 5/15/11 | 4/30/2012 | 2,200.00 | | | 2,200.00 |
| RVLTR-718 | Occupied | 1,453 | 3/15/11 | MTM | 2,790.00 | | | 0.00 |
| RVLTR-702 | Occupied | 1,462 | 2/01/11 | 1/31/2012 | 3,000.00 | | | 3,000.00 |
| RVLTR-705 | Occupied | 1,288 | 8/01/10 | 7/31/2011 | 3,136.00 | | | 3,136.00 |
| RVLTR-409 | Occupied | 884 | 2/01/11 | 1/31/2012 | 2,000.00 | | | 2,000.00 |
| RVLTR-709 | Occupied | 910 | 12/01/10 | 11/30/2011 | 2,300.00 | | | 2,500.00 |
| RVLTR-512 | Occupied | 918 | 5/09/11 | 4/30/2012 | 2,600.00 | | | 3,900.00 |
| RVLTR-614 | Occupied | 938 | 9/01/10 | 8/31/2011 | 2,496.00 | | | 2,500.00 |
| Total 83,068 | | | | | 189,304.00 | | | 205,950.00 |
| **Retail Tenants** | | | | | | | | |
| RVLTR-G723 | 727 WEST SEVENTH, LLC (SALVA | 2,750 | 06/01/11 | 05/31/11 | 7,975.00 | 2,639.29 | 10,614.29 | 0 |
| RVLTR-G729 | JANG ENTERPRISES, INC. | 4,276 | 3/01/09 | 4/30/2019 | 15,191.43 | 3,228.00 | 18,419.43 | |
| RVLTR-G733 | HAO LAM | 1,505 | 10/01/09 | 9/30/2019 | 6,358.35 | 1,136.00 | 7,494.35 | 5,200.00 |
| RVLTR-G735 | FAMIMA CORPORATION | 1,633 | 3/24/09 | 6/30/2014 | 9,887.90 | 1,233.00 | 11,120.90 | |
| Total | | | | | 31,437.68 | 5,597.00 | 37,034.68 | 20,210.78 |

*"The information in this rent roll is subject to verification and/or change at the time of closing, based on the actual in place tenancies and amounts paid by the tenants."*

*Confidential and Privileged Information*

| In re: | CHAPTER 11 |
|--------|------------|
| ROOSEVELT LOFTS, LLC, | CASE NUMBER 1:09-bk-14214-GM |
| Debtor(s). | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

A true and correct copy of the foregoing documents described as **NOTICE OF MOTION AND MOTION FOR ORDER ESTABLISHING BIDDING PROCEDURES FOR SALE OF DEBTOR'S PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO 11 U.S.C. §§ 105 AND 363; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF M. AARON YASHOUAFAR IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **July 5, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- John B Acierno     ecfcacb@piteduncan.com
- Carleton R Burch     crb@amclaw.com,
  amc@amclaw.com;jsh@amclaw.com;awh@amclaw.com;mav@amclaw.com;esf@amclaw.com;slc@amclaw.com;csh@amclaw.com
- Gary O Caris     gcaris@mckennalong.com, pcoates@mckennalong.com
- L Dominic Chacon     ldominicchacon@yahoo.com
- Cynthia M Cohen     cynthiacohen@paulhastings.com
- Travis W Feuerbacher     tfeuerbacher@gglts.com
- Steven R Fox     emails@foxlaw.com
- Helen R Frazer     hfrazer@aalrr.com
- Varand Gourjian     vg@gourjianlaw.com, lucy@gourjianlaw.com;naz@gourjianlaw.com;art@gourjianlaw.com
- Brian T Harvey     bharvey@buchalter.com, IFS_filing@buchalter.com
- Herbert Hayden     herbert@ntlg.us
- Brian L Holman     b.holman@mpglaw.com
- Alexandra Kazhokin     akazhokin@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- Mark J Krone     crb@amclaw.com, crs@amclaw.com;amc@amclaw.com
- Ian Landsberg     ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;rbenitez@landsberg-law.com
- David L. Neale     dln@lnbrb.com
- Juliet Y Oh     jyo@lnbrb.com, jyo@lnbrb.com
- Russell H Rapoport     rrapoport@prllplaw.com, lgillis@prllplaw.com
- Ronald N Richards     ron@ronaldrichards.com
- S Margaux Ross     margaux.ross@usdoj.gov
- Bruce D Rudman     bdr@agrlaw.net
- William D Schuster     bills@allieschuster.org
- Marian K Selvaggio     selvaggio@huntortmann.com
- Daniel H Slate     dslate@buchalter.com, rreeder@buchalter.com;ifs_filing@buchalter.com
- Lindsey L Smith     lls@lnbyb.com
- David A Tilem     davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov
- Marc Weinberg     marcweinberg@att.net
- Brandon J Witkow     bwitkow@lockelord.com
- Aimee Y Wong     aywong@mckennalong.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*April 2010*

**F 9013-3.1**

| In re:<br><br>ROOSEVELT LOFTS, LLC,<br><br>Debtor(s). | CHAPTER 11<br>CASE NUMBER 1:09-bk-14214-GM |
|---|---|

