1  DAVID L. NEALE (SBN 141225)
JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
4  Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
5  Email:  dln@lnbyb.com, jyo@lnbyb.com

6
Attorneys for Chapter 11 Debtor
7  and Debtor in Possession

8

9                **UNITED STATES BANKRUPTCY COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11               **SAN FERNANDO VALLEY DIVISION**

12

13  In re                                          )   Case No. 1:09-bk-14214-GM
                                                   )
14  ROOSEVELT LOFTS, LLC, a Delaware               )   Chapter 11
15  limited liability company,                     )
                                                   )   **NOTICE OF MOTION AND**
16                    Debtor.                       )   **MOTION PURSUANT TO FEDERAL**
                                                   )   **RULE OF BANKRUPTCY**
17                                                 )   **PROCEDURE 9019 FOR**
                                                   )   **AUTHORITY TO COMPROMISE**
18                                                 )   **CONTROVERSY WITH MISSAGH**
                                                   )   **PEZESHKIAN, HASMIK**
19                                                 )   **NAZARIAN AND AVAK**
                                                   )   **KHACHADORIAN;**
20                                                 )   **MEMORANDUM OF POINTS AND**
                                                   )   **AUTHORITIES; DECLARATION OF**
21                                                 )   **M. AARON YASHOUAFAR IN**
                                                   )   **SUPPORT THEREOF**
22                                                 )
                                                   )
23                                                 )
                                                   )   [No Hearing Required Unless Requested –
24                                                 )   Local Bankruptcy Rule 9013-1(o)]
                                                   )
25                                                 )
                                                   )
26                                                 )

27

28

                                    1

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Bankruptcy Procedure 9019 and Local Bankruptcy Rule 9013-1(o), Roosevelt Lofts, LLC, a Delaware limited liability company, the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), hereby submits this motion (the "Motion") for the entry of an order: (1) authorizing the settlement between the Debtor, on the one hand, and Missagh Pezeshkian, Hasmik Nazarian and Avak Khachadorian (collectively, the "Buyers"), on the other hand; and (2) approving the terms and conditions of, and authorizing the Debtor to enter into and implement the terms of, that certain *Settlement Agreement* (the "Settlement Agreement") attached as Exhibit "1" to the Declaration of M. Aaron Yashouafar annexed hereto (the "Yashouafar Declaration").  The complete bases of the Motion are set forth in the Memorandum of Points and Authorities annexed hereto.

The Settlement Agreement resolves the parties' disputes with respect to their respective rights, claims and defenses under that certain *Purchase and Sale Agreement and Joint Escrow Instructions* (the "Purchase Agreement") entered into by the parties pre-petition for the purchase and sale of Unit 924 in the Debtor's building located at 727 W. 7th Street, Los Angeles, California 90017.  Briefly, the Buyers contend, among other things, that they have the right to terminate the Purchase Agreement and obtain a full refund of their deposit (the "Deposit").  On the other hand, the Debtor contends that the Buyers have forfeited the Deposit under the terms of the Purchase Agreement and that the Purchase Agreement can be legally enforced against the Buyers.  The Buyers dispute the foregoing contention.  Recognizing the risks, costs and delays associated with litigation, the parties engaged in good faith, arm's length settlement negotiations, which were fruitful and resulted in the Settlement Agreement.  Under the Settlement Agreement, the parties have agreed, among other things, to terminate the Purchase Agreement, with the Buyers to receive the sum of $23,005.35 from the Deposit, and the Debtor to receive the remaining balance of the Deposit, net of any escrow fees.

The Motion is based upon Federal Rule of Bankruptcy Procedure 9019 and Local Bankruptcy Rule 9013-1(o), and is based upon this Notice and Motion, the attached

Memorandum of Points and Authorities and Yashouafar Declaration, the entire record in this case, and any other evidence properly presented to the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(o)(1)(A)(ii), any response and request for hearing must be filed with the Court and served on the Debtor's counsel and the United States Trustee within fourteen (14) days after the date of service of this Notice.

**PLEASE TAKE FURTHER NOTICE** that failure to file and serve a timely response to the Motion or request for a hearing on the Motion may be deemed by the Court to be consent to the granting of the relief requested in the Motion.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1)    affirming the adequacy of the Notice given herein;

(2)    granting the Motion in its entirety;

(3)    approving the Settlement Agreement in the form attached as Exhibit "1" to the Yashouafar Declaration annexed hereto;

(4)    authorizing and directing Mara Escrow Company to distribute the Deposit in accordance with the terms of the Settlement Agreement;

(5)    authorizing the Debtor to take all steps necessary to consummate the terms and conditions of the Settlement Agreement; and

(6)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  August 17, 2011                    ROOSEVELT LOFTS, LLC


                                           By:___*/s/ Juliet Y. Oh*_____
                                                DAVID L. NEALE
                                                JULIET Y. OH
                                                LEVENE, NEALE, BENDER, YOO
                                                    & BRILL L.L.P.
                                                Attorneys for Chapter 11 Debtor and
                                                Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

**A.    Background.**

1.    On April 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code").  The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is the owner of real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "Building").

3.    In or about March 2006, the Debtor entered into a construction loan agreement with Bank of America, N.A., individually and as agent for a group of lenders (the "Bank"), pursuant to which the Debtor obtained a loan from the Bank in the original principal sum of $78,840,375.00 (the "Loan").  The Loan was obtained by the Debtor for the purpose of converting the Building into 222 individually subdivided, luxury residential condominium units (the "Units"), a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Building.

4.    On or about December 30, 2008, the Bank issued a notice of default to the Debtor, contending that the Debtor had defaulted on its obligations under the Loan.  By that time, construction on the first eight floors of the Building, including all of the Building's commercial retail space, had been completed and the Debtor had obtained a temporary certificate of occupancy.

5.    Subsequently, on April 3, 2009, the Bank filed a complaint against the Debtor and others in the Superior Court of the State of California, County of Los Angeles ("State Court") for, among other things, specific performance, appointment of a receiver, and judicial foreclosure on its Deeds of Trust.  In connection with the action in State Court, the Bank made an *ex parte* application for the appointment of a receiver.

6.     As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code.

**B.     Summary Of The Disputes Between The Debtor And The Buyers And The Terms Of The Settlement Agreement.**

7.     Prior to the Petition Date, the Debtor, on the one hand, and Missagh Pezeshkian, Hasmik Nazarian and Avak Khachadorian (collectively, the "Buyers"), on the other hand, entered into that certain *Purchase and Sale Agreement and Joint Escrow Instructions* dated October 3, 2007, pursuant to which the Buyers agreed to purchase a Unit in the Building, specifically Unit 924, for the purchase price of $511,230.00. A true and correct copy of the *Purchase and Sale Agreement and Joint Escrow Instructions* (the "Purchase Agreement") is attached as Exhibit "2" to the Declaration of M. Aaron Yashouafar (the "Yashouafar Declaration") annexed hereto. Pursuant to the terms of the Purchase Agreement, the Buyers deposited funds (the "Deposit") into an escrow account in connection with the anticipated purchase of Unit 924, which account is maintained by Mara Escrow Company (the "Escrow Holder").

8.     After the Petition Date, the Buyers demanded that the Purchase Agreement be terminated and that the Deposit be returned in full to them. The Buyers contend that, under the terms of the Purchase Agreement, they are entitled to unilaterally terminate the Purchase Agreement and to obtain a full refund of their Deposit. The Debtor disagrees with the Buyers and instead contends that the Buyers have forfeited the Deposit under the terms of the Purchase Agreement and that the Purchase Agreement can be legally enforced against the Buyers. The Buyers dispute the foregoing contention.

9.     Recognizing the risks, costs and delays associated with litigation, the parties engaged in good faith, arm's length settlement negotiations, which were fruitful and ultimately resulted in that certain *Settlement Agreement* (the "Settlement Agreement") attached as Exhibit "1" to the Yashouafar Declaration annexed hereto. In summary, the Settlement Agreement provides for the termination of the Purchase Agreement and allocation of the Deposit between the Buyers and the Debtor. The principal terms of the Settlement Agreement are as follows:

a.    Upon the entry of a final order (as defined in the Settlement Agreement) approving the Settlement Agreement, the Purchase Agreement shall be deemed terminated and the escrow related thereto shall be deemed cancelled.

b.    Within two (2) business days following the entry of a final order of the Court approving the Settlement Agreement, the Escrow Holder shall distribute the Deposit as follows:  (i) the Buyers shall receive the sum of $23,005.35 from the Deposit, with the check for such sum made payable to "Missagh Pezeshkian"; and (ii) the Debtor shall receive the remaining balance of the Deposit, net of any escrow fees.

c.    Each party to the Settlement Agreement shall be responsible for its/their own attorneys' fees and costs as they pertain to the Purchase Agreement and the Settlement Agreement.  However, the Debtor shall be solely responsible for any fees charged by the Escrow Holder, any lender, appraiser or any other third party, which in any way relates to or arises out of the termination of the Purchase Agreement.

d.    The parties agree to provide mutual releases of any and all claims between and among them, other than as set forth in the Settlement Agreement.

## II.    DISCUSSION

**A.    The Agreement Reflects The Sound Business Judgment Of The Debtor, Is Fair, Reasonable And Beneficial To The Estate, And Should Be Approved.**

The authority granting a debtor in possession the ability to compromise a controversy or agree to a settlement is set forth in the Federal Rules of Bankruptcy Procedure 9019(a), which provides in pertinent part that "[o]n motion by the [debtor in possession] and after hearing on notice to creditors . . ., the court may approve a compromise or settlement."  The decision of whether a compromise should be accepted or rejected lies within the sound discretion of the court.  In re Carson, 82 B.R. 847, 852 (Bankr. S.D. Ohio 1987); In re Hydronic Enterprise, Inc., 58 B.R. 363, 365 (Bankr. D.R.I. 1986); In re Mobile Air Drilling Co., Inc., 53 B.R. 605, 607 (Bankr. N.D. Ohio 1985); Knowles v. Putterbaugh (In re Hallet), 33 B.R. 564, 565 (Bankr. D.Me. 1983).

The Ninth Circuit Court of Appeals has determined that, in considering a proposed compromise, the court must evaluate (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant to it; and (iv) the paramount interests of creditors and a deference to their views.  In re A & C Properties, 764 F.2d 1377, 1381 (9th Cir. 1986).  See also In re Lion Capital Group, 49 B.R. 163 (Bankr. S.D. N.Y. 1985); Matter of Marshall, 33 B.R. 42 (Bankr. D. Conn. 1983).

A court should not substitute its own judgment for the judgment of the trustee or the debtor in possession.  Matter of Carla Leather, Inc., 44 B.R. 457, 465 (Bankr. S.D. N.Y. 1984). "It is sufficient that, after apprising itself of all facts necessary for an intelligent and objective opinion concerning the claim's validity, the court determines that either (1) the claim has a 'substantial foundation' and is not 'clearly invalid as a matter of law,' or (2) the outcome of the claim's litigation is 'doubtful'."  Matter of Walsh Const., Inc., 669 F.2d 1325, 1328 (9th Cir. 1982).  A court, in reviewing a proposed settlement, "is not to decide the numerous questions of law and fact but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  In re W.T. Grant & Co., 699 F.2d 599, 608 (2nd Cir. 1983), accord, Newman v. Stein, 464 F.2d 689, 693 (2nd Cir. 1972).  The court should not conduct a "mini-trial" on the merits of the underlying cause of action.  Matter of Walsh Const., Inc., 669 F.2d 1325, 1328 (9th Cir. 1982) ; In re Blairu, 538 F.2d 849 (9th Cir. 1976).

The Debtor submits that the Settlement Agreement with the Buyers comports with the A & C Properties standards set forth above and is in the best interests of the Debtor's bankruptcy estate and all of its creditors.  The four factors, pursuant to A & C Properties, to be considered in reaching the aforementioned conclusion, are as follows:

1.    The probability of success in the litigation.

While the Debtor believes that it could ultimately be successful in litigation with the Buyers, such result is by no means guaranteed.  For example, although the Debtor believes that the Purchase Agreement can be legally enforced against the Buyers and that the Buyers' inability

or refusal to consummate the purchase of Unit 924 results in the forfeiture of the Deposit and other additional damages, such result is not certain and would require the use of the Debtor's limited resources, potentially in an amount that exceeds the amount of the Deposit. If the Debtor litigates with the Buyers and does not prevail, the Debtor will not be entitled to receive any portion of the Deposit and may even have damages awarded against it, all after having incurred tens of thousands of dollars of attorneys' fees and costs (if not more).

2.      The difficulties in collection.

Since the Deposit is currently in the possession of the Escrow Holder, the Debtor does not believe that it would be difficult to collect a judgment against the Buyers up to the amount of the Deposit. However, the Debtor has no financial information for the Buyers. If the Debtor were to obtain a judgment against the Buyers for damages in excess of the Deposit amount, there is certainly a risk that the Debtor would not be able to collect such judgment.

3.      The complexity of the litigation involved and the expense, inconvenience and delay attendant to it.

Any litigation of the Debtor's disputes with the Buyers is certain to be costly and time-consuming, and would quickly deplete the estate's resources with no guaranteed benefit to creditors. The Settlement Agreement avoids the expense and delay associated with litigation against the Buyers, provides the Debtor with immediate cash, and is of direct benefit to creditors of the Debtor's estate.

4.      The interests of creditors.

As noted above, the Settlement Agreement will result in the estate's receipt of immediate cash, without further litigation and the expense and delay associated therewith. Under the circumstances, the Debtor believes that the benefit to its estate is significant, and the interests of creditors are best served by the approval of the Settlement Agreement.

Based on the foregoing, the Debtor respectfully submits that the Settlement Agreement is in the best interests of the estate, and requests that the Court approve the Motion.

### III.    CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1)    affirming the adequacy of the Notice given herein;

(2)    granting the Motion in its entirety;

(3)    approving the Settlement Agreement in the form attached as Exhibit "1" to the Yashouafar Declaration annexed hereto;

(4)    authorizing and directing Escrow Holder (Mara Escrow Company) to distribute the Deposit in accordance with the terms of the Settlement Agreement;

(5)    authorizing the Debtor to take all steps necessary to consummate the terms and conditions of the Settlement Agreement; and

(6)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  August 17, 2011              ROOSEVELT LOFTS, LLC


                                     By:___*/s/ Juliet Y. Oh*_____
                                          DAVID L. NEALE
                                          JULIET Y. OH
                                          LEVENE, NEALE, BENDER, YOO
                                             & BRILL L.L.P.
                                          Attorneys for Chapter 11 Debtor and
                                          Debtor in Possession

### DECLARATION OF M. AARON YASHOUAFAR

I, M. Aaron Yashouafar, hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I am the President of Roosevelt Lofts, Inc., which is the Manager of Roosevelt Lofts, LLC, a Delaware limited liability company, debtor and debtor in possession herein (the "Debtor").

3.      On April 13, 2009, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its financial affairs and operating its bankruptcy estate as a debtor in possession.

4.      The Debtor is the owner of real property located at 727 West 7th Street in Los Angeles, California, a fifteen-story architecturally significant building located in the heart of the Financial District in downtown Los Angeles (the "Building").

5.      In or about March 2006, the Debtor entered into a construction loan agreement with Bank of America, N.A., individually and as agent for a group of lenders (the "Bank"), pursuant to which the Debtor obtained a loan from the Bank in the original principal sum of $78,840,375.00 (the "Loan").  The Loan was obtained by the Debtor for the purpose of converting the Building into 222 individually subdivided, luxury residential condominium units (the "Units"), a commercial retail component on the ground floor, and parking areas which are both subterranean and above grade within the Building.

6.      On or about December 30, 2008, the Bank issued a notice of default to the Debtor, contending that the Debtor had defaulted on its obligations under the Loan.  By that time, construction on the first eight floors of the Building, including all of the Building's commercial retail space, had been completed and the Debtor had obtained a temporary certificate of occupancy.

7.      Subsequently, on April 3, 2009, the Bank filed a complaint against the Debtor and others in the Superior Court of the State of California, County of Los Angeles ("State Court")

10

for, among other things, specific performance, appointment of a receiver, and judicial foreclosure on its Deeds of Trust.  In connection with the action in State Court, the Bank made an *ex parte* application for the appointment of a receiver.

8.    As a result of all the foregoing, the Debtor sought protection under Chapter 11 of the Bankruptcy Code.

9.    Prior to the Petition Date, the Debtor, on the one hand, and Missagh Pezeshkian, Hasmik Nazarian and Avak Khachadorian (collectively, the "Buyers"), on the other hand, entered into that certain *Purchase and Sale Agreement and Joint Escrow Instructions* dated October 3, 2007, pursuant to which the Buyers agreed to purchase a Unit in the Building, specifically Unit 924, for the purchase price of $511,230.00.  A true and correct copy of the *Purchase and Sale Agreement and Joint Escrow Instructions* (the "Purchase Agreement") is attached as Exhibit "2" hereto.  Pursuant to the terms of the Purchase Agreement, the Buyers deposited funds (the "Deposit") into an escrow account in connection with the anticipated purchase of Unit 924, which account is maintained by Mara Escrow Company (the "Escrow Holder").

10.    After the Petition Date, the Buyers demanded that the Purchase Agreement be terminated and that the Deposit be returned in full to them.  It is my understanding and belief that the Buyers contend that, under the terms of the Purchase Agreement, they are entitled to unilaterally terminate the Purchase Agreement and to obtain a full refund of their Deposit.  The Debtor disagrees with the Buyers and instead contends that the Buyers have forfeited the Deposit under the terms of the Purchase Agreement and that the Purchase Agreement can be legally enforced against the Buyers.

///

///

///

///

///

11.     Recognizing the risks, costs and delays associated with litigation, the parties engaged in good faith, arm's length settlement negotiations, which were fruitful and ultimately resulted in that certain *Settlement Agreement* attached hereto as Exhibit "1."

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of August, 2011, at Los Angeles, California.


*/s/ M. Aaron Yashouafar*
M. Yashouafar, Declarant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT "1"

23
24
25
26
27
28

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT ("Agreement") is entered into as of August 11, 2011 by and between ROOSEVELT LOFTS, LLC, a Delaware limited liability company (the "Seller") and MISSAGH PEZESHKIAN, HASMIK NAZARIAN and AVAK KHACHADORIAN (collectively, the "Buyer") with respect to the following. Both the Buyer and Seller are sometimes hereinafter referred to individually as a "Party" and collectively as the "Parties."

### RECITALS

**A.**    **WHEREAS**, Buyer and Seller entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions for the Roosevelt Building (Lot 1 of Tract No. 63153), dated October 3, 2007 (the "Purchase Agreement"), wherein Buyer agreed to purchase Condominium Unit 924 (the "Property") located within that certain condominium project commonly known as The Roosevelt Residences and located at 727 W. 7th Street, Los Angeles, CA 90017 (the "Project").

**B.**    **WHEREAS**, pursuant to the terms of the Purchase Agreement, Buyer deposited funds (the "Deposit") into an escrow account in connection with the anticipated purchase of the Property, which account is maintained by Mara Escrow Co. (the "Escrow Holder").

**C.**    **WHEREAS**, on April 13, 2009, Seller filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). Seller's bankruptcy case (the "Case") is pending before the Honorable Geraldine Mund, United States Bankruptcy Judge for the Central District of California, San Fernando Valley Division (the "Court"), and bears case number 1:09-bk-14214-GM.

**D.**    **WHEREAS**, Buyer has requested that Seller refund the Deposit and terminate the Purchase Agreement. Seller contends that Buyer has forfeited the Deposit under the Purchase Agreement, and that the Purchase Agreement could legally be enforced against Buyer. Buyer disputes the foregoing contention.

**E.**    **WHEREAS**, after good faith, arm's length negotiations, in order to avoid the time and expense associated with litigation, Buyer and Seller have mutually agreed to allocate the Deposit and terminate the Purchase Agreement based upon the terms and conditions contained in this Agreement. Nothing contained herein constitutes an admission by either Party of any fact pertaining to the subject matter hereof.

### AGREEMENT

NOW THEREFORE, in consideration of the foregoing recitals which are incorporated herein by reference and the covenants contained hereinbelow, and for such other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    **Recitals**.    The Parties hereto agree that the above-stated recitals are true and correct.

2.    **Definitions**.    All capitalized terms contained herein which are not otherwise defined in this Agreement, shall have the same definition as stated in the Purchase Agreement.

Buyer: _____        Page 1 of 5        Seller: _____

AUG-Aug. 17. 2011₂ 5:33AM   d Door Real Estate 818 550 9717        To:16264457&No. 7282   P. 1ge:2/2

3.   **Termination of Purchase Agreement**. Subject to the terms hereof, upon the entry of a final order of the Court approving this Agreement, Seller and Buyer agree to terminate the Purchase Agreement. For purposes of this Agreement, a "final order" of the Court means an order of the Court that has been entered upon the docket in the Case, and as to which (i) the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and no appeal, petition for certiorari, or motion for reargument or rehearing shall then be pending, or (ii) in the event that an appeal, writ of certiorari, or reargument or rehearing has been timely sought, (a) no stay of the effectiveness of such order shall have entered by any court and be in effect, or (b) such order has been affirmed by the highest court to which such order was timely appealed or from which reargument or rehearing was sought, or certiorari has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Federal Rules of Bankruptcy Procedure may be filed with respect to such order shall not cause such order not to be a "final order."

4.   **Distribution of Deposit**. Within two (2) business days following the entry of a final order of the Court approving this Agreement Escrow Holder shall distribute the Deposit as follows: (a) Buyer shall receive an amount which equals TWENTY THREE THOUSAND FIVE DOLLARS AND THIRTY FIVE CENTS ($23,005.35), check to be made payable to "Missagh Pezeshkian," and (b) all remaining amounts held by Escrow Holder shall be paid to Seller.

5.   **Bankruptcy Court Approval**. Within five (5) business days following the execution of this Agreement by the Parties, Seller shall file a motion in the Case in accordance with Rule 9019 of the Federal Rules of Bankruptcy Procedure requesting approval by the Court of the terms of this Agreement and such other relief as is necessary to implement the terms hereof. The order approving this Agreement shall contain a specific instruction to the Escrow Holder to disburse the Deposit in the manner set forth herein.

6.   **Cooperation**. The Parties shall use their reasonable best efforts and cooperate to the extent necessary to obtain a final order from the Court approving the terms of this Agreement. The Parties shall take such reasonable additional steps as may be necessary to implement this Agreement fully, including, without limitation, by executing and delivering such additional documents as may reasonably be required to give full effect to the terms hereof.

7.   **Fees, Costs and Expenses**. Each Party hereto shall be responsible for its own attorneys' fees and costs as it pertains to the Purchase Agreement and this Agreement. Seller shall be solely responsible for any fees charged by Escrow Holder, any lender, appraiser or any other third party, which in any way relates to or arises out of the termination of the Purchase Agreement, it being the intent of the Parties that Buyer receives TWENTY THREE THOUSAND FIVE DOLLARS AND THIRTY FIVE CENTS ($23,005.35). Seller shall not seek to recover any such fees, costs or expenses against Buyer, nor shall Seller involve Buyer in any claim or dispute regarding any such expenses with any such third party. In the event that it becomes necessary to enforce the rights created by operation of this Agreement, the prevailing party in such action shall be entitled to attorneys' fees and costs as they are incurred to preserve their rights as created by this Agreement.