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On **July 5, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

*[X] Service list served by Overnight Mail attached*

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 5, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**_Served via Attorney Service_**
Hon. Geraldine Mund
United States Bankruptcy Court
21041 Burbank Blvd., Ctrm 303
Woodland Hills, CA 91367

**_Served by Email_**

U.S. Trustee:
margaux.ross@usdoj.gov

Daniel Slate:
dslate@buchalter.com

Ian Landsberg:
ilandsberg@landsberg-law.com

David Tilem:
davidtilem@tilemlaw.com

Bruce D Rudman
bdr@agrlaw.com

Gerald Mouzis
gmouzis@mouzislaw.com

Robert Klyman
robert.klyman@lw.com

Robert Francis
robert.frances@lw.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| **July 5, 2011** | Stephanie Reichert | */s/ Stephanie Reichert* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*April 2010*                                                                                                      **F 9013-3.1**

## II. SERVED BY OVERNIGHT MAIL:

U.S. Trustee
Attn:  S Margaux Ross, Esq.
21051 Warner Ctr Ln Ste 115
Woodland Hills, CA 91367

_Counsel for Siemens Bldg Tech., Inc._
Benjamin R. Trachtman, Esq.
Trachtman & Trachtman
27401 Los Altos, Suite 300
Mission Viejo, Ca 92691

Roosevelt Lofts, LLC
c/o Mr. M. Aaron Yashouafar, President
16661 Ventura Blvd., #600
Encino, CA 91436

Homan Taghdiri, Esq.
Milbank
660 S. Figueroa St., 24th Floor
Los Angeles, CA 90017

Herbert Alfred Mayer
5360 Willow Oak Street
Simi Valley, CA 93063-4591

_Counsel for HD Supply Construction_
William D. Schuster, Esq.
Allie & Schuster PC
2122 N Broadway
Santa Ana, CA 92706-2614

_Counsel for Sidney Alter dba Alter Electric_
Bruce D. Rudman, Esq.
Abdulaziz, Grossbart & Rudman
PO Box 15458
North Hollywood, CA 91615

_Counsel for VGI_
Patrick J. Duffy III
Andrew W Hawthorne
Monteleone & McCrory
725 S. Figueroa St., Ste. 3200
Los Angeles, CA 90017

_Counsel for Bank of America_
Daniel H. Slate, Esq.
Buchalter, Nemer
1000 Wilshire Blvd., Ste 1500
Los Angeles, CA 90017

_Counsel for Infiniti Metals_
Law Ofcs Theodore A. Anderson
690 S. Brea Blvd.
Brea, CA 92821

Committee Member
Kuetar Flooring
Attn:  Joseph Kember/Ed Sheats
2 Innovation Drive
Renfrew
Ontario, **CANADA** K7V4B1

L.A. County Treasurer and Tax Collector
PO Box 54110
Los Angeles, CA 90054-0110

_Counsel for ThyssenKrupp Elevator_
William C. Hernquist II
Wallace H. Sweet
8407 La Mesa Blvd.
La Mesa, CA 91942

_Counsel for American Gunite, Inc._
Varand Gourjian, Esq.
Gourjian Law Group
101 N. Brand Blvd., Suite 1220
Glendale, CA 91203

_Committee Counsel_
Ian Landsberg, Esq.
Landsberg Margulies LLP
16030 Ventura Blvd., Ste. 470
Encino, CA 91436

_Committee Member_
A American Custom Flooring
Attn:  Richard S. Lauter
311 S. Wacker Drive
Chicago, IL 60066

Counsel to Bank of America
Seyfarth Shaw LLP
T. Larry Watts, Eric B. von Zeipel
2029 Century Park East, Suite 3500
Los Angeles, CA 90067-3021

_Committee Member_
Bontempi USA
Attn:  Yeujye Chen
8919 Beverly Blvd.
West Hollywood, CA 90048

Fred S. Pardes, Esq.
LAW OFFICES OF FRED S. PARDES
A Professional Corporation
34211 Pacific Coast Highway, Suite 103
Dana Point, Ca. 92629

S.E.C.
5670 Wilshire Blvd., Ste. 1100
Los Angeles, CA 90036

David Sherwood
CEO
Daniel's Jewelers
PO Box 3750
Culver City, CA 90231

PM Estrada Roofing
4257 W. 101st Street
Inglewood, CA 90304

_Counsel for Thermalair Inc._
Gerald W. Mouzis
The Mouzis Law Firm
13681 Newport Avenue, Suite 8-605
Tustin, CA  92780

Attorney for Canon Financial Svcs
Scott H. Marcus & Associates
121 Johnson Road
Turnersville, NJ 08012

Muir Chase Plumbing Co.
c/o Law Ofcs of David A. Tilem
206 N. Jackson Street, Ste 201
Glendale, CA 91206

Latham & Watkins, LLP
Attn: Robert Klyman & Robert Francis
355 South Grand Avenue
Los Angeles CA 90071-1560