8.   **Releases**. This Agreement constitutes full and final settlement of all matters between the Parties. Upon full execution and delivery of this Agreement, approval of this Agreement by the Bankruptcy Court, and distribution of the Deposit by Escrow Holder, the Parties hereto do hereby fully, finally and forever release and discharge each other, their officers, directors, members, managers, contractors, subcontractors, agents, attorneys and

employees, from any and all claims, rights, liabilities, indemnities, debts, liens, demands, obligations, promises, representations, expenses, attorneys' fees, damages, losses, costs, actions, and causes of action of any kind or nature whatsoever, known or unknown, related to or arising out of the Purchase Agreement, excepting breach of the Confidentiality provisions of this Agreement. It is understood and agreed that this release extends to all past, present and future claims by the Parties, of every kind, nature and description whatsoever, known or unknown, suspected or unsuspected, related to or arising out of the Purchase Agreement. In this regard, the Parties hereto acknowledge that they are familiar with and expressly waive every right that they may have under California Civil Code Section 1542, related to or arising out of the Purchase Agreement, which states as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR. "

**9. Covenant Not to Sue**: The Parties each agree that they will not initiate any legal action or arbitration proceeding against the other party for any claim the Parties ever had, now have, or which may hereafter accrue directly or indirectly arising out of or in any manner relating to the matters released hereby.

**10. Confidentiality**. Except as is necessary in the Case, Buyer (inclusive of any broker, agent, attorneys, or other person) shall not disclose to any person, entity, blog, or other method of communication, the terms (inclusive of amounts) of the settlement reached between the Parties pursuant to this Agreement, and, except as required by law, Buyer not hereafter disclose any information concerning this Agreement to any third person, including, but not limited to, oral discussions, written correspondence, comments to periodicals or newspapers, the posting of any blogs, responses to any blogs, orally, or otherwise (irrespective of whether anonymously or otherwise). Notwithstanding anything herein to the contrary, Buyers may disclose the terms of the Agreement to their attorneys, tax advisors and spouses, provided, however, that such individuals are admonished regarding the confidential nature of the Agreement, and that the information conveyed shall not be further communicated. Furthermore, and notwithstanding anything herein to the contrary, if Buyer is asked about the status or resolution of any claims against Seller, Buyer will state no more than the following, "the matter has been resolved to my satisfaction." Any disclosure contrary to the terms hereof shall be considered a material breach of the Agreement and shall entitle Seller to sue the Buyer who violates this provision for damages sustained as a result thereof, including the attorneys' fees and costs in enforcing this provision of the Agreement. So long as Buyer does not guide or encourage others, to the extent that third parties discover the terms of this Agreement by their own research of the Court's files, then the same shall not be considered a disclosure by the Buyer contrary to the terms of this Agreement.

**11. No Admission of Liability**: This Agreement is entered into solely for the purpose of compromising and settling matters in dispute by the Parties, and to avoid the expenses and inconvenience of litigation. As such, nothing contained in this Agreement shall be reflective of the validity of the Purchase Agreement, or is intended to constitute, or be construed as, an admission by any Party of any liability, fact, matter, truth, or validity of any claims that either Party may have.

Buyer: Page 3 of 5 Seller:

**12.    Binding Effect**. The parties acknowledge that in light of the Bankruptcy Action, this Agreement shall not be binding upon them unless and until the Bankruptcy Court has approved this Agreement. Until the time of such approval, the Parties expressly reserve all of their rights, claims and defenses with respect to the Purchase Agreement and the enforcement of the terms and conditions thereof.

**13.    No Assignment; Warranty**. The Parties represent and warrant to one another that neither of them has sold, assigned, transferred, conveyed or otherwise disposed of any of the claims being released by them under this Agreement, and that each Party has the authority to enter into this Agreement.

**14.    Interpretation of Agreement**. Each of the Parties has been represented by counsel and has participated in the negotiation and drafting of this Agreement. Therefore, there is no presumption that this Agreement shall be interpreted against the drafter. This Agreement is entered into for the sole purpose of resolving the dispute between the undersigned parties. Nothing contained herein shall constitute an admission of any wrongdoing, liability or responsibility of the Parties hereto.

**15.    Successors and Assigns**. This Agreement shall be binding on the successors and assigns of each Party.

**16.    Governing Law - Venue**: This Agreement shall be governed by and construed, interpreted and enforced in accordance with and under the laws of the State of California. The proper venue for the filing of any lawsuit in connection with this Agreement shall, in the first instance, be in the Court with jurisdiction over the Case for so long as the Case remains open. Thereafter, the proper venue for the filing of any lawsuit in connection with this Agreement shall be in Los Angeles County, California.

**17.    Entire Agreement**. This Agreement contains the entire understanding between the Parties concerning the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, statements, understandings, terms, conditions, negotiations, representations and warranties, whether oral or written, made by any of the Parties concerning the matters covered by this Agreement. Without limiting the generality of the preceding sentence, each party acknowledges and agrees that no promise, inducement, agreement, representation or warranty of any kind which is not expressly set forth in this Agreement has been made to induce such Party to enter into this Agreement.

**18.    Amendment**. Neither Party shall have the right to unilaterally terminate, modify or abridge any of its respective rights or obligations under this Agreement. Neither Party shall have the right to rescind, retract, revoke, void or otherwise seek to invalidate the terms of this Agreement pending the approval of this Agreement by the Bankruptcy Court. Any amendment to this Agreement must be in writing executed by all Parties hereto.

**19.    Duplicate Originals; Counterparts; Copies**. The Parties may execute duplicate originals to this Agreement or have this Agreement executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement. In addition, a copy of a signature by the executing Party (either by facsimile, email, or other format), shall have the same force and effect as an original.

Buyer

Seller

**IN WITNESS WHEREOF**, the Parties hereby execute this Agreement as of the date indicated above, accept the amount stated herein as the sole consideration of this Agreement, and voluntarily accept said sum for the purpose of making a full and final compromise, adjustment, and settlement of all claims for the injuries, losses, damages, and any other claims resulting from the incident described herein.

<u>SELLER</u>:

ROOSEVELT LOFTS, LLC
a Delaware limited liability company

By: THE ROOSEVELT LOFTS, INC.,
        a California corporation

By: _____
        M. Aaron Yashouafar
Its:    President

<u>BUYER</u>:

_____
Missagh Pezeshkian

_____
Hasmik Nazarian

_____
Avak Khachadorian

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT "2"

23
24
25
26
27
28

UNIT: __0924__

## PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS
### FOR
### THE ROOSEVELT BUILDING
### (LOT 1 OF TRACT NO. 63153)

This Purchase and Sale Agreement and Joint Escrow Instructions (this "Agreement"), including the following Basic Provisions, General Provisions, and any Addenda attached hereto, is made by and between ROOSEVELT LOFTS, LLC a Delaware limited liability company ("SELLER"), and the undersigned buyer(s) ("BUYER"), and, when mutually executed by both BUYER and SELLER, shall constitute a binding contract between BUYER and SELLER for the purchase and sale of the hereinafter described real property, and shall also constitute instructions to MARA ESCROW COMPANY, 2555 Townsgate Road, Suite 310, Westlake Village, California 91361, telephone (805) 497-7688, facsimile (805) 497-4299, attention Michaela Zeuner ("Escrow Holder"), in connection with this Escrow, which may be subject to change upon notice of the same to BUYER.

### BASIC PROVISIONS

BUYER'S Name: __Missagh Pezeshkian and Hasmik Nazarian__ _and Avak Khachadorian_    DATE: __10/3/2007__

BUYER'S Address: __1172 Old Phillips Rd., Glendale, CA 91207__

BUYER'S Telephones: (home) __(818) 546-1784__  (work) __(818) 409-0999__  (cell) __(818) 644-0540__

BUYER'S E-mail Address: _____

Unless otherwise instructed, title to the Property shall be vested in BUYER as follows:

_____

(Note: The manner of taking title may have significant legal and tax consequences)

ESCROW NO: _____ (the "Escrow")    DOOR NO./LEGAL UNIT NUMBER: __0924__

NO. OF PARKING SPACES: __One__    (See Section 47 below)

PROPERTY ADDRESS: __727 W. 7th Street, Los Angeles, CA 90017__

BASE SALES PRICE OF PROPERTY:
(The exact amounts will be determined prior to Close of Escrow in accordance with the terms of this Agreement)    **$511,230.00**

PLUS OPTIONAL ITEMS ORDERED BY BUYER:
(Attached hereto as an addendum, if any)    **$0.00**

TOTAL SALES PRICE (The "Purchase Price"):    **$511,230.00**

TOTAL DEPOSIT REQUIRED:    **$25,561.50**

RESERVATION DEPOSIT PAID:    **$25,000.00**

DEPOSIT REMAINING TO BE PAID:    **$561.50**

REMAINING BALANCE TO BE PAID:    **$485,668.50**
(Not including such other amounts to be paid in accordance with the terms of this Agreement)

ESTIMATED CLOSING DATE: __11/1/2007__

BUYER'S BROKER : __Lola Terpapian__    EMAIL: __lterapian@milbank.us__

BROKER COMPANY: __Milbank Real Estate Services__    TEL: __(213) 216-1217__  FAX: __(818) 789-3100__

ADDRESS: __16661 Ventura Blvd. Suite 660, Encino, CA 91436__

BUYER
06-12 07

Page 1 of 25

SELLER

UNIT: __0924__

For the consideration herein stated, BUYER agrees to purchase and SELLER agrees to sell the Property, as set forth above, and other real property as described in the grant deed (the "Grant Deed") attached hereto as <u>Exhibit "A"</u> and incorporated herein by this reference (the "Property"), located in the City of Los Angeles, County of Los Angeles, State of California, which is part of that certain subdivision project known as THE ROOSEVELT BUILDING (the "Project"), for the total purchase price as provided herein above (the "Purchase Price"), to be paid to SELLER by BUYER in cash through Escrow at the Close of Escrow. Concurrently with the execution of this Agreement, BUYER shall deliver to SELLER a deposit as herein provided above (the "Deposit"). SELLER shall deliver the Deposit to Escrow Holder, and such Deposit shall be subject to the Liquidated Damages Provision contained in Paragraph 11 herein.

## GENERAL CONDITIONS

1.      <u>TITLE</u>.  BUYER agrees to pay into Escrow the balance of the Purchase Price (plus such other amounts which may become due or owing pursuant to the terms of this Agreement) prior to the date scheduled for the Close of Escrow. SELLER will deliver to Escrow Holder, a Grant Deed conveying title to the Property to BUYER, and BUYER and SELLER will timely deliver to Escrow Holder all additional funds and documents required of them, respectively, to enable Escrow Holder to comply with these joint escrow instructions and to consummate this transaction, all of which Escrow Holder is authorized to use and/or deliver when all provisions and conditions of this Escrow have been complied with and Escrow Holder holds in this Escrow the money and documents called for under these instructions and can obtain a title company's standard CLTA Owners Policy of title insurance with a liability limit equal to the Purchase Price showing title vested in BUYER as specified above (the "Title Policy"), subject only to:

(a)      Non-delinquent real and personal property taxes and assessments;

(b)      The lien of supplemental taxes, if any are assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California, as the same may be amended;

(c)      Covenants, conditions, restrictions, reservations, easements, rights and rights of way of record or to be recorded in connection with the development of the Project, as they may be amended from time to time;

(d)      That certain Declaration of Establishment of Conditions, Covenants and Restrictions for The Roosevelt BUILDING, as to be recorded in the Official Records of Los Angeles County, California (the "Declaration"), as they may be amended from time to time;

(e)      Any easements and other matters reserved to SELLER in the Grant Deed by which SELLER conveys the Property to BUYER; and

(f)      Any encumbrance or other matter recorded in connection with any financing obtained by BUYER to finance the Purchase Price.

2.      <u>FINANCING</u>.  BUYER agrees to purchase the Property from SELLER on an all-cash basis.

(a)      IN THE EVENT THAT BUYER DESIRES TO SEEK FINANCING FOR THE PURCHASE OF THE PROPERTY, BUYER AGREES TO FIRST ATTEMPT TO SECURE SUCH FINANCING FROM SELLER'S PREFERRED LENDER AS FOLLOW:

(i)      BUYER SHALL MEET AND COMPLY WITH SUCH REQUIREMENTS SUBMITTED BY WELLS FARGO HOME MORTGAGE, ATTENTION: MR. ROBERT COHAN, 224 N. CANON DRIVE, BEVERLY HILLS, CALIFORNIA 90210, TELEPHONE: (866) 912-5629, FACSIMILE: (866) 359-0669 (THE "SELLER'S PREFERRED LENDER"), AND AT BUYER'S SOLE EXPENSE, SECURE A NEW FIRST TRUST DEED IN FAVOR OF  SELLER'S PREFERRED LENDER, IN SUCH AMOUNT NECESSARY TO PURCHASE THE PROPERTY. BUYER SHALL MAINTAIN A CURRENT AND OPEN FILE WITH SELLER'S PREFERRED LENDER  BUYER'S EXECUTION OF THE LOAN DOCUMENTS SHALL EVIDENCE BUYER'S FULL APPROVAL OF THE TERMS AND CONDITIONS CONTAINED HEREIN.

(ii)      NO LATER THAN TEN (10) BUSINESS DAYS FROM BUYER'S RECEIPT OF SUCH APPLICABLE DOCUMENTATION PROVIDED BY SELLER'S PREFERRED LENDER, BUYER SHALL PROVIDE TO SELLER'S PREFERRED LENDER ANY AND ALL INFORMATION NECESSARY TO COMPLETE AN APPLICATION FOR APPROVAL OF CREDIT BY SELLER'S PREFERRED LENDER.

(iii)      BUYER COVENANTS TO PROVIDE SUCH PERSONAL FINANCIAL STATEMENTS OR OTHER CREDIT INFORMATION REQUIRED BY SELLER'S PREFERRED LENDER SO AS TO ALLOW SELLER'S PREFERRED LENDER TO ASSESS BUYER'S CREDITWORTHINESS AND ABILITY TO CONSUMMATE THE



UNIT: __0924__

TRANSACTION CONTEMPLATED BY THIS AGREEMENT. IF BUYER IS UNABLE OR UNWILLING TO OBTAIN SUCH A LOAN FROM SELLER'S PREFERRED LENDER, THEN BUYER SHALL BE OBLIGATED TO PURCHASE THE PROPERTY ON AN ALL-CASH BASIS, OR SEEK ALTERNATIVE FINANCING, NEITHER OF WHICH SHALL BE A CONDITION TO CLOSING, OR BUYER'S REQUIREMENT TO PURCHASE THE PROPERTY.

     (b)     FINANCING FROM A THIRD-PARTY LENDER:

     (i)     BUYER HEREBY ACKNOWLEDGES AND AGREES THAT IN THE EVENT THAT BUYER DOES NOT PURCHASE THE PROPERTY FOR ALL-CASH, AND IF BUYER ELECTS TO APPLY FOR THIRD PARTY FINANCING (AFTER FIRST ATTEMPTING TO APPLY WITH SELLER'S PREFERRED LENDER), BUYER'S OBLIGATION TO OBTAIN ANY SUCH FINANCING AND PROCEED WITH THE TIMELY CLOSING OF ESCROW WILL NOT BE A CONTINGENCY, NOR WILL ESCROW BE EXTENDED FOR ANY PURPOSE RELATED TO BUYER'S ATTEMPT TO SECURE FINANCING. IN THE EVENT THAT BUYER FAILS TO QUALIFY FOR OR RECEIVE THIRD PARTY FINANCING, AND THEN FAILS TO CLOSE THE ESCROW FOR THAT REASON, BUYER WILL BE DEEMED TO BE IN DEFAULT OF THIS AGREEMENT AND IN ADDITION TO ANY OF SELLER'S OTHER REMEDIES UNDER THIS AGREEMENT, SELLER MAY CANCEL THIS ESCROW AND BE RELIEVED OF ANY AND ALL OBLIGATIONS HEREUNDER. IN SUCH EVENT, AND AT MINIMUM, THE PROVISIONS OF PARAGRAPH 11 HEREOF PERTAINING TO DEFAULT AND LIQUIDATED DAMAGES SHALL APPLY.

     (ii)     ESCROW HOLDER IS HEREBY SPECIFICALLY AUTHORIZED AND INSTRUCTED NOT TO FORWARD ANY DOCUMENTS TO A THIRD PARTY LENDER, INCLUDING BUT NOT LIMITED TO, THIS AGREEMENT, COPY OF BUYER'S EARNEST MONEY DEPOSIT AND/OR RECEIPT, PRELIMINARY TITLE REPORT, AND/OR ANY OTHER DOCUMENTS WITHOUT THE EXPRESS WRITTEN CONSENT OF SELLER. IN ADDITION, BUYER HEREBY AUTHORIZES AND INSTRUCTS THIRD PARTY LENDER, IF ANY, TO FULLY DISCUSS EVERY ASPECT OF BUYER'S LOAN, INCLUDING BUT NOT LIMITED TO THE TERMS, CONDITIONS, STATUS, ETC. WITH SELLER, ESCROW HOLDER, AND SELLER'S PREFERRED LENDER. FAILURE OF SAID THIRD PARTY LENDER TO COOPERATE WITH THIS INSTRUCTION SHALL GIVE SELLER THE RIGHT, BUT NOT THE OBLIGATION TO CANCEL THIS TRANSACTION AND BE RELIEVED OF ALL OBLIGATIONS HEREUNDER, EXCEPT THE OBLIGATION TO REFUND BUYER'S DEPOSIT. SELLER MAY EXERCISE ITS RIGHTS TO TERMINATE THIS AGREEMENT, AS STATED HEREIN, BY PROVIDING TO ESCROW HOLDER SELLER'S CANCELLATION INSTRUCTIONS REGARDING SAID TERMINATION, WHICH ESCROW INSTRUCTIONS SHALL NOT REQUIRE ANY FURTHER EXECUTION OR CONSENT BY BUYER.

     IF BUYERS CHOOSES TO APPLY FOR THIRD PARTY FINANCING, BUYER MUST NOTIFY SELLER WITHIN THE LATER TO OCCUR OF EITHER: (1) THIRTY (30) DAYS PRIOR TO THE ESTIMATED CLOSING DATE; OR (2) FORTY-EIGHT (48) HOURS OF SELLER'S ACCEPTANCE OF THIS AGREEMENT; AND MUST OBTAIN A WRITTEN UNCONDITIONAL LOAN COMMITMENT FROM BUYER'S LENDER AND DEPOSIT SAME INTO ESCROW WITHIN TWENTY (20) DAYS OF THE DATE HEREOF. IF BUYER DOES NOT NOTIFY SELLER AND LENDER IN WRITING WITHIN THE TIME SET FORTH IN THIS SUBPARAGRAPH, OR IF BUYER FAILS TO OBTAIN THE LOAN COMMITMENT AS DESCRIBED IN THIS SUBPARAGRAPH, THEN WITHOUT ANY REQUIREMENT OF FURTHER NOTICE OR OTHERWISE: (A) BUYER SHALL BE DEEMED TO BE IN DEFAULT UNDER THIS AGREEMENT AND WILL BE LIABLE FOR THE AMOUNT OF THE DEPOSIT AS LIQUIDATED DAMAGES (AS MORE SPECIFICALLY SET FORTH PURSUANT TO THE PROVISIONS OF PARAGRAPH 11 HEREOF; AND (B) THIS AGREEMENT MAY BE TERMINATED AT SELLER'S SOLE OPTION.

**BUYER'S Initials**      **SELLER'S Initials**

     (iii)     IT IS UNDERSTOOD AND AGREED THAT THE OBTAINING OF ANY FINANCING WHATSOEVER IS AND SHALL REMAIN THE BUYER'S AND NOT SELLER'S OBLIGATION. SELLER DOES NOT GUARANTEE THE AVAILABILITY OF ANY LOAN TO BUYER FROM ANY LENDER.

     (iv)     ESCROW IS AUTHORIZED AND INSTRUCTED TO FOLLOW THE DIRECTION OF THE SELLER'S PREFERRED LENDER IN CONNECTION WITH BUYER'S LOAN AND TO DELIVER A COPY OF THIS AGREEMENT AND ANY AMENDMENTS OR ADDENDA THERETO TO SELLER'S PREFERRED LENDER.

     (v)     THIS TRANSACTION IS NOT CONTINGENT UPON BUYER'S ABILITY TO RETAIN THE INTEREST RATE (FIXED OR ADJUSTABLE) AND/OR OTHER LOAN TERMS, INCLUDING BUT NOT LIMITED TO LOAN ORIGINATION FEES QUOTED AT THE TIME OF LOAN APPROVAL, AND BUYER WILL BE REQUIRED TO PAY THE INTEREST RATE CHARGED BY THE LENDER AT THE CLOSE OF ESCROW.

     (vi)     IN THE EVENT THAT BUYER OBTAINS BUYER'S NEW FINANCING FROM SELLER'S PREFERRED LENDER AND BUYER CLOSES THIS ESCROW ON OR BEFORE THE CLOSING DATE AS SET FORTH



UNIT: __0924__

HEREIN, THEN AT THE CLOSE OF ESCROW, ESCROW HOLDER IS HEREBY AUTHORIZED AND INSTRUCTED TO DEBIT THE SELLER AND CREDIT THE BUYER IN AN AMOUNT EQUAL TO THREE PERCENT (3%) OF THE TOTAL PURCHASE PRICE, WHICH AMOUNT BUYER SHALL APPLY TOWARDS BUYER'S CLOSING COSTS.  IN THE EVENT HOWEVER, THAT BUYER DOES NOT OBTAIN ITS NEW FINANCING FROM SELLER'S PREFERRED LENDER, BUT PROCEEDS WITH THE CLOSING OF ESCROW ON OR BEFORE THE CLOSING DATE AS SET FORTH HEREIN, THEN AT THE CLOSE OF ESCROW, ESCROW HOLDER IS HEREBY AUTHORIZED AND INSTRUCTED TO DEBIT THE SELLER AND CREDIT THE BUYER IN AN AMOUNT EQUAL TO TWO AND ONE HALF PERCENT (2.5%) OF THE TOTAL PURCHASE PRICE, WHICH AMOUNT BUYER SHALL APPLY TOWARDS BUYER'S CLOSING COSTS.

(vii)     IN THE EVENT THAT BUYER APPLIES FOR A LOAN FROM A THIRD PARTY LENDER, BUYER WILL PROVIDE A COPY OF BUYER'S CREDIT PACKAGE AND APPRAISAL DOCUMENTS TO SELLER'S PREFERRED LENDER WITHIN TEN (10) DAYS AFTER THE DATE OF SUBMISSION TO THE THIRD PARTY LENDER.

(viii)    IN THE EVENT OF CANCELLATION, DUE TO THE INABILITY OF BUYER TO OBTAIN FINANCING FOR THE PURCHASE OF THE PROPERTY, BUYER SHALL BE DEEMED IN DEFAULT OF THIS AGREEMENT AND BUYER'S DEPOSIT SHALL BE SUBJECT TO THE LIQUIDATED DAMAGES PROVISIONS OF PARAGRAPH 11 HEREOF, AND ESCROW HOLDER SHALL, WITHIN FIVE (5) DAYS AFTER DATE OF CANCELLATION, DISBURSE TO SELLER ALL FUNDS DEPOSITED BY BUYER IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, AND THEREAFTER, BUYER AND SELLER SHALL BE RELEASED OF ANY AND ALL LIABILITY HEREUNDER.

(c)     BUYER UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT BUYER WILL BE OBLIGATED TO PAY THE PURCHASE PRICE TO SELLER ON AN ALL CASH BASIS ON THE CLOSING DATE, AND THAT BUYER WILL BE SOLELY RESPONSIBLE FOR MAKING BUYER'S OWN FINANCIAL ARRANGEMENTS IN ORDER TO ENABLE BUYER TO PAY THE PURCHASE PRICE TO SELLER FOR THE PROPERTY.  THE FACT THAT BUYER MAY BE DEPENDING ON A FINANCING (CONSTITUTING A "LOAN") FROM EITHER THE SELLER'S PREFERRED LENDER OR BY A THIRD PARTY (COLLECTIVELY, A "LENDER") TO BE SECURED BY A DEED OF TRUST, OR DEPENDING ON A LENDER TO FUND THE LOAN, SUCH SHALL NOT BE A CONTINGENCY OR CONDITION PRECEDENT WITH RESPECT TO THIS AGREEMENT.  IN ADDITION, BUT NOT IN LIMITATION TO THE FOREGOING, THE FOLLOWING PROVISIONS SHALL APPLY TO ANY LOAN WHICH IS ANTICIPATED OR ACTUALLY OBTAINED BY BUYER IN CONNECTION WITH THIS AGREEMENT.

(i)     On or before the ninetieth (90th) day prior to the Closing Date (or Estimated Closing Date, if used), Buyer shall have obtained and delivered to Seller, (1) written proof of Buyer's receipt of final approval from a Lender for any applicable Loan, or (2) such other evidence as Seller may require evidencing Purchaser's ability to satisfy its purchase obligations under this Agreement at the Close of Escrow (the "Final Loan Approval").

(ii)     Buyer hereby authorizes Seller to be in direct contact and communication with any Lender to be used by Buyer, without any further notice to Buyer, in order to:  (i) obtain the status of the Loan; (ii) determine whether Buyer will qualify for the Loan; (iii) determine when and whether the Loan will be ready for funding when due; and (iv) obtain any other information which Seller deems reasonably necessary in connection with the terms of this Agreement and the obligations of the Buyer under this Agreement.

(iii)     Any delay in the Closing, whether related to Buyer's inability to obtain a Loan, or otherwise, for any reason other than an uncured material default by Seller, shall cause Seller to incur substantial damages. SELLER, IN ITS SOLE DISCRETION, AND OTHERWISE SUBJECT TO A LATER CANCELLATION OF THIS AGREEMENT (OR OTHER CANCELLATION RIGHT AS PROVIDED IN THIS AGREEMENT) MAY AGREE TO EXTEND THE CLOSING DATE, UNDER THE CONDITION THAT BUYER PAY AN INCREASE IN THE PURCHASE PRICE IN AN AMOUNT EQUAL TO EITHER SIX HUNDRED FIFTY DOLLARS ($650.00) PER DAY IN THE EVENT THE PURCHASE PRICE FOR THE UNIT IS LESS THAN $950,000, OR ONE THOUSAND DOLLARS ($1,000.00) PER DAY IN THE EVENT THE PURCHASE PRICE FOR THE UNIT EQUALS OR EXCEEDS $950,000, FOR EACH CALENDAR DAY AFTER THE CLOSING DATE, THAT THE CLOSING DOES NOT OCCUR. SELLER AND BUYER AGREE THAT SELLER'S DAMAGES RESULTING FROM A DELAY IN THE CLOSING ARE DIFFICULT TO ASCERTAIN AS OF THE EXECUTION OF THIS AGREEMENT, AND THEREFORE, THE INCREASE IN THE PURCHASE PRICE AS SET FORTH HEREIN IS THE ONLY MEANS BY WHICH THE PARTIES CAN REASONABLY ESTIMATE THE DAMAGES WHICH SELLER SHALL INCUR IN THE EVENT CLOSING IS DELAYED BEYOND THE ORIGINAL CLOSING DATE SET BY SELLER. AS SUCH, THE INCREASE IN PURCHASE PRICE SHALL BE DEEMED LIQUIDATED DAMAGES, AND NOT A PENALTY. THIS REMEDY WHICH IS AVAILABLE TO SELLER IS CUMULATIVE, AND NOT EXCLUSIVE TO ANY OTHER REMEDY OR RIGHT AFFORDED TO SELLER UNDER THIS AGREEMENT *Any Condition outside of our Control & we won't be responsible for* ↙ *any additional fees or penalty* ⊕ ⊕ ⊕ ✗.

(iv)     Notwithstanding, and without limiting any other provision of this Agreement, if Buyer fails to provide Seller with the Final Loan Approval, obtain the Loan, or proceed with the Closing, for any reason other than an



UNIT: __0924__

uncured default of Seller, such action or inaction (as the case may be), shall constitute a material default and possible breach of this Agreement.  In such an event, if Buyer fails to cure such default within three (3) days after receipt of written notice from Seller, Seller may, at Seller's option, terminate this Agreement and instruct Escrow Holder to immediately release the Deposits to Seller as liquidated damages as set forth in Paragraph 11.  Seller's right to cancellation of this Agreement shall be in addition to any other right or remedy available to Seller under this Agreement.

3.      EXECUTION OF DOCUMENTS BY BUYER.  BUYER agrees that not later than five (5) days after demand, BUYER will execute any and all documents which SELLER or SELLER'S PREFERRED LENDER or Escrow Holder may deem necessary or desirable and pay all cash required of BUYER in order to consummate this sale.  If, within five (5) days after such demand, BUYER has not executed documents as requested and paid such cash as required, SELLER may, at SELLER'S option and without liability to SELLER, terminate BUYER'S rights herein and SELLER shall be released of and from any obligation to sell the Property to BUYER and may place the Property back on the market "for sale." In such event, the provisions of Paragraph 11 hereof, if applicable, shall apply.

4.      PROPERTY OWNERS ASSOCIATION; ASSESSMENTS.

(a)     THE ROOSEVELT BUILDING OWNERS' ASSOCIATION ("Owners' Association") will be established prior to the Close of Escrow, for the purpose of preserving, operating and maintaining certain Association Property Improvements (each as defined in the Declaration) within the Project, and BUYER hereby agrees to become a member of the Owners' Association and to accept and abide by the terms and conditions of the Declaration, the Articles of Incorporation and Bylaws of the Owners' Association (as they may be amended from time to time), and all agreements entered into by the Owners' Association.  BUYER further acknowledges that the Property is subject to assessments for the maintenance and operation of the Association Property as set forth in the Budget approved by the Department of Real Estate billed per month ("Monthly Assessments").  From BUYER'S funds deposited into Escrow, Escrow Holder is hereby instructed to credit the SELLER with a proration of the Monthly Assessment installments which SELLER has paid for the month in which Escrow is closed, from the Close of Escrow to the first day of the following month (if assessments have commenced prior to the Close of Escrow), and to pay to the Owners' Association the following month's Monthly Assessment installment in advance.

(b)     Upon acquisition of record title to a Condominium from a Seller, each Buyer of a Condominium shall contribute to the capital of the Association an amount equal to two (2) months' Annual Assessment installments for Buyer's Unit.  This amount shall be deposited by the Buyer into Escrow and distributed therefrom to the Association or to Seller if Seller has previously advanced such funds to the Association.  Such capital contributions shall be deposited into the Association's working capital account and Seller shall be prohibited from using any of such capital contributions to defray any of its expenses, reserve contributions, or construction costs, or to make up any budget deficits while it is in control of the Association.

5.      PRORATIONS.  Prorations and adjustments shall be made on the basis of a 30-day month on the following items as of the Close of Escrow and shall be made by Escrow Holder as of the date BUYER is given possession (provided SELLER and BUYER advise Escrow Holder in writing, prior to Close of Escrow, of the date such possession by BUYER commences) or upon the Close of Escrow, whichever shall first occur:

(a)     Taxes, based on the latest figures available to Escrow Holder, including all items appearing on tax bills except taxes on property not subject to this Escrow.  Escrow Holder is hereby authorized and instructed to prorate property taxes based upon an annual amount to be computed in accordance with the following formula: the Total Sales Price (as set forth herein or as amended by mutual instruction) shall be multiplied by 1.25% (0.0125).  The resulting amount shall equal the "Annual Proration Amount."  Escrow Holder shall use the Annual Proration Amount to prorate real property taxes from the Close of Escrow to July 1st of the fiscal tax year in which this transaction closes (debit BUYER and credit SELLER).  BUYER and SELLER acknowledge that they are aware there is a possibility of additional tax amounts, which may be assessed by the County Assessor after the Close of Escrow due to improvements made to the Property and the transfer of title, and BUYER agrees to be responsible for any additional tax amounts due as a result of such assessment.  SELLER will reimburse BUYER if the Annual Proration amount exceeds the actual tax amounts.

(b)     Monthly Assessments (based upon the amount set forth in Paragraph 4 above) due to the Owners' Association pursuant to the amount set forth in the DRE-approved budget.

(c)     A one over two hundred twenty-two (1/222) portion of the master fire insurance policy for the Project from the Close of Escrow to the date of expiration of the policy

Maintenance figures in the budget for maintenance and operational expenses represent the estimated operating expenses for the first twelve (12) months of operation of the Association and said budget has been approved as submitted to the California Department of Real Estate.  However, because of inflation and general increases in costs of operation, the amount specified in the budget may or may not be sufficient to pay the first year's expenses of operation of the Project.



UNIT:  **0924**

Buyers shall also pay through Escrow, at Close of Escrow, the full maintenance fee for the month following the month in which Escrow closes.   At the Close of Escrow, Escrow Holder shall transmit to the Association the maintenance fee received from Buyers.

      6.      CLOSING COSTS.  From funds held for SELLER'S account, Escrow Holder shall pay premiums for the Title Policy (California Land Title Association Standard Coverage Policy), and SELLER'S Escrow fees and charges.  Escrow Holder is authorized to pay any encumbrances necessary to place title in the condition called for in Paragraph 1 and SELLER will hand Escrow Holder any funds or instruments required for such purpose.

      BUYER shall provide Escrow Holder with sums sufficient to pay for City and County documentary transfer tax on the Grant Deed, recording the Grant Deed and charges customarily borne by buyers, including, but not limited to, costs of credit report, ALTA lender's title insurance policy, fees and charges in connection with wire transfer of funds, tax service, loan fees, impounds as may be required by the lender, prorations, and advance payment of assessments, and BUYER'S Escrow fees and charges.  In addition, BUYER shall pay SELLER, at the Close of Escrow, a fee for move-in related expenses in the sum of Two Hundred Dollars ($200.00).  This amount shall cover expenses and fees incurred by Seller, including but not limited to any damages to the Project as a result of any activity that may occur during Buyer's move into Buyer's Unit, Seller's expense to have building personnel on-site during Buyer's move in, if necessary, and other expenses incurred by Seller, provided that this fee shall not (i) be refundable under any circumstances,  (ii) limit Seller's damages if Seller incurs any damage in excess of such fee as a result of Buyer's activities, and (iii) create any obligation by Seller to engage any on-site personnel at the Project during Buyer's move-in.

      7.      COMPLETION OF RENOVATION AND REHABILITATION.  If the Escrow is not closed on the date provided in Paragraph 8 below, because renovation and rehabilitation of the Property is not completed or ready for occupancy at such time, then BUYER and SELLER shall agree in writing to an extension of the Escrow until such then reasonably anticipated closing date.  By execution of this Agreement, BUYER agrees that, should SELLER fail to complete, or choose not to complete, the Property within two (2) years from the date of this Agreement, BUYER'S remedies shall be limited to termination of this Agreement and demand to Escrow of a refund of such amounts deposited into Escrow by BUYER, without deduction, within fifteen (15) calendar days.  SELLER MAKES NO REPRESENTATION AS TO THE ACTUAL DATE OF COMPLETION OF RENOVATION AND REHABILITATION, AND SELLER WILL NOT BE RESPONSIBLE FOR ANY INCONVENIENCE, LOSS OR EXPENSE TO BUYER RESULTING FROM DELAYS IN COMPLETION OF SUCH RENOVATION AND REHABILITATION.  BUYER ACKNOWLEDGES THAT, PRIOR TO THE CLOSE OF ESCROW, SELLER MAY MAKE CERTAIN MATERIAL CHANGES IN THE LEGAL DOCUMENTS DESCRIBED BELOW IN PARAGRAPH 17 AND CHANGES IN PLANS FOR DEVELOPMENT OF THE PROJECT, OR CHANGE THE MANNER OR CONTENT OF THE OFFERING OF UNITS IN THE PROJECT.  IF PRIOR TO THE CLOSE OF ESCROW ANY OF THE DESCRIBED MATERIAL CHANGES OCCUR, SELLER WILL PROVIDE BUYER WITH WRITTEN NOTICE OF THE SAME, AND BUYER AGREES THAT BUYER'S SOLE REMEDY AT THAT TIME WILL BE TO TERMINATE THIS AGREEMENT, REQUEST CANCELLATION OF ESCROW AND RECEIVE A FULL REFUND OF ALL AMOUNTS DEPOSITED HEREUNDER.  ANY ESCROW CANCELLATION FEES IN EITHER OF THE ABOVE EVENTS SHALL BE THE EXPENSE OF SELLER.

      (a)      Plans and Specifications.  Seller intends to construct the Unit and the Project in such a manner so as to be reasonably similar to the plans and specifications kept in Seller's office, as such plans and specifications may be amended from time to time, and subject to various normal and acceptable tolerances and pursuant to standard building practices found pursuant to the Adaptive Reuse Ordinance of the City of Los Angeles.  Seller may make any changes in the plans and specifications that Seller deems to be appropriate at any time, subject only to its own sole discretion, in an effort to comply with supply availability, labor requirements, or other factors necessary to allow Seller to accommodate its "in the field" construction needs, which may include response to recommendations or requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility or insurance providers.  Such plans and specifications, as they are so amended, are referred to in this Agreement as the "Plans and Specifications", and may be inspected by Buyer at Seller's office, after reasonable written notice to Seller.  Without limiting Seller's general and absolute right to make those changes which it deems appropriate, fit, or for the better interest of the Condominium Project as a whole, the Unit, or other particular units, Buyer specifically agrees that the changes described above, and any other changes which may become necessary, which would alter the dimensions of rooms, terraces, location of windows, doors, walls, partitions, utility (including, but not limited to, television, telephone, cable, computer modem) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes, and in the general layout of the Unit and/or the Condominium Project may be made by Seller  in its sole discretion, without the requirement of any form of notice or disclosure to Buyer.  In furtherance of the understanding and agreement stated above, Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs.  These changes and adjustments are essential in order to permit all components of the unit and the building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner.  Because of the foregoing, Buyer acknowledges and agrees that it is to Buyer's benefit to allow Seller the flexibility to make such changes in the Unit and/or the Condominium Project.  Purchaser further acknowledges and agrees that:  (i) the plans and specifications for the Unit, the Condominium Project on file with the applicable governmental authorities may not, initially, be identical in detail to the Plans and Specifications; and (ii) because of

BUYER
06-12-07

SELLER

the day-to-day nature of the changes which may be made to the Unit and/or the Condominium Project as described herein, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes, as there may not in all instances be a legal requirement to file all changes with such authorities. As a result of the foregoing, Seller and Buyer both acknowledge and agree that: the Unit and/or the Condominium Project may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities. Without limiting the generality of anything contained in this Agreement, Seller disclaims and Buyer waives any and all express or implied warranties that renovation and rehabilitation will be accomplished in compliance with such plans and specifications. Both Seller and Buyer hereby expressly acknowledge and represent that Seller has not given, and Buyer has not relied upon or bargained for, any such warranties.  Without limiting the generality of anything contained in this Agreement, Seller does not make any representation or warranty as to the level of sound transmission between and among Units and the other portions of the Project, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damages resulting from any sound transmission.

(b)     Renovation and Rehabilitation Schedule.  In constructing the Unit and Condominium Project, Seller shall endeavor to employ its normal renovation and rehabilitation schedule, which may be subject to delays caused by third parties, Buyer, Seller, or Force Majeure events (as defined below). Seller and Buyer recognize, and hereby acknowledge and agree, that it is not possible to agree upon a specific date of completion of the Unit as of the execution of this Agreement. As such, Buyer expressly acknowledges and represents that Seller has not made any form of oral or written representation, warranty, guaranty, or commitment to any exact completion date or schedule other than as expressly set forth herein. Accordingly, any failure to complete the Unit or Condominium Project by the Estimated Closing Date, or Buyer's desired or anticipated completion date, shall not excuse Buyer from full performance of all the terms and conditions of this Agreement, allow for any further delays by Buyer, or give Buyer the right to terminate this Agreement and Seller shall not be liable to Buyer for any damages whatsoever, including without limitation, those resulting from Seller's inability or failure to complete the Unit except for those provided for in this Agreement.  As used in this Agreement, "Force Majeure" means any delay caused by war, acts of terrorism, insurrection, strikes, lockout, riots, floods, earthquakes, fires, casualties, acts of God, acts of public enemies, epidemics, quarantine restrictions, governmental restrictions or moratoriums, acts or failures to act of any governmental authority or major utility company, unusually severe weather, shortage of materials, shortage of qualified laborers, bankruptcy of contractors, subcontractors or materialmen, or any other similar cause which may be beyond the control of, without the fault of, or unforeseeable by Seller

(c)     Unit Finishes.  The interior finishes for the Unit may be modified by Seller in its sole and absolute discretion.  Buyer understands, acknowledges, and agrees that this Agreement does not contemplate the renovation and rehabilitation of an individually designed Unit, except to the extent that there is a subsequent written addendum to this Agreement executed by both Seller and Buyer which specifically sets forth the details of specific finishes within the Unit.  As such, Buyer agrees that Buyer will not make any demand for, or seek any, additional features, amenities, appliances, fixtures, finishes, or other form of change or adjustment to the Unit finishes or Seller's anticipated plans or specifications for the Unit (as may be changed or amended in accordance with the terms of this Agreement). Likewise, Buyer understands, acknowledges, and agrees that Seller has made no specific representation or warranty regarding any form of finish, appliance, or detail within the Unit.  Seller may, but is not obligated to provide Buyer with a choice of materials, fixtures and finishes being offered by Seller and available for installation in the Unit ("Feature Items").  Buyer understands and agrees that Seller is under no obligation to provide Buyer with any extras, options, upgrades, or any form of customization with respect to the Unit, and that any renderings, samples, drawings, brochures, website materials, or other information which may have been provided to Buyer, have all been for informational purposes only, and are not to be considered as a final product, finish, or detail which will be included within the Unit, which Seller specifically hereby advises Buyer that all such products, finishes, and details are subject to change as provided herein.

8.     CLOSE OF ESCROW.  Subject to the provisions of this Agreement, Escrow shall close ("Closing Date") on the later to occur of either, (i) the tenth (10th) calendar day after BUYER is advised by SELLER or Escrow Holder that the Temporary Certificate of Occupancy ("TCO") or other Final Certificate of Occupancy has been received for the Property and that the Property is ready for occupancy, or (ii) thirty (30) days after the date hereof; or any extension thereof agreed to in writing by the parties ("Close of Escrow").  The SELLER'S determination that the Property is ready for occupancy shall be binding upon BUYER, provided that the TCO has been issued or the entire project completed with the issuance of a Final Certificate of Occupancy. BUYER agrees that if escrow does not close within thirty (30) days after the Closing Date, BUYER'S sole remedy shall be to terminate this escrow and obtain a refund of such funds deposited by BUYER in Escrow, except that Escrow Holder shall disburse from BUYER'S funds amounts required to pay for items demanded by the Escrow Holder.  In the event Escrow Holder should record or transmit any documents after the date for consummation of the Escrow, but prior to the receipt by Escrow Holder of any demand for termination by either of the parties, Escrow Holder shall be held harmless and free from any and all liability on account thereof by the parties hereto.  The BUYER'S rights with respect to the physical condition of the Property shall be governed by Paragraph 9 below.  BUYER agrees to execute and deposit into Escrow all documents as required by the lender, Escrow Holder and SELLER and to deposit into Escrow the balance of funds needed to close this Escrow (exclusive of any financing to be obtained by BUYER) no later than two (2) business days prior to the Closing Date.



In the event that BUYER is unable or unwilling to close said Escrow within such period, through no fault of SELLER, BUYER shall pay to SELLER, upon his written demand therefor, at such subsequent date that the Escrow does close, a sum of money equal to such amounts set forth in Paragraph 2(c)(iii) of this Agreement.

BUYER'S obligation to act to enable this Escrow to close within ten (10) calendar days following receipt of such notification shall in no way be affected by the status of the renovation and rehabilitation throughout the balance of the Project. BUYER hereby acknowledges that renovation and rehabilitation may be proceeding in other Units and in the Association Property at the Close of Escrow.

This Escrow shall not close, funds shall not be released and title shall not be conveyed to BUYER until each of the following conditions has been met:

(a)        Any and all blanket encumbrances, as defined in California Business and Professions Code Section 11013, affecting the Property have been released and the statutory period for recordation of all mechanic's lien claims has expired, or the Title Policy shall include an endorsement insuring BUYER and the Association against unrecorded mechanic's liens; and

(b)        Any or all monetary encumbrances of record prior to the recording of the Declaration have been subordinated to the Declaration; and

(c)        All common facilities and improvements in the Project have been completed, as evidenced by a Notice of Completion (as defined in Civil Code Section 3093) being recorded covering all the foregoing improvements; and either (i) the statutory period for recordation of all mechanic's lien claims has expired, or (ii) the BUYER and the Association are provided with policies of title insurance with endorsements against mechanic's liens; OR

BUYER'S funds may be released from Escrow after conveyance of title, upon completion of all such common facilities and improvements, but prior to expiration of the statutory period of mechanics' lien claims pertinent to said Project, if SELLER has provided that each such purchaser of a Unit shall receive a policy of title insurance with provisions guaranteeing the purchaser against any mechanics' liens affecting the purchaser's Property that may arise during the applicable statutory mechanics' lien period; OR

Escrow has accepted a deposit, by or on behalf of the SELLER, of a bond, cash deposit or other financial security in a form and amount acceptable to the Department of Real Estate of the State of California ("DRE"), as evidenced by Form RE 621A, to assure the lien-free completion of all those common facilities and improvements which are not completed and paid for as of the date of furnishing the financial security to assure completion.

(d)        Title free and clear of any blanket encumbrances to the Association Property within the Project is conveyed to the Association; and

(e)        SELLER has posted a bond or other security to ensure availability of funds for the operation and maintenance of the Association Property and facilities as provided in Subsection 2 of the Real Estate Commissioner's Regulation 2792.9, said bond to remain on deposit until eighty percent (80%) of the Units in the Project have been sold and Escrow is presented with written assurance from the Owners' Association that SELLER is current in its payment of assessments as required thereunder.

9.        <u>INSPECTION</u>.

(a)        Unit Inspection of Non-Constructed Unit.  In the event the Property has not been constructed at the time this Agreement is executed, Seller shall provide Buyer with written notice that the Property has been substantially completed, a "Temporary Certificate of Occupancy", "Final Certificate of Occupancy", or other permit or certificate has been or shortly will be obtained, and shall set a date and time for Buyer (along with Buyer's Lender (as defined herein), if applicable) to inspect the Property prior to Closing (the "Inspection Notice").  At the pre-Closing inspection, Buyer shall conduct a walk-through and inspection of the Property with the Seller, and if necessary, create a "Punch List" of items of workmanship or materials (only within the boundaries of the Property itself) which Seller may agree to correct within a reasonable time subsequent to Closing. Seller shall only be required to correct those items of workmanship and materials which should be corrected in order to conform renovation and rehabilitation of the Property to the Seller's plans and specifications (as they may have been changed or modified in accordance with the terms of this Agreement). Seller's general contractor shall make all reasonable efforts to complete the Punch List items within ninety (90) days after the Closing Date, (as such time may be extended once the general contractor has commenced making efforts to complete the Punch List items), subject to delays caused by the weather, availability of materials and labor, and other occurrences beyond the control of Seller and/or the general contractor. Buyer's failure to attend the pre-Closing inspection shall be deemed a waiver of any Punch List items. Notwithstanding the preparation of a Punch List, Seller's obligation to correct any items will not be grounds for deferring the

UNIT: **0924**

Closing, nor imposing any condition on Closing, and there shall be no postponement of Closing, holdbacks of Closing funds, or escrow of sums due to Punch List items.

At the pre-Closing inspection, Seller and Buyer shall execute a "Certificate of Acceptance" for the Property (similar to that attached hereto as Exhibit "B"), and attach a signed copy of the Punch List to the Certificate of Acceptance. Buyer's failure or refusal to execute the Certificate of Acceptance shall constitute an unqualified acceptance of the Property, and shall relieve Seller of any obligation to perform any further walk-through of the Property, create any Punch List, or to remedy any alleged deficiencies claimed by Buyer. Further, any and all warranties from Seller to Buyer as provided in this Agreement shall be deemed to be null and void, and without any force or effect. Additionally, Seller may, at Seller's sole and absolute option either: (a) treat Buyer's refusal to execute the Certificate of Acceptance as a material default and possible breach of this Agreement such that if Buyer refuses to execute the Certificate of Acceptance, and if Buyer fails to cure such default within three (3) days after receipt of written notice from Seller, Seller may, at Seller's option, terminate this Agreement, instruct Escrow Holder to immediately release the Deposits to Seller as liquidated damages as set forth in Paragraph 11, and Seller shall be entitled to all other remedies set forth herein or (b) in the event that Seller has not provided Buyer with a notice of default regarding Buyer's failure or refusal to execute the Certificate of Acceptance, and subject to the terms of this Agreement, Buyer shall be obligated to proceed with the Closing as described in this Agreement, and Buyer's failure to execute the Certificate of Acceptance shall not serve as a basis for Buyer's deferring of the Closing, nor imposing any condition on Closing, and there shall be no postponement of Closing, holdbacks of Closing funds, or escrow of sums due.

(b)      Unit Inspection of Renovated/Rehabilitated Unit. If any portion of the Property has been completed at the time this Agreement is executed by Buyer, Buyer acknowledges that Buyer has been afforded the opportunity, and has in fact, walked-through and inspected the Property with the Seller, and that all improvements constructed therein, together with all improvements therein on the land that is the subject of the Condominium Project and Master Project, are being accepted by Buyer in their current condition "AS-IS" and "WITH ALL FAULTS", and expressly subject to all other terms and conditions of this Agreement.

10.     TERMINATION OF ESCROW. If, for any reason, this Escrow cannot be closed on or before that date which is twelve (12) months from the date of SELLER'S acceptance hereof, or such later date as may be permitted pursuant to Paragraph 8 above, Escrow Holder shall nevertheless close this Escrow as soon as possible thereafter unless notice of cancellation is given by either party. Any notice of cancellation affecting this Escrow, for whatever reason and whenever given, may be given only in writing, and shall be delivered to Escrow Holder in duplicate. On receipt of such notice from one party, Escrow Holder shall, within three (3) business days, mail one (1) copy to the other party. Unless written objection thereto from such other party shall be received by Escrow Holder within fifteen (15) calendar days after such mailing, Escrow Holder is authorized to comply with any instructions in such notice and to cancel the Escrow upon payment of its cancellation charges. In the event written objection is received within the time stated or in the event conflicting claims are made upon Escrow Holder in this Escrow, Escrow Holder may refuse to take any further action hereunder or Escrow Holder may interplead the monies in dispute in any court of competent jurisdiction, in which case Escrow Holder shall be entitled to recover its attorneys' fees and costs, as may be allowed by the court. Escrow Holder is hereby authorized to deposit any funds or documents handed to it under these Escrow instructions, or cause the same to be deposited with an appropriate financial institution, or with any sub-Escrow agent, subject to Escrow Holder's order at or prior to Close of Escrow, in the event such deposit shall be necessary or convenient for the consummation of this Escrow.

11.     **LIQUIDATED DAMAGES. IF BUYER FAILS TO COMPLETE THE PURCHASE OF THE PROPERTY BECAUSE OF A DEFAULT BY BUYER, SELLER MAY PURSUE ANY REMEDY IN LAW OR EQUITY THAT IT MAY HAVE AGAINST BUYER ON ACCOUNT OF THE DEFAULT; PROVIDED, HOWEVER, THAT BY PLACING THEIR INITIALS HERE:**

**BUYER (         ) (         ) AND SELLER (         ) EACH AGREE THAT:**

(a)      THE AMOUNT EQUAL TO BUYER'S PURCHASE MONEY DEPOSIT SHALL CONSTITUTE LIQUIDATED DAMAGES PAYABLE TO SELLER IF BUYER FAILS TO COMPLETE THE PURCHASE OF THE PROPERTY BECAUSE OF A DEFAULT BY BUYER. THE VALIDITY AND REASONABLENESS OF THE AMOUNT OF LIQUIDATED DAMAGES SHALL BE DETERMINED IN ACCORDANCE WITH CALIFORNIA CIVIL CODE SECTIONS 1675 THROUGH 1678.

(b)      THE PAYMENT OF SUCH LIQUIDATED DAMAGES TO SELLER SHALL CONSTITUTE THE EXCLUSIVE REMEDY OF SELLER ON ACCOUNT OF ANY DEFAULT BY BUYER.

(c)      LIQUIDATED DAMAGES SHALL BE PAYABLE TO SELLER OUT OF BUYER'S PURCHASE MONEY DEPOSIT ACCORDING TO THE FOLLOWING PROCEDURES:

UNIT: __0924__

(i)    THE SELLER SHALL GIVE WRITTEN NOTICE ("SELLER'S NOTICE AND DEMAND"), IN THE MANNER PRESCRIBED BY SECTION 116.340 OF THE CODE OF CIVIL PROCEDURE FOR SERVICE IN A SMALL CLAIMS ACTION, TO ESCROW HOLDER AND TO BUYER, THAT BUYER IS IN DEFAULT UNDER THIS AGREEMENT AND THAT SELLER IS DEMANDING THAT ESCROW HOLDER REMIT THE PURCHASE MONEY DEPOSIT TO SELLER AS LIQUIDATED DAMAGES UNLESS, WITHIN TWENTY (20) DAYS, BUYER GIVES ESCROW HOLDER BUYER'S WRITTEN OBJECTION TO DISBURSEMENT OF  PURCHASE MONEY AS LIQUIDATED DAMAGES ("BUYER'S OBJECTION"). BUYER'S OBJECTION MUST ALSO AFFIRMATIVELY STATE THAT BUYER IS READY, WILLING AND ABLE TO CLOSE ESCROW AS PROVIDED FOR IN THIS AGREEMENT.    BUYER'S FAILURE TO SO SPECIFICALLY STATE THAT THEY ARE PREPARED TO PROCEED WITH THE CLOSE OF ESCROW FOR THE PURCHASE OF THE PROPERTY WILL IMMEDIATELY TERMINATE BUYER'S RIGHT TO PURCHASE THE PROPERTY AND ANY SUCH RIGHTS SHALL THEREUPON BECOME NULL AND VOID.  SELLER SHALL, IMMEDIATELY UPON GIVING THE SELLER'S NOTICE AND DEMAND, DELIVER TO ESCROW HOLDER ALL PURCHASE MONEY FUNDS OF BUYER HELD BY SELLER OUTSIDE OF ESCROW, IF ANY.

(ii)    BUYER SHALL HAVE A PERIOD OF TWENTY (20) DAYS FROM THE DATE OF RECEIPT OF SELLER'S NOTICE AND DEMAND IN WHICH TO GIVE ESCROW HOLDER BUYER'S OBJECTION.

(iii)    IF BUYER FAILS TO GIVE ESCROW HOLDER BUYER'S OBJECTION WITHIN TWENTY (20) DAYS FROM THE DATE OF RECEIPT OF SELLER'S NOTICE AND DEMAND: (a) ESCROW HOLDER SHALL PROMPTLY REMIT THE AMOUNT DEMANDED TO SELLER; AND (b) SELLER IS RELEASED FROM ANY OBLIGATION TO SELL THE PROPERTY TO BUYER.

(iv)    IF BUYER GIVES ESCROW HOLDER BUYER'S OBJECTION WITHIN TWENTY (20) DAYS FROM THE DATE OF RECEIPT OF SELLER'S NOTICE AND DEMAND, THEN THE CONTROVERSY SHALL BE DETERMINED BY SUBMISSION TO BINDING ARBITRATION AS PROVIDED IN PARAGRAPH 12 BELOW.

SHOULD BUYER NOT AGREE TO THE FOREGOING LIQUIDATED DAMAGES PROVISION, THEN THE AMOUNT SPECIFIED ABOVE SHALL NOT BE CONSIDERED A LIMITATION ON THE AMOUNT OF DAMAGES SELLER MIGHT RECOVER AS A RESULT OF BUYER'S DEFAULT.  SELLER AGREES TO INDEMNIFY AND HOLD ESCROW HOLDER HARMLESS FROM ANY CLAIM ARISING OUT OF ANY DISTRIBUTIONS MADE BY ESCROW HOLDER IN ACCORDANCE WITH AND PURSUANT TO THE PROVISIONS OF THIS PARAGRAPH.

12.    <u>ARBITRATION OF DISPUTES</u>.  ANY BINDING ARBITRATION REQUIRED PURSUANT TO THE FOREGOING PARAGRAPH 10 OF THIS AGREEMENT MAY INCLUDE A DETERMINATION OF THE REASONABLENESS OF THE AMOUNT TO BE PAID AS LIQUIDATED DAMAGES, THE VALIDITY OF THE FOREGOING LIQUIDATED DAMAGES PROVISION, AND THE DISPOSITION OF THE FUNDS DEPOSITED INTO ESCROW BY BUYER, AND SUCH ARBITRATION SHALL INCLUDE EVERY CAUSE OF ACTION THAT HAS ARISEN BETWEEN BUYER AND SELLER UNDER THIS AGREEMENT AND SHALL BE CONDUCTED AS PROVIDED HEREIN.

IF AFTER THE CLOSE OF ESCROW ANY OTHER CLAIMS, DISPUTES OR CONTROVERSIES ARISE BETWEEN THE PARTIES WITH RESPECT TO THIS AGREEMENT OR THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS BASED UPON ALLEGED LATENT OR PATENT DEFECTS IN THE RENOVATION AND REHABILITATION, ALL SUCH MATTERS SHALL BE DETERMINED BY ALTERNATIVE DISPUTE RESOLUTION PROCEDURES AS PROVIDED IN PARAGRAPH 13 BELOW.

THE RULES AND PROCEDURES FOR BINDING ARBITRATION SHALL BE SUBJECT TO THE FOLLOWING:

(a)    THE ARBITRATION SHALL BE CONDUCTED BY JAMS, IF SUCH ENTITY IS THEN IN EXISTENCE, AND, IF NOT, THEN BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA"), AT A LOCATION SELECTED BY THE ARBITRATOR IN THE COUNTY WHERE THE PROPERTY IS LOCATED (OR SUCH OTHER LOCATION AS THE PARTIES MAY AGREE UPON). JAMS OR AAA, AS THE CASE MAY BE,

UNIT: __0924__

ARE REFERRED TO HEREIN AS THE "ARBITRATION SERVICE". EXCEPT AS MODIFIED BY THE TERMS OF THIS AGREEMENT, THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE RULES AND PROCEDURES OF THE ARBITRATION SERVICE THEN IN EFFECT, EITHER THE STREAMLINED ARBITRATION RULES AND PROCEDURES, OR (IF APPLICABLE) THE COMPREHENSIVE ARBITRATION RULES OF JAMS, OR THE COMMERCIAL ARBITRATION RULES OF THE AAA.

(b)     THE ARBITRATION SHALL BE COMMENCED UPON DELIVERY BY EITHER PARTY TO THE OTHER AND TO THE ARBITRATION SERVICE (AND, IF ESCROW IS STILL OPEN, TO ESCROW HOLDER) OF A WRITTEN DEMAND FOR ARBITRATION, WHICH SHALL SET FORTH WITH SPECIFICITY THE PARTICULARS OF SUCH PARTY'S CLAIM(S), THE ISSUES TO BE SUBMITTED TO ARBITRATION AND THE RELIEF SOUGHT.

(c)     SELLER SHALL ADVANCE THE FEES NECESSARY TO INITIATE ARBITRATION, WITH THE COSTS AND FEES, INCLUDING ONGOING COSTS AND FEES TO BE PAID AS AGREED BY THE PARTIES, OR, IF THE PARTIES CANNOT AGREE UPON THE PAYMENT OF THE ONGOING COSTS AND FEES, THEN AS DETERMINED BY THE ARBITRATOR, WITH THE OVERALL COSTS AND FEES OF THE ARBITRATION TO BE ULTIMATELY BORNE AS DETERMINED BY THE ARBITRATOR.

(d)     THE ARBITRATION SHALL BE CONDUCTED BY ONE NEUTRAL AND IMPARTIAL ARBITRATOR WHO SHALL BE SELECTED JOINTLY BY THE PARTIES WITHIN FIFTEEN CALENDAR (15) DAYS, AND IN NO EVENT MORE THAN SIXTY (60) DAYS, FOLLOWING DELIVERY OF THE DEMAND FOR ARBITRATION, FROM THE LIST OF THEN AVAILABLE ARBITRATORS OF THE ARBITRATION SERVICE WHO ARE RETIRED JUDGES OF THE SUPERIOR COURT. UNLESS SUCH FIFTEEN (15) DAY PERIOD IS EXTENDED BY MUTUAL AGREEMENT OF THE PARTIES, IF THE PARTIES HAVE FAILED TO AGREE UPON AN ARBITRATOR WITHIN SUCH PERIOD, THE ARBITRATION SERVICE SHALL SELECT A RETIRED JUDGE OF THE SUPERIOR COURT FROM ITS LIST AS THE ARBITRATOR TO CONDUCT THE ARBITRATION. IN SELECTING THE ARBITRATOR, THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1297.121 SHALL APPLY AND AN ARBITRATOR MAY BE CHALLENGED FOR ANY OF THE GROUNDS SET FORTH THEREIN OR IN SECTION 1297.124.

(e)     THE ARBITRATION SHALL COMMENCE IN A PROMPT AND TIMELY MANNER ON THE DATE ESTABLISHED (i) IN ACCORDANCE WITH THE RULES OF THE ARBITRATION SERVICE, OR IF THE ARBITRATION SERVICE'S RULES DO NOT SPECIFY A DATE BY WHICH THE ARBITRATION MUST COMMENCE, THEN (ii) BY AGREEMENT OF THE PARTIES, OR IF THEY CANNOT AGREE, THEN (iii) BY THE ARBITRATOR. THE ARBITRATION SHALL BE CONDUCTED BY THE ARBITRATOR IN SUCH A MANNER SO AS TO OBTAIN A PROMPT AND TIMELY CONCLUSION OF THE MATTER.

(f)     BUYER AND SELLER SHALL EACH HAVE THE RIGHT TO BE REPRESENTED BY COUNSEL.

(g)     THE PARTIES MAY CONDUCT DISCOVERY AS IF THE MATTER WERE PENDING BEFORE A CALIFORNIA COURT AND THE ARBITRATOR SHALL HAVE THE POWER TO ISSUE AND ENFORCE SUBPOENAS AND TO AWARD SANCTIONS; PROVIDED, HOWEVER, THAT THE PARTIES MAY APPLY TO EITHER THE ARBITRATOR OR THE COURTS OF THE STATE OF CALIFORNIA FOR PROTECTIVE ORDERS WITH RESPECT TO SUCH DISCOVERY.

(h)     THE ARBITRATOR SHALL BE AUTHORIZED TO PROVIDE ANY REMEDIES OR RELIEF IN LAW OR IN EQUITY, OTHER THAN PUNITIVE DAMAGES, WHICH THE COURTS OF THE STATE OF CALIFORNIA COULD ISSUE BASED UPON THE SAME CLAIMS, FOR ANY CAUSE OF ACTION THAT IS THE BASIS OF THE ARBITRATION. THE ARBITRATOR SHALL FOLLOW THE STANDARDS FOR ISSUING SUCH RELIEF AS DEFINED UNDER CALIFORNIA LAW. THE ARBITRATOR'S JUDGMENT WITH RESPECT TO THE AMOUNT TO BE PAID AS LIQUIDATED DAMAGES, THE VALIDITY OF THE FOREGOING LIQUIDATED DAMAGES PROVISION, AND THE DISPOSITION OF THE FUNDS DEPOSITED INTO ESCROW BY BUYER, AND MATTERS RELATED THERETO, SHALL BE FINAL AND BINDING UPON THE PARTIES, SHALL CONSTITUTE MUTUAL WRITTEN ESCROW INSTRUCTIONS TO ESCROW HOLDER, AND MAY BE ENTERED IN ANY COURT OF THE STATE OF CALIFORNIA HAVING JURISDICTION THEREOF.

JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR WITH RESPECT TO ANY OTHER MATTER IN DISPUTE NOT RELATED TO THE FOREGOING LIQUIDATED DAMAGES PROVISION MAY BE ENTERED IN ANY COURT OF THE STATE OF CALIFORNIA HAVING JURISDICTION THEREOF, BUT SUCH JUDGMENT SHALL BE APPEALABLE IN THE SAME MANNER AND SUBJECT TO THE SAME RULES AS APPLY TO APPEALS OF JUDGMENTS OF THE COURT IN WHICH SUCH JUDGMENT IS ENTERED. HOWEVER (OTHER THAN WITH RESPECT TO LIQUIDATED DAMAGES MATTERS), THE FOREGOING SHALL NOT LIMIT THE SCOPE OF REVIEW WHICH WOULD OTHERWISE BE APPLICABLE TO THE ARBITRATION AWARD UNDER CALIFORNIA LAW OR THE RULES OF THE ARBITRATION SERVICE.

NOTICE: BY INITIALING IN THE SPACE BELOW, YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THIS ARBITRATION OF DISPUTES PROVISION, AND IN THE ARBITRATION OF DISPUTES PROVISION IN PARAGRAPH 13 BELOW, DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW, YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THIS ARBITRATION OF DISPUTES PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY. WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE ARBITRATION OF DISPUTES PROVISION TO NEUTRAL ARBITRATION.



BUYER'S Initials (　　　　　)      SELLER'S Initials (　　　　　)

13.     **ALTERNATE DISPUTE RESOLUTION.**  The following procedures provide for resolution of disputes through general judicial reference, or, in the alternative, binding arbitration.  In either event, BUYER and SELLER expressly acknowledge and accept that they are waiving their respective rights to a jury trial.

(a)     **JUDICIAL REFERENCE.**  IF, EITHER BEFORE OR AFTER THE CLOSE OF ESCROW, ANY CLAIMS, DISPUTES OR CONTROVERSIES (OTHER THAN DISPUTES DESCRIBED IN PARAGRAPH 10) ARISE BETWEEN THE PARTIES WITH RESPECT TO THIS PURCHASE AGREEMENT OR THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS BASED UPON ALLEGED LATENT OR PATENT DEFECTS IN THE RENOVATION OR REHABILITATION OF THE PROPERTY, AND ANY PARTY COMMENCES A LEGAL PROCEEDING BASED UPON SUCH CLAIMS, ALL SUCH MATTERS SHALL BE DETERMINED BY JUDICIAL REFERENCE AS PROVIDED IN THIS PARAGRAPH 13.  IF EITHER PARTY TO THIS PURCHASE AGREEMENT COMMENCES A LEGAL PROCEEDING FOR A DISPUTE ARISING UNDER THIS PURCHASE AGREEMENT, OR RELATING TO THE PROPERTY, OR THE CONDITION, RENOVATION OR REHABILITATION OF ANY PORTION OF THE PROPERTY, ALL THE ISSUES IN SUCH ACTION, WHETHER OF FACT OR LAW, SHALL BE RESOLVED BY JUDICIAL REFERENCE PURSUANT TO THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1.  BUYER AND SELLER SHALL COOPERATE IN GOOD FAITH TO ENSURE THAT ALL NECESSARY AND APPROPRIATE PARTIES ARE INCLUDED IN THE JUDICIAL REFERENCE PROCEEDING.  IN THE EVENT LITIGATION IS FILED BASED ON ANY SUCH DISPUTE, THE FOLLOWING SHALL APPLY:

(i)     The proceeding shall be brought and held in the County in which the Project is located, unless the parties agree to an   alternative venue.

(ii)     The parties shall use the procedures adopted by JAMS for judicial reference and selection of a referee (or any other entity offering judicial reference dispute resolution procedures as may be mutually acceptable to the parties).

(iii)     The referee must be a retired judge or a licensed attorney with substantial experience in relevant real estate matters.

UNIT: **0924**

(iv)        The parties to the litigation shall agree upon a single referee who shall have the power to try any and all of the issues raised, whether of fact or of law, which may be pertinent to the matters in dispute, and to issue a statement of decision thereon to the court.  Any dispute regarding the selection of the referee shall be resolved by JAMS or the entity providing the reference services, or, if no entity is involved, by the court with appropriate jurisdiction in accordance with California Code of Civil Procedure Sections 638 and 640.

(v)        The referee shall be authorized to provide all remedies available in law or equity appropriate under the circumstances of the controversy.

(vi)        The referee may require one or more pre-hearing conferences.

(vii)        The parties shall be entitled to discovery, and the referee shall oversee discovery and may enforce all discovery orders in the same manner as any trial court judge.

(viii)        A stenographic record of the trial shall be made.

(ix)        The referee's statement of decision shall contain findings of fact and conclusions of law to the extent applicable.

(x)        The referee shall have the authority to rule on all post-hearing motions in the same manner as a trial judge.

(xi)        The parties shall promptly and diligently cooperate with each other and the referee and perform such acts, as may be necessary for an expeditious resolution of the dispute.

(xii)        Except as otherwise agreed by the parties or as required by applicable law, Owner shall not be required to pay any fee of the judicial reference proceeding except to the extent of the cost that would be imposed upon the Owner if the dispute had been resolved as a dispute in court.  The referee may not award against the Owner any expenses in excess of those that would be recoverable as costs if the dispute had been litigated to final judgment in court.  Each party to the judicial reference proceeding shall bear its own attorney fees and costs in connection with such proceeding.

(xiii)        The statement of decision of the referee upon all of the issues considered by the referee shall be binding upon the parties, and upon filing of the statement of decision with the clerk of the court, or with the judge where there is no clerk, judgment may be entered thereon.  The decision of the referee shall be appealable as if rendered by the court.  This provision shall in no way be construed to limit any valid cause of action that may be brought by any of the parties.

EACH PARTY WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY FOR ALL CIVIL ACTIONS, ARBITRATION(S), OR PROCEEDINGS INVOLVING A DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT.

BUYER'S Initials ( ____ ) ( ____ )        SELLER'S Initials ( ____ )

(b)        **BINDING ARBITRATION**.  If for any reason the judicial reference procedures in Paragraph 12(a) are legally unavailable or unenforceable at the time a dispute would otherwise be referred to judicial reference, then any such dispute shall be submitted to binding arbitration.  Such disputes shall be administered by the American Arbitration Association ("AAA") and any such dispute involving allegations of patent or latent defects in the renovation or rehabilitation shall be administered in accordance with the AAA's Construction Industry Arbitration Rules in effect on the date of the submission.  If AAA is not then in existence, then the dispute shall be submitted to JAMS, and administered in accordance with either the Streamlined Arbitration Rules and Procedures, or (if applicable) the Comprehensive Arbitration Rules of JAMS.

UNIT: __0924__

(c)    **FEDERAL ARBITRATION ACT**.  The binding arbitration procedures contained in Paragraph 13(b) are implemented in accordance with the philosophy and intent of the Federal Arbitration Act (9 U.S.C. Section 1 et seq.) ("FAA"), which is designed to encourage the use of alternative methods of dispute resolution and avoid costly and potentially lengthy traditional court proceedings. The binding arbitration procedures in said Paragraph are to be interpreted and enforced as authorized by the FAA. Parties interpreting this Paragraph shall follow the federal court rulings, which provide among other things that: (1) the FAA is a congressional declaration of liberal federal policy favoring alternate dispute resolution notwithstanding substantive or procedural state policies or laws to the contrary,  (2) alternate dispute resolution agreements are to be rigorously enforced by state courts; and (3) the scope of issues subject to alternate dispute resolution are to be interpreted in favor of alternate dispute resolution.

14.    ATTORNEYS' FEES.  In any action, proceeding or arbitration arising out of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs.

15.    PROJECT DOCUMENTS.  BUYER'S initials below shall constitute BUYER'S acknowledgment that BUYER has received, read, understood and approved those items listed below.  BUYER shall be provided with the items below that are not initialed, prior to the Close of Escrow, and BUYER agrees to execute an acknowledgment of receipt of said documents upon delivery of same to BUYER.



The Declaration and any amendments thereto showing the date of recordation thereof;

Copies of a Preliminary Title Report and all items referred to in Schedule B to said Preliminary Title Report;

The Articles of Incorporation and the Bylaws of the Owners' Association;

A current estimated budget of the Owners' Association;

A copy of the Conditional Subdivision Public Report from the State of California Department of Real Estate, if applicable to the Project;

SELLER'S Disclosure Statement;

The form of Grant Deed (**Exhibit "A"** attached hereto and made a part hereof);

Escrow Holder's General Instructions (**Exhibit "C"** attached hereto and made a part hereof);

Limited Warranty;

Property Hazard Report.

16.    RISK OF LOSS.  If the Property is destroyed or materially damaged by twenty five percent (25%) or more prior to Close of Escrow, then, either BUYER or SELLER, upon demand, may cancel this Agreement, and in such event, Escrow Holder shall be advised to return any deposit made by BUYER and this Escrow shall terminate.

17.    PROJECT CHANGES.  BUYER acknowledges and agrees, as follows:

(a)    The Property is not being built to the order of or to the plans and specifications of BUYER, or as to a replica of any model(s), photograph(s), brochure(s), advertising material(s), rendering(s), website information or material(s), or other literature or drawings which may have been provided by SELLER or available to BUYER, as applicable; nor does BUYER have any right to require any changes in the same; but, instead, that the Property is being constructed substantially in accord with the plans and specifications on file in SELLER'S office, subject to the terms and conditions of this Agreement. **SELLER SHALL HAVE THE RIGHT TO MAKE CHANGES IN MATERIALS, EQUIPMENT, FURNISHINGS, DESIGN AND ARCHITECTURE THAT MAY VARY FROM MODELS, PHOTOGRAPH(S), BROCHURE(S), ADVERTISING MATERIAL(S), RENDERING(S), WEBSITE INFORMATION OR MATERIAL(S), OTHER LITERATURE OR DRAWINGS, PLANS, SPECIFICATIONS, SAMPLES, OR SKETCHES SHOWN TO BUYER.** Buyer fully understands, acknowledges, and hereby agrees that the Seller's Plans and Specifications for the Condominium Project and the Unit describe "proposed improvements" to be "constructed," and that the realities of renovation and rehabilitation are such that the final building and improvements will, in all likelihood, contain variations and deviations from the Seller's Plans and Specifications.  Notwithstanding, and without limiting the generality of any other provision of this Agreement, Buyer understands and acknowledges that the Unit actually built by Seller may be the reverse or mirror image of the floor plan of any model, or as shown on the Seller's Plans and

BUYER _____
06-12-07

Page 14 of 25

SELLER _____

UNIT: __0924__

Specifications, Seller's sales brochures, or other informational or advertising materials.  Furthermore, Buyer understands and acknowledges that the Unit may contain conditions, or undergo changes, which during the ordinary course of renovation and rehabilitation, may result in deviations from the Seller's Plans and Specifications, and may also result in a cosmetic or structural change in the originally intended manner of renovation and rehabilitation.  Such conditions may result from the type of materials used or available, the processes and procedures used for renovation and rehabilitation of the Property, and may include, without limitation, conditions such as:

      (i)      variations in the texture and thickness of stucco or other textured or smooth finishing, including cracks in such materials;

      (ii)      settlement cracks in drywall, concrete, stucco, flatwork and block walls;

      (iii)      twisting and warping of natural materials, including without limitation, wood and plastics, which can result in cracks, bulges and other types of imperfections;

      (iv)      deviations in color, grain and texture that may occur in wood products, concrete, tile, granite, stone and other finish materials;

      (v)      shrinkage, swelling, expansion or settlement of construction materials; and,

      (vi)      conditions resulting from normal wear, tear or deterioration.

(b)      Within the Project, SELLER reserves the right to make changes in its proposed land use, improvement plans, street pattern, or type, style or price of dwellings to be built.  No statement by SELLER or SELLER'S Agent as to a present intended use of SELLER'S property shall affect SELLER'S right to make changes in the future.  Further, BUYER understands that SELLER makes no representations as to how such property will be used.

(c)      The interior floor design and/or volume, exterior elevations, and appliances may vary from that depicted by any model(s), photograph(s), brochure(s), advertising material(s), rendering(s), website information or material(s), sales materials, or other literature or drawings, due to changes required by field modifications, design or on-site inspection changes;

(d)      No representations or warranties of any kind, express or implied, have been made by SELLER or its agents or employees in connection with the existence of views from the Property. Without limiting the generality of the foregoing, Buyer understands, acknowledges, and hereby represents that Seller has informed Buyer that views from the Property may already be obstructed, or may be obstructed by future developments of neighboring lands, and Seller hereby expressly disclaims any oral or written representation that any views from the Property exist.

**BUYER ACKNOWLEDGES THAT EVEN THOUGH SUCH CONDITIONS MAY EXIST, THEY SHOULD NOT INTERFERE WITH THE ISSUANCE OF A CERTIFICATE OF OCCUPANCY BY THE LOCAL GOVERNMENTAL ENTITY, AND SHALL NOT SERVE AS A BASIS FOR BUYER'S FAILURE TO EXECUTE THE CERTIFICATE OF ACCEPTANCE AND DELIVER THE SAME TO SELLER.  BUYER FURTHER AGREES AND HEREBY REPRESENTS, THAT AS LONG AS THESE CONDITIONS DO NOT CAUSE ANY MATERIAL PHYSICAL DAMAGE TO THE UNIT WHICH MAY MAKE THE UNIT UNINHABITABLE, AND HAVE NOT BEEN DETERMINED TO BE AN IMMEDIATE THREAT TO THE HEALTH, SAFETY AND WELFARE OF THE OCCUPANTS OF THE UNIT BY A BUILDING INSPECTOR, REPRESENTATIVE OF THE CALIFORNIA CONTRACTORS STATE LICENSING BOARD, A LICENSED ENGINEER, ARCHITECT OR CONTRACTOR APPROVED BY BOTH SELLER AND BUYER, BUYER WILL NOT CLAIM THAT SUCH CONDITIONS ARE DEFECTS AND HEREBY SPECIFICALLY WAIVES ANY CLAIMS IN THAT REGARD AS PERMITTED BY CALIFORNIA LAW.**

BUYER'S Initials ( ) ( )

18.    POSSESSION/RESTRICTED ACCESS.  BUYER'S right to possession, use and occupancy of the Property shall commence from and after the Close of Escrow, subject to the provisions of the Declaration.  If, prior to the Close of Escrow, BUYER or BUYER'S agents: (a) enter upon the Property or the development of which it is a part for the purpose of showing the Property or said development to any prospective purchaser thereof from BUYER; (b) place any signs on, about or near the Property or the development of which it is a part; (c) market for sale in any medium, including without limitation, any newspaper, magazine, or internet website, or listing service; or (d) enter into any contract or agreement for the sale, transfer or assignment of BUYER'S interest in the Property; then this Agreement and this Escrow and any attempted sale, transfer or assignment of said interest at SELLER'S option shall be null, void and of no force or effect.  A violation of the foregoing by BUYER shall constitute both a material breach of this Agreement and the failure of a condition precedent to SELLER'S further performance hereunder, entitling SELLER, at its option, to unilaterally cancel this Agreement and proceed in accordance with

Paragraph 11 hereof.  Escrow Holder is hereby instructed to notify SELLER in writing of any attempted sale, transfer or assignment of said interest and, except for such notification, to disregard any such attempted transfer._  Because of potential safety and health hazards present during renovation and rehabilitation of the Project, except as otherwise set forth in this Agreement, Buyer shall have absolutely no access to the Unit or any portion of the Project prior to Close of Escrow. Notwithstanding anything to the contrary, and without limiting the generality of any other provision of this Agreement, Buyer shall not have any access to the Project, and shall not do or cause any alteration, construction, or other work to be done in or about the Unit, irrespective of whether the Project, or Buyer's Unit has been completed, before the Close of Escrow. This prohibition includes actions by Buyer individually, requests by Buyer for work to be done by third parties, or requests by Buyer directly to Seller's employees, agents, contractors, or subcontractors.  **BUYER HEREBY AGREES TO INDEMNIFY AND HOLD HARMLESS SELLER, SELLER'S AFFILIATES, THE GENERAL CONTRACTOR, THE DEVELOPERS AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, MEMBERS, PRINCIPALS, ATTORNEYS, EMPLOYEES, AGENTS AND REPRESENTATIVES (COLLECTIVELY, "SELLER PARTIES") FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, ACTIONS, DAMAGES, LIABILITIES, COSTS, EXPENSES (INCLUDING COURT COSTS AND ATTORNEYS' FEES), DEMANDS OR CAUSES OF ACTION, ARISING EITHER IN FAVOR OF BUYER OR ANY THIRD PARTY WHO ENTERS ONTO THE MASTER PROJECT, CONDOMINIUM PROJECT OR UNIT, WITH OR AT THE REQUEST OF BUYER (IRRESPECTIVE OF BUYER'S ACTUAL KNOWLEDGE OF SUCH ENTRY), ON ACCOUNT OF BODILY INJURY, DEATH, DAMAGE TO, OR LOSS OF PROPERTY, IN ANY WAY OCCURRING, OR INCIDENT TO, THE CONDITION OF THE MASTER PROJECT, CONDOMINIUM PROJECT OR THE UNIT. THIS INDEMNITY IS GIVEN TO SELLER AND SHALL BE FULLY VALID AND ENFORCEABLE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, REGARDLESS OF WHETHER SELLER OR THE DEVELOPERS ARE NEGLIGENT, IN WHOLE OR IN PART, AND EVEN WHEN THE INJURY, DEATH OR DAMAGE IS CAUSED BY THE SOLE NEGLIGENCE OF A SELLER PARTY.**

19.    <u>BUYER'S REPRESENTATIONS</u>.  BUYER covenants, represents and warrants to SELLER as follows:

(a)    BUYER hereby agrees to indemnify and hold SELLER and broker harmless from and against any and all loss, threat of loss, suits, claims, actions, liabilities, damages, obligations, demands, costs and expenses (including attorneys' fees) arising out of or in connection with any breach by BUYER of any term, covenant, representation or warranty contained in this Agreement or any untrue statement made by BUYER in this Agreement;

(b)    No representations have been made to BUYER regarding the potential appreciation of the Property or the ability of BUYER to rent, lease or resell the Property.  Further, no representations have been made by SELLER, or SELLER'S agents, brokers, salespeople, or employees, to BUYER regarding the price which SELLER may sell other Units located in the Project.  BUYER specifically acknowledges and agrees that SELLER may in the future reduce the sales price of other Units in the Project or offer promotional or incentive programs and that any such reductions, promotional or incentive programs shall not affect the terms of this Agreement nor shall BUYER be entitled to participate in any such reductions, promotional or incentive programs; and

(c)    The agreements, representations and warranties of BUYER set forth in this Agreement shall be true as of the Close of Escrow, as if restated on that date, and shall survive the Close of Escrow and delivery and recordation of the Grant Deed.

(d)    No representations have been made to BUYER regarding the future use of adjacent properties.

(e)    Buyer has the financial ability to purchase the Property in the amount set forth herein and on the terms and conditions set forth herein.

20.    <u>ESCROW HOLDER NOT RESPONSIBLE</u>.  Escrow Holder is not to be concerned with the agreements of BUYER and SELLER as set forth in Paragraphs 7, 9, 12 through 19, 22 through 35 38 through 46.  The parties hereto jointly and severally agree to pay all costs, damages, judgments and expenses  including reasonable attorneys' fees, suffered or incurred by Escrow Holder in connection with or arising out of this Escrow.  Escrow Holder shall not be liable for any error of judgment or for any act done or omitted by Escrow Holder in good faith, or for any mistake of fact or law, except its own willful or grossly negligent misconduct, and Escrow Holder shall have no duties to anyone except to those parties executing this Agreement.

21.    <u>TIME OF THE ESSENCE</u>.  BUYER acknowledges that time is of the very essence in the performance of BUYER'S obligations under this Agreement, and any delay in BUYER'S performance under this Agreement will prejudice SELLER.  Therefore, any failure by BUYER to perform within the specified periods will constitute a breach of this Agreement, entitling SELLER to terminate this Agreement and proceed in accordance with Paragraph 11 above.  Unless otherwise provided herein, all references to "days" shall be references to consecutive "calendar days".  All agreements and obligations of BUYER (if more than one) hereunder shall be joint and several.  The language in all parts of this Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against BUYER or SELLER.  This Agreement constitutes the entire and complete Agreement of the parties hereto.  All prior negotiations, correspondence and agreements

UNIT: __0924__

of the parties hereto respecting the subject matter hereof are fully and completely merged herein and this Agreement supersedes any and all such prior matters. The only representations, agreements and warranties made by SELLER are those set forth in writing in this Agreement and in the Final Subdivision Public Report. BUYER understands and acknowledges that no salesperson, broker or other person has any authority whatsoever to make any representation, agreement or warranty, express or implied for SELLER, except those expressly set forth in writing in this Agreement and in the Final Subdivision Public Report; and that if any salesperson, broker or other person has made or makes in the future, orally or in writing, any representation, agreement or warranty different from or in addition to those expressly set forth in writing in this Agreement or in the Final Subdivision Public Report, each and all of the same are unauthorized, void and of no force or effect. BUYER acknowledges that BUYER has not executed this Agreement in reliance on any promise, representation or warranty not contained herein or in the Final Subdivision Public Report. If any provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of other provisions of this Agreement shall in no way be affected thereby. This Agreement shall be construed in accordance with the substantive laws of the State of California. The waiver by the SELLER of a breach of any provision of this Agreement shall not be deemed a continuing waiver or a waiver of any subsequent breach, whether of the same or another provision of this Agreement.

22.   ASSUMPTION OF RISK.   BUYER shall neither have, nor acquire, any right to or interest in the Property and/or the Project or any portion of the Project appurtenant thereto until the Close of Escrow as provided herein. If BUYER enters the Project without the specific written invitation of SELLER, BUYER assumes all risk, liability and obligation for any injuries or damages to BUYER and to any guest or invitees of BUYER and does hereby agree to indemnify and hold SELLER, its sales personnel, broker, and all officers, agents, servants and employees of SELLER, and broker, harmless from and against any claims for such injuries or damage.

23.   PROPOSITION 65 AND POSSIBLE HAZARDOUS SUBSTANCES DISCLOSURE.   SELLER hereby notifies BUYER that certain substances known to cause cancer, birth defects or reproductive harm may have, (i) existed within the Property since its original construction as an office building, (ii) been used in the renovation or rehabilitation of the Property as a residence, and (iii) been used in the renovation or rehabilitation of any improvements located in the Association Property. These substances include, but are not limited to, the following: paint, oil, benzene, gasoline, asbestos, plywood and particle board (from which some amount of formaldehyde gases have been known to emanate), metals and organic toxins from piping systems, wood preservatives in decks and patios, and emissions from heavy duty construction equipment. Detectable amounts of some or all of such substances may still be present in the Property and surrounding property within the Project. SELLER also notifies BUYER that because of the natural aging process of the soils and the decay of other elements underneath your Property, there may be certain gases released (such as radon, which has been linked to increased risk of cancer through elevated levels of exposure) which can become trapped in your Property if fresh air is not regularly circulated throughout your Property. These gases may seep into your Property through floor drains, sumps, joints and tiny cracks or pores in the walls, if any. Since the quality of air we breathe can affect our health, we recommend frequent airing of your house by simply opening your windows to introduce air uncontaminated with such gases. Other air transfer methods are also available and helpful such as circulating systems using outside air intake.

24.   MERGER.   As of the Close of Escrow, BUYER shall be deemed to have approved all aspects of the Property and to have acknowledged and agreed that SELLER has performed all of SELLER'S obligations to BUYER under the terms of this Agreement and with respect to the Property and the Project as a whole, except as to completion of those items which may be completed after Close of Escrow, as provided in Paragraph 9.

25.   NO RIGHT TO ENTER.   Neither BUYER, nor BUYER'S agents, employees or representatives may enter the Property without the prior written consent of SELLER, which may be refused, withheld or conditioned for any reason, in SELLER's sole and absolute discretion. BUYER acknowledges that any such entry by BUYER or its agents, employees or representatives may constitute a violation of the insurance policies covering the Project and may expose SELLER to substantial liability and/or cause such insurance policies to be ineffective. Accordingly, any such unauthorized entry by BUYER, or its agents, employees or representatives shall constitute a material breach of this Agreement whereupon SELLER may, at its option, terminate this Agreement and proceed to enforce the liquidated damages provision contained in Paragraph 10 hereof. Prior to Close of Escrow, BUYER may not contract with others to perform any work, alterations or improvements to the Property or any portion of the Project, and BUYER agrees to indemnify SELLER against any loss or damage resulting from any violation by BUYER or its agents of this Paragraph 24

26.   MISCELLANEOUS.   The Foreign Investment in Real Property Tax Act ("FIRPTA"), Internal Revenue Code Section 1445, requires every buyer of U.S. real property to deduct and withhold from a seller's proceeds ten percent (10%) of the sales price unless an exemption applies. One exemption which excuses the requirement to withhold is the providing by a seller to a buyer of an affidavit under penalty of perjury stating that seller is not a "foreign person." In this regard, at Close of Escrow, SELLER agrees to furnish BUYER with such an affidavit. This affidavit will also serve as an exemption for purposes of California Revenue and Taxation Code Section 18805 which would otherwise also require BUYER to deduct and withhold an additional tax equal to one-third of the amount required to be withheld under Section 1445.

 

UNIT: __0924__

(a)        California Revenue and Taxation Code Sections 18805 and 26131 require a buyer of real property to withhold California income taxes from escrow funds under certain circumstances. SELLER hereby warrants and represents to BUYER and Escrow Holder that BUYER is NOT required to withhold taxes in connection with this transaction since all the conditions that are necessary for these Codes to be applicable have not been met. However, prior to close of this Escrow, SELLER shall deposit into this Escrow SELLER'S Affidavit of Non-Resident Status and Escrow Holder shall deliver a copy of same to BUYER prior to Close of Escrow.

(b)        In accordance with California Revenue and Taxation Code Sections 480.3 and 480.4, effective July 1, 1985, all deeds and other documents, when presented for recordation, that reflect a change of ownership must include a Preliminary Change of Ownership Report. Said Report is to be furnished to Escrow Holder by BUYER prior to the Close of Escrow and attached to required documents for delivery to the County Recorder. Should said Report not be submitted to Escrow Holder for submission with the documents as called for or should said form be rejected by the County Recorder for any reason whatsoever (i.e., missing information), then Escrow Holder shall charge BUYER and pay the County Recorder a service charge of Twenty Dollars ($20.00) as required by said governmental agency. Escrow Holder is not to be further concerned with said Report and/or the provisions of this Paragraph.

27.        <u>NOTICES.</u> All notices pertaining to this Agreement shall be in writing and shall be delivered personally (which shall be deemed delivered on the date of delivery), by overnight courier delivery through a nationally recognized carrier that provides tracking information (which shall be deemed received on the actual day received by the recipient), or certified U.S. Mail (which shall be deemed delivered two business days after the date on which it is mailed), to the parties at the addresses listed herein, with all postage or delivery fees prepaid. In the event BUYER or SELLER utilizes facsimile transmitted signed documents, BUYER and SELLER hereby agree to accept, and hereby agree to instruct Escrow Holder to rely upon such documents as if they bore original signatures. BUYER and SELLER hereby acknowledge and agree to use their best efforts to provide the other party, prior to Close of Escrow, with such documents bearing the original signatures. BUYER and SELLER further acknowledge and agree that documents with non-original signatures will not be accepted for recording by the County Recorder.

28.        <u>AGENCY CONFIRMATION.</u> BUYER should be sure to receive a copy of the Confirmation Real Estate Agency Relationship form (and the attachment thereto) in addition to this Agreement. Real Estate Brokers are not parties to this Agreement between BUYER and SELLER.

29.        <u>MEGAN'S LAW/SEX OFFENDER DATABASE.</u> Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

Prior to the execution of this Agreement, BUYER may research the database to determine whether there are sex offenders in the area. SELLER makes no representations, warranties, or guarantees regarding the presence or absence of registered sex offenders within the Project or in the surrounding area. SELLER has no obligation or duty to investigate existing residents or prospective buyers to determine whether they are sex offenders, and does not intend to make any such investigation as to any prospective buyer's status. BUYER is solely responsible for making his or her own investigation. For further information, please contact your local law enforcement agency. Most law enforcement agencies have special stations to view the Megan's Law database.

30.        <u>CLAIMED DEFECTS RESOLUTION PROCEDURE.</u>

(a)        <u>Notice and Opportunity to Cure Claimed Defects</u>. Prior to the commencement of any legal proceeding by Buyer (or Buyer's successor(s)) against Seller based upon a claim for defects in the renovation or rehabilitation of the Property, or any improvements thereon, Buyer must first comply with the provisions of this paragraph. If at any time during the ten (10) years after the Close of Escrow, as such period may be extended by any applicable tolling statute or provision, or any shorter period as provided by applicable law, Buyer, or Buyer's successors or assigns (collectively, "Owner") believes Seller has violated any of the standards set forth applicable law ("Claimed Defect"), which such Owner feels may be the responsibility of Seller, such Owner shall promptly notify Seller in writing at the Seller's address above, and the address of Seller's agent for service of registered with the California Secretary of State, which is currently:  Warren J. Kessler, 1901 Avenue of the Stars, Suite 400, Los Angeles, California 90067.  Such notice shall be deemed a notice of intention to commence a legal proceeding and shall include: (a) a detailed description of the Claimed Defect, (b) the date upon which the Claimed Defect was first discovered, and (c) dates and times when Owner or Owner's agent will be available during ordinary business hours, for service calls or inspections by Seller. Seller shall, in its sole discretion, be entitled to inspect the Property regarding the reported Claimed Defect and, within its sole discretion, shall be entitled to cure such Claimed Defect. Nothing contained in this Paragraph 27 shall obligate Seller to perform any such inspection or repair, nor shall this Paragraph be deemed to increase Seller's legal obligations to Owner. Owner's written notice delivered to Seller shall be a condition precedent to Owner's right to institute any legal proceeding and to proceed to alternate dispute resolution as set forth Paragraph 13 above, and Owner shall not pursue any other remedies available to it, at law or otherwise, including without

UNIT: __0924__

limitation the initiation of any legal proceeding or action, until Seller has had the reasonable opportunity to inspect and cure the Claimed Defect. During the term of any written Limited Warranty provided to the original Owner of the Property by Seller, any conflict between the provisions of this Paragraph and the Limited Warranty shall be resolved in favor of the Limited Warranty. Seller shall not be liable for any general, special or consequential damage, cost, diminution in value or other loss which Owner may suffer as a result of any Claimed Defect in the Property, which might have been avoided had Owner given Seller the timely notice and opportunity to cure as described above. Except as otherwise provided in the written Limited Warranty, if any, provided to Owner, nothing contained herein shall establish any contractual duty or obligation on the part of Seller to repair, replace or cure any Claimed Defect. If Owner sells or otherwise transfers ownership of the Property to any other person during the effective period of this Paragraph, Owner covenants and agrees to give such person written notice of these procedures by personal delivery. Owner's continuing obligation under this covenant shall be binding upon Owner and Owner's successors and assigns and shall survive the Close of Escrow.

(b)     Receipt of Purchase Documents.  Buyer will be provided with certain documents through Escrow in conjunction with the purchase of the Property, including maintenance recommendations from Seller, maintenance recommendations for manufactured products or appliances included with the Property, claim forms, and other related documentation. Buyer and Buyer's successors in interest are required to retain these documents and provide copies of the documents to such Buyer's successors in interest upon the sale or transfer of the Property.

(c)     Obligation to Follow Maintenance Recommendations.  All Owners are obligated to follow Seller's maintenance recommendations and schedules, including the maintenance recommendations and schedules for manufactured products and appliances provided with the Property, as well as all commonly accepted maintenance practices (collectively, "Maintenance Recommendations"). Failure to follow the Maintenance Recommendations may reduce or preclude Owner's right to recover damages relating to such Owner's Property, which could have been prevented or mitigated had the Maintenance Recommendations been followed.

31.     CONDITIONAL SUBDIVISION PUBLIC REPORT.  Escrow shall not close, funds shall not be released from Escrow and title to the property shall not be conveyed to BUYER until a current Final Subdivision Public Report for the Project is furnished to BUYER.  In compliance with Section 11018.12(e)(3) of the Business and Professions Code, the entire sum of money paid or advanced by BUYER shall be returned to BUYER if the Final Subdivision Public Report has not been issued during the term of the Conditional Subdivision Public Report, or as such may be extended, or BUYER is dissatisfied with the contents of the Final Subdivision Public Report because of a material change to the setup of the subdivision pursuant to Section 11012 of the Business and Professions Code.

32.     CIVIL CODE SECTION 1134 DISCLOSURE.  Pursuant to California Civil Code Section 1134, SELLER hereby states that SELLER has inspected the Unit and the Association Property and has not discovered a substantial defect or malfunction of any major system in the Unit or Association Property, except as follows:

_____ NONE _____ .

33.     CONDITION OF THE PROPERTY.  BUYER acknowledges and agrees as follows:

(a)     EXCEPT AS OTHERWISE DISCLOSED IN WRITING BY SELLER, SELLER IS NOT AWARE OF ANY DEFECTS OR CONDITIONS THAT MAY EFFECT THE PROPERTY OR THE ASSOCIATION PROPERTY THAT ARE NOT EVIDENT FROM A VISUAL, NON-DESTRUCTIVE INSPECTION.  EXCEPT AS OTHERWISE DISCLOSED IN WRITING BY SELLER, SELLER HAS NOT MADE ANY REPRESENTATIONS TO BUYER REGARDING THE EXISTENCE OR NON-EXISTENCE OF ANY DEFECTS IN THE PROPERTY OR THE ASSOCIATION PROPERTY.

(b)     SOME ELEMENTS OF THE PROPERTY AND THE ASSOCIATION PROPERTY THAT HAVE NOT BEEN RENOVATED OR REPLACED BY SELLER MIGHT BE NEAR THE END OF THEIR ESTIMATED USEFUL LIVES.

(c)     BUYER IS PURCHASING THE PROPERTY BASED SOLELY UPON BUYER'S OWN INSPECTION OF THE PROPERTY AND THE CURRENT CONDITION OF THE PROPERTY.

(d)     BUYER IS ADVISED TO HAVE BUYER'S OWN PROFESSIONAL PROPERTY INSPECTION CONSULTANT INSPECT THE PROPERTY AND ADVISE BUYER AS TO ITS CONDITION AND ITS SUITABILITY FOR BUYER'S INTENDED PURPOSE. BUYER UNDERSTANDS AND AGREES THAT, SO LONG AS THE PROPERTY IS HABITABLE, THE REPAIR OF ANY ITEMS NOTED BY BUYER IN ITS INSPECTION PUNCH LIST AS STATED IN SECTION 9 ABOVE, AND FACT THAT SUCH ITEMS MAY NOT BE COMPLETED PRIOR TO THE CLOSE OF ESCROW, SHALL NOT BE A CONDITION PRECEDENT TO CLOSE OF ESCROW, NOR ENTITLE BUYER TO EXTEND OR OTHERWISE DELAY THE CLOSE OF ESCROW.

UNIT: __0924__

(e)    BUYER HEREBY WAIVES ANY NON-STATUTORY IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO, ANY WARRANTY REGARDING THE MERCHANTABILITY, VALUE, QUALITY AND/OR CONDITION OF THE PROPERTY AND THE ASSOCIATION PROPERTY.

BUYER'S Initials

34.    PROHIBITION AGAINST ASSIGNMENT.    BUYER AGREES AND ACKNOWLEDGES THAT BUYER MAY NOT ASSIGN OR TRANSFER BUYER'S RIGHTS AND/OR INTERESTS UNDER THIS AGREEMENT OR, PRIOR TO THE CLOSE OF THIS ESCROW, EITHER MARKET THE PROPERTY OR ENTER INTO A CONTRACT OR AN ESCROW FOR THE RESALE OF SAID REAL PROPERTY WITHOUT SELLER'S WRITTEN CONSENT. SELLER RESERVES THE UNRESTRICTED RIGHT TO WITHHOLD SUCH CONSENT, WHICH MAY EVEN BE ARBITRARY OR UNREASONABLE. SELLER'S CONSENT MAY BE CONDITIONED IN ANY MANNER IT DESIRES, IN ITS SOLE DISCRETION. IF BUYER ATTEMPTS TO DO OR DOES ANY OF THE FOREGOING, SUCH ACTION BY BUYER SHALL CONSTITUTE A DEFAULT. SELLER SHALL HAVE THE OPTION TO CANCEL THIS ESCROW AND BUYER'S DEPOSIT SHALL BE SUBJECT TO THE LIQUIDATED DAMAGES PROVISION AS STATED IN SECTION 11 OF THIS PURCHASE AND SALE AGREEMENT. THE FACT THAT THE SELLER REFUSES TO GIVE ITS CONSENT TO AN ASSIGNMENT SHALL NOT GIVE RISE TO ANY CLAIM FOR ANY DAMAGES AGAINST SELLER. IF BUYER IS A CORPORATION, OTHER BUSINESS ENTITY, TRUSTEE OR NOMINEE, A TRANSFER OF ANY EQUITABLE, BENEFICIAL, LEGAL OR PRINCIPAL INTEREST IN OR TO BUYER WILL CONSTITUTE AN ASSIGNMENT OF THE AGREEMENT REQUIRING SELLER'S CONSENT.  SELLER MAY FREELY ASSIGN, TRANSFER OR SELL ANY OR ALL OF ITS RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT. NOTWITHSTANDING

ANYTHING TO THE CONTRARY CONTAINED HEREIN, BUYER, WITHOUT SELLER'S CONSENT, SHALL BE ENTITLED TO ASSIGN BUYER'S RIGHT, TITLE AND INTEREST IN THIS AGREEMENT TO A CORPORATION, PARTNERSHIP OR TRUST, OF WHICH BUYER OWNS AND CONTROLS A FIFTY-ONE PERCENT (51%) OF THE VOTING AND CONTROLLING INTERESTS.  IN THE EVENT OF SUCH AN ASSIGNMENT BY BUYER, BUYER MAY NOT TRANSFER ANY EQUITY, BENEFICIAL OR PRINCIPAL INTEREST IN THE CORPORATION, PARTNERSHIP OR TRUST TO WHICH BUYER HAS ASSIGNED THIS AGREEMENT WITHOUT SELLER'S PRIOR WRITTEN CONSENT, WHICH CONSENT MAY BE WITHHELD OR CONDITIONED BY SELLER IN ANY MANNER SELLER DESIRES IN SELLER'S SOLE DISCRETION

35.    FORCE MAJEURE.    SELLER shall be deemed without fault in the event of delay in completion of any modification or improvements to the Property or Close of Escrow caused by or resulting from acts of God, riot or civil disorder, changes in governmental regulations, acts of government bodies or their employees or agents, inclement weather, strikes, boycotts, picketing or other obstructive actions of employees of SELLER or any subcontractor of SELLER, or by any labor organizations, for any reason; or the inability of SELLER to secure labor or any materials specified or reasonably necessary to construct the residence being purchased by BUYER through ordinary business channels for any reason except the failure of SELLER'S credit to meet reasonable requirements.  If this Agreement shall terminate due to the foregoing, BUYER shall be entitled to a refund of all payments deposited by BUYER in Escrow, except that Escrow Holder shall disburse from BUYER'S funds amounts required to pay for items specified by Escrow Holder.

36.    GOOD FUNDS LAW.    All parties hereto acknowledge having been made aware of Assembly Bill 512 (frequently referred to as the "Good Funds Law"), effective January 1, 1990, which adds Section 12413.1 to the California Insurance Code and sets forth the times for disbursement of monies after funds are deposited to the title company's escrow trust account.

BUYER has been made aware that, under said law, if the lender deposits other than cash or makes other than an electronic payment (wire transfer), BUYER may be charged an additional one (1), two (2) or three (3) days' interest for check clearance.  If the lender makes an electronic payment (wire transfer), BUYER may be charged a wire transfer fee by BUYER'S lender.  It is BUYER'S responsibility to determine the type of funds BUYER'S lender will be depositing to complete BUYER'S escrow.  Escrow Holder will not be responsible for accruals of interest resulting from compliance with the disbursement restrictions mandated by this law.

SELLER has been made aware that the sale proceeds cannot be disbursed by Escrow Holder until such funds have been received and are available for withdrawal by Escrow Holder.  (This could be one (1), two (2) or three (3) days following the recording of documents.)  SELLER is also aware that there may be an Electronic Transfer Fee charged by the title company to SELLER'S account.  Escrow Holder will not be responsible for accruals of interest resulting from compliance with the disbursement restrictions mandated by this law.

Regardless of the date of final disbursement of funds, all pro-rations shall be made as of the date of recordation of the Grant Deed and the Closing Date shall be deemed to be the date of recordation of the Grant Deed to the BUYER herein.

UNIT: __0924__

37.    COMPUTATION OF PERIODS.  All periods of time referred to in this Agreement shall include all Saturdays, Sundays, or national holidays, provided, that if the date to perform any act or give any notice specified in this Agreement shall fall on a Saturday, Sunday, or national holiday, such act or notice may be timely performed on the succeeding day which is not a Saturday, Sunday, or national holiday.

38.    REPRESENTATIONS AND ACKNOWLEDGEMENTS.  BY BUYER'S SIGNATURE BELOW, BUYER ACKNOWLEDGES AND REPRESENTS ITS UNDERSTANDING AND AGREEMENT WITH THE FOLLOWING:

(a)    THE PROJECT IS LOCATED IN A COMMERCIAL AREA, THERE IS A RETAIL COMPONENT TO THE BUILDING LOCATED DIRECTLY ON THE FIRST FLOOR OF THE PROJECT, AND THE PARKING GARAGE SERVING THE PROJECT MAY ALSO SERVE THE PUBLIC OR RETAIL TENANTS AND PATRONS OF THE BUILDING. BUYER ACKNOWLEDGES THAT THESE CONDITIONS AS WELL AS NEIGHBORING BUSINESS USES, MAY MAKE, CAUSE, OR RESULT IN NOTICEABLE AMOUNTS OF NOISE, ACTIVITY, PEDESTRIAN AND VEHICULAR TRAFFIC, LIGHTS OR REFLECTIONS, SHADOWS OR OBSTRUCTION OF LIGHT AND VIEWS, ODORS, AND OTHER CONDITIONS NOT LISTED HEREIN BUT ASSOCIATED WITH COMMERCIAL CENTERS.

(b)    THE PROJECT IS NOT NEW CONSTRUCTION.  IT WAS ORIGINALLY CONSTRUCTED IN THE 1920'S AND WAS USED AS A COMMERCIAL OFFICE BUILDING.  IT HAS BEEN RENOVATED IN ACCORDANCE WITH THE ADAPTIVE REUSE CONSTRUCTION GUIDELINES FOR THE CITY OF LOS ANGELES AND LOS ANGELES MUNICIPAL CODE SECTIONS 91.8501 AND 91.8502 REGARDING LIVE/WORK UNITS.  AS A CONSEQUENCE, THE UNITS IN PROJECT MAY CONTAIN UNEVEN SURFACES, INCLUDING, BUT NOT LIMITED TO, FLOORS AND WALLS. SUCH SURFACES MAY CONTAIN CRACKS, FISSURES AND OTHER "IMPERFECTIONS" THAT HAVE OCCURRED OVER TIME, OR INTENTIONALLY CREATED AS A PART OF THE ARCHITECTURAL OR DESIGN ELEMENTS IN ORDER TO CREATE A CERTAIN LOOK AND FEEL ASSOCIATED WITH A HISTORICAL OR OLDER BUILDINGS.

(c)    CRACKS, FISSURES AND OTHER "IMPERFECTIONS" EITHER COMMON TO OR RESULTING IN OLDER BUILDINGS SUCH AS THE PROJECT MAY PERMIT INTRUSION OF WATER FROM THE WINDOW FRAMES AND/OR WALLS, AND AS SUCH, THE WINDOWS AND WALLS ARE NOT WATERPROOF AND NOT GUARANTEED TO BE WATERPROOF BY THE SELLER.

(d)    BUYER IS AWARE OF AND ACKNOWLEDGES IRREGULARITIES IN THE WALLS, FLOORS, COLUMNS, ASSOCIATION PROPERTY, AND ALL OTHER EXISTING ELEMENTS OF THE PROJECT ARE PART OF THE CHARACTER OF THE PROJECT AND ARE ACCEPTED IN THEIR CURRENT CONDITION.

(e)    THE WINDOWS IN THE CONDOMINIUM UNIT MAY BE EXISTING WINDOWS FROM THE ORIGINAL CONSTRUCTION OF THE BUILDING, NEW WINDOWS, OR A COMBINATION OF BOTH.  THE WINDOW FRAMES WERE DESIGNED AND USED FOR NATURAL LIGHT AND VENTILATION FOR THE BUILDING'S ORIGINAL COMMERCIAL USE.  AS A RESULT OF VARIOUS HISTORICAL RESTRICTIONS, THE SELLER WAS PROHIBITED FROM REPLACING CERTAIN PORTIONS OF THE PROJECT AND WINDOWS, AND AS A RESULT EXISTING WINDOW FRAMES IN THE PROJECT HAVE BEEN RETROFITTED OR RE-GLAZED WITHIN THE CONSTRAINTS IMPOSED, AND THEREFORE, THE WINDOW SYSTEMS MAY NOT HAVE WEATHER STRIPING, AND ARE NOT AIR-TIGHT, WEATHER-TIGHT, WATER-TIGHT, OR IN ANY MANNER WEATHERPROOF FOR INSULATION, MOISTURE, WIND, OR SOUND PURPOSES.

(f)    THE CONCRETE FLOOR/CEILING SYSTEM IN THE CONDOMINIUM UNITS IS PART OF THE ORIGINAL STRUCTURE OF THE BUILDING, AND HAS NOT BEEN MODERNIZED OR MODIFIED TO LIMIT THE TRANSFER OF SOUND.  THE PROJECT IS A MULTI-FLOOR, MULTI-UNIT LIVE/WORK DEVELOPMENT, AND AS SUCH, WALLS, CEILINGS AND FLOORS ARE SHARED WITH NEIGHBORS.  EACH OWNER MUST BE CONSIDERATE OF OTHER OWNERS AND MAKE AN EFFORT TO AVOID THESE TYPES OF NOISES.

(g)    STRUCTURAL UPGRADES HAVE BEEN MADE TO THE BUILDING PURSUANT TO THE ADAPTIVE REUSE GUIDELINES OF THE CITY OF LOS ANGELES.

(h)    ALTHOUGH THE PROJECT IS CONSTRUCTED IN COMPLIANCE WITH APPLICABLE BUILDING CODE REQUIREMENTS REGARDING SOUND INSULATION, THE PROJECT IS NOT SOUNDPROOF.  THE HVAC SYSTEM, STAIRWAYS, ENTRY AREAS, GARAGE GATES, AND ELEVATOR SYSTEM WILL GENERATE NOISE. AIRBORNE AND IMPACT SOUNDS GENERATED BY OCCUPANTS WITHIN THEIR UNITS WILL BE HEARD.  AIRBORNE SOUNDS MAY INCLUDE, BUT NOT BE LIMITED TO, CONVERSATIONS, MUSICAL INSTRUMENTS, AUDIO EQUIPMENT, AND TELEVISIONS.  IMPACT SOUNDS MAY INCLUDE, BUT NOT BE LIMITED TO, FOOTFALL SOUNDS, DOORS CLOSING OR SLIDING, AND OBJECTS BEING DROPPED OR DRAGGED.  OTHER SOURCES OF NOISE INCLUDE, BUT ARE NOT LIMITED TO, STREET SOUNDS AND ACTIVITIES EITHER AT THE RETAIL PORTION OF THE PROJECT LOCATED ON THE GROUND FLOOR, OR FROM NEIGHBORING PROPERTIES OR BUSINESSES.  BUYER UNDERSTANDS, ACKNOWLEDGES, AND HEREBY CONFIRMS HAVING BEEN ADVISED BY SELLER THAT NOISE,

UNIT: __0924__

SOUND, AND ODOR TRANSMISSIONS IN HIGH RISE BUILDINGS ARE VERY DIFFICULT TO CONTROL, AND THAT NOISE, SOUND, AND ODORS FROM EITHER OTHER UNITS, OTHER PARTS OF THE PROJECT AND MECHANICAL EQUIPMENT CAN OFTEN BE HEARD IN OTHER UNITS. SELLER MAKES NO REPRESENTATION OR WARRANTY REGARDING THE LEVEL OF SOUND OR ODOR TRANSMISSION BETWEEN UNITS OR WITHIN THE PROJECT, AND BUYER HEREBY EXPRESSLY WAIVES AND RELEASES SELLER FROM ANY CLAIMS OR WARRANTIES IN CONNECTION WITH ANY DAMAGES OR LOSSES RESULTING FROM ANY NOISE OR ODOR TRANSMISSIONS WITHIN, IN, OR ABOUT THE UNIT OR PROJECT. IN THE EVENT THAT BUYER DESIRES TO INSTALL ANY TILE, MARBLE, HARD WOOD FLOORS, OR ANY OTHER HARD SURFACE FLOORING WITHIN THE UNIT OR THE BALCONIES, BUYER MUST FIRST OBTAIN THE APPROVAL OF THE ASSOCIATION , AND INSTALL NOISE INSULATION ALONG WITH THE INSTALLATION OF ANY SUCH HARD SURFACE FLOORING.

(i)    BUYER IS AWARE THAT THE CONDOMINIUM UNIT BEING PURCHASED BY BUYER IS A LIVE/WORK UNIT AND THE USE THEREOF IS GOVERNED BY CHAPTER IX, ARTICLE 1, SECTION 91.8501 OF THE LOS ANGELES MUNICIPAL CODE.

(j)    THE PROJECT IS A MIXED-USE PROJECT CONTAINING BOTH RESIDENTIAL AND COMMERCIAL CONDOMINIUM UNIT(S).    GROUND FLOOR CONDOMINIUM UNITS MAY BE LEASED FOR RESIDENTIAL, RETAIL, AND/OR COMMERCIAL USES. COMMERCIAL CONDOMINIUM UNIT(S) MAY BE USED FOR ANY PURPOSE PERMITTED BY THE DECLARATION AND APPLICABLE LAW.  SUCH USES MAY INCLUDE WITHOUT LIMITATION, RESTAURANTS, BARS, AND MARKETS.  THE USES OF THE COMMERCIAL UNIT(S) MAY PRODUCE ODORS AND IMPACT THE NOISE LEVEL AND THE CAR AND FOOT TRAFFIC PATTERNS WITHIN AND SURROUNDING THE PROJECT.  AT THE TIME OF EXECUTION OF THIS AGREEMENT, SELLER CONTEMPLATES ONLY FIVE (5) COMMERCIAL UNITS, TO BE OCCUPIED BY RESTAURANTS, BAR, AND MARKET, BUT RESERVES THE RIGHT TO HAVE MORE THAN FIVE (5) COMMERCIAL UNITS, AS PERMITTED BY THE CITY, WITH VARYING USES AS THE SELLER DEEMS BEST. SELLER IS CURRENTLY APPLYING TO THE CITY FOR A LIQUOR LICENSE AND A REVOCABLE PERMIT OR OTHER SUCH MECHANISM TO ALLOW USE OF THE PUBLIC SIDEWALK FOR OUTSIDE SEATING TO BE USED BY THE OWNER(S) AND/OR TENANT(S) OF COMMERCIAL UNIT(S).

(k)    EXCEPT FOR THE COMMERCIAL CONDOMINIUM UNIT(S), THE PROJECT IS NOT REQUIRED TO, AND DOES NOT COMPLY WITH THE REQUIREMENTS OF THE AMERICANS WITH DISABILITIES ACT.

(l)    ALL WASHERS AND DRYERS INSTALLED BY OWNERS MUST BE VENTLESS.

(m)    BUYER IS AWARE THAT THE SUBJECT PROPERTY MAY BE AFFECTED BY FUTURE DEVELOPMENT OF PROPERTY IN THE NEIGHBORHOOD OR SURROUNDING AREAS, INCLUDING WITHOUT LIMITATION, VIEW, NOISE, TRAFFIC, RIGHTS-OF-WAY, LOCAL SERVICES AND SAFETY. BUYER UNDERSTANDS THAT THIS PROJECT AND OTHER SURROUNDING PROJECTS ARE CURRENTLY, AND MAY IN THE FUTURE CONTINUE TO BE, UNDER DEVELOPMENT.  BUYER AGREES THAT SELLER AND BROKER MAKE NO REPRESENTATION AS TO THE PRESERVATION OF VIEWS, AND VIEWS MAY BE AFFECTED BY FUTURE DEVELOPMENT OR CONSTRUCTION/ALTERATION OF NEIGHBORING PROPERTIES. BUYER ACKNOWLEDGES THAT ANY CONSTRUCTION OR IMPROVEMENT BY SELLER, THE ASSOCIATION, OR ANY OTHER OWNER OF A CONDOMINIUM UNIT IN THE PROJECT, OR THE OWNERS OF ANY PROPERTY CONTIGUOUS OR ADJACENT TO THE PROJECT, MAY IMPAIR OR OBSTRUCT ANY VIEW THAT BUYER MAY HAVE ENJOYED AT THE TIME OF THE PURCHASE OF THE CONDOMINIUM UNIT. BUYER HEREBY ACKNOWLEDGES THAT ANY RIGHTS ACQUIRED DO NOT INCLUDE THE PRESERVATION OF ANY VIEW.

(n)    ALL CONSTRUCTION PLANS, CONDOMINIUM PLANS, AND SALES MATERIALS CONTAIN DIMENSIONS THAT ARE APPROXIMATE. THE DIMENSIONS LISTED IN THESE MATERIALS ARE NOT INTENDED TO BE PRECISE REPRESENTATIONS OF EXACT DIMENSIONS WITH REGARD TO THE PROJECT OR THE UNIT.

(o)    BUYER IS AWARE THAT THE DECLARATION IMPOSES CERTAIN RESTRICTIONS AND OBLIGATIONS REGARDING THE USE AND OCCUPANCY OF THE PROPERTY. BUYER IS ADVISED TO CAREFULLY REVIEW THE DECLARATION.

(p)    THIS AGREEMENT REPRESENTS THE ENTIRE AND COMPLETE AGREEMENT BETWEEN SELLER AND BUYER. ANY AND ALL STATEMENTS, REPRESENTATIONS, WARRANTIES, AGREEMENTS AND THE LIKE, WHETHER CONTAINED IN ANY PRIOR WRITTEN DOCUMENT OR MADE ORALLY, AND WHICH ARE NOT CONTAINED HEREIN, SHALL BE DEEMED TO BE, AND ARE HEREBY DECLARED TO BE, NULL AND VOID AND SUPERSEDED HEREBY.  BUYER EXPRESSLY ACKNOWLEDGES THAT BUYER IS NOT RELYING ON ANY STATEMENTS, REPRESENTATIONS OR WARRANTIES MADE BY ANY ENTITY OR PERSONS, INCLUDING ANY SALES REPRESENTATIVE(S), BROKER(S), AGENT, EMPLOYEE, CONTRACTOR, OR OTHER PERSON CLAIMING TO ACT ON, BEHALF, OR FOR THE SELLER, EITHER WRITTEN OR ORAL, EXPRESS OR IMPLIED, OTHER THAN THOSE SPECIFICALLY SET FORTH IN THIS AGREEMENT OR ANY ADDENDA OR AMENDMENTS HERETO. BUYER

UNIT: __0924__

UNDERSTANDS AND ACKNOWLEDGES THAT: (I) NO SALESMAN, BROKER, OR OTHER PERSON HAS ANY AUTHORITY WHATEVER TO MAKE ANY REPRESENTATION, AGREEMENT, OR WARRANTY, EXPRESS OR IMPLIED, FOR SELLER EXCEPT FOR THOSE EXPRESSLY SET FORTH HEREIN OR IN ANY ADDENDA OR AMENDMENTS HERETO; AND (II) IF ANY SALESMAN, BROKER, OR OTHER PERSON HAS MADE, OR MAKES IN THE FUTURE, EITHER ORALLY OR IN WRITING, ANY REPRESENTATION, AGREEMENT OR WARRANTY DIFFERENT FROM, OR IN ADDITION TO, THOSE EXPRESSLY SET FORTH HEREIN OR IN ANY ADDENDA OR AMENDMENTS HERETO, EACH AND ALL OF THE SAME SHALL BE INVALID, UNENFORCEABLE AND NOT BINDING ON SELLER.

(q)    BUYER REPRESENTS THAT BUYER IS MAKING THIS PURCHASE IN RELIANCE UPON BUYER'S INDEPENDENT INVESTIGATION OF THE ABOVE-DESCRIBED PROPERTY AND THE ASSOCIATION PROPERTY OF THE PROJECT AND NOT IN RELIANCE UPON ANY REPRESENTATIONS OR WARRANTIES MADE BY SELLER OR SELLER'S AGENTS.

(r)    UPON CLOSE OF ESCROW, BUYER SHALL BECOME A MEMBER OF THE ASSOCIATION, A NONPROFIT CORPORATION FORMED FOR, AMONG OTHER THINGS, MAINTAINING AND REPAIRING AND REPLACING THE ASSOCIATION PROPERTY ASSOCIATED WITH OR INCLUDED WITHIN THE PROJECT.

(s)    EXECUTION OF THIS AGREEMENT BY BUYER AND SELLER'S SALES REPRESENTATIVE SHALL CONSTITUTE ONLY AN OFFER TO PURCHASE WHICH SHALL NOT BE BINDING UNLESS SELLER DELIVERS TO BUYER A COPY OF THIS AGREEMENT EXECUTED BY SELLER WITHIN TWENTY (20) BUSINESS DAYS AFTER THE DATE OF THIS AGREEMENT. FAILURE OF SELLER TO SO ACCEPT SHALL AUTOMATICALLY REVOKE THIS OFFER AND ALL FUNDS DEPOSITED BY BUYER WITH SELLER SHALL BE PROMPTLY REFUNDED TO BUYER.

(t)    SELLER'S SALES REPRESENTATIVES ARE NOT AUTHORIZED TO ACCEPT THIS OFFER. RECEIPT AND DEPOSIT OF BUYER'S FUNDS SHALL NOT CONSTITUTE AN ACCEPTANCE OF THIS OFFER BY SELLER. NO AGREEMENT OR REPRESENTATION HAS BEEN MADE BY SELLER, SELLER'S AGENTS OR REPRESENTATIVES THAT BUYER'S CREDIT WILL BE APPROVED BY SELLER'S PREFERRED LENDER OR THAT A LOAN COMMITMENT WILL BE OBTAINED.

(u)    THE UNDERSIGNED BUYER(S) HEREBY REPRESENT AND WARRANT TO SELLER THAT THE UNDERSIGNED BUYER(S) ARE THE SOLE BUYER(S) AND ONLY THE UNDERSIGNED BUYER(S) WILL TAKE TITLE TO, AND POSSESSION OF, THE PROPERTY AND WILL EXECUTE, IN A TIMELY MANNER, ANY AND ALL PURCHASE AGREEMENTS, ESCROW INSTRUCTIONS, LOAN DOCUMENTS, LOAN GUARANTY AGREEMENTS, ETC., WITH RESPECT TO THIS TRANSACTION.

(v)    AS BETWEEN BUYER AND SELLER IT IS AGREED THAT THE VARIOUS STEPS OF CONSTRUCTION SHALL BE DEEMED TO HAVE BEEN SATISFACTORILY AND FULLY PERFORMED WHEN APPROVED BY THE APPROPRIATE GOVERNMENTAL AUTHORITY OR AGENCY EXERCISING JURISDICTION OVER THE SAME, AND SHALL BE DEEMED TO BE COMPLETED AND AS FULLY COMPLYING WITH THE TERMS THEREOF WHEN A NOTICE OF COMPLETION HAS BEEN RECORDED, AND WHEN SAID APPROPRIATE GOVERNMENTAL AUTHORITY OR AGENCY HAS ISSUED ITS CERTIFICATE (OR LIKE DOCUMENTS) PERMITTING OCCUPANCY. IT IS UNDERSTOOD AND AGREED THAT SELLER IS NOT BUILDING THE PROJECT OR THE DWELLING OR SPACE TO BE CONSTRUCTED ON THE REAL PROPERTY TO THE PRECISE SPECIFICATIONS OR DESIGNS OF ANY MODEL(S), PHOTOGRAPH(S), BROCHURE(S), ADVERTISING MATERIAL(S), RENDERING(S), WEBSITE INFORMATION OR MATERIAL(S), OR OTHER LITERATURE OR DRAWINGS, NOR TO THE SPECIFICATIONS OF BUYERS. ANY MODEL(S), PHOTOGRAPH(S), BROCHURE(S), ADVERTISING MATERIAL(S), RENDERING(S), WEBSITE INFORMATION OR MATERIAL(S), OR OTHER LITERATURE OR DRAWINGS WHICH HAVE BEEN USED OR DISPLAYED, HAVE BEEN FOR ILLUSTRATIVE PURPOSES ONLY, AND SUCH USE OR DESCRIPTION SHALL NOT CONSTITUTE AN AGREEMENT OR COMMITMENT ON THE PART OF SELLER TO DELIVER THE PROPERTY HEREIN PURCHASED IN EXACT ACCORDANCE WITH ANY SUCH MODEL(S), PHOTOGRAPH(S), BROCHURE(S), ADVERTISING MATERIAL(S), RENDERING(S), WEBSITE INFORMATION OR MATERIAL(S), OR OTHER LITERATURE OR DRAWINGS. CONSULTATION WITH BUYERS WITH RESPECT TO THE SPECIFICATIONS OF THE DWELLING TO BE BUILT SHALL NOT IN ANY CASE, BE DEEMED A WAIVER OF SELLER'S RIGHTS TO MAKE ANY CHANGES AS ARE IN THIS PARAGRAPH PROVIDED. IN THIS REGARD, SELLER RESERVES THE RIGHT TO MAKE ANY CHANGES OR SUBSTITUTIONS IN THE PROJECT AND/OR THE DWELLING AS SELLER MAY DEEM NECESSARY, DESIRABLE, OR APPROPRIATE INCLUDING BUT NOT LIMITED TO THE PLANS AND SPECIFICATIONS, CONSTRUCTION, LANDSCAPING, MATERIALS, FIXTURES AND OTHER INTEGRALS SO LONG AS THE SAME ARE OF SUBSTANTIALLY EQUAL QUALITY AND UTILITY AND WHICH MEET WITH THE APPROVAL OF THE APPROPRIATE GOVERNMENTAL AUTHORITY OR AGENCY. NONE OF THE ITEMS OR FURNISHINGS SHOWN IN ANY MODEL(S), PHOTOGRAPH(S), BROCHURE(S), ADVERTISING MATERIAL(S), RENDERING(S), WEBSITE INFORMATION OR MATERIAL(S), OR OTHER LITERATURE OR DRAWINGS, IS INCLUDED IN THIS PURCHASE UNLESS SELLER HEREIN SPECIFICALLY AGREES THERETO IN WRITING. ALL ADVERTISING MATERIAL, BROCHURES, MAPS AND/OR SKETCHES (OTHER THAN

BUYER
06-12-07

SELLER

UNIT: __0924__

THOSE PROVIDED BY THE TITLE COMPANY) CONSTITUTE ADVERTISING MATERIALS AND SHALL NOT BE CONSTRUED AS REPRESENTATIONS OR WARRANTIES OF MATTERS REQUIRING PERFORMANCE BY SELLER.

(w)    SELLER MAKES NO REPRESENTATIONS REGARDING THE LOCATION OF THE PROPERTY OR ANY ACCESS OR SERVICE TO OR FROM THE PROPERTY IN CONNECTION WITH ANY SCHOOLS, HOSPITALS, EMERGENCY SERVICES, PARKS, OR BUSINESSES. BUYER ACKNOWLEDGES THAT BUYER IS RESPONSIBLE FOR INVESTIGATING TO BUYER'S SATISFACTION THE PROXIMITY OF SCHOOLS, HOSPITALS, FACTORIES, HEAVILY TRAVELED STREETS, AIR CORRIDORS, OFF-SITE POWER SOURCES, PARKS AND OTHER SOURCES OF NOISE OR POLLUTION ADJACENT TO OR IN THE VICINITY OF THE PROPERTY AND THE LOCATION OF OTHER DESIRABLE OR UNDESIRABLE FACILITIES, INCLUDING, BUT NOT LIMITED TO, THE SEISMIC ACTIVITY IN THE AREA. SELLER MAKES NO REPRESENTATIONS ABOUT THE RELATIVE SAFETY OF THE COMMUNITY OR THE VICINITY IN WHICH SUBJECT PROPERTY IS LOCATED. AREAS NEAR SUBJECT PROPERTY MAY BE ZONED, AMONG OTHER THINGS, FOR RESIDENTIAL USE, COMMERCIAL USE, INDUSTRIAL USE OR SOME COMBINATION THEREOF. IT IS THE DUTY OF BUYER TO EVALUATE THE ZONING AND PAST USE OF NEARBY PROPERTY TO DETERMINE WHETHER PAST, PRESENT OR FUTURE USES OF NEARBY PROPERTY MAY INTERFERE WITH BUYER'S INTENDED USE OF SUBJECT PROPERTY. BUYER AGREES TO MAKE BUYER'S OWN INVESTIGATION, AND BY SIGNING THIS AGREEMENT, BUYER AGREES THAT SELLER NEED NOT LOCATE OR IDENTIFY FOR BUYER KNOWN OR SUSPECTED HAZARDS, ENVIRONMENTAL OR OTHERWISE, WHICH DO NOT ARISE ON THE SUBJECT PROPERTY.

(x)    SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE PRICE OR VALUE OF ANY OF THE DWELLINGS TO BE CONSTRUCTED BY SELLER, OR ITS SUCCESSORS. IT IS UNDERSTOOD, ACKNOWLEDGED AND AGREED THAT: THE DWELLING BEING PURCHASED MAY DIFFER IN PRICE FROM OTHER DWELLINGS IN THE PROJECT, AND MAY BE SOLD FOR HIGHER OR LOWER PRICES THAN THAT PAID FOR OTHER DWELLINGS BEING SOLD WITHIN THE PROJECT; INCENTIVES, PROMOTIONS OR CONCESSIONS NOT OFFERED TO BUYER MAY BE OFFERED TO OTHERS; AND SELLER RESERVES THE RIGHT, IN ITS SOLE DISCRETION, AND WITHOUT NOTICE TO BUYER, TO INCREASE OR DECREASE THE PRICE OF DWELLINGS IN THE PROJECT AT ANY TIME. BUYER SHALL HAVE NO RIGHTS TO PARTICIPATE IN INCENTIVES, PROMOTIONS OR CONCESSIONS OFFERED TO OTHERS NOR SHALL BUYER HAVE THE RIGHT TO MODIFY OR RESCIND THE TERMS OF THIS AGREEMENT OR BUYER'S PURCHASE OF THE DWELLING BY REASON OF THE SAME. BUYER UNDERSTANDS, ACKNOWLEDGES, AND HEREBY REPRESENTS THAT NEITHER SELLER, THE DEVELOPERS NOR ANY OF SELLER'S OR THE DEVELOPERS' EMPLOYEES, AGENTS, ATTORNEYS, BROKERS, SALESPERSONS HAS ADVISED OR MADE ANY REPRESENTATION TO BUYER, AND THAT SELLER MAKES ABSOLUTELY NO WARRANTIES, EXPRESS OR IMPLIED, ABOUT THE FEASIBILITY OR POTENTIAL OFFERING OR USE OF THE UNIT AS AN INVESTMENT OPPORTUNITY FOR APPRECIATION IN ITS VALUE, OR AS A MEANS OF OBTAINING INCOME FROM THE RENTAL OF THE UNIT. BUYER FURTHER ACKNOWLEDGES THAT NEITHER SELLER, NOR ANY OF SELLER'S EMPLOYEES, AGENTS, ATTORNEYS, BROKERS, OR SALESPERSONS HAS ADVISED OR MADE ANY REPRESENTATION TO BUYER THAT THERE IS ANY FORM OF ECONOMIC BENEFIT TO BE DERIVED FROM PURCHASING THE UNIT, INCLUDING WITHOUT LIMITATION, ANY BENEFITS TO BE DERIVED FROM A FUTURE SALE OF THE PROPERTY, RENTAL INCOME, OR ANY STATE OR FEDERAL TAX BENEFITS RESULTING FROM THE PURCHASE OF THE UNIT.

(y)    BUYER IS AWARE THAT AT THE TIME THIS ESCROW CLOSES, ALL OF THE INDIVIDUAL CONDOMINIUM UNITS AND THE ASSOCIATION PROPERTY OF THE PROJECT MAY NOT BE COMPLETED. CONTINUING CONSTRUCTION ACTIVITIES MAY AFFECT BUYER'S ENJOYMENT OF BUYER'S PROPERTY.

(z)    SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WITH REGARD TO THE TAX OR OTHER BENEFITS OF OWNERSHIP OF THE PROPERTY.

(aa)    BUILDING HAS A HISTORICAL DESIGNATION, AND THEREFORE, MANY ASPECTS OF THE BUILDING COULD NOT BE CHANGED BECAUSE OF NON-APPROVAL FROM APPLICABLE GOVERNMENTAL OR SUPERVISORY AGENCIES.

40.    SELLER DEFAULT. IN THE EVENT OF SELLER'S DEFAULT UNDER THIS AGREEMENT, BUYER'S REMEDY IS LIMITED TO LIQUIDATED DAMAGES PURSUANT TO PARAGRAPH 11 HEREIN. BY SIGNING BELOW, BUYER WAIVES THE RIGHT TO PURSUE ANY OTHER REMEDY AT LAW OR IN EQUITY.

42.    ATTACHMENTS. All Addenda and Amendments attached hereto by the parties are incorporated herein by this reference. By signing below, BUYER hereby acknowledges receipt and agreement with the terms and provisions of such Addenda and Amendments

43.    SEVERABILITY. If any term, condition or provision of this Agreement is declared illegal or invalid for any reason by a court of competent jurisdiction, or arbitrator, the remaining terms, conditions and provisions shall, nevertheless,

BUYER
06-12-07

SELLER

UNIT: __0924__

remain in full force and effect and the purchase price set forth herein shall be adjusted to reflect the greater or lesser obligations and risks imposed on the respective parties as a result of such modification of this Agreement.

44.    NOTICE OF YOUR 'SUPPLEMENTAL' PROPERTY TAX BILL.  California property tax law requires the Assessor to revalue real property at the time the ownership of the property changes.  Because of this law, you may receive one or two supplemental tax bills, depending on when your loan closes.  The supplemental tax bills are not mailed to your lender.  If you have arranged for your property tax payments to be paid through an impound account, the supplemental tax bills will not be paid by your lender.  It is your responsibility to pay these supplemental bills directly to the Tax Collector.  If you have any questions concerning this matter, please call your local Tax Collector's Office."

45.    DEVIATIONS FROM SELLER'S SALES INFORMATION.  Buyer understands, acknowledges, and agrees that the Unit may differ from the brochures, models, advertising information, website, floorplans, brands and models of appliances shown, and other materials which may have been shown or described to Buyer during different stages of the Project's development ("Seller's Sales Materials").  As a result, Buyer understands, acknowledges, and agrees that any changes to the Unit or Project as compared to the Seller's Sales Materials may be the result of many different factors or reasons, and that Seller is under no obligation to provide Buyer with any notice of any such changes, and that no such changes shall serve as a basis for Buyer's claim to have a right to cancel this Agreement or refuse to execute the Certificate of Acceptance and delivery the same to Seller.  Buyer understands, acknowledges, and agrees that Seller shall have the absolute right to make any changes, modifications, or omissions to the Unit, as the Seller deems appropriate, provided that such changes do not substantially, materially and adversely affect Buyer.

46.    PARKING.  BUYER UNDERSTANDS AND AGREES THAT BUYER MAY ENTER INTO A LEASE FOR A PARKING SPACE WITHIN THE PROJECT, SIMILAR TO THAT WHICH IS ATTACHED PURSUANT TO TERMS AND PROVISIONS SIMILAR TO THOSE STATED IN EXHIBIT "D" ATTACHED HERETO (WHICH AT ALL TIMES SHALL BE EXPRESSLY SUBJECT TO THE DECLARATION).  THE LEASE FOR SAID PARKING SPACE SHALL NOT BE PART OF THE PURCHASE PRICE OF BUYER'S UNIT.  BUYER FURTHER UNDERSTANDS AND AGREES THAT THE MONTHLY ASSESSMENT FOR ALL OWNERS, WHETHER OR NOT SAID OWNERS ARE PARTY TO A LEASE FOR A PARKING SPACE, SHALL INCLUDE A PAYMENT TO THE ASSOCIATION FOR THE ASSOCIATION'S EXPENSE TO LEASE GUEST PARKING SPACES IN THE PARKING FACILITY, AS SET FORTH IN THE DECLARATION.  BUYER MAY NOT USE VALET SERVICES OR SELF-PARK IN THE PARKING FACILITY AT ANY TIME IF BUYER DOES NOT ENTER INTO A LEASE FOR A PARKING SPACE, HOWEVER BUYER'S GUESTS MAY UTILIZE THE VALET SERVICES FOR GUEST PARKING.

**BUYER'S Initials** _____

47.    By signing below, both BUYER and SELLER agree to execute Escrow Holder's general instructions and any additional instructions from Escrow Holder as both may be modified or amended ("Instructions") within seven (7) calendar days of receipt of said Instructions.

*[Remainder Intentionally Left Blank – Continued on Next Page]*

BUYER _____    Page 25 of 25    SELLER _____
06-12-07

UNIT:  **0924**

**BUYER'S SIGNATURE HEREON CONSTITUTES AN OFFER BY BUYER TO SELLER TO PURCHASE THE PROPERTY.  UNLESS ACCEPTANCE HEREOF IS SIGNED BY SELLER WITHIN TWENTY-ONE (21) CALENDAR DAYS AFTER THE DATE HEREOF, THIS OFFER SHALL BE DEEMED REVOKED AND THE DEPOSIT SHALL BE RETURNED TO BUYER.**

**BUYER:**

_____        Date: _10 - 18_ , 200 _7_ .
**Missagh Pezeshkian**

_____        Date: _10-18_ , 200 _7_ .
**Hasmik Nazarian**

x. _Avak Khachadorian_                  _10. 18. 2007_
    **BROKER:**

x _____ _TER-PAPnee___             Date: _10/18_ , 200 _7_ .
    **Lola Terpapian**

SELLER HEREBY ACCEPTS THIS AGREEMENT AND BUYER'S OFFER TO PURCHASE, ON THIS _____, 200___ .

**SELLER:**                             Address:

ROOSEVELT LOFTS, LLC,                   727 W. 7th Street
a Delaware limited liability company    Los Angeles, CA 90017

By: THE ROOSEVELT LOFTS, INC.,          Telephone: (213) 623-3100
    a California corporation             Facsimile: (213) 623-3344
Its: Manager                            www.rsvlt.com

By:_____              With Copy To:
    M. Aaron Yashouafar
    Its: President                       c/o Milbank Real Estate Services, Inc.
                                         660 S. Figueroa Street, 24th Floor
                                         Los Angeles, California 90017
                                         Attention: Legal Department

UNIT: __0924__

## EXHIBIT "A"

### PURCHASER'S GRANT DEED

**RECORDING REQUESTED BY:**

ROOSEVELT LOFTS, LLC

**WHEN RECORDED RETURN TO:**

Robert O. Smylie, Esq.
Smylie & Associates
2049 Century Park East, Suite 4250
Los Angeles, CA 90068

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
#### GRANT DEED
#### (THE ROOSEVELT BUILDING – LOT 1 OF TRACT 63153)

The undersigned Grantor declares:

(1)     The documentary transfer tax is $_____. which is computed on full value of the property conveyed, County of Los Angeles.

(2)     The property is located in the City of Los Angeles, County of Los Angeles.

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, ROOSEVELT LOFTS, LLC, a Delaware limited liability company ("Grantor"), hereby grants to MR. & MRS. SAMPLE BUYER, ("Grantee") the following described real property in the City of Los Angeles, County of Los Angeles, State of California:

AS PER EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

|  |  |
|---|---|
| **GRANTOR:** | ROOSEVELT LOFTS, LLC |
|  | a Delaware limited liability company |

By: The Roosevelt Lofts, Inc.,
    a California corporation
Its: Manager

By: _____
Name: _____
Its: _____

### ACKNOWLEDGMENT

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF                    )

On _____, 200__, before me, _____, a Notary Public for the State of California, personally appeared _____. ⬜  personally known to me, or  ⬜  proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument, and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

(Seal)                                       _____
                                             Notary Public

BUYER_____ _____
06-12-07

SELLER_____

UNIT:  **0924**

### Exhibit A to Exhibit A (Purchaser's Grant Deed)

**A Condominium Comprised of:**

PARCEL 1: AN UNDIVIDED ONE OVER TWO HUNDRED TWENTY-TWO (1/222) FEE SIMPLE INTEREST AS TENANT IN COMMON IN AND TO THE RESIDENTIAL COMMON AREA IN MODULE "A" OF LOT 1 OF TRACT NO. 63153, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK ___, PAGES ____ THROUGH ____, INCLUSIVE, OF MAPS, AND AS SHOWN ON THAT CERTAIN CONDOMINIUM PLAN FOR ROOSEVELT BUILDING, WHICH CONDOMINIUM PLAN WAS RECORDED ON _____, 200__, AS INSTRUMENT NO. _____ OF OFFICIAL RECORDS ("CONDOMINIUM PLAN") AND ANY AMENDMENTS THERETO, ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2: UNIT NO. _____ IN MODULE "A" OF LOT 1 OF TRACT NO. 63153 AS SHOWN AND DESCRIBED IN SAID CONDOMINIUM PLAN.

RESERVING FROM SAID PARCELS 1 AND 2 ABOVE, FOR THE BENEFIT OF GRANTOR, ITS SUCCESSORS IN INTEREST, AND OTHERS, EASEMENTS FOR ACCESS, USE, ENJOYMENT, REPAIRS AND FOR OTHER PURPOSES ALL AS DESCRIBED IN THE DECLARATION OF ESTABLISHMENT OF CONDITIONS, COVENANTS AND RESTRICTIONS FOR THE ROOSEVELT BUILDING, RECORDED ON _____, 200__ AS INSTRUMENT NO. _____ OF THE OFFICIAL RECORDS OF LOS ANGELES COUNTY, CALIFORNIA ("DECLARATION"), AND ANY AMENDMENTS OR SUPPLEMENTS THERETO.

PARCEL 3:      THOSE CERTAIN EXCLUSIVE USE ASSOCIATION PROPERTY _____ DESIGNATED _____, EXCLUSIVE USE ASSOCIATION PROPERTY _____ DESIGNATED "_____", AS SHOWN AND DESIGNATED IN THE ABOVE-REFERENCED CONDOMINIUM PLAN.  SAID EXCLUSIVE USE ASSOCIATION PROPERTY AREAS CONSIST OF EXCLUSIVE EASEMENTS APPURTENANT TO PARCELS 1 AND 2 ABOVE, AS DEFINED AND DESCRIBED IN THE DECLARATION AND THE CONDOMINIUM PLAN AND ANY AMENDMENTS OR SUPPLEMENTS THERETO

PARCEL 4:  NONEXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, USE, ENJOYMENT, DRAINAGE, ENCROACHMENT, SUPPORT, MAINTENANCE, REPAIRS, AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE DECLARATION.

**SUBJECT TO:**

1.    Taxes for the fiscal year.

2.    That certain "Agreement for Development or Units for Lease or Sale", recorded on March 23, 2006, as Instrument No. 06-0625334, Official Records of the County Recorder of Los Angeles County, state of California.

3.    All other covenants, conditions, restrictions, reservations, rights, rights of way and easements of record as well as any of such matters that are apparent.

BY ACCEPTANCE AND RECORDATION OF THIS DEED, AND BY ITS EXECUTION OF THIS DEED, GRANTEE HEREBY (A) ACCEPTS AND APPROVES ALL OF THE FOREGOING IN THIS DEED, (B) GRANTS TO GRANTOR AND SANTEE VILLAGE CONDOMINIUM ASSOCIATION SUCH POWERS AND RIGHTS AS ARE SET FORTH IN THE DECLARATION, AND (C) ACCEPTS, APPROVES, ADOPTS, RATIFIES AND AGREES TO BE BOUND BY, AND TO ASSUME PERFORMANCE OF, ALL OF THE APPLICABLE REQUIREMENTS, COVENANTS, CONDITIONS, RESERVATIONS, RESTRICTIONS, EASEMENTS AND OTHER MATTERS SET FORTH IN THE DECLARATION, AND ALL AMENDMENTS AND SUPPLEMENTS THERETO, ALL OF WHICH PROVISIONS ARE INCORPORATED HEREIN BY REFERENCE THERETO WITH THE SAME FORCE AND EFFECT AS THOUGH FULLY SET FORTH HEREIN AT LENGTH, AND AGREES TO PAY PROMPTLY WHEN DUE, ANY AND ALL ASSESSMENTS AS REQUIRED UNDER SAID DECLARATION.

**ACCEPTANCE OF GRANT DEED:**

**GRANTEE:**

_____

Name: _____

BUYER  06-12-07                          SELLER

UNIT:  **0924**

### EXHIBIT "B"

### CERTIFICATE OF ACCEPTANCE

Buyer Name(s): _____

Unit Number:      _____

     The above-named Buyer(s) ("Buyer") hereby represents and warrants to Roosevelt Lofts, LLC ("Seller"), that Buyer has had the opportunity to walk through the above-referenced unit (the "Unit") and has either thoroughly inspect the Unit in accordance with the terms of the "Purchase and Sale Agreement", or has waived such right to an inspection.  To the extent possible, Buyer has also had the opportunity to walk through and inspect other accessible areas of the building in which the Unit is located and related parking facility.  Buyer has also had the opportunity to review all "Plans and Specifications" (as defined in the Purchase and Sale Agreement) as they relate to the Unit and Project.

     IN ACCORDANCE WITH BUYER'S EXAMINATION (OR BUYER'S WAIVER OF SUCH RIGHT), BUYER HEREBY REPRESENTS, WARRANTS, AND CERTIFIES THAT THE UNIT AND THE TOWER ARE IN THE CONDITION REQUIRED PURSUANT TO THE PURCHASE AND SALE AGREEMENT, AND THAT THE UNIT AND TOWER HAVE BEEN CONSTRUCTED IN CONFORMITY WITH THE APPLICABLE PLANS AND SPECIFICATIONS.

     BASED UPON THE FOREGOING, BUYER HEREBY ACCEPTS THE UNIT AND ALL RELATED IMPROVEMENTS, IN THEIR PRESENT CONDITION ON AN **"AS-IS"** AND **"WHERE IS"** BASIS, SUBJECT ONLY TO THE PUNCH LIST ITEMS ATTACHED HERETO IN SCHEDULE 1, IF APPLICABLE.  FURTHERMORE, BUYER HEREBY UNDERSTANDS, ACKNOWLEDGES, AGREES AND CONFIRMS THAT BUYER IS WAIVING ANY AND ALL CLAIMS REGARDING CONSTRUCTION, DESIGN, OR ANY OTHER ARCHITECTURAL ASPECTS OF THE IMPROVEMENTS RELATED TO THE UNIT OR TOWER, AND THAT SELLER IS MAKING ABSOLUTELY NO WARRANTY OR REPRESENTATION TO BUYER IN THAT REGARD, OTHER THAN AS EXPRESSLY SET FORTH IN THE PURCHASE AND SALE AGREEMENT.

**"Seller"**

By: _____

Name:      _____

Date:      _____

**"Buyer"**

By: _____

Name:      _____

Date:      _____

By: _____

Name:      _____

Date:      _____


BUYER
06-12-07


SELLER

UNIT: __0924_

### EXHIBIT "C"

### ESCROW HOLDER'S ADDITIONAL/GENERAL ESCROW INSTRUCTIONS AND PROVISIONS

<u>SAVINGS ACCOUNT</u>: The law concerning the disbursement of funds requires that all funds must be available for withdrawal by and from the account of the escrow entity prior to the disbursement of any such funds. Only cash or wire transferred funds can be considered immediately available on deposit. Cashiers checks, tellers checks and certified checks may be available one business day after deposit. All other funds are subject to mandatory holding periods which may cause delays in closing this escrow and the disbursement of funds. In order to avoid delays, please consider that all fundings and/or deposits should be made by wire transfer. Outgoing wire transfers will be authorized only upon confirmation of the respective incoming wire transfer(s) or the immediate availability of any deposited checks.

A.      <u>Deposited Funds Generally Bear No Interest</u>. All funds received in this escrow will be commingled and deposited with other funds from other escrows in a general escrow account or accounts at the discretion and in the name of Mara Escrow Company with any state or national bank or savings and loan association ("depository institution(s)") and may be transferred to any other such general account or accounts. The parties to this escrow acknowledge and agree that the maintenance of such escrow accounts with certain depository institutions may result in the receipt by Mara Escrow Company various bank services, accommodations and/or other benefits from the depository institutions. Mara Escrow Company or its affiliates may elect to enter into other business arrangements or transactions with or to obtain loans for investment or other purposes from such depository institutions. All such services, accommodations and other services shall accrue to Mara Escrow Company or its affiliates, who shall have no obligations to account to the parties to this escrow for the value of such services, accommodations or other benefits.

B.      <u>Option For Interest Baring Account</u>. Funds deposited into escrow shall not earn interest unless the parties execute instructions specifically directing Mara Escrow Company to deposit such funds in an interest bearing account. Upon receipt of such fully executed instructions along with an executed Form W-9 from the Buyer, Mara Escrow Company will place Buyer's initial deposit and any subsequent deposits in and interest bearing account in the name of Mara Escrow Company as Trustee for the escrow in questions (Dana-CK) with Comerica Bank-California, 10900 Wilshire Blvd., Los Angeles, CA 90024. Until such time as escrow is in a position to disburse or close escrow as provided herein, any accrued interest shall be credited to the account of the Buyer herein. Buyer acknowledges that there shall be a service charge to the Buyer for the servicing of said interest bearing account. In addition, the within parties hereby acknowledge their awareness of the fact that the Federal Deposit Insurance Corporation (FDIC) only insures depositors up to $100,000.00

Further, Escrow Holder will be given or provided reasonable notice and time to comply with any instructions for bank wires to process and complete this escrow. Accordingly, Escrow Holder's sole duty and responsibility shall be to place said wire transfer instructions with its wiring bank upon confirmation of (1) satisfaction of conditions precedent or (2) document recordation at close of escrow. Escrow Holder will NOT be held responsible for lost interest due to wire delays caused by any bank of the Federal Reserve System, and recommends that all parties make themselves aware of banking regulations with regard to placement of wires.

In the event there is insufficient time to place a wire upon any such confirmation or the wires have closed to the day, the parties agree to provide written instructions for an alternative method of disbursement. WITHOUT AN ALTERNATIVE DISBURSEMENT INSTRUCTION, FUNDS WILL BE HELD IN TRUST IN A NON-INTEREST BEARING ACCOUNT UNTIL THE NEXT OPPORTUNITY FOR WIRE PLACEMENT.

The following general provisions shall apply in this escrow:

1.      <u>Deposits and Disbursement of Funds</u>. Disbursements are ordinarily made by check of Escrow Holder. Escrow Holder offers its customers the opportunity to transfer funds by wire from its depository bank. Use of a wire transfer may offer benefits to a party who wishes to more quickly satisfy an obligation and stop the accrual of additional interest. Escrow Holder will charge a wire transfer service handling fee for each wire requested. Please let your escrow officer know should you require a wire transfer of any portion of the escrow proceeds.

2       <u>Prorations and Adjustments</u>. All prorations and/or adjustments called for in this escrow are to made on the basis of a thirty (30) day month unless otherwise instructed in writing. At closing, Escrow Holder may adjust estimated amounts and prorations and other items that may change based on the recording date. In all acts relating, but not limited to fire/hazard insurance, rents and rental deposits, real property taxes, and interest, Escrow Holder shall presume that the information provided to Escrow Holder by the parties to this escrow, or their agent(s), is correct and that insurance premiums have been paid.

3.      <u>Recordation of Instruments</u>. If necessary or proper for the issuance of the Policy of Title Insurance requested in this escrow, recordation of any instrument delivered to escrow is authorized. Escrow Holder is further authorized to take any action necessary to comply with these instructions of any lender and to execute any and all documents that may be necessary or incidental to the carrying out of these instructions.

4.      <u>Authorization to Furnish Copies</u>. Escrow Holder is authorized to furnish copies of these instructions and supplements thereto, notices of cancellation, and closing statements pertaining to this escrow to the real estate broker(s) and lender(s) named in this escrow.

BUYER

06-12-07

SELLER

UNIT: __0924_

5.      Delivery of Non-Recorded Documents.  Upon close of escrow, documents that are not required to be recorded may be delivered by Escrow Holder by depositing same in the United States Mail, postage prepaid, addressed to the party entitled thereto, at the mailing address provided to Escrow Holder.

6.      Conflicting Instructions.  Upon receipt of any conflicting instructions (other than cancellation instructions), Escrow Holder is no longer obligated to take any further action in connection with this escrow until further consistent instructions are received from the parties.  Escrow Holder is authorized to hold all monies and/or instruments in this escrow until otherwise directed, either by the parties' mutual written instructions or by final order of a court of competent jurisdiction.  In the event of conflicting claims to any funds or other documents, Escrow Holder shall have the absolute right, at Escrow Holder's discretion, to file am action in interpleader requiring the parties to answer and litigate their several claims and rights amongst themselves.  Any such action must comply with the requisite interpleader statutes of the state of California in this regard.

7.      Disclosure.  Escrow Holder shall have no duty to disclose to any party to this escrow any information, which may come to Escrow Holder's attention concerning this transaction unless specifically requested to do so by any party.

8.      Right of Cancellation.  This escrow shall be deemed canceled upon Escrow Holder's receipt of any party's instruction to cancel the escrow.  Upon receipt of a party's instructions to cancel the escrow, Escrow Holder shall distribute Cancellation Instructions to the parties or to their agents regarding disbursement of funds in the escrow.  Escrow Holder then is no longer obligated to take any further action in connection with this escrow until receipt of mutual non-conflicting instructions from the parties.  Upon receipt of mutual, non-conflicting instructions regarding the disbursement of funds in the escrow, Escrow Holder shall disburse the funds in accordance with the instructions, less fees and other costs incurred in connection with the escrow.  In the absence of non-conflicting instructions regarding the disbursement of funds in the escrow, Escrow Holder is authorized and instructed to hold all funds in excess of earnest money to the depositors of the funds or their assignees at Escrow Holder's sole discretion.

9.      Entire Agreement and Indemnification.  These General Provisions and the joint escrow instructions received and accepted by Escrow Holder (if applicable), shall be the whole and only agreement between the parties regarding the obligations of Escrow Holder to complete this escrow and shall supersede and cancel any prior instructions.  Escrow Holder shall disregard and assume no responsibility for complying with any other agreement(s) between the parties, whether or not such an agreement(s) have been made a part of this escrow.  To the extent of any conflicts between these General Provisions (including joint escrow instructions, if applicable) and any other agreement(s) between the parties, these General Provisions (including joint escrow instructions, if applicable) shall control.

10.     Compliance with Regulatory Matters.  Escrow Holder is not responsible or liable for determining that there has been compliance with any matters that are excluded from coverage under the title insurance policy to be issued in conjunction with close of this escrow including, but not limited to, county or municipal ordinances and state, county or municipal subdivision or land division regulations or laws.  Reference is made to the policy form on file with the Insurance Commissioner of the State of California and available through the Title Company for the customer's review for a complete statement of such exclusions.

11.     Licensee Status.  Escrow Holder is not responsible or liable for determining that any person or entity receiving a commission or other compensation from escrow is currently and regularly licensed, nor for communicating the license status of any person or entity receiving a commission or other compensation from escrow to the parties herein.

12.     Unclaimed Funds.  After Three (3) Years from the deposit of funds into escrow, any amounts thereafter remaining unclaimed may be escheated to the State of California in compliance with the State of California's Unclaimed Property Law and Regulations.

13.     Fees and Charges.  The parties to this escrow agree to pay all charges, billings, advances and expenses, including cancellation fees, that are properly chargeable to the undersigned, and further to pay any balance for fees, costs or shortages due in connection with these instructions.

14.     Payments From Escrow.  Escrow Holder is acting as the disbursing agent of the parties to this escrow for all payments, such as, but not limited to, commissions, signing service providers, notary fees and termite inspections and/or reports, owed and authorized herein by the parties.

15.     Inspections.  Escrow Holder is relieved of any obligation to order or obtain any of the inspections or reports required by this transaction.

16      Contingencies.  Escrow holder is relieved of any obligation to monitor, schedule the timing of, or obtain any party's compliance with, any of the contingencies required by this transaction.

BUYER
06-12-07

SELLER

UNIT:  <u>0924</u>

### EXHIBIT "D"

### ROOSEVELT BUILDING PARKING SPACE

This PARKING LEASE ("**Parking Lease**") is entered into on this ____ day of _____, 200___ by and between **ROOSEVELT LOFTS, LLC** a Delaware limited liability company ("**Lessor**") and _____ _____("**Lessee**").

### RECITALS

A.      Lessee is purchasing Condominium Unit No. _____ ("**Property**") in the Roosevelt Building ("**Project**") pursuant to that certain Joint Purchase Agreement and Joint Escrow Instructions for the Roosevelt BUILDING dated _____, 200___ by and between Lessee and Lessor ("**Purchase and Sale Agreement**").

B.      Lessor is the Owner of a Commercial Condominium Unit in the Project, which Commercial Condominium Unit consists of a subterranean, ground level, and above-grade parking garage ("**Parking Facility**").

C.      Lessee wishes to lease one (1) unreserved, unassigned parking space in the Parking Facility from Lessor and Lessor wishes to lease one (1) unreserved, unassigned parking space in the Parking Facility to Lessee.

### TERMS

NOW THEREFORE, for good and valuable consideration, the sufficiency of which the parties hereto acknowledge, Lessee and Lessor agree as follows:

1.      **Definitions**. All capitalized terms herein shall have the same definitions as stated in the Declaration of Establishment of Conditions, Covenants, and Restrictions for The Roosevelt BUILDING ("**Declaration**").

2.      **Lease of Parking Space**.  Lessor hereby leases to Lessee and Lessee hereby leases from Lessor one (1) unassigned, unreserved parking space in the Parking Facility ("**Parking Space**"), which shall at all times be in accordance with the terms of this Parking Lease and the Declaration.  Lessee hereby acknowledges, confirms, and represents that he/she/it has fully read and understands the terms of the Declaration, and that the Declaration with respect to the rights afforded to Lessee in connection with the Parking Space being provided hereby.  In the event of a conflict between the terms of this Parking Lease and the Declaration, the terms of the Declaration shall be controlling.

3.      **Term of Lease.**   The term of said lease of parking space shall be for an initial period of ten (10) years ("**Lease Term**"), commencing upon the close of escrow date of the Property.

4.      **Access to Parking Space.**  Lessee shall have no access to any parking space or any other area in the Parking Facility except through the use of a valet service, which valet service shall be provided for by Lessor in accordance with the terms of the Declaration.

5.      **Lease Fee.**  Lessee shall lease the Parking Space for the sum of $10.00 (the "**Lease Fee**") during the entire initial Lease Term.  During the Lease Term, there shall be no additional fee charged to Lessee for the lease of the Parking Space.

6.      **HOA Fees**.  Lessee acknowledges, confirms, and agrees that included in the monthly assessment for Lessee's Property, are fees to be paid by Lessee to the Association which shall include the costs for the general use of the Parking Facility by the Association for the benefits of all of the Property owners as an amenity, which are separate and apart from the Lease Fee due under this Parking Lease.

7.      **Lease Extension**.  Upon termination of the Lease Term Lessee shall have the option to extend the lease term, on a monthly basis, and the Lease Fee shall be adjusted to the lesser of either: (i) ninety percent (90%) of the then current market rates for parking spaces at the Parking Facility; or (ii) the then average market rates for parking spaces in the downtown Los Angeles area, within a  three block radius of the Property.  After the expiration of the initial Lease Term, the lease shall automatically continue on a month-to-month basis (subject to the adjusted Lease Fee payable by Lessee for the Parking Space), until such time that Lessee wishes to cancel the lease, in which case, Lessee shall provide Lessor with at least thirty (30) days written notice of Lessee's intent to cancel the lease. in which event, this Parking Lease shall be terminated effective on the first day of the full calendar month following the thirtieth (30th) day after service of the notice.

BUYER_____  _____    SELLER_____
06-12-07

UNIT: __0924__

8.    **Personal Interest**.  This lease shall not in any way convey, transfer or constitute an interest in real property to Lessee.  Lessee's right to lease a parking space within the Parking Facility pursuant to this Parking Lease shall be personal only to the individual Condominium Unit (and not to the Lessee), and while such rights shall be transferable to subsequent purchasers, Lessee shall have no right to sublease, rent, assign, or sell its rights to the Parking Space or this Parking Lease. In the event that Lessee transfers or conveys ownership of Lessee's Unit prior to the termination of the initial Lease Term, the HOA and Lessor (or then Parking Facility operator) shall be given written notice of the same, and amendment to this Parking Lease shall be prepared and entered into after the sale of the Condominium Unit.  Notwithstanding the foregoing, Lessee is entitled to transfer Lessee's right to use a parking space in the Facility to any tenant in Lessee's Unit, provided that such tenancy shall not create any rights to use any additional parking space(s) in the Parking Facility.

9.    **Security**.  Notwithstanding the valet service or any other party employed by Lessor in connection with Lessor's operation of the Parking Facility, Lessor does not guarantee nor provide for any security as to the parking space and shall not be responsible for theft, vandalism, fire, destruction or other damage to Lessee's vehicle and/or personal property. Lessee agrees that Lessee and/or Lessee's insurance carrier shall bear the risk of any loss or damage to Lessee's vehicle and/or personal property in the Parking Facility.

10.    **Indemnification**.  Lessee hereby agrees to indemnify and hold harmless Lessor, its officer's, directors, employees, successors and assigns from and against any damages, claims, fees, expenses or liabilities whatsoever arising from Lessee's storage of Lessee's vehicle in the Parking Facility.  Hazardous materials, contraband, firearms and all other dangerous and/or illegal items are strictly prohibited in the Parking Facility.

11.    **Effect of Parking Lease**.  All other terms and conditions of the Purchase and Sale Agreement and any and all addendums, amendments thereto shall remain in full force and effect.

This Parking Lease is dated as of the date first written above.

**LESSOR:**                                                      **LESSEE:**

ROOSEVELT LOFTS, LLC,
a Delaware limited liability company

By: THE ROOSEVELT LOFTS, INC.,                    _____
      a California corporation
      Its:  Manager                                              _____

By:_____
      M. Aaron Yashouafar
      Its:  President


BUYER
06-12-07


SELLER

| In re:                          | CHAPTER  11 |
|                                 | CASE NUMBER  1:09-bk-14214-GM |
|        ROOSEVELT LOFTS, LLC,    | |
|                      Debtor(s). | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

A true and correct copy of the foregoing documents described **NOTICE OF MOTION AND MOTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY TO COMPROMISE CONTROVERSY WITH MISSAGH PEZESHKIAN, HASMIK NAZARIAN AND AVAK KHACHADORIAN; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF M. AARON YASHOUAFAR IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **August 17, 2011,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- John B Acierno     ecfcacb@piteduncan.com
- Carleton R Burch     crb@amclaw.com, amc@amclaw.com;jsh@amclaw.com;awh@amclaw.com;mav@amclaw.com;esf@amclaw.com;slc@amclaw.com;csh@amclaw.com
- Gary O Caris     gcaris@mckennalong.com, pcoates@mckennalong.com
- L Dominic Chacon     ldominicchacon@yahoo.com
- Cynthia M Cohen     cynthiacohen@paulhastings.com
- Travis W Feuerbacher     tfeuerbacher@gglts.com
- Steven R Fox     emails@foxlaw.com
- Helen R Frazer     hfrazer@aalrr.com
- Varand Gourjian     vg@gourjianlaw.com, lucy@gourjianlaw.com;naz@gourjianlaw.com;art@gourjianlaw.com
- Brian T Harvey     bharvey@buchalter.com, IFS_filing@buchalter.com
- Herbert Hayden     herbert@ntlg.us
- Brian L Holman     b.holman@mpglaw.com
- Alexandra Kazhokin     akazhokin@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- Mark J Krone     crb@amclaw.com, crs@amclaw.com;amc@amclaw.com
- Ian Landsberg     ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;rbenitez@landsberg-law.com
- David L. Neale     dln@lnbrb.com
- Juliet Y Oh     jyo@lnbrb.com, jyo@lnbrb.com
- Russell H Rapoport     rrapoport@prllplaw.com, lgillis@prllplaw.com
- Ronald N Richards     ron@ronaldrichards.com
- S Margaux Ross     margaux.ross@usdoj.gov
- Bruce D Rudman     bdr@agrlaw.net
- William D Schuster     bills@allieschuster.org
- Marian K Selvaggio     selvaggio@huntortmann.com
- Daniel H Slate     dslate@buchalter.com, rreeder@buchalter.com;ifs_filing@buchalter.com
- Lindsey L Smith     lls@lnbyb.com
- David A Tilem     davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov
- Marc Weinberg     marcweinberg@att.net
- Brandon J Witkow     bwitkow@lockelord.com
- Aimee Y Wong     aywong@mckennalong.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*April 2010*                                                                                                              **F 9013-3.1**

| In re:                                | CHAPTER  11 |
|                                       | CASE NUMBER  1:09-bk-14214-GM |
| ROOSEVELT LOFTS, LLC, |  |
| Debtor(s). |  |

**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On **August 17, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

*None.*

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 17, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

***Served via Attorney Service***
Hon. Geraldine Mund
United States Bankruptcy Court
21041 Burbank Blvd., Ctrm 303
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 17, 2011 | Stephanie Reichert | /s/ Stephanie Reichert |
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*April 2010*                                                                                                                    **F 9013-3.1**